**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
Zachary R. Manning (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>RITE AID CORPORATION, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-18993 (MBK)<br><br>(Joint Administration Requested) |
| RITE AID CORPORATION, et al.,<br><br>Plaintiff,<br><br>v.<br><br>MCKESSON CORPORATION,<br><br>Defendant. | Adv. Pro. No. 23-_____ |

## VERIFIED ADVERSARY COMPLAINT

---

[1] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

Plaintiff, Rite Aid Corporation ("**Rite Aid**" or "**Plaintiff**"), together with the above-captioned debtors and debtors-in-possession (collectively, "**Debtors**"), brings this Complaint against Defendant McKesson Corporation ("**McKesson**" or "**Defendant**"), seeking a declaratory judgment, a temporary restraining order, and injunctive relief.

## INTRODUCTION

1. This lawsuit is necessary to stop McKesson's cynical ploy for negotiating leverage by purporting to terminate its supply agreement with Rite Aid and thereby jeopardize the health of Americans who rely on Rite Aid for life-saving and life-improving medicines. McKesson's gambit—threatening to immediately stop the supply of hundreds of thousands of prescriptions per day if Rite Aid will not accede to McKesson's demands—is opportunism and corporate greed in its basest form. And it is plainly illegal.

2. For nearly 20 years, McKesson has supplied Rite Aid's pharmacies with pharmaceutical products. Pursuant to a longstanding agreement ("**Supply Agreement**"), McKesson supplies—on a just-in-time basis—almost all of the pharmaceutical products to Rite Aid's 2,000-plus pharmacies. Those pharmacies fill nearly 672,000 prescriptions per day.

3. In September 2023, Rite Aid's senior executives began a confidential dialogue with McKesson's senior executives under an NDA regarding the Supply Agreement and a potential chapter 11 filing. The parties had multiple meetings, including in-person at McKesson's headquarters. The conversations were at the highest corporate level, including CFO to CFO. During those discussions, McKesson learned that Rite Aid was preparing for the possibility of an October 15, 2023 chapter 11 filing. The parties traded several term sheets. The discussions broke down when McKesson inexplicably thought that Rite Aid's willingness to agree that McKesson had an administrative claim for $700 million meant that Rite Aid would pay every dollar

2

*immediately after* a bankruptcy filing—effectively that McKesson would be paid first in time. Rite Aid would never agree to that provision because the Bankruptcy Code does not require it, and because Rite Aid has an enforceable contract with McKesson under which McKesson must perform.

4. Then, on Saturday afternoon, McKesson suddenly and unexpectedly pulled a stunt: it purported to terminate the Supply Agreement, alleging that Rite Aid was insolvent under the meaning of 11 U.S.C. § 101(32). An act of pure gamesmanship, the purported termination notice came less than 36 hours ago and on the eve of the anticipated filing.

5. McKesson's attempt to terminate the Supply Agreement is invalid and null and void. It lacks the requisite foundation—in fact and under the contract—and violates the Bankruptcy Code, among other things.

6. While McKesson may view the purported termination as a tactic, it will have immediate and irreparable consequences if allowed to stand. It will cause human pain and suffering. If McKesson does not honor its contractual obligation to supply medicines to Rite Aid's stores, as McKesson is obligated to do on a daily basis, Rite Aid will be unable to fill prescriptions.

7. Rite Aid will not permit McKesson to use its customers' health and well-being as a bargaining chip. Rite Aid gave McKesson multiple opportunities to withdraw the purported termination and made clear to McKesson the consequences of its conduct. McKesson refused. Rite Aid therefore brings this action to ensure McKesson will not put millions of lives at risk simply to extract unprecedented and unlawful benefits for McKesson.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtors' chapter 11 cases. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3

## PARTIES

9. Plaintiff Rite Aid Corporation is a corporation organized under the laws of Delaware with its principal place of business in Philadelphia, Pennsylvania.

10. Defendant McKesson Corporation is a corporation organized under the laws of Delaware with its principal place of business in Irving, Texas.

## BACKGROUND

I. **The Debtors' Operations.**

11. Rite Aid is on the front lines of delivering healthcare services and retail products to millions of Americans daily. Founded in 1962 with a single discount drugstore in Scranton, Pennsylvania, Rite Aid—and its over 45,000 employees—meet the fundamental consumer need for pharmacy services across the country through two divisions. On the retail side, Rite Aid employs more than 6,100 pharmacists and operates more than 2,100 retail pharmacy locations in 17 states.

12. Rite Aid supports the health of millions of customers through two primary business segments: Retail Pharmacy and Pharmacy Services. In the Retail Pharmacy segment, the Company's highly trained pharmacists offer a wide range of health care services, including dispensing medications. Rite Aid pairs its Retail Pharmacy Segment with its pharmacy benefit manager ("**PBM**") business. PBMs act as intermediaries to process prescriptions, help with drug utilization, and control costs for the groups that pay for drugs, such as insurance companies, unions, and large employers.

II. **The Debtors' Relationship with McKesson.**

13. Since 2003, the Debtors have relied on McKesson to supply generic and branded pharmaceutical products pursuant to the Supply Agreement. After two decades of successful partnership, the Debtors and their customers have come to rely on McKesson. McKesson is the

sole supplier to the Debtors for a majority of all products within the Debtors' retail business. Most importantly, Rite Aid purchases all of its branded pharmaceutical products and almost all generic pharmaceutical products from McKesson. The Supply Agreement does not expire until 2029.

14. The Debtors depend on McKesson's continued performance under the Supply Agreement to stock their shelves with medicines and other pharmaceutical products, including so that pharmacists can fill doctor-made prescriptions. McKesson supplies the pharmaceutical products to each of the Company's 2,100 retail locations several times per week on a *just-in-time* basis, meaning that Rite Aid maintains very little inventory and relies on deliveries from McKesson to replenish its supply every day. Those deliveries average approximately 352,000 units per day.

15. McKesson-supplied goods account for 98% of the dollar volume of Rite Aid's prescription drugs and 90% of sales in their Retail Pharmacy segment. Rite Aid paid McKesson approximately *$9 billion* in fiscal year 2023—approximately $750 million per month—which is approximately 55% of Rite Aid's yearly spend for the Retail Pharmacy segment.



16. The importance of the McKesson-supplied drugs cannot be understated. It includes life-saving medications. By way of just a few examples:



*Number of scripts based on 90 days of sales.

17. McKesson is also Rite Aid's main supplier for flu, COVID, RSV, and shingles vaccines.

18. Absent McKesson's continued performance under the Supply Agreement, the Debtors (and their customers) will experience swift and calamitous consequences. If McKesson does not perform, the Debtors cannot fill prescriptions for both branded and the vast majority of generic drugs, and cannot supply vaccines at a critical time (the start of cold and flu season), until the Debtors find a new wholesaler and negotiate an agreement or establish self-distribution of pharmaceutical drugs. Within a matter of 1-2 days, Rite Aid's inventory of branded drugs would be depleted. At that point, Rite Aid customers could no longer fill their prescriptions at their local Rite Aid pharmacy. Rite Aid serves many underserved communities, meaning that many of Rite Aid's customers do not have an alternative, nearby pharmacy (or the means to reach one). They

6

may then be forced to travel long distances to another pharmacy, or else simply go without their medication.

19. Finding an alternative supplier before Rite Aid and its customers begin to feel these devastating impacts would be impossible. It is unlikely that the Debtors could even find a new wholesaler on the same or better terms than the current Supply Agreement while in chapter 11; any potential contract counterparty is unlikely to offer favorable terms to the Debtors due to the inherent risks posed by these chapter 11 cases. Switching to another distributor could take six months or more due to the time needed to develop distribution channels and infrastructure. Implementing an in-house distribution scheme would be extremely expensive, labor intensive, and would require regulatory approval.

20. McKesson's performance under the Supply Agreement is essential to the Debtors' ability to continue operations and necessary to avoid immediate and irreparable harm to the Debtors and all of their stakeholders. Even a temporary disruption to the availability of customers' pharmaceuticals at the Debtors' retail locations will severely impact the Debtors and the numerous individuals who rely on the Debtors for their pharmaceutical products. The potential human cost of McKesson's greed would be tragic.

### III. The Parties' Prepetition Discussions.

21. Commercial discussions between Rite Aid and McKesson began in earnest in the summer of 2023. Given the centrality of the Supply Agreement—and Rite Aid's partnership with McKesson—to the Debtors' business, the Debtors reached out to McKesson more than a month ago to discuss a path forward in the event of a potential chapter 11 filing. On September 14, 2023, McKesson and Rite Aid signed a non-disclosure and confidentiality agreement ("**Confidentiality Agreement**"), pursuant to which Rite Aid shared nonpublic information with McKesson.

22. Rite Aid, through its advisors, facilitated extensive discussions among McKesson and certain groups of Rite Aid's creditors, working out details of the post-petition treatment of the McKesson relationship, including timing, payment terms, and performance commitments. As is often the case where stakeholders are engaged in prepetition negotiations, competing interests gave rise to potential tradeoffs and likely compromises.

23. An initial virtual meeting between Jeff Stein, the now-Chief Executive Officer and Chief Restructuring Officer of Rite Aid, Matt Schroeder, Chief Financial Officer of Rite Aid, Brian Tyler, Chief Executive Officer of McKesson, and Britt Vitalone, Executive Vice President and Chief Financial Officer of McKesson took place on September 26, 2023. At that meeting, McKesson expressed interest in meeting again to advance discussions related to finding a mutually beneficial path forward between the parties.

24. On October 4, 2023, Mr. Stein, Mr. Schroeder, Mr. Tyler, and Mr. Vitalone met in person at McKesson's offices in Irving, Texas to review certain materials containing confidential information subject to the Confidentiality Agreement, including discussions of the potential treatment of critical vendors and a path forward in the event of a potential chapter 11 filing. During the October 4 meeting, Rite Aid proposed ways in which the go-forward relationship would be mutually beneficial. At the conclusion of the October 4 meeting, it was Rite Aid's impression that all parties were generally aligned as to the benefits of negotiating a global resolution. Rite Aid provided McKesson with materials identifying the remaining items for the parties to work out in the next round of discussions.

25. On October 10, 2023, Rite Aid received an initial term sheet from McKesson outlining the framework for a potential agreement between the parties regarding the Supply Agreement. Rite Aid and McKesson engaged in what Rite Aid believed were productive

8

discussions related to the initial term sheet. Rite Aid felt that significant progress had been made towards an agreement and, on October 11, 2023, Rite Aid returned a counter to McKesson. Further discussions between the parties revealed McKesson's frustration with Rite Aid's counteroffer.

26. McKesson sent back a counter term sheet on October 13, 2023. The counter term sheet marked a significant departure from the previous proposal. At this point, Rite Aid began to realize that the parties may not be aligned in their vision for the future of the relationship and the potential for a global resolution. Despite the perceived setback, there was never any suggestion from McKesson of any termination right in the Supply Agreement nor any intent to exercise such a right.

### IV.    McKesson's Purported Termination.

27. With the knowledge that the Debtors were contemplating filing for chapter 11 relief by the next business day, McKesson's October 13 demand sought payment terms that were even more favorable than those provided under the Supply Agreement. Reversing course from several weeks of extensive negotiations, McKesson demanded that Rite Aid pay all amounts owed to McKesson, approximately $700 million, immediately after filing any chapter 11 petition. McKesson's shift in position was not premised on any change in Rite Aid's performance, financial condition, or operations. Rather, it was based on McKesson's perception of increased negotiating leverage.

28. Though bewildered by McKesson's last-minute change in course, Rite Aid's advisors sought to continue negotiations, sending an updated term sheet to McKesson. Rather than respond in good faith, on October 14, 2023, Britt Vitalone, McKesson's Executive Vice President and Chief Financial Officer, instead laid down an ultimatum: unless Rite Aid immediately agreed to pay McKesson in advance for all future deliveries starting Monday, October 16, McKesson

9

would refuse to conduct business according to the terms of the Supply Agreement on a post-petition basis.

> From: Vitalone, Britt <Britt.Vitalone@McKesson.com>
> Sent: Saturday, October 14, 2023 5:10 AM
> To: Matt Schroeder <mschroeder@riteaid.com>
> Cc: Nelson, Russell (Law Dept) (2) <Russell.G.Nelson@McKesson.com>; Thomas Sabatino <Thomas.Sabatino@riteaid.com>
> Subject: Re: [EXTERNAL] Term Sheet
>
> Matt –
>
> I appreciate you sending another proposal.
>
> However, even if we were willing to carry the pre-petition amounts (net of the $150M in the attached) until the conclusion of the case, we are not going to increase our exposure by shipping on the existing supply terms after you file. And you restored certain other provisions and economic terms which we previously rejected. If you are not willing to pay us in advance for future deliveries beginning Monday, then there is no need for a call this morning. We are not willing to increase the existing exposure.
>
> Regards,
>
> Britt
>
> **Britt Vitalone**
> Executive Vice President and Chief Financial Officer
> McKesson Corporation
> britt.vitalone@mckesson.com
> (804) 248-6622

29. In short, Mr. Vitalone threatened to violate federal law by refusing to honor a pre-petition contract on a post-petition basis.

30. After receiving Mr. Vitalone's email, bankruptcy counsel for Rite Aid and McKesson had a telephone conference at approximately 2:45 p.m. Eastern on October 14, 2023. Rite Aid's counsel conveyed that well-settled law blocked McKesson from making good on Mr. Vitalone's threat.

31. Far from being chastened when confronted with the unlawfulness of its threats, McKesson's intransigence only escalated. Just an hour after the call among the lawyers for the parties, McKesson tried a different approach. At approximately 3:45 p.m. Eastern on October 14, 2023, counsel for McKesson delivered a letter to Rite Aid purporting to terminate the Supply Agreement (the "**Termination Letter**"). In the Termination Letter, McKesson claimed the "prior occurrence of an event of default pursuant to Section 12.1(c)(v) of the [Supply] Agreement" served as the basis for terminating the Supply Agreement. Section 12.1(c)(v) of the Supply Agreement

10

provides that an event of default occurs "if . . . a Party shall become insolvent within the meaning of 11 U.S.C. § 101(32)." Yet, notwithstanding this language, McKesson offered no explanation or evidence of Rite Aid's purported "insolven[cy] within the meaning of 11 U.S.C. § 101(32)," nor did McKesson cite any other provision of the contract.[2] Upon information and belief, McKesson had not undertaken any fair valuation analysis of the Debtors prior to sending the Termination Letter, much less one sufficient to support the assertions in that letter. It was clear that any purported "termination" had nothing to do with Rite Aid's solvency.

32. Immediately thereafter, the Debtors delivered a response to the Termination Letter, notifying McKesson that the Termination Letter was invalid and should be withdrawn immediately. The Debtors expressed their surprise at McKesson's attempt to terminate the Supply Agreement and notified McKesson that Rite Aid intended to litigate the invalidity of the purported termination and McKesson's breach of the confidentiality agreement signed between the parties. The Debtors also alerted McKesson to the severe health risks to the Debtors' customers that would result from McKesson's actions.

33. Thereafter, McKesson's Chief Financial Officer, Britt Vitalone, sent a proposal to Rite Aid. Rite Aid immediately responded with a counter proposal noting that any offer from McKesson was untenable without an immediate retraction of the purported termination notice and a commitment to continue to ship pursuant to the Supply Agreement with certain limited modifications thereto. Then hours before the Debtors filed their chapter 11 petition, McKesson's outside counsel responded, stating that McKesson would supply product on Monday, October 16,

---

[2] Section 101(32) defines the term "insolvent" under the Bankruptcy Code. For a corporation to be insolvent under this section, "the sum of such entity's debts [must be] greater than all of such entity's property, at a fair valuation, exclusive of— (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under section 522 of [chapter 11]." 11 U.S.C. § 101(32).

11

but refusing to commit to supply product after that date without additional conditions not contained in the Supply Agreement or agreed to by the Parties. McKesson did not revoke their Termination Letter, nor did they agree to comply with the Supply Agreement.

34. On October 15, 2023, the Debtors filed voluntary petitions for relief under chapter 11 in this Court. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## COUNT I

## DECLARATORY JUDGMENT

## (28 U.S.C. §§ 2201–02)

35. Rite Aid restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

36. An actual legal and substantial controversy exists between the parties regarding whether McKesson properly terminated the Supply Agreement. This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02. The Court's declaration will resolve the uncertainty created by McKesson's Termination Letter and provide the parties with clarity with respect to their ongoing obligations.

37. This Court has the power to declare the rights, status, and legal relations between Rite Aid and McKesson for purposes of injunctive relief. McKesson's Termination Letter did not terminate the Supply Agreement because, among other reasons, (a) the Termination Letter did not demonstrate that any event of default had occurred, (b) no such default could have occurred, and (c) the asserted event of default—a party's insolvency within the meaning of 11 U.S.C. § 101(32)—is an unenforceable *ipso facto* clause.

38. Accordingly, Rite Aid is entitled to judgment declaring that McKesson's October 14, 2023 Termination Letter did not terminate the Supply Agreement, and the Supply Agreement remains in full force and effect.

39. Such a declaration will serve the twin interests of judicial efficiency and cost effectiveness by resolving all or nearly all of the substantial and actual controversy between the parties concerning the Parties' rights and obligations under the Supply Agreement.

## COUNT II

### INJUNCTIVE RELIEF

**(11 U.S.C. § 105 and Fed. R. Bank. P. 7065)**

40. Rite Aid restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

41. Rite Aid seeks an injunction under section 105(a) of the Bankruptcy Code and/or Federal Rule of Bankruptcy Procedure 7065 enjoining McKesson to continue performance pursuant to the Supply Agreement until the effective date of the Debtors' plan of reorganization or upon further order of this Court.

42. Relief under section 105(a) of the Bankruptcy Code is proper in a Chapter 11 case when necessary to protect a debtor's ability to effectively reorganize and preserve property of the debtor's estate and safeguard the interests of their stakeholders.

43. Likewise, relief under Federal Rule of Bankruptcy Procedure 7065 is proper where the plaintiff can demonstrate both a reasonable probability of eventual success and irreparable injury if injunctive relief is not granted, in light of the possibility of harm to other interested persons from the grant or denial of the injunction and subject to the public interest.

44. Any failure by McKesson to fulfill its obligations under the Supply Agreement will frustrate and jeopardize the Debtors' efforts to successfully reorganize by disrupting the Debtors'

business, undermining their ability to meet their customers' needs, and impairing the overall value of the Debtors' estates. If McKesson is not enjoined from terminating the Supply Agreement, the Debtors will likely suffer irreparable harm and their reorganization efforts will be threatened. The failure of McKesson to perform under the Supply Agreement will substantially impair the Debtors from continuing to operate their retail pharmacy business segment. Not only will this impose obstacles on customers who rely on the Debtors for their healthcare needs, but it will inevitably cause the Debtors' customer base to flee to competitors, thereby irreparably damaging the Debtors' prospects for successfully reorganizing.

45. McKesson provides just-in-time delivery for the majority of pharmaceutical products in Rite Aid's retail pharmacies. If McKesson ceases to comply with its obligations, Rite Aid likely will not be able to fill the prescriptions of its customers. Moreover, Rite Aid may not be able to continue to provide critical vaccinations, including Covid boosters, RSV vaccines, and similar services. Individuals who have no alternative pharmacies in their regions could lose access to essential healthcare services if McKesson does not uphold its end of the bargain.

46. The likelihood of irreparable harm to the Debtors in the absence of injunctive relief far outweighs any harm to McKesson. McKesson will suffer little or no harm if it continues to perform under the Supply Agreement pursuant to the same terms that existed prepetition. McKesson, like all other creditors, can rely on the tools of the Bankruptcy Code and the protections of the Supply Agreement.

47. The Debtors have a substantial likelihood of demonstrating that McKesson's purported termination was invalid. McKesson's sole basis for termination was an unsupported declaration of its view of the Debtors' solvency. The letter contained no support, let alone an

analysis that would satisfy the test in 11 U.S.C. § 101(32), the section cited in the Supply Agreement.

48. Finally, injunctive relief serves the public interest. The proposed injunctive relief will ensure McKesson will continue to operate pursuant to the Supply Agreement, which is central to the Debtors' ability to provide essential healthcare services to its customers. Absent this relief, the millions of customers whose ability to receive medications are at immediate risk.

## REQUEST FOR TEMPORARY RESTRAINING ORDER

49. Rite Aid incorporates herein by reference the allegations in the preceding paragraphs. The allegations set forth in this Verified Adversary Complaint are supported by the declaration of Marc Liebman, the Debtors' First Day Declaration, and the exhibits cited thereto.

50. Rite Aid respectfully asks the Court to set its application for temporary injunction for a hearing and, after the hearing, issue a temporary injunction against McKesson. Rite Aid has joined all indispensable parties under the Bankruptcy Rules. The bases for the temporary restraining order are set forth in the accompanying application and memorandum. In short, a temporary restraining order is necessary to maintain the status quo. Without a temporary restraining order, McKesson will cease to perform under the Supply Agreement. The Debtors have no other suppliers who could fill the void that would result from McKesson refusing to perform. The temporary restraining order should extend until such time that the Court can schedule a preliminary injunction hearing.

## REQUEST FOR PRELIMINARY INJUNCTION

51. Rite Aid incorporates herein by reference the allegations in the preceding paragraphs. Rite Aid respectfully asks the Court to set its application for preliminary injunction for a hearing and, after the hearing, issue a preliminary injunction against McKesson. Rite Aid has joined all indispensable parties under the Bankruptcy Rules.

**PRAYER FOR RELIEF**

**WHEREFORE**, by reason of the foregoing, Plaintiff Rite Aid Corporation respectfully requests that: (i) judgment be entered in favor of Rite Aid, declaring that McKesson has not terminated the Supply Agreement and that the Supply Agreement remains in effect, (ii) McKesson be enjoined from terminating the Supply Agreement; (iii) McKesson is ordered to perform under the Supply Agreement until further order of this Court; (iv) Rite Aid be awarded preliminary injunctive relief to prevent irreparable injury; and (iv) for other relief to which Rite Aid is entitled.

Dated: October 16, 2023

Respectfully submitted,

By: */s/ Michael D. Sirota*
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (*pro hac vice* pending)
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
Zachary R. Manning (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

## **VERIFICATION**

I, JEFFREY S. STEIN, hereby certify and verify under penalty of perjury that:

I am the Chief Executive Officer and Chief Restructuring Officer of Rite Aid Corporation.

I have read the factual allegations contained in the Verified Adversary Complaint and affirm such allegations are true and accurate to the best of my knowledge, information, and belief.

Dated: October 16, 2023

*/s/ Jeffrey S. Stein*
Jeffrey S. Stein
Chief Executive Officer
Chief Restructuring Officer
Rite Aid Corporation