**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
Zachary R. Manning (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RITE AID CORPORATION, *et al.*,[1] | ) | Case No. 23-18993 (MBK) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF JEFFREY S. STEIN IN
## SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Jeffrey S. Stein, hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer and Chief Restructuring Officer of Rite Aid
Corporation, a Delaware corporation and one of the above-captioned debtors in possession
(collectively, the "Company," "Rite Aid," or the "Debtors").  I have served as a consultant to the

---

[1]   The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034.  A complete list of the
Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the
website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid.  The
location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these
chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

Company since July 2023.  I was appointed Chief Executive Officer and Chief Restructuring Officer on October 15, 2023.

2.      I have over 30 years of experience in the distressed investing and restructuring industry.  I am regularly engaged as an officer and director of companies experiencing significant challenges, including financial and operational restructuring, complex contract renegotiation and litigation, and increased regulatory oversight.  I previously served as the Chief Executive Officer and Chief Restructuring Officer of GWG Holdings, Inc. and as the Chief Restructuring Officer of Liberty Steel Group Holdings Pte. Ltd., Whiting Petroleum Corporation, Philadelphia Energy Solutions, LLC, and Westmoreland Coal Company.  I received a B.A. in Economics from Brandeis University and an M.B.A. in Finance and Accounting from New York University.  I am a Certified Turnaround Professional as designated by the Turnaround Management Association.

3.      I submit this declaration to help the Court and interested parties understand the circumstances that led to these chapter 11 cases and to provide support for the Debtors' chapter 11 petitions and first-day motions.  Except as otherwise indicated, this declaration is based on my personal knowledge; discussions with the Debtors' management team and advisors; review of relevant documents; and/or my opinions based upon my restructuring experience and knowledge concerning the Debtors.  I am over the age of 18 and authorized to testify on behalf of the Debtors.  If called to testify, I would testify as follows.

## Introduction

4.      Rite Aid has been on the front lines of delivering healthcare services and retail products to millions of Americans for more than 60 years.  A trusted and iconic brand that has a long history of serving hundreds of American communities, Rite Aid's mission is to connect everyday care, drive down healthcare costs, and promote whole health for life.

5.    Rite Aid meets the consumer's fundamental need for pharmacy services through two segments:  Retail Pharmacy and Pharmacy Services.  On the retail side, Rite Aid employs more than 6,100 pharmacists and operates more than 2,100 pharmacies in 17 states.  Through Elixir, a pharmacy benefit manager ("PBM"), the Company manages pharmacy benefits for more than one million members.

6.    Rite Aid has a storied history of growth and success.  Starting from one store in Scranton, Pennsylvania, Rite Aid grew into a Fortune 200 company.  With more than $24 billion of revenue in fiscal year 2023, the Company employs more than 45,000 people and fills almost 200 million prescriptions every year.

7.    Despite its proud heritage, a confluence of operational and financial factors have stressed Rite Aid's financial condition and necessitate a comprehensive reorganization:

- ***Substantial Debt Obligations.***  Rite Aid has approximately $4.0 billion in funded debt obligations and pays approximately $200 million annually in interest. Debt-service obligations have limited Rite Aid's liquidity and constrained its ability to execute on its turnaround initiatives and in-store investments.

- ***Financial and Operational Headwinds.***  Rite Aid's financial performance has been further impacted by record inflation; elevated labor costs to retain in-demand pharmacist and corporate talent; declining reimbursement rates from third-party payors; reduced demand for front-end merchandise and COVID vaccines; increased shrink costs that are also impacting the rest of the industry; and the loss of key accounts at Elixir.  These headwinds have increased operating costs and decreased revenues.

- ***Sub-Optimal Retail Footprint.***  The Company's portfolio is burdened by unprofitable stores that it cannot effectively exit absent the tools available in chapter 11.  Those stores challenge the Company's earnings profile, turnaround initiatives, and free cash flow.  Even where the Company has been able to close stores, it is burdened by $80 million in annual "dead rent" costs because of its inability to exit the underlying leases outside of chapter 11.

- ***Liquidity and Trade Challenges***.  The Company is heavily reliant on trade credit, and as restructuring-related rumors have swirled, trade terms contracted.  The Company faces working capital constraints as vendors have increasingly demanded security deposits and cash-on-delivery (or cash-in-advance) for goods.  In fact, the

Company lost more than $100 million in liquidity to trade contraction in September and early October.

- *Litigation Overhang.*  The Company has a large and varied litigation claims portfolio, including more than 1,600 opioid-related suits.  Rite Aid also defends significant contract disputes, government investigations, and securities matters.  The Company's extensive litigation portfolio is expensive to manage, has drained liquidity, required substantial time and attention from key executives, and complicated the ability to explore out-of-court alternatives, particularly when combined with other operational headwinds.

- *Competitive Pressures*.  Rite Aid operates in a highly competitive pharma-retail space.  Traditional competitors include other (and much bigger) retail drugstore chains, like CVS and Walgreens; independent drugstores; supermarkets like Kroger; and mass merchandisers like Walmart and Target.  Further, online retailers like Amazon and online pharmacies like Capsule, which have different cost structures, have increased competition.

8.      Recognizing the headwinds, Rite Aid took action through a variety of measures—

over a number of years—to proactively address them:

- *Liability Management Transactions*.  The Company executed several transactions to reduce indebtedness and borrowing costs, including a 2020 exchange of senior notes due 2023 for senior secured notes due 2026; a 2021 redemption of certain outstanding notes at par; and a series of cash tender offers in 2022 for outstanding notes.  These transactions extended the Company's runway to explore additional turnaround opportunities.  The Company explored other, out-of-court alternatives.

- *Strategic Debt Paydowns*.  In recent years, the Company reduced interest expense by paying down approximately $280 million of second-lien notes due in 2025, $52 million of unsecured notes due in 2027, and $27 million of unsecured notes due in 2028.

- *Cost-Saving Measures*.  Over the past several years, the Company explored and executed several cost-saving measures and operational improvements.  The Company closed over 200 underperforming stores; initiated a series of restructuring plans to reorganize the executive management team and reduce managerial layers; rationalized its front-end retail offerings to free up working capital and refresh its merchandise assortment; and optimized its pricing and promotional strategies.

- *Sale-Leaseback Transactions*.  The Company took advantage of favorable real estate markets in each of 2021, 2022, and 2023, to sell dozens of owned properties (including distribution centers) and enter into long-term leases with the purchasers.  These transactions resulted in net proceeds of approximately $178 million in 2021, $57 million in 2022, and $73 million in 2023.

- ***Advisor Engagement***.  Rite Aid engaged Guggenheim Securities, LLC in December 2022 and Kirkland & Ellis LLP in April 2023 to assist Rite Aid in analyzing its financing needs and to explore capital structure alternatives and restructuring options.  The Company also engaged Alvarez & Marsal in May 2023 to conduct a footprint assessment, assist with the business plan and transformation, accelerate cost savings and, if necessary, support contingency preparations.

- ***Footprint Rationalization and Rite Aid 2.0 Business Plan***.  Rite Aid developed the Company's business plan over the course of the summer ("Rite Aid 2.0").  The Company and its advisors also undertook an intensive, store-level evaluation that tested the stores' financial performance, rent relative to market, supply chain, and other operational and geographic considerations influencing the competitive landscape.  Based on that analysis, the Company identified a series of stores for closure, which would allow the Company to focus on the remaining portfolio and its ability to invest capital into the remaining stores.

- ***Asset Sales***.  In parallel with Rite Aid's turnaround efforts, Rite Aid, with the assistance of Guggenheim Securities, began a marketing process for Elixir, the pharmacy benefit manager.  The Company will use the chapter 11 process to complete the Elixir marketing process.  The Company has also launched a marketing process for the retail business.

- ***Corporate Governance Refresh***.  The Board formed a Special Committee to consider the strategic and financial alternatives available to the Company.  In addition, Rite Aid proactively evaluated its corporate governance structure and engaged six seasoned disinterested directors with substantial restructuring experience to assist its boards.

- ***Stakeholder Engagement***.  In parallel with these efforts, Rite Aid engaged with key stakeholders across its capital structure in the hopes of consummating a deleveraging, out-of-court transaction.  Over several months, Rite Aid engaged with a large group of its second lien noteholders ("Ad Hoc Secured Noteholder Group") regarding options to strengthen its balance sheet and right-size its capital structure; the agent on its existing senior ABL Facility, regarding potential financing options; and various governmental agencies and litigation claimants regarding consensual resolutions of several investigations and claims.

9.     It became evident that a restructuring through chapter 11 would best position Rite Aid for long-term success.  An orderly process—with support from key creditors—should help the Company maintain trade credit and obtain post-petition financing to preserve thousands of jobs, continue operations in chapter 11, and take the necessary steps to right-size the business for a

successful emergence.   And Rite-Aid will work to develop consensus among all constituencies on an expedited basis.

10.    To finance the chapter 11 cases, the Company has negotiated a debtor-in-possession facility with their existing first-lien lenders.  The Company extensively marketed the facility, and it provides the best terms available under the circumstances.[2]  The DIP facility is critical to ensuring the Company restores the faith of its trade base and achieves its restructuring objectives.[3] The DIP facility also sends a strong message to the communities in which Rite Aid operates:  **Rite Aid is open for business and will continue to meet customers' health care needs**.

11.    Importantly, the Company and Ad Hoc Secured Noteholder Group accelerated negotiations during the summer regarding a comprehensive restructuring.  Following months of diligence and extensive, arm's-length negotiations, Rite Aid and the Ad Hoc Secured Noteholder Group have reached an agreement in principle regarding the terms of a Restructuring Support Agreement ("RSA").  That RSA term sheet is attached as **Exhibit A**.

12.    Paired with the DIP facility and support of the Company's secured creditors, the chapter 11 process provides several key benefits.  First, it provides an opportunity to implement Rite Aid 2.0.  The revised business plan shows meaningful promise.  The leaner footprint will have a more competitive cost structure and bring consolidated margins closer to peer performance. Under Rite Aid 2.0, the Company projects a 25% increase to adjusted EBITDA by fiscal year 2025.  Second, it will right-size the Company's balance sheet and strengthen its credit profile by equitizing or discharging certain existing funded debt.  The reduced leverage and debt service burden will improve free cash flow and increase reinvestment opportunities.  Third, an orderly

---

[2]    *See Declaration of Matthew Scheidemann*, filed contemporaneously herewith.

[3]    *See Declaration of Marc Liebman*, filed contemporaneously herewith.

chapter 11 process will enable the Company to treat similarly situated creditors equitably and prevent litigation claimants from trying to receive a disparate recovery to the disadvantage of other claimants.

13.    The RSA, together with the DIP, presents the best option for Rite Aid to continue serving communities for the years to come.   Rite Aid seeks to emerge from chapter 11 stronger than ever, with a leaner balance sheet, a rationalized store footprint, and a more competitive business.  And most importantly, this chapter 11 process will allow Rite Aid and its employees to continue their decades-long commitment to—and proud heritage of—meeting the healthcare needs of the communities they serve.

*        *        *        *        *

14.    To familiarize the Court with the Debtors, the circumstances leading to these chapter 11 cases, and the path forward, I have organized this declaration as follows.  **Section I** provides an overview of the Company's history and current operations.  **Section II** summarizes the Company's prepetition corporate and capital structure.  **Section III** summarizes the Company's pre-petition turnaround efforts.  **Section IV** describes the need for and the benefits of the RSA term sheet and DIP.   **Section V** and **Exhibit C** summarize the relief requested in, and facts supporting, each First Day Motion.

I.      **Rite Aid's Background and Current Operations.**

     A.      **The Beginning of the Rite Aid Story.**

     15.      In 1962, Alex Grass, a lawyer-turned-entrepreneur, opened a discount drugstore in Scranton, Pennsylvania.  He named it Thrif D Discount Center.



     16.      Mr. Grass's business was a quick success, and the Company grew rapidly.  In 1963, Thrif D opened five more drugstores, extending into New York.  The next year, Thrif D expanded into New Jersey and Virginia.  By 1966, there were 36 stores in five Northeast and Mid-Atlantic states, including its first in-store pharmacy in New Rochelle, New York.

17.     In 1968, the Company changed its name to Rite Aid Corporation and made its first

public offering, issuing 350,000 shares on the American Stock Exchange.  In 1970, Rite Aid

Corporation moved to the New York Stock Exchange, where its common stock has since traded.



18.     After going public, Rite Aid continued to grow its store count and geographic reach

through acquisitions.  By 1981, Rite Aid had become the third largest retail drug chain in the

country.  In 1983, Rite Aid's sales exceeded $1 billion, and the Company made the *Fortune* 500.

19.     By 1995, Rite Aid was the nation's No. 1 drugstore chain in store numbers and the

No. 2 chain in sales, operating nearly 3,000 stores.  In 1996, the Company announced its largest

acquisition, a merger with Thrifty PayLess Holdings, Inc., adding more than 1,000 stores in the

western United States.

**B.      Overcoming a Troubled Period.**

20.     Amid the growth, in 1995, Martin Grass succeeded his father as Rite Aid's

chairman and CEO.  By the late 1990s, *Business Week* and the *Wall Street Journal* investigated

allegations of improper dealings within Rite Aid.   The Company launched an internal

investigation, which uncovered accounting irregularities, among other issues.  In November 1999,

the Company's auditors resigned and withdrew their opinions regarding Rite Aid's financial

statements for fiscal years 1998 and 1999.  The Securities and Exchange Commission and the U.S. Attorney for the Middle District of Pennsylvania also investigated Rite Aid.  Several former, senior executives pled guilty in criminal proceedings.

21.     Along with legal troubles, Rite Aid faced serious financial headwinds.  Rite Aid struggled to integrate recent acquisitions, particularly that of Thrifty PayLess.  The Company labored under the $6-plus billion debt load that funded its growth.  In June 1999, the Company re-adjusted its earnings for prior years.  Its stock price sunk, and the Company negotiated a deal with its creditors to avoid bankruptcy.

22.     But, with a new executive team, the Company weathered the setbacks and gradually overcame them.  The new executive team brought Rite Aid's store expansion program to a halt. New management launched a rigorous review of the existing store portfolio.  It targeted underperforming units for closure and improved the productivity of the existing store base.

23.     Once Rite Aid recovered and regained its footing, Rite Aid slowly and strategically expanded the business.  In 2007, Rite Aid bought Brooks and Eckerd drugstore chains.  In 2014, Rite Aid acquired Health Dialog, which provides personalized healthcare coaching and disease management services.  Then, in 2015, Rite Aid entered the PBM business by acquiring what is now known as Elixir.  And in 2020, Rite Aid acquired Bartell Drugs, a 67-location Seattle-area chain.

24.     Rite Aid also has regularly explored various divestitures.  In October 2015, Walgreens announced that it would acquire Rite Aid for $17.2 billion pending regulatory approval. After a lengthy review by the Federal Trade Commission that lasted well over a year, Rite Aid and Walgreens determined not to move forward with Walgreen's acquisition of the full Company, when it became apparent that the transaction would not be approved.  Walgreens and Rite Aid then

negotiated a sale of a subset of Rite Aid's stores. After resolving certain antitrust concerns, the Federal Trade Commission ultimately approved an agreement for Walgreens to purchase 1,932 stores, approximately half of the then-store count, including some of Rite Aid's strongest performing locations, and three distribution centers for $4.38 billion. The sale closed in March 2018. In 2018, Rite Aid and Albertson Companies announced but ultimately terminated a merger of the then-remaining Rite Aid stores.

### C.    Rite Aid's Business Operations Today.

25.    Over the course of six decades, Rite Aid has cemented itself as a staple of American families in hundreds of communities. It supports the health of millions of customers through two primary business lines: Retail Pharmacy and Pharmacy Services.

26.    ***Retail Pharmacy***. In the Retail Pharmacy Segment, Rite Aid's highly trained pharmacists offer a wide range of health care services, including dispensing medications; performing immunizations and other clinical care; assisting customers with high blood pressure and diabetes care; and educating customers on managing their medications and potential side effects. Rite Aid also sells a full selection of health and beauty aids and personal care products, seasonal merchandise, and a large private brand portfolio of food and consumer products.

27.    Pharmacists are core to the business. In 2020, Rite Aid unveiled a new strategy called RxEvolution to elevate the role of Rite Aid pharmacists—the "last mile" of health care—to keep customers healthy and connected to their care teams. Throughout the pandemic, Rite Aid's pharmacists were on the front lines of testing and vaccinating, and the Company made great strides in changing perceptions of pharmacists as providers whose reach extends well beyond filling prescriptions. Rite Aid pharmacists have tremendous impact: in fiscal year 2022, Rite Aid

pharmacists administered 14.3 million COVID vaccines, 3.6 million COVID tests, 2.6 million influenza vaccines, and other vaccines, like Hepatitis and HPV.

28.    Today, Rite Aid operates 2,111 stores across 17 states:



29.    To ensure the proper flow of critical merchandise to their retail locations, Rite Aid manages a complex supply chain network with more than 9,000 vendors and seven distribution centers.  Rite Aid's supply chain team manages the steady flow of goods into the distribution centers and out to the stores and has an active quality control process up and down the supply chain.    To combat risks of patient misuse of prescription drugs, the Company maintains a Controlled Substance Compliance Program, including an Opioid Prescription Validation Process, among other things.

30.    The Company relies primarily on its partnership with McKesson to fulfill its prescription drug requirements.  Over the past twenty years, no partnership has been more crucial to the Company's success than its relationship with McKesson.  The Company purchases almost

all of its branded pharmaceutical products and generic pharmaceutical products from McKesson, accounting for 98% of the dollar volume of its prescription drugs in the Retail Pharmacy Segment.

31.    ***Pharmacy Services***.  Rite Aid pairs its Retail Pharmacy Segment with its PBM business.  PBMs act as intermediaries to process prescriptions, help with drug utilization, and control costs for the groups that pay for drugs, such as insurance companies, unions, and large employers, as depicted in the following summary chart:



32.    Through Elixir, the Pharmacy Services Segment provides a comprehensive suite of PBM offerings to various clients—including regional health plans, commercial employers, and labor groups—who represent approximately 1.5 million insured parties.  Elixir's services include plan design and administration, drug utilization management, and claim management and adjudication.  Like other PBMs, Elixir earns revenue through, among other things, administrative fees and "shared savings," where Elixir retains some of the rebates it negotiates with drug manufacturers.  The segment also offers drug benefits to eligible beneficiaries under the Medicare

Part D program, which is administered through a non-Debtor subsidiary, Elixir Insurance Company.

33.     Elixir is a leading independent PBM with national scale.  It is a comprehensive end-to-end provider that serves the middle market.  Led by a new management team, Elixir is undergoing a strategic redesign to target membership stabilization and expansion, improve operational excellence and competitive pricing, and focus on core competencies.  The business has great potential to win market share.

34.     The Company began a marketing process for Elixir over the summer.  The Company will use the chapter 11 process to complete the Elixir marketing process.

**D.    Rite Aid's Employee Base.**

35.     The Company employs approximately 45,000 people, most on a full-time basis. The Company is proud of its comprehensive compensation and benefit packages, including:

- Incentive payments or bonuses based on the employee's performance, sales targets, the Company's performance, and other identified goals;

- Opportunities to own Company equity; and

- A number of insurance and benefits programs, including health benefits, prescription drug benefits, life insurance, disability benefits, and retirement plans.

36.     Approximately 14,000 of the Company's employees are unionized under 18 collective bargaining agreements ("CBAs").  The CBAs cover batches of individual stores, largely arranged by geography.  Unionized employees work at stores in Washington, Pennsylvania, Ohio, California, New York, New Jersey, and Michigan.  The Company generally makes monthly contributions to provide health, welfare, and retirement benefits to certain union employees, and the unions administer the retirement benefits.

14

37.     The Company contributes to 10 multiemployer defined benefit pension plans under the terms of certain CBAs.  The Company also contributes to multiemployer health and welfare plans on behalf of certain of its union-represented employees.  The Company also sponsors benefit plans in which its non-union employees, and certain union employees, may be eligible to participate.  The benefit plans sponsored by the Company include medical, dental, and vision plans, life insurance, tuition assistance programs, and paid time off, among other things.

38.     Certain retired employees also receive retiree health and other benefits. The retirement plans sponsored by the Company include a defined benefit pension plan ("Pension Plan") and three 401(k) plans.  Under the 401(k) plans, the Company makes employer-matching contributions to eligible participants.  The Pension Plan has been closed for enrollment since December 31, 2001, but certain eligible participants continue to accrue benefits under the plan.

**E.      Regulatory Framework**

39.     The Company is subject to extensive and overlapping regulatory oversight.  There are various federal, state, and local laws, regulations, and administrative practices concerning the provision of and payment for healthcare services, including:

- Federal, state, and local licensure and registration requirements concerning the operation of pharmacies;

- Various insurance-related regulators;

- Medicare, Medicaid, and other publicly financed health benefit plan regulations regarding the submission of claims;

- The Affordable Care Act; and

- Regulations of the Food and Drug Administration, Consumer Product Safety Commission, Federal Trade Commission, and Drug Enforcement Administration.

40.     The Company is also subject to laws and regulations governing the purchase, sale, storage, and dispensing of controlled substances, listed chemicals, and other products, including

nicotine products, medical devices, and alcoholic beverages.  In addition, various laws govern the Company's relationship with its employees, including health and safety standards, minimum wage requirements, equal opportunity matters, and unionizing efforts.

## II.  Rite Aid's Prepetition Corporate and Capital Structure and Liquidity Profile.

### A.    Corporate Structure.

41.    Rite Aid Corporation is the ultimate parent of each Debtor.  It conducts business through its subsidiaries, the vast majority of which are Debtors.  A simplified corporate structure chart is attached as **Exhibit B**.  The Company maintains its corporate headquarters in Philadelphia, Pennsylvania.

### B.    Capital Structure.

42.    As of the Petition Date, the Debtors' long-term, funded debt obligations totaled approximately $4.0 billion:

| Instrument | Maturity | Principal *($ in millions)* |
|---|---|---|
| **Secured Debt** | | |
| ABL Facility | August 20, 2026 | $2,223[4] |
| FILO Term Loan Facility | August 20, 2026 | $400 |
| 2025 Notes | July 1, 2025 | $320 |
| 2026 Notes | November 15, 2026 | $850 |
| Finance Leases | — | $18 |
| **Total Secured Debt** | | **$3,811** |
| **Unsecured Debt** | | |
| 2027 Notes | February 15, 2027 | $186 |
| 2028 Notes | December 15, 2028 | $2 |
| **Total Unsecured Debt** | | **$188** |
| **Total Funded Debt** | | **$3,999** |

---

[4] Excludes approximately $237 million of outstanding letters of credit.

1.      **The Prepetition ABL and FILO Term Loan Facility.**

43.      Rite Aid Corporation, as a parent borrower, Bank of America, N.A., as administrative agent and collateral agent, and certain lenders are parties to that certain Credit Agreement, dated as of December 20, 2018 (as amended most recently as of December 1, 2022, the "Prepetition Credit Agreement").

44.      The Prepetition Credit Agreement provides for a senior secured asset-based revolving credit facility with a maximum availability of $2.85 billion (the "ABL Facility"). As of the Petition Date, approximately $2.2 billion in aggregate principal amounts remain outstanding under the ABL Facility.

45.      The Prepetition Credit Agreement also provides for a "first-in, last-out" term loan facility in the aggregate principal amount of $400 million (the "FILO Term Loan Facility" and together with the Prepetition ABL Facility, the "Prepetition Credit Facilities"). As of the Petition Date, $400 million in borrowings remain outstanding under the FILO Term Loan Facility.

46.      The Prepetition Credit Facilities mature on August 20, 2026. They are guaranteed by all of Rite Aid Corporation's subsidiaries, excluding the Non-Guarantor Subsidiaries (such guarantors, the "Prepetition Obligors"). They are secured by liens on substantially all assets (other than all real property and interests therein, all equity interest in the direct or indirect subsidiaries and other exclusions) of Rite Aid Corporation and the Prepetition Obligors. The Prepetition Credit Facilities have the same collateral package as the Senior Secured Notes (as defined below), but have first priority interest in certain assets, including accounts receivables, inventory, cash, deposit accounts, and intellectual property, among other things. There are certain restrictions on amounts available to be drawn under the Prepetition ABL Facility. Availability of the FILO Term Loan Facility is also subject to a borrowing base calculation.

2.      **The Prepetition Secured Notes.**

47.    Rite Aid Corporation has two tranches of secured debt facilities (the "Senior Secured Notes"):

- **7.500% Senior Secured Notes due 2025 (the "2025 Notes")**.  On February 5, 2020, Rite Aid Corporation issued $600 million of 7.500% Senior Secured Notes due July 1, 2025 (approximately $320 million of which remains outstanding).

- **8.000% Senior Secured Notes due 2026 (the "2026 Notes")**.  On July 27, 2020, Rite Aid Corporation issued $850 million of 8.000% Senior Secured Notes due November 15, 2026 (approximately $850 million of which remains outstanding).

48.    The Senior Secured Notes are secured by liens on substantially all assets (other than all real property and interests therein, all equity interest in the direct or indirect subsidiaries and other exclusions) of Rite Aid Corporation and the Prepetition Obligors.  The Prepetition Obligors guarantee both tranches.  Additionally, the collateral package for the Senior Secured Notes are the same as the Prepetition Credit Facilities, but have first priority interest in certain assets, including equipment, general intangibles (other than intellectual property), fixtures and equipment, among other things.

49.    Inability to refinance the 2025 Notes or the 2026 Notes would trigger a springing maturity on the Prepetition Credit Facilities.  Specifically, the Prepetition Credit Facilities mature on the 91 days prior to the stated maturity of the 2025 Notes and 2026 Notes if, on such 91 days, the 2025 Notes or the 2026 Notes are outstanding.

### 3.    The Prepetition Unsecured Notes.

50.    Rite Aid Corporation also has two tranches of unsecured debt facilities (the "Unsecured Notes"):

- **7.700% Notes due 2027 (the "2027 Notes")**.  On December 17, 1996, Rite Aid Corporation issued $300 million of 7.700% of Notes due February 15, 2027 (approximately $186 million of which remains outstanding as of the Petition Date). No other Debtor guarantees or is otherwise obligated under these notes.

- **6.875% Notes due 2028 (the "2028 Notes")**.  On December 21, 1998, Rite Aid Corporation issued $150 million of 6.875% Notes due December 15, 2028 (approximately $2 million of which remains outstanding as of the Petition Date).  No other Debtor guarantees or is otherwise obligated under these notes.

### 4.    Finance Leases.

51.    The Company leases most of its retail stores and certain distribution facilities under non-callable operating and finance leases, most of which have initial lease terms of five to 22 years.  The Company also leases certain of its equipment and other assets under non-callable operating leases with initial terms of three to 10 years.  As of the Petition Date, approximately $18 million remains outstanding under such equipment and other asset operating leases.

### 5.    Common Stock.

52.    Shares of Rite Aid Corporation's common stock trade on the New York Stock Exchange (the "NYSE") under the symbol "RAD."  In September 2023, Rite Aid Corporation received notice from the NYSE that it is no longer in compliance with certain NYSE continued listing standards relating to minimum market capitalization and minimum stock price.  Rite Aid Corporation is currently within specified cure periods for such deficiencies, and its common stock continues to be listed and traded on the NYSE during such periods.

### C.    Rite Aid's Liquidity

53.    The Company has two primary sources of liquidity: (i) cash provided by operating activities and (ii) borrowings under its debt facilities.  The Company principally uses its cash to provide working capital for operations, to service interest and principal payments, and to fund capital expenditures.  As of October 15, 2023, the Company has $524 million of liquidity:  revolver borrowing capacity of $390 million[5] and $134 million in cash.

---

[5] Excludes impact of $257.5 million FCCR blocker, which is currently active.

III.    **Prepetition Strategic, Financing, and Governance Initiatives.**

54.    A confluence of headwinds stressed the Company's financial performance.   Part III summarizes how—over several years—the Company reacted to those headwinds.

A.    **Liability Management Transactions and Debt Paydowns.**

55.    The Company executed several transactions and debt pay downs to reduce funded debt and borrowing costs.   These transactions extended the Company's runway to explore additional turnaround opportunities.

56.    *First*, on June 25, 2020, the Company announced it would exchange up to $750 million in aggregate principal amount of the then-outstanding 6.125% Senior Notes due 2023 ("2023 Notes") for a combination of $600 million of the newly issued 8.0% 2026 Notes and $145.5 million in cash.  Shortly thereafter, the Company increased the maximum exchange amount to $1.125 billion.  On July 24, 2020, the Company announced that it had exchanged $1.063 billion of the 6.125% Notes for $849.9 million of the 2026 Notes and $206 million in cash.

57.    *Second*, on May 28, 2021, the Company redeemed 100% of the remaining outstanding 2023 Notes at par.

58.    *Third*, on August 20, 2021, the Company amended its Prepetition Credit Agreement to provide for the $2.8 billion ABL Facility and the $350 million FILO Term Loan Facility.  As a result of the amendment, Rite Aid was able to extend its debt maturity profile and obtain additional liquidity.

59.    *Fourth*, on December 1, 2022, the Company further amended its Prepetition Credit Agreement, to upsize both Prepetition Credit Facilities, collectively increasing the Company's liquidity by $100 million.

60.    *Fifth*, in recent years, the Company reduced interest expense by paying down certain of its funded debt.  Specifically, in June, November, and December 2022, the Company

paid off $115, $160, and $5 million, respectively, of its second-lien 2025 Notes. In June 2022, the Company paid down $52 million of its unsecured 2027 Notes and $27 million of its unsecured 2028 Notes. In total, these pay downs saved approximately $22 million in cash interest expense since June 2022.

### B.    Cost-Saving Measures.

61.    The Company explored and executed several cost-saving measures and operational improvements. First, the Company closed over 200 underperforming stores. Second, the Company initiated a new, large-scale program to reduce operating and overhead costs to better align the operation to the optimized store footprint. The Company is now executing that program and focused on delivering pharmaceuticals and services with efficiency. Third, at its retail locations, the Company rationalized its front-end retail offerings to improve working capital and refresh its merchandise assortment. Finally, the Company has also initiated additional initiatives to enhance optimization of pricing and promotional strategies.

### C.    Sale-Leaseback Transactions.

62.    The Company also took advantage of favorable real estate markets in each of 2021, 2022, and 2023 to sell dozens of owned properties (including distribution centers) and enter into long-term leases with the purchasers. These transactions resulted in net proceeds of approximately $178 million in 2021, $57 million in 2022, and $73 million in 2023.

### D.    Advisor Engagement.

63.    Rite Aid engaged Guggenheim Securities and Kirkland & Ellis LLP in December 2022 and April 2023, respectively, to assist Rite Aid in analyzing its financing needs and explore capital structure alternatives and restructuring options. The Company also engaged Alvarez & Marsal in May 2023 to conduct a footprint assessment, assist with the business plan and transformation, accelerate cost savings and, if necessary, support contingency preparations.

E.    **Footprint Rationalization and Rite Aid 2.0 Business Plan.**

64.    Unprofitable stores have hampered the Company's growth, turnaround initiatives, and free cash flow, while the inability to reinvest in the business allowed competitors to outpace the Company.  Rite Aid undertook a bottoms-up footprint rationalization effort and developed the Company's business plan, called Rite Aid 2.0.  It became clear that supporting the unprofitable stores and rent payments for inactive stores was unsustainable for the business.  Accordingly, the Company undertook an intensive, store-level evaluation that tested the stores' financial performance, rent relative to market, and supply chain and other operational and geographic considerations impacting its competitive landscape and overall strategies with its network.  Based on that analysis, the Company identified a series of stores for closure to focus on the remaining portfolio and ability to invest capital into the remaining stores.

F.    **Asset Sales.**

65.    The Company began a marketing process for Elixir over the summer.   The Company, with the assistance of Guggenheim Securities, prepared marketing materials and contacted approximately 13 parties.  Due to the operational and regulatory expertise required to operate a PBM, the marketing efforts focused on potential strategic buyers.  Nine potential bidders executed non-disclosure agreements and were granted access to a virtual data room as well as offered management presentations.  The Company will use the chapter 11 process to complete the Elixir marketing process.

G.    **Corporate Governance Efforts.**

66.    The Company's board and senior management have proactively managed the Company's circumstances and maintained a strong governance process.

67.    *First*, beginning March 2023, a special committee of the board of directors or certain board committees began convening weekly meetings with the Company's restructuring

advisors. Those weekly meetings, which focused on restructuring-related updates and workstreams, supplemented the board's regular cadence of meetings.

68.     **Second**, seven advisor consultants, including myself, were engaged over the summer to aid the Company and certain of its subsidiaries in their evaluation of alternatives and contingency planning efforts. The consultants have substantial experience:

- *Lisa Broderick*. Ms. Broderick is an accomplished senior executive with 35 years of experience across technology, finance, and business development industries. She is founder and Managing Partner of Conversus Group LLC, a management consulting firm that has performed turn arounds of companies across technology, telecommunications, manufacturing and service-based industries.

- *Paul Keglevic*. Mr. Keglevic is an experienced independent director, with prior senior executive and Big 5 accounting experience. Mr. Keglevic's experience includes leading the restructuring of the largest LBO in U.S. history. Mr. Keglevic currently sits on the boards of WeWork, utility company Evergy, and healthcare company Envision, in addition to having served as an independent board member across a wide range of other companies and sectors.

- *Roger Meltzer*. With over 35 years of experience in law firm leadership, including nearly 15 years managing DLA Piper, including two terms as Chairman. Mr. Meltzer brings deep experience in managing large organizations through major financial headwinds, expansion, and growth. Mr. Meltzer has served as a director to several non-profit and for-profit organizations, where he has brought to bear decades of leadership experience and practice in corporate and securities law.

- *Steven Panagos*. Mr. Panagos is a turnaround expert with experience leading complex financial and operational restructurings for organizations across a spectrum of industries. He has served as an independent director to companies undergoing significant changes, including PhyMed, JCPenney, Pier1 Imports, and American Consolidated Natural Resources. Mr. Panagos also spent a decade as Vice Chairman and Managing Director of the Recapitalization & Restructuring Group at Moelis & Company.

- *Stefan Selig*. Mr. Selig is an accomplished banker and senior executive. He served as President Obama's Under Secretary of Commerce for International Trade. Prior to serving in that role, he was the Executive Vice Chairman of Global Corporate & Investment Banking at Bank of America Merrill Lynch. In 2017, Mr. Selig founded BridgePark Advisors LLC to advise a select group of CEOs, boards of directors, and institutional and high net worth investors on

business strategy, mergers and acquisitions, and financings, among other things. Mr. Selig has served as an independent director to numerous companies undergoing reorganizations.

- ***Carrie Teffner***. Ms. Teffner has more than 30 years of financial and operational leadership experience in consumer products and retail industries, having served as the Chief Financial Officer of Crocs, PetSmart, Weber-Stephen Products LLC, and Timberland. Ms. Teffner has also served as a director on the boards of public companies, including companies undergoing reorganizations.

69.    ***Third***, once it became clear that a near-term chapter 11 process was a distinct possibility, Rite Aid proactively evaluated its corporate governance structure. The Company determined to appoint the advisor consultants to disinterested director positions at three entities in the corporate structure:

| Entity | Disinterested Directors | Disinterested Directors' Counsel |
|---|---|---|
| Hunter Lane, LLC (Elixir) | Stefan Selig, Roger Meltzer | Katten Muchin Rosenman LLP |
| Rite Aid Corporation | Paul Keglevic, Carrie Teffner | Kobre & Kim[6] |
| Thrifty PayLess, Inc. | Steven Panagos, Lisa Broderick | Milbank LLP |

70.    The applicable boards delegated authority to the Disinterested Directors to address potential or actual conflicts of interest (if any) that may arise between their respective entity and other Company entities in connection with a restructuring.

**H.    Stakeholder Engagement.**

71.    In the lead-up to the Petition Date, Rite Aid engaged with key stakeholders across its capital structure in the hopes of consummating a deleveraging, out-of-court transaction. Over several months, Rite Aid engaged with the Ad Hoc Secured Noteholder Group regarding options

---

[6]    Wilson Sonsini Goodrich & Rosati represents the full board of Rite Aid Corporation.

to strengthen its balance sheet and right-size its capital structure; the agent on its existing ABL Facility, regarding potential financing options; and various governmental agencies, regarding resolution of a number of investigations.

## IV.    DIP Financing and RSA Term Sheet.

72.    In parallel with their various pre-petition initiatives, the Company, with the assistance of its advisors, negotiated the DIP and RSA term sheet.  Together, they provide the Company with the best opportunity to restructure its financial obligations and position the Company for long-term success.

73.    As Mr. Liebman details in his accompanying declaration, the Debtors' businesses are cash-intensive, with significant daily and monthly cash needs to meet obligations to vendors, employees, and landlords, among others.  The DIP facility will bolster liquidity, and the Debtors will benefit from the strong message the DIP facility provides to the Debtors' key stakeholders—that operations will continue post-petition in the ordinary course as the Company charts its path out of bankruptcy.

74.    The RSA term sheet provides a framework for a comprehensive reorganization and will position the Company to maximize recoveries for stakeholders in a timely manner.  Speed within chapter 11 is key for a retail business like Rite Aid to successfully reorganize.  The longer that the Debtors linger in chapter 11, significant administrative claims (including DIP interest and professional fees) will accrue, and the Company will risk the loss of customer and supplier confidence.  The Debtors are also mindful of the time constraints imposed by section 365(d)(4) of the Bankruptcy Code regarding their lease portfolio, as well as the regulatory approvals necessary for effectuating the sale of certain of the Debtors' assets.

**V.      Evidentiary Support for First Day Motions.**

75.      The Debtors have filed First Day Motions seeking various relief to stabilize the Debtors' business operations, ensure a "smooth landing," and facilitate the efficient administration of these chapter 11 cases.  A description of the relief requested in—and the facts supporting each First Day Motion—is set forth in **<u>Exhibit C</u>**.

76.      I have consulted with the Debtors' advisors regarding each of the First Day Motions.  The relief requested is necessary and in the best interests of the Debtors' estates, and it will allow the Debtors to operate with minimal disruption and maximize value during these chapter 11 cases.  The Debtors have tailored their requests for immediate relief where the failure to receive such relief would cause immediate and irreparable harm to the estates.

*      *      *      *      *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of information and belief.

Dated: October 16, 2023                              */s/ Jeffrey S. Stein*
                                                                     Jeffrey S. Stein
                                                                     Chief Executive Officer
                                                                     Chief Restructuring Officer
                                                                     Rite Aid Corporation

## Exhibit A

**RSA Term Sheet**

| RSA |  |
|---|---|
| **RSA** | • The Company and the ad hoc group of senior secured noteholders (the "**Secured AHG**") shall enter into a restructuring support agreement ("**RSA**") consistent with the terms set forth herein and as otherwise agreed by the Company and Consenting Noteholders that hold at least 66.67% of the aggregate principal amount of Secured Notes outstanding as of the petition date. |
|  | • RSA effectiveness shall be subject to the following CP (in addition to other customary CPs): |
|  |     o RSA shall be entered into by holders of at least 66.67% of the aggregate principal amount of Secured Notes outstanding as of the petition date (such participating holders, the "**Consenting Noteholders**"); |
|  |     o RSA shall contain, among other terms, (i) a covenant by the Debtors to make commercially reasonable efforts to sell, transfer, or otherwise monetize the CMS Receivable and to keep the professionals for the Required Consenting Noteholders and DIP ABL/FILO/Term Loan Lenders reasonably informed on the status thereof; (ii) will commence a process to sell, transfer, or otherwise monetize the CMS Receivable, which process shall be on terms acceptable to DIP ABL/FILO/Term Loan Lenders, the Consenting Noteholders holding at least 66.67% of the Secured Notes held by all Consenting Noteholders (the "**Required Consenting Noteholders**"), and which process the Debtors, the Required Consenting Noteholders, and DIP ABL/FILO/Term Loan Lenders shall negotiate in good faith; and (iii) the Debtors will use good faith efforts to commence a RFP process to solicit third-party bids to become the Debtors' primary pharmaceutical provider and to keep the professionals for the Required Consenting Noteholders and DIP ABL/FILO/Term Loan Lenders reasonably informed on the status thereof. |
|  |     o Company shall enter into agreement(s) on or before the Petition Date concerning the treatment of key critical vendors' claims and contract(s) (as applicable) both during the chapter 11 case and on a post-emergence basis on terms acceptable to the Company and the Required Consenting Noteholders |
|  |     o Agreement on the Paydown Escrow Schedule and Cash Collateral provisions (defined and set forth below) among the Company, the ABL, and the Required Consenting Noteholders |
|  | • The RSA shall provide that (a) the Consenting Noteholders reserve all rights as to Definitive Documents (to be defined in the RSA), including Global Bidding Procedures Order, the Interim DIP Order, the Interim Store Closing Order, the Confirmation Scheduling Order, the Plan, and the Disclosure Statement, that are filed within the first 30 days of the Petition Date, and no consent or approval by the Consenting Noteholders shall be deemed to have been given by a failure to object to such pleadings, (b) the Debtors and Consenting Noteholders shall negotiate in good faith on the form of all Definitive Documents, including amendments to any filed pleadings, and (c) upon the second business day following the date upon which the Final DIP Order is entered, the Required Consenting Noteholders shall have the option to terminate the RSA if any Definitive Documents, including any motions that have already been filed or orders that have already been entered, are not in form and substance acceptable to the Required Consenting Noteholders or otherwise inconsistent with the terms set herein. |
| **Implementation** |  |
| Mechanism | **Chapter 11 Plan of Reorganization / Section 363 Process**. The restructuring transactions will be effectuated through a chapter 11 plan (the "**Plan Restructuring**") on terms acceptable to the Company and the Required Consenting Noteholders (the "**Plan**") *if*, in addition to the satisfaction of other customary conditions and unless otherwise agreed by the Company and the Required Consenting Noteholders, (i) the Required Consenting Noteholders |

| | |
|---|---|
| | determine no later than two business days before the voting deadline in the Disclosure Statement Order that treatment and quantum of administrative expense and priority claims under the Plan is acceptable, (ii) the Confirmation Order is entered on or before the applicable milestone set forth below, and (iii) an Acceptable Sale Termination Event (as defined below) has not occurred (the "**Plan Conditions**").  To effectuate the restructuring transactions described herein, the Company Parties shall file a Plan that is materially consistent with this Term Sheet. <br><br> • Required Consenting Noteholders to credit bid to purchase RAD 2.0 (defined as RAD Retail Business, excluding [400] stores contemplated for closure, subject to Designation Rights Arrangement) (the "**AHG Credit Bid**"). <br><br> • If the Plan Conditions are satisfied on or before the applicable confirmation milestone set forth below, the AHG Credit Bid shall be effectuated pursuant to the Plan. <br><br> • "Reorganized Rite Aid" is defined as RAD 2.0, *less* any additional stores closed pursuant to the Additional GOB Sales (defined below), *less* the assets sold in the PBM Sale, *less* any other assets sold pursuant to the Retail Sale Process. <br><br> If the Plan Conditions are not satisfied on or before the milestone set forth below, the AHG Credit Bid, subject to the results of the Retail Sale Process, shall be implemented pursuant to a sale order under section 363 of the Bankruptcy Code (the "**Sale Order**") and a liquidating chapter 11 plan (in the event of the AHC Credit Bid, the "**Credit Bid – 363 Sale**"; and in the event of an alternative sale, the "**Alternative Sale Transaction**"). <br><br> Regardless of whether the parties are pursuing a Plan Restructuring, the Company will file a motion seeking approval of the AHG Credit Bid under section 363 (the "**Sale Motion**") such that the hearing to approve the Sale Motion and entry of the Sale Order may occur on or before the applicable milestones set forth below if the Plan is not confirmed on or before the applicable confirmation milestone. |
| **AHG Credit Bid** | • AHG Credit Bid shall be subject to the following CPs, in addition to other customary CPs: <br><br> o Reasonably acceptable inventory and working capital on an enterprise and per-store basis; <br><br> o Acceptable go-forward agreements with key vendors, including on treatment of any prepetition/administrative claims; <br><br> o Acceptable exit financing from ABL/FILO lenders; and <br><br> o NewCo to have access to sufficient liquidity at emergence / consummation of the sale. <br><br> • Company and the AHG to engage in good faith discussions on Rite Aid 2.0 store footprint, with additional stores identified for closure to be incorporated into GOB process |

| **Treatment of Claims & Interests under a Plan** | *ABL / FILO Claims* | Repaid in full in cash at exit or upon consummation of third-party sales, unless ABL/FILO lenders agree to roll into exit financing |
|---|---|---|
| | *Senior DIP TL Claims* | Repaid in full in cash at exit or upon consummation of third-party sales |

*Execution Version*

| | | |
|---|---|---|
| | *Senior Secured Notes Claims (if any)* | In the event of the Plan Restructuring, 100% of the new common stock in Reorganized Rite Aid, subject to dilution on account of the new stock issued pursuant to the Management Incentive Plan (the "**New Common Stock**") and any equity-linked instruments issued to Holders of Allowed General Unsecured Claims, plus takeback debt in an amount to be determined by the Required Consenting Noteholders and the Company; or<br><br>In the event the Restructuring Transaction is not a Plan Restructuring, [its Pro Rata share of the Distributable Proceeds, if any, pursuant to the Waterfall Recovery.] |
| | *Admin/Priority Claims* | Treatment and quantum on terms acceptable to the Required Consenting Noteholders. |
| | *Unsecured Trade Claims* | Subject to same treatment as General Unsecured Claims (excl. Trade Claims), described below. |
| | *General Unsecured Claims (excl. Trade Claims)* | Subject to (i) DIP Term Loan Claims and ABL/FILO Claims being satisfied in full, in cash, or such other treatment acceptable to the DIP Term Loan Lenders and/or ABL/FILO lenders, as applicable, in their sole discretion, and (ii) the satisfaction of any Allowed Adequate Protection Claims, [---]% of an equity-linked instrument in Reorganized Rite Aid (form and terms to be determined), calculated as of the Plan Effective Date and equal to the product of a formula calculated as the (Midpoint Value of owned Real Estate not encumbered prior to the Petition Date, *less* the costs and expenses paid by, or estimated to be paid by, the Debtors' estates to administer the chapter 11 cases) *divided by* (the sum of the numerator *plus* the total amount (including principal and accrued but unpaid interest) of equitized Senior Secured Notes Claims) |
| | Equity | Cancelled |
| | *MIP* | MIP at NewCo or Reorganized Rite Aid, as applicable, to be determined and allocated by the board of such entity |
| **Treatment of Claims & Interests if AHG Credit Bid Implemented Through a 363 Sale** | • See Paydown and Escrow Schedule.<br><br>• All proceeds, other than an agreed Wind-Down Budget, shall be used to repay DIP Term Loan Claims, ABL/FILO Claims, Secured Notes Claims, and, if applicable, any general unsecured claims in accordance with the priority set forth in Exhibit A (and otherwise in in accordance with Financing Order), or an otherwise agreed waterfall among the ABL/FILO Lenders, Company, and Required Consenting Noteholders.<br><br>• Wind-Down Budget shall include an amount sufficient to fund the Professional Fee Escrow, administrative expense claims and priority claims (in an amount to be negotiated and acceptable to the Required Consenting Noteholders, the DIP Term Loan lenders, ABL/FILO lenders and the Company Parties as a condition precedent of the effectiveness of the Sale Order as set forth above), [WARN obligations], and other amounts to be agreed among the DIP Term Loan lenders, the ABL/FILO Lenders, Company, and Required Consenting Noteholders. | |
| **Store Rationalization** | • The AHG Credit Bid shall include the exclusive right, whether implemented through a Plan Restructuring or otherwise, exercisable in the Required Consenting Noteholders' sole discretion, to designate the assumption, assumption and assignment, or rejection of store leases (the "**Designation Rights**") as set forth in that certain store rationalization agreement between the Company Parties and the Consenting Noteholders, pursuant to which the stores designated for rejection shall become subject to a GOB sale process on terms acceptable to the Company Parties and the Required Consenting Noteholders (the "**Additional GOB Sales**"). | |

| | |
|---|---|
| | • The following provisions apply with respect to the Designation Rights:<br><br>   o   The Required Consenting Noteholders will have reasonable consent rights on sell vs. pour decisions with respect to all stores/assets subject to the GOB process.<br><br>   o   The proceeds of prescription file sales in connection with of GOB sales (other than (x) Initial GOB Sales and (y) GOB sales conducted in connection with an exercise of remedies by ABL / FILO Lenders or DIP Term Loan Lenders or after a Cash Collateral Termination Event) representing [the excess above borrowing base advance amounts, determined in a manner acceptable to the ABL / FILO Lenders, the DIP Term Loan Lenders, and the Required Consenting Noteholders] to repay the DIP ABL facility and result in a corresponding permanent availability reserve.<br><br>• It shall be a condition to closing of the AHG Credit Bid, whether such credit bid is effectuated through the Plan or through the Sale Order, that, prior to the day that is 120 days after the Petition Date, the Debtors shall have obtained an extension of the deadline to assume or reject the leases subject to the AHG Credit Bid to 210 days after the Petition Date. |
| **PBM Sale** | • Sale of the PBM business to a third party if determined to be value-maximizing (based on good-faith discussions and consultation  between Company, DIP Term lenders, ABL / FILO Lenders, and Required Consenting Noteholders); *provided* that the RSA will include a termination right exercisable by the Required Consenting Noteholders if the Company receives a Qualified Bid (other than any AHG Credit Bid) for the PBM business that is acceptable to the Required Consenting Noteholders that the Debtors decline to accept (an "**Acceptable PBM Sale Termination Event**")<br><br>• PBM Sale Timeline Deadlines, subject to Court availability<br><br>   •   November 17, 2023 – Qualified Bid Deadline<br><br>   •   November 29, 2023 – Auction<br><br>   •   December 8, 2023 – Sale Hearing<br><br>• See Paydown and Escrow Schedule. |
| **CMS Receivable** | • See Paydown and Escrow Schedule below and RSA provisions above.<br><br>• The sale, transfer, encumbrance, or monetization of the CMS Receivable and the process thereto shall be in accordance with this term sheet, the DIP ABL/FILO/Term Loan facilities and the Paydown and Escrow Schedule/priority set forth in Exhibit A. |
| **Retail Business Sale** | • Company to run third party sale process for retail business, with to-be-agreed adjustment mechanics to the extent there are value-maximizing third party bids for particular assets, regions, or the Company as a whole<br><br>• Closing of any sales to occur as soon as possible following receipt of necessary regulatory approvals<br><br>• Retail Business Sale Timeline Deadlines, subject to Court availability |

*Execution Version*



o   November 16, 2023 – Initial Indications of Interest Deadline

o   December 7, 2023 – Qualified Bid Deadline

o   December 15, 2023 – Auction

o   January 8, 2024

   •   Disclosure Statement Hearing on updated Plan and Disclosure Statement, as updated to reflect auction results

   •   Approval Hearing: Third-party 363 Sales

o   Approval Hearing:

   •   AHG Credit Bid: (i) if Plan Restructuring → February 19, 2024 and (ii) if Credit-Bid 363 Sale → February 26, 2024

• Third-party sales executable by Company in its business judgment in consultation with the Required Consenting Noteholders, ABL/FILO Lenders, and DIP Term Lenders.

• The Required Consenting Noteholders shall have (i) an RSA termination right if (a) the Debtor seek approval of a Qualified Bid (other than the AHG Credit Bid) that the Required Consenting Noteholders do not support or (b) the Debtors refuse to seek approval of a Qualified Bid (other than the AHG Credit Bid) that is supported by the Required Consenting Noteholders, includes aggregate consideration of a value in excess of an amount to be agreed relative to the assets proposed to be sold in connection with such Qualified Bid, and is otherwise value maximizing and agreed to by and DIP ABL/FILO/Term Loan Lenders and (ii) a covenant that the Debtors will seek in good faith to maximize value to the greatest extent possible in pursuit of Qualified Bids (other than the AHG Credit Bid), take all such necessary actions to achieve that outcome, and work in good faith with the Consenting Noteholders in connection with such efforts.

• Allocation of sale proceeds to be in accordance with the priority set forth in Exhibit A (and otherwise in in accordance with Financing Order), or otherwise on terms acceptable to the Company, DIP Term lenders, ABL/FILO Lenders, and Required Consenting Noteholders

| **Critical Vendors / First Day Relief** | All payments under first day motions (critical vendor, etc.) above $1 million to a single party (or group of affiliated parties) will be subject to Required Consenting Noteholders' approval. |
| --- | --- |
| **Case Milestones** | • Milestones acceptable, subject to ongoing discussions and agreements on other open terms.<br><br>• October 15, 2023 – Petition Date; file "First Day Pleadings", including Plan and Disclosure Statement.<br><br>    o   Filing of store closing motion, which seeks authorization to establish procedures for the Company to conduct store closing sales, including sales (or pours) of prescription assets.<br><br>    o   Filing of lease rejection motion, which seeks to reject unexpired leases of non-residential real property and abandon certain personal |

*Execution Version*

|  |  |
|---|---|
|  |       property on the premises of the rejected lease.<br><br>    ○  Filing of confirmation scheduling motion.<br><br>• October 17, 2023<br><br>    ○  Entry of Global Bidding Procedures Order<br><br>    ○  Entry of Interim DIP Order<br><br>    ○  Entry of Interim Store Closing Order<br><br>    ○  Entry of Confirmation Scheduling Order<br><br>• November 16, 2023<br><br>    ○  Entry of Final DIP Order<br><br>    ○  Entry of Final Store Closing Order<br><br>    ○  Entry of First Lease Rejection Order<br><br>    ○  Entry of Bar Date Order<br><br>• December 7, 2023 – agreed form of Credit Bid APA among the Company and Consenting Noteholders consistent with the terms set forth herein<br><br>• January 8, 2024<br><br>    ○  File Sale Motion (regardless of whether the parties are still seeking to consummate the Plan Restructuring as of such date) to approve AHG Credit Bid<br><br>    ○  Obtain entry of order approving third-party bids resulting from the retail business sale process<br><br>• January 14, 2024 – Entry of Disclosure Statement Order<br><br>• February 19, 2024 – Entry of Confirmation Order<br><br>• February 26, 2024 - Entry the Sale Order if either (a) the Plan Conditions are not satisfied or (b) the Plan Conditions are satisfied but the Plan is not confirmed, in each case, on or before February 19 |
| **Adequate Protection For Senior Secured** | Secured noteholders to consent to Company's use of secured noteholders' prepetition collateral, including cash collateral. |

*Execution Version*

| Notes Claims | The cash collateral order shall include the following forms of adequate protection for the secured noteholders: |
|---|---|
| | • (a) to the extent of any diminution in value of the secured noteholders' collateral, (i) valid, binding, enforceable, and perfected security interests in, and liens on, the Debtors' assets, including pre-petition unencumbered assets (the "**Unencumbered Assets**") of the Company as of the Petition Date, which liens and security interests shall be junior and subordinate to the carve-out and otherwise have the priority set forth in Exhibit A and (ii) allowed superpriority administrative expense claims as provided for in sections 503(b) and 503(7) of the Bankruptcy Code, subject to the carve-out and other priority terms set forth in Exhibit A; *provided* that, for the avoidance of doubt, such liens shall not prime the DIP Term Loan Lenders' first-priority liens on the Unencumbered Assets. |
| | • (b) payment of the reasonable and documented prepetition and postpetition fees and expenses of Secured Notes Trustee (including Riker Danzig LLP) and the advisors to the Secured AHG (including Paul, Weiss, FTI, Evercore, and local counsel); |
| | • (c) the milestones set forth in this term sheet and otherwise set forth in the DIP documents; |
| | • (d) all reporting provided to the prepetition ABL Lenders and the DIP Lenders, including copies of the DIP Budget,(ii) weekly reporting and conference calls with the advisors to the Ad Hoc Group on status of the Retail Business sale process, (iii) weekly reporting on the status of lease renegotiations by property, including any settlements achieved with any landlords by property, and (iv) other customary reporting as reasonably requested by the advisors to the Ad Hoc Group; |
| | • (e) consent rights on payments on account of prepetition claims pursuant to any first day relief or otherwise in excess of $1 million to any single party or group of affiliated parties, including on account of 503(b)(9) claims; |
| | • (f) subject to entry of the Final DIP Order, standard 506(c) waiver, standard waiver of the equities of the case doctrine under section 552(b), and standard marshaling waiver; and |
| | • (g) the provisions set forth in the Paydown and Escrow Schedule. |
| **Cash Collateral** | • The Required Consenting Noteholders shall have the right to terminate the Debtors' use of cash collateral upon (a) the breach of any "ABL/FILO Case Milestone" (subject to the extension rights of the ABL/FILO/DIP TL agents for 10 BD in accordance with the ABL/FILO/DIP TL facilities) in effect as of the petition date, which may not be further extended, modified, or amended for the purposes of these provisions without the prior written consent of the Required Consenting Noteholders or (b) if the Plan is not confirmed or the order approving the Credit-Bid 363 Sale is not entered on or before [February 26, 2024] (each, a "**Cash Collateral Termination Event**") |
| | • If any Cash Collateral Termination Event exists, holders of at least 66.67% in aggregate principal amount of the Secured Notes outstanding at the time of such Cash Collateral Termination Event (the "**Required Secured Noteholders**") may elect to send a written notice to the ABL Agent, the DIP Agents, the Debtors and the Committee ( a "**Cash Collateral Standstill Notice**"), informing such parties that a Cash Collateral Termination Event has occurred and is continuing, and upon the expiration of 5 business days, the Required Secured Noteholders may elect to send a notice ("**Cash Collateral Termination Notice")** to the Debtors and the ABL/TL Agents terminating the Debtors' use of Cash Collateral effective as of the 30th day following delivery of such Cash Collateral Termination Notice (such date, the "**Cash Collateral Termination Date**") |
| | • Following the occurrence of the Cash Collateral Termination Date, the ABL/FILO Agent and the DIP TL Agent retains the right to consent to the use cash collateral solely for the purpose of conducting a sale of all or substantially all of the DIP Collateral (i) on terms and conditions acceptable to the ABL/FILO Agent and the DIP TL Agent, (ii) with respect to Notes Priority Collateral, on terms and conditions acceptable to the Required Secured |

*Execution Version*

| | |
|---|---|
| | Noteholders; and (iii) with respect to DIP Collateral that is not Notes Priority Collateral, in good-faith consultation with, and reasonable updates to, the Required Secured Noteholders. |
| **Paydown and Escrow Schedule** | With respect to the application of (i) [PBM Sale Proceeds][1] and (ii) CMS Receivable Proceeds:<br><br>• First $200 million to repay the DIP FILO Facility<br><br>• Second $250 million escrowed solely for the benefit of the Second Lien Notes and to pay down the Second Lien Notes<br><br>• Third, $100 million to repay the DIP ABL Facility (with a 100% corresponding permanent availability reserve)<br><br>• Any additional proceeds shall be shared 50/50 between the DIP ABL Facility on the one hand and the Second Lien Notes on the other hand *provided*:<br><br>    o Any amounts paid to the DIP ABL Facility shall result in a corresponding permanent availability reserve; and<br><br>    o Any amounts paid to the Second Lien Notes shall be escrowed solely for the benefit of the Second Lien Notes<br><br>Any amounts escrowed for the benefit of the Second Lien Notes shall be held in an interest-bearing escrow account and not be used for any other purpose and shall be escrowed solely for the benefit of the Second Lien Notes to be released upon the earliest of (a) the effective date of the Plan;  (b) consummation of a Sale approving the AHG Credit Bid and pursuant to such Sale, each of the ABL/FILO/DIP TL Facilities has either been paid in full in cash, consensually converted to an exit facility, or received such other treatment acceptable to the respective ABL/FILO/DIP TL Lenders in their sole discretion, or (c) consummation of a Sale approving a sale of substantially all of the Debtors' assets to one or more third party purchasers and pursuant to such Sale, each of the ABL/FILO/DIP TL Facilities has either been paid in full in cash, consensually converted to an exit facility, or received such other treatment acceptable to the respective ABL/FILO/DIP TL Lenders in their sole discretion, *provided*, if the Second Lien Notes are otherwise paid in full, in Cash, from the proceeds of the Retail Sale Process, such escrowed amounts shall be released back to the applicable Debtor for distribution in accordance with the Plan. Notwithstanding the foregoing, upon the earliest to occur of (a) a DIP Termination Event, (b) Cash Collateral Termination Date or (c) any (x) termination of the RSA, or (y) breach by the Required Secured Noteholders that would give rise to a termination by the Debtors of the RSA, any amounts previously escrowed for the benefit of the Second Lien Notes shall be applied in accordance with the lien priorities set forth in Exhibit A/Financing Order; provided that (1) any application of escrowed funds (as a result of the occurrence of any event described in clauses (a) or (b)) to the payment of any revolving loans under the ABL/FILO/DIP TL shall be accompanied by a permanent reserve against the borrowing base and (2) any application of escrowed funds (as a result of the occurrence of any event described in cause (c)) to the payment of any revolving loans under the ABL/FILO/DIP TL may, at the sole discretion of the ABL Agent, be accompanied by a permanent reserve against the borrowing base. |
| | Nothing set forth in the RSA or any related document shall be deemed to amend or otherwise modify the terms and conditions of the ABL/FILO/DIP TL facilities or the Financing Orders.  The exercise of all rights and remedies with respect to collateral shall at all times remain subject to the Pre-Petition ICA and the Financing Order. |

---

[1] Definitive documentation to include agreed formula for aggregate proceeds calculation.

*Execution Version*

| Other Key Provisions To Be Set Forth in RSA | <u>D&O Indemnification</u>.  Under the restructuring transactions, all indemnifications currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company Parties, as applicable, shall be assumed and survive the effectiveness of the restructuring. <br><br> <u>D&O Policy Assumption</u>.  On the Plan Effective Date, the applicable Company Parties shall be deemed to have assumed all unexpired directors', managers', and officers' liability insurance policies. <br><br> <u>Releases and Exculpation</u>.  The Plan shall contain customary releases and exculpations, which, for the avoidance of doubt, shall be supported by the Secured AHG pursuant to the RSA to which this term sheet will be appended. <br><br> <u>Fiduciary Out</u>.  The RSA shall contain a customary "fiduciary out" that each Debtor (and the Board thereof, including any special committee thereof) may exercise. |

*Execution Version*

**Exhibit A**

| **Priority** | **Assets of the Type Constituting both DIP Shared Collateral and ABL Priority Collateral, and Proceeds of Avoidance Actions with Respect to such Assets** | | **Assets of the Type Constituting both DIP Shared Collateral and Split-Lien Priority Collateral and Proceeds of Avoidance Actions with Respect to such Assets** | | **DIP Term Loan Exclusive Collateral** |
|---|---|---|---|---|---|
| **1ˢᵗ Priority** | Carve Out | | Carve Out | | Carve Out |
| **2ⁿᵈ Priority** | Permitted Prior Liens | | Permitted Prior Liens | | Permitted Prior Liens |
| **3ʳᵈ Priority** | DIP ABL Liens | DIP Term Loan Liens | Notes Adequate Protection Liens | | DIP Term Loan Liens |
| **4th Priority** | Prepetition ABL Adequate Protection Liens | | Notes Liens | | Notes Adequate Protection Liens |
| **5th Priority** | Prepetition ABL Liens | | DIP ABL Liens | DIP Term Loan Liens | Prepetition ABL Adequate Protection Liens |
| **6th Priority** | Notes Adequate Protection Liens | | Prepetition ABL Adequate Protection Liens | | |
| **7th Priority** | Notes Liens | | Prepetition ABL Liens | | |

*Execution Version*

**Defined Terms**:

"DIP Shared Collateral" means the Debtors' interest in all assets and properties (whether tangible or intangible), other than DIP Term Loan Exclusive Collateral, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, of the type that would constitute Prepetition Collateral (but for application of section 552(b) of the Bankruptcy Code) and, upon entry of the Final Order, proceeds of Avoidance Actions (other than proceeds of Avoidance Actions constituting DIP Term Loan Exclusive Collateral).

"ABL Priority Collateral" has the meaning set forth in the Prepetition Intercreditor Agreement.

"Split-Lien Priority Collateral" has the meaning set forth in the Prepetition Intercreditor Agreement.

"DIP Term Loan Exclusive Collateral" means the Debtors' interest in all of following assets and properties, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors, and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located: (a) all real property and interests therein (including both fee and leasehold interests); (b) all proceeds of leasehold interests; (c) all equity interests in the direct or indirect subsidiaries of Rite Aid; (d) all other assets of the Debtors, other than to the extent constituting DIP Shared Collateral; (e) all "Commercial Tort Claims" (as defined in Article 9 of the Uniform Commercial Code) related to the foregoing; (f) all insurance policies relating to the foregoing; (g) except to the extent constituting DIP Shared Collateral, all "Documents", all "General Intangibles", all "Instruments" and all "Letter-of-Credit Rights" (as each quoted term is defined in Article 9 of the Uniform Commercial Code) related to the foregoing; (h) all collateral and guarantees given by any other person with respect to any of the foregoing, and all "Supporting Obligations" (including "Letter-of-Credit Rights") (as each quoted term is defined in Article 9 of the Uniform Commercial Code) with respect to any of the foregoing; (i) all books and records to the extent relating to any of the foregoing; (j) all products and proceeds of the foregoing; and (k) upon entry of the Final DIP Order, proceeds of avoidance actions with respect to assets of the type referred to in clauses (a) through (d) of this definition; *provided* that DIP Term Loan Exclusive Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases) to the extent a grant of a security interest therein would violate or invalidate such lease or create a right of termination in favor of any other party thereto after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code and the Bankruptcy Code.

**<u>Exhibit B</u>**

**Corporate Structure Chart**







**<u>Exhibit C</u>**

**Evidentiary Support for First Day Motions[1]**

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First Day Motion.

**Evidentiary Support for First Day Motions**

**I.      Cash Management Motion.**

1.      In the ordinary course of business, Rite Aid operates a complex cash management system (the "Cash Management System"), a schematic of which is attached as Exhibit 1 to the Interim Order and the Final Order.  The main components of the Cash Management System consist of collections from brick-and-mortar store locations and credit card sales, reimbursement from private and government entities for prescription fills, transfers between Company entities, and disbursements to fund daily operations of the business.  The Cash Management System is comparable to the centralized cash management systems used by other similarly-sized companies to manage the cash flow of operating units in a cost-effective, efficient manner.  The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting.   Rite Aid's treasury department (the "Treasury") maintains daily oversight of the Cash Management System and implements cash management controls for accepting, processing, and releasing funds, including in connection with any Intercompany Transactions.   Additionally, Rite Aid's corporate accounting department maintains a regimented monthly closing process that reconciles the transactions to ensure that all transfers are accounted for properly and are in compliance with their financial reporting requirements as a public company.

2.      As of the Petition Date, the Cash Management System comprises 165 bank accounts (such accounts, together with any other bank accounts the Debtors or their non-Debtor affiliates may open in the ordinary course of business, the "Bank Accounts") that are owned by the Debtors and certain non-Debtor affiliates and are maintained at various branches of 62 banks (such banks, collectively, the "Cash Management Banks").   Of those Bank Accounts, 161 are

owned and controlled by the Debtors (the "Debtor Bank Accounts"), and four are owned by non-Debtor affiliates (the "Non-Debtor Bank Accounts").

3.       The Debtors' Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtors' businesses. The Debtors estimate that cash collections for the Cash Management System average approximately $1.9 billion per month, including store cash receipts, credit and debit card receipts, and e-commerce sales. In addition, the Debtors estimate that total disbursements will continue to average approximately $1.9 billion per month during these chapter 11 cases. Because of the nature of the Debtors' business and the disruption to the business that would result if they were forced to close their existing bank accounts, it is critical that the Debtors' Cash Management System remain in place on a postpetition basis.

4.       ***Concentration Accounts***. The Cash Management System is based around six concentration accounts (each a "Concentration Account" and, together, the "Concentration Accounts"). Prior to the Petition Date, the Debtors made certain modifications to the Cash Management System in accordance with their proposed debtor-in-possession financing facilities (collectively, the "DIP Facilities").[2] The Debtors make daily funding requests to the DIP Lenders, who transfer required funds via ACH to the Concentration Account at Bank of America ending in x2257 (the "Main Concentration Account"). As further described below, the Main Concentration Account, in turn, funds the Debtors' other Concentration Accounts and various Disbursement Accounts to meet cash requirements.

---

[2]    For the avoidance of doubt, the Debtors are seeking approval of the DIP Facilities in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, filed contemporaneously herewith.

5.    ***Store Depository Accounts.***  The Company maintains approximately 100 store level deposit accounts (the "Store Depository Accounts") close to their brick-and-mortar locations, into which all store-level cash sales are deposited on a daily basis.  The majority of the Store Depository Accounts pool cash collections from multiple of the Debtors' brick-and-mortar locations, but a smaller percentage of Store Depository Accounts collect funds on a single-store basis.  In certain circumstances, based on risk and branch availability, armored cars collect and transfer cash from the Debtors' store locations to a depository account where the cash is counted and electronically deposited into the applicable Store Depository Accounts.  In certain locations where armored cars are unavailable, cash is collected and transferred to a depository account on a daily basis.  The Debtors estimate that, on a weekly basis, the Store Depository Accounts aggregate approximately $45 million in cash collections.

6.    ***Collections Accounts.***  Cash deposited at the Store Depository Accounts is then transferred to a collections account at Bank of America ending in x5317 (such Bank Account, together with other collections accounts, the "Collections Accounts").  In addition, the proceeds of credit card sales, which are processed through a third party, are deposited (net of fees, charge backs, and returns) into the Collections Accounts.  The receipts primarily consist of income proceeds from stores (including those mentioned above), e-commerce, and third-party receipts. Pursuant to the terms of the DIP Facilities, funds in the Collections Account ending in x5317 will be subject to cash dominion, such that all receipts are automatically swept to an account held by Bank of America on a daily basis and are applied in repayment of obligations outstanding under certain of the Debtors' prepetition secured credit facilities.

7.    ***Disbursement Process.***  The Concentration Accounts fund the majority of the Debtors' 40 disbursement accounts (the "Disbursement Accounts").  The Disbursement Accounts

3

fund the Debtors' daily operations, such as accounts payable (including payments made to vendors, insurance, and freight providers), payroll (including benefits), sales tax and other tax obligations, employee obligations, and rent. Each of the 40 Disbursement Accounts is a zero-balance account and is funded by the Concentration Accounts on an as-needed basis. The Debtors anticipate that disbursements from the Disbursement Accounts will be funded, as they have been in the ordinary course of business, from funds in the Concentration Accounts generated from the Debtors' operations and from the use of the Debtors' cash collateral and funds available under the postpetition financing facility.

8.    ***Intercompany Transactions.***    The Debtors routinely engage in intercompany financial transactions with each other and certain non-Debtor affiliates (the "Intercompany Transactions"). At any given time, as a result of these Intercompany Transactions, there may be claims (the "Intercompany Claims") owing by or to one Debtor or non-Debtor affiliate to another Debtor or non-Debtor affiliate. These Intercompany Transactions are reflected as journal entry receivables and payables between the Debtors and non-Debtor affiliates and are balanced on a regular basis. The Debtors record all Intercompany Transactions through their accounting system and can ascertain, trace, and account for all Intercompany Transactions.

9.    Intercompany Transactions involving Company entities that are Debtors in these chapter 11 cases occur more frequently than Intercompany Transactions between Debtors and non-Debtors. In the ordinary course of business, Debtor HQ transfers funds to various Debtor affiliates for purposes of providing the cash required to fund local operations, such as certain payroll and other operating expenses. Debtor HQ also acts as an intermediary for transfers between the Company's distribution centers and its retail stores and receives cash receipts generated by retail locations as part of this process. Rite Aid's store locations place orders for replenished

inventory to intermediate, regional management entities, which then pay Debtor HQ for the cost of the required inventory. Debtor HQ clears the transaction with the Debtor entity that owns the applicable distribution center, and that distribution center provides the requested inventory to the store location.

10.     Similarly, ordinary-course transactions between Company entities that are Debtors and Company entities that are non-Debtors in these chapter 11 cases are integral to Rite Aid's Cash Management System. Intercompany Transactions between Debtor HQ and non-Debtor Elixir Insurance Company ("Elixir Insurance"), the principal entity through which Rite Aid operates its Pharmacy Services Segment, occur routinely and account for a substantial portion of Intercompany Transactions between Debtors and non-Debtors. These transactions are carried out through a third Company entity, Debtor Elixir Rx Options, LLC ("Rx Options"), as detailed more fully below.

11.     Elixir Insurance receives cash payments in the ordinary course of business for services rendered to various clients, including Medicare-eligible individuals, regional health plans, commercial employers, and labor groups. In its capacities as a pharmacy benefits manager and prescription drug plan sponsor, Elixir Insurance also receives ordinary-course payments from the Centers for Medicare and Medicaid Services ("CMS," and such payments, collectively, the "CMS Receivables") for the operation of a voluntary Medicare prescription drug plan pursuant to an agreement with CMS to provide basic prescription drug coverage for eligible participants. At the end of each contract year, CMS makes a one-time payment to EIC that reconciles actual levels of enrollment, risk factors, levels of incurred allowable drug costs (after rebates and other discounts), and other applicable pricing components for the contract year. Elixir Insurance has traditionally monetized the CMS Receivables by securitizing and selling its interests therein to a third-party purchaser for cash.

12.    To fund operating expenses at Elixir Insurance, HQ makes weekly disbursements to Rx Options, which in turn makes payments to third parties on behalf of Elixir Insurance to settle amounts owed.  Rx Options also provides certain management services to Elixir Insurance and charges management fees in connection with those services.  This arrangement as between Debtors HQ and Rx Options, on the one hand, and non-Debtor Elixir Insurance, on the other, ultimately results in a payable balance owed by Elixir Insurance to Rx Options.  In part, Rx Options reduces the receivable balance owing from Elixir Insurance by collecting rebates for purchases from Elixir Insurance.  In addition, proceeds of the sale of the CMS Receivables are also applied to reduce the balance of intercompany payables owed by Elixir Insurance to Rx Options.  Excess cash held in bank acounts owned by Elixir Insurance—including cash from operations and the proceeds of sales of CMS Receivables—is manually transferred by HQ on a regular basis.

13.    As a result, in the ordinary course of business, the Debtors and non-Debtors routinely engage in Intercompany Transactions, and there may be Intercompany Claims between them.  Any discontinuation of the Intercompany Transactions would unnecessarily disrupt the Cash Management System and the Debtors' operations to the detriment of the Debtors, their creditors, and other stakeholders.

14.    **_Bank Fees_**.  On a monthly basis, the Debtors pay approximately $450,000 in service fees (before earnings credits) owed under certain cash management and treasury service agreements covering the Bank Accounts (the "Bank Account Agreements") to the Cash Management Banks (collectively with any other amounts owning under the Bank Account Agreements, the "Bank Fees").  The Debtors paid approximately $4.8 million on account of Bank

Fees in the prior fiscal year (after earnings credits).   The Debtors estimate that they owe approximately $450,000 on account of Bank Fees as of the Petition Date.

15.    ***Critical Payment Processing Providers***.   The Debtors incur processor fees (the "Processor Fees") in connection with a merchant acquiring agreement with credit card processor Fiserv, Inc. ("Fiserv") that relates to the processing of the Debtors' credit-card, debit-card, and gift-card transactions.   In the ordinary course, Processor Fees are netted out of funds deposited in the Debtors' Collections Accounts.   The Debtors estimate that, on an annual basis, they pay approximately $98.0 million in processing fees, including fees associated with interchange for both debit and credit card acceptances and for smaller programs.   As of the Petition Date, the Debtors estimate that they owe approximately $800,000, which includes $700,000 to be netted out, on account of unpaid Processor Fees.

16.    ***Corporate Card Programs.***   As part of the Cash Management System, in the ordinary course of business and in accordance with the terms of the existing agreements between the Debtors, certain non-Debtor affiliates, and Bank of America, Rite Aid provides certain employees with access to company cards (each, a "Corporate Card") for authorized business or travel expenses (the "Corporate Card Programs").   The Corporate Card Programs can generally be divided into two categories:   (a) the corporate and property-level purchasing card program (such cards, the "Purchasing Cards," and such program, the "Purchasing Card Program"); and (b) the corporate travel card program (such cards, the "Corporate Travel Cards," and such program, the "Corporate Travel Card Program").

17.    Under the Purchasing Card Program, the Debtors provide employees with Purchasing Cards issued by Bank of America to pay for miscellaneous operational expenses, such as store supplies and online licenses, that are incurred in the ordinary course of business.  Expenses

incurred on the Purchasing Cards are billed directly to the Debtors and do not pass through any applicable employee's personal financial accounts.  On average, the Debtors pay approximately $1.4 million per month on account of the Purchasing Card Programs.  As of the Petition Date, the Debtors believe that there is approximately $1.0 million accrued and outstanding on account of the Purchasing Card Programs, some of which will become due and payable within the first 30 days of these chapter 11 cases.

18.      Under the Corporate Travel Card Program, private charge cards issued by Bank of America are provided to employees to cover certain payments for travel expenses, such as hotel stays and meals, and other necessary and approved company expenditures.[3]  Employees must obtain prior approval in accordance with Company policy before incurring expenses to be paid by the Debtors.  As of the Petition Date, Bank of America has issued approximately 900 Corporate Travel Cards under the Corporate Travel Card Program to employees of the Debtors and certain non-Debtor affiliates.  Debtor Rite Aid Hdqtrs Corporation ("HQ") guarantees all obligations owing under the Corporate Travel Card Program, including any obligations incurred by the Debtors and certain non-Debtor affiliates that use the Corporate Travel Card Program (collectively, such obligations and guarantee of such obligations, the "Corporate Travel Card Obligations").  On average, the Corporate Travel Card Obligations amount to approximately $575,000 per month, of which approximately 22 percent is paid directly by employees and is not reimbursed by the Debtors.  Notwithstanding the foregoing, HQ guarantees payment to Bank of America for all Corporate Travel Card Obligations.

---

[3]  For the avoidance of doubt, the Debtors are seeking authority to maintain the Corporate Travel Card Program and related obligations thereunder pursuant to the Wages Motion, filed contemporaneously herewith.

19.     ***Debtors' Existing Check Stock & Business Forms***.    As part of the Cash Management System, the Debtors use a number of preprinted business forms in the ordinary course of their business, including letterhead and deposit slips (collectively with checks, the "Business Forms").  The U.S. Trustee Guidelines require that the Cash Management Banks print "Debtor in Possession" and the bankruptcy case number on checks issued after the Petition Date.

20.     Continuing to use the existing Business Forms will minimize expenses to the Debtors' estates, reduce confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, avoid the delay in conducting business, and ensure continuity and avoid confusion between the Debtors' Business Forms.  The Debtors seek authority to continue using their prepetition printed existing stock without reference therein to the Debtors' status as "Debtors in Possession," provided that the Debtors shall include the "Debtors in Possession" designation with the corresponding case number on all replacement stock Business Forms once the existing preprinted stock is depleted.

21.     The Debtors have prepared communication materials for use with the various parties with which they conduct business that will, among other things, inform such parties of the commencement of these chapter 11 cases.

22.     ***Compliance with Section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines***.    While the majority of the Debtors' Bank Accounts are maintained at Cash Management Banks that have executed a Uniform Depository Agreement with, and are designated as authorized depositories by, the U.S. Trustee, all of the Bank Accounts are in the United States and are insured by the Federal Deposit Insurance Corporation ("FDIC").  Additionally, all but three of the noncompliant Bank Accounts are Store Depository Accounts.  In the vast majority of cases, the Store Depository Accounts are the only or nearest banks to these stores.

II.    **Kroll 156(c) Retention Application**.

23.    Although the Debtors have not yet filed their schedules of assets and liabilities and statements of financial affairs, they anticipate that there will be thousands of creditors and parties in interest to be noticed, many of which may file proofs of claim.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the appointment of a claims, noticing, and solicitation agent will provide the most effective and efficient means of noticing, administering claims, and soliciting and tabulating votes.

III.    **Case Management Motion**.

24.    The Debtors have thousands of potential creditors who, along with other parties in interest in these chapter 11 cases, may file requests for service of filings pursuant to Bankruptcy Rule 2002 (the "2002 List").  The Debtors also expect that numerous motions and applications will be filed in these chapter 11 cases in pursuit of various forms of relief.

25.    The advance scheduling of periodic omnibus hearings, as contemplated by the Case Management Procedures, will allow the Debtors and other to better plan for and schedule attendance at hearings.

26.    Further, a shortened mailing list will significantly reduce the substantial administrative and financial burden that would otherwise be placed on the Debtors' estates and other parties in interest that file documents in these chapter 11 cases.  Similarly, allowing electronic service of documents to those parties listed on the 2002 List in accordance with the Case Management Procedures will further reduce the administrative and financial burden on the Debtors' estates, as well as on other serving parties, and will, in many cases, allow for more expedient service of documents.

IV.     **Creditor Matrix Motion**.

27.     ***Consolidated Creditor Matrix***.  Allowing the Debtors to prepare and maintain a Consolidated Creditor Matrix in lieu of filing a separate creditor matrix for each Debtor is warranted under the circumstances of these chapter 11 cases where there are thousands of creditors and parties in interest.  Converting each Debtors' information to a format compatible with the matrix requirements, as well as the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, administratively burdensome, and increase the risk of error with respect to information already on computer systems maintained by the Debtors or their agents.

28.     ***Consolidated List of the 50 Largest Unsecured Creditors***.  The Debtors request authority to file a single, consolidated list of their 50 largest general unsecured creditors, which will help alleviate administrative burdens, costs, and the possibility of duplicative service, and will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix.

29.     ***Redact Certain Personally Identifiable Information***.  The Debtors seek authority to redact the names, home addresses, and e-mail addresses of natural persons from any paper filed or to be filed with the Court in these Chapter 11 Cases, including the Creditor Matrix and Schedules and Statements.  The Debtors may be subject to HIPAA and similar state regulations that carry significant financial penalties for the noncompliance thereof--accordingly, the Debtors have a duty to their patients and other stakeholders to maintain the confidentiality of patient information. Given the breadth of the Debtors' customer base, it is difficult to ascertain which of the Debtors' customers, individual creditors, employees, and individual equity holders are also patients subject to HIPAA.  Moreover, such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking.

30.    ***Waiving the Requirement to File a List of Equity Holders***.  Rite Aid Corporation

is a publicly-traded company with an actively trading stock of approximately 56 million

outstanding shares of common stock.  Rite Aid Corporation does not maintain an Equity List and

therefore must obtain the names and addresses of its shareholders from a securities agent.  Further,

the holders of such equity might have changed hands before the Petition Date.  As such, Debtor

Rite Aid Corporation would have to undertake an investigation and diligence to confirm the current

list of the names and addresses of its equity security holders.  Preparing an Equity List with

accurate names and last known addresses and providing notices to all such parties of the

commencement of these chapter 11 cases would create a significant expense and administrative

burden without a corresponding benefit to the estates or parties in interest.

## V.    SOFAs and Schedules Motion.

31.    The ordinary operation of the Debtors' business requires the Debtors to maintain

voluminous books, records, and complex accounting systems.  To prepare the Schedules and

Statements, the Debtors must compile information from those books and records, and from

documents relating to the claims of their thousands of creditors, and the Debtors' many assets and

contracts.  This information is extensive and located in numerous places throughout the Debtors'

organization.  Collecting the necessary information requires an enormous expenditure of time and

effort on the part of the Debtors, their employees, and their professional advisors in the near term—

when these resources would be best used to stabilize the Debtors' business operations.

32.    The Debtors, with the assistance of their professional advisors, are mobilizing their

employees to work diligently and expeditiously on preparing the Schedules and Statements, but

resources are strained.  Given the amount of work entailed in completing the Schedules and

Statements and the competing demands on the Debtors' employees and professionals to assist with

stabilizing business operations during the initial postpetition period, and the critical matters that

the Debtors' management and professionals were required to address prior to the commencement

of these Chapter 11 Cases, the Debtors likely will not be able to properly and accurately complete

the Schedules and Statements within the required time period.

## VI.    **Insurance Motion**.

33.    In the ordinary course of business, the Debtors maintain approximately 147

insurance policies (collectively, the "Insurance Policies") administered by multiple third-party

insurance carriers (collectively, the "Insurance Carriers").    The Insurance Policies provide

coverage for, among other things, the Debtors' property, general liability, automobile liability,

transportation liability, cyber liability, umbrella coverage, casualty liability, fiduciary liability,

pollution liability, and directors' and officers' liability (including tail coverage).

34.    Moreover, the Debtors maintain self-insured and self-administered general liability

and druggist liability policies (together, the "Self-Insurance Policies").    Under the terms of the

Self-Insurance Policies, the Debtors maintain control over the investigation, administration, and,

if necessary, adjudication of claims falling under the Self-Insurance Policies without involvement

from applicable Insurance Providers.    The Self-Insurance Policies provide coverage *only* to the

extent that a claim exceeds $7,000,000 per occurrence (the "Self-Insurance Threshold").    The

Debtors are responsible for any and all claims under the Self-Insurance Threshold.

35.    The Debtors retain third-party administrator services from Corvel Corporation,

Constitution State Services (a subsidiary of Travelers Insurance), and Gallagher Bassett Services,

Inc., and are responsible for payment of invoices of Sedgwick Claims Management Services[4]

(collectively, the "Third-Party Administrators").    The Third-Party Administrators assist the

---

[4]    Although Sedgwick Claims Management Services is retained by one of the Insurance Providers, the Debtors
agreed to pay any invoices delivered to the Insurance Provider within the limits of the SIR under the applicable
Insurance Policy.

Debtors with processing and paying claims made against the Insurance Policies.  The Third-Party Administrators charge fees that vary depending on the type of claims handled, coupled with account management, technical support, and intake and immediate intervention services provided (the "Third-Party Administrator Fees").  The Debtors also retain certain claim consulting services from Marsh, in addition to the insurance brokerage services Marsh provides discussed above.  The Debtors separately pay Marsh claim consulting fees (the "Claim Consulting Fees") in exchange for these services.

36.     In the ordinary course of business, the Debtors are required by certain statutes or ordinances to provide surety bonds or other forms of credit support to certain third parties, often utility companies, governmental units, or other public agencies, to secure the payment or performance of certain obligations (each, a "Surety Bond" and collectively, the "Surety Bonds").  When a governmental unit or other public agency requests a bond, and the Debtors determine in their business judgment that they do not wish to use cash and cash equivalents on hand to satisfy such request, the Debtors may post a Surety Bond.  Sureties (as defined herein) provide upfront, the full amount of the requested cash and cash equivalents to the requesting party on behalf of the Debtors, in exchange for, among other things, a fee from the Debtors to secure the Surety Bond issuance on the Debtors' behalf.  The issuance of a Surety Bond shifts the risk of the Debtors' nonperformance or nonpayment from the obligee (such as the utility company or a government agency) to the Surety.  As of the Petition Date, the Debtors maintain approximately 109 Surety Bonds, which provide approximately $149.7 million in aggregate Surety Bond coverage for the Debtors.

37.     Any interruption in insurance coverage or lapse in maintenance of a Surety Bond would expose the Debtors to a number of risks, including:  (a) the possible incurrence of direct

liability for the payment of claims that otherwise would have been covered under the Insurance Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed; (c) the possible inability to obtain similar insurance coverage on terms as equally favorable as the present coverage; (d) the possible incurrence of higher costs for reestablishing lapsed Insurance Policies or obtaining new insurance coverage; and (e) potential regulatory exposure in the event the Debtors are required to maintain certain insurance to continue their operations.

38.     Additionally, some of the Insurance Policies and certain of the Debtors' landlords require the Debtors to issue letters of credit (the "Letters of Credit") in the approximate aggregate amount of $236.5 million.  Wells Fargo and Bank of America issued the Letters of Credit needed to maintain the Debtors' access to the Insurance Policies, and Bank of America issued the Letters of Credit required by the Debtors' landlords.

39.     To continue their business operations during the reorganization process, the Debtors must be able to provide financial assurance to the Centers for Medicare & Medicaid Services, state regulators, U.S. Customs, certain utility providers, certain regulatory other authorities, Insurance Carriers, and landlords.  This, in turn, requires the Debtors to maintain the existing Surety Bond Program and Letters of Credit.

40.     The Debtors paid approximately $40.4 million in premiums due on account of the Insurance Policies, $4.25 million to Aon PLC, Marsh USA, Inc., and EHD Insurance—the Debtor's insurance brokers—in commissions related to the Insurance Policies, $1.1 million in Third-Party Administrator Fees, $263,375 in Claim Consulting Fees, and approximately $594,000 in premiums due on account of the Surety Bonds in 2022.

41.     Continuation and renewal of the Insurance Policies, and entry into new Insurance Policies, as needed, is essential to the preservation of the value of the Debtors' business and operations, and that failure to receive the requested relief in the Insurance Motion at the outset of these Chapter 11 Cases would expose the Debtors to direct liability for payment of claims otherwise covered by the Insurance Policies.

## VII.    Joint Administration Motion.

42.     Given the integrated nature of the Debtors' restructuring efforts, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  The entry of an order directing joint administration will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the United States Trustee and all parties in interest to monitor these cases with greater ease and efficiency.

## VIII.    NOL Motion.

43.     The Debtors had, as of February 26, 2022, approximately $1.9 billion of federal NOLs, approximately $105.7 million of 163(j) Carryforwards, approximately $12.6 million of business tax credits, and certain other tax attributes.  The Debtors expect to generate substantial additional tax attributes in the current tax year, including during the pendency of these chapter 11 cases.

44.     Implementation of the Procedures is necessary and appropriate to preserve the value of the Tax Attributes for the benefit of the Debtors' estates.  The Tax Attributes may provide the potential for material future tax savings (including in post-emergence years) or other potential tax structuring opportunities in these chapter11 cases.  In addition, the Debtors may utilize such Tax Attributes to offset any taxable income generated by transactions consummated during these

16

chapter 11 cases. The termination or limitation of the Tax Attributes could be materially detrimental to all parties in interest.

**IX.** **Record Date Motion.**

45.    The Debtors had, as of February 26, 2022, approximately $1.9 billion of federal NOLs, approximately $105.7 million of 163(j) Carryforwards, approximately $12.6 million of business tax credits, and certain other tax attributes. The Debtors expect to generate substantial additional tax attributes in the current tax year, including during the pendency of these chapter 11 cases.

46.    The Debtors ability to use their Tax Attributes may, however, be lost (or severely limited) if they experience an "ownership change" for tax purposes and are and are unable to take advantage of certain favorable rules that apply to ownership changes that occur pursuant to a bankruptcy plan of reorganization. Thus, to protect their ability to use the Tax Attributes (and, specifically, to rely on certain favorable rules under section 382($l$)(5) of the Internal Revenue Code of 1986), the Debtors may ultimately need to seek an requiring any persons or entities that have acquired debt claims against the Debtors during these chapter 11 cases in such an amount that the holders of such claims would be entitled to receive more than 4.75 percent of the equity of the reorganized Debtors to sell-down their claims below this threshold amount. Because it is too early to determine whether it is (or will be) necessary to obtain a Sell-Down Order, through this motion, the Debtors seek to establish a record date to preserve the Debtors' ability to implement sell-down procedures and provide notice to claim traders that claims acquired after the Record date may be subject to a sell-down order.

**X.** **Taxes Motion.**

47.    In the ordinary course of business, the Debtors collect, withhold, and incur income and franchise taxes, sales and use taxes, property taxes, customs and import duties, and regulatory

and other taxes and fees (collectively, the "Taxes and Fees").  The Debtors pay or remit, as applicable, Taxes and Fees to various governmental authorities (each, an "Authority," and collectively, the "Authorities") on a periodic basis (monthly, quarterly, semi-annually, annually, and on an ad hoc basis depending on the Debtors' reporting calendar) depending on the nature and incurrence of a particular Tax or Fee and as required by applicable laws and regulations.  The Debtors generally pay and remit Taxes and Fees through checks and electronic transfers that are processed through their banks and other financial institutions or service providers.  In some cases, the Debtors' customers or contract counterparties withhold taxes from the Debtors' invoice payments and remit the taxes directly to the Authorities.  From time to time, the Debtors may also receive tax credits for overpayments or refunds in respect of Taxes or Fees.  The Debtors generally use these credits in the ordinary course of business to offset against future Taxes or Fees or cause the amount of such credits to be refunded to the Debtors.

48.    Additionally, the Debtors are and may become subject to routine audit investigations on account of tax returns and/or tax obligations in respect of prior years ("Audits") during these chapter 11 cases.  Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors.  The Debtors estimate that approximately $68.4 million in Taxes and Fees is outstanding as of the Petition Date, in addition to other amounts that will become due and owing to the Authorities after the Petition Date in the ordinary course.

49.    Any failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including that:  (a) the Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that would harm the estates; and (c) in certain instances,

the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract them from their duties related to the Debtors' restructuring.  Taxes and Fees not paid on the due date as required by law may result in fine and penalties, the accrual of interest, or both.  In addition, nonpayment of the Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code.  Lastly, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and such funds may not constitute property of the Debtors' estates.

## XI.    Customer Programs Motion.

50.    Through the RAD Retail Segment, the Debtors offer their customers certain incentives, discounts, and other accommodations to their customers to attract and maintain positive customer relationships, the majority of which do not independently entail the expenditure of cash (the "RAD Customer Programs").  The RAD Customer Programs include (a) a loyalty program, (b) a charitable donation program, (c) a gift card program, (d) coupon and sales promotions, (e) a return and exchange program, (f) a rebate program, (g) a credits and refunds program, and (h) credit card processing programs.

51.    The ability to continue the RAD Customer Programs and to honor any obligations thereunder in the ordinary course of business is necessary to retain their reputation for reliability, comply with their legal obligations, meet competitive market pressures, and ensure customer satisfaction.  Continuing the RAD Customer Programs allows the Debtors to maintain the goodwill of their current customers and partners, attract new customers and partners, and, ultimately, enhance their businesses' revenue and profitability to the benefit of all of the Debtors' stakeholders.

52.    Elixir sits at the center of an intricate web of transactions, services, and relationships (the "Elixir Client Programs") with customers and counterparties (the "Elixir

Counterparties"), all of which serve the purpose of minimizing overall drug spend to the ultimate benefit of patients. Elixir effectively acts as a "clearinghouse" at the center of this integrated web of transactions with the Elixir Counterparties. Each of these transactions is critical to the seamless and cost-effective flow of pharmaceuticals from retail, mail-order, and specialty pharmacies to millions of customers who require them. Absent the relief requested herein, the Elixir Counterparties may cease to continue transacting with Elixir. This poses an immediate and material risk of harm to customers, who would suffer from any interruption in the flow of the pharmaceutical supply chain. Moreover, the Elixir business is a fully integrated business; accordingly, any disruption in the flow of the PBM business may have negative downstream consequences for the smooth functioning of the PDP business, the mail-order pharmacy business, the specialty pharmacy business, and, consequently, the Debtors' operations during the bankruptcy process and successful emergence from chapter 11.

53.     Many of the Debtors' customers rely on Elixir for the full suite of services offered, including PBM, Medicare Part D, and mail order and specialty pharmacy services. If the Debtors are unable to continue paying Rebates to a given Elixir customer in the ordinary course, such customer would likely cease services with Elixir across all services offered and contract with an alternative PBM that is able to provide rebates. And in that scenario, because most of the Debtors' customers rely on Elixir for the full suite of services offered, all service lines of the Elixir business would suffer.

54.     The Elixir business is wholly dependent on the ability to satisfy obligations related to the Elixir Client Programs on a postpetition basis. Accordingly, absent the relief requested herein, the value of the Elixir asset will invariably depreciate significantly, jeopardizing the marketing process and impairing the value of the Debtors' estates.

55.     Importantly, maintaining the Elixir Client Programs in the ordinary course does not entail significant outlays of cash that would otherwise remain with the Debtors' estates.  Rather, the majority of the funds involved in the transactions comprising the Elixir Client Programs are passthrough transactions, where the Debtors function as a clearinghouse, as described above. Accordingly, continuing to administer the Elixir Client Programs will not significantly burden the Debtors' liquidity position, nor will it prejudice any other stakeholders.

56.     The Elixir Client Programs are critical to preserve the value of the Debtors' estates. Without comfort that Elixir will continue to honor obligations related to the Elixir Client Programs in the ordinary course of business, the Elixir Counterparties could cease providing vital goods and services critical to the operation of the PBM business.  Any disruption to the smooth operation of the PBM business would very likely result in downstream consequences to the thousands of patients covered by Elixir's operations.  Moreover, continuing to administer the RAD Customer Programs without interruption during the pendency of these chapter 11 cases is critical to preserve the value of the Debtors' estates.  Customers expect and rely on the Customer Programs and may not continue supporting the Debtors' business if the Customer Programs are discontinued.

## XII.    Utilities Motion.

57.     In connection with the operation of their businesses and management of their properties, the Debtors obtain water, electricity, fuel oil, propane, steam, natural gas, irrigation, waste and trash disposal, sewer service, recycling, cable, telecommunications, and other similar services (collectively, the "Utility Services") from a number of utility providers or brokers (each, a "Utility Provider" and collectively, the "Utility Providers").  Further, to manage the Debtors' payments owed to many of their Utility Providers, the Debtors partner with certain utility service administrators, Engie Insight Services Inc. and Cass Information Systems, Inc. (together, the "Utility Service Administrators").  The Utility Service Administrators consolidate invoices

owed to the Utility Providers and send them to the Debtors.  The Debtors pay the Utility Service

Administrators the amounts invoiced for the Utility Services managed by such administrator, plus

monthly fees of approximately $50,000, in the ordinary course of business.

58.     On average, the Debtors pay approximately $13.5[5] million each month for Utility

Services, calculated as a historical average payment for the twelve-month period ended May 2023.

The Debtors do not anticipate this monthly average will change materially during the initial thirty

days following the commencement of these chapter 11 cases.

59.     To provide additional assurance of payment, the Debtors propose to deposit

$3.38 million into a segregated account (the "Adequate Assurance Deposit"), which represents an

amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services,

calculated based on the Debtors' average utility expenses over the twelve-month period ending

May 2023, and excludes Utility Services billed directly to the Landlords.

60.     Additionally, the Debtors seek approval of their proposed adequate assurance

procedures, which set forth a streamlined process for Utility Providers to address potential

concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue

their operations uninterrupted.

61.     Uninterrupted Utility Services are essential to the Debtors' ongoing business

operations and hence, the efficient administration of these chapter 11 cases.  The Debtors' retail

locations, distribution centers, and corporate offices require electricity, telecommunications, heat,

water, waste management, and other Utility Services to operate.  Should any Utility Company

refuse or discontinue service, even for a brief period, the Debtors' business operations may be

---

[5]   This figure does not include accrued amounts related to non-retail utilities.

severely disrupted, and such disruption would jeopardize the Debtors' ability to orderly effectuate the chapter 11 process.

### XIII.  <u>Wages Motion</u>.

62.     The Debtors seek authority to pay the following aggregate prepetition amounts on account of the Associate Compensation and Benefits:

| RELIEF SOUGHT | AMOUNT REQUESTED |
|---|---|
| **Compensation, Withholding, and Related Obligations** | |
| Unpaid Compensation | $100 million |
| Temporary Staff Compensation | $3 million |
| Non-Insider Commission Program | - |
| Withholding and Deduction Obligations | $31 million |
| Payroll Processing | $0.1 million |
| Reimbursable Expenses | $1 million |
| Severance Guidelines | $2.5 million |
| **Associate Benefit and Incentives Programs** | |
| Non-Insider Associate Incentive and Retention Programs | - |
| Health Benefit Plans | $12.1 million |
| Welfare Benefits, Disability, and Other Assistance Programs | $2.9 million |
| Workers' Compensation Programs | $65 million |
| Benefits & HR Service Fees | $5 million |
| Retiree Welfare Benefits | $0.1 million |
| 401(k) Plans | $33 million |
| Pension Plan | $0.1 million |
| Multiemployer Pension Plans | - |
| Paid Time Off | $65 million |
| WARN Act Obligations | $0.2 million |
| **TOTAL** | 327.5 million |

63.     As of the Petition Date, the Debtors employ approximately 45,500 individuals across the United States (the "<u>Employees</u>"), including approximately 27,600 full-time Employees and approximately 17,900 part-time Employees.[6]  Approximately 14,000 Employees are members

---

[6]     Certain of the Debtors' Associates are on leave of absence or suspension, pursuant to applicable policies.  As of the Petition Date, approximately 1,000 Associates are on such temporary leave or suspension, as applicable.

of labor force unions (the "Union Employees").[7]  In addition to the Employees, the Debtors also periodically retain individuals as independent contractors and temporary workers (collectively, the "Temporary Staff" and, together with the Employees, the "Associates") sourced regularly from various staffing agencies (the "Staffing Agencies") to fulfill certain duties on a short- and long-term basis.  At any given time, the Debtors retain approximately 2,000 Temporary Staff.

64.    The Associates perform a wide variety of functions, which are critical to the delivery of successful healthcare outcomes that are at the core of the Debtors' business and the ultimate preservation of value of the Debtors' estates.  In many instances, the Associates include personnel who are intimately familiar with the Debtors' business, processes, and systems, and who cannot be easily replaced.  Without the continued, uninterrupted services of the Associates, the Debtors' ability to efficiently conduct their business operations during the pendency of these Chapter 11 Cases will be threatened, and the Debtors' reorganization efforts will be severely hampered.

65.    The vast majority of Associates rely exclusively or primarily on the Associate Compensation and Benefits to pay their daily living expenses and support themselves and their families.  Thus, such Associates will face significant financial consequences and hardship if the Debtors are not permitted to continue the Associate Compensation and Benefits in the ordinary course of business.

66.    ***Unpaid Compensation.***  The Debtors' historical average monthly gross Associate Compensation, including wages, salaries, commissions, and related compensation, has been approximately $190 million.  The Debtors pay approximately 37,500 Associates—approximately

---

[7]    The Union Employees are members of twenty-six labor force unions (collectively, the "Unions").  The Debtors are party to eighteen collective bargaining agreements with the Unions (collectively, the "CBAs").

82 percent of their workforce—on an hourly basis (the "Hourly Associates") and the remaining approximately 8,000 Associates—approximately 18 percent of the workforce—are paid on a salaried basis (the "Salaried Associates").[8] The Debtors pay most of their Associates (both Hourly Associates and Salaried Associates) through a rotating schedule of two bi-weekly cycles and one weekly cycle. Because Associates are generally paid in arrears, certain Associates will be owed accrued but unpaid Associate Compensation as of the Petition Date.

67.    The Debtors anticipate that their monthly gross Associate Compensation, including wages, salaries, and related compensation, will range from approximately $180 million to approximately $220 million during the pendency of these chapter 11 cases.[9] As of the Petition Date, the Debtors estimate that they owe approximately $100 million on account of unpaid Associate Compensation earned by Associates prior to the Petition Date (the "Unpaid Compensation"), all of which will come due and owing within the first 30 days of these chapter 11 cases (the "Interim Period").

68.    ***Temporary Staff Compensation***.   The Debtors make payments to Staffing Agencies and certain of the Temporary Staff (the "Temporary Staff Compensation") for the performance of certain services important to the Debtors' operations. The Employees rely on the support of Temporary Staff to complete discrete projects in furtherance of the Debtors' business and to fill short-term positions, including roles in the Debtors' information technology department

---

[8]    Salaried Associates include certain Associates who are paid through a base salary in addition to hours-based compensation components.

[9]    Employee Compensation is expected to decrease throughout these chapter 11 cases as a result of contemplated store closings and corresponding reduction in force. The Debtors' planned store closings are discussed in further detail in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Entry into the Consulting Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (III) Granting Related Relief* (the "Store Closing Motion"), filed contemporaneously herewith.

and in other back-office roles.  Historically, the Debtors have paid approximately $1.5 million in Temporary Staff Compensation on a monthly basis, which includes fees that the Debtors remit to Staffing Agencies in exchange for the services they provide with respect to the Temporary Staff. The authority to continue paying the Temporary Staff Compensation is important to minimizing disruption of the Debtors' business operations.

69.     As of the Petition Date, the Debtors estimate that Temporary Staff and Staffing Agencies are owed an aggregate of approximately $3 million on account of accrued services rendered prior to the Petition Date.

70.     ***Non-Insider Commission Program***.  In addition to the Debtors' salary and wage obligations, certain of the non-insider Associates are entitled to sales commissions in addition to their base salary wages under the Debtors' sales commissions program (the "Commissions Program").  In particular, in the last six-month period, the Debtors paid commissions to approximately 17 Associates pursuant to the Commissions Program.  The amount of commissions due to any one Associate under the Commissions Program depends on business development and performance-based sale components, such as quantity of sales, aggregate value of the sold merchandise, and other related sales goals.

71.     The commissions are paid on a monthly basis, as applicable, and processed as part of the Debtors' normal payroll cycle.  The commissions form an integral part of several Associates' overall compensation packages and motivate the Associates to maintain customer goodwill and efficiently pursue the sale of certain pharmacy business management services, such as claims adjudication, rebate management, retail network management, and clinical/formulary services. Because many of the Associates rely on the commissions earned through the Commissions Program for their daily living expenses, failure to pay the commissions would impose undue

26

hardship on these Associates.  As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of accrued but unpaid commissions.

72.    ***Withholding Deduction Obligations.***  During each applicable payroll period, the Debtors routinely deduct certain amounts from Associates' paychecks, including garnishments, child support, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an applicable share of health care benefits and insurance premiums, 401(k) plan deferrals, legally-ordered deductions, deductions provided for under the CBAs for union dues or other benefits, and miscellaneous deductions (collectively, the "Deductions"), and forward such amounts to various third-party recipients.

73.    In addition to the Deductions, certain federal, state, and local laws require that the Debtors withhold certain amounts from Associates' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Associate Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities, as applicable. The Debtors must then match the Associate Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes ("Company Payroll Taxes," together with the Associate Payroll Taxes, the "Payroll Taxes").  The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities in accordance with each of the authorities' guidelines, rules, schedules, or regulations, as applicable.

74.    In the 12 months before the Petition Date, the Debtors incurred or remitted, as applicable, approximately $58 million per month on account of Payroll Taxes and the Deductions (collectively, the "Withholding and Deduction Obligations").  As of the Petition Date, the Debtors

estimate that they owe approximately $31 million on account of the Withholding and Deduction

Obligations, all of which is expected to come due during the Interim Period.  Any amounts held

by the Debtors on account of the Withholding and Deduction Obligations are held in trust by the

Debtors and are not property of the Debtors' estates.

75.     ***Payroll Processing Fees***.  Certain Withholding and Deduction Obligations for the

Debtors' Associates are processed and administered by the Debtors' in-house team using payroll

processing programs provided by Workday, Inc. ("Workday") for Associates working in the

United States and Automatic Data Processing, Inc. ("ADP") for Associates working in Puerto

Rico. Historically, the Debtors provided payroll processing services in-house for Associates in the

United States and used payroll processing programs provided by ADP for Associates in Puerto

Rico.  However, on or about December 31, 2021, the Debtors entered into certain master

subscription agreements with Workday to provide payroll processing programs for their in-house

payroll processing services for Associates in the United States.  The Debtors began their transition

to Workday as their payroll processing program provider on or about January 17, 2022 and

completed this transition in calendar Q2 2023.  As of the Petition Date, the Debtors estimate they

do not owe any amounts on account of accrued but unpaid payroll processing program.

76.     In connection with the Debtors' transition to Workday, the Debtors engaged certain

third-party vendors, including OneSource Virtual, Inc., Symmetry Software Corporation, Equifax

Inc., and PricewaterhouseCoopers International Limited (administered in part through Amazon

Web Services) to provide various payroll support services (the "Payroll Support Services").  These

Payroll Support Services include printing paper copies of paychecks and paystubs, verifying

addresses for tax purposes, certain other new hire and unemployment reporting services, and

certain management, integration, troubleshooting, and reporting services in connection with

Workday.  The Debtors pay certain fees and costs associated with the provision of the Payroll Support Services, and as of the Petition Date, the Debtors estimate that they owe approximately $100,000 on account of accrued but unpaid fees and costs associated with the Payroll Support Services.

77.    ***Reimbursable Expenses.***  In the ordinary course of business, the Debtors reimburse Associates or pay the credit card invoices of certain Associates for approved expenses incurred in connection with the performance of their assigned duties (the "Reimbursable Expenses").  The Reimbursable Expenses are largely on account of costs incurred related to (a) Associate travel for reasonable business-related purposes, including the Corporate Travel Card Obligations (as defined herein), (b) purchases of merchandise, or (c) payments to vendors for services (each as more fully described in the Wages Motion).  Associates who pay up front for Reimbursable Expenses apply for reimbursement of such expenses by submitting Expense Reports.  The Associate's direct manager and the travel and expense department review each submitted Expense Report.  Typically, Expense Reports are approved within a week after submission and reimbursements are processed on a rolling basis.

78.    In the 12 months before the Petition Date, the Debtors spent approximately $1.4 million on Reimbursable Expenses.  As of the Petition Date, the Debtors estimate that Reimbursable Expenses are owed in the aggregate of approximately $300,000 on account of accrued services rendered prior to the Petition Date.

79.    The Debtors provide certain Associates with access to company cards (each, a "Corporate Card") for authorized business or travel expenses (the "Corporate Card Programs").  Currently, approximately 3,100 Corporate Credit Cards are used by Associates.  The Corporate Card Programs can generally be divided into two categories:  (a) the corporate and property-level

purchasing card program (such cards, the "Purchasing Cards," and such program, the "Purchasing Card Program"); and (b) the corporate travel card program (such cards, the "Corporate Travel Cards," and such program, the "Corporate Travel Card Program").

80.     Under the Purchasing Card Program, the Debtors provide Associates with Purchasing Cards issued by Bank of America to pay for miscellaneous operational expenses, such as store supplies and online licenses, that are incurred in the ordinary course of business. Depending on the procurement policy, the purchases made with the Purchasing Cards must be approved by the Debtors' travel and expense department if they exceed a certain limit.  Associates may not use the Purchasing Cards for goods or services requiring a purchase order, temporary labor, consultancy services, cash advances, charitable donations, gift cards, lease payments, or business-related travel expenses.  Expenses incurred on the Purchasing Cards are billed directly to the Debtors and do not pass through any applicable Associate's personal financial accounts.  On average, the Debtors pay approximately $1.4 million per month on account of the Purchasing Card Programs.  As of the Petition Date, Bank of America has issued approximately 2,200 Purchasing Cards under the Purchasing Card Program to Associates of the Debtors and certain non-Debtor affiliates.  As of the Petition Date, the Debtors believe that there is approximately $1.5 million accrued and outstanding on account of the Purchasing Card Programs, some of which will become due and payable during the Interim Period.

81.     The Corporate Travel Card Program is comprised of private charge cards issued by Bank of America that are provided to Associates to cover certain payments for travel expenses, such as hotel stays and meals, and other necessary and approved company expenditures. Associates must obtain prior approval in accordance with Company policy before incurring expenses to be paid by the Debtors.  As of the Petition Date, Bank of America has issued

approximately 900 Corporate Travel Cards under the Corporate Travel Card Program to Associates of the Debtors and certain non-Debtor affiliates.  Debtor Rite Aid Hdqtrs Corporation ("HQ") guarantees all obligations owing under the Corporate Travel Card Program, including any obligations incurred by the Debtors or any non-Debtor affiliates that use the Corporate Travel Card Program (collectively, such obligations and guarantee of such obligations, the "Corporate Travel Card Obligations").  On average, the Corporate Travel Card Obligations amount to approximately $575,000 per month, of which approximately 22 percent is paid directly by Associates and is not reimbursed by the Debtors.  Notwithstanding the foregoing, HQ guarantees payment to Bank of America for all Corporate Travel Card Obligations.

82.    ***Severance Guidelines.***  In the ordinary course of business, the Debtors provide severance benefits to certain store and store-related Associates in the event of a termination by the Debtors that is not for "cause" (the "Non-Insider Associate Severance Guidelines").  Under the Non-Insider Associate Severance Guidelines, Associates receive, upon a qualifying termination, payment determined by a combination of the Associate's salary, job title, and length of time employed by the Debtors.  In addition, certain of the Debtors' CBAs require severance to be made to terminated Union Employees (the "Union Severance Guidelines," and together with the Non-Insider Associate Severance Guidelines, the "Severance Guidelines").

83.    As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed on account of the Severance Guidelines is approximately $2.5 million (the "Unpaid Severance Expenses"). [10]

---

[10]    Although the Debtors are working to retain Associates in connection with prepetition store closures, the Unpaid Severance Expenses are subject to fluctuation as Associates located at such stores subject to prepetition closures decide whether to continue their employment at another location, which could lead to additional amounts owed in connection with the Severance Guidelines.  The Debtors estimate that the Unpaid Severance Expenses will not exceed approximately $2.5 million.

84.     The Debtors' maintenance of the Severance Guidelines and payment of benefits related thereto are critical to maintaining Associate morale and loyalty.  Failure to maintain the Severance Guidelines will result in increased instability in the Debtors' workforce, which will undermine the Debtors' ability to attract and retain Associates, strengthen their financial and operational foundation, generate growth, and position themselves for long-term success.

85.     ***Non-Insider Associate Incentive Programs.***     The Debtors maintain several incentive and retention programs to motivate, reward, and retain certain of their non-insider Associates (each as more fully described in the Wages Motion, and collectively, the "Non-Insider Associate Incentive and Retention Programs").  The Debtors believe that they currently have no outstanding obligations to Associates on account of the Non-Insider Associate Incentive and Retention Programs but, out of an abundance of caution, seek authority to pay or remit any prepetition amounts and to continue these programs in the ordinary course of business.

86.     ***Health Benefit Plan.***  The Debtors offer a number of Health Benefit Plans eligible Associates.  Specifically, the Debtors provide the following:

- Primary Healthcare Plans:   The Debtors' primary healthcare plans (the "Primary Healthcare Plans") are administered by Highmark Blue Shield ("Highmark") and include a health reimbursement account and a healthcare flexible spending account offered through Highmark and the costs and fees associated therewith.  The Debtors estimate that the ongoing monthly cost of these Primary Healthcare Plans will be approximately $17 million.  As of the Petition Date, the Debtors estimate that they owe approximately $8.5 million under the Primary Healthcare Plans.

- Prescription Plan:  The Debtors' prescription drug plan is administered by Elixir (the "Prescription Plan").  The Debtors estimate that the ongoing monthly cost of the Prescription Plan will be approximately $5 million.  As of the Petition Date, the Debtors estimate that they owe approximately $2.5 million under the Prescription Plan.

- Other Healthcare Plans:  The Debtors' other healthcare plans (the "Other Healthcare Plans," and together with the Primary Healthcare Plans, the "Healthcare Plans") are administered by Hawaii Medical Service

Association, Kaiser Permanente, MCS Life Insurance Company, and Aflac Inc. The Debtors also offer continued healthcare coverage under COBRA to eligible Associates, administered by Businessolver.com, Inc. The Debtors estimate that the ongoing monthly cost of these Other Healthcare Plans will be approximately $1 million. As of the Petition Date, the Debtors estimate that they owe approximately $500,000 under the Other Healthcare Plans.

- <u>Dental Plan</u>: The Debtors offer their eligible Associates the option of participating in a dental plan (the "<u>Dental Plan</u>") administered by Delta Dental of Pennsylvania. The Debtors estimate that the ongoing monthly cost of the Dental Plan will be approximately $1 million. As of the Petition Date, the Debtors estimate that they owe approximately $500,000 under the Dental Plan.

- <u>Vision Plan</u>: The Debtors offer their eligible Associates the option of participating in a vision plan (the "<u>Vision Plan</u>") administered by Vision Services Plan. The Debtors estimate that the ongoing monthly cost of the Vision Plans will be approximately $200,000. As of the Petition Date, the Debtors estimate that they owe approximately $100,000 under the Vision Plan.

87. ***Welfare Benefits, Disability Benefits, and Other Assistance Programs.*** Additionally, the Debtors offer their eligible Associates certain life insurance, disability benefits, and other auxiliary benefits described further below. The Debtors incur, on average, approximately $22 million per year in costs on account of the Basic Life Insurance, Voluntary Life and AD&D Insurance, and Disability Benefits (each described more fully in the Wages Motion). As of the Petition Date, the Debtors estimate that they owe approximately $200,000 on account of the Basic Life Insurance and approximately $2 million on account of the Disability Benefits, and the Debtors do not believe that they owe any amounts on account of the Supplemental IDI Benefits.

88. ***Company Vehicle Benefits.*** The Debtors also provide certain eligible Associates with company vehicles (the "<u>Company Vehicles</u>"). The Debtors have a fleet of more than 378 Company Vehicles and approximately 348 Associates are granted access to Company Vehicles. In addition to granting access to the Company Vehicles, the Debtors also pay for services provided

by certain companies that manage the Company Vehicles, including payment of lease premiums, fuel maintenance, and other related expenses (the "Company Vehicle Benefits").  In the 12 months prior to the Petition Date, the Debtors spent approximately $4 million on the Company Vehicle Benefits.  As of the Petition Date, the Debtors owe approximately $475,000 on account of the Company Vehicle Benefits.

89.    ***Other Insurance and Assistance Programs***.  The Debtors further offer Associates the option to participate in the Wellness Programs, Educational Assistance Programs, and Additional Benefits Programs (each described more fully in the Wages Motion).  As of the Petition Date, the Debtors do not believe they owe any amounts pursuant to the Wellness Programs, Education Assistance Programs, and the Additional Benefits Programs.

90.    ***Benefits & HR Service Fees***.  In the ordinary course of business, the Debtors may pay certain fees to third-party administrators and human resources service providers (the "Benefits & HR Service Providers") associated with the Additional Benefits Programs (the "Benefits & HR Service Fees").  The Benefits & HR Service Providers provide benefits and human resources related services, including outplacement services, employment training and education services, scholarship services, and recruiting and onboarding services.  In the last 12 months prior to the Petition Date, the Debtors paid $24 million on account of the Benefits & HR Service Fees.  As of the Petition Date, the Debtors estimate that they owe approximately $5 million on account of the Benefits & HR Service Fees.

91.    ***Retiree Welfare Benefits.***  In the last 12 months preceding the Petition Date, the Debtors have incurred fees related to healthcare and other benefits for 9 retirees, totaling approximately $500,000 (the "Active Retiree Expenses").  As of the Petition Date, the Debtors estimate that they owe approximately $50,000 on account of obligations for Active Retiree

Expenses.  For the avoidance of doubt, during the pendency of these chapter 11 cases, the number of retirees may fluctuate and impact the amount of Active Retiree Expense.

92.     ***Associate Discount***.  Eligible Associates are entitled to a discount off merchandise in the Debtors' retail locations (the "Associate Discount").  The Associate Discount ranges from 20 to 30 percent depending on the type of merchandise.[11]  The Associate Discount is taken at the point of sale, so the Debtors are not liable for any amounts on account of the Associate Discount.

93.     ***Workers' Compensation Program.***  The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each jurisdiction in which the Debtors have Employees (collectively, the "Workers' Compensation Program").  In certain jurisdictions, the Debtors pay premiums based on payroll in accordance with statutory requirements.  The Debtors also maintain a master policy for all states that do not have statutory requirements that is subject to a $1 million deductible.  The Debtors maintain certain self-insurance coverage and administer insurance coverage through the Workers' Compensation Administrators for the Workers' Compensation Program.

94.     The Workers' Compensation Administrators open new claims and pays benefits on behalf of the Debtors.  The Debtors pay approximately $42 million in premiums, fees, and other costs annually to maintain the Workers' Compensation Program (the "Workers' Compensation Coverage Fees").  As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of accrued but unpaid Workers' Compensation Coverage Fees.

---

[11]   Rite Aid-branded items are eligible for a 30 percent Associate Discount, whereas national brands are eligible for a 20 percent Associate Discount.

95. Failure to continue the Workers' Compensation Program would cause Employees to experience severe hardship and make it difficult to retain the Debtors' workforce, and could result in the prohibition of the Debtors' operations in certain states.

96. ***401(k) Plans.*** The Debtors offer eligible Employees the opportunity to participate in the Rite Aid 401(k) Plan, the Union 401(k) Plan, and the Thrifty 401(k) Plan (collectively, the "401(k) Plans"). The 401(k) Plans generally provide for pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code. The Debtors make the following employer contributions to the 401(k) Plans (collectively, the "401(k) Contributions").

97. Each pay period, the Debtors deduct the Employees' 401(k) contributions from the Associates' paychecks (the "401(k) Deductions") and hold such amounts in trust until they are forwarded to Empower. The Debtors deduct approximately $10 million in the aggregate each month from Employees' paychecks on account of the 401(k) Deductions. As of the Petition Date, the Debtors estimate that they are current on account of the 401(k) Deductions.

98. In the 12 months before the Petition Date, the Debtors' payments and disbursements on account of 401(k) Contributions averaged approximately $41 million. As of the Petition Date, the Debtors estimate that they owe approximately $33 million on account of 401(k) Contributions, which will not become payable until the end of the fiscal year.

99. The Debtors also pay certain professionals who advise on certain aspects of the 401(k) Plans (the "401(k) Advisors") monthly administrative fees in the aggregate amount of $10,000 (the "401(k) Advisor Fees"). As of the Petition Date, the Debtors owe approximately $10,000 on account of the 401(k) Advisor Fees to the 401(k) Advisors.

100. Many Associates' retirement savings solely consist of the 401(k) Plan, and many Associates choose to participate in the 401(k) Plan because of the 401(k) Contribution provision.

Continuation of the 401(k) Plan and the 401(k) Contributions is essential to maintaining Associate morale and protecting Associate expectations.  The 401(k) Deductions are generally held in trust by the Debtors and are not property of their estates.

101.    ***Pension Plan.***  The Debtors maintain obligations to a limited number of eligible Employees who receive payments as part of a pension plan that has been closed for enrollment since December 31, 2001 (the "Pension Plan"), which is a defined benefit pension plan under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  While enrollment in the Pension Plan ceased in 2001, certain eligible Employees continue to accrue benefits under the Pension Plan.  There are 6,778 Employees who continue to receive approximately $5 to $5,000 in payments from the Pension Plan, paid on a monthly basis.  In the 12 months prior to the Petition Date, the Debtors spent approximately $1 million on the Pension Plan.  As of the Petition Date, the Debtors estimate that they owe approximately $100,000 on account of the Pension Plan.

102.    ***Union Benefits***.  The Debtors' Union Employees are members of one of twenty-six active Unions.  The Union Employees work in stores located in Washington, Pennsylvania, Ohio, California, New York, New Jersey, and Michigan.  As of the Petition Date, the Debtors are party to eighteen CBAs with local chapters of the Unions.  With the exception of two CBAs that, as of the Petition Date, are expired, each of the CBAs expires in 2023 or later.  Further, Union Employees may be eligible to participate in multiemployer benefit plans, which the Debtors contribute to pursuant to the relevant CBAs.

103.    ***Multiemployer Pension Plans.***  Pursuant to the terms of the CBAs, the Debtors participate in multiemployer defined benefit pension plans (the "Multiemployer Pension Plans").  The Debtors make monthly contributions on behalf of the Union Employees in amounts that are actuarially determined in order to satisfy the minimum funding standards prescribed by

the Internal Revenue Code and ERISA and provide the pension benefits specified in the CBA. Over the past 12 months, the Debtors have contributed approximately $66 million to the Multiemployer Pension Plans. As of the Petition Date, the Debtors estimate that they owe approximately $6 million on account of the Multiemployer Pension Plans.

104.    ***Union Travel Stipends.***  The Debtors provide certain eligible Union Employees with travel-related stipends in advance of certain work-related (the "Union Travel Stipends"). The Debtors issue the Union Travel Stipends by check in advance of an eligible Union Employee's work-related travel. Over the past 12 months, the Debtors have issued approximately $250,000 in Union Travel Stipends. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Union Travel Stipends.

105.    ***Paid Time Off.***  In the ordinary course of business, the Debtors provide paid time off to their eligible Associates, including sick pay, personal leaves of absence, bereavement leave, military leave of absence, and jury and witness duty leave ("Paid Time Off"). Paid Time Off generally accrues at specified rates up to a maximum amount based on the applicable state limit, if any. Accruals of Paid Time Off, however, are not a current cash payment obligation. In addition, the Debtors provide certain other forms of paid and unpaid leave, including, for example, (a) paid holidays, (b) leave under the Family and Medical Leave Act, and (c) other paid and unpaid leaves of absence for personal reasons, including those required by law. Importantly, these other forms of paid and unpaid leave do not involve incremental cash outlays beyond standard payroll obligations.

106.    As of the Petition Date, the Debtors estimate that approximately $65 million in non-cash obligations associated with Paid Time Off has accrued.

107.    Continuation of Paid Time Off is essential to maintaining Associate morale during these chapter 11 cases.  Further, the policies are broad-based programs upon which Associates have come to depend.  The Debtors anticipate that their Associates will utilize any accrued Paid Time Off in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' regular payroll obligations.

108.    ***WARN Act Obligations***.  Prior to the Petition Date, the Debtors initiated certain store closures in New Jersey, Maryland, and Pennsylvania, triggering potential obligations under: (i) New Jersey's Millville Dallas Airmotive Plan Job Loss Notification Act, N.J. Stat. § 34:21-2 (the "NJ WARN Act"), (ii) Maryland's' Economic Stabilization Act, Md. Code Ann., Lab. & Empl. §§ 11:301-306 (the "MD WARN Act"), and (iii) Philadelphia's Notification of Intention to Close or Relocate Operations, 9 Pa. Code § 9-1500 (the "Philadelphia WARN Act").

109.    As of the Petition Date, the Debtors estimate they do not owe accrued but unpaid prepetition obligations pursuant to the NJ WARN Act and MD WARN Act, and the Debtors estimate that they may owe approximately $200,000 in prepetition obligations pursuant to the Philadelphia WARN Act.  During these chapter 11 cases, the Debtors anticipate closing further stores and distribution centers during the postpetition period, and such closures may implicate the WARN Acts.

110.    ***Non-Employee Director Workforce Obligations.***  As of the Petition Date, certain of the Debtors' boards of directors include non-Employee directors (the "Non-Employee Directors").  Certain of the Non-Employee Directors' fees are paid quarterly in advance.  Certain Non-Employee Directors are also entitled to expense reimbursements for reasonable out-of-pocket expenses in connection with attendance at meetings of the Board, or committees of the Board, in accordance with the Debtors' generally applicable reimbursement policies.  The Debtors do not

believe they owe any prepetition amounts on account of the Non-Employee Director Compensation.

111.    The Associates provide the Debtors with services necessary to conduct the Debtors' businesses.  Absent the payment of the Associate Compensation and Benefits owed to the Associates, the Debtors may experience Associate turnover and instability at this critical time in these chapter 11 cases.  Such Associates may then elect to seek alternative employment opportunities.  Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases.  Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  Payment of the prepetition obligations with respect to the Associate Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Associates as the Debtors seek to operate their businesses during these chapter 11 cases.

## XIV.    Critical Vendors Motion.

112.    In the Critical Vendors Motion, the Debtors seek interim and final orders (a) authorizing, but not directing, the Debtors to pay prepetition amounts in the ordinary course owing on account of (i) 503(b)(9) Claimants, (ii) Lien Claimants, and (iii) Critical Vendors; (b) confirming the administrative expense priority status of Outstanding Orders and authorizing, but not directing, the payment of such obligations in the ordinary course of business; and (c) granting related relief.  In total, the Debtors seek to pay prepetition claims in the amount of $138 million on an interim basis and $65 million on a final basis.

113.    The Debtors contract with their vendors for key consumer goods and healthcare products and services including, most critically, the pharmaceuticals dispensed to patients at the

Debtors' retail pharmacies.  In most cases, finding replacement vendors for these products and services would be difficult if not impossible, particularly due to the highly regulated nature of the Debtors' businesses and the limited number of qualified vendors available in the market.  Even where alternative vendors may exist, the time and costs associated with switching from one vendor to another could irreparably damage the Debtors' businesses and ultimately harm the Debtors' customers.  Any disruption in the provision of the critical goods and services the Debtors source from their vendors and partners would have far-reaching and adverse economic and operational consequences on the Debtors' businesses and could jeopardize the well-being of millions of people who rely on the Debtors for vital products and services.

114.    The following table summarizes the categories of claims that the Debtors request authority to pay and the estimated prepetition amounts outstanding:

| Category | Description of Services Provided | Estimated Amount to Be Paid Within 21 Days (Interim Order) | Estimated Total Amount to Be Paid (Final Order) |
|---|---|---|---|
| 503(b)(9) Claimants | Suppliers that provided goods to the Debtors that were received within 20 days before the Petition Date. | $65 million | $40 million |
| Lien Claimants | Suppliers of goods or services that may assert mechanic's, possessory, or other similar liens (excluding 503(b)(9) Claimants). | $5 million | $0 |
| Critical Vendors | Suppliers of goods and services that are critical to maintain the Debtors' day-to-day operation and necessary to ensure the health, safety, regulatory, and environmental compliance of the Debtors' operations, but that are not Lien Claimants, 503(b)(9) Claimants, or other suppliers. | $68 million | $25 million |
| **Total amount of claims:** | | **$138 million** | **$65 million** |

The estimated amounts owing to these vendors pale in comparison to the potential damage to the Debtors' businesses if the Debtors' operations were to experience significant disruption.

115.    ***503(b)(9) Claimants.***   The Debtors may have received certain inventory, goods, and/or materials from various vendors (the "503(b)(9) Claimants") within the twenty days immediately preceding the Petition Date, thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"). Many of the Debtors' relationships with the 503(b)(9) Claimants for front-end store sales are not governed by long-term contracts or supply agreements.  Instead, the Debtors obtain inventory, goods, or other materials from such claimants on a purchase order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its 503(b)(9) Claims, and such refusal could negatively affect the Debtors' estates as the Debtors' businesses are dependent on the steady flow of inventory to replenish their stores.

116.    The 503(b)(9) Claimants include certain indispensable partners that fulfill the Debtors' prescription drug requirements.  The Debtors have concluded that payment of the 503(b)(9) Claimants is essential to avoid disruptions to the Debtors' operations.

117.    ***Lien Claimants.***  In the ordinary course of business, the Debtors incur obligations (the "Lien Claims") to various shippers, maintenance workers, and other service providers (collectively,  the "Lien Claimants") for (a) transporting the Debtors' merchandise from manufacturers to the Debtors' distribution centers and on to the Debtors' stores and (b) various services for the Debtors, including remodeling and on-site construction or repairs to the Debtors' stores or distribution centers.  Many of these vendors may be able to assert a variety of statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered.

118.    The Debtors' businesses depend on the uninterrupted flow of inventory and other goods through their supply chain and distribution network, including the purchase, importation, and shipment of the Debtors' goods and inventory.  To maintain their operations and efficiently transport products, the Debtors employ an extensive distribution network that requires the services of the Lien Claimants.  Under the laws of most states, these carriers will, in certain circumstances, have a lien on the goods in their possession that secures the charges or expenses incurred in connection with the transportation of goods.  Thus, if the Lien Claims are not satisfied, the Lien Claimants may refuse to release the Debtors' property, thereby disrupting the Debtors' supply chain and distribution network.  As such, the Debtors have concluded that payment to the Lien Claimants is essential to avoid disruptions to the Debtors' operations.

119.    ***Critical Vendors.***    Each of the Debtors' two primary business units operate in highly competitive industries.  The Debtors' ability to continue generating revenue and operating their businesses, and thus the success of these chapter 11 cases, fundamentally depends on the Debtors' ability to effectively manage the complex process by which they provide pharmacy and healthcare-related goods and services, as well as everyday products.  The Debtors rely on products and services provided by certain vendors (the "Critical Vendors") that enable them to effectively provide services and products.  Many Critical Vendors are providers of name-brand products for the Debtors' retail business, including food and beverages, personal care and hygiene products, healthcare products, and other essentials.  In addition, certain of the Critical Vendors provide life-sustaining medical products to the Debtor.

120.    Maintaining relationships with the Critical Vendors throughout the pendency of these chapter 11 cases is imperative to the Debtors' ability to preserve and maximize value for the benefit of their estates.  Any disruption to the Debtors' supply of healthcare products and other

consumer goods risks significant and irreparable harm to the Debtors' businesses, as customers would almost certainly turn to the many alternative sources in the market for such products and services.  It is therefore essential to the success of the Debtors' restructuring efforts that relationships with key legacy vendors be unimpeded by the filing of these chapter 11 cases.

121.    In light of these concerns, the Debtors, with the assistance of their advisors, have spent significant time evaluating the vendor relationships and the supply chain, consulting operation managers and merchandise managers, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practices to identify the Critical Vendors that supply the products and services most vital to the Debtors' operations.  The Debtors' selection process balanced the need to ensure that these chapter 11 cases do not disrupt their operations or negatively impact their operations and customers with the need to limit the expenditure of estate resources.  Paying targeted prepetition claims of Critical Vendors benefits the Debtors' estates, both monetarily and operationally, by preserving liquidity and enabling the Debtors to operate effectively during these chapter 11 cases.

122.    Jeopardizing the Debtors' relationships with any of the Critical Vendors and attempting to procure the products and services that Critical Vendors provide from replacement vendors, where available, would impose a severe strain on the Debtors' business operations and would likely result in significant revenue and profit loss.  To maintain stability during this critical stage of these chapter 11 cases and to avoid jeopardizing the Debtors' business operations going forward, the Debtors require authority to pay the Critical Vendor Claims as they become due and to continue paying the Critical Vendor Claims in the ordinary course of business, including on account of prepetition claims.  The Debtors intend to pay the Critical Vendor Claims only where they believe that the benefits to their estates for making such payments will exceed the costs.

123.    ***Payment of Outstanding Orders***.    Before the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").    To avoid the risk of becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.    To prevent any disruption to the Debtors' business operations, the Debtors seek entry of an order confirming the administrative expense priority status of Outstanding Orders and authorizing, but not directing, the payment of such obligations in the ordinary course of business.