**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
Zachary R. Manning (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Joint Administration Requested) |

# DEBTORS' MOTION
# FOR ENTRY OF AN ORDER
# (I) APPROVING BIDDING PROCEDURES
# AND BID PROTECTIONS, (II) SCHEDULING
# CERTAIN DATES AND DEADLINES WITH RESPECT
# THERETO, (III) APPROVING THE FORM AND MANNER
# OF NOTICE THEREOF, (IV) APPROVING THE ELIXIR STALKING
# HORSE APA, (V) ESTABLISHING NOTICE AND PROCEDURES FOR
# THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES,
# (VI) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS,
# (VII) AUTHORIZING THE SALE OF ASSETS, AND (VIII) GRANTING RELATED RELIEF

---

[1] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion"):[2]

**Preliminary Statement[3]**

1.      The Debtors enter these chapter 11 cases laser-focused on preserving and maximizing the value of their businesses for the benefit of ***all*** of their stakeholders.  The Debtors believe that the pathway to achieving this goal is a reorganization, effectuated through a chapter 11 plan, around a smaller, rationalized footprint of profitable retail pharmacy stores.  As set forth in the Debtors' proposed Plan and the restructuring term sheet to be embodied in the Restructuring Support Agreement (the "RSA")[4] between the Debtors and certain of the Debtors' secured noteholders (the "Ad Hoc Secured Noteholder Group"), the Debtors hope to facilitate this operational and financial restructuring of their businesses—"Rite Aid 2.0"—through the Plan Restructuring contemplated in the Plan.  The Debtors believe that the Plan Restructuring is the best path forward to ensure the continued operation of their iconic retail pharmacy business, to preserve the jobs of tens of thousands of employees, and to maintain crucial relationships with customers who depend on the Debtors for life-critical services and products.

---

[2]    A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Jeffrey S. Stein in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.  Capitalized terms used but not defined in this motion have the meanings ascribed to them in the Bidding Procedures Order, the Bidding Procedures, and the *Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* (the "Plan"), filed contemporaneously herewith, as applicable.

[3]    Capitalized terms used but not defined in this section have the meanings ascribed to them elsewhere in this Motion.

[4]    The term sheet (the "RSA Term Sheet"), attached as Exhibit A to the First Day Declaration, memorializes the agreement in principle regarding the terms of the forthcoming RSA.

2.      The Plan Restructuring is but a baseline restructuring proposal.  By this Motion, the Debtors seek authority to conduct an expedited, global sale process that both (a) market tests the Plan Restructuring against potentially higher and better whole-company, going-concern bids and (b) creates a platform to solicit and evaluate proposals to purchase discrete portions of the Debtors' asset portfolio across its businesses, as alternative or complementary sale transactions to the Plan Restructuring.  A critical component of this global sale process is the sale of the Debtors' non-core pharmacy benefit manager business, primarily owned by Debtor Hunter Lane, LLC and its Debtor and non-Debtor subsidiaries[5] (collectively, "Elixir," and the assets of Elixir, the "Elixir Assets," and the sale thereof, the "Elixir Sale Transaction").  Indeed, the Elixir Sale Transaction is a cornerstone of the broader restructuring transactions envisioned through these chapter 11 cases, and will provide crucial recoveries to the estate while the Debtors focus solely on their renewed and rationalized core retail business plan.  And the Debtors have been hard at work on this piece of their restructuring strategy: they come to these cases with the Elixir Stalking Horse APA in-hand with a committed strategic bidder, MedImpact Healthcare Systems, Inc. ("MedImpact," or the "Elixir Stalking Horse Bidder"), to serve as Stalking Horse Bidder in the Elixir Sale Transaction.

3.      By this Motion, the Debtors additionally seek authority to sell all or a portion of their remaining assets, separate from the Elixir Assets, to continue execution on "Rite Aid 2.0." These assets chiefly comprise assets in the Debtors' core retail pharmacy business that is the subject of the Plan Restructuring (such assets, the "Rite Aid Retail Assets" and together with the Elixir Assets, the "Assets," and the sale or sales of the Rite Aid Retail Assets, the "Rite Aid Retail Sale Transactions," and together with the Elixir Sale Transactions, the "Sale Transactions").

---

[5]     The sole non-Debtor subsidiary is Elixir Insurance Company.

4.      Time is of the essence.  If the Debtors are to realize maximum value, either through a market-tested Plan Restructuring or one or more Sale Transactions, they must do so as quickly as possible.  Elixir is party to numerous customer contracts, which the Debtors believe are a primary driver of the value of the Elixir business, and many of which may expire and/or be up for renewal during these chapter 11 cases.  As the Cohen Declaration establishes, an expedited Elixir sale process will help mitigate the risk of such contracts not being renewed by providing counterparties with certainty as to their future contract counterparty.  With the Elixir Stalking Horse APA in hand, the Debtors are ready to proceed to a public Auction and advance towards closing as quickly as practicable.

5.      As for the Rite Aid Retail Sale Transaction, as a retailer the Rite Aid Retail business is particularly exposed to supplier trade credit contraction and the potential loss of consumer confidence, even while in bankruptcy.  The Debtors, party to over 2,000 leases for their retail pharmacies, are further mindful of the time constraints imposed by section 365(d)(4) of the Bankruptcy Code and the potential regulatory approvals necessary for effectuating the sale of the Rite Aid Retail Assets.  Languishing in chapter 11 is not an option.

6.      Just as important, the DIP Lenders have conditioned their provision of the $3.45 billion aggregate debtor-in-possession credit facilities on the Debtors' compliance with key milestones set forth in the DIP Credit Agreements.  ***Specifically, among other milestones, the DIP Facilities contemplate the approval of the relief requested in this Motion on a final basis by October 18, 2023, and the entry of orders approving the Elixir Sale Transaction and the Rite Aid Retail Sale Transaction by December 14, 2023 and December 27, 2023, respectively.***  In light of these milestones and business considerations, the Debtors have crafted Sale Schedules that

provide flexibility to meet these deadlines while adequately accounting for the due process rights of all interested parties.

7.      The sale processes contemplated by this Motion will inform and guide the Debtors and parties in interest in these cases as they work towards consummation of the baseline restructuring proposal, the Plan Restructuring, and enable realization of value for stakeholders in the near-term.

8.      The Debtors crafted these procedures to provide maximum flexibility to solicit proposals for any and all assets of the Debtors' estates.  In all, the bidding and sale processes contained in the proposed Order and Bidding Procedures will ensure that the Debtors obtain the highest or otherwise best offers for their Assets, have sufficient time to receive and evaluate bids, hold Auctions, and prepare and negotiate asset purchase agreements, among other tasks and requirements, while remaining in compliance with the DIP Credit Agreements, the RSA Term Sheet, and the Plan, and the Debtors' duty to preserve and maximize stakeholder value.  While the Debtors are duty-bound to the due process rights of interested parties, the need for speed here cannot be overstated.  A restructuring of a retailer, like Rite Aid, demands all due haste.  The Bidding Procedures and the relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors respectfully request that the Court grant this Motion.

## **Relief Requested**

9.      The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"):  (a) approving the proposed marketing, auction, and bidding procedures attached as Exhibit 1 to the Order (the "Bidding Procedures"), by which the Debtors will solicit and select the highest or otherwise best offer(s) for the sale or sales of any Rite Aid Retail Assets and Elixir

Assets; (b) approving the break-up fee and expense reimbursements relating to certain stalking horse bidders (the "Stalking Horse Bid Protections"); (c) establishing certain dates and deadlines related thereto and scheduling an auction or auctions, if any, for the Sale Transactions (the "Auctions"); (d) approving the manner of notice of the Auctions and any sale hearing (the "Sale Hearing") as may be necessary; (e) approving and authorizing the Debtors to enter into a "stalking horse" asset purchase agreement (the "Elixir Stalking Horse APA") with MedImpact, attached to the Bidding Procedures as Schedule 2 with respect to the Elixir Sale Transaction; (f) approving procedures for the assumption and assignment of certain Executory Contracts (as defined herein) and Unexpired Leases (as defined herein) in connection with the Sale Transactions, if any; (g) providing that, in light of the fact that the Debtors' privacy policy does not prohibit the transfer of personal identifiable information, the appointment of a consumer privacy ombudsman is not required; and (h) granting related relief.

10.     Additionally, the Debtors will seek entry of one or more orders at the applicable Sale Hearing (the "Sale Order") (a) authorizing and approving the applicable Sale Transaction with the Successful Bidder(s) on the terms substantially set forth in the Successful Bid(s); (b) authorizing and approving the sale of the Debtors' Assets free and clear of liens, claims, encumbrances, and other interests to the extent set forth in an asset purchase agreement with any Successful Bidder(s); (c) authorizing the assumption and assignment of Executory Contracts and Unexpired Leases as set forth in an asset purchase agreement with any Successful Bidder(s); and (d) granting any related relief.

11.     In support of this Motion, the Debtors respectfully submit (a) the *Declaration of Adam Rifkin in Support of the Debtors' Bidding Procedures Motion* (the "Rifkin Declaration"), (b) the *Declaration of Casey Cohen in Support of the Debtors' Bidding Procedures Motion*

(the "Cohen Declaration"), and (c) the *Declaration of Elise S. Frejka in Support of Debtors'*
*Motions for Entry of Orders (I) Approving Bidding Procedures and Related Relief and*
*(II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to be Free*
*and Clear of All Liens, Claims, and Encumbrances and Related Relief* (the "Frejka Declaration")
(filed contemporaneously herewith).

### Jurisdiction and Venue

12.     The United States Bankruptcy Court for the District of New Jersey (the "Court")
has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of*
*Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on
September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a
final order in connection with this Motion to the extent that it is later determined that the Court,
absent consent of the parties, cannot enter final orders or judgments in connection herewith
consistent with Article III of the United States Constitution.

13.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507
of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, and 6006(a) of
the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and rules 6004-1, 6004-2,
and 9013-1(a)(3) of the Local Bankruptcy Rules for the District of New Jersey (the "Local Rules").

### Disclosures Under Local Rule 6004-1

15.     Local Rule 6004-1 requires, among other things, that a debtor include the "material
terms of the proposed sale" in a sale motion.  As set forth in this Motion, the Debtors and their
professionals are in the midst of marketing the Debtors' Assets, the continuation of a process that
began months ago.  Because the Debtors continue to have discussions with parties in interest, they
cannot, as of yet, identify, with any reasonable specificity, the terms of the sale of the Assets

(except with respect to the Elixir Assets and the Elixir Stalking Horse APA).  Accordingly, the Debtors are unable, at this time, to make the disclosures required under Local Rule 6004-1.  In the event the Debtors secure one or multiple additional Stalking Horse Bidder(s), the Debtors will file the applicable Stalking Horse Agreement and make the requisite disclosures.

**Proposed Sale Process and Selection of Stalking Horse Bidder(s)**

**I.     The Bidding Procedures.**

16.     The Debtors seek approval of the Bidding Procedures to establish an open process for the solicitation, receipt, and evaluation of bids in a fair, accessible, and expeditious manner. The Bidding Procedures facilitate the continuation of an ongoing, dual-track marketing process to solicit interest in a going-concern sale of the Elixir Assets and a sale or sales of the Rite Aid Retail Assets and right-size and reorient the Debtors' business, which process the Debtors have been diligently progressing with the assistance of their investment banker, Guggenheim Securities, LLC ("Guggenheim Securities").

17.     With respect to the Elixir Assets, the marketing process has been ongoing since early July 2023.  As described further in the Cohen Declaration, around that time, the Debtors, with the assistance of Guggenheim Securities, initially reached out to a group of twelve potential strategic investors experienced in investing in the pharmacy benefit manager sector.  An additional party proactively reached out and requested to participate in an evaluation of the Elixir business. Of these thirteen parties, nine investors executed nondisclosure agreements regarding the Elixir Sale Transaction.  The marketing process continued with diligence efforts and related meetings with these parties proceeding apace in mid-August.  This prepetition process ultimately resulted in the successful negotiation of the Elixir Stalking Horse APA with MedImpact.

18.     Prior to the commencement of these chapter 11 cases, the Debtors, with the assistance of Guggenheim Securities, commenced a marketing process to assess potential interest

in a value-maximizing sale of the Rite Aid Retail Assets (the "Rite Aid Retail Marketing Process").

Approximately 20 potential financial and strategic investors experienced in investing in the retail

and healthcare sectors, operational turnarounds, and/or distressed situations, including the Ad Hoc

Secured Noteholder Group had been contacted.  As of the Petition Date, 12 parties have executed

or are currently negotiating confidentiality agreements.

19.     In addition to advancing the diligence process with that initial wave of potential

parties, the Debtors plan to expand their outreach in the coming days.  The Debtors have completed

a confidential information memorandum with extensive information on the relevant assets and the

Debtors' projections, and have populated a virtual dataroom containing significant diligence

documentation.  The Debtors have made significant progress with the Senior Secured Noteholders

with respect to the Rite Aid Retail Sale Transaction, culminating in the negotiation of the Plan, the

Plan Restructuring proposal, and the RSA Term Sheet.  The Debtors plan to continue discussions

with potential third-party investors to ensure a value-maximizing outcome.

20.     The timelines set forth in the Bidding Procedures are calculated to balance the need

to provide adequate notice to parties in interest and any person or entity interested in purchasing

the Assets (a "Potential Bidder") with the Debtors' need to (a) run an expeditious and efficient sale

process or processes focused on stakeholder value, (b) take into account the prepetition processes

already conducted, and (c) comply with the milestones set forth in the DIP Credit Agreements and

the RSA Term Sheet.  The Bidding Procedures are designed to generate the highest or otherwise

best available recoveries to the Debtors' stakeholders by encouraging prospective bidders to

submit competitive, value-maximizing bids, and to market test the Plan Restructuring proposal.

The Debtors believe that the Bidding Procedures and the timelines set forth therein are in the best

interests of the Debtors' estates, will establish the extent of the market for the Debtors' Assets, and

provide interested parties with sufficient opportunity to participate. The Bidding Procedures contemplate that all parties that have executed confidentiality agreements in accordance with the Bidding Procedures will continue to have access to the virtual dataroom throughout the sale process.

21.     Because the Bidding Procedures are attached as <u>Exhibit 1</u> to the Order, they are not restated in their entirety herein. Generally speaking, however, the Bidding Procedures establish the following, among other things:[6]

a.     **Public Announcement of Auctions**.

1.     **Announcement of Elixir Auction**. As soon as practicable after entry of the Bidding Procedures Order, the Debtors shall serve on the parties that receive notice of the Bidding Procedures Motion the Elixir Auction Notice. As soon as practicable after entry of the Bidding Procedures Order, the Debtors shall also publish the Elixir Auction Notice, with any modifications necessary for ease of publication, in *The New York Times* (National Edition) to provide notice to any other potential interested parties. Finally, the Debtors shall post the Elixir Auction Notice on their case website, https://restructuring.ra.kroll.com/RiteAid. The Elixir Auction Notice shall include a complete list and general description of the Specified Elixir Assets.

2.     **Announcement of Rite Aid Retail Auction**. As soon as practicable after entry of the Bidding Procedures Order, the Debtors shall serve on the parties that receive notice of the Bidding Procedures Motion the Rite Aid Retail Auction Notice. As soon as practicable after entry of the Bidding Procedures Order, the Debtors shall also publish in *The New York Times* (National Edition) to provide notice to any other potential interested parties the Rite Aid Retail Auction Notice. Finally, the Debtors shall post the Rite Aid Retail Auction Notice on their case website, https://restructuring.ra.kroll.com/RiteAid. The Rite Aid Retail Auction Notice shall include a complete list and general description of the Specified Rite Aid Retail Assets.

*See* Bid. Proc., at § II.

---

[6]     The following is a summary of selected provisions in the Bidding Procedures. In the event of a conflict between the summary provided in this paragraph and the Bidding Procedures, the Bidding Procedures shall govern in all respects.

b.     **Potential Bidder Qualifications**.   To participate in the bidding process or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a Potential Bidder must deliver or have previously delivered to (a) proposed co-counsel to the Debtors, Kirkland & Ellis LLP, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com), Aparna Yenamandra, P.C. (aparna.yenamandra@kirkland.com), Ross J. Fiedler (ross.fiedler@kirkland.com), and Zachary R. Manning (zach.manning@kirkland.com), 300 North LaSalle, Chicago, Illinois 60654, Attn: Steve Toth (steve.toth@kirkland.com), (b) proposed co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn: Michael D. Sirota (msirota@coleschotz.com), Warren A. Usatine (wusatine@coleschotz.com), Felice R. Yudkin (fyudkin@coleschotz.com), and Seth Van Aalten (svanaalten@coleschotz.com), and (c) proposed investment banker to the Debtors, Guggenheim Securities, LLC, 330 Madison Avenue, New York, New York 10017, Attn: Brendan Hayes (brendan.hayes@guggenheimpartners.com), Casey Cohen (casey.cohen@guggenheimpartners.com), Matthew Scheidemann (matthew.scheidemann@guggenheimpartners.com), and Jeffrey Kirshner (jeffrey.kirshner@guggenheimpartners.com), the following Preliminary Bid Documents:

1.     an executed Confidentiality Agreement in form and substance acceptable to the Debtors;

2.     sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close a purchase of any portion, all, or substantially all of the Debtors' Assets, the adequacy of which must be acceptable to the Debtors, in consultation with the Consultation Parties; and

3.     a statement detailing whether the Potential Bidder is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

The Debtors, in consultation with their advisors, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may proceed as an Acceptable Bidder.  Notwithstanding anything to the contrary herein, the DIP Agents and the Ad Hoc Secured Noteholder Group shall each be an Acceptable Bidder for any Sale.

*See* Bid. Proc., at § III.

c.     **Qualified Bid Requirements**.  To participate in any Auction, an Acceptable Bidder must deliver to the Debtors and their above-referenced advisors an irrevocable Bid,

and shall meet the following criteria, in each case, on or prior to the applicable Bid Deadline (as defined below):

1.  **Purchased Assets and Assumed Liabilities**:  Each Bid must clearly state the following:  (a) the particular Assets, including Elixir Assets, or the portion thereof identified with reasonable specificity, to be purchased; (b) the liabilities and obligations to be assumed, including any debt and cure costs to be assumed; and (c) as applicable, whether the Acceptable Bidder intends to operate the Debtors' business as a going concern.

2.  **Good Faith Deposit**:  Except with respect to a Credit Bid, the Bid must be accompanied by Good Faith Deposit; *provided*, that the DIP Agents and Ad Hoc Secured Noteholder Group shall not be required to submit a Good Faith Deposit.  To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals 10% of the increased aggregate purchase price promptly and in no event later than one (1) business day following the conclusion of the applicable Auction;

3.  **Purchase Price**:  Each Bid must (a) clearly set forth the Purchase Price to be paid, assuming a purchase of the applicable Assets and any assumption of liabilities, (b) identify separately the cash and non-cash components of the Purchase Price, and (c) indicate the allocation of the Purchase Price among the applicable Assets; *provided that*, for the avoidance of doubt, such allocation shall be nonbinding on any third party, including with respect to the application of proceeds pursuant to the Financing Orders and the DIP Documents (as defined in the Financing Orders) and shall not prejudice the rights of any party in interest to contest such allocation.  The Purchase Price should be a single point value in U.S. Dollars for the applicable Assets on a cash-free, debt-free basis.  Any Bid for substantially all of the Assets must also include a statement as to whether the Bid is conditioned on purchasing all Assets or whether the Qualified Bid should be viewed as separate Bid for one or more sets of Assets;

4.  **Same or Better Terms; Bid Documents**:  Each Bid must include duly executed and non-contingent, where applicable, Bid Documents.  The Bid Documents shall include: (a) a form of purchase agreement; (b) a schedule of contracts and leases to be assumed to the extent applicable to the Bid, (c) with respect to the purchase agreement, a redline of such agreement marked to reflect the amendments and modifications made to a form of the applicable purchase agreement that the Debtors shall make available to Acceptable Bidders via the Debtors' electronic data room pursuant to the due diligence process, (d) any other material documents integral to such Bid, and (e) a statement from the Acceptable Bidder that (i) it is prepared to enter into and consummate the transactions contemplated in the form purchase agreement, no later than ten (10) business days after the conclusion of the Auction, subject to any necessary regulatory approvals, as

specified by the Acceptable Bidder (or, if no Auction is held, the applicable deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures), and (ii) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or Back-Up Bid until the consummation of the Sale Transaction;

5.    **No Qualified Bidder Bid Protections**:   Unless such Qualified Bid is selected as a Stalking Horse Bid, a Qualified Bid must include a statement that the bid does not entitle such bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the applicable Assets;

6.    **Employee Obligations**:  Each Bid must indicate whether the Acceptable Bidder intends to hire all employees who are primarily employed in connection with the applicable Assets included in such Bid.   If the Acceptable Bidder does not intend to hire all employees who are primarily employed in connection with the applicable Assets included in such Bid, the Acceptable Bidder must include a description of the Acceptable Bidder's intentions with respect to the relevant members of the Debtors' current management team and other employees who are primarily employed in connection with the applicable Assets, and a description of any contemplated incentive plan, to the extent applicable;

7.    **Sources of Financing**:  To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtors' satisfaction, in consultation with the Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale Transaction and other obligations under its Bid, including providing adequate assurance of future performance under all Contracts proposed to be assumed by such Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors;

8.    **Contingencies; No Financing or Diligence Outs**:  The Bid must not be conditioned on the obtaining or the sufficiency of financing, any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties, which shall not be more burdensome, in the Debtors' reasonable business judgment, than those contemplated by the Stalking Horse Bid, if any.  All diligence must be completed before the Bid Deadline.

9.      **Identity**:  Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties.   Each Bid must also include contact information for the specific person(s) whom Guggenheim Securities and Kirkland & Ellis should contact regarding such Bid;

10.     **As-Is, Where-Is**:  Each Bid must include a written acknowledgement and representation that the Acceptable Bidder:  (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, by the Debtors, Guggenheim Securities, Kirkland & Ellis, or the Debtors' other advisors regarding the completeness of any information provided in connection therewith, except, solely with respect to the Debtors, as expressly stated in the Acceptable Bidder's proposed purchase agreement;

11.     **Authorization**:  Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid;

12.     **Joint Bids**:  The Debtors will be authorized to approve joint Bids in their reasonable business judgment, in consultation with the Consultation Parties, on a case-by-case basis, so long as a joint bid meets the Qualified Bid Requirements and the applicable bidders otherwise comply with these Bidding Procedures;

13.     **Adequate Assurance of Future Performance**:  Each Bid must (i) identify any then-known Executory Contracts and Unexpired Leases to be assumed and assigned in connection with the proposed Sale Transaction, (ii) provide for the payment of all Cure Amounts related to such then-known Executory Contracts or Unexpired Leases by the Acceptable Bidder and (iii) demonstrate, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, that the Acceptable Bidder can provide adequate assurance of future performance under all such then-known Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code, and (iv) provide the following documentation:

a.   The legal name of the Proposed Assignee of such then-known Executory Contracts or Unexpired Leases and any guarantors, as applicable;

b.   Financial statements for the calendar or fiscal years ended 2021 and 2022 for the Proposed Assignee and any guarantors, as applicable, and other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of future performance;

c.   With respect to a Bid for the Rite Aid Retail Assets, summary documentation regarding the Proposed Assignee's and any guarantor's, as applicable, retail experience and present retail operations; and

d.   With respect to a Proposed Assignee of an Unexpired Lease identified in a Bid for the Rite Aid Retail Assets, a summary of the Proposed Assignee's proposed use of the premises;

14.   **Acknowledgement of Compliance with Bidding Procedures, Bidding Order, Bankruptcy Code, and Non-Bankruptcy Law**:  Each Bid must acknowledge its compliance in all respects with these Bidding Procedures, the Bidding Procedures Order, Bankruptcy Code and any applicable non-bankruptcy law;

15.   **Privacy Policy**:  The Acceptable Bidder must comply in all respects with the Debtors' consumer privacy policy, which does not restrict the transfer of the personally identifiable information of its customers, and each Bid must contain a statement acknowledging such compliance;

16.   **No Collusion**:  The Acceptable Bidder must acknowledge in writing (a) that it has not engaged in any collusion with respect to any Bids or the Sale Transaction, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price; and (b) agree not to engage in any collusion with respect to any Bids, the Auction, or the Sale Transaction.  For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (email shall suffice).

17.   **Good Faith Offer**:  The Bid must constitute a good faith, *bona fide* offer to consummate the Sale Transaction;

18.   **Irrevocable**:  Each Bid must state that in the event such Bid is chosen as the Back-Up Bid, it shall remain irrevocable until the Debtors and the Successful Bidder consummate the applicable Sale Transaction;

19.   **Back-Up Bid**:  Each Bid shall provide that the Acceptable Bidder will serve as a Back-Up Bidder if the Acceptable Bidder's Bid is the next highest or otherwise best bid;

20.    **Regulatory Approvals and Covenants**:   A Bid must set forth each regulatory and third-party approval required for the Acceptable Bidder to consummate the applicable Sale Transaction, if any, and the time period within which the Acceptable Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty days following execution and delivery of the applicable purchase agreement and/or confirmation of the Plan, those actions the Acceptable Bidder will take to ensure receipt of such approvals as promptly as possible);

21.    **Expected Closing Date**:   Each Bid must state the Acceptable Bidder's expected date of closing of the applicable Sale Transaction;

22.    **Time Frame for Closing**:   A Bid by an Acceptable Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors;

23.    **No Fees**:   Except to the extent the Acceptable Bidder is entitled to the Stalking Horse Bid Protections as a Stalking Horse Bidder, each Acceptable Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid(s) is agreeing to disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or other similar form of compensation; *provided*, *however*, that nothing in these Bidding Procedures shall limit, alter or impair the rights of any party to payment and reimbursement of expenses that are set forth in the DIP Orders, and parties entitled to payment or reimbursement of expenses under the DIP Orders shall be entitled to payment or reimbursement of expenses incurred in connection with the Bidding Procedures and the matters contemplated hereby;

For the avoidance of doubt, each Acceptable Bidder (except with respect to the DIP Agents or the Ad Hoc Secured Noteholder Group and any of their respective designees) by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code; *provided* that the Debtors are authorized in their reasonable business judgment, in consultation with the Consultation Parties and in a manner consistent with the Financing Orders (as defined in the Plan) to provide the Stalking Horse Bid Protections to the Stalking Horse Bidders in connection with any Stalking Horse Agreement in accordance with these Bidding Procedures; *provided,* that to the extent such Stalking Horse Bidder has submitted a Credit Bid, the Stalking Horse Bid Protections shall not be provided;

24.    **Adherence to Bidding Procedures**:   By submitting its Bid, each Acceptable Bidder is agreeing to abide by and honor the terms of these

Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction;

25.    **Consent to Jurisdiction**:  The Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, to the Auction, the Sale, the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, and the closing, as applicable; and

26.    **Conditions to Closing**:  Each Bid must identify with particularity each and every condition to closing, including any then-known Executory Contracts and Unexpired Leases for which assumption and assignment is required.

Only Bids, whether for Elixir Assets or Rite Aid Retail Assets, fulfilling all of the preceding requirements contained in this section may, or otherwise in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, be deemed to be Qualified Bids and only those parties submitting Qualified Bids may, at the Debtors' reasonable business judgment, be deemed to be Qualified Bidders; *provided* that notwithstanding anything to the contrary herein, any Bid submitted by the DIP Agents or Ad Hoc Secured Noteholder Group shall be Qualified Bids.

Neither the Debtors nor any of their advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the Assets, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Assets with governmental laws, the truth, accuracy, or completeness of any documents related to the Assets, or any other information provided by or on behalf of the Debtors to a bidder, or any other matter or thing regarding the Assets. All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the applicable Assets, except to the extent expressly provided in the Bankruptcy Court's order approving the Sale Transaction.  Neither the Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the Assets or relating thereto that the Debtors, any advisor, or agent representing or purporting to represent the Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtors only) specifically set forth in the Bankruptcy Court's order approving the Sale Transaction.

In advance of the commencement of any Auction, as is reasonably practicable, the Debtors shall determine, in consultation with the

Consultation Parties, which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction.  Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided* that if the Debtors receive a Bid prior to the applicable Bid Deadline that does not satisfy the requirements of a Qualified Bid, the Debtors may provide the Acceptable Bidder with the opportunity to remedy any deficiencies prior to the Auction.

*See* Bid. Proc., at § V.

d.    **Stalking Horse Bid Protections**.  Pursuant to the Bidding Procedures Order, a Stalking Horse Bidder, if any, that has not submitted a Credit Bid, is entitled to the Stalking Horse Bid Protections in the amounts set forth herein, and in accordance with the terms of the Bidding Procedures Order.

In the event that the Debtors receive multiple Qualified Bids, with respect to any Elixir Assets (and solely in the event of the termination of the Elixir Stalking Horse APA with MedImpact), at any time until November 8, 2023, at 5:00 p.m. (prevailing Eastern Time), and with respect to any Rite Aid Retail Assets, at any time until November 20, 2023, at 5:00 p.m. (prevailing Eastern Time), the Debtors shall be authorized, but not obligated, in an exercise of their reasonable business judgment, in consultation with the Consultation Parties, to (a) select one or more Acceptable Bidders to act as the Stalking Horse Bidder in connection with the Auction for such assets, and (b) in connection with any Stalking Horse Agreement with a Stalking Horse Bidder, provide Stalking Horse Bid Protections not to exceed (i) three and a half percent of the Purchase Price in the aggregate, with respect to the Elixir Sale Transaction, and (ii) three percent of the applicable Purchase Price with respect to a Rite Aid Retail Sale Transaction.  Any such Stalking Horse Bid Protections are authorized pursuant to these Bidding Procedures and the Bidding Procedures Order.

Except with respect to entry into the Elixir Stalking Horse APA with MedImpact, in the event that the Debtors enter into a Stalking Horse Agreement with one or more Elixir Stalking Horse Bidders, within two business days of entry, the Debtors shall file the Elixir Stalking Horse Notice and serve the Elixir Stalking Horse Notice on the Elixir Stalking Horse Bidder, the U.S. Trustee, and the Consultation Parties. The Elixir Stalking Horse Notice shall:  (i) set forth the identity of the applicable Elixir Stalking Horse Bidder (and if the Elixir Stalking Horse Bidder is a newly formed entity, then the Elixir Stalking Horse Bidder's parent company or sponsor); (ii) set forth the amount of the Elixir Stalking Horse Bid and what portion (if any) is cash; (iii) state whether the Elixir Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Elixir Stalking Horse Bid; (iv) specify any proposed Elixir Stalking Horse Bid Protections (including the amount and calculation thereof); (v) specify the Assets included in the Elixir Stalking Horse Bid; (vi) attach the applicable Stalking Horse Agreement, including all exhibits, schedules and attachments thereto; and (vii) set forth the deadline to object to the

Elixir Stalking Horse Bidder designation and any Elixir Stalking Horse Bid Protections. If there are no objections to the Elixir Stalking Horse Notice the Elixir Stalking Horse Notice Period, the Debtors may submit an order to the Court that incorporates any comments received during the Elixir Stalking Horse Notice Period that authorizes the Debtors to designate an Elixir Stalking Horse Bidder and to enter into a Stalking Horse Agreement, without the need for further hearing.   If a party timely files an objection to the Elixir Stalking Horse Notice, the Court shall hold a hearing after the expiration of the Elixir Stalking Horse Notice Period and as soon thereafter as the Court is available.

In the event that the Debtors enter into a Stalking Horse Agreement with one or more Rite Aid Retail Stalking Horse Bidders, within two business days of entry, the Debtors shall file the Rite Aid Retail Stalking Horse Notice and serve the Rite Aid Retail Stalking Horse Notice on the Rite Aid Retail Stalking Horse Bidder, the U.S. Trustee, and Consultation Parties.  The Rite Aid Retail Stalking Horse Notice shall:  (a) set forth the identity of the Rite Aid Retail Stalking Horse Bidder (and if the Rite Aid Retail Stalking Horse Bidder is a newly formed entity, then the Rite Aid Retail Stalking Horse Bidder's parent company or sponsor); (b) set forth the amount of the Rite Aid Retail Stalking Horse Bid and what portion (if any) is cash; (c) state whether the Rite Aid Retail Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Rite Aid Retail Stalking Horse Bid; (d) specify any proposed Rite Aid Retail Stalking Horse Bid Protections (including the amount and calculation thereof); (e) specify the Assets included in the Rite Aid Retail Stalking Horse Bid; (f) attach the applicable Rite Aid Retail Stalking Horse Agreement, including all exhibits, schedules and attachments thereto; and (g) set forth the deadline to object to the Rite Aid Retail Stalking Horse Bidder designation and any Rite Aid Retail Stalking Horse Bid Protections. If there are no objections to the Rite Aid Retail Stalking Horse Notice within the Rite Aid Retail Stalking Horse Notice Period, the Debtors may submit an order to the Court that incorporates any comments received during the Rite Aid Retail Stalking Horse Notice Period that authorizes the Debtors to designate an Rite Aid Retail Stalking Horse Bidder and to enter into an Rite Aid Retail Stalking Horse Agreement, without the need for further hearing.  If a party timely files an objection to the Rite Aid Retail Stalking Horse Notice, the Court shall hold a hearing after the expiration of the Rite Aid Retail Stalking Horse Notice Period and as soon thereafter as the Court is available.

Upon entry of the Bidding Procedures Order, the Debtors are authorized, but are not obligated or directed, to incur and pay the Stalking Horse Bid Protections to any Stalking Horse Bidder that has not submitted a Credit Bid in an aggregate amount not to exceed three and a half percent of the proposed Purchase Price, with respect to the Elixir Sale Transaction, and three percent of the applicable proposed Purchase Price, with respect to the Rite Aid Retail Sale Transaction.

Except as otherwise set forth herein, no person or entity, other than a Stalking Horse Bidder that has not submitted a Credit Bid, shall be entitled to any expense reimbursement, breakup fees, "topping," termination, or other similar fee or

payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of Bankruptcy Code section 503(b) or otherwise

*See* Bid. Proc., at § X.

22.     Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize value, and, as such, do not impair the Debtors' ability to consider all Qualified Bid proposals, and preserve the Debtors' right to modify the Bidding Procedures in accordance with their terms as necessary or appropriate to maximize value for their estates.

## II.     The Sale and Auction Dates and Deadlines Schedules.

23.     The Debtors are seeking approval of the Bidding Procedures and the following proposed timelines for the Elixir Sale Transaction (the "Elixir Sale Schedule") and Rite Aid Retail Sale Transaction (the "Rite Aid Retail Sale Schedule") processes (the dates set forth below, collectively, the "Sale Schedules") to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids on a timeline that allows the Debtors to consummate Sale Transactions that are above all else value maximizing.  Moreover, the Debtors, in their sound business judgment, reserve the right to alter the timing of either Sale Schedule as necessary under the circumstances, or to conduct multiple Sale Transactions across one or more Auctions in order to maximize the value of the estates, in each case in accordance with the Bidding Procedures.  The Debtors respectfully request that the Court approve the following Sale Schedules:

| Elixir Auction(s) | | |
| --- | --- | --- |
| **Action** | **Description** | **Deadline** |
| Elixir Stalking Horse Deadline (if applicable) | Solely in the event of the termination of the Elixir Stalking Horse APA, the deadline by which the Debtors may choose an Elixir Stalking Horse Bidder. | November 8, 2023 at 5:00 p.m., prevailing Eastern Time. |
| Elixir Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures. | November 16, 2023 at 5:00 p.m., prevailing Eastern Time. |
| Elixir Auction | The date and time of the Auction, if one is needed, which will be held at the offices of Kirkland & Ellis, LLP, 601 Lexington Avenue, New York, New York, 10022. | November 20, 2023 at 10:00 a.m., prevailing Eastern Time, if needed. |
| Notice of Successful Bidder | As soon as reasonably practicable after the conclusion of the Auction, the Debtors will file on the docket, but not serve, a Notice of Successful Bidder identifying the applicable Successful Bidder, Assets, and key terms of the agreement. | As soon as reasonably practicable after the conclusion of the Auction (if necessary). |
| Elixir Sale Hearing | The hearing before the Court to consider approval of the Winning Bid or Winning Bids, pursuant to which the Debtors and the Successful Bidder or Successful Bidders will consummate the Sale. | December 7, 2023, or as soon thereafter as the Debtors may be heard.[7] |

---

[7] The proposed order to approve the sale of the Elixir Assets shall be filed five days before the Sale Hearing.

| Rite Aid Retail Auction(s) | | |
|---|---|---|
| **Action** | **Description** | **Deadline** |
| Rite Aid Indication of Interest Deadline (the "Rite Aid Retail IOI Deadline") | The deadline by which an Acceptable Bidder must submit a non-binding indication of interest (a "Rite Aid Retail IOI"); *provided* that the Debtors may extend the Rite Aid Retail IOI Deadline or waive the requirement of a Rite Aid Retail IOI for one or Acceptable Bidders upon request, without further order of the Court. | November 16, 2023, at 5:00 p.m., prevailing Eastern Time, or extended as necessary. |
| Rite Aid Retail Stalking Horse Deadline | The deadline by which the Debtors may choose a Rite Aid Retail Stalking Horse Bidder. | November 20, 2023 at 5:00 p.m., prevailing Eastern Time. |
| Rite Aid Retail Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures. | November 30, 2023 at 5:00 p.m., prevailing Eastern Time. |
| Rite Aid Retail Auction | The date and time of the Auction, if one is needed, which will be held at the offices of Kirkland & Ellis, LLP, 601 Lexington Avenue, New York, New York, 10022. | December 4, 2023 at 10:00 a.m., prevailing Eastern Time, if needed. |
| Notice of Successful Bidder(s) | As soon as reasonably practicable after the conclusion of the Auction, the Debtors will file on the docket, but not serve, a notice identifying the Successful Bidder (as defined in the Bidding Procedures) (the "Notice of Successful Bidder"), identifying the applicable Successful Bidder, Assets, and key terms of the agreement. | As soon as reasonably practicable after the conclusion of the Auction (if necessary). |
| Rite Aid Retail Sale Hearing | The hearing before the Court to consider approval of the Winning Bid or Winning Bids, pursuant to which the Debtors and the Successful Bidder or Successful Bidders will consummate the Sale. | December 19, 2023, or as soon thereafter as the Debtors may be heard. |

24.     The timelines contemplated in the foregoing Sale Schedules are essential to maximize value for the Debtors' estates.  Both the Elixir Assets and the Rite Aid Retail Assets must be sold on expedited timelines to mitigate the risk of significant value destruction.

25.     Elixir is the Debtors' pharmacy benefit manager ("PBM") business segment that provides critical pharmacy benefits and services to over one million members nationwide.  Elixir is party to numerous contracts with its pharmacy partners, drug manufacturers, and health plans in the course of operating its business.  In particular, Elixir is party to several valuable pharmacy client contracts that are at risk of terminating arguably on their own terms during these chapter 11 cases; for example, many of Elixir's core customers hold an optional right to renew as of

January 1, 2024.[8]  Consummation of the sale of the Elixir Assets on the timelines proposed in the Sale Schedules, which would mitigate the risk of contractual termination, is crucial towards preserving significant value.

26.    Similarly, the Rite Aid Retail Assets must also be sold via an expedited process contemplated in the Sale Schedules, and as also contemplated in the Plan and the Confirmation Milestone.  The Rite Aid Retail Assets comprise a large and complex pharmacy and front-end convenience retail business that carries with it relationships with thousands of product suppliers and other vendors who transact with the Debtors on customary trade terms, extending significant trade credit.  While the Debtors have sought appropriate first day relief and sufficient DIP financing to assuage trade creditor fears and avoid disruption to retail operations, the risk of a significant trade credit contraction is significant.  Should trade partners decide to tighten payment terms and demand cash on delivery, the value of the Rite Aid Retail Assets would suffer.  Time is limited, and the Sale Schedules proposed here push for consummation of one or more sale transactions on timeframes that seek to mitigate these risks.

27.    The Debtors believe that the relief sought by this Motion appropriately balances the need to provide all parties in interest with notice and due process, affords the Debtors sufficient time to generate interest in any or all of the Assets, and provides the Debtors with an expeditious process commensurate with the Debtors' liquidity constraints, prepetition processes, and the terms and conditions of the DIP Credit Agreements, RSA Term Sheet, and the Plan.  In short, the relief sought by this Motion is the Debtors' best chance to preserve going-concern value .  Accordingly, the Debtors believe the relief requested herein is in the best interest of the Debtors' estates, will

---

[8]    The Debtors reserve all rights with respect to their contracts, including their rights to reject or assume the same, to the extent such contracts are executory, and their right to enforce the automatic stay with respect to any attempted termination of their contractual rights.

provide interested parties with sufficient opportunity to participate in the process, and, therefore,

should be approved.

### III.    Material Terms of the Elixir Stalking Horse APA

28.    The following chart summarizes the terms and conditions of the Stalking Horse

APA attached to the Bidding Procedures Order as <u>Exhibit 1</u> and discloses certain information

required pursuant to Local Rule 6004-1:[9]

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **Stalking Horse APA Parties**<br><br>*See Preamble* | <u>Seller</u>:  Hunter Lane, LLC and certain of its subsidiaries<br><br><u>Purchaser</u>:  MedImpact Healthcare Systems, Inc. |
| **Purchase Price**<br><br>**Local Bankr. R. 6004-1(b)(iv)(N)**<br><br><br>*See § 2.1* | The aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) subject to adjustment pursuant to <u>Section 2.7</u>, a cash payment of $575,000,000 (the "<u>Cash Payment</u>"). |
| **Acquired Assets**<br><br>*See § 1.1* | "<u>Acquired Assets</u>" means all of the properties, rights, interests and other assets owned by or held by a Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by any Seller after the date hereof and prior to the Closing, and including Sellers' right, title and interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:<br><br>• (i) subject to <u>Section 1.5</u>, all Contracts listed on <u>Schedule 1.1(a)(i)</u> to which any Seller is a party, but, in all cases, excluding Leases, which are addressed in <u>Section 1.1(g)</u> and (ii) the Contracts listed on <u>Schedule 1.1(a)(ii)</u> (the "<u>Commercial Interco Contracts</u>" and, together with (i), the "<u>Assigned Contracts</u>"), including that certain Pharmacy Benefit Management Services Agreement (the "<u>ROI Agreement</u>"), effective the 1st day of January, 2010, by and between Rx Options, Inc., an Ohio corporation and a Seller ("<u>ROI</u>"), and EIC (f/k/a Envision Insurance Company);<br><br>• all rights under non-disclosure, confidentiality, and similar arrangements with (or for the <u>benefit</u> of) employees and agents of Sellers or with third parties (including any non-disclosure, confidentiality agreements or similar |

---

[9]    This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Elixir Stalking Horse APA, the Elixir Stalking Horse APA shall govern in all respects.  All capitalized terms used but not defined in this summary have the meanings ascribed to them in the Elixir Stalking Horse APA.  All references to schedules or sections in the following summary shall refer to schedules or sections of the Elixir Stalking Horse APA.

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | arrangements entered into in connection the Auction), which any such agreements will be Assigned Contracts subject to designation as an Excluded Contract pursuant to <u>Section 1.5</u>;<br><br>• all accounts receivable (including Rebate Assets), notes receivable, negotiable instruments and chattel paper owing from Persons other than Sellers and their Affiliates, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, but in all cases excluding any CMS Receivable;<br><br>• all bank accounts;<br><br>• all credits, prepaid expenses, deferred charges and expenses, advance payments, and prepaid items and duties, including all lease and rental payments that have been prepaid by any Seller with respect to any Acquired Leased Real Property;<br><br>• all Documents (excluding any credit card numbers or related customer payment sources, social security numbers, or other information to the extent prohibited by any Law);<br><br>• subject to <u>Section 1.5</u>, the Leased Real Property listed on <u>Schedule 1.1(g)</u> (the "<u>Acquired Leased Real Property</u>" and the Lease governing any Acquired Leased Real Property, an "<u>Acquired Lease</u>") and any security deposits related thereto;<br><br>• all land, together with all buildings, structures, improvements, and fixtures located thereon, and all easements, privileges, appurtenances and other rights and interests appurtenant thereto and all right, title and interest in and to any streets, alleys, passages or other rights-of-way or appurtenances included in, adjacent to or used in connection with such land and all right, title and interest in all mineral rights appurtenant to such land, owned by the Sellers (the "<u>Owned Real Property</u>");<br><br>• all tangible assets (including Equipment) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property or the Owned Real Property and any tangible assets on order to be delivered to any Seller; <u>provided</u> that, with respect to any such tangible asset that is leased to any Seller, the lease agreement covering such leased tangible asset is an Assigned Contract;<br><br>• all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers (including pharmaceutical drug manufacturers), Group Purchasing Organizations, and counterparties to any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor, manufacturers (including pharmaceutical drug manufacturers), Group Purchasing Organizations, or supplier rebates), demands, allowances, refunds (other than Tax refunds attributable to a Pre-Closing Tax Period), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller or its Affiliates and excluding any CMS Receivable);<br><br>• to the extent transferable under applicable Law, all of the rights, interests and |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor and copies of all governmental filings associated therewith, including, to the extent transferable under applicable Law, those Permits and Governmental Authorizations listed on Schedule 1.1(k); |
| | • to the extent transferable, excluding all director and officer insurance policies, (i) all current and prior insurance policies of any Seller, and (ii) all insurance rights and benefits (including proceeds) of any nature to the extent arising from or relating to any of the Acquired Assets or Assumed Liabilities (including returns and refunds of any premiums paid, or other amounts due back to Sellers, with respect to cancelled policies), including all such insurance recoveries and rights to assert claims with respect to any such insurance recoveries (the foregoing clauses (i) and (ii), collectively, the "Acquired Insurance Assets"); |
| | • all Intellectual Property owned or purported to be owned by the Sellers, all rights to collect royalties and proceeds in connection with such Intellectual Property that are or were due or payable prior to, on, or after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations, violations of, or other conflicts with, such Intellectual Property, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including the Laker Software and the Intellectual Property set forth on Schedule 1.1(m) (collectively, the "Acquired Intellectual Property"); |
| | • all Inventory and supplies of the Sellers; |
| | • (i) all avoidance claims or causes of action available to Sellers under chapter 5 of the Bankruptcy Code (including sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law (whether or not asserted as of the Closing Date) ("Avoidance Actions") against any trade creditor, customer, supplier, manufacturer, distributor, broker, licensee, licensor, agent, or vendor of any Seller or any other Person with whom any Seller has an ordinary course commercial relationship, (ii) all Avoidance Actions relating to the Acquired Assets or Assumed Liabilities, or against any of the Sellers' counterparties to the Assigned Contracts, and (iii) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment of any Seller against any Transferred Employee (the foregoing clauses (i), (ii), and (iii), collectively, the "Acquired Avoidance Actions"); provided that, for the avoidance of doubt, the Acquired Avoidance Actions extend solely to actions related to the Acquired Assets and the Business and shall not include preference claims or avoidance claims and actions (including any such claims and actions arising under Sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code) against any representatives of the Debtors, or the Debtors' non-debtor Affiliates, Subsidiaries, or representatives of any of the foregoing; provided further that Purchaser will not pursue or cause to be pursued either directly or indirectly any Acquired Avoidance Actions except as a defense (to the extent permitted under applicable Law) against any claim or cause of action asserted by any Person enumerated in clauses (i), (ii), and (iii); |
| | • all deposits, including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise; and |
| | • all goodwill, payment intangibles and general intangible assets and rights of |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | Sellers. |
| **Assumption of Certain Liabilities**<br><br>*See* § 1.3 | On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with <u>Section 2.1</u>, Purchaser shall irrevocably assume from each Seller (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) (and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities (and no other Liabilities, which other Liabilities shall be retained by Sellers), without duplication and only to the extent not paid, performed, discharged or otherwise satisfied on or prior to the Closing (collectively, the "<u>Assumed Liabilities</u>"):<br><br>• all Cure Costs in an amount not to exceed $1,400,000 (the "<u>Assumed Cure Costs</u>");<br><br>• all Liabilities and obligations of any Seller under the Assigned Contracts and any Acquired Lease solely to the extent first arising after the Closing and, for the avoidance of doubt, excluding any Excluded Rebate Liability;<br><br>• all Liabilities arising out of the conduct of the Business or the ownership or operation of the Acquired Assets or the Business, in each case, by Purchaser on or after the Closing Date;<br><br>• all trade payables of Sellers to non-Affiliated third parties in connection with the Business existing on the Closing Date that remain unpaid and are not delinquent as of the Closing Date and incurred in the Ordinary Course and other Liabilities of Sellers of the types included in the definition of Closing Working Capital but not including any Excluded Rebate Liability or any Liabilities to the extent relating to or otherwise arising, whether before, on or after the Closing, under any of the Excluded Contracts (collectively, the "<u>Assumed Current Liabilities</u>";<br><br>• all recoupment obligations of any Seller under any Assigned Contracts or Excluded Contracts solely to the extent related to claims by any pharmaceutical drug manufacturer or Group Purchasing Organizations pursuant to any Assigned Contract, or Excluded Contract, for the recoupment of any Rebate Assets (collectively, the "<u>Assumed Rebate Liability</u>"), but excluding any Liabilities related to any billed and unbilled manufacture rebate receivable related to the business of EIC;<br><br>• without duplication: (i) all Liabilities for Taxes with respect to the Acquired Assets, the Business, or the Transferred Employees for any taxable period (or portion thereof) beginning after the Closing Date, and (ii) all Transfer Taxes pursuant to <u>Section 9.1</u>;<br><br>• all Liabilities relating to the Transferred Employees that arise after the Closing Date; and<br><br>• all Liabilities relating to the termination of Scheduled Employees who do not receive a Transfer Offer from Purchaser in compliance with <u>Section 6.3(a)</u>. |
| **Excluded Assets**<br><br>*See* § 1.2 | Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain |

27

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "Excluded Assets"): |

- all Cash and Cash Equivalents, such bank account(s) as the Parties reasonably agree prior to the Closing for Sellers to retain for windown and related purposes, and any retainers or similar amounts paid to Advisors or other professional service providers;

- subject to Section 1.5, all Contracts of Sellers other than Assigned Contracts and any Acquired Lease (the "Excluded Contracts"), including the Rejection Contracts;

- all Documents (including information stored on the computer systems, data networks or servers of any Seller) (i) that exclusively relate to any of the Excluded Assets or Excluded Liabilities, (ii) that are Sellers' financial accounting Documents, all minute books, Organizational Documents, stock certificates or other Equity Interests instrument, stock registers and such other books and records of any Seller pertaining to the ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks, or (iii) that any Seller is required by Law or Healthcare Law to retain; provided that Purchaser shall have the right to make copies of any portions of such Documents (other than Excluded Tax Returns) to the extent not prohibited by applicable Law or Healthcare Law;

- all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the Transactions, or the Bankruptcy Case, that are subject to any attorney-client privilege and the transfer of which to Purchaser would result in the waiver of any such privilege ("Retained Privileged Materials");

- other than the Acquired Insurance Assets, all current and prior insurance policies and Employee Benefit Plans of any Seller or its Affiliates, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers or its Affiliates with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

- all Equity Interests of any Seller or any of their respective Subsidiaries, including, EIC;

- except for the Acquired Avoidance Actions, (i) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller or its Affiliates, in each case, directly arising out of events occurring prior to the Closing Date, and (ii) all claims that any Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

- Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller or its Affiliates and Purchaser in connection with the Transactions, or any other agreement between any Seller or its Affiliates and Purchaser entered into on or after the date hereof;

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | • all Tax refunds attributable to a Pre-Closing Tax Period, and Tax attributes and Tax assets; <br><br> • any CMS Receivable and any billed and unbilled rebate receivables related to EIC; <br><br> • except for the Acquired Avoidance Actions and Rebate Assets, all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to Leases, licenses or any Contract, directly arising out of events occurring prior to the Closing Date; <br><br> • any properties, rights, interests, and assets of Sellers designated as an Excluded Asset pursuant to <u>Section 1.6</u>; and <br><br> • all Liabilities or other amounts owing from any Sellers or any of their respective Affiliates (other than any such Liabilities under any Assigned Contract). |
| **Excluded Liabilities** <br><br> *See* § 1.4 | Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place on or prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "<u>Excluded Liabilities</u>"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following Liabilities of any Seller: <br><br> • all Cure Costs other than the Assumed Cure Costs (the "<u>Excluded Cure Costs</u>"); <br><br> • except to the extent of any Assumed Cure Costs, Assumed Current Liabilities, or Assumed Rebate Liability expressly assumed pursuant to <u>Section 1.3</u>, any Liability arising out of facts or circumstances in existence on or prior to the Closing and from or related to any breach, default under, failure to perform, torts related to the performance of, violations of Law, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of the Sellers or any of their Affiliates under any Contract, agreement, arrangement or understanding to which any Seller or any of its Affiliates is a party prior to the Closing; <br><br> • except to the extent of any Assumed Cure Costs, Assumed Current Liabilities, or Assumed Rebate Liability expressly assumed pursuant to <u>Section 1.3</u>, all Liabilities arising out of, relating to or otherwise in respect of the operation of the Business or businesses of Sellers' Affiliates, or any of the Sellers', or Sellers' Affiliates', products or services, or the operation or condition of the Acquired Assets or the Assumed Liabilities, in each case, on or prior to the Closing or facts, actions, omissions, circumstances or conditions existing, occurring or accruing on or prior to the Closing; <br><br> • all Liabilities arising from or related to any Action (whether civil, criminal, |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | administrative, investigative, or informal) against any Sellers or their Affiliates, (including, for the avoidance of doubt, any Action related to fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of any Seller, or any of their Affiliates, or any of their respective directors, officers, or employees), or related to the Acquired Assets or the Assumed Liabilities, pending or threatened or having any other status or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing (including any breach, default, failure to perform, torts related to performance, violations of Law, infringements or indemnities, guaranties and overcharges, underpayments or penalties, whether in respect of any Contract, agreement, arrangement, promise or understanding of any kind) including any successor liability claims or that may be owed to or assessed by, any Governmental Body or other Person, and whether commenced, filed, initiated, or threatened prior to, on or following the Closing; <br><br> • all Liabilities to the extent relating to or otherwise arising, whether before, on or after the Closing, under any of the Excluded Contracts; <br><br> • all Liabilities of Sellers for Indebtedness and any Accrued Rebate Liability related to any billed and unbilled rebate receivables related to EIC; <br><br> • all guarantees of Indebtedness made by the Sellers and all reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit or other similar agreements or instruments; <br><br> • other than the Assumed Rebate Liability, all Liabilities related to claims or Actions by any pharmaceutical drug manufacturer, Group Purchasing Organizations, or any other Person related to rebates, recoupment, payments or similar items, whether or not pursuant to any Assigned Contract or any other Contract (the "Excluded Rebate Liability"); <br><br> • all Liabilities related to, resulting from or arising out of, prior to, on or after the Closing, any (i) unredeemed refund amounts, rebates (except for any Assumed Rebate Liability), or similar items, (ii) customer deposits or (iii) customer promotions and loyalty programs; <br><br> • all Liabilities to (i) any current or former owner of capital stock or other Equity Interests of the Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other Equity Interests of the Sellers, (ii) any current or former holder of indebtedness for borrowed money of the Sellers or (iii) in respect of obligations for indemnification or advancement of expenses, any current or former officer or director of the Sellers, in each case of (i), (ii), and (iii), solely in such Person's capacity as such; <br><br> • the sponsorship of and all Liabilities at any time arising under, pursuant to or in connection with any Employee Benefit Plans (whether arising prior to, on or after the Closing Date) and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" (as such term is defined in 26 C.F.R. § 54.4980B-9); <br><br> • Except as expressly assumed by Purchaser in Section 6.3(g), Liabilities arising under the WARN Act and similar Laws relating to the termination of any current or former employee or contractor of any Seller, or any Affiliate of a Seller, (including any Transferred Employees), and including any current, |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | threatened or potential claims for compensation or benefits, in each such case, to the extent related to employment or contracting with the Sellers (or any of their Affiliates) or termination thereof, whether arising prior to, on or after the Closing Date |
| | • all Liabilities and other payments incurred or otherwise payable by any of the Sellers or their respective Affiliates, or for which any of the Sellers or their respective Affiliates is liable, in connection with in connection with the administration of the Bankruptcy Cases or the negotiation, execution and consummation of the Transactions or any Transaction Agreement (including any preparation for a transaction process, bankruptcy process, any sale process involving other potential buyers or any contemplated public offering or financing), including the fees and expenses of financial advisors, accountants, legal counsel, consultants, brokers and other advisors with respect thereto, whether incurred, accrued or payable on or prior to or after the date of this Agreement or the Closing Date; |
| | • all Liabilities of Sellers arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by Sellers, whether or not used in the Ordinary Course, including any Liabilities for noncompliance with Environmental Laws or the Release of Hazardous Substances, to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing; |
| | • other than the Assumed Rebate Liability or any Assumed Current Liability expressly assumed pursuant to Section 1.3, all Liabilities relating to any Product that is or has been manufactured, tested, distributed, held or marketed by or on behalf of any Seller, or the Affiliate of any Seller, arising from any recall, withdrawal or suspension (whether voluntarily or otherwise), except to the extent that such recall, withdrawal or suspension results from Purchaser's operation of the Business or the Acquired Assets following the Closing; |
| | • all Liabilities as to which any Seller is an obligor, or is otherwise responsible or liable, to any Seller or any of its Affiliates, other than any Assumed Current Liability. |
| | • all Liabilities of Sellers arising out of any (i) Excluded Contract, (ii) Permit that is not transferred to Purchaser as part of the Acquired Assets or, (iii) Contract or Permit that is not transferred to Purchaser (subject to Section 1.5(c)) because of any failure to obtain any Consent or Governmental Authorization required for such transfer; |
| | • all Liabilities of Sellers related to any Contract of any Seller, or an Affiliate of any Seller, with Virginia Premier, which such Contracts shall be an Excluded Contract; |
| | • all Liabilities relating to Transferred Employees that arise on or prior to the Closing Date; |
| | • all Liabilities arising with respect to any Business Employees who are not required to receive a Transfer Offer or who otherwise fails to become employed by Purchaser or its Affiliates immediately following the Closing Date (including due to refusing to accept a Transfer Offer that complies with Section 6.3), other than as a result of Purchaser's breach of Section 6.3; |
| | • (i) all Liabilities relating to income Taxes imposed upon any of the Sellers (or |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | for which any of the Sellers may otherwise be liable, including as a transferee, successor, or by contract (other than as expressly provided in this Agreement)), without regard to whether such Taxes relate to periods (or portions thereof) ending on or prior to the Closing Date, (ii) all Liabilities relating to Taxes imposed on or with respect to the Acquired Assets for any Pre-Closing Tax Period, and (iii) all Liabilities of any of the Sellers relating to the payment for the income Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or non-U.S. Law); and<br><br>• drafts or checks outstanding as of the Closing;<br><br>provided that in the event of any conflict between the terms of Section 1.3 and this Section 1.4, the terms of Section 1.3 shall control. |
| **Representations and Warranties of Sellers**<br><br>*See § 3* | The Stalking Horse Purchase Agreement contains customary representations and warranties, including, but not limited to, representations of Seller regarding: (a) organization and qualification; (b) authorization of agreement; (c) conflicts and consents; (d) financial statements, internal controls, and SEC reports; (e) real property; (f) title to property and sufficiency of assets; (g) contracts; (h) litigation; (i) permits and compliance with laws; (j) environmental matters; (k) intellectual property; (l) privacy and security matters; (m) healthcare matters; (n) tax matters; (o) employees; (p) insurance; (q) affiliates transactions; (r) brokers; (s) anti-corruption laws; (t) absence of certain changes; (u) bank accounts; (v) employee benefit plans; and (w) no other representations or warranties. |
| **Representations and Warranties of Purchaser**<br><br>*See § 4* | The Stalking Horse Purchase Agreement contains customary representations and warranties, including, but not limited to, representations of the Purchaser regarding: (a) organization and qualification; (b) authorization of agreement; (c) conflicts and consents; (d) financing; (e) brokers; (f) litigation; (g) financing and contractual arrangements; (h) solvency; (i) WARN Act and mass layoffs; and (j) no additional representation or warranties. |
| **Agreements with Management**<br><br>**Local Bankr. R. 6004-1(b)(iv)(B)**<br><br>*See § 4.7* | Except for any financing sources or lenders of Purchaser related to Purchaser's financing of the Transaction, as of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of any Seller or its respective board of directors (or member of management or applicable governing body of any Affiliate of any Seller), any holder of equity or debt securities of any Seller, or any lender or creditor of any Seller or any Affiliate of any Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of any Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions. |
| **Good Faith Deposit**<br><br>**Local Bankr. R. 6004-1(b)(iv)(F)**<br><br>*See § 2.2* | <u>Deposit</u>.<br><br>• Purchaser has, on or prior to the date hereof (or, if the date hereof is not a Business Day, the first Business Day immediately following the date hereof) and pursuant to the Escrow Agreement, made an earnest money deposit with the Escrow Agent in the amount equal to $12,000,000 (the "<u>Initial Deposit</u>"), by wire transfer of immediately available funds for deposit into a separate segregated, non-interest bearing escrow account (the "<u>Escrow Account</u>") maintained by the Escrow Agent in accordance with the Escrow Agreement and Bidding Procedures Order.<br><br>• So long as this Agreement has not been earlier terminated, Purchaser will, on |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | or prior to October 23, 2023, and pursuant to the Escrow Agreement, make a second earnest money deposit with the Escrow Agent in the amount equal to $3,000,000 (the "Second Deposit"), by wire transfer of immediately available funds for deposit into the Escrow Account maintained by the Escrow Agent in accordance with the Escrow Agreement and Bidding Procedures Order. |
| | • So long as this Agreement has not been earlier terminated, Purchaser will, on or prior to October 30, 2023, and pursuant to the Escrow Agreement, make a third earnest money deposit with the Escrow Agent in the amount equal to the difference (i) $57,500,000 minus (ii) the sum of the Initial Deposit and the Second Deposit (such difference, the "Final Deposit"), by wire transfer of immediately available funds for deposit into the Escrow Account maintained by the Escrow Agent in accordance with the Escrow Agreement and Bidding Procedures Order, such that immediately after the Final Deposit is made the amount in the Escrow Account equals $57,500,000 (the total amount of funds held in the Escrow Account at any given time from the Initial Deposit, Second Deposit, or Final Deposit, shall be referred to herein as the "Deposit"). The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date. |
| | If this Agreement has been terminated by (i) Sellers pursuant to Section 8.1(d), Section 8.1(f), or Section 8.1(p) or (ii) Purchaser pursuant to Section 8.1(n) or Section 8.1(o), then, in any such case, the Parties shall promptly, but in any event within five (5) Business Days after such termination hereof, deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds 100% of the Deposit (together with any and all investment interest thereon (less any Taxes with respect to such interest), if any) to such account(s) as may be designated by Elixir, and Elixir shall retain the Deposit (together with any and all investment interest thereon (less any Taxes with respect to such interest), if any); provided that nothing in this paragraph shall be deemed to limit any other remedies to which Sellers may be entitled under this Agreement or applicable Law; provided that Sellers acknowledge and agree that retaining the Deposit pursuant to this Section 2.2(b) shall be Sellers' sole and exclusive remedy arising (i) from Seller's termination of this Agreement pursuant to Section 8.1(d), Section 8.1(f), or Section 8.1(p) (or upon any other grounds) as a result of Purchaser's breach of Section 2.2(a) or Section 4.4, (ii) from Purchaser's breach of Section 2.2(a) or Section 4.4, or (iii) from Purchaser's termination of this Agreement pursuant to Section 8.1(n) or Section 8.1(o); provided that nothing herein shall limit any Party's Liability for Fraud. |
| | If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Parties shall promptly, but in any event within five (5) Business Days after such termination hereof, deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds 100% of the Deposit (together with any and all investment interest thereon (less any Taxes with respect to such interest), if any) to such account(s) as may be designated by Purchaser, and the Deposit, together with any and all investment interest thereon (less any Taxes with respect to such interest), if any, shall be returned to Purchaser within five (5) Business Days after such termination. |
| | The Parties agree that Sellers' right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision. |
| | If the Closing occurs, at the Closing the Parties shall deliver a joint written instruction to the Escrow Agent directing the Escrow Agent to (i) transfer by wire transfer of immediately available funds an amount equal to (i) 100% of the Deposit (together with any and all investment interest thereon, if any) minus (ii) the Purchase Price Adjustment Escrow Amount, which shall continue to be held in accordance with the Escrow Agreement, to such account(s) as may be designated by Elixir. The Purchase Price Adjustment Escrow Amount shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser. |
| **Tax Exemption** <br><br> **Local Bankr. R. 6004-1(b)(iv)(I)** <br><br> *See § 9.1* | A Any U.S. federal, state, local, and non-U.S., GST/HST, sales Tax, consumption sales, use, excise, value added, registration, real property, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges (including all related interest, penalties, and additions to any of the foregoing) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes with the appropriate Taxing Authority. |
| **Requested Findings as to Successor Liability** <br><br> **Local Bankr. R. 6004-1(b)(iv)(L)** <br><br> *See § 6.15* | The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the closing, Purchaser shall not be deemed to: (a) be the successor of any Seller, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Acquired Assets other than as expressly set forth and agreed in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Purchaser shall have no Liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Acquired Assets) against Sellers or any of Sellers predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Sellers, the Acquired Assets or any Liability of Sellers arising prior to, or relating to any period occurring prior to, the Closing Date. The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this Section 6.15. |
| **Sale of Unexpired Leases Free and Clear** <br><br> **Local Bankr. R. 6004-1(b)(iv)(M)** <br><br> *See § 1.1* | Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. |

IV.    **Form and Manner of Auction Notice**s.

29.    The Auction for Elixir Assets, if needed, will be held on November 20, 2023 at 10:00 a.m. prevailing Eastern Time (or such other date as selected by the Debtors).  The Auction for Rite Aid Retail Assets, if needed, will be held on December 4, 2023 at 10:00 a.m. prevailing Eastern Time (or such other date as selected by the Debtors).  Any Auction will be held at the offices of the proposed co-counsel to the Debtors:  Kirkland & Ellis LLP, 601 Lexington Ave., New York, NY 10022.

30.    No later than October 20, 2023 at 5:00 p.m. prevailing Eastern Time, the Debtors will cause the Elixir Auction Notice attached as Schedule 1(a) to the Bidding Procedures to be served on the parties that receive notice of this Motion.  No later than November 8, 2023 at 5:00 p.m. prevailing Eastern Time, the Debtors will cause the Rite Aid Retail Auction Notice attached as Schedule 1(b) to the Bidding Procedures to be served on the parties that receive notice of this Motion.  In addition, concurrently therewith, the Debtors will post the Auction Notice on their restructuring website, https://restructuring.ra.kroll.com/RiteAid and publish the applicable Auction Notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times* (National Edition), to provide notice to any other potential interested parties. Each Auction Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed applicable Sale Transaction, including the date, time, and place of the Auction (if any), the Bidding Procedures, and the dates and deadlines related thereto.

<u>Basis for Relief</u>

I.    **The Relief Sought in the Order Is in the Best Interests of the Debtors' Estates and Should Be Approved**.

31.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g.,*

*In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [debtor] to show that a sound business purpose justifies such actions.' If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991)); *Schipper*, 933 F.2d at 515 (internal citations and quotations omitted) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (applying business judgment rule to bidding procedures and incentives and noting that "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence").

32.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *Integrated Res., Inc.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the [Debtor]'s duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (citation omitted)).

33.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See Integrated Res., Inc.*,

147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"). Where there is a court-approved auction process, the assets are presumed to sell for a full and fair price because the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

34.     Approval of bidding procedures on or around the Petition Date following the first-day hearing is appropriate where the debtors have demonstrated that such approval maximizes estate value, and this Court has approved bidding procedures on such a timeline several times. *See, e.g., In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. April 25, 2023) [Docket No. 92]; *In re David's Bridal, LLC¸* No. 23-13131 (CMG) (Bankr. D.N.J. April 17, 2023) [Docket No. 72]; *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. July 13, 2020) [Docket No. 72].

35.     Here, the proposed Bidding Procedures will promote active bidding from seriously interested parties and will maximize the value of their assets for the benefit of the Debtors' estates. The proposed Bidding Procedures will allow the Debtors to conduct any Sale Transactions in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who can demonstrate the ability to close a Sale Transaction. In particular, the Bidding Procedures contemplate an open and public marketing process with minimum barriers to entry and provide

Potential Bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid. The Bidding Procedures for the Elixir Assets are justifiably on an accelerated schedule to account for the cyclical nature of Elixir's contracts and the substantial prepetition marketing process with respect thereto, but are nevertheless designed to bring forward the best value-maximizing transaction for the benefit of the Debtors' stakeholders. The Bidding Procedures for the Rite Aid Retail Assets appropriately enable the Debtors to market test the Plan Restructuring contemplated through the Plan. In all, the timelines for the Bidding Procedures are also reflective of the milestones contained in the DIP Documents, the RSA Term Sheet, and the Plan.

36.    The proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings in bankruptcy proceedings, and are consistent with the controlling legal standard in the Third Circuit. Approval of the Bidding Procedures and entry of the proposed Order is necessary on an expedited basis in order to facilitate the time-sensitive Sale Transaction processes: delay will significantly erode estate value available to the Debtors' stakeholders. Accordingly, the Debtors request that the Court approve the Bidding Procedures as a valid exercise of the Debtors' business judgment.

## II.    The Bid Protections Have a Sound Business Purpose and Should Be Approved.

37.    The Debtors seek authority, after notice as set forth in the proposed Order, to offer customary bid protections to Stalking Horse Bidders (including the Elixir Stalking Horse Bidder but excluding those Stalking Horse Bidders that have submitted Credit Bids) consisting of a Break-Up Fee and Expense Reimbursement, in an aggregate amount not to exceed 3.5 percent of the Purchase Price with respect to the Elixir Sale Transaction, and 3 percent of the applicable Purchase Price with respect to a Rite Aid Retail Sale Transaction. The use of a stalking horse in a public auction process

for the sale of a debtor's assets is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Off. Comm. of Unsecured Creditors v. Interforum Holding LLC*, No. 11-CV-219, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011).

38.      Generally, bidding protections, such as break-up fees, are a normal and, in many cases, necessary component of significant sales under the Bankruptcy Code.  *See Integrated Res.*, 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value.") (emphasis added).  As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (internal quotations omitted) (alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *O'Brien*, 181 F.3d 527.  The Debtors believe that the allowance of the Stalking Horse Bid Protections are in the best interests of the Debtors' estates and their creditors, as any Stalking Horse Bidders, such as the Elixir Stalking Horse Bidder or a Stalking Horse Bidder with respect to the Rite Aid Retail Assets, if designated, will establish a floor for bidding that may ultimately increase the consideration given in exchange for the Assets.

39.      In the Third Circuit, bidding protections, such as those proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code.

*Energy Future*, 904 F.3d at 313 (citing *O'Brien*, 181 F.3d at 535); *Reliant Energy*, 594 F.3d at 206

(holding that the general standard used for all administrative expenses applies to break-up fees).

Thus, "the allowability of break-up fees, like that of other administrative expenses, depends upon

the requesting party's ability to show that the fees were actually necessary to preserve the value of

the estate." *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (quoting *O'Brien*, 181

F.3d at 535).

40.     The Debtors propose to pay the Stalking Horse Bid Protections only in the event they

determine, after good faith, arm's-length negotiations, that designating a Stalking Horse Bidder

would be necessary and beneficial for their estates.  Courts in this district have routinely approved

break-up fees and/or expense reimbursements offered to stalking horse bidders.  *See, e.g.*, *In re*

*Cyxtera Technologies, Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 29, 2023) [Docket No. 180]

(approving bidding procedures and bidding protections, including expense reimbursement, breakup

fees, "topping," termination, or other similar fees or payment); *In re Bed Bath & Beyond Inc.*, No.

23-13359 (VFP) (Bankr. D.N.J. April 25, 2023) [Docket No. 92] (same); *In re David's Bridal, LLC¸*

No. 23-13131 (CMG) (Bankr. D.N.J. April 17, 2023) [Docket No. 72] (same); *In re BlockFi Inc.*,

No. 22-19361 (MBK) (Bankr. D.N.J. Jan. 30, 2023) [Docket No. 441] (same); *In re Alliant Techs.,*

*L.L.C.*, No. 21-19748 (JKS) (Bankr. D.N.J. Jan. 21, 2022) [Docket No. 101] (same).

41.     Without the Stalking Horse Bid Protections, a potential bidder may elect not to

participate in the process at all to the detriment of the Debtors' estates.  The Bidding Procedures do

not require the payment of the Stalking Horse Bid Protections.  Rather, the Debtors have the option

of paying or otherwise incurring such obligations in the event that offering such Stalking Horse

Bid Protections is necessary to foster a competitive bidding process that will maximize the value of

the Debtors' estates.  In that instance, the value created for the Debtors' estates will likely greatly

outweigh the cost of any Stalking Horse Bid Protections (and the Debtors submit this is the case as to the Elixir Stalking Horse Bidder).  In any case, granting the Debtors authority to offer the Stalking Horse Bid Protections sends a strong signal to the market that the Debtors are serious about running a competitive sale process to generate the best result for the Debtors and their estates.

42.      The Stalking Horse Bid Protections shall not exceed (i) 3.5 percent of the Purchase Price with respect to the Elixir Sale Transaction and (ii) 3 percent of the Purchase Price with respect to a Rite Aid Retail Sale Transaction.  This is an amount that is within market for transactions of this type, and which has been routinely approved by courts in this district.  *See, e.g.*, *In re Cyxtera Technologies, Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 29, 2023) [Docket No. 180] (approving stalking horse bid protections, including a break-up fee and expense reimbursement, not to exceed three percent of the proposed purchase price in the aggregate); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. April 25, 2023) [Docket No. 92] (same); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. April 17, 2023) [Docket No. 72] (approving break-up fee of up to three percent of the proposed purchase price); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Jan. 30, 2023) [Docket No. 441] (same); *In re RTW Retailwinds, Inc.*, No. 20-18445 (JKS) (Bankr. D.N.J. Aug. 8, 2020) [Docket No. 192] (same).

43.      Accordingly, for the reasons set forth above, the Debtors respectfully submit that the Court grant the Debtors the authority to incur and pay the Stalking Horse Bid Protections to the extent the Stalking Horse Bid Protections are necessary to preserve the value of the Debtors' estates.

### III.    The Form and Manner of Notice Should Be Approved.

44.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of an auction.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the auction and the deadline for filing any objections to such a sale.

45.    In accordance with the Bidding Procedures and following entry of the proposed Order, the Debtors will cause the applicable Auction Notice to be served upon: (a) the office of the United States Trustee for the District of New Jersey; (b) the Debtors' 50 largest unsecured creditors (on a consolidated basis); (c) the agents under the Prepetition Credit Facilities and counsel thereto; (d) the DIP Agents and counsel thereto; (e) Paul, Weiss, Rifkind, Wharton & Garrison LLP and Fox Rothschild LLP, as counsel to the Ad Hoc Secured Noteholder Group; (f) the indenture trustee to the Senior Secured Notes; (g) the indenture trustee to the Senior Unsecured Notes; (h) the United States Attorney's Office for the District of New Jersey; (i) the Internal Revenue Service; (j) the U.S. Securities and Exchange Commission; (k) the attorneys general in the states where the Debtors conduct their business operations; (l) all parties who have expressed a written interest in the Elixir Assets; (m) all known holders of liens, encumbrances, and other claims secured by the Elixir Assets; (n) each governmental agency that is an interested party with respect to the Elixir Sale Transaction; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.

46.    The Debtors submit that the applicable Auction Notices constitute good and adequate notice of the applicable Auctions and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, no further notice is necessary and the Debtors request that this Court approve the form and manner of the notice of each Auction Notice.

IV.    **The Assumption and Assignment Procedures Are Appropriate and Should be Approved.**

47.    As set forth above, each of the Sale Transactions contemplate the assumption and assignment of Executory Contracts and Unexpired Leases to the Successful Bidder.  In connection with this process, the Debtors believe it is necessary to establish assumption and assignment procedures by which: (a) the Debtors and Contract Counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of the Executory Contracts and Unexpired Leases and/or related cure payments (the "Assumption and Assignment Procedures").  As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Executory Contract or Unexpired Lease be deemed to consent to the assumption and assignment of the applicable contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure payments identified in the Contract Assumption Notice.  *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

48.    The Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to parties to the executory contracts and leases, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request the Court approve the Assumption and Assignment Procedures set forth in the Bidding Procedures Order.

V.    **The Sale Transactions Should be Approved as an Exercise of Sound Business Judgment.**

49.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1).  A sale of a debtor's assets should be authorized pursuant to section

363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction.  *See,*

*e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession

can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also*

*In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm, of Equity Sec. Holders v. Lionel*

*Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc's, Inc.*,

179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

50.    Once the Debtors articulate a valid business justification, "[t]he business judgment

rule 'is a presumption that in making the business decision the directors of a corporation acted on

an informed basis, in good faith, and in the honest belief that the action was in the best interests of

the company.'"  *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted);

*In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr.

29, 2014) ("If a valid business justification exists, then a strong presumption follows that the

agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations

omitted); *Integrated Res., Inc.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16

(Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management

decisions").

**A.    A Sound Business Purpose Exists for the Sale Transactions.**

51.    Here, a sound business purpose exists for the Sale Transactions because the Debtors

believe that the Sale Transactions will maximize the value of their Assets, exposing them to the

market as part of a competitive, arms' length process.  Consequently, the ultimately successful

bids (or, if applicable, the Plan Restructuring with respect to the Rite Aid Retail Assets), after

being subject to a "market check" in the form of the Auctions, will constitute, in the Debtors'

reasonable business judgment, the highest or otherwise best offer for the Assets and will provide

a greater recovery for their estates than any known or practicably available alternative.  *See, e.g.,*

*In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001)

(while a "section 363(b) sale transaction does not require an auction procedure[, t]he auction

procedure has developed over the years as an effective means for producing an arm's length fair

value transaction.").  Also, because any sale of the Debtors' Assets will likely contemplate the

assumption of certain of the Debtors' Executory Contracts and Unexpired Leases, it will likely

result in payment in full for a number of the Debtors' creditors.

52.     Thus, the Debtors submit that any Successful Bid will constitute the highest or

otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than

would be provided by any other available alternative.  As such, the Debtors' determination to sell

the Assets through Auction processes and subsequently to enter into purchase agreements with the

Successful Bidder will be a valid and sound exercise of the Debtors' business judgment.

The Debtors will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the

Debtors request that the Court make a finding that the proposed sale of the Assets through the Sale

Transactions contemplated here is a proper exercise of the Debtors' business judgment and is

rightly authorized.

**B.     Adequate and Reasonable Notice of the Auction and Sale Will be Provided.**

53.     Each Auction Notice: (a) will be served in a manner that provides parties in interest

notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the

deadlines for objecting to the Sale or the assumption and assignment of the Contracts; and

(c) otherwise includes all information relevant to parties interested in or affected by the Sale

Transaction.  Significantly, the form and manner of the Sale Notices will have been approved by

this Court pursuant to the Bidding Procedures Order after notice and a hearing before they are served on parties in interest.

### C.    The Sale and Purchase Prices Reflect Fair Value Transactions.

54.    It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").

55.    As noted above, prior to each applicable Bid Deadline, the Debtors, with the assistance of Guggenheim Securities, will continue to market the Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting previously solicited parties, continuing to provide acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise continuing all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary the purchase price will, conclusively, be deemed fair value.

### D.    The Sale Transactions Have Been Proposed in Good Faith Without Collusion, and the Successful Bidder(s) in Each Are "Good-Faith Successful Bidders."

56.    The Debtors request that the Court find the Successful Bidder in each Sale Transaction be entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of Assets.

57.    Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease or property does
> not affect the validity of a sale or lease under such authorization to
> an entity that purchased or leased such property in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

58.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser

leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good

faith," courts have held that a purchaser shows its good faith through the integrity of its conduct

during the course of the sale proceedings, finding that where there is a lack of such integrity, a

good-faith finding may not be made.  *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.*, 788

F.2d 143, 147 (3d Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th

Cir. 1978)) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a

judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the

trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy

Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608,

610 (S.D.N.Y. 1988) (same).

59.     The Debtors submit that the Successful Bidder(s) with respect to the Sale

Transactions, including the Elixir Stalking Horse Bidder, will be "good faith purchasers" within

the meaning of section 363(m) of the Bankruptcy Code, and that the Elixir Stalking Horse APA,

any purchase agreement with respect to the Rite Aid Retail Assets, and any marked versions

thereof, would be a good-faith, arms'-length agreement entitled to the protections of section

363(m) of the Bankruptcy Code.[10]  *First,* as set forth in more detail above, the consideration to be received by the Debtors from a Successful Bidder will be substantial, fair, and reasonable. *Second,* any sale agreement with a Successful Bidder will presumably be the culmination of a competitive Auction process in which all parties will be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis.  *Third,* there has been and the Debtors anticipate that no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code.  And, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.  *Finally,* any bids that the Debtors ultimately determine to be Successful Bids will have been evaluated and approved by the Debtors in consultation with their advisors.  Accordingly, the Debtors believe that the Successful Bidder, if any, and any purchase agreement associated with a Successful Bid should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### E.    The Sale Transactions Should be Approved "Free and Clear" Under Section 363(f).

60.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of

---

[10]   The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder.  Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures.  In addition, the Debtors will not choose as the Successful Bidder or Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

61.    Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free and clear of all Encumbrances, except with respect to any interests that may be assumed liabilities under the applicable Purchase Agreement.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

62.    Any interest in the Assets that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such interest will be adequately protected by either being paid in full at the time of closing of any Sale Transaction, or by having it attach to the net proceeds of such Sale Transaction, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Assets to the Successful Bidders in the Sale Transactions, if any, free and clear of all encumbrances, with any such encumbrances to attach to the proceeds of the applicable Sale Transaction.

**VI.    The Assumption and Assignment of the Executory Contracts and Unexpired Leases Should be Approved.**

   **A.    The Assumption and Assignment of the Executory Contracts and Unexpired Leases Reflects the Debtors' Reasonable Business Judgment.**

63.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such

decision is clearly an unreasonable exercise of such judgment.  *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to section 365 of the Bankruptcy Code, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard.")

64.    Here, the Court should approve the decision to assume and assign certain designated Executory Contracts and Unexpired Leases (the "Assumed Contracts") in connection with the applicable Sale Transaction as a sound exercise of the Debtors' business judgment.  *First,* certain of the Executory Contracts and Unexpired Leases are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets.  *Second,* it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the Executory Contracts and Unexpired Leases needed to manage the Debtors' day-to-day operations were included in the transaction.  *Third,* the Elixir Stalking Horse APA, any form purchase agreement with respect to the Rite Aid Retail Assets, and any marked copy thereof submitted by a Potential Bidder will provide that the assumption and assignment of the Assumed Contracts is integral to, and inextricably integrated in, any proposed Sale Transaction.  *Finally,* the Assumed Contracts will be

assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

65.    Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

**B.    Defaults Under the Assumed Contracts Will Be Cured Through the Sale Transactions.**

66.    Upon finding that a debtor has exercised its business judgment in determining that assuming an Executory Contract or Unexpired Lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  Section 365 "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

67.    The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Elixir Stalking Horse APA, any form purchase agreement with respect to the Rite Aid Retail Assets, and any marked copy thereof submitted by a Potential Bidder will require that the Debtors cure all defaults associated with, or that are required to properly assume, any Executory Contracts or Unexpired Leases.  Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over cure payments or other defaults, including noticing applicable contract

counterparties upon announcement of any Successful Bid that the Debtors intend to assume the applicable Executory Contracts and Unexpired Leases, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of Executory Contract or Unexpired Lease counterparties (the "Contract Counterparties").

### C. Contract Counterparties Will Be Adequately Assured of Future Performance.

68.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is determined by the factual conditions, with the inquiry focusing on the seller's good faith and observance of commercial standards. *In re Texas Health Enterprises, Inc.*, 246 B.R. 832, 835 (Bankr. E.D. Tex. 2000).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

69.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Successful Bidder in each Sale Transaction will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder

(*e.g.,* financial credibility, willingness, and ability of the interested party to perform under any Contracts to be assumed) and will demonstrate such financial wherewithal, willingness, and ability to perform under any Executory Contracts or Unexpired Leases to be assumed and assigned to a Successful Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity following announcement of the applicable Successful Bid to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Contracts or proposed cure payments.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign any Executory Contract or Unexpired Lease to be assumed and assigned to any Successful Bidder.

## VII.   The Sale of Personally Identifiable Information Should be Allowed Without Appointment of a Consumer Privacy Ombudsman.

70.     Section 101(41A) of the Bankruptcy Code defines "personally identifiable information" ("Personally Identifiable Information") as an individual's name, residence address, email address, telephone number, social security number, or credit card number, as well as an individual's birth date or other information that, if associated with the information described previously, would permit the identification or contacting of the individual.  11 U.S.C. § 101(41A). Section 332 of the Bankruptcy Code requires the appointment of a consumer privacy ombudsman (an "Ombudsman") only when a debtor seeks to sell or transfer Personally Identifiable Information in contravention of the debtor's privacy policy with respect to the transfer of such Personally Identifiable Information.  *See* 11 U.S.C. § 363 (b)(1)(A).

71.    As set forth in the Frejka Declaration,[11] the Debtors maintain two consumer-facing websites: www.riteaid.com and www.elixirsolutions.com.  Both websites contain privacy policies (the "Rite Aid Privacy Policy" and the "Elixir Privacy Policy," respectively) that are applicable to the Debtors' maintenance of Personally Identifiable Information.  Both privacy policies explain what information the Company collects, why the Company collects the information, the permitted uses for that information, and how the consumer can update, manage, export, or delete his/her personal information.

72.    The Rite Aid Privacy Policy in effect on the Petition Date, and effective as of March 29, 2023, provides, in relevant part:

### 3.  How We May Share Information

We may share information about you with the following categories of third parties, where consistent with this Policy and applicable laws:

- Our legal affiliates and agents in connection with our business operations;

- Our service providers (*e.g.*, IT services, maintenance and hosting of our Sites, payment processors, marketing and analytics, customer communications, order fulfillment and shipping), but we only provide information to these providers to perform their required functions on our behalf; and

- Third-party brand manufacturers with whom we may partner to develop discount or coupon programs, and likewise with third parties who provide services that we offer through our Sites.

**We also may disclose information about you in certain unusual circumstances, including** (1) if we are required to do so by law or legal process; (2) in response to requests by government agencies, such as law enforcement authorities; (3) to establish, exercise, or defend our legal rights; (4) when we believe disclosure is necessary or appropriate to prevent physical or other harm or financial loss; (5) in connection with an investigation of suspected or actual fraud

---

[11]    *See* Frejka Decl. ¶¶ 7–17.

> or other illegal activity; or (6) **in the event we sell or transfer (or contemplate the sale or transfer of) all or a relevant portion of our business or assets (including in the event of a merger, acquisition, joint venture, reorganization, divestiture, dissolution, or liquidation).**

(emphasis added).  *See* RITE AID CORPORATION, https://www.riteaid.com/legal/privacy-policy, (last visited Oct. 6, 2023).  A sale or transfer of Personally Identifiable Information to an unaffiliated third party is expressly permitted under the Rite Aid Privacy Policy in effect on the Petition Date.

73.     The Rite Aid Notice of Privacy Practices patient privacy policy in effect on the Petition Date, and effective as of September 2, 2022, provides, in relevant part:

> We will use your protected health information to carry out health care operations.  These uses and disclosures are necessary to run the pharmacy and to make sure that all of our patients receive quality care.  For example, we may use your protected health information to monitor the quality of pharmacist performance and to train pharmacy personnel.  **Your protected health information may also be transferred for the purposes of carrying out pharmacy services if we buy or sell pharmacy locations**.

(emphasis added).  *See* RITE AID CORPORATION, https://www.riteaid.com/legal/patient-privacy-policy (last visited Oct. 5, 2023).[12]  A sale or transfer of Protected Health Information to an unaffiliated third party is expressly permitted, subject to certain limitations discussed herein, under the Rite Aid patient privacy policy in effect on the Petition Date.

74.     The Elixir Privacy Policy, applicable to Elixir RX Solutions, LLC and its affiliates, in effect on the Petition Date, and effective as of June 13, 2022, provides, in relevant part:

**6.3 Acquisitions**

All Personal Information, PHI, and Non-Personal Information

---

[12]  Notwithstanding the ability to transfer Protected Health Information as part of a business transaction, a consumer's written authorization is required before using or disclosing Protected Health Information for marketing purposes.

> obtained through our Website are owned by us. Accordingly, if
> another company acquires our company or our assets, that company
> will thereafter possess the Personal Information, PHI, and
> Non-Personal Information collected by us, and will assume the
> rights and obligations regarding your Personal Information, PHI,
> and Non-Personal Information as described in this Privacy Policy.

*See* ELIXIR RX SOLUTIONS LLC, https://www.elixirsolutions.com/privacy-policy (last visited

Oct. 6, 2023).  A sale or transfer of Personally Identifiable Information to an unaffiliated third

party is expressly permitted under the Elixir Privacy Policy in effect on the Petition Date.

75.    The Elixir Pharmacy LLC ("Elixir Pharmacy") Notice of Privacy Practices patient

privacy policy in effect on the Petition Date and effective as of July 31, 2020, provides, in relevant

part:

> **We use your PHI to carry out healthcare operations.  These
> uses and disclosures are necessary to run the pharmacy and to
> make sure that all of our patients receive quality care.  For
> example, we may use information in your health record to
> monitor the quality of pharmacist performance and to train
> pharmacy personnel.  Your PHI may be transferred for the
> purposes of carrying out pharmacy services if we buy or sell
> pharmacy locations.**

(emphasis added).  *See* ELIXIR RX SOLUTIONS, LLC, https://www.elixirsolutions.com/privacy-

notice (last visited Oct. 6, 2023).[13]  A sale or transfer of Protected Health Information to an

unaffiliated third party is expressly permitted, subject to certain limitations discussed herein, under

the Elixir patient privacy policy in effect on the Petition Date.

76.    Based on the language of the Debtors' privacy policies, section 363(b)(1) is not

implicated because the Debtors did not disclose to any "individual a policy *prohibiting* the transfer

of personally identifiable information."  *See* 11 U.S.C. § 363(b)(2) (emphasis added).  In any event,

---

[13]   Notwithstanding the ability to transfer Protected Health Information as part of a business transaction, a
consumer's written authorization is required before using or disclosing Protected Health Information for
marketing purposes.

the buyer of the Assets will utilize the "personally identifiable information" in exactly the same fashion as the Debtors.  Even if section 363(b)(1) were implicated, the Court may authorize the proposed Sale Transactions without appointing a privacy ombudsman because the transfer of the "personally identifiable information" in such Sale Transactions would be consistent with the Debtors' privacy policies as provided in 11 U.S.C § 363(b)(1).

77.    The transfer of Personally Identifiable Information is further consistent with the Debtors' privacy policies even to the extent the Debtors' privacy policies import requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") relating to transfers of medical information.  The Debtors' patient privacy policies (the Rite Aid and Elixir patient privacy policies described above) describe how the Debtors maintain and share medical information.  The Debtors' patient privacy further policies provide that such "protected health information" will not be used or disclosed unless as provided thereunder, "or as otherwise permitted or required by law."

78.    Under § 164.508 of the Privacy Rule of HIPAA, a "Covered Entity" may use and disclose Protected Health Information for purposes not otherwise permitted under that rule if the covered entity has obtained written authorization from the subject of the Protected Health Information.  Similarly, under section 13405(d)(1) of the HITECH Act, a covered entity may not receive direct or indirect remuneration in exchange for the disclosure of Protected Health Information unless the "Covered Entity" had obtained an authorization consistent with § 164.508.  The Omnibus Rule added § 164.502(a)(5)(ii) to the Privacy Rule, which permits the disclosure of Protected Health Information without prior customer written authorization in certain limited circumstances, including a sale of Protected Health Information.  Specifically, when a "Covered Entity" seeks to transfer Protected Health Information pursuant to a sale, transfer,

merger or consolidation with another "Covered Entity," written consent of a consumer is not required.  Therefore, a proposed sale of Protected Health Information is  permitted by law and consistent with the Rite Aid patient privacy policy and the Elixir patient privacy policy  to the extent the buyer is a "Covered Entity."  Likewise, to the extent Elixir is providing pharmacy benefit administration or ancillary services to support a "Covered Entity," it is a "Business Associate," and the transfer is subject to HIPAA but does not implicate the consumer privacy ombudsman process.    Accordingly, the appointment of a consumer privacy ombudsman is not required to effectuate a transfer of Rite Aid's or Elixir's Protected Health Information to an unaffiliated third-party provided that Rite Aid and Elixir comply with HIPAA.

## VIII.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

79.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

80.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately

"where there has been no objection to the procedure." 10 Collier on Bankruptcy ¶ 6004.11 (Richard Levin & Henry J. Sommer eds., 16th ed.).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

81.     To maximize the value received for the Assets, the Debtors seek to close the Sale Transactions as soon as possible after each applicable Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

82.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Waiver of Memorandum of Law

83.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

## Reservation of Rights

84.     Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an

59

administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

## No Prior Request

85.    No prior request for the relief sought in this Motion has been made to this Court or any other court.

## Notice

86.    The Debtors will provide notice of this motion to the following parties and/or their respective counsel, as applicable:  (a) the office of the United States Trustee for the District of New Jersey; (b) the Debtors' 50 largest unsecured creditors (on a consolidated basis); (c) the agents under the Prepetition Credit Facilities and counsel thereto; (d) the DIP Agents and counsel thereto; (e) Paul, Weiss, Rifkind, Wharton & Garrison LLP and Fox Rothschild LLP, as counsel to the Ad Hoc Secured Noteholder Group; (f) the indenture trustees for the Senior Secured Notes; (g) the indenture trustee for the Senior Unsecured Notes; (h) the United States Attorney's Office for the District of New Jersey; (i) the Internal Revenue Service; (j) the U.S. Securities and Exchange Commission; (k) the attorneys general in the states where the Debtors conduct their business operations; (l) all parties who have expressed a written interest in the Assets; (m) all known holders of liens, encumbrances, and other claims secured by the Assets; (n) each governmental agency that is an interested party with respect to the Sale Transactions; and (o) any

party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Dated: October 16, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:        msirota@coleschotz.com
              wusatine@coleschotz.com
              fyudkin@coleschotz.com
              svanaalten@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
Zachary R. Manning (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900
Email:    esassower@kirkland.com
          joshua.sussberg@kirkland.com
          aparna.yenamandra@kirkland.com
          ross.fiedler@kirkland.com
          zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
Zachary R. Manning (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Joint Administration Requested) |

---

[1] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

(Page | 2)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

**ORDER (I) APPROVING THE AUCTION AND
BIDDING PROCEDURES, (I) APPROVING BIDDING PROCEDURES
AND BID PROTECTIONS, (II) SCHEDULING CERTAIN DATES AND
DEADLINES WITH RESPECT THERETO, (III) APPROVING THE FORM
AND MANNER OF NOTICE THEREOF, (IV) APPROVING THE ELIXIR
STALKING HORSE APA, (V) ESTABLISHING NOTICE AND PROCEDURES
FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES,
(VI) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS,
(VII) AUTHORIZING THE SALE OF ASSETS, AND (VIII) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through and including

twenty (20), is **ORDERED**.

2

(Page | 3)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

Upon the *Debtors' Motion Seeking Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief*,[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") (a) approving the proposed marketing, auction, and bidding procedures attached hereto as **Exhibit 1** (the "Bidding Procedures"), by which the Debtors will solicit and select the highest or otherwise best offer(s) for the sale or sales (the "Sale Transactions") of all, substantially all, or any portion of any of the Rite Aid Retail Assets and/or the Elixir Assets (the "Assets"); (b) approving the break-up fee and expense reimbursements relating to certain stalking horse bidders (the "Stalking Horse Bid Protections"); (c) establishing certain dates and deadlines related thereto and scheduling an auction or auctions, if any, for the Sale Transactions (the "Auctions"); (d) approving the manner of notice of the Auctions and any sale hearing (the "Sale Hearing") as may be necessary; (e) approving and authorizing the Debtors to enter into a "stalking horse" asset purchase agreement (the "Elixir Stalking Horse APA") with MedImpact Healthcare Systems, Inc.

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

(Page | 4)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

("MedImpact"), substantially in the form attached to the Bidding Procedures as Schedule 2;

(f) approving procedures for the assumption and assignment of certain Executory Contracts and Unexpired Leases in connection with the Sale Transaction, if any; (g) providing that, in light of the fact that the Debtors' privacy policy does not prohibit the transfer of personal identifiable information, the appointment of a consumer privacy ombudsman is not required; and (h) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; the Rifkin Declaration; the Cohen Declaration; and the Frejka Declaration filed in support of the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion , the First Day Declaration, the Rifkin Declaration, the Cohen Declaration, and the Frejka Declaration, and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion establish

(Page | 5)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate under the circumstances and in the best interests of the Debtors' estates.

3.      The Debtors' proposed notice of the Motion and the Hearing was adequate and sufficient under the circumstances of these chapter 11 cases, and no other or further notice is required.

4.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled prior to or at the Hearing are overruled.

**I.      Important Dates and Deadlines**.

      **A.      Elixir Dates and Deadlines.**

5.      **Final Bid Deadline**.  November 16, 2023, at 5:00 p.m., prevailing Eastern Time, is the deadline by which all Qualified Bids for the Elixir Assets must be **actually received** by the parties specified in the Bidding Procedures.

6.      **Stalking Horse Bidders and Bid Protections**.  The Debtors are authorized to enter into the Elixir Stalking Horse APA with MedImpact, and the terms of the Elixir Stalking Horse

(Page | 6)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

APA are hereby approved.  MedImpact shall be deemed an Elixir Stalking Horse Bidder and Qualified Bidder and MedImpact's Bid contemplated by the Elixir Stalking Horse APA shall be deemed a Qualified Bid.

7.     The Bid Protections for the Elixir Stalking Horse Bidder are approved in their entirety and the amount of such Bid Protections as to MedImpact shall be an allowed administrative expense claim under section 503(b) of the Bankruptcy Code.  The Debtors are authorized, but not directed, to pay any amounts that may become due to the Elixir Stalking Horse Bidder on account of the Bid Protections on the terms set forth in the Elixir Stalking Horse APA.

8.     With respect to the Elixir Sale Transaction, no person or entity, other than MedImpact, shall be entitled to any expense reimbursement, breakup fees, "topping," termination, or other similar fee or payment on account of the Elixir Assets, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

9.     **<u>Auction</u>**.  The date and time of the Elixir Auction, if needed, is November 20, 2023, at 10:00 a.m. prevailing Eastern Time, for the Elixir Assets, which time may be extended by the Debtors in consultation with the Consultation Parties upon written notice with the Court. The Elixir Auction will be held at the offices of the proposed co-counsel to the Debtors:  Kirkland & Ellis LLP, 601 Lexington Ave., New York, NY 10022.  Except as otherwise determined by the

(Page | 7)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

Debtors, in consultation with the Consultation Parties, only the Debtors, the Consultation Parties, the U.S. Trustee, any Qualified Bidders, and, in each case, the respective representatives and professionals of the foregoing parties, shall be entitled to participate in the Elixir Auction, and only Qualified Bidders will be entitled to make Overbids (as defined in the Bidding Procedures) at the Elixir Auction; *provided, however*, that any party in interest may attend the Elixir Auction. The Debtors shall send written notice of the date, time, and place of any Elixir Auction to the Qualified Bidders, the Consultation Parties, and the U.S. Trustee no later than two business days before such Elixir Auction, and will post notice of the date, time, and place of such Elixir Auction no later than two business days before such Elixir Auction on the website of the Debtors' proposed notice, claims, and solicitation agent, Kroll Restructuring Administration LLC (the "Notice and Claims Agent") at https://restructuring.ra.kroll.com/riteaid. For the avoidance of doubt, the Debtors may also conduct more than above-listed Elixir Auctions with respect to other non-overlapping material portions of the Debtors' Elixir Assets.

10.     **Notice of Successful Bidder**. As soon as reasonably practicable upon conclusion of any Auction, the Debtors shall file a Notice of Successful Bidder and Contract Assumption for the Elixir Assets, in substantially the form attached hereto as **Exhibit 2**.

11.     **Sale Objection Deadline**. Objections to the sale, if any, and any adequate assurance of future performance with respect to any Elixir Assets must be made by December 1, 2023 at 4:00 p.m. prevailing Eastern Time.

(Page | 8)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

12.     **Sale Hearing**.  December 7, 2023, is the date and time for the hearing for the Court to consider the Successful Bid or Successful Bids of the Elixir Assets, if needed.  The proposed order approving the sale of the Elixir Assets shall be filed no later than five (5) days before the Sale Hearing.

**B.     Rite Aid Retail Dates and Deadlines.**

13.     **Final Bid Deadline**.  November 30, 2023, at 5:00 p.m., prevailing Eastern Time, is the deadline by which all Qualified Bids for the Rite Aid Retail Assets must be **actually received** by the parties specified in the Bidding Procedures.

14.     **Stalking Horse Bidders and Bid Protections**.  The Debtors, upon entry of this Order, shall be authorized, but are not obligated or directed, in an exercise of their reasonable business judgment, in consultation with the Consultation Parties, *provided*, *however*, that to the extent any of the DIP Agents or the Ad Hoc Secured Noteholder Group submits a Bid for any Rite Aid Retail Assets, such DIP Agent or Ad Hoc Secured Noteholder Group shall not be a Consultation Party with respect to the evaluation and qualification of competing Bids for such Rite Aid Retail Assets included in such DIP Agent's or Ad Hoc Secured Noteholder Group's Bid or with respect to seeking and/or obtaining information about other Bids, but shall remain a Consultation Party for other purposes set forth in the Bidding Procedures, to select one or more Rite Aid Retail Stalking Horse Bidders with respect to some or all of the Debtors' Rite Aid Retail Assets by no later than November 20, 2023, at 5:00 p.m., prevailing Eastern Time, and enter into

(Page | 9)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

a Stalking Horse Agreement, and to provide such Stalking Horse Bidders with Stalking Horse Bid Protections without further action or order by this Court, *provided* that to the extent a Rite Aid Retail Stalking Horse Bidder has submitted a Credit Bid, the Stalking Horse Bid Protections shall not be provided.

15.     With respect to a Rite Aid Retail Sale Transaction, no person or entity, other than any Rite Aid Retail Stalking Horse Bidder that has not submitted a Credit Bid, shall be entitled to any expense reimbursement, breakup fees, "topping," termination, or other similar fee or payment on account of the Rite Aid Retail Assets, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

16.     In the event that the Debtors enter into a Stalking Horse Agreement with one or more Rite Aid Retail Stalking Horse Bidders, within two business days of entry, the Debtors shall file a notice and proposed form of order with the Court (the "Rite Aid Retail Stalking Horse Notice") and serve the Rite Aid Retail Stalking Horse Notice on the Rite Aid Retail Stalking Horse Bidder, the Consultation Parties, and the U.S. Trustee.  The Rite Aid Retail Stalking Horse Notice shall:  (a) set forth the identity of the Rite Aid Retail Stalking Horse Bidder (and if the Rite Aid Retail Stalking Horse Bidder is a newly formed entity, then the Rite Aid Retail Stalking Horse Bidder's parent company or sponsor); (b) set forth the amount of the Rite Aid Retail Stalking

(Page | 10)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

Horse Bid and what portion (if any) is cash; (c) state whether the Rite Aid Retail Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Rite Aid Retail Stalking Horse Bid; (d) specify any proposed Rite Aid Retail Stalking Horse Bid Protections (including the amount and calculation thereof); (e) specify the Assets included in the Rite Aid Retail Stalking Horse Bid; (f) attach the applicable Rite Aid Retail Stalking Horse Agreement, including all exhibits, schedules and attachments thereto; and (g) set forth the deadline to object to the Rite Aid Retail Stalking Horse Bidder designation and any Rite Aid Retail Stalking Horse Bid Protections. If there are no objections to the Rite Aid Retail Stalking Horse Notice within five days of filing with the Court, (the "Rite Aid Retail Stalking Horse Notice Period"), the Debtors may submit an order to the Court that incorporates any comments received during the Rite Aid Retail Stalking Horse Notice Period that authorizes the Debtors to designate an Rite Aid Retail Stalking Horse Bidder and to enter into an Rite Aid Retail Stalking Horse Agreement, without the need for further hearing. If a party timely files an objection to the Rite Aid Retail Stalking Horse Notice, the Court shall hold a hearing after the expiration of the Rite Aid Retail Stalking Horse Notice Period and as soon thereafter as the Court is available.

17.    **Auction**. The date and time of the Rite Aid Retail Auction, if needed, is December 4, 2023, at 10:00 a.m. prevailing Eastern Time, for the Rite Aid Retail Assets, which time may be extended by the Debtors in consultation with the Consultation Parties upon written notice with the Court. The Rite Aid Retail Auction will be held at the offices of the proposed co-counsel to the

(Page | 11)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

Debtors:  Kirkland & Ellis LLP, 601 Lexington Ave., New York, NY 10022.  Except as otherwise determined by the Debtors, in consultation with the Consultation Parties, only the Debtors, the Consultation Parties, the U.S. Trustee, any Qualified Bidders, and, in each case, the respective representatives and professionals of the foregoing parties, shall be entitled to participate in the Rite Aid Retail Auction, and only Qualified Bidders will be entitled to make Overbids (as defined in the Bidding Procedures) at the Rite Aid Retail Auction; *provided*, *however*, that any party in interest may attend the Elixir Auction.  The Debtors shall send written notice of the date, time, and place of any Rite Aid Retail Auction to the Qualified Bidders, the Consultation Parties, and the U.S. Trustee no later than two business days before such Rite Aid Retail Auction, and will post notice of the date, time, and place of such Rite Aid Retail Auction no later than two business days before such Rite Aid Retail Auction on the website of the Debtors' Notice and Claims Agent at https://restructuring.ra.kroll.com/riteaid.  For the avoidance of doubt, the Debtors may also conduct more than the above-listed Auctions with respect to other non-overlapping material portions of the Debtors' Rite Aid Retail Assets.

18.    **Notice of Successful Bidder**.  As soon as reasonably practicable upon conclusion of any Auction, the Debtors shall file a Notice of Successful Bidder and Contract Assumption for the Rite Aid Retail Assets, in substantially the form attached hereto as **Exhibit 2**.

(Page | 12)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

19.     **Sale Objection Deadline**.  Objections to the sale, if any, and any adequate assurance of future performance with respect to any Rite Aid Retail Assets must be made by December 15, 2023 at 4:00 p.m. prevailing Eastern Time.

20.     **Sale Hearing**.  December 19, 2023, is the date and time for the hearing for the Court to consider the Successful Bid or Successful Bids of the Rite Aid Retail Assets, if needed.

**II.     Auction, Bidding Procedures, Auction Notice, and Related Relief**.

21.     The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to any proposed Sale Transaction. Any party desiring to submit a Bid shall comply with the Bidding Procedures and this Order.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures. Subject to the terms of the Bidding Procedures, the Debtors may modify the Bidding Procedures as necessary or appropriate to maximize value for their estates.

22.     Any deposit (including any Good Faith Deposit) provided by a Qualified Bidder shall be held in escrow by the Debtors or their agent, and shall not become property of the Debtors' bankruptcy estates unless and until released from escrow to the Debtors pursuant to the terms of the applicable escrow agreement, the Bidding Procedures, or order of this Court, as applicable.

23.     Each Auction Notice, substantially in the forms attached as Schedules 1(a) and 1(b) to the Bidding Procedures, is hereby approved.  As soon as reasonably practicable following entry

(Page | 13)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

of the Order, the Debtors will cause the Auction Notices to be served upon the following parties: (a) the office of the United States Trustee for the District of New Jersey; (b) the Debtors' 50 largest unsecured creditors (on a consolidated basis); (c) the agents under the Prepetition Credit Facilities and counsel thereto; (d) the DIP Agents and counsel thereto; (e) Paul, Weiss, Rifkind, Wharton & Garrison LLP and Fox Rothschild LLP, as counsel to the Ad Hoc Secured Noteholder Group; (f) the indenture trustee to the Senior Secured Notes; (g) the indenture trustee to the Senior Unsecured Notes; (h) the United States Attorney's Office for the District of New Jersey; (i) the Internal Revenue Service; (j) the U.S. Securities and Exchange Commission; (k) the attorneys general in the states where the Debtors conduct their business operations; (l) all parties who have expressed a written interest in the Elixir Assets; (m) all known holders of liens, encumbrances, and other claims secured by the Elixir Assets; (n) each governmental agency that is an interested party with respect to the Elixir Sale Transaction; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.

24.     Pursuant to Local Rule 6004-2(c)(2):  (a) each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale, as set forth in the Bidding Procedures; (b) the Auction shall be conducted openly; and (c) the Auction shall be documented, recorded, or videotaped.

(Page | 14)

| Debtors: | RITE AID CORPORATION, *et al*. |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

## III.    Assumption and Assignment Procedures.

25.    The procedures set forth below regarding the assumption and assignment of the Executory Contracts and Unexpired Leases proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Successful Bidder, if any, pursuant to section 364(f) of the Bankruptcy Code in connection with the Sale Transactions are hereby approved to the extent set forth herein.

26.    These Assumption and Assignment Procedures shall govern the assumption and assignment of all of the Debtors' Executory Contracts and Unexpired Leases to be assumed and assigned in connection with a Sale Transaction under any asset purchase agreement approved hereby, subject to the payment of any amount necessary to satisfy all defaults and actual pecuniary loss to the counterparty resulting from such defaults including, but not limited to, all claims, demands, charges, rights to refunds and monetary and non-monetary obligations that the relevant counterparty can assert under an Executory Contract or Unexpired Lease, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate, relating to money now owing or owing in the future, arising under or out of, in connection with, or in any way relating to a Contract (the foregoing amounts as stated in the Contract Assumption Notice, the "Cure Payments"):

(a)    **Notice of Successful Bidder and Contract Assumption.**  As soon as reasonably practicable upon conclusion of any Auction, but in any event no later than one day following such Auction, (the "Assumption and Assignment Service Deadline"), the Debtors shall serve a notice of

(Page | 15)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

contracts assumed and assigned to any Successful Bidder (the "Notice of Successful Bidder and Contract Assumption"), in substantially the form attached hereto as **Exhibit 2** via first class mail on the applicable Executory Contract or Unexpired Lease counterparties at the notice addresses set forth in the applicable Executory Contract or Unexpired Lease and on their counsel of record via email, each to the extent known, and provide a copy of the same to the Consultation Parties. The Notice of Successful Bidder and Contract Assumption, with respect to the assumption and assignment of Executory Contracts or Unexpired Leases, shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the Executory Contract or Unexpired Lease, (ii) the name of the counterparty to the Executory Contract or Unexpired Lease, (iii) Debtors' good faith estimates of the Cure Payments, if any, required in connection with the Executory Contract or Unexpired Lease, and (iv) the applicable Sale Objection Deadline; *provided*, however, that service of a Notice of Successful Bidder and Contract Assumption does not constitute an admission that any Executory Contract or Unexpired Lease listed thereon is an executory contract or that such stated Cure Payment constitutes a claim against the Debtors or a right against any Successful Bidder, all rights with respect thereto being expressly reserved. Further, the inclusion of a contract on the Notice of Successful Bidder and Contract Assumption is not a guarantee that such contract will ultimately be assumed and assigned.

(b)    **Cure Payments.** The payment of the applicable Cure Payments by the Debtors and/or the Successful Bidder, as applicable, shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the ultimately assumed Executory Contract or Unexpired Lease by the Debtors and the assignment of such Executory Contract or Unexpired Lease to the Successful Bidder, constitute adequate assurance of future performance thereof.

(Page | 16)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

(c)     **Supplemental Contract Assumption Notice.** To the extent the Debtors, at any time after the Assumption and Assignment Service Deadline (i) identify additional Executory Contracts or Unexpired Leases that may be assumed by and assigned to the Successful Bidder, (ii) remove any Executory Contracts or Unexpired Leases from the list attached to the Notice of Successful Bidder and Contract Assumption, (iii) and/or modify the previously stated Cure Payment associated with any Executory Contract or Unexpired Lease, the Debtors will promptly file with this Court and serve by first-class mail a supplemental notice of contract assumption (a "Supplemental Assumption Notice") on each of the Executory Contract or Unexpired Lease counterparties affected by the Supplemental Assumption Notice. Each Supplemental Assumption Notice will include the same information with respect to listed Executory Contracts or Unexpired Leases as was included in the Notice of Successful Bidder and Contract Assumption. A Successful Bidder may designate additional Executory Contracts or Unexpired Leases to be assumed and assigned up to two business days prior to closing and may remove Executory Contracts or Unexpired Leases from the list of Executory Contracts and Unexpired Leases up to two business days prior to closing.

(d)     **Objections.** Objections, if any, to the proposed assumption and assignment or the Cure Payment proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, and the Bankruptcy Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, state the correct Cure Payment alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon (a) proposed counsel to the Debtors, (b) counsel to the Stalking Horse Bidder, if any, (c) the Bid Notice Parties, and (v) any other party that has filed a notice of appearance in these chapter 11 cases, so as actually to be received on or before the Sale Objection Deadline or deadline set forth in the Supplemental Assumption Notice, as applicable.

(Page | 17)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

(e) **Dispute Resolution.**  In the event that the Debtors and a counterparty to an Executory Contract or Unexpired Lease cannot resolve an objection to a Cure Payment, the Executory Contract or Unexpired Lease at issue may be assumed by the Debtors and assigned to the Successful Bidder, *provided* that the Debtors shall segregate the Cure Payment that the Executory Contract or Unexpired Lease counterparty asserts is required to be paid, pending a resolution of the dispute by the Court or mutual agreement by the parties.  Any objection to the proposed assumption and assignment of an Executory Contract or Unexpired Lease or related Cure Payment proposed in connection with the Sale Transaction that remains unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at a later date as fixed by the Court).

(f) **Contract Assumption.**  No Executory Contract or Unexpired Lease shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order assuming and assigning such Executory Contract or Unexpired Lease or (ii) the date the Sale Transaction has closed.

27.     Any party failing to timely file an objection to the Cure Payments, adequate assurance of future performance, or the proposed assumption and assignment of an Executory Contract or Unexpired Lease is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Executory Contract or Unexpired Lease, (c) the related relief requested in the Motion, (d) and adequate assurance of future performance, and (e) the Sale Transaction.  Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Executory Contract or Unexpired Lease, adequate assurance of future performance, the relief requested in the Motion, whether or not applicable law excuses

(Page | 18)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

such counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder with respect to such party's Executory Contract or Unexpired Lease.

28.     To the extent the Debtors seek to assume and assign an Executory Contract or Unexpired Lease in connection with a Sale Transaction, the Debtors shall, at the request of the applicable Executory Contract or Unexpired Lease counterparty, prior to the applicable Sale Hearing, provide evidence to such Executory Contract or Unexpired Lease counterparty that the Proposed Assignee of the Executory Contract or Unexpired Lease has the ability to comply with the requirements of adequate assurance of future performance; *provided* that any such evidence that constitutes nonpublic information shall be provided on a confidential basis.  All Bidders are deemed to consent to the transmission of such evidence of adequate assurances of future performance on a confidential basis to counsel for the applicable Executory Contract or Unexpired Lease counterparties via email with such information to be used only for purpose of assessing the applicable Bidder.

**IV.     Miscellaneous**.

29.     Nothing in this Order or the Bidding Procedures shall be deemed a waiver of any rights, remedies or defenses that any party (including the sureties, the Debtors, the Debtors' lenders, and the agents under their respective credit agreements, the Stalking Horse Bidder, if

(Page | 19)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

applicable, or any other prospective purchaser) has or may have under applicable bankruptcy and non-bankruptcy law, under any indemnity agreements, surety bonds or related agreements or any letters of credit relating thereto, or any rights, remedies, or defenses of the Debtors with respect thereto, including seeking Bankruptcy Court relief with regard to the Auction, the Bidding Procedures, the Sale Transaction, and any related items (including, if necessary, to seek an extension of the applicable Bid Deadline).

30.     The Debtors are authorized to revise the Sale Schedule in consultation with the Consultation Parties.  The Debtors are further authorized, but not directed, to conduct multiple Sale Transactions and/or Auctions (as necessary) in substantial conformity with the Sale Schedule and Bidding Procedures established through this Order.

31.     The failure to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness or enforceability of such a provision in the Bidding Procedures.

32.     The Court, at the request of the Debtors in consultation with the Consultation Parties and subject to the Court's availability, may modify the dates of and adjourn any hearing set by this Order without further Order of this Court, *provided* that the Debtors will serve notice to all requisite parties informing them of such modification.

(Page | 20)

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

33.     The Debtors, in consultation with the Consultation Parties, may modify any of the deadlines set forth herein or provide for additional deadlines within a Sale Schedule, *provided* that the Debtors will disclose all applicable deadlines in the applicable Auction Notice.

34.     The Debtors may modify any Good Faith Deposit, in consultation with the Consultation Parties, as necessary or appropriate, based on the Assets being sold.

35.     In the event of any inconsistencies between this Order and the Motion and/or the Bidding Procedures, this Order shall govern in all respects.

36.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

37.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

38.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

39.     The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

40.     Any party may move for modification of this Final Order in accordance with Local Rule 9013-5(e).

(Page | 21)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief |

41.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## Exhibit 1

**Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Joint Administration Requested) |

**BIDDING PROCEDURES FOR THE**
**SUBMISSION, RECEIPT, AND ANALYSIS OF BIDS IN**
**CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS**

On October 15, 2023 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Court").

The Debtors filed these chapter 11 cases after reaching an agreement in principle, memorialized in a term sheet (the "RSA Term Sheet") [Docket No. 20, Ex. A], to conclude a Restructuring Support Agreement with the Ad Hoc Secured Noteholder Group. The RSA Term Sheet contemplates a chapter 11 plan of reorganization that provides for the equitization of some or all of the Senior Secured Notes Claims of Holders thereof into equity in New Rite Aid, after taking into account any sales consummated pursuant to these Bidding Procedures, including with respect to the Elixir Assets, through confirmation of the Plan (the "Plan Restructuring").

On the Petition Date, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* [Docket No. __] (the "Plan") and the *Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* [Docket No. __], each reflecting the terms of the Plan Restructuring.

The Plan Restructuring, however, serves as a baseline restructuring proposal. The Plan also contemplates that the Debtors will continue their prepetition marketing and bidding process pursuant to the procedures contained herein (these "Bidding Procedures"). These Bidding Procedures will enable the Debtors to consummate alternative or complementary sale transactions in the event that the Debtors receive offers for any portion of the Assets, including the Rite Aid Retail Assets, that, in their reasonable business judgment, represent higher or otherwise better bids in comparison with the value provided by the Plan Restructuring. These Bidding Procedures also

---

[1]    The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

enable the Debtors to complete the prepetition marketing process for the Elixir Assets through a value-maximizing Auction and Elixir Sale Transaction.

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. [__]] (the "Bidding Procedures Motion"), seeking approval of, among other things, these Bidding Procedures.

On [__], 2023, the Court entered the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. [__]] (the "Bidding Procedures Order"),[2] by which the Court approved these Bidding Procedures. These Bidding Procedures set forth the process by which the Debtors are authorized to solicit bids for and conduct auctions (collectively, the "Auctions," and each, an "Auction") for a sale or disposition of all, any portion of, or substantially all of the Debtors' Rite Aid Retail Assets, as a potential alternative to, or in conjunction with, the Plan Restructuring, and the Elixir Assets, or any portion thereof (collectively, the "Sale," and each, a "Sale Transaction").

Any Sale will be implemented pursuant to section 363 of the Bankruptcy Code, pursuant to an amended Plan, or a combination thereof and any individual Sale Transaction may be implemented pursuant to section 363 of the Bankruptcy Code or the Plan.

---

Copies of the Bidding Procedures Order or any other documents in the Debtors' chapter 11 cases are available upon request to Kroll Restructuring Administration LLC by calling 844-274-2766 (toll free) or +1 646-440-4878 (international) or visiting the Debtors' restructuring website at (https://restructuring.ra.kroll.com/RiteAid).

---

## I.     Assets to be Auctioned.

The Debtors are seeking to sell all of their Rite Aid Retail Assets and Elixir Assets or any portion thereof. These assets include, but are not limited to, the Debtors' going-concern business, real and personal property, unexpired leases, executory contracts, equipment, inventory, supplies, intellectual property, insurance proceeds, prepaid expenses and deposits, prescription files and related records, and books and records, in each case, free and clear of all liens, claims, interests,

---

[2]     All capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bidding Procedures Motion, the Bidding Procedures Order, or the Plan as applicable.

or other encumbrances to the greatest extent permitted by the Bankruptcy Code and applicable non-bankruptcy law (collectively, the "<u>Assets</u>").

## II.    Public Announcement of Auctions.

**<u>Announcement of Elixir Auction</u>**.  As soon as practicable after entry of the Bidding Procedures Order, the Debtors shall serve on the parties that receive notice of the Bidding Procedures Motion, (a) a notice setting forth (i) the date, time, and place of the (A) auction for the Elixir Assets (the "<u>Elixir Auction</u>") and (B) the Elixir Sale Hearing (as defined below) and (ii) the deadlines and procedures for objecting to the proposed Elixir Sale Transaction(s), and (b) the Bidding Procedures Order and these Bidding Procedures in the applicable form attached hereto as **<u>Schedule 1(a)</u>** (the "<u>Elixir Auction Notice</u>").  As soon as practicable after entry of the Bidding Procedures Order, the Debtors shall also publish the Elixir Auction Notice, with any modifications necessary for ease of publication, in *The New York Times* (National Edition) to provide notice to any other potential interested parties.  Finally, the Debtors shall post the Elixir Auction Notice on their case website, https://restructuring.ra.kroll.com/RiteAid.  The Elixir Auction Notice shall include a complete list and general description of the Elixir Assets for sale (such Elixir Assets, the "<u>Specified Elixir Assets</u>").

**<u>Announcement of Rite Aid Retail Auction</u>**.  As soon as practicable after entry of the Bidding Procedures Order, the Debtors shall serve on the parties that receive notice of the Bidding Procedures Motion, (a) a notice setting forth (i) the date, time, and place of the (A) auction for the Rite Aid Retail Assets (the "<u>Rite Aid Retail Auction</u>") and (B) the Rite Aid Retail Sale Hearing (as defined below) and (ii) the deadlines and procedures for objecting to the proposed Rite Aid Retail Sale Transaction(s), and (b) the Bidding Procedures Order and these Bidding Procedures in the applicable form attached hereto as **<u>Schedule 1(b)</u>** (the "<u>Rite Aid Retail Auction Notice</u>").  As soon as practicable after entry of the Bidding Procedures Order, the Debtors shall also publish in *The New York Times* (National Edition) to provide notice to any other potential interested parties the Rite Aid Retail Auction Notice.  Finally, the Debtors shall post the Rite Aid Retail Auction Notice on their case website, https://restructuring.ra.kroll.com/RiteAid.  The Rite Aid Retail Auction Notice shall include a complete list and general description of the Rite Aid Retail Assets for sale (such Rite Aid Retail Assets, the "<u>Specified Rite Aid Retail Assets</u>").

## III.    Potential Bidder Requirements.

To participate in the bidding process or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a person or entity interested in purchasing the Assets or part of the Assets (a "<u>Potential Bidder</u>") must deliver or have previously delivered to (a) proposed co-counsel to the Debtors, Kirkland & Ellis LLP, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com), Aparna Yenamandra, P.C. (aparna.yenamandra@kirkland.com), and Ross J. Fiedler (ross.fiedler@kirkland.com), 300 North LaSalle, Chicago, Illinois 60654, Attn: Steve Toth (steve.toth@kirkland.com), (b) proposed co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn:  Michael D. Sirota (msirota@coleschotz.com), Warren A. Usatine (wusatine@coleschotz.com), Felice R. Yudkin (fyudkin@coleschotz.com), and Seth Van Aalten (svanaalten@coleschotz.com), and (c) proposed investment banker to the Debtors, Guggenheim Securities, LLC, 330 Madison Avenue, New York, New York 10017, Attn:  Brendan Hayes

(brendan.hayes@guggenheimpartners.com), Casey Cohen (casey.cohen@guggenheimpartners.com), Matthew Scheidemann (matthew.scheidemann@guggenheimpartners.com), and Jeffrey Kirshner (jeffrey.kirshner@guggenheimpartners.com), the following preliminary documentation (collectively, the "Preliminary Bid Documents"):

    a.    an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance acceptable to the Debtors;

    b.    sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close a purchase of any portion, all, or substantially all of the Debtors' Assets, the adequacy of which must be acceptable to the Debtors, in consultation with the Consultation Parties;[3] and

    c.    a statement detailing whether the Potential Bidder is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

The Debtors, in consultation with their advisors, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may proceed to conduct due diligence and submit a bid (such Potential Bidder, an "Acceptable Bidder"). Notwithstanding anything to the contrary herein, the DIP Agents and the Ad Hoc Secured Noteholder Group shall each be an Acceptable Bidder for any Sale.

## IV.    Preliminary Indications of Interest with Respect to Rite Aid Retail Assets

In order to be eligible to submit a Bid for Rite Aid Retail Assets, Acceptable Bidders will first be required to submit a non-binding indication of interest (an "Rite Aid Retail IOIs") not later than 4:00 p.m. (prevailing Eastern Time) on November 16, 2023 (the "Rite Aid Retail IOI Deadline"), to the Rite Aid Retail Bid Notice Parties (as defined below); *provided* that the Debtors may extend the Rite Aid Retail IOI Deadline or waive the requirement of a Rite Aid Retail IOI for one or more Acceptable Bidders, without further order of the Court.

Each Rite Aid Retail IOI must include, except as the Debtors, in consultation with the Consultation Parties, otherwise determine:

    (i)    a letter outlining the Acceptable Bidder's offer, form(s) of consideration, any conditions precedent (other than the sufficiency of financing) and stating that the

---

[3]  "Consultation Parties" means the Prepetition Agent and the DIP Agents (collectively, the "DIP Agents") and the Ad Hoc Secured Noteholder Group, and any of their respective designees, and any official committee of unsecured creditors appointed in these chapter 11 cases; *provided*, *however*, that to the extent any of the DIP Agents or the Ad Hoc Secured Noteholder Group submits a Bid for any Assets, such DIP Agent or Ad Hoc Secured Noteholder Group shall not be a Consultation Party with respect to the evaluation and qualification of competing Bids for such Assets included in such DIP Agent's or Ad Hoc Secured Noteholder Group's Bid or with respect to seeking and/or obtaining information about other Bids, but shall remain a Consultation Party for other purposes set forth in the Bidding Procedures.

Acceptable Bidder is prepared to work in good faith to acquire the Rite Aid Retail Assets and finalize a binding proposal by the applicable Bid Deadline (as defined below);

(ii)    written evidence acceptable to the Debtors demonstrating financial wherewithal and a description of any corporate or governmental authorizations necessary to consummate the proposed Rite Aid Retail Sale Transaction;

(iii)    the identification of the ultimate beneficial owners of the Acceptable Bidder;

(iv)    a description of all remaining due diligence requirements and any material conditions to be satisfied prior to submission of a Bid; and

(v)    to the extent known at the time of the Rite Aid Retail IOI, any obligations related to employees of the Debtors the Acceptable Bidder may assume.

## V.    Qualified Bid Requirements.

To participate in any Auction, an Acceptable Bidder must deliver to the Debtors and their above-referenced advisors an irrevocable offer for the purchase of some or all of the Assets (each, a "Bid"), and shall meet the following criteria, in each case, on or prior to the applicable Bid Deadline (as defined below):

a.    **Purchased Assets and Assumed Liabilities**:  Each Bid must clearly state the following:  (a) the particular Assets, including Elixir Assets, or the portion thereof identified with reasonable specificity, to be purchased; (b) the liabilities and obligations to be assumed, including any debt and cure costs to be assumed; and (c) as applicable, whether the Acceptable Bidder intends to operate the Debtors' business as a going concern.

b.    **Good Faith Deposit**:  Except with respect to a credit bid (a "Credit Bid"), the Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit"); *provided*, that the DIP Agents and the Ad Hoc Secured Noteholder Group shall not be required to submit a Good Faith Deposit.  To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals 10% of the increased aggregate purchase price promptly and in no event later than one (1) business day following the conclusion of the applicable Auction;

c.    **Purchase Price**:  Each Bid must (a) clearly set forth the purchase price to be paid, assuming a purchase of the applicable Assets and any assumption of liabilities (the "Purchase Price"), (b) identify separately the cash and non-cash components of the Purchase Price, and (c) indicate the allocation of the Purchase Price among the applicable Assets; *provided that*, for the avoidance of doubt, such allocation shall be nonbinding on any third party, including with respect to the application of proceeds pursuant to the Financing Orders and the DIP Documents (as defined in

the Financing Orders) and shall not prejudice the rights of any party in interest to contest such allocation. The Purchase Price should be a single point value in U.S. Dollars for the applicable Assets on a cash-free, debt-free basis. Any Bid for substantially all of the Assets must also include a statement as to whether the Bid is conditioned on purchasing all Assets or whether the Qualified Bid should be viewed as separate Bid for one or more sets of Assets;

d. **Same or Better Terms; Bid Documents**: Each Bid must include duly executed and non-contingent, where applicable, transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents"). The Bid Documents shall include: (a) a form of purchase agreement; (b) a schedule of contracts and leases to be assumed to the extent applicable to the Bid, (c) with respect to the purchase agreement, a redline of such agreement marked to reflect the amendments and modifications made to a form of the applicable purchase agreement that the Debtors shall make available to Acceptable Bidders via the Debtors' electronic data room pursuant to the due diligence process, (d) any other material documents integral to such Bid, and (e) a statement from the Acceptable Bidder that (i) it is prepared to enter into and consummate the transactions contemplated in the form purchase agreement, no later than ten (10) business days after the conclusion of the Auction, subject to any necessary regulatory approvals, as specified by the Acceptable Bidder (or, if no Auction is held, the applicable deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures) and (ii) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or next highest or otherwise best bid (the "Back-Up Bid")) until the consummation of the Sale Transaction;

e. **No Qualified Bidder Bid Protections**: Unless such Qualified Bid is selected as a Stalking Horse Bid, a Qualified Bid must include a statement that the bid does not entitle such bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the applicable Assets;

f. **Employee Obligations**: Each Bid must indicate whether the Acceptable Bidder intends to hire all employees who are primarily employed in connection with the applicable Assets included in such Bid. If the Acceptable Bidder does not intend to hire all employees who are primarily employed in connection with the applicable Assets included in such Bid, the Acceptable Bidder must include a description of the Acceptable Bidder's intentions with respect to the relevant members of the Debtors' current management team and other employees who are primarily employed in connection with the applicable Assets, and a description of any contemplated incentive plan, to the extent applicable;

g. **Sources of Financing**: To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtors' satisfaction, in consultation with the Consultation

6

Parties, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale Transaction and other obligations under its Bid, including providing adequate assurance of future performance under all Contracts proposed to be assumed by such Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors;

h.    **Contingencies; No Financing or Diligence Outs**:   The Bid must not be conditioned on the obtaining or the sufficiency of financing, any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties, which shall not be more burdensome, in the Debtors' reasonable business judgment, than those contemplated by the Stalking Horse Bid, if any.  All diligence must be completed before the Bid Deadline.

i.    **Identity**:  Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties.  Each Bid must also include contact information for the specific person(s) whom Guggenheim Securities, LLC ("Guggenheim Securities") and Kirkland & Ellis LLP ("Kirkland & Ellis") should contact regarding such Bid;

j.    **As-Is, Where-Is**:   Each Bid must include a written acknowledgement and representation that the Acceptable Bidder:  (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, by the Debtors, Guggenheim Securities, Kirkland & Ellis, or the Debtors' other advisors regarding the completeness of any information provided in connection therewith, except, solely with respect to the Debtors, as expressly stated in the Acceptable Bidder's proposed purchase agreement;

k.    **Authorization**:  Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid;

l.    **Joint Bids**:  The Debtors will be authorized to approve joint Bids in their reasonable business judgment, in consultation with the Consultation Parties, on a case-by-case

7

basis, so long as a joint bid meets the Qualified Bid Requirements, and the applicable bidders otherwise comply with these Bidding Procedures;

m.   **Adequate Assurance of Future Performance**:  Each Bid must (i) identify any then-known executory contracts (the "Executory Contracts") and unexpired leases (the "Unexpired Leases") to be assumed and assigned in connection with the proposed Sale Transaction, (ii) provide for the payment of all cure amounts ("Cure Amounts") related to such then-known Executory Contracts or Unexpired Leases by the Acceptable Bidder and (iii) demonstrate, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, that the Acceptable Bidder can provide adequate assurance of future performance under all such then-known Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code, and (iv) provide the following documentation:

   (a)   The legal name of the proposed assignee of such then-known Executory Contracts or Unexpired Leases (the "Proposed Assignee") and any guarantors, as applicable;

   (b)   Financial statements for the calendar or fiscal years ended 2021 and 2022 for the Proposed Assignee and any guarantors, as applicable, and other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of future performance;

   (c)   With respect to a Bid for the Rite Aid Retail Assets, summary documentation regarding the Proposed Assignee's and any guarantor's, as applicable, retail experience and present retail operations; and

   (d)   With respect to a Proposed Assignee of an Unexpired Lease identified in a Bid for the Rite Aid Retail Assets, a summary of the Proposed Assignee's proposed use of the premises;

n.   **Acknowledgement of Compliance with Bidding Procedures, Bidding Order, Bankruptcy Code, and Non-Bankruptcy Law**:  Each Bid must acknowledge its compliance in all respects with these Bidding Procedures, the Bidding Procedures Order, Bankruptcy Code and any applicable non-bankruptcy law;

o.   **Privacy Policy**:  The Acceptable Bidder must comply in all respects with the Debtors' consumer privacy policy, which does not restrict the transfer of the personally identifiable information of its customers, and each Bid must contain a statement acknowledging such compliance;

p.   **No Collusion**:  The Acceptable Bidder must acknowledge in writing (a) that it has not engaged in any collusion with respect to any Bids or the Sale Transaction, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price; and (b) agree not to engage in any collusion with respect to any Bids,

the Auction, or the Sale Transaction.  For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (email shall suffice).

q.    **Good Faith Offer**:  The Bid must constitute a good faith, *bona fide* offer to consummate the Sale Transaction;

r.    **Irrevocable**:  Each Bid must state that in the event such Bid is chosen as the Back-Up Bid (as defined below), it shall remain irrevocable until the Debtors and the Successful Bidder consummate the applicable Sale Transaction;

s.    **Back-Up Bid**:  Each Bid shall provide that the Acceptable Bidder will serve as a Back-Up Bidder (as defined below) if the Acceptable Bidder's Bid is the next highest or otherwise best bid;

t.    **Regulatory Approvals and Covenants**:  A Bid must set forth each regulatory and third-party approval required for the Acceptable Bidder to consummate the applicable Sale Transaction, if any, and the time period within which the Acceptable Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty days following execution and delivery of the applicable purchase agreement and/or confirmation of the Plan, those actions the Acceptable Bidder will take to ensure receipt of such approvals as promptly as possible);

u.    **Expected Closing Date**:  Each Bid must state the Acceptable Bidder's expected date of closing of the applicable Sale Transaction;

v.    **Time Frame for Closing**:  A Bid by an Acceptable Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame acceptable to the Debtors;

w.    **No Fees**:  Except to the extent the Acceptable Bidder is entitled to the Stalking Horse Bid Protections as a Stalking Horse Bidder, each Acceptable Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid(s) is agreeing to disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or other similar form of compensation; *provided*, *however*, that nothing in these Bidding Procedures shall limit, alter or impair the rights of any party to payment and reimbursement of expenses that are set forth in the DIP Orders, and parties entitled to payment or reimbursement of expenses under the DIP Orders shall be entitled to payment or reimbursement of expenses incurred in connection with these Bidding Procedures and the matters contemplated hereby;

For the avoidance of doubt, each Acceptable Bidder (except with respect to the DIP Agents and the Ad Hoc Secured Noteholder Group and any of their respective designees) by submitting its Bid is agreeing to refrain from and waive any assertion

9

or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code; *provided* that the Debtors are authorized in their reasonable business judgment, in consultation with the Consultation Parties and in a manner consistent with the Financing Orders (as defined in the Plan) to provide the Stalking Horse Bid Protections to the stalking horse bidders (each, a "Elixir Stalking Horse Bidder" or "Rite Aid Retail Stalking Horse Bidder," and together, the "Stalking Horse Bidders") in connection with any stalking horse agreement (each, a "Stalking Horse Agreement") in accordance with these Bidding Procedures; *provided,* that to the extent such Stalking Horse Bidder has submitted a Credit Bid, the Stalking Horse Bid Protections shall not be provided;

x.    **Adherence to Bidding Procedures**:  By submitting its Bid, each Acceptable Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction;

y.    **Consent to Jurisdiction**:  The Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, to the Auction, the Sale, the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, and the closing, as applicable; and

z.    **Conditions to Closing**:  Each Bid must identify with particularity each and every condition to closing, including any then-known Executory Contracts and Unexpired Leases for which assumption and assignment is required.

Only Bids, whether for Elixir Assets or Rite Aid Retail Assets, fulfilling all of the preceding requirements contained in this section may, or otherwise in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, be deemed to be "Qualified Bids," and only those parties submitting Qualified Bids may, at the Debtors' reasonable business judgment, be deemed to be "Qualified Bidders;" *provided* that notwithstanding anything to the contrary herein, any Bid submitted by the DIP Agents or the Ad Hoc Secured Noteholder Group shall be Qualified Bids.

Neither the Debtors nor any of their advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the Assets, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Assets with governmental laws, the truth, accuracy, or completeness of any documents related to the Assets, or any other information provided by or on behalf of the Debtors to a bidder, or any other matter or thing regarding the Assets.  All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the applicable Assets, except to the extent expressly provided in the Bankruptcy Court's order approving the Sale Transaction.  Neither the Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to

the Assets or relating thereto that the Debtors, any advisor, or agent representing or purporting to represent the Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtors only) specifically set forth in the Bankruptcy Court's order approving the Sale Transaction.

In advance of the commencement of any Auction, as is reasonably practicable, the Debtors shall determine, in consultation with the Consultation Parties, which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction.  Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided* that if the Debtors receive a Bid prior to the applicable Bid Deadline that does not satisfy the requirements of a Qualified Bid, the Debtors may provide the Acceptable Bidder with the opportunity to remedy any deficiencies prior to the Auction.

## VI.    Right to Credit Bid.

The DIP Agents and the Ad Hoc Secured Noteholder Group, their respective designees, and any Qualified Bidder who has a valid and perfected lien on any Assets of the Debtors' estates (each, a "Secured Creditor") shall have the right to submit an additional or replacement Credit Bid consisting of all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to Credit Bid its claim only with respect to the collateral by which such Secured Creditor is secured; *provided*, *further*, that (i) the rights of the DIP Agents and the Ad Hoc Secured Noteholder group or their respective designees to Credit Bid shall be as set forth in the Financing Orders, (ii) the consummation of a Credit Bid in respect of any collateral is conditioned on payment in full in cash of any claims secured by senior liens on such collateral, unless the holders of such senior liens consent to a different treatment of such claims, and (iii) the rights of any party-in-interest to seek standing or authority to pursue a Challenge (as defined in the Financing Orders) and to object to any Secured Creditor's rights to Credit Bid are hereby reserved and preserved, in each case as set forth in the Financing Orders.

Any Credit Bid made by a Secured Creditor or their respective assignees, as applicable, will be deemed to be a cash Bid solely for purposes of evaluating Bids (including evaluating Qualified Bids and Subsequent Bids).  Notwithstanding anything to the contrary contained herein or the Bidding Procedures Order, the DIP Agents or the Ad Hoc Secured Noteholder Group or their respective assignees, as applicable, whether as a Stalking Horse Bidder or otherwise, shall not be subject to the Good Faith Deposit requirement (whether for a credit bid or otherwise), are hereby deemed Qualified Bidders, and their Bids, including any Credit Bid, are hereby deemed Qualified Bids.

## VII.    Obtaining Due Diligence Access.

Only Acceptable Bidders shall be eligible to receive due diligence information, access to the Debtors' electronic data room, and additional non-public information regarding the Debtors. ***No Acceptable Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement***.  Beginning on the date the Debtors determine that a party is an Acceptable Bidder, or as soon as reasonably practicable thereafter, the Debtors will provide such

Acceptable Bidder with access to an electronic data room and reasonable due diligence information, as requested by such Acceptable Bidder, as soon as reasonably practicable after such request. The Debtors shall post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic dataroom for the benefit of all Applicable Bidders. To the extent the Debtors provide any material written information to an Acceptable Bidder that the Debtors had not previously provided to a Consultation Party, the Debtors shall promptly make such information available to such Consultation Party.

Acceptable Bidders will not, directly or indirectly, contact or initiate or engage in discussions in respect of matters relating to the Debtors or a potential transaction with any customer, supplier, or other contractual counterparty of the Debtors without the prior written consent of the Debtors. The due diligence period will end on the applicable Bid Deadline and subsequent to the applicable Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not furnish any confidential information relating to the Debtors or a potential transaction to any person except an Acceptable Bidder or such Acceptable Bidder's duly authorized representatives to the extent provided in an applicable Confidentiality Agreement.

The Debtors and their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate a Sale Transaction. For any bidder who is a competitor or customer of the Debtors or is affiliated with any competitors or customers of the Debtors, the Debtors reserve the right to withhold or modify any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such bidder.

A.      **Communications with Acceptable Bidders (including Qualified Bidders).**

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive direct communications, including any diligence requests, with Acceptable Bidders (including any Qualified Bidders) shall be through Guggenheim Securities.

B.      **Due Diligence from Acceptable Bidders (including Qualified Bidders).**

Each Acceptable Bidder (including any Qualified Bidder) shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors and their respective advisors, regarding the ability of such Acceptable Bidder (including any Qualified Bidder) to consummate its contemplated transaction. Failure by an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder, if any) to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is no longer an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder, if any) or that a bid made by such bidder is not a Qualified Bid.

> The Debtors have designated Brendan Hayes, Casey Cohen, Matthew Scheidemann, and Jeffrey Kirshner at Guggenheim Securities to coordinate all requests for additional information and due diligence access on behalf of the Debtors.  They can be reached at brendan.hayes@guggenheimpartners.com, casey.cohen@guggenheimpartners.com, matthew.scheidemann@guggenheimpartners.com, and jeffrey.kirshner@guggenheimpartners.com.

## VIII.    Bid Deadlines.

### A.    Elixir Bid Deadline.

Binding Bids for the Elixir Assets must be submitted in writing to the following parties (the "Elixir Bid Notice Parties") so as to be **actually received** no later than 5:00 p.m. (prevailing Eastern Time) on November 16, 2023 (the "Elixir Bid Deadline").

(vi)    proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com), Aparna Yenamandra, P.C. (aparna.yenamandra@kirkland.com), Ross J. Fiedler (ross.fiedler@kirkland.com), and Zachary R. Manning (zach.manning@kirkland.com), 300 North LaSalle, Chicago, Illinois 60654, Attn:  Steve Toth (steve.toth@kirkland.com);

(vii)    proposed co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601 Attn:  Michael D. Sirota (msirota@coleschotz.com), Warren A. Usatine (wusatine@coleschotz.com), Felice R. Yudkin (fyudkin@coleschotz.com); and Seth Van Aalten (svanaalten@coleschotz.com); and

(viii)    the Debtors' proposed investment banker, Guggenheim Securities, LLC, 330 Madison Avenue, New York, New York 10017, Attn:  Brendan Hayes (brendan.hayes@guggenheimpartners.com), Casey Cohen (casey.cohen@guggenheimpartners.com), Matthew Scheidemann (matthew.scheidemann@guggenheimpartners.com), and Jeffrey Kirshner (jeffrey.kirshner@guggenheimpartners.com).

In consultation with the Consultation Parties, the Debtors may extend the Elixir Bid Deadline in their reasonable business judgment for all or certain Acceptable Bidders.

### B.    Rite Aid Retail Bid Deadline.

Binding Bids for any or all of the Rite Aid Retail Assets must be submitted in writing to the following parties (the "Rite Aid Retail Bid Notice Parties") so as to be **actually received** no later than 5:00 p.m. (prevailing Eastern Time) on November 30, 2023 (the "Rite Aid Retail Bid Deadline," and together with the Elixir Bid Deadline, the "Bid Deadlines").

(i)    proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Joshua A. Sussberg, P.C.

13

(joshua.sussberg@kirkland.com),  Aparna  Yenamandra,  P.C. (aparna.yenamandra@kirkland.com), Ross J. Fiedler (ross.fiedler@kirkland.com), and  Zachary  R.  Manning  (zach.manning@kirkland.com),  300  North  LaSalle, Chicago, Illinois, 60654, Attn: Steve Toth (steve.toth@kirkland.com);

(ii)    proposed co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street,  Hackensack,  New  Jersey  07601  Attn:  Michael  D.  Sirota (msirota@coleschotz.com),  Warren  A.  Usatine  (wusatine@coleschotz.com), Felice  R.  Yudkin  (fyudkin@coleschotz.com),  and  Seth  Van  Aalten (svanaalten@coleschotz.com); and

(iii)    the Debtors' proposed investment banker, Guggenheim Securities, LLC, 330 Madison  Avenue,  New  York,  New  York  10017,  Attn:  Brendan  Hayes (brendan.hayes@guggenheimpartners.com),  Casey  Cohen (casey.cohen@guggenheimpartners.com),  Matthew  Scheidemann (matthew.scheidemann@guggenheimpartners.com),  and  Jeffrey  Kirshner (jeffrey.kirshner@guggenheimpartners.com).

In consultation with the Consultation Parties, the Debtors may extend the Rite Aid Retail Bid Deadline for any reason whatsoever, in their reasonable business judgment for all or certain Acceptable Bidders.

## IX.    Evaluation of Qualified Bids.

The Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' business judgment, and, in consultation with the Consultation Parties, the highest or otherwise best Qualified Bid or combination of Qualified Bids for any Assets (the "Starting Bids"). The Debtors shall promptly provide to the Consultation Parties and the U.S. Trustee copies of all Bids received by the Debtors, including the Starting Bid; *provided* that the Consultation Parties and the U.S. Trustee must treat such Bids and any related information as confidential and shall not publicly disclose such information without the written consent of the Debtors and the applicable bidder.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors, in addition to any other factors that the Debtors deem appropriate:  (a) the amount and nature of the total consideration; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents, including the effect of the sale of Elixir Assets on Rite Aid Retail Assets, and *vice versa*; (d) whether the Qualified Bid contemplates a Sale Transaction that would be consummated through a Plan or a sale pursuant to section 363 of the Bankruptcy Code; (e) the certainty of a Qualified Bid leading to a confirmed Plan; (f) whether the Qualified Bid contemplates a Sale Transaction for the Debtors' new equity interest or a Sale Transaction for the Assets; and (g) the tax consequences of such Qualified Bid. Prior to commencing the Auction, the Debtors shall notify the Stalking Horse Bidder, if any, and all Qualified Bidders as to which Qualified Bid is the Starting Bid for the Auction with respect to

the applicable assets.  At such time, the Debtors shall also distribute copies of the Starting Bid to the Stalking Horse Bidder, if any, and each Qualified Bidder.

**X.      Stalking Horse Bid Protections.**

Pursuant to the Bidding Procedures Order, a Stalking Horse Bidder, if any, that has not submitted a Credit Bid, is entitled to the Stalking Horse Bid Protections (as defined below) in the amounts set forth herein, and in accordance with the terms of the Bidding Procedures Order.

In the event that the Debtors receive multiple Qualified Bids, with respect to any Elixir Assets (and solely in the event of the termination of the Elixir Stalking Horse APA, attached hereto as **Schedule 2**, with MedImpact), at any time until November 8, 2023, at 5:00 p.m. (prevailing Eastern Time), and with respect to any Rite Aid Retail Assets, at any time until November 20, 2023, at 5:00 p.m. (prevailing Eastern Time), the Debtors shall be authorized, but not obligated, in an exercise of their reasonable business judgment, in consultation with the Consultation Parties, to (a) select one or more Acceptable Bidders to act as the Stalking Horse Bidder in connection with the Auction for such assets, and (b) in connection with any stalking horse agreement (with respect to any Elixir Assets, an "Elixir Stalking Horse Agreement," and with respect to any Rite Aid Retail Assets, a "Rite Aid Stalking Horse Agreement") with a Stalking Horse Bidder, (x) provide a break-up fee and (y) agree to reimburse the reasonable and documented out of pocket fees and expenses (the "Stalking Horse Bid Protections") not to exceed (i) three and a half percent of the Purchase Price with respect to the foregoing clauses (x) and (y) in the aggregate, with respect to the Elixir Sale Transaction, and (ii) three percent of the applicable Purchase Price with respect to the foregoing clauses (x) and (y) in the aggregate, with respect to a Rite Aid Retail Sale Transaction. Any such Stalking Horse Bid Protections are authorized pursuant to these Bidding Procedures and the Bidding Procedures Order.

Except with respect to entry into the Elixir Stalking Horse APA with MedImpact, in the event that the Debtors enter into a Stalking Horse Agreement with one or more Elixir Stalking Horse Bidders, within two business days of entry, the Debtors shall file a notice and proposed form of order with the Court (the "Elixir Stalking Horse Notice") and serve the Elixir Stalking Horse Notice on the Elixir Stalking Horse Bidder, the U.S. Trustee, and the Consultation Parties.  The Elixir Stalking Horse Notice shall: (i) set forth the identity of the applicable Elixir Stalking Horse Bidder (and if the Elixir Stalking Horse Bidder is a newly formed entity, then the Elixir Stalking Horse Bidder's parent company or sponsor); (ii) set forth the amount of the Elixir Stalking Horse Bid and what portion (if any) is cash; (iii) state whether the Elixir Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Elixir Stalking Horse Bid; (iv) specify any proposed Elixir Stalking Horse Bid Protections (including the amount and calculation thereof); (v) specify the Assets included in the Elixir Stalking Horse Bid; (vi) attach the applicable Elixir Stalking Horse Agreement, including all exhibits, schedules and attachments thereto; and (vii) set forth the deadline to object to the Elixir Stalking Horse Bidder designation and any Elixir Stalking Horse Bid Protections.  If there are no objections to the Elixir Stalking Horse Notice within five days of filing with the Court, (the "Elixir Stalking Horse Notice Period"), the Debtors may submit an order to the Court that incorporates any comments received during the Elixir Stalking Horse Notice Period that authorizes the Debtors to designate an Elixir Stalking Horse Bidder and to enter into a Stalking Horse Agreement, without the need for further hearing.   If a party timely files an objection

to the Elixir Stalking Horse Notice, the Court shall hold a hearing after the expiration of the Elixir Stalking Horse Notice Period and as soon thereafter as the Court is available.

In the event that the Debtors enter into a Stalking Horse Agreement with one or more Rite Aid Retail Stalking Horse Bidders, within two business days of entry, the Debtors shall file a notice and proposed form of order with the Court (the "Rite Aid Retail Stalking Horse Notice") and serve the Rite Aid Retail Stalking Horse Notice on the Rite Aid Retail Stalking Horse Bidder, the U.S. Trustee, and Consultation Parties. The Rite Aid Retail Stalking Horse Notice shall:  (a) set forth the identity of the Rite Aid Retail Stalking Horse Bidder (and if the Rite Aid Retail Stalking Horse Bidder is a newly formed entity, then the Rite Aid Retail Stalking Horse Bidder's parent company or sponsor); (b) set forth the amount of the Rite Aid Retail Stalking Horse Bid and what portion (if any) is cash; (c) state whether the Rite Aid Retail Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Rite Aid Retail Stalking Horse Bid; (d) specify any proposed Rite Aid Retail Stalking Horse Bid Protections (including the amount and calculation thereof); (e) specify the Assets included in the Rite Aid Retail Stalking Horse Bid; (f) attach the applicable Rite Aid Retail Stalking Horse Agreement, including all exhibits, schedules and attachments thereto; and (g) set forth the deadline to object to the Rite Aid Retail Stalking Horse Bidder designation and any Rite Aid Retail Stalking Horse Bid Protections. If there are no objections to the Rite Aid Retail Stalking Horse Notice within five days of filing with the Court, (the "Rite Aid Retail Stalking Horse Notice Period"), the Debtors may submit an order to the Court that incorporates any comments received during the Rite Aid Retail Stalking Horse Notice Period that authorizes the Debtors to designate an Rite Aid Retail Stalking Horse Bidder and to enter into an Rite Aid Retail Stalking Horse Agreement, without the need for further hearing. If a party timely files an objection to the Rite Aid Retail Stalking Horse Notice, the Court shall hold a hearing after the expiration of the Rite Aid Retail Stalking Horse Notice Period and as soon thereafter as the Court is available.

Upon entry of the Bidding Procedures Order, the Debtors are authorized, but are not obligated or directed, to incur and pay the Stalking Horse Bid Protections to any Stalking Horse Bidder that has not submitted a Credit Bid in an aggregate amount not to exceed three and a half percent of the proposed Purchase Price, with respect to the Elixir Sale Transaction, and three percent of the applicable proposed Purchase Price, with respect to the Rite Aid Retail Sale Transaction.

Except as otherwise set forth herein, no person or entity, other than a Stalking Horse Bidder that has not submitted a Credit Bid, shall be entitled to any expense reimbursement, breakup fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

## XI.    No Qualified Bids.

If no Qualified Bids other than a Bid submitted by a Stalking Horse Bidder, if any, are received for the Assets included in such Stalking Horse Bid by the applicable Bid Deadline, then the Debtors may cancel the Auction with respect to such Assets. If any Stalking Horse Bid is the only Qualified Bid received by the applicable Bid Deadline, the Debtors may decide, in their

reasonable business judgment, in consultation with the Consultation Parties, to designate such Stalking Horse Bid as the Successful Bid (as defined below) as to the applicable Assets and pursue entry of an order approving a Sale Transaction with respect to such Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement. The Debtors shall promptly file notice of any cancellation of the Auction and/or designation of the Stalking Horse Bid, where applicable, as the Successful Bid with the Court.

## XII.   Auction.

The Auctions will be conducted in accordance with the following procedures (the "Auction Procedures"):

a.   the Auctions will be conducted openly;

b.   except as otherwise provided herein, only Qualified Bidders shall be entitled to bid at any Auction;

c.   the Qualified Bidders, including any Stalking Horse Bidders, if any, must appear in person or through duly-authorized representatives at the Auctions;

d.   bidding shall begin with the Starting Bid;

e.   subsequent bids (each, an "Overbid") may only be made at the Auctions and shall be at least (i) a 2% increase in cash, cash equivalents, or other such consideration that the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, deem equivalent (including the right of a Secured Creditor to Credit Bid any remaining amount of its secured claims) over the previous bid, *plus* (ii) solely with respect to the first Overbid made by a party in the event that the Debtors have entered into a Stalking Horse Agreement with respect to the Assets to which the Overbid relates, the aggregate amount of Bid Protections under such Stalking Horse Agreement (a "Minimum Overbid"), and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid. The Debtors may, in their reasonable business judgment, in consultation with the Consultation Parties, announce increases or reductions to the Minimum Overbid at any time during any Auction. For the avoidance of doubt, each successive Bid that a Qualified Bidder may submit at any Auction must contain a Purchase Price in cash, cash equivalents, or such other consideration that the Debtors, in their reasonable business judgment deem equivalent (including the right of a Secured Creditor to Credit Bid any remaining amount of its secured claims) that exceeds the then-existing highest Bid by at least the amount of the Minimum Overbid;

f.   at the commencement of any Auction, in consultation with the Consultation Parties, the Debtors may announce procedural and related rules governing such Auction, including time periods available to all Qualified Bidders to submit successive bid(s);

17

g.      each Qualified Bidder will be permitted a reasonable time to respond to previous bids at any Auction, as determined by the Debtors;

h.      during the course of any Auction, the Debtors shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of the previous bids and inform each Qualified Bidder which Overbid(s) reflect, in the Debtors' view, the highest or otherwise best bid(s) for the applicable Assets;

i.      the Auctions will be transcribed to ensure an accurate recording of the bidding at such Auction;

j.      each Qualified Bidder will be required to confirm on the record that it has not engaged, and will not engage, in any collusion with respect to the bidding or any Sale Transaction.  For the avoidance of doubt, this requirements does not restrict Qualified Bidder(s) from working with other Qualified Bidder(s) with the Debtors' prior written consent;

k.      each Qualified Bidder will be required to confirm that its bid is a good faith, *bona fide* offer and it intends to consummate the Sale Transaction if selected as the Successful Bid in accordance with these Bidding Procedures (as may be modified in accordance herewith at the Auction);

l.      subject to each of the Debtors' fiduciary obligations, including those explicitly set forth herein, the Court and the Debtors will not consider bids made after the applicable Auction has been closed;

m.      the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale Transaction, (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders, or (iv) otherwise violative of any of the Debtors' fiduciary obligations;

n.      the Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction;

o.      the Debtors reserve the right, in their reasonable business judgment, in consultation with the Consultation Parties, to adjourn any Auction one or more times to, among other things, (a) facilitate discussions between the Debtors and Qualified Bidders, (b) allow Qualified Bidders to consider how they wish to proceed, and (c) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require that

the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and

p.       notwithstanding anything herein to the contrary, the Debtors may, in consultation with the Consultation Parties, at any time choose to adjourn any Auction by announcement at such Auction.  The Debtors shall promptly file notice of such adjournment with the Court.

For the avoidance of doubt, nothing in the Auction Procedures will prevent the Debtors from exercising their respective fiduciary duties under applicable law.

Any Auction rules adopted by the Debtors will not modify any of the terms of the Stalking Horse Bid purchase agreement or the rights of the Stalking Horse Bidder, if any, without the consent of the Stalking Horse Bidder, if any.

Except as otherwise determined by the Debtors, in consultation with the Consultation Parties, only (i) the Debtors, (ii) the Consultation Parties, (iii) the Office of the United States Trustee, (iv) any Qualified Bidders, and (v) in each case, the respective representatives and professionals of the foregoing parties shall be entitled to participate in any Auction.

### A.       Elixir Auction.

Other than as expressly set forth herein, if the Debtors receive more than one Qualified Bid for any particular Elixir Asset or portion of Elixir Assets by the applicable Bid Deadline, the Debtors shall conduct an Elixir Auction to determine the Successful Bidder in their reasonable business judgment with respect to such Elixir Assets or portion of Elixir Assets in accordance with the Auction Procedures (as defined below).  If the Debtors do not receive a Qualified Bid for any particular Elixir Asset by the applicable Bid Deadline, the Debtors will not conduct an Elixir Auction with respect to such Elixir Asset.

The Auction for Elixir Assets shall commence on November 20, 2023 at 10:00 a.m. (prevailing Eastern Time), or such other time or other place as the Debtors determine.

### B.       Rite Aid Retail Auction.

Other than as expressly set forth herein, if the Debtors receive more than one Qualified Bid for any particular Rite Aid Retail Asset or portion of Rite Aid Retail Assets by the applicable Bid Deadline, the Debtors shall conduct a Rite Aid Retail Auction to determine the Successful Bidder in their reasonable business judgment with respect to such Rite Aid Retail Assets or portion of Rite Aid Retail Assets.  If the Debtors do not receive a Qualified Bid for any particular Rite Aid Retail Asset by the applicable Bid Deadline, the Debtors will not conduct a Rite Aid Retail Auction with respect to such Rite Aid Retail Asset.  If one or more Qualified Bids (other than the Rite Aid Retail Stalking Horse Bid, if any) are received by the applicable Bid Deadline with respect to the applicable Assets, then the Debtors shall conduct the Rite Aid Retail Auction with respect to such Rite Aid Retail Assets in accordance with the Auction Procedures (as defined below).

The Auction for Rite Aid Retail Assets shall commence on December 4, 2023 at 10:00 a.m. (prevailing Eastern Time), or such other time or other place as the Debtors determine.

## XIII.    Acceptance of the Successful Bid.

Each Auction shall continue until (i) there is only one Qualified Bid or a combination of Qualified Bids that the Debtors determine, in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties and outlined below in further detail, and in consultation with the Consultation Parties, is the highest or otherwise best bid to purchase the applicable Assets (each, a "Successful Bid"), and (ii) the Debtors determine, in their reasonable business judgment, in consultation with the Consultation Parties, that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be reasonably acceptable to the Debtors, at which point, such Auction will be closed.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors, in consultation with the Consultation Parties, may consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the amount and nature of the total consideration, which includes but is not limited to, assumed liabilities (administrative liabilities, cure payments), and the amount of executory contracts and leased locations being assumed; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents, including the effect of the sale of Elixir Assets on Rite Aid Retail Assets, and *vice versa*; (d) the tax consequences of such Qualified Bid; (e) whether the Qualified Bid contemplates a Sale Transaction that would be consummated through a Plan or a sale pursuant to section 363 of the Bankruptcy Code; (f) the certainty of a Qualified Bid leading to a confirmed Plan; and (g) any other consideration that may impact the Debtors' stakeholders.

Any Qualified Bidder that submits a Successful Bid will be deemed a "Successful Bidder" with respect to the Assets contemplated for the purchase pursuant to such Successful Bid. The Debtors shall file notice of the Successful Bid and the Successful Bidder with the Court as soon as reasonably practicable after conclusion of the applicable Auction. Following conclusion of the Auction and selection of a Successful Bidder, the Debtors shall present the results of the Auction at a hearing (each, a "Sale Hearing") and shall seek Court approval to enter into a binding purchase agreement with the Successful Bidder on the terms of the Successful Bid (the order approving such entry, the "Definitive Purchase Agreement Order"). For the avoidance of doubt, the Definitive Purchase Agreement Order shall deem the Debtors' selection of the Successful Bid final and, subject to the designation of the Back-Up Bid, the Debtors shall not solicit and /or accept any further bids or offers to submit a bid after such selection; *provided* that, notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor, or any special committee of any board of any Debtor, to take or refrain from taking any action that the Debtors determined in good faith, in consultation with counsel, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Within one (1) business day of the selection of the Successful Bidder, such Successful Bidder (including both the Stalking Horse Bidder, if any, and Back-Up Bidder, if applicable) shall

make a cash deposit, in addition to its Good Faith Deposit, in an amount calculated on the basis of the increased aggregate purchase price, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtors pursuant to a customary and reasonable escrow agreement; *provided* that the DIP Agents and the Ad Hoc Secured Noteholder Group shall not be required to make any deposit.  Each Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

## XIV.   Designation of Back-Up Bidder.

The Back-Up Bid to purchase any applicable Assets (the "<u>Back-Up Bidder</u>") will be determined by the Debtors at the conclusion of the Auction, in consultation with the Consultation Parties, and will be announced at that time to all the Qualified Bidders participating in the Auction. The Debtors' selection of a Back-Up Bid shall be deemed final and the Debtors shall not accept any further bids or offers to submit a bid after such selection.  The Debtors will be authorized, but not required, to consummate the Transaction with the Back-Up Bidder without further order of the Court, so long as such Back-Up Bid shall have been approved in connection with the Court's approval of the Successful Bid, or subject to Court approval if not.

If for any reason a Successful Bidder fails to consummate the purchase of such assets within the time permitted, then the Back-Up Bidder will automatically be deemed to have submitted the Successful Bid for such assets, and the Back-Up Bidder shall be deemed a Successful Bidder for such assets and shall be required to consummate any Sale Transaction with the Debtors as soon as is reasonably practicable without further order of the Court, upon 24 hours advance notice filed with the Court.  To the extent any objections are raised and remain unresolved, the Court may schedule a hearing on an expedited basis to adjudicate such objection.

The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (a) 90 days following the hearing to consider the applicable Sale Order, (b) consummation of a Sale Transaction with one or more Successful Bidders at an Auction, and (c) the release of such Back-Up Bid by the Debtors in writing (the "<u>Back-Up Termination Date</u>"); *provided* the Back-Up Termination Date with respect to the Elixir Sale Transaction shall be subject to the Elixir Stalking Horse APA.  The Debtors shall return the Back-Up Bidder's deposit owed within five (5) business days of the Back-Up Termination Date.

## XV.   Approval of the Sale Transaction.

At the applicable Sale Hearing certain findings will be sought from the Court regarding the Auction, including, among other things, that:  (1) the applicable Auction was conducted, and the Successful Bidder was selected, in accordance with the Bidding Procedures; (2) the Auction was fair in substance and procedure; (3) the Successful Bid was a Qualified Bid as defined in the Bidding Procedures; and (4) consummation of any Sale Transaction as contemplated by the Successful Bid in the Auction will provide the highest or otherwise best offer for the applicable Assets and is in the best interests of the Debtors and their estates.  **The applicable Sale Hearing may be continued to a later date by the Debtors, in consultation with the Consultation Parties, by sending notice to creditors or other parties in interest prior to, or making an**

announcement at, such Sale Hearing.  **No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder, if any).**

In the event a transaction is consummated through a Plan, a hearing before the Court to consider confirmation of the Plan (the "Confirmation Hearing") will be held at a date and time consistent with the any order approving the Debtors' disclosure statement and scheduling applicable dates and deadlines related thereto, including confirmation of the Plan.

## A.    Elixir Sale Transaction

With respect to the Elixir Assets, a hearing to consider approval of any Elixir Sale Transaction, is currently scheduled to take place on December 7, 2023, before the Honorable Chief Judge Kaplan, at the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Courtroom 8, Trenton, New Jersey 08608.  The proposed order approving the sale of Elixir Assets shall be filed no later than five days before the Sale Hearing.

Objections to the Sale Transaction(s), and entry of any order approving the applicable sale (the "Elixir Sale Order") must (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and all orders of the Court; and (iii) be filed with the Court and served so as to by **actually received** by the Debtors, the Elixir Bid Notice Parties, and the foregoing parties' respective counsel by December 1, 2023, at 4:00 p.m. (prevailing Eastern Time) (the "Elixir Sale Objection Deadline").

## B.    Rite Aid Retail Sale Transaction

With respect to the Rite Aid Retail Assets, a hearing to consider approval of any Rite Aid Retail Sale Transaction, is currently scheduled to take place on December 19, 2023, before the Honorable Chief Judge Kaplan, at the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Courtroom 8, Trenton, New Jersey 08608.

Objections to the Sale Transaction(s), and entry of any order approving the applicable sale order (the "Rite Aid Retail Sale Order," and collectively with any Elixir Sale Order, the "Sale Orders") must (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and all orders of the Court; and (iii) be filed with the Court and served so as to by **actually received** by the Debtors, the Rite Aid Retail Bid Notice Parties, and the foregoing parties' respective counsel by December 15, 2023, at 4:00 p.m. (prevailing Eastern Time) with respect to Sales of Rite Aid Retail Assets (the "Rite Aid Retail Sale Objection Deadline," and together with the Elixir Sale Objection Deadline, the "Sale Objection Deadlines").

## XVI.   Return of Good Faith Deposit.

The Good Faith Deposit(s) of the Successful Bidder or Successful Bidders, if any, will, upon consummation of the Successful Bid or Successful Bids, become property of the Debtors' estates and be credited to the portion of such Successful Bidder's or Successful Bidders' applicable Purchase Price.

If the Successful Bidder or Successful Bidders (or Back-Up Bidder or Back-Up Bidders, if applicable), if any, fails to consummate the Successful Bid or Successful Bids (or Back-Up Bid or Back-Up Bids, if applicable), then the Good Faith Deposit(s) of such Successful Bidder or Successful Bidders (or Back-Up Bidder or Back-Up Bidders, if applicable) will be irrevocably forfeited to the Debtors and may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, pursuant to the applicable asset purchase agreement.

The Good Faith Deposits of any unsuccessful Qualified Bidders (except for any Back-Up Bidder or Back-Up Bidders and any Stalking Horse Bidders) will be returned within five business days after consummation of the applicable Sale Transaction or upon the permanent withdrawal of the applicable proposed Sale Transaction.

The Good Faith Deposit(s) of any Back-Up Bidder or Back-Up Bidders, if any, will be returned to such Back-Up Bidder or Back-Up Bidders no later than five (5) business days of the Back-Up Termination Date.

The return of any Good Faith Deposits of any Stalking Horse Bidders will be subject to the terms of such Stalking Horse Bidders' Plan or purchase agreement, as applicable. All such deposits shall be held in escrow and at no time shall be deemed property of the Debtors' estates absent further order of the Court.

## XVII.  Reservation of Rights.

The Debtors, in consultation with the Consultation Parties, reserve their rights to modify these Bidding Procedures in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties in any manner that will best promote the goals of the bidding process, or impose, at or before any Auction, additional customary terms and conditions on the sale of the applicable Assets, including, without limitation:  (1) extending the deadlines set forth in the Bidding Procedures; (2) adjourning any Auction without further notice; (3) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting any Auction; (4) canceling any Auction; (5) rejecting any or all Bids or Qualified Bids; and (6) adjusting the applicable Minimum Overbid increment.

All parties expressly reserve all of their rights (and do not waive any such rights) to seek Court relief with regard to the Auction, the Bidding Procedures, the Sale Transaction, and any related items (including, if necessary, to seek an extension of the applicable Bid Deadline).

Each reference in these Bidding Procedures and the Bidding Procedures Order to "consultation" (or similar phrase) with the Consultation Parties shall mean consultation in good faith. All Consultation Parties will be permitted to seek relief from the Bankruptcy Court, on an expedited basis, if they disagree with any actions or decisions made by the Debtors as part of these Bidding Procedures. The rights of all Consultation Parties with respect to the outcome of any Auction are reserved, subject to the terms of the Financing Orders and RSA (as defined in the Plan), as applicable.

## XVIII. Consent to Jurisdiction.

All Qualified Bidders at any Auction will be deemed to have consented to the core jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to any Auction, Sale, Sale Transaction and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, any Auction, Sale Hearing, or the construction and enforcement of any agreement or any other document relating to any Sale or Sale Transaction if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Court on an expedited basis.

## XIX. Fiduciary Out.

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor, or any special committee of any board of any Debtor, to take any action or to refrain from taking any action related to any sale transaction or with respect to these Bidding Procedures, to the extent such Debtor, board of director, board of managers, or such similar governing body reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in these Bidding Procedures or the Bidding Procedures Order, through the date of the Auction (if held), nothing in these Bidding Procedures or the Bidding Procedures Order shall diminish the right of the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives to:  (a) consider, respond to, and facilitate alternate proposals for sales or other restructuring transactions involving the Assets (each an "Alternate Proposal"); (b) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity with respect to Alternative Proposals; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals; and (e) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposal.

## **Schedule 1(a)**

**Elixir Auction Notice**

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Joint Administration Requested) |

## NOTICE OF SALE BY AUCTION AND SALE HEARING

    **PLEASE TAKE NOTICE** that on [___], 2023, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. [___]] (the "Bidding Procedures Order")[2] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

    **PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of substantially all or a portion of the Elixir Assets consistent with the bidding procedures (the "Bidding Procedures") approved by the Court pursuant to the Bidding Procedures Order. **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order.** To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

    **PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "Auction") of the Elixir Assets **on November 20, 2023, at 10:00 a.m. (prevailing Eastern Time)** at the offices of Kirkland & Ellis, 601 Lexington Avenue, New York, New York 10022, as arranged by counsel to the Debtors.

    **PLEASE TAKE FURTHER NOTICE** that, except as otherwise determined by the Debtors, in consultation with the Consultation Parties, only the Debtors, the Consultation Parties,

---

[1]    The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

[2]    Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

the U.S. Trustee, any Qualified Bidders, and, in each case, the respective representatives and professionals of the foregoing parties, shall be entitled to attend the Auction, and only Qualified Bidders will be entitled to make Overbids at the Auction. **All interested or potentially affected parties should carefully read the Bidding Procedures and the Bidding Procedures Order.**

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale Transaction at a hearing scheduled to commence on or before **December 7, 2023** (the "Sale Hearing") before the Honorable Chief Judge Kaplan, at the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Courtroom 8, Trenton, New Jersey 08608.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order, objections to consummation or approval of the Sale and each Sale Transaction must (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be **_actually received_ on or before December 1, 2023, at 4:00 p.m. (prevailing Eastern Time)** by the following parties: (i) the Debtors, Rite Aid Corporation, 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112; (ii) counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com), Aparna Yenamandra, P.C. (aparna.yenamandra@kirkland.com), Ross J. Fiedler (ross.fiedler@kirkland.com), and Zachary R. Manning (zach.manning@kirkland.com), 300 North LaSalle, Chicago, Illinois, 60654, Attn: Steve Toth (steve.toth@kirkland.com); (iii) co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn:    Michael    D.    Sirota    (msirota@coleschotz.com),    Warren    A.    Usatine (wusatine@coleschotz.com), Felice R. Yudkin (fyudkin@coleschotz.com), and Seth Van Aalten (svanaalten@coleschotz.com); (iv) Office of the United States Trustee for Region 3, District of New Jersey, Raymond Boulevard, Suite 2100, Newark, NJ 07102, Attn: Jeffrey M. Sponder and Lauren Bielskie; (vi) counsel to the DIP Agents, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola (jventola@choate.com); Jonathan D. Marshall (jmarshall@choate.com); and Mark D. Silva (msilva@choate.com) and Greenberg Traurig, LLP, 500 Campus Drive, Suite 400, Florham Park, New Jersey 07932, Attn: Alan J. Brody (brodya@gtlaw.com) and Oscar N. Pinkas (pinkaso@gtlaw.com); (vii) counsel to the Ad Hoc Secured Noteholder Group, Paul, Weiss, Rifkind, Wharton & Garrison, 1285 6th Avenue, New York, NY 10019, Attn: Andrew N. Rosenberg (arosenberg@paulweiss.com); Brian S. Hermann (bhermann@paulweiss.com); and Christopher Hopkins (chopkins@paulweiss.com) and Fox Rothschild LLP, 49 Market Street, Morristown, NJ 07960, Attn: Howard A. Cohen (hcohen@foxrothschild.com); Joseph J. DiPasquale (jdipasquale@foxrothschild.com) and Michael R. Herz (mherz@foxrothschild.com); (viii) proposed counsel to any statutory committee appointed in these chapter 11 cases; and (ix) counsel to any Stalking Horse Bidder.

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE OR A SALE TRANSACTION, AS APPLICABLE, ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF**

**THE APPLICABLE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS MAY BE SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT OR THE PLAN, AS APPLICABLE.**

Dated:  [_____], 2023

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com
            svanaalten@coleschotz.com


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
Zachary R. Manning (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      esassower@kirkland.com
            joshua.sussberg@kirkland.com
            aparna.yenamandra@kirkland.com
            ross.fiedler@kirkland.com
            zach.manning@kirkland.com


*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

## **Schedule 1(b)**

**Rite Aid Retail Auction Notice**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Joint Administration Requested) |

**NOTICE OF SALE BY AUCTION AND SALE HEARING**

**PLEASE TAKE NOTICE** that on [___], 2023, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. [___]] (the "Bidding Procedures Order")[2] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of substantially all or a portion of the Rite Aid Retail Assets consistent with the bidding procedures (the "Bidding Procedures") approved by the Court pursuant to the Bidding Procedures Order.  **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order.**  To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "Auction") of the Rite Aid Retail Assets **on December 4, 2023, at 10:00 a.m. (prevailing Eastern Time)** at the offices of Kirkland & Ellis, 601 Lexington Avenue, New York, New York 10022, as arranged by counsel to the Debtors.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise determined by the Debtors, in consultation with the Consultation Parties, only the Debtors, the Consultation Parties,

---

[1]   The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

[2]   Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

the U.S. Trustee, any Qualified Bidders, and, in each case, the respective representatives and professionals of the foregoing parties, shall be entitled to attend the Auction, and only Qualified Bidders will be entitled to make Overbids at the Auction. **All interested or potentially affected parties should carefully read the Bidding Procedures and the Bidding Procedures Order.**

       **PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale Transaction at a hearing scheduled to commence on or before **December 19, 2023** (the "Sale Hearing") before the Honorable Chief Judge Kaplan, at the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Courtroom 8, Trenton, New Jersey 08608.

       **PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order, objections to consummation or approval of the Sale and each Sale Transaction must (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received* on or before December 15, 2023, at 4:00 p.m. (prevailing Eastern Time)** by the following parties: (i) the Debtors, Rite Aid Corporation, 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112; (ii) counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com), Aparna Yenamandra, P.C. (aparna.yenamandra@kirkland.com), Ross J. Fiedler (ross.fiedler@kirkland.com), and Zachary R. Manning (zach.manning@kirkland.com), 300 North LaSalle, Chicago, Illinois, 60654, Attn: Steve Toth (steve.toth@kirkland.com); (iii) co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn: Michael D. Sirota (msirota@coleschotz.com), Warren A. Usatine (wusatine@coleschotz.com), Felice R. Yudkin (fyudkin@coleschotz.com), and Seth Van Aalten (svanaalten@coleschotz.com); (iv) Office of the United States Trustee for Region 3, District of New Jersey, Raymond Boulevard, Suite 2100, Newark, NJ 07102, Attn: Jeffrey M. Sponder and Lauren Bielskie; (vi) counsel to the DIP Agents, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola (jventola@choate.com); Jonathan D. Marshall (jmarshall@choate.com); and Mark D. Silva (msilva@choate.com) and Greenberg Traurig, LLP, 500 Campus Drive, Suite 400, Florham Park, New Jersey 07932, Attn: Alan J. Brody (brodya@gtlaw.com) and Oscar N. Pinkas (pinkaso@gtlaw.com); (vii) counsel to the Ad Hoc Secured Noteholder Group, Paul, Weiss, Rifkind, Wharton & Garrison, 1285 6th Avenue, New York, NY 10019, Attn: Andrew N. Rosenberg (arosenberg@paulweiss.com); Brian S. Hermann (bhermann@paulweiss.com); and Christopher Hopkins (chopkins@paulweiss.com) and Fox Rothschild LLP, 49 Market Street, Morristown, NJ 07960, Attn: Howard A. Cohen (hcohen@foxrothschild.com); Joseph J. DiPasquale (jdipasquale@foxrothschild.com) and Michael R. Herz (mherz@foxrothschild.com); (viii) proposed counsel to any statutory committee appointed in these chapter 11 cases; and (ix) counsel to any Stalking Horse Bidder.

## <u>CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION</u>

       **ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE OR A SALE TRANSACTION, AS APPLICABLE, ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF**

**THE APPLICABLE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS MAY BE SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT OR THE PLAN, AS APPLICABLE.**

Dated: [_____], 2023

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
                wusatine@coleschotz.com
                fyudkin@coleschotz.com
                svanaalten@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
Zachary R. Manning (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      esassower@kirkland.com
                joshua.sussberg@kirkland.com
                aparna.yenamandra@kirkland.com
                ross.fiedler@kirkland.com
                zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

4

## **Schedule 2**

**Elixir Stalking Horse APA**

**Execution Copy**

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF OCTOBER 15, 2023**

**BY AND AMONG**

**MEDIMPACT HEALTHCARE SYSTEMS, INC., AS PURCHASER,**

**AND**

**HUNTER LANE, LLC**

**AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS**

---

## TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES**.......................................................................1
Section 1.1    Purchase and Sale of the Acquired Assets ..............................1
Section 1.2    Excluded Assets .....................................................................4
Section 1.3    Assumption of Certain Liabilities ...........................................5
Section 1.4    Excluded Liabilities ...............................................................6
Section 1.5    Assumption/Rejection of Certain Contracts / Non-Assignment...........................10
Section 1.6    Excluded Asset Designation ...................................................12
Section 1.7    EIC ........................................................................................12

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING**..................................13
Section 2.1    Consideration; Payment .........................................................13
Section 2.2    Deposit; Purchase Price Adjustment Escrow...........................13
Section 2.3    Closing ..................................................................................15
Section 2.4    Closing Deliveries by Sellers .................................................15
Section 2.5    Closing Deliveries by Purchaser .............................................16
Section 2.6    Withholding ..........................................................................17
Section 2.7    Purchase Price Adjustment .....................................................17

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS** .......................21
Section 3.1    Organization and Qualification ...............................................21
Section 3.2    Authorization of Agreement ...................................................21
Section 3.3    Conflicts; Consents ................................................................22
Section 3.4    Financial Statements ..............................................................22
Section 3.5    Title to Properties; Sufficiency of Assets ...............................23
Section 3.6    Contracts ...............................................................................25
Section 3.7    No Litigation..........................................................................27
Section 3.8    Permits; Compliance with Laws .............................................28
Section 3.9    Environmental Matters ...........................................................28
Section 3.10   Intellectual Property ..............................................................29
Section 3.11   Privacy and Security Matters. ................................................32
Section 3.12   Healthcare Matters .................................................................33
Section 3.13   Tax Matters ...........................................................................34
Section 3.14   Employees ..............................................................................35
Section 3.15   Insurance ...............................................................................36
Section 3.16   Affiliate Transactions.............................................................36
Section 3.17   Brokers ..................................................................................36
Section 3.18   Anti-Corruption.....................................................................36
Section 3.19   Absence of Certain Changes ...................................................37
Section 3.20   Bank Accounts .......................................................................37
Section 3.21   Employee Benefit Plans..........................................................37
Section 3.22   No Other Representations or Warranties ..................................37

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER**..................38
Section 4.1    Organization and Qualification ...............................................38

i

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| Section 4.2 | Authorization of Agreement | 38 |
| Section 4.3 | Conflicts; Consents | 39 |
| Section 4.4 | Financing | 39 |
| Section 4.5 | Brokers | 39 |
| Section 4.6 | No Litigation | 40 |
| Section 4.7 | Certain Arrangements | 40 |
| Section 4.8 | Solvency | 40 |
| Section 4.9 | WARN Act and Mass Layoffs | 40 |
| Section 4.10 | No Additional Representations or Warranties | 40 |

**ARTICLE V BANKRUPTCY COURT MATTERS** ........................................**40**

| | | |
|---|---|---|
| Section 5.1 | Bankruptcy Actions | 40 |
| Section 5.2 | Cure Costs | 42 |
| Section 5.3 | Approval | 42 |

**ARTICLE VI COVENANTS AND AGREEMENTS** ....................................**43**

| | | |
|---|---|---|
| Section 6.1 | Conduct of the Business of Sellers | 43 |
| Section 6.2 | Access to Information | 46 |
| Section 6.3 | Employee Matters | 47 |
| Section 6.4 | Regulatory Approvals | 50 |
| Section 6.5 | Antitrust Notification | 50 |
| Section 6.6 | Reasonable Efforts; Cooperation | 52 |
| Section 6.7 | Certain Financing Matters | 52 |
| Section 6.8 | Further Assurances | 53 |
| Section 6.9 | Insurance Matters | 54 |
| Section 6.10 | Receipt of Misdirected Assets; Liabilities | 54 |
| Section 6.11 | Guarantees; Third Party Assurances | 55 |
| Section 6.12 | Acknowledgment by Purchaser | 56 |
| Section 6.13 | Guaranty | 57 |
| Section 6.14 | Confidentiality | 58 |
| Section 6.15 | No Successor Liability | 60 |
| Section 6.16 | Retained Privileged Materials | 60 |
| Section 6.17 | Notification of Certain Matters | 61 |
| Section 6.18 | Change of Name | 61 |
| Section 6.19 | Open Source Remediation | 61 |
| Section 6.20 | CMS Novation | 61 |
| Section 6.21 | Completion of TSA Schedules | 62 |

**ARTICLE VII CONDITIONS TO CLOSING** ...............................................**62**

| | | |
|---|---|---|
| Section 7.1 | Conditions Precedent to the Obligations of Purchaser and Sellers | 62 |
| Section 7.2 | Conditions Precedent to the Obligations of Purchaser | 62 |
| Section 7.3 | Conditions Precedent to the Obligations of Sellers | 63 |
| Section 7.4 | Waiver of Conditions | 64 |

## TABLE OF CONTENTS

**Page**

**ARTICLE VIII TERMINATION** ..................................................................................**64**
Section 8.1    Termination of Agreement..........................................................................64
Section 8.2    Effect of Termination..................................................................................66

**ARTICLE IX TAXES**..........................................................................................................**67**
Section 9.1    Transfer Taxes ............................................................................................67
Section 9.2    Allocation of Purchase Price.......................................................................67
Section 9.3    Cooperation.................................................................................................68
Section 9.4    Post-Closing Actions...................................................................................68
Section 9.5    Preparation of Tax Returns and Payment of Taxes .....................................68

**ARTICLE X MISCELLANEOUS** ....................................................................................**69**
Section 10.1   Non-Survival of Representations and Warranties and Certain Covenants;
               Certain Waivers ..........................................................................................69
Section 10.2   Expenses .....................................................................................................70
Section 10.3   Notices ........................................................................................................70
Section 10.4   Binding Effect; Assignment; Designated Purchasers .................................71
Section 10.5   Amendment and Waiver ..............................................................................72
Section 10.6   Third Party Beneficiaries ............................................................................72
Section 10.7   Non-Recourse .............................................................................................72
Section 10.8   Severability .................................................................................................73
Section 10.9   Construction................................................................................................73
Section 10.10  Schedules ....................................................................................................73
Section 10.11  Complete Agreement ...................................................................................73
Section 10.12  Specific Performance ..................................................................................74
Section 10.13  Jurisdiction and Exclusive Venue ...............................................................74
Section 10.14  Governing Law; Waiver of Jury Trial .........................................................75
Section 10.15  No Right of Set-Off .....................................................................................75
Section 10.16  Counterparts and PDF ................................................................................75
Section 10.17  Publicity ......................................................................................................76
Section 10.18  Bulk Sales Laws..........................................................................................76
Section 10.19  Sellers' Representative.................................................................................76
Section 10.20  Financing Sources .......................................................................................76

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** ...........**77**
Section 11.1   Certain Definitions......................................................................................77
Section 11.2   Index of Defined Terms ................................................................................1
Section 11.3   Rules of Interpretation ..................................................................................2

## INDEX OF EXHIBITS

EXHIBIT A   FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
AGREEMENT

EXHIBIT B   FORM OF PATENT ASSIGNMENT AGREEMENT

EXHIBIT C   FORM OF TRADEMARK ASSIGNMENT AGREEMENT

EXHIBIT D   FORM OF DOMAIN NAME ASSIGNMENT AGREEMENT

EXHIBIT E   FORM OF CLOSING WORKING CAPITAL STATEMENT AND EXAMPLE
CALCULATION

EXHIBIT F   FORM OF BIDDING PROCEDURES ORDER

EXHIBIT G   FORM OF TSA

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of October 15, 2023, is made by and among MedImpact Healthcare Systems, Inc., a California corporation (subject to Section 10.4(b), "Purchaser"), MI OpCo Holdings, Inc., a Delaware corporation ("Guarantor"), and Hunter Lane, LLC, a Delaware limited liability company (as in existence on the date hereof, as a debtor-in-possession and a reorganized Debtor, as applicable, "Elixir") and the Subsidiaries of Elixir that are indicated on the signature pages attached hereto (together with Elixir, each a "Seller" and collectively "Sellers"). Purchaser and Sellers are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein including Article XI.

WHEREAS, on October 15, 2023 (the "Petition Date"), Sellers, together with certain of Sellers' Subsidiaries and Affiliates, commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. [●] ([●]) (Bankr. D.N.J.) (collectively, the "Bankruptcy Cases"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, the Parties hereby agree as follows.

## ARTICLE I
## PURCHASE AND SALE OF ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

**Section 1.1    Purchase and Sale of the Acquired Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of the properties, rights, interests and other assets owned by or held by a Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by any Seller after the date hereof and prior to the Closing, and including Sellers' right, title and interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:

(a)  (i) subject to Section 1.5, all Contracts listed on Schedule 1.1(a)(i) to which any Seller is a party, but, in all cases, excluding Leases, which are addressed in Section 1.1(g) and (ii) the Contracts listed on Schedule 1.1(a)(ii) (the "Commercial Interco Contracts" and, together with (i), the "Assigned Contracts"), including that certain Pharmacy Benefit Management Services Agreement (the "ROI Agreement"), effective the 1st day of January, 2010, by and between Rx Options, Inc., an Ohio corporation and a Seller ("ROI"), and EIC (f/k/a Envision Insurance Company);

(b)  all rights under non-disclosure, confidentiality, and similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties (including any non-disclosure, confidentiality agreements or similar arrangements entered into in connection the Auction), which any such agreements will be Assigned Contracts subject to designation as an Excluded Contract pursuant to Section 1.5;

(c)  all accounts receivable (including Rebate Assets), notes receivable, negotiable instruments and chattel paper owing from Persons other than Sellers and their Affiliates, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, but in all cases excluding any CMS Receivable;

(d)  all bank accounts;

(e)  all credits, prepaid expenses, deferred charges and expenses, advance payments, and prepaid items and duties, including all lease and rental payments that have been prepaid by any Seller with respect to any Acquired Leased Real Property;

(f)  all Documents (excluding any credit card numbers or related customer payment sources, social security numbers, or other information to the extent prohibited by any Law);

(g)  subject to Section 1.5, the Leased Real Property listed on Schedule 1.1(g) (the "Acquired Leased Real Property" and the Lease governing any Acquired Leased Real Property, an "Acquired Lease") and any security deposits related thereto;

(h)  all land, together with all buildings, structures, improvements, and fixtures located thereon, and all easements, privileges, appurtenances and other rights and interests appurtenant thereto and all right, title and interest in and to any streets, alleys, passages or other rights-of-way or appurtenances included in, adjacent to or used in connection with such land and all right, title and interest in all mineral rights appurtenant to such land, owned by the Sellers (the "Owned Real Property");

(i)  all tangible assets (including Equipment) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property or the Owned Real Property and any tangible assets on order to be delivered to any Seller; provided that, with respect to any such tangible asset that is leased to any Seller, the lease agreement covering such leased tangible asset is an Assigned Contract;

(j)  all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers (including pharmaceutical drug manufacturers), Group

2

Purchasing Organizations, and counterparties to any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor, manufacturers (including pharmaceutical drug manufacturers), Group Purchasing Organizations, or supplier rebates), demands, allowances, refunds (other than Tax refunds attributable to a Pre-Closing Tax Period), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller or its Affiliates and excluding any CMS Receivable);

(k)    to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor and copies of all governmental filings associated therewith, including, to the extent transferable under applicable Law, those Permits and Governmental Authorizations listed on Schedule 1.1(k);

(l)    to the extent transferable, excluding all director and officer insurance policies, (i) all current and prior insurance policies of any Seller, and (ii) all insurance rights and benefits (including proceeds) of any nature to the extent arising from or relating to any of the Acquired Assets or Assumed Liabilities (including returns and refunds of any premiums paid, or other amounts due back to Sellers, with respect to cancelled policies), including all such insurance recoveries and rights to assert claims with respect to any such insurance recoveries (the foregoing clauses (i) and (ii), collectively, the "Acquired Insurance Assets");

(m)    all Intellectual Property owned or purported to be owned by the Sellers, all rights to collect royalties and proceeds in connection with such Intellectual Property that are or were due or payable prior to, on, or after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations, violations of, or other conflicts with, such Intellectual Property, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including the Laker Software and the Intellectual Property set forth on Schedule 1.1(m) (collectively, the "Acquired Intellectual Property");

(n)    all Inventory and supplies of the Sellers;

(o)    (i) all avoidance claims or causes of action available to Sellers under chapter 5 of the Bankruptcy Code (including sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law (whether or not asserted as of the Closing Date) ("Avoidance Actions") against any trade creditor, customer, supplier, manufacturer, distributor, broker, licensee, licensor, agent, or vendor of any Seller or any other Person with whom any Seller has an ordinary course commercial relationship, (ii) all Avoidance Actions relating to the Acquired Assets or Assumed Liabilities, or against any of the Sellers' counterparties to the Assigned Contracts, and (iii) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment of any Seller against

3

any Transferred Employee (the foregoing clauses (i), (ii), and (iii), collectively, the "Acquired Avoidance Actions"); provided that, for the avoidance of doubt, the Acquired Avoidance Actions extend solely to actions related to the Acquired Assets and the Business and shall not include preference claims or avoidance claims and actions (including any such claims and actions arising under Sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code) against any representatives of the Debtors, or the Debtors' non-debtor Affiliates, Subsidiaries, or representatives of any of the foregoing; provided further that Purchaser will not pursue or cause to be pursued either directly or indirectly any Acquired Avoidance Actions except as a defense (to the extent permitted under applicable Law) against any claim or cause of action asserted by any Person enumerated in clauses (i), (ii), and (iii);

(p)      all deposits, including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise; and

(q)      all goodwill, payment intangibles and general intangible assets and rights of Sellers.

**Section 1.2      Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "Excluded Assets"):

(a)      all Cash and Cash Equivalents, such bank account(s) as the Parties reasonably agree prior to the Closing for Sellers to retain for winddown and related purposes, and any retainers or similar amounts paid to Advisors or other professional service providers;

(b)      subject to Section 1.5, all Contracts of Sellers other than Assigned Contracts and any Acquired Lease (the "Excluded Contracts"), including the Rejection Contracts;

(c)      all Documents (including information stored on the computer systems, data networks or servers of any Seller) (i) that exclusively relate to any of the Excluded Assets or Excluded Liabilities, (ii) that are Sellers' financial accounting Documents, all minute books, Organizational Documents, stock certificates or other Equity Interests instrument, stock registers and such other books and records of any Seller pertaining to the ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks, or (iii) that any Seller is required by Law or Healthcare Law to retain; provided that Purchaser shall have the right to make copies of any portions of such Documents (other than Excluded Tax Returns) to the extent not prohibited by applicable Law or Healthcare Law;

(d)      all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the Transactions, or the Bankruptcy Case, that are subject to any attorney-client privilege and the transfer of which to Purchaser would result in the waiver of any such privilege ("Retained Privileged Materials");

(e)    other than the Acquired Insurance Assets, all current and prior insurance policies and Employee Benefit Plans of any Seller or its Affiliates, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers or its Affiliates with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f)    all Equity Interests of any Seller or any of their respective Subsidiaries, including, EIC;

(g)    except for the Acquired Avoidance Actions, (i) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller or its Affiliates, in each case, directly arising out of events occurring prior to the Closing Date, and (ii) all claims that any Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(h)    Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller or its Affiliates and Purchaser in connection with the Transactions, or any other agreement between any Seller or its Affiliates and Purchaser entered into on or after the date hereof;

(i)    all Tax refunds attributable to a Pre-Closing Tax Period, and Tax attributes and Tax assets;

(j)    any CMS Receivable and any billed and unbilled rebate receivables related to EIC;

(k)    except for the Acquired Avoidance Actions and Rebate Assets, all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to Leases, licenses or any Contract, directly arising out of events occurring prior to the Closing Date;

(l)    any properties, rights, interests, and assets of Sellers designated as an Excluded Asset pursuant to Section 1.6; and

(m)    all Liabilities or other amounts owing from any Sellers or any of their respective Affiliates (other than any such Liabilities under any Assigned Contract).

**Section 1.3**    **Assumption of Certain Liabilities**. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 2.1, Purchaser shall irrevocably assume from each Seller (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) (and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following

Liabilities (and no other Liabilities, which other Liabilities shall be retained by Sellers), without duplication and only to the extent not paid, performed, discharged or otherwise satisfied on or prior to the Closing (collectively, the "Assumed Liabilities"):

(a)      all Cure Costs in an amount not to exceed $1,400,000 (the "Assumed Cure Costs");

(b)      all Liabilities and obligations of any Seller under the Assigned Contracts and any Acquired Lease solely to the extent first arising after the Closing and, for the avoidance of doubt, excluding any Excluded Rebate Liability;

(c)      all Liabilities arising out of the conduct of the Business or the ownership or operation of the Acquired Assets or the Business, in each case, by Purchaser on or after the Closing Date;

(d)      all trade payables of Sellers to non-Affiliated third parties in connection with the Business existing on the Closing Date that remain unpaid and are not delinquent as of the Closing Date and incurred in the Ordinary Course and other Liabilities of Sellers of the types included in the definition of Closing Working Capital but not including any Excluded Rebate Liability or any Liabilities to the extent relating to or otherwise arising, whether before, on or after the Closing, under any of the Excluded Contracts (collectively, the "Assumed Current Liabilities";

(e)      all recoupment obligations of any Seller under any Assigned Contracts or Excluded Contracts solely to the extent related to claims by any pharmaceutical drug manufacturer or Group Purchasing Organizations pursuant to any Assigned Contract, or Excluded Contract, for the recoupment of any Rebate Assets (collectively, the "Assumed Rebate Liability"), but excluding any Liabilities related to any billed and unbilled manufacture rebate receivable related to the business of EIC;

(f)      without duplication: (i) all Liabilities for Taxes with respect to the Acquired Assets, the Business, or the Transferred Employees for any taxable period (or portion thereof) beginning after the Closing Date, and (ii) all Transfer Taxes pursuant to Section 9.1;

(g)      all Liabilities relating to the Transferred Employees that arise after the Closing Date; and

(h)      all Liabilities relating to the termination of Scheduled Employees who do not receive a Transfer Offer from Purchaser in compliance with Section 6.3(a).

**Section 1.4      Excluded Liabilities**. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place on or prior to the Closing, other than the Assumed Liabilities (all

6

such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following Liabilities of any Seller:

(a)     all Cure Costs other than the Assumed Cure Costs (the "Excluded Cure Costs");

(b)     except to the extent of any Assumed Cure Costs, Assumed Current Liabilities, or Assumed Rebate Liability expressly assumed pursuant to Section 1.3, any Liability arising out of facts or circumstances in existence on or prior to the Closing and from or related to any breach, default under, failure to perform, torts related to the performance of, violations of Law, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of the Sellers or any of their Affiliates under any Contract, agreement, arrangement or understanding to which any Seller or any of its Affiliates is a party prior to the Closing;

(c)     except to the extent of any Assumed Cure Costs, Assumed Current Liabilities, or Assumed Rebate Liability expressly assumed pursuant to Section 1.3, all Liabilities arising out of, relating to or otherwise in respect of the operation of the Business or businesses of Sellers' Affiliates, or any of the Sellers', or Sellers' Affiliates', products or services, or the operation or condition of the Acquired Assets or the Assumed Liabilities, in each case, on or prior to the Closing or facts, actions, omissions, circumstances or conditions existing, occurring or accruing on or prior to the Closing;

(d)     all Liabilities arising from or related to any Action (whether civil, criminal, administrative, investigative, or informal) against any Sellers or their Affiliates, (including, for the avoidance of doubt, any Action related to fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of any Seller, or any of their Affiliates, or any of their respective directors, officers, or employees), or related to the Acquired Assets or the Assumed Liabilities, pending or threatened or having any other status or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing (including any breach, default, failure to perform, torts related to performance, violations of Law, infringements or indemnities, guaranties and overcharges, underpayments or penalties, whether in respect of any Contract, agreement, arrangement, promise or understanding of any kind) including any successor liability claims or that may be owed to or assessed by, any Governmental Body or other Person, and whether commenced, filed, initiated, or threatened prior to, on or following the Closing;

(e)     all Liabilities to the extent relating to or otherwise arising, whether before, on or after the Closing, under any of the Excluded Contracts;

(f)     all Liabilities of Sellers for Indebtedness and any Accrued Rebate Liability related to any billed and unbilled rebate receivables related to EIC;

(g)     all guarantees of Indebtedness made by the Sellers and all reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit or other similar agreements or instruments;

(h)     other than the Assumed Rebate Liability, all Liabilities related to claims or Actions by any pharmaceutical drug manufacturer, Group Purchasing Organizations, or any other Person related to rebates, recoupment, payments or similar items, whether or not pursuant to any Assigned Contract or any other Contract (the "Excluded Rebate Liability");

(i)     all Liabilities related to, resulting from or arising out of, prior to, on or after the Closing, any (i) unredeemed refund amounts, rebates (except for any Assumed Rebate Liability), or similar items, (ii) customer deposits or (iii) customer promotions and loyalty programs;

(j)     all Liabilities to (i) any current or former owner of capital stock or other Equity Interests of the Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other Equity Interests of the Sellers, (ii) any current or former holder of indebtedness for borrowed money of the Sellers or (iii) in respect of obligations for indemnification or advancement of expenses, any current or former officer or director of the Sellers, in each case of (i), (ii), and (iii), solely in such Person's capacity as such;

(k)     the sponsorship of and all Liabilities at any time arising under, pursuant to or in connection with any Employee Benefit Plans (whether arising prior to, on or after the Closing Date) and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" (as such term is defined in 26 C.F.R. § 54.4980B-9);

(l)     Except as expressly assumed by Purchaser in Section 6.3(g), Liabilities arising under the WARN Act and similar Laws relating to the termination of any current or former employee or contractor of any Seller, or any Affiliate of a Seller, (including any Transferred Employees), and including any current, threatened or potential claims for compensation or benefits, in each such case, to the extent related to employment or contracting with the Sellers (or any of their Affiliates) or termination thereof, whether arising prior to, on or after the Closing Date

(m)     all Liabilities and other payments incurred or otherwise payable by any of the Sellers or their respective Affiliates, or for which any of the Sellers or their respective Affiliates is liable, in connection with in connection with the administration of the Bankruptcy Cases or the negotiation, execution and consummation of the Transactions or any Transaction Agreement (including any preparation for a transaction process, bankruptcy process, any sale process involving other potential buyers or any contemplated public offering or financing), including the fees and expenses of financial advisors, accountants, legal counsel, consultants, brokers and other advisors with respect thereto, whether incurred, accrued or payable on or prior to or after the date of this Agreement or the Closing Date;

8

(n)      all Liabilities of Sellers arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by Sellers, whether or not used in the Ordinary Course, including any Liabilities for noncompliance with Environmental Laws or the Release of Hazardous Substances, to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing;

(o)      other than the Assumed Rebate Liability or any Assumed Current Liability expressly assumed pursuant to Section 1.3, all Liabilities relating to any Product that is or has been manufactured, tested, distributed, held or marketed by or on behalf of any Seller, or the Affiliate of any Seller, arising from any recall, withdrawal or suspension (whether voluntarily or otherwise), except to the extent that such recall, withdrawal or suspension results from Purchaser's operation of the Business or the Acquired Assets following the Closing;

(p)      all Liabilities as to which any Seller is an obligor, or is otherwise responsible or liable, to any Seller or any of its Affiliates, other than any Assumed Current Liability.

(q)      all Liabilities of Sellers arising out of any (i) Excluded Contract, (ii) Permit that is not transferred to Purchaser as part of the Acquired Assets or, (iii) Contract or Permit that is not transferred to Purchaser (subject to Section 1.5(c)) because of any failure to obtain any Consent or Governmental Authorization required for such transfer;

(r)      all Liabilities of Sellers related to any Contract of any Seller, or an Affiliate of any Seller, with Virginia Premier, which such Contracts shall be an Excluded Contract;

(s)      all Liabilities relating to Transferred Employees that arise on or prior to the Closing Date;

(t)      all Liabilities arising with respect to any Business Employees who are not required to receive a Transfer Offer or who otherwise fails to become employed by Purchaser or its Affiliates immediately following the Closing Date (including due to refusing to accept a Transfer Offer that complies with Section 6.3), other than as a result of Purchaser's breach of Section 6.3;

(u)      (i) all Liabilities relating to income Taxes imposed upon any of the Sellers (or for which any of the Sellers may otherwise be liable, including as a transferee, successor, or by contract (other than as expressly provided in this Agreement)), without regard to whether such Taxes relate to periods (or portions thereof) ending on or prior to the Closing Date, (ii) all Liabilities relating to Taxes imposed on or with respect to the Acquired Assets for any Pre-Closing Tax Period, and (iii) all Liabilities of any of the Sellers relating to the payment for the income Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or non-U.S. Law); and

(v)      drafts or checks outstanding as of the Closing;

9

provided that in the event of any conflict between the terms of <u>Section 1.3</u> and this <u>Section 1.4</u>, the terms of <u>Section 1.3</u> shall control.

**Section 1.5**    <u>**Assumption/Rejection of Certain Contracts / Non-Assignment**</u>.

(a)    <u>Assumption and Assignment of Executory Contracts</u>. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired Leases to which any Seller is a party that are Assigned Contracts or an Acquired Lease and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts or an Acquired Lease at Closing. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the applicable Sellers shall assume and assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts and any Acquired Lease, each of which shall be identified by the name or appropriate description and date of the Assigned Contract and any Acquired Lease (if available), the other party to the Assigned Contract, and any Acquired Lease, and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court. Such notice shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts and any Acquired Lease as determined by Sellers based on their books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Sellers shall, pursuant to the Sale Order, and the Assignment and Assumption Agreement(s) assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts and any Acquired Lease that may be assigned by any such Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to <u>Section 1.5(b)</u>. At the Closing, (i) Purchasers shall pay all Assumed Cure Costs and Sellers shall pay all Excluded Cure Costs, and (ii) Purchaser shall assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract and any Acquired Lease pursuant to section 365 of the Bankruptcy Code. On the date hereof, Sellers shall set forth on <u>Schedule 3.6(a)</u> their good faith estimate of the Cure Costs of each executory Assigned Contract, Material Contract, and unexpired Lease, including the Acquired Lease.

(b)    <u>Excluding or Adding Assigned Contracts and any Acquired Lease Prior to Closing</u>. Purchaser shall have the right to notify Sellers in writing of any Assigned Contract (other than Contracts with customers or pharmacies or any Commercial Interco Contract) and any Acquired Lease that it does not wish to assume or a Contract or Lease (other than any Contract set forth on <u>Schedule 1.5(b)</u> (the "<u>Rejection Contracts</u>")) to which any Seller is a party that Purchaser wishes to add as an Assigned Contract or an Acquired Lease, as applicable, at any time, and from time to time, up to one Business Day prior to the Bid Deadline (as defined in the Bidding Procedures Order), and (i) any such previously considered Assigned Contract (other than Contracts with customers or pharmacies or any Commercial Interco Contract) or Acquired Lease that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts or Acquired Lease, as applicable, and automatically deemed an Excluded Contract, in each case, without any adjustment to the Purchase Price, and (ii) any such

10

previously considered Excluded Contract (other than any Rejection Contract) that Purchaser wishes to assume as an Assigned Contract, or Acquired Lease, as applicable, shall be automatically deemed added to the Schedules related to Assigned Contracts, or Acquired Lease, as applicable, and automatically no longer deemed an Excluded Contract, and assumed by the applicable Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price.

(c)    Non-Assignment.

(i)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract or an Acquired Lease hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is terminated by a Seller, its Affiliates or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract or an Acquired Lease hereunder and is not continued or otherwise extended upon assumption.

(ii)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any Order of the Bankruptcy Court, including the Sale Order) in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this clause (ii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six (6) months following the Closing or the election of Purchaser, upon written notice to Sellers and in the sole discretion of Purchaser(or the closing of the Bankruptcy Cases or dissolution of the applicable Seller(s) if earlier), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2)Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, the

applicable Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order. Notwithstanding anything herein to the contrary, (x) the provisions of this <u>Section 1.5(c)</u> shall not apply to any Consent or approval required under the HSR Act and any Foreign Competition Laws, which Consent or approval shall be governed by <u>Section 6.5</u> and (y) no Seller will be obligated to pay any consideration therefor to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

**Section 1.6     <u>Excluded Asset Designation</u>**. At any time at least two (2) Business Day prior to the Closing, Purchaser may, in its sole discretion and by written notice to the Sellers, designate any of the Acquired Assets (other than any executory Contracts or unexpired Lease subject to <u>Section 1.5(b)</u>), as additional Excluded Assets. Purchaser acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Acquired Assets as Excluded Assets pursuant to the operation of this section.

**Section 1.7     <u>EIC</u>**.

(a)     "<u>EIC</u>" means Elixir Insurance Company, an Ohio corporation and wholly-owned Subsidiary of Sellers that is not a Debtor.

(b)     At the Closing, subject to the terms and subject to the conditions set forth herein, Sellers shall cause EIC to sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from EIC, all of EIC's right, title and interest in and to, as of the Closing, the following assets, free and clear of all Encumbrances other than Permitted Encumbrances:

(i)     the CMS Contracts;

(ii)     the EGWP Contracts; and

(iii)     all books and records maintained by or on behalf of EIC or any Affiliate for and with respect to the CMS Contracts and any EGWP Contracts.

(c)     On the terms and subject to the conditions set forth herein, effective as of the Closing, Purchaser shall irrevocably assume from EIC (and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and EIC shall irrevocably transfer, assign, convey, and deliver to Purchaser, all Liabilities and obligations of, and claims against, EIC under the CMS Contracts incurred from and after the Closing.

(d)     On the terms and subject to the conditions set forth herein, effective as of the Closing, Purchaser shall irrevocably assume from EIC (and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and EIC shall irrevocably transfer, assign, convey, and deliver to Purchaser, all Liabilities and obligations of EIC under the EGWP Contracts incurred from and after the Closing.

(e)     Where applicable, the CMS Contracts and the EGWP Contracts shall constitute Acquired Assets; provided that (i) the Parties acknowledge and agree that EIC is not and shall not in any event be a Debtor and (ii) as such, none of the provisions of this Agreement related to or involving the Bankruptcy Code shall apply to the transactions contemplated by this Section 1.7.

(f)     "CMS Contracts" means collectively, (i) that certain Contract titled "Contract with Approved Entity pursuant to Sections 1860D-1 Through 1860D-43 of the Social Security Act for the Operation of an Employer Group Only Voluntary Medicare Prescription Drug Plan" (Contract No. S7694), by and between CMS and EIC, executed on or about September 11, 2023, including all documents incorporated therein by reference and addenda thereto, (ii) any plans entered into thereunder, (iii) any "lives" covered by any of the foregoing], and (iv) that certain Contract titled "Medicare Mark License Agreement" (Contract No. S7694), by and between CMS and EIC,  executed on or about September 11, 2023.

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

**Section 2.1     Consideration; Payment**.

(a)     The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) subject to adjustment pursuant to Section 2.7, a cash payment of $575,000,000 (the "Cash Payment").

(b)     At the Closing, Purchaser shall deliver, or cause to be delivered, to Sellers the Cash Payment less the Deposit (the "Closing Date Payment"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two (2) Business Days prior to the date such payment is to be made.

**Section 2.2     Deposit; Purchase Price Adjustment Escrow**.

(a)     Deposit.

(i)     Purchaser has, on or prior to the date hereof (or, if the date hereof is not a Business Day, the first Business Day immediately following the date hereof) and pursuant to the Escrow Agreement, made an earnest money deposit with the Escrow Agent in the amount equal to $12,000,000 (the "Initial Deposit"), by wire transfer of immediately available funds for deposit into a separate segregated, non-interest bearing escrow account (the "Escrow Account") maintained by the Escrow Agent in accordance with the Escrow Agreement and Bidding Procedures Order.

(ii)     So long as this Agreement has not been earlier terminated, Purchaser will, on or prior to October 23, 2023, and pursuant to the Escrow Agreement, make

a second earnest money deposit with the Escrow Agent in the amount equal to $3,000,000 (the "Second Deposit"), by wire transfer of immediately available funds for deposit into the Escrow Account maintained by the Escrow Agent in accordance with the Escrow Agreement and Bidding Procedures Order.

(iii)    So long as this Agreement has not been earlier terminated, Purchaser will, on or prior to October 30, 2023, and pursuant to the Escrow Agreement, make a third earnest money deposit with the Escrow Agent in the amount equal to the difference (i) $57,500,000 minus (ii) the sum of the Initial Deposit and the Second Deposit (such difference, the "Final Deposit"), by wire transfer of immediately available funds for deposit into the Escrow Account maintained by the Escrow Agent in accordance with the Escrow Agreement and Bidding Procedures Order, such that immediately after the Final Deposit is made the amount in the Escrow Account equals $57,500,000 (the total amount of funds held in the Escrow Account at any given time from the Initial Deposit, Second Deposit, or Final Deposit, shall be referred to herein as the "Deposit"). The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.

(b)    If this Agreement has been terminated by (i) Sellers pursuant to Section 8.1(d), Section 8.1(f), or Section 8.1(p) or (ii) Purchaser pursuant to Section 8.1(n) or Section 8.1(o), then, in any such case, the Parties shall promptly, but in any event within five (5) Business Days after such termination hereof, deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds 100% of the Deposit (together with any and all investment interest thereon (less any Taxes with respect to such interest), if any) to such account(s) as may be designated by Elixir, and Elixir shall retain the Deposit (together with any and all investment interest thereon (less any Taxes with respect to such interest), if any); provided that nothing in this paragraph shall be deemed to limit any other remedies to which Sellers may be entitled under this Agreement or applicable Law; provided that Sellers acknowledge and agree that retaining the Deposit pursuant to this Section 2.2(b) shall be Sellers' sole and exclusive remedy arising (i) from Seller's termination of this Agreement pursuant to Section 8.1(d), Section 8.1(f), or Section 8.1(p) (or upon any other grounds) as a result of Purchaser's breach of Section 2.2(a) or Section 4.4, (ii) from Purchaser's breach of Section 2.2(a) or Section 4.4, or (iii) from Purchaser's termination of this Agreement pursuant to Section 8.1(n) or Section 8.1(o); provided that nothing herein shall limit any Party's Liability for Fraud.

(c)    If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Parties shall promptly, but in any event within five (5) Business Days after such termination hereof, deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds 100% of the Deposit (together with any and all investment interest thereon (less any Taxes with respect to such interest), if any) to such account(s) as may be designated by Purchaser, and the Deposit, together with any and all investment interest

14

thereon (less any Taxes with respect to such interest), if any, shall be returned to Purchaser within five (5) Business Days after such termination.

(d)      The Parties agree that Sellers' right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(e)      If the Closing occurs, at the Closing the Parties shall deliver a joint written instruction to the Escrow Agent directing the Escrow Agent to (i) transfer by wire transfer of immediately available funds an amount equal to (i) 100% of the Deposit (together with any and all investment interest thereon, if any) minus (ii) the Purchase Price Adjustment Escrow Amount, which shall continue to be held in accordance with the Escrow Agreement, to such account(s) as may be designated by Elixir. The Purchase Price Adjustment Escrow Amount shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser.

**Section 2.3      Closing**. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities in accordance with this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the first day of the month immediately following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date;" provided that if the Closing Date would otherwise occur on January 1, 2024, the Closing Date shall be January 2, 2024.

**Section 2.4      Closing Deliveries by Sellers**. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)      a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by the applicable Sellers;

(b)      a short-form patent assignment agreement substantially in the form of Exhibit B, duly executed by the applicable Sellers;

(c)      a short-form trademark assignment agreement substantially in the form of Exhibit C, duly executed by the applicable Sellers;

(d)      a short-form domain name assignment agreement substantially in the form of Exhibit D, duly executed by the applicable Sellers;

(e)      the TSA, duly executed by the applicable Sellers or their Affiliates;

(f)     chain of custody agreements, in customary form and only to the extent necessary in accordance with applicable Law to transfer Sellers' right, title, and interest in any pharmaceutical Investory to Purchaser, which agreements shall not expand any representation or warranty, or any remedy or Liability, of any Party, duly executed by the applicable Sellers;

(g)     a special warranty deed with respect to each Owned Real Property, conveying to Purchaser fee simple title to such Owned Real Property, subject only to Permitted Encumbrances;

(h)     an IRS Form W-9 or IRS Form W-8, as applicable, executed by each Seller or each Seller's regarded owner for U.S. federal income Tax purposes; provided that the Purchaser's sole remedy for the failure to provide any such form shall be to withhold any required amount under applicable Tax Law; and

(i)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Elixir certifying that the conditions set forth in Section 7.2(a), Section 7.2(b), and Section 7.2(d) have been satisfied.

**Section 2.5**     **Closing Deliveries by Purchaser**. At the Closing, Purchaser shall deliver to (or at the direction of) Sellers:

(a)     the Closing Date Payment, subject to adjustment pursuant to Section 2.7;

(b)     the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)     a short-form patent assignment agreement substantially in the form of Exhibit B, duly executed by the Purchaser;

(d)     a short-form trademark assignment agreement substantially in the form of Exhibit C, duly executed by the Purchaser;

(e)     a short-form domain name assignment agreement substantially in the form of Exhibit D, duly executed by the Purchaser;

(f)     the TSA, duly executed by the applicable Sellers or their Affiliates;

(g)     chain of custody agreements, in customary form and only to the extent necessary in accordance with applicable Law to transfer Sellers' right, title, and interest in any pharmaceutical Inventory to Purchaser, which agreements shall not expand any representation or warranty, or any remedy or Liability, of any Party, duly executed by the applicable Purchaser; and

(h)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied.

**Section 2.6**  **Withholding**. Purchaser, the Sellers, and their Affiliates (or any applicable agents thereof) shall be entitled to deduct and withhold from the Cash Payment or other consideration payable pursuant to this Agreement such amounts as may be required to be deducted and withheld under the Tax Code or any provision of applicable Law; provided that Purchaser and its Affiliates shall use commercially reasonable efforts to provide notice of any such intent by them to withhold or deduct (other than in respect of payments that are compensatory in nature) to Sellers at least five (5) Business Days in advance of such withholding or deduction, and Purchaser and its Affiliates shall cooperate in good faith with Sellers to reduce or eliminate any such withholding or deduction. To the extent that such amounts are paid over to the appropriate Taxing Authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding were made.

**Section 2.7**  **Purchase Price Adjustment**.

(a)  Closing Adjustment.

(i)  At the Closing, the Cash Payment component of the Closing Date Payment payable at Closing by Purchaser pursuant to Section 2.5(a) shall be adjusted in the following manner: either (1) an increase by the amount, if any, by which the Estimated Closing Working Capital (as determined in accordance with Section 2.7(a)(ii)) is greater than the Target Working Capital provided that in no event will such increase be more than $50,000,000, or (2) a decrease by the amount, if any, by which the Estimated Closing Working Capital is less than the Target Working Capital.

(ii)  At least 3 Business Days before the Closing, Sellers shall prepare and deliver to Purchaser a statement setting forth its good faith estimate of Closing Working Capital (the "Estimated Closing Working Capital"), which statement shall be substantially in the form of Exhibit E and contain a calculation of Estimated Closing Working Capital (the "Estimated Closing Working Capital Statement"), and prepared in accordance with GAAP applied using the accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies used by Sellers and their Affiliates in the preparation of the Financial Statements, subject to any modifications and limitations set forth on Exhibit E.

(iii)  The Parties agree that the amounts set forth in Exhibit E are solely for the purposes of providing an example calculation of Closing Working Capital in accordance with the terms of this Agreement but that such amounts are solely illustrative and do not constitute any agreement or representation or warranty by any Party as to what such amounts shall be in the Estimate Closing Working Capital or the Closing Working Capital and none of the Estimated Closing Working Capital Statement, the Closing Working Capital Statement, or the Statement of Objections shall be bound by or required to include the amounts set forth in Exhibit E.

(b)  Post-Closing Adjustment. Within 90 days after the Closing Date, Purchaser shall prepare and deliver to Seller a statement setting forth Purchaser's good faith

17

calculation of Closing Working Capital, which statement shall be substantially in the form of Exhibit E (the "Closing Working Capital Statement"), and prepared in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies used by Sellers and their Affiliates in the preparation of the Financial Statements, subject to any modifications and limitations set forth on Exhibit E.

(c)      Review.

(i)      After receipt of the Closing Working Capital Statement, Sellers shall have 45 days (or such longer period as the Parties may agree in writing, the "Review Period") to review the Closing Working Capital Statement. During the Review Period, Sellers and Sellers' Advisors shall have full access to the relevant books and records of Purchaser, the personnel of, and work papers prepared by, Purchaser or Purchaser's financial Advisors to the extent that they relate to Closing Working Capital and to such historical financial information (to the extent in Purchaser's possession) relating to Closing Working Capital as Sellers may reasonably request for the purpose of reviewing the Closing Working Capital Statement and to prepare a Statement of Objections; provided that such access shall be in a manner that does not interfere with the normal business operations of Purchaser.

(ii)      On or prior to the last day of the Review Period, Sellers may object to the Closing Working Capital Statement by delivering to Purchaser a written statement setting forth Sellers' objections in reasonable detail, indicating each disputed item or amount and the basis for Sellers' disagreement therewith (the "Statement of Objections"). If Sellers fail to deliver the Statement of Objections before the expiration of the Review Period, the Closing Working Capital reflected in the Closing Working Capital Statement will be deemed to have been accepted by Sellers and will be final and binding. If Sellers deliver the Statement of Objections before the expiration of the Review Period, Purchaser and Sellers shall negotiate in good faith to resolve such objections within 45 days after the delivery of the Statement of Objections or such longer period as the Parties may agree in writing (the "Resolution Period"), and, if the same are so resolved within the Resolution Period, the Closing Working Capital Statement with such changes as may have been previously agreed in writing by Purchaser and Sellers, shall be final and binding on the Parties. All discussions related thereto will be governed by Rule 408 of the Federal Rules of Evidence (as in effect as of the date of this Agreement) and any applicable similar state rule, unless otherwise agreed in writing by Sellers and Purchaser.

(iii)      If Sellers and Purchaser fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("Disputed Amounts") shall be submitted for resolution to RSM US LLP or Grant Thornton LLP, at the election of Purchaser, (the "Independent Accountant") who, acting as an expert and not an arbitrator, shall resolve the Disputed Amounts only and make any adjustments to the Closing Working Capital Statement. The Parties will execute a

customary engagement letter if so requested by the Independent Accountant and will cooperate with the Independent Accountant during the term of its engagement. The Independent Accountant will have exclusive jurisdiction over any disputes arising out of or relating to the adjustments pursuant to this <u>Section 2.7</u>, and resort to the process involving the Independent Accountant as provided in this <u>Section 2.7(c)</u> will be the only recourse and remedy of the Parties against one another with respect to any such dispute. The Parties agree that all adjustments shall be made without regard to materiality. The Independent Accountant shall decide only the Disputed Amounts and its decision for each Disputed Amount must be within the range of values assigned to each such item in the Closing Working Capital Statement and the Statement of Objections, respectively. The fees and expenses of the Independent Accountant (the "<u>Accounting Fees</u>") shall be paid *pro rata* by Sellers, on the one hand, and Purchaser, on the other hand, based upon the percentage that the amount actually contested but not awarded to Sellers or Purchaser, respectively, bears to the aggregate amount actually contested by Sellers or Purchaser, respectively, as determined by the Independent Accountant. The Independent Accountant shall make a determination as soon as practicable within 30 days (or such other time as the Parties shall agree in writing) after its engagement, and its resolution of the Disputed Amounts and its adjustments to the Closing Working Capital Statement and allocation of Accounting Fees between Purchaser and Sellers shall, in each case, be final, conclusive and binding upon the Parties.

(iv)    Closing Working Capital (i) will be determined in accordance with the definitions set forth in this Agreement, and (ii)(A) will not include any changes in assets or liabilities as a result of purchase accounting adjustments or other changes arising from or resulting as a consequence of the Transactions, (B) will be, and will be based on facts and circumstances as they exist as of the Closing, expressly including "Type 1" subsequent event evidence to the extent permitted under GAAP, but otherwise will exclude the effects of any act, decision, change in circumstances or event arising or occurring on or after the Closing, (C) will not include any reserve or accrual, or any line item or line item entry, not reflected in <u>Exhibit E</u>. The Parties agree that the purpose of determining the Closing Working Capital in accordance with this <u>Section 2.7</u> is solely to accurately measure changes (if any) in the amounts of the Closing Working Capital from the Estimated Closing Working Capital set forth in the Estimated Closing Working Capital Statement in order to determine the final Closing Working Capital and that such processes are not intended to permit the introduction of principles, policies, practices, procedures, methodologies, classifications, methods, conventions, assumptions, judgments or estimation techniques that are different from those used in the calculation of the Cash Payment (including any exclusions or deviations from GAAP and the methodology used by Sellers to prepare such estimates).

(d)    <u>Payments</u>.

(i)    If the amount of the Closing Working Capital set forth in the Closing Working Capital Statement as finally determined in accordance with <u>Section 2.7(c)</u>

is greater than the Estimated Closing Working Capital, Purchaser shall pay to Sellers an amount equal to such difference and the Parties shall direct the Escrow Agent to release to Sellers the Purchase Price Adjustment Escrow Amount from the Escrow Account; provided that notwithstanding anything contained in this Agreement to the contrary, in no event shall the Cash Payment as adjusted pursuant to this Section 2.7 exceed $625,000,000.

(ii)     If the amount of the Closing Working Capital set forth in the Closing Working Capital Statement as finally determined in accordance with Section 2.7(c) is less than the Estimated Closing Working Capital (any such excess, the "Purchaser Adjustment Amount"), Sellers shall pay to Purchaser an amount equal to such difference as follows: (A) if such difference equals or exceeds the amount available in the Escrow Account, the Parties shall direct the Escrow Agent (pursuant to the terms of the Escrow Agreement) to release to Purchaser the entire Purchase Price Adjustment Escrow Amount from the Escrow Account, and (B) if such difference is less than the amount available in the Escrow Account, the Parties shall direct the Escrow Agent (pursuant to the terms of the Escrow Agreement) to release to Purchaser an amount equal to such difference from the Escrow Account and release any remaining amounts in the Escrow Account to Sellers.

(iii)     Purchaser agrees that (i) payment of the Purchaser Adjustment Amount (if any) from the Escrow Account in accordance with the Escrow Agreement shall be the sole and exclusive remedy for Purchaser for payment of the Purchaser Adjustment Amount, if any, and the Purchase Price Adjustment Escrow Amount in the Escrow Account will be Purchaser's sole and exclusive source of recovery for any amounts owing to Purchaser pursuant to this Section 2.7, even if the Purchaser Adjustment Amount exceeds the Purchase Price Adjustment Escrow Amount, and (ii) the adjustments to the Purchase Price provided for in this Section 2.7, and the dispute resolution provisions provided for in this Section 2.7, will be the exclusive remedy for the matters addressed or could be addressed by this Section 2.7. For the avoidance of doubt, and without limiting the generality of the foregoing, no claim by Purchaser or any of its Affiliates or Advisors for the payment of the Purchaser Adjustment Amount will be asserted against any of the Sellers; provided that, for the avoidance of doubt, this sentence will not limit the obligations of Sellers expressly set forth in this Section 2.7, including with respect to the obligation, if any, to instruct the Escrow Agent to release the Purchaser Adjustment Amount from the Escrow Account.

(iv)     Any payments required to be made pursuant to this Section 2.7(d) will (A) be due (x) within five (5) Business Days of acceptance of the applicable Closing Working Capital Statement or (y) if there are Disputed Amounts, then within five (5) Business Days of the resolution of any Disputed Amounts pursuant to Section 2.7(c)(iii); and (B) be paid by wire transfer of immediately available funds to such account as is directed by Purchasers or Sellers, as the case may be.

(e)      _Adjustments for Tax Purposes_. Any payments made pursuant to Section 2.7 shall be treated as an adjustment to the Purchase Price by the Parties for Tax purposes, unless otherwise required by Law.

# ARTICLE III
# REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed in the forms, reports, schedules, statements, exhibits and other documents filed during the 6 months preceding the date hereof with the SEC by Rite Aid Corporation, a Delaware corporation and parent of Elixir, in respect of Sellers, their Affiliates, and their businesses to the extent publicly available on the EDGAR system of the United States Securities and Exchange Commission (the "Filed SEC Documents") (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements" and any other disclosures included therein to the extent they are forward-looking in nature) or set forth in the Schedules delivered by Sellers concurrently herewith (each, a "Schedule" and collectively, the "Schedules") and subject to Section 10.10, Sellers represent and warrant to Purchaser as of the date hereof as follows.

**Section 3.1      Organization and Qualification**. Each Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing, and in good standing under the Laws of the jurisdiction of its incorporation or formation. Each Seller is duly licensed or qualified to do business under the Laws of each jurisdiction in which the nature of the business conducted by it makes such licensing or qualification necessary, except where failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**Section 3.2      Authorization of Agreement**. Subject to requisite Bankruptcy Court approvals:

(a)      each Seller has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which each such Seller is a party and to perform its obligations hereunder and to consummate the Transactions;

(b)      the execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the Transactions, subject to requisite Bankruptcy Court approvals being granted, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions; and

(c)      this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such

21

enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

**Section 3.3    Conflicts; Consents**. Assuming that (a) requisite Bankruptcy Court approvals are obtained, (b) the notices, authorizations, approvals, Orders, Permits or consents set forth on Schedule 3.3 are made, given or obtained (as applicable), and (c) the requirements of the HSR Act and any other applicable antitrust, competition, foreign direct involvement or "FDI", or merger control Laws promulgated by any Governmental Body ("Foreign Competition Laws") are complied with, neither the execution and delivery by Sellers of this Agreement or the other Transaction Agreements, nor the consummation by Sellers of the Transactions, nor performance or compliance by Sellers with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of any Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable, (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate any Seller's obligations under any such Material Contract, (iii) conflict with or violate any Law or Order applicable to any Seller or any of the Acquired Assets, or by which any Seller, or any of the Acquired Assets, may be bound or affected, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any Acquired Assets, except, in each case of clauses (ii) thru (iv), as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets or the Assumed Liabilities, taken as a whole.

**Section 3.4    Financial Statements**.

(a)    Rite Aid Corporation, a Delaware corporation and direct or indirect parent of Sellers ("RAD"), has filed with the EDGAR system of the United States Securities and Exchange Commission:

(i)    its Form 10K, filing date May 1, 2023, which includes the audited consolidated balance sheet of RAD and subsidiaries as of March 4, 2023 and the related audited consolidated statements of operations, comprehensive loss, stockholders' (deficit) equity, and cash flows for the fiscal year ended March 4, 2023; and

(ii)    its Form 10Q, filing date July 11, 2023, which includes the unaudited consolidated balance sheet of RAD and subsidiaries as of June 3, 2023, the related unaudited consolidated statements of operations, comprehensive loss, stockholders' (deficit) equity, and cash flows for the thirteen weeks ended June 3, 2023.

(b)    Attached to Schedule 3.4(b) are:

(i)     the unaudited balance sheet of the Pharmacy Services Segment of RAD as of March 4, 2023 and the related unaudited statements of operations and cash flows for the fiscal year ended March 4, 2023; and

(ii)    the unaudited balance sheet of the Pharmacy Services Segment of RAD as of June 30, 2023 and the related unaudited statements of operations and cash flows for the six months ended June 30, 2023 ((a), and (b), collectively, the "Financial Statements").

(c)     The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto and, in the case of unaudited Financial Statements, subject to normal year-end audit adjustments, to the absence of notes and to any other adjustments described therein, including in any notes thereto) and fairly present in all material respects the consolidated financial position of the Sellers and their respective consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown, except as may be indicated in the notes thereto.

(d)     Each of the Sellers maintain a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformance with GAAP, and to maintain accountability for assets; (iii) access to Sellers' assets are permitted only in accordance with management's authorization; and (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences (v) violations of the applicable Anti-Corruption Laws will be prevented and detected. None of RAD, to the extent directly related to the Business, any of the Sellers or, to the Knowledge of Sellers, any of their respective independent auditors, has identified or been made aware of "significant deficiencies" or "material weaknesses" (as defined by the Public Company Accounting Oversight Board) in the design or operation of the their internal controls over financial reporting which would reasonably be expected to adversely affect in any material respect their ability to record, process, summarize and report financial data, in each case which has not been subsequently remediated.

**Section 3.5     Title to Properties; Sufficiency of Assets**.

(a)     (i) The Sellers own good and valid title to, or hold a valid leasehold interest in, all of the Acquired Assets, whether tangible or intangible, free and clear of all Encumbrances (other than Permitted Encumbrances), and (ii) at the Closing, Sellers will transfer, convey and assign good and valid title to, or a valid leasehold interest in, all of the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)     Other than the Excluded Assets, but together with the rights and services set forth in the TSA, the Acquired Assets constitute all of the assets, properties and rights necessary to operate and conduct the Business in substantially the same manner as the Business was operated and conducted immediately as of the date hereof.

23

(c)    Schedule 3.5(c) sets forth the address of each Owned Real Property.

(d)    With respect to the Owned Real Property:

(i)    a Seller has good and marketable fee simple title to such Owned Real Property, which shall be, free and clear of all Encumbrances as of the Closing Date, except for Permitted Encumbrances;

(ii)    no Seller has leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof or otherwise transferred any of its rights to the Owned Real Property or any improvements thereon;

(iii)    other than the right of Purchaser pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein; and

(iv)    the Sellers are not a party to any agreement or option to purchase any real property or interest therein relating to, or used in connection with, the Business.

(e)    One or more of the Sellers has a good and valid leasehold interest to all real property leased by Sellers (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). There are no leases, license agreements or other rights to occupy the Leased Real Property, or any portion thereof, except those rights of Seller as tenant pursuant to the applicable Acquired Lease or pursuant to any Permitted Encumbrance.

(f)    Schedule 3.5(f) sets forth the address of each Leased Real Property. The Sellers have made available to the Purchaser or the Purchaser's Advisors true, correct and complete copies of each Acquired Lease. Except as set forth on Schedule 3.5(f) (and subject to entry of the Sale Order), with respect to each Acquired Lease (i) such Acquired Lease is legal, valid, binding, enforceable and in full force and effect; (ii) to the Knowledge of Sellers, there are no existing material disputes with respect to such Acquired Lease; (iii) none of Sellers or, to the Knowledge of Sellers, any other party to the Acquired Lease is in material breach or material default under such Acquired Lease, and, to the Knowledge of Sellers, no event has occurred since January 1, 2022 or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material breach or material default, or permit the termination, modification or acceleration of rent under such Acquired Lease; (iv) no Seller has currently subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; (v) none of the Acquired Leases, or any interest therein, is collaterally assigned or subject to a security interest (other than Permitted Encumbrances); and (vi) a Seller has a valid leasehold interest in the Leased Real Property; and (vii) no notice of termination or default has been delivered or received with respect to any Acquired Lease.

(g)    The improvements and fixtures (including building systems, such as heating, plumbing, ventilation, air conditioning and electric) on the Owned Real Property

24

and Leased Real Property are in adequate operating condition and in a state of adequate maintenance and repair, ordinary wear and tear excepted, are adequate and suitable for the current operations of the Business. There is no condemnation, eminent domain, expropriation or similar proceeding pending or, to Sellers' Knowledge, threatened against any of the Owned Real Property or Leased Real Property or any improvement thereon. The Owned Real Property and Leased Real Property constitutes all of the real property utilized by a Seller in the operation of the Business other than, for the avoidance of doubt, any real property used by Sellers' Affiliates in providing services used by Sellers under the TSA.

**Section 3.6    Contracts**.

(a)    Schedule 3.6(a) sets forth a list of each Material Contract, as of the date of this Agreement. "Material Contract" means any Contract to which the Sellers are party, excluding any Employee Benefit Plan, that:

(i)    relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than Contracts entered into in the Ordinary Course;

(ii)    provides for indebtedness for borrowed money of Sellers having an outstanding or committed amount in excess of $100,000, other than letters of credit or expense advances made in the Ordinary Course or loans made under any 401(k) plan;

(iii)    relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract in excess of $500,000 pursuant to which any earn-out, indemnification or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Sellers of more than $500,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions supplies, merchandise, Inventory, products, Equipment, properties or other assets in the Ordinary Course, or of supplies, Inventory, merchandise, products, Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the Business);

(iv)    is a Contract pursuant to which Sellers would reasonably be expected to (i) make payments of more than $500,000 during any fiscal year or (ii) receive payments of more than $3,500,000 during any fiscal year;

(v)    contains any provision (A) limiting, in any material respect, the right of Sellers to engage in any business, solicit or hire any Person, compete with any Person, or operate anywhere in the world, (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, or (C) granting any right of first refusal, right of first offer or right of first negotiation in each case of (A), (B) and (C), that would reasonably be expected to be material to the Business, taken as a whole;

25

(vi)     is a Contract with a Governmental Body that involves aggregate annual payments in excess of $1,000,000 (not including drug spend);

(vii)    is a Contract with a Group Purchasing Organization that involves aggregate annual payments in excess of $500,000;

(viii)   contains minimum payment or purchase requirements, guarantees of purchase or sale, volume-based commitments or other pricing clauses of similar contractual language, in each case, except as would not reasonably be expected to be material to the Acquired Assets and the Business, taken as a whole;

(ix)     is a Contract between any Seller (on the one hand) and EIC (on the other hand);

(x)      is a collective bargaining agreement or other similar labor agreement covering (A) Business Employees or (B) to the extent such Contract would reasonably be expected to impact the Transactions or the hiring and employment of Business Employees by Purchaser hereunder, other employees of Sellers;

(xi)     is any Contract with any current Business Employee or contractor, that (A) involves aggregate annual compensation in excess of $100,000 during the past twelve-month period or that will be in excess of $100,000 during the twelve-month period following the date hereof for such person, other than offer letter agreements for at-will employment; or (B) involves any severance, change-in-control, retention, or similar type of payment payable by a Seller; or

(xii)    is any Contract for any employee staffing arrangement or any other arrangement whereby the Sellers spend in excess of $200,000 annually to retain the services of a staffing agency, professional employer organization, or employer of record.

(b)     True and complete copies of all Material Contracts have previously been made available to Purchaser or Purchaser's Advisors. Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law and except (i) as a result of the commencement of the Bankruptcy Cases, (ii) with respect to any Contract that has previously expired in accordance with its terms, or (iii) as set forth in Schedule 3.6(b), (A) each Material Contract is valid and binding on the Seller that is a party thereto and, to the Knowledge of Sellers, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) the applicable Seller, and to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Sellers have received no written notice of the existence of any breach or default on the part of any Sellers under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of a Seller, or to the Knowledge of Sellers, any counterparty under such Material

26

Contract and (E) to the Knowledge of Sellers, Sellers have not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract.

(c)    Schedule 3.6(c) sets forth a list of the top 10 suppliers by value of purchases for each of the specialty pharmacy and pharmacy benefit management segments of the Business for each of the year ended December 31, 2022 and the six (6) month period ended June 30, 2023 (each, a "Significant Supplier").

(d)    Schedule 3.6(d) sets forth a list of the top 20 customers by revenue (each, a "Significant Customer") for each of the specialty pharmacy and pharmacy benefit management segments of the Business for each of the year ended December 31, 2022 and the six (6) month period ended June 30, 2023.

(e)    Since January 1, 2023, none of the Significant Suppliers or Significant Customers has canceled or otherwise terminated (other than pursuant to natural expiration) or made any written threat to any Seller to cancel or otherwise terminate or materially curtail its relationship with any Seller.

(f)    Except as set forth on Schedule 3.6(f) and except with respect to Excluded Liabilities: (i) all Client Contracts, Pharmacy Contracts and Rebate Contracts are currently, and since January 1, 2022 have been, adjudicated in accordance with the terms and conditions of each such Client Contract, Pharmacy Contract or Rebate Contract, in all material respects; and (ii) all material rebate claims of the Sellers since January 1, 2022 have been submitted and processed in accordance with the terms and conditions of the applicable Rebate Contract in all material respects, it being understood, in the case of (i) and (ii), that such terms include, for instance, reconciliation processes to correct the amount of payments initially made and compliance with such terms shall give effect to such reconciliations and that the initial design and setup of logistical arrangements with counterparties involves some degree of trial and error.

(g)    Scheduled 3.6(g) sets forth a list of customer Contracts of Sellers pursuant to which Sellers have received revenue of at least 80% of the aggregate revenue of the Business for the seven (7) month period ended July 31, 2023, together with the lives associated therewith, the start date of such Contracts, and the expected end date of such Contracts.

**Section 3.7    No Litigation**.

(a)    There are no Actions pending or, to Sellers' knowledge, threatened against or affecting any of the Sellers that would reasonably be expected to adversely affect any Seller's performance of its obligations under any of the Transaction Agreements or the consummation of the Transactions.

(b)    Except as set forth on Schedule 3.8(b), there is no Action pending, or to the Knowledge of Sellers threatened, against or relating to any Seller, the Business, the Acquired Assets or the Assumed Liabilities that (i) if adversely determined against any Seller, the Business, or the Acquired Assets would reasonably be expected to result in Liabilities, fines or damages of more than $500,000 or would, individually or in the

aggregate, reasonably be expected to have a Material Adverse Effect, or (ii)(A) relates to a criminal matter or (B) calls for injunctive relief or other restriction that, if adversely determined against any Seller, would reasonably be expected to be material to the Business, Acquired Assets and the Assumed Liabilities, taken as a whole.

(c)    Except as set forth on Schedule 3.8(c), since January 1, 2022, there has been no (i) such Action pending, or to the Knowledge of Sellers threatened, against any Seller or (ii) material Order imposed (or otherwise pending or the Knowledge of Sellers threatened) upon any Seller, in each case, by or before any Governmental Body.

**Section 3.8    Permits; Compliance with Laws**.

(a)    Each Seller (with respect to the Business) is, and has been since January 1, 2022, in compliance in all material respects with all Laws or Orders, applicable to such Seller. Each Seller holds all licenses, permits, Healthcare Permits, certificates, approvals and authorizations from Governmental Bodies necessary for the lawful conduct of the Business (collectively, "Permits"). Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, (i) each Healthcare Permit is valid, subsisting and in full force and effect and (ii) the Business as currently conducted is not in violation of, nor are the Sellers in default or violation under, any Healthcare Permit.

(b)    To the Knowledge of the Sellers since January 1, 2022, no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation of any material terms, condition or provision of any Healthcare Permits. There are no actions pending or, to the Knowledge of the Sellers, threatened, that seek the revocation, cancellation or adverse modification of any Healthcare Permit.    To the Knowledge of the Sellers, each director, officer, employee, agent and independent contractor of the Sellers possesses all Permits necessary for the lawful conduct of his or her duties and obligations in the operation of the Business.

(c)    Each Seller and each of their respective directors, officers and employees acting in such capacity and, to the Knowledge of Sellers, each of its and their other agents acting on its or their behalf, is, and has been since January 1, 2022, in compliance in all material respects with the Foreign Corrupt Practices Act of 1977 and any rules and regulations promulgated thereunder.

(d)    Since January 1, 2022, none of the Sellers, nor to the Knowledge of Sellers, any Affiliate of Sellers, has received written notice from any Governmental Body claiming or alleging that any of the Sellers are not in compliance with any applicable Law or Order applicable to any of them, or the operation of their respective businesses, in any material respect, in each case except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, the Acquired Assets and the Assumed Liabilities, taken as a whole.

**Section 3.9    Environmental Matters**. Except as disclosed on Schedule 3.9, (a) Sellers are, and have been since January 1, 2022, in compliance in all material respects with all applicable Environmental Laws with respect to the conduct of the Business, (b) since January 1, 2022, no

Seller has received any written notice alleging that any Seller is in violation of, or liable under, in any material respect, any Environmental Law that is unresolved with respect to the conduct of the Business, and to the Knowledge of the Sellers, there are no facts or circumstances that would be reasonably expected to result in any future written notices, (c) Sellers possess and are in compliance in all material respects with all Permits required under Environmental Laws for the operation of the Business as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Sellers, threatened in writing against any Seller, (e) Sellers are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller, (f) since January 1, 2022 there has been no Release of Hazardous Materials with respect to any Seller's currently or formerly owned, leased, or operated property, or at any location or facility where wastes from the operations or assets of the Sellers have been disposed or recycled, (g) no Seller is subject to any outstanding Order under any Environmental Law, (h) no Seller has assumed responsibility for, or agreed to indemnify or hold harmless any Person for, any Liability or obligation, arising under or relating to Environmental Laws, including any obligation for investigation, corrective or remedial action, and (i) the Sellers have provided copies of all environmental assessments, environmental sampling and monitoring data, and health and safety audits concerning the business that are in their possession.

**Section 3.10    Intellectual Property**.

(a)    Sellers are the sole and exclusive owners of all of the rights, title and interest in and to the Acquired Intellectual Property, in each case free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, all of the Acquired Intellectual Property that is registered is subsisting, valid and enforceable.

(b)    Section 3.10(b) is a complete and accurate list of each trademark registration, application for trademark registration and domain name included in the Acquired Intellectual Property that is registered with or applied for with (collectively, "Registered Trademarks") the United States Patent and Trademark Office, any similar intellectual property office or any domain name registrar (each a "Registration Office") setting forth as applicable, the title, application number, filing date, and registration number. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, with respect to each Registered Trademark, all necessary filing, examination, registration, maintenance, renewal and other fees and Taxes due on or prior to the date hereof and the Closing Date have been timely paid in full, and all necessary documents (including responses to office actions and other correspondence from a Registration Office) and certificates have been timely filed with all relevant Registration Offices for the purposes of maintaining such Registered Trademarks, in each case in accordance with applicable Law and to avoid loss or abandonment thereof.

(c)    Sellers own or have valid, legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the Business as currently conducted by Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances). Sellers have taken reasonable steps to maintain and protect the confidentiality of the material trade

secrets and other material non-public Acquired Intellectual Property. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, Acquired Assets and the Assumed Liabilities, taken as a whole, the Sellers have not disclosed any material trade secrets or non-public information included in the Acquired Intellectual Property (or any tangible embodiment thereof) to any Person without having such Person execute a written agreement regarding the non-disclosure and non-use thereof. Nothing in this Section 3.10(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.10(d) and Section 3.10(e).

(d)    No Actions are pending or, to the Knowledge of Sellers, threatened against any Seller, and since January 1, 2022, Sellers have not received any written notice or claim (including any cease and desist letter), (i) challenging the ownership, validity, enforceability or use by any Seller of any Acquired Intellectual Property, (ii) alleging that the Business, any Acquired Assets, or any Seller in connection with the Business is infringing, misappropriating or otherwise violating the Intellectual Property of any Person, (iii) that any Seller in connection with the Business requires a license to any Person's Intellectual Property, or (iv) that includes any unsolicited written offer to license (or any other notice of) any Person's Intellectual Property.

(e)    To the Knowledge of Sellers, since January 1, 2022, no Person has infringed, misappropriated or otherwise violated the rights of Sellers with respect to any Acquired Intellectual Property, except as would not reasonably be expected to be material to the Business, taken as a whole. Since January 1, 2022, no Seller has notified any Person that such Person is infringing, misappropriating, or violating any Acquired Intellectual Property. Since January 1, 2022, the using, making, modifying, selling, licensing, or distributing any of the Acquired Assets and the conduct and operation of the Business by Sellers has not violated, misappropriated, or infringed the Intellectual Property rights of any other Person, except as would not reasonably be expected to be material to the Business, taken as a whole.

(f)    The consummation of the Transactions will not result in the grant of any right or license to any third party of any Acquired Intellectual Property.

(g)    No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or would reasonably be expected to, require the disclosure or delivery to any Person (including any technology/software escrow company) of the source code for any material, proprietary software (including the Laker Software) that is included in the Acquired Intellectual Property (collectively, the "Transaction Source Code"), other than disclosure prior to the Closing Date of source code to employees or contractors of a Seller in connection with their performance of services for a Seller. Other than employees and contractors of a Seller who perform services for a Seller, no Seller has provided to any Person any Transaction Source Code.

(h)    Each Seller is in compliance in all material respects with all Open License Terms applicable to any Public Software licensed to or used by a Seller. No Seller has received any written notice alleging that it is in violation or breach of any Open License

Terms. Each Seller's use, modification, and distribution of any Public Software does not (a) require a Seller to make available any Transaction Source Code or any third party's source code (other than the source code for third party software used by Seller under Open License Terms); (b) require a Seller to grant permission to create modifications to or derivative works of any material proprietary software included in or provided with the Acquired Intellectual Property ("Acquired Software"); (c) require a Seller to grant a royalty-free license to any Person under any Acquired Intellectual Property or any third party Intellectual Property provided therewith (including any Acquired Software).

(i)     Except as would not reasonably be expected to be material to the business of Laker Software, Inc., no software, systems or networks included in the Acquired Intellectual Property contain any "virus," "malware," "malicious code," or other similar software (collectively, "Viruses"). Except as would not reasonably be expected to be material to the business of Laker Software, Inc., the Sellers have taken reasonable steps to prevent the introduction of Viruses into any Acquired Intellectual Property.

(j)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the business of Laker Software, Inc., taken as a whole, no funding, facilities or resources of any Governmental Body or any university, college, other educational institution, multi-national, bi-national or international organization or research center was used in connection with the development or creation, in whole or in part, any Acquired Intellectual Property.

(k)     All current and former employees, consultants and independent contractors of Sellers who are or were involved in the creation or development of any material Acquired Intellectual Property have executed a written agreement regarding the protection of proprietary information and the present assignment to a Seller, or have otherwise assigned by operation of Law, all right, title and interest in such Intellectual Property created or developed by such Persons on behalf of such Seller.

(l)     Schedule 3.10(l) is a complete and accurate list of all Contracts to which any Seller is a party pursuant to which a Seller has granted or is required to grant to any Person any license to, any covenant not to assert or sue, other immunity from suit under, or any other rights, to any material Acquired Intellectual Property, other than (i) Contracts entered with customers and vendors in the ordinary course of business, (ii) Intellectual Property assignment Contracts entered into with employees or third-party contractors in the ordinary course of business, (iii) confidentiality or non-disclosure Contracts entered into in the ordinary course of business, and (iv) Contracts primarily for the provision of services where the granting or obtaining (or agreement to obtain) any right to use, or permission or agreement to permit any other Person to use, any Intellectual Property is ancillary or incidental to the transactions contemplated in such contract.

(m)     Schedule 3.10(m) is a complete and accurate list of all Contracts to which any Seller is a party pursuant to which any Person is currently granting or is required to grant in the future to a Seller any right under or license to, any covenant not to assert or sue or other immunity from suit under or any other rights to any material Intellectual Property, other than (i) Contracts granting rights to commercial, off the shelf software and services

31

with an annual license fee of less than $500,000, (ii) Contracts relating to free or open source software, (iii) confidentiality or non-disclosure Contracts entered into in the ordinary course of business, and (iv) Contracts primarily for the provision of services where the granting or obtaining (or agreement to obtain) any right to use, or permission or agreement to permit any other Person to use, any Intellectual Property is ancillary or incidental to the transactions contemplated in such Contract.

(n)     Schedule 3.10(n) is a complete and accurate list, grouped by subsection, of all Contracts as follows: (i) by which Seller acquired from another Person any material Acquired Intellectual Property, (ii) under which a Seller grants to or receives from any Person an option or right of first refusal or right of first negotiation relating to any material Intellectual Property, and (iii) Contracts entered into in connection with the settlement of any dispute related to material Intellectual Property, including settlement agreements, covenants not to sue, and coexistence agreements.

**Section 3.11    Privacy and Security Matters.**

(a)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, Acquired Assets and the Assumed Liabilities, taken as a whole, in connection with the Acquired Assets, the Sellers are, and have been since January 1, 2022, in compliance with (A) all Laws pertaining to (i) data security, and (ii) the collection, storage, use, access, disclosure, processing, security, and transfer of Personal Information (referred to collectively in this Agreement as "processing") ((i) and (ii) together "Privacy Laws"); (B) all Contracts (or portions thereof) to which any Seller is a party to the extent applicable to the Processing of Personal Information (collectively, "Privacy Agreements"); and (C) the Payment Card Industry Data Security Standard and all applicable rules and requirements by the PCI Security Standards Council, any member thereof, and any entity functioning as a card brand, card association, or other binding requirements pertaining to the acceptance of payment cards (collectively "PCI Requirements").

(b)     The Sellers have implemented written policies relating to processing of Personal Information, including, a publicly posted website privacy policy ("Privacy and Information Security Policies"). Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, Acquired Assets and the Assumed Liabilities, taken as a whole, the Sellers are and since January 1, 2022 have been, in compliance with all such Privacy and Information Security Policies.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, Acquired Assets and the Assumed Liabilities, taken as a whole, at all times since January 1, 2022, the Sellers have taken commercially reasonable steps designed to protect the confidentiality, integrity, and security of all Personal Information, confidential information, and any other proprietary data used in the operation of the Business (collectively, "Business Data") in Sellers' possession or control against damage, loss, and against unauthorized access, acquisition, use, modification, disclosure or other misuse.

(d)     Since January 1, 2022, Seller has not experienced any material unauthorized access, use, loss, destruction, modification, or disclosure of Business Data in the possession or control of any Seller that has had a material and adverse effect on the Business (a "Security Breach"). Since January 1, 2022, no Seller has provided any notices to, nor has it been legally required to provide any such notices, to any Person as a result of any Security Breach. Since January 1, 2022, no Seller, its Affiliates, nor any third party acting at its direction or authorization has paid any perpetrator of any actual or threatened Security Breach or cyber-attack, including, but not limited to a ransomware attack or a denial-of-service attack.

**Section 3.12    Healthcare Matters**. Except as would not reasonably be expected to be material to the Acquired Assets and the Business, taken as a whole:

(a)     Each of Seller and EIC is, and since January 1, 2022 has been, in compliance in all material respects with all applicable Healthcare Laws. Neither Sellers nor EIC has received any written or, to the Knowledge of Sellers, oral notice of any pending or threatened adverse Action, claim or default alleging material non-compliance with such Healthcare Laws by the Sellers, or EIC.  Neither Sellers nor EIC is a party to any corporate integrity agreement or has any reporting obligations pursuant to any deferred prosecution, consent decree, settlement, integrity agreement, corrective action plan or other similar obligation, Order, or agreement with any Governmental Body.

(b)     Neither Sellers nor EIC or any of their respective owners, directors, officers, managers, agents or managing employees (as such term is defined in 42 U.S.C. § 1320a-5(b)), is, or has, (i) been debarred, excluded or suspended from participating in any Governmental Health Program, or subject to sanction, charged, pled guilty or nolo contendere to, or been convicted of a crime in connection with, any Governmental Health Program or under any Healthcare Law; (ii) been listed on the Office of Inspector General's List of Excluded Individuals and Entities, state Medicaid exclusion lists, or the General Services Administration published list of parties excluded from federal procurement programs and non-procurement programs.; (iii) been audited or investigated, outside of the ordinary course of business, by any Governmental Health Programs (or any Governmental Body with respect to any Healthcare Laws); or (iv) had a contract terminated by any Governmental Health Programs for a material breach or material default of the terms of the applicable contract.

(c)     Each Seller and EIC is, and has been, since January 1, 2022 in material compliance with HIPAA and have established and implemented such policies, programs, procedures, Contracts and systems as are necessary to comply in all material respects with HIPAA. Neither Sellers nor EIC has received written notice of, and there is no Action, or inquiry or investigation pending or, to the Knowledge of Seller, threatened with respect to any alleged "breach" as defined in HIPAA by any Seller, EIC, or their workforce. Each Seller and EIC has undertaken all necessary risk assessments of the Business required by HIPAA and has implemented appropriate corrective action to address all material vulnerabilities in its HIPAA safeguards and controls identified through such assessments. Each Seller and EIC has a written, signed, and HIPAA-compliant business associate

33

agreement with each Person that is a "covered entity" or "business associate" (as such terms are defined by HIPAA) of such Seller or EIC, as applicable.

(d)      Neither Sellers nor EIC has knowingly billed, received, paid or reimbursed in excess of amounts allowed by applicable Healthcare Laws, nor advised or provided information that could be reasonably interpreted to advocate upcoding or otherwise improperly coding any claims for payment for healthcare items or services to obtain greater reimbursement than would be paid pursuant to a properly coded and submitted claim. Neither Sellers nor EIC has made, offered, received or solicited any bribes, kickback payments or other similar payments of cash or other consideration, including payments to customers or clients or employees of customers or clients for purposes of doing business with such Persons.

(e)      Each Seller and EIC has and maintains a compliance program reasonably designed to satisfy the elements of an effective corporate compliance and ethics program identified in U.S.S.G. § 8B2.1. There are no outstanding material compliance complaints, reports, corrective actions, or ongoing internal compliance investigations.

**Section 3.13    Tax Matters**. Except as would not reasonably be expected to be material to the Acquired Assets and the Business, taken as a whole:

(a)      Each Seller (or its applicable Affiliate) has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns with respect to the Acquired Assets required to be filed by it (taking into account valid extensions of time within which to file), and all such filed Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects and were prepared in compliance in all material respects with applicable Law.

(b)      All material Taxes with respect to the Acquired Assets owed by a Seller, that are due (whether or not shown on any Tax Return) have been timely paid or have been adequately reserved against in accordance with GAAP.

(c)      There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

(d)      None of the Sellers has waived any statute of limitations in respect of material Taxes with respect to the Acquired Assets or agreed to any extension of time with respect to an assessment or deficiency for material Taxes with respect to the Acquired Assets (in each case, other than pursuant to extensions of time or waivers to file Tax Returns obtained in the Ordinary Course or waivers or extensions that have expired).

(e)      Since January 1, 2020, no claim has been made in writing by a Taxing Authority in a jurisdiction where any Seller or its Affiliate does not file Tax Returns with respect to the Acquired Assets that any such Seller is or may be subject to taxation by that jurisdiction with respect to the Acquired Assets that has not otherwise been fully resolved.

(f)     Each Seller (or its applicable Affiliate) has withheld and paid to the applicable Taxing Authority all Taxes required to have been withheld and timely paid with respect to the Acquired Assets or the Transferred Employees, and such amounts to the appropriate Taxing Authority.

(g)     No federal, state, local, or non-U.S. Tax audits or administrative or judicial Tax proceedings are pending or being conducted with respect to any Seller with respect to the Acquired Assets. None of the Sellers has received from any federal, state, local, or non-U.S. taxing authority (including jurisdictions where Seller has not filed Tax Returns) any (i) written notice indicating an intent to open an audit or other review (since January 1, 2020), or (ii) written notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any Taxing Authority against Seller that has not been fully resolved, in each case, with respect to the Acquired Assets.

(h)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.13 shall constitute the sole representations and warranties in this Agreement with respect to Taxes and no representation or warranty set forth in this Section 3.13 shall be deemed to apply directly or indirectly with respect to any Seller Combined Tax Return. No representation or warranty is made with respect to any Tax attribute for any Post-Closing Tax Period.

**Section 3.14   Employees**.

(a)     Schedule 3.14(a) sets forth the following information for each Business Employee: (i) name; (ii) job title; (iii) date of hire (or seniority date, if different); (iv) full-time or part-time status; (v) exempt or non-exempt classification; (vi) base annual salary or hourly wage rate (as applicable); (vii) location (including location into which a remote employee reports); (viii) leave status; (ix) work authorization or permit type; (x) accrued, but unused paid-time-off; (xi) employing entity; and (xii) target annual bonus and the most recent bonus received; and, on a separate list on Schedule 3.14(a) (xiii) Healthcare Permit number and issuing authority, as applicable.

(b)     None of Sellers (with respect to the Business or Business Employees) is party to any collective bargaining agreements or similar labor-related Contracts with any labor union representing any Business Employees. There is no current written demand from any labor union seeking recognition as the exclusive bargaining representative of any Business Employees by any Seller and there is no pending or, to the Knowledge of Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by any Business Employees.

(c)     Sellers are in compliance in all material respects with all applicable Laws respecting employment practices and labor, including those related to wages and hours (including minimum wage and overtime Laws and wage payment Laws), collective bargaining, unemployment insurance, workers' compensation, immigration, retaliation, harassment and discrimination, disability rights and benefits, affirmative action, employee layoffs, employee notification, leave, affirmative action, health and safety, and child labor.

35

(d)     Except as would not result in material Liability, Sellers currently properly classify and have properly classified each Business Employee as exempt or non-exempt for the purposes of the Fair Labor Standards Act.

(e)     There is no Action pending or, to the Knowledge of Sellers, threatened in writing against any Seller alleging a violation of any labor or employment Law that if adversely determined against such Seller would reasonably be expected to result in Assumed Liabilities or would, individually or in the aggregate, reasonably be expected to be material to the Business, the Acquired Assets and the Assumed Liabilities, taken as a whole, nor have any such Actions been brought in the last 3 years.

(f)     No "mass layoff," "plant closing" or similarly defined conduct (as defined in the federal Worker Adjustment and Retraining Notification Act or any similar state, local or foreign Law (collectively, "WARN")) has been implemented by Sellers in the ninety (90) days immediately prior to the date of this Agreement. Except as set forth on Schedule 3.14(f), Sellers do not currently plan or contemplate any plant closings, reduction in force, terminations of employees, or similar personnel actions at any site of employment where any Business Employees or other employees of Sellers are located that would trigger obligations under WARN.

**Section 3.15   Insurance**. Schedule 3.15 sets forth a description of all material insurance policies maintained by Sellers other than any policies maintained in connection with an Employee Benefit Plan (the "Business Insurance Policies"). All such Business Insurance Policies are in full force and effect. No Seller since January 1, 2022, has received written notice from any insurer or agent of such insurer with respect to the cancellation or termination of any such Business Insurance Policies.

**Section 3.16   Affiliate Transactions**. Except as set forth on Schedule 3.16, to the Knowledge of Sellers, no Affiliate of any Seller, or any officer or director of any Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $1,000,000, other than (i) loans and other extensions of credit to directors and officers of a Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Employee Benefit Plans, or (b) has any material interest in any Acquired Asset.

**Section 3.17   Brokers**. Except for Guggenheim Securities, LLC ("Guggenheim Securities"), the fees and expenses of which will be paid by Sellers, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Sellers.

**Section 3.18   Anti-Corruption.** Since January 1, 2021, neither Sellers nor any of their Affiliates or their employees, or to the Knowledge of Sellers, any other Person acting on behalf of any of the foregoing, has directly or knowingly indirectly in connection with the business and operations of the Sellers: (i) made, offered, promised to make or authorized any unlawful payment, gift, or any other thing of value or advantage in violation of Anti-Corruption Laws, (ii) requested

36

or received any payment, gift, or other thing of value or advantage in violation of Anti-Corruption Laws or (iii) otherwise violated any provision of the Anti-Corruption Laws. The Sellers have implemented policies and procedures reasonably designed to prevent, detect, and deter violations of any Anti-Corruption Laws. Since January 1, 2021, neither Sellers nor its Affiliates have received any notice from any Governmental Body or any other Person regarding any actual, alleged, or investigated violation of, or failure to comply with or Liability under, any Anti-Corruption Laws, and to the Knowledge of Sellers there are no conditions or circumstances that would reasonably be expected to give rise to any material future Action against, or voluntary disclosure by, the Sellers with respect to any Anti-Corruption Laws.

Section 3.19   **Absence of Certain Changes**. Except as set forth on Schedule 3.19, since June 30, 2023, (i) the Sellers have conducted their business in the Ordinary Course in all material respects (other than the marketing of the Business and processes and negotiations with Advisors and third parties in connection therewith, and preparation and commencement of the Bankruptcy Cases and actions related thereto), (ii) there has not been any Material Adverse Effect and (iii) there is no material business interruption or similar event, change or circumstance that has occurred, or is occurring, at any of the facilities, plants, offices, laboratories, warehouses, distribution centers and other properties (including at any Owned Real Property or Leased Real Property) owned or operated by the Sellers.

Section 3.20   **Bank Accounts**.   Schedule 3.20 sets forth a complete list of all bank accounts (including any deposit accounts, securities accounts and any sub-accounts) of Sellers.

Section 3.21   **Employee Benefit Plans**.

(a)      Each Employee Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Tax Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS. There are no pending, or to the Knowledge of Sellers, threatened claims (other than routine claims for benefits) by, on behalf of or against any Employee Benefit Plan which could reasonably be expected to result in any Assumed Liability. The Employee Benefit Plans comply in form and in operation with their terms and applicable Laws, including the applicable requirements of the Tax Code and ERISA, except as would not reasonably be expected to be material to the Acquired Assets and the Business, taken as a whole.

(b)      The consummation of the Transactions is not reasonably expected to (i) accelerate the time of payment or vesting, or materially increase the amount, of compensation due to any Business Employee under any Employee Benefit Plan, (ii) cause a Seller to transfer or set aside any assets to fund any benefits under any Employee Benefit Plan or (iii) result in any "disqualified individual" with respect to any Seller receiving any "excess parachute payment" (as each such term is defined in section 280G of the Tax Code), determined without regard to any arrangements that may be implemented by, or at the direction of, Purchaser or any of its Affiliates.

Section 3.22   **No Other Representations or Warranties**. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this

Agreement) (the "<u>Express Representations</u>") (it being understood that Purchaser and the Purchaser Group have relied only on such Express Representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that no Seller nor any other Person on behalf of any Seller makes, and neither Purchaser nor any member of the Purchaser Group has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Seller, the Business, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Guggenheim Securities or AlixPartners) (the "<u>Information Presentation</u>") or in that certain "Project Poet" datasite administered by Datasite (the "<u>Dataroom</u>") or elsewhere to Purchaser or any of its Affiliates or Advisors. Except with respect to the Express Representations, all other representations and warranties, whether express or implied, are hereby expressly disclaimed by Sellers. Nothing in this <u>Section 3.22</u> shall limit any rights or remedies of Purchaser with respect to a claim for Fraud.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as of the date hereof as follows.

**Section 4.1    <u>Organization and Qualification</u>**. Purchaser is a corporation duly formed, validly existing and in good standing under the Laws of the State of California and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transaction. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties owned or used by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transaction by this Agreement.

**Section 4.2    <u>Authorization of Agreement</u>**. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

**Section 4.3**        **Conflicts; Consents**.

(a)        Assuming that (i) the Sale Order, and all other requisite Bankruptcy Court approvals are obtained, (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3(a) are made, given or obtained (as applicable), and (iii) the requirements of the HSR Act are complied with, neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's Organizational Documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other material Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (A) through (D), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

(b)        Except as set forth on Schedule 4.3(a), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except (i) any filings required to be made under the HSR Act or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

**Section 4.4**        **Financing**. As of October 28, 2023, Purchaser or Guarantor will, and will through the Closing, have sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with Transactions and does not know of any circumstance or condition that would reasonably be expected to prevent or substantially delay the availability of such funds or otherwise impair such capability at the Closing and such other dates that such obligations and transactions are required to be satisfied pursuant to the terms hereof. Purchaser affirms that it is not a condition to Closing or to any of its obligations under this Agreement that Purchaser obtains financing for the Transactions. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

**Section 4.5**        **Brokers**. Except for UBS Securities LLC, all of whose fees and expenses will be borne solely by Purchaser, there is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

Section 4.6    **No Litigation**. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will or would be reasonably likely to adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the Transactions.

Section 4.7    **Certain Arrangements**. Except for any financing sources or lenders of Purchaser related to Purchaser's financing of the Transaction, as of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of any Seller or its respective board of directors (or member of management or applicable governing body of any Affiliate of any Seller), any holder of equity or debt securities of any Seller, or any lender or creditor of any Seller or any Affiliate of any Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of any Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

Section 4.8    **Solvency**. Assuming the accuracy in all material respects of the representations and warranties in Article III, Purchaser is, and immediately after giving effect to the Transactions Purchaser shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Purchaser. In connection with the Transactions, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

Section 4.9    **WARN Act and Mass Layoffs**. Purchaser does not currently plan or contemplate any plant closings, reduction in force, terminations of employees, or similar personnel actions impacting Business Employees that would trigger obligations under the WARN Act or similar Laws.

Section 4.10   **No Additional Representations or Warranties**. Except for the representations and warranties contained in this Article IV, Sellers are not relying on and will not rely on the accuracy or completeness of any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser and acknowledge that neither Purchaser nor any other Person on behalf of Purchaser makes on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

## ARTICLE V
## BANKRUPTCY COURT MATTERS

Section 5.1    **Bankruptcy Actions**.

(a)    Bankruptcy Court Milestones. The Sellers shall comply with the following timeline (the "Bankruptcy Court Milestones"):

(i)       As promptly as practicable but in no event later than one (1) day after the Petition Date, the Sellers shall file with the Bankruptcy Court the Bidding Procedures Motion.

(ii)      No later than three (3) Business Days following the Second Day Hearing, the Sellers shall obtain entry of the Bidding Procedures Order.

(iii)     No later than 60 days after the Petition Date, the Bidding Deadline pursuant to the Bidding Procedures Order will occur.

(iv)      No later than 75 days after the Petition Date, the Auction (if necessary) shall have been held pursuant to the Bidding Procedures Order.

(v)       No later than 80 days after the Petition Date, but subject to the availability of the Bankruptcy Court, the Bankruptcy Court shall have held the hearing to consider entry of the Sale Order.

(b)       The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order. Sellers may modify the motion seeking approval of the Sale Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, with such modifications being acceptable to Purchaser in its commercially reasonable discretion.

(c)       From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Sellers shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(d)       The Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order. Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order, and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)       Each Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of

the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Sellers from the Bankruptcy Court with respect to the Transactions.

(f)     If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "Backup Bidder") and keep Purchaser's bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until the earlier of (i) 60 days following the hearing to consider the Sale Order, (ii) the closing of an Alternative Transaction with a Successful Bidder, or (iii) such other date as this Agreement is terminated.

(g)     Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(h)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a sufficient demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(i)     Nothing in this Section 5.1 shall prevent Sellers from modifying the Bidding Procedures as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations.

**Section 5.2     Cure Costs**. Subject to entry of the Sale Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Assumed Cure Costs.  Also, subject to entry of the Sale Order, Sellers shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Excluded Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

**Section 5.3     Approval**. Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement shall require

Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

**Section 6.1    Conduct of the Business of Sellers**.

(a)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement, or (iv) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Sellers shall use their commercially reasonable efforts to carry on the Business in the Ordinary Course; provided that no action by any Seller with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability, or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Sellers shall not take any of the following actions with respect to the Business:

(i)    (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or rights to acquire any debt securities of Sellers, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except, but only to the extent the following will constitute Excluded Liabilities, (1) for intercompany Indebtedness among Sellers and their Affiliates, (2) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (3) for Indebtedness incurred under arrangements that are not secured by the Acquired Assets, (4) for Indebtedness incurred under existing arrangements (including in respect of letters of credit) in an amount not to exceed $5,000,000 outstanding at any time and (5) for Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder, or (B) make any loans, capital contributions or advances to, or

43

investments in, any Person other than (1) as permitted pursuant to Section 6.1(b)(iv), (2) in the Ordinary Course, and (3) to any other Seller or Subsidiary; provided any such actions in the foregoing clauses (1), (2), and (3) do not give rise to an Assumed Liability;

(ii)      sell or lease to any Person, in a single transaction or series of related transactions, any of Acquired Assets, except (A) Ordinary Course dispositions of Inventory, (B) transfers among the Sellers, (C) leases or subleases of real property under which a Seller is a tenant or a subtenant and voluntary terminations or surrenders of such leases or subleases, in each case following prior good faith consultation with Purchaser, and (D) other sales and leases in the Ordinary Course;

(iii)      make or authorize capital expenditures, including for property, plant and Equipment, except for those (A) in connection with the repair or replacement of facilities, properties or assets destroyed or damaged due to casualty or accident (whether or not covered by insurance), (B) otherwise in an aggregate amount for all such capital expenditures made pursuant to this clause (B) not to exceed $5,000,000 in the aggregate or (C) in accordance with the capital expenditure budget set forth on Schedule 6.1(b)(iii);

(iv)      except as permitted under Section 6.1(b)(iii), make any acquisition of, or investment in, any securities or business (including by merger), (which for the avoidance of doubt shall not include acquisitions of Inventory in the Ordinary Course);

(v)      except (A) in the Ordinary Course or (B) as permitted pursuant to the terms of any Employee Benefit Plan, (1) grant to any Business Employee at the level of Director or above any increase in compensation (including bonus or long-term incentive opportunities), (2) hire any employee who would be a Business Employee at the level of Director or above; (3) establish, adopt, enter into, materially amend or terminate any material Employee Benefit Plan, except in connection with annual open enrollment in the Ordinary Course; (4) take any action to discretionally accelerate any rights or benefits of any Business Employee at the level of Director or above under any Employee Benefit Plan; or (5) terminate any Business Employee (other than for cause) at the level of Director or above; provided that the foregoing clauses (1) through (5) shall not restrict any Seller from taking any action, including the termination of any non-Business Employee, or establishing any Employee Benefit Plan or other compensation or benefit plan that is not targeted at Business Employees;

(vi)      make any material changes in financial accounting methods, principles or practices materially affecting the consolidated assets, Liabilities or results of operations of Sellers with respect to the Business, except insofar as may be required (A) by GAAP (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the Financial Accounting Standards Board or any similar organization);

44

(vii)    grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets; other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms) or permitted under Section 6.1(b)(i); provided that any such Encumbrance will be extinguished in connection with the Closing;

(viii)    waive, release, assign, institute, compromise, or settle any pending or threatened Action against, or related to, any Seller, the Business, the Acquired Assets, or the Assumed Liabilities and that would result in an Assumed Liability;

(ix)    (A) terminate, amend, supplement, modify or waive any provision of, or accelerate any rights, benefits or obligations under, any Material Contract, except any such action in the Ordinary Course or the expiration in accordance with its term or (B) enter into any Contract that would be a Material Contract if executed prior to the date of this Agreement or which would result in an aggregate obligation of Sellers in excess of $200,000, except for (Y) any renewal of any customer Contract in the Ordinary Course upon terms and conditions which are not materially less favorable in the aggregate to the Sellers than those in effect as of the date of this Agreement and (Z) any renewal of any other such Contract in the Ordinary Course upon terms and conditions which are no less favorable to the Sellers, in any material respect, than those in effect as of the date of this Agreement; provided that if Purchaser does not object within two (2) Business Days of a notice referencing this Section, describing in reasonable detail the Contract for which consent is being requested, and requesting consent for such Contract, Purchaser shall be deemed to have consented to Sellers entering into such Contract;

(x)    (A) abandon, cancel, fail to renew, or permit to lapse any Acquired Intellectual Property that is used in the conduct of the Business, or held for use by the Sellers, in each case that is material to the Business, taken as a whole other than pursuant to expiration of any such Acquired Intellectual Property at the end of its maximum term, or (ii) sell, transfer, license or otherwise encumber any material Acquired Intellectual Property, other than licenses of Acquired Intellectual Property in the Ordinary Course;

(xi)    solely with respect to Acquired Assets, (A) make any unusual or extraordinary efforts to collect any accounts receivable, intercompany obligation or Liability for Indebtedness, or give any discounts or concessions for early payment of such accounts receivable, intercompany obligation or Liability for Indebtedness or (B) make any sales of, or, other than Permitted Encumbrances, convey any interest in, any accounts receivable, intercompany obligation or Liability for Indebtedness to any third party; provided that Sellers shall be entitled to, in their reasonable business judgment, take such actions with respect to such items that have been outstanding for more than twelve (12) months;

(xii)    amend in any material respect, cancel or permit to terminate any material insurance policy naming any Seller as an insured, a beneficiary or a loss

45

payable payee without first obtaining comparable substitute insurance coverage with no lapse in coverage; or

(xiii)   grant any waiver under or amend or modify, or surrender, revoke, permit to lapse or otherwise terminate any Permit, other than in the Ordinary Course or as would not reasonably be expected to be material to the operation of the Business.

(c)      Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the Business (or the other business of Sellers and their Affiliates) prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations. Notwithstanding anything to the contrary contained herein, any action taken, or omitted to be taken, by any Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this Section 6.1.

**Section 6.2     Access to Information**.

(a)      From the date hereof until the Closing, Sellers will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours (and in accordance with the reasonable procedures established by Sellers) to the books and records of Sellers, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the Transactions; provided that (i) such access does not unreasonably interfere with the normal operations of any Seller, (ii) such access will occur in such a manner as Sellers reasonably determine to be appropriate to protect the confidentiality of the Transactions and such books and records, (iii) all requests for access will be directed to Guggenheim Securities or such other Person(s) as Guggenheim Securities may designate in writing from time to time (iv) nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to any Seller if the Transactions are not consummated, (B) would waive any legal privilege, (D) would be in violation of applicable Laws (including the HSR Act and Foreign Competition Laws) or the provisions of any agreement to which Sellers are bound or would violate any fiduciary duty, or (E) is in respect of Excluded Tax Returns. Notwithstanding anything to the contrary contained herein will permit Purchaser or its authorized Advisors to conduct any sampling or testing of environmental media or any other invasive investigation or assessment at any Leased Real Property including of the type commonly known as a Phase II environmental site assessment.

46

(b)     Subject to <u>Section 6.14,</u> the information provided pursuant to this <u>Section 6.2</u> will be governed by all the terms and conditions of the Confidentiality Agreement. Sellers and their Affiliates make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.2</u>, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)     From and after the Closing for a period of three years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by Sellers, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)     Prior to the Closing, the Parties shall reasonably cooperate with each other in coordinating their communications with any customer, supplier or other contractual counterparty of Sellers in relation to this Transaction; <u>provided</u> that Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of any Seller prior to the Closing with respect to any Seller, the Business or the Transactions, in each case without the prior written consent of Sellers for each such contact, such consent not to be unreasonably withheld.

**Section 6.3    <u>Employee Matters</u>**.

(a)     At least 15 Business Days prior to the Closing Date, Purchaser shall extend to each Business Employee set forth on <u>Schedule 6.3(a)</u> (the "<u>Scheduled Employees</u>") (which <u>Schedule 6.3(a)</u> Purchaser shall provide to Sellers by the date that is 15 days following the date hereof and which <u>Schedule 6.3(a)</u> shall include at least 900 Business Employees) a written offer of employment reviewed by Sellers, and which Sellers have had an opportunity to comment on, providing for a position that is materially the same as such employee's position immediately prior to the Closing (including level of responsibility, primary location of employment and authority) on the terms set forth in this <u>Section 6.3</u> ("<u>Transfer Offer</u>") and that, if accepted, shall become effective immediately following the Closing. Business Employees who accept such Transfer Offers and begin

employment with Purchaser as of the Closing Date shall be collectively referred to herein as "Transferred Employees." Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all Scheduled Employees employed by Sellers will accept the Transfer Offer, or that any Transferred Employee will continue in employment with Purchaser following the Closing for any period of time. Purchaser shall notify Sellers in a reasonable timeframe prior to the Closing Date with respect to whether each such offer has been accepted or rejected. Purchaser shall carry out all necessary actions, and Sellers shall reasonably cooperate with Purchaser, to effect the timely employment by Purchaser or its applicable Affiliate of each Transferred Employee immediately following the Closing, and Sellers shall reasonably cooperate in connection therewith. Effective as of the Closing, each Transferred Employee previously employed by Sellers shall cease to be an employee of each Sellers.

(b)    For a period of one year from and after the Closing Date, Purchaser shall provide each Transferred Employee, or cause each Transferred Employee to be provided, with: (i) a base compensation or wage rate, as applicable, that is no less than that provided to such Transferred Employee as of immediately prior to the Closing; (ii) cash incentive opportunities that are no less favorable than those provided to such Transferred Employee as of immediately prior to the Closing; (iii) health and welfare plans that are substantially similar in the aggregate to the health and welfare plans maintained by Purchaser or any of its Affiliates as of the Closing Date; and (iv) other employee benefits (including severance benefits and retention bonuses, but excluding long term incentive compensation and equity incentive compensation) that are no less favorable than those provided to such Transferred Employees as of the Closing Date. For purposes of eligibility, vesting and determining level of benefits under the benefit plans and programs maintained by Purchaser and its Affiliates or any of its Affiliates after the Closing Date (the "Purchaser Plans"), each Transferred Employee shall be credited with his or her years of service with Sellers (and any predecessor thereof) before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(c)    On the Closing, Transferred Employees (and their eligible dependents and beneficiaries) shall cease active participation in the Employee Benefit Plans. Without limiting the generality of any other provision of this Agreement: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans; (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Employee Benefit Plans); and (iii) Purchaser shall cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)    For the avoidance of doubt, Sellers shall be responsible for and ensure timely payment of all (i) final wages, including accrued wages, salary, accrued but unpaid

48

bonuses, commission and other incentive payments, accrued but unpaid vacation and other compensation owed to the Business Employees through the Closing Date, and Purchaser shall not be liable for any such payments arising through the Closing Date, and (ii) all contributions under Employee Benefit Plans accruing prior to the Closing Date, including any such 401(k) plan employer contributions notwithstanding any year end service requirement. Further, to the extent a Scheduled Employee refuses to accept a Transfer Offer that complies with Section 6.3(a) or otherwise fails to be employed by Purchaser or its Affiliate as of the Closing Date, in each case through no fault of Purchaser, Sellers shall be responsible for any termination or other liabilities related to the employment or termination of any such Scheduled Employee.

(e)     The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Sellers or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(f)     Sellers shall be solely responsible for any and all obligations and Liabilities arising under Section 4980B of the Tax Code with respect to all "M&A qualified beneficiaries" as defined in 26 C.F.R. § 54.4980B 9.

(g)     Sellers expressly agree to retain all obligations, Liabilities, and commitments related to WARN, including any requirement to provide notice, that accrue up to and including the Closing Date; provided that Purchaser shall provide Sellers with sufficient advance notice to allow Sellers to comply with WARN in the event that Purchasers fail to offer employment to a sufficient number of Scheduled Employees or offer terms of employment that, in either event, would reasonably be expected to constitute a constructive discharge under WARN. Notwithstanding anything to the contrary herein, Sellers or their Affiliates shall be permitted to provide WARN notices prior to the Closing to any employees they reasonably believe could be owed it under applicable Law, in consultation with Purchaser. Purchaser expressly agrees to assume all obligations, Liabilities, and commitments related to WARN, including any requirement to provide notice, that accrue following the Closing Date, as well as any WARN Liabilities relating to the termination of Scheduled Employees who do not receive a Transfer Offer that complies with the requirements under Section 6.3(a) from Purchaser.

(h)     For any Transferred Employees who are Delayed Transferred Employees, the provisions of this Section 6.3 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

(i)     In the event that the Closing is to occur prior to January 1, 2024, the Parties shall negotiate in good faith an amendment to the TSA or other Contract, pursuant to which Sellers shall continue to employee the Transferred Employees and administer their payroll and continue their existing benefits, all at Purchaser's sole cost and expense (with no markup by Seller) until such time as Purchaser is able to onboard such Transferred Employees to its payroll systems and Purchaser Plans, such time not to be later than February 1, 2024, and the provisions of this Section 6.3 shall be amended accordingly.

**Section 6.4     Regulatory Approvals**.

(a)     Subject to Section 6.5, Sellers will (i) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings made by the Purchaser Group pursuant to Section 6.4(b), and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.4(a) or Section 6.4(b) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)     Subject to Section 6.5, Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the Transactions, if any, including any Healthcare Laws, and including, obtaining any required Healthcare Permits, (ii) cooperate with Sellers in exchanging such information and providing such assistance as Sellers may reasonably request in connection with any filings made by a Seller pursuant to Section 6.4(a), and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.4(b) or Section 6.4(a) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

(c)     This Section 6.4 shall not apply to efforts related to Foreign Competition Laws, which shall be governed by the obligations set forth in Section 6.5 below.

**Section 6.5     Antitrust Notification**.

(a)     Sellers and Purchaser (and their respective Affiliates, if applicable) will, as promptly as practicable (and, in the case of filings under the HSR Act, no later than ten (10) Business Days following the date hereof), (i) file with the United States Federal Trade Commission and the United States Department of Justice, the notification form required pursuant to the HSR Act for the Transactions, and (ii) make all notifications, filings, registrations or other materials required or necessary under the Foreign Competition Laws set forth on Schedule 7.1(a). Each Seller and Purchaser shall (and shall cause their respective Affiliates to) furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act or such Foreign Competition Laws, and will respond to any requests made for any supplemental information by any Governmental Body as promptly as practicable. Sellers and Purchaser shall not extend any waiting period or enter into any agreement or understanding with any Governmental Body

without the prior written consent of the other; <u>provided</u> that such consent shall not be unreasonably withheld, conditioned, or delayed. Purchaser will be solely responsible for payment of all filing fees payable in connection with such filings.

(b)        Subject to the immediately following sentence, Sellers and Purchaser will use their reasonable best efforts to as promptly as practicable (and in any event prior to the Outside Date) obtain any clearances, Consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations required under the HSR Act or such Foreign Competition Laws for the consummation of this Agreement and the Transactions and will keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Body and will comply promptly with any such inquiry or request. Nothing in this Agreement, including this <u>Section 6.5</u>, obligates Purchaser to (i) oppose any motion or action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the Transactions, or undertake any appeal of any adverse decision or Order by any Governmental Body, (ii) propose offer, accept, or enter into any consent decree, consent agreement, settlement or other agreement or arrangement to hold separate, license, sell, transfer, dispose or divest any assets (whether tangible or intangible), rights, properties, products or businesses of Purchaser, its Affiliates or, after the Closing, the Acquired Assets, (iii) agree to the termination, modification, or assignment of existing relationships, joint ventures, Contracts or obligations of Purchaser or its Affiliates or (iv) agree to any limitations on conduct or actions of members of Purchaser, its Affiliates or after the Closing, the Acquired Assets.

(c)        The Parties commit to instruct their respective counsel to cooperate with each other and use reasonable best efforts to facilitate and expedite obtaining any clearances, Consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations under the HSR Act or Foreign Competition Laws at the earliest practicable dates and, in any event, prior to the Outside Date. Such reasonable best efforts and cooperation shall include each Party and its respective counsel undertaking to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any communication received by such Person from a Governmental Body in connection with the filings made pursuant to this <u>Section 6.5</u> and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to any Governmental Body in connection with this Agreement and the Transactions and any developments, meetings or discussions with any Governmental Body in respect thereof, including with respect to (A) the receipt of any non-action, action, clearance, Consent, approval, waiver, or other authorizations, (B) the expiration or termination of any waiting period, (C) the commencement or proposed or threatened commencement of any investigation, litigation or administrative or judicial Action or proceeding under applicable Laws, including any proceeding initiated by a private party, and (D) the nature and status of any objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the Transactions. Neither Sellers nor Purchaser will participate in any meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry relating to the Transaction without

giving the other Party reasonable prior notice of the meeting or discussion and, unless prohibited by the relevant Governmental Body, the opportunity to attend and participate in such meeting or discussion. Each Party will have the right to review and approve the content of any draft notifications, formal notifications, filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted by the other Party to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under this <u>Section 6.5</u>, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets.

(d)      Purchaser will not, and will not permit any member of the Purchaser Group or their respective Affiliates to, engage in any action or enter into any transaction or permit any action to be taken or transaction to be entered into that would reasonably be expected to (i) impose a material delay in the obtaining of, or materially increase the risk of not obtaining, any clearances, Consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations under the HSR Act or Foreign Competition Laws from any Governmental Body necessary to consummate the Transactions, (ii) materially increase the risk of any Governmental Body entering an Order preventing, delaying or prohibiting the consummation of the Transactions or (iii) delay the consummation of the Transactions.

**Section 6.6      <u>Reasonable Efforts; Cooperation</u>**.

(a)      Subject to the other terms of this Agreement, each Party shall (whether directly or through its Advisors) use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the Transactions to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder.

(b)      The obligations of Sellers pursuant to this Agreement, including this <u>Section 6.6</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), Sellers' debtor-in-possession financing, and Sellers' obligations as debtors-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, and the Sale Order), and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

**Section 6.7      <u>Certain Financing Matters</u>**.

(a)      From the date hereof until the Closing Date, Sellers shall (whether directly or through their respective Advisors) use their commercially reasonable efforts to provide all cooperation reasonably requested by Purchaser in connection with the Financing, at Purchaser's sole expense,  including by using commercially reasonable efforts to (i) furnish Purchaser on a reasonably timely basis with such documentation and information (including financial information) that Purchaser or Purchaser's financing sources have reasonably requested in writing (including electronic correspondence) in connection with obtaining or consummating the Financing, (ii) assist with the preparations for (but not the execution of) the provision of guarantees and the pledging of collateral (it being understood that no such pledging of collateral will be made by any Seller or be effective until at or after the Closing), (iii) provide all documentation and other information required by bank regulatory authorities under applicable "know-your-customer", anti-money laundering rules and regulations, including the PATRIOT Act and beneficial ownership regulations, at least three (3) Business Days prior to Closing, reasonably requested no later than five (5) Business Days prior to the Closing by Purchaser, and (iv) facilitate the taking of all actions reasonably requested by Purchaser in connection with the Financing; provided that (A) no personal liability shall be imposed on any of the Advisors, employees, officers or directors of Sellers involved in the foregoing cooperation, (B) Sellers will not be required to pay any commitment or other fees or expenses in connection with Purchaser's debt financing, and (C) no Advisor, director or officer of any of Sellers shall be obligated to execute any documentation in connection with Purchaser's debt financing unless continuing in such capacity after the Closing.

(b)      None of Sellers shall be required to take any action pursuant to this Section 6.7 that would subject it to actual or potential Liability for which it would not be indemnified hereunder or to bear any cost or expense or to pay any commitment or other fee or provide or agree to provide any indemnity in connection with the Financing or any of the foregoing prior to the Closing. Purchaser shall indemnify and hold harmless the Seller Parties from and against any and all Liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties suffered or incurred by them in connection with this Section 6.7 and any information utilized in connection therewith. Purchaser shall, promptly upon request by Elixir, reimburse Sellers for all reasonable out-of-pocket costs incurred by them in connection with this Section 6.7.

(c)      Notwithstanding this Section 6.7 or anything else in this Agreement, Purchaser acknowledges and agrees that (i) it is not a condition to the Closing or to any of Purchaser's other obligations under this Agreement that Purchaser obtain the Financing. The Parties agree that this Section 6.7 (and not Section 6.6 or Section 6.8) sets forth Sellers' sole obligations with respect to the Financing and (ii) the condition set forth in Section 7.2(b), as it applies to Sellers' obligations under this Section 6.7, shall be deemed satisfied unless the failure to obtain the Financing is a direct result of Sellers' knowing and material willful breach of their obligations under this Section 6.7.

Section 6.8    **Further Assurances**. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken,

all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

**Section 6.9**    **Insurance Matters**.

(a)    Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to any Seller and the Acquired Assets that is maintained by such Seller (whether such policies are maintained with third party insurers or with any Seller) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

(b)    To the extent that (i) any insurance policies issued for the benefit of any Seller (the "Sellers' Insurance Policies") cover any Liability relating to the Acquired Assets and relating to or arising out of occurrences or events on or prior to the Closing ("Pre-Closing Matters") and (ii) the Sellers' Insurance Policies continue to offer coverage after the Closing to permit claims to be made thereunder with respect to Pre-Closing Matters, the Sellers shall cooperate with Purchaser in submitting claims and seeking recovery with respect to Pre-Closing Matters on behalf of Purchaser under the Seller's Insurance Policies. Purchaser shall not make any such claims if, and to the extent that, such claims are covered by insurance policies held by Purchaser or its Affiliates. The Sellers shall, on request from Purchaser, with respect to any claim arising from an Assumed Liability that is covered or potentially covered the Sellers' Insurance Policies, (i) report such claim to the appropriate insurer as promptly as practicable after such claim is reported to the Sellers, and (ii) instruct that any proceeds of such insurance policy are paid directly to Purchaser, the attorneys handling the defense of such claim or, where applicable, to the claimant as a result of any judgment or settlement, rather than to the Sellers (but subject to all limitations and deductibles and exclusions under such policies and net of Sellers' out-of-pocket costs and expenses of seeking such recovery and any Taxes incurred by Sellers with respect to such recovery, all of which shall be paid directly to Sellers); provided that Purchaser shall notify the Sellers promptly of any such claim or potential claim and shall reasonably cooperate in the investigation and pursuit of any such claim or potential claim.

**Section 6.10**    **Receipt of Misdirected Assets; Liabilities**.

(a)    From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

(b)     From and after the Closing, if any Seller or any of its Affiliates is subject to a Liability that should belong to Purchaser or its Affiliates pursuant to the terms of this Agreement, such Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to a Seller or its Affiliates pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller or its Affiliates, and such Seller or its Affiliates shall assume and accept such Liability.

**Section 6.11    Guarantees; Third Party Assurances**.

(a)     Purchaser acknowledges Sellers and their Affiliates have entered into various arrangements (i) in which guarantees, letters of credit, sureties, bonds or similar arrangements were issued by Sellers or their Affiliates and (ii) in which Sellers or their Affiliates are the primary obligors on other Contracts, in any such case to support or facilitate Sellers, in each case, set forth in Schedule 6.11(a) ( "Seller Support Obligations"). It is understood that the Seller Support Obligations are not intended to continue after the Closing. Purchaser agrees that it shall use its reasonable best efforts to obtain replacements for the Seller Support Obligations (which shall include the full and unconditional release of Sellers and their Affiliates) that will be in effect at the Closing or, in the case of Seller Support Obligations described in the foregoing clause (ii), will use its commercially reasonable efforts to arrange for itself or one of its Subsidiaries to be substituted as the primary obligor thereon as of the Closing through an assumption, accession, acknowledgement or similar agreement (which shall include the full and unconditional release of Sellers and their Affiliates) with the beneficiary of the applicable Seller Support Obligation. Whether or not Purchaser is able to satisfy the terms of the immediately preceding sentence, Purchaser shall indemnify Sellers and their Affiliates and each of their respective officers, directors, employees, agents and representatives from and against any and all Liabilities incurred by any of them relating to the Seller Support Obligations. Purchaser agrees that, with respect to any Seller Support Obligation, its reasonable best efforts pursuant to this Section 6.11 shall include, if requested, the execution and delivery by Purchaser, or by an Affiliate of Purchaser acceptable to the beneficiary of such Seller Support Obligation, of a replacement guarantee that is substantially in the form of such Seller Support Obligation. All costs and expenses incurred in connection with providing the release or substitution of the Seller Support Obligations shall be borne by Purchaser.

(b)     At or prior to the Closing, Purchaser shall at its sole cost and expense arrange for the issuance of replacement surety bonds or similar instruments or post cash collateral to the issuer with respect to all outstanding surety bonds or similar instruments issued with respect to the Business and which are set forth in Schedule 6.11(b) (collectively, the "Third Party Assurances") such that all Third Party Assurances may be returned, terminated or otherwise unwound in full as of the Closing.

**Section 6.12    <u>Acknowledgment by Purchaser</u>**.

(a)      Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the Business (including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects), and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely, are relying, and will rely, solely, on the Express Representations and the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, any Information Presentation, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of any Seller, any of the Seller Parties or any other Person on behalf of any Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of the Business, or the quality, quantity or condition of any of the Acquired Assets are, in each case, specifically disclaimed by each Seller, on its behalf and on behalf of the Seller Parties. Purchaser, on its own behalf and on behalf of the Purchaser Group: (1) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence (which do not, for the avoidance of doubt, include Purchaser's or Purchaser Group's reliance on the Express Representations). Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Sellers, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and subject to <u>Section 6.12(c)</u>, Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (x) any potentially material information regarding any

Seller or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (y) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of any Seller's business (including the Business), operations, assets, Liabilities, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)    Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of the Business, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of any Seller, or other Seller Parties, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "Projections"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)    Nothing in this Section 6.12 shall limit any rights or remedies available to Purchaser in the case of a claim for Fraud.

(d)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.12, including any such Action with respect to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the information, statements, disclosures or materials in the Information Presentation, the Dataroom or Projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any other Seller Party or any failure of any of the foregoing to disclose any information.

**Section 6.13    Guaranty.**

(a)    Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Sellers (i) the due and punctual performance, when and as due, of all obligations, covenants and agreements of Purchaser arising under or pursuant to this Agreement; (ii) the accuracy of Purchaser's representations and warranties set forth herein; and (iii) the punctual payment of all sums, if any, now or hereafter owed by Purchaser under and in accordance with the terms of this Agreement, including the payment obligations of the Purchaser pursuant to Section 2.1 (the matters set forth in clauses (i), (ii), and (iii), collectively, "Guaranteed Obligations").

(b)     If Purchaser fails to perform any of the Guaranteed Obligations, then Guarantor shall itself be jointly and severally liable for the Guaranteed Obligations and shall perform or take whatever steps as may be necessary to procure performance of the same.

(c)     Notwithstanding any other provision of this Section 6.13, nothing herein shall be construed as imposing greater obligations or Liabilities on Guarantor than for which Purchaser itself would be liable under this Agreement or obliging Guarantor to indemnify and hold harmless Sellers against any losses, costs, or expenses for which Purchaser itself would not be liable under this Agreement, except as set forth in this Section 6.13, including Section 6.13(f) and Section 6.13(h).

(d)     The obligations of Sellers under this Agreement shall conclusively be deemed to have been created, contracted, or incurred in reliance upon this Section 6.13 and all dealings between Sellers and Purchaser shall likewise be conclusively presumed to have been consummated in reliance upon this Section 6.13.

(e)     Guarantor's obligations hereunder shall not be affected by any facts or circumstances that might constitute a legal or equitable bar, discharge or defense to any Guaranteed Obligations available to Guarantor but not available to Purchaser, and Guarantor hereby expressly waives and renounces any and all such bars, discharges and defenses.

(f)     The guarantee by Guarantor contained herein shall be a continuing guarantee, shall remain in full force and effect and shall continue to be enforceable by Sellers until the performance by Purchaser of all of the Guaranteed Obligations (notwithstanding any change, restructuring, bankruptcy, insolvency or termination of the corporate structure or existence of any Seller or any of its Subsidiaries) and that upon completion of all of the Guaranteed Obligations, this guarantee shall terminate automatically and Guarantor shall stand discharged of all of its obligations under this guarantee. Guarantor shall indemnify Sellers for any costs and expenses incurred by Sellers in enforcing this Section 6.13, including the fees and expenses of counsel and other Advisors of Sellers in the investigation and prosecution of any Action with respect hereto. Guarantor's obligations under this Section 6.13 shall not be terminated, modified, affected or impaired by reason of any relief or discharge of Purchaser from any of Purchaser's respective obligations in bankruptcy or similar proceedings, or by liquidation or dissolution.

(g)     The liability of Guarantor under this Section 6.13 shall be unlimited and unconditional, and this Section 6.13 shall be a continuing guaranty.

(h)     Guarantor hereby makes the representations and warranties set forth in Article IV as to itself, and such representations and warranties shall apply *mutatis mutandis* as if Guarantor were substituted for Purchaser therein.

**Section 6.14    Confidentiality**.

(a)     The Confidentiality Agreement is hereby incorporated herein by reference and shall continue in full force and effect in accordance with its terms; provided that from and after the Closing, all of Purchaser's and its Affiliates obligations under the Confidentiality Agreement with respect to confidential information that constitutes an Acquired Asset or Assumed Liability, shall terminate and be of no further force or effect.

(b)     From and after the Closing the confidential information and trade secrets included in the Acquired Assets ("Business Confidential Information") will be the confidential information of Purchaser; provided that Business Confidential Information shall not include any information that is or, after the Closing, becomes generally available to the public other than as a result of disclosure, directly or indirectly, by Sellers in violation of this Section 6.14. The Sellers will not use the Business Confidential Information except to (i) provide the services under the TSA, or (ii) comply with applicable Law or a Contract that is an Excluded Asset and solely for the purpose of complying with such Contract,, (iii) enforce Sellers' rights hereunder, or (iv) participate in commercial arrangements between Sellers and their Affiliates, on the one hand, and Purchaser and its Affiliates, on the other hand ((i) through (iv), the "Permitted Purposes").

(c)     Following the Sellers' delivery of the Acquired Assets to Purchaser and Purchaser's confirmation of receipt of the Acquired Assets, the Sellers will use commercially reasonable efforts to permanently delete and erase from the Sellers' systems and storage locations all software and other technology that is not needed by the Sellers to provide the services under the TSA, except Sellers may retain such documents, records, and copies as are be required in order to satisfy any retention policies, internal compliance procedures or regulations or Law to which Seller is subject, or where it is not reasonably possible to destroy copies that have been created by ordinary course electronic backup procedures, provided that (x) the obligations in this Section 6.14 shall continue to apply to such documents, records and copies and (y) in each case, such documents, records and copies are only available and accessible to employees of Seller with a need to know solely for the foregoing purposes. Following the termination or expiration of the TSA, Sellers will use commercially reasonable efforts permanently delete and erase from the Sellers' systems and storage locations all of the software and other technology included in the Acquired Assets that was needed by the Sellers to perform obligations under the TSA, except Sellers may retain such documents, records, and copies as are be required in order to satisfy any retention policies, internal compliance procedures or regulations or Law to which Seller is subject, or where it is not reasonably possible to destroy copies that have been created by ordinary course electronic backup procedures, provided that (x) the obligations in this Section 6.14 shall continue to apply to such documents, records and copies and (y) in each case, such documents, records and copies are only available and accessible to employees of Seller with a need to know solely for the foregoing purposes.

(d)     From and after the Closing, except with the prior written consent of Purchaser, the Sellers agree to keep confidential and not disclose the Business Confidential Information, except to the extent that (A) such information has otherwise been made public other than as a result of disclosure, directly or indirectly, by Sellers in violation of this Section 6.14, (B) any such information is reasonably necessary for enforcing the Sellers' rights hereunder and is disclosed to any Governmental Body in connection with any

Actions involving a dispute between any Seller and any Purchaser Group member, (C) any Seller is required by applicable Law (including, in connection with the Bankruptcy Cases) to divulge or disclose any such information (in which case Sellers shall promptly notify Purchaser in advance of disclosing such information and use commercially reasonable efforts to cooperate with Purchaser to limit such disclosure, to the extent permitted under applicable Law), and (D) to its Affiliates and Advisors solely on a need to know basis in connection with the Permitted Purposes and solely for the Permitted Purposes.

(e)    Purchaser acknowledges that Sellers' and their Affiliates' directors, officers and employees may unavoidably retain unassisted mental impressions of Business Confidential Information that were not the result of such individuals having studied, memorized, or reviewed Business Confidential Information for the purpose of remembering, preserving, replicating or otherwise using such Business Confidential Information ("Mental Impressions"), and such retention of such Mental Impressions shall not in and of itself constitute a breach of this Section 6.14. In addition, to the extent such Mental Impressions are recalled indirectly or subconsciously as part of such individual's general industry knowledge, and not as such individual's direct or conscious recollection (i) of Business Confidential Information or (ii) as information relating to or having been included in the Acquired Assets, such individual's actions or omissions, to the extent based on such general industry knowledge and not on specific Business Confidential Information, shall not in and of themselves constitute a breach of this Section 6.14. However, and notwithstanding anything to the contrary, this Section 6.14(e) will not (x) affect in any manner whatsoever Purchaser's rights in the Acquired Intellectual Property or (y) assign to Sellers or their Affiliates or any other Person or otherwise grant to Sellers or their Affiliates or any other Person any license or other rights whatsoever to, any of the Acquired Intellectual Property.

**Section 6.15   No Successor Liability**. The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the closing, Purchaser shall not be deemed to: (a) be the successor of any Seller, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Acquired Assets other than as expressly set forth and agreed in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Purchaser shall have no Liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Acquired Assets) against Sellers or any of Sellers predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Sellers, the Acquired Assets or any Liability of Sellers arising prior to, or relating to any period occurring prior to, the Closing Date. The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this Section 6.15.

**Section 6.16   Retained Privileged Materials**. Following the Closing (i) in the event of a dispute between Purchaser and its Affiliates, on the one hand, and a third party (other than Sellers),

on the other hand, Purchaser shall have the right to, or to require Sellers to, assert the attorney-client privilege to prevent disclosure of any Retained Privileged Materials to a third party, and (ii) without Purchaser's prior written consent, Sellers shall not, unless required by applicable Law, disclose, transfer or otherwise make available any Retained Privileged Materials to any third-party, in any manner that would reasonably be expected to result in the waiver of the attorney-client privilege with respect to such materials.

**Section 6.17   Notification of Certain Matters**. The Sellers will promptly (and, in any event, within ten (10) days) notify Purchaser in writing of: (i) any notice or other communication from any Person alleging that the Consent of such Person is or may be required in connection with the Transactions; (ii) any notice or other communication from any Governmental Body, or any Action by any Governmental Body, related to or in connection with the Transactions (including that may restrain, enjoin or otherwise prohibit the consummation of the Transactions); and (iii) the discovery of any variances from, or the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause, any of the representations and warranties contained in Article III to be untrue or inaccurate such that the condition set forth in Section 7.2(a) will not be satisfied.

**Section 6.18   Change of Name**. Promptly (and, in any event, within 60 days) following the Closing, each Seller shall, and shall cause their Subsidiaries (other than EIC) to, discontinue the use of their current legal entity name (and any other trade names or "d/b/a" names currently utilized by each Seller) and shall not subsequently change any of their names to or otherwise use or employ any name which includes the words "Elixir," "Ascend," "Laker," and/or "Tonic" and the other names listed on Schedule 6.18 without the prior written consent of Purchaser, and each Seller shall cause the name of Sellers in the caption of the Bankruptcy Cases to be changed to the new names of each Seller.

**Section 6.19   Open Source Remediation**.  Prior to Closing, Seller shall obtain and pay for commercial licenses for iTextSharp, ServiceStack and jqGrid software sufficient to permit Seller's use of such software.

**Section 6.20   CMS Novation**. As promptly as practicable, and in any event not later than ten (10) Business Days, after the date hereof, Sellers shall cause EIC to jointly prepare with EIC and to file with CMS a request for CMS to approve and consent to the novation of the CMS Contracts from EIC to Purchaser pursuant to the Novation Agreement, by and among CMS, EIC (as transferor) and Purchaser (as transferee) ("Novation Agreement"). Sellers shall cause EIC to include in such request all of the information and documentation required pursuant to 42 CFR § 423.552 and any additional information required or advisable pursuant to applicable Law. Thereafter, Sellers shall cause EIC, in coordination with Purchaser, to promptly update, as necessary or appropriate, the Novation Agreement request to include all of the information required pursuant to 42 CFR § 423.552 and any additional information required or advisable pursuant to applicable Law, including all information requested by CMS. Sellers shall cause EIC to furnish to Purchaser, and Purchaser shall furnish to Sellers, all necessary information as the other Party may reasonably request in connection with its preparation of any filing or submission in connection with the Novation Agreement, and shall keep the other Party apprised of the status of any communications with, and inquiries or requests for additional information from, CMS or other Governmental Body. Sellers shall cause EIC to, and Purchaser shall, comply promptly with

61

any such inquiry or request of CMS related to the Novation Agreement. Sellers shall cause EIC to, and Purchaser shall, satisfy all requirements applicable to the Novation Agreement pursuant to 42 CFR §§ 423.551 AND 423.552.  In the event that the Novation Agreement is not obtained pursuant to the terms and conditions set forth in this Section 6.20, the terms and conditions set forth in Section 1.7 shall become null and void.  Notwithstanding this Section 6.20 or anything else in this Agreement, Purchaser acknowledges and agrees that (a) it is not a condition to the Closing or to any of Purchaser's other obligations under this Agreement that the Parties obtain the Novation Agreement. The Parties agree that this Section 6.20 (and not Section 6.6 or Section 6.8) sets forth Sellers' sole obligations with respect to the potential Novation Agreement and (ii) the condition set forth in Section 7.2(b), as it applies to Sellers' obligations under this Section 6.20, shall be deemed satisfied unless the failure to obtain the Novation Agreement is a direct result of Sellers' knowing and material willful breach of their obligations under this Section 6.20.

Section 6.21    **Completion of TSA Schedules**. Purchaser and Sellers shall cooperate in good faith to finalize the TSA to the reasonable satisfaction of the Purchaser and Sellers as soon as reasonably practicable following the date hereof and in any event on or prior to the date that is 3 weeks following the date hereof. Purchaser and Sellers shall negotiate in good faith to modify and finalize the schedules to and the economic terms of the TSA; provided that Purchaser and Sellers acknowledge and agree that the form of TSA attached as Exhibit G is considered substantially complete but there are open matters relating primarily to finalizing the services and economic terms, which may include revisions to the body of the TSA.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

Section 7.1    **Conditions Precedent to the Obligations of Purchaser and Sellers**. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    the expiration or termination of any required waiting period under the HSR Act or under the Foreign Competition Laws set forth in Schedule 7.1(a) related to the Transactions, and receipt of any necessary approval related to the Transactions under the Foreign Competition Laws or other regulations set forth in Schedule 7.1(a);

(b)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; and

(c)    the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the Parties.

Section 7.2    **Conditions Precedent to the Obligations of Purchaser**. The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted

by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties made by Sellers in <u>Article III</u> (in each case, other than the Fundamental Representations and the Seller Sufficiency Representations) shall be true and correct in each case in all respects as of the Closing Date as though made on and as of the Closing Date (other than representations and warranties that are made as of a specified date need be true and correct only as of such date), except where the failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality", "Material Adverse Effect" or similar qualifiers contained therein (other than "material weaknesses" in <u>Section 3.4(d)</u> and the word "Material" when used in the instances of the defined term "Material Contract" and "Material Adverse Effect" in <u>Section 3.19</u>)) has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) the representations and warranties set forth in <u>Section 3.1</u>, <u>Section 3.2</u>, <u>Section 3.5(a)</u> and <u>Section 3.17</u> (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all respects other than for de minimis inaccuracies, in each case as of the Closing Date as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date) and (iii) the representations and warranties set forth in <u>Section 3.5(b)</u> (the "<u>Seller Sufficiency Representations</u>") shall be true and correct in all respects, in each case as of the Closing Date as though such representations and warranties had been made as of the Closing Date;

(b)    Sellers shall have performed or complied with, or caused to be performed or complied with, in all material respects, all of the obligations and covenants required by this Agreement to be performed or complied with by Sellers on or prior to the Closing;

(c)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.4</u>;

(d)    From the date of this Agreement, there shall not have occurred any Material Adverse Effect.

**Section 7.3    <u>Conditions Precedent to the Obligations of Sellers</u>**. The obligations of Sellers to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct, in each case as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct (without giving effect to any limitation as to "materiality", "material adverse effect",

"Material Adverse Effect" or similar qualifiers contained therein) would not materially impair or prevent Purchaser's ability to consummate the Transactions;

(b)      Purchaser shall have performed or complied with, or caused to be performed or complied with, in all material respects, all of the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing; and

(c)      Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.5.

**Section 7.4**      **Waiver of Conditions**. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

**ARTICLE VIII**
**TERMINATION**

**Section 8.1**      **Termination of Agreement**. This Agreement may be terminated at any time prior to the Closing only in accordance with this Section 8.1, and in no other manner:

(a)      by the mutual written consent of Sellers and Purchaser;

(b)      by written notice of either Purchaser or Sellers, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section 8.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)      by written notice of either Purchaser or Sellers, if the Closing shall not have occurred on or before May 31, 2024 (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d)      by written notice from Sellers to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or Section 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser (other than a breach or failure by Purchaser to close when required pursuant to Section 2.3) then Sellers may not terminate this Agreement under this Section 8.1(d) unless such breach has not been cured by the date which that the earlier of (A) two (2) Business Days prior to the

Outside Date and (B) 30 days after Sellers notify Purchaser of such breach and (ii) Sellers' right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Sellers at any time that Sellers are in material breach of, any covenant, representation or warranty hereunder;

(e)     by written notice from Purchaser to Sellers, upon a breach of any covenant or agreement on the part of Sellers, or if any representation or warranty of the Sellers will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or Section 7.2(b) would not be satisfied; provided that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) 30 days after Purchaser notifies Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)     by written notice from Sellers to Purchaser, if (i) all of the conditions set forth in Section 7.1 and Section 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but which conditions are capable of being satisfied) or waived, (ii) Sellers have confirmed in writing to Purchaser that Sellers are ready, willing, and able to consummate the Closing, and (iii) Purchaser fails to complete the Closing by, or at, the later of (A) three Business Days of receipt of the notice described in clause (ii), and (B) the time required by Section 2.3;

(g)     by written notice from Sellers to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(h)     by written notice of either Purchaser or Sellers, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder;

(i)     by written notice from either Purchaser or Sellers, if Purchaser (i) is not the Successful Bidder or the Backup Bidder at the Auction or (ii) is the Backup Bidder at the Auction and Sellers consummate an Alternative Transaction with the Successful Bidder;

(j)     by Sellers or Purchaser, if the Bankruptcy Cases are dismissed or converted to a case or cases under chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Bankruptcy Cases;

(k)     by Purchaser if Sellers withdraw or seek authority to withdraw the Bidding Procedures Motion;

(l)      by Purchaser if (i) following entry by the Bankruptcy Court of the Bidding Procedures Order, such order is (A) amended, modified or supplemented in a manner reasonably expected to be adverse to Purchaser without Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay, or (ii) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (A) amended, modified or supplemented in an adverse way without Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay;

(m)      by Purchaser, if any of the Bankruptcy Court Milestones are not met;

(n)      by Purchaser, in its sole discretion, on or prior to October 23, 2023;

(o)      by Purchaser, in its sole discretion, on or prior to October 30, 2023; or

(p)      by written notice from Sellers to Purchaser, upon a breach of Section 2.2(a) on the part of Purchaser.

### Section 8.2    Effect of Termination.

(a)      In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become null and void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided that Section 2.2, Section 6.2(b), Section 6.14, this Section 8.2 and Article X shall survive any such termination; provided further that no termination will relieve any Party from any Liability for any Willful Breach of this Agreement prior to the date of such termination; provided further that, subject to Section 10.12, the maximum Liability of Purchaser under, or arising out of, this Agreement shall be equal to the Deposit. Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement. Notwithstanding anything contained herein to the contrary, (i) retaining the Deposit pursuant to Section 2.2(b) is Sellers' sole and exclusive remedy arising from (A) Seller's termination of this Agreement pursuant to Section 8.1(p) or any other section of Section 8.1 (or upon any other grounds) as a result of Purchaser's breach of Section 2.2(a) or Section 4.4, and (B) Purchaser's breach of Section 2.2(a) or Section 4.4, and (ii) retaining the Deposit pursuant to Section 2.2(b) is Sellers' sole and exclusive remedy arising from Purchaser's termination of this Agreement pursuant to Section 8.1(n) or Section 8.1(o). For the avoidance of doubt, Sellers will not be entitled to specific performance or other equitable remedies to enforce specifically (1) the terms and provisions of Section 2.2(a) requiring Purchaser to make the Second Deposit or Final Deposit, or (2) requiring Purchaser to cure any breach of Section 4.4.

(b)      If this Agreement is terminated other than pursuant to Section 8.1(a), Section 8.1(d), Section 8.1(f), Section 8.1(n), Section 8.1(o), or Section 8.1(p), then the Sellers will pay to Purchaser by wire transfer of immediately available funds within three (3) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, diligence,

execution, performance and enforcement of this Agreement, which amount will shall not exceed $8,625,000 ("Expense Reimbursement").

(c)    In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated pursuant to Section 8.1(c), Section 8.1(e), Section 8.1(g), Section 8.1(h), Section 8.1(i), Section 8.1(j), Section 8.1(k), or Section 8.1(l), Sellers shall pay to Purchaser a break-up fee in an amount equal to $11,500,000 (the "Breakup Fee"); provided that the Breakup Fee shall be payable concurrently with the consummation of, and only out of the cash proceeds of, an Alternative Transaction, to an account designated by Purchaser in writing to Elixir.

(d)    Each of the Parties acknowledges and agrees that the agreements contained in this Section 8.2(b) are an integral part of this Agreement and that the Breakup Fee and Expense Reimbursement are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Purchaser in the circumstances in which such and Breakup Fee and Expense Reimbursement, as applicable, are payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(e)    Subject in all cases to Section 10.12, prior to the applicable Closing, in the event of any breach by any Seller of this Agreement, the sole and exclusive remedy of Purchaser shall be to terminate this Agreement in accordance with Section 8.1 and, if applicable, to receive the and Expense Reimbursement or the Breakup Fee, as applicable, in accordance with Section 8.2(b). Pursuant to the Bidding Procedures Order and subject to approval by the Bankruptcy Court and entry of the Sale Order, the claim of Purchaser in respect of the Expense Reimbursement or the Breakup Fee is and constitutes an allowed administrative expense claim against Sellers under section 503 of the Bankruptcy Code in the Bankruptcy Case.

## ARTICLE IX
## TAXES

**Section 9.1    Transfer Taxes**. Any U.S. federal, state, local, and non-U.S., GST/HST, sales Tax, consumption sales, use, excise, value added, registration, real property, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges (including all related interest, penalties, and additions to any of the foregoing) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes with the appropriate Taxing Authority.

**Section 9.2    Allocation of Purchase Price**. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price

for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the methodology set forth in Schedule 9.2 (the "Allocation Methodology"). As soon as commercially practicable, but no later than 90 days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price (and other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "Allocation") subject to Sellers' review and approval, and Purchaser shall incorporate any changes reasonably requested by Sellers with respect to such Allocation. If Sellers deliver a written objection within 30 days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Sellers shall negotiate in good faith to resolve any such objection, and, if Sellers and Purchaser cannot resolve such dispute within 30 days of Purchaser's receipt of Sellers' objection, then a nationally recognized accounting firm mutually acceptable to Purchaser and Sellers shall resolve such dispute, with the costs of such resolution to be allocated by such accounting firm between Purchaser and Sellers based upon the percentage of the aggregate contested amount submitted to such accounting firm that is ultimately awarded to Purchaser, on the one hand, or Sellers on the other hand, such that Purchaser bears a percentage of such costs and expenses equal to the percentage of the contested amount awarded to Sellers and Sellers bears a percentage of such costs and expenses equal to the percentage of the contested amount awarded to Purchaser. The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this Section 9.2) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of section 1313(a) of the Tax Code.

**Section 9.3**    **Cooperation**. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes; provided that in providing such information, assistance and access, each Party shall be entitled to redact information that is not related to the Business. Notwithstanding anything to the contrary in this Agreement, the Sellers shall not be obligated to provide or disclose any Excluded Tax Returns.

**Section 9.4**    **Post-Closing Actions**. Unless consented to by Sellers in writing (such consent not to be unreasonably withheld, conditioned, or delayed), or required by Applicable Law, Purchaser shall not, and shall cause its Affiliates not to, in each case with respect to the Acquired Assets, or the Business, (i) make or change any Tax election with retroactive effect to a Pre-Closing Tax Period, (ii) file any amended Tax Return for a Pre-Closing Tax Period, or (iii) make or initiate any voluntary discussion, examination or Contract with a Taxing Authority (including any voluntary disclosure agreement or similar process) for a Pre-Closing Tax Period, in each case, that would reasonably be expected to result in any increased Tax Liability or reduction of any Tax refund or credit of the Sellers.

**Section 9.5**    **Preparation of Tax Returns and Payment of Taxes**.

(a)    Except as otherwise provided by Section 9.1, Sellers shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets and the Business for any Tax period ending on or before the Closing Date (and Purchaser shall cooperate with Sellers in causing such Tax Returns to be filed) that has not been filed prior to the Closing Date and (ii) all income Tax Returns of Sellers. Each such Tax Return described in this

Section 9.5(a)(i) shall (A) be prepared in accordance with the terms of this Agreement, and (B) and Sellers shall use commercially reasonable efforts to submit such Tax Returns to Purchaser at least fifteen (15) Business Days prior to the filing of such Tax Return (taking into account any extensions of the time to file), or as soon as reasonably practicable if such timing is not possible, for Purchaser's reasonable review and Seller shall consider any reasonable written comments provided by Purchaser after receiving such Tax Return.

(b)    Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets and the Business for any Tax period ending after the Closing Date. With respect to any Straddle Period, Purchaser shall prepare such Tax Returns consistent with past practice, and shall use commercially reasonable efforts to provide Sellers or their successors in rights, as applicable, with a draft of such Tax Returns at least fifteen (15) Business Days prior to the filing of any such Tax Return (taking into account any extensions of the time to file), or as soon as reasonably practicable if such timing is not possible, for Sellers' reasonable review and Purchaser shall consider any reasonable written comments provided by Sellers after receiving any such Tax Return to the extent failing to do so would adversely impact the Liability of the Sellers (including under this Agreement).

(c)    <u>Allocation of Taxes for Straddle Periods</u>. The amount of Taxes allocable to either the Pre-Closing Tax Period or Post-Closing Tax Period of any Straddle Period shall equal: (a) for any Taxes imposed on a periodic basis (such as real, personal and intangible property Taxes), the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the denominator of which is the total number of days in the Straddle Period, and the numerator being either (i) the number of days during the Straddle Period that are in the Pre-Closing Tax Period (for the Pre-Closing Tax Period), or (ii) the number of days during the Straddle Period that are in the Post-Closing Tax Period (for the Post-Closing Tax Period) and (b) for all other Taxes, determined on an interim closing of the books basis, effective as of the end of the Closing Date. Any payment by a Party with respect to Taxes for a Straddle Period shall be credited towards such Party's Liability for their share of any Taxes with respect to a Straddle Period allocable to such Person under this <u>Section 9.5</u>.

## ARTICLE X
## MISCELLANEOUS

**Section 10.1    <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for seven (7) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving

covenant or agreement. Purchaser and Sellers acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this Section 10.1 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five years and (b) are an integral part of the Transactions and that, without the agreements set forth in this Section 10.1, none of the Parties would enter into this Agreement. The Purchaser on behalf of itself and the Purchaser Group hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement or the Transactions. Notwithstanding anything contained in this Agreement to the contrary (including in this Section 10.1), nothing set forth herein shall limit any rights or remedies available to Purchaser in respect of any claim for Fraud (subject in any event to the provisions of Section 10.7, which, insofar as they relate to Non-Recourse Persons, shall not be limited hereby in any way).

**Section 10.2   Expenses**. Whether or not the Closing takes place, except as otherwise provided herein, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all filing fees in connection with any filing or submission under the HSR Act and any Foreign Competition Laws will be allocated pursuant to Section 6.5, (b) all Transfer Taxes will be allocated pursuant to Section 9.1, and (c) all Cure Costs will be allocated pursuant to Section 5.2.

**Section 10.3   Notices**. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), if delivered by 5:00 P.M. local time of the recipient on a Business Day and otherwise on the following Business Day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

MedImpact
10181 Scripps Gateway Ct
San Diego, California 92131
Attention:      James Gollaher
Email:          james.gollaher@medimpact.com

with a copy to (which shall not constitute notice):

DLA Piper LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121
Attention:     David M. Clark
Email:         David.Clark@us.dlapiper.com

and

DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Attention:     Richard A. Chesley
Email:         richard.chesley@us.dlapiper.com


Notices to Sellers:

Hunter Lane, LLC
c/o Rite Aid Corporation
200 Newberry Commons
Etters, PA 17319
Attention:     Thomas Sabatino
Email:         Thomas.Sabatino@riteaid.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:     Aparna Yenamandra, P.C.

Email:         aparna.yenamandra@kirkland.com


Kirkland & Ellis LLP
300 N. Lasalle
Chicago, IL 60654
Attention:     Steve Toth
Email:         steve.toth@kirkland.com

**Section 10.4    Binding Effect; Assignment; Designated Purchasers.**

(a)     This Agreement shall be binding upon Purchaser and, subject to the terms
of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry
and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on
the Parties and their respective successors and permitted assigns, including any trustee or

estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided that, subject to Section 10.4(b), neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void; provided further that Purchaser (subject to Purchaser remaining liable for its obligations hereunder in the event such obligations are not performed in accordance with their terms) may assign any of its rights or obligations hereunder to any of its Affiliates without the consent of any Person.

(b)     At any time prior to the Closing, Purchaser shall be entitled to designate, by written notice to Sellers no later than five (5) Business Days prior to the Closing Date, one or more Affiliates to (i) purchase any of the Acquired Assets and pay the corresponding Purchase Price amount, (ii) assume Assumed Liabilities, or (iii) take title directly to any Acquired Asset (any such Affiliate that shall be designated in accordance with this clause, a "Designated Purchaser"), and, to the extent of any such designation, this Agreement shall be binding upon such Designated Purchaser, its successors and permitted assigns, which shall be treated as Purchaser to such extent. In addition, and for the avoidance of doubt, a Designated Purchaser shall be entitled to employ any of the Transferred Employees on and after the Closing Date and to perform any other covenants or agreements of Purchaser under this Agreement. Notwithstanding the foregoing, Purchaser's designation of any Designated Purchaser shall not relieve Purchaser of its obligations under this Agreement in the event such obligations are not performed by any such Designated Purchaser in accordance with their terms.

**Section 10.5   Amendment and Waiver**. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Party against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

**Section 10.6   Third Party Beneficiaries**. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than (i) for purposes of Section 10.7, the Non-Recourse Persons, and (ii) the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**Section 10.7   Non-Recourse**. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party (each, a "Non-Recourse Person") will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute and each of such Persons are intended third party beneficiaries of this Section 10.7 and shall be entitled to enforce this Section 10.7 as if a party directly hereto.

Section 10.8    <u>**Severability**</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

Section 10.9    <u>**Construction**</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

Section 10.10    <u>**Schedules**</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>provided</u> that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement in each case, to the extent (and solely to the extent) the relevance of such disclosure to such other section of the Schedules or such other representation or warranty set forth in this Agreement is reasonably apparent on the face of such disclosure (without review or other examination of the underlying documents listed therein). Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened). In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement, in each case, solely to the extent made available to Purchaser in accordance with <u>Section 11.3(i)</u>. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

Section 10.11    <u>**Complete Agreement**</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts

of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

Section 10.12 **Specific Performance**. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to the Parties pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Party from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with Section 10.13, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, plus ten (10) Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be.

Section 10.13 **Jurisdiction and Exclusive Venue**. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related

grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

**Section 10.14  <u>Governing Law; Waiver of Jury Trial</u>**.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.14(B)</u>.

**Section 10.15  <u>No Right of Set-Off</u>**. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

**Section 10.16  <u>Counterparts and PDF</u>**. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission,

will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

**Section 10.17 <u>Publicity</u>**. Neither Sellers (nor any of their Affiliates) nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; <u>provided</u> that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

**Section 10.18 <u>Bulk Sales Laws</u>**. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer Laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

**Section 10.19 <u>Sellers' Representative</u>**. Each Party agrees that Elixir has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, Consents and determinations on behalf of the Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by Elixir on behalf of the Sellers.

**Section 10.20 <u>Financing Sources</u>**. Each of the Sellers hereby waives any rights or claims against the Financing Sources (as defined below) and hereby agrees that in no event shall any of the Financing Sources have any liability or obligation to any Seller, or the respective Affiliates of any Seller, and in no event shall any Seller (or the respective Affiliates of any Seller) seek or obtain any other damages of any kind against any Financing Source (including without limitation, direct, economic, consequential, special, indirect or punitive damages), in each case, relating to or arising out of this Agreement, any Financing (as defined below) or the transactions contemplated hereby or thereby.  Further, notwithstanding anything to the contrary herein, (i) the Financing Sources

shall be third party beneficiaries of, and shall be entitled to enforce the provisions of this Section 10.20 (including the following clause (iii)), (ii) this Section 10.20 shall survive the termination of this Agreement, and (iii) the provisions set forth in this Section 10.20 may not be amended, modified or altered in any manner that could be adverse to the interests of any Financing Source in any respect without the prior written consent of the Financing Sources. Further, if for any reason pursuant to Section 2.2 or otherwise, the Sellers shall have the right to retain all or any portion of the Deposit, then each Seller hereby acknowledges and agrees (for itself and its Affiliates) that such retention of such Deposit amount by the Sellers shall also satisfy in full any claims that any Sellers might assert against any Financing Source. In this Section 10.20: (a) "Financing Sources" means all agents, arrangers, lenders, bookrunners, letter of credit providers and other entities that have provided, or have committed to provide, or will after the date of this Agreement provide, or arrange or otherwise enter into agreements in connection with, any Financing, with the Purchaser and/or any of its Affiliates, including the parties to any credit agreement, indenture or other financing or lending agreement, or any commitment or engagement letter (including any joinder thereto) or other agreements entered pursuant thereto or relating thereto, together with their respective Affiliates and the current, former or future officers, directors, employees, partners, trustees, shareholders, equityholders, managers, members, limited partners, controlling persons, agents and representatives of each of them and their respective Affiliates, and the successors and assigns of the foregoing Persons; and (b) "Financing" means any debt or other financings entered into by the Purchaser or any of its Affiliates in connection with the consummation of the transactions contemplated by this Agreement prior to, on, or after the date hereof, including any borrowing of loans and any related commitment letter, engagement letter, credit agreement, indenture, and any other related documentation governing such debt or other financing including any credit facilities or capital markets debt financing.

## ARTICLE XI
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

**Section 11.1    Certain Definitions**.

(a)      "Action" means any action, claim (including any "claim" as defined in the Bankruptcy Code), suit, litigation, arbitration, mediation, complaint, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding) or prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation of any kind whatsoever whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(b)      "Advisors" means, with respect to any Person as of any relevant time, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)      "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the

77

power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d) "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires a material portion of the Acquired Assets, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, a liquidation or wind-down of Sellers' estates shall not be an Alternative Transaction.

(e) "Anti-Corruption Laws" means all anti-corruption Laws applicable to the Sellers, including the United States Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd- 1, et seq.), and any other applicable anti-bribery or anti-corruption Law (including any Laws relating to the making of any unlawful payment to any foreign or domestic government official), including any rules, regulations and guidance promulgated under any of the foregoing that prohibit bribery, corruption, or substantially similar conduct.

(f) "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(g) "Bidding Deadline" means the deadline by which binding bids for the Sellers' assets must be submitted in the Auction, pursuant to the Bidding Procedures Order.

(h) "Bidding Procedures" means procedures governing submission and evaluation of bids to purchase some, all, or substantially all of the Sellers' assets, pursuant to the Bidding Procedures Order.

(i) "Bidding Procedures Motion" means the motion seeking entry of the Bidding Procedures Order, which shall be in form and substance reasonably satisfactory to the Sellers and Purchaser.

(j) "Bidding Procedures Order" means an Order of the Bankruptcy Court approving the Bidding Procedures Motion, in the form attached labeled as Exhibit F.

(k) "Business" means the business operations of Sellers as of the date hereof, including the provision of (i) pharmacy benefits manager services (including plan design and administration, cash card programs, formulary management, claims processing and associated clinical services, and trade and rebate administration) and (ii) specialty and mail order pharmacy services, including fulfillment actives associated therewith. For clarity, such business operations include the use, reproduction, modification, distribution, and licensing of the Laker Software.

(l) "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(m) "Business Employee" means each (i) employee of any of the Sellers, and (ii) employee of any non-Seller Affiliate of any Seller whose duties and responsibilities are

78

dedicated primarily to the Business and set forth on <u>Section 3.14(a)</u>, together with any replacement, if any, of any such individual only to the extent permitted by and in accordance with <u>Section 6.1(b)(v)</u>.

(n)      "<u>Cash and Cash Equivalents</u>" means all of Sellers cash (including checks and deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(o)      "<u>Closing Working Capital</u>" means: (a) Current Assets, <u>less</u> (b) Current Liabilities, determined as of 11:59 PM Eastern time on the date immediately preceding the Closing Date.

(p)      "<u>CMS</u>" means the Centers for Medicare & Medicaid Services, an agency within the U.S. Department of Health and Human Services.

(q)      "<u>CMS Receivable</u>" means all amounts payable to Seller or any of its Affiliates (i) by or on behalf of CMS pursuant to 42 C.F.R. Part 423 and the Contract by and between CMS and EIC for contract year 2023 and any predecessor Contracts by and between CMS and EIC for prior contract years or (ii) related to any financing of any historical amounts that are or would previously have been included in clause (i).

(r)      "<u>Confidentiality Agreement</u>" means that certain Confidentiality Agreement, dated as of August 3, 2023, by and between Rite Aid Corporation and MedImpact Healthcare Systems, Inc.

(s)      "<u>Consent</u>" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(t)      "<u>Contract</u>" means any written contract, license, arrangement, promise, obligation, indenture, note, bond, Lease, sublease, mortgage, agreement, guarantee, purchase order, service order, sales order, commitment, or other agreement or instrument, whether written or oral, that is binding upon a Person or any of its property.

(u)      "<u>Current Assets</u>" means, without duplication, the total current assets of Sellers using those line items used in the example calculation attached hereto as <u>Exhibit E</u> attached hereto, as determined in accordance with the GAAP consistently applied and in respect of Taxes, in accordance with the Tax Principles.

(v)      "<u>Cure Costs</u>" mean all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts.

(w)      "<u>Current Liabilities</u>" means, without duplication, the total current liabilities of Sellers using those line items used in the example calculation attached hereto as

Exhibit E attached hereto, as determined in accordance with the GAAP consistently applied and in respect of Taxes, in accordance with the Tax Principles.

(x)    "Debtors" means, collectively, the debtors-in-possession under the Bankruptcy Cases.

(y)    "Delayed Transferred Employee" means a Transferred Employee whose employment is not eligible for immediate transfer to Purchaser at or prior to the Closing as a result of (i) requirements under applicable Law or (ii) a leave of absence, but in each case, who successfully transfers to Purchaser within twelve (12) months of the Closing.

(z)    "Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form and, without limiting the generality of the foregoing, (i) any and all medical records, billing records, prescriptions, prescription files and records, pharmacy customer lists, signature logs and patient profiles including refill status reports and insurance coverages, co-pay and payment records (the information in this clause (ii), collectively, "Company Rx Data") relating to customers of the mail order and specialty pharmacy business (which shall in any event include no less than twenty four (24) months for any Company Rx Data relating to customers of the mail order and specialty pharmacy business maintained electronically or in hard copy.

(aa)    "EGWP Contracts" mean any EIC Contract (or portions thereof), pursuant to which EGWP plans are provided or administered to Medicare Part D eligible retirees and/or their Medicare Part D eligible spouses or dependents.

(bb)    "Employee Benefit Plan" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA, each other deferred compensation, bonus or incentive compensation, pension, retiree medical, disability or life insurance, or supplemental plan, program, Contract, agreement or arrangement, each employment, severance, change-of-control and each other employee benefit or compensation plan, program, Contract, agreement or arrangement, whether oral or written, whether or not subject to ERISA, whether funded or unfunded, in each case (i) that is maintained, sponsored, administered or contributed or required to be contributed to by any Seller or any ERISA Affiliate or any of their respective Affiliates for the benefit of Business Employees or former Business Employees, or (ii) with respect to which any Seller has any Liability; provided that the term "Employee Benefit Plan" shall not include any statutory benefit plan to which any of the Sellers are required to participate in or comply with that is sponsored and administered by a Governmental Body (such as Social Security).

(cc)    "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(dd)    "Environmental Laws" all applicable Laws concerning pollution or protection of the environment.

(ee)    "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(ff)    "Equity Interests" means, with respect to a Person, any membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or equity appreciation rights, phantom stock rights or other similar rights) or ownership interests of such Person, or any securities (including debt securities or other indebtedness) exercisable or exchangeable for or convertible into, or other rights to acquire, membership interests, partnership interests, capital stock or other equity securities or ownership interests of such Person (or otherwise constituting an investment in such Person).

(gg)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(hh)    "Escrow Agreement" means that certain Escrow Agreement entered into by Purchaser, Sellers and the Escrow Agent dated as of the date hereof.

(ii)    "Escrow Agent" means Acquiom Clearinghouse LLC.

(jj)    "Excluded Tax Returns" means Tax Returns (or any portion of any Tax Return) and other books and records related to (i) Taxes that are not related primarily to any Acquired Asset or the Business or (ii) any consolidated, combined, affiliated or unitary group for Tax purposes that includes any Seller or any of its Affiliates.

(kk)    "Fraud" means an act committed by (a) Sellers, in the making to Purchaser the representations and warranties in Article III or in the certificate delivered pursuant to Section 2.4(i) or (b) Purchaser, in the making to the Sellers the representations and warranties in Article IV or in the certificate delivered pursuant to Section 2.5(h), in any such case, with intent to deceive another Party, or to induce such other Party to enter into this Agreement and requires (i) a false representation of material fact made in such representation; (ii) with knowledge that such representation is false; (iii) with an intention to induce the Party to whom such representation is made to act or refrain from acting in reliance upon it; (iv) causing that Party, in justifiable reliance upon such false representation, to take or refrain from taking action; and (v) causing such Party to suffer damage by reason of such reliance, which together constitutes common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

(ll)     "First Day Pleadings" means the first-day pleadings that the Sellers determine are necessary or desirable to file in the Bankruptcy Court on or around the Petition Date.

(mm)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(nn)     "Governmental Authorization" means any permit, Healthcare Permit, license, franchise, certificate, approval, application, registration, drug listing, consent, permission, clearance, waiver, notification, designation, registration, certification, making, exemption, variance, order, tariff, rate schedule, qualification, or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, including any Healthcare Law.

(oo)     "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator of applicable jurisdiction.

(pp)     "Governmental Health Program" means any federal health care program as defined in 42 U.S.C. § 1320a-7b(f), including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA, and state programs that provide or otherwise make available healthcare coverage to certain of its residents.

(qq)     "Group Purchasing Organization" means any group purchasing organization, rebate aggregator, or other Person performing similar services.

(rr)     "Hazardous Material" means any substance, pollutant, contaminant, material and waste that is regulated by any Law or judgment or is classified in any Environmental Law as "hazardous," "toxic," "dangerous," a "pollutant," a "contaminant" or words of similar meaning, including asbestos, asbestos-containing materials, polychlorinated biphenyls, gasoline, diesel fuel, petroleum, petroleum by-products or petroleum products, radioactive materials and radon gas, per- and polyfluoroalkyl substances, and any other chemicals, materials, substances or wastes in any amount or concentration which are regulated under or for which Liability may be imposed under any Environmental Law.

(ss)     "Healthcare Law", means (a) all applicable healthcare Laws of any Governmental Body, or Governmental Health Program, relating to the provision, administration of, and payment for, healthcare services, including: (i) (A) Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq. (the Medicare statute), and 42 U.S.C. § 1395nn (Stark Law); (B) Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-5 (the Medicaid statute); (C) the Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); (D) the False Claims Act, 31 U.S.C. §§ 3729-3733; (E) the exclusion law, 42 U.S.C. § 1320a-7; (F) the civil monetary penalties law, 42 U.S.C. § 1320 a-7a; (G) the False Claim Law, 42 U.S.C. § 1320a-7b(a); (H) the anti-inducement law, 42 U.S.C. §

1320a-7a(a)(5); (I) HIPAA (as defined herein); (J) the Patient Protection and Affordable Care Act of 2010; (K) the Beneficiary Inducement Statute (42 U.S.C. § 1320a-7a(a)(5)); (L) the Prescription Drug Marketing Act of 1987; (M) the Confidentiality of Alcohol and Drug Abuse Patient Records law and regulations and any similar law (42 U.S.C. § 290dd-2, 42 C.F.R. Part 2); (ii) (A) any Laws with respect to healthcare-related fraud and abuse, false claims, staffing, rebates, pharmacy services, coverage reimbursement, corporate practice of medicine, credentialing, and Healthcare Permits (as defined herein); (B) any Laws with respect to engaging in the business of insurance; establishing, marketing and managing healthcare and pharmacy provider networks, and insurance fraud; (iii) in each case, as amended, and all regulations promulgated thereunder and (b) any and all state law equivalents to those Laws set forth in subsections (i), (ii) and (iii) above.

(tt)    "Healthcare Permit" means any and all licenses, certifications, consents, enrollments, authorizations, approvals, registrations, accreditations, and any other permission that is required by applicable Law for the operation of the Business and is issued or enforced by a Governmental Body or Governmental Health Program with jurisdiction over any Healthcare Law.

(uu)    "HIPAA" means the following, as the same may be amended, modified or supplemented from time to time, any successor statute thereto, and together with any and all rules or regulations promulgated from time to time thereunder: (i) the Health Insurance Portability and Accountability Act of 1996; (ii) the Health Information Technology for Economic and Clinical Health Act (Title XIII of the American Recovery and Reinvestment Act of 2009); and (iii) applicable state Laws regarding patient privacy and the security, use or disclosure of healthcare records.

(vv)    "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules and regulations promulgated thereunder.

(ww)    "Intellectual Property" means all of the following: (i) inventions, improvements, designs, methods and processes (whether or not patentable), patents (including utility and design patents), patent applications and patent disclosures (including invention disclosures, records of invention, certificates of invention, and applications for certificates of inventions and priority rights filed with a Registration Office); (ii) trademarks, service marks, trade dress, corporate names, logos, insignias, designs, symbols, trade names and fictitious business names, emblems, signs, slogans, other similar designations of source or origin and general intangibles of like nature and Internet domain names, social media accounts and profiles, together with all goodwill associated with each of the foregoing; (iii) copyrights, works of authorship and mask works and all other rights corresponding thereto throughout the world, including databases, data compilations and collections and economic rights in copyrights; (iv) registrations and applications for any of the foregoing; (v) know-how, formularies, clinical data, research and development information, technology, product roadmaps, customer lists, trade secrets and other non-public confidential and proprietary information; (vi) computer software (which includes firmware, middleware, code, programs, libraries, and applications); (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property.

83

(xx)   "Inventory" means all inventory (including active pharmaceutical ingredients, finished goods, supplies, raw materials, work in progress, spare, replacement and component parts, and packaging containers, labels and other similar items) maintained or held by, stored by or on behalf of, or in transit to, any of Sellers, whether for sale or non-commercial use (e.g., validation) or otherwise, together with any interests therein, including (x) being held by customers pursuant to consignment arrangements or (y) being held by suppliers or vendors under tolling or similar arrangements.

(yy)   "Knowledge of Seller", "Knowledge of Sellers", or words of like import means the actual knowledge, of Chris DuPaul, Rand Greenblatt, Anna Khais, Corrine Whisler, Cindy Pigg, and Alan Reicher, after reasonable inquiry of their direct reports with respect to the applicable subject matter, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal Liability or obligations regarding such knowledge.

(zz)   "Laker Software" means the software generally known as the Laker Software, including all modules, versions, releases of such software, which software is used to provide comprehensive pharmacy claim adjudication solutions for all populations segments, including through the "PBM Express" suite of applications.

(aaa)   "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, Healthcare Law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body anywhere in the world

(bbb)   "Lease" means all leases, subleases, licenses, concessions and other agreements (written or oral) pursuant to which any Seller holds any Leased Real Property.

(ccc)   "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(ddd)   "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") that, individually or in the aggregate (a) has, or would reasonably be expected to have, a material adverse effect on the Acquired Assets, Assumed Liabilities, taken as a whole, or on the results of operations or condition (financial or otherwise) of the Business, or (b) would reasonably be expected to impair, in any material respect, the ability of the Sellers to consummate the Transactions; provided that, for purposes of clause (a), none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: any Effect arising from or relating (and solely to the extent arising from or relating) to (i) general business or economic conditions affecting the industry in which Sellers operate, including

the effects of general competition therein and any change in market share or loss or non-renewal of customers; (ii) national or international political or social conditions, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or military installations; (iii) any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) financial, banking, or securities markets (including any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) changes in GAAP; (vi) changes in Laws (including, for the avoidance of doubt, any such items related to <u>Section 6.5</u>) and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (vii) the failure to take any action if such action is prohibited by this Agreement; (viii) Purchaser's failure to consent to any of the actions restricted in <u>Section 6.1</u>; (ix) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the Business with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (x) any failure, in and of itself, of Sellers to achieve any budgets, projections, forecasts, estimates, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) or failure to win or maintain customers; <u>provided</u> that the Effects giving rise to or contributing to such failure may be deemed to constitute, or be taken into account in determining whether there has been a Material Adverse Effect; (xi) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing thereof or any breach by Purchaser of this Agreement; (xii) the matters set forth on the Schedules; or (xiii)(A) the commencement or pendency of the Bankruptcy Cases; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions or thereby, (2) the Bidding Procedures Order, the Sale Order or the reorganization or liquidation of Sellers or their Affiliates, or (3) the assumption or rejection of any Assigned Contract or any Acquired Lease; or (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers or their Affiliates in compliance therewith; <u>provided</u> that any adverse Effect resulting or arising from any matter described in clauses (i) through (iv) may be taken into account in determining whether there has been a Material Adverse Effect to the extent, and only to the extent, that such Effect has had a materially disproportionate adverse effect on the Business relative to similarly situated participants in the industries and geographic areas in which the Sellers operate (in which case only such incremental materially disproportionate adverse effect may be taken into account in determining whether there has been a Material Adverse Effect).

(eee)  "<u>Open License Terms</u>" means license terms that are, or are substantially similar to, licenses now or in the future approved by the Open Source Initiative, or are

considered "free" or "open source software" by the Open Source Initiative or the Free Software Foundation, which include: (i) the GNU General Public License (GPL); (ii) Lesser/Library GPL (LGPL); (iii) the Common Development and Distribution License (CDDL); (iv) the Artistic License (including PERL); (v) the Netscape Public License; (vi) the Sun Community Source License (SCSL) or the Sun Industry Standards License (SISL); (vii) the Apache License; (viii) the Common Public License; (ix) the Affero GPL (AGPL); (x) the Berkeley Software Distribution (BSD); (xi) the Mozilla Public License (MPL), (xii) the Microsoft Limited Public License, (xiii) MongoDB, Inc.'s Server Side Public License, and (xiv) any other licenses that are defined as OSI (Open Source Initiative) licenses as listed on the site www.opensource.org.

(fff)    "Order" means any award. order, injunction, order, decree, ruling, writ, assessment, judgment, decision, subpoena, mandate, precept, command, directive, consent, approval, award (including any arbitration award) or similar determination or finding entered, issued, made or rendered by any Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

(ggg)    "Ordinary Course" means the ordinary and usual course of operations or conduct of the Business, taking into account the contemplation, commencement and pendency of the Bankruptcy Cases.

(hhh)    "Organizational Documents" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as bylaws, a partnership agreement or an operating, limited liability or members agreement).

(iii)    "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable or that are being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, or that are being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary Encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Owned Real Property and Leased Real Property, which do not, individually or in the aggregate, adversely affect, or materially restrict or impair the use or occupancy of such Owned Real Property or Leased Real Property as it relates to the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of such Owned Real Property and Leased Real Property, as applicable, (iv) Intellectual Property licenses granted by a Seller to customers on a non-exclusive basis in the Ordinary Course, and (v) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

86

(jjj)  "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(kkk)  "Personal Information" means (i) any representation of information that permits the identity of an individual to whom the information applies to be reasonably inferred by either direct or indirect means, including (1) any information that can be used to distinguish or trace an individual's identity, such as name, email address, phone number, social security number, date and place of birth, mother's maiden name, and (2) any other information that is linked or linkable to an individual, such as financial information; and (ii) any information defined as personal information, personal data, personally identifiable information, or similar term under any Privacy Requirements.

(lll)  "Post-Closing Tax Period" means any taxable period beginning on or after the Closing Date and the portion of any Straddle Period attributable to the portion of the period beginning after the Closing Date.

(mmm) "Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and the portion of any Straddle Period through the end of the Closing Date.

(nnn)  "Privacy Requirements" means Privacy Laws, Privacy and Information Security Policies, and Privacy Agreements.

(ooo)  "Products" means the medicinal or pharmaceutical products, product candidates or therapies that are or have been researched, developed, packaged, labeled, used, marketed, imported, exported tested (including through clinical trials), commercialized, manufactured, stored, sold, licensed, or distributed by or on behalf of any of the Sellers or any of their Affiliates, or which the process has taken substantial steps towards manufacturing, commercializing, developing, packaging, labeling, storing, using, marketing, importing, exporting, distributing or selling, including all products that are regulated as human or animal drugs, medical devices, or other health care products under Healthcare Laws, including drug and biological candidates, compounds or products being researched, tested, stored, developed, labeled, manufactured, packed, marketed, sold and/or distributed by any of the Sellers or any of their Affiliates.

(ppp)  "Public Software" means any software, libraries or other code that is licensed under or is otherwise subject to Open License Terms.

(qqq)  "Purchaser Group" means Purchaser (including any Designated Purchaser), any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(rrr)  "Purchase Price Adjustment Escrow Amount" means $14,375,000.

(sss)  "Rebate Assets" means all accounts receivable, or other amounts, owing from any Person, including pharmaceutical drug manufacturers or Group Purchasing Organizations, with respect to rebates, discounts, or similar claims.

(ttt)    "Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

(uuu)    "Sale Order" means the Order (i) approving this Agreement and the terms and conditions hereof, including pursuant to sections 363 and 365 of the Bankruptcy Code and (ii) approving and authorizing Sellers to consummate the Transactions, in form and substance reasonably acceptable to Sellers and Purchaser.

(vvv)    "Second Day Hearing" means the hearing before the Bankruptcy Court to consider approval of, among other things, certain of the First Day Pleadings on a final basis, but in any event shall not mean the initial hearing to consider the First Day Pleadings before the Bankruptcy Court on or around the Petition Date.

(www)    "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(xxx)    "Seller Parties" means each Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(yyy)    "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(zzz)    "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(aaaa)    "Target Working Capital" means negative $206,628,000.

(bbbb)    "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, goods and services, unclaimed property, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto in each case whether payable directly or a primary or secondary liability, or as a legal successor or transferee.

(cccc) "<u>Tax Code</u>" means the United States Internal Revenue Code of 1986, as amended.

(dddd) "<u>Tax Principles</u>" means, with respect to any Taxes, the principles that such Taxes should be: (i) calculated consistent with the past procedures and practices in preparing Tax Returns for such Taxes to the extent consistent with applicable Law, (ii) for any Straddle Period, calculated in accordance with the principles set forth in <u>Section 9.5</u>, (iii) calculated without regard to any increase in Tax liabilities by reason of actions described in <u>Section 9.4</u>, and (iv) calculated by excluding any deferred Tax assets and deferred Tax liabilities.

(eeee) "<u>Tax Return</u>" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(ffff) "<u>Taxing Authority</u>" means any U.S. federal, state, local, municipal, or foreign government, any subdivision, agency, commission or authority thereof or any quasi-Governmental Body exercising Tax regulatory authority.

(gggg) "<u>Transaction Agreements</u>" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

(hhhh) "<u>Transactions</u>" means the transactions contemplated by this Agreement and the other Transaction Agreements.

(iiii) "<u>TSA</u>" means a Transition Services Agreement, subject to <u>Section 6.21</u>, substantially in the form attached hereto as <u>Exhibit G</u>.

(jjjj) "<u>Willful Breach</u>" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

**Section 11.2    Index of Defined Terms**.

Accounting Fees........................................... 19
Acquired Assets ........................................... 1
Acquired Avoidance Actions ...................... 4
Acquired Insurance Assets........................... 3
Acquired Intellectual Property ................... 3
Acquired Lease ........................................... 2
Acquired Leased Real Property ................. 2
Acquired Software ..................................... 31
Agreement.................................................... 1
Agreement Dispute .................................... 74
Allocation.................................................... 68
Allocation Methodology ........................... 68
Assigned Contracts ..................................... 2
Assignment and Assumption Agreement.. 15
Assumed Cure Costs .................................... 6
Assumed Current Liabilities ...................... 6
Assumed Liabilities ..................................... 6
Assumed Rebate Liability........................... 6
Avoidance Actions....................................... 3
Backup Bidder ........................................... 42
Bankruptcy Cases......................................... 1
Bankruptcy Code ......................................... 1
Bankruptcy Court......................................... 1
Bankruptcy Court Milestones ................... 40
Breakup Fee ................................................ 67
Business Confidential Information .......... 59
Business Data.............................................. 32
Business Insurance Policies ...................... 36
Cash Payment............................................. 13
Chosen Courts ............................................ 74
Closing........................................................ 15
Closing Date................................................ 15
Closing Date Payment................................ 13
Closing Working Capital Statement ......... 18
CMS Contracts............................................ 13
Commercial Interco Contracts ................... 2
Cure Costs ........................................ 6, 7, 79
Dataroom.................................................... 38
Deposit ....................................................... 14
Designated Purchaser................................ 72
Disputed Amounts ..................................... 18
EIC .............................................................. 12
Elixir ............................................................ 1
Employee Benefit Plan ............................. 80

Enforceability Exceptions ......................... 22
Environmental Permits.............................. 29
Escrow Account ......................................... 13
Estimated Closing Working Capital ......... 17
Estimated    Closing    Working    Capital
    Statement.............................................. 17
Excluded Assets ........................................... 4
Excluded Contracts ..................................... 4
Excluded Cure Costs ................................... 7
Excluded Liabilities ..................................... 7
Excluded Rebate Liability........................... 8
Expense Reimbursement........................... 67
Express Representations ........................... 38
FDI .............................................................. 22
Filed SEC Documents................................ 21
Final Deposit .............................................. 14
Financial Statements ................................. 23
Financing..................................................... 77
Financing Sources ..................................... 77
Foreign Competition Laws ....................... 22
Fundamental Representations .................. 63
Guaranteed Obligations ........................... 57
Guarantor .................................................... 1
Guggenheim Securities ............................. 36
Indebtedness.............................................. 43
Independent Accountant .......................... 18
Information Presentation.......................... 38
Initial Deposit............................................. 13
Leased Real Property ................................. 24
Material Contract ...................................... 25
Mental Impressions .................................. 60
Non-Recourse Person................................ 72
Novation Agreement.................................. 61
Outside Date............................................... 64
Owned Real Property ................................... 2
Parties ........................................................... 1
Party ............................................................. 1
PCI Requirements ...................................... 32
Permits ....................................................... 28
Permitted Purposes................................... 59
Petition Date................................................ 1
Pre-Closing Matters .................................. 54
Privacy Agreements ................................... 32
Privacy and Information Security Policies 32

Privacy Laws.............................................. 32
processing ................................................. 32
Projections.................................................. 57
Purchase Price ........................................... 13
Purchaser.................................................... 1
Purchaser Adjustment Amount ................. 20
Purchaser Plans ......................................... 48
RAD .......................................................... 22
Registered Trademarks .............................. 29
Registration Office..................................... 29
Rejection Contracts ................................... 10
Resolution Period...................................... 18
Retained Privileged Materials.................... 4
Review Period............................................ 18
ROI............................................................ 2
ROI Agreement .......................................... 2
Schedule.................................................... 21
Scheduled Employees ............................... 47
Schedules .................................................. 21

Second Deposit ......................................... 14
Security Breach ......................................... 33
Seller ......................................................... 1
Seller Sufficiency Representations ........... 63
Seller Support Obligations........................ 55
Sellers........................................................ 1
Sellers' Insurance Policies ........................ 54
Significant Customer ................................ 27
Significant Supplier .................................. 27
Statement of Objections............................ 18
Successful Bidder...................................... 42
Third Party Assurances ............................. 55
Transaction Source Code .......................... 30
Transfer Offer ........................................... 47
Transfer Taxes .......................................... 67
Transferred Employees ............................. 48
Viruses ...................................................... 31
WARN ...................................................... 36

**Section 11.3  Rules of Interpretation**. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)     The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule and exhibit references contained in this Agreement are references to sections, clauses, Schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(b)     Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c)     The words "to the extent" shall mean "the degree by which" and not simply "if."

(d)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

2

(e)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(f)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(g)     All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(h)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(i)     Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is included in the Dataroom, by 5:00 p.m. New York time on the date that is two (2) Business Days prior to the date of this Agreement.

(j)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(k)     Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(l)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(m)     A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

*[Signature pages follow.]*

3

## EXHIBIT A

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

[*See attached.*]

## <u>EXHIBIT B</u>

**FORM OF PATENT ASSIGNMENT AGREEMENT**

[*See attached.*]

## <u>EXHIBIT C</u>

**FORM OF TRADEMARK ASSIGNMENT AGREEMENT**

[*See attached.*]

## EXHIBIT D

**FORM OF DOMAIN NAME ASSIGNMENT AGREEMENT**

[*See attached*]

## <u>EXHIBIT E</u>

**[FORM OF ESTIMATED CLOSING WORKING CAPITAL STATEMENT]**

[*See attached*.]

**<u>EXHIBIT F</u>**

**[FORM OF CLOSING WORKING CAPITAL STATEMENT]**

[*See attached.*]

## EXHIBIT G

**FORM OF TSA**

[*See attached.*]

## **Exhibit 2**

**Notice of Successful Bidder and Contract Assumption**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
Zachary R. Manning (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Joint Administration Requested) |

## NOTICE OF SUCCESSFUL BIDDER AND POTENTIALLY ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES

> YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
> OR ONE OF YOUR AFFILIATES ARE A COUNTERPARTY TO AN
> EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE
> OF THE DEBTORS AS SET FORTH ON **EXHIBIT A** ATTACHED HERETO.

**PLEASE TAKE NOTICE** that on [__], 2023, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures*

---

[1]    The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

*for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief,* [Docket No. [    ]] (the "Bidding Procedures Order")[2] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

PLEASE TAKE FURTHER NOTICE that on [    ], 2023, the Debtors conducted an Auction of certain of their Assets, pursuant to the Bidding Procedures Order.

PLEASE TAKE FURTHER NOTICE that in accordance with the Bidding Procedures Order and following the completion of the Auction, the Debtors, in consultation with the Consultation Parties, have determined [    ] to be the Successful Bidder.

PLEASE TAKE FURTHER NOTICE that pursuant to the Bidding Procedures Order, the applicable Sale Hearing to consider approval of the Sale Transaction to the Successful Bidder is currently scheduled to take place, with respect to Elixir Assets, on December 7, 2023, and with respect to Rite Aid Retail Assets, on December 19, 2023, before the Honorable Chief Judge Kaplan, at the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Courtroom 8, Trenton, New Jersey 08608.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder the contract or agreement listed on **Exhibit A** to which you are a counterparty, upon approval of the Sale Transaction. The Debtors have conducted a review of their books and records and have determined that the Cure Payments for unpaid monetary obligations under such Executory Contract or Unexpired Lease is as set forth on **Exhibit A**.

PLEASE TAKE FURTHER NOTICE that if you disagree with the proposed Cure Payments, object to a proposed assignment to the Successful Bidder of any Executory Contract or Unexpired Lease, or dispute the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Contract, or otherwise object to the applicable Sale Transaction, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payments, state the correct Cure Payments alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and **actually received no later than December 1, 2023 at 5:00 p.m. (prevailing Eastern Time) (the "Elixir Cure Objection Deadline") or December 15, 2023 at 5:00 p.m. (prevailing Eastern Time) (the "Rite Aid Retail Cure Objection Deadline**," and together with the Elixir Cure Objection Deadline, the "**Cure Objection Deadline**"), as applicable, by the Court and the following parties:  (i) the Debtors, Rite Aid Corporation, 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112; (ii) counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Joshua A. Sussberg,    P.C.    (joshua.sussberg@kirkland.com),    Aparna    Yenamandra (aparna.yenamandra@kirkland.com), Ross J. Fiedler (ross.fiedler@kirkland.com), and Zachary R. Manning (zach.manning@kirkland.com), 300 North LaSalle, Chicago, Illinois, 60654, Attn:  Steve Toth (steve.toth@kirkland.com); (iii) co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn:  Michael D. Sirota (msirota@coleschotz.com), Warren A.

---

2    Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

Usatine (wusatine@coleschotz.com), Felice R. Yudkin (fyudkin@coleschotz.com), and Seth Van Aalten (svanaalten@coleschotz.com); (iv) Office of the United States Trustee for Region 3, District of New Jersey, Raymond Boulevard, Suite 2100, Newark, NJ 07102, Attn: Jeffrey M. Sponder and Lauren Bielskie; (vi) counsel to the DIP Agents, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola (jventola@choate.com); Jonathan D. Marshall (jmarshall@choate.com); and Mark D. Silva (msilva@choate.com) and Greenberg Traurig, LLP, 500 Campus Drive, Suite 400, Florham Park, New Jersey 07932, Attn: Alan J. Brody (brodya@gtlaw.com) and Oscar N. Pinkas (pinkaso@gtlaw.com); (vii) counsel to the Ad Hoc Secured Noteholder Group, Paul, Weiss, Rifkind, Wharton & Garrison, 1285 6th Avenue, New York, NY 10019, Attn: Andrew N. Rosenberg (arosenberg@paulweiss.com); Brian S. Hermann (bhermann@paulweiss.com); and Christopher Hopkins (chopkins@paulweiss.com) and Fox Rothschild LLP, 49 Market Street, Morristown, NJ 07960, Attn: Howard A. Cohen (hcohen@foxrothschild.com); Joseph J. DiPasquale (jdipasquale@foxrothschild.com) and Michael R. Herz (mherz@foxrothschild.com); (viii) proposed counsel to any statutory committee appointed in these chapter 11 cases; and (viii) counsel to any Stalking Horse Bidder.

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Payments, (b) the proposed assignment and assumption of any Executory Contract or Unexpired Lease, or (c) adequate assurance of the Successful Bidder's ability to perform is filed by the applicable Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Payments as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional Cure Payments are due under the Executory Contract or Unexpired Lease, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale Transaction.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of an Executory Contract or Unexpired Lease or related Cure Payments in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date as may be fixed by the Court.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Executory Contract or Unexpired Lease on this Notice of Successful Bidder and Contract Assumption or any Supplemental Assumption Notice does not require or guarantee that such Executory Contract or Unexpired Lease will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Executory Contracts and/or Unexpired Leases are reserved. Moreover, the Debtors explicitly reserve the right, in their reasonable discretion, to seek to reject or assume each Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Executory Contract or Unexpired Lease as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Executory Contracts or Unexpired Leases or the validity, priority, or amount of any claims of a counterparty to any Contract against the Debtors that may arise under such Executory Contract or Unexpired Lease, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Executory Contract or Unexpired Lease against the Debtors that may arise under such Executory Contract or Unexpired Lease

Dated: [_____], 2023

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:       msirota@coleschotz.com
             wusatine@coleschotz.com
             fyudkin@coleschotz.com
             svanaalten@coleschotz.com


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
Zachary R. Manning (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:       esassower@kirkland.com
             joshua.sussberg@kirkland.com
             aparna.yenamandra@kirkland.com
             ross.fiedler@kirkland.com
             zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*