| | |
|---|---|
| **KIRKLAND & ELLIS LLP** | **COLE SCHOTZ P.C.** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Michael D. Sirota, Esq. |
| Edward O. Sassower, P.C. | Warren A. Usatine, Esq. |
| Joshua A. Sussberg, P.C. (*pro hac vice* pending) | Felice R. Yudkin, Esq. |
| Aparna Yenamandra, P.C. (*pro hac vice* pending) | Seth Van Aalten, Esq. (*pro hac vice* pending) |
| Ross J. Fiedler (*pro hac vice* pending) | Court Plaza North, 25 Main Street |
| Zachary R. Manning (*pro hac vice* pending) | Hackensack, New Jersey 07601 |
| 601 Lexington Avenue | Telephone: (201) 489-3000 |
| New York, New York 10022 | msirota@coleschotz.com |
| Telephone: (212) 446-4800 | wusatine@coleschotz.com |
| Facsimile: (212) 446-4900 | fyudkin@coleschotz.com |
| esassower@kirkland.com | svanaalten@coleschotz.com |
| joshua.sussberg@kirkland.com | |
| aparna.yenamandra@kirkland.com | *Proposed Co-Counsel to the Debtors and* |
| ross.fiedler@kirkland.com | *Debtors in Possession* |
| zach.manning@kirkland.com | |

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF**
**MARC LIEBMAN IN SUPPORT OF DEBTORS'**
**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING AND APPROVING THE CONDUCT OF STORE**
**CLOSING SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL**
**LIENS, CLAIMS, AND ENCUMBRANCES, AND (II) GRANTING RELATED RELIEF**

I, Marc Liebman, hereby declare under penalty of perjury:

---

[1] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

1.  I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), proposed financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I was appointed as Chief Transformation Officer of the Debtors on October 15, 2023.

2.  I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, and (II) Granting Related Relief* (the "Motion").[2]

3.  Except where specifically noted, the statements set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives. I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I would testify as follows.

### Qualifications

4.  I have been a financial advisor to stressed and distressed companies for more than two decades. I have a bachelor's degree in business administration with a concentration in accounting from the University of Notre Dame and an MBA in finance from the University of Chicago. I joined A&M in 2002. A&M is a restructuring consulting firm with extensive experience providing high quality, specialized management and restructuring advisory services to debtors and distressed companies, including turnaround advisory services, revenue enhancement, claims management, and creditor and risk management advisory services. My

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

2

representative restructuring engagements include AMERCO/U-Haul, Avaya, Clover Technologies, Forbes Energy, Fresh & Easy Markets, Grubb & Ellis, Katerra, LBI Media, Nellson Nutraceutical, Relativity Media, Washington Prime Group, Whiting Petroleum, William Lyon Homes, and World Kitchen.

5. The Debtors engaged A&M on May 5, 2023. Over the past five months, my team and I have assisted management to (a) conduct an assessment of the Debtors' store footprint and execute a store rationalization plan, (b) develop operational turnaround, cost savings and transformation plans, (c) formulate long-range business plans, and forecasts, (d) manage and forecast liquidity, (e) support contingency preparations and M&A processes, (f) analyze various considerations related to store closures, and (g) identify certain underperforming stores for closing, among other things. Based on our work, I am generally familiar with the Debtors' capital structure, day-to-day operations, business plan, transformation, and cost-reduction strategies, liquidity, relationships with their suppliers and partners, business and financial affairs, and books and records.

## The Store Closings

6. Prior to the Petition Date, the Debtors were engaged in an ongoing rationalization of their retail pharmacy store footprint. Through the Debtors' prepetition store closing process, commenced in August 2023, 164 store locations ceased operations, including 64 locations where prescription files were sold, generating approximately $55 million in net proceeds from such sales. In recent months, the Debtors accelerated their store closure process in connection with their broader restructuring efforts, including their development of a go-forward business plan. A key component of the Debtors' go-forward business plan, and of the agreed-in-principle value-maximizing restructuring of the Debtors to be memorialized in the Restructuring Support

Agreement, is the continuation and completion of their multi-year store footprint rationalization, including related sales and internal transfers of prescription files.

7. The Debtors, with the assistance of their advisors, conducted a comprehensive prepetition analysis of the Debtors' store portfolio, financial performance, and market geography to identify unprofitable, underperforming, or otherwise sub-optimal store locations. Once identified, the Debtors determined the best strategy to maximize proceeds from the closure process for each location based on proceeds realizable through the sale or internal transfer of prescription files and related records (collectively, the "Prescription Assets"), store inventory, including front-end retail inventory (collectively, "Inventory"), and store fixtures, furniture, and equipment (collectively, "FF&E," and together with Inventory, "Non-Prescription Assets"). With respect to Inventory, the Debtors' strategy for maximizing store proceeds consists of either (i) conducting a self-managed strategic mark-down plan followed by clearance sales; and / or (ii) transferring Inventory to other Company store locations that would remain open. With respect to Prescription Assets, the Debtors' strategy consists of either (i) transferring (or "pouring") Prescription Assets to nearby Company store locations that would remain open, or (ii) selling Prescription Assets to another (non-Rite Aid) pharmacy. The culmination of these efforts is a meticulous, carefully considered store closure plan centered on value maximization.

8. Consistent with the store closure plan developed by the Debtors and their advisors, the Debtors identified a set of 154 Initial Closing Stores (including certain of the 164 store locations that have already ceased operations) comprising store locations where the closing process started prepetition and is ongoing, or is planned to start soon after the Petition Date. The continuation and completion of the Initial Store Closings will allow the Debtors to realize a near-term liquidity improvement and related benefits. The Debtors anticipate that each

Store Closing will take approximately 4–6 weeks to complete. The Debtors expect to identify Additional Closing Stores in the future.

9. To facilitate the Store Closings, the Debtors and their advisors reviewed and analyzed the Sale Guidelines which are further described in the Motion. The Sale Guidelines are substantially similar to sale guidelines approved in retail bankruptcies across the United States, and provide streamlined procedures to sell the Closing Store Assets and effectuate the Store Closings. The Sale Guidelines will provide the best and most efficient means of selling the Store Closure Assets and the Prescription Assets to maximize their value to the estates.

10. Several states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination. These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated. The nature of the Store Closings contemplated by the Motion will result in the termination of certain Closing Store employees' employment during the Store Closings. Under ordinary circumstances, the Debtors' payroll department is able to coordinate delivery of final checks to coincide with an employee's final day of work where required by applicable law. This process requires the Debtors' payroll department to calculate individual payments upon termination, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for mailing. Given the number of employees who will be terminated during the Store Closings, this process could easily take several days, making compliance with the Fast Pay Laws burdensome to the Debtors' estates, if not impossible. Accordingly, the Debtors require relief from Fast Pay Laws in connection with the Store Closings.

11. For several reasons, any interruption or delay in the Store Closings and related Sales will diminish the value realizable upon the sale or other transfer of the Closing Stores' Prescription Assets and Non-Prescription Assets.

12. *First*, the Prescription Assets are prototypical "melting ice cube" assets. If customers anticipate a potential store closure—which they likely will given extensive media coverage of the Debtors' restructuring and the public nature of these cases—they may transfer their prescriptions to another pharmacy, leaving no saleable or internally transferable prescription file with the old pharmacy. This dynamic is compounded by the limited market for the Prescription Assets, which I understand generally can only be sold to another licensed/registered pharmacy, thus limiting the universe of potential acquirors. I further understand that, over time, the Debtors have developed an orderly, efficient system for monetizing prescription files, which includes a bidding process, robust analysis of competing bids, and a corresponding sale for each batch of prescription files being sold. Accordingly, the Debtors' continuation of Sales and internal transfers of Prescription Assets consistent with their historical practice, as the Motion contemplates, is the most effective way to maximize the value of those assets.

13. *Second*, more generally, any interruption or delay in Store Closings and related Sales could reduce the recovery value of other Closing Store Assets. In particular, interruptions and delays could cause incremental costs including those related to store occupancy, labor, spoilage, and shrinkage, deferring the Debtors' ability to generate cash from the monetization of Closing Store Assets.

14. *Third*, uninterrupted and orderly Store Closings and related Sales will allow the Debtors to reject or assume and assign the leases associated with the Closing Stores in a timely

manner, consistent with the planned cadence of the Debtors' chapter 11 process. Any delay in this process may cause the Debtors to incur additional postpetition rent obligations and other occupancy costs, potentially costing the estates millions of dollars each month with no net benefit to the estates.

15. For all of these reasons, the Motion and relief contemplated therein reflects the Debtors' sound business judgment and is in the best interests of their estates and their creditors.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Respectfully Submitted,
Dated:  October 16, 2023

*/s/ Marc Liebman*
Marc Liebman
Managing Director
Alvarez and Marsal North America, LLC