**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Jointly Administered) |
| | **HEARING DATE AND TIME:**<br>**December 7, 2023, at 4:00 p.m. (EST)** |
| | **ORAL ARGUMENT WAIVED UNLESS**<br>**OBJECTIONS TIMELY FILED** |

**NOTICE OF HEARING
ON DEBTORS' MOTION FOR ENTRY
OF AN ORDER (I) APPROVING ENTRY
INTO THE MEDIMPACT SELLER FINANCING
DOCUMENTS, (II) APPROVING THE PRIVATE SALE
OF THE DEBTORS' INTERESTS IN THE MEDIMPACT
SELLER FINANCING FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS AND (III) GRANTING RELATED RELIEF**

---

[1]  The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid.  The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Entry of an Order (I) Approving Entry into the MedImpact Seller Financing Documents, (II) Approving the Private Sale of the Debtors' Interests in the MedImpact Seller Financing Free and Clear of Liens, Claims, Encumbrances, and Interests and (III) Granting Related Relief* (the "<u>Seller Financing Motion</u>") will be held on **<u>December 7, 2023 at 4:00 p.m. (prevailing Eastern Time)</u>** or as soon thereafter as counsel may be heard (the "<u>Hearing</u>") before the Honorable Chief Judge Michael B. Kaplan, Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom 8, Trenton, NJ 08608.

**PLEASE TAKE FURTHER NOTICE** that the Seller Financing Motion sets forth the relevant factual bases upon which the relief requested should be granted.  A proposed Order granting the relief requested in the Seller Financing Motion, the *Declaration of Jeffrey S. Stein in Support of the Debtors' Seller Financing Motion*, and the *Declaration of Matthew Scheidemann in Support of the Debtors' Seller Financing Motion* are also submitted herewith.

**PLEASE TAKE FURTHER NOTICE** that Objections, if any, to the relief requested in the Seller Financing Motion shall:  (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the United States Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "<u>General Order</u>") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "<u>Supplemental Commentary</u>") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in

accordance with the General Order and the Supplemental Commentary, so as to be received on or

before **December 7, 2023 at 4:00 p.m. (prevailing Eastern Time)**.

      **PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are

timely filed, served, and received will be considered at the Hearing.  Failure to file a timely

objection may result in entry of a final order granting the Seller Financing Motion as requested

by the Debtors.

      **PLEASE TAKE FURTHER NOTICE** that unless objections are timely filed and served,

the Motion shall be decided on the papers in accordance with D.N.J. LBR 9013-3(d) and the relief

requested may be granted without further notice or hearing.

      **PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter

11 cases may be obtained free of charge by visiting the website of Kroll Restructuring

Administration, LLC at https://restructuring.ra.kroll.com/RiteAid.  You may also obtain copies of

any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with

the procedures and fees set forth therein.

Dated: November 16, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com
            svanaalten@coleschotz.com


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      esassower@kirkland.com
            joshua.sussberg@kirkland.com
            aparna.yenamandra@kirkland.com
            ross.fiedler@kirkland.com
            zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[2] | (Jointly Administered) |

**DEBTORS' MOTION**
**FOR ENTRY OF AN ORDER**
**(I) APPROVING ENTRY INTO THE MEDIMPACT**
**SELLER FINANCING DOCUMENTS, (II) APPROVING**
**THE PRIVATE SALE OF THE DEBTORS' INTERESTS IN THE**
**MEDIMPACT SELLER FINANCING FREE AND CLEAR OF LIENS, CLAIMS,**
**ENCUMBRANCES, AND INTERESTS AND (III) GRANTING RELATED RELIEF**

TO THE HONORABLE CHIEF JUDGE MICHAEL B. KAPLAN UNITED STATES

BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY:

---

[2] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (this "Motion"):[3]

### Preliminary Statement

1.      On October 16, 2023, the Debtors filed the Bidding Procedures Motion,[4] seeking

authority for certain Debtors to enter into the Elixir Stalking Horse APA with MedImpact

Healthcare Systems, Inc. (the "MedImpact Purchaser"), pursuant to which the MedImpact

Purchaser would serve as a Stalking Horse Bidder in a public auction process for the Debtors'

Elixir Assets, comprising their pharmacy benefit manager business.

2.      Entry into the Elixir Stalking Horse APA is a critical component of the Debtors'

restructuring strategy in these chapter 11 cases.  The proceeds of any sale of the Elixir Assets serve

as a major source of recovery for the Company's stakeholders.  And with a Stalking Horse Bidder

in hand for the Elixir Assets, the Debtors can set a competitive floor in the Elixir Asset Auction,

ensuring that the Debtors receive the highest and best value for the Elixir Assets, for the benefit of

all of the Debtors' stakeholders.  Additionally, as the Debtors made clear in the Bidding Procedures

Motion, the nature of the Elixir business necessitates an expedited postpetition sale process for the

Elixir Assets.  Without a quick process, the Elixir business risks facing potentially significant

customer attrition, degrading the ultimate value of the Elixir Assets.

---

[3]    A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Jeffrey S. Stein in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 20].

[4]    "Bidding Procedures Motion" means the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 33] filed on October 16, 2023.  Capitalized terms used but not immediately defined in this motion have the meanings ascribed to them later herein or in the Bidding Procedures Motion, as applicable.

3.      Unfortunately, absent the relief requested herein, the Elixir Stalking Horse APA, and consequently, the Debtors' sale process for the Elixir Assets, are now at risk because the MedImpact Purchaser is unable to obtain the financing necessary to fund the Purchase Price (as defined in the Elixir Stalking Horse APA) and close the sale contemplated under the Elixir Stalking Horse APA.

4.      The Debtors cannot allow this to happen.  The Debtors, with the assistance of Guggenheim Securities, have been marketing the Elixir Assets since July 2023, and the MedImpact Purchaser has been the most engaged potential purchaser throughout that process.  Simply put, without the MedImpact Purchaser, the Debtors at the very least risk a depressed purchase price for the Elixir Assets, and may not even be able to consummate an Elixir Sale Transaction at all.

5.      By this Motion, the Debtors seek authority to enter into the MedImpact Seller Financing (as defined below), pursuant to which the Debtors will provide a term loan to fund a portion of the Elixir Stalking Horse APA Purchase Price.  The MedImpact Seller Financing reflects the best terms available to the Debtors and to the MedImpact Purchaser, and reflects extensive, arm's-length negotiations between the parties.  The MedImpact Seller Financing is a sound exercise of the Debtors' business judgment, representing a pathway to the realization of significant value through an Elixir Sale Transaction, and towards a successful reorganization of the Elixir business.  The Debtors' interests will be well-protected in the MedImpact Seller Financing:  to the extent the Debtors' interest in the MedImpact Seller Financing is not successfully sold or otherwise monetized, the Debtors will receive the benefit of valid, perfected, and enforceable liens on the applicable MedImpact Parties' collateral pursuant to applicable documentation.

6.      Also by this Motion, the Debtors seek authority to sell or otherwise monetize their interests in the MedImpact Seller Financing to interested parties (the "MedImpact Loan Sale"),

with such interests sold free and clear of all liens, claims, encumbrances, and interests.  In order to

best position the Debtors for a successful marketing process, the MedImpact Parties have agreed

to provide significant assistance to the Debtors in connection with their potential sale efforts

pursuant to the Syndication Assistance Side Letter.  However, in the event the Debtors are unable

to successfully sell or otherwise monetize their interests in the MedImpact Seller Financing, the

Debtors will distribute the interests in the MedImpact Seller Financing to their creditors pursuant

to an amended Plan.  The Debtors have obtained the consent of the DIP Lenders to these

transactions, who are in full agreement regarding the importance of the MedImpact Seller

Financing and the Elixir Stalking Horse APA to the success of the Debtors' broader reorganization.

The Debtors are in ongoing discussion with the advisors to the official committees and the Ad Hoc

Group of Senior Secured Noteholders regarding these transactions.[5]

## **Relief Requested**

7.    The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"):  (a) approving Debtor Rite Aid Corporation's entry into (i) that certain

Second Amended and Restated Credit Agreement, dated as of November 8, 2023 (as amended,

restated, amended and restated, supplemented or otherwise modified from time to time,

the "MedImpact Credit Agreement"), by and between MI OpCo Holdings, Inc., as borrower

thereunder, MI OpOco H2, LLC, as "Holdings" thereunder, the other guarantors from time to time

party thereto (collectively, with the MedImpact Purchaser, the "MedImpact Parties"), Debtor Rite

Aid Corporation, as a lender, each other lender from time to time party thereto, Bank of America,

---

[5]    By this Motion, the Debtors also request authority to amend the Elixir Stalking Horse APA as necessary to permit
the MedImpact Seller Financing.  The Debtors have attached an amended Elixir Stalking Horse APA to the Order
as Exhibit 2 thereto.  The Debtors and the DIP Lenders have executed necessary amendments to the DIP
Documents, and will submit modified DIP Documents for Court approval including modifications necessary to
permit the MedImpact Seller Financing in connection with the Court's consideration of the Final DIP Order.

N.A., as Administrative Agent, Swing Line Lender and an L/C Issuer (each as defined in the MedImpact Credit Agreement), and the other L/C Issuers from time to time party thereto, and (ii) that certain Syndication Assistance Side Letter, dated as of November 8, 2023, by and between MI OpCo Holdings, Inc, a Delaware corporation, and Debtor Rite Aid Corporation (the "Syndication Assistance Side Letter," and together with the MedImpact Credit Agreement, the "MedImpact Seller Financing Documents," and the seller financing facility thereunder, the "MedImpact Seller Financing")[6]; (b) authorizing the Debtors' sale of their interests in the MedImpact Seller Financing free and clear of liens, claims, encumbrances, and interests; and (c) granting related relief.

### Jurisdiction and Venue

8.    The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.    The bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 20021-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

---

[6]    The MedImpact Seller Financing Documents are attached to the Order as Exhibit 1 thereto.  The MedImpact Credit Agreement is being filed with limited redactions on pages 3 and 6 thereof, which relate to confidential, non-public financial terms not applicable to the MedImpact Seller Financing to be provided by Debtor Rite Aid Corporation.

11.     In support of this Motion, the Debtors respectfully submit (a) the *Declaration of Jeffrey S. Stein in Support of the Debtors' Seller Financing Motion* (the "Stein Declaration"), and (b) the *Declaration of Matthew Scheidemann in Support of the Debtors' Seller Financing Motion* (the "Scheidemann Declaration") (filed contemporaneously herewith).

### Background

12.     The Debtors, together with their non-Debtor affiliates (collectively, "Rite Aid" or the "Company"), are on the front lines of delivering healthcare services and retail products to millions of Americans daily.  Founded in 1962 with a single discount drugstore in Scranton, Pennsylvania, and now headquartered in Philadelphia, Rite Aid—and its over 45,000 employees— meet the fundamental consumer need for pharmacy services across the country through two divisions.  On the retail side, Rite Aid employs more than 6,100 pharmacists and operates more than 2,100 retail pharmacy locations in 17 states. Through Elixir, the Company manages pharmacy benefits for approximately 1.5 million members via accredited mail and specialty pharmacies, prescription discount programs, and an industry-leading claim adjudication platform."

13.     On October 15, 2023 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases are set forth in greater detail in the First Day Declaration and incorporated by reference herein."

14.     The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On October 17, 2023, the Court entered an order [Docket No. 122] authorizing procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  On November 2, 2023, the United States Trustee for the District of New Jersey

(the "U.S. Trustee") appointed (a) an official committee of unsecured creditors (the "Unsecured Creditors' Committee") [Docket No. 431] and (b) an official committee of tort claimants (the "Tort Claimants' Committee," together with the Unsecured Creditors' Committee, collectively, the "Committees") [Docket No. 432], each pursuant to section 1102 of the Bankruptcy Code.

### The MedImpact Seller Financing

15.     Pursuant to the MedImpact Seller Financing, the Debtors intend to finance a portion of the Purchase Price payable by the MedImpact Purchaser under the Elixir Stalking Horse APA through a term loan.  Indicative of their confidence in the business and their desire to consummate the Elixir Sale Transaction, the MedImpact Purchaser has already funded $57.5 million in cash deposits pursuant to the Elixir Stalking Horse APA.  The MedImpact Seller Financing will finance the remainder of the Purchase Price, up to an amount not to exceed approximately $604 million. The MedImpact Seller Financing is the result of an arm's-length, extensive negotiation process between the Debtors, the MedImpact Purchaser, and each party's key stakeholders, including the DIP Lenders, the advisors to the Ad Hoc Group of Senior Secured Noteholders, and the MedImpact Parties' existing term loan A lenders.  The material terms of the MedImpact Seller Financing are summarized in the following table:[7]

| Term | Summary of Material Term |
|---|---|
| **Borrower** | MI OpCo Holdings, Inc.<br><br>*See* MedImpact Credit Agreement, Recitals |
| **Guarantors** | (a) Each Material Subsidiary identified as a "Guarantor" on the signature pages of the MedImpact Credit Agreement, (b) MI OpCoH2, LLC, (c) each of Lunaria Data Solutions, Inc., Prescient Holdings Group, LLC, and Dividend Group, LLC and such of the |

---

[7]    To the extent anything in this Motion is inconsistent with the MedImpact Seller Financing Documents, the terms of the applicable MedImpact Seller Financing Documents shall control.  Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the MedImpact Seller Financing Documents, as applicable.

| Term | Summary of Material Term |
|---|---|
| | respective Subsidiaries of each of the aforementioned that may be required to become Non-Subsidiary Loan Parties from time to time under the terms of the MedImpact Credit Agreement, (d) each Person that joins as a Guarantor pursuant to Section 6.13 of the MedImpact Credit Agreement or otherwise, (e) with respect to (i) Obligations under any Secured Hedge Agreement, (ii) Obligations under any Secured Cash Management Agreement and (iii) any Swap Obligation of a Specified Loan Party (determined before giving effect to Sections 10.01 and 10.08 of the MedImpact Credit Agreement) under the Guaranty, MI OpCo Holdings, Inc., and (f) the successors and permitted assigns of the foregoing. *See* MedImpact Credit Agreement, § 1.01, "Guarantor." |
| **Facility** | The aggregate amount of the 2023 Term Loans shall not exceed $604 million (the "Maximum 2023 Term Loan Amount"). *See* MedImpact Credit Agreement, Recitals; § 1.01, "Elixir Acquisition Closing Date Purchase Price" "Elixir Acquisition Closing Date Loan Amount" |
| **Pricing** | *Coupon*: SOFR + CSA + 725bps *Issue Price*: 94.0 *Floor; CSA*: 0.00%; CSA of 10bps *See* MedImpact Credit Agreement, § 1.01, "Applicable Rate"; "Term SOFR"; "SOFR Adjustment"; §2.08; § 6.11(c); § 11.01. |
| **Maturity** | March 31, 2028 with a springing maturity to September 15, 2026, unless the existing revolving credit facility and term loans have been repaid or extended to a maturity date no earlier than September 30, 2027 on or prior to December 31, 2025. *See* MedImpact Credit Agreement, § 1.01, "Maturity Date."; § 2.07. |
| **Amortization** | 5.0% p.a. paid quarterly. *See* MedImpact Credit Agreement § 2.07(b). |
| **Mandatory Repayment Provision** | The MedImpact Seller Financing is subject to the consummation of the Elixir Acquisition. Among other mandatory prepayment provisions, the MedImpact Credit Agreement includes excess cash flow sweep and asset sale sweep terms to match MedImpact's existing Term Loan A. shared *pro rata*. *See* MedImpact Credit Agreement, § 1.01, "ECF Prepayment Percentage," "Excess Cash Flow," "Excess Cash Flow Period"; § 2.01(b); § 2.05(b); |
| **Optional Redemption** | In the event the MedImpact Seller Financing is not sold or otherwise monetized and is distributed to Rite Aid stakeholders pursuant to the Plan, the MedImpact Seller Financing will be callable at par for 6 months from the closing date of the Elixir Sale Transaction, followed by NC-6 months / 102 / 101 / par, and otherwise NC-1 / 102 / 101 / par. *See* MedImpact Credit Agreement, § 1.01, "Applicable Premium," "Applicable Preimum Period," "Applicable Premium Trigger Event," "Non-Call Period,"  § 2.05. |

| Term | Summary of Material Term |
|---|---|
| **Financial Covenants** | <u>Consolidated Net Leverage Ratio</u>: (i) with respect to each fiscal quarter ended after the Second Restatement Date and prior to the fiscal quarter during which the Elixir Acquisition shall have been consummated, 3.50:1.00; and (ii) if the Elixir Acquisition occurs, (x) with respect to each fiscal quarter of the Borrower from and including the fiscal quarter during which the Elixir Acquisition shall have been consummated until and including the sixth fiscal quarter ended after the consummation of the Elixir Acquisition, 3.75:1.00, and (y) at all times thereafter, 3.50:1.00.<br><br><u>Consolidated Interest Coverage Ratio</u>: (i) with respect to each fiscal quarter of the Borrower ended after the date of the Second Restatement Date and prior to the fiscal quarter of the Borrower during which the Elixir Acquisition shall have been consummated, 3.00:100, and (ii) if the Elixir Acquisition occurs, (x) with respect to each fiscal quarter of the Borrower from and including the fiscal quarter during which the Elixir Acquisition shall have been consummated until and including the fourth fiscal quarter ended after the consummation of the Elixir Acquisition, 2.50:1.00, and (y) with respect to each fiscal quarter thereafter, 3.00:1.00.<br><br>A Consolidated Interest Coverage Ratio Event of Default shall not constitute an Event of Default with respect to any 2023 Term Loans unless and until either (i) the Required 2021 Replacement Term Lenders have declared all amounts outstanding under the 2021 Replacement Term Facility to be immediately due and payable, or (ii) the Required Revolving Lenders have declared all amounts outstanding under the Revolving Credit Facility to be immediately due and payable and all outstanding Revolving Credit Commitments to be immediately terminated, in each case, in accordance with this Agreement and such declaration has not been rescinded (the "<u>2023 Term Loan Standstill Period</u>").<br><br>*See* MedImpact Credit Agreement, § 7.11; § 8.01(b). |

## Basis for Relief

**I.      The MedImpact Seller Financing Should Be Approved Under Section 363(b) of the Bankruptcy Code as an Exercise of the Debtors' Sound Business Judgment.**

16.      Under section 363(b)(1) of the Bankruptcy Code, a debtor in possession may "use, sell, or lease" estate property "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  A debtor may use, sell, or lease estate property outside the ordinary course of business if there is a good business reason for doing so.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("[U]nder normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification." (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991))); *In re Tower Air, Inc.*, 416 F.3d 229, 238

9

(3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

17.    Once a debtor articulates a valid business justification for its actions, courts should "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose." *In re Global Crossing Ltd.*, 295 B.R. at 744 (Bankr. S.D.N.Y. 2003) (citing *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 n.17 (Del. 1994)); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (presuming, based on the business judgment rule, "that in making a business decision the directors of [the debtor] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company" (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985))); *In re Filene's Basement*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr 29, 2014) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

18.    The MedImpact Seller Financing is a sound exercise of the Debtors' business judgment.  ***First,*** entry into the MedImpact Seller Financing currently represents the best available pathway towards consummation of an Elixir Sale Transaction on the timeline necessary to preserve the value of the Elixir business.  The Elixir Sale Transaction is a cornerstone of the Plan and the DIP Facilities, and ultimately a global reorganization.  Without the proceeds from the Elixir Sale

Transaction, recoveries for the Debtors' stakeholders are at risk. ***The Debtors and all stakeholders in this case <u>cannot</u> afford extensive delay in the Elixir Sale Transaction process.*** Elixir is a party to numerous customer contracts, which are a primary driver of the value of the Elixir business, and many of which may expire and/or be up for renewal during these chapter 11 cases. Completing the sales process and providing certainty on the go-forward Elixir business will mitigate the risk of expiration of such contracts by providing customer counterparties with corresponding certainty, as soon as possible, as to their future contract counterparty. Conversely, disrupting the sale process risks a potentially devastating loss of value by this contracting uncertainty because customer relationships are at risk. Importantly, the Debtors' ongoing dialogue with their Elixir customers since the announcement of the Elixir Sale Transaction reflects positive stakeholder feedback around the transaction. Customers are encouraged about the prospect of Elixir continuing as a vital PBM platform through the going-concern sale contemplated through this process.

19.    ***Second***, entry into the MedImpact Seller Financing provides several key cash flow and financial risk mitigation benefits to the Debtors' estates. The Debtors have estimated that the MedImpact Seller Financing will provide the Debtors with superior long-term cash proceeds relative to the Debtors forgoing an Elixir Sale Transaction altogether and continuing to operate the Elixir business on their own. Cash proceeds from the MedImpact Seller Financing would reduce the Debtors' use of their existing asset-based lending facilities.

20.    Additionally, the Debtors believe that the MedImpact Seller Financing also provides the Debtors with meaningful security and creditworthy borrowers and guarantors in the form of the MedImpact business ("<u>MedImpact</u>"). The Debtors will receive the benefit of valid, perfected, and enforceable liens on the applicable MedImpact Parties' collateral pursuant to applicable documentation. Further, MedImpact is one of the country's leading, independent

pharmacy benefit managers. Founded in 1989, MedImpact is a privately-held corporation headquartered in California that employs more than 1,500 people nationwide. MedImpact serves employer, commercial and government health plans and more than 55 million consumers. MedImpact provides PBM services to approximately 26 million Medicaid lives, and its clients include organizations such as Kaiser Permanente (over 11 million lives), the Kentucky Cabinet of Health and Family Services, Department for Medicaid Services (approximately 1.5 million lives) and Health Partners of Minnesota (approximately 1.8 million lives).

21.     Per Moody's, MedImpact generated over $7.5 billion in revenue and approximately $320 million in EBITDA for the twelve months ended June 30, 2023. Immediately prior to giving effect to the MedImpact Seller Financing, MedImpact's capital structure primarily consists of a $125 million revolving credit facility (of which approximately $95 million is drawn) and an approximately $325 million[8] term loan facility (the "<u>Existing Credit Facilities</u>"), each secured by liens on substantially all of the underlying loan parties' assets. MedImpact's most recently assigned corporate credit ratings are B2 and B+ from Moody's and S&P respectively. The MedImpact Seller Financing is also expected to rank *pari passu*, in terms of lien priority, with the Existing Credit Facilities.

22.     Additionally, after giving effect to the sale contemplated under the Elixir Stalking Horse APA, MedImpact is expected to generate annual revenues in excess of approximately $11.5 billion, as well as approximately $462 million in EBITDA (including synergies), and, immediately after consummating the MedImpact Seller Financing, to have an aggregate amount of funded debt

---

[8]     Excludes impact of $25 million term loan A paydown required by MedImpact at the signing of the credit agreement amendment.

equal to approximately $919 million, which is approximately 2.0x projected EBITDA (including synergies).

23.     **Third,** entry into the MedImpact Seller Financing does not foreclose the Debtors' ability to consummate an alternative transaction with a Qualified Bidder submitting a higher or otherwise better Qualified Bid in the upcoming Auction.  By its terms, the MedImpact Seller Financing will not go forward should the Elixir Stalking Horse APA not close.  *See* MedImpact Credit Agreement, § 4.03, "Conditions to all Credit Extensions with Respect to 2023 Term Loans." Nothing in the MedImpact Seller Financing Documents or the proposed Order disturbs the Debtors' rights, including their fiduciary responsibilities, under the Bidding Procedures Order to select a higher or otherwise better Qualified Bid for the Elixir Assets, including a cash bid should one materialize.  While the Debtors continue to encourage market participants to put forth their best offer for the Elixir Assets, the Elixir Stalking Horse APA, as amended in light of the MedImpact Seller Financing, represents the best currently available alternative for the Elixir Assets.

24.     Accordingly, the MedImpact Seller Financing is a sound exercise of the Debtors' business judgment and should be approved under section 363(b) of the Bankruptcy Code.

**II.     Sale of the Debtors' Interests in the MedImpact Seller Financing Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.**

25.     Section 363(f) of the Bankruptcy Code permits a debtor in possession to sell estate property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  11 U.S.C. § 363(f).

13

26.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any one of the requirements will suffice to warrant the Debtors' sale of their interests in the MedImpact Seller Financing free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances).  *See, e.g.*, *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

27.     The sale of the MedImpact Seller Financing is permitted under section 363(f) of the Bankruptcy Code.  The DIP Lenders and the Ad Hoc Group of Senior Secured Noteholders, who would otherwise hold liens on the Debtors' interests in the MedImpact Seller Financing, have consented to or are expected to consent to the transaction, and interests in the MedImpact Seller Financing will be sold free and clear of all liens, security interests and other encumbrances (collectively, "Non-Excepted Encumbrances").  To the extent such Non-Excepted Encumbrances exist, the MedImpact Loan Sale satisfies or will satisfy at least one of the five elements of section 363(f) of the Bankruptcy Code with respect thereto.  With respect to any other Non-Excepted Encumbrances, such Non-Excepted Encumbrances (if any) will be satisfied upon the closing of the MedImpact Loan Sale or otherwise will attach to the proceeds of the MedImpact Loan Sale, subject to any claims and defenses the Debtors may possess with respect thereto.

28.     Accordingly, the MedImpact Seller Financing satisfies (or will satisfy) section 363(f) of the Bankruptcy Code with respect to any Non-Excepted Encumbrances, and the Court should approve the contemplated sale or other monetization of the MedImpact Seller Financing to interested parties free and clear of any Non-Excepted Encumbrances.

III.     **Potential Participants in the MedImpact Loan Sale Would Be Good Faith Purchasers and Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code.**

29.      Potential purchasers of the Debtors' interests in the MedImpact Seller Financing are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code. Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code protects a purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  Purchasers are provided this protection so long as they purchased the assets in "good faith."  *Id.*  Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, in *In re Abbotts Dairies*, held that:

> [t]he requirement that a Buyer act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

30.      Here, the Debtors, through and with the assistance of their advisors, propose to engage in good faith, arm's-length discussions with potential participants in the process to sell the MedImpact Seller Financing, in order to reach agreements mutually beneficial to all parties. Notably, as set forth in the Syndication Assistance Side Letter, the Debtors have obtained a comprehensive commitment from the MedImpact Parties to provide assistance with these sale efforts.  Among other support, this assistance includes commitments from the MedImpact Parties

to use commercially reasonable efforts to ensure the sale process benefits from existing relationships the MedImpact Parties have with investment banks and potential lenders.   The Syndication Assistance Side Letter also includes commitments from the MedImpact Parties to refrain from issuing, offering, placing or arranging competing financings and to assist with preparing informational materials and conducting lender outreach.   The sale and/or syndication process will be done at arm's-length, without collusion or fraud, and parties will proceed in good faith.

31.     Accordingly, potential purchasers of interests in the MedImpact Seller Financing will each be a "good faith purchaser" of such interests and entitled to the full protection of section 363(m) of the Bankruptcy Code in connection with the MedImpact Loan Sale.

## IV.   The MedImpact Seller Financing Is Appropriate Under Bankruptcy Rule 6004(f).

32.     Bankruptcy Rule 6004(f) authorizes a debtor in possession to sell estate property outside of the ordinary course of business by private sale or public auction.  Courts generally afford debtors in possession broad discretion to determine the manner in which estate property is sold. *See, e.g.*, *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998); *In re Alisa P'ship*, 15 B.R. 802, 802 (Bankr. D. Del. 1981).  Private sales are appropriate where the debtor demonstrates that the proposed sale is permissible under section 363(b) of the Bankruptcy Code; *i.e.*, where the debtor articulates a good business reason for the sale.  *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009) ("[T]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

33.     Here, there is a sound business reason for the MedImpact Seller Financing and any sale or other monetization of interests therein.  A customary, professionally-run marketing process will enable superior and more timely monetization of the MedImpact Seller Financing for the Debtors, that would provide more immediate cash proceeds to contribute to the Debtors'

reorganization efforts.  Further, at this juncture, a public bankruptcy auction process for interests in the MedImpact Seller Financing, in place of a more customary secondary market loan sale process, is impractical and unlikely to yield more value for the Debtors' estates.  For these reasons, a private sale of interests in the MedImpact Seller Financing, through a more customary secondary market loan sale process, is appropriate under Bankruptcy Rule 6004(f).

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

34.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Waiver of Memorandum of Law

35.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

### Reservation of Rights

36.     Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365

17

of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection

of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or

(g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other

party in interest against any person or entity under the Bankruptcy Code or any other applicable

law.

### No Prior Request

37.     No prior request for the relief sought in this motion has been made to this or any

other court.

### Notice

38.     The Debtors will provide notice of this motion to the following parties and/or their

respective counsel, as applicable:  (a) the office of the United States Trustee for the District of

New Jersey; (b) counsel to the Committees; (c) the agents under the Prepetition Credit Facilities

and counsel thereto; (d) the DIP Agents and counsel thereto; (e) Paul, Weiss, Rifkind, Wharton &

Garrison LLP and Fox Rothschild LLP, as counsel to the Ad Hoc Group of Senior Secured

Noteholders; (f) the indenture trustees for the Senior Secured Notes; (g) the indenture trustee for

the Senior Unsecured Notes; (h) the United States Attorney's Office for the District of New Jersey;

(i) the Internal Revenue Service; (j) the U.S. Securities and Exchange Commission; (k) the

attorneys general in the states where the Debtors conduct their business operations; (l) counsel to

the MedImpact Purchaser; and (m) any party that has requested notice pursuant to Bankruptcy

Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or

further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially

in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such

other relief as is just and proper.

Dated: November 16, 2023

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:    msirota@coleschotz.com
          wusatine@coleschotz.com
          fyudkin@coleschotz.com
          svanaalten@coleschotz.com


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900
Email:    esassower@kirkland.com
          joshua.sussberg@kirkland.com
          aparna.yenamandra@kirkland.com
          ross.fiedler@kirkland.com
          zach.manning@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

## Exhibit A

**Proposed Order**

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** | |
| In re:<br><br>RITE AID CORPORATION, *et al.*,<br><br>                                        Debtors.[1] | Chapter 11<br><br>Case No. 23-18993 (MBK)<br><br>(Jointly Administered) |

**ORDER (I) APPROVING
ENTRY INTO THE MEDIMPACT
SELLER FINANCING DOCUMENTS, (II) APPROVING
THE PRIVATE SALE OF THE DEBTORS' INTERESTS IN THE
MEDIMPACT SELLER FINANCING FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS AND (III) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through seven (7), is **ORDERED**.

---

[1]    The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Page | 3)

| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Entry into the MedImpact Seller Financing Documents, (II) Approving the Private Sale of the Debtors' Interests in the MedImpact Seller Financing Free and Clear of Liens, Claims, Encumbrances, and Interests and (III) Granting Related Relief |

Upon the *Debtors' Motion for Entry of an Order (I) Approving Entry into the Medimpact Seller Financing Documents, (II) Approving the Private Sale of the Debtors' Interests in the Medimpact Seller Financing Free and Clear of Liens, Claims, Encumbrances, and Interests and (III) Granting Related Relief* (the "Motion")[1] of the above-captioned debtors and debtors in possession (the "Debtors") for the entry of an order (this "Order"): (a) approving Debtor Rite Aid Corporation's entry into (i) that certain Second Amended and Restated Credit Agreement, dated as of November 7, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "MedImpact Credit Agreement"), by and between MI OpCo Holdings, Inc., as borrower thereunder, MI OpOco H2, LLC, as "Holdings" thereunder, the other guarantors from time to time party thereto (collectively, with the MedImpact Purchaser, the "MedImpact Parties"), Debtor Rite Aid Corporation, as a lender, each other lender from time to time party thereto, Bank of America, N.A., as Administrative Agent, Swing Line Lender and an L/C Issuer (each as defined in the MedImpact Credit Agreement), and the other L/C Issuers from time to time party thereto, and (ii) that certain Syndication Assistance Side Letter dated as of November 7, 2023, by and between by and between MI OpCo Holdings, Inc, a Delaware corporation, and Debtor Rite Aid Corporation (the "Syndication Assistance Side Letter," and together with the MedImpact Credit Agreement, the "MedImpact Seller Financing Documents," and the seller financing facility thereunder, the "MedImpact Seller Financing"); (b) authorizing the Debtors' sale of their interests in the MedImpact Seller Financing free and clear of liens, claims,

---

[1]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

3

| Page | 4) | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Entry into the MedImpact Seller Financing Documents, (II) Approving the Private Sale of the Debtors' Interests in the MedImpact Seller Financing Free and Clear of Liens, Claims, Encumbrances, and Interests and (III) Granting Related Relief |

encumbrances, and interests; and (c) granting related relief; all as more fully set forth in the Motion; and upon the First Day Declaration, the Stein Declaration, and the Scheidemann Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY ORDERED THAT**:

1.    The MedImpact Seller Financing Documents attached hereto as **Exhibit 1** are approved in all respects.  The Debtors are authorized, but not directed, to take any and all actions necessary, appropriate, or desirable to (a) consummate the transactions described in the MedImpact Seller Financing Documents in accordance with the terms and conditions set forth therein; and (b) otherwise implement and effectuate the terms thereof.

Page | 5)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Entry into the MedImpact Seller Financing Documents, (II) Approving the Private Sale of the Debtors' Interests in the MedImpact Seller Financing Free and Clear of Liens, Claims, Encumbrances, and Interests and (III) Granting Related Relief |

2.      Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, upon the closing of any MedImpact Loan Sale, all of the Debtors' right, title, and interest in and to, and possession of, their interests in the MedImpact Seller Financing shall be transferred to potential purchasers or other participants free and clear of any and all liens, claims, encumbrances, and interests, with all such liens, claims, encumbrances, and interests (collectively, "Non-Excepted Encumbrances") to attach to the proceeds thereof in the order of their priority, with the same force, effect, and validity that they had immediately prior to the entry of this Order, subject to any rights, claims, or defenses the Debtors may have with respect thereto.  Such transfer shall constitute a legal, valid, binding, and effective transfer of the Debtors' interests in the MedImpact Seller Financing.

3.      This Order shall be effective as a determination that, as of the closing of any MedImpact Loan Sale, except as may be provided in the MedImpact Seller Financing Documents, (a) no Non-Excepted Encumbrances will be assertable against potential purchasers or other participants or any of their assets and (b) interests in the MedImpact Seller Financing shall have been transferred to potential purchasers or other participants free and clear of any Non-Excepted Encumbrances.

4.      This Order is and shall be binding upon all persons and entities that may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or that may be required to report or insure any title or state of title in or to any property; and each of the foregoing persons and entities shall accept

| Page | 6) | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Entry into the MedImpact Seller Financing Documents, (II) Approving the Private Sale of the Debtors' Interests in the MedImpact Seller Financing Free and Clear of Liens, Claims, Encumbrances, and Interests and (III) Granting Related Relief |

for filing any and all of the documents and instruments necessary and appropriate to consummate the MedImpact Seller Financing and MedImpact Loan Sale.

5.       Participants in the MedImpact Seller Financing and MedImpact Loan Sale will be deemed to be good faith purchasers of their respective interests therein.  Pursuant to section 363(m) of the Bankruptcy Code, if this Order is reversed or modified on appeal, such reversal or modification shall not affect the validity of the MedImpact Seller Financing or any MedImpact Loan Sale.  Consideration provided for the MedImpact Seller Financing under the MedImpact Seller Financing Documents is fair and reasonable, and the MedImpact Seller Financing, including any sale of interests therein, is not subject to avoidance under section 363(n) of the Bankruptcy Code or otherwise.

6.       The Debtors shall consult in good faith with the advisors to the Ad Hoc Group of Senior Secured Noteholders regarding the MedImpact Loan Sale or any other monetization of the Debtors' interests in the MedImpact Seller Financing.

7.       To the extent there are any inconsistencies between this Order and the MedImpact Seller Financing Documents, the terms of this Order shall control.

8.       The amended Elixir Stalking Horse APA, attached hereto as **Exhibit 2**, is hereby approved.

9.       Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any prepetition claim, interest, or lien against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any prepetition claim, interest, or lien on any grounds; (c) a

Page | 7)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption: | Order (I) Approving Entry into the MedImpact Seller Financing Documents, (II) Approving the Private Sale of the Debtors' Interests in the MedImpact Seller Financing Free and Clear of Liens, Claims, Encumbrances, and Interests and (III) Granting Related Relief |

promise or requirement to pay prepetition claims; (d) a waiver of the obligation of any party in interest to file a proof of claim; (e) an implication or admission that any particular claim, interest, or lien is of a type specified or defined in the Motion or this Order; (f) an authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (g) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

10. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

11. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

12. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

13. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## **Exhibit 1**

**MedImpact Seller Financing Documents**

**EXECUTION VERSION**

**Published CUSIP Number: 55314VAN6**
**Revolving Credit Facility CUSIP Number: 55314VAP1**
**2021 Replacement Term Facility CUSIP Number: 55314VAQ9**
**2023 Term Facility CUSIP Number: 55314VAR7**

**SECOND AMENDED AND RESTATED CREDIT AGREEMENT**

Dated as of November 8, 2023

among

MI OPCO HOLDINGS, INC.,
as the Borrower,

MI OPCO H2, LLC,
as Holdings and as a Guarantor,

the other Guarantors party hereto,

BANK OF AMERICA, N.A.,
as Administrative Agent, Swing Line Lender and an L/C Issuer,

the other L/C Issuers party hereto

and

the other Lenders party hereto

Arranged by:

BANK OF AMERICA, N.A.,
CITIZENS CAPITAL MARKETS, INC.,
FIFTH THIRD BANK, NATIONAL ASSOCIATION,
REGIONS CAPITAL MARKETS, A DIVISION OF REGIONS BANK,
TRUIST SECURITIES, INC.
and
U.S. BANK NATIONAL ASSOCIATION,
as Joint Lead Arrangers and Joint Bookrunners

**TABLE OF CONTENTS**

**ARTICLE I** DEFINITIONS AND ACCOUNTING TERMS ........................................................... 2

Section 1.01    Defined Terms ............................................................................................ 2

Section 1.02    Other Interpretive Provisions ................................................................... 48

Section 1.03    Accounting Terms .................................................................................... 49

Section 1.04    Rounding .................................................................................................. 50

Section 1.05    Times of Day; Rates ................................................................................ 50

Section 1.06    Letter of Credit Amounts ........................................................................ 51

Section 1.07    Limited Condition Acquisition ................................................................ 51

Section 1.08    Effect of Amendment and Restatement .................................................... 52

**ARTICLE II** THE COMMITMENTS AND CREDIT EXTENSIONS ........................................ 52

Section 2.01    The Loans ................................................................................................. 52

Section 2.02    Borrowings, Conversions and Continuations of Loans ............................ 53

Section 2.03    Letters of Credit ...................................................................................... 55

Section 2.04    Swing Line Loans .................................................................................... 62

Section 2.05    Prepayments ............................................................................................ 65

Section 2.06    Termination or Reduction of Commitments ............................................ 67

Section 2.07    Repayment of Loans ................................................................................ 68

Section 2.08    Interest .................................................................................................... 69

Section 2.09    Fees ......................................................................................................... 69

Section 2.10    Computation of Interest and Fees; Retroactive Adjustments of Applicable Rate ............. 71

Section 2.11    Evidence of Debt ..................................................................................... 71

Section 2.12    Payments Generally; Administrative Agent's Clawback .......................... 72

Section 2.13    Sharing of Payments by Lenders .............................................................. 74

Section 2.14    Defaulting Lenders .................................................................................. 74

Section 2.15    Incremental Facilities .............................................................................. 77

Section 2.16    Extension of Maturity Date ..................................................................... 80

**ARTICLE III** TAXES, YIELD PROTECTION AND ILLEGALITY ........................................ 82

Section 3.01    Taxes ....................................................................................................... 82

Section 3.02    Illegality .................................................................................................. 87

Section 3.03    Inability to Determine Rates .................................................................... 87

Section 3.04    Increased Costs; Reserves on Term SOFR Loans .................................... 89

Section 3.05    Compensation for Losses ......................................................................... 91

Section 3.06    Mitigation Obligations; Replacement of Lenders ..................................... 91

Section 3.07    Survival ................................................................................................................. 92

Section 3.08    Tax Treatment of the 2023 Term Facility ........................................................... 92

**ARTICLE IV** CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ............................. 92

Section 4.01    Conditions of Occurrence of Second Restatement Date .................................... 92

Section 4.02    Conditions to all Credit Extensions ................................................................... 95

Section 4.03    Conditions to all Credit Extensions with Respect to 2023 Term Loans............. 96

**ARTICLE V** REPRESENTATIONS AND WARRANTIES .................................................... 96

Section 5.01    Existence, Qualification and Power .................................................................... 96

Section 5.02    Authorization; No Contravention ....................................................................... 96

Section 5.03    Governmental Authorization; Other Consents ................................................... 97

Section 5.04    Binding Effect ..................................................................................................... 97

Section 5.05    Financial Statements; No Material Adverse Effect ............................................. 97

Section 5.06    Litigation ............................................................................................................. 98

Section 5.07    No Default ........................................................................................................... 98

Section 5.08    Ownership of Property ........................................................................................ 98

Section 5.09    Environmental Compliance ................................................................................ 98

Section 5.10    Insurance ............................................................................................................. 99

Section 5.11    Taxes ................................................................................................................... 99

Section 5.12    ERISA Compliance ............................................................................................ 99

Section 5.13    Subsidiaries ....................................................................................................... 100

Section 5.14    Margin Regulations; Investment Company Act ............................................... 100

Section 5.15    Disclosure .......................................................................................................... 100

Section 5.16    Compliance with Laws ...................................................................................... 101

Section 5.17    Intellectual Property; Licenses, Etc .................................................................. 101

Section 5.18    Solvency ............................................................................................................ 101

Section 5.19    Perfection of Security Interests in the Collateral............................................... 101

Section 5.20    Business Locations; Taxpayer Identification Number ...................................... 102

Section 5.21    OFAC ................................................................................................................. 102

Section 5.22    Anti-Corruption Laws ....................................................................................... 102

Section 5.23    No Affected Financial Institution ...................................................................... 102

**ARTICLE VI** AFFIRMATIVE COVENANTS ..................................................................... 102

Section 6.01    Financial Statements ......................................................................................... 102

Section 6.02    Certificates; Other Information ......................................................................... 103

Section 6.03    Notices............................................................................................................... 106

Section 6.04    Payment of Taxes.............................................................................................. 106

Section 6.05    Preservation of Existence, Etc........................................................................... 106

Section 6.06    Maintenance of Properties ................................................................................. 107

Section 6.07    Maintenance of Insurance ................................................................................. 107

Section 6.08    Compliance with Laws ....................................................................................... 107

Section 6.09    Books and Records ............................................................................................ 107

Section 6.10    Inspection Rights ............................................................................................... 108

Section 6.11    Use of Proceeds ................................................................................................. 108

Section 6.12    ERISA Compliance ............................................................................................ 108

Section 6.13    Additional Guarantors ...................................................................................... 108

Section 6.14    Pledged Assets; Further Assurances ............................................................... 109

Section 6.15    Maintenance of Depository Relationships ..................................................... 109

Section 6.16    Anti-Corruption Laws; Sanctions.................................................................... 110

Section 6.17    Information Regarding Collateral .................................................................... 110

Section 6.18    Material Contracts ............................................................................................. 110

Section 6.19    Maintenance of Ratings..................................................................................... 110

Section 6.20    Quarterly Lender Calls ..................................................................................... 110

Section 6.21    Post-Closing Obligations .................................................................................. 111

**ARTICLE VII** NEGATIVE COVENANTS ................................................................................ 111

Section 7.01    Liens..................................................................................................................... 111

Section 7.02    Investments ......................................................................................................... 112

Section 7.03    Indebtedness ....................................................................................................... 113

Section 7.04    Fundamental Changes ....................................................................................... 115

Section 7.05    Dispositions ........................................................................................................ 115

Section 7.06    Restricted Payments .......................................................................................... 116

Section 7.07    Change in Nature of Business .......................................................................... 116

Section 7.08    Transactions with Affiliates ............................................................................. 116

Section 7.09    Burdensome Agreements .................................................................................. 117

Section 7.10    Use of Proceeds ................................................................................................. 117

Section 7.11    Financial Covenants .......................................................................................... 117

Section 7.12    Organization Documents; Fiscal Year; Legal Name, State of Formation; Form of
Entity; Elixir Purchase Agreement ................................................................. 117

Section 7.13    Ownership of Subsidiaries ................................................................................ 118

Section 7.14    Sale Leasebacks.................................................................................................. 118

Section 7.15    Sanctions ............................................................................................................. 118

Section 7.16    Anti-Corruption Laws ....................................................................................... 118

Section 7.17    Restrictions on Holdings .................................................................................. 118

**ARTICLE VIII** EVENTS OF DEFAULT AND REMEDIES ............................................. 119

Section 8.01    Events of Default.............................................................................................. 119

Section 8.02    Remedies Upon Event of Default...................................................................... 121

Section 8.03    Application of Funds ......................................................................................... 121

**ARTICLE IX** ADMINISTRATIVE AGENT ..................................................................... 122

Section 9.01    Appointment and Authority .............................................................................. 122

Section 9.02    Rights as a Lender ............................................................................................ 123

Section 9.03    Exculpatory Provisions ..................................................................................... 123

Section 9.04    Reliance by Administrative Agent ..................................................................... 124

Section 9.05    Delegation of Duties......................................................................................... 125

Section 9.06    Resignation of Administrative Agent................................................................. 125

Section 9.07    Non-Reliance on Administrative Agent, Arrangers and Other Lenders ......................... 126

Section 9.08    No Other Duties; Etc ........................................................................................ 127

Section 9.09    Administrative Agent May File Proofs of Claim; Credit Bidding .................................. 127

Section 9.10    Collateral and Guaranty Matters ....................................................................... 128

Section 9.11    Secured Cash Management Agreements and Secured Hedge Agreements.................... 129

Section 9.12    Certain ERISA Matters ..................................................................................... 129

Section 9.13    Recovery of Erroneous Payments ..................................................................... 130

**ARTICLE X** GUARANTY .................................................................................................. 130

Section 10.01    The Guaranty................................................................................................... 130

Section 10.02    Obligations Unconditional .............................................................................. 131

Section 10.03    Reinstatement ................................................................................................ 132

Section 10.04    Certain Additional Waivers ............................................................................. 132

Section 10.05    Remedies ....................................................................................................... 132

Section 10.06    Rights of Contribution..................................................................................... 132

Section 10.07    Guarantee of Payment; Continuing Guarantee................................................... 133

Section 10.08    Keepwell ......................................................................................................... 133

**ARTICLE XI** MISCELLANEOUS...................................................................................... 133

Section 11.01    Amendments, Etc ........................................................................................... 133

Section 11.02    Notices; Effectiveness; Electronic Communications ........................................ 136

Section 11.03    No Waiver; Cumulative Remedies; Enforcement .............................................. 138

Section 11.04    Expenses; Indemnity; Damage Waiver ............................................................. 139

Section 11.05    Payments Set Aside ........................................................................................ 141

Section 11.06    Successors and Assigns.................................................................................. 141

Section 11.07    Treatment of Certain Information; Confidentiality ........................................................ 145

Section 11.08    Rights of Setoff ................................................................................................................ 146

Section 11.09    Interest Rate Limitation.................................................................................................... 147

Section 11.10    Counterparts; Integration; Effectiveness ........................................................................ 147

Section 11.11    Survival of Representations and Warranties ................................................................... 147

Section 11.12    Severability ....................................................................................................................... 148

Section 11.13    Replacement of Lenders ................................................................................................... 148

Section 11.14    Governing Law; Jurisdiction; Etc..................................................................................... 149

Section 11.15    Waiver of Jury Trial ......................................................................................................... 150

Section 11.16    No Advisory or Fiduciary Responsibility ........................................................................ 150

Section 11.17    California Judicial Reference ............................................................................................ 151

Section 11.18    Electronic Execution of Assignments and Certain Other Documents............................. 151

Section 11.19    USA PATRIOT Act Notice............................................................................................... 152

Section 11.20    Subordination of Intercompany Indebtedness.................................................................. 152

Section 11.21    Acknowledgement and Consent to Bail-In of Affected Financial Institutions ............... 152

Section 11.22    Acknowledgement Regarding Any Supported QFCs ..................................................... 153

SCHEDULES

2.01A          Commitments and Applicable Percentages
2.01B          Swing Line Commitments
2.01C          Letter of Credit Commitments
5.03           Governmental Authorizations; other Consents.
5.10           Insurance
5.13           Subsidiaries
5.17           IP Rights
5.20(a)        Location of Chief Executive Office, Taxpayer Identification Number, Etc.
5.20(b)        Changes in Legal Name, State of Formation and Structure
6.21           Post-Closing Obligations
7.01           Liens Existing on the Second Restatement Date
7.02           Investments Existing on the Second Restatement Date
7.03           Indebtedness Existing on the Second Restatement Date
11.02          Certain Addresses for Notices

EXHIBITS

1.01           Form of Secured Party Designation Notice
2.02           Form of Loan Notice
2.04           Form of Swing Line Notice
2.05           Form of Notice of Loan Prepayment
2.11(a)(A)     Form of Revolving Credit Note
2.11(a)(B)     Form of Term Note

| | |
|---|---|
| 3.01 | Forms of U.S. Tax Compliance Certificates |
| 6.02 | Form of Compliance Certificate |
| 6.13 | Form of Joinder Agreement |
| 11.06(b) | Form of Assignment and Assumption |
| 11.06(b)(iv) | Form of Administrative Questionnaire |

## SECOND AMENDED AND RESTATED CREDIT AGREEMENT

This SECOND AMENDED AND RESTATED CREDIT AGREEMENT is made as of November 8, 2023, among MI OPCO HOLDINGS, INC., a Delaware corporation (the "Borrower"), MI OPCO H2, LLC, a Delaware limited liability company ("Holdings"), the other GUARANTORS (as defined below) from time to time party hereto, each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), BANK OF AMERICA, N.A., as Administrative Agent, Swing Line Lender and an L/C Issuer (each as defined below), and the other L/C Issuers from time to time party hereto.

WHEREAS, a term loan facility and a revolving credit facility were previously made available to the Borrower pursuant to that certain Amended and Restated Credit Agreement, dated as of March 15, 2021 (as amended, modified, supplemented, increased and extended from time to time prior to the date hereof, the "Existing Credit Agreement"), by and among Holdings, the Borrower, the other guarantors from time to time party thereto, the lenders from time to time party thereto, Bank of America, N.A., as administrative agent, an L/C issuer and swing line lender, and the other L/C issuers from time to time party thereto;

WHEREAS, the Borrower has requested that the Existing Credit Agreement be amended and restated to (i) amend certain provisions of the Existing Credit Agreement as set forth herein with the consent of Lenders collectively constituting the "Required Lenders" under, and as defined in, the Existing Credit Agreement, and (ii) permit the incurrence of, and then obtain a tranche of, additional term loans in an aggregate principal amount equal to the Elixir Acquisition Closing Date Loan Amount (as defined below) (which shall in any event not exceed $604,000,000 (the "Maximum 2023 Term Loan Amount")), to be used after the Second Restatement Date as purchase price consideration with respect to the Elixir Acquisition (as defined below), in each case on the terms and conditions set forth herein;

WHEREAS, the parties hereto intend that the Obligations (as defined in the Existing Credit Agreement) which remain outstanding after giving effect to this Agreement shall continue to exist and remain outstanding in full under this Agreement on the terms set forth herein and that this Agreement shall not constitute a novation or a termination of such Obligations, and the Guarantees and Collateral (each as defined in the Existing Credit Agreement) shall continue to secure, support and otherwise benefit the Obligations of the Loan Parties under this Agreement and the other Loan Documents;

WHEREAS, each of the Lenders under the Existing Credit Agreement which are signatories to this Agreement (collectively, the "Consenting Lenders" and, each a "Consenting Lender"), which Consenting Lenders collectively constitute the "Required Lenders", as well as the "Required Class Lenders" with respect to each Class of Loans and Commitments outstanding under the Existing Credit Agreement, in each case, as of the date hereof immediately prior to the occurrence of the Second Restatement Date, are prepared to amend and restate the Existing Credit Agreement on the terms and conditions set forth herein (including, without limitation, in consideration for the making by the Borrower of the Second Restatement Date 2021 Replacement Term Loan Paydown (as defined below)); and

WHEREAS, in consideration of the premises and the mutual covenants herein contained and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree that the Existing Credit Agreement is amended and restated in its entirety as hereinafter set forth;

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

# ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

**Section 1.01**    **Defined Terms**.

As used in this Agreement, the following terms shall have the meanings set forth below:

"2021 Replacement Term Facility" means, at any time, (a) on or prior to the First Restatement Date, the aggregate amount of the 2021 Replacement Term Loan Commitments at such time and (b) thereafter, the aggregate principal amount of the 2021 Replacement Term Loans of all 2021 Replacement Term Lenders outstanding at such time.

"2021 Replacement Term Lender" means, at any time, any Lender that holds 2021 Replacement Term Loans at such time.  The aggregate principal amount held by each 2021 Replacement Term Lender as of the Second Restatement Date is the amount set forth opposite such Lender's name on Schedule 2.01A.

"2021 Replacement Term Loan Commitments" has the meaning set forth in the Fifth Amendment.

"2021 Replacement Term Loan Exposure" means, as to any Lender at any time, the aggregate Outstanding Amount at such time of its 2021 Replacement Term Loans; provided that at any time prior to the making of the 2021 Replacement Term Loans, the 2021 Replacement Term Loan Exposure of any Lender shall be equal to such Lender's 2021 Replacement Term Loan Commitment.

"2021 Replacement Term Loans" has the meaning set forth in the Fifth Amendment.

"2023 Term Facility" means the delayed issuance term loan credit facility described in Section 2.01(b).

"2023 Term Lender" means at any time, any Lender that has a 2023 Term Loan Commitment and, after the Borrowing under the 2023 Term Facility, any Lender that holds 2023 Term Loans at such time.

"2023 Term Loan" means an advance made by any 2023 Term Lender under the 2023 Term Facility.

"2023 Term Loan Availability Period" means the period from and including the Second Restatement Date to and including the earliest of (i) the date on which the Elixir Acquisition shall have been consummated, (ii) May 31, 2024, (iii) the date of termination of the 2023 Term Loan Commitments pursuant to Section 2.06, and (iv) the date of termination of the Commitment of each 2023 Term Loan Lender to make 2023 Term Loans pursuant to Section 8.02.

"2023 Term Loan Commitment" means, as to each 2023 Term Lender, its obligation to be deemed to make 2023 Term Loans to the Borrower pursuant to Section 2.01(b) in an aggregate principal amount at any one time outstanding not to exceed such 2023 Term Lender's ratable share, expressed as a percentage, of the Aggregate 2023 Term Loan Commitments, as set forth opposite such Lender's name on Schedule 2.01A under the caption "2023 Term Loan Commitment".

"2023 Term Loan Standstill Period" has the meaning specified in Section 8.01(b).

"Acquisition", by any Person, means the acquisition by such Person, in a single transaction or in a series of related transactions, of either (a) all or any substantial portion of the property of, or a line of

business or division of, another Person or (b) at least a majority of the Voting Stock of another Person, in each case whether or not involving a merger or consolidation with such other Person.

"Act" has the meaning specified in Section 11.19.

"Administrative Agent" means Bank of America in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 11.02 or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in substantially the form of Exhibit 11.06(b)(iv) or any other form approved by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate 2023 Term Loan Commitments" means the 2023 Term Loan Commitments of all Lenders.  The Aggregate 2023 Term Loan Commitments shall be in an amount, at all times during which the 2023 Term Loan Commitments shall be outstanding, equal to the Elixir Acquisition Closing Date Loan Amount (but which shall in any event not exceed $604,000,000).

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" means this Second Amended and Restated Credit Agreement, as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Applicable Fee Rate" means, at any time, in respect of the Revolving Credit Facility (a) from the First Restatement Date to the date on which the Administrative Agent receives a Compliance Certificate pursuant to Section 6.02(b) for the fiscal quarter ending June 30, 2021, ▮▮▮▮ per annum and (b) thereafter, the applicable percentage per annum set forth below determined by reference to the Consolidated Net Leverage Ratio as set forth in the most recent Compliance Certificate received by the Administrative Agent pursuant to Section 6.02(b):

| Pricing Tier | Consolidated Net Leverage Ratio | Applicable Fee Rate |
|:---:|:---:|:---:|
| 1 | > 2.75:1.0 | ▮▮▮ |
| 2 | ≤ 2.75:1.0 but > 1.75:1.0 | ▮▮▮ |
| 3 | ≤ 1.75:1.0 but > 1.25:1.0 | ▮▮▮ |
| 4 | ≤ 1.25:1.0 but > 0.75:1.0 | ▮▮▮ |
| 5 | ≤ 0.75:1.0 | ▮▮▮ |

Any increase or decrease in the Applicable Fee Rate resulting from a change in the Consolidated Net Leverage Ratio shall become effective as of the first Business Day immediately following the date a Compliance Certificate is delivered pursuant to Section 6.02(b); provided, however, that if a Compliance Certificate is not delivered when due in accordance with such Section, then, upon the request of the

AMERICAS/2024053109.31

Required Revolving Lenders, Pricing Tier 1 shall apply as of the first Business Day after the date on which such Compliance Certificate was required to have been delivered and shall remain in effect until the date on which such Compliance Certificate is delivered.  As of the Second Restatement Date, Pricing Tier 3 is applicable to the Applicable Fee Rate.

"Applicable Law" means, as to any Person, all applicable Laws binding upon such Person or to which such a Person is subject.

"Applicable Percentage" means (a) in respect of the 2021 Replacement Term Facility, with respect to any 2021 Replacement Term Lender at any time, the percentage (carried out to the ninth decimal place) of the 2021 Replacement Term Facility represented by (i) on or prior to the First Restatement Date, such 2021 Replacement Term Lender's 2021 Replacement Term Loan Commitment at such time, subject to adjustment as provided in Section 2.14, and (ii) thereafter, the outstanding principal amount of such 2021 Replacement Term Lender's 2021 Replacement Term Loans at such time, (b) in respect of the 2023 Term Loan Facility, with respect to any 2023 Term Lender at any time, the percentage (carried out to the ninth decimal place) of the 2023 Term Facility represented by the outstanding principal amount of such 2023 Term Lender's 2023 Term Loans at such time, subject to adjustment as provided in Section 2.14, and (c) in respect of the Revolving Credit Facility, with respect to any Revolving Credit Lender at any time, the percentage (carried out to the ninth decimal place) of the Revolving Credit Facility represented by such Revolving Credit Lender's Revolving Credit Commitment at such time, subject to adjustment as provided in Section 2.14.  If the commitment of each Revolving Credit Lender to make Revolving Credit Loans and the obligation of the L/C Issuers to make L/C Credit Extensions have been terminated pursuant to Section 8.02, or if the Revolving Credit Commitments have expired, then the Applicable Percentage of each Revolving Credit Lender in respect of the Revolving Credit Facility shall be determined based on the Applicable Percentage of such Revolving Credit Lender in respect of the Revolving Credit Facility most recently in effect, giving effect to any subsequent assignments and to any Lender's status as a Defaulting Lender at the time of determination  The initial Applicable Percentage of each Lender for each Facility is set forth opposite the name of such Lender on Schedule 2.01A or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.  The Applicable Percentages shall be subject to adjustment as provided in Section 2.15.

"Applicable Premium" means:

(a)    if either (x) the Reorganization Completion Date has not occurred or (y) a timely Successful 2023 Term Loan Syndication shall have occurred, as of any date of determination (i) during the applicable Non-Call Period, an amount equal to (x) the present value at the relevant determination date of all required remaining scheduled interest payments due (assuming that such interest will be based on Term SOFR with a duration of 30 days or, during the continuance of an Event of Default which has occurred prior to such date of determination and is continuing on such date of determination, based on the Default Rate) on the principal amount of the 2023 Term Loans being repaid or prepaid through the last day of the Non-Call Period (in each case, excluding accrued but unpaid interest to such payment date), discounted to such prepayment date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate as of such prepayment date plus 0.50% plus (y) 2.00% of the principal amount of the 2023 Term Loans being repaid or prepaid; (ii) from (but not including) the last day of the Non-Call Period until and including the second anniversary of the Second Restatement Date, an amount equal to 2.00% of the principal amount of the 2023 Term Loans being repaid or prepaid; (iii) from (but not including) the second anniversary of the Second Restatement Date until and including the third anniversary of the Second Restatement Date, an amount equal to 1.00% of the principal amount of the 2023 Term Loans being repaid or prepaid; and (iv) thereafter, zero; or

(b)    if a timely Successful 2023 Term Loan Syndication shall not have occurred on or prior to the Reorganization Completion Date, as of any date of determination (i) during the period from and

including the Reorganization Completion Date to (and including) the date that is six months (the corresponding date in the sixth following month, or the last day of such sixth following month if there is no corresponding date) after the Reorganization Completion Date, zero; (ii) during the applicable Non-Call Period (for the avoidance of doubt, determined in accordance with the proviso in the definition thereof), an amount equal to (x) the present value at the relevant determination date of all required remaining scheduled interest payments due (assuming that such interest will be based on Term SOFR with a duration of 30 days or, during the continuance of an Event of Default which has occurred prior to such date of determination and is continuing on such date of determination, based on the Default Rate) on the principal amount of the 2023 Term Loans being repaid or prepaid through the last day of the Non-Call Period (for the avoidance of doubt, determined in accordance with the proviso in the definition thereof) (in each case, excluding accrued but unpaid interest to such payment date), discounted to such prepayment date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate as of such prepayment date plus 0.50% <u>plus</u> (y) 2.00% of the principal amount of the 2023 Term Loans being repaid or prepaid; (iii) from (but not including) the last day of the Non-Call Period (for the avoidance of doubt, determined in accordance with the proviso in the definition thereof) until and including the second anniversary of the Reorganization Completion Date, an amount equal to 2.00% of the principal amount of the 2023 Term Loans being repaid or prepaid; (iv) from (but not including) the second anniversary of the Reorganization Completion Date until and including the third anniversary of the Reorganization Completion Date, an amount equal to 1.00% of the principal amount of the 2023 Term Loans being repaid or prepaid; and (v) thereafter, zero.

"<u>Applicable Premium Period</u>" means the period from and including the Elixir Acquisition Closing Date, through and ending on the date that is the third anniversary of the Elixir Acquisition Closing Date; <u>provided</u>, <u>however</u>, that if a timely Successful 2023 Term Loan Syndication has not occurred on or prior to the Reorganization Completion Date, the "Applicable Premium Period" shall instead be the period from and including the Reorganization Completion Date and ending on the date that is the third anniversary of the Reorganization Completion Date.

"<u>Applicable Premium Trigger Event</u>" means:

(a)    any voluntary prepayment by any Loan Party of all, or any part, of the principal balance of any 2023 Term Loan pursuant to <u>Section 2.05(a)</u>;

(b)    any mandatory prepayment of any 2023 Term Loan pursuant to <u>Section 2.05(b)(ii)</u>;

(c)    the acceleration of the Obligations in accordance with <u>Section 8.02(b)</u>, including as a result of the commencement of any proceeding under any Debtor Relief Law;

(d)    the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any of the Obligations in any proceeding under any Debtor Relief Law, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any proceeding under any Debtor Relief Law to the Administrative Agent, for the account of the Lenders in full or partial satisfaction of the Obligations; or

(e)    the termination of this Agreement by the Borrower or any Loan Party for any reason or the replacement of any 2023 Term Lender pursuant to <u>Section 3.06(b)</u> or <u>11.13</u>.

For purposes of the definition of the term Applicable Premium, if an Applicable Premium Trigger Event occurs under clause (c) or (d) above, the entire outstanding principal amount of the 2023 Term Loans shall be deemed to have been prepaid on the date on which such Applicable Premium Trigger Event occurs. Notwithstanding the foregoing, in no event shall any prepayment or repayment effected in

AMERICAS/2024053109.31

connection with mandatory prepayment of the 2023 Term Loans made in accordance with the terms of Section 2.05(b)(i), (iii) or (iv) be deemed to an Applicable Premium Trigger Event.

"Applicable Rate" means (a) with respect to the Revolving Credit Facility and 2021 Replacement Term Loans, at any date on and after the First Restatement Date, the applicable percentage per annum set forth below determined by reference to the Consolidated Net Leverage Ratio as set forth in the most recent Compliance Certificate received by the Administrative Agent pursuant to Section 6.02(b) of the Existing Credit Agreement or hereof, as applicable:

| Pricing Tier | Consolidated Net Leverage Ratio | Term SOFR Loans | Base Rate Loans |
|---|---|---|---|
| 1 | > 2.75:1.0 | ██ | ██ |
| 2 | ≤ 2.75:1.0 but > 1.75:1.0 | ██ | ██ |
| 3 | ≤ 1.75:1.0 but > 1.25:1.0 | ██ | ██ |
| 4 | ≤ 1.25:1.0 but > 0.75:1.0 | ██ | ██ |
| 5 | ≤ 0.75:1.0 | ██ | ██ |

provided, however, that if an Elixir Termination Date shall occur, then the Applicable Rate with respect to the Revolving Credit Facility and 2021 Replacement Term Loans, shall be reduced by ██ per annum (such ██ per annum reduction to be subtracted from each rate in each applicable Pricing Tier set forth in the table above). Such reduction in the Applicable Rate resulting from the occurrence of an Elixir Termination Date shall become effective as of the first Business Day immediately following such Elixir Termination Date and shall apply to the Revolving Credit Facility and the 2021 Replacement Term Loans at all times thereafter. As of the Second Restatement Date, Pricing Tier 3 is applicable to the Revolving Credit Facility and the 2021 Replacement Term Loans; and

(b) with respect to the 2023 Term Facility, 6.25% per annum for Base Rate Loans and 7.25% per annum for Term SOFR Loans.

Any increase or decrease in the Applicable Rate resulting from a change in the Consolidated Net Leverage Ratio shall become effective as of the first Business Day immediately following the date a Compliance Certificate is delivered pursuant to Section 6.02(b); provided, however, that if a Compliance Certificate is not delivered when due in accordance with such Section, then, upon the request of the Required Revolving Lenders, Pricing Tier 1 of the then-applicable pricing table above shall apply as of the first Business Day after the date on which such Compliance Certificate was required to have been delivered and shall remain in effect until the first Business Day immediately following the date on which such Compliance Certificate is delivered in accordance with Section 6.02(b), whereupon the Applicable Rate shall be adjusted based upon the calculation of the Consolidated Net Leverage Ratio contained in such Compliance Certificate. Notwithstanding anything to the contrary contained in this definition, the determination of the Applicable Rate for any period shall be subject to the provisions of Section 2.10(b).

"Applicable Revolving Credit Percentage" means with respect to any Revolving Credit Lender at any time, such Revolving Credit Lender's Applicable Percentage in respect of the Revolving Credit Facility at such time.

"Appropriate Lender" means, at any time, (a) with respect to any of the 2021 Replacement Term Facility, the 2023 Term Facility, the Revolving Credit Facility or any Incremental Facility, a Lender that has a Commitment with respect to such Facility or holds any Loans under such Facility, respectively, at such time, (b) with respect to the Letter of Credit Sublimit, (i) the L/C Issuers and (ii) if any Letters of Credit have been issued pursuant to Section 2.03(a), the Revolving Credit Lenders and (c) with respect to

the Swing Line Sublimit, (i) the Swing Line Lender and (ii) if any Swing Line Loans are outstanding pursuant to Section 2.04(a), the Revolving Credit Lenders.

"Approved Bank" has the meaning specified in the definition of "Cash Equivalents".

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Arrangers" means Bank of America, N.A., Truist Securities, Inc., U.S. Bank National Association, Citizens Capital Markets, Inc., Fifth Third Bank, National Association and Regions Capital Markets, a division of Regions Bank, in each case, in its capacity as a joint lead arranger and a joint bookrunner; provided that for purposes of Section 11.04, such term shall also include all "Arrangers" under and as defined in the Existing Credit Agreement.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit 11.06(b) or any other form (including electronic documentation generated by use of an electronic platform) approved by the Administrative Agent.

"Attributable Indebtedness" means, with respect to any Person on any date, (a) in respect of any capital lease, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease, (c) in respect of any Securitization Transaction, the outstanding principal amount of such financing, after taking into account reserve accounts and making appropriate adjustments, determined by the Administrative Agent in its reasonable judgment and (d) in respect of any Sale and Leaseback Transaction, the present value (discounted in accordance with GAAP at the debt rate implied in the applicable lease) of the obligations of the lessee for rental payments during the term of such lease.

"Audited Financial Statements" means the audited consolidated balance sheet of the Borrower and its Subsidiaries for the fiscal year ended December 31, 2022, and the related consolidated statements of income or operations, shareholders' equity and cash flows of the Borrower and its Subsidiaries for such fiscal year, including the notes thereto.

"Auto-Extension Letter of Credit" has the meaning specified in Section 2.03(b).

"Availability Period" means, in respect of the Revolving Credit Facility, the period from and including the First Restatement Date to the earliest of (i) the Maturity Date for the Revolving Credit Facility, (ii) the date of termination of the Revolving Credit Commitments pursuant to Section 2.06, and (iii) the date of termination of the commitment of each Revolving Credit Lender to make Revolving Credit Loans and of the obligation of the L/C Issuers to make L/C Credit Extensions pursuant to Section 8.02.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks,

7

investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bank of America" means Bank of America, N.A. and its successors.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor statute thereto.

"Bankruptcy Court" has the meaning specified in the definition of "Elixir Acquisition Requirements".

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 0.50%, (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate" and (c) Term SOFR plus 1.0%; provided, if the Base Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement. The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such "prime rate" announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change. If the Base Rate is being used as an alternate rate of interest pursuant to Section 3.03 hereof, then the Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Internal Revenue Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Internal Revenue Code) the assets of any such "employee benefit plan" or "plan".

"BHC Act Affiliate" has the meaning specified in Section 11.22.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowing" means Loans of the same Class and Type, made, issued, converted or continued on the same date and, in the case of Term SOFR Loans, as to which a single Interest Period is in effect.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located.

"Capital Expenditures" means, with respect to any Person for any period, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset (excluding normal replacements and maintenance which are properly charged to current operations). For purposes of this definition, the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount

by which such purchase price exceeds the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such insurance proceeds, as the case may be.

"<u>Cash Collateralize</u>" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of one or more of the L/C Issuers or Swing Line Lender (as applicable) and the Lenders, as collateral for L/C Obligations, Obligations in respect of Swing Line Loans, or obligations of Lenders to fund participations in respect of L/C Obligations or Swing Line Loans (as the context may require), cash or deposit account balances or, if the Administrative Agent, the L/C Issuers or Swing Line Lender shall agree in their sole discretion, other credit support, in each case pursuant to documentation in form and substance satisfactory to the Administrative Agent, the L/C Issuers and Swing Line Lender.  "<u>Cash Collateral</u>" and "<u>Cash Collateralization</u>" shall have the respective meanings correlative to the foregoing and shall include the proceeds of such Cash Collateral and other credit support.

"<u>Cash Equivalents</u>" means, as at any date, (a) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve months from the date of acquisition, (b) Dollar denominated time deposits and certificates of deposit of (i) any Lender, (ii) any domestic commercial bank of recognized standing having capital and surplus in excess of $1,000,000,000 or (iii) any bank whose short term commercial paper rating from S&P is at least A-1 or the equivalent thereof or from Moody's is at least P-1 or the equivalent thereof (any such bank being an "<u>Approved Bank</u>"), in each case with maturities of not more than 180 days from the date of acquisition, (c) commercial paper issued by any Approved Bank (or by the parent company thereof) or any variable rate notes issued by, or guaranteed by, any domestic corporation rated A-1 (or the equivalent thereof) or better by S&P or P-1 (or the equivalent thereof) or better by Moody's and maturing within six months of the date of acquisition, (d) repurchase agreements entered into by any Person with a bank or trust company (including any of the Lenders) or recognized securities dealer having capital and surplus in excess of $1,000,000,000 for direct obligations issued by or fully guaranteed by the United States in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations, and (e) investments, classified in accordance with GAAP as current assets, in money market investment programs registered under the Investment Company Act of 1940 which are administered by reputable financial institutions having capital of at least $1,000,000,000 and the portfolios of which are limited to Investments of the character described in the foregoing subdivisions (a) through (d).

"<u>Cash Management Agreement</u>" means any agreement that is not prohibited by the terms hereof to provide treasury or cash management services, including deposit accounts, overnight draft, credit cards, debit cards, p-cards (including purchasing cards and commercial cards), funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services.

"<u>Cash Management Bank</u>" means any Person that (a) at the time it enters into a Cash Management Agreement, is a Lender or the Administrative Agent or an Affiliate of a Lender or the Administrative Agent, (b) in the case of any Cash Management Agreement in effect on or prior to the Closing Date, is, as of the Closing Date or within 30 days thereafter, a Lender or the Administrative Agent or an Affiliate of a Lender or the Administrative Agent and a party to a Cash Management Agreement or (c) within 30 days after the time it enters into the applicable Cash Management Agreement, becomes a Lender, the Administrative Agent or an Affiliate of a Lender or the Administrative Agent, in each case, in its capacity as a party to such Cash Management Agreement.

"<u>Change in Law</u>" means the occurrence, after the Closing Date, of any of the following:  (a) the adoption or taking effect of any Law, (b) any change in any Law or in the administration, interpretation,

implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of Law) by any Governmental Authority; <u>provided</u> that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith or in the implementation thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, implemented or issued.

"Change of Control" means an event or series of events by which:

(a)    the Permitted Investors shall cease to own and control, legally and beneficially, directly or indirectly, outstanding Equity Interests of Holdings representing more than 65% of the combined voting power of all Equity Interests entitled to vote for members of the board of directors or equivalent governing body of Holdings on a fully diluted basis; or

(b)    Holdings shall cease to (i) own and control, of record and beneficially, directly 100% of the outstanding Equity Interests of the Borrower or (ii) have the ability to elect all of the board of directors or equivalent governing body of the Borrower; or

(c)    the Permitted Investors shall cease to own and control, legally and beneficially, directly or indirectly, outstanding Equity Interests of any Non-Subsidiary Loan Party (but only to the extent that such Non-Subsidiary Loan Party is not owned directly by another Loan Party), representing more than 65% of the combined voting power of all Equity Interests entitled to vote for members of the board of directors or equivalent governing body of such Non-Subsidiary Loan Party on a fully diluted basis.

"Chapter 11 Case" has the meaning specified in the definition of "Elixir Acquisition Requirements".

"Class" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Credit Loans, 2021 Replacement Term Loans, 2023 Term Loans or Incremental Term Loans and, (b) any Commitment, refers to whether such Commitment is a Revolving Credit Commitment, 2021 Replacement Term Loan Commitment, 2023 Term Loan Commitment or Incremental Term Loan Commitment.

"Closing Date" means July 29, 2016.

"CME" means CME Group Benchmark Administration Limited.

"Collateral" means a collective reference to all property with respect to which Liens in favor of the Administrative Agent, for the benefit of itself and the other Secured Parties, are purported to be granted pursuant to and in accordance with the terms of the Collateral Documents.

"Collateral Documents" means a collective reference to the Security Agreement and other security documents as may be executed and delivered by any Loan Party pursuant to the terms of Section 6.14 or any of the Loan Documents.

"Commitment" means a 2021 Replacement Term Loan Commitment, a Revolving Credit Commitment, a 2023 Term Loan Commitment, or an Incremental Commitment, as the context may require.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), as amended from time to time, and any successor statute.

"Communication" means this Agreement, any Loan Document and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to any Loan Document.

"Compliance Certificate" means a certificate substantially in the form of Exhibit 6.02.

"Conforming Changes" means, with respect to the use, administration or any conventions associated with SOFR, any proposed Successor Rate or Term SOFR, as applicable, any conforming changes to the definitions of "Base Rate", "SOFR", "Term SOFR", "Interest Period", "Interest Payment Date", timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definitions of "Business Day" and "U.S. Government Securities Business Day", timing of borrowing requests or prepayment, conversion or continuation notices and length of lookback periods) as may be appropriate, in the discretion of the Administrative Agent, to reflect the adoption and implementation of such applicable rate(s) and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such rate exists, in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement and any other Loan Document).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consent Fee" has the meaning specified in Section 2.09(c).

"Consenting Lenders" has the meaning specified in the recitals.

"Consolidated EBITDA" means, for any period, for the Loan Parties and their respective Subsidiaries on a combined basis, an amount equal to Consolidated Net Income for such period plus the following to the extent deducted in calculating such Consolidated Net Income:  (a) Consolidated Interest Charges for such period; (b) the provision for federal, state, local and foreign income taxes payable for such period; (c) depreciation and amortization expense for such period; (d) "run rate" cost savings, operating expense reductions, other operating improvements and initiatives and synergies that are reasonably anticipated by the Borrower (as reasonably determined by the Borrower in good faith and certified by a Responsible Officer of the Borrower) to be realized after the Elixir Acquisition or any Permitted Acquisition within 12 months after such period, in each case, whether such action has been taken or is reasonably expected to be taken (which will be added to Consolidated EBITDA as so projected until fully realized and calculated on a Pro Forma Basis as though such synergies, cost savings, operating expense reductions, other operating improvements and initiatives had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions; provided, that amounts added back to Consolidated EBITDA pursuant to this clause (d) shall not, in the aggregate, exceed 20% of Consolidated EBITDA for any four fiscal quarter period (determined after giving effect thereto); (e) non-cash charges and losses for such period (excluding any such non-cash charges or losses to the extent (i) there were cash charges with respect to such charges and losses in past accounting periods, (ii) there is a reasonable expectation that there will be cash charges with respect to such charges and losses in future accounting periods or (iii) such charges or losses relate to the write-down of current assets or inventory); and (f)(i) charges, costs and expenses paid in cash for severance, restructuring, retention and recruiting, opening and/or closing offices and (ii) accounting, legal and other professional services fees and expenses in connection with (x) the entering into this Agreement or (y) entering into or

pursuing the Elixir Acquisition or any Permitted Acquisition (whether or not consummated), in an aggregate amount for all such charges, costs and expenses under the foregoing clauses (i) and (ii)(y) not to exceed 10% of Consolidated EBITDA for such period (calculated without giving effect to this <u>clause (f)</u> and without giving effect to the <u>clause (d)</u> above); <u>provided</u> that a Responsible Officer of the Borrower shall have provided a reasonably detailed statement or schedule of such charges, costs and expenses; <u>minus</u> the aggregate amount of all non-cash items increasing Consolidated Net Income (other than to the extent (i) there were cash receipts with respect to such items in past accounting periods, (ii) there is a reasonable expectation that there will be cash receipts with respect to such items within the following 12 months, and including in future accounting periods or (iii) representing the accrual of revenue or recording of receivables in the ordinary course of business, in each case without duplication of such amounts included in other periods) for such period.

"<u>Consolidated First Lien Indebtedness</u>" means Consolidated Funded Indebtedness that is secured by Liens on assets of the Loan Parties or any of their respective Subsidiaries (including, without limitation, any Collateral) that do not rank junior in priority to the Liens on the Collateral securing the Obligations.

"<u>Consolidated Funded Indebtedness</u>" means, as of any date of determination with respect to the Loan Parties and their respective Subsidiaries on a combined basis, without duplication, the sum of: (a) all obligations for borrowed money (including the Obligations) and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (b) the maximum amount available to be drawn under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments; (c) all obligations in respect of the deferred purchase price of property or services, including earnouts and other similar contingent payment obligations (other than trade accounts payable in the ordinary course of business); (d) indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned by a Loan Party or a Subsidiary (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Loan Party or such Subsidiary or is limited in recourse; (e) all Attributable Indebtedness; (f) all obligations to purchase, redeem, retire, defease or otherwise make any payment (other than payments consisting solely of Equity Interests) prior to the Maturity Date in respect of any Equity Interests or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference <u>plus</u> accrued and unpaid dividends; (g) all Guarantees with respect to Indebtedness of the types specified in clauses (a) through (f) above of another Person; and (h) all Indebtedness of the types referred to in clauses through (g) above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which any Loan Party or any Subsidiary is a general partner or joint venturer, except to the extent that Indebtedness is expressly made non-recourse to such Person.

"<u>Consolidated Interest Charges</u>" means, for any period, for the Loan Parties and their respective Subsidiaries on a combined basis, the sum of (a) all interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, <u>plus</u> (b) the portion of rent expense with respect to such period under capital leases that is treated as interest in accordance with GAAP <u>plus</u> (c) the implied interest component of Synthetic Lease Obligations with respect to such period.

"<u>Consolidated Interest Coverage Ratio</u>" means, as of any date of determination, the ratio of (a) Consolidated EBITDA for the most recently completed four fiscal quarters of the Borrower to (b) Consolidated Interest Charges, for the most recently completed four fiscal quarters of the Borrower.

"<u>Consolidated Interest Coverage Ratio Event of Default</u>" has the meaning specified in <u>Section 8.01(b)</u>.

AMERICAS/2024053109.31

"Consolidated Net First Lien Leverage Ratio" means, as of any date of determination, the ratio of (a) the sum of (i) Consolidated First Lien Indebtedness as of such date minus (ii) up to $35,000,000 of Qualified Cash, to (b) Consolidated EBITDA for the most recently completed four fiscal quarters.

"Consolidated Net Income" means, for any period, for the Loan Parties and their respective Subsidiaries on a combined basis, net income (or loss) for such period; provided that Consolidated Net Income shall exclude (a) extraordinary gains and extraordinary losses for such period, (b) the net income of any Subsidiary during such period to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of such income is not permitted by operation of the terms of its Organization Documents or any agreement, instrument or Law applicable to such Subsidiary during such period, and (c) any income (or loss) for such period of any Person if such Person is not a Subsidiary, except that the Loan Parties' equity in the net income of any such Person for such period shall be included in Consolidated Net Income up to the aggregate amount of cash actually distributed by such Person during such period to a Loan Party or a Subsidiary as a dividend or other distribution (and in the case of a dividend or other distribution to a Subsidiary, such Subsidiary is not precluded from further distributing such amount to a Loan Party as described in clause (b) of this proviso).

"Consolidated Net Leverage Ratio" means, as of any date of determination, the ratio of (a) the sum of (i) Consolidated Funded Indebtedness as of such date minus (ii) up to $35,000,000 of Qualified Cash, to (b) Consolidated EBITDA for the most recently completed four fiscal quarters.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto. Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote 10% or more of the securities having ordinary voting power for the election of directors, managing general partners or the equivalent.

"Covered Entity" has the meaning specified in Section 11.22.

"Covered Party" has the meaning specified in Section 11.22.

"Credit Extension" means a Borrowing.

"Daily Simple SOFR" means the rate per annum equal to SOFR determined for any day pursuant to the definition thereof plus the SOFR Adjustment. Any change in Daily Simple SOFR shall be effective from and including the date of such change without further notice. If the rate as so determined would be less than 0.00%, such rate shall be deemed to be 0.00% for purposes of this Agreement.

"Debt Issuance" means the issuance by Holdings or any Subsidiary of any Indebtedness other than Indebtedness permitted under Section 7.03.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Debtors" means Rite Aid Corporation, a Delaware corporation, and its Subsidiaries and Affiliates that have commenced cases under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of New Jersey.

13

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means (a) with respect to any Obligation for which a rate is specified, a rate per annum equal to two percent (2%) in excess of the rate otherwise applicable thereto and (b) with respect to any Obligation for which a rate is not specified or available, a rate per annum equal to the Base Rate plus the Applicable Rate for 2023 Term Loans that are Base Rate Loans plus two percent (2%), in each case, to the fullest extent permitted by Applicable Law.

"Default Right" has the meaning specified in Section 11.22.

"Defaulting Lender" means, subject to Section 2.14(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, any L/C Issuer, the Swing Line Lender or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit or Swing Line Loans) within two Business Days of the date when due, (b) has notified the Borrower, the Administrative Agent, any L/C Issuer or the Swing Line Lender in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action, other than the Chapter 11 Case of Rite Aid Corporation, a Delaware corporation; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.14(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower, each L/C Issuer, the Swing Line Lender and each other Lender promptly following such determination.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"<u>Disposition</u>" or "<u>Dispose</u>" means the sale, transfer, license, lease or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise) of any property by Holdings or any Subsidiary, including any Sale and Leaseback Transaction, any issuance of Equity Interests by a Subsidiary of such Person, and any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, but excluding any Recovery Event.

"<u>Dividing Person</u>" has the meaning assigned to it in the definition of "Division."

"<u>Division</u>" means the division of the assets, liabilities and/or obligations of a Person (the "<u>Dividing Person</u>") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"<u>Division Successor</u>" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division.  A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"<u>Dollar</u>" and "$" mean lawful money of the United States.

"<u>Domestic Subsidiary</u>" means any Subsidiary that is organized under the Laws of any state of the United States or the District of Columbia.

"<u>ECF Prepayment Percentage</u>" means, for any relevant Excess Cash Flow Period, (a) 50% if the Consolidated Net Leverage Ratio for the four fiscal quarter period ended as of the last day of such Excess Cash Flow Period is greater than 2.75 to 1.00, (b) 25% if the Consolidated Net Leverage Ratio for the four fiscal quarter period ended as of the last day of such Excess Cash Flow Period is less than or equal to 2.75 to 1.00 but greater than 2.50 to 1.00, and (c) 0% if the Consolidated Net Leverage Ratio for the four fiscal quarter period ended as of the last day of Excess Cash Flow Period year is less than or equal to 2.50 to 1.00.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Effective Yield</u>" means, as to any Indebtedness on any date of determination, the effective yield paid by the Borrower on such Indebtedness as reasonably determined by the Administrative Agent in a manner consistent with generally accepted financial practices, taking into account (a) the applicable interest rate margins (including, any credit spread or similar adjustment applicable thereto), (b) any interest rate "floors" (the effect of which floors shall be determined in a manner set forth in the proviso below and assuming that, if interest on such Indebtedness is calculated on the basis of a floating rate, that the "SOFR Adjustment" or similar component of such formula is included in the calculation of Effective

Yield), (c) any amendment to the relevant interest rate margins and interest rate floors prior to the applicable date of determination and (d) all fees, including upfront or similar fees or original issue discounts (amortized over the shorter of (x) the remaining Weighted Average Life to Maturity of such Indebtedness and (y) the four years following the date of incurrence thereof, and, if applicable, assuming any Revolving Credit Commitments were fully drawn) payable generally by or on behalf of the Borrower to Lenders or other institutions providing such Indebtedness, but excluding arrangement fees, structuring fees, commitment fees, underwriting fees, closing payments or other fees payable to any lead arranger, bookrunner, manager, agent or Person in a similar capacity (or their Affiliates) in connection with the commitments for or syndication of such Indebtedness and not payable to all Lenders, ticking fees accruing prior to the funding of such Indebtedness, consent or amendment fees for an amendment paid generally to consenting Lenders (and regardless of whether any such fees are paid to, or shared in whole or in part with, any Lender) and any other fees of the type not paid or payable generally by or on behalf of the Borrower to Lenders or other institutions in the syndication of such Indebtedness; provided that, with respect to any Indebtedness that includes a "floor", (A) to the extent that Term SOFR on the date that the Effective Yield is being calculated is less than such floor, the amount of such difference shall be deemed added to the interest rate margin for such Indebtedness for the purpose of calculating the Effective Yield and (B) to the extent that Term SOFR on the date that the Effective Yield is being calculated is greater than such floor, then the floor shall be disregarded in calculating the Effective Yield.

"Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Sections 11.06(b)(iii) and (v) (subject to such consents, if any, as may be required under Section 11.06(b)(i) and (iii)).

"Elixir Acquisition" means the Acquisition by the Borrower, directly or indirectly through any of its Subsidiaries that is a Loan Party, of the Elixir Acquisition Target.

"Elixir Acquisition Closing Date" means that date on which the Elixir Acquisition is consummated and the 2023 Term Loans are incurred by the Borrower.

"Elixir Acquisition Closing Date Paydown" has the meaning specified in the definition of "Elixir Acquisition Requirements".

"Elixir Acquisition Closing Date Purchase Price" means an aggregate amount equal to the "Term Loans Consideration Amount" as defined in the Elixir Purchase Agreement, which shall in no event exceed $567,500,000.

"Elixir Acquisition Closing Date Loan Amount" means an aggregate amount equal to the Elixir Acquisition Closing Date Purchase Price divided by 0.94.

"Elixir Acquisition Requirements" means, with respect to the Elixir Acquisition:

(a)      Representations and Warranties.

(i)      The representations and warranties of each Loan Party contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the Second Restatement Date (or in the case of any such representations and warranties that contain a materiality or Material Adverse Effect qualification, be true and correct in all respects as of each such date), on a Pro Forma Basis after giving effect to the consummation of the Elixir Acquisition and the incurrence of the 2023 Term Loans, except to the extent that such representations and

16

warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (or in the case of any such representations and warranties that contain a materiality or Material Adverse Effect qualification, be true and correct in all respects as of such earlier date).

(ii)     The Elixir Purchase Agreement Representations shall be true and correct to the extent required by the definition thereof in this Agreement (without any waiver by the Borrower or any of its Affiliates).

(iii)    The Specified Representations shall, (i) with respect to Specified Representations that contain a materiality or Material Adverse Effect qualification, be true and correct in all respects on and as of the date of the Elixir Acquisition Closing Date and (ii) with respect to Specified Representation that do not contain a materiality or Material Adverse Effect qualification, be true and correct in all material respects on and as of the Elixir Acquisition Closing Date, in each case, both before and after giving effect to the consummation of the Elixir Acquisition and the incurrence of the 2023 Term Loans, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (or in the case of any such representations and warranties that contain a materiality or Material Adverse Effect qualification, be true and correct in all respects as of such earlier date).

(b)     Default.

(i)     No Default shall exist or would result from the consummation of the Elixir Acquisition by the Borrower (or any of its Subsidiaries that is a party to the Elixir Purchase Agreement), on a Pro Forma Basis after giving effect to the consummation of the Elixir Acquisition and the incurrence of the 2023 Term Loans, as of the Second Restatement Date.

(ii)    No Specified Event of Default shall exist, or would result from the consummation of the Elixir Acquisition and the incurrence of the 2023 Term Loans.

(iii)   No "Material Adverse Effect" (as defined in the Elixir Purchase Agreement) shall have occurred.

(c)     Security Interests.    The Loan Parties shall have granted a first-priority security interest in substantially all assets of the Elixir Acquisition Target and, to the extent applicable, its Subsidiaries, to the extent required pursuant to Section 6.14 (without regard to any time periods set forth therein), and taken all other actions required pursuant to Section 6.14 with respect to such assets on the Elixir Acquisition Closing Date substantially concurrently therewith, including the delivery to the Administrative Agent the following (each in form and substance satisfactory to the Administrative Agent):

(i)     on the Elixir Acquisition Closing Date, to the extent applicable, a Joinder Agreement to this Agreement and the Security Agreement, executed and delivery by any entities constituting the Elixir Acquisition Target and each of its Subsidiaries (subject to the limitations set forth in Section 6.13 and Section 6.14, respectively);

(ii)    on the Elixir Acquisition Closing Date, UCC financing statements for each appropriate jurisdiction as is necessary, in the Administrative Agent's reasonable determination, to perfect the Administrative Agent's security interest in such Collateral;

17

(iii)    as soon as reasonably practicable, but in any event no later than five Business Days after the Elixir Acquisition Closing Date (or by such later date as the Administrative Agent shall agree to in its reasonable discretion without any requirement for Lender consent), to the extent applicable, all certificates evidencing any certificated Equity Interests in the Elixir Acquisition Target and its Subsidiaries required to be pledged to the Administrative Agent pursuant to the Security Agreement, together with duly executed in blank, undated stock powers attached thereto (unless, with respect to the pledged Equity Interests of any Foreign Subsidiary, such stock powers are deemed unnecessary by the Administrative Agent in its reasonable discretion under the Law of the jurisdiction of organization of such Person);

(iv)    as soon as reasonably practicable, but in any event no later than five Business Days after the Elixir Acquisition Closing Date (or by such later date as the Administrative Agent shall agree to in its reasonable discretion without any requirement for Lender consent), to the extent required to be delivered, filed, registered or recorded pursuant to the terms and conditions of the Collateral Documents, all instruments, documents and chattel paper in the possession of any of the Loan Parties relating to the Elixir Acquisition Target or, to the extent applicable, any Subsidiary thereof, together with allonges or assignments as may be necessary or appropriate to create and perfect the Administrative Agent's and the Lenders' security interest in the Collateral;

(v)    as soon as reasonably practicable, but in any event no later than five Business Days after the Elixir Acquisition Closing Date (or by such later date as the Administrative Agent shall agree to in its reasonable discretion without any requirement for Lender consent), duly executed notices of grant of security interest in the form required by the Security Agreement as are necessary, in the Administrative Agent's sole discretion, to perfect the Administrative Agent's security interest in the United States registered intellectual property of the Loan Parties; and

(vi)    as soon as reasonably practicable, but in any event no later than 30 days after the Elixir Acquisition Closing Date (or by such later date as the Administrative Agent shall agree to in its reasonable discretion without any requirement for Lender consent), duly executed control agreements in form and substance reasonably satisfactory to the Administrative Agent pursuant to which each of the Elixir Target and, to the extent applicable, its Subsidiaries (subject to the limitations set forth in Section 6.14) shall grant a first priority, perfected security interest in each of its Deposit Accounts and Securities Accounts (other than Excluded Accounts) (each as defined in the Security Agreement).

(d)    On or before the date of the Elixir Acquisition Closing Date, the United States bankruptcy court (the "Bankruptcy Court") in which the proceedings under Chapter 11 of the Bankruptcy Code with respect to the Elixir Acquisition are held (the "Chapter 11 Case") shall have entered a sale order with respect to the Elixir Acquisition Target (the "Sale Order"), with and such Sale Order shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties to the Elixir Purchase Agreement (unless such requirement shall be waived by the Required Lenders in accordance with Section 11.01), and the Sale Order shall have:

(i)    approved and authorized the Elixir Acquisition and the Elixir Purchase Agreement;

(ii)    approved and authorized the transfer of the Elixir Acquisition Target to the Borrower (or any Subsidiary thereof that is a party to, or permitted assignee and/or

designee under, the Elixir Purchase Agreement that is designated as a purchaser thereunder) as purchaser under the Elixir Purchase Agreement, and vested the Borrower (or any Subsidiary thereof that is a party to the Elixir Purchase Agreement as a purchaser thereunder) with all right, title, and interest of the debtors that are Elixir Sellers in the relevant Chapter 11 Case (the "Relevant Debtors") in and to the Elixir Acquisition Target, free and clear of all Interests accruing or arising any time prior to the Elixir Acquisition Closing Date (other than those liabilities assumed and Interests permitted under the Elixir Purchase Agreement);

(iii)    approved and authorized the assignment of the assumed contracts relating to the Elixir Acquisition Target to the Borrower (or any Subsidiary thereof that is a party to, or permitted assignee and/or designee under, the Elixir Purchase Agreement that is designated as a purchaser thereunder) such that each of them will be in full force and effect from and after the Elixir Acquisition Closing Date with the counterparties thereto being barred and enjoined from asserting against the purchaser under the Elixir Purchase Agreement or any of its Affiliates, among other things, defaults, breaches or claims of pecuniary losses existing as of the Elixir Acquisition Closing Date or by reason of the consummation of the Elixir Acquisition, other than certain assumed liabilities; and

(iv)    found that the Borrower as purchaser under the Elixir Purchase Agreement (or any Subsidiary thereof that is a party to, or permitted assignee and/or designee under, the Elixir Purchase Agreement that is designated as a purchaser thereunder) is a good faith purchaser, entitled to the protections under Section 363(m) of the Bankruptcy Code.

(e)    The Borrower (or any Subsidiary thereof that is a party to, or permitted assignee and/or designee under, the Elixir Purchase Agreement that is designated as a purchaser thereunder) shall not have agreed to waive any of the requirements set forth in Sections 7.1(b) or 7.1(c) of the Elixir Purchase Agreement.

(f)    The deadline to bring any appeal of the Sale Order shall have passed, the Borrower shall have had adequate time to review the merits of any pending appeals, the Borrower shall have evaluated the potential effects of any appeal on and under the Elixir Acquisition Target, the Elixir Purchase Agreement and the Sale Order, and the Borrower shall have provided copies of the Sale Order, and any filed appeals thereof, to the Administrative Agent.

(g)    The Elixir Acquisition shall be consummated in all material respects in accordance with the terms of the Elixir Purchase Agreement.

(h)    The Borrower shall have made a voluntary prepayment (the "Elixir Acquisition Closing Date Paydown") of 2021 Replacement Term Loans to the Administrative Agent pursuant to Section 2.05(a), for the ratable account of each of the 2021 Replacement Term Lenders, in the principal amount of $25,000,000, along with all interest accrued and unpaid thereon through and including the Elixir Acquisition Closing Date (it being understood and agreed that the Borrower shall not be required to deliver any Notice of Loan Prepayment to the Administrative Agent pursuant to Section 2.05(a) with respect to the Elixir Acquisition Closing Date Paydown).

(i)    The Borrower shall have paid the Consent Fee in accordance with Section 2.09(c).

(j)    The Borrower shall have paid to the Administrative Agent, for the respective account of the applicable Arrangers and Lenders, any and all other fees required to be paid on the Elixir Acquisition Closing Date.

19

"Elixir Acquisition Target" means all of the "Acquired Assets", as such term is defined in the Elixir Purchase Agreement.

"Elixir Purchase Agreement" means that certain Asset Purchase Agreement, dated as of October 15, 2023 (the "Original Execution Date") (as amended on or prior to the Second Restatement Date, and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time to the extent permitted under the terms of this Agreement), by and among MedImpact Healthcare Systems, Inc., a California corporation, as purchaser, the Borrower, as guarantor, and Hunter Lane, LLC, a Delaware limited liability company (as in existence on October 15, 2023, as a debtor-in-possession and a reorganized debtor, as applicable, "Elixir") and the Subsidiaries of Elixir that are indicated on the signature pages thereto (together with Elixir, each an "Elixir Seller" and collectively the "Elixir Sellers"), governing the Elixir Acquisition.

"Elixir Purchase Agreement Representations" means, with respect to the Elixir Acquisition, the representations and warranties made by (or, where applicable, relating to) the Elixir Sellers, the Elixir Acquisition Target and/or its subsidiaries, and their respective businesses in the Elixir Purchase Agreement (but only with respect to those representations and warranties that are material to the interests of the Lenders, and only to the extent that the Borrower (or any of its Affiliates that is a party to the Elixir Purchase Agreement) has the right (determined without regard to any notice requirement) to terminate its obligations (or otherwise decline to consummate the Elixir Acquisition) under the Elixir Purchase Agreement without liability to the Borrower or any of its Affiliates in accordance with the terms thereof as a result of a breach of such representations and warranties in the Elixir Purchase Agreement.

"Elixir Seller" has the meaning specified in the definition of "Elixir Purchase Agreement".

"Elixir Termination Date" means the earliest date on which both of the following events shall have occurred: (a) the Elixir Purchase Agreement shall have been terminated without the consummation of the Elixir Acquisition; and (b) the 2023 Term Loan Availability Period shall have ended without the incurrence of any 2023 Term Loans.

"Environmental Laws" means any and all federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Loan Party or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Internal Revenue Code (and Sections 414(m) and (o) of the Internal Revenue Code for purposes of provisions relating to Section 412 of the Internal Revenue Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is insolvent; (d) the filing of a notice of intent to terminate or the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA, (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Internal Revenue Code or Sections 303, 304 and 305 of ERISA, (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate or (i) a failure by the Borrower or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules in respect of a Pension Plan, whether or not waived, or the failure by the Borrower or any ERISA Affiliate to make any required contribution to a Multiemployer Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified in Section 8.01.

"Excess Cash Flow" means, for any Excess Cash Flow Period, an amount equal to:

(a)      Consolidated EBITDA for such Excess Cash Flow Period; minus

(b)      the sum (for such Excess Cash Flow Period) of, without duplication of any adjustments made pursuant to the definition of Consolidated EBITDA or this definition of Excess Cash Flow:

(i)      Consolidated Interest Charges actually paid in cash by the Loan Parties and their respective Subsidiaries;

(ii)      all principal amortization payments, voluntary prepayments, mandatory prepayments and mandatory repayments of principal in respect of the Term Loans, and all voluntary or mandatory prepayments and mandatory repayments of principal in respect of the Revolving Credit Loans (to the extent the applicable Revolving Credit Commitments are permanently reduced by the amount of such payments) and any other permitted Indebtedness secured by Liens on the Collateral on a *pari passu* basis or senior basis to the Liens on the Collateral (provided that, in the case of loans under a revolving credit facility, the applicable commitments are permanently reduced by the amount of such payments), together with the amount of any premium, make-whole, breakage or penalty applicable with respect thereto to the extent not deducted in calculating Consolidated EBITDA, in each case, to the extent actually made during such Excess Cash Flow Period (or, at the option of the Borrower, after the end of applicable Excess Cash Flow Period but prior to the relevant prepayment date, without duplication in the

21

next Excess Cash Flow Period) and to the extent not financed with the proceeds of long-term Indebtedness or Revolving Credit Loans;

(iii)    all taxes and tax distributions actually paid in cash by the Loan Parties and their respective Subsidiaries during such Excess Cash Flow Period;

(iv)    Capital Expenditures actually made and paid in cash by the Loan Parties and their respective Subsidiaries during such Excess Cash Flow Period (or, at the option of the Borrower, after the end of the applicable Excess Cash Flow Period but prior to the relevant prepayment date, without duplication in the next Excess Cash Flow Period) and to the extent not financed with the proceeds of long-term Indebtedness or Revolving Credit Loans; and

(v)    all payments made in respect of Permitted Acquisitions and other Investments not prohibited hereunder, in each case, to the extent actually paid in cash by the Loan Parties and their respective Subsidiaries during such Excess Cash Flow Period (including without limitation contingent consideration, earn-out payments, non-compete payments, consulting payments and deferred purchase price payments and related fees, costs and expenses) and to the extent not financed with the proceeds of long-term Indebtedness or Revolving Credit Loans (or, at the option of the Borrower, after the end of applicable Excess Cash Flow Period but prior to the relevant prepayment date, without duplication in the next Excess Cash Flow Period).

"Excess Cash Flow Period" means each fiscal year of the Borrower beginning with the fiscal year ending on or about December 31, 2024.

"Excluded Property" means, with respect to any Loan Party, (a) any owned or leased real property, unless requested by the Administrative Agent or the Required Lenders (b) unless requested by the Administrative Agent or the Required Lenders, any IP Rights for which a perfected Lien thereon is not effected either by filing of a Uniform Commercial Code financing statement or by appropriate evidence of such Lien being filed in either the United States Copyright Office or the United States Patent and Trademark Office, (c) unless requested by the Administrative Agent or the Required Lenders, any personal property (other than personal property described in clause (b) above) for which the attachment or perfection of a Lien thereon is not governed by the Uniform Commercial Code, (d) the Equity Interests of any direct Foreign Subsidiary of any Loan Party to the extent not required to be pledged to secure the Obligations pursuant to Section 6.14(a), (e) any property which, subject to the terms of Section 7.09, is subject to a Lien of the type described in Section 7.01(i) or 7.01(r) pursuant to documents which prohibit such Loan Party from granting any other Liens in such property and (f) any lease, license, contract or other agreement of a Loan Party if the grant of a security interest in such lease, license, contract or other agreement in the manner contemplated by the Loan Documents is prohibited under the terms of such lease, license, contract or other agreement or under Applicable Law or would result in default thereunder, the termination thereof or give the other parties thereto the right to terminate, accelerate or otherwise alter such Loan Party's rights, titles and interests thereunder (including upon the giving of notice or the lapse of time or both); provided that (i) any such limitation described in the foregoing clause (f) on the security interests granted under the Loan Documents shall only apply to the extent that any such prohibition could not be rendered ineffective pursuant to the UCC or any other Applicable Law (including Debtor Relief Laws) or principles of equity and (ii) in the event of the termination or elimination of any such prohibition or the requirement for any consent contained in such lease, license, contract or other agreement or Applicable Law to the extent sufficient to permit any such item to become Collateral, or upon the granting of any such consent, or waiving or terminating any requirement for such consent, a security interest in such lease, license, contract or other agreement shall no longer constitute Excluded Property.

"Excluded Subsidiary" means any Subsidiary that is prohibited by Requirements of Law from guaranteeing the Obligations (and for so long as such restrictions or any replacement or renewal thereof is

22

in effect), including any Subsidiary that is a regulated insurance company prohibited by Applicable Law from guaranteeing the Obligations.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant under a Loan Document by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act (or the application or official interpretation thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to Section 10.08 and any and all guarantees of such Guarantor's Swap Obligations by other Loan Parties) at the time the Guaranty of such Guarantor, or grant by such Guarantor of a security interest, becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply to only the portion of such Swap Obligation that is attributable to Swap Contracts for which such Guaranty or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the Laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a Law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 11.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.01(a)(ii), 3.01(a)(iii) or 3.01(c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(e) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Existing Collateral Documents" has the meaning specified in Section 1.08(c).

"Existing Credit Agreement" has the meaning specified in the recitals hereto.

"Extended Revolving Credit Commitment" means any Class of Revolving Credit Commitments the maturity of which shall have been extended pursuant to Section 2.16.

"Extended Revolving Loans" means any Revolving Loans made pursuant to the Extended Revolving Credit Commitments.

"Extended Term Loans" means any Class of Term Loans the maturity of which shall have been extended pursuant to Section 2.16.

"Extending Lender" means any Lender providing any Extended Revolving Loan or Extended Term Loan.

"Extension" has the meaning set forth in Section 2.16(a).

"Extension Amendment" means an amendment to this Agreement (which may, at the option of the Administrative Agent and the Borrower, be in the form of an amendment and restatement of this Agreement) among the Loan Parties, the applicable Extending Lenders, the Administrative Agent and, to

the extent required by Section 2.16, the L/C Issuers and/or the Swing Line Lender implementing an Extension in accordance with Section 2.16.

"Extension Offer" has the meaning specified in Section 2.16(a).

"Facility" means the 2021 Replacement Term Facility, 2023 Term Facility, any Incremental Term Facility, the Revolving Credit Facility, or any Incremental Revolving Credit Facility, as the context may require.

"Facility Termination Date" means the date as of which all of the following shall have occurred: (a) all Commitments have terminated and (b) all Obligations arising under the Loan Documents have been paid in full (other than contingent indemnification obligations).

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the Second Restatement Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by the Administrative Agent.

"Fee Letter" means the Amended and Restated Fee Letter, dated November 2, 2023, by and among, inter alios, the Borrower, BofA Securities, Inc. and Bank of America.

"Fifth Amendment" means that certain Fifth Amendment to Credit Agreement, dated as of March 15, 2021, by and among the Borrower, Holdings, the Guarantors party thereto, the Administrative Agent and the Lenders party thereto.

"First Restatement Date" means March 15, 2021.

"Foreign Lender" means (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the Laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.  For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Fourth Amendment" means that certain Fourth Amendment to Credit Agreement, dated as of the Fourth Amendment Effective Date, by and among the Borrower, Holdings, the Guarantors party thereto, the Administrative Agent and the Lenders party thereto.

"Fourth Amendment Effective Date" means August 25, 2020.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fronting Exposure" means, at any time there is a Defaulting Lender that is a Revolving Credit Lender, (a) with respect to any L/C Issuer, such Defaulting Lender's Applicable Percentage of the Revolving Credit Facility in respect of the outstanding L/C Obligations other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Revolving Credit Lenders or Cash Collateralized in accordance with the terms hereof, and (b) with respect to the Swing Line Lender, such Defaulting Lender's Applicable Percentage of Swing Line Loans other than Swing Line Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Revolving Credit Lenders in accordance with the terms hereof.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Group Loan Party" means Holdings, the Borrower or any Subsidiary of the Borrower that is a Loan Party.

"Group Non-Loan Party Subsidiary" means any Subsidiary of the Borrower that is not a Loan Party.

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means, collectively, (a) each Material Subsidiary identified as a "Guarantor" on the signature pages hereto, (b) Holdings, (c) each Non-Subsidiary Loan Party, (d) each Person that joins as a Guarantor pursuant to Section 6.13 or otherwise, (e) with respect to (i) Obligations under any Secured

25

Hedge Agreement, (ii) Obligations under any Secured Cash Management Agreement and (iii) any Swap Obligation of a Specified Loan Party (determined before giving effect to <u>Sections 10.01</u> and <u>10.08</u>) under the Guaranty, the Borrower, and (f) the successors and permitted assigns of the foregoing.

"<u>Guaranty</u>" means the Guaranty made by the Guarantors in favor of the Administrative Agent and the other holders of Obligations pursuant to <u>Article X</u>.

"<u>Hazardous Materials</u>" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"<u>Hedge Bank</u>" means any Person that (i) at the time it enters into a Swap Contract, is a Lender or the Administrative Agent or an Affiliate of a Lender or the Administrative Agent or a Permitted Hedge Counterparty, (ii) in the case of any Swap Contract in effect on or prior to the Closing Date, is, as of the Closing Date or within 30 days thereafter, a Lender or the Administrative Agent or an Affiliate of a Lender or the Administrative Agent and a party to a Swap Contract or (iii) within 30 days after the time it enters into the applicable Swap Contract, becomes a Lender, the Administrative Agent or an Affiliate of a Lender or the Administrative Agent, in each case, in its capacity as a party to such Swap Contract; <u>provided</u>, in the case of a Secured Hedge Agreement with a Person who is no longer a Lender (or Affiliate of a Lender), such Person shall be considered a Hedge Bank only through the stated termination date (without extension or renewal) of such Secured Hedge Agreement.

"<u>Holdings</u>" has the meaning specified in the introductory paragraph hereto.

"<u>IFRS</u>" means international accounting standards within the meaning of IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements delivered under or referred to herein.

"<u>Immaterial Subsidiary</u>" means any Domestic Subsidiary not designated by the Borrower as a Material Subsidiary, <u>provided</u>, that as of the end of any fiscal quarter, if Immaterial Subsidiaries (other than any Excluded Subsidiaries) in the aggregate contribute more than (x) 20% of Consolidated EBITDA as of the end of the period of the four fiscal quarters most recently ended for which the Borrower has delivered financial statements pursuant to <u>Section 6.01(a)</u> or <u>(b)</u> or (y) 20% of the total assets of the Loan Parties and their respective Subsidiaries on a combined basis as of the end of the fiscal year most recently ended for which the Borrower has delivered financial statements pursuant to <u>Section 6.01(a)</u>, then the Borrower shall designate one or more Domestic Subsidiaries as a Material Subsidiary and cause such Domestic Subsidiaries to become Guarantors in accordance with <u>Section 6.13</u>, such that immediately thereafter the tests in clauses (x) and (y) above are satisfied.  Notwithstanding anything to the contrary herein, in no event may any Non-Subsidiary Loan Party or any of its Subsidiaries be designated an Immaterial Subsidiary.

"<u>Incremental Available Amount</u>" means, at any time, the Incremental Fixed Amount <u>plus</u> the Incremental Ratio Amount.

"<u>Incremental Commitments</u>" has the meaning assigned to it in <u>Section 2.15</u>.

"<u>Incremental Facilities</u>" has the meaning assigned to it in <u>Section 2.15</u>.

"<u>Incremental Fixed Amount</u>" means, at any time, (a) the greater of (x) $300,000,000 and (y) an amount equal to 100% of Consolidated EBITDA of the Loan Parties and their respective Subsidiaries calculated on a Pro Forma Basis for the four fiscal quarters most recently ended for which the Borrower has delivered financial statements pursuant to <u>Section 6.01(a)</u> or <u>(b), minus</u> (b) the aggregate principal

AMERICAS/2024053109.31

amount outstanding at such time of all Incremental Loans and Incremental Commitments incurred or issued in reliance on the Incremental Fixed Amount.

"Incremental Loans" means Incremental Revolving Credit Loans or Incremental Term Loans.

"Incremental Ratio Amount" means an aggregate principal amount such that, immediately after giving effect to the incurrence of the relevant Incremental Facilities (and (x) treating any Incremental Commitments being so incurred as fully drawn for purposes of such calculation and (y) treating any unsecured Incremental Facilities being so incurred as Consolidated First Lien Indebtedness for purposes of testing the Incremental Ratio Amount), the use of proceeds thereof and any related pro forma adjustment thereto, the Loan Parties' Consolidated Net First Lien Leverage Ratio equals 2.00 to 1.00, calculated on a Pro Forma Basis as of the last day of the most recently ended fiscal quarter for which financial statements have been delivered.

"Incremental Revolving Credit Commitments" has the meaning assigned to it in Section 2.15.

"Incremental Revolving Credit Facility" has the meaning assigned to it in Section 2.15.

"Incremental Revolving Credit Loans" means any loans made pursuant to an Incremental Revolving Credit Facility.

"Incremental Term Commitments" has the meaning assigned to it in Section 2.15.

"Incremental Term Facility" has the meaning assigned to it in Section 2.15.

"Incremental Term Loan" means any loans made pursuant to an Incremental Term Facility.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount available to be drawn under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    the Swap Termination Value of any Swap Contract;

(d)    all obligations to pay the deferred purchase price of property or services, including earnouts and other similar contingent payment obligations (other than trade accounts payable in the ordinary course of business);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness;

(g)    all obligations to purchase, redeem, retire, defease or otherwise make any payment prior to the Maturity Date in respect of any Equity Interests or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends;

27

(h)      all Guarantees of such Person in respect of any of the foregoing; and

(i)      all Indebtedness of the types referred to in clauses (a) through (h) above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 11.04(b).

"Information" has the meaning specified in Section 11.07.

"Interest Payment Date" means (a) as to any Term SOFR Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Facility under which such Loan was made; provided, however, that if any Interest Period for a Term SOFR Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan or Swing Line Loan, the last Business Day of each March, June, September and December and the Maturity Date of the Facility under which such Loan was made (with Swing Line Loans being deemed made under the Revolving Credit Facility for purposes of this definition).

"Interest Period" means, as to each Term SOFR Loan, the period commencing on the date such Term SOFR Loan is disbursed or converted to or continued as a Term SOFR Loan and ending on the date one, three or six months thereafter (in each case, subject to availability), as selected by the Borrower in its Loan Notice (subject to the penultimate sentence of Section 2.01(b)); provided that:

(a)      any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)      any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)      no Interest Period shall extend beyond the Maturity Date.

"Interests" means all of the following, in each case, to the extent against or with respect to the Relevant Debtors, or in, on, or against, or with respect to the Elixir Acquisition Target:

(a)      encumbrances, charges, liens (whether consensual, statutory, possessory, judicial, or otherwise), claims, mortgages, leases, subleases, licenses, hypothecations, deeds of trust, pledges, levies, security interests or similar interest, title defect, options, hypothecations, rights of use or possession, rights of first offer or first refusal (or any other type of preferential arrangement), profit sharing interests, rights of consent, rights of setoff, statutory claims or rights of rights of recovery, restrictive covenants, encroachments, servitude, restrictions on transferability of any type, charge, easement, right of way, restrictive covenant, transfer restriction under any shareholder agreement, judgment, conditional sale or other title retention agreement, any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Relevant Debtors' or the Borrower's (or any Affiliate thereof that is a party to the Elixir Purchase

28

Agreement) interest in the Elixir Acquisition Target, or any similar rights, or other imposition, imperfection or defect of title or restriction on transfer or use of any nature whatsoever;

(b)      whether arising prior to or subsequent to the commencement of the applicable Chapter 11 Case, any and all claims as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, causes of actions, payments and rights to payment, charges, judgments, assessments, losses, monetary damages, penalties, fines, fees, interest obligations, deficiencies, debts, obligations, costs and expenses and other liabilities (whether absolute, accrued, contingent, fixed, unliquidated or otherwise, or whether known or unknown, or due or to become due or otherwise), including, without limitation: (1) any and all claims or causes of action based on or arising under any labor, employment or pension laws, labor or employment agreements, including any employee claims related to worker's compensation, occupational disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, I the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code and of any similar state law (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Relevant Debtors or any of their predecessors, or (l) the WARN Act (29 U.S.C. §§ 2101 et seq.); (2) any rights under any pension or multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Relevant Debtors or any multiemployer plan to which the Relevant Debtors have at any time contributed to or had any liability or potential liability; (3) any and all claims or causes of action based upon or relating to any putative successor or transferee liability; (4) any rights related to intercompany loans and receivables between the Relevant Debtors and any subsidiary or affiliate of the Elixir Sellers that is not a Relevant Debtor; (5) any assets or liabilities of the Elixir Sellers excluded from the sale by the terms of the Elixir Purchase Agreement; (6) any and all claims or causes of action based upon or relating to any unexpired and executory contract or unexpired lease that is not a contract that will be assumed and assigned pursuant to the applicable Sale Order and the Elixir Purchase Agreement; (7) any and all claims or causes of action based upon or relating to any bulk sales, transfer taxes or similar law; (8) any and all claims or causes of action based upon or relating to any tax statutes or ordinances, including, without limitation, the Internal Revenue Code, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Relevant Debtors' assets prior to the consummation of the Elixir Acquisition, including, without limitation, any ad valorem taxes assessed by any applicable taxing authority; and (9) any and all other claims, causes of action, proceedings, warranties, guaranties, rights of recovery, setoff, recoupment, rights, remedies, obligations, liabilities, counterclaims, cross-claims, third party claims, demands, restrictions, responsibilities, or contribution, reimbursement, subrogation, or indemnification claims or liabilities based on or relating to any act or omission of any kind or nature whatsoever asserted against any of the Relevant Debtors or any of their respective affiliates, subsidiaries, directors, officers, agents, successors or assigns in connection with or relating to the Relevant Debtors, their operations, their business, their liabilities, the Relevant Debtors' marketing and bidding process with respect to the Elixir Acquisition Target contemplated by the Elixir Purchase Agreement; and

AMERICAS/2024053109.31

(c)      without limiting any of the foregoing, any other interest within the meaning of, and from which property may be sold free and clear, section 363(f) of the Bankruptcy Code (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the applicable Chapter 11 Case, and whether imposed by agreement, understanding, Applicable Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability.

"Internal Revenue Code" means the Internal Revenue Code of 1986.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, or (c) an Acquisition.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IP Rights" has the meaning specified in Section 5.17.

"IRS" means the United States Internal Revenue Service.

"ISDA Definitions" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"ISP" means the International Standby Practices, International Chamber of Commerce Publication No. 590 (or such later version thereof as may be in effect at the applicable time).

"Issuer Documents" means with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the L/C Issuer and the Borrower (or any other Loan Party or Subsidiary) or in favor of such L/C Issuer and relating to such Letter of Credit.

"Joinder Agreement" means a joinder agreement substantially in the form of Exhibit 6.13 executed and delivered by a Domestic Subsidiary in accordance with the provisions of Section 6.13 or any other documents as the Administrative Agent shall deem appropriate for such purpose.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of Law.

"L/C Advance" means, with respect to each Revolving Credit Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Applicable Revolving Credit Percentage.

"L/C Borrowing" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Revolving Credit Borrowing.

30

"<u>L/C Commitment</u>" means, with respect to each L/C Issuer, the commitment of such L/C Issuer to issue Letters of Credit hereunder.  The initial amount of each L/C Issuer's Letter of Credit Commitment is set forth on <u>Schedule 2.01(C)</u>, or if an L/C Issuer has entered into an Assignment and Assumption or has otherwise assumed a Letter of Credit Commitment after the Closing Date, the amount set forth for such L/C Issuer as its Letter of Credit Commitment in the Register maintained by the Administrative Agent.  The Letter of Credit Commitment of an L/C Issuer may be modified from time to time by agreement between such L/C Issuer and the Borrower, and notified to the Administrative Agent.

"<u>L/C Credit Extension</u>" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"<u>L/C Issuer</u>" means Bank of America, Truist Bank and U.S. Bank National Association and each other Lender (if any) as the Borrower may from time to time select as an L/C Issuer hereunder pursuant to <u>Section 2.03</u>; <u>provided</u> that such Lender has agreed to be an L/C Issuer.  Any L/C Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such L/C Issuer, in which case the term "L/C Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.  Each reference herein to the "L/C Issuer" in connection with a Letter of Credit or other matter shall be deemed to be a reference to the relevant L/C Issuer with respect thereto.

"<u>L/C Obligations</u>" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit <u>plus</u> the aggregate of all Unreimbursed Amounts, including all L/C Borrowings.  For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with <u>Section 1.06</u>.  For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"<u>LCA Election</u>" has the meaning specified in <u>Section 1.07(a)</u>.

"<u>LCA Test Date</u>" has the meaning specified in <u>Section 1.07(a)</u>.

"<u>Lender Party</u>" and "<u>Lender Recipient Party</u>" each mean, collectively, the Lenders, the Swing Line Lenders and the L/C Issuers.

"<u>Lenders</u>" means each of the Persons identified as a "Lender" on the signature pages hereto, each other Person that becomes a "Lender" in accordance with this Agreement and their successors and assigns, and includes the Swing Line Lender.

"<u>Lending Office</u>" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent, which office may include any Affiliate of such Lender or any domestic or foreign branch of such Lender or such affiliate.  Unless the context otherwise requires each reference to a Lender shall include its applicable Lending Office.

"<u>Letter of Credit</u>" means any standby letter of credit issued hereunder, providing for the payment of cash upon the honoring of a presentation thereunder.

"<u>Letter of Credit Application</u>" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the applicable L/C Issuer.

"<u>Letter of Credit Disbursement</u>" means a payment made by the L/C Issuer pursuant to a Letter of Credit.

"<u>Letter of Credit Fee</u>" has the meaning specified in <u>Section 2.03(i)</u>.

AMERICAS/2024053109.31

"<u>Letter of Credit Sublimit</u>" means an amount equal to $35,000,000.  The Letter of Credit Sublimit is part of, and not in addition to, the Revolving Credit Facility.

"<u>Lien</u>" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"<u>Limited Condition Acquisition</u>" has the meaning specified in <u>Section 1.07(a)</u>.

"<u>Loan</u>" means an extension of credit by a Lender to the Borrower under <u>Article II</u> or any Incremental Facility Amendment in the form of a Term Loan, a Revolving Credit Loan or a Swing Line Loan.

"<u>Loan Documents</u>" means this Agreement, including schedules and exhibits hereto, each Note, each Joinder Agreement, the Collateral Documents any amendments, modifications or supplements hereto or to any other Loan Document, and the Fee Letter (but specifically excluding Secured Hedge Agreements and any Secured Cash Management Agreements).

"<u>Loan Notice</u>" means a notice of (a) a Borrowing of a Term Loan, (b) a Revolving Credit Borrowing, (c) a conversion of Loans from one Type to the other, or (d) a continuation of Term SOFR Loans, in each case pursuant to <u>Section 2.02(a)</u>, which shall be substantially in the form of <u>Exhibit 2.02</u> or such other form as may be approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent) appropriately completed and signed by a Responsible Officer of the Borrower.

"<u>Loan Parties</u>" means, collectively, the Borrower and each Guarantor.

"<u>Lunaria</u>" means Lunaria Data Solutions Inc., a Delaware corporation.

"<u>Lunaria Audited Financial Statements</u>" means the audited consolidated balance sheet of Lunaria and its Subsidiaries for the fiscal year ended December 31, 2022, and the related consolidated statements of income or operations, shareholders' equity and cash flows of Lunaria and its Subsidiaries for such fiscal year, including the notes thereto.

"<u>Master Agreement</u>" has the meaning specified in the definition of "Swap Contract."

"<u>Material Adverse Effect</u>" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Loan Parties and their respective Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party.

"<u>Material Contract</u>" means, with respect to any Person, each contract to which such Person is a party involving aggregate consideration payable to or by such Person of $100,000,000 or more in any fiscal year of such Person or otherwise material to the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person.

"<u>Material Subsidiary</u>" means those Domestic Subsidiaries that the Borrower has designated as a "Material Subsidiary" in writing to the Administrative Agent; <u>provided</u>, that once a Domestic Subsidiary is designated as a Material Subsidiary, it shall not be redesignated as an Immaterial Subsidiary.

"<u>Maturity Date</u>" means: (i) with respect to the 2021 Replacement Term Loans, March 15, 2026; (ii) with respect to the 2023 Term Loans, March 31, 2028; <u>provided</u>, that the 2023 Term Loans shall instead mature on September 15, 2026 unless by no later than December 31, 2025 (x) either (A) the Maturity Date with respect to all then-remaining 2021 Replacement Term Loans shall have been extended to a date no earlier than September 30, 2027, or (B) all 2021 Replacement Term Loans shall have been repaid in full (together with any accrued but unpaid interest and any other fees owed to the 2021 Replacement Term Lenders); <u>and</u> (y) either (A) the Maturity Date with respect to the Revolving Credit Facility shall have been extended, or refinanced, in either case with a maturity date no earlier than September 30, 2027, or (B) the Revolving Credit Loans shall have been repaid in full and the Revolving Credit Commitments shall have been terminated; and (iii) with respect to the Revolving Credit Facility, March 15, 2026; <u>provided</u>, <u>however</u>, that, in each case, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"<u>Maximum 2023 Term Loan Amount</u>" has the meaning specified in the recitals.

"<u>Minimum Collateral Amount</u>" means, at any time, (i) with respect to Cash Collateral consisting of cash or deposit account balances, an amount equal to 103% of the Fronting Exposure of all L/C Issuers with respect to Letters of Credit issued and outstanding at such time and (ii) otherwise, an amount determined by the Administrative Agent and the L/C Issuers in their sole discretion.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and any successor thereto.

"<u>Multiemployer Plan</u>" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"<u>Multiple Employer Plan</u>" means a Plan which has two or more contributing sponsors (including the Borrower or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"<u>Net Cash Proceeds</u>" means the aggregate cash or Cash Equivalents proceeds received by any Loan Party or any Subsidiary in respect of any Disposition, Debt Issuance or Recovery Event, net of (a) direct costs incurred in connection therewith (including legal, accounting and investment banking fees, and sales commissions), (b) taxes paid or payable as a result thereof and (c) in the case of any Disposition or any Recovery Event, the amount necessary to retire any Indebtedness secured by a Permitted Lien (ranking senior or pari passu (to the extent such payment is permitted under any intercreditor agreement) to any Lien of the Administrative Agent) on the related property; it being understood that "Net Cash Proceeds" shall include any cash or Cash Equivalents received upon the sale or other disposition of any non-cash consideration received by any Loan Party or any Subsidiary in any Disposition, Debt Issuance or Recovery Event.

"<u>Non-Call Period</u>" means the period from and including the Elixir Acquisition Closing Date and ending on the date that is the first anniversary of the Elixir Acquisition Closing Date; <u>provided</u>, <u>however</u>, that if a timely Successful 2023 Term Loan Syndication has not occurred on or prior to the Reorganization Completion Date, then the "Non-Call Period" (x) shall exclude the period beginning on the Reorganization Completion Date and ending on the date that is six months after the Reorganization Completion Date (the corresponding date in the sixth following month, or the last day of such sixth following month if there is no corresponding month), and (y) shall end on the date that is the first anniversary of the Reorganization Completion Date.

"<u>Non-Consenting Lender</u>" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of <u>Section 11.01</u> and (b) has been approved by the Required Lenders.

33

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Extension Notice Date" has the meaning specified in Section 2.03(b).

"Non-Group Non-Loan Party Subsidiary" means any Subsidiary of a Non-Subsidiary Loan Party that is not a Loan Party.

"Non-Subsidiary Loan Parties" means, collectively, Lunaria, Prescient, Dividend Group, LLC, a Delaware limited liability company, and such of the respective Subsidiaries of each of the aforementioned that may be required to become Non-Subsidiary Loan Parties from time to time under the terms of this Agreement.

"Note" means a Term Note or a Revolving Credit Note, as the context may require.

"Notice of Loan Prepayment" means a notice of prepayment with respect to a Loan, which shall be substantially in the form of Exhibit 2.05 or such other form as may be approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Borrower.

"Obligations" means with respect to each Loan Party (i) all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit, and (ii) all obligations of any Loan Party or any Subsidiary owing to a Cash Management Bank or a Hedge Bank in respect of Secured Cash Management Agreements or Secured Hedge Agreements, in each case identified in clauses (i) and (ii) whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding; provided, however, that, without limiting the foregoing, the Obligations include (a) the obligation to pay principal, interest, Letter of Credit commissions, charges, expenses, fees, indemnities and other amounts payable by any Loan Party under any Loan Document, and (b) the obligation of the Loan Parties to reimburse any amount in respect of any of the foregoing that the Administrative Agent or any Lender, in each case in its sole discretion, may elect to pay or advance on behalf of the Loan Parties in accordance with the Loan Documents; provided further that the Obligations shall exclude any Excluded Swap Obligations.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement (or equivalent or comparable documents with respect to any non-U.S. jurisdiction); (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization (or equivalent or comparable documents with respect to any non-U.S. jurisdiction) and (d) with respect to all entities, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization (or equivalent or comparable documents with respect to any non-U.S. jurisdiction).

34

"<u>Original Execution Date</u>" has the meaning specified in the definition of Elixir Purchase Agreement.

"<u>Other Connection Taxes</u>" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"<u>Other Taxes</u>" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 3.06</u>).

"<u>Outstanding Amount</u>" means (a) with respect to Term Loans, Revolving Credit Loans and Swing Line Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Term Loans, Revolving Credit Loans and Swing Line Loans, as the case may be, occurring on such date; and (b) with respect to any L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by the Borrower of Unreimbursed Amounts.

"<u>Participant</u>" has the meaning specified in <u>Section 11.06(d)</u>.

"<u>Participant Register</u>" has the meaning specified in <u>Section 11.06(d)</u>.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation.

"<u>Pension Act</u>" means the Pension Protection Act of 2006.

"<u>Pension Funding Rules</u>" means the rules of the Internal Revenue Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Internal Revenue Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Internal Revenue Code and Sections 302, 303, 304 and 305 of ERISA.

"<u>Pension Plan</u>" means any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by the Borrower and any ERISA Affiliate or with respect to which the Borrower or any ERISA Affiliate has any liability and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Internal Revenue Code.

"<u>Permitted Acquisition</u>" means an Investment consisting of an Acquisition by any Loan Party or any Subsidiary, <u>provided</u>, that (a) no Default shall have occurred and be continuing or would result from such Acquisition; (b) the property acquired (or the property of the Person acquired) in such Acquisition is used or useful in the same or a similar line of business as the Borrower and its Subsidiaries were engaged in on the Second Restatement Date (or any reasonable extensions or expansions thereof); (c) in the case of an Acquisition of the Equity Interests of another Person, the board of directors (or other comparable governing body) of such other Person shall have duly approved such Acquisition; (d) the Borrower shall have delivered to the Administrative Agent a Pro Forma Compliance Certificate demonstrating that after giving effect to such transaction on a Pro Forma Basis: (i) the Loan Parties would be in compliance with

the financial covenants set forth in <u>Section 7.11</u> recomputed as of the end of the period of the four fiscal quarters most recently ended for which the Borrower has delivered financial statements pursuant to <u>Section 6.01(a)</u> or <u>(b)</u> and (ii) the Consolidated Net Leverage Ratio recomputed as of the end of the period of the four fiscal quarters most recently ended for which the Borrower has delivered financial statements pursuant to <u>Section 6.01(a)</u> or <u>(b)</u> would not exceed 3.00:1.0; (e) the representations and warranties made by the Loan Parties in each Loan Document shall be true and correct in all material respects at and as if made as of the date of such Acquisition (after giving effect thereto) (or in the case of any such representations and warranties that contain a materiality or Material Adverse Effect qualification, be true and correct in all respects at and as if made as of the date of such Acquisition, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (or in the case of any such representations and warranties that contain a materiality or Material Adverse Effect qualification, be true and correct in all respects as of such earlier date)); (f) if such transaction involves the purchase of an interest in a partnership between any Loan Party as a general partner and entities unaffiliated with the Borrower as the other partners, such transaction shall be effected by having such equity interest acquired by a corporate holding company directly or indirectly wholly owned by such Loan Party newly formed for the sole purpose of effecting such transaction; (g) in case of an Acquisition of Equity Interests of a Foreign Subsidiary, (i) within thirty days (or such later date as the Administrative Agent may agree in its sole discretion) after any Person, and any subsidiaries of such Person, becomes a Foreign Subsidiary (or, in the case of any subsidiary of such acquired Foreign Subsidiary, either a Foreign Subsidiary or a Domestic Subsidiary, as the case may be) (other than an Immaterial Subsidiary) of a Loan Party, the Loan Parties shall cause such Person(s) to, notwithstanding anything to the contrary in <u>Section 6.13</u> or otherwise herein (a) become a Guarantor by executing and delivering to the Administrative Agent a Joinder Agreement or such other documents as the Administrative Agent shall deem appropriate for such purpose, and (b) upon the request of the Administrative Agent in its sole discretion, deliver to the Administrative Agent such Organization Documents, resolutions and favorable opinions of counsel, all in form, content and scope reasonably satisfactory to the Administrative Agent, and (ii) such acquired Person, each subsidiary of such acquired Person, and any Loan Party which owns any Equity Interests in such acquired Person, shall comply with the provisions of <u>Section 6.14</u> as if each such acquired Person and its subsidiaries (whether Foreign Subsidiaries or Domestic Subsidiaries) were Domestic Subsidiaries (for the avoidance of doubt, notwithstanding anything to the contrary in <u>Section 6.14</u> or otherwise herein regarding Foreign Subsidiaries) (<u>provided</u>, that if the target of a Permitted Acquisition owns one or more subsidiaries that would constitute Foreign Subsidiaries if so acquired pursuant to an otherwise Permitted Acquisition (such subsidiaries, "<u>Foreign Target Subsidiaries</u>"), then such acquisition may constitute a Permitted Acquisition so long as the acquisition of those <u>Foreign</u> Target Subsidiaries (and their respective subsidiaries) is permitted pursuant to (and utilizes the Investments capacity set forth in) <u>Sections 7.02(i) and/or 7.02(k)</u>); and (h) in no event shall the acquisition of any Excluded Subsidiary constitute a Permitted Acquisition under this Agreement (<u>provided</u>, that if the target of a Permitted Acquisition owns one or more subsidiaries that would constitute Excluded Subsidiaries if so acquired pursuant to an otherwise Permitted Acquisition (such subsidiaries, "<u>Excluded Target Subsidiaries</u>"), then such acquisition may constitute a Permitted Acquisition so long as the acquisition of those Excluded Target Subsidiaries (and their respective subsidiaries) is permitted pursuant to (and utilizes the Investments capacity set forth in) <u>Section 7.02(k)</u>).

"<u>Permitted Hedge Counterparty</u>" means a counterparty that has entered into a Swap Contract with the Borrower approved by the Administrative Agent in its sole discretion not to be unreasonably withheld or delayed.

"<u>Permitted Investors</u>" means Frederick Howe and (a) any spouse, descendant or other immediate family member (which includes any child, stepchild, parent, stepparent, son-in-law or daughter-in-law) of such person, or (b) any estate, trust, corporation, partnership or other entity, the beneficiaries and

stockholders, partners or owners and beneficiaries of which consist solely of, and such entity is controlled by, Frederick Howe and one or more persons referred to in clause (a).

"Permitted Liens" means, at any time, Liens in respect of property of any Loan Party or any Subsidiary permitted to exist at such time pursuant to the terms of Section 7.01.

"Permitted Tax Distributions" means:

(a)    for any taxable period in which any Loan Party and/or any of its Subsidiaries is a member of a consolidated, combined or similar income tax group of which a direct or indirect parent of the Borrower is the common parent (a "Tax Group"), distributions by such Person to such direct or indirect parent of the Borrower to pay federal, foreign, state and local income Taxes of such Tax Group that are attributable to the taxable income of such Loan Party and/or its Subsidiaries; provided that, for each taxable period, the amount of such payments made in respect of such taxable period in the aggregate shall not exceed the amount that such Loan Party and its Subsidiaries would have been required to pay as a stand-alone Tax Group, reduced by any portion of such income Taxes directly paid by such Loan Party or any of its Subsidiaries; or

(b)    with respect to any taxable year (or portion thereof) with respect to which a Loan Party is a partnership or disregarded entity for U.S. federal, state and/or local income tax purposes, distributions to such Loan Party's direct owner(s) in an aggregate amount equal to the product of (i) the net taxable income of such Loan Party for such taxable year (or portion thereof), reduced by any cumulative net taxable loss with respect to all prior taxable years (or portions thereof) beginning after the date hereof (determined as if all such periods were one period) to the extent such cumulative net taxable loss is of a character (ordinary or capital) that would permit such loss to be deducted against the income of the taxable year in question (or portion thereof) and (ii) the highest combined marginal federal and applicable state and/or local income tax rate (taking into account, to the extent applicable, the deductibility of state and local income taxes for U.S. federal income tax purposes and the character of the taxable income in question (*i.e.,* long term capital gain, qualified dividend income, etc.)) applicable to any direct owner (or, if a direct owner is a pass-through entity, indirect owner) of such Loan Party for the taxable year in question (or portion thereof); provided that in the case of Non-Subsidiary Loan Parties, this clause (b) shall only apply to permit distributions to direct owners of such Loan Parties that are wholly owned directly or indirectly by a common parent of the Borrower.

"Permitted Transfers" means (a) Dispositions of inventory in the ordinary course of business; (b) Dispositions of property to any Loan Party or any Subsidiary; provided, that if the transferor of such property is (i) a Group Loan Party, then the transferee thereof must be a Group Loan Party, (ii) a Non-Subsidiary Loan Party, then the transferee thereof must be a Loan Party, and (iii) a Group Non-Loan Party Subsidiary, then the transferee must be a Group Loan Party or a Group Non-Loan Party Subsidiary; (c) Dispositions of delinquent accounts receivable in connection with the collection or compromise thereof; (d) Dispositions of machinery and equipment no longer used or useful in the conduct of business of the Loan Parties and their respective Subsidiaries that are Disposed of in the ordinary course of business; (e) non-exclusive licenses, sublicenses, leases or subleases granted to others not interfering in any material respect with the business of the Loan Parties and their respective Subsidiaries and, with respect to IP Rights, in the ordinary course of business and substantially consistent with past practice; (f) the sale or disposition of Cash Equivalents for fair market value; (g) Dispositions pursuant to contractual obligations existing at the time of, and acquired through the Elixir Acquisition or any Permitted Acquisition (in each case, so long as such contractual obligation existed prior to the consummation of the Elixir Acquisition or the applicable Permitted Acquisition, as applicable, and was not entered into in anticipation of the Elixir Acquisition or the applicable Permitted Acquisition, as applicable); and (h) to the extent constituting Dispositions, Investments in Immaterial Subsidiaries permitted under Section 7.02.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Plan</u>" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of the Borrower or any ERISA Affiliate or any such Plan to which the Borrower or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"<u>Platform</u>" has the meaning specified in <u>Section 6.02</u>.

"<u>Pre-Adjustment Successor Rate</u>" has the meaning specified in <u>Section 3.03(b)</u>.

"<u>Prescient</u>" means Prescient Holdings Group, LLC, a Delaware limited liability company.

"<u>Prescient Audited Financial Statements</u>" means the audited consolidated balance sheet of Prescient and its Subsidiaries for the fiscal year ended December 31, 2022, and the related consolidated statements of income or operations, shareholders' equity and cash flows of Prescient and its Subsidiaries for such fiscal year, including the notes thereto.

"<u>Pro Forma Basis</u>" means, with respect to any transaction, that for purposes of calculating the financial covenants set forth in <u>Section 7.11</u>, such transaction (including the incurrence of any Indebtedness therewith, and the application of the proceeds of such Indebtedness) shall be deemed to have occurred as of the first day of the most recent four fiscal quarter period preceding the date of such transaction for which financial statements were required to be delivered pursuant to <u>Section 6.01(a)</u> or <u>6.01(b)</u>.  In connection with the foregoing, (a) with respect to any Disposition or Recovery Event, (i) income statement and cash flows statement items (whether positive or negative) attributable to the property disposed of shall be excluded to the extent relating to any period occurring prior to the date of such transaction and (ii) Indebtedness which is retired shall be excluded and deemed to have been retired as of the first day of the applicable period and (b) with respect to any Acquisition, (i) income statement and cash flows statement items attributable to the Person or property acquired shall be included to the extent relating to any period applicable in such calculations to the extent (A) such items are not otherwise included in such income statement and cash flows statement items for the Loan Parties and their respective Subsidiaries in accordance with GAAP or in accordance with any defined terms set forth in <u>Section 1.01</u> and (B) such items are supported by financial statements or other information reasonably satisfactory to the Administrative Agent and (ii) any Indebtedness incurred or assumed by any Loan Party or any Subsidiary (including the Person or property acquired) in connection with such transaction and any Indebtedness of the Person or property acquired which is not retired in connection with such transaction (A) shall be deemed to have been incurred as of the first day of the applicable period and (B) if such Indebtedness has a floating or formula rate, shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate which is or would be in effect with respect to such Indebtedness as at the relevant date of determination.  In addition, for all purposes of this Agreement, any determination of Consolidated EBITDA that is made on a Pro Forma Basis giving effect to the Elixir Acquisition shall incorporate such adjustments and/or add-backs to the portion of Consolidated EBITDA attributable to the Elixir Acquisition Target as may be set out in a quality of earnings report with respect to the Elixir Acquisition Target that has been prepared by an independent registered public accounting firm of nationally recognized standing and delivered to the Arrangers on or prior to the Second Restatement Date (without duplication of any other add-backs or adjustments in this definition, in the definition of "Consolidated Net Income" or in the definition of "Consolidated EBITDA").

"<u>Pro Forma Compliance Certificate</u>" means a certificate of a Responsible Officer of the Borrower containing reasonably detailed calculations of the financial covenants set forth in <u>Section 7.11</u> recomputed as of the end of the period of the four fiscal quarters most recently ended for which the

Borrower has delivered financial statements pursuant to Section 6.01(a) or (b) after giving effect to the applicable transaction on a Pro Forma Basis.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" has the meaning specified in Section 6.02.

"QFC" has the meaning specified in Section 11.22.

"QFC Credit Support" has the meaning specified in Section 11.22.

"Qualified Cash" means cash or Cash Equivalents of the Loan Parties that (a) are (x) maintained in a deposit account with the Administrative Agent or (y) maintained in a deposit account with a Revolving Credit Lender and subject to a deposit account control agreement in form and substance satisfactory to the Administrative Agent in its sole discretion, in each case only to the extent that such arrangements perfect a first priority Lien on and in such cash or Cash Equivalents for the benefit of the Secured Parties, (b) do not appear (or would not be required to appear) as "restricted" on a consolidated balance sheet of Holdings and (c) are not subject to a Lien (other than Liens of the type described in Sections 7.01(a), (m) and (n)).

"Qualified ECP Guarantor" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Recipient" means the Administrative Agent, any Lender, any L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"Recovery Event" means any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any property of Holdings or any Subsidiary.

"Reduction Amount" has the meaning specified in Section 2.5(b)(vi).

"Register" has the meaning specified in Section 11.06(c).

"Regulation U" means Regulation U of the FRB, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Related Adjustment" means, in determining any Successor Rate, the first relevant available alternative set forth in the order below that can be determined by the Administrative Agent applicable to such Successor Rate:

(A)    the spread adjustment, or method for calculating or determining such spread adjustment, that has been selected or recommended by the Relevant Governmental Body for the relevant Pre-Adjustment Successor Rate (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto) and which adjustment or method (x) is published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion or (y) solely with respect to Term SOFR, if not currently published, which was previously so recommended for Term SOFR and published on an information service acceptable to the Administrative Agent; or

(B)    the spread adjustment that would apply (or has previously been applied) to the fallback rate for a derivative transaction referencing the ISDA Definitions (taking into account

39

the interest period, interest payment date or payment period for interest calculated and/or tenor thereto).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors, consultants, service providers and representatives of such Person and of such Person's Affiliates.

"Relevant Debtors" has the meaning specified in the definition of "Elixir Acquisition Requirements".

"Relevant Governmental Body" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York.

"Reorganization Completion Date" means the occurrence of the effective date of the Debtors' chapter 11 plan according to its terms or the date by which the Debtors close one or more sales, directly or indirectly, of some, all, or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code consistent with the restructuring term sheet attached as Exhibit A to the *Declaration Of Jeffrey S. Stein In Support Of Debtors' Chapter 11 Petitions And First Day Motions* [Docket No. 20].

"Replacement Term Loans" has the meaning specified in the Fourth Amendment.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty-day notice period has been waived.

"Request for Credit Extension" means (a) with respect to a Borrowing, conversion or continuation of Term Loans or Revolving Credit Loans, a Loan Notice, (b) with respect to any L/C Credit Extension, a Letter of Credit Application and (c) with respect to a Swing Line Loan, a Swing Line Notice.

"Required Class Lenders" means, at any time with respect to any Class of Loans or Commitments, Lenders having Total Credit Exposures with respect to such Class representing more than 50% of the Total Credit Exposures of all Lenders of such Class. The Total Credit Exposure of any Defaulting Lender with respect to such Class shall be disregarded in determining Required Class Lenders at any time.

"Required 2021 Replacement Term Lenders" means, as of any date of determination, 2021 Replacement Term Lenders holding more than 50% of the 2021 Replacement Term Facility on such date; provided that the portion of the 2021 Replacement Term Facility held by any Defaulting Lender shall be excluded for purposes of making a determination of Required 2021 Replacement Term Lenders.

"Required 2021 Replacement Term/Revolving Lenders" means, as of any date of determination, 2021 Replacement Term Lenders and Revolving Credit Lenders holding, in the aggregate, more than 50% of the sum of (a) the aggregate outstanding principal amount of the 2021 Replacement Term Facility, (b) Total Revolving Credit Outstandings (with the aggregate amount of each Revolving Credit Lender's risk participation and funded participation in L/C Obligations and Swing Line Loans being deemed "held" by such Revolving Credit Lender for purposes of this definition) and (c) the aggregate principal amount of the unused Revolving Credit Commitments; provided that the unused Revolving Credit Commitment of, the portion of the 2021 Replacement Term Facility held by, and Total Revolving Credit Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required 2021 Replacement Term/Revolving Lenders.

"Required 2023 Term Lenders" means, as of any date of determination, 2023 Term Lenders holding more than 50% of the 2023 Term Facility on such date; provided that the portion of the 2023

AMERICAS/2024053109.31

Term Facility held by any Defaulting Lender shall be excluded for purposes of making a determination of Required 2023 Term Lenders.

"Required Lenders" means, at any time, collectively, (i) Lenders holding more than 50% of the sum of the (A) Total Outstandings (with the aggregate amount of each Revolving Credit Lender's risk participation and funded participation in L/C Obligations and Swing Line Loans being deemed "held" by such Revolving Credit Lender for purposes of this definition) and (B) aggregate unused Commitments, and (ii) the Required Revolving Lenders, and (iii) the Required 2021 Replacement Lenders; provided that, notwithstanding any of the foregoing to the contrary, (I) with respect only to a determination of whether the consent of the "Required Lenders" has been obtained to an amendment or waiver of any provision herein affecting only the Revolving Credit Lenders, "Required Lenders" shall mean the Required Revolving Credit Lenders, (II), with respect only to a determination of whether the consent of the "Required Lenders" has been obtained to an amendment or waiver of any provision herein affecting only the 2021 Replacement Term Lenders, "Required Lenders" shall mean the Required 2021 Replacement Term Lenders, and (III) with respect only to a determination of whether the consent of the "Required Lenders" has been obtained to an amendment or waiver of any provision herein affecting only the 2023 Term Lenders, "Required Lenders" shall mean the Required 2023 Term Lenders, except that any such amendment or waiver pursuant to these clauses (I) through (III) of this proviso shall not (x) increase the principal of, or the rate of interest specified herein on, or any commitment or other fees or other amounts payable herein in each case with respect to, the Revolving Credit Facility, the 2021 Replacement Term Facility or the 2023 Term Facility, respectively, (y) advance any date fixed by this Agreement or any other Loan Document for any payment (excluding by operation of the mandatory prepayment provisions herein as in effect as of the Second Restatement Date) of principal (including on maturity), interest fees or other amounts due to the Revolving Credit Lenders, the 2021 Replacement Term Lenders or the 2023 Term Lenders, respectively, or (z) amend or add any negative or affirmative covenant or any Event of Default in a manner that benefits any of the Revolving Credit Facility, the 2021 Replacement Term Facility or the 2023 Term Facility, or any of the Revolving Credit Lenders, the 2021 Replacement Term Lenders or the 2023 Term Lenders, without conferring identical benefits upon all of the other Lenders or Facilities, as applicable, in the case of clauses (x) through (z) above, without the consent of the "Required Lenders" determined in accordance with clauses (i) through (iii) above; provided, further, that the amount of any participation in any Swing Line Loan and Unreimbursed Amounts that such Defaulting Lender has failed to fund that have not been reallocated to and funded by another Lender shall be deemed to be held by the Lender that is the Swing Line Lender or the applicable L/C Issuer, as the case may be, in making such determination; provided further that, this definition is subject to Section 3.03.

"Required Revolving Lenders" means, as of any date of determination, Revolving Credit Lenders holding more than 50% of the sum of the (a) Total Revolving Credit Outstandings (with the aggregate amount of each Revolving Credit Lender's risk participation and funded participation in L/C Obligations and Swing Line Loans being deemed "held" by such Revolving Credit Lender for purposes of this definition) and (b) aggregate unused Revolving Credit Commitments; provided that the unused Revolving Credit Commitment of, and the portion of the Total Revolving Credit Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Revolving Lenders.

"Requirements of Law" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Rescindable Amount" has the meaning specified in Section 2.12(b)(ii).

"Resignation Effective Date" has the meaning specified in Section 9.06.

AMERICAS/2024053109.31

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer, assistant treasurer or controller of a Loan Party, and, solely for purposes of the delivery of incumbency certificates, the secretary or any assistant secretary of a Loan Party and, solely for purposes of notices given pursuant to Article II, any other officer or employee of the applicable Loan Party so designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to an agreement between the applicable Loan Party and the Administrative Agent.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.  To the extent requested by the Administrative Agent, each Responsible Officer will provide an incumbency certificate and appropriate authorization documentation, in form and substance reasonably satisfactory to the Administrative Agent.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interests or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent Person thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Revolving Credit Borrowing" means a borrowing consisting of simultaneous Revolving Credit Loans of the same Type and, in the case of Term SOFR Loans, having the same Interest Period made by each of the Revolving Credit Lenders pursuant to Section 2.01(c).

"Revolving Credit Commitment" means, as to each Revolving Credit Lender, its obligation to (a) make Revolving Credit Loans to the Borrower pursuant to Section 2.01(c), (b) purchase participations in L/C Obligations, and (c) purchase participations in Swing Line Loans, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01A under the caption "Revolving Credit Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Revolving Credit Exposure" means, as to any Lender at any time, the aggregate principal amount at such time of its outstanding Revolving Credit Loans and such Lender's participation in L/C Obligations and Swing Line Loans at such time.

"Revolving Credit Facility" means, at any time, the aggregate amount of the Revolving Credit Lenders' Revolving Credit Commitments at such time.

"Revolving Credit Lender" means, at any time, any Lender that has a Revolving Credit Commitment at such time.

"Revolving Credit Loan" has the meaning specified in Section 2.01(c).

"Revolving Credit Note" means a promissory note made by the Borrower in favor of a Revolving Credit Lender evidencing Revolving Credit Loans or Swing Line Loans, as the case may be, made by such Revolving Credit Lender, substantially in the form of Exhibit 2.11(a)(A).

"S&P" means S&P Global Ratings, a business of S&P Global Inc., and any successor thereto.

"<u>Sale and Leaseback Transaction</u>" means, with respect to any Person, any arrangement, directly or indirectly, whereby such Person shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"<u>Sale Order</u>" has the meaning assigned to it in the definition of "Elixir Acquisition Requirements."

"<u>Sanction(s)</u>" means any sanction administered or enforced by the United States Government, including OFAC, the United Nations Security Council, the European Union, His Majesty's Treasury ("<u>HMT</u>") or other relevant sanctions authority.

"<u>Scheduled Unavailability Date</u>" has the meaning specified in <u>Section 3.03(b)(ii)</u>.

"<u>SEC</u>" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"<u>Second Restatement Date</u>" has the meaning specified in <u>Section 4.01</u>.

"<u>Second Restatement Date 2021 Replacement Term Loan Paydown</u>" has the meaning specified in <u>Section 4.01(e)</u>.

"<u>Secured Cash Management Agreement</u>" means any Cash Management Agreement that is entered into by and between any Loan Party or any Subsidiary, and any Cash Management Bank with respect to such Cash Management Agreement.  For the avoidance of doubt, a Secured Party in respect of Secured Cash Management Agreements shall be subject to the last paragraph of <u>Section 8.03</u> and <u>Section 9.11</u>.

"<u>Secured Hedge Agreement</u>" means any Swap Contract that is entered into by and between any Loan Party or any Subsidiary, and any Hedge Bank with respect to such Swap Contract.  For the avoidance of doubt, a Secured Party in respect of Secured Hedge Agreements shall be subject to the last paragraph of <u>Section 8.03</u> and <u>Section 9.11</u>.

"<u>Secured Parties</u>" means, collectively, the Administrative Agent, the Lenders, the L/C Issuers, the Hedge Banks, the Cash Management Banks, each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to <u>Section 9.05</u>, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Collateral Documents.

"<u>Secured Party Designation Notice</u>" shall mean a notice from any Lender, an Affiliate of a Lender or a Permitted Hedge Counterparty substantially in the form of <u>Exhibit 1.01</u>.

"<u>Securitization Transaction</u>" means, with respect to any Person, any financing transaction or series of financing transactions (including factoring arrangements) pursuant to which such Person or any Subsidiary of such Person may sell, convey or otherwise transfer, or grant a security interest in, accounts, payments, receivables, rights to future lease payments or residuals or similar rights to payment to a special purpose subsidiary or affiliate of such Person.

"<u>Security Agreement</u>" means the Amended and Restated Security and Pledge Agreement, dated as of the Second Restatement Date, executed in favor of the Administrative Agent for the benefit of the Secured Parties by each of the Loan Parties.

"<u>SOFR</u>" means with respect to any applicable determination date the Secured Overnight Financing Rate published on the fifth U.S. Government Securities Business Day preceding such date by the SOFR Administrator on the Federal Reserve Bank of New York's website (or any successor source);

43

provided however that if such determination date is not a U.S. Government Securities Business Day, then SOFR means such rate that applied on the first U.S. Government Securities Business Day immediately prior thereto.

"<u>SOFR Adjustment</u>" with respect to (i) (x) Daily Simple SOFR and (y) Term SOFR when applicable to 2023 Term Loans, means 0.10%, and (ii) Term SOFR when applicable to Revolving Credit Loans and/or 2021 Replacement Term Loans, means 0.10% for an Interest Period of one month's duration, 0.15% for an Interest Period of three months' duration, and 0.25% for an Interest Period of six months' duration.

"<u>SOFR Administrator</u>" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"<u>Solvent</u>" and "<u>Solvency</u>" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature in the ordinary course of business, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital, and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"<u>Specified Event of Default</u>" means an Event of Default pursuant to <u>Section 8.01(a)</u>, <u>8.01(f)</u> or <u>8.01(g)</u>.

"<u>Specified Loan Party</u>" has the meaning specified in <u>Section 10.08</u>.

"<u>Specified Representations</u>" means the representations and warranties of the Borrower set forth in <u>Sections 5.01</u>, <u>5.02(a)</u> (related to the entering into and performance of the Loan Documents and the incurrence of the extensions of credit thereunder), <u>5.02(b)</u> (related to the entering into and performance of the Loan Documents and the incurrence of the extensions of credit thereunder), <u>5.02(c)</u> (related to the entering into and performance of the Loan Documents and the incurrence of the extensions of credit thereunder), <u>5.04</u>, <u>5.14</u>, <u>5.18</u>, <u>5.19</u> (subject to <u>clause (c)</u> of the definition of "Elixir Acquisition Requirements") and <u>5.21</u> (limited to the use of proceeds of any Indebtedness incurred in connection therewith) and <u>5.22</u> (limited to the use of proceeds of any Indebtedness incurred in connection therewith).

"<u>Subsidiary</u>" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of Voting Stock is at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Holdings, or of a Non-Subsidiary Loan Party, as the context shall require.

"<u>Successful 2023 Term Loan Syndication</u>" means that as of the Reorganization Completion Date, Rite Aid Corporation, a Delaware corporation, shall hold 0.00% of the 2023 Term Loans Commitments and the 2023 Term Loans.

"<u>Successor Rate</u>" has the meaning specified in <u>Section 3.03(b)</u>.

"Supported QFC" has the meaning specified in Section 11.22.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" means with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Swing Line Borrowing" means a borrowing of a Swing Line Loan pursuant to Section 2.04.

"Swing Line Commitment" means as to any Lender (a) the amount set forth opposite such Lender's name on Schedule 2.01B hereof or (b) if such Lender has entered into an Assignment and Assumption or has otherwise assumed a Swing Line Commitment after the First Restatement Date, the amount set forth for such Lender as its Swing Line Commitment in the Register maintained by the Administrative Agent pursuant to Section 11.06(c).

"Swing Line Lender" means Bank of America in its capacity as provider of Swing Line Loans, or any successor swing line lender hereunder.

"Swing Line Loan" has the meaning specified in Section 2.04(a).

"Swing Line Notice" means a notice of a Swing Line Borrowing pursuant to Section 2.04(b), which shall be substantially in the form of Exhibit 2.04 or such other form as approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Borrower.

"Swing Line Sublimit" means an amount equal to the lesser of (a) $10,000,000 and (b) the Revolving Credit Facility.  The Swing Line Sublimit is part of, and not in addition to, the Revolving Credit Facility.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of

45

property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Tax Group" has the meaning assigned to it in the definition of "Permitted Tax Distributions."

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Commitment" means either a 2021 Replacement Term Loan Commitment, a 2023 Term Loan Commitment or an Incremental Term Commitment.

"Term Loan" means, as the context may require, a 2021 Replacement Term Loan, a 2023 Term Loan or an Incremental Term Loan.

"Term Loan Facilities" means the 2021 Replacement Term Facility, the 2023 Term Facility, and each Incremental Term Facility then outstanding.

"Term Note" means a promissory note made by the Borrower in favor of a Term Lender evidencing Term Loans of the applicable Class, as the case may be, made by such Term Lender, substantially in the form of Exhibit 2.11(a)(B).

"Term SOFR" means:

    (a)    for any Interest Period with respect to a Term SOFR Loan, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to the commencement of such Interest Period with a term equivalent to such Interest Period; provided that if the rate is not published prior to 11:00 a.m. on such determination date then Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto, in each case, plus the SOFR Adjustment for such Interest Period; and

    (b)    for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to such date with a term of one month commencing that day; provided that if the rate is not published prior to 11:00 a.m. on such determination date then Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto, in each case, plus the SOFR Adjustment for such term;

provided that if Term SOFR determined in accordance with either of the foregoing provisions (a) or (b) of this definition would otherwise be less than, (x) with respect to any such determination of Term SOFR for 2021 Replacement Term Loans, Revolving Credit Loans or Revolving Credit Commitments, 0.00%, Term SOFR shall for such purposes be deemed 0.00%, (y) with respect to any such determination of Term SOFR for 2023 Term Loans or 2023 Term Loan Commitments, 0.00%, Term SOFR shall be deemed 0.00%, in each case for purposes of this Agreement.

"Term SOFR Loan" means a Loan that bears interest based on Term SOFR (other than pursuant to clause (c) of the definition of "Base Rate").

"Term SOFR Replacement Date" has the meaning specified in Section 3.03(b).

"Term SOFR Screen Rate" means the forward-looking SOFR term rate administered by CME (or any successor administrator satisfactory to the Administrative Agent) and published on the applicable

Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time).

"Threshold Amount" means the greater of (x) $40,000,000 and (y) 10% of Consolidated EBITDA for the most recently ended four fiscal quarter period for which financial statements have been delivered pursuant to Section 6.01(a) or 6.01(b).

"Total 2023 Term Loan Outstandings" means the aggregate Outstanding Amount of all 2023 Term Loans.

"Total Credit Exposure" means, as to any Lender at any time, the unused Commitments and Revolving Credit Exposure, and Outstanding Amount of all Term Loans (including, without limitation, all 2021 Replacement Term Loans, 2023 Term Loans and Incremental Term Loans) of such Lender at such time.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans and all L/C Obligations.

"Total Revolving Credit Outstandings" means the aggregate Outstanding Amount of all Revolving Credit Loans, Swing Line Loans and L/C Obligations.

"Treasury Rate" means, as of any date, the rate of interest per annum on U.S. treasury notes having a maturity closest to the last day of the applicable Non-Call Period at the time of repayment, of the Federal Reserve statistical release FORM H 15 which has been most recently published (or, if for any reason that published rate as of a date not more than 10 days prior to the date of determination is not available, another rate determined by Administrative Agent to be comparable, in its reasonable discretion, will be used for this purpose).

"Type" means, with respect to any Loan, its character as a Base Rate Loan or a Term SOFR Loan.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"United States" and "U.S." mean the United States of America.

"Unreimbursed Amount" has the meaning specified in Section 2.03(f).

"U.S. Government Securities Business Day" means any Business Day, except any Business Day on which any of the Securities Industry and Financial Markets Association, the New York Stock

AMERICAS/2024053109.31

Exchange or the Federal Reserve Bank of New York is not open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"U.S. Special Resolution Regimes" has the meaning specified in Section 11.22.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(e)(ii)(B)(3).

"Voting Stock" means, with respect to any Person, Equity Interests issued by such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even though the right so to vote has been suspended by the happening of such a contingency.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years (and/or portion thereof) obtained by dividing:  (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"Yield Differential" has the meaning assigned to such term in Section 2.15(h)(ii)(C).

**Section 1.02    Other Interpretive Provisions.**

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Loan Document or Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, modified, extended, restated, replaced or supplemented from time to time (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "hereto," "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a

Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, Preliminary Statements of and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any Law shall include all statutory and regulatory rules, regulations, orders and provisions consolidating, amending, replacing or interpreting such Law and any reference to any Law or regulation shall, unless otherwise specified, refer to such Law or regulation as amended, modified, extended, restated, replaced or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all assets and properties, tangible and intangible, real and personal, including cash, securities, accounts and contract rights.

(b)       In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)       Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)       Any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any Division of a limited liability company shall constitute a separate Person hereunder (and each Division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

**Section 1.03    Accounting Terms**.

(a)       Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.  Notwithstanding the foregoing, (i) for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Loan Parties and their respective Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded and (ii) all references to extraordinary gains, extraordinary losses or extraordinary items (or words of similar import) in this Agreement or any other Loan Document shall be defined consistent with GAAP as in effect immediately prior to the issuance of FASB Accounting Standards Update 2015-01, Simplifying Income Statement Presentation by Eliminating the Concept of Extraordinary Items.

(b)       Changes in GAAP.  If at any time any change in GAAP (including the adoption of IFRS) would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement

shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Without limiting the foregoing, leases shall continue to be classified and accounted for on a basis consistent with that reflected in the Audited Financial Statements for all purposes of this Agreement, notwithstanding any change in GAAP relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes, as provided for above.

(c)    <u>Consolidation of Variable Interest Entities</u>.  All references herein to consolidated financial statements of the Borrower and its Subsidiaries or to the determination of any amount for the Borrower and its Subsidiaries on a consolidated basis or any similar reference shall, in each case, be deemed to include each variable interest entity that the Borrower is required to consolidate pursuant to FASB ASC 810 as if such variable interest entity were a Subsidiary as defined herein.

(d)    <u>Calculations</u>.  Notwithstanding any other provision of this Agreement, the parties hereto acknowledge and agree that all calculations of the financial covenants in <u>Section 7.11</u> (including for purposes of determining the Applicable Rate) shall be made on a Pro Forma Basis with respect to (i) any Disposition of all of the Equity Interests of, or all or substantially all of the assets of, a Subsidiary, (ii) any Disposition of a line of business or division of any Loan Party or Subsidiary, or (iii) any Acquisition, in each case, occurring during the applicable period.

## Section 1.04    <u>Rounding</u>.

Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

## Section 1.05    <u>Times of Day; Rates</u>.

Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to any reference rate referred to herein or with respect to any rate (including, for the avoidance of doubt, the selection  of such rate and any related spread or other adjustment) that is an alternative or replacement for or successor to any such rate (including, without limitation, any Successor Rate) (or any component of any of the foregoing) or the effect of any of the foregoing, or of any Conforming Changes. The Administrative Agent and its Affiliates or other related entities may engage in transactions or other activities that affect any reference rate referred to herein, or any alternative, successor or replacement rate (including, without limitation, any Successor Rate) (or any component of any of the foregoing) or any related spread or other adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any reference rate referred to herein or any alternative, successor or replacement rate (including, without limitation, any Successor Rate) (or any component of any of the foregoing), in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity),

for any error or other action or omission related to or affecting the selection, determination, or calculation of any rate (or component thereof) provided by any such information source or service.

**Section 1.06    Letter of Credit Amounts**.  Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

**Section 1.07    Limited Condition Acquisition**.

(a)    Notwithstanding anything to the contrary in this Agreement, for purposes of (i) determining compliance with any provision of this Agreement that requires the calculation of the Consolidated Net Leverage Ratio, the Consolidated Net First Lien Leverage Ratio and/or the Consolidated Interest Coverage Ratio, determining compliance with representations and warranties (other than customary "specified representations" and those representations of the seller or target company (as applicable) included in the acquisition agreement for the relevant Limited Condition Acquisition that are material to the interest of the Lenders and only to the extent that the relevant acquirer has the right to terminate its obligations under such acquisition agreement as a result of such representations (which representations, for the avoidance of doubt, shall be required to be accurate as of the date of the consummation of any Limited Condition Acquisition)), covenants, Defaults or Events of Default (other than a Specified Event of Default (the absence of which, for the avoidance of doubt, shall be required on the date of the consummation of any Limited Condition Acquisition)) or (ii) testing availability under baskets set forth herein (including, in each case with respect to the incurrence of Indebtedness pursuant to Section 2.15), in each case, in connection with a Permitted Acquisition or an Investment made by the Loan Parties, in each case, the consummation of which is not conditioned on the availability of, or on obtaining, third party financing (any such acquisition, a "Limited Condition Acquisition"), at the irrevocable written option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "LCA Election"), the date of determination of whether any such Limited Condition Acquisition is permitted hereunder shall be deemed to be the date the definitive agreement(s) for such Limited Condition Acquisition are entered into (the "LCA Test Date"), and if, on a Pro Forma Basis, after giving effect to the Limited Condition Acquisition and the other transactions to be entered into in connection therewith as if they had occurred at the beginning of the four fiscal quarter period of the Borrower ending on the most recent fiscal quarter end date for which financial statements have been delivered before the LCA Test Date, the Borrower could have taken such action on the relevant LCA Test Date in compliance with such ratio or basket, such ratio or basket shall be deemed to have been complied with for such Limited Condition Acquisition; provided that, no LCA Test Date may occur more than 180 days before consummation of the applicable Limited Condition Acquisition or Investment.

(b)    For the avoidance of doubt, if the Borrower has made an LCA Election and any of the ratios or baskets for which compliance was determined or tested as of the LCA Test Date (including with respect to the incurrence of any Indebtedness) are exceeded (or in the case of a coverage ratio, not met) as a result of fluctuations in any such ratio or basket (including due to fluctuations of the target of any Limited Condition Acquisition) at or before consummation of the relevant transaction or action, such ratios or baskets will not be deemed to have been exceeded (or not met, as applicable) as a result of such fluctuations.  If the Borrower has made an LCA Election for any Limited Condition Acquisition, then in connection with any subsequent

calculation of any ratio or basket (other than maintenance testing of the financial covenants in Section 7.11) on or following the relevant LCA Test Date and before the earlier of (i) the date on which such Limited Condition Acquisition is consummated or (ii) the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such ratio or basket shall be (x), solely with respect to the incurrence test under which such Limited Condition Acquisition is being made, calculated on a Pro Forma Basis assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of debt and the use of proceeds thereof) have been consummated, and (y) for all other purposes, calculated (and tested) on a Pro Forma Basis assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have not been consummated, as applicable.

**Section 1.08    Effect of Amendment and Restatement**.

(a)    The occurrence of the Second Restatement Date and the effectiveness of this Agreement shall not constitute a novation of any Obligations owing under (and as defined in) the Existing Credit Agreement.  All Loans and Commitments outstanding under (and as defined in) the Existing Credit Agreement and all accrued and unpaid amounts owing by any Loan Party pursuant to the Existing Credit Agreement shall continue to be outstanding and owing hereunder.  Any payment or performance of any Obligation under the Existing Credit Agreement or any Obligation described in this Agreement during any period prior to the Second Restatement Date shall constitute payment or performance of such Obligation under this Agreement.  Except as otherwise specifically noted to be determined only after the Second Restatement Date, any usage under any "basket" set forth in any covenant or exception in the Existing Credit Agreement shall be included in the determination of baskets under this Agreement.

(b)    After giving effect to this Agreement and the modifications effectuated thereby, each reference to the "Credit Agreement" in the Loan Documents shall be deemed a reference to the Existing Credit agreement, as amended and restated on the Second Restatement Date.

(c)    Each undersigned Loan Party agrees that this Agreement amends and restates and is substituted for (and is not executed in payment or novation of) the Existing Credit Agreement and that the security interest provided under the Collateral Documents referenced therein (the "Existing Collateral Documents") and the Guarantee provided pursuant to the Guaranty shall continue uninterrupted under the Collateral Documents and the Guaranty, respectively, and that the security interests granted under the Existing Collateral Documents and the Guarantee provided under the Guaranty continues in effect as security for and a Guaranty of, respectively, all obligations and liabilities under the Existing Credit Agreement, as amended and restated by this Agreement.

(d)    Each of the Consenting Lenders, by its execution and delivery of its duly executed counterpart signature page to this Agreement, hereby consents to the amendment and restatement of the Existing Credit Agreement as set forth in this Amendment.

**ARTICLE II**

**THE COMMITMENTS AND CREDIT EXTENSIONS**

**Section 2.01    The Loans**.

(a)    The 2021 Replacement Term Loans.  Subject to the terms and conditions set forth in the Existing Credit Agreement, each Lender severally agreed to make its portion of a

52

2021 Replacement Term Loan to the Borrower in Dollars on the First Restatement Date in an amount not exceeding such Lender's respective 2021 Replacement Term Loan Commitment. Amounts repaid on the 2021 Replacement Term Loan may not be reborrowed.  The 2021 Replacement Term Loan may consist of Base Rate Loans or Term SOFR Loans, or a combination thereof, as further provided herein.

(b)    The 2023 Term Borrowing.  For value received, from time to time (but in any event limited to one single draw), on any Business Day during the 2023 Term Loan Availability Period, and subject only to the consummation of the Elixir Acquisition and the satisfaction (or waiver, in accordance with Section 11.01) of the Elixir Acquisition Requirements and the other conditions precedent set forth in Section 4.03 hereof, the aggregate amount of the Elixir Acquisition Closing Date Loan Amount shall, automatically and without any further action by any Person, constitute "2023 Term Loans", to be held by the 2023 Term Lenders in accordance with the full amount of their respective 2023 Term Loan Commitments.  Amounts repaid or prepaid on the 2023 Term Loan may not be reborrowed.  All unused 2023 Term Loan Commitments shall automatically terminate as provided in Section 2.06(b) below. The 2023 Term Loan may consist of Base Rate Loans or Term SOFR Loans, or a combination thereof, as further provided herein; provided, however, that, notwithstanding anything to the contrary herein, from and including the Second Restatement Date until the earliest to occur of (i) the date on which a Successful 2023 Term Loan Syndication shall have occurred, (ii) the occurrence of the Reorganization Completion Date, and (iii) the date that is 90 days following the Elixir Acquisition Closing Date, the 2023 Term Loan may only (subject only to Section 2.08(b)(iii), Section 3.02, Section 3.03 and during the continuance of an Event of Default) consist of Term SOFR Loans with an Interest Period of one month, and the Borrower shall not at any time during such period be permitted to select any other length of Interest Period or Type of Loan with respect to the 2023 Term Loan.  The requirement set forth in the immediately preceding proviso may be permanently waived at any time with the consent of the Borrower and the Required 2023 Term Lenders.

(c)    The Revolving Credit Borrowings.  Subject to the terms and conditions set forth herein, each Revolving Credit Lender severally agreed under the Existing Credit Agreement, and continues to agree under this Agreement, to make loans (each such loan, a "Revolving Credit Loan") to the Borrower from time to time, on any Business Day during the Availability Period for the Revolving Credit Facility, in an aggregate amount not to exceed at any time outstanding the amount of such Lender's respective Revolving Credit Commitment; provided, however, that after giving effect to any Revolving Credit Borrowing, (i) the Total Revolving Credit Outstandings shall not exceed the Revolving Credit Facility, and (ii) the Revolving Credit Exposure shall not exceed such Revolving Credit Lender's Revolving Credit Commitment.  Within the limits of each Revolving Credit Lender's Revolving Credit Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01(c), prepay under Section 2.05, and reborrow under this Section 2.01(c).  Revolving Credit Loans may be Base Rate Loans or Term SOFR Loans, as further provided herein.

**Section 2.02    Borrowings, Conversions and Continuations of Loans**.

(a)    Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Term SOFR Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by (A) telephone, or (B) a Loan Notice; provided that any telephonic notice must be confirmed immediately by delivery to the Administrative Agent of a Loan Notice.  Each such Loan Notice must be received by the Administrative Agent not later than 11:00 a.m. (i) two Business Days prior to the requested date of any Borrowing of, conversion to or continuation of, Term SOFR Loans or of any conversion of Term SOFR Loans

to Base Rate Loans, and (ii) on the requested date of any Borrowing of Base Rate Loans. Each Borrowing of, conversion to or continuation of Term SOFR Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof (or, if less, the entire principal thereof outstanding). Except as provided in Sections 2.03(c) and 2.04(c), each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof (or, if less, the entire principal thereof outstanding). Each Loan Notice shall specify (i) whether the Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of Term SOFR Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or continued or to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of a Loan in a Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Term SOFR Loans. If the Borrower requests a Borrowing of, conversion to, or continuation of Term SOFR Loans in any Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month. Notwithstanding anything to the contrary herein, a Swing Line Loan may not be converted to a Term SOFR Loan.

(b)     Following receipt of a Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage under the applicable Facility of the applicable Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in Section 2.02(a). In the case of a Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing occurs on the Second Restatement Date, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower; provided, however that if, on the date a Loan Notice with respect to a Revolving Credit Borrowing is given by the Borrower, there are L/C Borrowings outstanding, then the proceeds of such Revolving Credit Borrowing, first, shall be applied to the payment in full of any such L/C Borrowings, and second, shall be made available to the Borrower as provided above.

(c)     Except as otherwise provided herein, a Term SOFR Loan may be continued or converted only on the last day of the Interest Period for such Term SOFR Loan. During the existence of a Default, no Loans may be requested as, converted to or continued as Term SOFR Loans without the consent of the Required Lenders.

(d)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Term SOFR Loans upon determination of such interest rate.

(e)     After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than ten Interest Periods in effect.

(f)    Notwithstanding anything to the contrary in this Agreement, any Lender may exchange, continue or rollover all of the portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent and such Lender.

**Section 2.03    Letters of Credit**.

(a)    _General_.  Subject to the terms and conditions set forth herein, in addition to the Loans provided for in Section 2.01, the Borrower may request that any L/C Issuer, in reliance on the agreements of the Revolving Credit Lenders set forth in this Section 2.03, issue, at any time and from time to time during the Availability Period, Letters of Credit denominated in Dollars for its own account or the account of any of its Subsidiaries in such form as is acceptable to the Administrative Agent and such L/C Issuer in its reasonable determination.  Letters of Credit issued hereunder shall constitute utilization of the Revolving Credit Commitments.

(b)    _Notice of Issuance, Amendment, Extension, Reinstatement or Renewal_.  To request the issuance of a Letter of Credit (or the amendment of the terms and conditions, extension of the terms and conditions, extension of the expiration date, or reinstatement of amounts paid, or renewal of an outstanding Letter of Credit), the Borrower shall deliver (or transmit by electronic communication, if arrangements for doing so have been approved by the applicable L/C Issuer to an L/C Issuer selected by it and to the Administrative Agent not later than 11:00 a.m. at least two Business Days (or such later date and time as the Administrative Agent and such L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, extended, reinstated or renewed, and specifying the date of issuance, amendment, extension, reinstatement or renewal (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with clause (d) of this Section 2.03), the amount of such Letter of Credit, the name and address of the beneficiary thereof, the purpose and nature of the requested Letter of Credit and such other information as shall be necessary to prepare, amend, extend, reinstate or renew such Letter of Credit.  If requested by the applicable L/C Issuer, the Borrower also shall submit a letter of credit application and reimbursement agreement on such L/C Issuer's standard form in connection with any request for a Letter of Credit.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application and reimbursement agreement or other agreement submitted by the Borrower to, or entered into by the Borrower with, an L/C Issuer relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

If the Borrower so requests in any applicable Letter of Credit Application (or the amendment of an outstanding Letter of Credit), the applicable L/C Issuer may, in its sole discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that any such Auto-Extension Letter of Credit shall permit such L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such twelve-month period to be agreed upon by the Borrower and the applicable L/C Issuer at the time such Letter of Credit is issued.  Unless otherwise directed by the applicable L/C Issuer, the Borrower shall not be required to make a specific request to such L/C Issuer for any such extension.  Once an Auto-Extension Letter of Credit has been issued, the Revolving Credit Lenders shall be deemed to have authorized (but may not require) the applicable L/C Issuer to permit the extension of such Letter of Credit at any time to an expiration date not later than the date permitted pursuant to Section 2.03(d); provided, that such L/C Issuer shall not (i) permit any such extension if (A) such L/C Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue such Letter of Credit in its extended form under the terms hereof (except that the expiration date may be extended to a

date that is no more than one year from the then-current expiration date) or (B) it has received notice (which may be in writing or by telephone (if promptly confirmed in writing)) on or before the day that is seven Business Days before the Non-Extension Notice Date from the Administrative Agent that the Required Revolving Lenders have elected not to permit such extension or (ii) be obligated to permit such extension if it has received notice (which may be in writing or by telephone (if promptly confirmed in writing)) on or before the day that is seven Business Days before the Non-Extension Notice Date from the Administrative Agent, any Revolving Credit Lender or the Borrower that one or more of the applicable conditions set forth in <u>Section 4.02</u> is not then satisfied, and in each such case directing such L/C Issuer not to permit such extension.

(c)    <u>Limitations on Amounts, Issuance and Amendment</u>.  A Letter of Credit shall be issued, amended, extended, reinstated or renewed only if (and upon issuance, amendment, extension, reinstatement or renewal of each Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, extension, reinstatement or renewal (i) the aggregate amount of the outstanding Letters of Credit issued by any L/C Issuer shall not exceed its L/C Commitment,  (ii) the aggregate L/C Obligations shall not exceed the Letter of Credit Sublimit, (iii) the Revolving Credit Exposure of any Lender shall not exceed its Revolving Credit Commitment and (iv) the total Revolving Credit Exposures shall not exceed the total Revolving Credit Commitments.

(i)    No L/C Issuer shall be under any obligation to issue any Letter of Credit if:

(A)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such L/C Issuer from issuing the Letter of Credit, or any Law applicable to such L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such L/C Issuer shall prohibit, or request that such L/C Issuer refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon such L/C Issuer with respect to the Letter of Credit any restriction, reserve or capital requirement (for which such L/C Issuer is not otherwise compensated hereunder) not in effect on the First Restatement Date, or shall impose upon such L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the First Restatement Date and which such L/C Issuer in good faith deems material to it;

(B)    the issuance of such Letter of Credit would violate one or more policies of such L/C Issuer applicable to letters of credit generally;

(C)    except as otherwise agreed by the Administrative Agent and such L/C Issuer, the Letter of Credit is in an initial stated amount less than $50,000, in the case of a standby Letter of Credit;

(D)    any Revolving Credit Lender is at that time a Defaulting Lender, unless such L/C Issuer has entered into arrangements, including the delivery of Cash Collateral, satisfactory to such L/C Issuer (in its sole discretion) with the Borrower or such Lender to eliminate such L/C Issuer's actual or potential Fronting Exposure (after giving effect to <u>Section 2.14(a)</u>) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or that Letter of Credit and all other L/C Obligations as to which such L/C Issuer has actual or potential Fronting Exposure, as it may elect in its sole discretion**.**

(ii)    No L/C Issuer shall be under any obligation to amend any Letter of Credit if (A) such L/C Issuer would have no obligation at such time to issue the Letter of Credit in its amended

form under the terms hereof, or (B) the beneficiary of the Letter of Credit does not accept the proposed amendment to the Letter of Credit.

(d)     Expiration Date.  Each Letter of Credit shall have a stated expiration date no later than the earlier of (i) the date twelve months after the date of the issuance of such Letter of Credit (or, in the case of any extension of the expiration date thereof, whether automatic or by amendment, twelve months after the then-current expiration date of such Letter of Credit) and (ii) the date that is five Business Days prior to the Maturity Date.

(e)     Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount or extending the expiration date thereof), and without any further action on the part of the applicable L/C Issuer or the Lenders, such L/C Issuer hereby grants to each Revolving Credit Lender, and each Revolving Credit Lender hereby acquires from such L/C Issuer, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  Each Revolving Credit Lender acknowledges and agrees that its obligation to acquire participations pursuant to this clause (e) in respect of Letters of Credit is absolute, unconditional and irrevocable and shall not be affected by any circumstance whatsoever, including any amendment, extension, reinstatement or renewal of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Revolving Credit Commitments.

In consideration and in furtherance of the foregoing, each Revolving Credit Lender hereby absolutely, unconditionally and irrevocably agrees to pay to the Administrative Agent, for account of the applicable L/C Issuer, such Lender's Applicable Percentage of each Letter of Credit Disbursement made by an L/C Issuer not later than 1:00 p.m. on the Business Day specified in the notice provided by the Administrative Agent to the Revolving Credit Lenders pursuant to Section 2.03(f) until such Letter of Credit Disbursement is reimbursed by the Borrower or at any time after any reimbursement payment is required to be refunded to the Borrower for any reason, including after the Maturity Date.  Such payment shall be made without any offset, abatement, withholding or reduction whatsoever.  Each such payment shall be made in the same manner as provided in Section 2.02 with respect to Loans made by such Lender (and Section 2.02 shall apply, mutatis mutandis, to the payment obligations of the Revolving Credit Lenders pursuant to this Section 2.03), and the Administrative Agent shall promptly pay to the applicable L/C Issuer the amounts so received by it from the Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to Section 2.03(f), the Administrative Agent shall distribute such payment to the applicable L/C Issuer or, to the extent that the Revolving Credit Lenders have made payments pursuant to this clause (e) to reimburse such L/C Issuer, then to such Lenders and such L/C Issuer as their interests may appear.  Any payment made by a Lender pursuant to this clause (e) to reimburse an L/C Issuer for any Letter of Credit Disbursement shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such Letter of Credit Disbursement.

Each Revolving Credit Lender further acknowledges and agrees that its participation in each Letter of Credit will be automatically adjusted to reflect such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit at each time such Lender's Commitment is amended pursuant to the operation of Section 2.14, as a result of an assignment in accordance with Section 11.06 or otherwise pursuant to this Agreement.

If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the applicable L/C Issuer any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.03(e), then, without limiting the other provisions of this Agreement, the applicable L/C Issuer shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to such L/C Issuer at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the applicable L/C Issuer in accordance with banking industry rules on interbank compensation, plus any administrative,

57

processing or similar fees customarily charged by such L/C Issuer in connection with the foregoing. If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Revolving Credit Loan included in the relevant Revolving Credit Borrowing or L/C Advance in respect of the relevant L/C Borrowing, as the case may be. A certificate of any L/C Issuer submitted to any Revolving Credit Lender (through the Administrative Agent) with respect to any amounts owing under this clause (vi) shall be conclusive absent manifest error.

(f)      <u>Reimbursement</u>.   If an L/C Issuer shall make any Letter of Credit Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such L/C Issuer in respect of such Letter of Credit Disbursement by paying to the Administrative Agent an amount equal to such Letter of Credit Disbursement not later than 12:00 noon on (i) the Business Day that the Borrower receives notice of such Letter of Credit Disbursement, if such notice is received prior to 10:00 a.m. or (ii) the Business Day immediately following the day that the Borrower receives such notice, if such notice is not received prior to such time, provided that, if such Letter of Credit Disbursement is not less than $50,000, the Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with <u>Section 2.02</u> or <u>Section 2.04</u> that such payment be financed with a Borrowing of Base Rate Loans or Swing Line Loan in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting Borrowing of Base Rate Loans or Swing Line Loan. If the Borrower fails to make such payment when due, the Administrative Agent shall notify each Revolving Credit Lender of the applicable Letter of Credit Disbursement, the payment then due from the Borrower in respect thereof (the "<u>Unreimbursed Amount</u>") and such Lender's Applicable Percentage thereof. In such event, the Borrower shall be deemed to have requested a Revolving Credit Borrowing of Base Rate Loans to be disbursed on the date of payment by the applicable L/C Issuer under a Letter of Credit in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in <u>Section 2.02</u> for the principal amount of Base Rate Loans, but subject to the amount of the unutilized portion of the aggregate Revolving Credit Commitments and the conditions set forth in <u>Section 4.02</u> (other than the delivery of a Loan Notice). Any notice given by any L/C Issuer or the Administrative Agent pursuant to this <u>Section 2.03(f)</u> may be given by telephone if immediately confirmed in writing; <u>provided</u> that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(g)      <u>Obligations Absolute</u>.   The Borrower's obligation to reimburse Letter of Credit Disbursements as provided in <u>clause (f)</u> of this <u>Section 2.03</u> shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of:

(i)      any lack of validity or enforceability of this Agreement, any other Loan Document or any Letter of Credit, or any term or provision herein or therein;

(ii)      the existence of any claim, counterclaim, setoff, defense or other right that the Borrower or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), any L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)      any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement in such draft or other document being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

58

(iv)    waiver by any L/C Issuer of any requirement that exists for such L/C Issuer's protection and not the protection of the Borrower or any waiver by such L/C Issuer which does not in fact materially prejudice the Borrower;

(v)    payment by the applicable L/C Issuer under a Letter of Credit against presentation of a draft or other document that does not comply strictly with the terms of such Letter of Credit; or

(vi)    any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.03, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.

None of the Administrative Agent, the Lenders, any L/C Issuer, or any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit by the applicable L/C Issuer or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms, any error in translation or any consequence arising from causes beyond the control of the applicable L/C Issuer; provided that the foregoing shall not be construed to excuse an L/C Issuer from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by Applicable Law) suffered by the Borrower that are caused by such L/C Issuer's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of an L/C Issuer (as finally agreed by Borrower and such L/C Issuer or finally determined by a court of competent jurisdiction), an L/C Issuer shall be deemed to have exercised care in each such determination, and that:

(vii)    an L/C Issuer may replace a purportedly lost, stolen, or destroyed original Letter of Credit or missing amendment thereto with a certified true copy marked as such or waive a requirement for its presentation;

(viii)    an L/C Issuer may accept documents that appear on their face to be in substantial compliance with the terms of a Letter of Credit without responsibility for further investigation, regardless of any notice or information to the contrary, and may make payment upon presentation of documents that appear on their face to be in substantial compliance with the terms of such Letter of Credit and without regard to any non-documentary condition in such Letter of Credit;

(ix)    an L/C Issuer shall have the right, in its sole discretion, to decline to accept such documents and to make such payment if such documents are not in strict compliance with the terms of such Letter of Credit; and

(x)    this sentence shall establish the standard of care to be exercised by an L/C Issuer when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof (and the parties hereto hereby waive, to the extent permitted by Applicable Law, any standard of care inconsistent with the foregoing).

Without limiting the foregoing, none of the Administrative Agent, the Lenders, any L/C Issuer, or any of their Related Parties shall have any liability or responsibility by reason of (i) any presentation that includes forged or fraudulent documents or that is otherwise affected by the fraudulent, bad faith, or illegal conduct of the beneficiary or other Person, (ii) an L/C Issuer declining to take-up documents and make payment (A) against documents that are fraudulent, forged, or for other reasons by which that it is

59

entitled not to honor or (B) following a Borrower's waiver of discrepancies with respect to such documents or request for honor of such documents or (iii) an L/C Issuer retaining proceeds of a Letter of Credit based on an apparently applicable attachment order, blocking regulation, or third-party claim notified to such L/C Issuer.

(h)    Applicability of ISP.  Unless otherwise expressly agreed by the applicable L/C Issuer and the Borrower when a Letter of Credit is issued by it the rules of the ISP shall apply to each standby Letter of Credit.  Notwithstanding the foregoing, no L/C Issuer shall be responsible to the Borrower for, and L/C Issuer's rights and remedies against the Borrower shall be impaired by, any action or inaction of any L/C Issuer required or permitted under any law, order, or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including the Law or any order of a jurisdiction where any L/C Issuer or the beneficiary is located, the practice stated in the ISP, or in the decisions, opinions, practice statements, or official commentary of the ICC Banking Commission, the Bankers Association for Finance and Trade – International Financial Services Association (BAFT-IFSA), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

(i)    Each L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and each L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article IX with respect to any acts taken or omissions suffered by such L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article IX included such L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to such L/C Issuer.

(j)    Letter of Credit Fees.  The Borrower shall pay to the Administrative Agent for the account of each Revolving Credit Lender in accordance with its Applicable Revolving Credit Percentage a Letter of Credit fee (the "Letter of Credit Fee") for each standby Letter of Credit equal to the Applicable Rate then used to determine the interest rate applicable to Revolving Credit Loans that are Term SOFR Loans times the daily amount available to be drawn under such Letter of Credit.  For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06.  Letter of Credit Fees shall be (i) due and payable on the first Business Day after the end of each March, June, September and December, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Maturity Date and thereafter on demand and (ii) computed on a quarterly basis in arrears.  If there is any change in the Applicable Rate during any quarter, the daily amount available to be drawn under each standby Letter of Credit shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect.  Notwithstanding anything to the contrary contained herein, upon the request of the Required Revolving Lenders, while any Event of Default exists, all Letter of Credit Fees shall accrue at the Default Rate.

(k)    Fronting Fee and Documentary and Processing Charges Payable to L/C Issuers.  The Borrower shall pay directly to the applicable L/C Issuer for its own account a fronting fee with respect to each Letter of Credit, at the rate per annum equal to 0.125%, computed on the daily amount available to be drawn under such Letter of Credit on a quarterly basis in arrears.  Such fronting fee shall be due and payable on the tenth Business Day after the end of each March, June, September and December in respect of the most recently-ended quarterly period (or portion thereof, in the case of the first payment), commencing with the first such date to occur after the issuance of such Letter of Credit, on the Maturity Date and thereafter on demand.  For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06.  In addition, the Borrower shall pay directly to the applicable L/C Issuer for its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and

charges, of such L/C Issuer relating to letters of credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(l)       Disbursement Procedures.  The L/C Issuer for any Letter of Credit shall, within the time allowed by Applicable Laws or the specific terms of the Letter of Credit following its receipt thereof, examine all documents purporting to represent a demand for payment under such Letter of Credit.  Such L/C Issuer shall promptly after such examination notify the Administrative Agent and the Borrower in writing of such demand for payment if such L/C Issuer has made or will make an Letter of Credit Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse such L/C Issuer and the Lenders with respect to any such Letter of Credit Disbursement.

(m)      Interim Interest.  If the L/C Issuer for any Letter of Credit shall make any L/C Disbursement, then, unless the Borrower shall reimburse such Letter of Credit Disbursement in full on the date such Letter of Credit Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such L/C Disbursement is made to but excluding the date that the Borrower reimburses such Letter of Credit Disbursement, at the rate per annum then applicable to Base Rate Loans; provided that if the Borrower fails to reimburse such Letter of Credit Disbursement when due pursuant to clause (f) of this Section 2.03, then Section 2.08(b) shall apply.  Interest accrued pursuant to this clause (m) shall be for account of such L/C Issuer, except that interest accrued on and after the date of payment by any Lender pursuant to clause (f) of this Section 2.03 to reimburse such L/C Issuer shall be for account of such Lender to the extent of such payment.

(n)       Replacement of any L/C Issuer.  Any L/C Issuer may be replaced at any time by written agreement between the Borrower, the Administrative Agent, the replaced L/C Issuer and the successor L/C Issuer.  The Administrative Agent shall notify the Lenders of any such replacement of an L/C Issuer.  At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced L/C Issuer pursuant to Section 2.03(j).  From and after the effective date of any such replacement, (i) the successor L/C Issuer shall have all the rights and obligations of an L/C Issuer under this Agreement with respect to Letters of Credit to be issued by it thereafter and (ii) references herein to the term "L/C Issuer" shall be deemed to include such successor or any previous L/C Issuer, or such successor and all previous L/C Issuer, as the context shall require.  After the replacement of an L/C Issuer hereunder, the replaced L/C Issuer shall remain a party hereto and shall continue to have all the rights and obligations of an L/C Issuer under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(o)       Cash Collateralization.  If any Event of Default shall occur and be continuing, on the Business Day that the Borrower receives notice from the Administrative Agent or the Required Revolving Lenders (or, if the maturity of the Loans has been accelerated, Revolving Credit Lenders with L/C Obligations representing at least 50% of the total L/C Obligations) demanding the deposit of Cash Collateral pursuant to this clause (o), the Borrower shall immediately deposit into an account established and maintained on the books and records of the Administrative Agent (the "Collateral Account") an amount in cash equal to 103% of the total L/C Obligations as of such date plus any accrued and unpaid interest thereon, provided that the obligation to deposit such Cash Collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in clause (f) of Section 8.01.  Such deposit shall be held by the Administrative Agent as collateral for the payment and performance of the obligations of the Borrower under this Agreement.  In addition, and without limiting the foregoing or clause (d) of this Section 2.03, if any L/C Obligations remain outstanding after the expiration date specified in said clause (d), the Borrower shall immediately deposit

61

into the Collateral Account an amount in cash equal to 103% of such L/C Obligations as of such date plus any accrued and unpaid interest thereon.

The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over the Collateral Account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in the Collateral Account. Moneys in the Collateral Account shall be applied by the Administrative Agent to reimburse each L/C Issuer for Letter of Credit Disbursements for which it has not been reimbursed, together with related fees, costs, and customary processing charges, and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the L/C Obligations at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of Lenders with L/C Obligations representing 50% of the total L/C Obligations), be applied to satisfy other obligations of the Borrower under this Agreement. If the Borrower is required to provide an amount of Cash Collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived.

(p)     Letters of Credit Issued for Subsidiaries. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Subsidiary, the Borrower shall be obligated to reimburse, indemnify and compensate the applicable L/C Issuer hereunder for any and all drawings under such Letter of Credit as if such Letter of Credit had been issues solely for the account of the Borrower. The Borrower irrevocably waives any and all defenses that might otherwise be available to it as a guarantor or surety of any or all of the obligations of such Subsidiary in respect of such Letter of Credit. The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of Subsidiaries inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such Subsidiaries.

(q)     Conflict with Issuer Documents. In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

**Section 2.04    Swing Line Loans**.

(a)     The Swing Line. Subject to the terms and conditions set forth herein, the Swing Line Lender, in reliance upon the agreements of the other Lenders set forth in this Section 2.04, may in its sole discretion make loans (each such loan, a "Swing Line Loan") to the Borrower from time to time on any Business Day during the Availability Period in an aggregate amount not to exceed at any time outstanding the amount of the Swing Line Sublimit; provided, however, that after giving effect to any Swing Line Loan, (i) the Total Revolving Credit Outstandings shall not exceed the Revolving Credit Facility at such time, and (ii) the Revolving Credit Exposure of any Revolving Credit Lender shall not exceed such Lender's Revolving Credit Commitment, (y) the Borrower shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan, and (z) the Swing Line Lender shall not be under any obligation to make any Swing Line Loan if it shall determine (which determination shall be conclusive and binding absent manifest error) that it has, or by such Credit Extension may have, Fronting Exposure. Within the foregoing limits, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.04, prepay under Section 2.05, and reborrow under this Section 2.04. Each Swing Line Loan shall bear interest only at a rate based on the Base Rate. Immediately upon the making of a Swing Line Loan, each Revolving Credit Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Lender a risk participation in such Swing Line Loan in an amount equal to the product of such Revolving Credit Lender's Applicable Revolving Credit Percentage times the amount of such Swing Line Loan. Except for purposes of calculating the

62

Commitment Fee, availability under the Revolving Credit Facility shall be reduced on a dollar-for-dollar basis by Borrowings of Swing Line Loans.

(b)    _Borrowing Procedures._  Each Swing Line Borrowing shall be made upon the Borrower's irrevocable notice to the Swing Line Lender and the Administrative Agent, which may be given by (A) telephone or (B) by a Swing Line Notice; _provided_ that any telephonic notice must be confirmed promptly by delivery to the Swing Line Lender and the Administrative Agent of a Swing Line Notice. Each such notice must be received by the Swing Line Lender and the Administrative Agent not later than 1:00 p.m. on the requested borrowing date, and shall specify (i) the amount to be borrowed, which shall be a minimum of $50,000, and (ii) the requested borrowing date, which shall be a Business Day. Promptly after receipt by the Swing Line Lender of any Swing Line Notice, the Swing Line Lender will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has also received such Swing Line Notice and, if not, the Swing Line Lender will notify the Administrative Agent (by telephone or in writing) of the contents thereof.  Unless the Swing Line Lender has received notice (by telephone or in writing) from the Administrative Agent (including at the request of any Revolving Credit Lender) prior to 2:00 p.m. on the date of the proposed Swing Line Borrowing (A) directing the Swing Line Lender not to make such Swing Line Loan as a result of the limitations set forth in the first proviso to the first sentence of Section 2.04(a), or (B) that one or more of the applicable conditions specified in Article IV is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender will, not later than 3:00 p.m. on the borrowing date specified in such Swing Line Notice, make the amount of its Swing Line Loan available to the Borrower.

(c)    _Refinancing of Swing Line Loans._

(i)    The Swing Line Lender at any time in its sole and absolute discretion may request, on behalf of the Borrower (which hereby irrevocably authorizes the Swing Line Lender to so request on its behalf), that each Revolving Credit Lender make a Base Rate Loan in an amount equal to such Lender's Applicable Revolving Credit Percentage of the amount of Swing Line Loans then outstanding.  Such request shall be made in writing (which written request shall be deemed to be a Loan Notice for purposes hereof) and in accordance with the requirements of Section 2.02, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but subject to the unutilized portion of the Revolving Credit Facility and the conditions set forth in Section 4.02.  The Swing Line Lender shall furnish the Borrower with a copy of the applicable Loan Notice promptly after delivering such notice to the Administrative Agent.  Each Revolving Credit Lender shall make an amount equal to its Applicable Revolving Credit Percentage of the amount specified in such Loan Notice available to the Administrative Agent in immediately available funds (and the Administrative Agent may apply Cash Collateral available with respect to the applicable Swing Line Loan) for the account of the Swing Line Lender at the Administrative Agent's Office not later than 1:00 p.m. on the day specified in such Loan Notice, whereupon, subject to Section 2.04(c)(ii), each Revolving Credit Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrower in such amount.  The Administrative Agent shall remit the funds so received to the Swing Line Lender.

(ii)    If for any reason any Swing Line Loan cannot be refinanced by such a Revolving Credit Borrowing in accordance with Section 2.04(c)(i), the request for Base Rate Loans submitted by the Swing Line Lender as set forth herein shall be deemed to be a request by the Swing Line Lender that each of the Revolving Credit Lenders fund its risk participation in the relevant Swing Line Loan and each Revolving Credit Lender's payment to the Administrative Agent for the account of the Swing Line Lender pursuant to Section 2.04(c)(i) shall be deemed payment in respect of such participation.

63

(iii)    If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the Swing Line Lender any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.04(c) by the time specified in Section 2.04(c)(i), the Swing Line Lender shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the Swing Line Lender in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Swing Line Lender in connection with the foregoing.  If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Revolving Credit Loan included in the relevant Revolving Credit Borrowing or funded participation in the relevant Swing Line Loan, as the case may be.  A certificate of the Swing Line Lender submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

(iv)    Each Revolving Credit Lender's obligation to make Revolving Credit Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this Section 2.04(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the Swing Line Lender, the Borrower or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided, however, that each Revolving Credit Lender's obligation to make Revolving Credit Loans pursuant to this Section 2.04(c) is subject to the conditions set forth in Section 4.02.  No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrower to repay Swing Line Loans, together with interest as provided herein.

(d)    Repayment of Participations.

(i)    At any time after any Revolving Credit Lender has purchased and funded a risk participation in a Swing Line Loan, if the Swing Line Lender receives any payment on account of such Swing Line Loan, the Swing Line Lender will distribute to such Revolving Credit Lender its Applicable Revolving Credit Percentage thereof in the same funds as those received by the Swing Line Lender.

(ii)    If any payment received by the Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by the Swing Line Lender under any of the circumstances described in Section 11.05 (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Revolving Credit Lender shall pay to the Swing Line Lender its Applicable Revolving Credit Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the Federal Funds Rate.  The Administrative Agent will make such demand upon the request of the Swing Line Lender.  The obligations of the Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)    Interest for Account of Swing Line Lender.  The Swing Line Lender shall be responsible for invoicing the Borrower for interest on the Swing Line Loans.  Until each Revolving Credit Lender funds its Base Rate Loan or risk participation pursuant to this Section 2.04 to refinance such Revolving Credit Lender's Applicable Revolving Credit Percentage of any Swing Line Loan, interest in respect of such Applicable Revolving Credit Percentage shall be solely for the account of the Swing Line Lender.

(f)      Payments Directly to Swing Line Lender.  The Borrower shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Swing Line Lender.

**Section 2.05      Prepayments**.

(a)      Voluntary Prepayments of Loans.  Subject to the to the requirements of this Section 2.05(a) and Section 2.09(b), upon delivery of a Notice of Loan Prepayment to the Administrative Agent, the Borrower may at any time or from time to time voluntarily prepay any Term Loans and Revolving Credit Loans in whole or in part without premium or penalty (except, in the case of any voluntary prepayment of any 2023 Term Loans, as to any Applicable Premium, as set forth in Section 2.09(b)); provided that (A) such notice must be in a form reasonably acceptable to the Administrative Agent and be received by the Administrative Agent not later than 11:00 a.m. (1) two Business Days prior to any date of prepayment of Term SOFR Loans and (2) on the date of prepayment of Base Rate Loans; (B) any such prepayment of Term SOFR Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof (or, if less, the entire principal amount thereof then outstanding); (C) any prepayment of Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof (or, if less, the entire principal amount thereof then outstanding); and (D) any prepayment of Term Loans shall be applied ratably to the Term Loans (and ratably to the remaining principal amortization payments of each Term Loan).  Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if Term SOFR Loans are to be prepaid, the Interest Period(s) of such Loans.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a Term SOFR Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05.  Subject to Section 2.14, each such prepayment shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages in respect of the relevant Facilities.

The Borrower may, upon notice to the Swing Line Lender pursuant to delivery to the Swing Line Lender of a Notice of Loan Prepayment (with a copy to the Administrative Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; provided that (A) such notice must be received by the Swing Line Lender and the Administrative Agent not later than 1:00 p.m. on the date of the prepayment, and (B) any such prepayment shall be in a minimum principal amount of $50,000.  Each such notice shall specify the date and amount of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(b)      Mandatory Prepayments of Loans.

(i)      Dispositions and Recovery Events.  The Borrower shall prepay the Loans as hereafter provided in an aggregate amount equal to 100% of the Net Cash Proceeds received by Holdings or any Subsidiary from all Dispositions (other than Permitted Transfers) and Recovery Events to the extent such Net Cash Proceeds are not, at a time during which no Event of Default shall have occurred and be continuing, reinvested in assets (excluding current assets as classified by GAAP) that are useful in the business of the Borrower and its Subsidiaries within 365 days of the date of such Disposition or Recovery Event (it being understood that such prepayment shall be due immediately upon the expiration of such 365 day period).

65

(ii)    <u>Debt Issuances</u>.    Immediately upon receipt by Holdings or any Subsidiary of the Net Cash Proceeds of any Debt Issuance, the Borrower shall prepay the Loans as hereafter provided in an aggregate amount equal to 100% of such Net Cash Proceeds, plus, in the case of any 2023 Term Loans so prepaid, any Applicable Premium in accordance with <u>Section 2.09(b)</u>.

(iii)    <u>Excess Cash Flow</u>.    Following the end of each Excess Cash Flow Period, within five Business Days after financial statements are required to be delivered pursuant to <u>Section 6.01(a)</u> and the related Compliance Certificate is required to be delivered pursuant to <u>Section 6.02(b)</u>, the Borrower shall prepay an aggregate principal amount of the Term Loans as hereafter provided, equal to the applicable ECF Prepayment Percentage of Excess Cash Flow for the Excess Cash Flow Period covered by such financial statements.

(iv)    <u>Overadvances</u>.    If for any reason the Total Revolving Credit Outstandings at any time exceed the Revolving Credit Commitments at such time, the Borrower shall immediately prepay Revolving Credit Loans, Swing Line Loans and L/C Borrowings and/or Cash Collateralize the L/C Obligations (other than the L/C Borrowings) in an aggregate amount equal to such excess.

(v)    <u>Application of Mandatory Prepayments</u>.    All amounts required to be paid pursuant to this <u>Section 2.05(b)</u> shall be applied, <u>first</u>, other than in respect of <u>Section 2.05(b)(iv),</u> ratably to the Term Loan Facilities (and ratably to the remaining scheduled installments of principal due in respect of all Term Loans within each Term Loan Facility, in the direct order of maturity thereof)(except with respect to any Incremental Term Facility the terms of which provide for less-than-ratable participation in such prepayments), in the manner set forth in <u>Section 2.05(b)(vii),</u> and, <u>second</u>, other than in respect of <u>Section 2.05(b)(iii)</u>, to the Revolving Credit Facility in the manner set forth in <u>Section 2.05(b)(vi)</u>.    All amounts required to be paid pursuant to <u>Section 2.05(b)(iii)</u> shall be applied against the remaining scheduled installments of principal due in respect of the Term Loans in the direct order of maturity thereof and any excess amounts remaining, if any, may be retained by the Borrower and used for any purpose permitted hereunder.

(vi)    <u>Application to Revolving Credit Facility</u>.    Prepayments of the Revolving Credit Facility made pursuant to clause <u>(i)</u>, <u>(ii)</u> or <u>(iv)</u> of this <u>Section 2.05(b)</u>, <u>first</u>, shall be applied ratably to the L/C Borrowings and the Swing Line Loans, <u>second</u>, shall be applied ratably to the outstanding Revolving Credit Loans, and, <u>third</u>, shall be used to Cash Collateralize the remaining L/C Obligations; and,  the amount remaining, if any, after the prepayment in full of all L/C Borrowings, Swing Line Loans and Revolving Credit Loans outstanding at such time and the Cash Collateralization of the remaining L/C Obligations in full (the sum of such prepayment amounts, Cash Collateralization amounts and remaining amount being, collectively, the "<u>Reduction Amount</u>") may be retained by the Borrower for use in the ordinary course of its business, and the Revolving Credit Facility shall be automatically and permanently reduced by the Reduction Amount to the extent set forth in <u>Section 2.06(b)(iii)</u>.    Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrower or any other Loan Party) to reimburse the L/C Issuer or the Revolving Credit Lenders, as applicable.

(vii)    <u>Application to Term Loans; Applicable Premium.</u>    Within the parameters of the applications set forth above, prepayments shall be applied first to Base Rate Loans and then to Term SOFR Loans in direct order of Interest Period maturities.    All

prepayments under this <u>Section 2.05(b)</u> shall be subject to <u>Section 3.05</u>, but otherwise without premium or penalty; <u>provided</u>, <u>however</u>, that, notwithstanding any of the foregoing, in the event that the Borrower makes any mandatory prepayment of 2023 Term Loans pursuant to <u>Section 2.05(b)(ii)</u> during the Applicable Premium Period, the Borrower shall pay to the Administrative Agent, for the ratable account of each applicable 2023 Term Lender the Applicable Premium in accordance with <u>Section 2.09(b)</u>), and shall be accompanied by interest on the principal amount prepaid through the date of prepayment.

**Section 2.06**    <u>**Termination or Reduction of Commitments**</u>.

(a)    <u>Optional</u>.    The Borrower may, upon notice to the Administrative Agent, terminate the Revolving Credit Facility, the Letter of Credit Sublimit or the Swing Line Sublimit, or from time to time permanently reduce the Revolving Credit Facility, the Letter of Credit Sublimit or the Swing Line Sublimit; <u>provided</u> that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. three Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $10,000,000 or any whole multiple of $1,000,000 in excess thereof and (iii) the Borrower shall not terminate or reduce (A) the Revolving Credit Facility if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Credit Outstandings would exceed the Revolving Credit Facility, (B) the Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of L/C Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit, or (C) the Swing Line Sublimit if, after giving effect thereto and to any concurrent prepayments hereunder, the Outstanding Amount of Swing Line Loans would exceed the Letter of Credit Sublimit.  In addition, during the 2023 Term Loan Availability Period, the Borrower may, upon notice to the Administrative Agent (provided consistent with the notice provisions set forth above), from time to time terminate (in whole or in part) the unused portion of the Aggregate 2023 Term Loan Commitments.

(b)    <u>Mandatory</u>.

(i)    The aggregate 2021 Replacement Term Loan Commitments were automatically and permanently reduced to zero on the date of the Borrowing of the 2021 Replacement Term Loans.  The Aggregate 2023 Term Loan Commitments shall be automatically and permanently reduced to zero on the earlier of (i) date of the Borrowing of the 2023 Term Loans and (ii) 5:00 p.m. on the last day of the 2023 Term Loan Availability Period.

(ii)    The Revolving Credit Commitments shall be automatically and permanently reduced on each date on which the prepayment of Revolving Credit Loans outstanding thereunder is required to be made pursuant to <u>Section 2.05(b)(i)</u>, <u>(ii)</u> or <u>(iv)</u> by an amount equal to the applicable Reduction Amount.

(iii)    If after giving effect to any reduction or termination of Revolving Credit Commitments under this <u>Section 2.06</u>, the Letter of Credit Sublimit or the Swing Line Sublimit exceeds the Revolving Credit Facility at such time, the Letter of Credit Sublimit or the Swing Line Sublimit, as the case may be, shall be automatically reduced by the amount of such excess.

(iv)    The Aggregate 2023 Term Loan Commitments shall be automatically and permanently reduced to zero on the earlier of (x) the date on which the Elixir Acquisition shall have been consummated and (y) the date on which the Elixir Purchase Agreement shall have been validly terminated in accordance with its terms.

67

(c)      <u>Application of Commitment Reductions; Payment of Fees</u>.  The Administrative Agent will promptly notify the Lenders of any termination or reduction of the Aggregate 2023 Term Loan Commitment, Letter of Credit Sublimit, Swing Line Sublimit or the Revolving Credit Commitment under this <u>Section 2.06</u>.   Upon any reduction of the Revolving Credit Commitments, the Revolving Credit Commitment of each Revolving Credit Lender shall be reduced by such Lender's Applicable Revolving Credit Percentage of such reduction amount.  All fees in respect of the Revolving Credit Facility accrued until the effective date of any termination of the Revolving Credit Facility shall be paid on the effective date of such termination.  Upon any reduction of the Aggregate 2023 Term Loan Commitment, the 2023 Term Loan Commitment of each 2023 Term Lender shall be reduced by such Lender's pro rata portion of such reduction.

**Section 2.07      <u>Repayment of Loans</u>**.

(a)      <u>2021 Replacement Term Loans</u>.   The Borrower shall repay the outstanding principal amount of the 2021 Replacement Term Loan in installments on the dates and in the amounts set forth in the table below (as such installments may hereafter be adjusted as a result of prepayments made pursuant to <u>Section 2.05</u>), unless accelerated sooner pursuant to <u>Section 8.02</u>:

| Payment Dates | Principal Amortization Payment |
| --- | --- |
| June 30, 2021 | $4,687,500 |
| September 30, 2021 | $4,687,500 |
| December 31, 2021 | $4,687,500 |
| March 31, 2022 | $4,687,500 |
| June 30, 2022 | $4,687,500 |
| September 30, 2022 | $4,687,500 |
| December 31, 2022 | $4,687,500 |
| March 31, 2023 | $4,687,500 |
| June 30, 2023 | $7,031,250 |
| September 30, 2023 | $7,031,250 |
| December 31, 2023 | $7,031,250 |
| March 31, 2024 | $7,031,250 |
| June 30, 2024 | $7,031,250 |
| September 30, 2024 | $7,031,250 |
| December 31, 2024 | $7,031,250 |
| March 31, 2025 | $7,031,250 |
| June 30, 2025 | $9,375,000 |
| September 30, 2025 | $9,375,000 |
| December 31, 2025 | $9,375,000 |
| Maturity Date | Outstanding Principal Balance of the 2021 Replacement Term Loan |

(b)      <u>2023 Term Loans</u>.  The Borrower shall repay the 2023 Term Loans on the last Business Day of each March, June, September and December (commencing with the last day of the full fiscal quarter of the Borrower starting after the date of the Borrowing under the 2023 Term Facility) in an amount equal to (i) the aggregate outstanding principal amount of 2023 Term Loans immediately after the Borrowing thereof on the date of such Borrowing multiplied by (ii) 1.25% (as such installments may hereafter be adjusted as a result of the application of prepayments made pursuant to <u>Section 2.05</u>), unless accelerated sooner pursuant to <u>Section 8.02</u>. To the extent not previously paid, all 2023 Term Loans shall be due and payable on the Maturity Date for the 2023 Term Loans.

AMERICAS/2024053109.31

(c)    Revolving Credit Loans.  The Borrower shall repay to the Revolving Credit Lenders on the Maturity Date for the Revolving Credit Facility the aggregate principal amount of all Revolving Credit Loans outstanding on such date.

(d)    Swing Line Loans.  The Borrower shall repay each Swing Line Loan on the earlier to occur of (i) the date ten Business Days after such Loan is made and (ii) the Maturity Date.  At any time that there shall exist a Defaulting Lender, immediately upon the request of the Swing Line Lender, the Borrower shall repay the outstanding Swing Line Loans made by the Swing Line Lender in an amount sufficient to eliminate any Fronting Exposure in respect of such Swing Line Loans.

**Section 2.08    Interest**.

(a)    Subject to the provisions of subsection (b) below, (i) each Term SOFR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the sum of Term SOFR for such Interest Period plus the Applicable Rate; (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the sum of the Base Rate plus the Applicable Rate; and (iii) each Swing Line Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)    (1)    If any outstanding amount of principal of any Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by Applicable Laws.

(ii)    If any outstanding amount (other than principal of any Loan) payable by the Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then upon the request of the Required Lenders, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by Applicable Laws.

(iii)    Upon the request of the Required Lenders, while any Event of Default exists (other than as set forth in clauses (b)(i) and (b)(ii) above), the Borrower shall pay interest on the principal amount of all outstanding Obligations hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by Applicable Laws.

(iv)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**Section 2.09    Fees**.

(a)    Commitment Fee on Revolving Credit Commitments.  The Borrower shall pay to the Administrative Agent for the account of each Revolving Credit Lender in accordance with its Applicable Revolving Credit Percentage, a commitment fee (the "Commitment Fee") equal to the

Applicable Fee Rate <u>times</u> the actual daily amount by which the Revolving Credit Facility exceeds the sum of (i) the Outstanding Amount of Revolving Credit Loans and (ii) the Outstanding Amount of L/C Obligations, subject to adjustment as provided in <u>Section 2.17</u>.  For the avoidance of doubt, the Outstanding Amount of Swing Line Loans shall not be counted towards or considered usage of the Aggregate Commitments for purposes of determining the Commitment Fee.  The Commitment Fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in <u>Article IV</u> is not met, and shall be due and payable quarterly in arrears on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the First Restatement Date, and on the last day of the Availability Period for the Revolving Credit Facility.  The Commitment Fee shall be calculated quarterly in arrears, and if there is any change in the Applicable Fee Rate during any quarter, the actual daily amount shall be computed and multiplied by the Applicable Fee Rate separately for each period during such quarter that such Applicable Fee Rate was in effect.

(b)      <u>Prepayment Premium</u>.  Upon the occurrence of an Applicable Premium Trigger Event during the Applicable Premium Period, the Borrower shall pay to the Administrative Agent, for the accounts of the 2023 Term Lenders, the Applicable Premium.  Without limiting the generality of the foregoing, and notwithstanding anything to the contrary in this Agreement or any other Loan Document, it is understood and agreed that if an acceleration of the Obligations causes an Applicable Premium Trigger Event during the Applicable Premium Period, the Applicable Premium, if any, determined as of the date of acceleration, will also be due and payable and will be treated and deemed as though the 2023 Term Loans were prepaid as of such date of acceleration, and shall constitute part of the Obligations for all purposes herein.  Any Applicable Premium payable in accordance with this <u>Section 2.09(b)</u> shall be presumed to be equal to the liquidated damages sustained by the Lenders as the result of the occurrence of the Applicable Premium Trigger Event, and the Loan Parties agree that it is reasonable under the circumstances currently existing.  THE LOAN PARTIES EXPRESSLY WAIVE TO THE EXTENT PERMITTED BY APPLICABLE LAW THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING APPLICABLE PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION.  The Loan Parties expressly agree that (i) the Applicable Premium is reasonable and is the product of an arm's-length transaction between sophisticated business people, ably represented by counsel, (ii) the Applicable Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the Applicable Premium, (iv) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this <u>Section 2.09(b)</u>, (v) their agreement to pay the Applicable Premium is a material inducement to the Lenders to provide the 2023 Term Loan Commitments and make the 2023 Term Loans, and (vi) the Applicable Premium represents a good faith, reasonable estimate and calculation of the lost profits or damages of the Lenders, and does not constitute an unreasonable penalty, and it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lenders or profits lost by the Lenders as a result of such Applicable Premium Trigger Event.

(c)      <u>Consent Fee</u>.  On the Elixir Acquisition Closing Date, the Borrower shall pay to the Administrative Agent, for the ratable benefit of each Consenting Lender, a consent fee (the "<u>Consent Fee</u>") in an amount equal to 0.50% of the aggregate outstanding principal amount of such Consenting Lender's 2021 Replacement Term Loans (calculated without giving effect to the Second Restatement Date 2021 Replacement Term Loan Paydown) and its Revolving Credit Commitments (drawn or undrawn) under the Existing Credit Agreement, in each case, determined

as of immediately prior to the occurrence of the Second Restatement Date.  The Consent Fee shall be fully earned on the Second Restatement Date, and shall be due and payable on, and subject to the occurrence of, the Elixir Acquisition Closing Date.

(d)      The Borrower shall pay to the Arrangers and the Administrative Agent for their own respective accounts fees in the amounts and at the times specified in the Fee Letters.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(e)      The Borrower shall pay to the Lenders such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**Section 2.10**      **Computation of Interest and Fees; Retroactive Adjustments of Applicable Rate**.

(a)      All computations of interest for Base Rate Loans (including Base Rate Loans determined by reference to Term SOFR) shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of interest on Loans shall be made on the basis of a 360-day year and actual days elapsed (which results in more interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(b)      If, as a result of any restatement of or other adjustment to the financial statements of the Borrower or for any other reason, the Borrower or the Lenders determine that (i) the Consolidated Net Leverage Ratio as calculated by the Borrower as of any applicable date was inaccurate and (ii) a proper calculation of the Consolidated Net Leverage Ratio would have resulted in higher pricing for such period, the Borrower shall immediately and retroactively be obligated to pay to the Administrative Agent for the account of the applicable Lenders or the applicable L/C Issuer, as the case may be, promptly on demand by the Administrative Agent (or, after the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code, automatically and without further action by the Administrative Agent, any Lender or any L/C Issuer), an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period.  This paragraph shall not limit the rights of the Administrative Agent, any Lender or any L/C Issuer, as the case may be, under this Agreement.  The Borrower's obligations under this paragraph shall survive the termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

**Section 2.11**      **Evidence of Debt**.

(a)      The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent (including the Register) in respect of such matters, the accounts and records

of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)    In addition to the accounts and records referred to in <u>Section 2.11(a)</u>, each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Lender of participations in Letters of Credit and Swing Line Loans.  In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

**Section 2.12    <u>Payments Generally; Administrative Agent's Clawback</u>**.

(a)    <u>General</u>.  All payments to be made by the Borrower shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Applicable Percentage in respect of the relevant Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    (i)    <u>Funding by Lenders; Presumption by Administrative Agent</u>.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Term SOFR Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.02</u> (or, in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by <u>Section 2.02</u>) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to such Borrowing.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period,

the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)     Payments by Borrower; Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Borrower, prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or any L/C Issuer hereunder, that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Appropriate Lenders or the applicable L/C Issuers, as the case may be, the amount due.  With respect to any payment that the Administrative Agent makes for the account of the Lenders or any L/C Issuer hereunder as to which the Administrative Agent determines (which determination shall be conclusive absent manifest error) that any of the following applies (such payment referred to as the "Rescindable Amount"): (1) the Borrower has not in fact made such payment; (2) the Administrative Agent has made a payment in excess of the amount so paid by the Borrower (whether or not then owed); or (3) the Administrative Agent has for any reason otherwise erroneously made such payment; then each of the Appropriate Lenders or the applicable L/C Issuers, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount so distributed to such Lender or such L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Term Loans and Revolving Credit Loans, to fund participations in Letters of Credit and Swing Line Loans and to make payments pursuant to Section 11.04(c) are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 11.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 11.04(c).

(e)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)      Insufficient Funds.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, L/C Borrowings, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal and L/C Borrowings then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and L/C Borrowings then due to such parties.

**Section 2.13      Sharing of Payments by Lenders**.

If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it resulting in such Lender receiving payment of a proportion of the aggregate amount of such Loans or participations and accrued interest thereon greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans or subparticipations in L/C Obligations and Swing Line Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them, provided that:

(i)      if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)      the provisions of this Section 2.13 shall not be construed to apply to (A) any payment made by or on behalf of the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), (B) the application of Cash Collateral provided for in Section 2.14 or (C) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or subparticipations in L/C Obligations or Swing Line Loans to any assignee or participant, other than an assignment to any Loan Party or any Subsidiary (as to which the provisions of this Section 2.13 shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**Section 2.14      Defaulting Lenders**.

(a)      Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

(i)      Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 11.01.

(ii)      Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or

74

otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 11.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows:  first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to any L/C Issuer or the Swing Line Lender hereunder; third, to Cash Collateralize the L/C Issuers' Fronting Exposure with respect to such Defaulting Lender in accordance with Section 2.14; fourth as the Borrower may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) Cash Collateralize the L/C Issuers' future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with Section 2.14; sixth, to the payment of any amounts owing to the Lenders, L/C Issuers or Swing Line Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, L/C Issuer or the Swing Line Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans or L/C Borrowings in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Obligations owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Obligations owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in L/C Obligations and Swing Line Loans are held by the Lenders pro rata in accordance with the Commitments hereunder without giving effect to Section 2.14(b).  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.14(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Reallocation of Applicable Percentages to Reduce Fronting Exposure. All or any part of such Defaulting Lender's participation in L/C Obligations and Swing Line Loans, and any fees payable by the Borrower related thereto, shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that such reallocation does not cause the aggregate Revolving Credit Exposure of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Revolving Credit Commitment.  Subject to Section 11.21, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(iv)    Cash Collateral, Repayment of Swing Line Loans.  If the reallocation described in clause (a)(iii) above cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under Applicable Law, (x) first, prepay Swing Line Loans in an amount equal to the Swing Line Lender's Fronting Exposure and (y) second, Cash Collateralize the L/C Issuers' Fronting Exposure in accordance with the procedures set forth in Section 2.03.

(b)    Defaulting Lender Cure.  If the Borrower, the Administrative Agent, the Swing Line Lender and each L/C Issuer agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Revolving Credit Loans and funded and unfunded participations in Letters of Credit and Swing Line Loans to be held on a pro rata basis by the Lenders in accordance with their Revolving Credit Commitments (without giving effect to Section 2.14(a)(iii)), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)    New Swing Line Loans/Letters of Credit.  So long as any Revolving Credit Lender is a Defaulting Lender, (i) the Swing Line Lender shall not be required to fund any Swing Line Loans unless it is satisfied that it will have no Fronting Exposure after giving effect to such Swing Line Loan and (ii) no L/C Issuer shall be required to issue, extend, increase, reinstate or renew any Letter of Credit unless it is satisfied that it will have no Fronting Exposure after giving effect thereto.

(d)    Cash Collateral.

(i)    Obligation to Cash Collateralize.  At any time that there shall exist a Defaulting Lender, within one Business Day following the written request of the Administrative Agent or any L/C Issuer (with a copy to the Administrative Agent), the Borrower shall Cash Collateralize the L/C Issuers' Fronting Exposure with respect to such Defaulting Lender (determined after giving effect to Section 2.14(a)(iii) and any Cash Collateral provided by such Defaulting Lender) in an amount not less than the Minimum Collateral Amount.

(ii)    Grant of Security Interest.  The Borrower, and to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to (and subjects to the control of) the Administrative Agent, for the benefit of the Administrative Agent, the L/C Issuers and the Lenders, and agrees to maintain, a first priority security interest in all such cash, deposit accounts and all balances therein, and all other property so provided as collateral pursuant hereto, and in all proceeds of the foregoing, all as security for the obligations to which such Cash Collateral may be applied pursuant to Section 2.14.  If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent or the applicable L/C Issuer as herein provided, or that the total amount of such Cash Collateral is less than the Minimum Collateral Amount, the Borrower will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash

76

Collateral in an amount sufficient to eliminate such deficiency (determined in the case of Cash Collateral provided pursuant to Section 2.14(a)(iv), after giving effect to Section 2.14(a)(iv) and any Cash Collateral provided by the Defaulting Lender).  All Cash Collateral (other than credit support not constituting funds subject to deposit) shall be maintained in an account at Bank of America.  The Borrower shall pay on demand therefor from time to time all customary account opening, activity and other administrative fees and charges in connection with the maintenance and disbursement of Cash Collateral.

(iii)    Application.  Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under any of this Section 2.14 or Sections 2.04, 2.05, 2.06, 2.13 or 8.02 in respect of Letters of Credit or Swing Line Loans shall be held and applied to the satisfaction of the specific L/C Obligations, Swing Line Loans, obligations to fund participations therein (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) and other obligations for which the Cash Collateral was so provided, prior to any other application of such property as may be provided for herein.

(iv)    Release.  Cash Collateral (or the appropriate portion thereof) provided to reduce Fronting Exposure or to secure other obligations shall be released promptly following (i) the elimination of the applicable Fronting Exposure or other obligations giving rise thereto (including by the termination of Defaulting Lender status of the applicable Lender (or, as appropriate, its assignee following compliance with Section 11.06(b)(vi))) or (ii) the determination by the Administrative Agent and the applicable L/C Issuer that there exists excess Cash Collateral; provided, however, (x) the Person providing Cash Collateral and the applicable L/C Issuer may agree that Cash Collateral shall not be released but instead held to support future anticipated Fronting Exposure or other obligations.

**Section 2.15    Incremental Facilities.**

After the Second Restatement Date, the Borrower may from time to time add one or more new term loan commitment tranches (each an "Incremental Term Commitment", and any such increase, an "Incremental Term Facility"), and/or subsequently increase the then-existing Revolving Credit Commitments (each an "Incremental Revolving Credit Commitment" (and together with each Incremental Term Commitment, the "Incremental Commitments"), and any such increase, an "Incremental Revolving Credit Facility" (and together with each Incremental Term Facility, collectively, the "Incremental Facilities")), to this Agreement at the option of the Borrower by an agreement in writing entered into by the Loan Parties, the Administrative Agent and each Person (including any existing Lender) that agrees to provide a portion of such Incremental Facility (each an "Incremental Facility Amendment"); provided that:

(a)    no more than four Incremental Facilities may be implemented by the Borrower during the term of this Agreement and the aggregate principal amount of each Incremental Facility shall not exceed the Incremental Available Amount (determined at the time of incurrence of each Incremental Facility);

(b)    no Default shall exist on the effective date of such Incremental Facility or would exist after giving effect to such Incremental Facility (except, in the connection with a Limited Condition Acquisition, in which case this requirement shall be that, as of the effective date of such Incremental Facility, no Specified Event of Default shall have occurred and be continuing or would result from such Incremental Facility);

77

(c)        each Incremental Facility shall be in an aggregate principal amount of at least $20,000,000 and integral multiples of $1,000,000 in excess thereof;

(d)        subject to Section 1.07 with respect to any Limited Condition Acquisition, the representations and warranties of each Loan Party contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the effective date of such Incremental Facility (or in the case of any such representations and warranties that contain a materiality or Material Adverse Effect qualification, be true and correct in all respects on and as of the effective date of such Incremental Facility), except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (or in the case of any such representations and warranties that contain a materiality or Material Adverse Effect qualification, be true and correct in all respects as of such earlier date);

(e)        no existing Lender shall be under any obligation to provide any portion of an Incremental Facility and any such decision whether to provide a commitment to an Incremental Facility shall be in such Lender's sole and absolute discretion;

(f)        each Person providing a portion of an Incremental Facility shall qualify as an Eligible Assignee;

(g)        the Borrower shall deliver to the Administrative Agent:

(i)        a certificate of each Loan Party dated as of the date of such Incremental Facility signed by a Responsible Officer of such Loan Party (A) certifying and attaching resolutions adopted by the board of directors or equivalent governing body of such Loan Party approving such Incremental Facility and (B) in the case of the Borrower, certifying that, before and after giving effect to such Incremental Facility, (1) subject to Section 1.07 with respect to any Incremental Facility incurred in connection with a Limited Condition Acquisition, the representations and warranties of each Loan Party contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such increase (or in the case of any such representations and warranties that contain a materiality or Material Adverse Effect qualification, shall be true and correct in all respects on and as of the date of sch increase), except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (or in the case of any such representations and warranties that contain a materiality or Material Adverse Effect qualification, shall be true and correct in all respects on and as of such earlier date), and (2) subject to Section 1.07 (and pursuant to clause (b) above) with respect to any Incremental Facility incurred in connection with a Limited Condition Acquisition, no Default or Specified Event of Default, as applicable, exists;

(ii)        such amendments to the Collateral Documents as the Administrative Agent may reasonably request to cause the Collateral Documents to secure the Obligations after giving effect to such Incremental Facility (collectively "Collateral Document Amendments");

(iii)        opinions of legal counsel to the Loan Parties in form and substance reasonably acceptable to the Administrative Agent, addressed to the Administrative

AMERICAS/2024053109.31

Agent and each Lender (including each Person providing a portion of an Incremental Facility), dated as of the effective date of such Incremental Facility; and

(iv)    a Pro Forma Compliance Certificate demonstrating that after giving effect to the incurrence of such Incremental Facility on a Pro Forma Basis (and for purposes of the calculation under this clause (iv) assuming any Incremental Revolving Credit Facility is fully drawn) the Loan Parties would be in compliance with the financial covenants set forth in Section 7.11 recomputed as of the end of the period of the four fiscal quarters most recently ended for which the Borrower has delivered financial statements pursuant to Section 6.01(a) or (b), but subject to Section 1.07 with respect to any Incremental Facility incurred in connection with a Limited Condition Acquisition;

(h)    in the case of an Incremental Term Facility:

(i)    the interest rate, interest rate margins, fees, discount, prepayment premiums, amortization and final maturity date for such Incremental Term Facility shall be as agreed by the Loan Parties and the Lenders providing such Incremental Term Facility; provided that:

(A)    the final maturity of such Incremental Term Facility shall not be earlier than the later of the latest maturity date set forth in the definition of "Maturity Date" and the latest maturity date of any previously incurred Term Loan under this Agreement;

(B)    the Weighted Average Life to Maturity of such Incremental Term Facility shall not be shorter than the Weighted Average Life to Maturity of any previously incurred Term Loan; and

(C)    in the event that the Effective Yield for any Incremental Term Loan is greater than the then lowest Effective Yield for any of the 2023 Term Loans and/or the 2021 Replacement Term Loans then outstanding (any such difference, a "Yield Differential") by more than 0.50%, then the Applicable Rate (and/or, as provided in the proviso below, the Term SOFR or Base Rate "floor") applicable to the 2023 Term Loans and/or the 2021 Replacement Term Loans (as applicable) shall, in each case, each be increased to the extent necessary so that the Yield Differential for each of the 2023 Term Loans the 2021 Replacement Term Loans is 0.50%; provided, that, to the extent any portion of the Yield Differential is attributable to a higher Term SOFR "floor" being applicable to such Incremental Term Loans and such "floor" is greater than the Term SOFR in effect for an Interest Period of three months' duration at such time, the Term SOFR "floor" applicable to the outstanding Term Loans shall be increased to an amount not to exceed the Term SOFR "floor" applicable to such Incremental Term Loans prior to any increase in the Applicable Rate applicable to such Term Loans then outstanding;

(ii)    such Incremental Term Facility shall share ratably in any mandatory prepayments of the other term loans under this Agreement (or otherwise provide for more favorable prepayment treatment for the then outstanding term loans under this Agreement) and shall have ratable voting rights as the other term loans under this Agreement (or otherwise provide for more favorable voting rights for the then outstanding term loans under this Agreement); and

79

(i)      in the case of the Incremental Revolving Credit Facility, the interest rate, interest rate margins, fees, discount, prepayment premiums, and final maturity date for the Incremental Revolving Credit Facility shall be as agreed by the Loan Parties and the Lenders providing the Incremental Revolving Credit Facility; provided, there shall be no scheduled commitment reductions applicable to such Incremental Revolving Credit Facility and the final maturity of such Incremental Revolving Credit Facility shall not be, in each case, earlier than the later of the Maturity Date and the latest maturity date of any previously incurred term loan under this Agreement.

The commitments to an Incremental Facility and credit extensions thereunder shall constitute Commitments and Credit Extensions under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the Guarantees and security interests created by the Collateral Documents (and no Incremental Facility may be secured by any assets of the Loan Parties or their respective Subsidiaries which do not constitute Collateral, and no Incremental Facility may be guaranteed by any Subsidiary of Holdings which is not a Guarantor of the Obligations pursuant hereto).  Each Incremental Facility shall rank pari passu in right of payment with, and be secured by Liens on the Collateral ranking pari passu with, the other Loans under this Agreement.  The Lenders hereby authorize the Administrative Agent to enter into, and the Lenders agree that this Agreement and the other Loan Documents shall be amended by, an amendment implementing an Incremental Facility and any amendments to the Collateral Documents to the extent the Administrative Agent and the Borrower deem necessary in order to establish the applicable Incremental Facility and to effect such other changes agreed by the Borrower and the Persons providing such Incremental Facility and approved by the Administrative Agent; provided, however, that no such amendment shall effect any change described in Section 11.01(a) without the consent of each Person required to consent to such change under such clause (it being agreed, however, that any establishment of any Incremental Facility will not, of itself, be deemed to effect any of the changes described in Section 11.01(a) and that modifications to the definitions of "Commitments", "Loans" and "Required Lenders" or other provisions relating to voting provisions to provide the Persons providing the applicable Incremental Facility with the benefit of such provisions will not, by themselves, be deemed to effect any of the changes described in Section 11.01(a)).  The Administrative Agent shall promptly notify each Lender as to the effectiveness of any amendment implementing an Incremental Facility.

### Section 2.16    Extension of Maturity Date.

(a)      Requests for Extension.  The Borrower may, by notice to the Administrative Agent from time to time request an extension (each, an "Extension") of the maturity date of any Class of Loans and Commitments to the extended maturity date specified in such notice.  Such notice shall (i) set forth the amount of the applicable Class of Revolving Credit Commitments (in each case, for the purposes of this Section 2.16, along with any applicable funded Revolving Credit Loans) and/or Term Loans that will be subject to the Extension (which shall be in minimum increments of $1,000,000 and a minimum amount of $5,000,000), (ii) set forth the date on which such Extension is requested to become effective (which shall be not less than ten Business Days nor more than sixty days after the date of such Extension notice (or such longer or shorter periods as the Administrative Agent shall agree in its sole discretion)) and (iii) identify the relevant Class of Revolving Credit Commitments and/or Term Loans to which such Extension relates.  Each Lender of the applicable Class shall be offered (an "Extension Offer") an opportunity to participate in such Extension on a pro rata basis and on the same terms and conditions as each other Lender of such Class pursuant to procedures established by, or reasonably acceptable to, the Administrative Agent and the Borrower.  If the aggregate principal amount of Revolving Credit Commitments or Term Loans in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Revolving Credit Commitments or Term Loans, as applicable, subject to the Extension Offer as

set forth in the Extension notice, then the Revolving Credit Commitments or Term Loans, as applicable, of Lenders of the applicable Class shall be extended ratably up to such maximum amount based on the respective principal amounts with respect to which such Lenders have accepted such Extension Offer.

(b)      The following shall be conditions precedent to the effectiveness of any Extension: (i) no Default or Event of Default shall have occurred and be continuing prior to and after giving effect to such Extension, (ii) the representations and warranties set forth in Article V and in each other Loan Document shall be deemed to be made and shall be true and correct in all material respects on and as of the effective date of such Extension (or in the case of any such representations and warranties that contain a materiality or Material Adverse Effect qualification, be true and correct in all respects as of such date), except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (or in the case of any such representations and warranties that contain a materiality or Material Adverse Effect qualification, be true and correct in all respects as of such earlier date), (iii) the L/C Issuers and the Swing Line Lender shall have consented to any Extension of the Revolving Credit Commitments, to the extent that such Extension provides for the issuance or extension of Letters of Credit or making of Swing Loans at any time during the extended period and (iv) the terms of such Extended Revolving Credit Commitments and Extended Term Loans shall comply with clause (c) of this Section 2.16.

(c)      The terms of each Extension shall be determined by the Administrative Agent, the Borrower and the applicable Extending Lenders and set forth in an amendment to this Agreement (an "Extension Amendment"); provided that (i) the final maturity date of any Extended Revolving Credit Commitment or Extended Term Loan shall be no earlier than the date that is six months after the maturity date of the Class of Term Loans or Revolving Credit Commitments being extended, respectively, (ii)(A) there shall be no scheduled amortization of the loans or reductions of commitments under any Extended Revolving Credit Commitments and (B) the Weighted Average Life to Maturity of the Extended Term Loans shall be no shorter than the remaining Weighted Average Life to Maturity of the Class of Term Loans being extended, (iii) the Extended Revolving Loans and the Extended Term Loans will rank pari passu in right of payment and with respect to security with the existing Revolving Loans and the existing Term Loans and the borrower and guarantors of the Extended Revolving Credit Commitments or Extended Term Loans, as applicable, shall be the same as the Borrower and Guarantors with respect to the existing Revolving Loans or Term Loans, as applicable, (iv) the interest rate margin, rate floors, fees, original issue discount and premium applicable to any Extended Revolving Credit Commitment (and the Extended Revolving Loans thereunder) and Extended Term Loans shall be as determined by the Borrower and the applicable Extending Lenders, (v)(A) the Extended Term Loans may participate on a pro rata or less than pro rata (but not greater than pro rata) basis in voluntary or mandatory prepayments with each other Class of Term Loans and (B) borrowing and prepayment of Extended Revolving Loans, or reductions of Extended Revolving Credit Commitments, and participation in Letters of Credit and Swingline Loans, shall be on a pro rata basis with the other Revolving Loans or Revolving Credit Commitments (other than upon the maturity of the non-extended Revolving Loans and Revolving Credit Commitments) and (vi) the terms of the Extended Revolving Credit Commitments or Extended Term Loans, as applicable, shall be identical to the terms set forth herein (except as set forth in clauses (i) through (v) above).

(d)      In the event that the Yield Differential between any Extended Term Loan and the 2023 Term Loans and/or the 2021 Replacement Term Loans (for the avoidance of doubt, with the Extended Term Loan having the higher Effective Yield), then the Applicable Rate (and/or, as provided in the proviso below, the Term SOFR or Base Rate "floor") applicable to the 2023 Term

Loans and/or the 2021 Replacement Term Loans (as applicable) shall each be increased to the extent necessary so that the Yield Differential for each of the 2023 Term Loans and the 2021 Replacement Term Loans is 0.50%; provided, that, to the extent any portion of the Yield Differential is attributable to a higher Term SOFR "floor" being applicable to such Extended Term Loans and such "floor" is greater than the Term SOFR in effect for an Interest Period of three months' duration at such time, the Term SOFR "floor" applicable to the outstanding Term Loans shall be increased to an amount not to exceed the Term SOFR "floor" applicable to such Extended Term Loans prior to any increase in the Applicable Rate applicable to such Term Loans then outstanding.

(e)    In the event that the Yield Differential between any Extended Revolving Credit Loans and the Revolving Credit Loans (for the avoidance of doubt, with the Extended Revolving Credit Loans having the higher Effective Yield), then the Applicable Rate (and/or, as provided in the proviso below, the Term SOFR or Base Rate "floor") applicable to the Revolving Credit Loans shall each be increased to the extent necessary so that the Yield Differential for the Revolving Credit Loans is 0.50%; provided, that, to the extent any portion of the Yield Differential is attributable to a higher Term SOFR "floor" being applicable to such Extended Revolving Credit Loans and such "floor" is greater than the Term SOFR in effect for an Interest Period of three months' duration at such time, the Term SOFR "floor" applicable to the outstanding Revolving Credit Loans shall be increased to an amount not to exceed the Term SOFR "floor" applicable to such Extended Revolving Credit Loans prior to any increase in the Applicable Rate applicable to such Revolving Credit Loans then outstanding.

In connection with any Extension, the Borrower, the Administrative Agent and each applicable Extending Lender shall execute and deliver to the Administrative Agent an Extension Amendment and such other documentation as the Administrative Agent shall reasonably specify to evidence the Extension. The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Extension. Any Extension Amendment may, without the consent of any other Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable determination of the Administrative Agent, to implement the terms of any such Extension, including any amendments necessary to establish Extended Revolving Credit Commitments or Extended Term Loans as a new Class or tranche of Revolving Credit Commitments or Term Loans, as applicable, and such other technical amendments as may be necessary or appropriate in the reasonable determination of the Administrative Agent in connection with the establishment of such new Class or tranche (including to preserve the pro rata treatment of the extended and non-extended Classes or tranches and to provide for the reallocation of Revolving Credit Exposure upon the expiration or termination of the commitments under any Class or tranche), in each case on terms consistent with this Section 2.16.  To the extent reasonably necessary to implement the provisions of this Section 2.16, this Section 2.16 shall supersede any provisions in Section 2.13 or 11.01 to the contrary.

## ARTICLE III

## TAXES, YIELD PROTECTION AND ILLEGALITY

**Section 3.01    Taxes**.

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)    Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Laws.  If any Applicable Laws (as determined in

AMERICAS/2024053109.31

the good faith discretion of the Administrative Agent) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or a Loan Party, then the Administrative Agent or such Loan Party shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)     If any Loan Party or the Administrative Agent shall be required by the Internal Revenue Code to withhold or deduct any Taxes, including both United States Federal backup withholding and withholding taxes, from any payment, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Internal Revenue Code, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii)    If any Loan Party or the Administrative Agent shall be required by any Applicable Laws other than the Internal Revenue Code to withhold or deduct any Taxes from any payment, then (A) such Loan Party or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) such Loan Party or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)     Payment of Other Taxes by the Loan Parties.  Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with Applicable Laws, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     Tax Indemnifications. (i)  Each of the Loan Parties shall, and does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within ten days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.  Each of the Loan Parties shall, and does hereby, jointly and severally indemnify the Administrative Agent, and shall make payment in respect thereof within ten days after

demand therefor, for any amount which a Lender for any reason fails to pay indefeasibly to the Administrative Agent as required pursuant to Section 3.01(c)(ii) below.

(ii)      Each Lender shall, and does hereby, severally indemnify, and shall make payment in respect thereof within 10 days after demand therefor, (x) the Administrative Agent against any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (y) the Administrative Agent and the Loan Parties, as applicable, against any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.06(d) relating to the maintenance of a Participant Register and (z) the Administrative Agent and the Loan Parties, as applicable, against any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent or a Loan Party in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this clause (ii).

(d)      Evidence of Payments.  As soon as practicable, after any payment of Taxes by any Loan Party to a Governmental Authority as provided in this Section 3.01, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)      Status of Lenders; Tax Documentation.

(i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(e)(ii)(A), 3.01(e)(ii)(B) and 3.01(e)(ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)      Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

AMERICAS/2024053109.31

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BENE (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BENE (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed copies of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate substantially in the form of Exhibit 3.01-A to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BENE (or W-8BEN, as applicable); or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BENE (or W-8BEN, as applicable), a U.S. Tax Compliance Certificate substantially in the form of Exhibit 3.01-B or Exhibit 3.01-C, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit 3.01-D on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of

AMERICAS/2024053109.31

copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the First Restatement Date.

(iii)     Each Lender agrees that if any form or certification it previously delivered pursuant to this <u>Section 3.01</u> expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)     <u>Treatment of Certain Refunds</u>.  Unless required by Applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender or an L/C Issuer, or have any obligation to pay to any Lender or any L/C Issuer, any refund of Taxes withheld or deducted from funds paid for the account of such Lender or such L/C Issuer, as the case may be.  If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this <u>Section 3.01</u>, it shall pay to the Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by a Loan Party under this <u>Section 3.01</u> with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u> that the Loan Party, upon the request of the Recipient, agrees to repay the amount paid over to the Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to the Loan Party pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be

construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Loan Party or any other Person.

(g)    Survival.  Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender or an L/C Issuer, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

**Section 3.02    Illegality.**

If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its Lending Office to perform any of its obligations hereunder or make, maintain or fund, or charge interest with respect to, any Credit Extensions or to determine or charge interest rates based upon, or with reference to, SOFR or Term SOFR, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the secured overnight financing or other relevant interbank market, then, upon notice thereof by such Lender to the Borrower through the Administrative Agent, (i) any obligation of such Lender to issue, make, maintain or fund, or charge interest with respect to, any such Credit Extension or continue Term SOFR Loans or to convert Base Rate Loans to Term SOFR Loans shall be suspended and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Term SOFR component of the Base Rate, the interest rate on which Base Rate Loans of such Lender, shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (x) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term SOFR Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon SOFR, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 3.05.

**Section 3.03    Inability to Determine Rates; Successor Rates.**

(a)    Inability to Determine Rate.  If in connection with any request for a Term SOFR Loan or a conversion of Base Rate Loans to Term SOFR Loans or a continuation of any of such Loans, as applicable, (i) the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (A) no Successor Rate has been determined in accordance with Section 3.03(b), and the circumstances under clause (i) of Section 3.03(b) or the Scheduled Unavailability Date has occurred, or (B) adequate and reasonable means do not otherwise exist for determining Term SOFR for any requested Interest Period with respect to a proposed Term SOFR  Loan or in connection with an existing or proposed Base Rate Loan, or (ii) the Administrative Agent or the Required Lenders determine that for any reason that Term SOFR for any requested Interest Period with respect to a proposed Loan does not adequately and fairly

reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.

Thereafter, (x) the obligation of the Lenders to make or maintain Term SOFR Loans, or to convert Base Rate Loans to Term SOFR Loans, shall be suspended (to the extent of the affected Term SOFR Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence with respect to the Term SOFR component of the Base Rate, the utilization of the Term SOFR component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (or, in the case of a determination by the Required Lenders described in clause (ii) of this <u>Section 3.03(a)</u>, until the Administrative Agent upon instruction of the Required Lenders) revokes such notice.

Upon receipt of such notice, (i) the Borrower may revoke any pending request for a Borrowing of, or conversion to, or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein and (ii) any outstanding Term SOFR Loans shall be deemed to have been converted to Base Rate Loans immediately at the end of their respective applicable Interest Period(s).

(b)     <u>Replacement of Term SOFR or Successor Rate</u>. Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Borrower or Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to the Borrower) that the Borrower or Required Lenders (as applicable) have determined, that:

(i)     adequate and reasonable means do not exist for ascertaining one month, three month and six month interest periods of Term SOFR, including, without limitation, because the Term SOFR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)     CME or any successor administrator of the Term SOFR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent or such administrator with respect to its publication of Term SOFR, in each case acting in such capacity, has made a public statement identifying a specific date after which one month, three month and six month  interest periods of Term SOFR or the Term SOFR Screen Rate shall or will no longer be representative or made available, or permitted to be used for determining the interest rate of U.S. dollar denominated syndicated loans, or shall or will otherwise cease, provided that, at the time of such statement, there is no successor administrator that is satisfactory to the Administrative Agent, that will continue to provide such  representative interest periods of Term SOFR after such specific date (the latest date on which one month, three month and six month interest periods of Term SOFR or the Term SOFR Screen Rate are no longer representative or available permanently or indefinitely, the "<u>Scheduled Unavailability Date</u>");

then, on a date and time determined by the Administrative Agent (any such date, the "<u>Term SOFR Replacement Date</u>"), which date shall be at the end of an Interest Period or on the relevant interest payment date, as applicable, for interest calculated and, solely with respect to clause (ii) above, no later than the Scheduled Unavailability Date, Term SOFR will be replaced hereunder and under any Loan Document with Daily Simple SOFR for any payment period for interest calculated that can be determined by the Administrative Agent, in each case, without any amendment to, or further action or consent of any other party to, this Agreement or any other

Loan Document (the "Successor Rate"; and any such rate before giving effect to the Related Adjustment, the "Pre-Adjustment Successor Rate").

If the Successor Rate is Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

Notwithstanding anything to the contrary herein, (i) if the Administrative Agent determines that Daily Simple SOFR is not available on or prior to the Term SOFR Replacement Date, or (ii) if the events or circumstances of the type described in Section 3.03(b)(i) or (ii) have occurred with respect to the Successor Rate then in effect, then in each case, the Administrative Agent and the Borrower may amend this Agreement solely for the purpose of replacing Term SOFR or any then current Successor Rate in accordance with this Section 3.03 at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, as applicable, with an alternative benchmark rate giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated credit facilities syndicated and agented in the United States for such alternative benchmark. and, in each case, including any mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated credit facilities syndicated and agented in the United States for such benchmark.  For the avoidance of doubt, any such proposed rate and adjustments, shall constitute a "Successor Rate".  Any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders object to such amendment.

The Administrative Agent will promptly (in one or more notices) notify the Borrower and each Lender of the implementation of any Successor Rate.

Any Successor Rate shall be applied in a manner consistent with market practice; provided that to the extent such market practice is not administratively feasible for the Administrative Agent, such Successor Rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

Notwithstanding anything else herein, if at any time any Successor Rate as so determined would otherwise be less than 0.00%, the Successor Rate will be deemed to be 0.00% for the purposes of this Agreement and the other Loan Documents.

In connection with the implementation of a Successor Rate, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement; provided that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such Conforming Changes to the Borrower and the Lenders reasonably promptly after such amendment becomes effective.

For purposes of this Section 3.03, those Lenders that either have not made, or do not have an obligation under this Agreement to make, the relevant Loans shall be excluded from any determination of Required Lenders for such Loans.

**Section 3.04**     **Increased Costs; Reserves on Term SOFR Loans**.

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender or any L/C Issuer;

(ii)      subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)      impose on any Lender or any L/C Issuer or the secured overnight financing market any other condition, cost or expense affecting this Agreement or Term SOFR Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or such L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or such L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or such L/C Issuer, the Borrower will pay to such Lender or such L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)      Capital Requirements.  If any Lender or any L/C Issuer determines that any Change in Law affecting such Lender or such L/C Issuer or any Lending Office of such Lender or such Lender's or such L/C Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or such L/C Issuer's capital or on the capital of such Lender's or such L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit or Swing Line Loans held by, such Lender, or the Letters of Credit issued by such L/C Issuer, to a level below that which such Lender or such L/C Issuer or such Lender's or such L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such L/C Issuer's policies and the policies of such Lender's or such L/C Issuer's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender or such L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such L/C Issuer or such Lender's or such L/C Issuer's holding company for any such reduction suffered.

(c)      Certificates for Reimbursement.  A certificate of a Lender or an L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or such L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender or such L/C Issuer, as the case may be, the amount shown as due on any such certificate within ten days after receipt thereof.

(d)      Delay in Requests.  Failure or delay on the part of any Lender or any L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's or such L/C Issuer's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender or an L/C Issuer pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or

90

reductions suffered more than nine months prior to the date that such Lender or such L/C Issuer, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**Section 3.05    Compensation for Losses**.

Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (other than lost profits, including the Applicable Rate) incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Term SOFR Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Term SOFR Loan on the date or in the amount notified by the Borrower; or

(c)    any assignment of a Term SOFR Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 11.13;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Term SOFR Loan made by it at Term SOFR used in determining the Term SOFR for such Loan by a matching deposit or other borrowing in the secured overnight financing market for a comparable amount and for a comparable period, whether or not such Term SOFR Loan was in fact so funded.

**Section 3.06    Mitigation Obligations; Replacement of Lenders**.

(a)    Designation of a Different Lending Office.  Each Lender may make any Credit Extension to the Borrower through any Lending Office, provided that the exercise of this option shall not affect the obligation of the Borrower to repay the Credit Extension in accordance with the terms of this Agreement.  If any Lender requests compensation under Section 3.04, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender, any L/C Issuer or any Governmental Authority for the account of any Lender or L/C Issuer pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then at the request of the Borrower such Lender or such L/C Issuer shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender or such L/C Issuer, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender or such L/C Issuer, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender or such L/C Issuer, as the case may be.  The

AMERICAS/2024053109.31

Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender or any L/C Issuer in connection with any such designation or assignment.

(b)     Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 or if such Lender gives a notice pursuant to Section 3.02, and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 3.06(a), the Borrower may replace such Lender in accordance with Section 11.13.

**Section 3.07     Survival**.

All of the Loan Parties' obligations under this Article III shall survive termination of the aggregate Revolving Credit Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent.

**Section 3.08     Tax Treatment of the 2023 Term Facility**.

The Loan Parties and each of the 2023 Term Lenders hereby agree and acknowledge that, for U.S. federal (and applicable state and local) income tax purposes, the 2023 Term Loan shall not be treated as a "contingent payment debt instrument" within the meaning of Treasury Regulations Section 1.1275-4, and the parties hereto shall report consistently with such treatment for all U.S. federal (and applicable state and local) income tax purposes unless required by applicable tax law.

# ARTICLE IV

# CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**Section 4.01     Conditions of Occurrence of Second Restatement Date**.

This Agreement shall become effective the first date on which the following conditions precedent shall have been satisfied or waived in accordance with Section 11.01 (such date, the "Second Restatement Date"):

(a)     Receipt by the Administrative Agent of the following, each dated the Second Restatement Date (or, in the case of certificates of governmental officials, a recent date before the Second Restatement Date), and each in form and substance reasonably satisfactory to the Administrative Agent and each Lender:

(i)     Loan Documents.

(A)     Executed counterparts of this Agreement, properly executed and delivered by a Responsible Officer of each Loan Party, and by each 2023 Term Lender;

(B)     a Note executed and delivered by a Responsible Officer of the Borrower in favor of each 2023 Term Lender that requested a Note at least three Business Days prior to the Second Restatement Date; and

(C)     executed counterparts of the Security Agreement, properly executed and delivered by a Responsible Officer of each Loan Party.

(ii)     Opinions of Counsel.  Favorable opinions of legal counsel to the Loan Parties, addressed to the Administrative Agent and each Lender, dated as of the Second Restatement Date as to such matters concerning the Loan Parties and the Loan

92

Documents as the Administrative Agent and the Required Lenders may reasonably request.

(iii)    <u>Organization Documents, Resolutions, Etc</u>.

(A)    copies of the Organization Documents of each Loan Party certified to be true and complete as of a recent date by the appropriate Governmental Authority of the state or other jurisdiction of its incorporation or organization, where applicable, and certified by a secretary, assistant secretary or authorized Person of such Loan Party to be true and correct as of the Second Restatement Date;

(B)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party; and

(C)    such documents and certifications as the Administrative Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and is validly existing, in good standing and qualified to engage in business in its state of organization or formation.

(iv)    <u>Personal Property Collateral</u>.

(A)    UCC financing statements for each appropriate jurisdiction as is necessary, in the Administrative Agent's sole discretion, to perfect the Administrative Agent's security interest in the Collateral;

(B)    all certificates evidencing any certificated Equity Interests pledged to the Administrative Agent pursuant to the Security Agreement, together with duly executed in blank, undated stock powers attached thereto (unless, with respect to the pledged Equity Interests of any Foreign Subsidiary, such stock powers are deemed unnecessary by the Administrative Agent in its reasonable discretion under the Law of the jurisdiction of organization of such Person);

(C)    to the extent required to be delivered, filed, registered or recorded pursuant to the terms and conditions of the Collateral Documents, all instruments, documents and chattel paper in the possession of any of the Loan Parties, together with alonges or assignments as may be necessary or appropriate to create and perfect the Administrative Agent's and the Lenders' security interest in the Collateral; and

(D)    duly executed notices of grant of security interest in the form required by the Security Agreement as are necessary, in the Administrative Agent's sole discretion, to perfect the Administrative Agent's security interest in the United States registered and pending registrations of intellectual property of the Loan Parties.

(v)    <u>Evidence of Insurance</u>.  Copies of insurance policies or certificates of insurance of the Loan Parties evidencing liability and casualty insurance meeting the requirements set forth in the Loan Documents, including naming the Administrative

AMERICAS/2024053109.31

Agent and its successors and assigns as additional insured (in the case of liability insurance) or loss payee (in the case of property insurance) on behalf of the Lenders.

(vi)      Closing Certificate.  A certificate signed by a Responsible Officer of the Borrower (i) certifying that the conditions specified in Sections 4.02(a) and 4.02(b) have been satisfied and (ii) to which certificate shall be attached a true, correct and complete copy of the Elixir Purchase Agreement as in effect on the Second Restatement Date, certified by such Responsible Office of the Borrower to be so true, correct and complete (including all amendments, supplements and other modifications thereto).

(vii)      Solvency Certificates.

(A)      A certificate signed by a Responsible Officer of the Borrower certifying that after giving effect to the Credit Extensions on the Second Restatement Date and the use of proceeds thereof, the Borrower and its Subsidiaries are Solvent on a consolidated basis; and

(B)      A certificate of each Non-Subsidiary Loan Party, signed by a Responsible Officer of such Non-Subsidiary Loan Party certifying that after giving effect to the Credit Extensions on the Second Restatement Date and the use of proceeds thereof, such Non-Subsidiary Loan Party is Solvent on a consolidated basis with its respective consolidated Subsidiaries.

(b)      No Material Litigation.  The absence of any action, suit, investigation or proceeding pending or, to the knowledge of the Borrower, threatened in any court or before any arbitrator or governmental authority that could reasonably be expected to have a Material Adverse Effect.

(c)      Existing Credit Agreement Lender Consent.  Lenders collectively constituting the "Required Lenders", the "Required Revolving Credit Lenders" and the "Required 2021 Replacement Term Lenders" under (and each as defined in) the Existing Credit Agreement as of immediately prior to the occurrence of the Second Restatement Date shall have consented to the amendment and restatement of the Existing Credit Agreement as set forth in this Agreement by each delivering to the Administrative Agent its duly executed counterpart signature page to this Agreement.

(d)      Anti-Money-Laundering; Beneficial Ownership.  Upon the reasonable request of any Lender made at least four days prior to the Second Restatement Date, the Borrower shall have provided to such Lender, and such Lender shall be reasonably satisfied with, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Act, in each case at least two days prior to the Second Restatement Date and (y) at least two days prior to the Second Restatement Date, any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall have delivered, to each Lender that so requests, a Beneficial Ownership Certification in relation to such Loan Party.

(e)      Paydown of 2021 Replacement Term Loans.  The Borrower shall, immediately prior to the occurrence of the Second Restatement Date, have made a voluntary prepayment (the "Second Restatement Date 2021 Replacement Term Loan Paydown") of 2021 Replacement Term Loans to the Administrative Agent pursuant to Section 2.05(a) of the Existing Credit Agreement, for the ratable account of each of the 2021 Replacement Term Lenders, in the principal amount of $25,000,000, along with all interest accrued and unpaid thereon through and including the Second Restatement Date (and the Administrative Agent and each Consenting Lender hereby waive any

AMERICAS/2024053109.31

requirement of the Borrower pursuant to Section 2.05(a) of the Existing Credit Agreement to deliver a Notice of Loan Prepayment to the Administrative Agent with respect to the Second Restatement Date 2021 Replacement Term Loan Paydown).

(f)        Fees.    Receipt by (x) the Administrative Agent, (y) each Arranger and (z) the Lenders of any fees required to be paid on or before the Second Restatement Date.

(g)        Attorney Costs.    The Borrower shall have paid all fees, charges and disbursements of counsel to the Administrative Agent (directly to such counsel if requested by the Administrative Agent) to the extent invoiced at least one Business Day prior to the Second Restatement Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrower and the Administrative Agent).

Without limiting the generality of the provisions of the last paragraph of Section 9.03, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Second Restatement Date specifying its objection thereto.

**Section 4.02        Conditions to all Credit Extensions.**

The obligation of each Lender to honor any Request for Credit Extension (other than a 2023 Term Loan Borrowing subject to Section 4.03 below, or a Loan Notice requesting only a conversion of Loans to the other Type, or a continuation of Term SOFR Loans) is subject to the following conditions precedent:

(a)        The representations and warranties of each Loan Party contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension (or in the case of any such representations and warranties that contain a materiality or Material Adverse Effect qualification, be true and correct in all respects on and as of the date of such Credit Extension), except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (or in the case of any such representations and warranties that contain a materiality or Material Adverse Effect qualification, be true and correct in all respects as of such earlier date), subject to Section 1.07 if such Credit Extension is made in respect of a Limited Condition Acquisition.

(b)        No Default (or Specified Event of Default, as applicable) shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof, subject to Section 1.07 if such Credit Extension is made in respect of a Limited Condition Acquisition.

(c)        The Administrative Agent and, if applicable, the applicable L/C Issuer or the Swing Line Lender shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)        The existence of availability at least in the amount of the requested credit extension (after giving effect to any repayment of Revolving Credit Loans or termination or expiration of Letters of Credit on or prior to the date such Revolving Credit Loan is to be made or such Letter of Credit is to be issued).

Each Request for Credit Extension (other than a Loan Notice requesting only a conversion of Loans to the other Type, or a continuation of Term SOFR Loans) submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in <u>Sections 4.02(a)</u> and <u>(b)</u> have been satisfied on and as of the date of the applicable Credit Extension.

**Section 4.03**    <u>**Conditions to all Credit Extensions with Respect to 2023 Term Loans**</u>.

The obligation of each Lender to honor any Request for Credit Extension of a 2023 Term Loan is subject to (I) the prior occurrence of the Second Restatement Date and (II) the following conditions precedent:

(a)    The Elixir Acquisition Requirements shall have been satisfied (or waived in accordance with <u>Section 11.01</u>) on or prior to the date of such Credit Extension.

(b)    The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

(c)    concurrently with the Borrowing of any 2023 Term Loans, the Elixir Acquisition shall be consummated, in all material respects in accordance with the terms of the Elixir Purchase Agreement.

Any Request for Credit Extension submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in <u>Section 4.03(a)</u> (other than with respect to <u>clause (c)</u> of the definition of the Elixir Acquisition Requirements) and (c) have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

The Loan Parties represent and warrant to the Administrative Agent and the Lenders that:

**Section 5.01**    <u>**Existence, Qualification and Power**</u>.

Each Loan Party and each Subsidiary (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in <u>clause (b)(i)</u> or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 5.02**    <u>**Authorization; No Contravention**</u>.

The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is party (a) have been duly authorized by all necessary corporate or other organizational action and do not contravene the terms of any of such Person's Organization Documents; (b) do not conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; and (c) do not violate any Law.

AMERICAS/2024053109.31

**Section 5.03    Governmental Authorization; Other Consents**.

Other than as set forth on <u>Schedule 5.03</u>, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, or for the consummation of the transactions contemplated hereby, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof) to the extent required thereby or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) the authorizations, approvals, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect, and (b) filings to perfect the Liens created by the Collateral Documents.

**Section 5.04    Binding Effect**.

Each Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  Each Loan Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against each such Loan Party in accordance with its terms.

**Section 5.05    Financial Statements; No Material Adverse Effect**.

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial position of the Borrower and its Subsidiaries as of the date thereof and their results of operations, changes in cash flows and changes in shareholder equity for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other material liabilities, direct or contingent, of the Borrower and its Subsidiaries as of the date thereof, including material liabilities for taxes, material commitments and material Indebtedness.

(b)    The unaudited combined financial statements of the Loan Parties and their respective Subsidiaries for the fiscal quarter ending June 30, 2023 (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial position of the Loan Parties and their respective Subsidiaries as of the date thereof and their results of operations, changes in cash flows and changes in shareholder equity for the period covered thereby (subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments); and (iii) show all material indebtedness and other liabilities, direct or contingent, of the Loan Parties and their respective Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(c)    From the date of the Audited Financial Statements to and including the Second Restatement Date, there has been no Disposition or any Recovery Event, in each case, of any material part of the business or property of the Loan Parties and their respective Subsidiaries, taken as a whole, and no purchase or other acquisition by any of them of any business or property (including any Equity Interests of any other Person) material in relation to the combined financial condition of the Loan Parties and their respective Subsidiaries, taken as a whole, in each case, which is not reflected in the foregoing financial statements or in the notes thereto and has not otherwise been disclosed in writing to the Lenders on or prior to the Second Restatement Date.

AMERICAS/2024053109.31

(d)     Since the date of the Audited Financial Statements, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

**Section 5.06     Litigation**.

There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any Subsidiary or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby or (b) could reasonably be expected to have a Material Adverse Effect.

**Section 5.07     No Default**.

(a)     No Loan Party nor any Subsidiary is in default under or with respect to any Contractual Obligation that individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

(b)     No Default has occurred and is continuing.

**Section 5.08     Ownership of Property**.

Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 5.09     Environmental Compliance**.

(a)     The Loan Parties and their respective Subsidiaries conduct in the ordinary course of business a review of the effect of existing Environmental Laws and claims alleging potential liability or responsibility for violation of any Environmental Law on their respective businesses, operations and properties, and as a result thereof the Loan Parties have reasonably concluded that such Environmental Laws and claims could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     None of the properties currently or formerly owned, leased or operated by any Loan Party or any Subsidiary is listed or proposed for listing on the National Priorities List under CERCLA or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned, leased or operated by any Loan Party or any Subsidiary or, to the best of the knowledge of the Loan Parties, on any property formerly owned, leased or operated by any Loan Party or any Subsidiary; there is no asbestos or asbestos-containing material on any property currently owned, leased or operated by any Loan Party or any Subsidiary; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly, leased owned or operated by any Loan Party or any Subsidiary.

(c)     No Loan Party nor any Subsidiary is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at, on or under any site, location or operation, either voluntarily or

pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned, leased or operated by any Loan Party or any Subsidiary have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary.

**Section 5.10**    **Insurance**.

(a)    The properties of the Loan Parties and their respective Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Loan Party or the applicable Subsidiary operates.  The property and general liability insurance coverage of the Loan Parties as in effect on the Second Restatement Date is outlined as to carrier, policy number, expiration date, type, amount and deductibles on Schedule 5.10.

(b)    Each Loan Party and each of its Subsidiaries maintain, if available, fully paid flood hazard insurance on all real property that is located in a special flood hazard area and that constitutes Collateral, on such terms and in such amounts as required by The National Flood Insurance Reform Act of 1994 or as otherwise required by the Administrative Agent.

**Section 5.11**    **Taxes**.

Each Loan Party and each of its Subsidiaries have filed all federal, state and other material tax returns and reports required to be filed, and have paid all federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.  There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect.  No Loan Party nor any Subsidiary is party to any tax sharing agreement.

**Section 5.12**    **ERISA Compliance**.

(a)    Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code and other federal or state Laws, or any such noncompliance could not reasonably be expected to have a Material Adverse Effect.  Each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the IRS to the effect that the form of such Plan is qualified under Section 401(a) of the Internal Revenue Code and the trust related thereto has been determined by the IRS to be exempt from federal income tax under Section 501(a) of the Internal Revenue Code, or an application for such a letter is currently being processed by the IRS.  To the best knowledge of the Loan Parties, nothing has occurred that would reasonably be expected to prevent or cause the loss of such tax-qualified status.

(b)    There are no pending or, to the best knowledge of the Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    (i) No ERISA Event has occurred, and no Loan Party nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result

AMERICAS/2024053109.31

in an ERISA Event with respect to any Pension Plan or Multiemployer Plan; (ii) each Loan Party and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained; (iii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Internal Revenue Code) is 60% or higher and no Loan Party nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date; (iv) no Loan Party nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (v) no Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; and (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

(d)     The Borrower represents and warrants as of the Second Restatement Date that the Borrower is not and will not be using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans for payments on the Loans or the Commitments nor as additions to the Borrower's balance sheet.

### Section 5.13    Subsidiaries.

Set forth on Schedule 5.13 is a complete and accurate list as of the Second Restatement Date of each Non-Subsidiary Loan Party, and each Subsidiary of any Loan Party, together with (i) jurisdiction of organization, (ii) number of shares of each class of Equity Interests outstanding, and (iii) number and percentage of outstanding shares of each class owned (directly or indirectly) by any Loan Party or any Subsidiary.  The outstanding Equity Interests of each Non-Subsidiary Loan Party and each Subsidiary of any Loan Party are validly issued, fully paid and non assessable.  Each of the Persons on the signature pages listed as "Guarantors" are hereby designated as Material Subsidiaries as of the Second Restatement Date.

### Section 5.14    Margin Regulations; Investment Company Act.

(a)     The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U), or extending credit for the purpose of purchasing or carrying margin stock. Following the application of the proceeds of each Borrowing or drawing under each Letter of Credit, not more than 25% of the value of the assets (either of the Borrower only or of the Borrower and its Subsidiaries on a consolidated basis) subject to the provisions of Section 7.01 or Section 7.05 or subject to any restriction contained in any agreement or instrument between the Borrower and any Lender or any Affiliate of any Lender relating to Indebtedness and within the scope of Section 8.01(e) will be margin stock.

(b)     None of the Borrower, any Person Controlling the Borrower, any Non-Subsidiary Loan Party or any Subsidiary of any of the foregoing Persons is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

### Section 5.15    Disclosure.

Each Loan Party has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in

a Material Adverse Effect.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.  As of the Second Restatement Date and the date of delivery of any Beneficial Ownership Certification thereafter, the information included in the most recently delivered Beneficial Ownership Certification is true and correct in all respects.

###### Section 5.16    Compliance with Laws.

Each Loan Party and each of its Subsidiaries is in compliance with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

###### Section 5.17    Intellectual Property; Licenses, Etc.

Each Loan Party and each of its Subsidiaries own, or possess the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of their respective businesses without conflict with the rights of any other Person, and Schedule 5.17 sets forth a complete and accurate list of (i) all IP Rights registered or pending registration with the United States Copyright Office or the United States Patent and Trademark Office that, as of the Second Restatement Date, a Loan Party owns and (ii) all licenses of IP Rights registered with the United States Copyright Office or the United States Patent and Trademark Office as of the Second Restatement Date. Except for such claims and infringements that could not reasonably be expected to have a Material Adverse Effect, no claim has been asserted and is pending by any Person challenging or questioning the use of any IP Rights or the validity or effectiveness of any IP Rights, nor does any Loan Party know of any such claim, and, to the knowledge of the Responsible Officers of the Loan Parties, the use of any IP Rights by any Loan Party or any Subsidiary or the granting of a right or a license in respect of any IP Rights from any Loan Party or any Subsidiary does not infringe on the rights of any Person.  As of the Second Restatement Date, none of the IP Rights owned by any Loan Party is subject to any licensing agreement or similar arrangement except as set forth on Schedule 5.17.

###### Section 5.18    Solvency.

The Borrower is Solvent, Holdings and its Subsidiaries are Solvent on a consolidated basis, and each Non-Subsidiary Loan Party is Solvent on a consolidated basis with its respective consolidated Subsidiaries.

###### Section 5.19    Perfection of Security Interests in the Collateral.

The Collateral Documents create valid security interests in, and Liens on, the Collateral purported to be covered thereby, which security interests and Liens are currently perfected security interests and Liens, prior to all other Liens other than Permitted Liens.

AMERICAS/2024053109.31

**Section 5.20**     **Business Locations; Taxpayer Identification Number**.

Set forth on Schedule 5.20(a) is the jurisdiction of organization, chief executive office, exact legal name, U.S. tax payer identification number and organizational identification number of each Loan Party as of the Second Restatement Date. Except as set forth on Schedule 5.20(b), no Loan Party has during the five years preceding the Second Restatement Date (i) changed its legal name, (ii) changed its state of formation or (iii) been party to a merger, consolidation or other change in structure.

**Section 5.21**     **OFAC**.

None of the Loan Parties, nor any of their respective Subsidiaries, nor, to the knowledge of the Loan Parties and their respective Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals, HMT's Consolidated List of Financial Sanctions Targets or the Investment Ban List, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction. Each Loan Party and each of its Subsidiaries have conducted their businesses in compliance in all material respects with all applicable Sanctions and have instituted and maintained policies and procedures designed to promote and achieve compliance with such Sanctions.

**Section 5.22**     **Anti-Corruption Laws**.

The Loan Parties and their respective Subsidiaries have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

**Section 5.23**     **No Affected Financial Institution**.

No Loan Party is an Affected Financial Institution.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

Until the Facility Termination Date, each Loan Party shall and shall cause each Subsidiary to:

**Section 6.01**     **Financial Statements**.

Deliver to the Administrative Agent (for distribution to the Lenders), in form and detail satisfactory to the Administrative Agent:

(a)     as soon as available, but in any event within ninety days (or, with respect to the fiscal year ending December 31, 2023 and the first fiscal year end following the Elixir Acquisition, one hundred and twenty days) after the end of each fiscal year of the Borrower, Lunaria and Prescient, commencing with the fiscal year ending December 31, 2023, a consolidated balance sheet of each of (x) the Borrower, (y) Lunaria, and (z) Prescient in each case and its respective Subsidiaries as at the end of such fiscal year, the related consolidated statements of income or operations and changes in cash flows of each for such fiscal year and the related consolidated changes in shareholders' equity of each for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, and in the case of such consolidated statements audited and accompanied by a report and opinion of BDO USA, P.C. or any other independent certified public accountant of nationally recognized standing reasonably acceptable to the Administrative

Agent, each of which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit.  Such consolidated statements shall be accompanied by a combined balance sheet of the Loan Parties and their respective consolidated Subsidiaries as of the fiscal years presented within such consolidated statements, and the related combined statement of income or operations, and cash flow for the fiscal years presented within such consolidated statements, and in the case of such combined statements certified by the chief executive officer, chief financial officer, treasurer or controller of the Borrower to the effect that such statements are fairly stated in all material respects; and

(b)       as soon as available, but in any event within forty-five days (or, with respect to the first two fiscal quarters ending following the Elixir Acquisition, seventy five and sixty days, respectively) after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, commencing with the fiscal quarter ending September 30, 2023, a consolidated balance sheet of each of the Borrower and its Subsidiaries, Lunaria and its Subsidiaries, and Prescient and its Subsidiaries, in each case, as at the end of such fiscal quarter, the related consolidated statements of income or operations of each and changes in cash flows of each for such fiscal quarter and for the portion of such Person's fiscal year then ended, and the related consolidated statements of changes in shareholders' equity of each for such fiscal quarter and for the portion of such Person's fiscal year then ended, in each case setting forth in comparative form, as applicable, the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and in the case of such consolidated statements certified by the chief executive officer, chief financial officer, treasurer or controller of the Borrower (or relevant Non-Subsidiary Loan Party) as fairly presenting in all material respects the financial position, results of operations, shareholders' equity and cash flows of such Person and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.  Such consolidated statements shall be accompanied by a combined balance sheet of the Loan Parties and their respective consolidated Subsidiaries as of the most recently ended fiscal quarter presented within such consolidated statements, and the related combined statement of income or operations, and cash flow for the portion of the fiscal year then ended presented within such consolidated statements, and in the case of such combined statements certified by the chief executive officer, chief financial officer, treasurer or controller of the Borrower to the effect that such statements are fairly stated in all material respects.

As to any information contained in materials furnished pursuant to Section 6.02(d), the Borrower shall not be separately required to furnish such information under Section 6.01(a) or 6.01(b), but the foregoing shall not be in derogation of the obligation of the Borrower to furnish the information and materials described in Section 6.01(a) or 6.01(b) at the times specified therein.

**Section 6.02      Certificates; Other Information**.

Deliver to the Administrative Agent (for distribution to the Lenders), in form and detail satisfactory to the Administrative Agent and the Required Lenders:

(a)       concurrently with the delivery of the financial statements referred to in Section 6.01(a), a certificate of its independent certified public accountants certifying such financial statements and stating that in making the examination necessary therefor no knowledge was obtained of any Default under the financial covenants set forth herein or, if any such Default shall exist, stating the nature and status of such event;

AMERICAS/2024053109.31

(b)     concurrently with the delivery of the financial statements referred to in Sections 6.01(a) and 6.01(b), (i) a duly completed Compliance Certificate signed by the chief executive officer, chief financial officer, treasurer or controller of the Borrower which shall include (x) the supplements to Schedule 5.17 and Schedule 4 to the Security Agreement, in each case, as required by clause (j) below (which delivery may, unless the Administrative Agent, or a Lender requests executed originals, be by electronic communication including fax or email and shall be deemed to be an original authentic counterpart thereof for all purposes), and (ii) a copy of management's discussion and analysis with respect to such financial statements;

(c)     not later than forty-five days (or, with respect to the fiscal year beginning January 1, 2024, sixty days) after the beginning of each fiscal year of the Borrower, commencing with the fiscal year beginning January 1, 2024, an annual business plan and budget of the Borrower and its Subsidiaries containing, among other things, pro forma financial statements for each quarter of such fiscal year;

(d)     promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the public equityholders of any Loan Party or any Subsidiary, and copies of all annual, regular, periodic and special reports and registration statements which a Loan Party or any Subsidiary may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, and not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(e)     promptly after any request by the Administrative Agent or any Lender, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of the Borrower by independent accountants in connection with the accounts or books of the Borrower or any Subsidiary, or any audit of any of them;

(f)     promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or any Subsidiary pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02;

(g)     promptly, and in any event within five Business Days after receipt thereof by any Loan Party or any Subsidiary, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party or any Subsidiary;

(h)     promptly following any request therefor, information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the Act, the Beneficial Ownership Regulation or other applicable anti-money laundering laws;

(i)     promptly, such additional information regarding the business, financial or corporate affairs of any Loan Party or any Subsidiary (including, without limitation, any changes in shareholders' equity of any such Loan Party or Subsidiary), or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may from time to time reasonably request; and

(j)     concurrently with the delivery of the financial statements referred to in Section 6.01(a), (i) a report supplementing Schedule 5.17, setting forth (A) a list of registration numbers for all patents, trademarks, service marks, trade names and copyrights awarded to any Loan Party

AMERICAS/2024053109.31

or any Subsidiary thereof during such fiscal year and (B) a list of all patent applications, trademark applications, service mark applications, trade name applications and copyright applications submitted by any Loan Party or any Subsidiary thereof during such fiscal year and the status of each such application, and (ii) a report supplementing Schedule 4 to the Security Agreement containing a description of all changes in the information included in such Schedule as may be necessary for such Schedule to be accurate and complete, each such report described in clauses (i) and (ii) above to be signed by a Responsible Officer of the Borrower and to be in a form reasonably satisfactory to the Administrative Agent.

Documents required to be delivered pursuant to Section 6.01(a) or 6.01(b) or Section 6.02(d) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 11.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third party website or whether sponsored by the Administrative Agent); provided that: (i) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender upon its request to the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify the Administrative Agent (by facsimile or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request by a Lender for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or each Arranger may, but shall not be obligated to, make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks, Syndtrak, ClearPar or a substantially similar electronic transmission system (the "Platform") and (b) certain of the Lenders (each a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees that so long as the Borrower is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering or is actively contemplating issuing any such securities (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the L/C Issuers, the Arrangers and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States federal and state securities Laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 11.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent and each Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated as "Public Side Information." Notwithstanding the foregoing, the Borrower shall be under no obligation to mark any Borrower Materials "PUBLIC."

**Section 6.03**      **Notices**.

Promptly notify the Administrative Agent, for distribution to each Lender, of:

(a)      the occurrence of any Default;

(b)      any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)      the occurrence of any ERISA Event;

(d)      any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary, including any determination by the Borrower referred to in Section 2.10(b);

(e)      any change in the information provided in any Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification;

(f)      of the (i) occurrence of any Disposition of property or assets for which the Borrower is required to make a mandatory prepayment pursuant to Section 2.05(b)(i), or (ii) incurrence or issuance of any Indebtedness for which the Borrower is required to make a mandatory prepayment pursuant to Section 2.05(b)(ii);

(g)      of any announcement by Moody's and/or S&P of any change or possible change in the credit rating of the 2023 Term Facility or in the corporate credit rating or corporate family rating with respect to the Borrower; and

(h)      any proposed amendment, supplement, waiver or other modification of the Elixir Purchase Agreement or any other document which has or could reasonably be expected to have the practical effect of amending or otherwise modifying the Elixir Purchase Agreement.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**Section 6.04**      **Payment of Taxes**.

Pay and discharge, as the same shall become due and payable, all its tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by such Loan Party or such Subsidiary.

**Section 6.05**      **Preservation of Existence, Etc**.

(a)      Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or 7.05.

(b)      Preserve, renew and maintain in full force and effect its good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or 7.05.

106

(c)     Take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(d)     Preserve,  renew and maintain all of its IP Rights, the non-preservation or non-renewal of which could reasonably be expected to have a Material Adverse Effect.

**Section 6.06     <u>Maintenance of Properties</u>**.

(a)     Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted.

(b)     Make all necessary repairs thereto and renewals and replacements thereof, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(c)     Use the standard of care typical in the industry in the operation and maintenance of its facilities.

**Section 6.07     <u>Maintenance of Insurance</u>**.

(a)     Maintain in full force and effect insurance (including worker's compensation insurance, liability insurance, casualty insurance and business interruption insurance) with financially sound and reputable insurance companies not Affiliates of the Borrower, in such amounts (after giving effect to any such self-insurance satisfying such standards), with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where such Loan Party or such Subsidiary operates.

(b)     Cause the Administrative Agent and its successors and assigns to be named as lender's loss payee or mortgagee, as its interest may appear, and/or additional insured with respect to any such insurance providing liability coverage or coverage in respect of any Collateral, and cause each provider of any such insurance to agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to the Administrative Agent, that it will give the Administrative Agent thirty days (or such lesser amount as the Administrative Agent may agree) prior written notice before any such policy or policies shall be altered or canceled.

**Section 6.08     <u>Compliance with Laws</u>**.

Comply with all Requirements of Law and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such Requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**Section 6.09     <u>Books and Records</u>**.

(a)     Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Loan Party or such Subsidiary, as the case may be.

(b)    Maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over such Loan Party or such Subsidiary, as the case may be.

### Section 6.10    Inspection Rights.

Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that (i) absent an Event of Default, the Borrower shall be required to pay for only one such visit and/or inspection by the Administrative Agent in any fiscal year of the Borrower and (ii) when an Event of Default exists the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and without advance notice.

### Section 6.11    Use of Proceeds.

(a)    Use the proceeds of the 2021 Replacement Term Loans to replace or otherwise refinance in full the balance of the aggregate principal amount of the "Replacement Term Loans" outstanding on the First Restatement Date; provided that in no event shall the proceeds of the Credit Extensions be used in contravention of any Law or of any Loan Document.

(b)    Use the proceeds of all the Revolving Credit Loans after the First Restatement Date to finance Permitted Acquisitions, to finance working capital needs and Capital Expenditures and for other general corporate purposes of Loan Parties and its Subsidiaries.

(c)    Use the 2023 Term Loans after the Second Restatement Date as consideration pursuant to the Elixir Purchase Agreement.  The aggregate amount of the 2023 Term Loans shall not exceed the Elixir Acquisition Closing Date Purchase Price divided by 0.94.

(d)    Use the proceeds of each Incremental Loan for the purposes set forth in the definitive documentation therefor.

(e)    Use all Letters of Credit for general corporate purposes.

### Section 6.12    ERISA Compliance.

Do, and cause each of its ERISA Affiliates to do, each of the following:  (a) maintain each Plan in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code and other federal or state Law; (b) cause each Plan that is qualified under Section 401(a) of the Internal Revenue Code to maintain such qualification; and (c) make all required contributions to any Plan subject to Section 412, Section 430 or Section 431 of the Internal Revenue Code.

### Section 6.13    Additional Guarantors.

Within thirty days (or such later date as the Administrative Agent may agree in its sole discretion) after any Person becomes a Domestic Subsidiary (other than an Immaterial Subsidiary or an Excluded Subsidiary) of a Loan Party (including, without limitation, upon the formation of any Domestic Subsidiary that is a Division Successor), cause such Person to (a) become a Guarantor by executing and delivering to the Administrative Agent a Joinder Agreement or such other documents as the Administrative Agent shall deem appropriate for such purpose, and (b) upon the request of the Administrative Agent in its sole discretion, deliver to the Administrative Agent such Organization

Documents, resolutions and favorable opinions of counsel, all in form, content and scope reasonably satisfactory to the Administrative Agent.

**Section 6.14    Pledged Assets; Further Assurances**.

(a)    Equity Interests.  Cause (i) 100% of the issued and outstanding Equity Interests of each Domestic Subsidiary directly owned by any Loan Party and (ii) 65% (or such greater percentage that, due to a change in an Applicable Law after the Closing Date, (A) could not reasonably be expected to cause the undistributed earnings of such Foreign Subsidiary as determined for United States federal income tax purposes to be treated as a deemed dividend to such Foreign Subsidiary's United States parent and (B) could not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956 2(c)(2)) and 100% of the issued and outstanding Equity Interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956 2(c)(2)) in each Foreign Subsidiary directly owned by any Loan Party to be subject at all times to a first priority, perfected Lien in favor of the Administrative Agent pursuant to the terms and conditions of the Collateral Documents, and, in connection with the foregoing, deliver to the Administrative Agent such other documentation as the Administrative Agent may request including, any filings and deliveries to perfect such Liens and favorable opinions of counsel all in form and substance reasonably satisfactory to the Administrative Agent.

(b)    Other Property.  Cause all property (other than Excluded Property) of each Loan Party to be subject at all times to first priority, perfected and, in the case of real property (whether leased or owned), title insured Liens in favor of the Administrative Agent to secure the Obligations pursuant to the Collateral Documents (subject to Permitted Liens) and, in connection with the foregoing, deliver to the Administrative Agent such other documentation as the Administrative Agent may request including filings and deliveries necessary to perfect such Liens, Organization Documents, resolutions, landlord's waivers and favorable opinions of counsel to such Person, all in form, content and scope reasonably satisfactory to the Administrative Agent.

(c)    Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, (i) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (A) carry out more effectively the purposes of the Loan Documents (subject to the limitations set forth in the Loan Documents), (B) to the fullest extent permitted by Applicable Law, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (C) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (D) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

**Section 6.15    Maintenance of Depository Relationships**.

Maintain the Administrative Agent and/or any Revolving Credit Lender or one of their respective Affiliates as its principal depository bank(s), including business, cash management, operating and

administrative Deposit Accounts and Securities Accounts, and remain in compliance at all times with the requirements and other terms of Section 4(b)(v) of the Security Agreement with respect to Deposit Accounts and Securities Accounts.

**Section 6.16    Anti-Corruption Laws; Sanctions**.

Conduct its businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar anti-corruption legislation in other jurisdictions and with all applicable Sanctions, and maintain policies and procedures designed to promote and achieve compliance with such laws and Sanctions.

**Section 6.17    Information Regarding Collateral**.

Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or entity type, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Administrative Agent not less than ten days' prior written notice, or such lesser notice period agreed to by the Administrative Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Administrative Agent to maintain the perfection and priority of the security interest of the Administrative Agent for the benefit of the Secured Parties in the Collateral, if applicable.  Each Loan Party agrees to promptly provide the Administrative Agent with certified Organization Documents reflecting any of the changes described in the preceding sentence.

**Section 6.18    Material Contracts**.

Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time requested by the Administrative Agent and, upon request of the Administrative Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 6.19    Maintenance of Ratings**.  Use commercially reasonable efforts to maintain (a) a public corporate credit rating or public corporate family rating, as applicable, from S&P and Moody's, in each case, in respect of the Borrower (but not a specific rating), and (b) a public rating in respect of the 2023 Term Loans from S&P and Moody's (but not a specific rating).

**Section 6.20    Quarterly Lender Calls**.  At a date to be mutually agreed upon between the Administrative Agent and the Borrower occurring on or prior to the tenth Business Day after the date the financial statements are required to be delivered pursuant to Sections 6.01(a) and 6.01(b), the Borrower will hold a conference call or teleconference with all of the Lenders who choose to attend such conference call or teleconference to discuss, among other things, the financial results of the Borrower and its Subsidiaries for the previous fiscal quarter of the Borrower and the annual budget presented for the current fiscal year of the Borrower, if applicable.

Section 6.21    **Post-Closing Obligations**.

As promptly as practicable, and in any event within the time periods after the Second Restatement Date specified in Schedule 6.21 or such later date as the Administrative Agent reasonably agrees to in its sole discretion, and which extension may be granted by electronic mail, each Loan Party shall deliver the documents or take the actions specified on Schedule 6.21.  The parties acknowledge and agree that notwithstanding anything herein to the contrary, all conditions, representations, warranties and covenants of the Loan Documents with respect to the taking of such actions are qualified by the noncompletion of such actions until such time as they are completed or required to be completed in accordance with this Section

**ARTICLE VII**

**NEGATIVE COVENANTS**

Until the Facility Termination Date, no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

Section 7.01    **Liens**.

Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens pursuant to any Loan Document;

(b)    Liens existing on the Second Restatement Date and listed on Schedule 7.01 and any renewals or extensions thereof, provided that the property covered thereby is not increased;

(c)    Liens (other than Liens imposed under ERISA) for taxes, assessments or governmental charges or levies not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)    Liens of carriers, warehousemen, mechanics, materialmen and repairmen or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)    pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f)    deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g)    easements, rights-of-way, restrictions and other similar encumbrances affecting real property which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

111

(h)      Liens securing judgments for the payment of money (or appeal or other surety bonds relating to such judgments) not constituting an Event of Default under Section 8.01(h) provided that enforcement of such Liens is effectively stayed;

(i)      Liens securing Indebtedness permitted under Section 7.03(e); provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) such Liens attach to such property concurrently with or within ninety days after the acquisition thereof;

(j)      leases, subleases or non-exclusive licenses granted to others not interfering in any material respect with the business of any Loan Party or any Subsidiary and, with respect to IP Rights, in the ordinary course of business and substantially consistent with past practice;

(k)      any interest of title of a lessor under, and Liens arising from precautionary UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) relating to, leases permitted by this Agreement;

(l)      [reserved];

(m)      normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions;

(n)      Liens of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection;

(o)      Liens on cash and Cash Equivalents securing Indebtedness permitted under Section 7.03(g);

(p)      Liens on an insurance policy of any Loan Party or any Subsidiary and the identifiable cash proceeds thereof in favor of the issuer of such policy and securing Indebtedness permitted to finance the premiums of such policies;

(q)      Liens arising out of conditional, sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Borrower, any Non-Subsidiary Loan Party, or any of their respective Subsidiaries, in the ordinary course of business in accordance with past practices of such Person;

(r)      Liens securing Acquired Indebtedness permitted under Section 7.03(k), provided, that (i) such Liens do not at any time encumber any property other than property of the Person acquired in the applicable Permitted Acquisition at the time of such Permitted Acquisition and (ii) such Liens shall exist prior to the applicable Permitted Acquisition and shall not be incurred in anticipation of the applicable Permitted Acquisition; and

(s)      Liens securing obligations in an aggregate amount not to exceed $100,000,000 at any time outstanding (provided, for the avoidance of doubt, that such Liens may not secure any Indebtedness incurred, assumed or suffered to exist in reliance on Section 7.03(l)).

**Section 7.02      Investments**.

Make any Investments, except:

(a)      Investments held in the form of cash or Cash Equivalents;

(b)      Investments existing as of the Second Restatement Date and set forth on Schedule 7.02;

112

(c)    Investments in any Person that is a Loan Party prior to giving effect to such Investment; provided, that no Investments made or owned by any Group Loan Party or any Group Non-Loan Party Subsidiary in any Non-Subsidiary Loan Party shall be permitted pursuant to this clause (c);

(d)    Investments by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party; provided, that (i) no Investments made or owned by any Group Non-Loan Party Subsidiary in any Non-Group Non-Loan Party Subsidiary, and (ii) no Investments made or owned by any Domestic Subsidiary in any Foreign Subsidiary shall be permitted pursuant to this clause (d);

(e)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(f)    Guarantees permitted by Section 7.03;

(g)    Permitted Acquisitions (including investments in Subsidiaries consisting of the acquisition consideration necessary to consummate such Permitted Acquisition);

(h)    Loans and advances to directors, employees and officers of the Borrower and its Subsidiaries or any Non-Subsidiary Loan Party and its respective Subsidiaries for *bona fide* business purposes, in an aggregate amount not to exceed $3,000,000 at any time outstanding;

(i)    Investments by any Loan Party in any Foreign Subsidiary that is not a Loan Party in an aggregate amount under this Section 7.02(i) not to exceed $20,000,000 at any time outstanding;

(j)    Investments in any Immaterial Subsidiary in an aggregate amount under this Section 7.02(j) not to exceed $5,000,000 at any time outstanding;

(k)    other Investments in an aggregate amount not to exceed the greater of (x) $50,000,000 and (y) 12.5% of Consolidated EBITDA for the most recently completed four fiscal quarter period for which financial statements have been delivered pursuant to Section 6.01(a) or 6.01(b) at any one time outstanding; and

(l)    the Elixir Acquisition may be consummated; provided that the Elixir Acquisition Requirements shall have been satisfied, on or before, the Elixir Acquisition Closing Date, or waived in accordance with Section 11.01.

**Section 7.03    Indebtedness.**

Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness under the Loan Documents, including the 2023 Term Facility and any Incremental Facility;

(b)    Indebtedness outstanding on the Second Restatement Date set forth on Schedule 7.03 (and renewals, refinancings and extensions thereof); provided that (i) the amount of such Indebtedness is not increased at the time of such refinancing, renewal or extension except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing

AMERICAS/2024053109.31

commitments unutilized thereunder and (ii) the terms relating to principal amount, amortization, maturity, collateral (if any) and subordination (if any), and other material terms taken as a whole, of any such refinancing, renewal or extension are no less favorable in any material respect to the Loan Parties and their respective Subsidiaries or the Lenders than the terms of the Indebtedness being refinanced, renewed or extended;

(c)       intercompany Indebtedness permitted under Section 7.02; provided that in the case of Indebtedness owing by a Loan Party to a Subsidiary that is not a Loan Party (i) such Indebtedness shall be subordinated to the Obligations in a manner and to an extent reasonably acceptable to the Administrative Agent and (ii) such Indebtedness shall not be prepaid unless no Default exists immediately prior to or after giving effect to such prepayment;

(d)       obligations (contingent or otherwise) existing or arising under any Swap Contract, provided that (i) such obligations are (or were) entered into by such Person in the ordinary course of business for the purpose of directly mitigating risks associated with fluctuations in interest rates or foreign exchange rates, and not for purposes of speculation or taking a "market view;" and (ii) such Swap Contract does not contain any provision exonerating the non defaulting party from its obligation to make payments on outstanding transactions to the defaulting party;

(e)       purchase money Indebtedness (including obligations in respect of capital leases and Synthetic Lease Obligations) hereafter incurred to finance the purchase of fixed assets, and renewals, refinancings and extensions thereof, provided that (i) the aggregate outstanding principal amount of all such Indebtedness when incurred shall not exceed the greater of (x) $50,000,000 and (y) 12.5% of Consolidated EBITDA for the most recently completed four fiscal quarter period for which financial statements have been delivered pursuant to Section 6.01(a) or 6.01(b) at any one time outstanding; and (ii) such Indebtedness when incurred shall not exceed the purchase price of the asset(s) financed;

(f)       Indebtedness in respect of appeal, bid, performance or surety, statutory, appeal or similar bonds, workers' compensation claims and self-insurance obligations issued for the account of any Loan Party or any Subsidiary in the ordinary course of business;

(g)       Indebtedness consisting of letters of credit, bankers acceptances or similar obligations incurred in the ordinary course of business, in an aggregate amount not to exceed the greater of (x) $80,000,000 and (y) 20% of Consolidated EBITDA for the most recently completed four fiscal quarter period for which financial statements have been delivered pursuant to Section 6.01(a) or 6.01(b) at any one time outstanding;

(h)       contingent obligations to financial institutions, in each case, to the extent in the ordinary course of business and on terms and conditions which are within the general parameters customary in the banking industry, entered into to obtain cash management services or deposit account overdraft protection services or other services in connection with the management or opening of deposit accounts or incurred as a result of endorsement of negotiable instruments for deposit or collection purposes;

(i)       Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business or arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within five days of incurrence;

(j)      Indebtedness incurred in connection with the financing of insurance premiums in an aggregate amount at any time outstanding not to exceed the premiums owed under such policy;

(k)      Indebtedness in an aggregate amount not to exceed $50,000,000 outstanding at any one time of Persons acquired in Permitted Acquisitions (the "Acquired Indebtedness"), provided that such Acquired Indebtedness shall exist prior to the applicable Permitted Acquisition and shall not have been incurred in anticipation of the applicable Permitted Acquisition; and

(l)      other unsecured Indebtedness in an aggregate principal amount not to exceed $100,000,000 at any one time outstanding; and

(m)     Guarantees with respect to Indebtedness permitted under this Section 7.03.

**Section 7.04      Fundamental Changes**.

Merge, dissolve, liquidate or consolidate with or into another Person (including pursuant to a Division), except that so long as no Default exists or would result therefrom, (a) the Borrower may merge or consolidate with any of its Subsidiaries, provided that the Borrower is the continuing or surviving Person; (b) any Loan Party (except the Borrower and Holdings) or any of their respective Subsidiaries may merge or consolidate with any other Loan Party (except the Borrower and Holdings) or any of their respective Subsidiaries, provided that if (i) a Group Loan Party is a party to such transaction, the continuing or surviving Person is a Group Loan Party, (ii) a Non-Subsidiary Loan Party is a party to such transaction, the continuing surviving Person is a Loan Party, and (iii) a Group Non-Loan Party Subsidiary is a party to such transaction, the continuing or surviving person must be a Group Loan Party or a Group Non-Loan Party Subsidiary; (c) any Loan Party (other than Holdings) or any Subsidiary of a Loan Party may merge with any other Person in connection with a Permitted Acquisition, provided that (i) if the Borrower is a party to such transaction, the Borrower is the continuing or surviving Person and (ii) if a Loan Party is a party to such transaction, such Loan Party is the surviving Person; and (d) any Subsidiary of the Borrower or any Subsidiary of any Non-Subsidiary Loan Party may dissolve, liquidate or wind up its affairs at any time provided that such dissolution, liquidation or winding up, as applicable, could not have a Material Adverse Effect.

**Section 7.05      Dispositions**.

Make any Disposition (including pursuant to a Division) except:

(a)      Permitted Transfers; and

(b)      other Dispositions so long as (i) at least 75% of the consideration paid in connection therewith shall be cash or Cash Equivalents paid contemporaneous with consummation of the transaction and shall be in an amount not less than the fair market value of the property disposed of, (ii) if such transaction is a Sale and Leaseback Transaction, such transaction is not prohibited by the terms of Section 7.14, (iii) such transaction does not involve the sale or other disposition of a minority equity interest in any Subsidiary, (iv) such transaction does not involve a sale or other disposition of receivables other than receivables owned by or attributable to other property concurrently being disposed of in a transaction otherwise permitted under this Section 7.05, (v) at the time of such Disposition, no Default exists or would result therefrom, (vi) the aggregate net book value of all of the assets sold or otherwise disposed of by the Loan Parties and their respective Subsidiaries in all such transactions shall not exceed (x) the greater of (A) $80,000,000 and (B) 20% of Consolidated EBITDA for the most recently completed four fiscal quarter period for which financial statements have been delivered pursuant to Section 6.01(a) or 6.01(b) in the aggregate after the Second Restatement Date or (y) the greater

of (A) $40,000,000 and (B) 10% of Consolidated EBITDA for the most recently completed four fiscal quarter period for which financial statements have been delivered pursuant to Section 6.01(a) or 6.01(b)in the aggregate in any four fiscal quarter period.

**Section 7.06      Restricted Payments**.

Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

(a)      each Subsidiary of the Borrower or of a Non-Subsidiary Loan Party may declare and make Restricted Payments in cash to Persons that own Equity Interests in such Subsidiary, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made;

(b)      each Loan Party and each Subsidiary may declare and make dividend payments or other distributions payable solely in common Equity Interests of such Person;

(c)      each Loan Party may make Restricted Payments in cash (and each Subsidiary may make Restricted Payments its Loan Party equity owners for such purpose) so long as (i) no Default exists immediately prior to or after giving effect thereto and (ii) after giving effect to such Restricted Payment on a Pro Forma Basis, the Consolidated Net Leverage Ratio recomputed as of the end of the period of the four fiscal quarters most recently ended for which the Borrower has delivered financial statements pursuant to Section 6.01(a) or (b) does not exceed 1.75:1.00;

(d)      each Loan Party may make Restricted Payments in cash (and each Subsidiary may make Restricted Payments to its Loan Party equity holders for such purpose, without duplication) not otherwise permitted by this Section 7.06, so long as (i) no Default exists immediately prior to and after giving effect thereto and (ii) such Restricted Payments would not exceed $30,000,000 in the aggregate in any fiscal year of the Borrower (provided, that any amounts unused in any fiscal year of the Borrower may be used in any subsequent fiscal year of the Borrower); and

(e)      the Loan Parties may make Permitted Tax Distributions.

**Section 7.07      Change in Nature of Business**.

Engage in any material line of business substantially different from those lines of business conducted by the Loan Parties and their respective Subsidiaries on the Second Restatement Date or any business substantially related or incidental thereto or are reasonable extensions thereof.

**Section 7.08      Transactions with Affiliates**.

Enter into or permit to exist any transaction or series of transactions with any Affiliate of such Person, whether or not in the ordinary course of business, other than (a) advances of working capital to any Loan Party (other than from a Group Loan Party or a Group Non-Loan Party Subsidiary to a Non-Subsidiary Loan Party), (b) transfers of cash and assets to any Loan Party to the extent permitted under this Agreement, (c) intercompany transactions expressly permitted by Section 7.02, Section 7.03, Section 7.04, Section 7.05 or Section 7.06, (d) normal and reasonable compensation and reimbursement of expenses of officers and directors and (e) except as otherwise specifically limited in this Agreement, other transactions which are on terms and conditions substantially as favorable to such Person as would be obtainable by it in a comparable arm's-length transaction with a Person other than an Affiliate.

**Section 7.09    Burdensome Agreements**.

Enter into, or permit to exist, any Contractual Obligation that (a) encumbers or restricts the ability of any such Person to (i) make Restricted Payments to any Loan Party, (ii) pay any Indebtedness or other obligation owed to any Loan Party, (iii) make loans or advances to any Loan Party, (iv) transfer any of its property to any Loan Party, (v) pledge its property pursuant to the Loan Documents or any renewals, refinancings, exchanges, refundings or extension thereof or (vi) act as a Loan Party pursuant to the Loan Documents or any renewals, refinancings, exchanges, refundings or extension thereof, except (in respect of any of the matters referred to in clauses (i) through (v) above) for (1) this Agreement and the other Loan Documents, (2) any document or instrument governing Indebtedness incurred pursuant to Section 7.03(e) or 7.03(k), provided that any such restriction contained therein relates only to the asset or assets constructed or acquired in connection therewith, (3) any Permitted Lien or any document or instrument governing any Permitted Lien, provided that any such restriction contained therein relates only to the asset or assets subject to such Permitted Lien or (4) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 7.05 pending the consummation of such sale, or (b) requires the grant of any security for any obligation if such property is given as security for the Obligations.

**Section 7.10    Use of Proceeds**.

Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

**Section 7.11    Financial Covenants**.

(a)    Consolidated Net Leverage Ratio.  Permit the Consolidated Net Leverage Ratio as of the end of any fiscal quarter of the Borrower, to be greater than, (i) with respect to each fiscal quarter ended after the Second Restatement Date and prior to the fiscal quarter during which the Elixir Acquisition shall have been consummated, 3.50:1.00; and (ii) if the Elixir Acquisition occurs, (x) with respect to each fiscal quarter of the Borrower from and including the fiscal quarter during which the Elixir Acquisition shall have been consummated until and including the sixth fiscal quarter ended after the consummation of the Elixir Acquisition, 3.75:1.00, and (y) at all times thereafter, 3.50:1.00.

(b)    Consolidated Interest Coverage Ratio.  For so long as the Revolving Credit Facility or the 2021 Replacement Term Facility is outstanding only, permit the Consolidated Interest Coverage Ratio as of the end of any fiscal quarter of the Borrower to be less than, (i) with respect to each fiscal quarter of the Borrower ended after the date of the Second Restatement Date and prior to the fiscal quarter of the Borrower during which the Elixir Acquisition shall have been consummated, 3.00:100, and (ii) if the Elixir Acquisition occurs, (x) with respect to each fiscal quarter of the Borrower from and including the fiscal quarter during which the Elixir Acquisition shall have been consummated until and including the fourth fiscal quarter ended after the consummation of the Elixir Acquisition, 2.50:1.00, and (y) with respect to each fiscal quarter thereafter, 3.00:1.00.

**Section 7.12    Organization Documents; Fiscal Year; Legal Name, State of Formation; Form of Entity; Elixir Purchase Agreement**.

(a)    Amend, modify or change its Organization Documents in a manner adverse to the Lenders.

(b)      Change its fiscal year.

(c)      Amend, waive, supplement or otherwise modify the Elixir Purchase Agreement in a manner that could reasonably be expected to be adverse to the interests of the Lenders, without the prior written consent of the Required Lenders.

### Section 7.13      Ownership of Subsidiaries.

Notwithstanding any other provisions of this Agreement to the contrary, (a) permit any Person (other than a Loan Party or any wholly-owned Subsidiary) to own any Equity Interests of any Subsidiary except to qualify directors where required by Applicable Law or to satisfy other requirements of Applicable Law with respect to the ownership of Equity Interests of Foreign Subsidiaries, or (b) permit any Subsidiary to issue or have outstanding any shares of preferred Equity Interests.

### Section 7.14      Sale Leasebacks.

Enter into any Sale and Leaseback Transaction.

### Section 7.15      Sanctions.

Directly or indirectly, use any Credit Extension or the proceeds of any Credit Extension, or lend, contribute or otherwise make available such Credit Extension or the proceeds of any Credit Extension to any Person, to fund any activities of or business with any Person, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as Lender, an Arranger, Administrative Agent, L/C Issuer, Swing Line Lender or otherwise) of Sanctions.

### Section 7.16      Anti-Corruption Laws.

Directly or indirectly use the proceeds of any Credit Extension for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 or other similar anti-corruption legislation in other jurisdictions.

### Section 7.17      Restrictions on Holdings.

Notwithstanding anything to the contrary in this Agreement, Holdings shall not (a) hold any material property other than cash and Cash Equivalents and Equity Interests of the Borrower, (b) have any material liabilities other than (i) obligations under the Loan Documents, its Organization Documents and contracts and agreements (including with respect to indemnities) with officers, directors, consultants and employees of Holdings relating to their employment, services or directorships, (ii) tax liabilities in the ordinary course of business or incurred as a member of the consolidated group of Holdings and its Subsidiaries, and (iii) corporate, administrative and operating expenses incurred in the ordinary course of business, or (c) engage in any business other than (i) maintaining its existence and activities related thereto, (ii) owning the Equity Interests of its Subsidiaries and activities incidental or related thereto, (iii) performing its obligations under the Loan Documents, documents evidencing Permitted Acquisitions and contracts and agreements (including with respect to indemnities) with officers, directors, consultants and employees of Holdings relating to their employment, services or directorships and (iv) activities in the ordinary course reasonably related to the foregoing.

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

**Section 8.01    Events of Default**.

The occurrence of any of the following shall constitute an "Event of Default":

(a)    Non-Payment.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or any L/C Obligation or deposit any funds as Cash Collateral in respect of L/C Obligations, or (ii) within three days after the same becomes due, any interest on any Loan or on any L/C Obligation, or any fee due hereunder, or (iii) within five days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)    Specific Covenants.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02, 6.03(a), 6.05(a), 6.10 or 6.11 or Article VII; provided, that any Event of Default in respect of Section 7.11(b) (a "Consolidated Interest Coverage Ratio Event of Default") shall not constitute an Event of Default with respect to any 2023 Term Loans unless and until either (i) the Required 2021 Replacement Term Lenders have declared all amounts outstanding under the 2021 Replacement Term Facility to be immediately due and payable, or (ii) the Required Revolving Lenders have declared all amounts outstanding under the Revolving Credit Facility to be immediately due and payable and all outstanding Revolving Credit Commitments to be immediately terminated, in each case, in accordance with this Agreement and such declaration has not been rescinded (the "2023 Term Loan Standstill Period"); or

(c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty days; or

(d)    Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made, or in the case of any representation, warranty, certificate or statement of fact already qualified by materiality or Material Adverse Effect, in any respect; or

(e)    Cross-Default. (i) Any Loan Party or any Subsidiary (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii)

there occurs under any Swap Contract an "Early Termination Date" (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which any Loan Party or any Subsidiary is the "Defaulting Party" (as defined in such Swap Contract) or (B) any "Termination Event" (as so defined) under such Swap Contract as to which any Loan Party or any Subsidiary is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by such Loan Party or such Subsidiary as a result thereof is greater than the Threshold Amount; or

(f)    Insolvency Proceedings, Etc.  Any Loan Party or any Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty calendar days, or an order for relief is entered in any such proceeding; or

(g)    Inability to Pay Debts; Attachment. (i) Any Loan Party or any Subsidiary becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within thirty days after its issue or levy; or

(h)    Judgments.  There is entered against any Loan Party or any Subsidiary (i) one or more final unsatisfied judgments or orders for the payment of money in an aggregate amount (as to all such judgments or orders) exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of the claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)    ERISA. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount, or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount; or

(j)    Invalidity of Loan Documents.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect  (other than pursuant to a termination permitted hereunder); or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document; or

AMERICAS/2024053109.31

(k)    Change of Control.  There occurs any Change of Control; or

(l)    Collateral Documents.  Any Collateral Document after delivery thereof pursuant to Section 4.01, the definition of "Elixir Acquisition Requirements" or Section 6.14 shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority Lien (subject to Liens permitted by Section 7.01) on any material portion of the Collateral purported to be covered thereby.

### Section 8.02    Remedies Upon Event of Default.

If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders (or, if a Consolidated Interest Coverage Ratio Event of Default occurs and is continuing and prior to the expiration of the 2023 Term Loan Standstill Period, if the only Events of Default then having occurred and continuing are pursuant to a Consolidated Interest Coverage Ratio Event of Default, at the request of either (i) the Required 2021 Replacement Term Lenders under the 2021 Replacement Term Facility only or (ii) the Required Revolving Lenders under the Revolving Credit Facility only), take any or all of the following actions:

(a)    declare the commitment of each Lender to make Loans and any obligation of each L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document (including any Applicable Premium) to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(c)    require that the Borrower Cash Collateralize the L/C Obligations (in an amount equal to the Minimum Collateral Amount with respect thereto); and

(d)    exercise on behalf of itself, the Lenders and the L/C Issuers all rights and remedies available to it, the Lenders and the L/C Issuers under the Loan Documents;

provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code, the obligation of each Lender to make Loans and any obligation of each L/C Issuer to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Borrower to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender.

### Section 8.03    Application of Funds.

After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02 as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall, subject to the provisions of Section 2.14, be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

AMERICAS/2024053109.31

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest and Letter of Credit Fees) payable to the Lenders and the L/C Issuers (including fees, charges and disbursements of counsel to the respective Lenders and the L/C Issuers (including fees and time charges for attorneys who may be employees of any Lender or any L/C Issuer) arising under the Loan Documents and amounts payable under Article III), ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid Letter of Credit Fees and interest on the Loans and L/C Borrowings, ratably among the Lenders and the L/C Issuers in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to (a) payment of that portion of the Obligations constituting unpaid principal of the Loans and L/C Borrowings, (b) payment of Obligations then owing under any Secured Hedge Agreements and (c) payment of Obligations then owing under any Secured Cash Management Agreements, ratably among the Lenders, L/C Issuers the Hedge Banks and the Cash Management Banks in proportion to the respective amounts described in this clause Fourth payable to them;

Fifth, to the Administrative Agent for the account of the applicable L/C Issuers, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit to the extent not otherwise Cash Collateralized by the Borrower pursuant to Sections 2.03 and 2.14; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

Excluded Swap Obligations with respect to any Guarantor shall not be paid with amounts received from such Guarantor or such Guarantor's assets, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Obligations otherwise set forth above in this Section.

Subject to Sections 2.03(c) and 2.14, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Fifth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

Notwithstanding the foregoing, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements shall be excluded from the application described above if the Administrative Agent has not received a Secured Party Designation Notice, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be. Each Cash Management Bank or Hedge Bank not a party to this Agreement that has given the notice contemplated by the preceding sentence shall, by such notice, be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of Article IX for itself and its Affiliates as if a "Lender" party hereto.

## ARTICLE IX

## ADMINISTRATIVE AGENT

### Section 9.01    Appointment and Authority.

Each of the Lenders and L/C Issuers hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to

the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the L/C Issuers, and no Loan Party shall have rights as a third party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (in its capacities as a Lender, potential Hedge Bank and potential Cash Management Bank) and each L/C Issuer hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender and such L/C Issuer for purposes of acquiring, holding and enforcing any and all Liens on Collateral, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX and Article XI (including Section 11.04(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

### Section 9.02    Rights as a Lender.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders or to provide notice to or consent of the Lenders with respect thereto.

### Section 9.03    Exculpatory Provisions.

The Administrative Agent or the Arrangers, as applicable, shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent or the Arrangers, as applicable:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or Applicable Law, including for the avoidance of doubt any action that may be in violation of the

AMERICAS/2024053109.31

automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law;

(c)      shall not have any duty or responsibility to disclose, and shall not be liable for the failure to disclose, to any Lender or any L/C Issuer, any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their Affiliates, that is communicated to, obtained or in the possession of, the Administrative Agent, the Arrangers or any of their Related Parties in any capacity, except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein;

(d)      shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 11.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction by a final and nonappealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower or a Lender or an L/C Issuer; and

(e)      shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

**Section 9.04      Reliance by Administrative Agent**.

The Administrative Agent shall be entitled to rely upon, and shall be fully protected in relying and shall not incur any liability for relying upon, any notice, request, certificate, communication, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall be fully protected in relying and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance, extension, renewal or increase of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or an L/C Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or such L/C Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or such L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit.  The Administrative Agent may consult with legal counsel (who may be counsel for the Loan Parties), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

AMERICAS/2024053109.31

**Section 9.05**      **Delegation of Duties**.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Administrative Agent.  The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of the Administrative Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**Section 9.06**      **Resignation of Administrative Agent**.

(a)      The Administrative Agent may at any time give notice of its resignation to the Lenders, the L/C Issuers and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders and the L/C Issuers, appoint a successor Administrative Agent meeting the qualifications set forth above, provided that in no event shall any such successor Administrative Agent be a Defaulting Lender.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)      If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Borrower or the Required Lenders may, to the extent permitted by Applicable Law, by notice in writing to the Borrower (in the case of the Required Lenders) and such Person remove such Person as Administrative Agent and, in consultation with the Borrower, appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)      With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the L/C Issuers under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and each L/C Issuer directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of

125

the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent (other than as provided in Section 3.01(g) and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 11.04 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them (i) while the retiring or removed Administrative Agent was acting as Administrative Agent and (ii) after such resignation or removal for as long as any of them continues to act in any capacity hereunder or under the other Loan Documents, including (A) acting as collateral agent or otherwise holding any collateral security on behalf of any of the Lenders and (B) in respect of any actions taken in connection with transferring the agency to any successor Administrative Agent.

### Section 9.07    Non-Reliance on Administrative Agent, Arrangers and Other Lenders.

Each Lender and each L/C Issuer expressly acknowledges that none of the Administrative Agent nor any Arranger has made any representation or warranty to it, and that no act by the Administrative Agent or any Arranger hereafter taken, including any consent to, and acceptance of any assignment or review of the affairs of any Loan Party of any Affiliate thereof, shall be deemed to constitute any representation or warranty by the Administrative Agent or any Arranger to any Lender or each L/C Issuer as to any matter, including whether the Administrative Agent or any Arranger have disclosed material information in their (or their Related Parties') possession.  Each Lender and each L/C Issuer represents to the Administrative Agent and each Arranger that it has, independently and without reliance upon the Administrative Agent, any Arranger, any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis of, appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder.  Each Lender and each L/C Issuer also acknowledges that it will, independently and without reliance upon the Administrative Agent, any Arranger, any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties.  Each Lender and each L/C Issuer represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility and (ii) it is engaged in making, acquiring or holding commercial loans in the ordinary course and is entering into this Agreement as a Lender or L/C Issuer for the purpose of making, acquiring or holding commercial loans and providing other facilities set forth herein as may be applicable to such Lender or L/C Issuer, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument, and each Lender and each L/C Issuer agrees not to assert a claim in contravention of the foregoing. Each Lender and each L/C Issuer represents and warrants that it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender or such L/C Issuer, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other

facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.

### Section 9.08     No Other Duties; Etc.

Anything herein to the contrary notwithstanding, none of the bookrunners, arrangers, syndication agents, documentation agents or co-agents shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender or an L/C Issuer hereunder.

### Section 9.09     Administrative Agent May File Proofs of Claim; Credit Bidding.

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuers and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuers and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuers and the Administrative Agent under Sections 2.03(i) and (j), 2.09 and 11.04) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each L/C Issuer to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuers, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 11.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or any L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or any L/C Issuer to authorize the Administrative Agent to vote in respect of the claim of any Lender or any L/C Issuer in any such proceeding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar Laws in any other jurisdictions to which a Loan Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any Applicable Law.  In connection with any

127

such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).   In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses (a)(i) through (a)(vi) of Section 11.01, and (ii) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

### Section 9.10    Collateral and Guaranty Matters.

Without limiting the provisions of Section 9.09, each of the Lenders (including in its capacities as a potential Cash Management Bank and a potential Hedge Bank) and the L/C Issuers irrevocably authorize the Administrative Agent, at its option and in its discretion,

(a)      to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon the Facility Termination Date, (ii) that is sold or otherwise disposed of as part of or in connection with any sale or other disposition permitted hereunder or under any other Loan Document or any Recovery Event, or (iii) as approved in accordance with Section 11.01;

(b)      to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i) or 7.01(r); and

(c)      to release any Guarantor from its obligations under the Guaranty and its other obligations under the Loan Documents, if such Person ceases to be a Loan Party or a Subsidiary as a result of a transaction permitted under the Loan Documents.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty, pursuant to this Section 9.10.   In each case as specified in this Section 9.10, the Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the

existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

### Section 9.11    Secured Cash Management Agreements and Secured Hedge Agreements.

No Cash Management Bank or Hedge Bank that obtains the benefit of Section 8.03, the Guaranty or any Collateral by virtue of the provisions hereof or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) (or to notice of or to consent to any amendment, waiver or modification of the provisions hereof or of the Guaranty or any Collateral Document) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Article IX to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements except to the extent expressly provided herein and unless the Administrative Agent has received a Secured Party Designation Notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be. The Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements in the case of the Facility Termination Date.

### Section 9.12    Certain ERISA Matters.

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit,  the Commitments and this Agreement,,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in,

129

administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) subclause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) such Lender has not provided another representation, warranty and covenant in accordance with subclause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that none of the Administrative Agent, any Arranger or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

**Section 9.13    Recovery of Erroneous Payments**

Without limitation of any other provision in this Agreement, if at any time the Administrative Agent makes a payment hereunder in error to any Lender Recipient Party, whether or not in respect of an Obligation due and owing by the Borrower at such time, where such payment is a Rescindable Amount, then in any such event, each Lender Recipient Party receiving a Rescindable Amount severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount received by such Lender Recipient Party in immediately available funds in the currency so received, with interest thereon, for each day from and including the date such Rescindable Amount is received by it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.  Each Lender Recipient Party irrevocably waives any and all defenses, including any "discharge for value" (under which a creditor might otherwise claim a right to retain funds mistakenly paid by a third party in respect of a debt owed by another) or similar defense to its obligation to return any Rescindable Amount. The Administrative Agent shall inform each Lender Recipient Party promptly upon determining that any payment made to such Lender Recipient Party comprised, in whole or in part, a Rescindable Amount.

**ARTICLE X**

**GUARANTY**

**Section 10.01    The Guaranty**.

Each of the Guarantors hereby jointly and severally guarantees to each Lender and each other holder of Obligations as hereinafter provided, as primary obligor and not as surety, the prompt payment of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) strictly in accordance with the terms thereof.  The Guarantors hereby further agree that if any of the Obligations are not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or

AMERICAS/2024053109.31

otherwise), the Guarantors will, jointly and severally, promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) in accordance with the terms of such extension or renewal.

Notwithstanding any provision to the contrary contained herein or in any other of the Loan Documents or the other documents relating to the Obligations, the obligations of each Guarantor under this Agreement and the other Loan Documents shall not exceed an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under applicable Debtor Relief Laws.

**Section 10.02    Obligations Unconditional**.

The obligations of the Guarantors under Section 10.01 are joint and several, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Loan Documents or other documents relating to the Obligations, or any substitution, release, impairment or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by Applicable Law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 10.02 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances. Each Guarantor agrees that such Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against the Borrower or any other Loan Party for amounts paid under this Article X until such time as the Obligations have been paid in full and the Commitments have expired or terminated. Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by Law, the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall remain absolute and unconditional as described above:

(a)    at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions of any of the Loan Documents or other documents relating to the Obligations shall be done or omitted;

(c)    the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under any of the Loan Documents or other documents relating to the Obligations shall be waived or any other guarantee of any of the Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(d)    any Lien granted to, or in favor of, the Administrative Agent or any other holder of Obligations as security for any of the Obligations shall fail to attach or be perfected; or

(e)    any of the Obligations shall be determined to be void or voidable (including for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including any creditor of any Guarantor).

With respect to its obligations hereunder, each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Administrative Agent or any other holder of Obligations exhaust any right, power or remedy or proceed against any Person under any of the Loan Documents or any other document relating to the Obligations, or against any other Person under any other guarantee of, or security for, any of the Obligations.

131

**Section 10.03    Reinstatement**.

The obligations of each Guarantor under this Article X shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of Obligations, whether as a result of any Debtor Relief Law or otherwise, and each Guarantor agrees that it will indemnify the Administrative Agent and each other holder of Obligations on demand for all reasonable costs and expenses (including the fees, charges and disbursements of counsel) incurred by the Administrative Agent or such other holder of Obligations in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Debtor Relief Law.

**Section 10.04    Certain Additional Waivers**.

Each Guarantor agrees that such Guarantor shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation pursuant to Section 10.02 and through the exercise of rights of contribution pursuant to Section 10.06.

**Section 10.05    Remedies**.

The Guarantors agree that, to the fullest extent permitted by Law, as between the Guarantors, on the one hand, and the Administrative Agent and the other holders of Obligations, on the other hand, the Obligations may be declared to be forthwith due and payable as specified in Section 10.02 (and shall be deemed to have become automatically due and payable in the circumstances specified in Section 10.02) for purposes of Section 10.01 notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing the Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or the Obligations being deemed to have become automatically due and payable), the Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by the Guarantors for purposes of Section 10.01. The Guarantors acknowledge and agree that their obligations hereunder are secured in accordance with the terms of the Collateral Documents and that the holders of Obligations may exercise their remedies thereunder in accordance with the terms thereof.

**Section 10.06    Rights of Contribution**.

The Guarantors hereby agree as among themselves that, if any Guarantor shall make an Excess Payment (as defined below), such Guarantor shall have a right of contribution from each other Guarantor in an amount equal to such other Guarantor's Contribution Share (as defined below) of such Excess Payment. The payment obligations of any Guarantor under this Section 10.06 shall be subordinate and subject in right of payment to the Obligations until such time as the Obligations have been paid-in-full and the Commitments have terminated, and none of the Guarantors shall exercise any right or remedy under this Section 10.06 against any other Guarantor until such Obligations have been paid-in-full and the Commitments have terminated. For purposes of this Section 10.06, (a) "Excess Payment" shall mean the amount paid by any Guarantor in excess of its Ratable Share of any Obligations; (b) "Ratable Share" shall mean, for any Guarantor in respect of any payment of Obligations, the ratio (expressed as a percentage) as of the date of such payment of Obligations of (i) the amount by which the aggregate present fair salable value of all of its assets and properties exceeds the amount of all debts and liabilities of such Guarantor (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of such Guarantor hereunder) to (ii) the amount by which the aggregate present fair salable value of all assets and other properties of all of the Loan Parties exceeds the amount of all of the debts and liabilities (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of the Loan Parties hereunder) of the Loan Parties; provided, however, that, for purposes of calculating the Ratable Shares of the Guarantors in respect of any payment of Obligations, any Guarantor that

132

became a Guarantor subsequent to the date of any such payment shall be deemed to have been a Guarantor on the date of such payment and the financial information for such Guarantor as of the date such Guarantor became a Guarantor shall be utilized for such Guarantor in connection with such payment; and (c) "Contribution Share" shall mean, for any Guarantor in respect of any Excess Payment made by any other Guarantor, the ratio (expressed as a percentage) as of the date of such Excess Payment of (i) the amount by which the aggregate present fair salable value of all of its assets and properties exceeds the amount of all debts and liabilities of such Guarantor (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of such Guarantor hereunder) to (ii) the amount by which the aggregate present fair salable value of all assets and other properties of the Loan Parties other than the maker of such Excess Payment exceeds the amount of all of the debts and liabilities (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of the Loan Parties) of the Loan Parties other than the maker of such Excess Payment; provided, however, that, for purposes of calculating the Contribution Shares of the Guarantors in respect of any Excess Payment, any Guarantor that became a Guarantor subsequent to the date of any such Excess Payment shall be deemed to have been a Guarantor on the date of such Excess Payment and the financial information for such Guarantor as of the date such Guarantor became a Guarantor shall be utilized for such Guarantor in connection with such Excess Payment.  This Section 10.06 shall not be deemed to affect any right of subrogation, indemnity, reimbursement or contribution that any Guarantor may have under Law against the Borrower in respect of any payment of Obligations.

### Section 10.07    Guarantee of Payment; Continuing Guarantee.

The guarantee in this Article X is a guaranty of payment and not of collection, is a continuing guarantee, and shall apply to the Obligations whenever arising.

### Section 10.08    Keepwell.

Each Loan Party that is a Qualified ECP Guarantor at the time the Guaranty in this Article X by any Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act (a "Specified Loan Party") or the grant of a security interest under the Loan Documents by any such Specified Loan Party, in either case, becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under this Article X voidable under applicable Debtor Relief Laws, and not for any greater amount).  The obligations and undertakings of each Qualified ECP Guarantor under this Section shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full.  Each Loan Party intends this Section to constitute, and this Section shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each Specified Loan Party for all purposes of the Commodity Exchange Act.

## ARTICLE XI

## MISCELLANEOUS

### Section 11.01    Amendments, Etc.

No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and

acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that:

(a)    no such amendment, waiver or consent shall be:

(i)    extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of such Lender (it being understood and agreed that a waiver of any condition precedent set forth in Section 4.02 or Section 4.03 or of any Default or mandatory reduction in Commitments is not considered an extension or increase in Commitments of any Lender);

(ii)    postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees (including any Applicable Premium) or other amounts due to the Lenders or any scheduled reduction of the Commitments hereunder or under any other Loan Document without the written consent of each Lender entitled to receive such payment or whose Commitments are to be reduced;

(iii)    reduce the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing, or (subject to clause (i) of the final proviso to this Section 11.01) any fees (including any Applicable Premium) or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender entitled to receive such amount; provided, however, that (A) only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest or Letter of Credit Fees at the Default Rate and (B) an amendment to any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or L/C Borrowing or to reduce any fee payable hereunder shall not be deemed to be a reduction of the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing, or any fees or other amounts payable hereunder or under any other Loan Document;

(iv)    change Section 2.13, Section 8.03 or any other pro rata sharing provisions contained herein in a manner that would alter the application of or pro rata sharing of payments required thereby without the written consent of each Lender;

(v)    change (i) any provision of this Section 11.01(a) or the definition of "Required Lenders," or "Required Class Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder (other than the definitions specified in clause (ii) of this Section 11.01(a)(v)), without the written consent of each Lender or (ii) any provision of this clause (ii) of Section 11.01(a)(v) or the definition of "Required Revolving Lenders," "Required 2021 Replacement Term Lenders," "Required 2021 Replacement Term/Revolving Lenders," "Required 2023 Term Lenders," "Required Revolving Lenders" or "Required Lenders," without the written consent of each Lender under the applicable Facility;

(vi)    release all or substantially all of the Collateral without the written consent of each Lender whose Obligations are secured by such Collateral;

(vii)    release the Borrower without the consent of each Lender, or, except in connection with a transaction permitted under Section 7.04 or Section 7.05, all or substantially all of the value of the Guaranty without the written consent of each Lender

134

whose Obligations are guarantied thereby, except to the extent such release is permitted pursuant to Section 9.10 or the express terms of the Security Agreement (in which case such release may be made by the Administrative Agent acting alone);

(viii)    waive any condition set forth in Section 4.02 or Section 4.03 as to any Credit Extension under a particular Facility without the written consent of the Required Revolving Lenders, the Required 2021 Replacement Term Lenders or the Required 2023 Term Lenders, as the case may be;

(ix)    subordinate the payment priority of the Obligations or the lien priority of any Liens securing the Obligations (in each case, except as otherwise expressly permitted herein or in the other Loan Documents (in each case, as in effect on the Second Restatement Date)) without the written consent of each Lender;

(x)    change Section 7.11(b) or the definition of "Consolidated Interest Coverage Ratio Event of Default," "Consolidated Interest Coverage Ratio," or any other defined term which is used to determine the Consolidated Interest Coverage Ratio or any component thereof (in the case of each of the foregoing defined terms, however, solely the extent any such defined term applies for the purpose of determining the Consolidated Interest Coverage Ratio), or waive any Consolidated Interest Coverage Ratio Event of Default, in each case without the written consent of the Required 2021 Replacement Term/Revolving Lenders (provided, that any such change or waiver described in this clause (x) shall require only the prior written consent of the Required 2021 Replacement Term/Revolving Lenders, and not that of the Required Lenders);

(xi)    change Section 7.02(l) or Section 7.12(c) or waive any Default or Event of Default occurring as a result of a breach of Section 7.02(l) or Section 7.12(c), without the written consent of each of the Required Revolving Lenders, the Required 2021 Replacement Term Lenders and the Required 2023 Term Lenders; and

(xii)    unless also signed by the Administrative Agent, no amendment, waiver or consent shall affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document;

provided, further, that notwithstanding anything to the contrary herein, (i) no amendment, waiver or consent shall, unless in writing and signed by the L/C Issuers in addition to the Lenders required above, affect the rights or duties of the L/C Issuers under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it, (ii) no amendment, waiver or consent shall, unless in writing and signed by the Swing Line Lender in addition to the Lenders required above, affect the rights or duties of the Swing Line Lender under this Agreement, (iii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto, (ii) each Lender is entitled to vote as such Lender sees fit on any bankruptcy reorganization plan that affects the Loans, and each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code supersedes the unanimous consent provisions set forth herein and (iii) the Required Lenders shall determine whether or not to allow a Loan Party to use cash collateral in the context of a bankruptcy or insolvency proceeding and such determination shall be binding on all of the Lenders.

Notwithstanding anything to the contrary herein, in the event that a Successful 2023 Term Loan Syndication is not achieved on or prior to the Reorganization Completion Date, the Administrative Agent and the Loan Parties shall, at the request of the Required 2023 Term Lenders, each cooperate to effectuate such amendments to this Agreement as are required to amend the last proviso of the definition of "Term SOFR", as such term applies to the 2023 Term Facility, the 2021 Replacement Term Facility and the Revolving Credit Facility, to increase the Term SOFR "floor" to such level as requested by the Required

135

2023 Term Lenders, but in no event to a level exceeding 1.00% per annum. No amendments made pursuant to this paragraph shall require the consent of the 2021 Replacement Term Lenders or the Revolving Credit Lenders.

No Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of such Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects such Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding any provision herein to the contrary, this Agreement may be amended with the written consent of the Required Lenders, the Administrative Agent and the Loan Parties (i) to add one or more additional revolving credit or term loan facilities to this Agreement and to permit the extensions of credit and all related obligations and liabilities arising in connection therewith from time to time outstanding to share ratably (or on a basis subordinated to the existing facilities hereunder) in the benefits of this Agreement and the other Loan Documents with the obligations and liabilities from time to time outstanding in respect of the existing facilities hereunder, and (ii) in connection with the foregoing, to permit, as deemed appropriate by the Administrative Agent and approved by the Required Lenders, the Lenders providing such additional credit facilities to participate in any required vote or action required to be approved by the Required Lenders or by any other number, percentage or class of Lenders hereunder.

Notwithstanding any provision herein to the contrary, the Administrative Agent and the Borrower may amend, modify or supplement this Agreement or any other Loan Document to cure or correct administrative errors or omissions, any ambiguity, omission, defect or inconsistency or to effect administrative changes, and such amendment shall become effective without any further consent of any other party to such Loan Document so long as (i) such amendment, modification or supplement does not adversely affect the rights of any Lender or other holder of Obligations in any material respect and (ii) the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment.

**Section 11.02    Notices; Effectiveness; Electronic Communications**.

(a)    Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or electronic mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to any Loan Party, the Administrative Agent, any L/C Issuer or the Swing Line Lender, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 11.02; and

(ii)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Borrower).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in <u>subsection (b)</u> below, shall be effective as provided in such <u>subsection (b)</u>.

(b)    <u>Electronic Communications</u>.  Notices and other communications to the Lenders and the L/C Issuers hereunder may be delivered or furnished by electronic communication (including e-mail, FpML messaging and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender or any L/C Issuer pursuant to <u>Article II</u> if such Lender or such L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent, the Swing Line Lender, any L/C Issuer or the Borrower may each, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement) and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; <u>provided</u> that, for both <u>clauses (i)</u> and (ii), if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)    <u>The Platform</u>.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "<u>Agent Parties</u>") have any liability to the Borrower, any Lender, any L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of Borrower Materials or notices through the Platform, any other electronic platform or electronic messaging service, or through the Internet.

(d)    <u>Change of Address, Etc</u>.  Each of the Borrower, the Administrative Agent, each L/C Issuer and the Swing Line Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the Borrower, the Administrative Agent, each L/C Issuer

137

and the Swing Line Lender.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and Applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities Laws.

(e)      Reliance by Administrative Agent, L/C Issuers and Lenders.  The Administrative Agent, L/C Issuers and the Lenders shall be entitled to rely and act upon any notices (including telephonic notices, Loan Notices, Letter of Credit Applications and Swing Line Notices) purportedly given by or on behalf of any Loan Party even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Administrative Agent, each Lender, each L/C Issuer and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of a Loan Party.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent or the Loan Parties, and each of the parties hereto hereby consents to such recording.

**Section 11.03    No Waiver; Cumulative Remedies; Enforcement**.

No failure by any Lender, any L/C Issuer or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document (including the imposition of the Default Rate) preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders and the L/C Issuers; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any L/C Issuer or the Swing Line Lender from exercising the rights and remedies that inure to its benefit (solely in its capacity as L/C Issuer or Swing Line Lender, as the case may be) hereunder and under the other Loan Documents (c) any Lender from exercising setoff rights in accordance with Section 11.08 (subject to the terms of Section 2.13), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section

138

<u>8.02</u> and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to <u>Section 2.13</u>, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**Section 11.04    Expenses; Indemnity; Damage Waiver**.

(a)    <u>Costs and Expenses</u>.  The Loan Parties shall pay (i) all reasonable out of pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent) in connection with the syndication of the credit facilities provided for herein and the preparation, negotiation, execution, and delivery and the administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable out of pocket expenses incurred by the L/C Issuers in connection with the issuance, amendment, extension, reinstatement or renewal of any Letter of Credit or any demand for payment thereunder and (iii) all out of pocket expenses incurred by the Administrative Agent, any Lender or any L/C Issuer (including the fees, charges and disbursements of any counsel for the Administrative Agent, any Lender or any L/C Issuer), and shall pay all fees and time charges for attorneys who may be employees of the Administrative Agent, any Lender or any L/C Issuer in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Loans made or Letters of Credit issued made hereunder, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b)    <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Administrative Agent (and any sub-agent thereof), each Arranger, each Lender and each L/C Issuer, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any Loan Party) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby (including, without limitation, the Indemnitee's reliance on any Communication executed using an Electronic Signature, or in the form of an Electronic Record), the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in <u>Section 3.01</u>), (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by any L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do no strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by a Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to a Loan Party or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party, and regardless of whether any Indemnitee is a party thereto, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are

AMERICAS/2024053109.31

determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by any Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.  Without limiting the provisions of <u>Section 3.01(c)</u>, this <u>Section 11.04(b)</u> shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)      <u>Reimbursement by Lenders</u>.  To the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under <u>subsection (a)</u> or <u>(b)</u> of this Section to be paid by them to the Administrative Agent (or any sub-agent thereof), any L/C Issuer, the Swing Line Lender or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Credit Exposures of all Lenders at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender), such payment to be made severally among them based on such Lenders' Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), <u>provided</u>, <u>further</u> that, the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), such L/C Issuer or the Swing Line Lender in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), such L/C Issuer or the Swing Line Lender in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of <u>Section 2.12(d)</u>.

(d)      <u>Waiver of Consequential Damages, Etc</u>.  To the fullest extent permitted by Applicable Law, no Loan Party shall assert, and each Loan Party hereby waives, and acknowledges that no other Person shall have, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from (x) the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction or (y) a claim brought by any Loan Party against such Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(e)      <u>Payments</u>.  All amounts due under this Section shall be payable not later than ten Business Days after demand therefor.

(f)      <u>Survival</u>.  The agreements in this Section and the indemnity provisions of <u>Section 11.02(e)</u> shall survive the resignation of the Administrative Agent, the L/C Issuers and the Swing Line Lender, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

AMERICAS/2024053109.31

**Section 11.05    Payments Set Aside**.

To the extent that any payment by or on behalf of any Loan Party is made to the Administrative Agent, any L/C Issuer or any Lender, or the Administrative Agent, any L/C Issuer or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, such L/C Issuer or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and each L/C Issuer severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders and the L/C Issuers under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**Section 11.06    Successors and Assigns**.

(a)    Successors and Assigns Generally.  The provisions of this Agreement (and, to the extent applicable, the other Loan Documents) shall be binding upon and inure to the benefit of the parties hereto and thereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder or thereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (e) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (and, to the extent applicable, the other Loan Documents) (including all or a portion of its Commitment and the Loans (including for purposes of this Section 11.06(b), participations in L/C Obligations and in Swing Line Loans) at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under any Facility and the related Loans at the time owing to it (in each case with respect to any Facility) or contemporaneous assignments to related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in subsection (b)(i)(B) of this Section in the aggregate or in the case of an

assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)      in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the applicable Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the "Trade Date", shall not be less than $1,000,000 in the case of any assignment in respect of the Revolving Credit Facility or any Term Loan unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)      Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's Loans and Commitments, and rights and obligations with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not apply to the Swing Line Lender's rights and obligations in respect of Swing Line Loans;

(iii)      Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)      the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that, other than with respect to any assignment of Revolving Credit Commitments, the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof; provided, further, that the Borrower's consent shall not be required during the primary syndication of the 2023 Term Facility;

(B)      the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (i) any Revolving Credit Commitment if such assignment is to a Person that is not a Lender with a Revolving Credit Commitment, an Affiliate of such Lender or an Approved Fund with respect to such Lender or (ii) any Term Loan to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund; and

(C)      the consent of each L/C Issuer and the Swing Line Lender shall be required for any assignment in respect of the Revolving Credit Facility.

(iv)      Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)    No Assignment to Certain Persons.  No such assignment shall be made to (A) the Borrower or any of the Borrower's Affiliates or Subsidiaries, (B) any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B), or (C) a natural Person (or a holding company, investment vehicle or trust for, or owned and operated by or for the primary benefit of one or more natural Persons.

(vi)    Certain Additional Payments.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, any L/C Issuer, or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit and Swing Line Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under Applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 11.04 with respect to facts and circumstances occurring prior to the effective date of such assignment); provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)    Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower (and such agency being solely for Tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is

143

recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of one of more natural Persons), a Defaulting Lender or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in L/C Obligations and/or Swing Line Loans); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent, the Lenders and the L/C Issuers shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 11.04(c) without regard to the existence of any participation.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 11.01(a) that affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section (it being understood that the documentation required under Section 3.01(e) shall be delivered to the Lender who sells the participation) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Sections 3.06, 11.07 and 11.13 as if it were an assignee under paragraph (b) of this Section and (B) shall not be entitled to receive any greater payment under Sections 3.01 or 3.04, with respect to any participation, than the Lender from whom it acquired the applicable participation would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 3.06 with respect to any Participant. To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 11.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.13 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the

144

Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)      Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a creditor (including to a Federal Reserve Bank); provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)      Resignation as L/C Issuer or Swing Line Lender after Assignment. Notwithstanding anything to the contrary contained herein, if at any time any L/C Issuer/Swing Line Lender assigns all of its Revolving Credit Commitment and Revolving Credit Loans pursuant to clause (b) above, such L/C Issuer/Swing Line Lender may, (i) upon 30 days' notice to the Administrative Agent, the Borrower and the Lenders, resign as an L/C Issuer and/or (ii) upon 30 days' notice to the Borrower, resign as Swing Line Lender.  In the event of any such resignation as an L/C Issuer or Swing Line Lender, the Borrower shall be entitled to appoint from among the Lenders a successor L/C Issuer or Swing Line Lender hereunder; provided, however, that no failure by the Borrower to appoint any such successor shall affect the resignation of the applicable L/C Issuer/Swing Line Lender as an L/C Issuer or Swing Line Lender, as the case may be.  If the applicable L/C Issuer resigns as an L/C Issuer, it shall retain all the rights, powers, privileges and duties of an L/C Issuer hereunder with respect to all Letters of Credit issued by it and outstanding as of the effective date of its resignation as an L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to make Base Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.03(c)).  If Bank of America resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.04(c).  Upon the appointment of a successor L/C Issuer and/or Swing Line Lender, (x) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer or Swing Line Lender, as the case may be, and (y) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the applicable retiring L/C Issuer to effectively assume the obligations of the applicable retiring L/C Issuer with respect to such Letters of Credit.

**Section 11.07    Treatment of Certain Information; Confidentiality**.

Each of the Administrative Agent, the Lenders and the L/C Issuers agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, its auditors and its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing confidentiality provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement or any Eligible Assignee invited to

145

become a Lender pursuant to <u>Section 2.15</u>, (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder, or (iii) any of its secured lenders, (g) on a confidential basis to (i) any rating agency in connection with rating any Loan Party or its Subsidiaries or the credit facilities provided hereunder or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers or other market identifiers with respect to the credit facilities provided hereunder, (h) with the consent of the Borrower or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, (y) becomes available to the Administrative Agent, any Lender, any L/C Issuer or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower (other than a source known by such disclosing Person to be bound by confidentiality obligations with respect to such Information) or (z) is independently discovered or developed by a party hereto without utilizing any Information received from the Borrower or violating the terms of this <u>Section 11.07</u>.  In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agents and the Lenders in connection with the administration of this Agreement, the other Loan Documents, and the Commitments.

For purposes of this Section, "<u>Information</u>" means all information received from a Loan Party or any Subsidiary relating to the Loan Parties or any Subsidiary or any of their respective businesses, other than any such information that is available to the Administrative Agent, any Lender or any L/C Issuer on a nonconfidential basis prior to disclosure by the Borrower or any Subsidiary.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent, the Lenders and the L/C Issuers acknowledges that (a) the Information may include material non-public information concerning a Loan Party or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with Applicable Law, including United States Federal and state securities Laws.

The Loan Parties and their Affiliates agree that they will not in the future issue any press releases or other public disclosure using the name of the Administrative Agent or any Lender or their respective Affiliates or referring to this Agreement or any of the Loan Documents without the prior written consent of the Administrative Agent, unless (and only to the extent that) the Loan Parties or such Affiliate is required to do so under law and then, in any event the Loan Parties or such Affiliate will consult with such Person before issuing such press release or other public disclosure.

**Section 11.08    <u>Rights of Setoff</u>.**

If an Event of Default shall have occurred and be continuing, each Lender, each L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, such L/C Issuer or their respective Affiliates, irrespective of whether or not such Lender or such L/C Issuer or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Loan Party may be contingent or unmatured or are owed to a branch or office or Affiliate of such Lender or such L/C Issuer different from

the branch or office or Affiliate holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.14 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender, each L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, such L/C Issuer or their respective Affiliates may have. Each Lender and each L/C Issuer agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application. Notwithstanding the provisions of this Section 11.08, if at any time any Lender or any of their respective Affiliates maintains one or more deposit accounts for the Borrower or any of its Subsidiaries into which Medicare and/or Medicaid receivables are deposited, such Person shall waive the right of setoff set forth herein.

### Section 11.09    Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by Applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

### Section 11.10    Counterparts; Integration; Effectiveness.

This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent or any L/C Issuer, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

### Section 11.11    Survival of Representations and Warranties.

All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

**Section 11.12    Severability**.

If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 11.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, any L/C Issuer or the Swing Line Lender, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

**Section 11.13    Replacement of Lenders**.

If the Borrower is entitled to replace a Lender pursuant to the provisions of Section 3.06, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.06), all of its interests, rights (other than its existing rights to payments pursuant to Sections 3.01 and 3.04) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)    the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 11.06(b);

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and L/C Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(d)    such assignment does not conflict with Applicable Laws; and

(e)    in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Each party hereto agrees that (a) an assignment required pursuant to this Section 11.13 may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee and (b) the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective and shall be deemed to have consented to and be bound by the terms thereof; provided that, following the effectiveness of any such assignment, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as

148

reasonably requested by the applicable Lender, provided, further that any such documents shall be without recourse to or warranty by the parties thereto.

Notwithstanding anything in this Section 11.13 to the contrary, (i) any Lender that acts as an L/C Issuer may not be replaced hereunder at any time it has any Letter of Credit outstanding hereunder unless arrangements satisfactory to such Lender (including the furnishing of a backstop standby letter of credit in form and substance, and issued by an issuer, reasonably satisfactory to such L/C Issuer or the depositing of Cash Collateral into a Cash Collateral account in amounts and pursuant to arrangements reasonably satisfactory to such L/C Issuer) have been made with respect to such outstanding Letter of Credit and (ii) the Lender that acts as the Administrative Agent may not be replaced hereunder except in accordance with the terms of Section 9.06.

**Section 11.14    Governing Law; Jurisdiction; Etc.**

(a)      GOVERNING LAW.    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)      SUBMISSION TO JURISDICTION.    THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE ADMINISTRATIVE AGENT, ANY LENDER, ANY L/C ISSUER OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.    EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.    NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, ANY LENDER OR ANY L/C ISSUER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)      WAIVER OF VENUE.    EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY

APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

**Section 11.15    Waiver of Jury Trial**.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 11.16    No Advisory or Fiduciary Responsibility**.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Loan Parties acknowledges and agrees, and acknowledges its Affiliates' understanding, that:  (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Arrangers and the Lenders are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent, the Arrangers and the Lenders, on the other hand, (B) each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Loan Parties is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent, the Arrangers and the Lenders each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Loan Parties or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent, any Arranger, nor any Lender has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Arrangers, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent, any Arranger, nor any Lender has any obligation to disclose any of such interests to the Loan Parties and their respective Affiliates.  To the fullest extent permitted by Law, each of the Loan Parties hereby waives and releases any claims that it may have against the Administrative Agent, the Arrangers or any Lender with respect to

150

any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**Section 11.17    <u>California Judicial Reference</u>**.

If any action or proceeding is filed in a court of the State of California by or against any party hereto in connection with any of the transactions contemplated by this Agreement or any other Loan Document, (a) the court shall, and is hereby directed to, make a general reference pursuant to California Code of Civil Procedure Section 638 to a referee (who shall be a single active or retired judge) to hear and determine all of the issues in such action or proceeding (whether of fact or of law) and to report a statement of decision, provided that at the option of any party to such proceeding, any such issues pertaining to a "provisional remedy" as defined in California Code of Civil Procedure Section 1281.8 shall be heard and determined by the court, and (b) without limiting the generality of <u>Section 11.04</u>, the Borrower shall be solely responsible to pay all fees and expenses of any referee appointed in such action or proceeding.

**Section 11.18    <u>Electronic Execution of Assignments and Certain Other Documents</u>**.

This Agreement, any Loan Document and any other Communication, including Communications required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures. The Borrower, each other Loan Party and each of the Administrative Agent, and the Lender Parties agrees that any Electronic Signature on or associated with any Communication shall be valid and binding on such Person to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of such Person enforceable against such Person in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered. Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Administrative Agent and each of the Lender Parties may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("Electronic Copy"), which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document. All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, none of the Administrative Agent, any L/C Issuer or the Swing Line Lender is under any obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by such Person pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Administrative Agent, any L/C Issuer and/or the Swing Line Lender has agreed to accept such Electronic Signature, the Administrative Agent and each of the Lender Parties shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of the Borrower, any other Loan Party and/or any Lender Party without further verification and (b) upon the request of the Administrative Agent or any Lender Party, any Electronic Signature shall be promptly followed by such manually executed counterpart.

None of the Administrative Agent, any L/C Issuer the Swing Line Lender shall be responsible for or have any duty to ascertain or inquire into the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document (including, for the avoidance of doubt, in connection with the Administrative Agent's, any L/C Issuer's or the Swing Line Lender's reliance on any Electronic Signature transmitted by telecopy, emailed .pdf or any other

electronic means).  The Administrative Agent, each L/C Issuer and Swing Line Lender shall be entitled to rely on, and shall incur no liability under or in respect of this Agreement or any other Loan Document by acting upon, any Communication (which writing may be a fax, any electronic message, Internet or intranet website posting or other distribution or signed using an Electronic Signature) or any statement made to it orally or by telephone and believed by it to be genuine and signed or sent or otherwise authenticated (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the maker thereof).

The Borrower, each other Loan Party and each Lender Party hereby waives (i) any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document and/or any document ancillary thereto based solely on the lack of paper original copies of this Agreement, such other Loan Document and/or such ancillary document, and (ii) waives any claim against the Administrative Agent, each Lender Party and of their respective Related Parties for any liabilities arising solely from the Administrative Agent's and/or any Lender Party's reliance on or use of Electronic Signatures, including any liabilities arising as a result of the failure of the Loan Parties to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

**Section 11.19    USA PATRIOT Act Notice**.

Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Loan Parties in accordance with the Act.  The Loan Parties shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**Section 11.20    Subordination of Intercompany Indebtedness**.

Each Loan Party (a "Subordinating Loan Party") agrees that the payment of all obligations and indebtedness, whether principal, interest, fees and other amounts and whether now owing or hereafter arising, owing to such Subordinating Loan Party by any other Loan Party is expressly subordinated to the payment in full in cash of the Obligations.  If the Administrative Agent so requests, any such obligation or indebtedness shall be enforced and performance received by the Subordinating Loan Party as trustee for the Secured Parties and the proceeds thereof shall be paid over to the Secured Parties on account of the Obligations, but without reducing or affecting in any manner the liability of the Subordinating Loan Party under this Agreement or any other Loan Document.  Without limitation of the foregoing, so long as no Default has occurred and is continuing, the Loan Parties may make, receive and retain payments with respect to any such obligations and indebtedness, provided, that in the event that any Loan Party receives any payment of any such obligations and indebtedness at a time when such payment is prohibited by this Section, such payment shall be held by such Loan Party, in trust for the benefit of, and shall be paid forthwith over and delivered, upon written request, to the Administrative Agent.

**Section 11.21    Acknowledgement and Consent to Bail-In of Affected Financial Institutions**.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent

such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

**Section 11.22    <u>Acknowledgement Regarding Any Supported QFCs</u>**.

To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Contract or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>", and each such QFC, a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this <u>Section 11.22</u>, the following terms have the following meanings:

"<u>BHC Act Affiliate</u>" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

AMERICAS/2024053109.31

"<u>Covered Entity</u>" means any of the following:  (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"<u>Default Right</u>" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"<u>QFC</u>" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

[SIGNATURE PAGES FOLLOW]

AMERICAS/2024053109.31

*Execution Version*

## RITE AID CORPORATION
200 Newberry Commons
Etters, Pennsylvania 17319

**CONFIDENTIAL**

November 8, 2023

MI OpCo Holdings, Inc.
10181 Scripps Gateway Ct.
San Diego, California 92131
Attn:  James Gollaher, Chief Financial Officer

Project Poet
Syndication Assistance Side Letter

Ladies and Gentlemen:

Reference is hereby made that certain Second Amended and Restated Credit Agreement, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among MI OpCo Holdings, Inc., a Delaware corporation (the "Borrower"), MI OpOco H2, LLC, a Delaware limited liability company ("Holdings"), the other guarantors from time to time party thereto (together with the Borrower and Holdings, collectively, "you"), Rite Aid Corporation, a Delaware corporation ("RAD", "us" or "we"), as a lender, each other lender from time to time party thereto (together with RAD, the "Lenders" and individually, each a "Lender"), Bank of America, N.A., as Administrative Agent, Swing Line Lender and an L/C Issuer (each as defined therein), and the other L/C Issuers from time to time party thereto.  Capitalized terms used but not defined herein are used with the respective meanings assigned to them in the Credit Agreement.

1. Syndication Assistance

We hereby reserve the right, prior to and/or after the execution of the Credit Agreement and the other applicable Loan Documents, to syndicate all or a portion of our 2023 Term Loan Commitments and/or 2023 Term Loans under the Credit Agreement to a group of banks, financial institutions and other institutional lenders and investors identified by us, in each case, pursuant to assignments made pursuant to Section 11.06(b) of the Credit Agreement.

Without limiting your obligations to assist with syndication efforts as set forth herein, it is understood that RAD's 2023 Term Loan Commitment under the Credit Agreement are not conditioned upon the syndication of, or receipt of commitments in respect of, the 2023 Term Facility, and in no event shall the commencement or successful completion of syndication of the 2023 Term Facility constitute a condition to the availability of the 2023 Term Facility nor reduce RAD's 2023 Term Loan Commitments under the Credit Agreement.  RAD may commence syndication efforts promptly after the date hereof.  Until the earlier of (i) the date on which a Successful 2023 Term Loan Syndication is achieved and (ii) the Reorganization Completion Date (the "Syndication Date"), you agree to assist RAD in seeking to complete a timely syndication that is reasonably satisfactory to us.  Such assistance shall include, (a) your using commercially reasonable efforts to ensure that any syndication efforts benefit from your existing lending and investment banking relationships, (b) direct contact between senior management, representatives and advisors of you and the proposed Lenders, in all such cases at times and locations mutually agreed upon, (c) assistance by you in the preparation of the Information Materials (as hereinafter defined) and other customary offering and marketing materials to be used in connection with the syndication, (d) the hosting,

with RAD, of a reasonable number of conference calls with prospective Lenders at times to be mutually agreed upon, and (e) at any time prior to the Syndication Date, there being no competing issues, offerings, placements or arrangements of debt securities or syndicated commercial bank or other syndicated credit facilities by or on behalf of you or any of your subsidiaries being offered, placed or arranged (other than (i) the 2023 Term Facility, (ii) any short-term working capital facilities, letters of credit, capital leases, purchase money indebtedness and equipment financings, in each case in the ordinary course of business and (iii) certain other indebtedness that Holdings and RAD reasonably agree may remain outstanding after the Second Restatement Date), without our consent, if such issuance, offering, placement or arrangement would materially impair the primary syndication of the 2023 Term Facility.  Notwithstanding anything to the contrary contained in this letter agreement, any Loan Document or other letter agreement or undertaking concerning the 2023 Term Facility to the contrary, the compliance with any of the provisions set forth in clauses (a) through (e), nor the commencement, conduct or completion of such syndication shall not constitute a condition to RAD's 2023 Term Loan Commitment or the availability or funding of the 2023 Term Facility pursuant to the Credit Agreement.

RAD will manage all aspects of the syndication of the 2023 Term Facility, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocation of the commitments among the Lenders and the amount and distribution of fees among the Lenders.  To assist RAD in its syndication efforts, you agree to promptly prepare and provide to RAD all customary information with respect to you and any of your subsidiaries as RAD may reasonably request in connection with the syndication of the 2023 Term Facility.  You will not be required to provide any information to the extent that the provision thereof would violate any attorney-client privilege, law, rule or regulation or any obligation of confidentiality binding upon you or any of your subsidiaries or affiliates; *provided*, that, you will inform us, to the extent legally permitted, that you are withholding any information in reliance on this sentence and you shall use your commercially reasonable efforts to communicate the applicable information in a way that would not violate the applicable obligation or risk waiver of such privilege; *provided*, *further*, that none of the foregoing shall be construed to limit any of your representations and warranties or any of the conditions, in any case, set forth in this letter agreement or the Loan Documents.

You hereby acknowledge that (a) RAD may make available Information (as defined below), Projections and other offering and marketing materials and presentations, including confidential information memoranda customary for transactions of this type to be used in connection with the syndication of the 2023 Term Facility (any such memorandum, an "Information Memorandum", and such Information, Projections, other customary offering and marketing materials and any Information Memorandum, collectively, with the Credit Agreement, the "Information Materials") on a confidential basis to the proposed syndicate of Lenders and (b) certain of the Lenders may be "public side" Lenders (*i.e.*, Lenders that wish to receive only information that (i) is publicly available, (ii) is not material with respect to you or your subsidiaries or securities for purposes of United States federal and state securities laws or (iii) constitutes information of the type that would be publicly available if you or your subsidiaries were public reporting companies (as reasonably determined by you) (collectively, the "Public Side Information"; any information that is not Public Side Information, "Private Side Information")) and who may be engaged in investment and other market related activities with respect to you or your subsidiaries or securities (each such Lender, a "Public Sider" and each Lender that is not a Public Sider, a "Private Sider").  You will be solely responsible for the contents of the Information Materials, and RAD shall be entitled to use and rely upon the information contained therein without responsibility for independent verification thereof.

At our reasonable request, you agree to assist us in preparing an additional version of the Information Materials to be used in connection with the syndication of the 2023 Term Facility that includes only Public Side Information with respect to you and any of your subsidiaries or securities for the purposes

of United States federal and state securities laws to be used by Public Siders.  We agree that the Public Side Information will be substantially consistent with the information that is to be in any filings that have been made by you with the Securities and Exchange Commission or would have been made by you or any of your subsidiaries with the Securities and Exchange Commission if you and/or your subsidiaries were public reporting companies.  It is understood that in connection with your assistance described above, (a) authorization letters in a form customarily included in the Information Materials for senior secured bank financings in the United States will be included in any Information Materials (*i.e.*, separate authorization letters and/or Information Materials containing only Public Side Information and/or Information Materials containing Private Side Information) that authorize the distribution of the Information Materials to prospective Lenders, contain, if applicable, a representation that the additional "Public Style" version of the Information Materials contains only Public Side Information with respect to you and your subsidiaries and securities (as reasonably determined by you) and (b) the Information Materials will include provisions consistent with the Information Materials used for the financing in connection with the Credit Agreement that exculpate RAD and our affiliates with respect to any liability related to the use or misuse of the content of such Information Materials or related offering and marketing materials by the recipients thereof, and exculpate you and your subsidiaries, your affiliates their respective officers and directors, in the event of any unauthorized use or misuse of the Information Materials or related offering and marketing materials.  Before distribution of any Information Materials, at our reasonable request, you agree to use commercially reasonable efforts to identify that portion of the Information Materials that may be distributed to the Public Siders as "Public Side Information", which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof.  By marking Information Materials as "PUBLIC" you shall be deemed to have authorized RAD and the proposed Lenders to treat such Information Materials as containing only Public Side Information (it being understood that you shall not be obligated to mark such information as "PUBLIC").  You agree that, unless expressly identified as "Public Side Information", each document to be disseminated by RAD (or any other agent) to any Lender in connection with the 2023 Term Facility will be deemed to contain Private Side Information and we will not make any such materials available to Public Siders.

You acknowledge and agree that, subject to the confidentiality and other provisions of this letter agreement, the Credit Agreement and the other Loan Documents, the following documents contain solely Public Side Information (unless you notify us prior to their intended distribution that any such document contains Private Side Information): (i) drafts and final copies of the Loan Documents; (ii) administrative materials prepared by RAD for prospective Lenders (such as a lender meeting invitation, bank allocation, if any, and funding and closing memoranda); and (iii) notification of changes in the terms of the Credit Agreement and any other Loan Documents.  If you advise RAD in writing (including by email) within a reasonable period of time prior to dissemination that any of the foregoing items should be distributed only to Private Siders, then we will not distribute such materials to Public Siders without further discussions with you.

2.  <u>Information</u>

You hereby represent and warrant that (a) all written factual information concerning you and your subsidiaries (other than (i) information of a general economic or industry nature and (ii) financial projections, budgets, estimates, forecasts and other forward-looking information) that has been or will be made available by or on behalf of you or any of your representatives, to RAD, any Lender or any of their affiliates in connection with 2023 Term Facility (the "<u>Information</u>"), when taken as a whole, does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto) and (b) the financial projections that have been or will be made available by or on behalf of you or any of your representatives to RAD in connection with the 2023 Term Facility (the "<u>Projections</u>") have

3

been or will be prepared in good faith based upon assumptions believed by you to be reasonable both at the time prepared and furnished (it being understood that the Projections are not to be viewed as facts and the Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurances can be given that the Projections will be realized and that actual results during the period or periods covered by the Projections may differ significantly from the projected results and such differences may be material).  You agree that if, at any time prior to the Syndication Date, you become aware that any of the representations and warranties in the immediately preceding sentence is incorrect in any material respect, then you will promptly supplement the Information and the Projections so that such representations and warranties are correct in all material respects under those circumstances (it being understood that such supplementation shall cure any breach of such representations and warranties).  You understand and agree that in arranging the 2023 Term Facility, we may use and rely on the Information and the Projections without responsibility for independent verification thereof and we do not assume responsibility for the accuracy or completeness of the Information or the Projections.  Notwithstanding anything to the contrary contained in this letter agreement, none of the making of any representation or warranty under this Section 2, the provision of any supplement to any of the Information or the Projections nor the accuracy of any such representation, warranty or supplement shall constitute a condition precedent to the availability of the 2023 Term Facility pursuant to the Credit Agreement.

3.   Sharing of Information, Absence of Fiduciary Relationship and Affiliate Activities

You acknowledge that RAD (or its affiliates) may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you your affiliates and of other companies that may be the subject of the transactions contemplated by Loan Documents.  You also acknowledge that RAD and its affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or other persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and us (or any of our affiliates) is intended to be or has been created in respect of any of the transactions contemplated by this letter agreement or any Loan Document, irrespective of whether we (or any of our affiliates) has advised or is advising you on other matters, except as expressly provided herein, (b) we (or any of our affiliates) , on the one hand, and you, on the other hand, have an arm's length business relationship that does not give rise to any fiduciary duty on the part of us (or any of our affiliates) in respect of any of the transactions contemplated by this letter agreement or any of the Loan Documents, (c) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed it appropriate to do so and you are not relying on the us for such advice and (d) in connection with the transactions contemplated by this letter agreement and the Loan Documents, we (and our affiliates) has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity.  You hereby waive to the fullest extent permitted by law any claims for breach or alleged breach of fiduciary duties against us (and our affiliates) in connection with this letter agreement, the Loan Documents and/or the 2023 Term Facility.

4.   Confidentiality

This Commitment Letter is delivered to you on a confidential basis, subject to the confidentiality provisions contained in Section 11.07 and elsewhere in the Credit Agreement, *mutatis mutandis*.

5.  <u>Miscellaneous</u>

This letter agreement shall (x) be a Loan Document for all purposes under the Credit Agreement and (y) shall not be assignable by any party hereto without the prior written consent of each other party hereto (not to be unreasonably withheld, conditioned or delayed) (and any such purported assignment without such consent shall be null and void), are intended to be solely for the benefit of the parties hereto (and their permitted assignees) and are not intended to and do not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and their permitted assignees).  This letter agreement may not be amended or any provision hereof waived or modified except by an instrument in writing signed by you and the other parties hereto.  This letter agreement may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this Commitment Letter by facsimile or other electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this letter agreement and/or any document to be signed in connection with this letter agreement and the transactions contemplated hereby and thereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.  "<u>Electronic Signatures</u>" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.  This Commitment Letter and the Fee Letter are the only agreements that have been entered into among us and you with respect to the Facilities and set forth the entire understanding of the parties with respect thereto and supersede any prior written or oral agreements among the parties hereto with respect to the Facilities.

The provisions of Sections 11.14 and 11.15 of the Credit Agreement are hereby incorporated by reference, *mutatis mutandis*.

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this letter agreement.

[Remainder of Page Intentionally Left Blank; Signature Pages Follow]

## Exhibit 2

**Amended Elixir Stalking Horse APA**

Execution Version

## AMENDMENT NO. 4 TO ASSET PURCHASE AGREEMENT

November 8, 2023

This AMENDMENT NO. 4 TO ASSET PURCHASE AGREEMENT (this "Amendment")
is made and entered into as of the date first above written, by and among MedImpact Healthcare
Systems, Inc., a California corporation ("Purchaser") and Hunter Lane, LLC, a Delaware limited
liability company (as in existence on the date hereof, as a debtor-in-possession and a reorganized
Debtor, as applicable, "Elixir"). Purchaser and Elixir are referred to herein individually as a
"Party" and collectively as the "Parties."  Capitalized terms used but not otherwise defined in
herein have the respective meanings ascribed to such terms in the Purchase Agreement (as defined
below).

WHEREAS, the Parties and certain other parties have entered into that certain Asset
Purchase Agreement, dated as of October 15, 2023 (the "Signing Date"), as amended by that
certain Amendment No. 1 to Asset Purchase Agreement, dated as of October 28, 2023
("Amendment No. 1"), that certain Amendment No. 2 to Asset Purchase Agreement, dated
November 1, 2023 ("Amendment No. 2"), and that certain Amendment No. 3 to Asset Purchase
Agreement, dated November 7, 2023 ("Amendment No. 3")   (collectively,  the "Purchase
Agreement");

WHEREAS, the Parties wish to amend the Purchase Agreement in accordance with the
terms of the Purchase Agreement and this Amendment; and

WHEREAS, Section 10.5 (Amendment and Waiver) of the Purchase Agreement provides
that the Purchase Agreement be amended only in a writing signed by Purchaser and Sellers (or
Elixir, on behalf of Sellers, pursuant to Section 10.19 of the Purchase Agreement).

NOW, THEREFORE, in consideration of premises, and of the representations, warranties,
covenants and agreements contained herein, the value, receipt and sufficiency of which are hereby
acknowledged, the Parties hereby agree as follows:

1.     Amendment.  The Purchase Agreement and the Schedules to the Purchase
Agreement are hereby amended by making the additions in blue or green underlined text (indicated
textually in the same manner as the following example: **underlined text** or **underlined text**) and
deletions in green or red stricken text (indicated textually in the same manner as the following
example: ~~stricken text~~ or ~~stricken text~~) as set forth in Exhibit A attached hereto; provided, for
the purpose of clarity, certain such additions in blue or green underlined text and deletions in green
or red stricken text reflect amendments to the Purchase Agreement previously effected by
Amendment No. 1, Amendment No. 2, and Amendment No. 3 which will remain in full force and
effect and are hereby ratified and confirmed by the Parties.

2.     Effect of Amendment.  This Amendment shall be deemed incorporated into, and
form a part of, the Purchase Agreement and have the same legal validity and effect as the Purchase
Agreement.  Except as expressly and specifically amended hereby, all terms and provisions of the
Purchase Agreement are and shall remain in full force and effect, and all references to the Purchase
Agreement in this Amendment and in any ancillary agreements or documents delivered in

connection with the Purchase Agreement shall hereafter refer to the Purchase Agreement as amended by this Amendment, and as it may hereafter be further amended or restated.  Each reference in the Purchase Agreement to "this Agreement," "herein," "hereof," "hereunder" or words of similar import shall hereafter be deemed to refer to the Purchase Agreement as amended hereby (except that references in the Purchase Agreement to the "date hereof" or "date of this Agreement" or words or phrases of similar import shall continue to mean the Signing Date).

3.      <u>Inconsistency or Conflict</u>.  In the event of any inconsistency or conflict between the terms and provisions of the Purchase Agreement, on the one hand, and this Amendment, on the other hand, the terms and provisions of this Amendment shall govern and control.

4.      <u>Additional Provisions</u>.  The provisions set forth in Article X (Miscellaneous) (except Section 10.18 (Bulk Sales Laws)) and Section 11.3 (Rules of Interpretation) of the Purchase Agreement are incorporated herein by reference as if set forth in full herein and shall apply to the terms and provisions of this Amendment and the Parties hereto *mutatis mutandis*.

*(Signature pages follow)*

2

**Exhibit A**

(See attached)

**Execution Copy**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF OCTOBER 15, 2023**

**BY AND AMONG**

**MEDIMPACT HEALTHCARE SYSTEMS, INC., AS PURCHASER,**

**AND**

**HUNTER LANE, LLC**

**AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS**

## TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** ................................................................ **1**
Section 1.1      Purchase and Sale of the Acquired Assets ................................. 1
Section 1.2      Excluded Assets ............................................................................ 4
Section 1.3      Assumption of Certain Liabilities ................................................ 5
Section 1.4      Excluded Liabilities ..................................................................... 6
Section 1.5      Assumption/Rejection of Certain Contracts / Non-Assignment ...... 10
Section 1.6      Excluded Asset Designation ....................................................... 12
Section 1.7      EIC ................................................................................................ 12

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ....................................... **13**
Section 2.1      Consideration; Payment .............................................................. 13
Section 2.2      Deposit; Purchase Price Adjustment Escrow ............................. 13
Section 2.3      Closing .......................................................................................... 15
Section 2.4      Closing Deliveries by Sellers ...................................................... 15
Section 2.5      Closing Deliveries by Purchaser .................................................. 16
Section 2.6      Withholding ................................................................................... 17
Section 2.7      Purchase Price Adjustment .......................................................... 17

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS** ................. **21**
Section 3.1      Organization and Qualification .................................................... 21
Section 3.2      Authorization of Agreement ......................................................... 21
Section 3.3      Conflicts; Consents ...................................................................... 22
Section 3.4      Financial Statements .................................................................... 22
Section 3.5      Title to Properties; Sufficiency of Assets ................................... 23
Section 3.6      Contracts ....................................................................................... 25
Section 3.7      No Litigation ................................................................................ 27
Section 3.8      Permits; Compliance with Laws .................................................. 28
Section 3.9      Environmental Matters ................................................................. 28
Section 3.10     Intellectual Property ..................................................................... 29
Section 3.11     Privacy and Security Matters ....................................................... 32
Section 3.12     Healthcare Matters ....................................................................... 33
Section 3.13     Tax Matters ................................................................................... 34
Section 3.14     Employees ..................................................................................... 35
Section 3.15     Insurance ....................................................................................... 36
Section 3.16     Affiliate Transactions .................................................................. 36
Section 3.17     Brokers .......................................................................................... 36
Section 3.18     Anti-Corruption ............................................................................ 36
Section 3.19     Absence of Certain Changes ........................................................ 37
Section 3.20     Bank Accounts .............................................................................. 37
Section 3.21     Employee Benefit Plans ............................................................... 37
Section 3.22     No Other Representations or Warranties ...................................... 37

# TABLE OF CONTENTS

**Page**

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ............................................. **38**
Section 4.1     Organization and Qualification ............................................. 38
Section 4.2     Authorization of Agreement ............................................. 38
Section 4.3     Conflicts; Consents ............................................. 39
Section 4.4     Financing ............................................. 39
Section 4.5     Brokers ............................................. 39
Section 4.6     No Litigation ............................................. 40
Section 4.7     Certain Arrangements ............................................. 40
Section 4.8     Solvency ............................................. 40
Section 4.9     WARN Act and Mass Layoffs ............................................. 40
Section 4.10    No Additional Representations or Warranties ............................................. 40

**ARTICLE V BANKRUPTCY COURT MATTERS** ............................................. **40**
Section 5.1     Bankruptcy Actions ............................................. 40
Section 5.2     Cure Costs ............................................. 42
Section 5.3     Approval ............................................. 42

**ARTICLE VI COVENANTS AND AGREEMENTS** ............................................. **43**
Section 6.1     Conduct of the Business of Sellers ............................................. 43
Section 6.2     Access to Information ............................................. 46
Section 6.3     Employee Matters ............................................. 47
Section 6.4     Regulatory Approvals ............................................. 50
Section 6.5     Antitrust Notification ............................................. 50
Section 6.6     Reasonable Efforts; Cooperation ............................................. 52
Section 6.7     Certain Financing Matters ............................................. 52
Section 6.8     Further Assurances ............................................. 53
Section 6.9     Insurance Matters ............................................. 54
Section 6.10    Receipt of Misdirected Assets; Liabilities ............................................. 54
Section 6.11    Guarantees; Third Party Assurances ............................................. 55
Section 6.12    Acknowledgment by Purchaser ............................................. 56
Section 6.13    Guaranty ............................................. 57
Section 6.14    Confidentiality ............................................. 58
Section 6.15    No Successor Liability ............................................. 60
Section 6.16    Retained Privileged Materials ............................................. 60
Section 6.17    Notification of Certain Matters ............................................. 61
Section 6.18    Change of Name ............................................. 61
Section 6.19    Open Source Remediation ............................................. 61
Section 6.20    CMS Novation ............................................. 61
Section 6.21    Completion of TSA Schedules ............................................. 62

**ARTICLE VII CONDITIONS TO CLOSING** ............................................. **62**
Section 7.1     Conditions Precedent to the Obligations of Purchaser and Sellers ............................................. 62
Section 7.2     Conditions Precedent to the Obligations of Purchaser ............................................. 62
Section 7.3     Conditions Precedent to the Obligations of Sellers ............................................. 63

# TABLE OF CONTENTS

**Page**

Section 7.4    Waiver of Conditions ................................................................... 64

**ARTICLE VIII TERMINATION** .......................................................................... **64**
Section 8.1    Termination of Agreement ........................................................... 64
Section 8.2    Effect of Termination .................................................................... 66

**ARTICLE IX TAXES** ........................................................................................... **67**
Section 9.1    Transfer Taxes .............................................................................. 67
Section 9.2    Allocation of Purchase Price ....................................................... 67
Section 9.3    Cooperation .................................................................................. 68
Section 9.4    Post-Closing Actions .................................................................... 68
Section 9.5    Preparation of Tax Returns and Payment of Taxes ..................... 68

**ARTICLE X MISCELLANEOUS** ....................................................................... **69**
Section 10.1    Non-Survival of Representations and Warranties and Certain Covenants;
                Certain Waivers ........................................................................... 69
Section 10.2    Expenses ..................................................................................... 70
Section 10.3    Notices ........................................................................................ 70
Section 10.4    Binding Effect; Assignment; Designated Purchasers .............. 71
Section 10.5    Amendment and Waiver ............................................................ 72
Section 10.6    Third Party Beneficiaries .......................................................... 72
Section 10.7    Non-Recourse ............................................................................ 72
Section 10.8    Severability ................................................................................ 73
Section 10.9    Construction ............................................................................... 73
Section 10.10   Schedules ................................................................................... 73
Section 10.11   Complete Agreement ................................................................. 73
Section 10.12   Specific Performance ................................................................ 74
Section 10.13   Jurisdiction and Exclusive Venue ............................................. 74
Section 10.14   Governing Law; Waiver of Jury Trial ....................................... 75
Section 10.15   No Right of Set-Off ................................................................... 75
Section 10.16   Counterparts and PDF ............................................................... 75
Section 10.17   Publicity ..................................................................................... 76
Section 10.18   Bulk Sales Laws ........................................................................ 76
Section 10.19   Sellers' Representative .............................................................. 76
Section 10.20   Financing Sources ..................................................................... 76

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** ...... **77**
Section 11.1    Certain Definitions ..................................................................... 77
Section 11.2    Index of Defined Terms .............................................................. 1
Section 11.3    Rules of Interpretation ................................................................ 2

## INDEX OF EXHIBITS

EXHIBIT A   FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
            AGREEMENT
EXHIBIT B   FORM OF PATENT ASSIGNMENT AGREEMENT
EXHIBIT C   FORM OF TRADEMARK ASSIGNMENT AGREEMENT
EXHIBIT D   FORM OF DOMAIN NAME ASSIGNMENT AGREEMENT
EXHIBIT E   FORM OF CLOSING WORKING CAPITAL STATEMENT AND EXAMPLE
            CALCULATION
EXHIBIT F   FORM OF BIDDING PROCEDURES ORDER
EXHIBIT G   FORM OF TSA

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of October 15, 2023, is made by and among MedImpact Healthcare Systems, Inc., a California corporation (subject to Section 10.4(b), "Purchaser"), MI OpCo Holdings, Inc., a Delaware corporation ("Guarantor"), and Hunter Lane, LLC, a Delaware limited liability company (as in existence on the date hereof, as a debtor-in-possession and a reorganized Debtor, as applicable, "Elixir") and the Subsidiaries of Elixir that are indicated on the signature pages attached hereto (together with Elixir, each a "Seller" and collectively "Sellers"). Purchaser and Sellers are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein including Article XI.

WHEREAS, on October 15, 2023 (the "Petition Date"), Sellers, together with certain of Sellers' Subsidiaries and Affiliates, commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. [●] ([●]) (Bankr. D.N.J.) (collectively, the "Bankruptcy Cases"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, the Parties hereby agree as follows.

## ARTICLE I
## PURCHASE AND SALE OF ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

**Section 1.1     Purchase and Sale of the Acquired Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of the properties, rights, interests and other assets owned by or held by a Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by any Seller after the date hereof and

prior to the Closing, and including Sellers' right, title and interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:

(a)    (i) subject to Section 1.5, all Contracts listed on Schedule 1.1(a)(i) to which any Seller is a party, but, in all cases, excluding Leases, which are addressed in Section 1.1(g) and (ii) the Contracts listed on Schedule 1.1(a)(ii) (the "Commercial Interco Contracts" and, together with (i), the "Assigned Contracts"), including that certain Pharmacy Benefit Management Services Agreement (the "ROI Agreement"), effective the 1st day of January, 2010, by and between Rx Options, Inc., an Ohio corporation and a Seller ("ROI"), and EIC (f/k/a Envision Insurance Company);

(b)    all rights under non-disclosure, confidentiality, and similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties (including any non-disclosure, confidentiality agreements or similar arrangements entered into in connection the Auction), which any such agreements will be Assigned Contracts subject to designation as an Excluded Contract pursuant to Section 1.5;

(c)    all accounts receivable (including Rebate Assets), notes receivable, negotiable instruments and chattel paper owing from Persons other than Sellers and their Affiliates, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, but in all cases excluding any CMS Receivable;

(d)    all bank accounts;

(e)    all credits, prepaid expenses, deferred charges and expenses, advance payments, and prepaid items and duties, including all lease and rental payments that have been prepaid by any Seller with respect to any Acquired Leased Real Property;

(f)    all Documents (excluding any credit card numbers or related customer payment sources, social security numbers, or other information to the extent prohibited by any Law);

(g)    subject to Section 1.5, the Leased Real Property listed on Schedule 1.1(g) (the "Acquired Leased Real Property" and the Lease governing any Acquired Leased Real Property, an "Acquired Lease") and any security deposits related thereto;

(h)    all land, together with all buildings, structures, improvements, and fixtures located thereon, and all easements, privileges, appurtenances and other rights and interests appurtenant thereto and all right, title and interest in and to any streets, alleys, passages or other rights-of-way or appurtenances included in, adjacent to or used in connection with such land and all right, title and interest in all mineral rights appurtenant to such land, owned by the Sellers (the "Owned Real Property");

(i)    all tangible assets (including Equipment) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property or the Owned Real Property and any tangible assets on order to be delivered to any Seller; provided that,

2

with respect to any such tangible asset that is leased to any Seller, the lease agreement covering such leased tangible asset is an Assigned Contract;

(j)      all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers (including pharmaceutical drug manufacturers), Group Purchasing Organizations, and counterparties to any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor, manufacturers (including pharmaceutical drug manufacturers), Group Purchasing Organizations, or supplier rebates), demands, allowances, refunds (other than Tax refunds attributable to a Pre-Closing Tax Period), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller or its Affiliates and excluding any CMS Receivable);

(k)      to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor and copies of all governmental filings associated therewith, including, to the extent transferable under applicable Law, those Permits and Governmental Authorizations listed on Schedule 1.1(k);

(l)      to the extent transferable, excluding all director and officer insurance policies, (i) all current and prior insurance policies of any Seller, and (ii) all insurance rights and benefits (including proceeds) of any nature to the extent arising from or relating to any of the Acquired Assets or Assumed Liabilities (including returns and refunds of any premiums paid, or other amounts due back to Sellers, with respect to cancelled policies), including all such insurance recoveries and rights to assert claims with respect to any such insurance recoveries (the foregoing clauses (i) and (ii), collectively, the "Acquired Insurance Assets");

(m)      all Intellectual Property owned or purported to be owned by the Sellers, all rights to collect royalties and proceeds in connection with such Intellectual Property that are or were due or payable prior to, on, or after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations, violations of, or other conflicts with, such Intellectual Property, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including the Laker Software and the Intellectual Property set forth on Schedule 1.1(m) (collectively, the "Acquired Intellectual Property");

(n)      all Inventory and supplies of the Sellers;

(o)      (i) all avoidance claims or causes of action available to Sellers under chapter 5 of the Bankruptcy Code (including sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law (whether or not asserted as of the Closing Date) ("Avoidance Actions") against any trade creditor, customer, supplier,

manufacturer, distributor, broker, licensee, licensor, agent, or vendor of any Seller or any other Person with whom any Seller has an ordinary course commercial relationship, (ii) all Avoidance Actions relating to the Acquired Assets or Assumed Liabilities, or against any of the Sellers' counterparties to the Assigned Contracts, and (iii) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment of any Seller against any Transferred Employee (the foregoing clauses (i), (ii), and (iii), collectively, the "Acquired Avoidance Actions"); provided that, for the avoidance of doubt, the Acquired Avoidance Actions extend solely to actions related to the Acquired Assets and the Business and shall not include preference claims or avoidance claims and actions (including any such claims and actions arising under Sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code) against any representatives of the Debtors, or the Debtors' non-debtor Affiliates, Subsidiaries, or representatives of any of the foregoing; provided further that Purchaser will not pursue or cause to be pursued either directly or indirectly any Acquired Avoidance Actions except as a defense (to the extent permitted under applicable Law) against any claim or cause of action asserted by any Person enumerated in clauses (i), (ii), and (iii);

(p)     all deposits, including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise; and

(q)     all goodwill, payment intangibles and general intangible assets and rights of Sellers.

**Section 1.2     Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "Excluded Assets"):

(a)     all Cash and Cash Equivalents, such bank account(s) as the Parties reasonably agree prior to the Closing for Sellers to retain for winddown and related purposes, and any retainers or similar amounts paid to Advisors or other professional service providers;

(b)     subject to Section 1.5, all Contracts of Sellers other than Assigned Contracts and any Acquired Lease (the "Excluded Contracts"), including the Rejection Contracts;

(c)     all Documents (including information stored on the computer systems, data networks or servers of any Seller) (i) that exclusively relate to any of the Excluded Assets or Excluded Liabilities, (ii) that are Sellers' financial accounting Documents, all minute books, Organizational Documents, stock certificates or other Equity Interests instrument, stock registers and such other books and records of any Seller pertaining to the ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks, or (iii) that any Seller is required by Law or Healthcare Law to retain; provided that Purchaser shall have the right

to make copies of any portions of such Documents (other than Excluded Tax Returns) to the extent not prohibited by applicable Law or Healthcare Law;

(d)      all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the Transactions, or the Bankruptcy Case, that are subject to any attorney-client privilege and the transfer of which to Purchaser would result in the waiver of any such privilege ("Retained Privileged Materials");

(e)      other than the Acquired Insurance Assets, all current and prior insurance policies and Employee Benefit Plans of any Seller or its Affiliates, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers or its Affiliates with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f)      all Equity Interests of any Seller or any of their respective Subsidiaries, including, EIC;

(g)      except for the Acquired Avoidance Actions, (i) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller or its Affiliates, in each case, directly arising out of events occurring prior to the Closing Date, and (ii) all claims that any Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(h)      Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller or its Affiliates and Purchaser in connection with the Transactions, or any other agreement between any Seller or its Affiliates and Purchaser entered into on or after the date hereof;

(i)      all Tax refunds attributable to a Pre-Closing Tax Period, and Tax attributes and Tax assets;

(j)      any CMS Receivable and any billed and unbilled rebate receivables related to EIC;

(k)      except for the Acquired Avoidance Actions and Rebate Assets, all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to Leases, licenses or any Contract, directly arising out of events occurring prior to the Closing Date;

(l)      any properties, rights, interests, and assets of Sellers designated as an Excluded Asset pursuant to Section 1.6; and

(m)      all Liabilities or other amounts owing from any Sellers or any of their respective Affiliates (other than any such Liabilities under any Assigned Contract).

**Section 1.3      Assumption of Certain Liabilities**. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the ~~payment~~issuance of the ~~Cash Payment~~Term Loans in accordance with Section 2.1, Purchaser shall irrevocably assume from each Seller (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) (and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities (and no other Liabilities, which other Liabilities shall be retained by Sellers), without duplication and only to the extent not paid, performed, discharged or otherwise satisfied on or prior to the Closing (collectively, the "Assumed Liabilities"):

(a)      all Cure Costs in an amount not to exceed $1,400,000 (the "Assumed Cure Costs");

(b)      all Liabilities and obligations of any Seller under the Assigned Contracts and any Acquired Lease solely to the extent first arising after the Closing and, for the avoidance of doubt, excluding any Excluded Rebate Liability;

(c)      all Liabilities arising out of the conduct of the Business or the ownership or operation of the Acquired Assets or the Business, in each case, by Purchaser on or after the Closing Date;

(d)      all trade payables of Sellers to non-Affiliated third parties in connection with the Business existing on the Closing Date that remain unpaid and are not delinquent as of the Closing Date and incurred in the Ordinary Course and other Liabilities of Sellers of the types included in the definition of Closing Working Capital but not including any Excluded Rebate Liability or any Liabilities to the extent relating to or otherwise arising, whether before, on or after the Closing, under any of the Excluded Contracts (collectively, the "Assumed Current Liabilities";

(e)      all recoupment obligations of any Seller under any Assigned Contracts or Excluded Contracts solely to the extent related to claims by any pharmaceutical drug manufacturer or Group Purchasing Organizations pursuant to any Assigned Contract, or Excluded Contract, for the recoupment of any Rebate Assets (collectively, the "Assumed Rebate Liability"), but excluding any Liabilities related to any billed and unbilled manufacture rebate receivable related to the business of EIC;

(f)      without duplication: (i) all Liabilities for Taxes with respect to the Acquired Assets, the Business, or the Transferred Employees for any taxable period (or portion thereof) beginning after the Closing Date, and (ii) all Transfer Taxes pursuant to Section 9.1;

6

(g)      all Liabilities relating to the Transferred Employees that arise after the Closing Date; and

(h)      all Liabilities relating to the termination of Scheduled Employees who do not receive a Transfer Offer from Purchaser in compliance with Section 6.3(a).

**Section 1.4      Excluded Liabilities**. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place on or prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following Liabilities of any Seller:

(a)      all Cure Costs other than the Assumed Cure Costs (the "Excluded Cure Costs");

(b)      except to the extent of any Assumed Cure Costs, Assumed Current Liabilities, or Assumed Rebate Liability expressly assumed pursuant to Section 1.3, any Liability arising out of facts or circumstances in existence on or prior to the Closing and from or related to any breach, default under, failure to perform, torts related to the performance of, violations of Law, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of the Sellers or any of their Affiliates under any Contract, agreement, arrangement or understanding to which any Seller or any of its Affiliates is a party prior to the Closing;

(c)      except to the extent of any Assumed Cure Costs, Assumed Current Liabilities, or Assumed Rebate Liability expressly assumed pursuant to Section 1.3, all Liabilities arising out of, relating to or otherwise in respect of the operation of the Business or businesses of Sellers' Affiliates, or any of the Sellers', or Sellers' Affiliates', products or services, or the operation or condition of the Acquired Assets or the Assumed Liabilities, in each case, on or prior to the Closing or facts, actions, omissions, circumstances or conditions existing, occurring or accruing on or prior to the Closing;

(d)      all Liabilities arising from or related to any Action (whether civil, criminal, administrative, investigative, or informal) against any Sellers or their Affiliates, (including, for the avoidance of doubt, any Action related to fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of any Seller, or any of their Affiliates, or any of their respective directors, officers, or employees), or related to the Acquired Assets or the Assumed Liabilities, pending or threatened or having any other status or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing (including any breach, default, failure to perform, torts related to performance, violations of Law, infringements or indemnities, guaranties and

overcharges, underpayments or penalties, whether in respect of any Contract, agreement, arrangement, promise or understanding of any kind) including any successor liability claims or that may be owed to or assessed by, any Governmental Body or other Person, and whether commenced, filed, initiated, or threatened prior to, on or following the Closing;

(e)    all Liabilities to the extent relating to or otherwise arising, whether before, on or after the Closing, under any of the Excluded Contracts;

(f)    all Liabilities of Sellers for Indebtedness and any ~~Accrued~~Liability, including, any Assumed Rebate Liability, related to any billed and unbilled rebate receivables related to EIC;

(g)    all guarantees of Indebtedness made by the Sellers and all reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit or other similar agreements or instruments;

(h)    other than the Assumed Rebate Liability, all Liabilities related to claims or Actions by any pharmaceutical drug manufacturer, Group Purchasing Organizations, or any other Person related to rebates, recoupment, payments or similar items, whether or not pursuant to any Assigned Contract or any other Contract (the "Excluded Rebate Liability");

(i)    all Liabilities related to, resulting from or arising out of, prior to, on or after the Closing, any (i) unredeemed refund amounts, rebates (except for any Assumed Rebate Liability), or similar items, (ii) customer deposits or (iii) customer promotions and loyalty programs;

(j)    all Liabilities to (i) any current or former owner of capital stock or other Equity Interests of the Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other Equity Interests of the Sellers, (ii) any current or former holder of indebtedness for borrowed money of the Sellers or (iii) in respect of obligations for indemnification or advancement of expenses, any current or former officer or director of the Sellers, in each case of (i), (ii), and (iii), solely in such Person's capacity as such;

(k)    the sponsorship of and all Liabilities at any time arising under, pursuant to or in connection with any Employee Benefit Plans (whether arising prior to, on or after the Closing Date) and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" (as such term is defined in 26 C.F.R. § 54.4980B-9);

(l)    Except as expressly assumed by Purchaser in Section 6.3(g), Liabilities arising under the WARN Act and similar Laws relating to the termination of any current or former employee or contractor of any Seller, or any Affiliate of a Seller, (including any Transferred Employees), and including any current, threatened or potential claims for compensation or benefits, in each such case, to the extent related to employment or

contracting with the Sellers (or any of their Affiliates) or termination thereof, whether arising prior to, on or after the Closing Date

(m)     all Liabilities and other payments incurred or otherwise payable by any of the Sellers or their respective Affiliates, or for which any of the Sellers or their respective Affiliates is liable, in connection with in connection with the administration of the Bankruptcy Cases or the negotiation, execution and consummation of the Transactions or any Transaction Agreement (including any preparation for a transaction process, bankruptcy process, any sale process involving other potential buyers or any contemplated public offering or financing), including the fees and expenses of financial advisors, accountants, legal counsel, consultants, brokers and other advisors with respect thereto, whether incurred, accrued or payable on or prior to or after the date of this Agreement or the Closing Date;

(n)     all Liabilities of Sellers arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by Sellers, whether or not used in the Ordinary Course, including any Liabilities for noncompliance with Environmental Laws or the Release of Hazardous Substances, to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing;

(o)     other than the Assumed Rebate Liability or any Assumed Current Liability expressly assumed pursuant to Section 1.3, all Liabilities relating to any Product that is or has been manufactured, tested, distributed, held or marketed by or on behalf of any Seller, or the Affiliate of any Seller, arising from any recall, withdrawal or suspension (whether voluntarily or otherwise), except to the extent that such recall, withdrawal or suspension results from Purchaser's operation of the Business or the Acquired Assets following the Closing;

(p)     all Liabilities as to which any Seller is an obligor, or is otherwise responsible or liable, to any Seller or any of its Affiliates, other than any Assumed Current Liability.

(q)     all Liabilities of Sellers arising out of any (i) Excluded Contract, (ii) Permit that is not transferred to Purchaser as part of the Acquired Assets or, (iii) Contract or Permit that is not transferred to Purchaser (subject to Section 1.5(c)) because of any failure to obtain any Consent or Governmental Authorization required for such transfer;

(r)     all Liabilities of Sellers related to any Contract of any Seller, or an Affiliate of any Seller, with Virginia Premier, which such Contracts shall be an Excluded Contract;

(s)     all Liabilities relating to Transferred Employees that arise on or prior to the Closing Date;

(t)     all Liabilities arising with respect to any Business Employees who are not required to receive a Transfer Offer or who otherwise fails to become employed by

Purchaser or its Affiliates immediately following the Closing Date (including due to refusing to accept a Transfer Offer that complies with <u>Section 6.3</u>), other than as a result of Purchaser's breach of <u>Section 6.3</u>;

(u)      (i) all Liabilities relating to income Taxes imposed upon any of the Sellers (or for which any of the Sellers may otherwise be liable, including as a transferee, successor, or by contract (other than as expressly provided in this Agreement)), without regard to whether such Taxes relate to periods (or portions thereof) ending on or prior to the Closing Date, (ii) all Liabilities relating to Taxes imposed on or with respect to the Acquired Assets for any Pre-Closing Tax Period, and (iii) all Liabilities of any of the Sellers relating to the payment for the income Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or non-U.S. Law); and

(v)      drafts or checks outstanding as of the Closing;

<u>provided</u> that in the event of any conflict between the terms of <u>Section 1.3</u> and this <u>Section 1.4</u>, the terms of <u>Section 1.3</u> shall control.

**Section 1.5      <u>Assumption/Rejection of Certain Contracts / Non-Assignment</u>**.

(a)      <u>Assumption and Assignment of Executory Contracts</u>. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired Leases to which any Seller is a party that are Assigned Contracts or an Acquired Lease and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts or an Acquired Lease at Closing. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the applicable Sellers shall assume and assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts and any Acquired Lease, each of which shall be identified by the name or appropriate description and date of the Assigned Contract and any Acquired Lease (if available), the other party to the Assigned Contract, and any Acquired Lease, and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court. Such notice shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts and any Acquired Lease as determined by Sellers based on their books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Sellers shall, pursuant to the Sale Order, and the Assignment and Assumption Agreement(s) assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts and any Acquired Lease that may be assigned by any such Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to <u>Section 1.5(b)</u>. At the Closing, (i) Purchasers shall pay all Assumed Cure Costs and Sellers shall pay all Excluded Cure Costs, and (ii) Purchaser shall assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract and any Acquired Lease pursuant to section 365 of the Bankruptcy Code. On the date hereof, Sellers shall set forth on <u>Schedule 3.6(a)</u> their good

10

faith estimate of the Cure Costs of each executory Assigned Contract, Material Contract, and unexpired Lease, including the Acquired Lease.

(b)  Excluding or Adding Assigned Contracts and any Acquired Lease Prior to Closing. Purchaser shall have the right to notify Sellers in writing of any Assigned Contract (other than Contracts with customers or pharmacies or any Commercial Interco Contract) and any Acquired Lease that it does not wish to assume or a Contract or Lease (other than any Contract set forth on Schedule 1.5(b) (the "Rejection Contracts")) to which any Seller is a party that Purchaser wishes to add as an Assigned Contract or an Acquired Lease, as applicable, at any time, and from time to time, up to one Business Day prior to the Bid Deadline (as defined in the Bidding Procedures Order), and (i) any such previously considered Assigned Contract (other than Contracts with customers or pharmacies or any Commercial Interco Contract) or Acquired Lease that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts or Acquired Lease, as applicable, and automatically deemed an Excluded Contract, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract (other than any Rejection Contract) that Purchaser wishes to assume as an Assigned Contract, or Acquired Lease, as applicable, shall be automatically deemed added to the Schedules related to Assigned Contracts, or Acquired Lease, as applicable, and automatically no longer deemed an Excluded Contract, and assumed by the applicable Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price.

(c)  Non-Assignment.

(i)  Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract or an Acquired Lease hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is terminated by a Seller, its Affiliates or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract or an Acquired Lease hereunder and is not continued or otherwise extended upon assumption.

(ii)  Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any Order of the Bankruptcy Court, including the Sale Order) in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this clause (ii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six (6) months following the Closing or the election of Purchaser, upon written notice to Sellers and in the sole

discretion of Purchaser(or the closing of the Bankruptcy Cases or dissolution of the applicable Seller(s) if earlier), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2)Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, the applicable Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order. Notwithstanding anything herein to the contrary, (x) the provisions of this Section 1.5(c) shall not apply to any Consent or approval required under the HSR Act and any Foreign Competition Laws, which Consent or approval shall be governed by Section 6.5 and (y) no Seller will be obligated to pay any consideration therefor to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

Section 1.6    **Excluded Asset Designation**. At any time at least two (2) Business Day prior to the Closing, Purchaser may, in its sole discretion and by written notice to the Sellers, designate any of the Acquired Assets (other than any executory Contracts or unexpired Lease subject to Section 1.5(b)), as additional Excluded Assets. Purchaser acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Acquired Assets as Excluded Assets pursuant to the operation of this section.

Section 1.7    **EIC**.

(a)    "EIC" means Elixir Insurance Company, an Ohio corporation and wholly-owned Subsidiary of Sellers that is not a Debtor.

(b)    At the Closing, subject to the terms and subject to the conditions set forth herein, Sellers shall cause EIC to sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from EIC, all of EIC's right, title and interest in and to, as of the Closing, the following assets, free and clear of all Encumbrances other than Permitted Encumbrances:

(i)    the CMS Contracts;

12

(ii)    the EGWP Contracts; and

(iii)    all books and records maintained by or on behalf of EIC or any Affiliate for and with respect to the CMS Contracts and any EGWP Contracts.

(c)    On the terms and subject to the conditions set forth herein, effective as of the Closing, Purchaser shall irrevocably assume from EIC (and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and EIC shall irrevocably transfer, assign, convey, and deliver to Purchaser, all Liabilities and obligations of, and claims against, EIC under the CMS Contracts incurred from and after the Closing.

(d)    On the terms and subject to the conditions set forth herein, effective as of the Closing, Purchaser shall irrevocably assume from EIC (and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and EIC shall irrevocably transfer, assign, convey, and deliver to Purchaser, all Liabilities and obligations of EIC under the EGWP Contracts incurred from and after the Closing.

(e)    Where applicable, the CMS Contracts and the EGWP Contracts shall constitute Acquired Assets; provided that (i) the Parties acknowledge and agree that EIC is not and shall not in any event be a Debtor and (ii) as such, none of the provisions of this Agreement related to or involving the Bankruptcy Code shall apply to the transactions contemplated by this Section 1.7.

(f)    "CMS Contracts" means collectively, (i) that certain Contract titled "Contract with Approved Entity pursuant to Sections 1860D-1 Through 1860D-43 of the Social Security Act for the Operation of an Employer Group Only Voluntary Medicare Prescription Drug Plan" (Contract No. S7694), by and between CMS and EIC, executed on or about September 11, 2023, including all documents incorporated therein by reference and addenda thereto, (ii) any plans entered into thereunder, (iii) any "lives" covered by any of the foregoing], and (iv) that certain Contract titled "Medicare Mark License Agreement" (Contract No. S7694), by and between CMS and EIC,  executed on or about September 11, 2023.

**ARTICLE II**
**CONSIDERATION; PAYMENT; CLOSING**

**Section 2.1    Consideration; Payment**.

(a)    The aggregate consideration (collectively, the "Purchase Price") to be paidprovided by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and, (ii) subject to adjustment pursuant to Section 2.7, a cash payment of $575,000,000(a)(i), issuance of the Term Loans by Guarantor, (iii) pursuant to Section 2.2(e), the Deposit minus the Purchase Price Adjustment Escrow Amount, (iv) subject to Section 2.7(d), the Purchase Price Adjustment Escrow Amount, and (v) other than the Purchase Price Adjustment Escrow Amount, any cash payment required to be made by Purchaser pursuant to Section 2.7(d)(i) (the "Cash Payment").

(i)      The "Term Loans" means those certain 2023 Term Loans pursuant to that certain Second Amended and Restated Credit Agreement, dated as of November 8, 2023,  (the "Credit Agreement") among Guarantor, MI OpCo H2, LLC, certain Guarantors (as defined in the Credit Agreement), certain Lenders (as defined in the Credit Agreement),  and Bank of America, N.A., to be issued by Guarantor to Term Loan Holder at the Closing in a principal amount of the Principal Amount.

(ii)      The "Principal Amount" means an amount equal to (A) subject to adjustment pursuant to Section 2.7(a)(i), $575,000,000 less the Deposit ("Term Loans Consideration Amount"), divided by (B) 0.94.

(iii)      The "Term Loan Holder" means Elixir, or any other debtor in the Bankruptcy Cases designated in writing by Elixir to Purchaser not less than five (5) Business Days prior to the Closing.

(b)      At the Closing, ~~Purchaser shall deliver, or cause to be delivered, to Sellers the Cash Payment less the Deposit (the "Closing Date Payment~~pursuant to the Credit Agreement, Guarantor shall issue the Term Loans to the Term Loan Holder~~"). The Closing Date Payment and any~~. Any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two (2) Business Days prior to the date such payment is to be made.

**Section 2.2      Deposit; Purchase Price Adjustment Escrow**.

(a)      <u>Deposit</u>.

(i)      Purchaser has, on or prior to the date hereof (or, if the date hereof is not a Business Day, the first Business Day immediately following the date hereof) and pursuant to the Escrow Agreement, made an earnest money deposit with the Escrow Agent in the amount equal to $12,000,000 (the "<u>Initial Deposit</u>"), by wire transfer of immediately available funds for deposit into a separate segregated, non-interest bearing escrow account (the "<u>Escrow Account</u>") maintained by the Escrow Agent in accordance with the Escrow Agreement and Bidding Procedures Order.

(ii)      So long as this Agreement has not been earlier terminated, Purchaser will, on or prior to October 23, 2023, and pursuant to the Escrow Agreement, make a second earnest money deposit with the Escrow Agent in the amount equal to $3,000,000 (the "<u>Second Deposit</u>"), by wire transfer of immediately available funds for deposit into the Escrow Account maintained by the Escrow Agent in accordance with the Escrow Agreement and Bidding Procedures Order.

(iii)      So long as this Agreement has not been earlier terminated, Purchaser will, on or prior to ~~October 30~~November 8, 2023, and pursuant to the

14

Escrow Agreement, make a third earnest money deposit with the Escrow Agent in the amount equal to the difference (i) $57,500,000 minus (ii) the sum of the Initial Deposit and the Second Deposit (such difference, the "Final Deposit"), by wire transfer of immediately available funds for deposit into the Escrow Account maintained by the Escrow Agent in accordance with the Escrow Agreement and Bidding Procedures Order, such that immediately after the Final Deposit is made the amount in the Escrow Account equals $57,500,000 (the total amount of funds held in the Escrow Account at any given time from the Initial Deposit, Second Deposit, or Final Deposit, shall be referred to herein as the "Deposit"). The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.

(b)    If this Agreement has been terminated by (i) Sellers pursuant to Section 8.1(d), Section 8.1(f), or Section 8.1(p) or (ii) Purchaser pursuant to Section 8.1(n) or Section 8.1(o), then, in any such case, the Parties shall promptly, but in any event within five (5) Business Days after such termination hereof, deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds 100% of the Deposit (together with any and all investment interest thereon (less any Taxes with respect to such interest), if any) to such account(s) as may be designated by Elixir, and Elixir shall retain the Deposit (together with any and all investment interest thereon (less any Taxes with respect to such interest), if any); provided that nothing in this paragraph shall be deemed to limit any other remedies to which Sellers may be entitled under this Agreement or applicable Law; provided that Sellers acknowledge and agree that retaining the Deposit pursuant to this Section 2.2(b) shall be Sellers' sole and exclusive remedy arising (i) from Seller's termination of this Agreement pursuant to Section 8.1(d), Section 8.1(f), or Section 8.1(p) (or upon any other grounds) as a result of Purchaser's breach of Section 2.2(a) or Section 4.4, (ii) from Purchaser's breach of Section 2.2(a) or Section 4.4, or (iii) from Purchaser's termination of this Agreement pursuant to Section 8.1(n) or Section 8.1(o); provided that nothing herein shall limit any Party's Liability for Fraud.

(c)    If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Parties shall promptly, but in any event within five (5) Business Days after such termination hereof, deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds 100% of the Deposit (together with any and all investment interest thereon (less any Taxes with respect to such interest), if any) to such account(s) as may be designated by Purchaser, and the Deposit, together with any and all investment interest thereon (less any Taxes with respect to such interest), if any, shall be returned to Purchaser within five (5) Business Days after such termination.

(d)    The Parties agree that Sellers' right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this

Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(e)     If the Closing occurs, at the Closing the Parties shall deliver a joint written instruction to the Escrow Agent directing the Escrow Agent to (i) transfer by wire transfer of immediately available funds an amount equal to (i) 100% of the Deposit (together with any and all investment interest thereon, if any) minus (ii) the Purchase Price Adjustment Escrow Amount, which shall continue to be held in accordance with the Escrow Agreement, to such account(s) as may be designated by Elixir. The Purchase Price Adjustment Escrow Amount shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser.

**Section 2.3    Closing**. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities in accordance with this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the first day of the month immediately following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date;" provided that if the Closing Date would otherwise occur on January 1, 2024, the Closing Date shall be January 2, 2024.

**Section 2.4    Closing Deliveries by Sellers**. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)     a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by the applicable Sellers;

(b)     a short-form patent assignment agreement substantially in the form of Exhibit B, duly executed by the applicable Sellers;

(c)     a short-form trademark assignment agreement substantially in the form of Exhibit C, duly executed by the applicable Sellers;

(d)     a short-form domain name assignment agreement substantially in the form of Exhibit D, duly executed by the applicable Sellers;

(e)     the TSA, duly executed by the applicable Sellers or their Affiliates;

(f)     chain of custody agreements, in customary form and only to the extent necessary in accordance with applicable Law to transfer Sellers' right, title, and interest in any pharmaceutical Investory to Purchaser, which agreements shall not expand any representation or warranty, or any remedy or Liability, of any Party, duly executed by the applicable Sellers;

(g)    a special warranty deed with respect to each Owned Real Property, conveying to Purchaser fee simple title to such Owned Real Property, subject only to Permitted Encumbrances;

(h)    an IRS Form W-9 or IRS Form W-8, as applicable, executed by each Seller or each Seller's regarded owner for U.S. federal income Tax purposes; provided that the Purchaser's sole remedy for the failure to provide any such form shall be to withhold any required amount under applicable Tax Law; and

(i)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Elixir certifying that the conditions set forth in Section 7.2(a), Section 7.2(b), and Section 7.2(d) have been satisfied.

**Section 2.5    Closing Deliveries by Purchaser**. At the Closing, Purchaser shall deliver to (or at the direction of) Sellers:

(a) the Closing Date Payment, subject to adjustment pursuant to Section 2.7;

(a)    written confirmation that upon the Closing, the Term Loan Holder will be the holder of the Term Loans in the Principal Amount;

(b)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)    a short-form patent assignment agreement substantially in the form of Exhibit B, duly executed by the Purchaser;

(d)    a short-form trademark assignment agreement substantially in the form of Exhibit C, duly executed by the Purchaser;

(e)    a short-form domain name assignment agreement substantially in the form of Exhibit D, duly executed by the Purchaser;

(f)    the TSA, duly executed by the applicable Sellers or their Affiliates;

(g)    chain of custody agreements, in customary form and only to the extent necessary in accordance with applicable Law to transfer Sellers' right, title, and interest in any pharmaceutical Inventory to Purchaser, which agreements shall not expand any representation or warranty, or any remedy or Liability, of any Party, duly executed by the applicable Purchaser; and

(h)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied.

**Section 2.6    Withholding**. Purchaser, the Sellers, and their Affiliates (or any applicable agents thereof) shall be entitled to deduct and withhold from the Cash Payment or other consideration payable pursuant to this Agreement such amounts as may be required to be deducted and withheld under the Tax Code or any provision of applicable Law; provided that

Purchaser and its Affiliates shall use commercially reasonable efforts to provide notice of any such intent by them to withhold or deduct (other than in respect of payments that are compensatory in nature) to Sellers at least five (5) Business Days in advance of such withholding or deduction, and Purchaser and its Affiliates shall cooperate in good faith with Sellers to reduce or eliminate any such withholding or deduction. To the extent that such amounts are paid over to the appropriate Taxing Authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding were made.

**Section 2.7**    **Purchase Price Adjustment**.

(a)    Closing Adjustment.

(i)    At the Closing, the ~~Cash Payment component of the Closing Date Payment payable at Closing by Purchaser pursuant to Section 2.5(a)~~Term Loans Consideration Amount shall be adjusted in the following manner: either (1) an increase by the amount, if any, by which the Estimated Closing Working Capital (as determined in accordance with Section 2.7(a)(ii)) is greater than the Target Working Capital provided that in no event will such increase be more than $50,000,000, or (2) a decrease by the amount, if any, by which the Estimated Closing Working Capital is less than the Target Working Capital.

(ii)    At least 3 Business Days before the Closing, Sellers shall prepare and deliver to Purchaser a statement setting forth its good faith estimate of Closing Working Capital (the "Estimated Closing Working Capital"), which statement shall be substantially in the form of Exhibit E and contain a calculation of Estimated Closing Working Capital (the "Estimated Closing Working Capital Statement"), and prepared in accordance with GAAP applied using the accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies used by Sellers and their Affiliates in the preparation of the Financial Statements, subject to any modifications and limitations set forth on Exhibit E. During the period after the delivery of the Estimated Closing Working Capital Statement and prior to the Closing Date, Purchaser shall have an opportunity to review the Estimated Closing Working Capital Statement and Elixir (on behalf of the Sellers) shall provide Purchaser and its Advisors reasonable access to all properties, books and records relating thereto and the officers and other employees and advisors of the Sellers and their Affiliates, in each case, to the extent reasonably necessary to assist Purchaser and its Advisors in their review of the Estimated Closing Working Capital Statement; provided that such access shall be in a manner that does not interfere with the normal business operations of Sellers. The Sellers shall in good faith consider any questions or comments received from Purchaser regarding the Estimated Closing Working Capital Statement; provided that, to the extent that Elixir and Purchaser disagree as to any one or more items, then with respect to each such item, the amount of such item set forth in the initial Estimated Closing Working Capital Statement sent by Elixir will be used for purposes of calculating the Term Loans Consideration Amount for the Closing.

The agreement, if any, of the Parties to revisions to the Estimated Closing Working Capital Statement or the failure of the Parties to agree to any such revisions shall not constitute a waiver or limitation of a Party's rights and obligations pursuant to Section 2.7(b), Section 2.7(c), or Section 2.7(d).

(iii)    The Parties agree that the amounts set forth in Exhibit E are solely for the purposes of providing an example calculation of Closing Working Capital in accordance with the terms of this Agreement but that such amounts are solely illustrative and do not constitute any agreement or representation or warranty by any Party as to what such amounts shall be in the Estimate Closing Working Capital or the Closing Working Capital and none of the Estimated Closing Working Capital Statement, the Closing Working Capital Statement, or the Statement of Objections shall be bound by or required to include the amounts set forth in Exhibit E.

(b)    Post-Closing Adjustment. Within 90 days after the Closing Date, Purchaser shall prepare and deliver to Seller a statement setting forth Purchaser's good faith calculation of Closing Working Capital, which statement shall be substantially in the form of Exhibit E (the "Closing Working Capital Statement"), and prepared in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies used by Sellers and their Affiliates in the preparation of the Financial Statements, subject to any modifications and limitations set forth on Exhibit E.

(c)    Review.

(i)    After receipt of the Closing Working Capital Statement, Sellers shall have 45 days (or such longer period as the Parties may agree in writing, the "Review Period") to review the Closing Working Capital Statement. During the Review Period, Sellers and Sellers' Advisors shall have full access to the relevant books and records of Purchaser, the personnel of, and work papers prepared by, Purchaser or Purchaser's financial Advisors to the extent that they relate to Closing Working Capital and to such historical financial information (to the extent in Purchaser's possession) relating to Closing Working Capital as Sellers may reasonably request for the purpose of reviewing the Closing Working Capital Statement and to prepare a Statement of Objections; provided that such access shall be in a manner that does not interfere with the normal business operations of Purchaser.

(ii)    On or prior to the last day of the Review Period, Sellers may object to the Closing Working Capital Statement by delivering to Purchaser a written statement setting forth Sellers' objections in reasonable detail, indicating each disputed item or amount and the basis for Sellers' disagreement therewith (the "Statement of Objections"). If Sellers fail to deliver the Statement of Objections before the expiration of the Review Period, the Closing Working Capital reflected in the Closing Working Capital Statement will be deemed to have been accepted by Sellers and will be final and binding. If Sellers deliver the Statement of

19

Objections before the expiration of the Review Period, Purchaser and Sellers shall negotiate in good faith to resolve such objections within 45 days after the delivery of the Statement of Objections or such longer period as the Parties may agree in writing (the "Resolution Period"), and, if the same are so resolved within the Resolution Period, the Closing Working Capital Statement with such changes as may have been previously agreed in writing by Purchaser and Sellers, shall be final and binding on the Parties. All discussions related thereto will be governed by Rule 408 of the Federal Rules of Evidence (as in effect as of the date of this Agreement) and any applicable similar state rule, unless otherwise agreed in writing by Sellers and Purchaser.

(iii)    If Sellers and Purchaser fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("Disputed Amounts") shall be submitted for resolution to RSM US LLP or Grant Thornton LLP, at the election of Purchaser, (the "Independent Accountant") who, acting as an expert and not an arbitrator, shall resolve the Disputed Amounts only and make any adjustments to the Closing Working Capital Statement. The Parties will execute a customary engagement letter if so requested by the Independent Accountant and will cooperate with the Independent Accountant during the term of its engagement. The Independent Accountant will have exclusive jurisdiction over any disputes arising out of or relating to the adjustments pursuant to this Section 2.7, and resort to the process involving the Independent Accountant as provided in this Section 2.7(c) will be the only recourse and remedy of the Parties against one another with respect to any such dispute. The Parties agree that all adjustments shall be made without regard to materiality. The Independent Accountant shall decide only the Disputed Amounts and its decision for each Disputed Amount must be within the range of values assigned to each such item in the Closing Working Capital Statement and the Statement of Objections, respectively. The fees and expenses of the Independent Accountant (the "Accounting Fees") shall be paid *pro rata* by Sellers, on the one hand, and Purchaser, on the other hand, based upon the percentage that the amount actually contested but not awarded to Sellers or Purchaser, respectively, bears to the aggregate amount actually contested by Sellers or Purchaser, respectively, as determined by the Independent Accountant. The Independent Accountant shall make a determination as soon as practicable within 30 days (or such other time as the Parties shall agree in writing) after its engagement, and its resolution of the Disputed Amounts and its adjustments to the Closing Working Capital Statement and allocation of Accounting Fees between Purchaser and Sellers shall, in each case, be final, conclusive and binding upon the Parties.

(iv)    Closing Working Capital (i) will be determined in accordance with the definitions set forth in this Agreement, and (ii)(A) will not include any changes in assets or liabilities as a result of purchase accounting adjustments or other changes arising from or resulting as a consequence of the Transactions, (B) will be, and will be based on facts and circumstances as they exist as of the Closing, expressly including "Type 1" subsequent event evidence to the extent

permitted under GAAP, but otherwise will exclude the effects of any act, decision, change in circumstances or event arising or occurring on or after the Closing, (C) will not include any reserve or accrual, or any line item or line item entry, not reflected in Exhibit E. The Parties agree that the purpose of determining the Closing Working Capital in accordance with this Section 2.7 is solely to accurately measure changes (if any) in the amounts of the Closing Working Capital from the Estimated Closing Working Capital set forth in the Estimated Closing Working Capital Statement in order to determine the final Closing Working Capital and that such processes are not intended to permit the introduction of principles, policies, practices, procedures, methodologies, classifications, methods, conventions, assumptions, judgments or estimation techniques that are different from those used in the calculation of the ~~Cash Payment~~Term Loans Consideration Amount (including any exclusions or deviations from GAAP and the methodology used by Sellers to prepare such estimates).

(d)    <u>Payments</u>.

(i)    If the amount of the Closing Working Capital set forth in the Closing Working Capital Statement as finally determined in accordance with Section 2.7(c) is greater than the Estimated Closing Working Capital, Purchaser shall pay to Sellers an amount equal to such difference and the Parties shall direct the Escrow Agent to release to Sellers the Purchase Price Adjustment Escrow Amount from the Escrow Account; <u>provided</u> that notwithstanding anything contained in this Agreement to the contrary, in no event shall the ~~Cash Payment~~sum of (A) the Term Loans Consideration Amount as adjusted pursuant to this Section 2.7, (B) the Deposit, and (C) the Cash Payment required pursuant to this Section 2.7(d)(i), if any, exceed $625,000,000.

(ii)    If the amount of the Closing Working Capital set forth in the Closing Working Capital Statement as finally determined in accordance with Section 2.7(c) is less than the Estimated Closing Working Capital (any such excess, the "Purchaser Adjustment Amount"), Sellers shall pay to Purchaser an amount equal to such difference as follows: (A) if such difference equals or exceeds the amount available in the Escrow Account, the Parties shall direct the Escrow Agent (pursuant to the terms of the Escrow Agreement) to release to Purchaser the entire Purchase Price Adjustment Escrow Amount from the Escrow Account, and (B) if such difference is less than the amount available in the Escrow Account, the Parties shall direct the Escrow Agent (pursuant to the terms of the Escrow Agreement) to release to Purchaser an amount equal to such difference from the Escrow Account and release any remaining amounts in the Escrow Account to Sellers.

(iii)    Purchaser agrees that (i) payment of the Purchaser Adjustment Amount (if any) from the Escrow Account in accordance with the Escrow Agreement shall be the sole and exclusive remedy for Purchaser for payment of the Purchaser Adjustment Amount, if any, and the Purchase Price Adjustment

Escrow Amount in the Escrow Account will be Purchaser's sole and exclusive source of recovery for any amounts owing to Purchaser pursuant to this Section 2.7, even if the Purchaser Adjustment Amount exceeds the Purchase Price Adjustment Escrow Amount, and (ii) the adjustments to the Purchase Price provided for in this Section 2.7, and the dispute resolution provisions provided for in this Section 2.7, will be the exclusive remedy for the matters addressed or could be addressed by this Section 2.7. For the avoidance of doubt, and without limiting the generality of the foregoing, no claim by Purchaser or any of its Affiliates or Advisors for the payment of the Purchaser Adjustment Amount will be asserted against any of the Sellers; provided that, for the avoidance of doubt, this sentence will not limit the obligations of Sellers expressly set forth in this Section 2.7, including with respect to the obligation, if any, to instruct the Escrow Agent to release the Purchaser Adjustment Amount from the Escrow Account.

(iv)    Any payments required to be made pursuant to this Section 2.7(d) will (A) be due (x) within five (5) Business Days of acceptance of the applicable Closing Working Capital Statement or (y) if there are Disputed Amounts, then within five (5) Business Days of the resolution of any Disputed Amounts pursuant to Section 2.7(c)(iii); and (B) be paid by wire transfer of immediately available funds to such account as is directed by Purchasers or Sellers, as the case may be.

(e)    Adjustments for Tax Purposes. Any payments made pursuant to Section 2.7 shall be treated as an adjustment to the Purchase Price by the Parties for Tax purposes, unless otherwise required by Law.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed in the forms, reports, schedules, statements, exhibits and other documents filed during the 6 months preceding the date hereof with the SEC by Rite Aid Corporation, a Delaware corporation and parent of Elixir, in respect of Sellers, their Affiliates, and their businesses to the extent publicly available on the EDGAR system of the United States Securities and Exchange Commission (the "Filed SEC Documents") (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements" and any other disclosures included therein to the extent they are forward-looking in nature) or set forth in the Schedules delivered by Sellers concurrently herewith (each, a "Schedule" and collectively, the "Schedules") and subject to Section 10.10, Sellers represent and warrant to Purchaser as of the date hereof as follows.

Section 3.1    Organization and Qualification. Each Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing, and in good standing under the Laws of the jurisdiction of its incorporation or formation. Each Seller is duly licensed or qualified to do business under the Laws of each jurisdiction in which the nature of the business conducted by it makes such licensing or qualification necessary, except where failure to be so licensed, qualified or in good standing

would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**Section 3.2**    **Authorization of Agreement**. Subject to requisite Bankruptcy Court approvals:

(a)    each Seller has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which each such Seller is a party and to perform its obligations hereunder and to consummate the Transactions;

(b)    the execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the Transactions, subject to requisite Bankruptcy Court approvals being granted, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions; and

(c)    this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

**Section 3.3**    **Conflicts; Consents**. Assuming that (a) requisite Bankruptcy Court approvals are obtained, (b) the notices, authorizations, approvals, Orders, Permits or consents set forth on <u>Schedule 3.3</u> are made, given or obtained (as applicable), and (c) the requirements of the HSR Act and any other applicable antitrust, competition, foreign direct involvement or "<u>FDI</u>", or merger control Laws promulgated by any Governmental Body ("<u>Foreign Competition Laws</u>") are complied with, neither the execution and delivery by Sellers of this Agreement or the other Transaction Agreements, nor the consummation by Sellers of the Transactions, nor performance or compliance by Sellers with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of any Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable, (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate any Seller's obligations under any such Material Contract, (iii) conflict with or violate any Law or Order applicable to any Seller or any of the Acquired Assets, or by which any Seller, or any of the Acquired Assets, may be bound or affected, or (iv) result in the creation of any Encumbrance (other than a Permitted

23

Encumbrance) on any Acquired Assets, except, in each case of clauses (ii) thru (iv), as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets or the Assumed Liabilities, taken as a whole.

**Section 3.4      Financial Statements**.

(a)      Rite Aid Corporation, a Delaware corporation and direct or indirect parent of Sellers ("RAD"), has filed with the EDGAR system of the United States Securities and Exchange Commission:

(i)      its Form 10K, filing date May 1, 2023, which includes the audited consolidated balance sheet of RAD and subsidiaries as of March 4, 2023 and the related audited consolidated statements of operations, comprehensive loss, stockholders' (deficit) equity, and cash flows for the fiscal year ended March 4, 2023; and

(ii)      its Form 10Q, filing date July 11, 2023, which includes the unaudited consolidated balance sheet of RAD and subsidiaries as of June 3, 2023, the related unaudited consolidated statements of operations, comprehensive loss, stockholders' (deficit) equity, and cash flows for the thirteen weeks ended June 3, 2023.

(b)      Attached to Schedule 3.4(b) are:

(i)      the unaudited balance sheet of the Pharmacy Services Segment of RAD as of March 4, 2023 and the related unaudited statements of operations and cash flows for the fiscal year ended March 4, 2023; and

(ii)      the unaudited balance sheet of the Pharmacy Services Segment of RAD as of June 30, 2023 and the related unaudited statements of operations and cash flows for the six months ended June 30, 2023 ((a), and (b), collectively, the "Financial Statements").

(c)      The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto and, in the case of unaudited Financial Statements, subject to normal year-end audit adjustments, to the absence of notes and to any other adjustments described therein, including in any notes thereto) and fairly present in all material respects the consolidated financial position of the Sellers and their respective consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown, except as may be indicated in the notes thereto.

(d)      Each of the Sellers maintain a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformance with GAAP, and to maintain accountability for assets; (iii) access to Sellers' assets are permitted only in

accordance with management's authorization; and (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences (v) violations of the applicable Anti-Corruption Laws will be prevented and detected. None of RAD, to the extent directly related to the Business, any of the Sellers or, to the Knowledge of Sellers, any of their respective independent auditors, has identified or been made aware of "significant deficiencies" or "material weaknesses" (as defined by the Public Company Accounting Oversight Board) in the design or operation of the their internal controls over financial reporting which would reasonably be expected to adversely affect in any material respect their ability to record, process, summarize and report financial data, in each case which has not been subsequently remediated.

**Section 3.5**     <u>**Title to Properties; Sufficiency of Assets**</u>.

(a)     (i) The Sellers own good and valid title to, or hold a valid leasehold interest in, all of the Acquired Assets, whether tangible or intangible, free and clear of all Encumbrances (other than Permitted Encumbrances), and (ii) at the Closing, Sellers will transfer, convey and assign good and valid title to, or a valid leasehold interest in, all of the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)     Other than the Excluded Assets, but together with the rights and services set forth in the TSA, the Acquired Assets constitute all of the assets, properties and rights necessary to operate and conduct the Business in substantially the same manner as the Business was operated and conducted immediately as of the date hereof.

(c)     <u>Schedule 3.5(c)</u> sets forth the address of each Owned Real Property.

(d)     With respect to the Owned Real Property:

(i)     a Seller has good and marketable fee simple title to such Owned Real Property, which shall be, free and clear of all Encumbrances as of the Closing Date, except for Permitted Encumbrances;

(ii)     no Seller has leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof or otherwise transferred any of its rights to the Owned Real Property or any improvements thereon;

(iii)     other than the right of Purchaser pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein; and

(iv)     the Sellers are not a party to any agreement or option to purchase any real property or interest therein relating to, or used in connection with, the Business.

(e)     One or more of the Sellers has a good and valid leasehold interest to all real property leased by Sellers (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). There are no leases, license agreements or other rights to occupy the Leased Real Property, or any portion thereof, except those rights of Seller as tenant pursuant to the applicable Acquired Lease or pursuant to any Permitted Encumbrance.

(f)     Schedule 3.5(f) sets forth the address of each Leased Real Property. The Sellers have made available to the Purchaser or the Purchaser's Advisors true, correct and complete copies of each Acquired Lease. Except as set forth on Schedule 3.5(f) (and subject to entry of the Sale Order), with respect to each Acquired Lease (i) such Acquired Lease is legal, valid, binding, enforceable and in full force and effect; (ii) to the Knowledge of Sellers, there are no existing material disputes with respect to such Acquired Lease; (iii) none of Sellers or, to the Knowledge of Sellers, any other party to the Acquired Lease is in material breach or material default under such Acquired Lease, and, to the Knowledge of Sellers, no event has occurred since January 1, 2022 or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material breach or material default, or permit the termination, modification or acceleration of rent under such Acquired Lease; (iv) no Seller has currently subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; (v) none of the Acquired Leases, or any interest therein, is collaterally assigned or subject to a security interest (other than Permitted Encumbrances); and (vi) a Seller has a valid leasehold interest in the Leased Real Property; and (vii) no notice of termination or default has been delivered or received with respect to any Acquired Lease.

(g)     The improvements and fixtures (including building systems, such as heating, plumbing, ventilation, air conditioning and electric) on the Owned Real Property and Leased Real Property are in adequate operating condition and in a state of adequate maintenance and repair, ordinary wear and tear excepted, are adequate and suitable for the current operations of the Business. There is no condemnation, eminent domain, expropriation or similar proceeding pending or, to Sellers' Knowledge, threatened against any of the Owned Real Property or Leased Real Property or any improvement thereon. The Owned Real Property and Leased Real Property constitutes all of the real property utilized by a Seller in the operation of the Business other than, for the avoidance of doubt, any real property used by Sellers' Affiliates in providing services used by Sellers under the TSA.

**Section 3.6     Contracts**.

(a)     Schedule 3.6(a) sets forth a list of each Material Contract, as of the date of this Agreement. "Material Contract" means any Contract to which the Sellers are party, excluding any Employee Benefit Plan, that:

(i)    relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than Contracts entered into in the Ordinary Course;

(ii)    provides for indebtedness for borrowed money of Sellers having an outstanding or committed amount in excess of $100,000, other than letters of credit or expense advances made in the Ordinary Course or loans made under any 401(k) plan;

(iii)    relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract in excess of $500,000 pursuant to which any earn-out, indemnification or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Sellers of more than $500,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions supplies, merchandise, Inventory, products, Equipment, properties or other assets in the Ordinary Course, or of supplies, Inventory, merchandise, products, Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the Business);

(iv)    is a Contract pursuant to which Sellers would reasonably be expected to (i) make payments of more than $500,000 during any fiscal year or (ii) receive payments of more than $3,500,000 during any fiscal year;

(v)    contains any provision (A) limiting, in any material respect, the right of Sellers to engage in any business, solicit or hire any Person, compete with any Person, or operate anywhere in the world, (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, or (C) granting any right of first refusal, right of first offer or right of first negotiation in each case of (A), (B) and (C), that would reasonably be expected to be material to the Business, taken as a whole;

(vi)    is a Contract with a Governmental Body that involves aggregate annual payments in excess of $1,000,000 (not including drug spend);

(vii)    is a Contract with a Group Purchasing Organization that involves aggregate annual payments in excess of $500,000;

(viii)    contains minimum payment or purchase requirements, guarantees of purchase or sale, volume-based commitments or other pricing clauses of similar contractual language, in each case, except as would not reasonably be expected to be material to the Acquired Assets and the Business, taken as a whole;

(ix)    is a Contract between any Seller (on the one hand) and EIC (on the other hand);

(x)    is a collective bargaining agreement or other similar labor agreement covering (A) Business Employees or (B) to the extent such Contract would reasonably be expected to impact the Transactions or the hiring and employment of Business Employees by Purchaser hereunder, other employees of Sellers;

(xi)    is any Contract with any current Business Employee or contractor, that (A) involves aggregate annual compensation in excess of $100,000 during the past twelve-month period or that will be in excess of $100,000 during the twelve-month period following the date hereof for such person, other than offer letter agreements for at-will employment; or (B) involves any severance, change-in-control, retention, or similar type of payment payable by a Seller; or

(xii)    is any Contract for any employee staffing arrangement or any other arrangement whereby the Sellers spend in excess of $200,000 annually to retain the services of a staffing agency, professional employer organization, or employer of record.

(b)    True and complete copies of all Material Contracts have previously been made available to Purchaser or Purchaser's Advisors. Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law and except (i) as a result of the commencement of the Bankruptcy Cases, (ii) with respect to any Contract that has previously expired in accordance with its terms, or (iii) as set forth in Schedule 3.6(b), (A) each Material Contract is valid and binding on the Seller that is a party thereto and, to the Knowledge of Sellers, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) the applicable Seller, and to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Sellers have received no written notice of the existence of any breach or default on the part of any Sellers under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of a Seller, or to the Knowledge of Sellers, any counterparty under such Material Contract and (E) to the Knowledge of Sellers, Sellers have not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract.

(c)    Schedule 3.6(c) sets forth a list of the top 10 suppliers by value of purchases for each of the specialty pharmacy and pharmacy benefit management segments of the Business for each of the year ended December 31, 2022 and the six (6) month period ended June 30, 2023 (each, a "Significant Supplier").

(d)    Schedule 3.6(d) sets forth a list of the top 20 customers by revenue (each, a "Significant Customer") for each of the specialty pharmacy and pharmacy benefit management segments of the Business for each of the year ended December 31, 2022 and the six (6) month period ended June 30, 2023.

(e)     Since January 1, 2023, none of the Significant Suppliers or Significant Customers has canceled or otherwise terminated (other than pursuant to natural expiration) or made any written threat to any Seller to cancel or otherwise terminate or materially curtail its relationship with any Seller.

(f)     Except as set forth on Schedule 3.6(f) and except with respect to Excluded Liabilities: (i) all Client Contracts, Pharmacy Contracts and Rebate Contracts are currently, and since January 1, 2022 have been, adjudicated in accordance with the terms and conditions of each such Client Contract, Pharmacy Contract or Rebate Contract, in all material respects; and (ii) all material rebate claims of the Sellers since January 1, 2022 have been submitted and processed in accordance with the terms and conditions of the applicable Rebate Contract in all material respects, it being understood, in the case of (i) and (ii), that such terms include, for instance, reconciliation processes to correct the amount of payments initially made and compliance with such terms shall give effect to such reconciliations and that the initial design and setup of logistical arrangements with counterparties involves some degree of trial and error.

(g)     Scheduled 3.6(g) sets forth a list of customer Contracts of Sellers pursuant to which Sellers have received revenue of at least 80% of the aggregate revenue of the Business for the seven (7) month period ended July 31, 2023, together with the lives associated therewith, the start date of such Contracts, and the expected end date of such Contracts.

**Section 3.7     No Litigation**.

(a)     There are no Actions pending or, to Sellers' knowledge, threatened against or affecting any of the Sellers that would reasonably be expected to adversely affect any Seller's performance of its obligations under any of the Transaction Agreements or the consummation of the Transactions.

(b)     Except as set forth on Schedule ~~3.8(b)~~3.7(b), there is no Action pending, or to the Knowledge of Sellers threatened, against or relating to any Seller, the Business, the Acquired Assets or the Assumed Liabilities that (i) if adversely determined against any Seller, the Business, or the Acquired Assets would reasonably be expected to result in Liabilities, fines or damages of more than $500,000 or would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, or (ii)(A) relates to a criminal matter or (B) calls for injunctive relief or other restriction that, if adversely determined against any Seller, would reasonably be expected to be material to the Business, Acquired Assets and the Assumed Liabilities, taken as a whole.

(c)     Except as set forth on Schedule ~~3.8(c)~~3.7(c), since January 1, 2022, there has been no (i) such Action pending, or to the Knowledge of Sellers threatened, against any Seller or (ii) material Order imposed (or otherwise pending or the Knowledge of Sellers threatened) upon any Seller, in each case, by or before any Governmental Body.

**Section 3.8**      **Permits; Compliance with Laws**.

(a)      Each Seller (with respect to the Business) is, and has been since January 1, 2022, in compliance in all material respects with all Laws or Orders, applicable to such Seller. Each Seller holds all licenses, permits, Healthcare Permits, certificates, approvals and authorizations from Governmental Bodies necessary for the lawful conduct of the Business (collectively, "Permits"). Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, (i) each Healthcare Permit is valid, subsisting and in full force and effect and (ii) the Business as currently conducted is not in violation of, nor are the Sellers in default or violation under, any Healthcare Permit.

(b)      To the Knowledge of the Sellers since January 1, 2022, no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation of any material terms, condition or provision of any Healthcare Permits. There are no actions pending or, to the Knowledge of the Sellers, threatened, that seek the revocation, cancellation or adverse modification of any Healthcare Permit.  To the Knowledge of the Sellers, each director, officer, employee, agent and independent contractor of the Sellers possesses all Permits necessary for the lawful conduct of his or her duties and obligations in the operation of the Business.

(c)      Each Seller and each of their respective directors, officers and employees acting in such capacity and, to the Knowledge of Sellers, each of its and their other agents acting on its or their behalf, is, and has been since January 1, 2022, in compliance in all material respects with the Foreign Corrupt Practices Act of 1977 and any rules and regulations promulgated thereunder.

(d)      Since January 1, 2022, none of the Sellers, nor to the Knowledge of Sellers, any Affiliate of Sellers, has received written notice from any Governmental Body claiming or alleging that any of the Sellers are not in compliance with any applicable Law or Order applicable to any of them, or the operation of their respective businesses, in any material respect, in each case except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, the Acquired Assets and the Assumed Liabilities, taken as a whole.

**Section 3.9**      **Environmental Matters**. Except as disclosed on Schedule 3.9, (a) Sellers are, and have been since January 1, 2022, in compliance in all material respects with all applicable Environmental Laws with respect to the conduct of the Business, (b) since January 1, 2022, no Seller has received any written notice alleging that any Seller is in violation of, or liable under, in any material respect, any Environmental Law that is unresolved with respect to the conduct of the Business, and to the Knowledge of the Sellers, there are no facts or circumstances that would be reasonably expected to result in any future written notices, (c) Sellers possess and are in compliance in all material respects with all Permits required under Environmental Laws for the operation of the Business as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Sellers, threatened in writing against any Seller, (e) Sellers are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller, (f)

since January 1, 2022 there has been no Release of Hazardous Materials with respect to any Seller's currently or formerly owned, leased, or operated property, or at any location or facility where wastes from the operations or assets of the Sellers have been disposed or recycled, (g) no Seller is subject to any outstanding Order under any Environmental Law, (h) no Seller has assumed responsibility for, or agreed to indemnify or hold harmless any Person for, any Liability or obligation, arising under or relating to Environmental Laws, including any obligation for investigation, corrective or remedial action, and (i) the Sellers have provided copies of all environmental assessments, environmental sampling and monitoring data, and health and safety audits concerning the business that are in their possession.

**Section 3.10    Intellectual Property**.

(a)     Sellers are the sole and exclusive owners of all of the rights, title and interest in and to the Acquired Intellectual Property, in each case free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, all of the Acquired Intellectual Property that is registered is subsisting, valid and enforceable.

(b)     Section 3.10(b) is a complete and accurate list of each trademark registration, application for trademark registration and domain name included in the Acquired Intellectual Property that is registered with or applied for with (collectively, "Registered Trademarks") the United States Patent and Trademark Office, any similar intellectual property office or any domain name registrar (each a "Registration Office") setting forth as applicable, the title, application number, filing date, and registration number. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, with respect to each Registered Trademark, all necessary filing, examination, registration, maintenance, renewal and other fees and Taxes due on or prior to the date hereof and the Closing Date have been timely paid in full, and all necessary documents (including responses to office actions and other correspondence from a Registration Office) and certificates have been timely filed with all relevant Registration Offices for the purposes of maintaining such Registered Trademarks, in each case in accordance with applicable Law and to avoid loss or abandonment thereof.

(c)     Sellers own or have valid, legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the Business as currently conducted by Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances). Sellers have taken reasonable steps to maintain and protect the confidentiality of the material trade secrets and other material non-public Acquired Intellectual Property. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, Acquired Assets and the Assumed Liabilities, taken as a whole, the Sellers have not disclosed any material trade secrets or non-public information included in the Acquired Intellectual Property (or any tangible embodiment thereof) to any Person without having such Person execute a written agreement regarding the non-disclosure and non-use thereof. Nothing in this Section 3.10(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any

infringement, misappropriation, or violation of any Intellectual Property, which is the subject of <u>Section 3.10(d)</u> and <u>Section 3.10(e)</u>.

(d)      No Actions are pending or, to the Knowledge of Sellers, threatened against any Seller, and since January 1, 2022, Sellers have not received any written notice or claim (including any cease and desist letter), (i) challenging the ownership, validity, enforceability or use by any Seller of any Acquired Intellectual Property, (ii) alleging that the Business, any Acquired Assets, or any Seller in connection with the Business is infringing, misappropriating or otherwise violating the Intellectual Property of any Person, (iii) that any Seller in connection with the Business requires a license to any Person's Intellectual Property, or (iv) that includes any unsolicited written offer to license (or any other notice of) any Person's Intellectual Property.

(e)      To the Knowledge of Sellers, since January 1, 2022, no Person has infringed, misappropriated or otherwise violated the rights of Sellers with respect to any Acquired Intellectual Property, except as would not reasonably be expected to be material to the Business, taken as a whole. Since January 1, 2022, no Seller has notified any Person that such Person is infringing, misappropriating, or violating any Acquired Intellectual Property. Since January 1, 2022, the using, making, modifying, selling, licensing, or distributing any of the Acquired Assets and the conduct and operation of the Business by Sellers has not violated, misappropriated, or infringed the Intellectual Property rights of any other Person, except as would not reasonably be expected to be material to the Business, taken as a whole.

(f)      The consummation of the Transactions will not result in the grant of any right or license to any third party of any Acquired Intellectual Property.

(g)      No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or would reasonably be expected to, require the disclosure or delivery to any Person (including any technology/software escrow company) of the source code for any material, proprietary software (including the Laker Software) that is included in the Acquired Intellectual Property (collectively, the "<u>Transaction Source Code</u>"), other than disclosure prior to the Closing Date of source code to employees or contractors of a Seller in connection with their performance of services for a Seller. Other than employees and contractors of a Seller who perform services for a Seller, no Seller has provided to any Person any Transaction Source Code.

(h)      Each Seller is in compliance in all material respects with all Open License Terms applicable to any Public Software licensed to or used by a Seller. No Seller has received any written notice alleging that it is in violation or breach of any Open License Terms. Each Seller's use, modification, and distribution of any Public Software does not (a) require a Seller to make available any Transaction Source Code or any third party's source code (other than the source code for third party software used by Seller under Open License Terms); (b) require a Seller to grant permission to create modifications to or derivative works of any material proprietary software included in or provided with the Acquired Intellectual Property ("<u>Acquired Software</u>"); (c) require a Seller to grant a

royalty-free license to any Person under any Acquired Intellectual Property or any third party Intellectual Property provided therewith (including any Acquired Software).

(i)    Except as would not reasonably be expected to be material to the business of Laker Software, Inc., no software, systems or networks included in the Acquired Intellectual Property contain any "virus," "malware," "malicious code," or other similar software (collectively, "Viruses"). Except as would not reasonably be expected to be material to the business of Laker Software, Inc., the Sellers have taken reasonable steps to prevent the introduction of Viruses into any Acquired Intellectual Property.

(j)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the business of Laker Software, Inc., taken as a whole, no funding, facilities or resources of any Governmental Body or any university, college, other educational institution, multi-national, bi-national or international organization or research center was used in connection with the development or creation, in whole or in part, any Acquired Intellectual Property.

(k)    All current and former employees, consultants and independent contractors of Sellers who are or were involved in the creation or development of any material Acquired Intellectual Property have executed a written agreement regarding the protection of proprietary information and the present assignment to a Seller, or have otherwise assigned by operation of Law, all right, title and interest in such Intellectual Property created or developed by such Persons on behalf of such Seller.

(l)    Schedule 3.10(l) is a complete and accurate list of all Contracts to which any Seller is a party pursuant to which a Seller has granted or is required to grant to any Person any license to, any covenant not to assert or sue, other immunity from suit under, or any other rights, to any material Acquired Intellectual Property, other than (i) Contracts entered with customers and vendors in the ordinary course of business, (ii) Intellectual Property assignment Contracts entered into with employees or third-party contractors in the ordinary course of business, (iii) confidentiality or non-disclosure Contracts entered into in the ordinary course of business, and (iv) Contracts primarily for the provision of services where the granting or obtaining (or agreement to obtain) any right to use, or permission or agreement to permit any other Person to use, any Intellectual Property is ancillary or incidental to the transactions contemplated in such contract.

(m)    Schedule 3.10(m) is a complete and accurate list of all Contracts to which any Seller is a party pursuant to which any Person is currently granting or is required to grant in the future to a Seller any right under or license to, any covenant not to assert or sue or other immunity from suit under or any other rights to any material Intellectual Property, other than (i) Contracts granting rights to commercial, off the shelf software and services with an annual license fee of less than $500,000, (ii) Contracts relating to free or open source software, (iii) confidentiality or non-disclosure Contracts entered into in the ordinary course of business, and (iv) Contracts primarily for the provision of services where the granting or obtaining (or agreement to obtain) any right to use, or

permission or agreement to permit any other Person to use, any Intellectual Property is ancillary or incidental to the transactions contemplated in such Contract.

(n)     Schedule 3.10(n) is a complete and accurate list, grouped by subsection, of all Contracts as follows: (i) by which Seller acquired from another Person any material Acquired Intellectual Property, (ii) under which a Seller grants to or receives from any Person an option or right of first refusal or right of first negotiation relating to any material Intellectual Property, and (iii) Contracts entered into in connection with the settlement of any dispute related to material Intellectual Property, including settlement agreements, covenants not to sue, and coexistence agreements.

**Section 3.11    Privacy and Security Matters.**

(a)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, Acquired Assets and the Assumed Liabilities, taken as a whole, in connection with the Acquired Assets, the Sellers are, and have been since January 1, 2022, in compliance with (A) all Laws pertaining to (i) data security, and (ii) the collection, storage, use, access, disclosure, processing, security, and transfer of Personal Information (referred to collectively in this Agreement as "processing") ((i) and (ii) together "Privacy Laws"); (B) all Contracts (or portions thereof) to which any Seller is a party to the extent applicable to the Processing of Personal Information (collectively, "Privacy Agreements"); and (C) the Payment Card Industry Data Security Standard and all applicable rules and requirements by the PCI Security Standards Council, any member thereof, and any entity functioning as a card brand, card association, or other binding requirements pertaining to the acceptance of payment cards (collectively "PCI Requirements").

(b)     The Sellers have implemented written policies relating to processing of Personal Information, including, a publicly posted website privacy policy ("Privacy and Information Security Policies"). Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, Acquired Assets and the Assumed Liabilities, taken as a whole, the Sellers are and since January 1, 2022 have been, in compliance with all such Privacy and Information Security Policies.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, Acquired Assets and the Assumed Liabilities, taken as a whole, at all times since January 1, 2022, the Sellers have taken commercially reasonable steps designed to protect the confidentiality, integrity, and security of all Personal Information, confidential information, and any other proprietary data used in the operation of the Business (collectively, "Business Data") in Sellers' possession or control against damage, loss, and against unauthorized access, acquisition, use, modification, disclosure or other misuse.

(d)     Since January 1, 2022, Seller has not experienced any material unauthorized access, use, loss, destruction, modification, or disclosure of Business Data in the possession or control of any Seller that has had a material and adverse effect on the Business (a "Security Breach"). Since January 1, 2022, no Seller has provided any notices

34

to, nor has it been legally required to provide any such notices, to any Person as a result of any Security Breach. Since January 1, 2022, no Seller, its Affiliates, nor any third party acting at its direction or authorization has paid any perpetrator of any actual or threatened Security Breach or cyber-attack, including, but not limited to a ransomware attack or a denial-of-service attack.

**Section 3.12**   **Healthcare Matters**. Except as would not reasonably be expected to be material to the Acquired Assets and the Business, taken as a whole:

(a)      Each of Seller and EIC is, and since January 1, 2022 has been, in compliance in all material respects with all applicable Healthcare Laws. Neither Sellers nor EIC has received any written or, to the Knowledge of Sellers, oral notice of any pending or threatened adverse Action, claim or default alleging material non-compliance with such Healthcare Laws by the Sellers, or EIC.  Neither Sellers nor EIC is a party to any corporate integrity agreement or has any reporting obligations pursuant to any deferred prosecution, consent decree, settlement, integrity agreement, corrective action plan or other similar obligation, Order, or agreement with any Governmental Body.

(b)      Neither Sellers nor EIC or any of their respective owners, directors, officers, managers, agents or managing employees (as such term is defined in 42 U.S.C. § 1320a-5(b)), is, or has, (i) been debarred, excluded or suspended from participating in any Governmental Health Program, or subject to sanction, charged, pled guilty or nolo contendere to, or been convicted of a crime in connection with, any Governmental Health Program or under any Healthcare Law; (ii) been listed on the Office of Inspector General's List of Excluded Individuals and Entities, state Medicaid exclusion lists, or the General Services Administration published list of parties excluded from federal procurement programs and non-procurement programs.; (iii) been audited or investigated, outside of the ordinary course of business, by any Governmental Health Programs (or any Governmental Body with respect to any Healthcare Laws); or (iv) had a contract terminated by any Governmental Health Programs for a material breach or material default of the terms of the applicable contract.

(c)      Each Seller and EIC is, and has been, since January 1, 2022 in material compliance with HIPAA and have established and implemented such policies, programs, procedures, Contracts and systems as are necessary to comply in all material respects with HIPAA. Neither Sellers nor EIC has received written notice of, and there is no Action, or inquiry or investigation pending or, to the Knowledge of Seller, threatened with respect to any alleged "breach" as defined in HIPAA by any Seller, EIC, or their workforce. Each Seller and EIC has undertaken all necessary risk assessments of the Business required by HIPAA and has implemented appropriate corrective action to address all material vulnerabilities in its HIPAA safeguards and controls identified through such assessments. Each Seller and EIC has a written, signed, and HIPAA-compliant business associate agreement with each Person that is a "covered entity" or "business associate" (as such terms are defined by HIPAA) of such Seller or EIC, as applicable.

35

(d)    Neither Sellers nor EIC has knowingly billed, received, paid or reimbursed in excess of amounts allowed by applicable Healthcare Laws, nor advised or provided information that could be reasonably interpreted to advocate upcoding or otherwise improperly coding any claims for payment for healthcare items or services to obtain greater reimbursement than would be paid pursuant to a properly coded and submitted claim. Neither Sellers nor EIC has made, offered, received or solicited any bribes, kickback payments or other similar payments of cash or other consideration, including payments to customers or clients or employees of customers or clients for purposes of doing business with such Persons.

(e)    Each Seller and EIC has and maintains a compliance program reasonably designed to satisfy the elements of an effective corporate compliance and ethics program identified in U.S.S.G. § 8B2.1. There are no outstanding material compliance complaints, reports, corrective actions, or ongoing internal compliance investigations.

**Section 3.13    Tax Matters**. Except as would not reasonably be expected to be material to the Acquired Assets and the Business, taken as a whole:

(a)    Each Seller (or its applicable Affiliate) has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns with respect to the Acquired Assets required to be filed by it (taking into account valid extensions of time within which to file), and all such filed Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects and were prepared in compliance in all material respects with applicable Law.

(b)    All material Taxes with respect to the Acquired Assets owed by a Seller, that are due (whether or not shown on any Tax Return) have been timely paid or have been adequately reserved against in accordance with GAAP.

(c)    There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

(d)    None of the Sellers has waived any statute of limitations in respect of material Taxes with respect to the Acquired Assets or agreed to any extension of time with respect to an assessment or deficiency for material Taxes with respect to the Acquired Assets (in each case, other than pursuant to extensions of time or waivers to file Tax Returns obtained in the Ordinary Course or waivers or extensions that have expired).

(e)    Since January 1, 2020, no claim has been made in writing by a Taxing Authority in a jurisdiction where any Seller or its Affiliate does not file Tax Returns with respect to the Acquired Assets that any such Seller is or may be subject to taxation by that jurisdiction with respect to the Acquired Assets that has not otherwise been fully resolved.

(f)    Each Seller (or its applicable Affiliate) has withheld and paid to the applicable Taxing Authority all Taxes required to have been withheld and timely paid

36

with respect to the Acquired Assets or the Transferred Employees, and such amounts to the appropriate Taxing Authority.

(g)    No federal, state, local, or non-U.S. Tax audits or administrative or judicial Tax proceedings are pending or being conducted with respect to any Seller with respect to the Acquired Assets. None of the Sellers has received from any federal, state, local, or non-U.S. taxing authority (including jurisdictions where Seller has not filed Tax Returns) any (i) written notice indicating an intent to open an audit or other review (since January 1, 2020), or (ii) written notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any Taxing Authority against Seller that has not been fully resolved, in each case, with respect to the Acquired Assets.

(h)    Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.13 shall constitute the sole representations and warranties in this Agreement with respect to Taxes and no representation or warranty set forth in this Section 3.13 shall be deemed to apply directly or indirectly with respect to any Seller Combined Tax Return. No representation or warranty is made with respect to any Tax attribute for any Post-Closing Tax Period.

**Section 3.14   Employees**.

(a)    Schedule 3.14(a) sets forth the following information for each Business Employee: (i) name; (ii) job title; (iii) date of hire (or seniority date, if different); (iv) full-time or part-time status; (v) exempt or non-exempt classification; (vi) base annual salary or hourly wage rate (as applicable); (vii) location (including location into which a remote employee reports); (viii) leave status; (ix) work authorization or permit type; (x) accrued, but unused paid-time-off; (xi) employing entity; and (xii) target annual bonus and the most recent bonus received; and, on a separate list on Schedule 3.14(a) (xiii) Healthcare Permit number and issuing authority, as applicable.

(b)    None of Sellers (with respect to the Business or Business Employees) is party to any collective bargaining agreements or similar labor-related Contracts with any labor union representing any Business Employees. There is no current written demand from any labor union seeking recognition as the exclusive bargaining representative of any Business Employees by any Seller and there is no pending or, to the Knowledge of Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by any Business Employees.

(c)    Sellers are in compliance in all material respects with all applicable Laws respecting employment practices and labor, including those related to wages and hours (including minimum wage and overtime Laws and wage payment Laws), collective bargaining, unemployment insurance, workers' compensation, immigration, retaliation, harassment and discrimination, disability rights and benefits, affirmative action, employee layoffs, employee notification, leave, affirmative action, health and safety, and child labor.

(d)    Except as would not result in material Liability, Sellers currently properly classify and have properly classified each Business Employee as exempt or non-exempt for the purposes of the Fair Labor Standards Act.

(e)    There is no Action pending or, to the Knowledge of Sellers, threatened in writing against any Seller alleging a violation of any labor or employment Law that if adversely determined against such Seller would reasonably be expected to result in Assumed Liabilities or would, individually or in the aggregate, reasonably be expected to be material to the Business, the Acquired Assets and the Assumed Liabilities, taken as a whole, nor have any such Actions been brought in the last 3 years.

(f)    No "mass layoff," "plant closing" or similarly defined conduct (as defined in the federal Worker Adjustment and Retraining Notification Act or any similar state, local or foreign Law (collectively, "WARN")) has been implemented by Sellers in the ninety (90) days immediately prior to the date of this Agreement. Except as set forth on Schedule 3.14(f), Sellers do not currently plan or contemplate any plant closings, reduction in force, terminations of employees, or similar personnel actions at any site of employment where any Business Employees or other employees of Sellers are located that would trigger obligations under WARN.

**Section 3.15    Insurance**. Schedule 3.15 sets forth a description of all material insurance policies maintained by Sellers other than any policies maintained in connection with an Employee Benefit Plan (the "Business Insurance Policies"). All such Business Insurance Policies are in full force and effect. No Seller since January 1, 2022, has received written notice from any insurer or agent of such insurer with respect to the cancellation or termination of any such Business Insurance Policies.

**Section 3.16    Affiliate Transactions**. Except as set forth on Schedule 3.16, to the Knowledge of Sellers, no Affiliate of any Seller, or any officer or director of any Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $1,000,000, other than (i) loans and other extensions of credit to directors and officers of a Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Employee Benefit Plans, or (b) has any material interest in any Acquired Asset.

**Section 3.17    Brokers**. Except for Guggenheim Securities, LLC ("Guggenheim Securities"), the fees and expenses of which will be paid by Sellers, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Sellers.

**Section 3.18    Anti-Corruption.** Since January 1, 2021, neither Sellers nor any of their Affiliates or their employees, or to the Knowledge of Sellers, any other Person acting on behalf of any of the foregoing, has directly or knowingly indirectly in connection with the business and operations of the Sellers: (i) made, offered, promised to make or authorized any unlawful payment, gift, or any other thing of value or advantage in violation of Anti-Corruption Laws, (ii)

38

requested or received any payment, gift, or other thing of value or advantage in violation of Anti-Corruption Laws or (iii) otherwise violated any provision of the Anti-Corruption Laws. The Sellers have implemented policies and procedures reasonably designed to prevent, detect, and deter violations of any Anti-Corruption Laws. Since January 1, 2021, neither Sellers nor its Affiliates have received any notice from any Governmental Body or any other Person regarding any actual, alleged, or investigated violation of, or failure to comply with or Liability under, any Anti-Corruption Laws, and to the Knowledge of Sellers there are no conditions or circumstances that would reasonably be expected to give rise to any material future Action against, or voluntary disclosure by, the Sellers with respect to any Anti-Corruption Laws.

Section 3.19   **Absence of Certain Changes**. Except as set forth on Schedule 3.19, since June 30, 2023, (i) the Sellers have conducted their business in the Ordinary Course in all material respects (other than the marketing of the Business and processes and negotiations with Advisors and third parties in connection therewith, and preparation and commencement of the Bankruptcy Cases and actions related thereto), (ii) there has not been any Material Adverse Effect and (iii) there is no material business interruption or similar event, change or circumstance that has occurred, or is occurring, at any of the facilities, plants, offices, laboratories, warehouses, distribution centers and other properties (including at any Owned Real Property or Leased Real Property) owned or operated by the Sellers.

Section 3.20   **Bank Accounts**.   Schedule 3.20 sets forth a complete list of all bank accounts (including any deposit accounts, securities accounts and any sub-accounts) of Sellers.

Section 3.21   **Employee Benefit Plans**.

(a)    Each Employee Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Tax Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS. There are no pending, or to the Knowledge of Sellers, threatened claims (other than routine claims for benefits) by, on behalf of or against any Employee Benefit Plan which could reasonably be expected to result in any Assumed Liability. The Employee Benefit Plans comply in form and in operation with their terms and applicable Laws, including the applicable requirements of the Tax Code and ERISA, except as would not reasonably be expected to be material to the Acquired Assets and the Business, taken as a whole.

(b)    The consummation of the Transactions is not reasonably expected to (i) accelerate the time of payment or vesting, or materially increase the amount, of compensation due to any Business Employee under any Employee Benefit Plan, (ii) cause a Seller to transfer or set aside any assets to fund any benefits under any Employee Benefit Plan or (iii) result in any "disqualified individual" with respect to any Seller receiving any "excess parachute payment" (as each such term is defined in section 280G of the Tax Code), determined without regard to any arrangements that may be implemented by, or at the direction of, Purchaser or any of its Affiliates.

Section 3.22   **No Other Representations or Warranties**. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and

exclusions) of this Agreement) (the "Express Representations") (it being understood that Purchaser and the Purchaser Group have relied only on such Express Representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that no Seller nor any other Person on behalf of any Seller makes, and neither Purchaser nor any member of the Purchaser Group has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Seller, the Business, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Guggenheim Securities or ~~AlixPartners~~Alvarez and Marsal North America, LLC) (the "Information Presentation") or in that certain "Project Poet" datasite administered by Datasite (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or Advisors. Except with respect to the Express Representations, all other representations and warranties, whether express or implied, are hereby expressly disclaimed by Sellers. Nothing in this Section 3.22 shall limit any rights or remedies of Purchaser with respect to a claim for Fraud.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as of the date hereof as follows.

**Section 4.1    Organization and Qualification**. Purchaser is a corporation duly formed, validly existing and in good standing under the Laws of the State of California and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transaction. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties owned or used by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transaction by this Agreement.

**Section 4.2    Authorization of Agreement**. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

**Section 4.3     Conflicts; Consents**.

(a)     Assuming that (i) the Sale Order, and all other requisite Bankruptcy Court approvals are obtained, (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3(a) are made, given or obtained (as applicable), and (iii) the requirements of the HSR Act are complied with, neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's Organizational Documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other material Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (A) through (D), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

(b)     Except as set forth on Schedule 4.3(a), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except (i) any filings required to be made under the HSR Act or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

**Section 4.4     Financing**. As of ~~October 28~~November 8, 2023, the Credit Agreement will have been amended to permit the issuance of the Term Loans to the Term Loan Holder in an amount equal to the Principal Amount at the Closing.  As of November 8, 2023, Purchaser or Guarantor will, and will through the Closing, have sufficient funds in an aggregate amount necessary to ~~pay the Purchase Price, to~~ perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions, including ~~the~~ payment of ~~the Purchase Price and~~ all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with Transactions and does not know of any circumstance or condition that would reasonably be expected to prevent or substantially delay the availability of such funds or otherwise impair such capability at the Closing and such other dates that such obligations and transactions are required to be satisfied pursuant to the terms hereof. Purchaser affirms that it is not a condition to Closing or to any of its obligations under this Agreement that Purchaser obtains financing for the Transactions. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

**Section 4.5    Brokers**. Except for UBS Securities LLC, all of whose fees and expenses will be borne solely by Purchaser, there is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

**Section 4.6    No Litigation**. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will or would be reasonably likely to adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the Transactions.

**Section 4.7    Certain Arrangements**. Except for any financing sources or lenders of Purchaser related to Purchaser's financing of the Transaction, as of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of any Seller or its respective board of directors (or member of management or applicable governing body of any Affiliate of any Seller), any holder of equity or debt securities of any Seller, or any lender or creditor of any Seller or any Affiliate of any Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of any Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

**Section 4.8    Solvency**. Assuming the accuracy in all material respects of the representations and warranties in Article III, Purchaser is, and immediately after giving effect to the Transactions Purchaser shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Purchaser. In connection with the Transactions, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

**Section 4.9    WARN Act and Mass Layoffs**. Purchaser does not currently plan or contemplate any plant closings, reduction in force, terminations of employees, or similar personnel actions impacting Business Employees that would trigger obligations under the WARN Act or similar Laws.

**Section 4.10    No Additional Representations or Warranties**. Except for the representations and warranties contained in this Article IV, Sellers are not relying on and will not rely on the accuracy or completeness of any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser and acknowledge that neither Purchaser nor any other Person on behalf of Purchaser makes on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

## ARTICLE V
### BANKRUPTCY COURT MATTERS

**Section 5.1**   **Bankruptcy Actions**.

(a)   <u>Bankruptcy Court Milestones</u>. The Sellers shall comply with the following timeline (the "<u>Bankruptcy Court Milestones</u>"):

(i)   As promptly as practicable but in no event later than one (1) day after the Petition Date, the Sellers shall file with the Bankruptcy Court the Bidding Procedures Motion.

(ii)   No later than three (3) Business Days following the Second Day Hearing, the Sellers shall obtain entry of the Bidding Procedures Order.

(iii)   No later than 60 days after the Petition Date, the Bidding Deadline pursuant to the Bidding Procedures Order will occur.

(iv)   No later than 75 days after the Petition Date, the Auction (if necessary) shall have been held pursuant to the Bidding Procedures Order.

(v)   No later than 80 days after the Petition Date, but subject to the availability of the Bankruptcy Court, the Bankruptcy Court shall have held the hearing to consider entry of the Sale Order.

(b)   The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order. Sellers may modify the motion seeking approval of the Sale Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, with such modifications being acceptable to Purchaser in its commercially reasonable discretion.

(c)   From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Sellers shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(d)   The Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order. Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order, and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available

to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)    Each Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Sellers from the Bankruptcy Court with respect to the Transactions.

(f)    If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "Backup Bidder") and keep Purchaser's bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until the earlier of (i) 60 days following ~~the hearing to consider~~entry by the Bankruptcy Court of the Sale Order, (ii) the closing of an Alternative Transaction with a Successful Bidder, or (iii) such other date as this Agreement is terminated.

(g)    Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(h)    Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a sufficient demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(i)    Nothing in this Section 5.1 shall prevent Sellers from modifying the Bidding Procedures as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations.

**Section 5.2**   **Cure Costs**. Subject to entry of the Sale Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Assumed Cure Costs. Also, subject to entry of the Sale Order, Sellers shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Excluded Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

**Section 5.3**   **Approval**. Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

# ARTICLE VI
## COVENANTS AND AGREEMENTS

**Section 6.1**   **Conduct of the Business of Sellers**.

(a)      Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement, or (iv) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Sellers shall use their commercially reasonable efforts to carry on the Business in the Ordinary Course; provided that no action by any Seller with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)      Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability, or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Sellers shall not take any of the following actions with respect to the Business:

(i)      (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or rights to acquire any debt securities of Sellers, guarantee any such indebtedness or any debt securities of

another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "<u>Indebtedness</u>"), except, but only to the extent the following will constitute Excluded Liabilities, (1) for intercompany Indebtedness among Sellers and their Affiliates, (2) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (3) for Indebtedness incurred under arrangements that are not secured by the Acquired Assets, (4) for Indebtedness incurred under existing arrangements (including in respect of letters of credit) in an amount not to exceed $5,000,000 outstanding at any time and (5) for Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder, or (B) make any loans, capital contributions or advances to, or investments in, any Person other than (1) as permitted pursuant to <u>Section 6.1(b)(iv)</u>, (2) in the Ordinary Course, and (3) to any other Seller or Subsidiary; <u>provided</u> any such actions in the foregoing clauses (1), (2), and (3) do not give rise to an Assumed Liability;

(ii)     sell or lease to any Person, in a single transaction or series of related transactions, any of Acquired Assets, except (A) Ordinary Course dispositions of Inventory, (B) transfers among the Sellers, (C) leases or subleases of real property under which a Seller is a tenant or a subtenant and voluntary terminations or surrenders of such leases or subleases, in each case following prior good faith consultation with Purchaser, and (D) other sales and leases in the Ordinary Course;

(iii)     make or authorize capital expenditures, including for property, plant and Equipment, except for those (A) in connection with the repair or replacement of facilities, properties or assets destroyed or damaged due to casualty or accident (whether or not covered by insurance), (B) otherwise in an aggregate amount for all such capital expenditures made pursuant to this clause (B) not to exceed $5,000,000 in the aggregate or (C) in accordance with the capital expenditure budget set forth on <u>Schedule 6.1(b)(iii)</u>;

(iv)     except as permitted under <u>Section 6.1(b)(iii)</u>, make any acquisition of, or investment in, any securities or business (including by merger), (which for the avoidance of doubt shall not include acquisitions of Inventory in the Ordinary Course);

(v)     except (A) in the Ordinary Course or (B) as permitted pursuant to the terms of any Employee Benefit Plan, (1) grant to any Business Employee at the level of Director or above any increase in compensation (including bonus or long-term incentive opportunities), (2) hire any employee who would be a Business Employee at the level of Director or above; (3) establish, adopt, enter into, materially amend or terminate any material Employee Benefit Plan, except in connection with annual open enrollment in the Ordinary Course; (4) take any action to discretionally accelerate any rights or benefits of any Business Employee

at the level of Director or above under any Employee Benefit Plan; or (5) terminate any Business Employee (other than for cause) at the level of Director or above; provided that the foregoing clauses (1) through (5) shall not restrict any Seller from taking any action, including the termination of any non-Business Employee, or establishing any Employee Benefit Plan or other compensation or benefit plan that is not targeted at Business Employees;

(vi)     make any material changes in financial accounting methods, principles or practices materially affecting the consolidated assets, Liabilities or results of operations of Sellers with respect to the Business, except insofar as may be required (A) by GAAP (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the Financial Accounting Standards Board or any similar organization);

(vii)     grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets; other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms) or permitted under Section 6.1(b)(i); provided that any such Encumbrance will be extinguished in connection with the Closing;

(viii)     waive, release, assign, institute, compromise, or settle any pending or threatened Action against, or related to, any Seller, the Business, the Acquired Assets, or the Assumed Liabilities and that would result in an Assumed Liability;

(ix)     (A) terminate, amend, supplement, modify or waive any provision of, or accelerate any rights, benefits or obligations under, any Material Contract, except any such action in the Ordinary Course or the expiration in accordance with its term or (B) enter into any Contract that would be a Material Contract if executed prior to the date of this Agreement or which would result in an aggregate obligation of Sellers in excess of $200,000, except for (Y) any renewal of any customer Contract in the Ordinary Course upon terms and conditions which are not materially less favorable in the aggregate to the Sellers than those in effect as of the date of this Agreement and (Z) any renewal of any other such Contract in the Ordinary Course upon terms and conditions which are no less favorable to the Sellers, in any material respect, than those in effect as of the date of this Agreement; provided that if Purchaser does not object within two (2) Business Days of a notice referencing this Section, describing in reasonable detail the Contract for which consent is being requested, and requesting consent for such Contract, Purchaser shall be deemed to have consented to Sellers entering into such Contract;

(x)     (A) abandon, cancel, fail to renew, or permit to lapse any Acquired Intellectual Property that is used in the conduct of the Business, or held for use by the Sellers, in each case that is material to the Business, taken as a whole other than pursuant to expiration of any such Acquired Intellectual Property at the end of its maximum term, or (ii) sell, transfer, license or otherwise encumber any

material Acquired Intellectual Property, other than licenses of Acquired Intellectual Property in the Ordinary Course;

(xi)    solely with respect to Acquired Assets, (A) make any unusual or extraordinary efforts to collect any accounts receivable, intercompany obligation or Liability for Indebtedness, or give any discounts or concessions for early payment of such accounts receivable, intercompany obligation or Liability for Indebtedness or (B) make any sales of, or, other than Permitted Encumbrances, convey any interest in, any accounts receivable, intercompany obligation or Liability for Indebtedness to any third party; provided that Sellers shall be entitled to, in their reasonable business judgment, take such actions with respect to such items that have been outstanding for more than twelve (12) months;

(xii)    amend in any material respect, cancel or permit to terminate any material insurance policy naming any Seller as an insured, a beneficiary or a loss payable payee without first obtaining comparable substitute insurance coverage with no lapse in coverage; or

(xiii)    grant any waiver under or amend or modify, or surrender, revoke, permit to lapse or otherwise terminate any Permit, other than in the Ordinary Course or as would not reasonably be expected to be material to the operation of the Business.

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the Business (or the other business of Sellers and their Affiliates) prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations. Notwithstanding anything to the contrary contained herein, any action taken, or omitted to be taken, by any Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this Section 6.1.

**Section 6.2    Access to Information.**

(a)    From the date hereof until the Closing, Sellers will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours (and in accordance with the reasonable procedures established by Sellers) to the books and records of Sellers, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the Transactions; provided that (i) such access does not unreasonably interfere with the normal operations of any Seller, (ii) such access will occur in such a manner as Sellers reasonably determine

48

to be appropriate to protect the confidentiality of the Transactions and such books and records, (iii) all requests for access will be directed to Guggenheim Securities or such other Person(s) as Guggenheim Securities may designate in writing from time to time (iv) nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to any Seller if the Transactions are not consummated, (B) would waive any legal privilege, (D) would be in violation of applicable Laws (including the HSR Act and Foreign Competition Laws) or the provisions of any agreement to which Sellers are bound or would violate any fiduciary duty, or (E) is in respect of Excluded Tax Returns. Notwithstanding anything to the contrary contained herein will permit Purchaser or its authorized Advisors to conduct any sampling or testing of environmental media or any other invasive investigation or assessment at any Leased Real Property including of the type commonly known as a Phase II environmental site assessment.

(b)    Subject to <u>Section 6.14,</u> the information provided pursuant to this <u>Section 6.2</u> will be governed by all the terms and conditions of the Confidentiality Agreement. Sellers and their Affiliates make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.2</u>, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)    From and after the Closing for a period of three years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by Sellers, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)    Prior to the Closing, the Parties shall reasonably cooperate with each other in coordinating their communications with any customer, supplier or other contractual counterparty of Sellers in relation to this Transaction; <u>provided</u> that Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of any Seller prior to the

Closing with respect to any Seller, the Business or the Transactions, in each case without the prior written consent of Sellers for each such contact, such consent not to be unreasonably withheld.

**Section 6.3      Employee Matters**.

(a)      At least 15 Business Days prior to the Closing Date, Purchaser shall extend to each Business Employee set forth on Schedule 6.3(a) (the "Scheduled Employees") (which Schedule 6.3(a) Purchaser shall provide to Sellers by ~~the date that is 15 days following the date hereof~~November 27, 2023 and which Schedule 6.3(a) shall include at least 900 Business Employees) a written offer of employment reviewed by Sellers, and which Sellers have had an opportunity to comment on, providing for a position that is materially the same as such employee's position immediately prior to the Closing (including level of responsibility, primary location of employment and authority) on the terms set forth in this Section 6.3 ("Transfer Offer") and that, if accepted, shall become effective immediately following the Closing. Business Employees who accept such Transfer Offers and begin employment with Purchaser as of the Closing Date shall be collectively referred to herein as "Transferred Employees." Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all Scheduled Employees employed by Sellers will accept the Transfer Offer, or that any Transferred Employee will continue in employment with Purchaser following the Closing for any period of time. Purchaser shall notify Sellers in a reasonable timeframe prior to the Closing Date with respect to whether each such offer has been accepted or rejected. Purchaser shall carry out all necessary actions, and Sellers shall reasonably cooperate with Purchaser, to effect the timely employment by Purchaser or its applicable Affiliate of each Transferred Employee immediately following the Closing, and Sellers shall reasonably cooperate in connection therewith. Effective as of the Closing, each Transferred Employee previously employed by Sellers shall cease to be an employee of each Sellers.

(b)      For a period of one year from and after the Closing Date, Purchaser shall provide each Transferred Employee, or cause each Transferred Employee to be provided, with: (i) a base compensation or wage rate, as applicable, that is no less than that provided to such Transferred Employee as of immediately prior to the Closing; (ii) cash incentive opportunities that are no less favorable than those provided to such Transferred Employee as of immediately prior to the Closing; (iii) health and welfare plans that are substantially similar in the aggregate to the health and welfare plans maintained by Purchaser or any of its Affiliates as of the Closing Date; and (iv) other employee benefits (including severance benefits and retention bonuses, but excluding long term incentive compensation and equity incentive compensation) that are no less favorable than those provided to such Transferred Employees as of the Closing Date. For purposes of eligibility, vesting and determining level of benefits under the benefit plans and programs maintained by Purchaser and its Affiliates or any of its Affiliates after the Closing Date (the "Purchaser Plans" ), each Transferred Employee shall be credited with his or her years of service with Sellers (and any predecessor thereof) before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(c)     On the Closing, Transferred Employees (and their eligible dependents and beneficiaries) shall cease active participation in the Employee Benefit Plans. Without limiting the generality of any other provision of this Agreement: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans; (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Employee Benefit Plans); and (iii) Purchaser shall cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)     For the avoidance of doubt, Sellers shall be responsible for and ensure timely payment of all (i) final wages, including accrued wages, salary, accrued but unpaid bonuses, commission and other incentive payments, accrued but unpaid vacation and other compensation owed to the Business Employees through the Closing Date, and Purchaser shall not be liable for any such payments arising through the Closing Date, and (ii) all contributions under Employee Benefit Plans accruing prior to the Closing Date, including any such 401(k) plan employer contributions notwithstanding any year end service requirement. Further, to the extent a Scheduled Employee refuses to accept a Transfer Offer that complies with Section 6.3(a) or otherwise fails to be employed by Purchaser or its Affiliate as of the Closing Date, in each case through no fault of Purchaser, Sellers shall be responsible for any termination or other liabilities related to the employment or termination of any such Scheduled Employee.

(e)     The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Sellers or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(f)    Sellers shall be solely responsible for any and all obligations and Liabilities arising under Section 4980B of the Tax Code with respect to all "M&A qualified beneficiaries" as defined in 26 C.F.R. § 54.4980B 9.

(g)    Sellers expressly agree to retain all obligations, Liabilities, and commitments related to WARN, including any requirement to provide notice, that accrue up to and including the Closing Date; provided that Purchaser shall provide Sellers with sufficient advance notice to allow Sellers to comply with WARN in the event that Purchasers fail to offer employment to a sufficient number of Scheduled Employees or offer terms of employment that, in either event, would reasonably be expected to constitute a constructive discharge under WARN. Notwithstanding anything to the contrary herein, Sellers or their Affiliates shall be permitted to provide WARN notices prior to the Closing to any employees they reasonably believe could be owed it under applicable Law, in consultation with Purchaser. Purchaser expressly agrees to assume all obligations, Liabilities, and commitments related to WARN, including any requirement to provide notice, that accrue following the Closing Date, as well as any WARN Liabilities relating to the termination of Scheduled Employees who do not receive a Transfer Offer that complies with the requirements under Section 6.3(a) from Purchaser.

(h)    For any Transferred Employees who are Delayed Transferred Employees, the provisions of this Section 6.3 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

(i)    In the event that the Closing is to occur prior to January 1, 2024, the Parties shall negotiate in good faith an amendment to the TSA or other Contract, pursuant to which Sellers shall continue to employee the Transferred Employees and administer their payroll and continue their existing benefits, all at Purchaser's sole cost and expense (with no markup by Seller) until such time as Purchaser is able to onboard such Transferred Employees to its payroll systems and Purchaser Plans, such time not to be later than February 1, 2024, and the provisions of this Section 6.3 shall be amended accordingly.

## Section 6.4    Regulatory Approvals.

(a)    Subject to Section 6.5, Sellers will (i) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings made by the Purchaser Group pursuant to Section 6.4(b), and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.4(a) or Section 6.4(b) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)    Subject to Section 6.5, Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the Transactions, if any, including any Healthcare Laws, and including, obtaining any required Healthcare Permits, (ii) cooperate with Sellers in exchanging such information

and providing such assistance as Sellers may reasonably request in connection with any filings made by a Seller pursuant to Section 6.4(a), and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.4(b) or Section 6.4(a) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

(c)     This Section 6.4 shall not apply to efforts related to Foreign Competition Laws, which shall be governed by the obligations set forth in Section 6.5 below.

**Section 6.5**     **Antitrust Notification**.

(a)     Sellers and Purchaser (and their respective Affiliates, if applicable) will, as promptly as practicable (and, in the case of filings under the HSR Act, no later than ten (10) Business Days following the date hereof), (i) file with the United States Federal Trade Commission and the United States Department of Justice, the notification form required pursuant to the HSR Act for the Transactions, and (ii) make all notifications, filings, registrations or other materials required or necessary under the Foreign Competition Laws set forth on Schedule 7.1(a). Each Seller and Purchaser shall (and shall cause their respective Affiliates to) furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act or such Foreign Competition Laws, and will respond to any requests made for any supplemental information by any Governmental Body as promptly as practicable. Sellers and Purchaser shall not extend any waiting period or enter into any agreement or understanding with any Governmental Body without the prior written consent of the other; provided that such consent shall not be unreasonably withheld, conditioned, or delayed. Purchaser will be solely responsible for payment of all filing fees payable in connection with such filings.

(b)     Subject to the immediately following sentence, Sellers and Purchaser will use their reasonable best efforts to as promptly as practicable (and in any event prior to the Outside Date) obtain any clearances, Consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations required under the HSR Act or such Foreign Competition Laws for the consummation of this Agreement and the Transactions and will keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Body and will comply promptly with any such inquiry or request. Nothing in this Agreement, including this Section 6.5, obligates Purchaser to (i) oppose any motion or action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the Transactions, or undertake any appeal of any adverse decision or Order by any Governmental Body, (ii) propose offer, accept, or enter into any consent decree, consent agreement, settlement or other agreement or arrangement to hold separate, license, sell, transfer, dispose or divest any assets (whether tangible or intangible), rights, properties, products or businesses of Purchaser, its Affiliates or, after the Closing, the Acquired Assets, (iii) agree to the termination, modification, or assignment of existing relationships, joint ventures, Contracts or

obligations of Purchaser or its Affiliates or (iv) agree to any limitations on conduct or actions of members of Purchaser, its Affiliates or after the Closing, the Acquired Assets.

(c)     The Parties commit to instruct their respective counsel to cooperate with each other and use reasonable best efforts to facilitate and expedite obtaining any clearances, Consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations under the HSR Act or Foreign Competition Laws at the earliest practicable dates and, in any event, prior to the Outside Date. Such reasonable best efforts and cooperation shall include each Party and its respective counsel undertaking to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any communication received by such Person from a Governmental Body in connection with the filings made pursuant to this Section 6.5 and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to any Governmental Body in connection with this Agreement and the Transactions and any developments, meetings or discussions with any Governmental Body in respect thereof, including with respect to (A) the receipt of any non-action, action, clearance, Consent, approval, waiver, or other authorizations, (B) the expiration or termination of any waiting period, (C) the commencement or proposed or threatened commencement of any investigation, litigation or administrative or judicial Action or proceeding under applicable Laws, including any proceeding initiated by a private party, and (D) the nature and status of any objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the Transactions. Neither Sellers nor Purchaser will participate in any meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry relating to the Transaction without giving the other Party reasonable prior notice of the meeting or discussion and, unless prohibited by the relevant Governmental Body, the opportunity to attend and participate in such meeting or discussion. Each Party will have the right to review and approve the content of any draft notifications, formal notifications, filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted by the other Party to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under this Section 6.5, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets.

(d)     Purchaser will not, and will not permit any member of the Purchaser Group or their respective Affiliates to, engage in any action or enter into any transaction or permit any action to be taken or transaction to be entered into that would reasonably be expected to (i) impose a material delay in the obtaining of, or materially increase the risk of not obtaining, any clearances, Consents, approvals, waivers, actions, waiting period

54

expirations or terminations, non-actions or other authorizations under the HSR Act or Foreign Competition Laws from any Governmental Body necessary to consummate the Transactions, (ii) materially increase the risk of any Governmental Body entering an Order preventing, delaying or prohibiting the consummation of the Transactions or (iii) delay the consummation of the Transactions.

**Section 6.6    Reasonable Efforts; Cooperation**.

(a)    Subject to the other terms of this Agreement, each Party shall (whether directly or through its Advisors) use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the Transactions to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder.

(b)    The obligations of Sellers pursuant to this Agreement, including this Section 6.6, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), Sellers' debtor-in-possession financing, and Sellers' obligations as debtors-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, and the Sale Order), and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

**Section 6.7    Certain Financing Matters**.

(a)    From the date hereof until the Closing Date, Sellers shall (whether directly or through their respective Advisors) use their commercially reasonable efforts to provide all cooperation reasonably requested by Purchaser in connection with the Financing, at Purchaser's sole expense,  including by using commercially reasonable efforts to (i) furnish Purchaser on a reasonably timely basis with such documentation and information (including financial information) that Purchaser or Purchaser's financing sources have reasonably requested in writing (including electronic correspondence) in connection with obtaining or consummating the Financing, (ii) assist with the preparations for (but not the execution of) the provision of guarantees and the pledging of collateral (it being understood that no such pledging of collateral will be made by any Seller or be effective until at or after the Closing), (iii) provide all documentation and other information required by bank regulatory authorities under applicable "know-your-customer", anti-money laundering rules and regulations, including the PATRIOT Act and beneficial ownership regulations, at least three (3) Business Days prior to Closing, reasonably requested no later than five (5) Business Days prior to the Closing by Purchaser, and (iv) facilitate the taking of all actions reasonably requested by Purchaser in connection with the Financing; provided that (A) no personal liability shall be imposed on any of the Advisors, employees, officers or directors of Sellers involved in the foregoing cooperation, (B) Sellers will not be required to pay any commitment or other fees or expenses in connection with Purchaser's debt financing, and (C) no Advisor, director or

officer of any of Sellers shall be obligated to execute any documentation in connection with Purchaser's debt financing unless continuing in such capacity after the Closing.

(b)      None of Sellers shall be required to take any action pursuant to this Section 6.7 that would subject it to actual or potential Liability for which it would not be indemnified hereunder or to bear any cost or expense or to pay any commitment or other fee or provide or agree to provide any indemnity in connection with the Financing or any of the foregoing prior to the Closing. Purchaser shall indemnify and hold harmless the Seller Parties from and against any and all Liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties suffered or incurred by them in connection with this Section 6.7 and any information utilized in connection therewith. Purchaser shall, promptly upon request by Elixir, reimburse Sellers for all reasonable out-of-pocket costs incurred by them in connection with this Section 6.7.

(c)      Notwithstanding this Section 6.7 or anything else in this Agreement, Purchaser acknowledges and agrees that (i) it is not a condition to the Closing or to any of Purchaser's other obligations under this Agreement that Purchaser obtain the Financing. The Parties agree that this Section 6.7 (and not Section 6.6 or Section 6.8) sets forth Sellers' sole obligations with respect to the Financing and (ii) the condition set forth in Section 7.2(b), as it applies to Sellers' obligations under this Section 6.7, shall be deemed satisfied unless the failure to obtain the Financing is a direct result of Sellers' knowing and material willful breach of their obligations under this Section 6.7.

Section 6.8      **Further Assurances**. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

Section 6.9      **Insurance Matters**.

(a)      Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to any Seller and the Acquired Assets that is maintained by such Seller (whether such policies are maintained with third party insurers or with any Seller) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

(b)      To the extent that (i) any insurance policies issued for the benefit of any Seller (the "Sellers' Insurance Policies") cover any Liability relating to the Acquired Assets and relating to or arising out of occurrences or events on or prior to the Closing ("Pre-Closing Matters") and (ii) the Sellers' Insurance Policies continue to offer coverage after the Closing to permit claims to be made thereunder with respect to Pre-Closing Matters, the Sellers shall cooperate with Purchaser in submitting claims and seeking recovery with respect to Pre-Closing Matters on behalf of Purchaser under the Seller's Insurance Policies. Purchaser shall not make any such claims if, and to the extent that, such claims are covered by insurance policies held by Purchaser or its Affiliates. The

Sellers shall, on request from Purchaser, with respect to any claim arising from an Assumed Liability that is covered or potentially covered the Sellers' Insurance Policies, (i) report such claim to the appropriate insurer as promptly as practicable after such claim is reported to the Sellers, and (ii) instruct that any proceeds of such insurance policy are paid directly to Purchaser, the attorneys handling the defense of such claim or, where applicable, to the claimant as a result of any judgment or settlement, rather than to the Sellers (but subject to all limitations and deductibles and exclusions under such policies and net of Sellers' out-of-pocket costs and expenses of seeking such recovery and any Taxes incurred by Sellers with respect to such recovery, all of which shall be paid directly to Sellers); <u>provided</u> that Purchaser shall notify the Sellers promptly of any such claim or potential claim and shall reasonably cooperate in the investigation and pursuit of any such claim or potential claim.

**Section 6.10    <u>Receipt of Misdirected Assets; Liabilities</u>**.

(a)    From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

(b)    From and after the Closing, if any Seller or any of its Affiliates is subject to a Liability that should belong to Purchaser or its Affiliates pursuant to the terms of this Agreement, such Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to a Seller or its Affiliates pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller or its Affiliates, and such Seller or its Affiliates shall assume and accept such Liability.

**Section 6.11    <u>Guarantees; Third Party Assurances</u>**.

(a)    Purchaser acknowledges Sellers and their Affiliates have entered into various arrangements (i) in which guarantees, letters of credit, sureties, bonds or similar arrangements were issued by Sellers or their Affiliates and (ii) in which Sellers or their Affiliates are the primary obligors on other Contracts, in any such case to support or facilitate Sellers, in each case, set forth in <u>Schedule 6.11(a)</u> ( "<u>Seller Support Obligations</u>"). It is understood that the Seller Support Obligations are not intended to continue after the Closing. Purchaser agrees that it shall use its reasonable best efforts to

obtain replacements for the Seller Support Obligations (which shall include the full and unconditional release of Sellers and their Affiliates) that will be in effect at the Closing or, in the case of Seller Support Obligations described in the foregoing clause (ii), will use its commercially reasonable efforts to arrange for itself or one of its Subsidiaries to be substituted as the primary obligor thereon as of the Closing through an assumption, accession, acknowledgement or similar agreement (which shall include the full and unconditional release of Sellers and their Affiliates) with the beneficiary of the applicable Seller Support Obligation. Whether or not Purchaser is able to satisfy the terms of the immediately preceding sentence, Purchaser shall indemnify Sellers and their Affiliates and each of their respective officers, directors, employees, agents and representatives from and against any and all Liabilities incurred by any of them relating to the Seller Support Obligations. Purchaser agrees that, with respect to any Seller Support Obligation, its reasonable best efforts pursuant to this Section 6.11 shall include, if requested, the execution and delivery by Purchaser, or by an Affiliate of Purchaser acceptable to the beneficiary of such Seller Support Obligation, of a replacement guarantee that is substantially in the form of such Seller Support Obligation. All costs and expenses incurred in connection with providing the release or substitution of the Seller Support Obligations shall be borne by Purchaser.

(b)     At or prior to the Closing, Purchaser shall at its sole cost and expense arrange for the issuance of replacement surety bonds or similar instruments or post cash collateral to the issuer with respect to all outstanding surety bonds or similar instruments issued with respect to the Business and which are set forth in Schedule 6.11(b) (collectively, the "Third Party Assurances") such that all Third Party Assurances may be returned, terminated or otherwise unwound in full as of the Closing.

**Section 6.12   Acknowledgment by Purchaser.**

(a)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the Business (including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects), and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely, are relying, and will rely, solely, on the Express Representations and the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, any Information Presentation, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations,

warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of any Seller, any of the Seller Parties or any other Person on behalf of any Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of the Business, or the quality, quantity or condition of any of the Acquired Assets are, in each case, specifically disclaimed by each Seller, on its behalf and on behalf of the Seller Parties. Purchaser, on its own behalf and on behalf of the Purchaser Group: (1) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence (which do not, for the avoidance of doubt, include Purchaser's or Purchaser Group's reliance on the Express Representations). Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Sellers, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and subject to <u>Section 6.12(c)</u>, Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (x) any potentially material information regarding any Seller or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (y) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of any Seller's business (including the Business), operations, assets, Liabilities, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)      Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of the Business, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of any Seller, or other Seller Parties, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for

59

making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)     Nothing in this <u>Section 6.12</u> shall limit any rights or remedies available to Purchaser in the case of a claim for Fraud.

(d)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this <u>Section 6.12</u>, including any such Action with respect to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the information, statements, disclosures or materials in the Information Presentation, the Dataroom or Projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any other Seller Party or any failure of any of the foregoing to disclose any information.

**Section 6.13   <u>Guaranty</u>.**

(a)     Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Sellers (i) the due and punctual performance, when and as due, of all obligations, covenants and agreements of Purchaser arising under or pursuant to this Agreement; (ii) the accuracy of Purchaser's representations and warranties set forth herein; and (iii) the punctual payment of all sums, if any, now or hereafter owed by Purchaser under and in accordance with the terms of this Agreement, including the payment obligations of the Purchaser pursuant to <u>Section 2.1</u> (the matters set forth in <u>clauses (i)</u>, <u>(ii)</u>, and <u>(iii)</u>, collectively, "<u>Guaranteed Obligations</u>").

(b)     If Purchaser fails to perform any of the Guaranteed Obligations, then Guarantor shall itself be jointly and severally liable for the Guaranteed Obligations and shall perform or take whatever steps as may be necessary to procure performance of the same.

(c)     Notwithstanding any other provision of this <u>Section 6.13</u>, nothing herein shall be construed as imposing greater obligations or Liabilities on Guarantor than for which Purchaser itself would be liable under this Agreement or obliging Guarantor to indemnify and hold harmless Sellers against any losses, costs, or expenses for which Purchaser itself would not be liable under this Agreement, except as set forth in this <u>Section 6.13</u>, including <u>Section 6.13(f)</u> and <u>Section 6.13(h)</u>.

(d)     The obligations of Sellers under this Agreement shall conclusively be deemed to have been created, contracted, or incurred in reliance upon this <u>Section 6.13</u> and all dealings between Sellers and Purchaser shall likewise be conclusively presumed to have been consummated in reliance upon this <u>Section 6.13</u>.

(e)     Guarantor's obligations hereunder shall not be affected by any facts or circumstances that might constitute a legal or equitable bar, discharge or defense to any Guaranteed Obligations available to Guarantor but not available to Purchaser, and

Guarantor hereby expressly waives and renounces any and all such bars, discharges and defenses.

(f)     The guarantee by Guarantor contained herein shall be a continuing guarantee, shall remain in full force and effect and shall continue to be enforceable by Sellers until the performance by Purchaser of all of the Guaranteed Obligations (notwithstanding any change, restructuring, bankruptcy, insolvency or termination of the corporate structure or existence of any Seller or any of its Subsidiaries) and that upon completion of all of the Guaranteed Obligations, this guarantee shall terminate automatically and Guarantor shall stand discharged of all of its obligations under this guarantee. Guarantor shall indemnify Sellers for any costs and expenses incurred by Sellers in enforcing this Section 6.13, including the fees and expenses of counsel and other Advisors of Sellers in the investigation and prosecution of any Action with respect hereto. Guarantor's obligations under this Section 6.13 shall not be terminated, modified, affected or impaired by reason of any relief or discharge of Purchaser from any of Purchaser's respective obligations in bankruptcy or similar proceedings, or by liquidation or dissolution.

(g)     The liability of Guarantor under this Section 6.13 shall be unlimited and unconditional, and this Section 6.13 shall be a continuing guaranty.

(h)     Guarantor hereby makes the representations and warranties set forth in Article IV as to itself, and such representations and warranties shall apply *mutatis mutandis* as if Guarantor were substituted for Purchaser therein.

**Section 6.14   Confidentiality**.

(a)     The Confidentiality Agreement is hereby incorporated herein by reference and shall continue in full force and effect in accordance with its terms; provided that from and after the Closing, all of Purchaser's and its Affiliates obligations under the Confidentiality Agreement with respect to confidential information that constitutes an Acquired Asset or Assumed Liability, shall terminate and be of no further force or effect.

(b)     From and after the Closing the confidential information and trade secrets included in the Acquired Assets ("Business Confidential Information") will be the confidential information of Purchaser; provided that Business Confidential Information shall not include any information that is or, after the Closing, becomes generally available to the public other than as a result of disclosure, directly or indirectly, by Sellers in violation of this Section 6.14. The Sellers will not use the Business Confidential Information except to (i) provide the services under the TSA, or (ii) comply with applicable Law or a Contract that is an Excluded Asset and solely for the purpose of complying with such Contract,, (iii) enforce Sellers' rights hereunder, or (iv) participate in commercial arrangements between Sellers and their Affiliates, on the one hand, and Purchaser and its Affiliates, on the other hand ((i) through (iv), the "Permitted Purposes").

(c)     Following the Sellers' delivery of the Acquired Assets to Purchaser and Purchaser's confirmation of receipt of the Acquired Assets, the Sellers will use commercially reasonable efforts to permanently delete and erase from the Sellers' systems and storage locations all software and other technology that is not needed by the Sellers to provide the services under the TSA, except Sellers may retain such documents, records, and copies as are be required in order to satisfy any retention policies, internal compliance procedures or regulations or Law to which Seller is subject, or where it is not reasonably possible to destroy copies that have been created by ordinary course electronic backup procedures, provided that (x) the obligations in this Section 6.14 shall continue to apply to such documents, records and copies and (y) in each case, such documents, records and copies are only available and accessible to employees of Seller with a need to know solely for the foregoing purposes. Following the termination or expiration of the TSA, Sellers will use commercially reasonable efforts permanently delete and erase from the Sellers' systems and storage locations all of the software and other technology included in the Acquired Assets that was needed by the Sellers to perform obligations under the TSA, except Sellers may retain such documents, records, and copies as are be required in order to satisfy any retention policies, internal compliance procedures or regulations or Law to which Seller is subject, or where it is not reasonably possible to destroy copies that have been created by ordinary course electronic backup procedures, provided that (x) the obligations in this Section 6.14 shall continue to apply to such documents, records and copies and (y) in each case, such documents, records and copies are only available and accessible to employees of Seller with a need to know solely for the foregoing purposes.

(d)     From and after the Closing, except with the prior written consent of Purchaser, the Sellers agree to keep confidential and not disclose the Business Confidential Information, except to the extent that (A) such information has otherwise been made public other than as a result of disclosure, directly or indirectly, by Sellers in violation of this Section 6.14, (B) any such information is reasonably necessary for enforcing the Sellers' rights hereunder and is disclosed to any Governmental Body in connection with resolving a dispute between any Seller and any Purchaser Group member, (C) any Seller is required by applicable Law (including, in connection with the Bankruptcy Cases) to divulge or disclose any such information (in which case Sellers shall promptly notify Purchaser in advance of disclosing such information and use commercially reasonable efforts to cooperate with Purchaser to limit such disclosure, to the extent permitted under applicable Law), and (D) to its Affiliates and Advisors solely on a need to know basis in connection with the Permitted Purposes and solely for the Permitted Purposes.

(e)     Purchaser acknowledges that Sellers' and their Affiliates' directors, officers and employees may unavoidably retain unassisted mental impressions of Business Confidential Information that were not the result of such individuals having studied, memorized, or reviewed Business Confidential Information for the purpose of remembering, preserving, replicating or otherwise using such Business Confidential Information ("Mental Impressions"), and such retention of such Mental Impressions shall not in and of itself constitute a breach of this Section 6.14. In addition, to the extent such Mental Impressions are recalled indirectly or subconsciously as part of such individual's

general industry knowledge, and not as such individual's direct or conscious recollection (i) of Business Confidential Information or (ii) as information relating to or having been included in the Acquired Assets, such individual's actions or omissions, to the extent based on such general industry knowledge and not on specific Business Confidential Information, shall not in and of themselves constitute a breach of this Section 6.14. However, and notwithstanding anything to the contrary, this Section 6.14(e) will not (x) affect in any manner whatsoever Purchaser's rights in the Acquired Intellectual Property or (y) assign to Sellers or their Affiliates or any other Person or otherwise grant to Sellers or their Affiliates or any other Person any license or other rights whatsoever to, any of the Acquired Intellectual Property.

**Section 6.15   No Successor Liability**. The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the closing, Purchaser shall not be deemed to: (a) be the successor of any Seller, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Acquired Assets other than as expressly set forth and agreed in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Purchaser shall have no Liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Acquired Assets) against Sellers or any of Sellers predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Sellers, the Acquired Assets or any Liability of Sellers arising prior to, or relating to any period occurring prior to, the Closing Date. The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this Section 6.15.

**Section 6.16   Retained Privileged Materials**. Following the Closing (i) in the event of a dispute between Purchaser and its Affiliates, on the one hand, and a third party (other than Sellers), on the other hand, Purchaser shall have the right to, or to require Sellers to, assert the attorney-client privilege to prevent disclosure of any Retained Privileged Materials to a third party, and (ii) without Purchaser's prior written consent, Sellers shall not, unless required by applicable Law, disclose, transfer or otherwise make available any Retained Privileged Materials to any third-party, in any manner that would reasonably be expected to result in the waiver of the attorney-client privilege with respect to such materials.

**Section 6.17   Notification of Certain Matters**. The Sellers will promptly (and, in any event, within ten (10) days) notify Purchaser in writing of: (i) any notice or other communication from any Person alleging that the Consent of such Person is or may be required in connection with the Transactions; (ii) any notice or other communication from any Governmental Body, or any Action by any Governmental Body, related to or in connection with the Transactions (including that may restrain, enjoin or otherwise prohibit the consummation of the Transactions); and (iii) the discovery of any variances from, or the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to

cause, any of the representations and warranties contained in Article III to be untrue or inaccurate such that the condition set forth in Section 7.2(a) will not be satisfied.

Section 6.18   **Change of Name**. Promptly (and, in any event, within 60 days) following the Closing, each Seller shall, and shall cause their Subsidiaries (other than EIC) to, discontinue the use of their current legal entity name (and any other trade names or "d/b/a" names currently utilized by each Seller) and shall not subsequently change any of their names to or otherwise use or employ any name which includes the words "Elixir," "Ascend," "Laker," and/or "Tonic" and the other names listed on Schedule 6.18 without the prior written consent of Purchaser, and each Seller shall cause the name of Sellers in the caption of the Bankruptcy Cases to be changed to the new names of each Seller.

Section 6.19   **Open Source Remediation**.  Prior to Closing, Seller shall obtain and pay for commercial licenses for iTextSharp, ServiceStack and jqGrid software sufficient to permit Seller's use of such software.

Section 6.20   **CMS Novation**. As promptly as practicable, and in any event not later than ten (10) Business Days, after the date hereof, Sellers shall cause EIC to jointly prepare with EIC and to file with CMS a request for CMS to approve and consent to the novation of the CMS Contracts from EIC to Purchaser pursuant to the Novation Agreement, by and among CMS, EIC (as transferor) and Purchaser (as transferee) ("Novation Agreement"). Sellers shall cause EIC to include in such request all of the information and documentation required pursuant to 42 CFR § 423.552 and any additional information required or advisable pursuant to applicable Law. Thereafter, Sellers shall cause EIC, in coordination with Purchaser, to promptly update, as necessary or appropriate, the Novation Agreement request to include all of the information required pursuant to 42 CFR § 423.552 and any additional information required or advisable pursuant to applicable Law, including all information requested by CMS. Sellers shall cause EIC to furnish to Purchaser, and Purchaser shall furnish to Sellers, all necessary information as the other Party may reasonably request in connection with its preparation of any filing or submission in connection with the Novation Agreement, and shall keep the other Party apprised of the status of any communications with, and inquiries or requests for additional information from, CMS or other Governmental Body. Sellers shall cause EIC to, and Purchaser shall, comply promptly with any such inquiry or request of CMS related to the Novation Agreement. Sellers shall cause EIC to, and Purchaser shall, satisfy all requirements applicable to the Novation Agreement pursuant to 42 CFR §§ 423.551 AND 423.552.  In the event that the Novation Agreement is not obtained pursuant to the terms and conditions set forth in this Section 6.20, the terms and conditions set forth in Section 1.7 shall become null and void.  Notwithstanding this Section 6.20 or anything else in this Agreement, Purchaser acknowledges and agrees that (a) it is not a condition to the Closing or to any of Purchaser's other obligations under this Agreement that the Parties obtain the Novation Agreement. The Parties agree that this Section 6.20 (and not Section 6.6 or Section 6.8) sets forth Sellers' sole obligations with respect to the potential Novation Agreement and (ii) the condition set forth in Section 7.2(b), as it applies to Sellers' obligations under this Section 6.20, shall be deemed satisfied unless the failure to obtain the Novation Agreement is a direct result of Sellers' knowing and material willful breach of their obligations under this Section 6.20.

**Section 6.21    Completion of TSA Schedules**. Purchaser and Sellers shall cooperate in good faith to finalize the TSA to the reasonable satisfaction of the Purchaser and Sellers as soon as reasonably practicable following the date hereof and in any event on or prior to ~~the date that is 3 weeks following the date hereof~~November 13, 2023. Purchaser and Sellers shall negotiate in good faith to modify and finalize the schedules to and the economic terms of the TSA; provided that Purchaser and Sellers acknowledge and agree that the form of TSA attached as Exhibit G is considered substantially complete but there are open matters relating primarily to finalizing the services and economic terms, which may include revisions to the body of the TSA.

## ARTICLE VII
### CONDITIONS TO CLOSING

**Section 7.1    Conditions Precedent to the Obligations of Purchaser and Sellers**. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    the expiration or termination of any required waiting period under the HSR Act or under the Foreign Competition Laws set forth in Schedule 7.1(a) related to the Transactions, and receipt of any necessary approval related to the Transactions under the Foreign Competition Laws or other regulations set forth in Schedule 7.1(a);

(b)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; and

(c)    the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the Parties.

**Section 7.2    Conditions Precedent to the Obligations of Purchaser**. The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties made by Sellers in Article III (in each case, other than the Fundamental Representations and the Seller Sufficiency Representations) shall be true and correct in each case in all respects as of the Closing Date as though made on and as of the Closing Date (other than representations and warranties that are made as of a specified date need be true and correct only as of such date), except where the failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality", "Material Adverse Effect" or similar qualifiers contained therein (other than "material weaknesses" in Section 3.4(d) and the word "Material" when used in the instances of the defined term "Material Contract" and "Material Adverse Effect" in Section 3.19)) has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material

Adverse Effect, (ii) the representations and warranties set forth in <u>Section 3.1</u>, <u>Section 3.2</u>, <u>Section 3.5(a)</u> and <u>Section 3.17</u> (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all respects other than for de minimis inaccuracies, in each case as of the Closing Date as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date) and (iii) the representations and warranties set forth in <u>Section 3.5(b)</u> (the "<u>Seller Sufficiency Representations</u>") shall be true and correct in all respects, in each case as of the Closing Date as though such representations and warranties had been made as of the Closing Date;

(b)    Sellers shall have performed or complied with, or caused to be performed or complied with, in all material respects, all of the obligations and covenants required by this Agreement to be performed or complied with by Sellers on or prior to the Closing;

(c)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.4</u>;

(d)    From the date of this Agreement, there shall not have occurred any Material Adverse Effect.

**Section 7.3    <u>Conditions Precedent to the Obligations of Sellers</u>**. The obligations of Sellers to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct, in each case as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct (without giving effect to any limitation as to "materiality", "material adverse effect", "Material Adverse Effect" or similar qualifiers contained therein) would not materially impair or prevent Purchaser's ability to consummate the Transactions;

(b)    Purchaser shall have performed or complied with, or caused to be performed or complied with, in all material respects, all of the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 2.5</u>.

**Section 7.4    <u>Waiver of Conditions</u>**. Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the

Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

## ARTICLE VIII
## TERMINATION

**Section 8.1    Termination of Agreement**. This Agreement may be terminated at any time prior to the Closing only in accordance with this Section 8.1, and in no other manner:

(a)    by the mutual written consent of Sellers and Purchaser;

(b)    by written notice of either Purchaser or Sellers, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section 8.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)    by written notice of either Purchaser or Sellers, if the Closing shall not have occurred on or before May 31, 2024 (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d)    by written notice from Sellers to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or Section 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser (other than a breach or failure by Purchaser to close when required pursuant to Section 2.3) then Sellers may not terminate this Agreement under this Section 8.1(d) unless such breach has not been cured by the date which that the earlier of (A) two (2) Business Days prior to the Outside Date and (B) 30 days after Sellers notify Purchaser of such breach and (ii) Sellers' right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Sellers at any time that Sellers are in material breach of, any covenant, representation or warranty hereunder;

(e)    by written notice from Purchaser to Sellers, upon a breach of any covenant or agreement on the part of Sellers, or if any representation or warranty of the Sellers will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or Section 7.2(b) would not be satisfied; provided that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) 30 days after Purchaser notifies Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will

67

not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)     by written notice from Sellers to Purchaser, if (i) all of the conditions set forth in Section 7.1 and Section 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but which conditions are capable of being satisfied) or waived, (ii) Sellers have confirmed in writing to Purchaser that Sellers are ready, willing, and able to consummate the Closing, and (iii) Purchaser fails to complete the Closing by, or at, the later of (A) three Business Days of receipt of the notice described in clause (ii), and (B) the time required by Section 2.3;

(g)     by written notice from Sellers to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(h)     by written notice of either Purchaser or Sellers, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder;

(i)     by written notice from either Purchaser or Sellers, if Purchaser (i) is not the Successful Bidder or the Backup Bidder at the Auction or (ii) is the Backup Bidder at the Auction and Sellers consummate an Alternative Transaction with the Successful Bidder;

(j)     by Sellers or Purchaser, if the Bankruptcy Cases are dismissed or converted to a case or cases under chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Bankruptcy Cases;

(k)     by Purchaser if Sellers withdraw or seek authority to withdraw the Bidding Procedures Motion;

(l)     by Purchaser if (i) following entry by the Bankruptcy Court of the Bidding Procedures Order, such order is (A) amended, modified or supplemented in a manner reasonably expected to be adverse to Purchaser without Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay, or (ii) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (A) amended, modified or supplemented in an adverse way without Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay;

(m)     by Purchaser, if any of the Bankruptcy Court Milestones are not met;

(n)     by Purchaser, in its sole discretion, on or prior to October 23, 2023;

(o)     by Purchaser, in its sole discretion, on or prior to ~~October 30~~November 8, 2023; or

(p)     by written notice from Sellers to Purchaser, upon a breach of Section 2.2(a) on the part of Purchaser.

**Section 8.2     Effect of Termination**.

(a)     In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become null and void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided that Section 2.2, Section 6.2(b), Section 6.14, this Section 8.2 and Article X shall survive any such termination; provided further that no termination will relieve any Party from any Liability for any Willful Breach of this Agreement prior to the date of such termination; provided further that, subject to Section 10.12, the maximum Liability of Purchaser under, or arising out of, this Agreement shall be equal to the Deposit. Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement. Notwithstanding anything contained herein to the contrary, (i) retaining the Deposit pursuant to Section 2.2(b) is Sellers' sole and exclusive remedy arising from (A) Seller's termination of this Agreement pursuant to Section 8.1(p) or any other section of Section 8.1 (or upon any other grounds) as a result of Purchaser's breach of Section 2.2(a) or Section 4.4, and (B) Purchaser's breach of Section 2.2(a) or Section 4.4, and (ii) retaining the Deposit pursuant to Section 2.2(b) is Sellers' sole and exclusive remedy arising from Purchaser's termination of this Agreement pursuant to Section 8.1(n) or Section 8.1(o). For the avoidance of doubt, Sellers will not be entitled to specific performance or other equitable remedies to enforce specifically (1) the terms and provisions of Section 2.2(a) requiring Purchaser to make the Second Deposit or Final Deposit, or (2) requiring Purchaser to cure any breach of Section 4.4.

(b)     If this Agreement is terminated other than pursuant to Section 8.1(a), Section 8.1(d), Section 8.1(f), Section 8.1(n), Section 8.1(o), or Section 8.1(p), then the Sellers will pay to Purchaser by wire transfer of immediately available funds within three (3) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement, which amount will shall not exceed $8,625,000 ("Expense Reimbursement").

(c)     In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated pursuant to Section 8.1(c), Section 8.1(e), Section 8.1(g), Section 8.1(h), Section 8.1(i), Section 8.1(j), Section 8.1(k), or Section 8.1(l), Sellers shall pay to Purchaser a break-up fee in an amount equal to $11,500,000 (the "Breakup Fee"); provided that the Breakup Fee shall be payable concurrently with the

consummation of, and only out of the cash proceeds of, an Alternative Transaction, to an account designated by Purchaser in writing to Elixir.

(d)    Each of the Parties acknowledges and agrees that the agreements contained in this Section 8.2(b) are an integral part of this Agreement and that the Breakup Fee and Expense Reimbursement are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Purchaser in the circumstances in which such and Breakup Fee and Expense Reimbursement, as applicable, are payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(e)    Subject in all cases to Section 10.12, prior to the applicable Closing, in the event of any breach by any Seller of this Agreement, the sole and exclusive remedy of Purchaser shall be to terminate this Agreement in accordance with Section 8.1 and, if applicable, to receive the and Expense Reimbursement or the Breakup Fee, as applicable, in accordance with Section 8.2(b). Pursuant to the Bidding Procedures Order and subject to approval by the Bankruptcy Court and entry of the Sale Order, the claim of Purchaser in respect of the Expense Reimbursement or the Breakup Fee is and constitutes an allowed administrative expense claim against Sellers under section 503 of the Bankruptcy Code in the Bankruptcy Case.

## ARTICLE IX
### Taxes

**Section 9.1    Transfer Taxes**. Any U.S. federal, state, local, and non-U.S., GST/HST, sales Tax, consumption sales, use, excise, value added, registration, real property, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges (including all related interest, penalties, and additions to any of the foregoing) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes with the appropriate Taxing Authority.

**Section 9.2    Allocation of Purchase Price**. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the methodology set forth in Schedule 9.2 (the "Allocation Methodology"). As soon as commercially practicable, but no later than 90 days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price (and other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "Allocation") subject to Sellers' review and approval, and Purchaser shall incorporate any changes reasonably requested by Sellers with respect to such Allocation. If Sellers deliver a written objection within 30 days after receipt of the draft Allocation proposed by Purchaser, then

Purchaser and Sellers shall negotiate in good faith to resolve any such objection, and, if Sellers and Purchaser cannot resolve such dispute within 30 days of Purchaser's receipt of Sellers' objection, then a nationally recognized accounting firm mutually acceptable to Purchaser and Sellers shall resolve such dispute, with the costs of such resolution to be allocated by such accounting firm between Purchaser and Sellers based upon the percentage of the aggregate contested amount submitted to such accounting firm that is ultimately awarded to Purchaser, on the one hand, or Sellers on the other hand, such that Purchaser bears a percentage of such costs and expenses equal to the percentage of the contested amount awarded to Sellers and Sellers bears a percentage of such costs and expenses equal to the percentage of the contested amount awarded to Purchaser. The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this Section 9.2) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of section 1313(a) of the Tax Code.

Section 9.3    **Cooperation**. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes; provided that in providing such information, assistance and access, each Party shall be entitled to redact information that is not related to the Business. Notwithstanding anything to the contrary in this Agreement, the Sellers shall not be obligated to provide or disclose any Excluded Tax Returns.

Section 9.4    **Post-Closing Actions**. Unless consented to by Sellers in writing (such consent not to be unreasonably withheld, conditioned, or delayed), or required by Applicable Law, Purchaser shall not, and shall cause its Affiliates not to, in each case with respect to the Acquired Assets, or the Business, (i) make or change any Tax election with retroactive effect to a Pre-Closing Tax Period, (ii) file any amended Tax Return for a Pre-Closing Tax Period, or (iii) make or initiate any voluntary discussion, examination or Contract with a Taxing Authority (including any voluntary disclosure agreement or similar process) for a Pre-Closing Tax Period, in each case, that would reasonably be expected to result in any increased Tax Liability or reduction of any Tax refund or credit of the Sellers.

Section 9.5    **Preparation of Tax Returns and Payment of Taxes**.

(a)    Except as otherwise provided by Section 9.1, Sellers shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets and the Business for any Tax period ending on or before the Closing Date (and Purchaser shall cooperate with Sellers in causing such Tax Returns to be filed) that has not been filed prior to the Closing Date and (ii) all income Tax Returns of Sellers. Each such Tax Return described in this Section 9.5(a)(i) shall (A) be prepared in accordance with the terms of this Agreement, and (B) and Sellers shall use commercially reasonable efforts to submit such Tax Returns to Purchaser at least fifteen (15) Business Days prior to the filing of such Tax Return (taking into account any extensions of the time to file), or as soon as reasonably practicable if such timing is not possible, for Purchaser's reasonable review and Seller shall consider any reasonable written comments provided by Purchaser after receiving such Tax Return.

(b)      Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets and the Business for any Tax period ending after the Closing Date. With respect to any Straddle Period, Purchaser shall prepare such Tax Returns consistent with past practice, and shall use commercially reasonable efforts to provide Sellers or their successors in rights, as applicable, with a draft of such Tax Returns at least fifteen (15) Business Days prior to the filing of any such Tax Return (taking into account any extensions of the time to file), or as soon as reasonably practicable if such timing is not possible, for Sellers' reasonable review and Purchaser shall consider any reasonable written comments provided by Sellers after receiving any such Tax Return to the extent failing to do so would adversely impact the Liability of the Sellers (including under this Agreement).

(c)      <u>Allocation of Taxes for Straddle Periods</u>. The amount of Taxes allocable to either the Pre-Closing Tax Period or Post-Closing Tax Period of any Straddle Period shall equal: (a) for any Taxes imposed on a periodic basis (such as real, personal and intangible property Taxes), the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the denominator of which is the total number of days in the Straddle Period, and the numerator being either (i) the number of days during the Straddle Period that are in the Pre-Closing Tax Period (for the Pre-Closing Tax Period), or (ii) the number of days during the Straddle Period that are in the Post-Closing Tax Period (for the Post-Closing Tax Period) and (b) for all other Taxes, determined on an interim closing of the books basis, effective as of the end of the Closing Date. Any payment by a Party with respect to Taxes for a Straddle Period shall be credited towards such Party's Liability for their share of any Taxes with respect to a Straddle Period allocable to such Person under this <u>Section 9.5</u>.

## ARTICLE X
### MISCELLANEOUS

**Section 10.1   <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for seven (7) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Sellers acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement. The Purchaser on

behalf of itself and the Purchaser Group hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement or the Transactions. Notwithstanding anything contained in this Agreement to the contrary (including in this <u>Section 10.1</u>), nothing set forth herein shall limit any rights or remedies available to Purchaser in respect of any claim for Fraud (subject in any event to the provisions of <u>Section 10.7</u>, which, insofar as they relate to Non-Recourse Persons, shall not be limited hereby in any way).

      **Section 10.2**  <u>**Expenses**</u>. Whether or not the Closing takes place, except as otherwise provided herein, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all filing fees in connection with any filing or submission under the HSR Act and any Foreign Competition Laws will be allocated pursuant to <u>Section 6.5</u>, (b) all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u>, and (c) all Cure Costs will be allocated pursuant to <u>Section 5.2</u>.

      **Section 10.3**  <u>**Notices**</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement and will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), if delivered by 5:00 P.M. local time of the recipient on a Business Day and otherwise on the following Business Day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

      <u>Notices to Purchaser:</u>

      MedImpact
      10181 Scripps Gateway Ct
      San Diego, California 92131
      Attention:    James Gollaher
      Email:      james.gollaher@medimpact.com

      with a copy to (which shall not constitute notice):

      DLA Piper LLP (US)
      4365 Executive Drive, Suite 1100
      San Diego, California 92121
      Attention:    David M. Clark
      Email:      David.Clark@us.dlapiper.com

and

DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Attention:    Richard A. Chesley
Email:         richard.chesley@us.dlapiper.com


Notices to Sellers:

Hunter Lane, LLC
c/o Rite Aid Corporation
200 Newberry Commons
Etters, PA 17319
Attention:    Thomas Sabatino
Email:         Thomas.Sabatino@riteaid.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:    Aparna Yenamandra, P.C.

Email:         aparna.yenamandra@kirkland.com


Kirkland & Ellis LLP
300 N. Lasalle
Chicago, IL 60654
Attention:    Steve Toth
Email:         steve.toth@kirkland.com

**Section 10.4    Binding Effect; Assignment; Designated Purchasers.**

(a)    This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided that, subject to Section 10.4(b), neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void; provided further that Purchaser (subject to Purchaser remaining liable for its obligations hereunder in the event such

obligations are not performed in accordance with their terms) may assign any of its rights or obligations hereunder to any of its Affiliates without the consent of any Person.

(b)    At any time prior to the Closing, Purchaser shall be entitled to designate, by written notice to Sellers no later than five (5) Business Days prior to the Closing Date, one or more Affiliates to (i) purchase any of the Acquired Assets and pay the corresponding Purchase Price amount, (ii) assume Assumed Liabilities, or (iii) take title directly to any Acquired Asset (any such Affiliate that shall be designated in accordance with this clause, a "Designated Purchaser"), and, to the extent of any such designation, this Agreement shall be binding upon such Designated Purchaser, its successors and permitted assigns, which shall be treated as Purchaser to such extent. In addition, and for the avoidance of doubt, a Designated Purchaser shall be entitled to employ any of the Transferred Employees on and after the Closing Date and to perform any other covenants or agreements of Purchaser under this Agreement. Notwithstanding the foregoing, Purchaser's designation of any Designated Purchaser shall not relieve Purchaser of its obligations under this Agreement in the event such obligations are not performed by any such Designated Purchaser in accordance with their terms.

**Section 10.5    Amendment and Waiver**. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Party against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

**Section 10.6    Third Party Beneficiaries**. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than (i) for purposes of Section 10.7, the Non-Recourse Persons, and (ii) the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**Section 10.7    Non-Recourse**. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party (each, a "Non-Recourse Person") will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute and each of such Persons are intended third party beneficiaries of this Section 10.7 and shall be entitled to enforce this Section 10.7 as if a party directly hereto.

**Section 10.8    Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity

in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

**Section 10.9** <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

**Section 10.10** <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>provided</u> that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement in each case, to the extent (and solely to the extent) the relevance of such disclosure to such other section of the Schedules or such other representation or warranty set forth in this Agreement is reasonably apparent on the face of such disclosure (without review or other examination of the underlying documents listed therein). Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened). In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement, in each case, solely to the extent made available to Purchaser in accordance with <u>Section 11.3(i)</u>. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

**Section 10.11** <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the

meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

Section 10.12 **Specific Performance**. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to the Parties pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Party from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with Section 10.13, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, plus ten (10) Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be.

Section 10.13 **Jurisdiction and Exclusive Venue**. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen

Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

Section 10.14 <u>Governing Law; Waiver of Jury Trial</u>.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.14(B)</u>.

Section 10.15 <u>No Right of Set-Off</u>. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

Section 10.16 <u>Counterparts and PDF</u>. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be

78

considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

Section 10.17 **Publicity**. Neither Sellers (nor any of their Affiliates) nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; provided that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

Section 10.18 **Bulk Sales Laws**. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer Laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

Section 10.19 **Sellers' Representative**. Each Party agrees that Elixir has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, Consents and determinations on behalf of the Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by Elixir on behalf of the Sellers.

Section 10.20 **Financing Sources**.  Each of the Sellers hereby waives any rights or claims against the Financing Sources (as defined below) and hereby agrees that in no event shall any of the Financing Sources have any liability or obligation to any Seller, or the respective Affiliates of any Seller, and in no event shall any Seller (or the respective Affiliates of any Seller) seek or obtain any other damages of any kind against any Financing Source (including without limitation, direct, economic, consequential, special, indirect or punitive damages), in each case, relating to or arising out of this Agreement, any Financing (as defined below) or the transactions contemplated hereby or thereby.  Further, notwithstanding anything to the contrary herein, (i) the Financing Sources shall be third party beneficiaries of, and shall be entitled to

79

enforce the provisions of this <u>Section 10.20</u> (including the following clause (iii)), (ii) this <u>Section 10.20</u> shall survive the termination of this Agreement, and (iii) the provisions set forth in this <u>Section 10.20</u> may not be amended, modified or altered in any manner that could be adverse to the interests of any Financing Source in any respect without the prior written consent of the Financing Sources.  Further, if for any reason pursuant to <u>Section 2.2</u> or otherwise, the Sellers shall have the right to retain all or any portion of the Deposit, then each Seller hereby acknowledges and agrees (for itself and its Affiliates) that such retention of such Deposit amount by the Sellers shall also satisfy in full any claims that any Sellers might assert against any Financing Source.  In this <u>Section 10.20</u>:  (a) "<u>Financing Sources</u>" means all agents, arrangers, lenders, bookrunners, letter of credit providers and other entities that have provided, or have committed to provide, or will after the date of this Agreement provide, or arrange or otherwise enter into agreements in connection with, any Financing, with the Purchaser and/or any of its Affiliates, including the parties to any credit agreement, indenture or other financing or lending agreement, or any commitment or engagement letter (including any joinder thereto) or other agreements entered pursuant thereto or relating thereto, together with their respective Affiliates and the current, former or future officers, directors, employees, partners, trustees, shareholders, equityholders, managers, members, limited partners, controlling persons, agents and representatives of each of them and their respective Affiliates, and the successors and assigns of the foregoing Persons; and (b) "<u>Financing</u>" means any debt or other financings entered into by the Purchaser or any of its Affiliates in connection with the consummation of the transactions contemplated by this Agreement prior to, on, or after the date hereof, including any borrowing of loans and any related commitment letter, engagement letter, credit agreement, indenture, and any other related documentation governing such debt or other financing including any credit facilities or capital markets debt financing.

## ARTICLE XI
### ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

**Section 11.1   Certain Definitions**.

(a)      "<u>Action</u>" means any action, claim (including any "claim" as defined in the Bankruptcy Code), suit, litigation, arbitration, mediation, complaint, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding) or prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation of any kind whatsoever whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(b)      "<u>Advisors</u>" means, with respect to any Person as of any relevant time, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)      "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and

policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)    "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires a material portion of the Acquired Assets, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, a liquidation or wind-down of Sellers' estates shall not be an Alternative Transaction.

(e)    "Anti-Corruption Laws" means all anti-corruption Laws applicable to the Sellers, including the United States Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd- 1, et seq.), and any other applicable anti-bribery or anti-corruption Law (including any Laws relating to the making of any unlawful payment to any foreign or domestic government official), including any rules, regulations and guidance promulgated under any of the foregoing that prohibit bribery, corruption, or substantially similar conduct.

(f)    "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(g)    "Bidding Deadline" means the deadline by which binding bids for the Sellers' assets must be submitted in the Auction, pursuant to the Bidding Procedures Order.

(h)    "Bidding Procedures" means procedures governing submission and evaluation of bids to purchase some, all, or substantially all of the Sellers' assets, pursuant to the Bidding Procedures Order.

(i)    "Bidding Procedures Motion" means the motion seeking entry of the Bidding Procedures Order, which shall be in form and substance reasonably satisfactory to the Sellers and Purchaser.

(j)    "Bidding Procedures Order" means an Order of the Bankruptcy Court approving the Bidding Procedures Motion, in the form attached labeled as Exhibit F.

(k)    "Business" means the business operations of Sellers as of the date hereof, including the provision of (i) pharmacy benefits manager services (including plan design and administration, cash card programs, formulary management, claims processing and associated clinical services, and trade and rebate administration) and (ii) specialty and mail order pharmacy services, including fulfillment actives associated therewith. For clarity, such business operations include the use, reproduction, modification, distribution, and licensing of the Laker Software.

(l)    "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(m)    "Business Employee" means each (i) employee of any of the Sellers, and (ii) employee of any non-Seller Affiliate of any Seller whose duties and responsibilities are dedicated primarily to the Business and set forth on Section 3.14(a), together with any replacement, if any, of any such individual only to the extent permitted by and in accordance with Section 6.1(b)(v).

(n)    "Cash and Cash Equivalents" means all of Sellers cash (including checks and deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(o)    "Closing Working Capital" means: (a) Current Assets, less (b) Current Liabilities, determined as of 11:59 PM Eastern time on the date immediately preceding the Closing Date.

(p)    "CMS" means the Centers for Medicare & Medicaid Services, an agency within the U.S. Department of Health and Human Services.

(q)    "CMS Receivable" means all amounts payable to Seller or any of its Affiliates (i) by or on behalf of CMS pursuant to 42 C.F.R. Part 423 and the Contract by and between CMS and EIC for contract year 2023 and any predecessor Contracts by and between CMS and EIC for prior contract years or (ii) related to any financing of any historical amounts that are or would previously have been included in clause (i).

(r)    "Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of August 3, 2023, by and between Rite Aid Corporation and MedImpact Healthcare Systems, Inc.

(s)    "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(t)    "Contract" means any written contract, license, arrangement, promise, obligation, indenture, note, bond, Lease, sublease, mortgage, agreement, guarantee, purchase order, service order, sales order, commitment, or other agreement or instrument, whether written or oral, that is binding upon a Person or any of its property.

(u)    "Current Assets" means, without duplication, the total current assets of Sellers using those line items used in the example calculation attached hereto as Exhibit E attached hereto, as determined in accordance with the GAAP consistently applied and in respect of Taxes, in accordance with the Tax Principles.

(v)    "Cure Costs" mean all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts.

(w)   "Current Liabilities" means, without duplication, the total current liabilities of Sellers using those line items used in the example calculation attached hereto as Exhibit E attached hereto, as determined in accordance with the GAAP consistently applied and in respect of Taxes, in accordance with the Tax Principles.

(x)   "Debtors" means, collectively, the debtors-in-possession under the Bankruptcy Cases.

(y)   "Delayed Transferred Employee" means a Transferred Employee whose employment is not eligible for immediate transfer to Purchaser at or prior to the Closing as a result of (i) requirements under applicable Law or (ii) a leave of absence, but in each case, who successfully transfers to Purchaser within twelve (12) months of the Closing.

(z)   "Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form and, without limiting the generality of the foregoing, (i) any and all medical records, billing records, prescriptions, prescription files and records, pharmacy customer lists, signature logs and patient profiles including refill status reports and insurance coverages, co-pay and payment records (the information in this clause (ii), collectively, "Company Rx Data") relating to customers of the mail order and specialty pharmacy business (which shall in any event include no less than twenty four (24) months for any Company Rx Data relating to customers of the mail order and specialty pharmacy business maintained electronically or in hard copy.

(aa)   "EGWP Contracts" mean any EIC Contract (or portions thereof), pursuant to which EGWP plans are provided or administered to Medicare Part D eligible retirees and/or their Medicare Part D eligible spouses or dependents.

(bb)   "Employee Benefit Plan" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA, each other deferred compensation, bonus or incentive compensation, pension, retiree medical, disability or life insurance, or supplemental plan, program, Contract, agreement or arrangement, each employment, severance, change-of-control and each other employee benefit or compensation plan, program, Contract, agreement or arrangement, whether oral or written, whether or not subject to ERISA, whether funded or unfunded, in each case (i) that is maintained, sponsored, administered or contributed or required to be contributed to by any Seller or any ERISA Affiliate or any of their respective Affiliates for the benefit of Business Employees or former Business Employees, or (ii) with respect to which any Seller has any Liability; provided that the term "Employee Benefit Plan" shall not include any statutory benefit

83

plan to which any of the Sellers are required to participate in or comply with that is sponsored and administered by a Governmental Body (such as Social Security).

(cc)    "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(dd)    "Environmental Laws" all applicable Laws concerning pollution or protection of the environment.

(ee)    "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(ff)    "Equity Interests" means, with respect to a Person, any membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or equity appreciation rights, phantom stock rights or other similar rights) or ownership interests of such Person, or any securities (including debt securities or other indebtedness) exercisable or exchangeable for or convertible into, or other rights to acquire, membership interests, partnership interests, capital stock or other equity securities or ownership interests of such Person (or otherwise constituting an investment in such Person).

(gg)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(hh)    "Escrow Agreement" means that certain Escrow Agreement entered into by Purchaser, Sellers and the Escrow Agent dated as of the date hereof.

(ii)    "Escrow Agent" means Acquiom Clearinghouse LLC.

(jj)    "Excluded Tax Returns" means Tax Returns (or any portion of any Tax Return) and other books and records related to (i) Taxes that are not related primarily to any Acquired Asset or the Business or (ii) any consolidated, combined, affiliated or unitary group for Tax purposes that includes any Seller or any of its Affiliates.

(kk)    "Fraud" means an act committed by (a) Sellers, in the making to Purchaser the representations and warranties in Article III or in the certificate delivered pursuant to Section 2.4(i) or (b) Purchaser, in the making to the Sellers the representations and warranties in Article IV or in the certificate delivered pursuant to Section 2.5(h), in any such case, with intent to deceive another Party, or to induce such other Party to enter into this Agreement and requires (i) a false representation of material fact made in such representation; (ii) with knowledge that such representation is false; (iii) with an intention to induce the Party to whom such representation is made to act or refrain from acting in reliance upon it; (iv) causing that Party, in justifiable reliance upon such false representation, to take or refrain from taking action; and (v) causing such Party to suffer damage by reason of such reliance, which together constitutes common law fraud under

Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

(ll)  "First Day Pleadings" means the first-day pleadings that the Sellers determine are necessary or desirable to file in the Bankruptcy Court on or around the Petition Date.

(mm)  "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(nn)  "Governmental Authorization" means any permit, Healthcare Permit, license, franchise, certificate, approval, application, registration, drug listing, consent, permission, clearance, waiver, notification, designation, registration, certification, making, exemption, variance, order, tariff, rate schedule, qualification, or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, including any Healthcare Law.

(oo)  "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator of applicable jurisdiction.

(pp)  "Governmental Health Program" means any federal health care program as defined in 42 U.S.C. § 1320a-7b(f), including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA, and state programs that provide or otherwise make available healthcare coverage to certain of its residents.

(qq)  "Group Purchasing Organization" means any group purchasing organization, rebate aggregator, or other Person performing similar services.

(rr)  "Hazardous Material" means any substance, pollutant, contaminant, material and waste that is regulated by any Law or judgment or is classified in any Environmental Law as "hazardous," "toxic," "dangerous," a "pollutant," a "contaminant" or words of similar meaning, including asbestos, asbestos-containing materials, polychlorinated biphenyls, gasoline, diesel fuel, petroleum, petroleum by-products or petroleum products, radioactive materials and radon gas, per- and polyfluoroalkyl substances, and any other chemicals, materials, substances or wastes in any amount or concentration which are regulated under or for which Liability may be imposed under any Environmental Law.

(ss)  "Healthcare Law", means (a) all applicable healthcare Laws of any Governmental Body, or Governmental Health Program, relating to the provision, administration of, and payment for, healthcare services, including: (i) (A) Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq. (the Medicare statute), and 42 U.S.C. § 1395nn (Stark Law); (B) Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-5 (the Medicaid statute); (C) the Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); (D) the False Claims Act, 31 U.S.C. §§

3729-3733; (E) the exclusion law, 42 U.S.C. § 1320a-7; (F) the civil monetary penalties law, 42 U.S.C. § 1320 a-7a; (G) the False Claim Law, 42 U.S.C. § 1320a-7b(a); (H) the anti-inducement law, 42 U.S.C. § 1320a-7a(a)(5); (I) HIPAA (as defined herein); (J) the Patient Protection and Affordable Care Act of 2010; (K) the Beneficiary Inducement Statute (42 U.S.C. § 1320a-7a(a)(5)); (L) the Prescription Drug Marketing Act of 1987; (M) the Confidentiality of Alcohol and Drug Abuse Patient Records law and regulations and any similar law (42 U.S.C. § 290dd-2, 42 C.F.R. Part 2); (ii) (A) any Laws with respect to healthcare-related fraud and abuse, false claims, staffing, rebates, pharmacy services, coverage reimbursement, corporate practice of medicine, credentialing, and Healthcare Permits (as defined herein); (B) any Laws with respect to engaging in the business of insurance; establishing, marketing and managing healthcare and pharmacy provider networks, and insurance fraud; (iii) in each case, as amended, and all regulations promulgated thereunder and (b) any and all state law equivalents to those Laws set forth in subsections (i), (ii) and (iii) above.

(tt)      "Healthcare Permit" means any and all licenses, certifications, consents, enrollments, authorizations, approvals, registrations, accreditations, and any other permission that is required by applicable Law for the operation of the Business and is issued or enforced by a Governmental Body or Governmental Health Program with jurisdiction over any Healthcare Law.

(uu)      "HIPAA" means the following, as the same may be amended, modified or supplemented from time to time, any successor statute thereto, and together with any and all rules or regulations promulgated from time to time thereunder: (i) the Health Insurance Portability and Accountability Act of 1996; (ii) the Health Information Technology for Economic and Clinical Health Act (Title XIII of the American Recovery and Reinvestment Act of 2009); and (iii) applicable state Laws regarding patient privacy and the security, use or disclosure of healthcare records.

(vv)      "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules and regulations promulgated thereunder.

(ww)      "Intellectual Property" means all of the following: (i) inventions, improvements, designs, methods and processes (whether or not patentable), patents (including utility and design patents), patent applications and patent disclosures (including invention disclosures, records of invention, certificates of invention, and applications for certificates of inventions and priority rights filed with a Registration Office); (ii) trademarks, service marks, trade dress, corporate names, logos, insignias, designs, symbols, trade names and fictitious business names, emblems, signs, slogans, other similar designations of source or origin and general intangibles of like nature and Internet domain names, social media accounts and profiles, together with all goodwill associated with each of the foregoing; (iii) copyrights, works of authorship and mask works and all other rights corresponding thereto throughout the world, including databases, data compilations and collections and economic rights in copyrights; (iv) registrations and applications for any of the foregoing; (v) know-how, formularies, clinical data, research and development information, technology, product roadmaps, customer lists, trade secrets and other non-public confidential and proprietary

86

information; (vi) computer software (which includes firmware, middleware, code, programs, libraries, and applications); (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property.

(xx)    "Inventory" means all inventory (including active pharmaceutical ingredients, finished goods, supplies, raw materials, work in progress, spare, replacement and component parts, and packaging containers, labels and other similar items) maintained or held by, stored by or on behalf of, or in transit to, any of Sellers, whether for sale or non-commercial use (e.g., validation) or otherwise, together with any interests therein, including (x) being held by customers pursuant to consignment arrangements or (y) being held by suppliers or vendors under tolling or similar arrangements.

(yy)    "Knowledge of Seller", "Knowledge of Sellers", or words of like import means the actual knowledge, of Chris DuPaul, Rand Greenblatt, Anna Khais, Corrine Whisler, Cindy Pigg, and Alan Reicher, after reasonable inquiry of their direct reports with respect to the applicable subject matter, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal Liability or obligations regarding such knowledge.

(zz)    "Laker Software" means the software generally known as the Laker Software, including all modules, versions, releases of such software, which software is used to provide comprehensive pharmacy claim adjudication solutions for all populations segments, including through the "PBM Express" suite of applications.

(aaa)    "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, Healthcare Law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body anywhere in the world

(bbb)    "Lease" means all leases, subleases, licenses, concessions and other agreements (written or oral) pursuant to which any Seller holds any Leased Real Property.

(ccc)    "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(ddd)    "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") that, individually or in the aggregate (a) has, or would reasonably be expected to have, a material adverse effect on the Acquired Assets, Assumed Liabilities, taken as a whole, or on the results of

operations or condition (financial or otherwise) of the Business, or (b) would reasonably be expected to impair, in any material respect, the ability of the Sellers to consummate the Transactions; provided that, for purposes of clause (a), none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: any Effect arising from or relating (and solely to the extent arising from or relating) to (i) general business or economic conditions affecting the industry in which Sellers operate, including the effects of general competition therein and any change in market share or loss or non-renewal of customers; (ii) national or international political or social conditions, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or military installations; (iii) any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) financial, banking, or securities markets (including any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) changes in GAAP; (vi) changes in Laws (including, for the avoidance of doubt, any such items related to Section 6.5) and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (vii) the failure to take any action if such action is prohibited by this Agreement; (viii) Purchaser's failure to consent to any of the actions restricted in Section 6.1; (ix) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the Business with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (x) any failure, in and of itself, of Sellers to achieve any budgets, projections, forecasts, estimates, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) or failure to win or maintain customers; provided that the Effects giving rise to or contributing to such failure may be deemed to constitute, or be taken into account in determining whether there has been a Material Adverse Effect; (xi) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing thereof or any breach by Purchaser of this Agreement; (xii) the matters set forth on the Schedules; or (xiii)(A) the commencement or pendency of the Bankruptcy Cases; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions or thereby, (2) the Bidding Procedures Order, the Sale Order or the reorganization or liquidation of Sellers or their Affiliates, or (3) the assumption or rejection of any Assigned Contract or any Acquired Lease; or (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers or their Affiliates in compliance therewith; provided that any adverse Effect resulting or arising from any matter described in clauses (i) through (iv) may be taken into account in determining whether there has been a Material Adverse Effect to the

extent, and only to the extent, that such Effect has had a materially disproportionate adverse effect on the Business relative to similarly situated participants in the industries and geographic areas in which the Sellers operate (in which case only such incremental materially disproportionate adverse effect may be taken into account in determining whether there has been a Material Adverse Effect).

(eee)    "Open License Terms" means license terms that are, or are substantially similar to, licenses now or in the future approved by the Open Source Initiative, or are considered "free" or "open source software" by the Open Source Initiative or the Free Software Foundation, which include: (i) the GNU General Public License (GPL); (ii) Lesser/Library GPL (LGPL); (iii) the Common Development and Distribution License (CDDL); (iv) the Artistic License (including PERL); (v) the Netscape Public License; (vi) the Sun Community Source License (SCSL) or the Sun Industry Standards License (SISL); (vii) the Apache License; (viii) the Common Public License; (ix) the Affero GPL (AGPL); (x) the Berkeley Software Distribution (BSD); (xi) the Mozilla Public License (MPL), (xii) the Microsoft Limited Public License, (xiii) MongoDB, Inc.'s Server Side Public License, and (xiv) any other licenses that are defined as OSI (Open Source Initiative) licenses as listed on the site www.opensource.org.

(fff)    "Order" means any award. order, injunction, order, decree, ruling, writ, assessment, judgment, decision, subpoena, mandate, precept, command, directive, consent, approval, award (including any arbitration award) or similar determination or finding entered, issued, made or rendered by any Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

(ggg)    "Ordinary Course" means the ordinary and usual course of operations or conduct of the Business, taking into account the contemplation, commencement and pendency of the Bankruptcy Cases.

(hhh)    "Organizational Documents" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as bylaws, a partnership agreement or an operating, limited liability or members agreement).

(iii)    "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable or that are being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, or that are being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary Encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Owned Real Property and Leased Real Property, which do not, individually or in the aggregate, adversely affect, or

materially restrict or impair the use or occupancy of such Owned Real Property or Leased Real Property as it relates to the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of such Owned Real Property and Leased Real Property, as applicable, (iv) Intellectual Property licenses granted by a Seller to customers on a non-exclusive basis in the Ordinary Course, and (v) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

(jjj)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(kkk)    "Personal Information" means (i) any representation of information that permits the identity of an individual to whom the information applies to be reasonably inferred by either direct or indirect means, including (1) any information that can be used to distinguish or trace an individual's identity, such as name, email address, phone number, social security number, date and place of birth, mother's maiden name, and (2) any other information that is linked or linkable to an individual, such as financial information; and (ii) any information defined as personal information, personal data, personally identifiable information, or similar term under any Privacy Requirements.

(lll)    "Post-Closing Tax Period" means any taxable period beginning on or after the Closing Date and the portion of any Straddle Period attributable to the portion of the period beginning after the Closing Date.

(mmm)      "Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and the portion of any Straddle Period through the end of the Closing Date.

(nnn)    "Privacy Requirements" means Privacy Laws, Privacy and Information Security Policies, and Privacy Agreements.

(ooo)    "Products" means the medicinal or pharmaceutical products, product candidates or therapies that are or have been researched, developed, packaged, labeled, used, marketed, imported, exported tested (including through clinical trials), commercialized, manufactured, stored, sold, licensed, or distributed by or on behalf of any of the Sellers or any of their Affiliates, or which the process has taken substantial steps towards manufacturing, commercializing, developing, packaging, labeling, storing, using, marketing, importing, exporting, distributing or selling, including all products that are regulated as human or animal drugs, medical devices, or other health care products under Healthcare Laws, including drug and biological candidates, compounds or products being researched, tested, stored, developed, labeled, manufactured, packed, marketed, sold and/or distributed by any of the Sellers or any of their Affiliates.

(ppp)    "Public Software" means any software, libraries or other code that is licensed under or is otherwise subject to Open License Terms.

(qqq) "Purchaser Group" means Purchaser (including any Designated Purchaser), any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(rrr)    "Purchase Price Adjustment Escrow Amount" means $14,375,000.

(sss)    "Rebate Assets" means all accounts receivable, or other amounts, owing from any Person, including pharmaceutical drug manufacturers or Group Purchasing Organizations, with respect to rebates, discounts, or similar claims.

(ttt)    "Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

(uuu)    "Sale Order" means the Order (i) approving this Agreement and the terms and conditions hereof, including pursuant to sections 363 and 365 of the Bankruptcy Code and (ii) approving and authorizing Sellers to consummate the Transactions, in form and substance reasonably acceptable to Sellers and Purchaser.

(vvv)    "Second Day Hearing" means the hearing before the Bankruptcy Court to consider approval of, among other things, certain of the First Day Pleadings on a final basis, but in any event shall not mean the initial hearing to consider the First Day Pleadings before the Bankruptcy Court on or around the Petition Date.

(www) "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(xxx)    "Seller Parties" means each Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(yyy)    "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(zzz)    "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or

controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(aaaa) "Target Working Capital" means negative $206,628,000.

(bbbb) "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, goods and services, unclaimed property, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto in each case whether payable directly or a primary or secondary liability, or as a legal successor or transferee.

(cccc) "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(dddd) "Tax Principles" means, with respect to any Taxes, the principles that such Taxes should be: (i) calculated consistent with the past procedures and practices in preparing Tax Returns for such Taxes to the extent consistent with applicable Law, (ii) for any Straddle Period, calculated in accordance with the principles set forth in Section 9.5, (iii) calculated without regard to any increase in Tax liabilities by reason of actions described in Section 9.4, and (iv) calculated by excluding any deferred Tax assets and deferred Tax liabilities.

(eeee) "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(ffff) "Taxing Authority" means any U.S. federal, state, local, municipal, or foreign government, any subdivision, agency, commission or authority thereof or any quasi-Governmental Body exercising Tax regulatory authority.

(gggg) "Transaction Agreements" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

(hhhh) "Transactions" means the transactions contemplated by this Agreement and the other Transaction Agreements.

(iiii)   "TSA" means a Transition Services Agreement, subject to Section 6.21, substantially in the form attached hereto as Exhibit G.

(jjjj)   "Willful Breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

## Section 11.2    Index of Defined Terms.

Accounting Fees ............................................ 19
Acquired Assets ............................................. 1
Acquired Avoidance Actions ......................... 4
Acquired Insurance Assets ............................ 3
Acquired Intellectual Property ...................... 3
Acquired Lease ............................................. 2
Acquired Leased Real Property ..................... 2
Acquired Software ....................................... 31
Agreement .................................................... 1
Agreement Dispute ..................................... 74
Allocation .................................................. 68
Allocation Methodology ............................ 68
Assigned Contracts ...................................... 2
Assignment and Assumption Agreement ..... 15
Assumed Cure Costs ..................................... 6
Assumed Current Liabilities ......................... 6
Assumed Liabilities ...................................... 6
Assumed Rebate Liability ............................. 6
Avoidance Actions ........................................ 3
Backup Bidder ........................................... 42
Bankruptcy Cases ......................................... 1
Bankruptcy Code .......................................... 1
Bankruptcy Court ......................................... 1
Bankruptcy Court Milestones ..................... 40
Breakup Fee ............................................... 67
Business Confidential Information .............. 59
Business Data ............................................ 32
Business Insurance Policies ....................... 36
Cash Payment ............................................ 13
Chosen Courts ............................................ 74
Closing ...................................................... 15
Closing Date .............................................. 15
Closing Date Payment ................................ 13
Closing Working Capital Statement ............ 18
CMS Contracts .......................................... 13
Commercial Interco Contracts ...................... 2
Cure Costs .......................................... 6, 7, 79
Dataroom .................................................. 38
Deposit ...................................................... 14
Designated Purchaser ................................. 72
Disputed Amounts ..................................... 18
EIC ............................................................ 12
Elixir ........................................................... 1
Employee Benefit Plan ............................... 80
Enforceability Exceptions .......................... 22

Environmental Permits ............................... 29
Escrow Account ......................................... 13
Estimated Closing Working Capital ............ 17
Estimated Closing Working Capital
    Statement ............................................. 17
Excluded Assets ........................................... 4
Excluded Contracts ...................................... 4
Excluded Cure Costs ..................................... 7
Excluded Liabilities ...................................... 7
Excluded Rebate Liability ............................. 8
Expense Reimbursement ............................. 67
Express Representations ............................. 38
FDI ............................................................ 22
Filed SEC Documents ................................ 21
Final Deposit ............................................. 14
Financial Statements .................................. 23
Financing ................................................... 77
Financing Sources ...................................... 77
Foreign Competition Laws ......................... 22
Fundamental Representations ..................... 63
Guaranteed Obligations .............................. 57
Guarantor ..................................................... 1
Guggenheim Securities .............................. 36
Indebtedness ............................................. 43
Independent Accountant ............................. 18
Information Presentation ............................ 38
Initial Deposit ............................................ 13
Leased Real Property ................................. 24
Material Contract ....................................... 25
Mental Impressions .................................... 60
Non-Recourse Person ................................. 72
Novation Agreement ................................... 61
Outside Date .............................................. 64
Owned Real Property .................................... 2
Parties ......................................................... 1
Party ............................................................ 1
PCI Requirements ...................................... 32
Permits ...................................................... 28
Permitted Purposes .................................... 59
Petition Date ................................................ 1
Pre-Closing Matters ................................... 54
Privacy Agreements ................................... 32
Privacy and Information Security Policies .. 32
Privacy Laws ............................................. 32
processing .................................................. 32

| | |
|---|---|
| Projections | 57 |
| Purchase Price | 13 |
| Purchaser | 1 |
| Purchaser Adjustment Amount | 20 |
| Purchaser Plans | 48 |
| RAD | 22 |
| Registered Trademarks | 29 |
| Registration Office | 29 |
| Rejection Contracts | 10 |
| Resolution Period | 18 |
| Retained Privileged Materials | 4 |
| Review Period | 18 |
| ROI | 2 |
| ROI Agreement | 2 |
| Schedule | 21 |
| Scheduled Employees | 47 |
| Schedules | 21 |

| | |
|---|---|
| Second Deposit | 14 |
| Security Breach | 33 |
| Seller | 1 |
| Seller Sufficiency Representations | 63 |
| Seller Support Obligations | 55 |
| Sellers | 1 |
| Sellers' Insurance Policies | 54 |
| Significant Customer | 27 |
| Significant Supplier | 27 |
| Statement of Objections | 18 |
| Successful Bidder | 42 |
| Third Party Assurances | 55 |
| Transaction Source Code | 30 |
| Transfer Offer | 47 |
| Transfer Taxes | 67 |
| Transferred Employees | 48 |
| Viruses | 31 |
| WARN | 36 |

**Section 11.3   Rules of Interpretation**. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)     The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule and exhibit references contained in this Agreement are references to sections, clauses, Schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(b)     Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c)     The words "to the extent" shall mean "the degree by which" and not simply "if."

(d)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(e)      Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(f)      The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(g)      All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(h)      All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(i)      Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is included in the Dataroom, by 5:00 p.m. New York time on the date that is two (2) Business Days prior to the date of this Agreement.

(j)      Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(k)      Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(l)      A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(m)      A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

[*Signature pages follow.*]

3