WESTBELT COUNTRY PROPERTY LTD.
c/o BARKAN & ROBON LTD.
Marvin A. Robon (0000664)
1701 Woodlands Drive, Suite 100
Maumee, Ohio 43537
Phone: (419) 897-6500
Fax: (419) 897-6200
E-Mail: mar.br@bex.net
*Attorney for and Managing Member of*
   *Westbelt Country Property Ltd.*

FILED
JEANNE A. NAUGHTON, CLERK
DEC - 1 2023
U.S. BANKRUPTCY COURT
TRENTON, NJ
BY_____ DEPUTY

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| RITE AID CORPORATION, *et al.*, | ) | |
| | ) | Case No.: 23-18993 (MBK) |
| Debtors. | ) | |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | |

## OBJECTIONS OF WESTBELT COUNTRY PROPERTY LTD. TO CLOSING THE RITE AID STORE SITUATED AT 1301 W. 14 MILE ROAD, CLAWSON, MICHIGAN, KNOWN AS STORE NO. 4546

**I.   Appearance**

Now comes Westbelt Country Property Ltd., an Ohio limited liability company, authorized to do business in the State of Michigan, and hereby opposes the notice it received of the potential store closing from Kroll Restructuring Administration for several reasons:

**II.   Facts**

This Rite Aid Store in question was constructed back in 2006 with monies provided by the landlord. A lease was entered into on November 25, 2005, with Perry Drug Stores, Inc., a Michigan corporation, with a guaranty by the parent company Rite Aid. The lease term was for a period of twenty (20) years and would expire in 2026. The annual rental in the last year of the

LAW OFFICES
ARKAN & ROBON LTD.
1701 WOODLANDS DRIVE
SUITE 100
MAUMEE, OH 43537-4056
(419) 897-6500

lease term was to be $352,403.00 plus CAM charges for taxes, insurance and maintenance of the common areas.

The lease was first amended on December 8, 2016, which dealt with easements and restrictions.

A second amendment to the lease was negotiated and executed on April 8, 2022, at the request of Rite Aid, which extended the lease through August 31, 2032, plus options. In addition, it reduced the annual rental from $352,403.00 annually to $316,802.50, with an initial savings by Rite Aid of $35,600.50 annually. Under the old lease at the end of the lease term the annual rent would be $396,095.00, a savings to Rite Aid of $79,292.50 annually.

### III.  Lease Negotiations

Rite Aid requested a rental reduction so it could keep the store open if it filed Chapter 11 bankruptcy.

Leading up to the lease negotiations on April 8, 2022, and the second amendment which reduced the rental substantially, the representatives of Rite Aid indicated to the property owner the following:

1. Rite Aid has a policy never to close a store where there is a competing CVS or Walgreens within a few hundred feet of a Rite Aid Store; and

2. If a Chapter 11 bankruptcy was to be filed, this store would never be closed because of the above policy and the fact that there has been a substantial rental reduction in anticipation of filing a Chapter 11 bankruptcy.

### IV.  Factual Analysis

Quite obviously, the property owner, being the landlord, relied upon the representations of Rite Aid to its detriment in reducing the rent with the promise that there would never be a

LAW OFFICES
BARKAN & ROBON LTD.
1701 WOODLANDS DRIVE
SUITE 100
MAUMEE, OH 43537-4056
(419) 897-6500

2

closing of this store because of Rite Aid's policy relating to not closing stores near competitors CVS and Walgreens and because of the rental reduction. Those representations were a major factor in the owner giving a concession on rent for a period of ten (10) years from April 2022 to April 2032 resulting in savings to Rite Aid well over $1,000,000.00.

Equity demands that this store remain open and that Rite Aid adhere to its promises and representations and its policy never to close a store when a CVS or Walgreens is in the area.

In this particular case, there is a CVS store directly across the street on West 14 Mile Road that was constructed after Rite Aid opened its facility.

### V.    Legal Analysis

Rite Aid should be prohibited from closing this store based upon three basic theories of law as follows:

1. Fraudulent inducement to enter into a transaction.

2. Detrimental reliance by the landlord in the rent reduction.

3. Equitable estoppel, meaning that Rite Aid had unclean hands in negotiating the rent reduction with promises that were never kept.

### VI.    Reservation

The landlord Westbelt Country Property Ltd. reserves the right to submit additional deposition testimony and/or affidavits and other evidence which is not available in the short time span set by the Court and the Debtor.

### VII.    Exhibits

To substantiate the statements set forth above, attached as **Exhibit A** are the first three pages of the lease with the original owner being Kimco Clawson 143, Inc. and Perry Drug Stores, Inc. as tenant dated November 25, 2005.

LAW OFFICES
BARKAN & ROBON LTD.
1701 WOODLANDS DRIVE
SUITE 100
MAUMEE, OH 43537-4056
(419) 897-6500

3

Attached as **Exhibit B** is the second amendment to lease entered into on April 8, 2022 showing the substantial rent reduction based upon the representations made by Rite Aid Corporation's authorized representatives.

WHEREFORE, Westbelt Country Property Ltd. prays that this Court not allow the closure of Rite Aid Store #4546 located at 1301 West 14 Mile Road, Clawson, Michigan.

Alternatively, if the Court decides to allow the Debtor to close this store, at least it should prevent the Debtor from canceling the lease obligation.

Dated: November 30, 2023

Respectfully Submitted,

WESTBELT COUNTRY PROPERTY LTD.
c/o BARKAN & ROBON LTD.

By: _____
Marvin A. Robon (0000664)
BARKAN & ROBON LTD.
1701 Woodlands Drive, Suite 100
Maumee, Ohio 43537
Phone: (419) 897-6500
Fax: (419) 897-6200
E-Mail: mar.br@bex.net
*Attorney for and Managing Member of*
*Westbelt Country Property Ltd.*

LAW OFFICES
BARKAN & ROBON LTD.
1701 WOODLANDS DRIVE
SUITE 100
MAUMEE, OH 43537-4056
(419) 897-6500

4

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served on this ___30th___ day of November, 2023, by electronic mail or Ordinary U.S. Mail upon the following:

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
Aparna Yenamandra, P.C.
Ross J. Fiedler
Zach R. Manning
601 Lexington Avenue
New York, New York 10022
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

COLE SCHOTZ P.C.
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq.
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

KROLL RESTRUCTURING ADMINISTRATION
850 Third Avenue, Suite 412
Brooklyn, New York 11232

_____
Of Counsel

LAW OFFICES
BARKAN & ROBON LTD.
1701 WOODLANDS DRIVE
SUITE 100
MAUMEE, OH 43537-4056
(419) 897-6500

5

EXHIBIT A

ORIGINAL DOCUMENT
DO NOT REMOVE
FROM OFFICE

c:\ccb-office\ritcaid\leases\clawson
ccb:06/30/05; rev. 10/17/05; 11/02/05; 11/03/05 ; 11/04/05

ED-143

## LEASE

THIS LEASE dated as of November 25, 2005 (the "Effective Date"), by and between **KIMCO CLAWSON 143, INC.**, a Michigan corporation ("Landlord") and **PERRY DRUG STORES, INC.**, a Michigan corporation ("Tenant").

WHEREAS, Tenant presently operates a drug store located at 1075 West 14 Mile Road (the "Existing Premises") pursuant to a Sublease (the "Sublease") with A&P Farmer Jack Supermarket, the term of which Sublease expires on January 31, 2006; and

WHEREAS, Landlord owns fee simple title to the premises that are subject to the Sublease; and

WHEREAS, Landlord also owns certain real property located at 1305 West 14 Mile Road, Clawson, Michigan which is more fully described in Exhibit A attached hereto (the "Leased Premises" or the "Premises") which Tenant desires to lease from Landlord and which Landlord desires to lease to Tenant.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **LEASE EXHIBITS**

Attached to this Lease and hereby made a part hereof are the following:

EXHIBIT A - being a plot plan of the Leased Premises.

EXHIBIT B - being a legal description of the Leased Premises.

EXHIBIT C – being Tenant Plans and Specifications and Elevations

EXHIBIT D – being Restrictions and Exclusives *deleted*

EXHIBIT E – being a true and complete copy of the Sublease.

EXHIBIT F - being a form of Memorandum of Lease *deleted*

EXHIBIT G – being a list of prohibited uses

2. **LEASED PREMISES**

Landlord hereby leases unto Tenant, and Tenant hereby rents from Landlord, for the consideration and upon the terms and conditions herein set forth, that parcel of land shown on Exhibit A attached hereto, located in the City of Clawson, Oakland County, Michigan (the "Leased Premises").

3. **LEASE TERM**

**TO HAVE AND TO HOLD** the Leased Premises, together with all and singular the improvements, appurtenances, rights, privileges and easements thereunto belonging or in anywise appertaining, unto Tenant, for a term commencing on the date hereof and ending on the last day of the calendar month in which the twentieth (20th) anniversary of the Rent Commencement Date (hereinafter defined) occurs (provided that the Rent Commencement Date shall be postponed on a day for day basis for each day following the date hereof before which Landlord delivers sole and exclusive possession of the Leased Premises to Tenant) (the "Lease Term"). Within three (3) business days after receipt of a request from Tenant, Landlord shall provide to Tenant a written statement verifying Tenant's right to occupy and control the Leased Premises in accordance with the terms and provisions in this Lease.

4. **OPTION TO EXTEND**

Provided Tenant is not then in default and not in default at the time any properly exercised renewal period commences, Tenant is hereby granted the right to renew this Lease upon the same terms and conditions set forth herein, except for the amount of Minimum Rent (hereinafter defined) and those Lease provisions which have expressly expired, for four (4) consecutive five (5) year renewal periods. To exercise such options, Tenant shall be required to give to Landlord written notice at least nine (9) months prior to the expiration of the original term or the then current term.

5. **RENT**

(a) Commencing on the Rent Commencement Date, Tenant herein covenants and agrees to pay Landlord, as additional rent, one and one-half percent (1 ½%) of Tenant's gross sales from the Leased Premises annually in excess of the applicable breakpoint set forth below. If the date Tenant initially opens for business in the Leased Premises is other than the first day of a year, then the percentage rent attributable to the period between such initial opening date and the first day of the year shall be based upon gross sales in excess of the applicable breakpoint set forth below as reduced on a pro rata basis for such period. Gross sales shall include the sale of all merchandise at the Leased Premises, but shall exclude: (a) sales for which cash has been refunded or rejected, to the extent of such refund or reject; (b) any and all sales, use, excise or similar taxes imposed on any items sold by Tenant; (c) sales of cigarettes, tobacco-related products, newspapers and magazines; (d) the sale of lottery tickets (provided, however, that fees and commissions earned by Tenant on

Page 2

the sale of lottery tickets shall be included in gross sales); (e) receipts from amusement devices, public telephones, weighing and blood pressure machines; (f) sale of postage stamps, travelers checks, money orders, credit card service fees or similar items; (g) container deposits; (h) sale of merchandise to physicians at the customary discount but not to exceed two percent (2%) of gross sales; (i) sales of fixtures or equipment or other bulk sales, in each case not in the ordinary course of Tenant's business; and (j) automated teller machine ("ATM") transactions (provided that purchases of goods or services paid for with ATM cards and any transaction fees earned on such ATM transactions shall be included in gross sales).

Tenant's annual gross sales together with its percentage rent payment, if any, shall be reported and paid to Landlord within sixty (60) days after the close of each calendar year. Such annual report shall be in writing, signed and certified as true and correct by a corporate officer of Tenant. Landlord shall have the right, but not more often than once each year, to require an inspection of the books and records of Tenant to confirm sales as reported. If such inspection discloses a liability for rent to the extent of three percent (3%) or more, Tenant shall pay to Landlord the reasonable cost of such inspection in addition to the deficiency within thirty (30) days following Landlord's notice (which deficiency shall be payable regardless of Tenant's reporting errors). However, Tenant shall not be required to retain such books or records for more than a three (3) year period. Landlord shall keep all such sales figures confidential, but may disclose such sales to Landlord's mortgagee or agents so long as such parties keep sales information confidential.

(b) Tenant shall become obligated to commence the payment of Minimum Rent (hereinafter defined) and all other charges payable hereunder (the "Rent Commencement Date") on the earlier to occur of the first day of (a) the date that Tenant opens for business from the Leased Premises or (b) one hundred eighty (180) days following the later to occur of (i) the date that Landlord delivers sole and exclusive possession of the entirety of the Leased Premises, free and clear of all other tenancies and (ii) the date on which Tenant obtains final and unappealable Approvals (as hereinafter defined) by applicable governmental authorities of Tenant's development of the Premises in the manner contemplated herein. Commencing on the Rent Commencement Date, Tenant covenants and agrees to pay to Landlord, as minimum annual rental for the Leased Premises, the following amounts, determined and payable in the manner, at the time, and upon the conditions set forth below:

| Years | Annual Rent | Monthly Installments | Applicable Breakpoint |
|---|---|---|---|
| Original Term | | | |
| Years 1- 5 | $330,563.00 | $27,546.92 | $22,037,533.00 |
| Years 6- 10 | $337,843.00 | $28,153.58 | $22,522,866.00 |
| Years 11- 15 | $345,123.00 | $28,760.25 | $23,008,200.00 |
| Years 16-20 | $352,403.00 | $29,366.92 | $23,493,533.00 |
| 1st Renewal Term | $366,967.00 | $30,580.58 | $24,464,466.00 |
| 2nd Renewal Term | $381,531.00 | $31,794.25 | $25,435,400.00 |
| 3rd Renewal Term | $396,095.00 | $33,007.92 | $26,406,333.00 |
| 4th Renewal Term | $410,659.00 | $34,221.58 | $27,377,266.00 |

Page 3

DocuSign Envelope ID: 28E2F261-4658-4BB7-B794-A4DDAE6FC8FB

**EXHIBIT B**

## SECOND AMENDMENT TO LEASE

**THIS SECOND AMENDMENT TO LEASE** ("Amendment") is made this 8th day of April, 2022 (the "Effective Date") by and between **MASHALL R. REALTY, LLC**, having an address of 23 Pheatons Drive, Melville, New York 11747 ("Landlord") and **RDS DETROIT, INC.**, having an address of Post Office Box 3165, Harrisburg, Pennsylvania 17105, Attention: Secretary ("Tenant").

**WHEREAS**, Landlord's predecessor-in-interest and Tenant's predecessor-in-interest entered into a Lease dated November 25, 2005, as amended by First Amendment to Lease dated December 8, 2016 (collectively, the "Lease"), for premises located at 1301 West 14 Mile Road, Clawson, Michigan (the "Premises"); and

**WHEREAS**, by its present terms, the Lease will expire on August 31, 2026; with four (4) five (5) year options to renew the term of the Lease; and

**WHEREAS**, the parties hereto have agreed to extend the term of the Lease, and to otherwise modify and amend certain terms and conditions of the Lease as set forth herein.

**NOW, THEREFORE, WITNESSETH**, intending to be legally bound hereby, and in consideration of the promises and mutual covenants herein contained the parties do hereby agree as follows:

1. Effective the date hereof, the term of the Lease is hereby extended and shall now expire August 31, 2032 (the "Extended Term").

2. Notwithstanding anything to the contrary set forth in the Lease, during the Extended Term, Tenant shall pay minimum rent as follows:

| Period | Annual Rent | Monthly Installment |
|---|---|---|
| 4/1/2022 – 8/31/32 | $316,802.50 | $26,400.21 |

3. Notwithstanding anything to the contrary set forth in the Lease, Tenant shall retain its four (4) renewal options of five (5) years each as set forth in the Lease, and if Tenant elects such renewal options, Tenant shall pay minimum rent during the same as follows:

| | Period | Annual Rent | Monthly Installment |
|---|---|---|---|
| First Renewal Option: | 9/1/32 – 8/31/37 | $366,967.00 | $30,580.58 |
| Second Renewal Option: | 9/1/37 – 8/31/42 | $381,531.00 | $31,794.25 |
| Third Renewal Option: | 9/1/42 – 8/31/47 | $396,095.00 | $33,007.92 |
| Fourth Renewal Option: | 9/1/47 – 8/31/52 | $410,659.00 | $34,221.58 |

4. Landlord agrees that Tenant shall have the right to make payments of monthly rent and any other charges payable by Tenant in accordance with the Lease by electronic payment using the Automated Clearing House (ACH) system or other similar system. In order to effectuate the foregoing, Landlord shall provide to Tenant a completed ACH Authorization Form upon request from Tenant, substantially in the form attached hereto as Exhibit A, with such modifications as may be required by future banking requirements applicable to electronic payments.

DocuSign Envelope ID: 28E2F261-4658-4BB7-B794-A4DDAE6FC8FB

5. Landlord acknowledges and affirms that as of the date of this Amendment, Tenant is not in default under any of the terms, covenants, conditions or provisions of the Lease and Landlord has no offsets, claims or defenses against Tenant with respect to any obligation or duty of Tenant arising pursuant to the Lease.

6. <u>Insurance.</u> Section 8(e) of the Lease is hereby delete. The following is hereby added to the Lease as Section 43:

"43. **Insurance**

(a) From and after the Commencement Date, Tenant shall maintain at its sole cost and expense the following insurance on the Premises:

(i) Commercial general liability insurance in a good and solvent insurance company or companies licensed to do business in the state wherein the Premises is located in the amount of One Million Dollars ($1,000,000.00) with respect to injury or death to more than one person in any one accident or occurrence and Five Million Dollars ($5,000,000.00) in the aggregate and One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate with respect to damage to property. Such policy or policies shall include Landlord and any Lender as an additional insured as its interest appears, but only for any insurable damages, losses, liabilities, settlements, and expenses (including without limitation, costs and reasonable attorneys' fees) to the extent a claim arises from any insurable allegation or claim brought by a third party ("Claim") regarding Tenant's negligent acts or omissions in fulfilling its obligations under this Lease that give rise to a third party claim. Tenant agrees to deliver certificates of such insurance to Landlord.

(ii) So called "causes of loss, special form" first party fire and casualty insurance with broad form, extended coverage endorsements including but not limited to vandalism, malicious mischief, sprinkler leakage, plate glass, rental coverage and flood (if required by Landlord/any mortgagee/governmental authority) in an amount adequate to cover the replacement value of all buildings, improvements and other real and personal property (such as decorations, trade fixtures, furnishings, equipment and all contents therein) located at any time on the Premises (regardless whether the same originally were constructed by Landlord, Tenant or others), as well as all leasehold improvements, alterations and betterments. Landlord, and at the request of Landlord, any Lender, shall be named as loss payees as their interests may appear. Such insurance shall be non-cancelable by the carrier without at least thirty (30) days written notice to Landlord.

(iii) Worker's compensation insurance covering all persons employed by Tenant on the Premises in connection with any work done on or about any of the Premises for which claims for death or bodily injury could be asserted against Landlord, Tenant or the Premises, which insurance shall include insurance against Occupational Disease and Voluntary Compensation Insurance, together with Employer's Liability Insurance with a limit of not less than $1,000,000 per occurrence.

-2-

(b) Notwithstanding anything contained herein to the contrary, Tenant may insure for the amount of any liability and/or property damage insurance which it is required to carry hereunder (i) under a self-insurance retention plan of no greater than $3,000,000.00 (or such greater amount as may be customary and reasonable for the Tenant), or (ii) under a blanket policy or policies, of Tenant and its subsidiaries, controlling or affiliated entities, provided that such coverage is not diminished or limited by virtue of such coverage being provided by a blanket policy as opposed to an individual policy, or (iii) partly under such a plan of self-insurance (subject to the limitations set forth above) and partly under such blanket policies.

(c) Except as otherwise provided in Paragraph 43(b), the insurance required by Paragraph 43(a) shall be written by companies having a claims paying ability rating by Standard & Poor's of not less than A-, and all such companies shall be authorized to do an insurance business in the State, or otherwise agreed to by Landlord. Sums due from Tenant in lieu of insurance proceeds because of such self-insurance programs shall be treated as insurance proceeds for all purposes under this Lease. The insurance policies (i) shall be in amounts sufficient at all times to satisfy any coinsurance requirements thereof, and (ii) shall (except for the worker's compensation insurance referred to in Paragraph 43(a)(iii) hereof) name Landlord and any Lender as additional insured (or loss payee, as the case may be) parties, as their respective interests may appear. If said insurance or any part thereof shall expire, be withdrawn, become void by breach of any condition thereof by Tenant or become void or unsafe by reason of the failure or impairment of the capital of any insurer, Tenant shall immediately obtain new or additional insurance fulfill the insurance obligation under this agreement.

(d) Each insurance policy referred to in Paragraphs 43(a)(i), shall contain standard non-contributory mortgagee clauses in favor of any Lender which holds a Mortgage on the Premises. To the extent commercially available, Tenant shall keep each such policy in force during the Term. The waiver of subrogation set forth in Article 22 of the Lease shall not apply to relieve a party of its indemnity or defense obligations under the Lease with respect to the independent acts or negligence of the indemnifying party.

(e) Tenant shall pay, as they become due, all premiums for the insurance required by this Paragraph 43, shall renew or replace each policy, and shall deliver to Landlord and Lender a certificate of the existing policy and such renewal or replacement of each policy.

(f) Anything in this Paragraph 43 to the contrary notwithstanding, any insurance, which Tenant is required to obtain pursuant to Paragraph 43(a) may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant, provided that such "blanket" policy or policies otherwise comply with the provisions of this Paragraph 43. In the event any such insurance is carried under a blanket policy, Tenant shall deliver to Landlord evidence of the issuance and effectiveness of the policy, the amount and character of the coverage with respect to the Premises and the presence in the policy of provisions of the character required in this Paragraph 43."

7. Landlord hereby makes the following representations and warranties, each of which is material and being relied upon by Tenant:

-3-

(a) The persons executing this Amendment on behalf of Landlord are authorized to do so and, upon execution by such parties, this Amendment shall be a valid and binding obligation of Landlord, enforceable against Landlord in accordance with its terms.

(b) Landlord has not sold, transferred, conveyed, assigned and/or subrogated any of its interest as Landlord in the Lease or the Premises.

(c) The consent to this Amendment of any ground lessor, mortgagee, other lending institution or any other entity or individual having an interest in the Premises is not necessary. Landlord further agrees to indemnify, defend and hold Tenant harmless from and against any losses or claims arising from Landlord's failure to obtain consent to this Amendment from any such ground lessor, mortgagee, lending institution or other entity or individual.

8. Each party represents to the other that it has not dealt with any broker in such a manner as to incur any liability for any commission, fee or compensation whatsoever in connection with this transaction, and each shall indemnify the other against any loss, cost or expense resulting from any such claim and shall hold the other harmless from any liability in connection with such claim as may result from their dealing with brokers.

9. Landlord is duly organized, validly existing and in good standing under the laws of the State of Michigan, and has the full and sole right, capacity, power and authority to enter into this Amendment.

10. This Amendment may be executed in electronic format and in several counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same Amendment.

11. Except as specifically modified hereby, all of the terms, covenants and conditions of the Lease shall remain in full force and effect and shall be binding on the parties hereto, their successors and assigns. In the event of any conflict between the terms of the Lease and this Amendment, this Amendment shall control.

12. **Contingency**. At the date of execution of this Amendment by Landlord, Landlord may not have acquired title to the Premises and this Amendment is contingent upon Landlord acquiring marketable title to the Premises. This Amendment shall become effective immediately upon Landlord acquiring title to the Premises. Landlord shall provide to Tenant fully executed copies of the deed and lease assignment as evidence of Landlord's acquisition of title to the Premises. If Landlord does not acquire title to the Premises by April 30, 2022, then this Amendment shall automatically become null and void.

DocuSign Envelope ID: 28E2F261-4658-4BB7-B794-A4DDAE6FC8FB

IN WITNESS WHEREOF, the parties hereto have placed their hands as of the day and year first above written.

WITNESS:

LANDLORD:
**MASHALL R. RELATY, LLC**

By _____
Name: Pravin Aminacdat
Title: Member

WITNESS:

[signature: Alison Frengel]

TENANT:
**RDS DETROIT, INC.**

By: [signature: Lisa M. Winnick]
Lisa M. Winnick
Vice President

5