Caption in Compliance with D.N.J. LBR 9004-1(b)

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| In re:<br><br>RITE AID CORPORATION, *et al.*,<br><br>                       Debtors.[1] | |

**Order Filed on January 9, 2024**
**by Clerk**
**U.S. Bankruptcy Court**
**District of New Jersey**

Chapter 11

Case No. 23-18993 (MBK)(Jointly Administered)

# ORDER (I) AUTHORIZING THE EMPLOYMENT AND RETENTION OF A&G REALTY PARTNERS, LLC AS REAL ESTATE CONSULTANT AND ADVISOR TO THE DEBTORS AND DEBTORS IN POSSESSION EFFECTIVE AS OF THE PETITION DATE, (II) APPROVING THE TERMS OF A&G'S EMPLOYMENT, (III) WAIVING CERTAIN TIMEKEEPING REQUIREMENTS, AND (IV) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered three (3) through nine (9), is **ORDERED**.

**DATED: January 9, 2024**

*Michael B. Kaplan*
Honorable Michael B. Kaplan
United States Bankruptcy Judge

---

[1] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Proposed Co-Counsel for Debtors and Debtors in Possession*

2

(Page | 3)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Authorizing the Employment and Retention of A&G Realty Partners, LLC as Real Estate Consultant and Advisor to the Debtors and Debtors in Possession Effective as of the Petition Date, (II) Approving the Terms of A&G's Employment, (III) Waiving Certain Timekeeping Requirements, and (IV) Granting Related Relief |

Upon the *Debtors' Application for Entry of an Order (I) Authorizing the Employment and Retention of A&G Realty Partners, LLC as Real Estate consultant and Advisor to the Debtors and Debtors in Possession Effective as of the Petition Date, (II) Approving the Terms of A&G's Employment, (III) Waiving Certain Timekeeping Requirements, and (IV) Granting Related Relief* (the "Application") of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") (a) authorizing the Debtors to, under sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(a), and Local Rules 2014-1 and 2016-1, employ and retain A&G Realty Partners, LLC  ("A&G"), as real estate consultant and advisor to the Debtors in accordance with that certain real estate services agreement executed May 20, 2023 (as amended, modified, or supplemented from time to time), a copy of which is attached hereto as **Exhibit 1** (collectively, the "Real Estate Services Agreement"); (b) approving the terms of A&G's employment and  retention, including the fee and expense structure and the indemnification provisions set forth in the Real Estate Services Agreement; (c) waiving certain timekeeping requirements of the Bankruptcy Rules, Local Rules, and the Trustee Guidelines; and (d) granting related relief, all as more fully set forth in the Application; and upon the First Day Declaration and the Graiser Declaration;[1] and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the Application or the Real Estate Services Agreement, as the case may be.

3

(Page | 4)

| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Authorizing the Employment and Retention of A&G Realty Partners, LLC as Real Estate Consultant and Advisor to the Debtors and Debtors in Possession Effective as of the Petition Date, (II) Approving the Terms of A&G's Employment, (III) Waiving Certain Timekeeping Requirements, and (IV) Granting Related Relief |

U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court having found that venue of this proceeding and the Application in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Application was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Application and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY ORDERED THAT**:

1. The Application is **GRANTED** to the extent set forth herein.

2. In accordance with sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(a), and Local Rules 2014-1 and 2016-1, the Debtors are hereby authorized to employ and retain A&G as their real estate consultant and advisor in accordance with the terms and conditions set forth in the Application and the Real Estate Services Agreement, as modified by this Order, effective as of the Petition Date.

3. The Real Estate Services Agreement, together with all annexes and exhibits thereto and all compensation set forth therein, including, without limitation, the Fee

4

(Page | 5)
Debtors:            RITE AID CORPORATION, *et al.*
Case No.            23-18993 (MBK)
Caption of Order:   Order (I) Authorizing the Employment and Retention of A&G Realty Partners, LLC as Real Estate Consultant and Advisor to the Debtors and Debtors in Possession Effective as of the Petition Date, (II) Approving the Terms of A&G's Employment, (III) Waiving Certain Timekeeping Requirements, and (IV) Granting Related Relief

Structure and indemnification provisions are approved pursuant to section 328(a) of the Bankruptcy Code and A&G shall be compensated, reimbursed, and indemnified pursuant to section 328(a) of the Bankruptcy Code in accordance with the terms of, and at the times specified in, the Real Estate Services Agreement, as modified by this Order.

4.      The terms and provisions of the Real Estate Services Agreement are approved, and the Debtors are authorized to compensate A&G in accordance with the Real Estate Services Agreement.  A&G shall not be required to file interim fee applications for its fixed fee Services; *provided*, *however*, that A&G shall be required to file a final fee application upon completion of its Services which shall be subject to the standard of review provided for in section 328(a) of the Bankruptcy Code, subject to the rights of the U.S. Trustee to review pursuant to section 330 of the Bankruptcy Code as set forth in paragraph 6 herein.

5.      Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, orders of this Court, and the United States  Trustee Program's *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases* (the "U.S. Trustee Guidelines")  A&G shall be granted a limited waiver of the information requirements such that A&G shall not be required to maintain records of detailed time entries in connection with the Services as that term is defined in the Real Estate Services Agreement; *provided* that in the event that A&G provides any Additional Services to the Debtors, A&G shall be required to file interim and final fee applications on an hourly basis only

5

(Page | 6)
Debtors:              RITE AID CORPORATION, *et al.*
Case No.              23-18993 (MBK)
Caption of Order:     Order (I) Authorizing the Employment and Retention of A&G Realty
                      Partners, LLC as Real Estate Consultant and Advisor to the Debtors and
                      Debtors in Possession Effective as of the Petition Date, (II) Approving the
                      Terms of A&G's Employment, (III) Waiving Certain Timekeeping
                      Requirements, and (IV) Granting Related Relief

and the time detail provided for such fees may be provided in a summary fashion.

Specifically, A&G will submit time records setting forth the hours spent on each activity and

a description of the Additional Services provided but will not break out its time into tenth-

of-an- hour increments.  Any compensation for Additional Services performed on an hourly

basis shall be subject to review under the reasonableness standard in section 330 of the

Bankruptcy Code.

6.      Notwithstanding anything to the contrary in this Order, the Application, the Real

Estate Services Agreement or the Graiser Declaration, the U.S. Trustee shall retain the right and

be entitled to object to A&G's fees and expenses based on the reasonableness standard provided

for in section 330 of the Bankruptcy Code.  The Debtors and A&G further stipulate and agree

that this Order and the record relating to the Court's consideration of the Application shall not

prejudice or otherwise affect the rights of the U.S. Trustee to challenge the reasonableness of

A&G's compensation and reimbursement requests under section 330 and 331 of the Bankruptcy

Code.  Accordingly, nothing in this Order or the record shall constitute a finding of fact or

conclusion of law binding the U.S. Trustee on appeal or otherwise, with respect to the

reasonableness of A&G's fees and compensation and reimbursement requests.

7.      In the event that, during the pendency of these chapter 11 cases, A&G requests

reimbursement for any attorneys' fees and/or expenses, the invoices and supporting time

records from such attorneys shall be included in A&G's fee applications, and such invoices

and time records shall be in compliance with the Local Rules, the U.S. Trustee Guidelines and

6

(Page | 7)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Authorizing the Employment and Retention of A&G Realty Partners, LLC as Real Estate Consultant and Advisor to the Debtors and Debtors in Possession Effective as of the Petition Date, (II) Approving the Terms of A&G's Employment, (III) Waiving Certain Timekeeping Requirements, and (IV) Granting Related Relief |

approval of the Court under the standards of section 330 and 331 of the Bankruptcy Code, without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code and without regard to whether such attorney's services satisfy section 330(a)(3)(C) of the Bankruptcy Code. Notwithstanding the foregoing, A&G shall only be reimbursed for any legal fees incurred in connection with these chapter 11 cases to the extent permitted under applicable law.

8.      A&G shall disclose any and all facts that may have a bearing on whether A&G, its affiliates, and/or any individuals working on the engagement hold or represent any interest adverse to the Debtors, their creditors, or other parties in interest in these cases. The obligation to disclose identified in this paragraph shall be a continuing obligation.

9.      With respect to controversies or claims arising out of or in any way related to the Services in the Real Estate Services Agreement, notwithstanding any arbitration, dispute resolution, or exclusive jurisdiction provisions contained in the Real Estate Services Agreement, any disputes arising under the Real Estate Services Agreement shall be heard in this Court.

9.      The Indemnification Provision set forth in the Real Estate Services Agreement is approved, subject during the pendency of these cases to the following:

     a.      A&G shall not be entitled to indemnification, contribution, or reimbursement set forth in the Indemnification Provision, unless such indemnification, contribution, or reimbursement is approved by the Court;

(Page | 8)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Authorizing the Employment and Retention of A&G Realty Partners, LLC as Real Estate Consultant and Advisor to the Debtors and Debtors in Possession Effective as of the Petition Date, (II) Approving the Terms of A&G's Employment, (III) Waiving Certain Timekeeping Requirements, and (IV) Granting Related Relief |

    b.    notwithstanding any provision of the Application and the Real Estate Services Agreement to the contrary, the Debtors shall have no obligation to indemnify or provide contribution or reimbursement to any Indemnified Person under the Real Estate Services Agreement for any claim or expense that is either: (i) judicially determined (the determination having become final) to have arisen from such Indemnified Person's gross negligence, willful misconduct, bad faith, fraud or self-dealing to which the Debtors have not consented; (ii) for a contractual dispute in which the Debtors allege the breach of A&G's contractual obligations under the Real Estate Services Agreement unless the Court determines that indemnification, contribution, or reimbursement would be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003); or (iii) settled without the Debtors' consent prior to a judicial determination as to the Indemnified Person's gross negligence, willful misconduct, bad faith, fraud, or unconsented self-dealing, but determined by this Court, after notice and a hearing, to be a claim or expense for which such Indemnified Person should not receive indemnification, contribution, or reimbursement under the terms of the Real Estate Services Agreement, as modified by this Order;

    c.    if, before the earlier of: (i) the entry of an order confirming a chapter 11 plan in the chapter 11 cases (that order having become a final order no longer subject to appeal); and (ii) the entry of an order closing the chapter 11 cases, any Indemnified Person believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution, and/or reimbursement obligations under the Indemnification Letter (as modified by this Order), including, without limitation, the advancement of defense costs, such Indemnified Person must file an application therefor in this Court, and the Debtors may not pay any such amounts to the Indemnified Person before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses for indemnification, contribution, and/or reimbursement by any Indemnified Persons, and is not a provision limiting the duration of the Debtors' obligation to indemnify, or make contributions or reimbursements to, the Indemnified Persons. All parties in interest shall retain the right to object to any demand by any Indemnified Person for indemnification, contribution, and/or reimbursement. The

8

(Page | 9)
Debtors:        RITE AID CORPORATION, *et al.*
Case No.        23-18993 (MBK)
Caption of Order:   Order (I) Authorizing the Employment and Retention of A&G Realty
                Partners, LLC as Real Estate Consultant and Advisor to the Debtors and
                Debtors in Possession Effective as of the Petition Date, (II) Approving the
                Terms of A&G's Employment, (III) Waiving Certain Timekeeping
                Requirements, and (IV) Granting Related Relief

U.S. Trustee and all other parties in interest shall retain the right to object to any request for indemnification by A&G under the relevant standards set forth above that apply, respectively, to the U.S. Trustee and to all other parties in interest.; and

d.      any limitation on l i a b i l i t y   p u r s u a n t   t o   t h e   Real Estate Services Agreement shall be eliminated.

10.     A&G will work to ensure that the services to be provided by A&G will not duplicate the services of any of the other professionals retained by the Debtors.  As such, A&G shall use its best efforts to avoid any duplication of services provided by any of the Debtors' other retained professionals in these chapter 11 cases.

11.     None of the fees payable to A&G under the Real Estate Services Agreement shall constitute a "bonus" or fee enhancement under applicable law.

12.     Notwithstanding anything in the Application, Graiser Declaration, or the Real Estate Services Agreement to the contrary, A&G shall apply any remaining amounts of its prepetition retainer as a credit towards post-petition fees and expenses, after such post-petition fees and expenses are approved pursuant to an order of the Court awarding fees and expenses to A&G.  At the conclusion of A&G's engagement by the Debtors, if the amount of the prepetition retainer held by A&G is in excess of the amount of A&G's outstanding and estimated post-petition fees, expenses and cots, A&G will pay to the Debtors the amount by which the prepetition retainer exceeds such fees, expenses and costs, in each case in accordance with the Real Estate Services Agreement.

(Page | 10)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Authorizing the Employment and Retention of A&G Realty Partners, LLC as Real Estate Consultant and Advisor to the Debtors and Debtors in Possession Effective as of the Petition Date, (II) Approving the Terms of A&G's Employment, (III) Waiving Certain Timekeeping Requirements, and (IV) Granting Related Relief |

13.     A&G shall not seek the reimbursement of any fees or costs, including attorney fees and costs, arising from the defense of any objections to any of A&G's fee applications in these cases.

14.     To the extent A&G utilizes the services of independent contractors ("Contractors") in connection with rendering Services to the Debtors pursuant to the Real Estate Services Agreement, A&G will: (a) pass through the costs of such Contractors at the same rate that A&G pays the Contractors; (b) seek reimbursement for actual costs only; (c) ensure that the Contractors are subject to the same conflict checks as required for A&G, and(d) file with the Court such disclosures as are required by Bankruptcy Rule 2014 with respect to the Contractors.  A&G shall include a statement under oath in any fee applications filed in these cases setting forth that A&G complied with the above requirements concerning its use of Contractors.

15.     If the Court denies the *Debtors' Motion for Entry of an Order Authorizing the Debtors to File Under Seal the Names of Certain Confidential Transaction Parties in Interest Related to the Debtors' Professional Retention Applications* [Docket No. 806] (the "Motion to Seal"), or the Motion to Seal is withdrawn or the relief requested therein is moot, A&G will, within fourteen days of such denial, withdrawal or other resolution, and through a supplemental declaration, disclose the connections of A&G to such Confidential Transaction Parties.

(Page | 11)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Authorizing the Employment and Retention of A&G Realty Partners, LLC as Real Estate Consultant and Advisor to the Debtors and Debtors in Possession Effective as of the Petition Date, (II) Approving the Terms of A&G's Employment, (III) Waiving Certain Timekeeping Requirements, and (IV) Granting Related Relief |

16.     To the extent that there may be any inconsistency between the terms of the Application, the Graiser Declaration, the Real Estate Services Agreement, and this Order, the terms of this Order shall govern.

17.     Notice of the Application as provided therein shall be deemed good and sufficient notice of such Application and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

18.     The Debtors and A&G are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

19.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## Exhibit 1

**Real Estate Services Agreement**

DocuSign Envelope ID: CE85693G-7961-43B4-83A0-F66C22EDBED6



# REAL ESTATE SERVICES
# AGREEMENT WITH
# RITE AID CORPORATION

DocuSign Envelope ID: CE85603G-7961-43B4-83A0-F66C22EDBFD6

This Real Estate Services Agreement including the Schedules attached hereto (collectively the "Agreement") is made as of May 20 , 2023 (the "Agreement Date"), by and between **A&G REALTY PARTNERS**, LLC, a New York limited liability company, with its principal place of business at 445 Broadhollow Road, Suite 410, Melville, New York 11797 ("A&G"), and **RITE AID CORPORATION**, a Delaware corporation, with its corporate headquarters located at 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112 (including its affiliates and subsidiaries, collectively the "Company" and, together with A&G, collectively, the "Parties" and, individually, a "Party").

WITNESSETH:

**WHEREAS**, the Company is the (i) lessee or sublessee of non-residential real property leases as more particularly identified on Schedule A (each, a "Lease" and, collectively, the "Leases") for its retail drugstore operations (each a "Store" and collectively, the "Stores") and (ii) fee owner of certain real estate as more particularly identified on Schedule B (each a "Property" and, collectively, the "Properties");

**WHEREAS**, the Company desires to (i) reduce or amend its obligations under the Leases by modifying the terms and conditions thereof or reduce risk and provide optionality under certain Leases; (ii) obtain the right to terminate certain Leases prior to their expiration date; (iii) in the event of a Chapter 11 bankruptcy proceeding, (a) sell certain of the Leases (including, designation rights) and Properties and (b) obtain landlord consents, including, but not limited to, for extensions of time to assume or reject the Leases ("Landlord Consents"); and (iv) obtain other real estate consulting and advisory services as set forth herein; and

**WHEREAS**, under the terms and conditions contained in this Agreement, the Company desires to retain A&G and A&G is willing to provide the Services (as defined herein).

**NOW THEREFORE**, in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Services to be Provided.  In accordance with the terms and conditions of this Agreement, A&G will provide the following services (the "Services"):

    a) assist the Company with real estate strategy with respect to the Company's portfolio of Leases (the "Lease Portfolio");

    b) consult with the Company regarding its goals, objectives and financial parameters in relation to the Lease Portfolio;

    c) assist the Company in developing store segmentation buckets in view of, and that correspond to, the Company's goals and objectives for the Lease Portfolio, prepare an analysis of market rents, determine the rent reduction requests to be made to the

2

DocuSign Envelope ID: CE85603G-7961-43B4-83A0-F66C22EDBEF6

Landlords (as defined below) and prioritization of Stores, and obtain market rents from A&G's broker network, and determine Lease modification requests (collectively, the "Real Estate Analysis");

d) provide ongoing advice and guidance related to individual financial and non-financial lease restructuring opportunities;

e) in the event the Company does not file for bankruptcy protection, and subject to the Parties' further agreement on A&G's fees, (i) advise and consult with the Company's internal deal making team with respect to requesting and negotiating Lease Modifications (as defined below) and Early Lease Terminations (as defined below) and (ii) review and provide feedback to said team regarding proposed deal terms for Lease Modifications and Early Termination Rights (collectively, the "Internal Deal Team Project");

f) in the event the Company files for bankruptcy protection,

i. negotiate with the landlords of the Leases (collectively, the "Landlords" and, individually, a "Landlord") on behalf of the Company to obtain Lease Modifications acceptable to the Company;

ii. negotiate with Landlords on behalf of the Company to obtain Early Termination Rights acceptable to the Company;

iii. market some or all of the Leases designated by the Company in a manner and form as determined by A&G and approved by the Company, and negotiate with the Landlords and other third parties on behalf of the Company to assist the Company with Lease Sales (as defined herein);

iv. at the request and with the approval of the Company, prepare and implement a marketing plan to sell, and conduct a sale process, for the Properties;

v. at the request and with the approval of the Company, represent the Company in, and negotiate, the sale of the Properties;

vi. assist the Company and its counsel in the documentation of sale transactions involving one or more of the Properties;

vii. at the request and with the approval of the Company, negotiate with Landlords on behalf of the Company to assist the Company in obtaining Landlord Consents; and

g) provide regular update reports to the Company regarding the status of the Services.

2. <u>Term of Agreement</u>. Subject to Section 15 herein, this Agreement shall be for a term of one (1) year following the Agreement Date (the "<u>Term</u>"). In the event the Services are not completed at the end of the Term, the Agreement may be extended or renewed by written agreement of the Parties.

3. <u>Compensation</u>. The compensation for the Services is set forth on <u>Schedule C</u>, which is attached hereto and incorporated herein ("<u>Compensation</u>"). The Company acknowledges that the calculations necessary to determine Compensation are predicated on Company Information (as that term is defined below) provided by the Company to A&G.

4. <u>Additional Services.</u> A&G may provide additional services requested by the Company that are not otherwise specifically provided for in this Agreement. In addition to the hourly compensation set forth in Section 9 hereof, to the extent the Company requests A&G to provide any written reports outside the scope of the Real Estate Analysis and any other reporting agreed upon by the Parties at the outset of the Services or to attend meetings (virtually or in person) outside of meetings related to the Internal Deal Team Project, deal review or legal status, the Company shall pay A&G an hourly rate of $450; *provided*, *however*, that the Company and A&G shall first agree that any such request made by the Company falls outside of the scope of the Real Estate Analysis. Except as set forth herein, any additional services will be mutually agreed upon by the Parties and documented in an amendment to this Agreement.

5. <u>Recordkeeping</u>. The Services to be provided by A&G pursuant to this Agreement are, in general, transactional in nature. Accordingly, except as expressly provided herein, A&G will not bill the Company by the hour or maintain time records.

6. <u>Expenses and Disbursements</u>. The Company shall reimburse A&G for A&G's reasonable out-of-pocket expenses (including, but not limited to, legal, mailing, marketing, and any service providers retained by A&G under Section 9 hereof with Company's prior written consent) incurred in connection with its retention and provision of Services, subject to the incurrence of expenses being pre-approved by the Company. The Company's reimbursement obligation includes, but is not limited to, responding to any litigation or other type of inquiry, deposition or otherwise relating to the Services or this Agreement. Any reimbursable expenses shall be paid to A&G within ten (10) business days upon receipt of invoice, except as may be approved or directed otherwise in any chapter 11 bankruptcy proceeding of the Company. Additionally, upon execution of this Agreement, the Company shall provide A&G an advance in the amount of $250,000 for the actual costs A&G expects to incur in retaining and compensating local brokers to provide a market rent analysis for the Lease Portfolio, which broker fee shall not exceed $150 per Lease (the "<u>Market Rent Analysis</u>") with any remaining portion of the advance to be returned to the Company upon completion of the Market Rent Analysis.

4

7.    <u>Exclusive</u>.  During the Term of this Agreement, A&G shall have the sole and exclusive authority to perform the Services for the Leases set forth on <u>Schedule A</u> and the Properties set forth on <u>Schedule B</u>. The Company agrees to forward to A&G all relevant inquiries regarding the Leases and Properties made to the Company, its representatives or related parties. <u>Schedule A</u> and <u>Schedule B</u>. may be amended from time to time during the term of this Agreement to add additional Leases or Properties, as applicable, upon mutual written consent by the Parties.

The Company acknowledges that A&G may be engaged to provide the same or similar services as those referenced herein to other persons or entities and that any such engagement shall not constitute or be deemed to be a violation of this Agreement, provided that such other engagement is not a conflict of interest or otherwise does not materially interfere with A&G's ability to provide the Services; provided, however, that A&G shall use reasonable best efforts to, and as may be directed by the Company, avoid any duplication of effort by other advisors to the Company and provide services to the Company in the most cost-efficient and cost-effective manner.

8.    <u>Company Representative</u>.  Angele Robinson-Gaylord will be the Company's representative ("<u>Company Representative</u>") in dealing with A&G. The Company reserves the right, at any time and from time to time, upon written notice to A&G, to designate a successor representative or an additional representative and to limit the authority of the representative in any respect.  A&G will report regularly and as otherwise reasonably requested to the Company's Representative in order to keep her fully apprised of A&G's performance.  The designated principal representative for A&G will be Andy Graiser.  If A&G seeks to change its principal representative, the Company agrees to reasonably consent to any proposed replacement. Notwithstanding anything to the contrary herein, A&G shall report only to the Company Representative and shall not speak to or otherwise communicate with any employee or member of the Company, including regarding the Company's contingency planning efforts, other than members of the Company's management team, without the express written consent of the Company's General Counsel, Chief Executive Officer, and Chief Financial Officer.

9.    <u>Company Cooperation</u>.  The Company shall: (a) provide A&G with all reasonable applicable information concerning the Leases and Properties necessary for the performance of A&G's obligations hereunder, including, but not limited to (i) copies of the Leases and any Lease abstracts, (ii) populating an Excel spreadsheet provided by A&G with, among other things, current rents, taxes and other charges relating to the Leases, rent bumps, percentage rent and breakpoints, premises size, the commencement and expiration dates of the Leases, any Lease options, up to date Landlord contact information (including name, email and phone number information for each Landlord), any outstanding or deferred rent, and any default letters sent by Landlords, (iii) Property appraisals, condition reports, environmental surveys, any land surveys and any other surveys, reports or other documents relating to the Properties and/or regulations, local ordinances or laws and rules that relate to the Properties; (b) provide access to A&G to any internal

lease administration reporting and tracking systems; (c) prepare a field questionnaire which will include, but not be limited to, information regarding (I) the quality of the Stores/Properties and shopping centers in which they are located, (II) major co-tenants in each shopping center, (III) whether each Store/Property is free standing, drive through or in-line, (IV) historical financial performance and financial projections for each Store, (V) competition data (including proximity to the Store), and (VI) last remodel of each Store (the "Field Questionnaire"); and (d) provide such other information as A&G requests for the performance of its Services (collectively, the "Lease and Property Information"). Additionally, the Company shall input the results of the Field Questionnaire and Real Estate Analysis into the Company's dashboard and tear sheets.

All information provided by the Company to A&G, including, but not limited to, the Company's goals and objectives, financial information and the Lease and Property Information referenced above, shall collectively be referred to as "Company Information." It is understood and agreed by the Parties that A&G shall have no obligation to verify the accuracy of such information and that A&G shall have no liability whatsoever resulting from, whether directly or indirectly, the inaccuracy or incompleteness of the Company Information. Both Parties understand and agree that A&G shall base its Services on the Company Information and any material inaccuracies, discrepancies or omissions in the information may delay or impede A&G's ability to render the Services. If any of the Company Information turns out to be inaccurate, the Company shall provide such internal personnel and administrative support as necessary to correct the information or upon the written request of the Company authorize A&G to make the necessary corrections (for which A&G's hourly rate shall be $450). Furthermore, both Parties understand and agree that the commencement of this Agreement and the continuation of its Services are contingent upon A&G's receipt of the Company Information.

Additionally, the Company agrees to assist A&G in the performance of its Services, including but not limited to, by providing (i) a response, within seven (7) business days of A&G's transmittal to the Company of a deal sheet for each Lease, which states whether a proposed Service is approved or not, and (ii) all necessary legal support to review Documents (as defined below) submitted by A&G in connection with a Service and getting all Documents in form and substance acceptable to the Company executed accurately and timely. In addition, the Company shall track the status of all Documents through an A&G legal tracking report provided by A&G and provide such Lease and Property Information as reasonably requested by A&G in an A&G usable format.

10.    Use of Company Name.  A&G may use the Company's name and logo to identify the Company as one of A&G's clients.

11.    No Authority to Execute Agreements.  A&G shall have no right or power to enter into any agreement in the name of or on behalf of the Company or to otherwise obligate the Company in any manner unless authorized in writing.

6

12.    <u>Meetings</u>.  Promptly after the commencement of the Agreement, A&G shall meet with, in a manner reasonably agreed to by the Parties, the Company's Representative(s) to review the Company's goals, objectives and financial parameters.  Thereafter, A&G shall meet with or participate in telephone conferences, at least once a week or more if designated by the Company, with the Company's Representative(s) regarding the status of the Services as reasonably designated by the Company.

13.    <u>Disclosures/Reports/Confidentiality</u>.  All information, advice, recommendations (whether written or oral) or any reports, presentations or other communications that A&G provides under the terms of this Agreement are solely for the benefit of the Company and no such opinion, advice, recommendations or reports shall be used for any other purpose, or reproduced, disseminated, quoted or referred to at any time, in any manner, other than as provided herein, without the prior written consent of A&G.  Notwithstanding the foregoing, the Company may provide such information, advice and recommendations to its representatives, consultants, Board of Directors and attorneys as required to effectuate the Services, provided however that both Parties understand and agree that A&G shall have no liability to such Parties and such Parties are not intended to be third-party beneficiaries to this Agreement.

If the Company receives a subpoena, summons or court order by any federal, state or other regulatory agency having jurisdiction over the Company relating in any respect to A&G or its Services, the Company shall promptly notify A&G in writing, if legally permissible, so that A&G may obtain, at its sole cost, a protective order for such information.  If A&G is unable to obtain a protective order and the Company is required to provide information regarding A&G and/or the Services, the Company agrees to provide only that information which is legally required and to use reasonable efforts to ensure the confidentiality of such information and documentation.

By virtue of this Agreement, A&G will have access to information that is confidential to the Company.  "<u>Confidential Information</u>" means Company Information, business, technical, systems and/or engineering information, financial data, forecasts, marketing and sales information, customer information, pricing and cost data, vendor information, marketing strategies, and general non-public business information disclosed by the Company to A&G orally or in tangible form. Confidential Information of the Company shall not include any information that: (a) is or becomes part of the public domain or which is publicly available through no act or omission of A&G and through no breach of this Section 13; (b) that A&G can demonstrate was known to A&G at the time of disclosure without an obligation to keep it confidential; (c) becomes rightfully known to A&G from another source without known restriction on disclosure or use; or (d) A&G can show is independently developed without the use of or any reference to Confidential Information.  A&G agrees, on behalf of itself and it agents and representatives and unless required by law or legal process, not to make the Company's Confidential Information available in any form to any third party for any purpose.  Access to and

the use of Confidential Information may be provided to those third parties that comply with the following: (a) the third party is not a competitor of the Company; (b) it has a business need to use and access such Confidential Information in providing such services; and (c) is bound by an obligation of confidentiality at least as restrictive as the confidentiality restrictions of this Agreement. A&G agrees to take all reasonable steps required to ensure that Confidential Information is not disclosed or distributed by its directors, officers, employees, agents, or subcontractors in violation of the terms of this Agreement.  Upon request, A&G agrees to return any and all Confidential Information to the Company.  In addition to the above, A&G represents that it shall process, keep, maintain, and store all Company information regardless of format including, but not limited to, Confidential Information in a secure manner, and shall in no event disclose any such information to any of the Company's competitors, vendors, or other third parties. Notwithstanding the foregoing, and subject to the Company's prior written approval, A&G shall be authorized to provide such Confidential Information to Landlords in connection with the provision of Services hereunder as the Company authorizes. A&G's obligations hereunder with respect to Confidential Information disclosed by the Company during the term of this Agreement shall continue for two (2) years following the expiration or earlier termination of this Agreement.  For the avoidance of doubt, and notwithstanding anything to the contrary herein, any information related to, or arising out of, the turnaround plan of the Company's management team, known and referenced as "RAMP," shall constitute "Confidential Information" and A&G shall not disclose or otherwise communicate regarding any such information, without the express written consent of the Company's General Counsel, Chief Executive Officer, and Chief Financial Officer.

14.    Independent Contractor. Each Party acknowledges and agrees that the arrangements contemplated herein are and will be for the provision of the Services and that nothing contained herein shall create or be construed as creating a contract or other arrangement of employment between the Company and A&G.  A&G shall provide the Services as an independent contractor and not as an employee, agent, partner or joint venture of the Company.

15.    Early Termination.  Either Party may terminate this Agreement without cause upon thirty (30) days' prior written notice in accordance with the notice provision below. Additionally, if either Party fails to perform its obligations in accordance with the terms herein and does not cure such failure within ten (10) days after written notice of default, the other Party will have the right to terminate this Agreement by notice of termination to the non-performing Party, effective ten (10) days after the date of such notice.  Additionally, if for any reason either Party becomes unable to perform its duties as a result of a legal, contractual or regulatory restriction, such Party shall have the right to terminate this Agreement.  Any rights or obligations incurred or accrued by either Party prior to termination shall survive termination of this Agreement.

16.     Assignment.  Neither Party may delegate or assign its rights and obligations under this Agreement in whole or in part to an unaffiliated third party without the prior written consent of the other Party.

17.     Bankruptcy.

   a.   In the event the Company files for bankruptcy protection during the Term of this Agreement, the Company agrees to apply promptly to the bankruptcy court for an order, in a form mutually acceptable to the Company and A&G, authorizing the Company to retain A&G effective as of the filing date and to compensate A&G in accordance with the terms of this Agreement, and to use its best efforts to obtain such order.  The Company agrees to (a) seek the hiring and retention of A&G under sections 327 and 328 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) file any applications necessary and otherwise assist A&G in obtaining Bankruptcy Court approval of the payment of its fees and costs hereunder. The Company agrees to provide A&G with a copy of the pleadings requesting retention of A&G prior to submission to the bankruptcy court for A&G's review and comments and advise A&G of any objection or hearings pertaining to A&G's retention.  The order authorizing A&G's retention must be acceptable to A&G and A&G's obligations hereunder are conditioned upon the grant of such order.  Furthermore, if such order is not obtained within sixty (60) days from the date that it is filed, A&G shall have the right to terminate this Agreement at any time thereafter.  If an acceptable order is not obtained authorizing A&G's services and fees as set forth herein, the Company agrees to amend the application in conjunction with and the approval of A&G and request a hearing to review the application. In the event the Company is unable to obtain an acceptable order authorizing the hiring and retention of A&G under the terms of this Agreement and the Agreement is terminated, A&G reserves the right to seek a substantial contribution claim for any rights or obligations incurred or accrued prior to such termination.

   b.   Before finalizing any cash collateral/debtor in possession financing budget with its secured lender, the Company shall provide A&G with a reasonable opportunity to review and provide input into the budget regarding its estimated fees and expenses during the relevant budget period(s).

18.     Notices.  Unless otherwise expressly provided herein or waived in writing by the Party to whom notice is given, any notice or other communication required or permitted hereunder will be effective if given in writing (i) when delivered by hand; (ii) three days after sent by certified mail, return receipt requested; (iii) when delivered by electronic email communication to the email address set forth below and verified by confirmed receipt; or (iv) one day after delivery to a commercial overnight courier, and addressed to the Parties as follows:

9

|                    |                                                      |
|--------------------|------------------------------------------------------|
| To the Company:    | Rite Aid Corporation                                 |
|                    | 1200 Intrepid Avenue, 2nd Floor                      |
|                    | Philadelphia, PA 19112                               |
|                    | Attention: Angele Robinson-Gaylord,                  |
|                    | Senior V.P. of Real Estate                           |
|                    | Tel: (717) 612-8688                                  |
|                    | Email: Angele.Robinson-gaylord@riteaid.com           |
|                    |                                                      |
| To A&G:            | A&G Realty Partners, LLC                             |
|                    | 445 Broadhollow Road, Suite 410                      |
|                    | Melville, NY  11747                                  |
|                    | Attn:  Andy Graiser, Co-President                    |
|                    | Tel: (631) 465-9506                                  |
|                    | Email: andy@agrep.com                                |

19. <u>Representations, Warranties and Covenants</u>. Each Party has all requisite power and authority to enter into this Agreement. This Agreement has been validly authorized by all necessary corporate action and constitutes a legal, valid and binding agreement of the Company and A&G.  Each Party represents that this Agreement does not and will not violate any applicable law or conflict with any agreement, instrument, judgment, order or decree to which it is a party or by which it is bound.  Furthermore, each Party represents and agrees that it will comply with all applicable laws, rules, regulations, orders or decrees during the term of this Agreement in performing its obligations hereunder. Each Party agrees to deal with the other fairly and in good faith so as to allow each Party to perform their duties and earn the benefit of this Agreement.  A&G agrees to utilize commercially reasonable efforts and diligence to achieve the purpose of this Agreement.

20. <u>Survival of Fee</u>.  In the event that within ninety (90) days following the termination or earlier expiration of this Agreement, the Company or its successors or assigns, enters into a transaction with a Landlord or other third party (including a purchaser of any Property) and A&G has substantially performed the Services, which is the proximate cause of the transaction being entered into with such Landlord or other third party (including a purchaser of any Property) and within ten (10) days after the termination or earlier expiration of this Agreement, A&G has provided the Company with a list identifying such Landlord or other third party and such Services and the result of such Services would have entitled A&G to a fee pursuant to this Agreement, then in that event, A&G shall be entitled to and paid its fee pursuant to the terms of this Agreement notwithstanding the fact that the Agreement has terminated or expired.  Notwithstanding any provision to the contrary in this Agreement, in no event shall A&G be entitled to a fee under this Section 20 if: (a) this Agreement is terminated by the Company due to a material breach by A&G of this Agreement by A&G as determined by a final order of a court of competent jurisdiction, or (b) A&G wrongfully terminates this Agreement prior to the end of its full term.

10

DocuSign Envelope ID: CE85693G-7961-43B4-83A0-F66C22EDBFD6

21. <u>Intellectual Property</u>.  A&G may use data, software, designs, utilities, tools, models, systems and other methodologies that it owns or licenses in performing the Services hereunder. Notwithstanding the delivery of any reports by A&G to the Company, A&G shall retain all intellectual property rights in such materials (including any improvements or knowledge developed while performing the Services) and in any working papers compiled in connection with the Services. Notwithstanding the foregoing, A&G shall have no rights to own or use proprietary information of the Company for any purpose other than for providing the Services.

22. <u>Indemnification</u>.  Each Party agrees to indemnify the other Party and its affiliates, officers, directors, employees, agents and independent contractors, and hold each of them harmless from and against all third party claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted against, resulting from (directly or indirectly), or related to the Services or actions or omissions of A&G or the Company taken pursuant to this Agreement or in any written agreement entered into in connection herewith except to the extent that such claims or liabilities arise as a direct result of the indemnified Party's fraud, gross negligence or willful misconduct.

23. <u>Limitation on Liability</u>.  Neither Party shall be responsible for any indirect, incidental, consequential, exemplary, punitive or other special damages (including, but not limited to, loss of profits and damage to reputation or business) arising under or by reason of this Agreement, the Services or any act or omission hereunder. Neither Party shall be liable if it is unable to perform its responsibilities hereunder as a result of events beyond its control.  Furthermore, in no event shall A&G's liability for a default or breach of this Agreement exceed the amount of fees paid to A&G hereunder.

24. <u>Binding Effect. No Third-Party Beneficiaries</u>.  This Agreement binds and inures to the benefit of the Parties hereto and their respective successors and permitted assigns and except as expressly provided herein, is not intended to confer any rights or remedies upon any person not a party to this Agreement.

25. <u>Waivers and Amendments</u>.  Waiver by either Party of any default by the other Party shall not be deemed a waiver of any other default. This Agreement (including the Schedule (s) attached hereto) may not be waived, amended, or modified by either Party unless in writing and signed by the Parties hereto.

26. <u>Severability</u>.  If any provision, or any portion of any provision, contained in this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, then it is the intent of the Parties to modify or limit such provision or portion thereof so as to be valid and enforceable to the extent permitted under applicable law. In the event that such provision or portion thereof cannot be modified, then such provision or portion thereof shall be deemed omitted and this Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

DocuSign Envelope ID: CE85603G-7961-43B4-83A0-F66C22EDBFD6

27. <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof. All prior agreements, representations, statements, negotiations, understandings, and undertakings are superseded by this Agreement.

28. <u>Counterpart Execution/Facsimile and Electronic Signatures</u>.  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which together shall constitute one document.  Facsimile and electronic signatures on this Agreement and any document contemplated hereby shall be deemed to be original signatures.

29. <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of New York without reference to its conflict of laws rules.  Any dispute resulting from this Agreement shall be resolved by binding arbitration with the proceedings to be conducted in New York City, New York, by one arbitrator, following the applicable rules of the American Arbitration Association, and administered by a respectable dispute resolution provider as reasonably selected by the Party commencing the proceedings. To the extent arbitration proceedings are not feasible or if to enforce an arbitration award or otherwise, any court action under this Agreement shall be brought in the federal or state courts of the State of New York.  In the event the Company files a Chapter 11 bankruptcy petition, then the Bankruptcy Court shall have exclusive jurisdiction over any matters arising out of or relating to this Agreement.

30. <u>Waiver of Jury Trial</u>.  Each of the Parties unconditionally waives, to the fullest extent allowed by law, the right to a jury trial in connection with any claim arising out of or related to this Agreement.

31. <u>Headings/Tenses</u>.  The section headings and use of defined terms in the singular or plural or past or present tenses in this Agreement are solely for the convenience of the Parties.  To the extent that there may be any inconsistency between the headings and/or the tenses and the intended meaning, the intent of the Parties or the provision, the terms of such provision shall govern.

32. <u>No Presumptions</u>. This Agreement shall be deemed drafted by both Parties and there shall be no presumption for or against either Party in the interpretation of this Agreement.

[SIGNATURES ON THE FOLLOWING PAGE]

DocuSign Envelope ID: CE85603G-7961-43B4-83A0-F66C22EDBEB6

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized representatives effective as of the Agreement Date.

RITE AID CORPORATION

By: *Angele Robinson-Gaylord*

Name: Angele Robinson-Gaylord

Title: SVP, Store Development

A&G REALTY PARTNERS, LLC

By: *Andy Graiser*

Name: Andy Graiser

Title: Co-President

**Schedules**

Schedule A    List of Leased Locations
Schedule B    Owned Real Property
Schedule C    Compensation

13

DocuSign Envelope ID: CE85693G-7961-43B4-83A0-F66C22EDBFD6

**SCHEDULE A**
**List of Leased Locations**

14

DocuSign Envelope ID: CE85603G-7961-43B4-83A0-F66C22EDBFD6

## SCHEDULE B
## Owned Real Property

15

**Schedule C**
**Compensation**

## A.    Definitions

"Document" - shall be defined as any amendment or agreement that modifies a Lease in any manner, including, but not limited to, the granting of a Lease Modification, Early Termination Right or Landlord Consent. It also includes any amendment or agreement that effectuates a Lease Sale or Property Sale, or any part thereof. A Document also shall include any letter agreement relating to a Lease or Property or any other written communication (including, but not limited to, an email communication) from a Landlord or third party consenting to the applicable Service. For the avoidance of doubt, a Document can be generated by the Landlord, a third party or the Company.

"Early Termination Right" - shall be defined as the Company's exclusive right to terminate the Lease prior to the expiration date of the Lease, which is obtained by A&G from a Landlord.

"Gross Occupancy Cost" - shall be defined as the sum of the remaining base rent, any annual increases, percentage rent, CAM, taxes payable directly to the Landlord, insurance, rental tax, marketing and merchants' association charges, utility charges, HVAC usage charges, trash removal charges, sprinkler usage charges, unpaid rents, or any other sums due to the Landlord under a particular Lease as of the Agreement Date.  For clarification purposes, Gross Occupancy Cost is calculated using the first date that the Service commences (i.e., the date that the rent reduction commences) through the earlier of the end of the Lease term in effect as of the Agreement Date (or longer if a Lease extension is also requested and negotiated by A&G on behalf of the Company) or when the Service is no longer in effect. CAM, taxes, insurance, marketing and merchants' association charges and all other applicable charges will be calculated using the last available full year charge for each item (which may be a calendar year or a lease year, depending upon which is the most recent full year charge available). In the event that rent increases periodically based upon the change in the Consumer Price Index (CPI), the assumed annual CPI increase shall be four percent (4%).

"Gross Proceeds" - shall be defined as the total consideration paid or payable to the Company by a landlord, investor, purchaser, or any other party to either waive, terminate, sublease, or purchase a Lease or Property or any right related to a Lease or Property. It includes, but is not limited to, cash and any other form of currency paid or waived by the Landlord, sub-tenant or other third party to the Company in relation to a Lease or Property Sale. This list is not meant to be exhaustive and Gross Proceeds shall include any consideration or other quantifiable economic benefit paid or payable to the Company in conjunction with a Lease Sale or Property Sale, including all (i) Company debt assumed, satisfied or paid by a purchaser or which remains outstanding at closing (including, without limitation, the amount of any indebtedness "credit bid" at any sale), and (ii) amounts placed in escrow and deferred, contingent payments and installment payments.

"Lease Sale" - shall be defined as the sale or assignment, whether all or part, of a Lease

16

and includes the sale of designation rights to a third party.

"Monetary Lease Modification" - shall be defined as any modification to or inclusion of additional provisions relating to the monetary terms of a Lease agreement, including, but not limited to, reduction in rent/other Lease charges, reduction in Lease Term, reduction in Lease space, deferral of/termination of/waiver of/free rent or other Lease charges (including any previously deferred rent payment due or other Lease charges), reduction or elimination of any outstanding amounts due under a Lease, reduction in square footage of premises covered by a Lease,  the granting of tenant allowance or capital improvement dollars from the Landlord, the waiver of Company's capital expenditure obligations, extensions of existing rent reductions past their original end date, reduction in CAM charges, taxes, elimination of percentage rent, conversion to percentage rent, reductions in or returns of security deposits and FF&E if otherwise non-refundable (either pursuant to the terms of the Lease or as determined by the Landlord), or any other amendment to a Lease that results in Occupancy Cost Savings to the Company.

"New Gross Occupancy Cost" - shall be defined as the reduced Gross Occupancy Cost that results from a Lease Modification or any other amendment to the Lease.

"Non-Monetary Lease Modification" - shall be defined as any modification to the non-monetary terms of a Lease agreement, including, but not limited to, change of use, co-tenancy clause, sublease rights, the negotiation of a lease extension, the granting of an additional option term or terms, an amendment to the current option term or terms (Early Termination Right fees are set forth separately for fee purposes), relocation of Lease spaces that do not result in a reduction in Gross Occupancy Cost and any other amendments to the Lease that is or would be beneficial to the Company that do not fall within the above definition of Monetary Lease Modifications.

"Occupancy Cost Savings" - shall be defined as the difference between the original Gross Occupancy Cost and the New Gross Occupancy Cost for the period the date in which the Lease Modification or other Service becomes effective or the date in which A&G becomes entitled to its Fees under the terms herein, through the end of the then-current Lease Term, the Revised Lease Term, or the date on which the Company no longer realizes the savings, pursuant to the terms of the Services, less any payment(s) or costs payable by the Company to effectuate the Lease Modification or other Service, excluding legal fees. "Lease Term" shall be defined as the commencement date and expiration date of the then-current term of the Lease as set forth in the Lease as of the Agreement Date.  "Revised Lease Term" shall be defined as the new Lease expiration date pursuant to any Lease extensions obtained by A&G on behalf of the Company.  For example, if a Service includes a Monetary Lease Modification and an extension of the Lease, the Occupancy Cost Savings shall be applicable through the duration of such Lease extension (i.e., the Revised Lease Term).

Occupancy Cost Savings include, but are not limited to, reduction in rent/other Lease charges, reduction in term, reduction in Lease space, deferral of/termination of/waiver of/free rent or other Lease charges (including any previously deferred rent or other Lease charges), reduction or elimination of any outstanding amounts due under a Lease, reduction

17

DocuSign Envelope ID: CE85603C-7961-43B4-83A0-F66C22EDBEB6

of unamortized tenant allowance, reduction or elimination of the obligation to repay tenant allowance to the Landlord, reduction or elimination of the requirement to improve the Lease space that have a direct monetary benefit to the Company, the granting of tenant allowance or capital improvement dollars from Landlord or Landlord improvements to the property, the waiver of Company's capital expenditure obligations, reduction in square footage of premises covered by a Lease, extensions of existing rent reductions past their original end date, any lease extensions that result in a rent decrease, reduction in CAM charges, taxes, elimination of percentage rent, conversion to percentage rent, or any or any other amendment to a Lease that results in direct monetary savings to the Company.

For Occupancy Cost Savings resulting from the extension of a rent reduction past the Lease Term in effect as of the Agreement Date, the savings shall be based upon the original rent and option rent set forth in the Lease, allocated proportionately to the time period during the Lease Term and the extended term, as the case may be.  For example purposes only, if A&G obtains a 4-year rent reduction and only 2 years remain on the Lease Term, A&G's fee will be based upon the blended Occupancy Costs Savings resulting from the reduced rent as compared to the rent in effect during the Term for a period of 2 years, and the Occupancy Costs Savings resulting from the reduced rent as compared to the option rent set forth in the Lease, provided the Company exercises such option.  For Occupancy Cost Savings resulting from lease extensions where there is no rent increase, the savings shall be based upon the option price for the period of the duration of the extension or if there is no option price, the rent price for the immediately preceding period increased by an assumed annual CPI increase of four percent (4%).

In the event base or gross rent (i.e., contract rent) is converted to percentage rent based on sales, Occupancy Cost Savings will be calculated based on the difference between the contract rent and the percentage rent using sales figures for the twelve (12) months ended April 30, 2023.

"Property Sale" - shall be defined as the sale, or any other transfer of ownership, of any Property to a third party.

B.    **Fees**

A&G shall be compensated for the Services as follows:

1.  Security Retainer. The Company shall pay A&G a security retainer in the amount of one hundred fifty thousand dollars ($150,000) upon execution of this Agreement.  The security retainer shall be non-refundable and shall be applied to the final invoice for fees and expenses due under the terms of this Agreement.

2.  Real Estate Analysis Fee.  A&G shall be entitled to a flat fee of $250,000.00 for the Real Estate Analysis, payable upon completion and delivery of the Real Estate Analysis to the Company.

18

3.  <u>Non-Bankruptcy MLM Fee</u>. Before the commencement of the Internal Deal Team Project, the Parties shall enter into a written amendment to this Agreement setting forth the fees to be payable to A&G.

4.  In the event the Company files for bankruptcy protection:[1]

    a.  <u>Monetary Lease Modifications</u>. For each Monetary Lease Modification obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee in the amount of two percent (2%) of the Occupancy Cost Savings in years 1 through 5 of the remaining Lease Term and one percent (1%) of the Occupancy Cost Savings in any years of the Lease Term remaining thereafter (including with respect to any unexercised option period(s) which the Company requests A&G to obtain).

    b.  <u>Non-Monetary Lease Modifications.</u> For each Lease that becomes subject to one or more Non-Monetary Lease Modifications obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee of $500.00 per Lease.

    c.  <u>Early Termination Rights.</u> For each Early Termination Right obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee of twenty percent (20%) of one (1) month's Gross Occupancy Cost per Lease.

    d.  <u>Property Sales</u>. For each Property Sale obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee of two percent (2%) of the Gross Proceeds (the "<u>Property Sale Fee</u>").

    e.  <u>Lease Sales</u>. For each Lease Sale obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee of three percent (3%) of the Gross Proceeds (the "<u>Lease Sale Fee</u>"), provided, however, the Lease Sale Fee shall not apply to any assignment of a Lease to an affiliate of the Company.

    f.  <u>Landlord Consents</u> – If requested by the Company, for each consent obtained by A&G to extend the Company's time to assume or reject a Lease as a part of any applicable Chapter 11 case, A&G shall earn and be paid a fee in the amount of four hundred dollars ($400) per Lease.

    g.  <u>Rejected Leases</u>. Except as otherwise set forth herein, A&G shall earn no fees for any Lease rejected in a bankruptcy proceeding.

---

[1]   For the avoidance of doubt, the Parties acknowledge that A&G shall not earn or be compensated for any Property Sale Fee or Lease Sale Fee for any sale of any Lease or Property in connection with the Company's consummation of a sale of all or substantially all of its assets pursuant to section 363 of the Bankruptcy Code.

19

C.    **Payment of Fees**.

In the event the Company files for bankruptcy protections, A&G shall provide the Company with a deal sheet with the terms of the proposed Lease Modification or Early Termination Right (the "Deal Sheet").  For clarification purposes, a Deal Sheet can include, but not be limited to, an email or other written communication from A&G setting forth the terms of the proposed Service.  If: (i) the Company approves the terms of the Deal Sheet and the Company and the Landlord or other third party (if applicable) executes a Document that reflects the Company accepted Deal Sheet; (ii) the Company approves a Document that embodies a Lease Modification or Early Termination Right to be transmitted to a Landlord and the Company and that Landlord enter into a Document evidencing such Lease Modification or Early Termination Right; or (iii)  the Company begins to receive the benefit of the terms set forth in the Deal Sheet (to the extent the Company receives such benefits), A&G shall be entitled to, and be paid, its fees in accordance with the above fee structure. For the avoidance of doubt, A&G shall be entitled to its fees to the extent the Company received the benefits of A&G's Services notwithstanding the fact that the Service transaction is not fully executed by the Company, except with respect to a Lease Termination or Lease Sale, which has to be executed by both parties for A&G to earn its fees. A Service may incur more than one fee.

With respect to Services provided by A&G, the Company shall pay all fees to A&G payable under this Agreement within ten (10) business days of the receipt of an invoice therefor, except that for Lease Sales and Property Sales, A&G shall be paid its fee upon the closing of the applicable sale, except, in each case, as may be approved or directed otherwise in the Company's chapter 11 bankruptcy proceeding.

## AMENDMENT TO REAL ESTATE SERVICES
## AGREEMENT WITH RITE AID CORPORATION

This Amendment (the "Amendment") is made as of October 6, 2023 (the "Amendment Date"), to the Real Estate Services Agreement by and between **A&G REALTY PARTNERS**, **LLC**, a New York limited liability company, with its principal place of business at 445 Broadhollow Road, Suite 410, Melville, New York 11797 ("A&G"), and **RITE AID CORPORATION**, a Delaware corporation, with its corporate headquarters located at 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112 (including its affiliates and subsidiaries, collectively the "Company" and, together with A&G, collectively, the "Parties" and, individually, a "Party").

### WITNESSETH:

**WHEREAS**, the Parties entered into a Real Estate Services Agreement dated as of May 20, 2023 (the "Agreement");

**WHEREAS**, the Company wishes to amend the Agreement as set forth herein.

**NOW THEREFORE**, in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Parties agree as follows:

1. The following subsection (h) is added to Section 1 of the Agreement (Services to be Provided):

   (h)  provide: (i) broker opinion of value ("BOV") in the form already approved by the Company of the so-called "Owned Retail Locations" (i.e., all owned retail locations, inclusive of surplus) and "Owned Non-Retail Locations" (i.e., all owned non-retail locations, inclusive of surplus (if any exist)); and (ii) table of dark market rent real estate quality grade and expected downtime ("Market Rent Table") for the so-called "Leased Surplus Retail Locations" (i.e., all surplus retail locations that are leased (whether building or ground) that are on the Company's day-1 rejection list or could be rejected later and "Leased Non-Retail Locations" (i.e., all non-retail locations that are leased (whether building or ground), inclusive of surplus (if any exist)).[1]

2. The  following new paragraph is added to Section 9 (Company Cooperation) of the Agreement:

   Additionally, the Company shall provide the following information to A&G in connection with the Services to be rendered under Section 1(h) hereof (collectively, the "BOV/Market Rent Company Information"), to the extent not already provided:

---

[1] The Parties agree that A&G shall not be required to provide a Market Rent Table for any Leases of "Leased Surplus Retail Locations" which have a total Lease Term, including options, of less than 10 years.

for (i) "Owned Retail Locations", store ID, address (Street, City, State, Zip), gross square footage, and selling square footage; (ii) "Leased Surplus Retail Locations," store ID, address (Street, City, State, Zip), gross square footage, selling square footage, current annual base rent, current annual percentage rent, current Lease expiration date, number and duration of remaining renewal options, max control date (end date of last option); (iii) "Owned Non-Retail Locations", store ID, address (Street, City, State, Zip), gross square footage and ceiling height (if DC/warehouse); and (iv) "Leased Non-Retail Locations," location ID, address (Street, City, State, Zip), gross square footage, current annual base rent, current Lease expiration date, number and duration of remaining renewal options, max control date (end date of last option), and ceiling height (if DC/warehouse).

3. The following Section B (Fees) 4a. is modified as follows:

4. In the event the Company files for bankruptcy protection:

a. Monetary Lease Modifications. For each Monetary Lease Modification, but for reduction in Lease Term, obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee in the amount of two percent (2%) of the Occupancy Cost Savings in years 1 through 5 of the remaining Lease Term and one percent (1%) of the Occupancy Cost Savings in any years of the Lease Term remaining including with respect to any unexercised option period(s) which the Company requests A&G to obtain. For each Monetary Lease Modification, specific to reduction in Lease Term, A&G shall earn and be paid a fee in the amount of one and a half percent (1.5%) of the Occupancy Cost Savings in years 1 through 5 of the remaining Lease Term and one percent (1%) of the Occupancy Cost Savings in any years of the Lease Term remaining thereafter (for avoidance of doubt no Monetary Lease Modification fee shall be applicable to any amendment to an option term).

4. The following subsections 5 and 6 are added to Section B (**Fees**) of Schedule B **(Compensation)** of the Agreement:

5.    BOV's. For each BOV obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee (the "BOV Fees") as follows (each, inclusive of broker cost):

    a.  Owned Retail Locations - $750 each.
    b.  Owned Non-Retail Locations - $2,500 each.

6.    Market Rent Tables. For each Market Rent Table obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee (the "Market Rent Table Fees") as follows (each, inclusive of broker cost):

    a.  Leased Surplus Retail Locations - $250 each.
    b.  Leased Non-Retail Locations  - $1,000 each.

2

5. The following section is added to Section C (**Payment of Fees**) of Schedule B (**Compensation**) of the Agreement:

The Company shall pay the BOV Fees and Market Rent Table Fees to A&G upon A&G's delivery of the BOV's and Market Rent Tables, as the case may be. The Market Rent Table for the Leased Surplus Retail Locations shall be provided to the Company within two (2) weeks of A&G's receipt of the BOV/Market Rent Company Information for those locations; the remaining BOV's/Market Rent Tables shall be provided to the Company within three (3) weeks of A&G's receipt of the BOV/Market Rent Company Information for those locations.

All other terms and conditions of the Agreement shall remain in full force and effect and not changed by this Amendment. Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement.

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed by their respective duly authorized representatives effective as of the Amendment Date.


RITE AID CORPORATION

By: *Paul Davidovicz*
⎿66C23EDA5D794C5...
Name:    Paul Davidovicz
Title:    GVP Store Development


A&G REALTY PARTNERS, LLC

By: *Andrew Graiser*
⎿1EA4BAF90E624FF...
Name:  Andy Graiser
Title:   Co-President

3

**SECOND AMENDMENT TO REAL ESTATE SERVICES
AGREEMENT WITH RITE AID CORPORATION**

This Second Amendment (the "Second Amendment") is made as of November 22, 2023
(the "Second Amendment Date"), to the Real Estate Services Agreement by and between
**A&G REALTY PARTNERS, LLC**, a New York limited liability company, with its
principal place of business at 445 Broadhollow Road, Suite 410, Melville, New York 11797
("A&G"), and **RITE AID CORPORATION**, a Delaware corporation, with its corporate
headquarters located at 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112
(including its affiliates and subsidiaries, collectively the "Company" and, together with
A&G, collectively, the "Parties").

WITNESSETH:

**WHEREAS**, the Parties entered into a Real Estate Services Agreement dated as of May 20,
2023 (the "Original Agreement"), as amended on October 6, 2023 (the "Amendment" and,
together with the Original Agreement, collectively, the "Agreement");

**WHEREAS**, the Parties wish to amend the Agreement further as set forth herein.

**NOW THEREFORE**, in consideration of the mutual covenants and conditions contained
herein and other good and valuable consideration, the receipt and sufficiency of which
hereby are acknowledged, the Parties agree as follows:

1.  **Schedule C (Compensation)**, **Section B (Fees)**, Subsection 4(a), is replaced with
    the following:

    Monetary Lease Modifications. For each Monetary Lease Modification
    obtained by A&G on behalf of the Company, A&G shall earn and be
    paid a fee in the amount of two and one-half percent (2.5%) of the Occupancy Cost
    Savings in years 1 through 5 of the remaining Lease Term and one
    percent (1%) of the Occupancy Cost Savings in any years of the Lease
    Term remaining thereafter (including with respect to any unexercised
    option period(s) which the Company requests A&G to obtain).

2.  **Schedule C (Compensation)**, **Section B (Fees)**, Subsection 4(g), is replaced with
    the following:

    Rejected Leases. Except to the extent A&G otherwise has earned its fee as set forth
    herein, A&G shall earn no fees for any Lease rejected in a bankruptcy proceeding.

3.  The first paragraph of **Schedule C (Compensation)**, **Section C (Payment of
    Fees)**, is replaced with the following:

    If: (i) the Company approves the terms of the Deal Sheet and the Landlord or other
    third party (if applicable) executes a Document that reflects the Company accepted
    Deal Sheet with no contingencies; (ii) the Company approves a Document that

DocuSign Envelope ID: F1971EA19805-4274-B687-7289B4C775E7

embodies a Lease Modification or Early Termination Right to be transmitted to a Landlord and the Landlord executes a Document evidencing such Lease Modification or Early Termination Right; or (iii) the Company begins to receive the benefit of the terms set forth in the Deal Sheet (to the extent the Company receives such benefits), A&G shall be entitled to, and be paid, its fees in accordance with the above fee structure. For the avoidance of doubt, A&G shall be entitled to its fees if (i) or (ii) is satisfied even if the Service transaction is not fully executed by the Company, except with respect to a Lease Sale, which has to be executed by both parties for A&G to earn its fees. A Service may incur more than one fee.

All other terms and conditions of the Agreement shall remain in full force and effect and not changed by this Second Amendment. Capitalized terms used but not defined herein have the meanings ascribed to them in the Original Agreement.

IN WITNESS WHEREOF, the Parties have caused this Second Amendment to be executed by their respective duly authorized representatives effective as of the Second Amendment Date.

RITE AID CORPORATION

By: _Paul Davidovicz_

Name: Paul Davidovicz

Title:    GVP Store Development

A&G REALTY PARTNERS, LLC

By: _Andrew Graiser_

Name: Andy Graiser

Title:    Co-President

2