**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' OMNIBUS REPLY IN**
**SUPPORT OF DEBTORS' MOTION**
**FOR ENTRY OF AN ORDER (I) AUTHORIZING**
**(A) REJECTION OF CERTAIN UNEXPIRED LEASES AND**
**(B) ABANDONMENT OF ANY PERSONAL PROPERTY, EFFECTIVE**
**AS OF THE REJECTION DATE AND (II) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Debtors file this omnibus reply (this "Reply")[2] in support of the *Debtors' Motion for*

*Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential*

---

[1] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

[2] Capitalized terms used but not otherwise defined in this Reply shall have the meanings ascribed to them in the First Lease Rejection Order, the Lease Rejection Motion, or the Objection, as applicable.

*Real Property and (B) Abandonment of Any Personal Property, Each Effective as of the Rejection Date and, (II) Granting Related Relief* [Docket No. 25] (the "<u>First Lease Rejection Motion</u>"), and in response to the objections of 3214 Thirty First Street LLC (the "<u>Astoria Landlord</u>," the lease related thereto, the "<u>Astoria Prime Lease</u>") [Docket Nos. 519, 1027] (the "<u>Astoria Landlord Objection</u>") and 32-14 31st Food LLC (the "<u>Astoria Subtenant</u>," and the sublease related thereto, the "<u>Astoria Sublease</u>") [Docket Nos. 549, 1559] (the "<u>Astoria Subtenant Objection</u>," and together with the Astoria Landlord Objection, the "<u>Objections</u>")[3] and the *Application for Payment of Administrative Expense Claims of 3214 Thirty First Street LLC* [Docket No. 1072] (the "<u>Motion to Compel</u>") filed by the Astoria Landlord, and respectfully state as follows.

### <u>Preliminary Statement</u>

1.       Due to a confluence of operational and financial factors that stressed their financial condition, the Debtors filed these cases to avail themselves of the tools and benefits of chapter 11. Perhaps chief among them is the ability of a debtor to rid itself of burdensome lease obligations through the rejection (or renegotiation and assumption) of uneconomic leasehold interests.  It is not foreign to debtors, especially retail debtors (like Rite Aid), to use the tool of rejection to effectuate a comprehensive reorganization of their operations.  Indeed, as a retail business with over 2,100 stores as of the Petition Date, a key component of the Debtors' ability to restructure (and implement Rite Aid 2.0) is the right under the Bankruptcy Code to preserve value through the rejection and/or renegotiation of overmarket leases that the Debtors may no longer wish to operate or view as uneconomical.  To that end, on the first day of these cases and on numerous

---

[3]      The rejection of certain leases, submitted to the Court as <u>Exhibit 1</u> of the *Notice of Agenda of Matters Scheduled to Be Heard On January 29, 2024 at 10:00 a.m. (ET)*, have been adjourned on a consensual basis to allow the Landlords and Subtenants additional time to finalize a consensual resolution (the "<u>Adjourned Leases</u>").  While the legal arguments made herein apply to the rejection of the Adjourned Leases, the Debtors are not proceeding on the Adjourned Leases at the hearing on January 29, 2024 with the understanding that a resolution is likely to be reached in the near term.

occasions thereafter, the Debtors moved swiftly to safeguard estate resources by filing papers—and properly delivering surrender notices to lease counterparties—to effectuate the rejection of leases pertaining to unprofitable stores (including vacant stores).  To date, the Debtors have successfully rejected approximately 495 leases and renegotiated (or are in the process of renegotiating) hundreds more.  While the majority of these rejections were effectuated without objection from the lease counterparties, in certain circumstances the Debtors assumed the role of coalescing support from their subtenant and prime landlord around a consensual path forward that adequately balances the competing interests of all parties.  That includes absolving the Debtors of ongoing administrative rent obligations; allowing the Debtors' subtenant to remain in the space through a new, direct lease with the prime landlord; and providing the Debtors' prime landlord with a go-forward tenant on economical lease terms.  While the Debtors, with the cooperation of their lease counterparties, successfully brokered resolutions relating to twenty-eight prime lease-sublease arrangements (each reflected in a consensual rejection order entered by this Court), certain arrangements remain unresolved.  One of them is a prime lease-sublease arrangement pertaining to a store in Astoria, Queens, New York (the "Astoria Store" at the "Astoria Property") that the Debtors, in their business judgment, no longer wish to retain and that is subject of the Astoria Landlord Objection and the Astoria Subtenant Objection.

2.      As discussed more fully in the declaration of Matthew Davidson in support of this Motion (attached as **Exhibit A** hereto, the "Davidson Declaration"), the Debtors ceased operations at the Astoria Store in February 2022.  They did so because, by 2021, the Astoria Store produced negative trailing twelve month EBITDA of nearly $1 million, resulting from low script volume and high fixed costs.  This, together with several other underperforming retail locations, challenged the Company's earnings profile, turnaround initiatives, and free cash flow.  Rather than burden

itself with the "dead rent" cost of approximately $66,000 per month in rent and $26,000 per month in common area maintenance and taxes due to its inability to exit the Astoria Prime Lease, Rite Aid entered into good-faith negotiations with the Astoria Subtenant on the terms of the Astoria Sublease.  Despite the unfounded, ill-conceived, and dangerous aspersions cast on Rite Aid's negotiation of the sublease in the Astoria Subtenant Objection (which have no bearing on the Debtors' business decision to reject the lease in chapter 11), the Debtors successfully executed a sublease arrangement that alleviated their burden of accruing "dead rent" costs.[4]  While the Astoria Subtenant obtained a year's worth of free rent under the Astoria Sublease, the Debtor obtained a subtenant at an average monthly rate of approximately $40,380 over months 13 through and including 84.  But this stream of rental income remained, and still remains, well below the Debtors' obligations under the Astoria Prime Lease.

3.       Rather than burn approximately $4.7 million by maintaining the Astoria Leases over the course of the lease terms, the Debtors, in a prudent exercise of their business judgment, determined to proceed with the rejection of the Astoria Leases through the filing and proper noticing of the First Lease Rejection Motion along with the timely delivery of the Astoria Surrender Letters (defined herein).[5]  The Astoria Landlord acknowledges timely receipt of notice of the First Rejection Motion and the Astoria Surrender Letter.  Despite the Astoria Landlord's

---

[4]    Though the Debtors vehemently contest the assertions of impropriety set forth in the Astoria Subtenant Objection, "a summary proceeding such as a lease rejection motion 'is not the time or place for prolonged discovery or a lengthy trial with disputed issues.'  Instead, such motions concern the Court's efficient review of the debtor's business judgment."  *See In re The Great Atlantic & Pacific Tea Company, Inc.*, 544 B.R. 43, 53-54 (Bankr. S.D.N.Y. 2016) (citing *In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993)).  To the extent the Astoria Subtenant truly believes in its allegations (rather than recklessly waving them as a cudgel to stand in the way of rejection), they may be properly raised in another context, such an adversary proceeding.

[5]    Letters setting for the surrender of the Astoria Property were delivered to the Astoria Landlord and the Astoria Subtenant on October 16, 2023 (the "Astoria Surrender Letters").  Like all other surrender letters properly delivered to lease counterparties in these cases, the Astoria Surrender Letters unequivocally state that the Debtors, as of the date of the Surrender Letter, surrender possession of the applicable premises and relinquish control of the same to the affected landlord, permitting the affected landlord to rekey the premises as necessary.

assertions otherwise, the Debtors have done everything possible to surrender, and have surrendered, the premises to the landlord; rejection of the Astoria Leases effective as of the date of surrender—i.e., October 16, 2023—is therefore appropriate under the circumstances. *See Chatlos Systems, Inc. v. Kaplan*, 147 B.R. 96, 100 (D. Del. 1992) *aff'd sub nom. In re TIE Commc'ns*, 998 F.2d 1005 (3d Cir. 1993). To accept the Astoria Landlord's position that postpetition rent be due while the subtenant, a tenant at sufferance, remains in the location would lead to the absurd result of the estates being on the hook for administrative expense rent for the remainder of the sublease term, thereby abolishing the debtor's rejection tool for a property it no longer occupies. This contravenes the clear intent of section 365(d)(3) of the Bankruptcy Code— that a debtor be required to pay its landlord for the *benefit* of using the property. Here, of course, there is no benefit to Debtors' estates at all.

4.      Given rejection of the Astoria Prime Lease is appropriate, it necessarily follows that rejection of the sublease is not just appropriate, but automatic, as the Debtor retains no possessory interest in the property. While the Astoria Subtenant retains the ability to negotiate a direct lease with the Astoria Landlord post-rejection, its reliance on section 365(h) is misguided. As the bankruptcy court in the A&P Cases (defined below)[6] and in *Child World* correctly recognized, "[w]hen a prime lease fails, so does the sublease." *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992). Moreover, as the Astoria Subtenant agreed under the terms of its

---

[6]     *See In re The Great Atlantic & Pacific Tea Company, Inc.*, 544 B.R. 43 (Bankr. S.D.N.Y. 2016), *In re The Great Atlantic & Pacific Tea Company, Inc.*, Case No. 10-24549, Docket No. 2504, Hr'g Tr. 247:8-13. June 14, 2011 ("the rejection of the main lease, the prime lease, divests the debtors of its interest, its ability to sublease to your – to your clients. So it effectively rejected that lease when that happened, the sublease.") (together, the "A&P Cases").

sublease, when the Astoria Prime Lease terminates, so does the Astoria Sublease.  *See* Astoria

Sublease § 11(F).[7]

5.      At bottom, the Debtor has been, at all times, a dutiful actor, seeking to balance the

competing harms of any resolution among the Astoria Subtenant and the Astoria Landlord.  Indeed,

prior adjournments of the proposed rejections were aimed to allow additional time for discussions

to progress to a consensual resolution, obviating the need for costly litigation.  But it seems the

economic gap between the rent that the subtenant is willing to pay on a go-forward basis and the

rent amount that the landlord will accept is a bridge too far.  The Debtors' estates cannot be saddled

with the indefinite accrual of postpetition rent.  Rejection of both Astoria Leases is appropriate

under the facts and circumstances as well as prevailing caselaw.  And the equities demand it.

Accordingly, for the reasons set forth herein, the Debtors respectfully request that the Court

overrule the Objections and grant the First Lease Rejection Motion on the terms set forth herein.

## **Reply**

### **I.      THE DEBTORS' REJECTION OF THE LEASES AUTOMATICALLY REJECTS THE SUBLEASES AND SUCH REJECTION IS NOT IMPEDED BY A SUBTENANT'S CONTINUED POSSESSION OF THE PROPERTY.**

6.      Section 365(a) of the Bankruptcy Code provides a debtor the statutory right to

"reject" a lease of nonresidential real property in order to limit the financial burden of future rent

and property maintenance payments.  *See* 11 U.S.C. § 365(a).  A debtor's right to reject a lease is

"vital to the basic purposes of a chapter 11 reorganization, because it can release the debtor's estate

from burdensome obligations that can impede a successful reorganization."  *In re Bildisco*, 465

U.S. 513, 528 (1984).

---

[7]      The Debtors continue to evaluate, and reserve all rights with respect to, any default existing under the Astoria Sublease, including, but not limited to, those alleged in the Astoria Landlord Objection.  *See* Astoria Landlord Objection ¶ 9.

7.      The Objecting Parties, a landlord under the Astoria Lease and a subtenant under the

Astoria Sublease, argue that the Debtors, in fairly and properly exercising their rights entrenched

under section 365(a) of the Bankruptcy Code, have failed to consider the right to remain in

possession afforded to subtenants under section 365(h) of the Bankruptcy Code and, in turn, have

failed to properly surrender the premises to the landlord where a subtenant remains.

8.      The Debtors' rejection of the Astoria Lease constitutes the immediate rejection of

the Astoria Sublease, and to read section 365 of the Bankruptcy Code to the contrary would

contravene the intent of Congress in enacting section 365 of the Bankruptcy Code.

Section 365(h)(1)(A) provides that a lessee "may retain its rights *under [a] lease . . .* for the balance

of the term of such lease *. . . to the extent that such rights are enforceable under applicable

nonbankruptcy law.*" *See* 11 U.S.C. § 365(h) (emphasis added); *see also In re The Great Atlantic

& Pacific Tea Company, Inc.*, 544 B.R. 43, 53-54 (Bankr. S.D.N.Y. 2016) ("[A] proper reading of

section 365(h)(1)(A)(ii)'s reference to the subtenant's rights under such sublease and section

365(d)(4)'s surrender requirement show that section 365(h) does not give the subtenant a

meaningful election to remain in its former subtenancy when the debtor has rejected the

overlease.").  The majority of courts, including those within the Third Circuit, hold that Congress,

in drafting the Bankruptcy Code, intended for possession of a property to revert *immediately* to the

landlord upon rejection of an unexpired lease by a debtor sublandlord pursuant to section 365(a)

of the Bankruptcy Code.  *See Chatlos Sys., Inc. v. Kaplan*, 147 B.R. 96, 100 (D. Del. 1992), *aff'd

sub nom. In re TIE Commc'ns, Inc.*, 998 F.2d 1005 (3d Cir. 1993) ("[W]hen a lease is deemed

rejected pursuant to section 365(d)(4), any subleases under that primary lease must also be deemed

rejected since the sublessee's rights in the property extinguish with those of the sublessor."); *The

Great Atlantic & Pacific Tea Company, Inc.*, 544 B.R. at 53-54 ("When the debtor has rejected

the overlease . . . [i]n that instance, the requirement that the debtor surrender possession to its

landlord is tantamount to termination as far as the subtenant's rights as lessee . . . are concerned.

The subtenant may have common law rights *against the landlord* . . . [but] the subtenant lacks any

meaningful right to possession from the debtor under the [sub]lease.") (internal quotations omitted;

emphasis in original); *In re 6177 Realty Assocs., Inc.*, 142 B.R. 1017, 1019 (Bankr. S.D. Fla. 1992)

("Rejection of a non-residential lease results in termination of the lease.  Once the underlying lease

is terminated, leasehold mortgages or sublessees retain no interest that can be pursued in

bankruptcy court or state court."); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992)

("As a sublessee, [subtenant] has no possessory interest to preserve following the debtor's rejection

of the prime lease."); *In re Stalter & Co.*, 99 B.R. 327, 330-331 (E.D. La. 1989) ("A law that

commands two mutually exclusive events cannot be obeyed.  The only rational view is that section

365(h) does not afford the [subtenant] a right against the [sublessor] to occupy the Leased Premises

after . . .  the rejection of the Master Lease . . . there is no real property to which the subleasehold

attaches as soon as the debtor's right to possession under the primary lease ends."); *see also, In re

Elephant Bar Rest., Inc.*, 195 B.R. 353, 357 (Bankr W.D. Pa. 1996); (holding that subtenant

retained possessory right in the rejected premises only to the extent enforceable under applicable

nonbankruptcy law, or state law) (internal citations omitted); *In re Dial-A-Tire, Inc.*, 78 B.R. 13,

16 (Bankr. W.D.N.Y. 1987) (finding rejection of a lease must result in the sublease being deemed

rejected as well.  "The application of [section 365(d)(4) and section 365(h)(1)] . . . produces [an]

anomalous result . . . [t]he matter of which is resolved by resort to forum law. . .  dual rejection []

will leave [the landlord] and [the subtenant] to vie for possession of the Premises according to

New York Law."); *In re Elmhurst Transmission Corp.*, 60 B.R. 9, 10 (Bankr. E.D.N.Y. 1986) ("If

a debtor's lease is rejected in bankruptcy, [section 365(h)(l)], affords his subtenants no more than

their rights under state law."). A contrary conclusion would prevent a debtor tenant and sublandlord from utilizing section 365(d)(4) to maximize value for the Debtors' estate.

9.      It is blackletter law that a debtor may assume or reject an executory contract or unexpired leases, and that such assumption or rejection must be of the entire contract. *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) (citing *Stewart Title Guar. Co.*, 83 F.3d at 741 (5th Cir. 1996)). A provision authorizing the sublease of non-residential real property is part and parcel of the entire agreement to be rejected. *See, e.g., In re Magna Cum Latte, Inc.*, 2007 WL 231633, at *4 (Bankr. S.D. Tex. Oct. 30, 2007) (finding that where a sublease was tied to a master lease the rejection of the master lease terminated the sublease).

10.     To be sure, the law of this jurisdiction does not diverge from the majority, and the Debtors have effectuated a timely and well-noticed rejection of the Astoria Leases through the First Lease Rejection Motion. In *In re Chi-Chi's, Inc.*, the Bankruptcy Court for the District of Delaware held that the "appropriate [rejection] date is the day the Debtors surrendered the premises to the Landlords, and the Landlords were able to enter into agreements with the current tenants." *See In re Chi-Chi's, Inc.*, 305 B.R. 396, 399 (Bankr. D. Del. 2004) (approving the retroactive rejection of the debtors' leases where the premises at issue were subject to subleases and sublessees remained on the premises as of the date of the entry of the order). As stated above, the Astoria Landlord and the Astoria Subtenant have been able, and encouraged, to enter into such agreements since the proposed rejection effective date of October 16, 2023.

11.     The Objecting Parties raise *In re Amicus Wind Down Corp.*, 2012 WL 604143 (Bankr. D. Del. Feb. 24, 2012), for the proposition that rejection is improper where a subtenant remains on the premises. However, *Amicus* requires only that the Debtors "deliver, at least, constructive possession of the premises." *In re Amicus Wind Down Corp.*, 2012 WL 604143, at

*2.  Here, unlike in *Amicus*, where the debtor had not yet surrendered keys or security codes, the Debtors (a) filed the First Lease Rejection Motion, (b) provided notice of the First Lease Rejection Motion to all Lease and Sublease counterparties, *and* (c) promptly delivered, via overnight mail, the Astoria Surrender Letters to the Astoria Landlord and Subtenant, explicitly stating the landlords' right to repossess and rekey the premises.  As such, the Debtors have done "everything possible to surrender the premises."  *Chatlos Systems, Inc. v. Kaplan*, 147 B.R. 96, 100 (D. Del. 1992) *aff'd sub nom. In re TIE Commc'ns*, 998 F.2d 1005 (3d Cir. 1993).

12.    Additionally, this Court and other courts in this Circuit have held that the presence of a subtenant in possession of a premises does not impede the debtor's retroactive rejection of the lease related to that premises.  *See In re Southern Air Holdings, Inc.*, Case No. 12-12690 (CSS) (Bankr. D. Del. Oct. 26, 2012) [Docket No. 227], Hr'g Tr. at pp. 58-62 (finding that a debtor had the right to retroactively reject a lease, as of the day that the debtor turned over the keys to the landlord by letter, even where a subtenant remained in possession of the premises and noting that "the landlord has the right to [] get the [sub]tenant out, and to charge until that [sub]tenant leaves, charge whatever the reasonable rental would be" as it "doesn't involve the debtor"); *see also In re Cinram Group, Inc.*, Case No. 17-15258 (VFP) (Bankr. D.N.J. March 29, 2017) [Docket No. 98], Hr'g Tr. at pp. 75-76 (relying on *Chatlos* and *Southern Air Holdings* in holding that the presence of subtenancies does not prevent the debtor from rejecting a sublease and stating that "the better-reasoned view [is], that once the debtor has given landlord notice of the rejection . . . that the relationship between the [] overlandlord and the subtenant is whatever it is under state law," but is not an issue before the Bankruptcy Court.).

13.    It also bears noting that the Astoria Subtenant cites to *In re Revel AC, Inc*., 532 B.R. 216, 227 (Bankr. D.N.J. 2015) for the proposition that this Court has recognized the statutory rights

of lessees under section 365(h) of the Bankruptcy Code in the context of a "free and clear" sale

under section 363 of the Bankruptcy Code.  However, the holding in that case hinged on the fact

that the sale order entered during the pendency of the case specified "that the sale was made subject

to the possessory interests of the tenants [pursuant to section 365(h)]."  *In re Revel AC, Inc.,* 532

B.R. 216, 224 (Bankr. D.N.J. 2015).  Furthermore, on appeal for summary judgment, the Third

Circuit stayed the sale free and clear without ultimately reaching the question of whether or not a

sale under section 363 could be effectuated free and clear of a tenant's rights under 365(h).  *See In

re Revel AC*, 802 F.3d 558, 575 (3d Cir. 2015).

14.    Section 365 of the Bankruptcy Code does not specifically address whether the

Bankruptcy Court may order rejection to be applied retroactively.  Courts, however, generally

approve retroactive rejection where it promotes the purposes of section 365(a) of the Bankruptcy

Code.  *See In re Chi Chi's, Inc.*, 305 B.R. at 339 (stating that section 365 allows for retroactive

rejection of nonresidential leases where the principles of equity dictate); *see also In re CCI

Wireless, LLC*, 297 B.R. 133, 138 (D. Colo. 2003) (noting that section 365 "does not prohibit the

bankruptcy court from allowing the rejection of leases to apply retroactively").  Bankruptcy courts

may, in their discretion, authorize rejection retroactively to a date prior to entry of the order

authorizing such rejection where the balance of equities favor such relief.  *See, e.g., In re Virginia

Packaging Supply Co., Inc.*, 122 B.R. 491, 493 (Bankr. E.D. Va. 1990) (allowing retroactive

rejection of a lease where the debtor timely filed a motion for rejection); *see also, e.g., In re

Philadelphia Newspapers, LLC*, 424 B.R. 178, 185 (Bankr. E.D. Pa. 2010) (granting retroactive

rejection where equitable considerations did not weigh against it); *BP Energy Co. v. Bethlehem

Steel Corp.*, 2002 WL 31548723, at *3 (S.D.N.Y. Nov. 15, 2002) ("[W]e cannot conclude . . . that

a bankruptcy court's assignment of a retroactive rejection date falls outside of its authority when

the balance of the equities favors this solution."); *In re At Home Corp.*, 392 F.3d 1064, 1065–66 (9th Cir. 2004) cert. denied sub nom., 546 U.S. 814 (2005) (affirming bankruptcy court's approval of retroactive rejection); *In re Thinking Machs., Corp.*, 67 F.3d 1021, 1028 (1st. Cir. 1995) ("[B]ankruptcy courts may enter retroactive orders of approval, and should do so when the balance of equities preponderates in favor of such remediation."). Notably, permitting rejection to occur retroactively, as of a certain date, is also consistent with prior rulings in this jurisdiction. *See, e.g.*, *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D. N.J. May 18, 2023) (authorizing rejection of unexpired leases effective as of a specified date); *In re Bed Bath & Beyond Inc*., No. 23-13359 (VFP) (Bankr. D. N.J. May 17, 2023) (same); *In re L'Occitane, Inc.,* No. 21-10632 (MBK) (Bankr. D. N.J. Jan. 28, 2021) (same); *In re SLT Holdco, Inc.,* No. 20-18368 (MBK) (Bankr. D. N.J. July 10, 2020) (same); *In re Modell's Sporting Goods, Inc.,* No. 20-12179 (VFP) (Bankr. D. N.J. Mar. 13, 2020) (same).[8]

15. Following rejection of the Astoria Leases, the Debtors no longer have any interest in the Astoria Property, and the Astoria Sublease that was subject to the Debtors' rejected Astoria Lease is accordingly terminated. *Chatlos*, 147 B.R. at 101. As the Debtors no longer have an interest in the Astoria Property against which Astoria Subtenant asserts rights under section 365(h) of the Bankruptcy Code, the law of this Circuit dictates that the presence of a subtenant does not impede a prior-effective rejection. *Id.* at 100. At present, the Astoria Subtenant, by remaining on the Astoria Property, is merely a tenant at sufferance to which the Debtor have neither privity nor responsibility. Accordingly, the presence of the Astoria Subtenant does not act to impede rejection of the Astoria Leases in any way.

---

[8]  Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' counsel.

## II.    THE BALANCE OF EQUITIES FAVORS APPROVAL OF REJECTION OF THE ASTORIA LEASES.

16.    The ability to assume or reject executory contracts and unexpired leases is "vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 528 (1984).  The decision to assume or reject executory contracts or unexpired leases is a matter within the "business judgment" of the debtor.  *See, e.g., Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996); *see also Nat'l Labor Relations Board v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982) *aff'd*, 465 U.S. 513 (1984) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test." (citation omitted)); *see also Glenstone Lodge, Inc. v. Buckhead Am. Corp. (In re Buckhead Am. Corp.)*, 180 B.R. 83, 88 (D. Del. 1995).  Application of the business judgment standard requires a court to approve a debtor's business decision unless the decision is the product of bad faith, whim, or caprice.  *See, e.g.*, *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511–12 (Bankr. D. Del. 2003).  In addition, section 105(a) of the Bankruptcy Code authorizes the Court to issue any order "necessary or appropriate to carry out the provisions of [the Bankruptcy Code]," thereby codifying the Court's inherent equitable powers.  *See* 11 U.S.C. § 105(a). *See In re The Home Corp.* 392 F. 3d 1064, 1070 (9th Cir. 2004) (noting that a Bankruptcy Court, in exercising its equitable powers under section 105(a), may approve the retroactive rejection of a nonresidential lease when "necessary or appropriate to carry out the provisions of" section 365(d)).

17.    After evaluation and analysis, the Debtors, with the assistance of their advisors, identified each of the Astoria Leases as uneconomical or unfit to form part of the Rite Aid 2.0 business.  Accordingly, in an effort to reduce unnecessary postpetition rent and administrative

costs, the Debtors determined that it was in the best interests of their estates to reject the Astoria

Leases, further allowing the Debtors to focus on their ongoing lease modification negotiations and

efforts to monetize other leases.  The Astoria Subtenant challenges this exercise of the Debtors'

business judgment, arguing not only the Debtors' decision is mathematically unsound but also that

it will impair the Debtors' ability to continue to enter into subleases upon their emergence from

chapter 11, particularly in the event that the Debtors ever file another chapter 11 case in the future.

Putting aside the Astoria Subtenant's preposterous suggestion that this Court judge the Debtors'

use of lease rejection, a tool available only to chapter 11 debtors, in relation to its possible use of

lease rejection in an imagined chapter 22 scenario, it should be noted that the Debtors' status as a

valuable lease counterparty has remained strong through the successful rejection of over 495

unexpired leases since the Petition Date.  Through the case, the Debtors have successfully

negotiated renewed terms on several leases.  Each of these agreements represents a lease

counterparty's hope of maintaining a positive ongoing relationship with the Debtors, both in

chapter 11 and after emergence.

18.    In this instance, the balance of the equities overwhelmingly favors approval of

retroactive rejection of the Astoria Leases.  The Debtors have no interest in the Astoria Property

related to the rejected Astoria Leases.  As was the case for nearly all of the leases rejected since

the Petition Date, the Debtors pay a higher rent rate to the Astoria Landlord as compared to the

rent rates slated to be paid by the Astoria Subtenant to the Debtors for the remainder of the Astoria

Subleases' term.  Therefore, the Debtors are therefore incurring costs so that they can function as

a landlord for the subtenant.  This arrangement is waste of estate resources and does not provide a

benefit to the estates.

19.    With respect to the Astoria Landlord's Motion to Compel, the Debtors seek to retroactively reject the Astoria Leases as of the Rejection Date, which this and other courts in this Circuit have granted to similarly situated debtors over the objection of landlords that took issue with the holdover presence of a subtenant on the premises.  *See* cases cited *supra* paragraph 14. If the Court holds in accordance with the weight of authority, then the Motion to Compel is moot, as no postpetition amounts could be owed to a landlord whose lease was rejected as of the Rejection Date.  However, to the extent that the Court grants the relief requested by the First Lease Rejection Motion, but alternatively finds that a later rejection effective date is appropriate, the Debtors will honor all of their obligations under section 365(d)(3) consistent with the Court's finding.

20.    Furthermore, in response to the Astoria Landlord's attempts to compel administrative expense payments arising from the costs of clean-up and abandonment of the premises, it bears repeating that the Debtors' surrender of the property was properly effectuated by the service of the Surrender Letter.  Furthermore, administrative priority applies only to expenses that are both "actual" and "necessary" to preserve the estate.  *See* 11 U.S.C. § 503(b)(1)(A).  "The words 'actual' and 'necessary' are construed narrowly:  the debt must benefit [the] estate and its creditors." *Toma Steel Supply, Inc. v. TransAmerican Nat. Gas Corp.* (*In re TransAmerican Nat. Gas Corp.*), 978 F.2d 1409, 1416 (5th Cir. 1992) (internal citations omitted); *see also In re the Grand Union Co.*, 266 B.R. 621, 628 (Bankr. D.N.J. 2001) (internal citations omitted) (indeed, "[t]here must be an actual concrete benefit to the estate before a claim is allowable as an administrative expense.")  The payment of alleged administrative expenses related to a premises that was properly surrendered and rejected not only confers no benefit to

estate but, to the contrary, constitutes a needless waste of estate resources to the detriment of other general unsecured creditors.

21.     The Debtors do not have any more control over any Astoria Subtenant than the Astoria Landlord would and section 365 of the Bankruptcy Code was not, and could not have been, designed to force a debtor to have to wait in suspended state of waste to exercise its rejection rights in such a circumstance.  While the Debtors acknowledge the difficult situation that the Astoria Landlord and Astoria Subtenant find themselves in, the Debtors are duty bound to maximize the value of their estates.  The Debtors have determined to reject the Astoria Leases for the simple business reason that the Debtors cannot incur additional administrative rent on the Astoria Leases. To the extent that the Astoria Subtenant desires to stay in the location and pay such rent, it may do so through a direct lease arrangement with the Astoria Landlord.  Any other costs incurred by Astoria Landlord or Astoria Subtenant are rightly viewed as rejection damages to be addressed through the proof of claim process.  To hold to the contrary would be to permit a needless burn on estate resources that will reduce recoveries available for the benefit of all general unsecured creditors.  Accordingly, this Court should find that the balance of the equities weighs in favor of the Debtors.

## Conclusion

22.     For all of these reasons set forth herein—and for the reasons set forth in the First Lease Rejection Motion—the Objections and the Motion to Compel should be overruled, and the relief requested by the First Lease Rejection Motion granted.

*[Remainder of page intentionally left blank.]*

Dated: January 25, 2024

*/s/ Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:     msirota@coleschotz.com
                wusatine@coleschotz.com
                fyudkin@coleschotz.com
                svanaalten@coleschotz.com

**<u>Exhibit A</u>**

**Declaration of Matthew Davidson**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and Debtors in
Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF
MATTHEW DAVIDSON IN
SUPPORT OF DEBTORS' OMNIBUS
REPLY IN SUPPORT OF DEBTORS' MOTION
FOR ENTRY OF AN ORDER (I) AUTHORIZING
(A) REJECTION OF CERTAIN UNEXPIRED LEASES AND
(B) ABANDONMENT OF ANY PERSONAL PROPERTY, EFFECTIVE
AS OF THE REJECTION DATE AND (II) GRANTING RELATED RELIEF**

I, Matthew Davidson, hereby declare under penalty of perjury:

1.     I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"),

the financial advisor to the above-captioned debtors and debtors in possession (collectively,

the "Debtors").  I submit this declaration (this "Declaration") in support of the *Debtors' Omnibus*

---

[1]    The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034.  A complete list of the
Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the
website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid.  The location of
Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11
cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

*Reply in Support of Debtors' Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Any Personal Property, Each Effective as of the Rejection Date and, (II) Granting Related Relief*, filed contemporaneously herewith,[2] and in response to the Objections.

2.       Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtors and their professionals, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.  I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.

## Professional Background and Qualifications

3.       I have been a financial advisor to stressed and distressed companies for over 18 years.  I am a Managing Director at A&M, where I have been employed for over 5 years.  A&M is a restructuring consulting firm with extensive experience providing high quality, specialized management and restructuring advisory services to debtors and distressed companies.  A&M's services include turnaround advisory services, interim and crisis management, revenue enhancement, claims management, and creditor and risk management advisory services.

4.       Since joining A&M in 2018, my primary areas of concentration include interim management, in- and out- of court restructurings, mergers and acquisitions, and refinance transactions involving both performing and underperforming companies.  My representative

---

[2]     Capitalized terms used but not defined herein have the meaning ascribed to them in the Reply or the First Lease Rejection Motion, as applicable.

engagements have included clients across various industries, including retail, gas and oil, and hospitality.

5.      I hold a bachelor's degree in corporate finance from Western Michigan University and a Master of Business Administration degree from Wayne State University. I am also an active member of the Turnaround Management Association.

6.      A&M has been advising the Debtors since May 2023, and as a result, I am generally familiar with the Debtors' day-to-day operations, real estate portfolio, business and financial affairs, and books and records. Members of the A&M team and I have assisted the Debtors with their ongoing efforts to right-size their retail footprint, among other things.

**The Lease Rejection Analysis**

7.      A key component of the Company's go-forward business plan is the continuation and completion of the Debtors' ongoing effort to rationalize their lease footprint. This effort entails, among other things, the closure of certain underperforming stores and rejecting leases based on a cost-benefit analysis. The Debtors, with the assistance of A&M, conducted a analysis of the Debtors' lease portfolio and financial performance to identify leases that provided limited or no benefit to the Debtors. For all leases in which the Debtors were sublandlords, the Debtors compared the rent they were paying on behalf of the prime lease and the rent they were receiving from the subtenant on behalf of the sublease. The Debtors also considered the administrative resources incurred to maintain each lease, including the valuable time and resources that the Debtors' employees had to expend to ensure the subtenant was complying with the terms of the lease, maintain the premises in good condition, and maintain an accounting team to facilitate all rent and CAM payments in a timely fashion. For many subleases, the Debtors were incurring costs, rent and administrative costs, so that they can function as a landlord for the subtenant. Prior to the Petition Date, the Debtors, with the assistance of A&M, after careful evaluation and analysis,

identified the Astoria Leases (defined below) as loss-generating and determined that there was little, if any, likelihood that any net value would be realized from the Debtors' efforts to retain and market them.

8.        Accordingly, on the Petition Date, the Debtors filed the First Lease Rejection Motion seeking to reject 345 leases, including the Astoria Leases. The Debtors were essentially paying rent, administrative expenses, and associated costs solely to act as a "middleman" between the Landlords and the subtenants, in an arrangement that served only to facilitate an egregiously wasteful allocation of estate resources that yields zero benefits to the Debtors.

9.        Specifically, under the prime lease for the premises located at 32-14 31st (the "Astoria Prime Lease"), the Debtors would pay approximately $66,000.00 per month in rent for the year 2024 and $26,000.00 per month for common area maintenance and taxes, and under the sublease for the same premises (the "Astoria Sublease" and together the "Astoria Leases"), the Astoria Subtenant is required to pay $0 in rent for the first 12 months of the lease (from June 2023 through May 2024).[3]  As part of the chapter 11 restructuring process, Rite Aid and its advisors examined the cash inflows received on account of the Astoria Sublease and cash outflows related to payments on the Astoria Lease, and calculated that the maintenance of the Astoria Leases would yield a $4.7 million cash deficiency over the term of the Astoria Leases.  As such, Rite Aid, with the assistance of A&M, determined that it was in the Debtors' best interests to reject the Astoria Leases.  Given this cash deficiency, I believe that this decision is a sound exercise of business judgment intended to maximize the value of the estates for the benefit of all creditors.  The decision to reject the Astoria Leases was made as part of the chapter 11 restructuring process in the two

---

[3]    Under the Astoria Sublease, the subtenant was required to pay $0.00 in rent for months 1-12, $29,583.33 for months 13-24, $40,375.00 for months 25-36, and $41,182.50 for months 37-48.

months immediately preceding the bankruptcy filing, several months after the Debtors decided to enter into the Astoria Sublease with the Astoria Subtenant.

## The Lease Rejection Process

10.      On the Petition Date, the Debtors filed the First Lease Rejection Motion and served surrender letters on each of the affected lease counterparties, including the Astoria Landlord and Astoria Subtenant.  The Astoria Surrender Letters unequivocally state that the Debtors, as of the date of the Surrender Letter, surrender possession of the applicable premises and relinquish control of the same to the affected landlord, permitting the affected landlord to rekey the premises as necessary.

## Conclusion

11.      I believe that the rejection of the Astoria Leases is a valid and sound exercise of the Debtors' business judgment.  For all of the reasons set forth in this Declaration, I submit it would be appropriate for the Court to overrule the Objections.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: January 25, 2024                    */s/ Matthew Davidson*
                                           Name:  Matthew Davidson
                                           Title:   Managing Director
                                                      Alvarez & Marsal North America, LLC