SUBJECT TO CONTINUING NEGOTIATIONS

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF RITE AID CORPORATION AND ITS DEBTOR AFFILIATES

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:     (201) 489-3000
Email:     msirota@coleschotz.com
         wusatine@coleschotz.com
         fyudkin@coleschotz.com
         svanaalten@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     esassower@kirkland.com
         joshua.sussberg@kirkland.com
         aparna.yenamandra@kirkland.com
         ross.fiedler@kirkland.com
         zach.manning@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

---

[1]     The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' Claims and Noticing Agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these Chapter 11 Cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

i

## TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
    GOVERNING LAW ............................................................................................................. 1
    A.    Defined Terms. ................................................................................................................ 1
    B.    Rules of Interpretation. ................................................................................................. 35
    C.    Computation of Time. .................................................................................................... 36
    D.    Governing Law. .............................................................................................................. 36
    E.    Reference to Monetary Figures. .................................................................................... 36
    F.    Controlling Document. ................................................................................................... 36
    G.    Nonconsolidated Plan. ................................................................................................... 36
    H.    Purchase Agreement Consent Rights and Controlling Documents ................................ 36
    I.    Reference to the Debtors and the Reorganized Debtors ................................................ 37

ARTICLE II ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE  CLAIMS, PRIORITY TAX
    CLAIMS, AND DIP CLAIMS ........................................................................................... 37
    A.    Administrative Claims. .................................................................................................. 37
    B.    Payment of Fees and Expenses under Financing Orders ................................................ 38
    C.    Professional Fee Claims. ................................................................................................ 38
    D.    Priority Tax Claims. ....................................................................................................... 39
    E.    DIP Claims. .................................................................................................................... 40
    F.    AHG New-Money Commitment Agreement Claims and MedImpact Term Loan Backstop
    Commitment Agreement Claims ................................................................................... 41

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................................... 41
    A.    Classification of Claims and Interests. ......................................................................... 41
    B.    Treatment of Claims and Interests. .............................................................................. 42
    C.    Special Provision Governing Unimpaired Claims. ....................................................... 46
    D.    Elimination of Vacant Classes. ..................................................................................... 47
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes. ................................... 47
    F.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ................. 47
    G.    Controversy Concerning Impairment. .......................................................................... 47
    H.    Subordinated Claims. ..................................................................................................... 47

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ............................................................... 48
    A.    General Settlement of Claims and Interests. ................................................................. 48
    B.    Settlement of Tort Claims .............................................................................................. 48
    C.    Equitization Transaction. ............................................................................................... 49
    D.    Sale Transaction Restructuring. .................................................................................... 51
    E.    Committee Settlement .................................................................................................... 52
    F.    Insurance Neutrality. ..................................................................................................... 61
    G.    Sources of Consideration for Plan Distributions. ......................................................... 61
    H.    Plan Administrator and the Wind-Down Debtors. ........................................................ 65
    I.    Liquidating Trust. .......................................................................................................... 67
    J.    Release of Liens. ............................................................................................................ 68
    K.    Cancellation of Existing Securities and Agreements. ................................................... 68
    L.    Corporate Action. .......................................................................................................... 70
    M.    New Corporate Governance Documents. ...................................................................... 70
    N.    Management Incentive Plan. .......................................................................................... 70
    O.    Effectuating Documents; Further Transactions. ........................................................... 70
    P.    Section 1146 Exemption. ............................................................................................... 71
    Q.    Exemption from Securities Act Registration ................................................................ 71
    R.    Preservation of Causes of Action. ................................................................................. 72
    S.    Private Company. ........................................................................................................... 73

T.     Additional Sale Transactions. .......................................................................... 73
U.     Employment Obligations. ................................................................................. 74

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................. 74
A.     Assumption and Rejection of Executory Contracts and Unexpired Leases. .................................. 74
B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases. ................................... 76
C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ................................ 77
D.     Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases. ........... 78
E.     Insurance Policies. ........................................................................................... 78
F.     Indemnification Provisions. .............................................................................. 79
G.     D&O Liability Insurance Policies. ...................................................................... 79
H.     Modifications, Amendments, Supplements, Restatements, or Other Agreements. ...................... 80
I.     Reservation of Rights. ...................................................................................... 80
J.     Nonoccurrence of Effective Date. ...................................................................... 80
K.     Contracts and Leases Entered Into After the Petition Date. ..................................... 81
L.     Sale Order Assignment Procedures. .................................................................... 81

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ................................................................. 81
A.     Timing and Calculation of Amounts to Be Distributed. ......................................... 81
B.     Distributions on Account of Obligations of Multiple Debtors. ................................ 81
C.     Distributions Generally. ................................................................................... 82
D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions. ................ 83
E.     Manner of Payment. ....................................................................................... 84
F.     Compliance with Tax Requirements. .................................................................. 84
G.     Allocations. .................................................................................................. 84
H.     Foreign Currency Exchange Rate. ...................................................................... 85
I.     Setoffs and Recoupment. ................................................................................. 85
J.     Claims Paid or Payable by Third Parties. ............................................................ 85
K.     Co-Defendant Defensive Rights ........................................................................ 86

ARTICLE VII THE PLAN ADMINISTRATOR .................................................................................... 86
A.     The Plan Administrator. ................................................................................... 86
B.     Wind-Down. ................................................................................................. 88
C.     Exculpation, Indemnification, Insurance & Liability Limitation. ............................. 88
D.     Tax Returns. ................................................................................................. 88

ARTICLE VIII RESERVES ADMINISTERED BY THE PLAN ADMINISTRATOR ....................................... 88
A.     Establishment of Reserve Accounts. .................................................................. 89
B.     Undeliverable Distribution Reserve. .................................................................. 89
C.     Wind-Down Reserve. ...................................................................................... 89
D.     Administrative / Priority Claims Reserve. ........................................................... 90

ARTICLE IX PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ........................................................................................ 90
A.     Disputed Claims Process ................................................................................. 90
B.     Allowance of Claims. ...................................................................................... 90
C.     Estimation of Claims. ...................................................................................... 91
D.     Adjustment to Claims or Interests without Objection. ........................................... 91
E.     Time to File Objections to Claims. ..................................................................... 92
F.     Disallowance of Claims or Interests. .................................................................. 92
G.     No Distributions Pending Allowance. ................................................................. 92
H.     Distributions After Allowance. .......................................................................... 93
I.     Tax Treatment of Reserves for Disputed Claims. .................................................. 93
J.     No Interest. ................................................................................................... 93
K.     Amendments to Claims. ................................................................................... 93

ARTICLE X SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ................................. 94
    A.    Settlement, Compromise, and Release of Claims and Interests. ........................................ 94
    B.    Release of Liens. .................................................................................................................. 94
    C.    Debtor Release. ..................................................................................................................... 95
    D.    Third-Party Release. ............................................................................................................. 96
    E.    Exculpation. .......................................................................................................................... 98
    F.    Injunction. ............................................................................................................................. 99
    G.    Channeling Injunction. ....................................................................................................... 100
    H.    Insurer Injunction. .............................................................................................................. 101
    I.    Controlled Substance Injunction ....................................................................................... 102
    J.    Preservation of Setoff Rights. ............................................................................................ 103
    K.    Protections Against Discriminatory Treatment. ................................................................ 103
    L.    Document Retention. .......................................................................................................... 103
    M.    Reimbursement or Contribution ........................................................................................ 103
    N.    Term of Injunctions or Stays. ............................................................................................ 103
    O.    Subordination Rights. ......................................................................................................... 104

ARTICLE XI CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ................................. 104
    A.    Conditions Precedent to the Effective Date. ..................................................................... 104
    B.    Waiver of Conditions. ........................................................................................................ 107
    C.    Effect of Failure of Conditions. ........................................................................................ 107
    D.    Substantial Consummation. ............................................................................................... 107

ARTICLE XII MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ......................... 107
    A.    Modification and Amendments. ......................................................................................... 107
    B.    Effect of Confirmation on Modifications. ......................................................................... 108
    C.    Revocation or Withdrawal of Plan. ................................................................................... 108

ARTICLE XIII RETENTION OF JURISDICTION ...................................................................................... 108

ARTICLE XIV MISCELLANEOUS PROVISIONS ..................................................................................... 110
    A.    Immediate Binding Effect. ................................................................................................. 110
    B.    Additional Documents. ....................................................................................................... 111
    C.    Payment of Statutory Fees. ................................................................................................ 111
    D.    Statutory Committees and Cessation of Fee and Expense Payment. ............................... 111
    E.    Rights of Purchasers under a Sale Order. .......................................................................... 111
    F.    Reservation of Rights. ........................................................................................................ 111
    G.    Successors and Assigns. ..................................................................................................... 111
    H.    Notices. ............................................................................................................................... 112
    I.    Entire Agreement. .............................................................................................................. 113
    J.    Exhibits. .............................................................................................................................. 113
    K.    Nonseverability of Plan Provisions. .................................................................................. 114
    L.    Votes Solicited in Good Faith. .......................................................................................... 114
    M.    Closing of Chapter 11 Cases. ............................................................................................ 114
    N.    Waiver or Estoppel. ........................................................................................................... 114
    O.    Conflicts. ............................................................................................................................. 114

THIS DRAFT OF THE PLAN REMAINS SUBJECT TO CONTINUING NEGOTIATIONS WITH ALL PARTIES IN INTEREST AND THE FINAL VERSION MAY CONTAIN MATERIAL DIFFERENCES.  FOR THE AVOIDANCE OF DOUBT, NO PARTY HAS CONSENTED TO THIS VERSION AS THE FINAL FORM, AND ALL PARTIES RESERVE THEIR RESPECTIVE RIGHTS WITH RESPECT TO THIS DOCUMENT AND ANY RELATED DOCUMENTS.  THE DEBTORS SHALL FILE A REDLINE VERSION WITH THE BANKRUPTCY COURT CONCURRENTLY WITH THE FILING OF ANY AMENDED OR MODIFIED VERSION OF THIS PLAN.

## INTRODUCTION

Rite Aid Corporation ("Rite Aid") and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 Cases (each a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") for the resolution of the outstanding Claims against, and Interests in, the Debtors pursuant to chapter 11 of the Bankruptcy Code.  Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor.  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable.  The Plan does not contemplate substantive consolidation of any of the Debtors.  Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.  *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.  "*1145 Securities*" means, collectively, (a) the New Common Stock (excluding New Common Stock underlying the Management Incentive Plan), (b) the Takeback Notes, (c) the MedImpact Rights Offering NewCo Notes (if any), and (d) the MedImpact Backstop Fee NewCo Notes (if any); *provided, however*, that the number of holders of any of the classes of securities mentioned in clauses (a) through (d) of this definition shall not exceed 300 holders.

2.  "*2025 Secured Notes*" means the 7.500% secured notes due July 1, 2025, issued by Rite Aid pursuant to the 2025 Secured Notes Indenture.

3.  "*2025 Secured Notes Indenture*" means that certain indenture, dated as of February 5, 2020, among Rite Aid, as issuer, the subsidiary guarantors party thereto, and the 2025 Secured Notes Trustee, and any related documents, as amended, supplemented, or otherwise modified from time to time.

4.  "*2025 Secured Notes Trustee*" means The Bank of New York Mellon Trust Company, N.A., and any successor thereto, as trustee and notes collateral agent for the 2025 Secured Notes under the 2025 Secured Notes Indenture.

5.  "*2026 Secured Notes*" means the 8.000% secured notes due November 15, 2026, issued by Rite Aid pursuant to the 2026 Secured Notes Indenture.

6.      "*2026 Secured Notes Indenture*" means that certain indenture, dated as of July 27, 2020, among Rite Aid, as issuer, the subsidiary guarantors party thereto, and the 2026 Secured Notes Trustee, and any related documents, as amended, supplemented, or otherwise modified from time to time.

7.      "*2026 Secured Notes Trustee*" means The Bank of New York Mellon Trust Company, N.A., and any successor thereto, as trustee and notes collateral agent for the 2026 Secured Notes under the 2026 Secured Notes Indenture.

8.      "*2027 Unsecured Notes*" means the 7.700% unsecured notes due February 15, 2027, issued by Rite Aid pursuant to the 2027 Unsecured Notes Indenture.

9.      "*2027 Unsecured Notes Indenture*" means that certain indenture, dated as of August 1, 1993, by and between Rite Aid, as issuer, and Morgan Guaranty Trust Company of New York, as trustee, as supplemented by that certain supplemental indenture, dated as of February 3, 2000, by and between Rite Aid, as issuer, and U.S. Bank Trust National Association, as trustee, as may be amended, supplemented, or otherwise modified from time to time.

10.      "*2027 Unsecured Notes Trustee*" means U.S. Bank Trust National Association, and any successor thereto, as trustee for the 2027 Unsecured Notes under the 2027 Unsecured Notes Indenture.

11.      "*2028 Unsecured Notes*" means the 6.875% unsecured notes due December 15, 2028, issued by Rite Aid pursuant to the 2028 Unsecured Notes Indenture.

12.      "*2028 Unsecured Notes Indenture*" means that certain indenture, dated as of December 21, 1998, by and between Rite Aid, as issuer, and Harris Trust and Savings Bank, as trustee, as supplemented by that certain supplemental indenture, dated as of February 3, 2000, by and between Rite Aid, as issuer, and Harris Trust and Savings Bank, as trustee (as may be amended, supplemented, or otherwise modified from time to time).

13.      "*2028 Unsecured Notes Trustee*" means Harris Trust and Savings Bank, and any successor thereto, as trustee for the 2028 Unsecured Notes under the 2028 Unsecured Notes Indenture.

14.      "*ABL Facility*" means the senior secured asset-based revolving credit facility provided for under the Prepetition Credit Agreement.

15.      "*ABL Facility Claim*" means, to the extent not converted into a DIP ABL Claim, any Claim derived from, based upon, or arising under the ABL Facility.

16.      "*ABL Lenders*" means the lenders from time to time under the ABL Facility.

17.      "*Acquired Assets*" means, collectively, the Elixir Acquired Assets and the Retail Acquired Assets.

18.      "*Ad Hoc Secured Noteholder Group*" means an ad hoc group of Holders of Senior Secured Notes Claims represented by the Ad Hoc Secured Noteholder Group Professionals.

19.      "*Ad Hoc Secured Noteholder Group Professionals*" means, collectively, (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as primary counsel, (b) Evercore Group L.L.C., as investment banker, (c) FTI Consulting, Inc. as financial advisor, (d) Fox Rothschild LLP, as New Jersey counsel, (e) Littler Mendelson P.C., as special labor counsel, (f) Flaherty & O'Hara, P.C., as special regulatory counsel, (g) Reed Smith LLP, as special regulatory counsel, and (h) any other professionals retained by the Ad Hoc Secured Noteholder Group in connection with the Chapter 11 Cases subject to the consent of the Debtors and in accordance with the Financing Orders.

20.      "*Administrative / Priority Claims Reserve*" means a segregated account established by the Wind-Down Debtors established in accordance with Article VIII.D.

21.      "*Administrative / Priority Claims Reserve Amount*" means in the event of a Sale Transaction Restructuring, the amount of Cash necessary to satisfy all Allowed Administrative Claims, Allowed Priority Claims,

Allowed Secured Tax Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims to the extent any such Claims are not Assumed Liabilities under the applicable Sale Transaction Documentation or any other Purchase Agreement, which aggregate amount shall be funded into the Administrative / Priority Claims Reserve and shall be acceptable to the Required AHG Noteholders and the Debtors. For the avoidance of doubt, the Administrative / Priority Claims Reserve Amount shall include any amounts necessary to fund costs associated with any claims or obligations arising under the WARN Act and its state law equivalents.

22.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; (d) the Disinterested Director Fee Claims; (e) the MedImpact Termination Fee (if any); and (f) the AHG Notes Ticking Fee; *provided*, *however*, that in the event of a Sale Transaction Restructuring or an Other Asset Sale, any Administrative Claim that is an Assumed Liability shall be satisfied pursuant to the applicable Purchase Agreement in accordance with <u>Article V.A</u> of this Plan.

23.     "*Administrative Claim Bar Date*" means the deadline for filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be the later of (i) 30 days after the Effective Date or (ii) in the event an Executory Contract is rejected following the Effective Date, solely as to Administrative Claims related to such rejected Executory Contract, 30 days after notice to the counterparty to such rejected Executory Contract; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

24.     "*Administrative Claim Objection Bar Date*" means the deadline for filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims), which shall be the first Business Day that is 180 days following the Effective Date; *provided* that the Administrative Claims Objection Bar Date may be extended by the Bankruptcy Court after notice and a hearing.

25.     "*Affiliate*" means, with respect to any person, or any other person, which directly or indirectly controls, or is under common control with, or is controlled by, such Person, and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code as if such Person were a debtor in a case under the Bankruptcy Code.

26.     "*Agents*" means, collectively, the Prepetition Agent, the DIP Agents, the Exit Facilities Agent, and the Takeback Notes Trustee (if any), including, in each case, any successors thereto.

27.     "*AHG New Money*" means Cash in the amount of $57,000,000.

28.     "*AHG New-Money Commitment Agreement*" means that certain Commitment Agreement, dated as of [●], 2024, by and among the Debtors and the AHG New-Money Commitment Parties, as may be amended, supplemented, amended and restated, or otherwise modified from time to time. For the avoidance of doubt, entry of the Confirmation Order shall constitute Bankruptcy Court approval of, among other things, the Debtors' entry into the AHG New-Money Commitment Agreement, and approving, as Allowed Administrative Claims, the AHG Notes Ticking Fee, in accordance with, and subject to, the terms and conditions of the AHG New-Money Commitment Agreement.

29.     "*AHG New-Money Commitment Parties*" means certain members of the Ad Hoc Secured Noteholder Group that are signatories to the AHG New-Money Commitment Agreement as "Commitment Parties" thereunder, together with their designees, successors, and permitted assigns, and that provide each of the commitments set forth therein, including the obligation to fund the AHG New Money on or prior to the Effective Date to purchase AHG Notes in accordance with, and subject to, the terms and conditions of the AHG New-Money Commitment Agreement and the Confirmation Order.

30.     "*AHG New-Money Commitment Premium*" means a commitment premium equal to [●]% of the AHG New Money, payable in kind to the applicable AHG New-Money Commitment Parties in additional AHG Notes

issued on the Effective Date in accordance with, and subject to, the terms and conditions of the AHG New-Money Commitment Agreement and the Confirmation Order.

31.      "*AHG Notes*" means the new senior secured notes issued by the SCD Trust pursuant to the AHG New-Money Commitment Agreement and the Plan, and secured by all of the SCD Trust's assets, including, for the avoidance of doubt, the SCD Claim.  For the avoidance of doubt, no entity other than the SCD Trust, including any Affiliate or subsidiary of Rite Aid (including any Debtor), shall be an obligor on the AHG Notes, and the AHG Notes shall not be secured by any assets, including any assets of any subsidiary or Affiliate of Rite Aid (including any Debtor), other than the assets of the SCD Trust.  The principal amount of AHG Notes issued shall be equal to the AHG New Money plus the accrued amount of the AHG New-Money Commitment Premium plus the AHG Notes Ticking Fee (then accrued), which (a) shall be issued, or caused to be issued, by the SCD Trust to the applicable AHG New-Money Commitment Parties in accordance with the AHG Notes Documentation on or prior to the Effective Date and (b) bear interest at a rate of 12%, per annum, paid-in-kind on a monthly basis, subject to the terms and conditions of the AHG New-Money Commitment Agreement.

32.      "*AHG Notes Documentation*" means the AHG Notes Purchase Agreement, the AHG Notes Indenture, and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee statements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents, each of which shall be consistent in all respects with the terms and conditions of the AHG New-Money Commitment Agreement.

33.      "*AHG Notes Indenture*" means the definitive agreement governing the AHG Notes.

34.      "*AHG Notes Purchase Agreement*" means the purchase agreement with respect to the AHG Notes.

35.      "*AHG Notes Ticking Fee*" means, subject to the terms and conditions of the AHG New-Money Commitment Agreement, an amount of AHG Notes equal to the following formula:  (Days between the Effective Date and Confirmation Date) divided by 365 times (AHG New Money plus AHG New-Money Commitment Premium) times [●]%.  The AHG Notes Ticking Fee shall be an Allowed Administrative Claim under section 503(b) of the Bankruptcy Code and shall be paid (i) in AHG Notes issued on or as soon as reasonably practicable following the Effective Date or (ii) if the AHG New-Money Commitment Agreement is terminated, in Cash to the applicable AHG New-Money Commitment Parties, if so entitled, all in accordance with the terms and conditions of the AHG New-Money Commitment Agreement.

36.      "*Allowed*" means with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is evidenced by a Proof of Claim or request for payment of an Administrative Claim, as applicable, Filed by the Claims Bar Date or the Administrative Claims Bar Date, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed) in accordance with the terms of the Bar Date Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.  Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim is or has been timely Filed (where such Proof of Claim is required to be Filed), is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt: (x) a Proof of Claim or request for payment of an Administrative Claim, as applicable, Filed after the Claims Bar Date or the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim or agreement in writing by the Debtors and

the Holder of such late-Filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  "Allow" and "Allowing" shall have correlative meanings.

37.     "*Alternative Sale Transaction*" means a Sale Transaction Restructuring with one or more third parties for some, all, or substantially all of the Retail Acquired Assets pursuant to Article IV.D of the Plan, which Sale Transaction Restructuring is not a Credit Bid Transaction.

38.     ["*Assigned Claims*" means, collectively, all of the Debtors' claims and Causes of Action, including all of the Debtors' claims and Causes of Action against the Excluded Parties, except:  (a) preference actions waived or settled during the Chapter 11 Cases, or as otherwise agreed by the Committees; (b) claims or Causes of Action against third parties, with respect to which the Reorganized Debtors have an ongoing trade or commercial relationship and with respect to which the Reorganized Debtors assume indemnification obligations under the Plan or otherwise through the Chapter 11 Cases (other than indemnification claims against potential joint tortfeasors and Co-Defendants); (c) claims or Causes of Action (including Avoidance Actions) against contractual counterparties, vendors, or other go-forward commercial counterparties with the Reorganized Debtors (other than indemnification claims against potential joint tortfeasors and Co-Defendants); (d) claims or Causes of Action (including Avoidance Actions) against the DIP Secured Parties, the Prepetition Secured Parties, the Senior Secured Noteholders, and in each case their respective Agents, Trustees, and other Related Parties; (e) any and all claims or Causes of Action against any Debtor Related Party.  Notwithstanding the foregoing, the Assigned Claims shall include all of the Debtors' claims and Causes of Action against or relating to McKinsey & Co., Inc., and its Related Parties.  [For the avoidance of doubt, any Assigned Claims against any officer or director of Rite Aid Corporation or any of Rite Aid's directors or officers who are not released by the Debtors in accordance with this Plan (including those not included in the definition of Debtor Related Party) shall have recovery expressly limited to the proceeds of any Insurance Policy, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability, and no Person, Entity, or other party shall attempt to collect, collect, or cause to be collected, on any assets of any officer or director of Rite Aid or any of Rite Aid's directors or officers that are not Debtor Related Parties other than the available proceeds of any Insurance Policy, and all such individuals shall have the full protections of any D&O Liability Insurance Policies.  Notwithstanding anything to the contrary herein, all of the Debtors' claims and Causes of Action against the Excluded Parties shall be Assigned Claims.]]

39.     ["*Assigned Insurance Rights*" means, collectively, any and all rights, titles, privileges, interests, claims, demands or entitlements of the Debtors [and/or any Holder of Tort Claims] to any and all proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity arising under, or attributable to, any and all Insurance Policies, now existing or hereafter arising, accrued, or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including those arising under or attributable to any and all commercial general liability policies, punitive damages policies, products liability policies, life sciences policies, D&O Liability Insurance Policies, and any of the Debtors' rights under any third parties' policies, but in all cases excluding the Unassigned Insurance Rights.]

40.     "*Assignment Procedures*" means any assignment procedures attached to a Sale Order.

41.     "*Assumed Contracts*" means collectively, all Executory Contracts and Unexpired Leases that were assumed by the Debtors pursuant to the Schedule of Assumed Contracts and Unexpired Leases.

42.     "*Assumed Liabilities*" means, in a transaction that is a Sale Transaction Restructuring or an Other Asset Sale, the liabilities assumed by the Purchaser in the Sale Transaction Restructuring or the Other Asset Sale(s) pursuant to the terms of the applicable Purchase Agreement(s).

43.     "*Assumption/Rejection Procedures Order*" means the *Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 702].

44.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, Causes of Action, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including claims, Causes of Action,

actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common Law, including fraudulent transfer Laws.

45.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

46.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 156, the United States District Court for the District of New Jersey.

47.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

48.    "*Bar Date Order*" mean the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 703].

49.    "*Bidding Procedures*" means the bidding procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.

50.    "*Bidding Procedures Order*" means the *Amended Order (I) Approving the Auction and Bidding Procedures, (II) Approving Bidding Procedures and Bid Protections, (III) Scheduling Certain Dates and Deadlines with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving the Elixir Stalking Horse APA, (VI) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VII) Authorizing the Assumption and Assignment of Assumed Contracts, (VIII) Authorizing the Sale of Assets, and (IX) Granting Related Relief* [Docket No. 1413].

51.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

52.    "*California AG Agreement*" means that certain settlement agreement entered among the State of California, acting through the California Department of Justice, Office of the Attorney General, Division of Medi-Cal Fraud and Elder Abuse ("California AG"), Rite Aid Corporation, Rite Aid Hdqtrs. Corp., Thrifty Payless, Inc., and Loyd F. Schmuckley Jr. on October 13, 2023. *See* Docket No. 411 at 7–31.

53.    "*California AG Proofs of Claim*" means those unsecured Proofs of Claim, each for $58,000,000.00, filed by the California AG in connection with the California AG Agreement on January 12, 2024 (Claim Nos. 7119, 7199, and 7220).

54.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

55.    "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

56.    "*Casualty Insurance Policies*" means any Insurance Policies held or maintained by any of the Debtors covering losses with respect to casualty, damage, destruction, or other similar loss with respect to real property or personal property or improvements; *provided* that Casualty Insurance Policies shall not include the Debtors' commercial general liability policies.

57.    "*Cause of Action*" or "*Causes of Action*" means any claim, controversy, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, including Indemnification Rights, guaranty, interest, damage, remedy, cause of action, proceeding, agreement, cross claim, counterclaim, contribution, suit, class action, third-party claim, or franchise of any kind or character whatsoever,

whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, direct or indirect, choate or inchoate, Disputed or undisputed, liquidated or unliquidated, Secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, in tort, at Law, in equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign Law, or breach of any duty imposed by Law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer Laws.

58.     "*Channeling Injunction*" means the channeling injunction set forth in <u>Article XG</u> of the Plan.

59.     "*Chapter 11 Cases*" means the procedurally consolidated cases Filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

60.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

61.     "*Claims and Noticing Agent*" means Kroll Restructuring Administration LLC, the claims and noticing agent retained by the Debtors in the Chapter 11 Cases by order of the Bankruptcy Court [Docket No. 143].

62.     "*Claims Bar Date*" means the date established pursuant to the Bar Date Order, by which Proofs of Claim must be Filed with respect to Claims, other than Administrative Claims, including Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the Holders of such Claims or Interests from the requirement of Filing Proofs of Claim.

63.     "*Claims Objection Deadline*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to Claims.

64.     "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

65.     "*Class*" means a category of Claims or Interests under section 1122(a) of the Bankruptcy Code.

66.     "*CM/ECF*" means the Bankruptcy Court's case management and electronic case filing system.

67.     "*CMS*" means Centers for Medicare & Medicaid Services, an agency within the U.S. Department of Health and Human Services.

68.     "*CMS Receivable*" means any 2023 plan year Medicare Part D final reconciliation payment that is or may become owing to EIC by CMS, together with any related obligations of CMS owing to EIC for such plan year.

69.     "*CMSR Recovery*" means all Cash held by the SCD Trust or distributed (in accordance with applicable law) therefrom after (a) the indefeasible payment of $57,000,000 of the AHG Notes and (b) the payment of any mandatory prepayments required under the terms of the Exit Facilities Documents from the proceeds of the CMS Receivable, in each case, in accordance with the terms and conditions of the Elixir Intercreditor Agreement and the AHG New-Money Commitment Agreement.

70.     "*Co-Defendant*" means (i) any Holder of a Co-Defendant Claim, whether or not such Co-Defendant Claim has been asserted as of the Effective Date, and (ii) any co-defendant in a Pending Opioid Action commenced

as of the Effective Date, in each case, other than the Debtors and their current and former officers, directors, authorized agents and employees, and any applicable insurers under the Debtors' Insurance Policies.

71.    "*Co-Defendant Claims*" means any and all Claims, other than Claims held by an insurer, solely in such insurer's capacity with respect to an Insurance Policy, that (i) either (A) are or could be asserted against any Debtor or Reorganized Debtor, including without limitation any and all Claims that would otherwise be a Cure Cost or (B) seek to recover from any property of any Debtor or its Estate, any Reorganized Debtor, or any Insurance Policy, and (ii) either (A) are for or based upon or arise from contribution, indemnification, reimbursement, setoff or recoupment or any other similar claim or Cause of Action (other than indemnification obligations expressly assumed pursuant to the Plan or an order of the Bankruptcy Court) or (B) are for or based upon or arise from any alleged right, claim, or interest, of any Co-Defendant, under any Insurance Policy, provided that such right is derivative, as opposed to direct, in nature, and (iii) seek to recover, directly or indirectly, any costs, losses, damages, fees, expenses or any other amounts whatsoever, actually or potentially imposed upon the Holder of such Claims, in each case based upon, arising from, or attributable to any actual or potential litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter based on, arising under, or attributable to, in whole or in part, Opioid-Related Activities, any Opioid Claim or any Opioid Demand (including any such Claims or demands asserted by any manufacturer, distributor, pharmacy, pharmacy-benefit manager, group purchasing organization or physician or other contract counterparty or business partner of any Debtor, but excluding any Claims in respect of any D&O Liability Insurance Policy or Indemnification Provisions expressly assumed pursuant to Article V of the Plan).  For the avoidance of doubt, a Co-Defendant Claim shall not include any Co-Defendant Surviving Pre-Effective Date Claim and shall not include any Claims of Co-Defendants against insurers under any applicable Insurance Policies in which Co-Defendants hold an interest that are not derivative in nature and are not otherwise released.  Notwithstanding anything to the contrary in the Plan, any Claim that satisfies the definition of a Co-Defendant Claim shall be a Co-Defendant Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim. For the avoidance of doubt, Co-Defendant Claim includes a Claim that is held by an insurance company in its capacity as subrogee of a Holder of a Co-Defendant Claim.  For the avoidance of doubt, nothing in this definition shall alter or limit Article X of the Plan in any way, and the assumption of a contract or lease, the non-Debtor counterparty to which is a Released Co-Defendant, shall not constitute the assumption of any indemnification obligations contained therein to the extent such indemnification objections are released by Article X of the Plan.

72.    "*Co-Defendant Defensive Rights*" means any and all direct, or indirect, rights, remedies, protections, immunities, objections, defenses, assertions, Claims, Causes of Action, and, in each case, of any kind, character, or nature, whether legal, equitable, or contractual, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, including, without limitation, all rights, remedies, defenses, assertions, and Claims against liability, rights to setoff, offset, recoupment, counter-claims, cross-claims, rights to allocation or apportionment of fault and judgment reduction, apportionment of damages, any other defenses, affirmative defenses, or judgment reduction mechanisms or rights similar to the foregoing, and any steps necessary to assert the foregoing, in each case, solely to reduce the liability, judgment, obligation or fault of the applicable Holder of a Co-Defendant Claim to any Person that asserts any Cause of Action or claim against the Holder of any Co-Defendant Claim based in whole or in part on Opioid-Related Activities.  Co-Defendant Defensive Rights (i) may be used to offset, set-off, recoup, allocate or apportion fault, liability, or damages, or seek judgment reduction or otherwise to defend against any Cause of Action or Claim brought by any Person against the Holder of any Co-Defendant Claim based in whole or in part on Opioid-Related Activities; and (ii) shall in no case be used to seek any affirmative monetary recovery from any Protected Party or any asset of any Protected Party (including from applicable Insurance Policy of a Protected Party) on account of any Claim or Cause of Action released pursuant to Article X.  For the avoidance of doubt, Co-Defendant Defensive Rights also includes all rights of a Co-Defendant, based on the conduct or alleged conduct of any Debtor or Reorganized Debtor, to judgment setoff, allocation or apportionment of fault and judgment reduction, apportionment of damages, any other defenses, affirmative defenses, or judgment reduction mechanisms or rights similar to the foregoing, and any steps necessary to assert the foregoing, in each case, solely to reduce the liability, judgment, obligation or fault, even where the Co-Defendant does not have a Claim against a Debtor or Reorganized Debtor.  Notwithstanding the foregoing, in no instance will Co-Defendant Defensive Rights apply to offset or otherwise reduce Indemnification Rights.

73.    "*Co-Defendant Related Action*" means any Pending Opioid Action and any previous, pending, or future litigation or dispute that alleges substantially similar facts or Causes of Action as those alleged in the Pending Opioid Actions and that concerns conduct occurring before the Effective Date.

74.     "*Co-Defendant Related Parties*" means, with respect to a Released Co-Defendant, (i) such Person's predecessors, successors, assigns, subsidiaries, Affiliates, or managed accounts or funds, in each case in their respective capacities as such; (ii) its and its Affiliates' respective past, present and future officers, board members, directors, principals, agents, servants, independent contractors, co-promoters, third-party sales representatives, medical liaisons, members, partners (general or limited), managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and advisors, trusts (including trusts established for the benefit of such Person), trustees, protectors, beneficiaries, direct or indirect owners and/or equity holders, parents, transferees, heirs, executors, estates, nominees, administrators, and legatees, in each case in their respective capacities as such; and (iii) any insurer of any Released Co-Defendant solely in its capacity as such.  For the avoidance of doubt, the citizens and residents of a State shall not be deemed to be Related Parties of such State solely as a result of being citizens or residents of such State.

75.     "*Co-Defendant Surviving Pre-Effective Date Claim*" means any Cause of Action held by a Co-Defendant against any of the Debtors that (i) arose in the ordinary course of business, (ii) is not related to a Co-Defendant Related Action, and (iii) concerns conduct occurring before the Effective Date.

76.     "*Combined Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, pursuant to sections 1128 and 1129 of the Bankruptcy Code, and approval of the Disclosure Statement on a final basis, as such hearing may be continued from time to time.

77.     "*Committee Settlement*" means the comprehensive settlement between the Debtors, the Committees, the Ad Hoc Secured Noteholder Group, and the DIP Agents, as set forth in Article IV.E of the Plan.

78.     "*Committee Settlement Documents*" means (i) the Litigation Trust Documents, (ii) the Litigation Trust Cooperation Agreement, (iii) the UCC / TCC Recovery Allocation Agreement, (iv) the GUC Sub-Trust Documents, (v) the GUC Equity Trust Documents, and (vi) any other documents necessary to implement the Committee Settlement and reasonably acceptable to the Debtors and the Required AHG Noteholders (to the extent they impact the Litigation Trust Class B Interests).  Each of the Committee Settlement Documents shall be subject to the consent rights set forth in this Plan.

79.     "*Committees*" means, collectively, the UCC and the TCC.

80.     "*Committees Initial Cash Consideration*" means $20 million in Cash, in the aggregate, for the benefit of Holders of General Unsecured Claims, to be allocated in amounts agreed between the UCC and the TCC pursuant to the UCC / TCC Recovery Allocation Agreement, subject to adjustment to the extent that the hourly and monthly fees (but not success fees, as provided for in the respective engagement letters of the Committee Professionals) and expenses of the Committees and the Committees' Professionals incurred on or after March 26, 2024 are less than $7.5 million (consisting of (i) $1.5 million in certain agreed-upon compensation litigation matters and (ii) $6.0 million for all other fees and expenses of the Committees and the Committees' Professionals incurred on or after March 26, 2024, excluding fees and expenses described in the preceding clause (i)), in which case the Committees' Initial Cash Consideration shall be increased by an amount equal to the difference between (a) $7.5 million and (b) the fees and expenses actually incurred by the Committees and the Committees' Professionals during the aforementioned period.

81.     "*Committees Post-Emergence Cash Consideration*" means up to $27.5 million in Cash, in the aggregate, for the benefit of Holders of General Unsecured Claims, payable pursuant to Article IIIB.6 of the Plan in accordance with the terms of the Committee Settlement, consisting of:  (a) up to $2.5 million from the proceeds of the sale of unoccupied real estate of the Debtors that is not part of the Reorganized Debtors, to be paid by the first anniversary of the Effective Date simultaneously with the distribution of $2.5 million to Holders of Senior Secured Notes Claims; (b) $5 million from the proceeds of the Elixir Rx Intercompany Claim, to be distributed simultaneously with the receipt of $285 million from the proceeds of the Elixir Rx Intercompany Claim by Holders of Senior Secured Notes Claims, subject in all respects to the waterfall distributions set forth in Article IV.E..1.(a) of the Plan; *provided* that to the extent that Holders of Senior Secured Notes Claims receive less than $285,000,000 on account of the Elixir Rx Intercompany Claim, the $5,000,000 will be reduced on a dollar-by-dollar basis by each dollar the SCD Trust receives under $285,000,000, until the $5,000,000 reaches zero (provided that amounts distributable to the Holders of

General Unsecured Claims on account of (b) shall not be less than zero) the limitation set forth in Article IV.E..1.(a) of the Plan; and (c) $20 million in Cash, payable semi-annually in the amount of $5 million per year for four years, commencing on the first anniversary of the Effective Date and at each six-month anniversary thereof (the "Required Payment Dates," and each such payment on a Required Payment Date, a "Specified Committee Payment"), subject to the limitations set forth in either Article IV.E..1.(b)(i) or Article IV.E..1.(b)(ii) of the Plan, at the Committees' election.

82.    "*Committees Professionals*" means any and all professionals retained or engaged by the Committees by order of the Bankruptcy Court in connection with the Chapter 11 Cases and the administration thereof.

83.    "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

84.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

85.    "*Confirmation Order*" means the order entered by the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code; *provided* that, if the Restructuring Transaction is a Sale Transaction Restructuring, the Sale Order shall govern the consummation of such Sale Transaction Restructuring.

86.    "*Consummation*" means the occurrence of the Effective Date.

87.    "*Controlled Substance Injunction*" means the operating injunction, as set forth in that certain Rite Aid Controlled Substance Compliance Program & Anti Diversion Injunctive Terms, by and among Rite Aid Corporation and the Settling States, attached as **Exhibit A** to this Plan.

88.    "*Controlled Substance Injunction Order*" means an order enforcing the terms of the Controlled Substance Injunction, which, for the avoidance of doubt, may be the Confirmation Order.

89.    "*Credit Bid*" means a bid by Holders of Senior Secured Notes Claims, in a manner consistent with the Bidding Procedures and Bidding Procedures Order, the MedImpact Term Loan Bidding Procedures, the Confirmation Order, the Final Financing Order, a Sale Order, and section 363(k) of the Bankruptcy Code.

90.    "*Credit Bid Transaction*" means a Sale Transaction Restructuring whereby the Debtors sell some, all, or substantially all of their assets to the Holders of Senior Secured Notes Claims pursuant to a Purchase Agreement on account of a Credit Bid, which Credit Bid is selected by the Debtors as the highest or otherwise best bid for some, all, or substantially all of the Debtors' assets except for the Elixir Acquired Assets (subject to any Alternative Sale Transaction consummated pursuant to the Bidding Procedures and Bidding Procedures Order), as approved by the Bankruptcy Court pursuant to the Sale Order, pursuant to Article IV.D of the Plan.

91.    "*Cure Cost*" means all amounts, including an amount of $0.00, required to cure any monetary defaults and other non-monetary defaults to the extent required by section 365 of the Bankruptcy Code, under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors or assumed and assigned by the Debtors pursuant to a Sale Order or the Confirmation Order pursuant to sections 365 and/or 1123 of the Bankruptcy Code.

92.    "*D&O Liability Insurance Policies*" means all directors and officers/liability Insurance Policies (including any "tail policy") issued or providing coverage at any time to any of the Debtors, any of their predecessors, and/or any of their current or former subsidiaries for current or former directors', managers', and officers' liability and all agreements, documents, or instruments relating thereto.

93.    "*Debtor Related Party*" means: (a) any Person who serves as an officer of Rite Aid or any of its subsidiaries as of the Petition Date, in their capacities as such; (b) any Person who serves as an employee, officer, or director who currently works, or worked, as of the Petition Date, for Rite Aid or any of its subsidiaries and Affiliates in any capacity and who will serve New Rite Aid or any of its subsidiaries or Affiliates in any capacity (*provided*, that such individual was offered employment by New Rite Aid); (c) each of the Chief Executive Officer of Rite Aid or any

of its Affiliates or subsidiaries (in place as of the Petition Date), the Chief Transformation Officer of Rite Aid or any of its Affiliates or subsidiaries (in place as of the Petition Date), and each of the Disinterested Directors, in all capacities in which they served Rite Aid or any of its Affiliates and subsidiaries; and (d)(i) any professionals retained by the Debtors under sections 327 and 328 of the Bankruptcy Code and including, for the avoidance of doubt, the Retained Professionals, in any capacity and (ii) any firm or professional retained under the *Order Granting Debtors' Motion for Entry of an Order Authorizing Employment and Payment of Professionals Utilized in the Ordinary Course of Business* [Docket No. 1138], in their capacities as such.

94.    "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in <u>Article X.C</u> of the Plan.

95.    "*Debtors*" means, collectively, each of the following: Rite Aid Corporation; 1515 West State Street, Boise, Idaho, LLC; 1740 Associates, L.L.C.; 4042 Warrensville Center Road – Warrensville Ohio, Inc.; 5277 Associates, Inc.; 5600 Superior Properties, Inc.; Apex Drug Stores, Inc.; Broadview and Wallings-Broadview Heights Ohio, Inc.; Eckerd Corporation; EDC Drug Stores, Inc.; Ex Benefits, LLC; Ex Design, LLC; Ex Design Holdings, LLC; Ex Holdco, LLC; Ex Initiatives, LLC; Ex Options, LLC; Ex Pharmacy, LLC; Ex PR, Inc.; Ex Procurement, LLC; Ex Rxclusives, LLC; Ex Savings, LLC; Ex Software, LLC; EX Solutions of MO, LLC; Ex Solutions of NV, LLC; Ex Solutions of OH, LLC; Ex Tech, LLC; First Florida Insurers of Tampa, LLC; GDF, Inc.; Genovese Drug Stores, Inc.; Gettysburg and Hoover-Dayton, Ohio, LLC; Harco, Inc.; Health Dialog Services Corporation; Hunter Lane, LLC; JCG (PJC) USA, LLC; JCG Holdings (USA), Inc.; Juniper Rx, LLC; K & B Alabama Corporation; K & B Louisiana Corporation; K & B Mississippi Corporation; K & B Services, Incorporated; K & B Tennessee Corporation; K&B Texas Corporation; K & B, Incorporated; Lakehurst and Broadway Corporation; Maxi Drug North, Inc.; Maxi Drug South, L.P.; Maxi Drug, Inc.; Maxi Green Inc.; Munson & Andrews, LLC; Name Rite, L.L.C.; P.J.C. Distribution, Inc.; P.J.C. Realty Co., Inc.; PDS-1 Michigan, Inc.; Perry Drug Stores, Inc.; PJC Lease Holdings, Inc.; PJC Manchester Realty LLC; PJC of Massachusetts, Inc.; PJC of Rhode Island, Inc.; PJC of Vermont Inc.; PJC Peterborough Realty LLC; PJC Realty MA, Inc.; PJC Revere Realty LLC; PJC Special Realty Holdings, Inc.; RCMH LLC; RDS Detroit, Inc.; READ's Inc.; RediClinic Associates, Inc.; RediClinic of PA, LLC; RediClinic LLC; Rite Aid Drug Palace, Inc.; Rite Aid Hdqtrs. Corp.; Rite Aid Hdqtrs. Funding, Inc.; Rite Aid Lease Management Company; Rite Aid of Connecticut, Inc.; Rite Aid of Delaware, Inc.; Rite Aid of Georgia, Inc.; Rite Aid of Indiana, Inc.; Rite Aid of Kentucky, Inc.; Rite Aid of Maine, Inc.; Rite Aid of Maryland, Inc.; Rite Aid of Michigan, Inc.; Rite Aid of New Hampshire, Inc.; Rite Aid of New Jersey, Inc.; Rite Aid of New York, Inc.; Rite Aid of North Carolina, Inc.; Rite Aid of Ohio, Inc.; Rite Aid of Pennsylvania, LLC; Rite Aid of South Carolina, Inc.; Rite Aid of Tennessee, Inc.; Rite Aid of Vermont, Inc.; Rite Aid of Virginia, Inc.; Rite Aid of Washington, D.C. Inc.; Rite Aid of West Virginia, Inc.; Rite Aid Online Store, Inc.; Rite Aid Payroll Management, Inc.; Rite Aid Realty Corp.; Rite Aid Rome Distribution Center, Inc.; Rite Aid Specialty Pharmacy, LLC; Rite Aid Transport, Inc.; Rite Investments Corp.; Rite Investments Corp., LLC; Rx Choice, Inc.; The Bartell Drug Company; The Jean Coutu Group (PJC) USA, Inc.; The Lane Drug Company; Thrift Drug, Inc.; Thrifty Corporation; Thrifty PayLess, Inc.; Richfield Road – Flint, Michigan, LLC; LMW – 90B Avenue Lake Oswego, Inc.; ILG – 90 B Avenue Lake Oswego, LLC; Drug Palace, Inc.; Grand River & Fenkell, LLC; Rx USA, Inc.; RediClinic of Dallas-Fort Worth, LLC; RediClinic of DC, LLC; RediClinic of MD, LLC; RediClinic of VA, LLC; RediClinic US, LLC; and RediClinic of DE, LLC.  For the avoidance of doubt, the term "Debtors" does not include EIC.

96.    ["*Definitive Documents*" means, collectively, and in each case in form and substance acceptable to the Debtors, the Required AHG Noteholders, the DIP Agents, and the Exit Facilities Agent, (a) the Plan and any Plan Supplement, (b) the Disclosure Statement and the Solicitation Materials, (c) the Confirmation Order, (d) any Sale Order, I the Disclosure Statement Order, (f) the Exit Facilities Documents, (g) the Sale Transaction Documentation, (h) the New Corporate Governance Documents, (i) the Takeback Notes Documents, if applicable, (j) the GUC Equity Trust Documents, (k) the MIP Documents, (l) all material pleadings Filed by the Debtors in connection with the Chapter 11 Cases (and related orders), (m) any and all filings with or requests for regulatory or other approvals from any governmental Entity or unit, other than ordinary course filings and requests, necessary or desirable to implement the Restructuring Transactions, (n) the Bidding Procedures and the Bidding Procedures Order, (o) the Registration Rights Agreement, (p) the McKesson Settlement Documents, including the McKesson 503(b)(9) Settlement, (q) the AHG Notes Documentation, AHG New-Money Commitment Agreement, and the SCD Trust Documentation; (r) the MedImpact Term Loan Bidding Procedures Order and any motion seeking entry of the MedImpact Term Loan Bidding Procedures Order, the MedImpact Term Loan Bidding Procedures (which shall be reasonably acceptable to the Ad Hoc Secured Noteholder Group), the MedImpact Term Loan Rights Offering Procedures, and, solely in the event that

11

the MedImpact Term Loan Backstop Parties acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures, the MedImpact NewCo Notes Documentation, the MedImpact Term Loan Rights Offering Procedures, and the MedImpact Term Loan Stalking Horse Bidder Documentation, (s) such other agreements and documentation contemplated in, or necessary or advisable to, consummate and implement the Restructuring Transactions, and (u) any amendments or modifications to each of the Definitive Documents in clauses (a) through (s); *provided*, *however*, that the DIP Agents and the Exit Facilities Agent shall not have consent rights over the Definitive Documents set forth in clauses (h), (j), (k), or (o), or any amendments or modifications thereto; *provided*, *further*, that the Ad Hoc Secured Noteholder Group shall not have consent rights over the Definitive Documents set forth in (j) or (s) except to the extent that such Definitive Documents adversely affect the rights or entitlements of the Ad Hoc Secured Noteholder Group, in which case such Definitive Documents must be reasonably acceptable to the Ad Hoc Secured Noteholder Group.  Each Definitive Document except the UCC / TCC Recovery Allocation Agreement shall be in form and substance acceptable to the Debtors, including, for the avoidance of doubt, the Litigation Trust Cooperation Agreement, except for the GUC Equity Trust Documents and other Committee Settlement Documents, which shall be in form and substance reasonably acceptable to the Debtors. The Definitive Documents shall not be inconsistent with the terms and conditions of the Committee Settlement.  The UCC/TCC Recovery Allocation Agreement shall be acceptable to the Committees in their sole discretion, and the Definitive Documents set forth in clauses (j) and (s) shall be acceptable to the Committees; *provided* that, with respect to any Definitive Documents not subject to the foregoing clause, any provisions in such documents that materially and adversely impact the rights or entitlements of the constituencies of the Committees under the Committee Settlement shall be reasonably acceptable to the Committees.][2]

97.     "*Designee*" shall have the meaning set forth in the Purchase Agreement(s) in the event of a Sale Transaction Restructuring or Other Asset Sale(s).

98.     "*DIP ABL Claim*" means any Claim arising under or relating to the DIP ABL Facility under the DIP ABL Credit Agreement or the Financing Orders, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP ABL Credit Agreement.

99.     "*DIP ABL Credit Agreement*" means the debtor-in-possession financing credit agreement by and among the Debtors, the applicable DIP Agent, and the DIP ABL Lenders, as approved by the Financing Orders, setting forth the terms and conditions of the DIP ABL Facility and the DIP FILO Facility.

100.    "*DIP ABL Facility*" means the new superpriority secured revolving asset-based loan made in accordance with the DIP ABL Credit Agreement and the Financing Orders in the principal amount of $2.85 billion.

101.    "*DIP ABL Lenders*" means, collectively, the lenders from time to time under the DIP ABL Facility.

102.    "*DIP Agents*" means Bank of America, N.A., in its capacities as administrative, collateral agent, and senior collateral agent, as applicable, under the DIP Credit Agreements, together with its respective successors, assigns, or any replacement agent(s) appointed pursuant to the terms of the DIP Credit Agreements.

103.    "*DIP Claims*" means, collectively, the DIP ABL Claims, the DIP FILO Claims, and the DIP Term Loan Claims.

104.    "*DIP Credit Agreements*" means, collectively, the DIP ABL Credit Agreement and the DIP Term Loan Credit Agreement.

105.    "*DIP Documents*" means, collectively, the DIP Credit Agreements and any other agreements, documents, and instruments delivered or entered into therewith, including, without limitation, any guarantee amendments, pledge and collateral agreements, intercreditor agreements, and other security documents.

---

[2]     Consent rights with respect to Definitive Documents remain subject to ongoing negotiation among the parties.

106.    "*DIP FILO Claim*" means any Claim arising under or relating to the DIP FILO Facility under the DIP ABL Credit Agreement or the Financing Orders, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP ABL Credit Agreement.

107.    "*DIP FILO Facility*" means the new superpriority secured first-in, last-out term loan made in accordance with the DIP ABL Credit Agreement and the Financing Orders in the initial principal amount of $400 million.

108.    "*DIP FILO Lenders*" means, collectively, the lenders from time to time under the DIP FILO Facility.

109.    "*DIP Lenders*" means the lenders from time to time under the DIP Credit Agreements.

110.    "*DIP Secured Parties*" means, collectively, the DIP Agents, the DIP Lenders, the other "Senior Secured Parties" (as defined in the DIP ABL Credit Agreement), and the other "Secured Parties" (as defined in the DIP Term Loan Credit Agreement).

111.    "*DIP Term Loan Claim*" means any Claim arising under or relating to the DIP Term Loan Facility under the DIP Term Loan Credit Agreement or the Financing Orders, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP Term Loan Credit Agreement.

112.    "*DIP Term Loan Credit Agreement*" means the debtor-in-possession financing credit agreement by and among the Debtors, the applicable DIP Agent, and the DIP Term Loan Lenders, as approved by the Financing Orders, setting forth the terms and conditions of the DIP Term Loan Facility.

113.    "*DIP Term Loan Facility*" means the new secured term loan to be made in accordance with the DIP Term Loan Credit Agreement in the principal amount of $200 million.

114.    "*DIP Term Loan Lenders*" means, collectively, the lenders from time to time under the DIP Term Loan Facility.

115.    "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is scheduled as zero or as contingent, Disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

116.    "*Disbursing Agent*" means, as applicable, the Debtors, the Reorganized Debtors, the Wind-Down Debtors (as applicable), the GUC Equity Trustee (solely with respect to GUC Equity Trust Interests distributed to General Unsecured Claims subject to the allocation set forth in the UCC / TCC Recovery Allocation Agreement), the Litigation Trustee (solely with respect to General Unsecured Claims and Senior Secured Notes Claims), the Senior Secured Notes Trustees (solely with respect to Senior Secured Notes Claims), or any Entity or Entities selected by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors to make or facilitate distributions contemplated under the Plan.

117.    "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time.

118.    "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

119.    "*Disinterested Director Fee Claims*" means all unpaid fees and expenses as of the Effective Date due to the Disinterested Directors of each of the Debtors pursuant to their respective director agreements with the applicable Debtor Entity.  On the Effective Date, the Disinterested Director Fee Claims shall be deemed Allowed Administrative Claims against the Debtors.

120.    "*Disinterested Directors*" means, in the aggregate, the six disinterested directors of each of the Debtors, in all capacities in which they served Rite Aid or any of its subsidiaries.

121.    "*Disputed*" means, with respect to any Claim or Interest (or portion thereof), any Claim or Interest (or portion thereof) that is not yet Allowed.

122.    "*Distributable Proceeds*" means in the event of a Sale Transaction Restructuring, all Cash of the Debtors or the Wind-Down Debtors, as applicable, on or after the Effective Date, after giving effect to the funding of the Professional Fee Escrow Account, the Wind-Down Reserve, and the Administrative / Priority Claims Reserve, including, as determined by the Debtors or the Wind-Down Debtors, in consultation with the Required AHG Noteholders and the Committees, any Cash returned to the Debtors or the Wind-Down Debtors, as applicable, after the irrevocable payment in full of all Allowed Professional Fee Claims, Allowed Administrative / Priority Claims, and all costs and expenses obligated to be paid from the Wind-Down Reserve.

123.    "*Distribution Date*" means a date on which the Disbursing Agent makes distributions to Holders of Claims and Interests pursuant to the Plan, which shall be as soon as reasonably practicable after the Effective Date.

124.    "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Effective Date or such other date as designated in a Final Order of the Bankruptcy Court; *provided* that the Distribution Record Date shall not apply to any securities of the Debtors deposited with DTC, the Holders of which shall receive a distribution in accordance with the customary procedures of DTC.

125.    "*DOJ*" means the United States Department of Justice.

126.    "*DOJ CID*" means, collectively, (a) the DOJ Civil Investigative Demand No. 22-545 issued on or about June 17, 2022 and served on or about August 11, 2022 against EIC, (b) the DOJ Civil Investigative Demand No. 22-546 issued on or about June 17, 2022 and served on or about August 11, 2022 against Debtor Ex Solutions of OH, LLC, and (c) the DOJ Civil Investigative Demand No. 22-547 issued on or about June 17, 2022 and served on or about August 11, 2022 against Debtor Ex Options, LLC.

127.    "*DOJ Claims*" means any Claim against the Debtors and their non-Debtor Affiliates arising from, asserted in, or related to the subject matter of (a) that certain complaint filed on March 13, 2023 by the DOJ against certain of the Debtors and their non-Debtor Affiliates in the United States District Court for the Northern District of Ohio (Eastern Division) under the caption *United States of America ex Rel. White, et al. v. Rite Aid Corporation, et al.* or (b) the DOJ CID.

128.    "*DOJ Elixir Settlement*" means that certain settlement[3] between EIC and certain of the Debtors, on the one hand, and the DOJ, on the other hand, with respect to the DOJ CID.

---

[3]    Certain of the Debtors and the DOJ have reached a settlement in principle, subject to the completion of definitive documentation, to resolve the allegations in the government's complaint.  The settlement remains conditioned on final DOJ approval, as well as the completion of definitive documentation.  The Debtors shall consult with the Committees and the Required AHG Noteholders regarding the definitive documentation of the DOJ Elixir Settlement.

129.     "*DOJ FCA Settlement*" means the settlement[4] between certain of the Debtors, on the one hand, and the DOJ, on the other hand, with respect to the lawsuit captioned *United States ex. rel. White v. Rite Aid Corp.*, Case No. 1:21-CV-1239 (N.D. Ohio).

130.     "*DTC*" means the Depository Trust Company.

131.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article XI.A of the Plan have been satisfied or waived in accordance with Article XI.B of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter; *provided* that the Litigation Trust Assets or the rights thereto, as applicable, shall be transferred to the Litigation Trust and/or the GUC Equity Trust, as applicable, on the Effective Date.

132.     "*EIC*" means Elixir Insurance Company, a non-Debtor subsidiary of Rite Aid.

133.     "*Eligible Holder*" means each Holder of a Senior Secured Notes Claim.

134.     "*Elixir Acquired Assets*" means the assets of the PBM Business acquired pursuant to the Elixir Sale Order, which, for the avoidance of doubt, does not include any assets of, or the equity interests in, EIC.

135.     "*Elixir Intercreditor Agreement*" means that certain intercreditor agreement or similar arrangement entered into on or before the Effective Date by Debtor Ex Options, LLC and the SCD Trust on terms acceptable to the Required CMSR Commitment Parties, the Required MedImpact Commitment Parties, the DIP Agents, the Exit Facilities Agent, and to the Debtors in accordance with the terms and conditions of the AHG New-Money Commitment Agreement. For the avoidance of doubt, entry of the Confirmation Order shall constitute Bankruptcy Court approval of, among other things, the Debtors' entry into the Elixir Intercreditor Agreement.

136.     "*Elixir Rx Intercompany Claim*" means that certain Intercompany Claim payable by EIC to Debtor Ex Options, LLC.

137.     "*Elixir Sale Order*" means the *Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform their Obligations Under the Elixir APA, (III) Approving Assumption and Assignment of Certain Executory Contracts, and (IV) Granting Related Relief* [Docket No. 1510], as may be amended.

138.     "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

139.     "*Equity Security*" has the meaning set forth in section 101(16) of the Bankruptcy Code.

140.     "*ERISA*" means the Employee Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. §§ 1301-1461, and the regulations promogulated thereunder.

141.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 upon the commencement of the applicable Debtor's Chapter 11 Case.

142.     "*Excess Availability*" shall have the meaning ascribed to it in the Exit ABL Facility.

143.     "*Exchange Act*" means the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78a et seq, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

---

[4]     Certain of the Debtors and the DOJ have reached a settlement in principle, subject to the completion of definitive documentation, to resolve the allegations in the government's complaint. The settlement remains conditioned on final DOJ approval, as well as the completion of definitive documentation.

144.    ["*Excluded Parties*" means (a) any potential joint tortfeasor with the Debtors, Co-Defendant to the Debtors, or named party in connection with any Tort Claims related to any of the Debtors' Products; (b) any of the Debtors' current or former third party agents, partners, representatives, professionals or consultants named in connection with any Tort Claims related to any of the Debtors' Products (excluding any Debtor Related Party); (c) any distributor, manufacturer, supplier, or other party engaged in the distribution, manufacture, supply, or dispensing/sale of the Debtors' Products named in connection with any Tort Claims related to any of the Debtors' Products; (d) any of the Debtors' current and former directors and officers other than any Debtor Related Party; (e) (i) the seller counterparties and subsequent transferees for (A) the Envision acquisition completed in February 2015 and (B) the Bartell acquisition completed in December 2020, (ii) such seller counterparties' Related Parties and subsequent transferees, solely in their capacities as Related Parties, and (iii) the attorneys, financial advisors, investment bankers, agents, representatives, consultants, underwriters, and other professionals, in each case, to the Debtors in connection with such acquisition or the related financings thereof, except to the extent that any parties identified herein are Debtor Related Parties; (f) the consultants who provided shareholder proxy advisory services in connection with the failed merger with Albertsons Companies, Inc., solely in their capacity as such; (g) Walgreens Boots Alliance, Inc. and Walgreen Co., together with any of their Related Parties; (h) McKinsey and Company, together with any of its Related Parties; (i) CVS Health Corp., together with any of its Related Parties; (j) Optum Rx, together with any of its Related Parties; (k) Express Scripts, together with any of its Related Parties; and (l) certain additional parties to be identified by the Committees, with the consent of the Debtors, prior to the Voting Deadline;] *provided*, that none of the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates), the Wind-Down Debtors, the DIP Secured Parties, the Prepetition Secured Parties, the Senior Secured Noteholders, the Senior Secured Notes Trustees, or any of their Related Parties in their capacities as such shall be an Excluded Party. For the avoidance of doubt, no Debtor Related Party shall be an Excluded Party.

145.    "*Exculpated Parties*" means, collectively, and in each case solely in its capacity as such: (a) each of the Debtors; (b) each of the Wind-Down Debtors (if applicable) and the Plan Administrator; (c) each of the Reorganized Debtors (if applicable); (d) the Committees and each of their respective members; (e) the GUC Equity Trustee, the Litigation Trustee, and any of the GUC Sub-Trust Trustees (if any); and (f) each Related Party of each Entity in clauses (a) through (e). For the avoidance of doubt, none of the Excluded Parties shall be Exculpated Parties.

146.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

147.    "*Existing Equity Interests*" means, collectively, the shares (or any Class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into or exercisable for the shares (or any Class thereof), common stock, preferred stock, limited liability company interests, or other equity, ownership, or profit interests of any Debtors (in each case, whether or not arising under or in connection with any employment agreement).

148.    "*Exit ABL Facility*" means the new money asset-based loan facility to be provided pursuant to the Exit Facilities Credit Agreement, which shall be in form and substance acceptable to the Debtors, the DIP ABL Lenders, and (a) in the event of a Plan Restructuring or Credit Bid Transaction, the Required AHG Noteholders, or (b) in the event of an Alternative Sale Transaction(s), the Purchaser(s).

149.    "*Exit ABL Facility Loans*" means the loans incurred under the Exit ABL Facility

150.    "*Exit Facilities*" means, collectively, the Exit ABL Facility and the Exit FILO Term Loan Facility, each provided for under the Exit Facilities Credit Agreement.

151.    "*Exit Facilities Agent*" means the administrative agent under the Exit Facilities Credit Agreement, together with such agent's successors, assigns, or any replacement agent(s) appointed pursuant to the terms of the Exit Facilities Credit Agreement.

152.    "*Exit Facilities Credit Agreement*" means that certain credit agreement evidencing the Exit Facilities, a form of which shall be included in the Plan Supplement, and which shall be in form and substance acceptable to the Debtors, the DIP ABL Lenders, the DIP FILO Lenders, and (a) in the event of a Plan Restructuring

or Credit Bid Transaction, the Required AHG Noteholders, or (b) in the event of an Alternative Sale Transaction(s), the Purchaser(s).

153.    "*Exit Facilities Documents*" means, collectively, the Exit Facilities Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection with the Exit Facilities, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.  In the event of a Plan Restructuring or a Credit Bid Transaction, the Exit Facilities Documents shall be acceptable to the Required AHG Noteholders.

154.    "*Exit FILO Term Loan Facility*" means the new money first-in, last-out term loan facility to be provided pursuant to the Exit Facilities Credit Agreement, which shall be acceptable to the Debtors, the DIP FILO Lenders, and (a) in the event of a Plan Restructuring or Credit Bid Transaction, the Required AHG Noteholders, or (b) in the event of an Alternative Sale Transaction(s), the Purchaser(s).

155.    "*Exit FILO Term Loan Facility Loans*" means the loans incurred under the Exit FILO Term Loan Facility.

156.    "*Exit Lenders*" means, collectively, the lenders from time to time under the Exit Facilities.

157.    "*Extension Order*" means (a) the *Order Pursuant to Section 365(d)(4) of the Bankruptcy Code (I) Extending the Debtors' Time to Assume or Reject Unexpired Leases of Non-Residential Real Property and (II) Granting Related Relief* [Docket No. 1132] and (b) any further order(s) of the Bankruptcy Court extending the time within which the Debtors may assume or reject Unexpired Leases.

158.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

159.    "*File*" or "*Filed*" means file, filed, or filing with the Bankruptcy Court or its authorized Designee in the Chapter 11 Cases.

160.    "*FILO Lenders*" means, collectively, the lenders from time to time under the FILO Term Loan Facility.

161.    "*FILO Term Loan Facility*" means that certain first-in, last-out term loan facility provided under the Prepetition Credit Agreement.

162.    "*FILO Term Loan Facility Claims*" means any Claim against a Debtor arising under, derived from, related to, or based on the FILO Term Loan Facility.

163.    "*Final Financing Order*" means the *Amended Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 2230].

164.    "*Final MedImpact Term Loan Bid – Cash Amount*" means Cash in the amount equal to (a) the Initial MedImpact Term Loan Bid – Cash Amount and (b) such other amount of Cash bid as determined by the MedImpact Term Loan Backstop Parties in accordance with the MedImpact Term Loan Bidding Procedures and the MedImpact Term Loan Backstop Commitment Agreement.

165.    "*Final MedImpact Term Loan Bid – Senior Secured Notes Claims Amount*" means Senior Secured Notes Claims in the amount equal to (a) the Initial MedImpact Term Loan Bid – Senior Secured Notes Claims Amount and (b) such other amount of Senior Secured Notes Claims bid as determined by the MedImpact Term Loan Backstop Parties in accordance with the MedImpact Term Loan Bidding Procedures and the MedImpact Term Loan Backstop Commitment Agreement.

166.    "*Final MedImpact Term Loan Bid Amount*" means (a) the Final MedImpact Term Loan Bid – Cash Amount plus (b) the Final MedImpact Term Loan Bid – Senior Secured Notes Claims Amount.

167.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is not subject to any pending stay and as to which the time to appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or Filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be Filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

168.    "*Financing Orders*" means, collectively, the Interim Financing Order and the Final Financing Order.

169.    "*General Unsecured Claim*" means any Claim, other than a Secured Claim, that is not (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim and a Disinterested Director Fee Claim), (b) an Other Secured Claim, (c) an Other Priority Claim, (d) a DIP Claim, (e) a Prepetition Credit Agreement Claim, (f) a Senior Secured Notes Claim, including any Senior Secured Notes Deficiency Claim, (g) an Intercompany Claim, or (h) a Section 510 Claim.

170.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

171.    "*GUC Equity Pool*" means 10% of the New Common Stock, subject to (a) reasonable and customary minority protections, (b) certain agreed-upon anti-dilution protections, and (c) dilution on account of the New Common Stock issued pursuant to the Management Incentive Plan, which shall be issued to, and held by, the GUC Equity Trust for the benefit of Holders of Allowed General Unsecured Claims; *provided* that neither the Committees nor Holders of General Unsecured Claims shall have management, governance, or board appointment rights on account of their interests in the GUC Equity Pool.  The GUC Equity Pool shall be contributed to either the GUC Equity Trust, a GUC Sub-Trust, or some other trust or consented to investment entity in consideration of tax efficiencies and regulatory compliance, which shall be mutually agreed by the Debtors, the Required AHG Noteholders, and the Committees (which consent shall not be unreasonably withheld).

172.    "*GUC Equity Trust*" means one or more trusts and/or sub-trusts (including as a sub-trust of a single trust that also includes the Litigation Trust as a sub-trust) established prior to, on, or after the Effective Date pursuant to, and in accordance with, Article IV.E.2 of the Plan to hold the GUC Equity Trust Assets for the benefit of Holders of Allowed General Unsecured Claims pursuant to the applicable GUC Equity Trust Agreement.  For the avoidance of doubt, the GUC Equity Trust and the Litigation Trust may be sub-trusts within a single trust, as mutually agreed between the Debtors, the Committees.

173.    "*GUC Equity Trust Agreement*" means each of the trust agreements establishing and delineating the terms and conditions for the creation and operation of the applicable GUC Equity Trust to be entered into on or before the Effective Date between the Debtors and the GUC Equity Trustee.

174.    "*GUC Equity Trust Assets*" means the GUC Equity Pool.  For the avoidance of doubt, the GUC Equity Trust Assets shall not include any asset(s) other than the GUC Equity Pool.

175.    "*GUC Equity Trust Documents*" means the GUC Equity Trust Agreements and all other agreements, documents, and instruments delivered or entered into in connection with the establishment and formation of the GUC Equity Trust; *provided, however*, that under the GUC Equity Trust Documents, the number of holders of any securities, including New Common Stock, shall not exceed 300 holders.

176.    "*GUC Equity Trust Fees and Expenses*" means all reasonable and documented fees, expenses, and costs (including any taxes imposed on or payable by the GUC Equity Trust) incurred by the GUC Equity Trust, any professionals retained by the GUC Equity Trust, and any additional amount determined necessary by the GUC Equity Trustee to adequately reserve for the operating expenses of the GUC Equity Trust.

177.    "*GUC Equity Trust Interests*" means the beneficial interest in the GUC Equity Trust Assets, granted to each beneficiary of the applicable GUC Equity Trust, which shall entitle such Holder of Allowed General Unsecured Claims to a Pro Rata share of the GUC Equity Trust Assets, subject to, and on, the terms and conditions as set forth in this Plan, the applicable GUC Equity Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and any documents related thereto.  GUC Equity Trust Interests will be non-voting.

178.    "*GUC Equity Trustee*" means, in its capacity as such, the Person selected by the Committees, [in consultation with the Debtors], to serve as the trustee of each of the GUC Equity Trust, and any successor thereto, in accordance with the GUC Equity Trust Agreements.

179.    "*GUC Sub-Trust*" means one or more trusts, if any, to be established on the Effective Date pursuant to, and in accordance with, the UCC / TCC Recovery Allocation Agreement, to hold and/or distribute assets for the benefit a subset of Holders of Allowed General Unsecured Claims pursuant to the applicable GUC Sub-Trust Documents.

180.    "*GUC Sub-Trust Documents*" means the trust agreements, together with any associated trust distribution procedures, governing any GUC Sub-Trust, which GUC Sub-Trust Documents shall be in form and substance reasonably acceptable to the Committees.

181.    "*GUC Sub-Trust Trustee*" means, in its capacity as such, the Person selected by the TCC and/or the UCC, as applicable, to serve as the trustee of a GUC Sub-Trust, and any successor thereto, in accordance with the GUC Sub-Trust Documents.

182.    "*Holder*" means any holder of an Allowed Claim or Interest.

183.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

184.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, indemnification agreements, employment contracts, or trust agreements, for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, other Professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

185.    "*Indemnification Right*" means the Debtors' indemnification rights against any manufacturer, distributor, supplier, or other party, with respect to any of the Debtors' Products, including by way of contract, statute, common law, or otherwise.

186.    "*Indentures*" means, collectively, the Senior Secured Notes Indentures and the Unsecured Notes Indentures.

187.    "*Initial MedImpact Term Loan Bid – Cash Amount*" means Cash in the amount set forth in the MedImpact Term Loan Backstop Commitment Agreement.

188.    "*Initial MedImpact Term Loan Bid – Senior Secured Notes Claims Amount*" means Senior Secured Notes Claims in the amount set forth in the MedImpact Term Loan Backstop Commitment Agreement.

189.    "*Initial MedImpact Term Loan Bid Amount*" means (a) the Initial MedImpact Term Loan Bid – Cash Amount plus (b) the Initial MedImpact Term Loan Bid – Senior Secured Notes Claims Amount.

190.    "*Insurance Policies*" means, collectively, insurance policies, including commercial general liability policies, punitive damages policies, products liability policies, life sciences policies, D&O Liability Insurance Policies, and any of the Debtors' rights under any third parties' insurance policies.

191.    "*Insurer Injunction*" means the insurer injunction set forth in Article X.H of the Plan.

192.    "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor.

193.    "*Intercompany Interest*" means any Interest held by a Debtor in another Debtor or non-Debtor subsidiary or Affiliate.

194.    "*Interest*" means any Equity Security in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

195.    "*Interim Financing Order*" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 120].

196.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

197.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

198.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

199.    "*Liquidating Trust*" means, in the event the Restructuring Transaction is not a Plan Restructuring, the trust, if any, formed under the Liquidating Trust Agreement, which shall hold the Liquidating Trust Assets.

200.    "*Liquidating Trust Agreement*" means the trust or similar agreement (if any) providing for the Liquidating Trust, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof that, among other things, establishes the Liquidating Trust and governs the powers, duties, and responsibilities of the Plan Administrator, Filed as part of the Plan Supplement (if applicable).

201.    "*Liquidating Trust Assets*" means in the event the Restructuring Transaction is not a Plan Restructuring, the Remnant Assets transferred from the Wind-Down Debtors to the Liquidating Trust in accordance with Article IV.E.3 herein.

202.    "*Litigation Trust*" means the one or more trusts and/or sub-trusts (including as a sub-trust of a single trust that also includes the GUC Equity Trust as a sub-trust) formed under the Litigation Trust Agreement(s), which trust(s) shall hold the Litigation Trust Assets.

203.    "*Litigation Trust Agreement*" means the trust or similar agreement (if any) providing for the Litigation Trust, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof.

204.    "*Litigation Trust Assets*" means (i) the Committees' Initial Cash Consideration, (ii) the Committees' Post-Emergence Cash Consideration, (iii) the Assigned Claims, (iv) the proceeds of the Assigned Claims, (v) the Assigned Insurance Rights, and (vi) the Tort Claim Insurance Proceeds.

205.    "*Litigation Trust Class A Interests*" means the class A beneficial interests in the Litigation Trust as provided for in the Litigation Trust Agreement, which interests shall only be available to Holders of General

Unsecured Claims, subject to the terms of the UCC / TCC Recovery Allocation Agreement.  For the avoidance of doubt, Litigation Trust Class A Interests shall include, in addition to other Litigation Trust Assets other than Litigation Trust Class B Interests, (a) 85% of the first $100 million of Proceeds of Assigned Claims; (b) 75% of any amounts above $100 million and less than $200 million of Proceeds of Assigned Claims; and (c) 65% of any amounts above $200 million of Proceeds of Assigned Claims.

206.    "*Litigation Trust Class B Interests*" means the class B beneficial interests in the Litigation Trust as provided for in the Litigation Trust Agreement, which interests shall only be available to Holders of Senior Secured Notes Claims.  For the avoidance of doubt, Litigation Trust Class B Interests shall only include (a) 15% of the first $100 million of Proceeds of Assigned Claims; (b) 25% of any amounts above $100 million and less than $200 million of Proceeds of Assigned Claims; and (c) 35% of any amounts above $200 million of Proceeds of Assigned Claims.

207.    "*Litigation Trust Cooperation Agreement*" means an agreement between the Reorganized Debtors and the Litigation Trust, to be operative as of and after the Effective Date, (a) transferring to the Litigation Trust, inter alia, documents, information, and privileges relevant for the pursuit and administration by the Litigation Trust of the Assigned Claims and Assigned Insurance Rights; and (b) providing for reasonable terms for cooperation between the Reorganized Debtors and the Litigation Trust regarding the same.

208.    "*Litigation Trust Documents*" means the Litigation Trust Agreement and all other agreements, documents, procedures, and instruments delivered or entered into in connection with the establishment, formation, and implementation of the Litigation Trust, including the Litigation Trust Cooperation Agreement.

209.    "*Litigation Trust Interests*" means all beneficial interests in the Litigation Trust, as provided for in the Litigation Trust Agreement.

210.    "*Litigation Trustee*" means the trustee for the Litigation Trust to be selected by the Committees, in consultation with the Ad Hoc Secured Noteholder Group, which Person (and any successor Litigation Trustee) shall be a "U.S. Person" as determined for U.S. federal income tax purposes.

211.    "*Management Incentive Plan*" means, in the event of a Plan Restructuring, the post-Effective Date management equity incentive plan of New Rite Aid, to be determined and allocated by the New Rite Aid Board.

212.    "*Massachusetts OAG Agreement*" means that certain settlement agreement between Debtor Maxi Drug, Inc. and the Massachusetts Office of the Attorney General establishing the terms of an Assurance of Discontinuance under Massachusetts Law, as filed in the Suffolk County Superior Court on or about October 10, 2023.

213.    "*McKesson*" means, collectively, the McKesson Corporation and certain corporate Affiliates, as creditors and contract counterparties in the Chapter 11 Cases.

214.    "*McKesson 503(b)(9) Settlement*" means that certain settlement, by and between the Debtors and McKesson, setting forth the treatment of all Claims held by McKesson against any Debtor under section 503(b)(9) of the Bankruptcy Code, on the terms and conditions set forth in the Plan Supplement.

215.    "*McKesson Claim*" means all Claims of McKesson arising under the McKesson Prepetition Contract or otherwise, including any Claims under section 503(b)(9) of the Bankruptcy Code.

216.    "*McKesson New Contract*" means that certain supply agreement, effective as of the Effective Date, pursuant to which McKesson will supply certain of the Reorganized Debtors with, among other things, pharmaceutical Products.

217.    "*McKesson Prepetition Contract*" means that certain supply agreement, originally entered into and dated as of December 22, 2003, pursuant to which McKesson supplied certain of the Debtors with, among other things, pharmaceutical Products, prior to the Petition Date, as the same was previously amended, supplemented, or otherwise modified from time to time.

218.    "*McKesson Settlement*" means that certain compromise and settlement, by and among the Debtors and McKesson, with respect to, among other things, the treatment of the McKesson Claim and the terms of the go-forward McKesson New Contract.

219.    "*McKesson Settlement Documents*" means, collectively, the McKesson New Contract, the McKesson Settlement Term Sheet, the McKesson 503(b)(9) Settlement, and any and all other documents memorializing or implementing the McKesson Settlement.

220.    "*McKesson Settlement Term Sheet*" means that certain term sheet setting forth certain terms and conditions of the McKesson Settlement.

221.    "*Mediation*" means the mediation between the Debtors and certain key parties in interest in the Chapter 11 Cases authorized by the Bankruptcy Court pursuant to the Mediation Order.

222.    "*Mediation Order*" means the *Stipulation and Agreed Order (I) Appointing Hon. Shelley C. Chapman (Ret.) as Mediator to Mediate the Mediation Topics, (II) Referring Such Matters to Mediation, (III) Directing the Mediation Parties to Participate in the Mediation, and (IV) Granting Related Relief* [Docket No. 1771], as may be amended, supplemented, or otherwise modified from time to time.

223.    "*Mediator*" has the meaning ascribed to it in the Mediation Order.

224.    "*MedImpact*" means MedImpact Healthcare Systems, Inc., as Purchaser under the Elixir Sale Order.

225.    "*MedImpact Aggregate Rights Offering Amount*" means an amount of Cash representing the aggregate purchase price of MedImpact Rights Offering NewCo Notes sufficient to generate net Cash proceeds sufficient to fund the Final MedImpact Term Loan Bid – Cash Amount.

226.    "*MedImpact Backstop Fee NewCo Notes*" means the MedImpact NewCo Notes issued to the MedImpact Term Loan Backstop Parties on account of the MedImpact Term Loan Backstop Commitment Premium in accordance with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement and the Plan.

227.    "*MedImpact NewCo Notes*" means the new senior secured notes issued by the MedImpact Term Loan NewCo pursuant to, and in accordance with, the MedImpact Term Loan Backstop Commitment Agreement, MedImpact Term Loan Rights Offering, and Article III.B..5.(c)(i)(2)(A)(I) of the Plan, and secured by all of the MedImpact Term Loan NewCo's assets, which shall only include the MedImpact Term Loan.  For the avoidance of doubt, no entity other than the MedImpact Term Loan NewCo, including any Debtor or non-Debtor subsidiary or Affiliate of Rite Aid, shall be an obligor on the MedImpact NewCo Notes, and the MedImpact NewCo Notes shall not be secured by any assets, including the assets of any Debtor or non-Debtor, other than the assets of the MedImpact Term Loan NewCo.  The MedImpact NewCo Notes shall include (a) the MedImpact Backstop Fee NewCo Notes, (b) the MedImpact Rights Offering NewCo Notes, and (c) the MedImpact Unsubscribed NewCo Notes and otherwise be on terms and conditions set forth in the MedImpact Term Loan Backstop Commitment Agreement.

228.    "*MedImpact NewCo Notes Documentation*" means the MedImpact NewCo Notes Indenture and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee statements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents, to the extent contemplated by, and in accordance with the terms and conditions of, the MedImpact Term Loan Backstop Commitment Agreement.

229.    "*MedImpact NewCo Notes Indenture*" means the definitive agreement governing the MedImpact NewCo Notes.

230.    "*MedImpact NewCo Subscription Rights*" means the right of Eligible Holders to purchase MedImpact Rights Offering NewCo Notes in the MedImpact Term Loan Rights Offering pursuant to the MedImpact Term Loan Rights Offering Procedures and the MedImpact Term Loan Backstop Commitment Agreement.

231.    "*MedImpact NewCo Trustee*" means the trustee, agent, manager, or other representative with respect to the MedImpact Term Loan NewCo, selected in accordance with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement, and any of its successors and assigns, in its capacity as such.

232.    "*MedImpact Rights Offering NewCo Notes*" means the MedImpact NewCo Notes issued to Eligible Holders that timely and validly exercise their MedImpact NewCo Subscription Rights in accordance with the terms and conditions of the MedImpact Term Loan Rights Offering, which shall be in accordance with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement.

233.    "*MedImpact Term Loan*" means that certain seller financing term loan facility provided under the MedImpact Term Loan Credit Agreement as the "2023 Term Loans" (as defined therein).

234.    "*MedImpact Term Loan Backstop Commitment Agreement*" means that certain Commitment Agreement, dated as of [●], 2024, by and among Debtors and the MedImpact Term Loan Backstop Parties, pursuant to which the MedImpact Term Loan Backstop Parties have submitted (a) a stalking horse bid to purchase the MedImpact Term Loan and (b) to backstop the MedImpact Term Loan Rights Offering, in each case on the terms and conditions therein, as may be amended, supplemented, amended and restated, or otherwise modified from time to time.

235.    "*MedImpact Term Loan Backstop Commitment Premium*" means a commitment premium equal to 15% of the Final MedImpact Term Loan Bid – Cash Amount, payable to the MedImpact Term Loan Backstop Parties through the issuance of MedImpact Backstop Fee NewCo Notes in accordance with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement.

236.    "*MedImpact Term Loan Backstop Parties*" means certain members of the Ad Hoc Secured Noteholder Group that are signatories to the MedImpact Term Loan Backstop Commitment Agreement as "Backstop Parties" thereunder, together with their successors and permitted assigns, in accordance with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement.

237.    "*MedImpact Term Loan Bidding Procedures*" means the bidding procedures governing the Debtors' process to market for sale the MedImpact Term Loan, approved by the Bankruptcy Court pursuant to the MedImpact Term Loan Bidding Procedures Order, and which shall be acceptable to the DIP Agents and the Required AHG Noteholders and consistent with the MedImpact Term Loan Backstop Commitment Agreement.

238.    "*MedImpact Term Loan Bidding Procedures Order*" means a Final Order of the Bankruptcy Court approving the MedImpact Term Loan Bidding Procedures and the MedImpact Term Loan Sales Process, which Final Order may be the Confirmation Order, which shall be consistent with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement.

239.    "*MedImpact Term Loan Credit Agreement*" means that certain second amended and restated credit agreement, dated as of November 8, 2023, by and among MI OpCo Holdings, Inc., as borrower, MI OpOco H2, LLC, as guarantor, the other subsidiary guarantors from time to time party thereto, the lenders and other L/C issuers from time to time party thereto, and Bank of America, N.A., as administrative agent, swing-line lender, and L/C issuer, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

240.    "*MedImpact Term Loan NewCo*" means a newly formed entity or entities (including trusts) formed pursuant to the Plan, the organizational documents of which shall be in form and substance agreed to in the MedImpact Term Loan Backstop Commitment Agreement, which, if the MedImpact Term Loan Backstop Parties acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures, shall hold all right, title, and interest in the MedImpact Term Loan and shall issue the MedImpact NewCo Notes in accordance with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement.

241.    "*MedImpact Term Loan Rights Offering*" means the rights offering pursuant to which each Eligible Holder shall be offered the right to purchase MedImpact Rights Offering NewCo Notes in the aggregate amount of the MedImpact Aggregate Rights Offering Amount at a [●]% discount to the face amount of the MedImpact Rights

Offering NewCo Notes in accordance with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement and the Plan.

242.     "*MedImpact Term Loan Rights Offering Procedures*" means the procedures for Holders of Allowed Senior Secured Notes Claims to participate in the MedImpact Term Loan Rights Offering, which shall be consistent with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement.

243.     "*MedImpact Term Loan Sale*" means the sale of the MedImpact Term Loan pursuant to the MedImpact Term Loan Sales Process.

244.     "*MedImpact Term Loan Sales Process*" means the competitive marketing and bidding process conducted by the Debtors pursuant to the MedImpact Term Loan Bidding Procedures, as approved by the Bankruptcy Court.

245.     "*MedImpact Term Loan Stalking Horse Bid*" means the binding and irrevocable stalking horse bid to purchase the MedImpact Term Loan submitted by the MedImpact Term Loan Backstop Parties in the amount of the Initial MedImpact Term Loan Bid Amount pursuant to the terms and conditions set forth in the MedImpact Term Loan Backstop Commitment Agreement.

246.     "*MedImpact Term Loan Stalking Horse Bidder Documentation*" means the definitive documentation for the creation of the MedImpact Term Loan NewCo and the appointment of the MedImpact Term Loan NewCo Trustee, including all agreements, documents, and instruments delivered or entered into in connection with the MedImpact Term Loan NewCo, which each shall be in form and substance acceptable to the Debtors and the Required AHG Noteholders and be consistent with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement.

247.     "*MedImpact Termination Fee*" means a "break-up" fee in Cash in an amount equal to 2.5% of the Initial MedImpact Term Loan Bid – Cash Amount, payable in accordance with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement and the MedImpact Term Loan Bidding Procedures.

248.     "*MedImpact Unsubscribed NewCo Notes*" means the MedImpact NewCo Notes issued to the MedImpact Term Loan Backstop Parties in accordance with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement.

249.     "*MIP Documents*" means, collectively, the documents governing the Management Incentive Plan, as such documents may be amended, supplemented, or otherwise modified from time to time in accordance with their terms.

250.     "*New Common Stock*" means, in the event of a Plan Restructuring, the common stock, limited liability company membership units, or functional equivalent thereof of New Rite Aid having the terms set forth in the New Corporate Governance Documents to be issued on the Effective Date subject to the terms and conditions set forth in this Plan and the New Shareholders Agreement.

251.     "*New Corporate Governance Documents*" means, in the event of a Plan Restructuring, the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, or such other applicable formation documents (if any) of New Rite Aid, including any certificates of designation and the New Shareholders Agreement, each of which shall be included in the Plan Supplement and be in form and substance acceptable to the Debtors and the Required AHG Noteholders.

252.     "*New Rite Aid*" means, in each case, after taking into account any Alternative Sale Transaction or Other Asset Sale consummated pursuant to the Bidding Procedures and Bidding Procedures Order, either (a) Rite Aid, as reorganized pursuant to and under the Plan, or any successor or assign thereto, by merger, amalgamation, consolidation or otherwise, or any Affiliate thereto, on or after the Effective Date, or (b) a new Entity that may be formed to, among other things, directly or indirectly to acquire the assets and/or Interests of the Debtors in the Chapter 11 Cases, and issue the New Common Stock to be distributed pursuant to the Plan.

253.    "*New Rite Aid Board*" means the board of directors of New Rite Aid, as selected by the Required AHG Noteholders.

254.    "*New Shareholders Agreement*" means, in the event of the Plan Restructuring, the agreement with respect to the New Common Stock, which shall include customary minority shareholder protections and shall be otherwise acceptable to the Debtors and the Required AHG Noteholders.

255.    "*Notes*" means, collectively, the Senior Secured Notes and the Unsecured Notes.

256.    "*Notes Claims*" means, collectively, the Senior Secured Notes Claims and Unsecured Notes Claims.

257.    "*Opioid Claim*" means a Claim or Cause of Action (other than Claims or Causes of Action arising from violations of any opioid-related injunction entered by the Bankruptcy Court in connection with the Chapter 11 Cases), whether existing now or arising in the future, based in whole or in part on any conduct or circumstance occurring or existing on or before the Effective Date and arising out of, relating to, or in connection with any opioid product or substance, and any and all Opioid Demands related thereto, including, for the avoidance of doubt, claims for indemnification, contribution, or reimbursement on account of payments or losses in any way arising out of, relating to, or in connection with any such conduct or circumstances and Co-Defendant Claims.  For the avoidance of doubt, Opioid Claims do not include (i) any liability solely to the extent premised on allegations regarding conduct undertaken by the Reorganized Debtors after the Effective Date or (ii) any claims arising under section 502(h) of the Bankruptcy Code.

258.    "*Opioid Demand*" means any present or future demand for payment against a Debtor that (a) was not a Claim during the Chapter 11 Cases prior to the Effective Date; (b) is based in whole or in part on any conduct or circumstance occurring or existing on or before the Effective Date; or (c) arises out of, relating to, or in connection with the same or similar conduct or events that gave rise to the Opioid Claims addressed by the Plan.  For the avoidance of doubt, Opioid Demands do not include (i) any liability solely to the extent premised on allegations regarding conduct undertaken by the Reorganized Debtors after the Effective Date or (ii) any claims arising under section 502(h) of the Bankruptcy Code.

259.    "*Opioid-Related Activities*" means the development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution, dispensing, or sale of opioid Products or the use or receipt of any proceeds therefrom, or the use of opioids, including opioids that are not Products, or any other activities that form the basis of an Opioid Claim.

260.    "*Other Asset Sale*" means, in the event the Plan Restructuring occurs and the Debtors agree to sell certain of the Debtors' assets, one or more sale(s) of some of the Debtors' assets pursuant to the Bidding Procedures, consummated through one or more Sale Order(s).  For the avoidance of doubt, the sale transaction consummated pursuant to the Elixir Sale Order shall not be considered an "Other Asset Sale."

261.    "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases; *provided* that any Other Priority Claim that (i) is an Assumed Liability under a Purchase Agreement shall be satisfied solely under the applicable Purchase Agreement and shall not be an obligation of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors and (ii) solely in the event of a Sale Transaction Restructuring, is not an Assumed Liability under a Purchase Agreement shall be satisfied solely from the Administrative / Priority Claims Reserve.

262.    "*Other Secured Claim*" means any Secured Claim, other than (a) an ABL Facility Claim, (b) a FILO Term Loan Facility Claim, (c) a DIP ABL Claim, (d) a DIP FILO Claim, (e) a DIP Term Loan Claim, or (f) a Senior Secured Notes Claim; *provided* that any Other Secured Claim that (i) is an Assumed Liability under a Purchase Agreement shall be satisfied solely under the applicable Purchase Agreement and shall not be an obligation of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors and (ii) solely in the event of a Sale Transaction Restructuring, is not an Assumed Liability under a Purchase Agreement shall be satisfied solely from the Administrative / Priority Claims Reserve.

263.    "*PBGC*" means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation and agency of the United States created by ERISA.

264.    "*PBM Business*" means the pharmacy benefit manager business conducted by certain Debtor subsidiaries, which, for the avoidance of doubt, includes Hunter Lane, LLC and each of its direct and indirect subsidiaries, other than non-Debtor EIC.

265.    "*Pending Opioid Actions*" means the judicial, administrative or other actions or proceedings to bring or assert Opioid Claims or Opioid Demands, that were commenced before the Petition Date against any of the Debtors, including, for the avoidance of doubt, any such actions or proceedings in respect of any Co-Defendants.

266.    "*Pension Plan*" means the Debtors' pension plan.

267.    "*Permitted Transfer*" means a transfer of all or a portion of the assets of the Wind-Down Debtors to the Liquidating Trust in accordance with Article IV.I herein.

268.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code and shall include, without limitation, the Litigation Trust and the Litigation Trustee.

269.    "*Petition Date*" means October 15, 2023, the date on which the Debtors commenced the Chapter 11 Cases.

270.    "*Plan*" has the meaning set forth in the Introduction.

271.    "*Plan Administrator*" means, in the event the Restructuring Transaction is not a Plan Restructuring, the person or persons, if any, identified in the Plan Supplement (as determined by the Debtors) to be appointed on the Effective Date and who will serve as the trustee and administrator for the Wind-Down Debtors as set forth in Article IV.H of the Plan.  In the event of a Credit Bid Transaction, the Plan Administrator shall be reasonably acceptable to the Required AHG Noteholders.

272.    "*Plan Restructuring*" means the transactions and reorganization contemplated by, and pursuant to, this Plan in accordance with Article IV.B of this Plan.

273.    ["*Plan Supplement*" means, and each in form and substance acceptable to the Debtors and the Required AHG Noteholders, the DIP Agents, and the Exit Facilities Agent, the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), drafts of which shall be Filed by the Debtors no later than seven days before the Voting Deadline (*provided* that the drafts of the documents described in clauses (e), (h), (i), (m), and (n) shall be Filed no later than seven days before the Combined Hearing) or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) the New Corporate Governance Documents; (b) the Management Incentive Plan; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) the Restructuring Transactions Memorandum; (e) the Exit Facilities Documents; (f) the Takeback Notes Documents; (g) a document listing the members of the New Rite Aid Board, to the extent known; (h) the GUC Equity Trust Agreements (which shall be consistent with the Committee Settlement); (i) the Litigation Trust Agreement (which shall be consistent with the Committee Settlement); (j) the identity of the Plan Administrator (if any) and the terms of compensation of the Plan Administrator; (k) the Liquidating Trust Agreement (if any); (l) the McKesson 503(b)(9) Settlement; (m) the AHG New-Money Commitment Agreement; (n) the AHG Notes Documentation and the SCD Trust Documentation; (o) the MedImpact NewCo Notes Documentation, the MedImpact Term Loan Rights Offering Procedures, the MedImpact Term Loan Bidding Procedures, the MedImpact Term Loan Backstop Commitment Agreement, and the MedImpact Term Loan Stalking Horse Bidder Documentation; (p) the UCC / TCC Recovery Allocation Agreement (which shall be acceptable to the Committees in their sole discretion); (q) any GUC Sub-Trust Documents and any other documents reasonably necessary to implement the Committee Settlement; (r) the Litigation Trust Cooperation Agreement; (s) any documents related to the opt-out election to be provided to Holders of Claims, which documents shall be consistent with the Committee Settlement, and reasonably acceptable to the Committees

and the Required AHG Noteholders; and (t) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement; *provided*, *however*, that the DIP Agents and the Exit Facilities Agent shall not have consent rights over the documents or exhibits set forth in clauses (a), (b), (c), (g), (h), (i), (p), or (q), or any amendments or modifications thereto.  The Plan Supplement, other than the UCC / TCC Recovery Allocation Agreement, shall be in form and substance acceptable to the Debtors except for the GUC Equity Trust Agreements, GUC Sub-Trust Documents, and Litigation Trust Documents, which shall be reasonably acceptable to the Debtors; *provided* that the Ad Hoc Secured Noteholders Group shall not have consent rights over the documents or exhibits set forth in clauses (h), (i), (p), or (q) except to the extent that such Plan Supplement documents adversely affect the rights or entitlements of the Ad Hoc Secured Noteholder Group, in which case such Plan Supplement documents must be reasonably acceptable to the Ad Hoc Secured Noteholder Group, or any amendments or modifications thereto; *provided, further*, that the documents set forth in clauses (m) and (n) shall be subject to the consent rights set forth in the AHG New-Money Commitment Agreement; *provided, further*, that he documents set forth in clause (o) shall be subject to the consent rights set forth in the MedImpact Term Loan Backstop Commitment Agreement.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, any Purchase Agreement(s), any Sale Order, and the Financing Orders, subject to the consent rights set forth herein.  For the avoidance of doubt, the finalization and execution of the UCC / TCC Recovery Allocation Agreement and any GUC Sub-Trust Documents shall not be a condition to Confirmation or Consummation of the Plan.  The Plan Supplement documents set forth in (h), (i), (p), (q), and (r) shall be reasonably acceptable to the Committees, provided, that, with respect to any Plan Supplement documents not subject to the foregoing clause, any provisions in such documents that materially and adversely impact the rights or entitlements of the constituencies of the Committees under the Committee Settlement shall be reasonably acceptable to the Committees.][5]

274.    "*Prepetition Agent*" means Bank of America, N.A., in its capacity as administrative and collateral agent under the Prepetition Credit Agreement.

275.    "*Prepetition Credit Agreement*" means that certain credit agreement, dated as of December 20, 2018, by and between Rite Aid, as borrower, the Prepetition Agent, as administrative agent and collateral agent, and the lenders parties thereto, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

276.    "*Prepetition Credit Agreement Claim*" any Claim derived from, based upon, or arising under the Prepetition Credit Agreement and the other "Senior Loan Documents" (as defined therein).

277.    "*Prepetition Credit Agreement Lenders*" means the lenders from time to time under the Prepetition Credit Agreement.

278.    "*Prepetition Credit Facilities*" means, together, the ABL Facility and the FILO Term Loan Facility.

279.    "*Prepetition Secured Parties*" means, collectively, the Prepetition Agent, the Prepetition Credit Agreement Lenders, and the other "Senior Secured Parties" as defined in the Prepetition Credit Agreement.

280.    "*Priority Claims*" means, collectively, the Priority Tax Claims and Other Priority Claims.

281.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

282.    "*Private Placement Securities*" means, collectively, (a) the New Common Stock issued pursuant to the Management Incentive Plan, (b) the AHG Notes, and (c) the MedImpact Unsubscribed NewCo Notes (if any) *provided, however*, that the number of holders of any of the classes of securities mentioned in clauses (a) through (d) of this definition shall not exceed 300 holders.

---

[5]    Consent rights with respect to Definitive Documents remain subject to ongoing negotiation among the parties.

283.    "*Pro Forma Closing Liquidity*" means the sum of (a) Excess Availability, as of the Effective Date and after giving effect to the Restructuring Transaction on the Effective Date (including any borrowings under the Exit ABL Facility, the payment of all transaction costs in connection with the Exit Facilities and the occurrence of the Effective Date, including any Cash payments pursuant to the Plan, and the pro forma application of the proceeds of the AHG Notes to pay down the DIP ABL Facility), (b) the pro forma effect on Excess Availability of the expansion of trade terms with McKesson to 10 days commencing on the Effective Date, with the amount of this clause (b) not to exceed $75,000,000, and (c) Cash in collection accounts, which is to be swept to pay down the DIP ABL Facility balance by the end of the Business Day on the Effective Date, consistent with the DIP Agents' prior practices.  For purposes of clause (a) above, Excess Availability shall be determined as if all trade debt of the Debtors is paid current consistent with ordinary course treatment during the Chapter 11 Cases.

284.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

285.    "*Proceeds of Assigned Claims*" means the Cash proceeds obtained through the pursuit of Assigned Insurance Rights for any Assigned Claims and any amounts received from any third parties in connection with any Assigned Claims; *provided, however*, that "Proceeds of Assigned Claims" shall not include Tort Claim Insurance Proceeds.

286.    "*Products*" means any and all products developed, designed, manufactured, marketed, dispensed, or sold by the Debtors.

287.    "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

288.    "*Professional Fee Claim*" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Effective Date that the Bankruptcy Court has not denied by Final Order.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

289.    "*Professional Fee Escrow Account*" means an interest-bearing escrow account to be funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount.

290.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors or to either of the Committees prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II of the Plan.

291.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable bar date.

292.    "*Property Insurance Policies*" means any Insurance Policies held or maintained by any of the Debtors covering losses with respect to real or personal property or improvements or losses from business interruption of the Debtors.

293.    "*Protected Party*" means (a) the Debtors, (b) the Reorganized Debtors, (c) the Wind-Down Debtors, (d) any Purchaser in connection with any Credit Bid Transaction, and (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Persons' (i) predecessors, successors, permitted assigns, subsidiaries, and controlled Affiliates, respective heirs, executors, Estates, and nominees, in each case solely in their capacity as such, and

(ii) respective current and former officers and directors, managers, principals, members, partners, employees, agents, advisors (including financial advisors), attorneys (including attorneys retained by any director in his or her capacity as a director or manager of a Person), accountants, investment bankers (including investment bankers retained by any director in his or her capacity as a director or manager of a Person), consultants, experts and other professionals (including any professional advisor retained by any director in his or her capacity as a director or manager of a Person) or other representatives of the Persons described in clauses (a) through (d).

294.    "*Purchase Agreement*" means one or more agreements entered into by some or all of the Debtors, on the one hand, and one or more parties (which may include the Senior Secured Noteholders in connection with a Credit Bid Transaction), on the other hand, involving the sale of some, all, or a portion of the Debtors' assets and/or equity, including in connection with an Alternative Sale Transaction, any Sale Transaction Restructuring, or an Other Asset Sale, together with all exhibits, appendices, supplements, documents, and agreements ancillary thereto, in each case as amended, modified, or supplemented from time to time.

295.    "*Purchasers*" means the purchasers under any Purchase Agreement(s).

296.    "*Registration Rights Agreement*" means a registration statement or registration rights agreement (or equivalent governing documents of any of the foregoing), if any, pursuant to which New Common Stock is issued, which may be entered into in the discretion of the Debtors and the Required AHG Noteholders.

297.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

298.    "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.  For the avoidance of doubt, no Excluded Party shall be a Related Party.

299.    "*Released Co-Defendant*" means the parties listed on **Exhibit [   ]** hereto.

300.    ["*Released Party*" means, collectively, in each case in its capacity as such:  (a) the Debtors (including any Debtor Related Party); (b) the Reorganized Debtors; (c) the Wind-Down Debtors; (d) the Releasing Parties (except to the extent that any Excluded Party would otherwise constitute a Releasing Party); (e) the Senior Secured Noteholders (including the Ad Hoc Secured Noteholder Group and each of its members); (f) the Agents; (g) the Trustees; (h) the DIP Secured Parties; (i) the Prepetition Secured Parties; (j) each of the lenders under the Exit Facilities; (k) the Committees and each member of the Committees; (l) the Litigation Trustee, the GUC Equity Trustee, and the GUC Sub-Trust Trustee (if any); (m) in the event of any Sale Transaction Restructuring or Other Asset Sale, the Purchaser(s); (n) the MedImpact Term Loan Backstop Parties, MedImpact Term Loan NewCo, and the MedImpact NewCo Trustee; (o) the AHG New-Money Commitment Parties and the SCD Trustee; (p) each current and former Affiliate of each Entity in clauses (a), (b), and (c); (q) each Debtor Related Party of each Entity in clauses (a), (b), and (c); (r) each current and former Affiliate of each Entity in clauses (d) through (p) and the following clause (s); and (s) each Related Party of each Entity in clauses (d) through (p) and this clause (r); *provided* that, in each case, any Holder of a Claim or Interest that is not a Releasing Party shall not be a "Released Party."[6]  For the avoidance of doubt, no Excluded Party shall be a Released Party.  For the avoidance of doubt, notwithstanding anything herein to the contrary, Holders of Tort Claims shall not be deemed to release the Debtors, provided, however, that any recovery from any such Tort Claim against the Debtors (and their Affiliates), the Reorganized Debtors (and their Affiliates), and/or the

---

[6]    This definition and any related provision in this Plan remain subject to the outcome of any ongoing diligence efforts of the Disinterested Directors at the applicable Debtor Entities.

Wind-Down Debtors, as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets, as applicable, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.  For the avoidance of doubt, any Debtor Related Party shall be a Released Party.]

301.    ["*Releasing Party*" means, collectively, in each case solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Wind-Down Debtors; (d) the Agents; (e) the Trustees; (f) the Prepetition Secured Parties; (g) the DIP Secured Parties; (h) the Senior Secured Noteholders (including the Ad Hoc Secured Noteholder Group and each of its members); (i) each of the lenders under the Exit Facilities; (j) the Committees and each member of the Committees; (k) the Litigation Trustee and the GUC Equity Trustee; (l) in the event of any Sale Transaction Restructuring or Other Asset Sale, the Purchaser(s); (m) the MedImpact Term Loan Backstop Parties, MedImpact Term Loan NewCo, and the MedImpact NewCo Trustee; (n) the AHG New-Money Commitment Parties and the SCD Trustee; (o) all Holders of Claims that vote to accept the Plan and who do not affirmatively opt out of the releases provided for in the Plan; (p) all Holders of Claims that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (q) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (r) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (s) all Holders of General Unsecured Claims who are deemed to reject the Plan and who do not affirmatively opt out of the releases provided for in the Plan;[7] (t) each current and former Affiliate of each Entity in clauses (a) through (s); and (u) each Related Party of each Entity in clauses (a) through clause (s).  For the avoidance of doubt and notwithstanding anything to the contrary herein, Holders of Tort Claims shall not be deemed to release the Debtors, provided, however, that any recovery from any such Tort Claim against the Debtors (and their Affiliates), the Reorganized Debtors (and their Affiliates), and/or the Wind-Down Debtors, as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets, as applicable, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.  Notwithstanding anything to the contrary herein, any of the Debtors' current and former directors and officers that are not a Debtor Related Party shall not be a Releasing Party.]

302.    "*Remnant Assets*" means, in the event of any Sale Transaction Restructuring, any of the assets of the Debtors that are not Retail Acquired Assets or Elixir Acquired Assets.

303.    "*Reorganized Debtors*" means New Rite Aid and any Affiliates thereto that are Debtors, on or after the Effective Date.

304.    "*Required AHG Noteholders*" means, as of the relevant date, members of the Ad Hoc Secured Noteholder Group holding at least 50 percent of the aggregate outstanding principal amount of the Senior Secured Notes Claims that are held by the Ad Hoc Secured Noteholder Group.

305.    "*Required CMSR Commitment Parties*" shall have the meaning ascribed to it in the AHG New-Money Commitment Agreement.

---

[7]    As explained in the Disclosure Statement, the Solicitation Materials will not include a form or mechanism for Holders to opt-out of the releases set forth in the Plan.  Solicitation of elections with respect to Holder releases will occur after Confirmation of the Plan, pursuant to the Confirmation Order or separate Court order, and will not occur pursuant to the Solicitation Materials; *provided* that, for the avoidance of doubt, such solicitation will be completed prior to the Effective Date of the Plan.  The Debtors shall consult with the Committees and the Required AHG Noteholders regarding such solicitation process and the solicitation process shall be consistent with the Committee Settlement and reasonably acceptable to the Committees as it relates to the solicitation process for general unsecured creditors.

306.    "*Required MedImpact Commitment Parties*" shall have the meaning ascribed to it in the MedImpact Term Loan Backstop Commitment Agreement.

307.    "*Restructuring Transaction*" means the Plan Restructuring or the Sale Transaction Restructuring as such transactions are described in <u>Article IV</u> of the Plan.

308.    "*Restructuring Transactions Memorandum*" means, with respect to a Plan Restructuring, a document to be included in the Plan Supplement that will set forth a summary of the transaction steps to complete the Restructuring Transactions.

309.    "*Retail Acquired Assets*" means the assets, other than the Elixir Acquired Assets, acquired in a Sale Transaction Restructuring or Other Asset Sale.

310.    "*Retained Professionals*" means each of Kroll Restructuring Administration LLC, Cole Schotz P.C., Guggenheim Securities, LLC, Deloitte, Alvarez & Marsal North America, LLC, A&G Realty Partners, Pricewaterhouse Coopers LLP, Wilson Sonsini Goodrich & Rosati, Milbank LLP, Katten Muchin Rosenman LLP, Kirkland & Ellis LLP, and Kobre & Kim LLP, each in any capacity.

311.    "*Rite Aid Retail Assets*" shall have the meaning given to it in the Bidding Procedures

312.    "*Rules*" means Rule 501(a)(1), (2), (3) and (7) of the Securities Act.

313.    "*Sale Order*" means one or more Bankruptcy Court orders approving the Debtors' entry into one or more definitive Purchase Agreement(s) in connection with the Sale Transaction Restructuring, or the Other Asset Sale(s).

314.    "*Sale Transaction Documentation*" means the definitive documentation for the Sale Transaction Restructuring and/or any Other Asset Sale(s).

315.    "*Sale Transaction Restructuring*" means one or more sale(s) of some, all, or substantially all of the Debtors' assets pursuant to the Bidding Procedures, consummated through one or more Sale Orders, including a Credit Bid Transaction and an Alternative Sale Transaction, that results, in the aggregate, in the disposition of all or substantially all of the Debtors' assets through one or more sale transactions.  For the avoidance of doubt, the sale transaction consummated pursuant to the Elixir Sale Order shall not be considered a "Sale Transaction Restructuring."

316.    "*SCD Claim*" means the face amount of the Elixir Rx Intercompany Claim that is transferred to the SCD Trust in accordance with the AHG New-Money Commitment Agreement, the Plan, and the Elixir Intercreditor Agreement.

317.    "*SCD Trust*" means a newly formed entity or entities formed pursuant to the Plan on or prior to the Effective Date, to be controlled by the SCD Trustee, the organizational documents of which shall be in form and substance set forth in the AHG New-Money Commitment Agreement, the DIP Agents, and the Exit Facilities Agent and in accordance with the SCD Trust Documentation.

318.    "*SCD Trust Assets*" means the applicable portion of the Elixir Rx Intercompany Claim that is transferred from the Debtors or the Reorganized Debtors to the SCD Trust in accordance with the terms and conditions of the AHG New-Money Commitment Agreement.

319.    "*SCD Trust Documentation*" means the definitive documentation for the creation of the SCD Trust and the appointment of the SCD Trustee, including all agreements, documents, and instruments delivered or entered into in connection with the SCD Trust, including the Elixir Intercreditor Agreement, which shall be consistent with, and subject to the terms and conditions of, the AHG New-Money Commitment Agreement.

320.    "*SCD Trustee*" means the trustee or similar designee for the SCD Trust, selected in accordance with the AHG New-Money Commitment Agreement, and any of its successors and assigns, in its capacity as such.

321.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means that certain schedule Filed with the Plan Supplement of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan and in accordance with the respective Purchase Agreement (if applicable), as such schedule may be amended, modified, or supplemented from time to time by the Debtors in accordance with Article V of the Plan, which, including any modifications thereto, shall be acceptable to the Purchasers.

322.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

323.    "*Section 510(b) Claim*" means any Claim arising from:  (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

324.    "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable Holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a Secured Claim.

325.    "*Secured Claim*" means a Claim secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable Holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

326.    "*Secured Tax Claim*" means any Secured Claim that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties; *provided* that any Secured Tax Claim that (a) is an Assumed Liability under a Purchase Agreement shall not be satisfied from the Administrative / Priority Claim Reserve and shall not be an obligation of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors and shall not be considered a Secured Tax Claim and (b) solely in the event of a Sale Transaction Restructuring, is not an Assumed Liability under a Purchase Agreement shall be satisfied solely from the Administrative / Priority Claims Reserve.

327.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

328.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

329.    "*Seller Financing Order*" means the *Order (I) Approving Entry into the MedImpact Seller Financing Documents and (II) Granting Related Relief* [Docket No. 1139].

330.    "*Senior Secured Noteholders*" means, collectively, the parties holding the Senior Secured Notes from time to time under the Senior Secured Notes Indentures.

331.    "*Senior Secured Notes*" means, collectively, the 2025 Secured Notes and the 2026 Secured Notes.

332.    "*Senior Secured Notes Adequate Protection Claim*" means any Claim arising under or related to any adequate protection provided to the Senior Secured Noteholders.

333.    "*Senior Secured Notes Claim*" means any Claim against a Debtor, the Estates, or property of a Debtor arising under, related to, or in connection with the Senior Secured Notes.

334.    "*Senior Secured Notes Deficiency Claim*" means any Senior Secured Notes Claim that is not a Secured Claim.  For the avoidance of doubt, the only recovery that any Senior Secured Notes Claim shall receive on account of their Senior Secured Notes Deficiency Claim shall be the Litigation Trust Class B Interests.

335.    "*Senior Secured Notes Indentures*" means, collectively, the 2025 Secured Notes Indenture and the 2026 Secured Notes Indenture.

336.    "*Senior Secured Notes Trustees*" means The Bank of New York Mellon Trust Company, N.A., in its respective capacity as trustee and notes collateral agent under the 2025 Secured Notes Indenture and the 2026 Secured Notes Indenture, together with its successors and assigns.

337.    "*Solicitation Materials*" means all solicitation materials in respect of the Plan.

338.    "*Takeback Indenture*" means the definitive agreement governing the Takeback Notes.

339.    "*Takeback Notes*" means the new secured notes in the aggregate principal amount of $350 million to be issued by New Rite Aid to Holders of Allowed Senior Secured Notes Claims pursuant to the Plan and the Takeback Notes Documents.

340.    "*Takeback Notes Documents*" means, if applicable, the Takeback Indenture and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee statements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

341.    "*Takeback Notes Trustee*" means the trustee under the Takeback Indenture, together with such trustee's respective successors, assigns, or any replacement trustee(s) appointed pursuant to the terms of the respective Takeback Indenture.

342.    "*TCC*" means the official committee of tort claimants appointed in the Chapter 11 Cases [Docket No. 432].

343.    "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article X.D of the Plan.

344.    "*Tort Claim*" means a Claim made on or before the Effective Date (other than Claims or Causes of Action arising from violations of the automatic stay or any injunction entered by the Bankruptcy Court in connection with the Chapter 11 Cases) based in whole or in part on any alleged tortious act or omission by any Debtor and arising out of, relating to, or in connection with any Product, but not including, for the avoidance of doubt, claims for indemnification, contribution, or reimbursement on account of payments or losses in any way arising out of, relating to, or in connection with any such conduct or circumstances and Co-Defendant Claims.  For the avoidance of doubt, Tort Claims do not include (i) any liability solely to the extent premised on allegations regarding conduct undertaken by the Reorganized Debtors after the Effective Date or (ii) any Claims arising under section 502(h) of the Bankruptcy Code.

345.    "*Tort Claim Insurance Proceeds*" means the Cash proceeds obtained through the pursuit of Assigned Insurance Rights for Tort Claims, except any Cash proceeds obtained through the pursuit of Assigned Insurance Rights for any prepetition settlement or defense expenses in connection with Tort Claims.

346.    "*Trustees*" means, collectively, the Senior Secured Notes Trustees and any other indenture trustee, collateral agent, or trustee or similar Entity under the 2025 Secured Notes Indenture, the 2026 Secured Notes Indenture, the 2027 Unsecured Notes Indenture, or the 2028 Unsecured Notes Indenture, including any successors thereto.

347.    "*UCC*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases [Docket No. 431].

348.    ["*UCC / TCC Recovery Allocation Agreement*" means that certain agreement between the UCC and the TCC, dated as of [●], 2024, which shall govern the allocation of the consideration provided under the Committee Settlement.]

349.    ["*UCC / TCC Recovery Allocation Agreement Notice*" mean the notice to be Filed with the Bankruptcy Court [●] days prior to the Combined Hearing, which shall set forth a description of the UCC/TCC Recovery Allocation Agreement.  The Plan shall be amended in advance of the Combined Hearing to reflect the results of the UCC / TCC Recovery Allocation Agreement Notice.]

350.    "*U.S. Trustee*" means the United States Trustee for the District of New Jersey.

351.    "*U.S. Trustee Fees*" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

352.    "*Unassigned Insurance Policies*" means, each of, (a) the Property Insurance Policies, (b) the Casualty Insurance Policies, (c) any Insurance Policy reasonably necessary to operate the Reorganized Debtors' business (or any proceeds recovered in connection with the operation of the Reorganized Debtors' business), (d) any Insurance Policy issued to McKesson under which any Debtor is designated as an additional insured party, and (e) any Insurance Policy purchased to maintain the insurance covenant in any Exit Facilities Documents, Takeback Notes Documents, or documents necessary to effectuate any security interests agreed to be granted to McKesson in connection with the McKesson Settlement.

353.    "*Unassigned Insurance Rights*" means, collectively, any and all rights, titles, privileges, interests, claims, demands or entitlements of the Debtors to any and all proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity arising under, or attributable to, any and all Unassigned Insurance Policies, now existing or hereafter arising, accrued, or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent.

354.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

355.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

356.    "*Unsecured Noteholders*" means the Holders of Unsecured Notes.

357.    "*Unsecured Notes*" means, collectively, the 2027 Unsecured Notes and the 2028 Unsecured Notes.

358.    "*Unsecured Notes Claims*" means any Claim against a Debtor, the Estates, or property of a Debtor, arising under, related to, or in connection with the Unsecured Notes.

359.    "*Unsecured Notes Indentures*" means, collectively, the 2027 Unsecured Notes Indenture and the 2028 Unsecured Notes Indenture.

360.    "*Unsecured Notes Trustees*" means, collectively, U.S. Bank Trust National Association, in its capacity as trustee under the 2027 Unsecured Notes Indenture, and Harris Trust and Savings Bank, in its capacity as trustee under the 2028 Unsecured Notes Indenture, together with their successors and assigns.

361.    "*Voting Deadline*" means 4:00 p.m., prevailing Eastern Time, on the date that is seven days before the Combined Hearing, which date may be extended by the Debtors.

362.    "*WARN Act*" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and the rules and regulations promulgated thereunder.

363.    "*Waterfall Recovery*" means, in the event of a Sale Transaction Restructuring, and subject to the terms set forth in the Final Financing Order, as applicable, including as it relates to treatment of the MedImpact Term Loan, the priority by which Distributable Proceeds shall be allocated and paid to the Holders of Claims or Interests, as applicable, until paid in full, in each case, on a Pro Rata basis, except as otherwise agreed to by such Holders of Claims or Interests, as follows, subject to the terms of the Final Financing Order, including paragraph 17 thereof: (a) Allowed Administrative Claims and Allowed Priority Tax Claims; (b) Allowed DIP ABL Claims; (c) Allowed DIP FILO Claims; (d) Allowed DIP Term Loan Claims; (e) Allowed Other Secured Claims; (f) Allowed Other Priority Claims; (g) Allowed ABL Facility Claims; (h) Allowed FILO Term Loan Facility Claims; and (i) Allowed Senior Secured Notes Claims;; *provided* that the aggregate amount of Distributable Proceeds allocated to Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims shall not exceed the Administrative / Priority Claims Reserve Amount.

364.    "*Wind-Down*" means, in the event of a Sale Transaction Restructuring pursuant to Article IV.D of the Plan, the wind-down, dissolution, and liquidation of the Debtors' Estates after the Effective Date.

365.    "*Wind-Down Budget*" means a budget for the activities and expenses to be incurred in connection with a Wind-Down, in amount to be mutually agreed by the Debtors and the Required AHG Noteholders, which shall include amounts necessary to fund the Professional Fee Escrow Account, the Administrative / Priority Claims Reserve, and the Wind-Down Reserve in accordance with the Purchase Agreement(s), as applicable, the Plan, and the Confirmation Order.

366.    "*Wind-Down Debtors*" means, for any Sale Transaction Restructuring pursuant to Article IV.D of the Plan, the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

367.    "*Wind-Down Reserve*" means a segregated account established by the Wind-Down Debtors established in accordance with Article VIII.C and funded in accordance with the Wind-Down Budget.

B.    *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (9) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal Law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the Laws of the State of New York, without giving effect to the principles of conflict of Laws; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) any effectuating provisions may be interpreted by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive;

(15) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (16) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; and (18) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors or the Wind-Down Debtors shall mean the Debtors and the Reorganized Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the Laws of the State of New York, without giving effect to the principles of conflict of Laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate or limited liability company governance matters relating to the Debtors not incorporated in Delaware shall be governed by the Laws of the state of incorporation or formation of the applicable Debtor.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control. In the event of any inconsistency between the Plan or Plan Supplement, on the one hand, and the Confirmation Order on the other hand, the Confirmation Order shall control.

G.      *Nonconsolidated Plan.*

Although for purposes of administrative convenience and efficiency the Plan has been Filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for substantive consolidation of any of the Debtors.

H.      *Purchase Agreement Consent Rights and Controlling Documents*

In the event of a MedImpact Term Loan Sale, Sale Transaction Restructuring, or an Other Asset Sale, any and all consent rights of the Purchasers set forth in the Purchase Agreement(s) with respect to the form and substance of this Plan, the Confirmation Order, the Disclosure Statement, the Disclosure Statement Order, any Definitive Documents and any other documents related to the MedImpact Term Loan Sale, Sale Transaction Restructuring, or the Other Asset Sale, as applicable, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents,

shall be incorporated herein by this reference (including to the applicable definitions in Article I.A of the Plan) and be fully enforceable as if stated in full herein until such time as the Purchase Agreement(s) is terminated in accordance with its terms. Failure to reference in this Plan the rights referred to in the immediately preceding sentence as such rights relate to any document referenced in the Purchase Agreement(s) shall not impair such rights and obligations.

       *I.*       *Reference to the Debtors and the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors and the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**ARTICLE II**
**ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE**
**CLAIMS, PRIORITY TAX CLAIMS, AND DIP CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

       *A.*       *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided* that, in the event of a Sale Transaction Restructuring or an Other Asset Sale, any Allowed Administrative Claim that is an Assumed Liability under a Purchase Agreement shall be an obligation of the applicable Purchaser and shall not be an obligation of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors; *provided*, *further*, that, in the event of a Sale Transaction Restructuring, any Allowed Administrative Claim that is not an Assumed Liability under any Purchase Agreement shall instead be satisfied solely from the Administrative / Priority Claims Reserve; *provided, further*, that in the event of the Plan Restructuring or the Credit Bid Transaction, (i) the aggregate amount of Cash distributed to Holders of Allowed Administrative Claims, Allowed Priority Claims, Allowed Secured Tax Claims, and Allowed Other Secured Claims and (ii) the treatment of such Claims shall be acceptable to the Required AHG Noteholders. For the avoidance of doubt, any McKesson Claim that is an Administrative Claim shall be treated in accordance with the terms of the McKesson Settlement.

Except for Professional Fee Claims, DIP Claims, Disinterested Director Fee Claims, AHG Notes Ticking Fee Claims, and MedImpact Termination Fee Claims, and unless previously Filed, subject to the terms of any Sale Orders, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors or the Wind-Down Debtors, as applicable, no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Objections to such requests must be Filed and served on the Reorganized Debtors or the Wind-Down Debtors and the requesting party on or before the Administrative Claim Objection Bar Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts,

if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Except for Professional Fee Claims, DIP Claims, Disinterested Director Fee Claims, AHG Notes Ticking Fee Claims, and MedImpact Termination Fee Claims, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request on or before the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Estates, the Wind-Down Debtors, or the property of any of the foregoing, and such Administrative Claims shall be deemed released as of the Effective Date without the need for any objection from the Debtors, the Wind-Down Debtors, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

B.     *Payment of Fees and Expenses under Financing Orders.*

On the Effective Date, the Debtors shall pay all accrued and unpaid fees, expenses, disbursements, contribution or indemnification obligations, including without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by each of the DIP Agents, the DIP Lenders, the Prepetition Agent, the Ad Hoc Secured Noteholder Group, and the Trustees, whether incurred prior to or after the Petition Date, in each case to the extent payable or reimbursable under or pursuant to the Financing Orders, the DIP Credit Agreements, the Prepetition Credit Agreement, or the Indentures, as applicable (subject to any applicable conditions set forth in the Financing Orders). Such fees, expenses, disbursements, contribution, or indemnification obligations shall constitute Allowed Administrative Claims. Nothing herein shall require the DIP Agents, DIP Lenders, the Prepetition Agent, the Trustees, or their respective Professionals, to File applications, a Proof of Claim, or otherwise seek approval of the Court as a condition to the payment of such Allowed Administrative Claims. For the avoidance of doubt, nothing herein shall be deemed to impair, discharge, or negatively impact or affect the rights of the DIP Agents, Prepetition Agent, or the Trustees to exercise any charging Liens pursuant to the terms of the DIP Credit Agreements, the Indentures, or the Prepetition Credit Agreement, as applicable, subject to any applicable intercreditor agreements.

C.     *Professional Fee Claims.*

1.     <u>Final Fee Applications and Payment of Professional Fee Claims.</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Reorganized Debtors or the Wind-Down Debtors (or the authorized signatories to the Professional Fee Escrow Account, after consultation with the Plan Administrator), as applicable, shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

2.     <u>Professional Fee Escrow Account.</u>

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, Claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, or the Wind-Down Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court;

*provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account and such Allowed Professional Fee Claims shall also be payable from the Wind-Down Reserve.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.      Professional Fee Amount.

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors, the DIP Agents, and/or the Committees before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors and the DIP Agents no later than five days before the anticipated Effective Date; *provided* that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional, with such estimate provided to the DIP Agents.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account in consultation with the Required AHG Noteholders.  For the avoidance of doubt, to the extent the hourly and monthly fees (but not success fees) and expenses of the Committees and the Committees' Professionals incurred on or after March 26, 2024 are less than $7.5 million (consisting of (i) $1.5 million in connection with certain agreed-upon compensation litigation matters and (ii) $6.0 million for all other fees and expenses of the Committees and the Committees' Professionals incurred on or after March 26, 2024, excluding fees and expenses described in the preceding clause (i)), the Committees' Initial Cash Consideration shall be increased by an amount equal to the difference between (a) $7.5 million and (b) the fees and expenses actually incurred by the Committees and the Committees' Professionals during the aforementioned period.

4.      Post-Effective Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors or the Wind-Down Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Purchaser(s) shall not be liable or otherwise responsible for the payment of any Professional Fee Claims.

After the Effective Date, to the extent the Trustees provide services or incur expenses, including professional fees, related to the Plan or the applicable indenture, including with respect to the effectuation of any distributions under the Plan or any action the Debtors request to be taken in furtherance of the Plan, the reasonable and documented fees and expenses of the Trustees, including professional fees, shall be paid in the ordinary course by the Debtors or the Debtors' successor-in-interest.  Notwithstanding this section, the Trustees shall have the right to exercise their respective charging liens under the applicable Indentures against distributions on account of the respective Notes Claims for the payment of the Trustees' fees and expenses, to the extent not otherwise paid.

D.      Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that (a) any Allowed Priority Tax Claim that is an Assumed Liability under a Purchase Agreement shall be an obligation of the applicable Purchaser, shall not be an obligation of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, (b) in the event of a Sale Transaction Restructuring

pursuant to Article IV.D, any Allowed Priority Tax Claim that (i) is an Assumed Liability under a Purchase Agreement shall be an obligation of the applicable Purchaser, shall not be an obligation of the Debtors or the Wind-Down Debtor, and shall not be satisfied from the Administrative / Priority Claims Reserve and (ii) is not an Assumed Liability under a Purchase Agreement shall be satisfied solely from the Administrative / Priority Claims Reserve, and (c) the aggregate amount of Cash distributed to Holders of Allowed Priority Tax Claims shall be acceptable to the Required AHG Noteholders.

  E.  *DIP Claims.*

  As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreements, including principal, interest, fees, costs, other charges, and expenses.  Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of this Plan, the Final Financing Order, and the Purchase Agreement, all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

  Pursuant to the DIP Credit Agreement, all distributions pursuant to this Article II.E shall be made to the applicable DIP Agent for distributions to the applicable DIP Lenders in accordance with the DIP Credit Agreements and DIP Documents unless otherwise agreed upon in writing by such DIP Agent and the Debtors.  The DIP Agents shall hold or direct distributions for the benefit of the applicable Holders of DIP Claims.  Each DIP Agent shall retain all rights as DIP Agent under the DIP Documents in connection with the delivery of the distributions to the DIP Lenders.  The DIP Agents shall not have any liability to any person with respect to distributions made or directed to be made by such DIP Agents.

  1.  <u>DIP ABL Claims</u>

  Except to the extent that a Holder of an Allowed DIP ABL Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed DIP ABL Claim, each Holder of an Allowed DIP ABL Claim shall receive:  (a) in the event of a Plan Restructuring, at the option of the applicable Holder of an Allowed DIP ABL Claim, (i) its Pro Rata share of the Exit ABL Facility or (ii) payment in full in Cash on the Effective Date; or (b) in the event of a Sale Transaction Restructuring, either, at each of the DIP ABL Lenders' discretion, (i) payment in full in Cash on the Effective Date or (ii) its Pro Rata share of the Exit ABL Facility.

  2.  <u>DIP FILO Claims</u>

  Except to the extent that a Holder of an Allowed DIP FILO Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed DIP FILO Claim, each Holder of an Allowed DIP FILO Claim shall receive:  (a) in the event of a Plan Restructuring, at the option of the applicable Holder of an Allowed DIP FILO Claim, (i) its Pro Rata share of the Exit FILO Term Loan Facility or (ii) payment in full in Cash on the Effective Date; or (b) in the event of a Sale Transaction Restructuring, either, at each of the DIP FILO Lenders' discretion, (i) payment in full in Cash on the Effective Date or (ii) its Pro Rata share of the Exit FILO Term Loan Facility.

  3.  <u>DIP Term Loan Claims</u>

  Except to the extent that a Holder of an Allowed DIP Term Loan Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed DIP Term Loan Claim, each Holder of an Allowed DIP Term Loan Claim shall receive payment in full in Cash on the Effective Date.

F.    *AHG New-Money Commitment Agreement Claims and MedImpact Term Loan Backstop Commitment Agreement Claims.*

As of the Effective Date, in accordance with, and subject to, the terms and conditions of the AHG New-Money Commitment Agreement and the MedImpact Term Loan Backstop Commitment Agreement, the Claims of the AHG New-Money Commitment Parties and the MedImpact Term Loan Backstop Parties on account of the AHG Notes Ticking Fee and the MedImpact Termination Fee shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the AHG New-Money Commitment Agreement and the MedImpact Term Loan Backstop Commitment Agreement, and the MedImpact Termination Fee, if any, and the AHG Notes Ticking Fee, shall each be an Allowed Administrative Claim under section 503(b) of the Bankruptcy Code.

1.    <u>MedImpact Termination Fee</u>

Except to the extent that a Holder of an Allowed MedImpact Termination Fee Claim (if any) agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each such Claim, each Holder thereof shall receive payment in full in Cash on or prior to the Effective Date in accordance with, and subject to, the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement.

2.    <u>AHG Notes Ticking Fee Claims</u>

Except to the extent that a Holder of an Allowed AHG Notes Ticking Fee Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each such Claim, each Holder thereof shall receive (i) if the AHG New-Money Commitment Agreement is not terminated, AHG Notes issued on or prior to the Effective Date or (ii) if the AHG New-Money Commitment Agreement is terminated, payment in full in Cash, if so entitled, in each case, in accordance with, and subject to, the terms and conditions of the AHG New-Money Commitment Agreement.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in <u>Article II</u> of the Plan, all Claims and Interests are classified in the Classes set forth in this <u>Article III</u> for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | ABL Facility Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | FILO Term Loan Facility Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | Senior Secured Notes Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 6 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing Equity Interests in Rite Aid | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Subject to Article IV hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.      Class 1 – Other Secured Claims

   (a)      *Classification*:  Class 1 consists of all Other Secured Claims.

   (b)      *Treatment*:  Each Holder of an Allowed Other Secured Claim, unless such Holder agrees to less favorable treatment, shall receive, at the option of the Debtors, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

      (i)      payment in full in Cash;

      (ii)      the collateral securing its Other Secured Claim;

      (iii)      Reinstatement of its Other Secured Claim; or

      (iv)      such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code;

   (c)      *Voting*: Class 1 is Unimpaired.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Priority Claims

   (a)      *Classification*:  Class 2 consists of all Other Priority Claims.

   (b)      *Treatment*:  Each Holder of an Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable

treatment, shall receive, at the option of the applicable Debtor or Wind-Down Debtor, as applicable, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

(i)      payment in full in Cash; or

(ii)     such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code;

(c)      *Voting*:  Class 2 is Unimpaired.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.      Class 3 – ABL Facility Claims

(a)      *Classification:*  Class 3 consists of all ABL Facility Claims.

(b)      *Treatment*:  To the extent any Allowed ABL Facility Claim remains outstanding on the Effective Date, and except to the extent that a Holder of an Allowed ABL Facility Claim and the Debtor against which such Allowed ABL Facility Claim is asserted agree to less favorable treatment, each Holder of an Allowed ABL Facility Claim shall receive, at the option of the applicable Holder of an Allowed ABL Facility Claim, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

(i)      payment in full in Cash; or

(ii)     its Pro Rata share of the Exit ABL Facility Loans issued under the Exit ABL Facility.

(c)      *Voting:*  Class 3 is Unimpaired.  Holders of ABL Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of ABL Facility Claims are not entitled to vote to accept or reject the Plan.

4.      Class 4 – FILO Term Loan Facility Claims

(a)      *Classification:*  Class 4 consists of all FILO Term Loan Facility Claims against any Debtor.

(b)      *Treatment*:  To the extent any Allowed FILO Term Loan Facility Claims remain outstanding, and except to the extent that a Holder of an Allowed FILO Term Loan Facility Claim and the Debtor against which such Holder asserts a Claim agree to less favorable treatment for such Holder, each Holder of an Allowed FILO Term Loan Facility Claim shall receive, at the option of the applicable Holder of an Allowed FILO Term Loan Facility Claim, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

(i)      payment in full in Cash; or

(ii)     its Pro Rata share of Exit FILO Term Loan Facility Loans issued under the Exit FILO Term Loan Facility.

(c)    *Voting:* Class 4 is Unimpaired.  Holders of FILO Term Loan Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of FILO Term Loan Facility Claims are not entitled to vote to accept or reject the Plan.

5.    Class 5 – Senior Secured Notes Claims

(a)    *Classification:* Class 5 consists of all Senior Secured Notes Claims against any Debtor.

(b)    *Allowance*: The Senior Secured Notes Claims shall be deemed Allowed in the aggregate principal amount of $1,170,000,000, plus interest, fees, and other expenses and amounts provided for in the 2025 Secured Notes Indenture and the 2026 Secured Notes Indenture, incurred through the Effective Date, solely to the extent Allowed by the Bankruptcy Code.

(c)    *Treatment:* Except to the extent that a Holder of an Allowed Senior Secured Notes Claim and a Debtor against which such Allowed Senior Secured Notes Claim is asserted agree to less favorable treatment, on the Effective Date, each Holder of a Senior Secured Notes Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

(i)    in the event of a Plan Restructuring:

(1)    its Pro Rata share of (A) 90% of the New Common Stock, subject to dilution on account of the New Common Stock issued pursuant to the Management Incentive Plan, (B) the Takeback Notes, (C) the CMSR Recovery, (D) up to $2.5 million from the proceeds of the sale of unoccupied real estate of the Debtors that is not part of the Reorganized Debtors, distributed on the first anniversary of the Effective Date, and (E) the Litigation Trust Class B Interests; and

(2)    (A) if the MedImpact Term Loan Backstop Parties acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures, (I) such Holder's MedImpact NewCo Subscription Rights and (II) such Holder's Pro Rata share of the MedImpact NewCo Notes issued on account of the Final MedImpact Term Loan Bid – Senior Secured Notes Claims Amount, subject to dilution by the MedImpact Backstop Fee NewCo Notes, the MedImpact Rights Offering NewCo Notes, and the MedImpact Unsubscribed NewCo Notes; or (B) if the MedImpact Term Loan Backstop Parties do not acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures, such Holder's Pro Rata share of Cash available for distribution to Holders of Senior Secured Notes Claims in accordance with Section (II)(A) of Exhibit E of the Final Financing Order; or

(ii)    in the event of a Sale Transaction Restructuring, its Pro Rata share of the Distributable Proceeds, if any, pursuant to the Waterfall Recovery.

(d)    *Voting:* Class 5 is Impaired under the Plan.  Therefore, Holders of Senior Secured Notes Claims are entitled to vote to accept or reject the Plan.

6.    Class 6 – General Unsecured Claims

(a)    *Classification:* Class 6 consists of all General Unsecured Claims.

(b)     *Treatment:*  As a settlement of all open disputes with the Debtors, the Holders of
DIP Claims, and the Holders of Senior Secured Notes Claims, each Holder of an
Allowed General Unsecured Claim shall receive, in full and final satisfaction,
compromise, settlement, and release of and in exchange for its Claim, a portion
of the Litigation Trust Assets and the GUC Equity Trust Interests, as set forth in
the UCC / TCC Recovery Allocation Agreement and in accordance with the
Litigation Trust Documents, the GUC Equity Trust Documents, and any GUC
Sub-Trust Documents, including:

   (i)      the Committees Initial Cash Consideration;

   (ii)     the Committees Post-Emergence Cash Consideration;

   (iii)    100% of the GUC Equity Trust Interests;

   (iv)     the Tort Claim Insurance Proceeds; and

   (v)      Litigation Trust Class A Interests.

(c)     *[Channeling*: As of the Effective Date, in accordance with the Plan and the
Litigation Trust Documents, any and all liability of the Debtors and/or the
Reorganized Debtors for any and all Tort Claims shall automatically, and without
further act, deed or court order, be channeled exclusively to, and all of the
Debtors' and Reorganized Debtors' liability for such claims shall be assumed by,
the Litigation Trust or any applicable GUC Sub-Trust.  Each Tort Claim shall be
asserted exclusively against the Litigation Trust or GUC Sub-Trust and resolved
solely in accordance with the terms, provisions and procedures of the Litigation
Trust Documents or GUC Sub-Trust Documents.  The sole recourse of any
Person, Entity, or other party on account of any Tort Claim, whether or not the
Holder thereof participated in the Chapter 11 Cases and whether or not such
Holder Filed a Proof of Claim in the Chapter 11 Cases, shall be to the Litigation
Trust or GUC Sub-Trust as and to the extent provided in the Litigation Trust
Documents and GUC Sub-Trust Documents.  Notwithstanding anything to the
contrary herein, Holders of Tort Claims are enjoined from asserting against any
Debtor (or their Affiliates) or any Reorganized Debtor (or their Affiliates) any
Tort Claim and may not proceed in any manner against any Debtor (or their
Affiliates) or Reorganized Debtor (or their Affiliates) on account of any Tort
Claim in any other forum whatsoever, including any state, federal, or non-U.S.
court or administrative or arbitral forum, and are required to pursue Tort Claims
exclusively against the Litigation Trust or GUC Sub-Trust, solely as and to the
extent provided in the Litigation Trust Documents and GUC Sub-Trust
Documents.]

(d)     *Voting:*  Class 6 is Impaired under the Plan.  Holders of Allowed General
Unsecured Claims are conclusively deemed to have rejected the Plan.  Therefore,
Holders of General Unsecured Claims are not entitled to vote to accept or reject
the Plan.

7.     Class 7 – Intercompany Claims

(a)     *Classification*:  Class 7 consists of all Intercompany Claims.

(b)     *Treatment*:  Each Intercompany Claim shall be, at the option of the Debtors, and,
in the event of a Plan Restructuring or a Credit Bid Transaction, with the consent
of the Required AHG Noteholders, Reinstated, set off, settled, distributed,

contributed, cancelled, or released without any distribution on account of such Intercompany Claim, or such other treatment as is reasonably determined by the Debtors.

(c)      *Voting*:  Holders of Claims in Class 7 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

8.       Class 8 – Intercompany Interests

(a)      *Classification*:  Class 8 consists of all Intercompany Interests.

(b)      *Treatment*:  Each Intercompany Interest shall be, at the option of the Debtors, and, in the event of a Plan Restructuring or a Credit Bid Transaction, with the consent of the Required AHG Noteholders, Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Interest, or such other treatment as is reasonably determined by the Debtors.

(c)      *Voting*:  Holders of Interests in Class 8 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

9.       Class 9 – Existing Equity Interests in Rite Aid

(a)      *Classification*:  Class 9 consists of all Existing Equity Interests in Rite Aid.

(b)      *Treatment*:  All Existing Equity Interests in Rite Aid will be cancelled and extinguished, and Holders of Existing Equity Interests in Rite Aid shall receive no recovery on account of such Interests.

(c)      *Voting*:  Class 9 is Impaired.  Holders of Existing Equity Interests in Rite Aid are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests in Rite Aid are not entitled to vote to accept or reject the Plan.

10.      Class 10 – Section 510(b)

(a)      *Classification:*  Class 10 consists of all Section 510(b) Claims.

(b)      *Treatment:*  Section 510(b) Claims shall be discharged, cancelled, released, and extinguished without any distribution to Holders of such Claims.

(c)      *Voting:*  Class 10 is Impaired.  Holders (if any) of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan.  Therefore, Holders (if any) of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

C.       *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired; *provided* that the Reinstatement or other treatment of such

Claims shall not be inconsistent with the Purchase Agreement.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

       D.      *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Combined Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

       E.      *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

       F.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XII of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules, *provided, however*, that the treatment of Holders of General Unsecured Claims shall only be modified with the consent of the Committees, except any modifications that are consistent with the Committee Settlement and otherwise reasonably acceptable to the Committees.

       G.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

       H.      *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtors reserve the right to reclassify any Allowed Claim (other than the Allowed Senior Secured Notes Claim and Senior Secured Notes Deficiency Claims) or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  For the avoidance of doubt, neither the Debtors nor the Wind-Down Debtors may reclassify any Senior Secured Notes Deficiency Claim as a General Unsecured Claim entitled to a recovery in Class 6.

# ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan, including the McKesson Settlement, the DOJ FCA Settlement, the DOJ Elixir Settlement, the Committee Settlement[, and the Settlement of Tort Claims.]  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to <u>Article VI</u> hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

B.      *[[Settlement of Tort Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action and controversies related to Tort Claims in an amount that the TCC believes is worth $[●] (the "<u>Settlement of Tort Claims</u>").  With respect to the Settlement of Tort Claims, the Debtors and the TCC believe the Plan's treatment of Tort Claims is fair, equitable, reasonable, and appropriate, including, without limitation, the resolution of the Debtors' liability for Tort Claims, the distributions to be made under the Plan, and the release, injunction and all other provisions contained in the Plan. More than [25,000] Proofs of Claim alleging liability arising out of or in connection with Tort Claims were Filed against the Debtors by the Claims Bar Date.  The TCC believes that any reasonable estimate, projection or valuation of the total liability for Tort Claims, if the Debtors had the ability to pay those Tort Claims outside of the Chapter 11 Cases, exceeds the full face value of all Insurance Policies providing coverage for Tort Claims, and likely exceeds the total value of the Estates.

In exchange for the settlement of their Claims, Holders of Tort Claims shall receive such treatment as set forth in this Plan, but subject to the allocation of recoveries on account of such treatment as set forth in the UCC / TCC Recovery Allocation Agreement.  Nothing in the Plan or the Committee Settlement Documents, including the UCC / TCC Recovery Allocation Agreement, is intended to, and shall not be construed to, limit the amount of Tort Claim Insurance Proceeds available to Holders of Tort Claims [or other beneficiaries of the Litigation Trust to the extent applicable in accordance with the UCC / TCC Recovery Allocation Agreement], and the Litigation Trustee shall retain the right to pursue the full agreed settlement value of the Tort Claims from Insurance Policies (other than the Unassigned Insurance Policies) pursuant to the Assigned Insurance Rights subject to the terms and conditions of the Plan.  For the avoidance of doubt, nothing herein is intended to alter or enlarge the rights and obligations of any insurer under any Insurance Policy.  This paragraph does not and shall not be construed to impair, diminish, or compromise (i) any of the rights and protections of the Debtors, the Reorganized Debtors (and any Affiliates), the Wind-Down Debtors, and the Debtor Related Parties or (ii) any of the release, discharge, and exculpation provisions in this Plan.]]

1.      <u>Non-Precedential Effect for Holders of Tort Claims</u>

[[This Plan, the Plan Supplement, and the Confirmation Order constitute a good faith, full and final comprehensive compromise and settlement of Tort Claims based on the unique circumstances of these Chapter 11 Cases (such as the unique facts and circumstances relating to the Debtors as compared to other defendants in tort litigation and the need for an accelerated resolution without litigation) such that (i) none of the of the foregoing documents, nor any materials used in furtherance of Confirmation (including, but not limited to, the Disclosure Statement, and any notes related to, and drafts of, such documents and materials), may be offered into evidence, deemed and admission, used as precedent, or used by any party or Person in any context whatsoever beyond the purposes of this Plan, in any other litigation or proceeding except as necessary, and as admissible in such context, to enforce their terms and to evidence the terms of the Plan before the Bankruptcy Court or any other court of competent

jurisdiction and (ii) any obligation of any party, in furtherance of such compromise and settlement, to not exercise rights that might otherwise be applicable to such party shall be understood to be an obligation solely in connection with this specific compromise and settlement and to be inapplicable in the absence of such compromise and settlement. This Plan, the Plan Supplement, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding involving opioid claims or other tort claims in which none of the Debtors, the Reorganized Debtors, or the Litigation Trust is a party; provided that such litigation or proceeding is not to enforce or evidence the terms of the Plan, the Plan Supplement, or the Confirmation Order. Any claimant's support of, or position or action taken in connection with this Plan, the Plan Supplement, and the Confirmation Order may differ from their position or testimony in any other litigation or proceeding except in connection with these Chapter 11 Cases. Further, the treatment of tort claims as set forth in this Plan is not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other Chapter 11 Cases relating to tort claims, nor shall it be used as precedent by any Entity or party in any other chapter 11 case related to tort claims. This provision does not and shall not be construed to impair, diminish, or compromise (A) any of the rights and protections of the Debtors, the Reorganized Debtors (and any Affiliates), the Wind-Down Debtors, and the Debtor Related Parties or (B) any of the release, discharge, and exculpation provisions in this Plan.]]

C.    *Equitization Transaction.*[8]

If the Plan Restructuring occurs, the following provisions shall govern in lieu of <u>Article IV.D</u>.

On the Effective Date (or before the Effective Date, as specified in the Restructuring Transactions Memorandum), the Debtors or the Reorganized Debtors (as applicable) shall take all actions set forth in the Restructuring Transactions Memorandum, and enter into any transaction and take any reasonable actions as may be necessary or appropriate to effect the Plan Restructuring described herein, subject in all respects to the terms set forth herein, including, as applicable: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial Law; (iv) the execution, delivery, and Filing of the Exit Facilities Documents, (v) the issuance of New Common Stock and any other securities necessary to implement the Restructuring Transactions, all of which shall be authorized and approved in all respects; (vi) the execution and delivery of the Definitive Documents, (vii) the execution and delivery of the Takeback Notes Documents, if applicable, and (viii) all other actions that the Debtors determine (with the consent of the Required AHG Noteholders) to be necessary or appropriate in connection with the Consummation of the Plan Restructuring.

The Confirmation Order shall, and shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, approved by, or necessary to effectuate the Plan, including the Restructuring Transactions, including, for the avoidance of doubt, any and all actions required to be taken under applicable non-bankruptcy law.

1.    <u>Reorganized Debtors.</u>

On the Effective Date, in accordance with the terms of the New Corporate Governance Documents, the New Rite Aid Board shall be appointed, and New Rite Aid shall adopt the New Corporate Governance Documents; *provided* that each Disinterested Director of the Debtors shall retain authority following the Effective Date with respect to

---

[8]    Unless otherwise determined no later than seven days prior to the Voting Deadline pursuant to a public notice served on parties receiving documents pursuant to Bankruptcy Rule 2002, the Debtors shall pursue the Plan Restructuring.

matters relating to Professional Fee Claim requests by Professionals acting at their authority and discretion in accordance with the terms of the Plan. Each Disinterested Director shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to New Rite Aid, the Reorganized Debtors, or any other Entity without such director's prior written consent. Each Disinterested Director of the Debtors retains the right to review, approve, and make decisions, as well as to file papers and be heard before the Bankruptcy Court, on all matters under such director's continuing authority.

2. <u>Corporate Existence.</u>

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist on and after the Effective Date as a separate legal Entity with all the powers available to such Entity pursuant to the applicable Law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Corporate Governance Documents, in each case consistent with the Plan, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

3. <u>New Rite Aid Board.</u>

Under the Plan Restructuring, on or prior to the Effective Date, the New Rite Aid board shall be appointed. The Required AHG Noteholders shall select the New Rite Aid board members.

4. <u>Vesting of Assets.</u>

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, or entered into in connection with or pursuant to, the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan (other than the GUC Equity Pool, the Committees' Initial Cash Consideration, the Committees' Post-Emergence Cash Consideration, and the other Litigation Trust Assets), shall vest in each respective Reorganized Debtor free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, including <u>Article X</u> hereof, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property, enter into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, and compromise or settle any claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects. For the avoidance of doubt, Holders of General Unsecured Claims shall be entitled to the Committees' Post-Emergence Cash Consideration and Litigation Trust Assets as set forth in the Committee Settlement.

Notwithstanding anything contained herein to the contrary and for the avoidance of doubt, any DIP ABL Lender's and/or any DIP FILO Lender's potential entry into the Exit Facilities and the Exit Facilities Documents shall be fully subject to the express written consent of the relevant DIP ABL Lenders and the DIP FILO Lenders, and nothing contained herein shall imply that any of the DIP ABL Lenders or the DIP FILO Lenders have consented at this time to provide any loans or financial accommodations pursuant to the Exit Facilities and the Exit Facilities Documents.

5. <u>Other Asset Sales.</u>

In the event the Plan Restructuring occurs and it incorporates one or more Other Asset Sale(s), the Reorganized Debtors will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Reorganized Debtors shall have the power and authority to take any action necessary to wind-down and dissolve any applicable Debtor's Estate(s).  As soon as practicable after the Effective Date, the Reorganized Debtors shall:  (1) cause such Debtors to comply with, and abide by, the terms of the Plan, Confirmation Order, the Purchase Agreement(s), the Sale Order, the Committee Settlement, and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of such Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions as the Reorganized Debtors may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Reorganized Debtors without need for any action or approval by the shareholders or board of directors or managers of any Debtor.  From and after the Effective Date, except with respect to the Reorganized Debtors as set forth herein, such Debtors (a) for all purposes shall be deemed to have withdrawn their business operations from any state in which such Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (b) shall be deemed to have canceled pursuant to this Plan all Interests, and (c) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  For the avoidance of doubt, notwithstanding such Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.  For the avoidance of doubt, in the event one or more Other Asset Sales and the Effective Date occurs, the Committee Settlement shall remain in full force and effect, including such adjustments as are necessary to provide Holders of General Unsecured Claims with the economic equivalent of the Committee Settlement.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Reorganized Debtors.

D.    *Sale Transaction Restructuring.*

If the Sale Transaction Restructuring occurs, the following provisions shall govern in lieu of Article IV.B.

On the Effective Date (or before the Effective Date, as specified in the Restructuring Transactions Memorandum), the Debtors or the Wind-Down Debtors (as applicable) shall take all actions set forth in the Restructuring Transactions Memorandum, and enter into any transaction and take any reasonable actions as may be necessary or appropriate to effect the Sale Transaction Restructuring as described herein, subject in all respects to the terms set forth herein, including, as applicable:  (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial Law; (iv) the execution, delivery, and Filing of the Exit Facilities Documents, (v) the execution and delivery of the Definitive Documents, and (vi) all other actions that the Debtors and the Purchasers determine to be necessary or appropriate in connection with the Consummation of the Sale Transaction Restructuring, including, among other things, making filings or recordings that may be required by applicable law in connection with the Plan and authorizing and directing the Senior Secured Notes Trustees to effectuate the Credit Bid in accordance with the Sale Order, as applicable, and providing that any assignees of the Credit Bid, if applicable, are bound by the terms and provisions of the direction to the Senior Secured Notes Trustees.  For the avoidance of doubt, in the event of a Sale Transaction Restructuring, the Committee Settlement shall be incorporated into any Sale Transaction Restructuring and shall remain in full force and effect, including such adjustments as are necessary to provide Holders of General Unsecured Claims with the economic equivalent of the Committee Settlement.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

1.      Formation of New Rite Aid.

In the event of a Credit Bid Transaction, on or prior to the Effective Date, New Rite Aid and certain direct or indirect subsidiaries (as applicable) shall be formed for the purpose of acquiring all of the Acquired Assets and assuming all of the Assumed Liabilities.

2.      Wind-Down Debtors.

In the event of a Sale Transaction Restructuring, on and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (a) resolving Disputed Claims, (b) making distributions on account of Allowed Claims as provided hereunder, (c) establishing and funding the Administrative / Priority Claims Reserve and the Wind-Down Reserve, (d) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (e) filing appropriate tax returns, (f) complying with its continuing obligations under the Purchase Agreement(s), if any, (g) liquidating all assets of the Wind-Down Debtors, and (h) otherwise administering the Plan.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Wind-Down Debtors to File motions or substitutions of parties or counsel in each such matter.

3.      Vesting of Assets.

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, or entered into in connection with or pursuant to, the Plan or the Plan Supplement, in the event of a Sale Transaction Restructuring, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan, including the Remnant Assets of the Debtors, shall vest in each respective Wind-Down Debtor for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  On and after the Effective Date, the Wind-Down Debtors may, at the direction of the Plan Administrator, and subject to the Purchase Agreement(s), the Sale Order, and the Confirmation Order, use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

E.      *Committee Settlement.*

The Debtors, the Committees, the Ad Hoc Secured Noteholder Group, and the DIP Agents agreed to the terms of the Committee Settlement to be implemented through the Plan and to be approved by the Bankruptcy Court as a good faith compromise and settlement of Claims and controversies among the Debtors, the Committees, the Ad Hoc Secured Noteholder Group, and the DIP Agents.  The compromises and settlements included in the Committee Settlement are each (a) integrated with and dependent on all other compromises and settlements contemplated in connection with the Plan and (b) necessary and integral to this Plan and the success of these Chapter 11 Cases.  The description of the Committee Settlement contained herein is qualified in its entirety by the applicable definitive documents pertaining thereto, which definitive documents shall, unless otherwise specified herein, be Filed with the Plan Supplement.  For the avoidance of doubt, no Holder of a General Unsecured Claim, including Holders of Tort Claims, shall attempt to recover, including on account of any Tort Claim or other Claim or Cause of Action, from the Reorganized Debtors or their Affiliates (including EIC).

Notwithstanding anything to the contrary in this Plan, the Plan Supplement, the Confirmation Order, or otherwise, the finalization and execution of the UCC / TCC Recovery Allocation Agreement shall not be a condition to Confirmation or Consummation of the Plan.  To the extent the UCC / TCC Recovery Allocation Agreement is

finalized prior to Confirmation of the Plan, it shall be approved by the Court in a manner in form and substance satisfactory to the Committees.

      1.    <u>Consideration.</u>

Holders of General Unsecured Claims shall receive the GUC Equity Trust Interests and Litigation Trust Class A Interests, as set forth in <u>Article III</u> of the Plan, subject to the terms of the UCC / TCC Recovery Allocation Agreement.

The Committees Post-Emergence Cash Consideration shall be subject to the following limitations:

(a)    Committees Post-Emergence Cash Consideration on account of the CMS Receivable shall in all respects remain subject to the waterfall distribution set forth in the Elixir Intercreditor Agreement (the "<u>CMSR Distributions Schedule</u>"), which states that proceeds from the CMS Receivable shall be allocated: (i) *first*, to the SCD Trust in an amount sufficient to repay $57,000,000 in Cash of the AHG Notes; (ii) *second*, to the SCD Trust for the benefit of the Exit Lenders in an amount sufficient to repay the [Exit ABL Facility] in the amount of $60,000,000 (which amount shall be applied to fund an immediate prepayment under the Exit FILO Term Loan Facility); (iii) *third*, to the extent Excess Availability is less than $700,000,000, to the SCD Trust for the benefit of the Exit Lenders, in an amount equal to the lesser of $57,000,000 and the amount necessary to fund a prepayment under the Exit ABL Facility to cause Excess Availability to equal $700,000,000 (which amount shall be used to fund an immediate prepayment under the Exit ABL Facility); and (iv) *fourth*, to the extent the aggregate amount of proceeds of the CMS Receivable paid to the SCD Trust to repay in full in Cash the AHG Notes and to fund distributions under the Plan pursuant to clause (v) below are $285,000,000, $5,000,000 to the Litigation Trust (such amount, the "<u>Creditor Distribution</u>"), except to the extent that the SCD Trust receives to repay in full in Cash the AHG Notes and to fund distributions under the Plan less than $285,000,000 on account of the CMS Receivable, in which case, the Creditor Distribution will be reduced on a dollar-by-dollar basis by each dollar the SCD Trust receives under $285,000,000 until the Creditor Distribution reaches zero; *provided* that the Creditor Distribution shall not be less than zero; and (v) *fifth*, to the SCD Trust in an amount equal to all remaining proceeds of the CMS Receivable (which amount the SCD Trust shall use to fund a distribution pursuant to <u>Article IIIB.5</u> of the Plan).  The Debtors may, with the consent of the DIP Agents and the Required AHG Noteholders, enter into one or more alternative transactions or structuring arrangements with respect to the transactions, arrangements, and distributions described in this paragraph, which alternative transactions, arrangements, and distributions shall be economically neutral with respect to the Creditor Distribution.  The CMSR Distributions Schedule shall not be modified without the consent of the Debtors, the DIP Agents, and the Required AHG Noteholders (together, the "<u>CMSR Distributions</u>"); *provided*, *however*, that the allocation in the CMSR Distributions Schedule shall not be modified in a manner inconsistent with the Committee Settlement and adverse to the Committees without the consent of the Committees.

(b)    The Committees Post-Emergence Cash Consideration payment of $20 million shall be subject to the Payment Conditions (as defined in the Exit Facilities Documents); *provided, however*, that, at the Committees' election, either:

(i)    (1) there must be capacity under the Payment Conditions to pay the Ad Hoc Secured Noteholder Group on account of each corresponding dollar paid to the Committees; or (2) if, on or prior to the date on which such Specified Committee Payments are due, the Senior Secured Noteholders

shall have received dividends or distributions (other than as a result of (A) the immediately preceding Article IV.E..1.(b)(i)(1) (in an amount not to exceed the amount of the Specified Committee Payment) or (B) the CMSR Distributions (collectively (A) and (B), the "Excluded Distributions")), then, the Specified Committee Payments (in an aggregate amount up to the amount of dividends and distributions made to the Ad Hoc Secured Noteholder Group during the immediately preceding 12-month period (other than Excluded Distributions)) shall be exempted from the requirements to satisfy Payment Conditions.  In no event shall the Specified Committee Payments exceed (x) $5 million in any 12-month period and (y) $20 million in the aggregate; or

(ii)        (1) there must be capacity under the Payment Conditions to pay the Ad Hoc Secured Noteholder Group on account of each corresponding dollar paid to the Committees; or (2) if the Ad Hoc Secured Noteholder Group shall take dividends or distributions (other than as a result of (A) the immediately preceding Article IV.E..1.(b)(ii)(1) (in an amount not to exceed the amount of the Specified Committee Payment) or (B) the CMSR Distributions (collectively, (A) and (B), the "Alternative Excluded Distributions")), there must be capacity under the Payment Conditions for a corresponding dollar to go to satisfy the Specified Committee Payments that are payable in the immediately succeeding 12-month period, and upon such dividends or distributions to the Ad Hoc Secured Noteholder Group (other than Alternative Excluded Distributions), New Rite Aid shall cause a corresponding amount (up to the Specified Committee Payments that are payable in the immediately succeeding 12-month period and not previously escrowed) to be segregated and escrowed for the benefit of the Committees and paid to the Committees to satisfy the Specified Committee Payments on the applicable Required Payment Dates.

To the extent the Payment Condition applies and cannot be satisfied at the time a payment is due to the Committees or to the Ad Hoc Secured Noteholder Group, such obligation shall remain outstanding (without accruing interest) until the Payment Condition can be satisfied to permit the payments as described above. Payment to the Committees as set forth herein are subject to a prepayment discount if paid early at the election of the Ad Hoc Secured Noteholder Group.

2.        GUC Equity Trust.

On or prior to the Effective Date, the Debtors shall take all reasonably necessary steps to establish the GUC Equity Trust as one or more standalone trusts and/or sub-trusts in accordance with the Plan, *provided, however*, that the Debtors will not be required to take any actions which would result in holders of New Common Stock exceeding 300 holders.  Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect, except to the extent the Debtors and the Committees determine otherwise in their reasonable discretion to treat all or any portion of the GUC Equity Trust as a "qualified settlement fund," "disputed ownership fund," or otherwise, to treat the GUC Equity Trust as a "widely held fixed investment trust" under section 1.671-5 of the Treasury Regulations and the GUC Equity Trustee will report consistently therewith.  Such treatment is assumed with respect to the following discussion.  In accordance therewith, neither the GUC Equity Trust nor GUC Equity Trustee shall have the power to vary the investment of the GUC Equity Trust within the meaning of section 301.7701-4(c) of the Treasury Regulations.  For U.S. federal income tax purposes, each holder of a GUC Equity Trust Interest will generally be required to include their pro rata share of each item of income, gain, deduction, loss, or credit attributable to the GUC Equity Trust Assets.

To the extent the Debtors and the Committees determine in their reasonable discretion to treat all or any portion of the GUC Equity Trust as a "disputed ownership fund" under section 1.468B-9 of the Treasury Regulations

or a "qualified settlement fund" under section 1.468B-1 of the Treasury Regulations, any appropriate elections with respect thereto shall be made, and such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return may be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

No request for a ruling from the IRS will be sought on the classification of the GUC Equity Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Equity Trust.  If the IRS were to successfully challenge the classification of the GUC Equity Trust as a widely held fixed investment trust, the federal income tax consequences to the GUC Equity Trust and the holders of GUC Equity Trust Interests could vary from those discussed in the Plan (including the potential for an entity-level tax).  For example, the IRS could characterize the GUC Equity Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

The GUC Equity Trust will file information tax returns with the IRS and provide tax information statements to holders of GUC Equity Trust Interests consistently with the rules of section 1.671-5 of the Treasury Regulations and any other applicable provisions of law, including information regarding items of income, gain, deduction, loss or credit attributable to the GUC Equity Trust Assets.  Each holder of GUC Equity Trust Interests must report on its federal income tax return its share of all such items.

If, as of the Effective Date, the UCC / TCC Recovery Allocation Agreement is not in full force and effect, the GUC Equity Trustee shall hold the GUC Equity Trust Assets for the benefit of the Holders of the GUC Equity Trust Interests as later determined in accordance with the terms of the UCC / TCC Recovery Allocation Agreement.  The GUC Equity Trust Interests shall be distributed in accordance with the UCC / TCC Recovery Allocation Agreement.

    3.    Litigation Trust.

On the Effective Date, the Debtors shall take all necessary steps to establish the Litigation Trust as one or more standalone trust and/or sub-trusts in accordance with the Plan and the Litigation Trust Documents, including as set forth in the Litigation Trust Cooperation Agreement.  Notwithstanding anything to the contrary herein, the Debtors and the Reorganized Debtors, as applicable, shall transfer the Litigation Trust Assets to the Litigation Trust, which, except to the extent the Debtors and the Committees determine otherwise in their reasonable discretion to treat all or any portion of the Litigation Trust as a "qualified settlement fund," "disputed ownership fund," "widely held fixed investment trust," and/or otherwise, shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations, and such treatment is assumed with respect to the following discussion.  For the avoidance of doubt, in the event of any transfer of the Litigation Trust Assets to the Litigation Trust, the provisions set forth herein shall continue to govern all matters associated with the prosecution, settlement, or collection upon any Causes of Action transferred to the Litigation Trust.  The Litigation Trust shall be established for the purposes of liquidating the Litigation Trust's assets, reconciling claims asserted against the Debtors and the Reorganized Debtors, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Litigation Trust and the purposes described in the Plan.  Upon the transfer of the Debtors' or the Reorganized Debtors' assets to the Litigation Trust, the Debtors and the Reorganized Debtors will have no reversionary or further interest in or with respect to the Litigation Trust Assets.  To the extent beneficial interests in the Litigation Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests; *provided* that, for the avoidance of doubt, to the extent the GUC Equity Trust is established as a sub-trust under the Litigation Trust, such GUC Sub-Trust shall be governed by the GUC Equity Trust provisions set forth in Article IV.E..2 of the Plan.  Prior to any transfer of the Litigation Trust Assets to the Litigation Trust, the Committees may designate trustee(s) for the Litigation Trust for the purposes of administering the Litigation Trust, as more fully described in the Litigation Trust Documents.  The reasonable costs and expenses of the trustee(s) shall be paid from the Litigation Trust.

(a)      Transfer of Assigned Claims and Assigned Insurance Rights

In furtherance of the transfer of the Litigation Trust Assets to the Litigation Trust and in accordance with the Litigation Trust Agreements, on the Effective Date, the Debtors shall be deemed to have irrevocably transferred, granted and assigned to the Litigation Trust, and the Litigation Trust shall receive and accept, any and all of the Assigned Claims and the Assigned Insurance Rights.  The foregoing transfer shall be (i) free and clear of any and all actual or alleged Liens or encumbrances of any nature whatsoever (other than, as applicable, the Tort Claims and the Assigned Claims), (ii) made to the maximum extent possible under applicable law, (iii) absolute and without requirement of any further action by the Debtors, the Litigation Trust, the Bankruptcy Court, or any other Person, and (iv) governed by, and construed in accordance with, the Bankruptcy Code and the other applicable laws governing the applicable Insurance Policies.  The transfer of the Assigned Insurance Rights contemplated in this Section is not an assignment of any Insurance Policy itself.  The Confirmation Order shall contain findings with respect to the preservation of Assigned Claims and Assigned Insurance Rights as contemplated by the Committee Settlement and the Plan. Notwithstanding the foregoing, the Litigation Trustee and/or GUC Sub-Trust Trustee shall have the power to assign and/or transfer Assigned Insurance Rights for Tort Claims to Holders of Allowed Tort Claims, subject to reasonable restrictions so as not to interfere with, increase costs to, or impede the efforts of, the Litigation Trust, as further described in the Litigation Trust Documents.

(b)      [Vesting of the Litigation Trust Assets in the Litigation Trust

The corpus of the Litigation Trust shall consist of the Litigation Trust Assets.  On the Effective Date, pursuant to the Plan and in accordance with the Litigation Trust Documents, the Litigation Trust Assets shall be irrevocably transferred to and vest in the Litigation Trust free and clear of any and all actual or alleged Claims, Interests, Liens, other encumbrances and liabilities of any kind (other than, as applicable, the Tort Claims and the Assigned Claims). The Litigation Trust shall have no liability for, and the Litigation Trust Assets shall vest in the Litigation Trust free and clear of, any and all actual or alleged pre-petition and post-petition Claims, Causes of Action or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and the Litigation Trust Documents.  From and after the Effective Date, all proceeds of the Litigation Trust Assets, including without limitation, the Proceeds of Assigned Claims and the Tort Claim Insurance Proceeds, shall be paid to the Litigation Trust to be applied in accordance with the Plan, including the treatment of claims set forth in Article III, the Litigation Trust Documents and, as applicable, the UCC / TCC Recovery Allocation Agreement.  Notwithstanding the foregoing, the Litigation Trustee and/or GUC Sub-Trust Trustee shall have the power to assign and/or transfer Assigned Insurance Rights for Tort Claims to Holders of Allowed Tort Claims, subject to reasonable restrictions so as not to interfere with, increase costs to, or impede the efforts of, the Litigation Trust, as further described in the Litigation Trust Documents.

(c)      Assumption of Liability for Tort Claims

As of the Effective Date, any and all liability of the Debtors (or their Affiliates) and the Reorganized Debtors (or their Affiliates) for any and all Tort Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Litigation Trust solely for the purpose of effectuating the purpose of the Litigation Trust.  Distributions, in accordance with the Litigation Trust Documents from the Litigation Trust, any GUC Sub-Trust and the GUC Equity Trust, shall be the sole source of recovery, if any, in respect of such Tort Claims, and the Holder of such Tort Claims shall have no other or further recourse to the Debtors (and their Affiliates), their Estates, the Reorganized Debtors (and their Affiliates), or the Wind-Down Debtors.  In furtherance of the foregoing, the Litigation Trust, subject to and only to the extent provided in the Litigation Trust Documents, shall have all defenses, cross-claims, offsets, and recoupments regarding the Tort Claims that the Debtors, as applicable, have, or would have had, under applicable law, but solely to the extent consistent with the Litigation Trust Documents and the Plan. For the avoidance of doubt, nothing in this Section shall limit or affect the transfer of the Assigned Insurance Rights or the Assigned Claims.

(d)      Institution and Maintenance of Legal and Other Proceedings

On the Effective Date (and subject to the establishment of the Litigation Trust and/or any GUC Sub-Trust), (a) the Litigation Trust and/or any GUC Sub-Trust shall be empowered, and have the sole authority, to initiate,

prosecute, defend, and resolve the Assigned Claims and Assigned Insurance Rights that are transferred to the Litigation Trust by operation of this Plan, subject to the terms and conditions of the Plan; (b) the Litigation Trust and/or any GUC Sub-Trust shall be empowered, and have the sole authority, to initiate, prosecute, defend and resolve the Assigned Claims, the Tort Claims, and the Assigned Insurance Rights in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the Litigation Trustee(s) and/or any GUC Sub-Trust Trustee, subject to the terms and conditions of the Plan; and (c) subject to applicable law and contractual rights, the Litigation Trust and/or any GUC Sub-Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Litigation Trust and/or any GUC Sub-Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

(e)     Administration of Tort Claims

On the Effective Date (and subject to the establishment of the Litigation Trust and/or any GUC Sub-Trust): (a) all Tort Claims will be administered, processed, and resolved pursuant to the provisions outlined in the Litigation Trust Documents; (b) the Litigation Trustee or GUC Sub-Trust Trustee, as applicable, shall determine the eligibility, amount and allowance of Tort Claims in accordance with the applicable Litigation Trust Documents; (c) the determination by the Litigation Trustee or GUC Sub-Trust Trustee, as applicable, of the eligibility, amount and allowance of each Tort Claim shall be final and binding, and shall not be subject to any challenge or review of any kind, by any court or other Person, except as set forth herein and in the Litigation Trust Documents; and (d) the Litigation Trust, any GUC Sub-Trust and the GUC Equity Trust shall be the sole source of recovery for Holders of Tort Claims.  Holders of Disallowed Tort Claims shall have no recourse to the Litigation Trust, any GUC Sub-Trust or the GUC Equity Trust, the Debtors (or their Affiliates or their Estates), the Reorganized Debtors (or their Affiliates), the Wind-Down Debtors, or the Released Parties in respect of such Disallowed Tort Claims.]

(f)     Litigation Trust Distributions

The Litigation Trust and/or any GUC Sub-Trust shall make distributions in accordance with the Plan, the Confirmation Order, the Litigation Trust Documents, and, as applicable, the UCC / TCC Recovery Allocation Agreement.

(g)     Litigation Trust Treatment.

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, except to the extent the Debtors and the Committees determine otherwise in their reasonable discretion to treat all or any portion of the Litigation Trust as a "qualified settlement fund," "disputed ownership fund," "widely held fixed investment trust," and/or otherwise, the Debtors expect to treat the Litigation Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Litigation Trust will take a position on the Litigation Trust's tax return accordingly.  Such treatment is assumed with respect to the following discussion.  For U.S. federal income tax purposes, the transfer of assets to the Litigation Trust will be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Litigation Trust.

No request for a ruling from the IRS will be sought on the classification of the Litigation Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust. If the IRS were to successfully challenge the classification of the Litigation Trust as a grantor trust, the federal income tax consequences to the Litigation Trust and the Litigation Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax).  For example, the IRS could characterize the Litigation Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the trustee(s) of the Litigation Trust shall make a good faith valuation of the Litigation Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the trustee(s) of the Litigation Trust, and the Holders of Claims receiving interests in the Litigation Trust shall take consistent positions with respect

to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of the Litigation Trust among the Litigation Trust beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each such beneficiary if the Litigation Trust had sold all of the Litigation Trust Assets at their tax book value and distributed the proceeds to the Litigation Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust.  The tax book value of the Litigation Trust Assets shall equal their fair market value on the date of the transfer of the Litigation Trust Assets to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Litigation Trust shall in no event be dissolved later than five (5) years from the creation of such Litigation Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Litigation Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

The Litigation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Litigation Trust Assets (*e.g.*, income, gain, loss, deduction and credit).  Each Litigation Trust beneficiary holding a beneficial interest in the Litigation Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items.  The information provided by the Litigation Trust will pertain to Litigation Trust beneficiaries who receive their interests in the Litigation Trust in connection with the Plan.

(h)     Disputed Ownership Fund, Qualified Settlement Fund, or Widely Held Fixed Investment Trust Treatment.

To the extent the Debtors and the Committees determine in their reasonable discretion to treat all or any portion of the Litigation Trust as a "disputed ownership fund" under section 1.468B-9 of the Treasury Regulations or a "qualified settlement fund" under section 1.468B-1 of the Treasury Regulations, any appropriate elections with respect thereto shall be made, and such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return may be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  The treatment of a "widely held fixed investment trust" would be as described above with respect to the GUC Equity Trust.

4.     GUC Sub-Trusts.

To the extent provided for in the UCC / TCC Recovery Allocation Agreement, the GUC Sub-Trusts shall be established on the Effective Date subject to such documentation as may be required, to hold and distribute, as applicable, such consideration as may be allocated to any subset of Holders of General Unsecured Claims.

5.     SCD Trust.

Subject to the terms and conditions of the AHG New-Money Commitment Agreement and the Plan, no earlier than the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall transfer the applicable portion of the Elixir Rx Intercompany Claim to the SCD Trust, which shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations.  The SCD Trust shall be established for the primary purpose of liquidating the SCD Trust's assets and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent

with, the purpose of the SCD Trust.  Upon the transfer of the SCD Claim to the SCD Trust, the Debtors and the Reorganized Debtors, will have no reversionary or further interest in or with respect to the assets of the SCD Trust. To the extent beneficial interests in the SCD Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests.  Prior to any transfer of the SCD Claim to the SCD Trust, the Debtors and the Reorganized Debtors, as applicable, may designate trustee(s) for the SCD Trust for the purposes of administering the SCD Trust in accordance with the terms and conditions of the AHG New-Money Commitment Agreement.  The reasonable costs and expenses of the trustee(s) shall be paid from the SCD Trust.

(a)      SCD Trust Treatment.

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the SCD Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any SCD Trust will take a position on the SCD Trust's tax return accordingly.  For U.S. federal income tax purposes, the transfer of the SCD Claim to the SCD Trust will be deemed to occur as (a) a first-step transfer of the SCD Claim to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the SCD Trust.

No request for a ruling from the IRS will be sought on the classification of the SCD Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the SCD Trust.  If the IRS were to successfully challenge the classification of the SCD Trust as a grantor trust, the federal income tax consequences to the SCD Trust and the SCD Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax).  For example, the IRS could characterize the SCD Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the SCD Trust Assets to the SCD Trust, the trustee(s) of the SCD Trust shall make a good faith valuation of the SCD Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the trustee(s) of the SCD Trust, and the Holders of Claims receiving interests in the SCD Trust shall take consistent positions with respect to the valuation of the SCD Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of the SCD Trust among the SCD Trust beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each such beneficiary if the SCD Trust had sold all of the SCD Trust Assets at their tax book value and distributed the proceeds to the SCD Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the SCD Trust.  The tax book value of the SCD Trust Assets shall equal their fair market value on the date of the transfer of the SCD Trust Assets to the SCD Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The SCD Trust shall in no event be dissolved later than five (5) years from the creation of such SCD Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the SCD Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the SCD Trust Assets.

The SCD Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the SCD Trust Assets (*e.g.*, income, gain, loss, deduction and credit). Each SCD Trust beneficiary holding a beneficial interest in the SCD Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items.  The information provided by the

SCD Trust will pertain to SCD Trust beneficiaries who receive their interests in the SCD Trust in connection with the Plan.

        (b)        Disputed Ownership Fund Treatment.

With respect to any of the assets of the SCD Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the SCD Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

      6.      Cooperation.

The Debtors and Reorganized Debtors, as applicable, shall provide reasonable cooperation necessary to maximize the value of Estate Causes of Action, the Assigned Claims and the Assigned Insurance Rights, including, without limitation, (i) providing the Litigation Trust and its Professionals with reasonable access to the Debtors' books, records, and other documents that are relevant to and necessary for the advancement of Assigned Claims assigned to the Litigation Trust (including privileged documents that are relevant to and necessary for the advancement of Assigned Claims and Assigned Insurance Rights assigned to the Litigation Trust only), (ii) to the extent able by applicable law, providing the Litigation Trust and its Professionals with reasonable access to Debtors' employees and agents for fact finding, consultation, interviews, and as witnesses (including as needed to authenticate documents where appropriate) as relevant to and necessary for the advancement of Claims assigned to the Litigation Trust, (iii) to the extent able by applicable law, providing the Litigation Trust and its Professionals with reasonable access to systems and Debtor personnel as relevant for administration of the Litigation Trust, (iv) funding insurance archival efforts, including costs to retain Marsh to undertake archival efforts and costs incurred by personnel of the Debtors, the Reorganized Debtors, and/or the Wind-Down Debtors, as applicable, and Professionals of the Debtors, the Reorganized Debtors, and/or the Wind-Down Debtors to cooperate with and assist Marsh in the insurance archival efforts, (v) taking commercially reasonable measures to retain documents related to the advancement of Assigned Claims assigned to the Litigation Trust, consistent with the Litigation Trust Cooperation Agreement, and (vi) to the extent able by applicable law, providing assistance to maximize the value of the Assigned Insurance Rights, as reasonably determined by the Committees, the Litigation Trust or any of their respective Professionals. Any attorney-client privilege, work-product protections, or other privilege or immunity held by any of the Debtors, including any predecessors, committee or sub-committees, or other designated Entities or Persons, related to the Claims assigned to the Litigation Trust shall be extended to and shared with Litigation Trust under the terms of the Litigation Trust Cooperation Agreement (and for the avoidance of doubt, will not be extended to or shared with the Committees, their members, or their professionals). The transfer of any privileged books and records provided to the Litigation Trust under the terms of the Litigation Trust Cooperation Agreement shall not result in the destruction or waiver of any applicable privileges pertaining to such books and records. Further, none of the Debtors or the Reorganized Debtors shall be liable for violating any confidentiality or privacy protections as a result of transferring the books and records to the Litigation Trust in accordance with the Litigation Trust Cooperation Agreement. The Reorganized Debtors (and, to the extent the Litigation Trust is formed and funded prior to the Effective Date, the Debtors) shall be promptly reimbursed for all reasonable and documented costs and expenses, including costs associated with allocating time of employees and professionals of the Reorganized Debtors (or Debtors) in connection with any such obligations. For the avoidance of doubt, after the Confirmation Date and prior to the Effective Date, the Debtors shall reasonably cooperate with the foregoing, subject to and consistent with any budget requirements and as is necessary to comply with and satisfy closing conditions (including Article XI.A.28).

      7.      Additional Terms.

The Debtors shall assume the Pension Plan as well as all CBAs and union contracts.

F.      *Insurance Neutrality.*

Nothing in the Plan, the Plan Supplement, or the Confirmation Order shall alter, supplement, change, decrease, or modify the terms (including the conditions, limitations, and/or exclusions) of the Insurance Policies, provided that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including the conditions, limitations, and/or exclusions) of the Insurance Policies, and thus the rights or obligations of any insurer, the Debtors, and the Litigation Trust, arising out of or under any Insurance Policy, whether before or after the Effective Date, are subject to the Bankruptcy Code and applicable law (including any actions or obligations of the Debtors thereunder), the terms of the Plan, the Plan Supplement, and the Confirmation Order (including the findings contained therein or issued in conjunction therewith), and, to the extent the insurers have or had adequate notice from any source, any other ruling made or order entered by the Bankruptcy Court whether prior to or after the Confirmation Date.  Furthermore, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall relieve or discharge any insurer of the Debtors from their obligations under the Insurance Policies.

G.      *Sources of Consideration for Plan Distributions.*

All amounts necessary for the Debtors and, if applicable, the Wind-Down Debtors, to make payments or distributions pursuant hereto shall be (in each case subject to the terms of the Purchase Agreement(s) and the Sale Order, as applicable) obtained from the proceeds of the issuance of New Common Stock, Exit Facilities, Takeback Notes, the MedImpact NewCo Notes (if any), the CMSR Distribution, the AHG Notes, Cash of the Debtors, and any additional Cash consideration provided under one or more Purchase Agreements, in accordance with the terms thereof. Unless otherwise agreed, distributions required by this Plan on account of Allowed Claims that are Assumed Liabilities under a Purchase Agreement shall be the sole responsibility of the applicable Purchaser.

1.      The New Common Stock.

In the event of a Plan Restructuring, on the Effective Date, New Rite Aid is authorized to issue or cause to be issued and shall, as provided for in the Restructuring Transactions Memorandum, issue the New Common Stock for distribution to the Holders of Allowed Senior Secured Notes Claims and the GUC Equity Trust in accordance with the terms of this Plan and the New Corporate Governance Documents (including the New Shareholders Agreement) without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.  The New Common Stock shall be issued and distributed free and clear of all Liens, Claims, and other Interests.  All of the New Common Stock issued pursuant to the Plan, as contemplated by the Plan Restructuring, shall be duly authorized and validly issued and shall be full paid and non-assessable.

2.      Exit Facilities.

On the Effective Date, New Rite Aid shall enter into the Exit Facilities on the terms set forth in the Exit Facilities Documents.  To the extent not already approved, Confirmation shall be deemed approval of the Exit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by New Rite Aid in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of New Rite Aid to enter into and execute the Exit Facilities Credit Agreement, and such other Exit Facilities Documents as may be required to effectuate the Exit Facilities.

On the Effective Date or such date as otherwise approved by the Sale Order, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facilities Documents; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

61

To the extent not already approved, New Rite Aid and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

3.    MedImpact Term Loan Sales Process, Rights Offering, and NewCo Notes.

(a)    *MedImpact Term Loan Sales Process*

In accordance with, and subject to, the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement, following the Confirmation Date, the Debtors shall commence or continue, as applicable, the MedImpact Term Loan Sales Process in accordance with the MedImpact Term Loan Bidding Procedures. Entry of the MedImpact Term Loan Bidding Procedures Order, which shall be entered on or before the Confirmation Date, shall (i) constitute Bankruptcy Court approval of the MedImpact Term Loan Sales Process, (ii) authorize the Debtors' entry into and performance under the MedImpact Term Loan Backstop Commitment Agreement and constitute Bankruptcy Court approval thereof, including the payment of the MedImpact Term Loan Backstop Commitment Premium or the MedImpact Term Loan Termination Fee, as applicable, in accordance with the terms thereof, and (iii) approve the MedImpact Term Loan Bidding Procedures. The Cash proceeds of the sale of the MedImpact Term Loan shall be applied pursuant to Section (II)(A) of Exhibit E to the Final Financing Order, unless otherwise agreed as among the DIP Agents and the Required AHG Noteholders.

(b)    *Creation of MedImpact Term Loan NewCo and MedImpact Term Loan Rights Offering*

If the MedImpact Term Loan Backstop Parties acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures and the MedImpact Term Loan Backstop Commitment Agreement, the following provisions shall be in effect, subject in all respects to the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement:

On or prior to the Effective Date, the Debtors shall create the MedImpact Term Loan NewCo and enter into the MedImpact Term Loan Stalking Horse Bidder Documentation and the MedImpact NewCo Notes Documentation. Pursuant to the MedImpact Term Loan Rights Offering Procedures[, prior to the Effective Date,] the Debtors shall distribute the MedImpact NewCo Subscription Rights to Eligible Holders in accordance with the Plan, the MedImpact Term Loan Backstop Commitment Agreement, and the MedImpact Term Loan Rights Offering Procedures. Eligible Holders shall be entitled to participate in the MedImpact Term Loan Rights Offering up to a maximum amount of each Eligible Holder's Pro Rata share of the MedImpact Aggregate Rights Offering Amount.

The MedImpact Term Loan Rights Offering will be backstopped, severally and not jointly, by the MedImpact Term Loan Backstop Parties pursuant to the MedImpact Term Loan Backstop Commitment Agreement. 20% of the MedImpact Rights Offering NewCo Notes to be sold and issued pursuant to the MedImpact Term Loan Rights Offering shall be reserved for the MedImpact Term Loan Backstop Parties pursuant to the MedImpact Term Loan Backstop Commitment Agreement. MedImpact Term Loan NewCo will pay the MedImpact Term Loan Backstop Commitment Premium to the MedImpact Term Loan Backstop Parties no later than the Effective Date in accordance with the terms and conditions set forth in the MedImpact Term Loan Backstop Commitment Agreement and the Plan.

Upon exercise of the MedImpact NewCo Subscription Rights pursuant to the terms of the MedImpact Term Loan Backstop Commitment Agreement and the MedImpact Term Loan Rights Offering Procedures, MedImpact Term Loan NewCo shall be authorized to issue the applicable principal amount of MedImpact Rights Offering NewCo Notes issuable pursuant to such exercise. Pursuant to the MedImpact Term Loan Backstop Commitment Agreement, if after following the procedures set forth in the MedImpact Term Loan Rights Offering Procedures, there remain any unexercised subscription rights, the MedImpact Term Loan Backstop Parties shall purchase, severally and not jointly, their applicable portion of the aggregate principal amount of the MedImpact Rights Offering NewCo Notes associated

with such unexercised subscription rights in accordance with the terms and conditions set forth in the MedImpact Term Loan Backstop Commitment Agreement and the MedImpact Term Loan Rights Offering Procedures.

On the Effective Date, upon the consummation of the MedImpact Term Loan Rights Offering, the issuance of the MedImpact NewCo Notes and the transfer of the MedImpact Term Loan to MedImpact Term Loan NewCo, the Debtors shall transfer all equity or other ownership or residual interests in MedImpact Term Loan NewCo to the MedImpact NewCo Trustee or its designee in a manner acceptable to the Debtors and the MedImpact Term Loan Backstop Parties.

(c)      *MedImpact NewCo Notes*

If the MedImpact Term Loan Backstop Parties acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures and the MedImpact Term Loan Backstop Commitment Agreement, the following provisions shall be in effect, subject to the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement:

On the Effective Date, the MedImpact Term Loan NewCo shall issue the MedImpact NewCo Notes on the terms set forth in the MedImpact NewCo Notes Documentation. To the extent not already approved, Confirmation shall be deemed approval of the MedImpact NewCo Notes Documentation, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the MedImpact Term Loan NewCo in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the MedImpact Term Loan NewCo to enter into and execute the MedImpact NewCo Notes Indenture, and such other MedImpact NewCo Notes Documentation as may be required to issue the MedImpact NewCo Notes.

Subject to the terms and conditions of the AHG New-Money Commitment Agreement, on the Effective Date, all of the Liens and security interests to be granted in accordance with the MedImpact NewCo Notes Documentation, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the MedImpact NewCo Notes Documentation; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the MedImpact NewCo Notes Documentation; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent not already approved, the MedImpact Term Loan NewCo and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

4.      The SCD Trust and the AHG Notes.

On or prior to the Effective Date, subject to the terms and conditions of the AHG New-Money Commitment Agreement, the Debtors shall create the SCD Trust and enter into the SCD Trust Documentation and the AHG Notes Documentation. On or prior to the Effective Date, subject to the terms and conditions of the AHG New-Money Commitment Agreement, the SCD Trust shall, and to the maximum extent permitted by applicable law, (a) (i) hold all right, title, and interest to no less than $[350,000,000] of the SCD Claim, which the Debtors shall transfer from Debtor Ex Options, LLC to the SCD Trust, (b) issue, or cause to be issued, the AHG Notes to the applicable AHG New-Money Commitment Parties in accordance with the AHG Notes Documentation, (c) be vested with all requisite authority to distribute the CMSR Recovery in accordance with the Plan and the terms and conditions of the AHG New-Money Commitment Agreement, and (d) following receipt of the proceeds of the CMS Receivable, be vested with all requisite authority to distribute sufficient Cash to the Reorganized Debtors to fund any mandatory

prepayments required under the terms of the Exit Facilities Documents from the proceeds of such CMS Receivable. To the extent not already approved, Confirmation shall be deemed approval of the AHG Notes Documentation and the SCD Trust Documentation, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the SCD Trust in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the SCD Trust to enter into and execute the SCD Trust Documentation, the AHG Notes Purchase Agreement, the AHG Notes Indenture, and such other AHG Notes Documentation as may be required to issue the AHG Notes.

Subject to the terms and conditions of the AHG New-Money Commitment Agreement, the Elixir Intercreditor Agreement shall provide, among other things, that distributions from EIC on account of the SCD Claim shall be allocated (i) *first*, to the SCD Trust in an amount sufficient to repay $57,000,000 in Cash of the AHG Notes; (ii) *second*, to the SCD Trust for the benefit of the Exit Lenders in an amount sufficient to repay the [Exit ABL Facility] in the amount of $60,000,000 (which amount shall be applied to fund an immediate prepayment under the Exit FILO Term Loan Facility); (iii) *third*, to the extent Excess Availability is less than $700,000,000, to the SCD Trust for the benefit of the Exit Lenders, in an amount equal to the lesser of $57,000,000 and the amount necessary to fund a prepayment under the Exit ABL Facility to cause Excess Availability to equal $700,000,000 (which amount shall be used to fund an immediate prepayment under the Exit ABL Facility); (iv) *fourth*, to the extent the aggregate amount of proceeds of the CMS Receivable paid to the SCD Trust pursuant to clause (v) below are $285,000,000, (the "Creditor Distribution"), except to the extent that SCD Trust receives less than $285,000,000 to repay in full in Cash the AHG Notes and to fund distributions under the Plan, in which case the Creditor Distribution will be reduced on a dollar-by-dollar basis by each dollar the SCD Trust receives under $285,000,000 to repay in full in Cash the AHG Notes and to fund distributions under the Plan, until the Creditor Distribution reaches zero, provided that the Creditor Distribution shall not be less than zero; and (v) *fifth*, to the SCD Trust in an amount equal to all remaining proceeds of the CMS Receivable (which amount the SCD Trust shall use to fund a distribution pursuant to Article III.B..5 of the Plan.). The Debtors may, with the consent of the DIP Agents and the Required AHG Noteholders, enter into one or more alternative transactions or structuring arrangements with respect to the transactions, arrangements, and distributions described in this paragraph and the preceding paragraph, which alternative transactions, arrangements, and distributions shall be economically neutral with respect to the Creditor Distribution.

Subject to the terms and conditions of the AHG New-Money Commitment Agreement, on the Effective Date, all of the Liens and security interests to be granted in accordance with the AHG Notes Documentation, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the AHG Notes Documentation; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the AHG Notes Documentation; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent not already approved, the SCD Trust and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

The Cash proceeds of the AHG Notes shall be used to pay down the loans outstanding under the DIP ABL Facility, thereby reducing the DIP ABL Claims on a dollar-for-dollar basis.

5.    Takeback Notes.

On the Effective Date, in the event of a Plan Restructuring, New Rite Aid shall enter into the Takeback Notes on the terms set forth in the Takeback Notes Documents. To the extent not already approved, Confirmation shall be

deemed approval of the Takeback Notes Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by New Rite Aid in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of New Rite Aid to enter into and execute the Takeback Indenture, and other such Takeback Notes Documents as may be required to effectuate the Takeback Notes.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Takeback Notes Documents, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Takeback Notes Documents; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Takeback Notes Documents; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent New Rite Aid and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

6.      Cash on Hand.

Except as otherwise provided herein, the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, shall use Cash on hand to fund distributions to certain Holders of Claims solely in accordance with the terms of the Plan, including any Cure Costs in connection with a Plan Restructuring.

7.      Creation of the Administrative / Priority Claims Reserve and the Wind-Down Reserve.

On or before the Effective Date, in the event of a Sale Transaction Restructuring, each of the Administrative / Priority Claims Reserve and Wind-Down Reserve shall be funded in accordance with the Purchase Agreement, the Sale Order, and section 1129 of the Bankruptcy Code, as applicable, and subject to the applicable consent rights of the Required AHG Noteholders.

8.      Payment of Cure Costs.

In the event of a Sale Transaction Restructuring or an Other Asset Sale, the Debtors or Purchaser shall pay all Cure Costs, if any, pursuant to sections 365 or 1123 of the Bankruptcy Code and in accordance with the Purchase Agreement(s) and Sale Order(s).

H.      *Plan Administrator and the Wind-Down Debtors.*

This Article IV.H shall apply to a Sale Transaction Restructuring.

1.      Plan Administrator.

As set forth below, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down and as otherwise provided in the Confirmation Order.  On the Effective Date, the authority, power, and incumbency of the Persons acting as managers, directors, and

officers of the Wind-Down Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and shall succeed to the powers of the Wind-Down Debtors' managers, directors, and officers.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors as further described in Article VII hereof.  The Plan Administrator shall have the authority to sell, liquidate, or otherwise dispose of any and all of the Wind-Down Debtors' assets without any additional notice to or approval from the Bankruptcy Court.

2.     Board of the Debtors.

As of the Effective Date, in the event of a Sale Transaction Restructuring: (a) the existing board of directors or managers, as applicable, of each of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity Holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor; *provided* that each Disinterested Director of the Debtors shall retain respective authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and direction in accordance with the terms of the Plan; (b) each Disinterested Director shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Reorganized Debtors, or the Wind-Down Debtors, or any other Entity without such director's prior written consent; (c) each Disinterested Director of the Debtors retains the right to review, approve, and make decisions as well as to file papers and be heard before the Bankruptcy Court on all matters under such director's continuing authority; and (d) subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Wind-Down Debtors with respect to its affairs.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind-down and dissolve any of the Debtors, and shall:  (a) file a certificate of dissolution, cancellation, or equivalent document for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of any of the Debtors under the applicable laws of each applicable Debtor's state of formation; (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (c) represent the interests of the Debtors or the Estates before any taxing authority in all tax matters, including any action, suit, proceeding, or audit.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Debtors or any of their Affiliates.

3.     Tax Returns.

After the Effective Date and subject to the Purchase Agreement(s), the Plan Administrator shall complete and file all final or otherwise required federal, state, provincial, and local tax returns for each of the Debtors and the Wind-Down Debtors.

4.     Dissolution of the Wind-Down Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which the Debtors are formed or any other jurisdiction.  Notwithstanding the foregoing, the Plan Administrator shall retain the authority to

take all necessary actions to dissolve the Debtors in, and withdraw the Debtors from, applicable states and provinces to the extent required by applicable law.

    *I.*     *Liquidating Trust.*

This <u>Article IV.I</u> shall apply to a Sale Transaction Restructuring.

Notwithstanding anything to the contrary herein, the Plan Administrator, on behalf of the Wind-Down Debtors, may, subject to the consent of the Required AHG Noteholders, may transfer all or any portion of the Remnant Assets to the Liquidating Trust, which shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations. For the avoidance of doubt, in the event of a Permitted Transfer, the provisions set forth in <u>Article IV.R</u> herein shall continue to govern all matters associated with the prosecution, settlement, or collection upon any Causes of Action transferred to the Liquidating Trust. The Liquidating Trust shall be established for the primary purpose of liquidating the Liquidating Trust's assets, reconciling claims asserted against the Debtors and the Wind-Down Debtors, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidating Trust. Upon the transfer of the Debtors' or the Wind-Down Debtors' assets to the Liquidating Trust, the Debtors and the Wind-Down Debtors will have no reversionary or further interest in or with respect to the assets of the Liquidating Trust. To the extent beneficial interests in the Liquidating Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests. Prior to any Permitted Transfer, the Plan Administrator may designate trustee(s) for the Liquidating Trust for the purposes of administering the Liquidating Trust. The reasonable costs and expenses of the trustee(s) shall be paid from the Liquidating Trust.

    1.    <u>Liquidating Trust Treatment.</u>

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the Liquidating Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each such beneficiary if the Liquidating Trust had sold all of the Liquidating Trust Assets at their tax book value and distributed the proceeds to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the

Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than five (5) years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

2.    <u>Disputed Ownership Fund Treatment.</u>

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

*J.*    *Release of Liens.*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates that have not been previously released shall be fully released, settled, and compromised, and the Holder of such mortgages, deeds of trust, Liens, pledges, or other security interest against any property of the Debtors' Estates shall be authorized to take such actions as may be reasonably requested by the Debtors to evidence such releases, at the sole expense of the Debtors or the Wind-Down Debtors, as applicable. Notwithstanding anything to the contrary in the Plan, the Liens securing the DIP Claims shall not be released and such Liens shall remain in full force and effect until the DIP Claims are paid in full in Cash or otherwise treated in a manner consistent with <u>Article II.E</u> of the Plan.

*K.*    *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except as otherwise specifically provided for in the Plan or one or more Purchase Agreements: (1) the obligations under the DIP Documents, the Prepetition Credit Agreement, the 2025 Secured Notes Indenture, the 2026 Secured Notes Indenture, the 2027 Unsecured Notes Indenture, the 2028 Unsecured Notes Indenture, and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled, except as set forth herein, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements,

indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released.

On or after the Effective Date, each Holder of a certificate or instrument evidencing a Claim that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture(s) or credit agreement that governs the rights of such Holder of such Claim upon such Holder's (or its nominee's or designee's) receipt of the distributions to which it is entitled pursuant to the Plan. Such surrendered certificate or instrument shall be deemed cancelled as set forth in, and subject to the exceptions set forth in, this Article IV.K. If the record Holder of a Notes Claim is DTC or its nominee, the applicable Trustee, or another securities depository or custodian thereof, and Holders of Notes Claims are represented by a global security held by or on behalf of DTC, the applicable Trustee, or such other securities depository or custodian, then each such Holder of such Notes Claims shall be deemed to have surrendered such Holder's note, debenture, or other evidence of indebtedness upon surrender of such global security by DTC, the applicable Trustee, or such other securities depository or custodian thereof.

Notwithstanding the foregoing, (a) no Executory Contract or Unexpired Lease (i) that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date, (b) the Prepetition Credit Agreement, the Senior Secured Notes Indentures, and the Unsecured Notes Indentures shall continue in effect solely for the purpose of (i) allowing Holders of the ABL Facility Claims, FILO Term Loan Facility Claims, the Trustees, to receive the distributions provided for under the Plan, (ii) allowing the Prepetition Agent, the Trustees to receive or direct distributions from the Debtors and to make further distributions to the Holders of such Claims on account of such Claims, as set forth in Article VI.A of the Plan, (iii) preserving all rights, including rights of enforcement, of the Prepetition Agent, the Trustees to indemnification or contribution pursuant and subject to the terms of the Prepetition Credit Agreement, the Indentures, in respect of any claim or Cause of Action asserted against the Prepetition Agent, the Trustees, as applicable, (iv) permitting each of the Prepetition Agent, the Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, and (v) preserving any rights of the DIP Agents, the Prepetition Agents, the Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant indenture, Prepetition Credit Agreement, or DIP Credit Agreements, including any rights to priority of payment and/or to exercise charging Liens.

The Prepetition Agent shall be released and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Prepetition Agent and their respective representatives and Professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the Prepetition Agent shall be relieved of and released from any obligations and duties arising thereunder.

Except as provided in this Plan, on the Effective Date, each DIP Agent and its respective agents, successors, and assigns shall be automatically and fully released of all of their duties and obligations associated with the applicable DIP Documents. The commitments and obligations, if any, of the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

On and after the Effective Date, the duties and responsibilities of the Trustees under the applicable indenture shall be discharged and released, except (i) to the extent required to effectuate the Plan including, but not limited to, making distributions under the Plan to the Holders of Allowed Notes Claims under the applicable indenture, and (ii) with respect to any rights of the Trustees to payment of reasonable and documented fees, expenses, and indemnification obligations (to be documented in accordance with the terms of the applicable indenture) as against any money or property distributable to Holders of Claims pursuant and subject to the terms of the applicable Indenture, including any rights to priority of payment and/or to exercise charging liens. After the performance by the Trustees and their respective representatives and professionals of any obligations and duties required under or related to the Plan or the Confirmation Order, the Trustees shall be deemed to be forever relieved of and released from any obligations and duties arising thereunder.

L.       *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including, as applicable: (1) selection of the Plan Administrator; (2) implementation of the Restructuring Transactions; (3) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors, before, on, or after the Effective Date involving the corporate structure of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, in connection with the Plan or corporate structure of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security Holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors, except for any filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution with applicable governmental authorities required pursuant to applicable state or provincial Law.  Before, on, or after the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this <u>Article IV.L</u> shall be effective notwithstanding any requirements under non-bankruptcy law.

M.       *New Corporate Governance Documents.*

In the event of a Plan Restructuring or Credit Bid Transaction, on the Effective Date, New Rite Aid shall enter into and deliver the New Corporate Governance Documents to each holder of New Common Stock, and the New Corporate Governance Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each party shall be bound thereby, in each case, and as applicable, without the need for execution by any party thereto other than New Rite Aid.  Any Entity's acceptance of New Common Stock, including any New Common Stock issuable upon exercise of any warrants issued pursuant to the Plan or otherwise, shall be deemed as its agreement to the New Corporate Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms, and each such Entity will be bound thereby in all respects.

The New Corporate Governance Documents will prohibit the issuance of non-voting Equity Securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the New Corporate Governance Documents may be amended or restated as permitted by such documents and the Laws of their respective states, provinces, or countries of incorporation or organization.

N.       *Management Incentive Plan.*

On the Effective Date, the New Rite Aid Board shall adopt and implement the Management Incentive Plan as determined by the New Rite Aid Board and in accordance with the MIP Documents.

O.       *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the Committee Settlement, the MedImpact Term Loan Sale, Sale Transaction Restructuring, the Other Asset Sale(s), and the instruments issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors or the Wind-Down Debtors, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

On the Effective Date, or as soon thereafter as reasonably practicable, the Reorganized Debtors or the Wind-Down Debtors, as applicable, may issue, execute, deliver, file, or record, such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate implement, and

further evidence the terms and conditions of the Committee Settlement, including, but not limited to, the Litigation Trust Agreement, the GUC Equity Trust Documents, the GUC Sub-Trust Documents, the Litigation Trust Cooperation Agreement, and the other Committee Settlement Documents.

P.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers (whether from a Debtor to New Rite Aid, from a Debtor to the Wind-Down Debtor, or from the Wind-Down Debtor to the Liquidating Trust or to any other Person) of property under the Plan (including pursuant to the Purchase Agreement(s), if applicable, or a Plan Restructuring) or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Wind-Down Debtors, including in accordance with any Purchase Agreement, (2) the Restructuring Transactions, (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (4) the making, assignment, or recording of any lease or sublease, or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including any Restructuring Transaction), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

Q.      *Exemption from Securities Act Registration.*

No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of securities under the Plan. The issuance of the 1145 Securities under the Plan is expected to be exempt from the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code. Thus, the 1145 Securities to be issued under the Plan (a) would not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) would be freely tradable and transferable by any initial recipient thereof that (i) is not an "Affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "Affiliate" within 90 days of such transfer, and (iii) is not an Entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code. Should the Debtors elect on or after the Effective Date to reflect any ownership of the 1145 Securities to be issued under the Plan through the facilities of DTC, the Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the 1145 Securities to be issued under the Plan under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the 1145 Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the 1145 Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding any policies, practices, or procedures of DTC, DTC shall cooperate with and take all actions reasonably requested by a Disbursing Agent or an indenture trustee to facilitate distributions to Holders of Allowed Claims without requiring that such distribution be characterized as repayments of principal or interest. No Disbursing Agent or indenture trustee shall be required to provide indemnification or other security to DTC in connection with any distributions to Holders of Allowed Claims through the facilities of DTC. The rights of holders of New Common Stock, including the right to transfer such interests, will also be subject to any restrictions in the New Corporate Governance Documents, to the extent applicable.

To the extent that section 1145 of the Bankruptcy Code is inapplicable, the offering, issuance, exchange, or distribution of any securities pursuant to the Plan, including the Private Placement Securities, is or shall be conducted in a manner that is exempt from the registration requirements of section 5 of the Securities Act and applicable state and local securities laws, pursuant to section 4(a)(2) of the Securities Act and/or the regulations promulgated thereunder (including Regulation D), Regulation S under the Securities Act and/or another available exemption from registration under Section 5 of the Securities Act. To the extent such securities are issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder or Regulation S under the Securities Act, each will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law. In that regard, each recipient shall be required to make customary representations to the Debtors including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a qualified institutional buyer (as defined under Rule 144A promulgated under the Securities Act).

The interests in the Liquidating Trust, the Litigation Trust, any GUC Sub-Trust, or the GUC Equity Trust Interests are not expected to be deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, or the provision of section 1145 of the Bankruptcy Code is expected to apply to such interests (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code) or the issuance of such interests is expected to be exempt from the registration under Section 5 of the Securities Act pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the 1145 Securities, Private Placement Securities, or interests in the Liquidating Trust, the Litigation Trust, any GUC Sub-Trust, or the GUC Equity Trust Interests under applicable securities laws.

*R.        Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to <u>Article VII</u> and <u>Article X</u> hereof, and the terms of the Committee Settlement, the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action other than the Assigned Claims and the Assigned Insurance Rights, whether arising before or after the Petition Date and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action (a) that constitute Elixir Acquired Assets or Retail Acquired Assets, (b) exculpated or released (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in <u>Article X</u>, or (c) waived in accordance with <u>Article IV.R</u> which in the case of the foregoing (b) or (c) shall be deemed released and waived by the Debtors and the Reorganized Debtors or the Wind-Down Debtors, as applicable, as of the Effective Date.

The Debtors and the Wind-Down Debtors, as applicable, shall waive any Avoidance Action against the Commonwealth of Massachusetts on account of, or relating to, the Massachusetts OAG Agreement, and the Confirmation Order shall serve as approval by the Bankruptcy Court of the release of such claims. Additionally, each of the California AG Proofs of Claim is an Allowed General Unsecured Claim. The Debtors and the Wind-Down Debtors, as applicable, shall waive any Avoidance Action against the California AG, or any mediate or immediate transferee of the California AG, on account of, or relating to, the California AG Agreement, and the Confirmation Order shall serve as approval by the Bankruptcy Court of the release of such claims.

The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, may pursue such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights), as appropriate, in accordance with the best interests of the Reorganized Debtors and the Wind-Down Debtors, as applicable. The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall retain and may exclusively enforce any and all such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights). The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights) and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it, except as assigned or transferred to the Purchaser in accordance with the Purchase Agreement(s) or otherwise expressly provided in the Plan, including this Article IV and Article X of the Plan.  Unless any such Causes of Action against an Entity are expressly waived (including pursuant to this Article IV.R of the Plan), relinquished, exculpated, released, compromised, assigned, or transferred to a Purchaser in accordance with a Purchase Agreement, or settled in the Plan or a Final Order, the Reorganized Debtors and the Wind-Down Debtors expressly reserve all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

Notwithstanding anything to the contrary in this Plan, in the Plan Supplement or in the Confirmation Order, the Debtors shall preserve and transfer and/or assign to the Litigation Trust, the Assigned Claims and the Assigned Insurance Rights and the right to commence, prosecute, or settle all Assigned Claims and Assigned Insurance Rights belonging to such Debtors or their Estates, subject to the occurrence of the Effective Date and the other terms and conditions set forth in this Plan; *provided*, that, subject to the terms and conditions of the Plan, (a) the Litigation Trust or GUC Sub-Trust(s) shall be the successor-in-interest to the Debtors' rights, title, and interest in any Assigned Claims and Assigned Insurance Rights, (b) the Litigation Trust or GUC Sub-Trust(s) as may be applicable, shall have exclusive standing to pursue the Assigned Claims and Assigned Insurance Rights, and (c) the Litigation Trustee or GUC Sub-Trust Trustee(s), pursuant to the Committee Settlement Documents, shall have the right to commence, prosecute, or settle such Assigned Claims and Assigned Insurance Rights and to decline to do any of the foregoing in its discretion and without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  In pursuing any Assigned Claim or Assigned Insurance Right, the Litigation Trust or GUC Sub-Trust(s) shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the time periods in which an Assigned Claim or Assigned Insurance Right may be bought under section 546 of the Bankruptcy Code.  The Litigation Trust or GUC Sub-Trust(s) shall be entitled to recover on any Assigned Claims or Assigned Insurance Rights as a result of the Settlement of Tort Claims described in Article IVB of this Plan and/or any settlement or judgment with respect to the other Assigned Claims and no consent shall be necessary for the Litigation Trust or GUC Sub-Trust(s) to transfer such the proceeds of any such Assigned Claims or Assigned Insurance Rights once received from an insurer or other third-party.  For the avoidance of doubt, the Litigation Trust or applicable GUC Sub-Trust shall be solely responsible for effectuating all distributions on account of the Litigation Trust Assets for General Unsecured Claims.

> S.      *Private Company.*

In the event of a Plan Restructuring, the Reorganized Debtors shall not have any class of Equity Securities listed on a national securities exchange and shall make commercially reasonable efforts to take the steps necessary to be a private company without Securities Act or Exchange Act reporting obligations upon emergence or as soon as reasonably practicable thereafter in accordance with and to the extent permitted by the Securities Act and the Exchange Act.

> T.      *Additional Sale Transactions.*

Pursuant to the Bidding Procedures and Bidding Procedures Order, interested parties may submit a bid for some, all, or any portion of the Debtors' assets.  If, in the Debtors' business judgment, and subject to the Bidding Procedures and the terms of the Bidding Procedures Order, the Debtors determine that one or more bids for all or a portion of the Debtors' assets offers higher or otherwise better terms to the Debtors' Estates, then the Debtors may conduct (a) in the event of a Plan Restructuring, Other Asset Sale(s) for those assets or (b) in the event of a Sale Transaction Restructuring, Alternative Sale Transaction(s) for those assets, with the consent of the Required AHG Noteholders in the event of a Plan Restructuring or a Credit Bid Transaction.  Such Other Asset Sale(s) or Alternative Sale Transaction(s), as applicable, would be consummated pursuant to section 363 of the Bankruptcy Code either pursuant to the Plan or separate Purchase Agreement(s) to be approved pursuant to separate Sale Order(s), and the treatment of proceeds from such Other Asset Sale(s) or Alternative Sale Transaction(s) shall be distributed pursuant to the Plan or separate Court order and in a manner consistent with the Final Financing Order.  For the avoidance of doubt, pursuit of any Other Asset Sales shall not impact the Committee Settlement.

U.       *Employment Obligations.*

For the avoidance of doubt, the collective bargaining agreements ("CBAs") between labor unions and various Debtors may only be rejected pursuant to and in accordance with the procedures and standards set forth in section 1113 of the Bankruptcy Code; *provided* that the Debtors shall assume the Pension Plan as well as all CBAs and union contracts.

The cure amounts, if any, related to the assumption of the CBAs shall be satisfied in full by payment by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course, of all the Debtors' or the Reorganized Debtors' obligations under the assumed CBA(s), as applicable, arising under the CBAs to the extent such obligations are valid and payable.  As a result, if the CBAs are assumed, no Proof of Claim, request for administrative expense, or cure claim need be Filed with respect to such cure amounts, provided, however, that the Debtors' and the Reorganized Debtors' rights, defenses, claims, and counterclaims with respect to any such obligations are expressly preserved.

After the Effective Date, the Reorganized Debtors intend to, in the ordinary course of their business, as and to the extent required by the Pension Plan's governing documents and in accordance with applicable non-bankruptcy law: (i) satisfy the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 as required by applicable law; (ii) pay, or cause to be paid, all required premiums, if any, owed to PBGC under 29 U.S.C. §§ 1306 and 1307, for the Pension Plan under ERISA or the Internal Revenue Code; and (iii) administer the Pension Plan in accordance with the applicable provisions of ERISA and the IRC.  Further, if the Pension Plan continues and is assumed by the Reorganized Debtors, PBGC and the Debtors agree that all Proofs of Claim Filed by PBGC would be deemed withdrawn on the Effective Date without incurring liability in the bankruptcy.

Nothing in the Chapter 11 Cases, the Disclosure Statement, the Plan, the Confirmation Order, or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release, limit, or relieve any individual from any claim by the PBGC or the Pension Plan for breach of any fiduciary duty under ERISA, including prohibited transactions, with respect to the Pension Plan, subject to any and all applicable rights and defenses of such parties, which are expressly preserved.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Disclosure Statement, Plan, Confirmation Order, Bankruptcy Code, or other document Filed in the Chapter 11 Cases.  For the avoidance of doubt, if the Pension Plan continues, the Reorganized Debtors shall not be released from any liability or obligation under ERISA, the IRC, and any other applicable law relating to the Pension Plan.

# ARTICLE V
# TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.       *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected by the applicable Debtor, unless otherwise agreed by the applicable counterparty, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (1) are specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) have been previously assumed or rejected by the Debtors pursuant to the Assumption/Rejection Procedures Order or any other Bankruptcy Court order; (3) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; (4) are to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, through a Sale Order in connection with any sale transaction, including in a Sale Transaction Restructuring that is pending on the Confirmation Date; (5) are a contract, release, or other agreement or document entered into in connection with the Plan; or (6) are an Insurance Policy.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Debtors shall make all assumption and rejection determinations for their Executory Contracts and Unexpired Leases either through the Filing

of a motion or identification in the Plan Supplement, in each case prior to the applicable deadlines set forth in sections 365(d)(2) and 365(d)(4) of the Bankruptcy Code, as clarified by the Extension Order.  To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease by a deadline, including section 365(d) of the Bankruptcy Code, such requirement shall be satisfied if the Debtors make an election, either through the Filing of a motion or identification in the Plan Supplement or similar schedule in connection with a Sale Order, to assume or reject such Executory Contract or Unexpired Lease prior to the applicable deadline, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts and Unexpired Leases as set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein or in the Confirmation Order or any Purchase Agreement to be approved pursuant to the Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Notwithstanding anything herein to the contrary, with respect to any Unexpired Lease that is not assumed on the Effective Date pursuant to this Article V.A, the effective date of rejection of such Unexpired Leases shall be the later of:  (A) the Effective Date, except (1) in connection with a Court-Ordered Cure Cost pursuant to Article V.C or (2) if agreed by the applicable counterparty, and (B) the date upon which the Debtors notify the landlord in writing (e-mail being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable; *provided* that on the date the Debtors surrender the premises as set forth in subsection (B) above, all property remaining in the premises will be deemed abandoned free and clear of any interests, Liens, Claims, and encumbrances and landlords may dispose of such property without further notice or court order, unless otherwise agreed by the applicable lessor or pursuant to an order of the Bankruptcy Court.  If the effective date of any rejection of an Unexpired Lease is after the Confirmation Date pursuant to the terms herein, the Reorganized Debtors shall provide notice of such rejection to the applicable landlord no later than the Initial Extended 365(d)(4) Deadline[9] setting forth the deadline for Filing any Claims arising from such rejection, which notice shall also be served upon the GUC Equity Trustee and Litigation Trustee.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the rights of counterparties to Unexpired Leases of nonresidential real property to object to the continued possession of such leased property, including the ability to conduct GOB sales on the properties, or failure to comply with any other lease terms or obligations, including payment of rents and charges and insurance obligations, in each case related to such Unexpired Lease following entry of the Confirmation Order are expressly preserved, and the rights of such counterparties to request such objection be heard on shortened notice are preserved.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in, and be fully enforceable by the applicable Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties thereto, subject to this Article V.A.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to a Final Order on or after the Confirmation Date but may be withdrawn, settled, or otherwise prosecuted by the applicable Debtor, Reorganized Debtor, or Wind-Down Debtor, as applicable.

Subject to any Sale Order, to the maximum extent permitted by Law, the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or any other transaction, event, or matter that would (A) result in a violation, breach, or default under such Executory Contract or Unexpired Lease, (B) increase, accelerate, or otherwise alter any obligations, rights, or liabilities of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors under such Executory Contract or Unexpired Lease, or (C) result in the creation or imposition of a Lien upon any property or asset of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors

---

[9]    "Initial Extended 365(d)(4) Deadline" shall have the meaning given to such term in the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures for Exiting Certain Leased Real Property and (II) Granting Related Relief* [Docket No. 2024].

pursuant to the applicable Executory Contract or Unexpired Lease, and to the extent any provision in any such Executory Contract or Unexpired Lease restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the transactions contemplated by the Plan, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, and any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption thereof (subject to the other provisions of this Article V.A) shall be deemed satisfied by Confirmation.

Notwithstanding anything to the contrary in the Plan, after the Confirmation Date, an Executory Contract or Unexpired Lease on the Schedule of Assumed Contracts and Unexpired Leases as of the Confirmation Date may not be rejected by the applicable Debtor(s), other than as provided for in the Plan, unless the applicable lessor or contract counterparty has (x) consented to such rejection, (y) objected to the assumption of such Executory Contract or Unexpired Lease and such objection remains outstanding, or (z) in the case of Unexpired Leases, consented to an extension of the time period in which the applicable Debtor(s) must assume or reject such Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code (as extended with the applicable lessor's consent, the "Deferred Deadline"), in which case for purposes of clause (z) the applicable Debtor(s) shall have until the Deferred Deadline to assume such Unexpired Lease, subject to the applicable lessor's right to object to such assumption, or such Unexpired Lease shall be deemed rejected. For any Executory Contract or Unexpired Lease assumed pursuant to this paragraph, all Cure Costs shall be paid on the Effective Date or as soon as reasonably practicable thereafter, unless subject to a dispute with respect to Cure Cost, such dispute shall be addressed in accordance with Article V.C.

Notwithstanding anything to the contrary in the Plan, in the event of a Sale Transaction Restructuring under Article IVD of the Plan, the Debtors or the Wind-Down Debtors, as applicable, reserve the right to alter, amend, modify, or supplement (i) the Schedule of Assumed Executory Contracts and Unexpired Leases and (ii) any schedule of Executory Contracts and Unexpired Leases that is attached to any Purchase Agreement(s), with the consent of the Purchaser, at any time up to the earlier of (x) 90 days following the closing date of a Sale Transaction Restructuring, and (y) solely with respect to Unexpired Leases of nonresidential real property, the deadline set forth in section 365(d)(4) of the Bankruptcy Code, as such date may be extended with the consent of the applicable landlord counterparty, consistent with the Purchase Agreement, as applicable (the "Designation Rights Period").

B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time shall be barred from asserting such Claims against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions on account of such Claims in these Chapter 11 Cases. The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any Claims not timely filed; *provided* that the Debtors will provide notice to such claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such claimant that its Claim will be removed from the Claims Register as a result of being untimely filed.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B and may be objected to in accordance with the provisions of Article IX of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules. For the avoidance of doubt, unless otherwise agreed, any property remaining on the premises subject to a rejected Unexpired Lease shall be deemed abandoned by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, as of the effective date of the rejection, and the counterparty to such Unexpired Lease shall be authorized to (i) use or dispose of any property left on the premises in its sole and absolute discretion without notice or liability to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, or any third party, and (ii) shall be authorized to assert a Claim for any and all damages arising from the abandonment of such property by filing a Claim in accordance with this Article V.B.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall, in accordance with the Schedule of Assumed Executory Contracts and Unexpired Leases, pay all Cure Costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan on such terms as the parties to such Executory Contracts or Unexpired Leases may agree; *provided* that, if a dispute regarding assumption or Cure Cost is unresolved as of the Effective Date, then payment of the applicable Cure Cost shall occur as soon as reasonably practicable after such dispute is resolved.  Any Cure Cost shall be deemed fully satisfied, released, and discharged upon payment of the Cure Cost.

Unless otherwise agreed in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Cost must be Filed, served, and actually received by counsel to the Debtors no later than 14 days after the service of notice of assumption on affected counterparties.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment and any untimely request for an additional or different Cure Cost shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any of the Debtors without the need for any objection by the applicable Reorganized Debtors or the Wind-Down Debtors, as applicable, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

Any payment of Cure Costs by the Debtors or a Purchaser, as applicable, in connection with Executory Contracts and Unexpired Leases assumed or assumed and assigned pursuant to a Sale Transaction Restructuring or an Other Asset Sale shall be satisfied in full by the Debtors or the Purchaser(s), as applicable, in accordance with the terms in the Purchase Agreement(s) and the Sale Order(s), as applicable (including the Assignment Procedures), including in the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Debtors, the Purchaser, or any assignee to provide "adequate assurance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption.

Except as otherwise set forth in any applicable Sale Order, if there is any dispute regarding any Cure Costs, the ability of the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assumption and assignment, then payment of any Cure Costs shall occur as soon as reasonably practicable after (a) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (b) as may be agreed upon by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  Any such disputes shall be scheduled for hearing upon request of the affected counterparty or the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, at the earliest convenience of the Court; *provided* that no hearing will be scheduled on less than 10 days' notice to the affected counterparty, and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and that no such hearing shall be scheduled less than 30 days after the Effective Date unless agreed to between the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and the affected counterparty.  The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, may reconcile and settle in the ordinary course of the Debtors' business any dispute (following a timely Filed objection) regarding any Cure Cost or any other matter pertaining to assumption without any further notice to or action, order, or approval of the Bankruptcy Court.

If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Assumed Contracts and Unexpired Leases (such greater amount, the "Court-Ordered Cure Cost"), the Debtors shall have the right to (a) satisfy the Court-Ordered Cure Cost as soon as reasonably practicable thereafter and assume such Executory Contract or Unexpired Lease in accordance with the terms herein or, (b) within 14 days of such determination, remove such Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected on the later of (i) the date of entry of the Court-Ordered Cure Cost and, (ii) solely with respect to Unexpired Leases, the date upon which the Debtors notify the landlord in writing (email being sufficient) that they have surrendered the premises to the landlord and returned

the keys, key codes, or security codes, as applicable, and in the case of rejection of an Unexpired Lease pursuant to the preceding clause (ii), the Debtors shall, pursuant to section 365(d)(4) of the Bankruptcy Code, immediately surrender the related premises to the lessor unless otherwise agreed with the applicable lessor or ordered by the Court, subject to the applicable counterparty's right to object to such rejection; *provided* that, after the deadline to assume an Executory Contract or Unexpired Lease set forth in section 365(d) of the Bankruptcy Code, as clarified by the Extension Order, an Executory Contract or Unexpired Lease may only be removed from the Schedule of Assumed Executory Contracts and Unexpired Leases if (1) the applicable counterparty consents to such rejection, (2) the applicable counterparty objected to the assumption or cure of such Executory Contract or Unexpired Lease and such objection remains outstanding, or (3) the court orders a Court-Ordered Cure Cost.  Notwithstanding anything to the contrary herein, the Reorganized Debtors, the Wind-Down Debtors, and the applicable counterparty shall be entitled to the full benefits of the Executory Contract or Unexpired Lease (including without limitation, any license thereunder) pending the resolution of any Cure Cost dispute.

The assumption of any Executory Contract or Unexpired Lease in connection with any Sale Transaction Restructuring, Plan Restructuring, or Other Asset Sale and the cure of defaults associated therewith in accordance with section 365(b) of the Bankruptcy Code, including the payment of any Cure Costs as adjudicated or agreed upon by the Debtors and the applicable Purchaser, shall result in the full release and satisfaction of any Cure Cost, Claims, or defaults, whether monetary or nonmonetary, including those arising from or triggered by the filing of these Chapter 11 Cases and provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, in each case at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption or (2) the effective date of such assumption without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court; *provided, however*, that nothing herein shall affect the allowance of Claims or any Cure Cost agreed to by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, in any written agreement amending or modifying any Executory Contract or Unexpired Lease prior to its assumption**.  Notwithstanding anything in this Plan, the Purchase Agreement(s), the Sale Order(s), the Plan Supplement, or otherwise to the contrary, any non-Debtor party to any such Executory Contract or Unexpired Lease shall be entitled to receive, and nothing herein shall release or result in the satisfaction of such party's right to receive, payment in full of all Cure Costs and all amounts that have accrued or otherwise arisen as of the Effective Date (but are not in default as of the Effective Date) with respect to any Executory Contract or Unexpired Lease.

    D.      *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors (for themselves and for their successors) expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

    E.      *Insurance Policies.*

Notwithstanding anything to the contrary in the Plan, the Plan Supplement or the Confirmation Order:

Nothing in the Plan, the Plan Supplement or the Confirmation Order shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies.  After the Effective Date, all directors, officers, managers, authorized agents or employees of the Debtors (or their Affiliates) who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any applicable D&O Liability Insurance Policies for the full term of such policies, including but not limited to any extension of coverage after the end of such policy period if any extended reporting period has been purchased, in accordance with the terms thereof.

The Debtors shall maintain tail coverage for any current D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the current D&O Liability Insurance Policies.

Each of the Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (ii) such Insurance Policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall vest in the Reorganized Debtors or the Wind-Down Debtors, as applicable.

The Litigation Trust or GUC Sub-Trust(s) shall be responsible for monitoring and preserving the ability to maintain claims that are Assigned Claims or Assigned Insurance Rights against the Insurance Policies (except for (a) the Debtors' Unassigned Insurance Policies and (b) the Unassigned Insurance Rights), including the D&O Liability Insurance Policies. To the extent the Debtors are not the first named insured under any Insurance Policy and notwithstanding Confirmation of the Plan or the occurrence of the Effective Date (i) nothing herein shall constitute a rejection of such Insurance Policy, (ii) such Insurance Policy shall remain in full force and effect, and (iii) any and all rights of the Debtors under such Insurance Policy shall remain in full force and effect. For the avoidance of doubt, the dissolution of the Debtors or the Reorganized Debtors shall have no impact upon the rights of the Litigation Trust or GUC Sub-Trust(s) to assert the Assigned Insurance Rights or Assigned Claims.

After the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, and the Litigation Trust, the GUC Sub-Trust(s), and any successor or assign of the Litigation Trust or the GUC Sub-Trust(s) shall not terminate the coverage under any D&O Liability Insurance Policies (including the "tail policy") in effect prior to the Effective Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy in accordance with and subject in all respects to the terms and conditions of any applicable D&O Liability Insurance Policy, which shall not be altered, for the full term of such D&O Liability Insurance Policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

For the avoidance of doubt, nothing herein shall in any way impair the Litigation Trust's or GUC Sub-Trust's ability on and after the Effective Date to assert on behalf of the Debtors or Reorganized Debtors, as applicable, any Assigned Claims or any Assigned Insurance Rights, on account of such Assigned Claims or such Assigned Insurance Rights, which shall not be altered except as otherwise provided herein. Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement the Insurance Policies, with the reasonable consent and cooperation of the Litigation Trust or GUC Sub-Trust(s) and as the Debtors and the Litigation Trust or GUC Sub-Trust(s) deem necessary (except with respect to the Unassigned Insurance Policies, for which no consent is required).

F.      *Indemnification Provisions.*

All Indemnification Provisions, consistent with applicable law, currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of each of the Debtors, as applicable, shall be Reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of the Debtors than the Indemnification Provisions in place prior to the Effective Date. For the avoidance of doubt, Indemnification Provisions shall be Reinstated for any Excluded Party.

G.      *D&O Liability Insurance Policies.*

Each of the Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, pursuant to section 365 of the Bankruptcy Code or otherwise, subject to the Debtors' rights to seek amendment to such Insurance Policies and (ii) such Insurance Policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall vest in the Reorganized Debtors or the Wind-Down Debtors, as applicable. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of

79

each of the Insurance Policies of the Debtors, including each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the Insurance Policies, including D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

The Debtors shall maintain tail coverage under any D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the D&O Liability Insurance Policies. In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

For the avoidance of doubt, nothing herein shall in any way impair the Litigation Trust's ability on and after the Effective Date to assert on behalf of the Debtors or Reorganized Debtors, as applicable, any Assigned Claims or any Assigned Insurance Rights, on account of such Assigned Claims or such Assigned Insurance Rights, subject to the terms and conditions of the applicable Insurance Policies, including the D&O Liability Insurance Policies, which shall not be altered. Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement the Insurance Policies, including the D&O Liability Insurance Policies, as the Debtors and Reorganized Debtors, as applicable, deem necessary.

> H.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, a Sale Order, or the Purchase Agreement(s), each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including easements, reciprocal easement agreements, construction operating and reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

> I.    *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Contracts and Unexpired Leases, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan or a Sale Order. Following the expiration of the Designation Rights Period, as applicable, the Debtors may not subsequently reject any Unexpired Lease previously designated as assumed or assumed and assigned and may not assume or assume and assign an Unexpired Lease previously designated as rejected on the Schedule of Assumed Contracts and Unexpired Leases absent the consent of the applicable lessor or order of the Bankruptcy Court. A final and timely designation with respect to all Unexpired Leases of nonresidential real property will be made in accordance with <u>Article V.A</u> of this Plan.

> J.    *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4)(B)(ii) of the Bankruptcy Code.

K.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor (but excluding any contracts or leases assigned to a Purchaser in accordance with a Purchase Agreement), will be performed by the applicable Debtor or, after the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases but excluding any Executory Contracts or Unexpired Leases that have been rejected as of the date of entry of the Confirmation Order) will survive and remain unaffected by entry of the Confirmation Order.

L.      *Sale Order Assignment Procedures.*

Nothing contained in the Plan or the Confirmation Order constitutes or shall be construed as any modification or amendment of a Sale Order or the Assignment Procedures attached thereto, in the event of a Sale Transaction Restructuring or an Other Asset Sale.

**ARTICLE VI**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter, (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter) each Holder of an Allowed Claim or Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in <u>Article IX</u> hereof.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this <u>Article VI</u>; *provided, however*, and notwithstanding anything to the contrary in the Plan, including in this <u>Article VI</u>, the Plan Supplement, or the Confirmation Order, that the GUC Equity Pool shall be contributed to the GUC Equity Trust and the GUC Equity Trust Interests shall be distributed in accordance with the GUC Equity Trust Agreement, subject to the terms of the UCC / TCC Recovery Allocation Agreement.

B.      *Distributions on Account of Obligations of Multiple Debtors.*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan, *provided* that Claims held by a single Entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor.  Any such Claims shall be released pursuant to <u>Article X</u> of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this Article VI.

C.      *Distributions Generally.*

Except as otherwise provided herein, distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors, or the Wind-Down Debtors, as applicable; *provided, however,* that the costs and expenses associated with the Litigation Trust, any GUC Sub-Trust, and the GUC Equity Trust shall be the responsibility of the applicable trust, as and to the extent agreed in the Committee Settlement.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, the GUC Equity Trust Documents, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this Article VI.

Notwithstanding any provision of the Plan to the contrary, distributions to Holders of DIP Claims shall be made to or at the direction of the applicable DIP Agent and distributions to Holders of ABL Facility Claims and FILO Term Loan Facility Claims shall be made to or at the direction of the Prepetition Agent, as applicable, each of which shall act as Disbursing Agent for distributions to the respective Holders of ABL Facility Claims and FILO Term Loan Facility Claims, as applicable, in each case, at the sole expense of the Debtors or the Reorganized Debtors or the Wind-Down Debtors, as applicable.  The Prepetition Agent shall arrange to deliver such distributions to or on behalf of such Holders of ABL Facility Claims and FILO Term Loan Facility Claims.  The Trustees may establish their own record dates for distribution in accordance with the Plan and each applicable indenture, and shall, to the extent possible, transfer or direct the transfer of such distributions through the facilities of DTC, as set forth in the following paragraph. The Trustees shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall use commercially reasonable efforts to (i) seek the cooperation of DTC with respect to effectuating distributions and the cancellation of the Notes as of the Effective Date, and (ii) seek the cooperation of the relevant bank and broker participants in the DTC system to facilitate delivery of the distribution directly to the relevant beneficial owners as soon as practicable after the Effective Date.  None of the DIP Agent, the Prepetition Agent, the Trustees shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

Notwithstanding any provision of the Plan to the contrary, distributions to Holders of Senior Secured Notes Claims shall be made to or at the direction of the Senior Secured Notes Trustees and distributions to Holders of Unsecured Notes Claims shall be made to or at the direction of the Unsecured Notes Trustees, each of which shall act as Disbursing Agent for distributions to the respective Holders of Senior Secured Notes Claims and Unsecured Notes Claims, as applicable, in each case, at the sole expense of the Debtors or the Reorganized Debtors or the Wind-Down Debtors, as applicable.  The Senior Secured Notes Trustees and the Unsecured Notes Trustees, as applicable, shall arrange to deliver such distributions to or on behalf of such Holders of Senior Secured Notes Claims and Unsecured Notes Claims, subject in all respects to any rights of the Senior Secured Notes Trustees to assert their respective charging Liens as set forth in the Senior Secured Notes Indentures.  The Senior Secured Notes Trustees and the Unsecured Notes Trustees, as applicable, may, but are not required to, establish their own record date for distribution and shall transfer or direct the transfer of such distributions through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), to the extent possible.  All distributions to be made to Holders of Senior Secured Notes Claims and Unsecured Notes Claims through DTC and as provided for under the applicable indenture shall be made eligible for distribution through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Senior Secured Notes Trustees or the Unsecured Notes Trustees be responsible for making, or be required to make, any distribution under the Plan to Holders of Allowed Senior Secured Notes Claims or Unsecured Notes Claims if such distribution is not eligible to be distributed through the facilities of DTC.

1.      <u>Powers of the Disbursing Agent.</u>

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ Professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred On or After the Effective Date.</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement Claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors, or from the Wind-Down Reserve, as applicable.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      <u>Delivery of Distributions.</u>

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records or the register or related document maintained by, as applicable, the DIP Agents as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the reasonable discretion of the Disbursing Agent; *provided further* that the address for each Holder of an Allowed Claim or Interest shall be deemed to be the address set forth in, as applicable, any Proof of Claim or Interest Filed by such Holder, or, if no Proof of Claim or Interest has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder may be aggregated into one Claim and one distribution may be made with respect to the aggregated Claim.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this Article VI.

2.      <u>Minimum Distributions.</u>

No fractional interests in New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of New Common Stock that is not a whole number, the actual distribution of New Common Stock shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.  For distribution purposes (including rounding), DTC will be treated as a single Holder.

No Cash payment of less than $100.00 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

3.      <u>Undeliverable Distributions and Unclaimed Property.</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of twelve months from the Effective Date.  After such date, in the event of a Sale Transaction Restructuring, all unclaimed property or interests in property

shall revert to the Wind-Down Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property Laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be released and forever barred.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this <u>Article VI</u>.

A distribution shall be deemed unclaimed if a Holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors or the Wind-Down Debtors, as applicable, of an intent to accept a particular distribution; (c) responded to the Debtors', Reorganized Debtors' or Wind-Down Debtors' requests, as applicable, for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

E.      *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in the applicable agreements.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this <u>Article VI</u>.

F.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this <u>Article VI</u>.

G.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this <u>Article VI</u>.

H.       *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Petition Date.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this <u>Article VI</u>.

I.       *Setoffs and Recoupment.*

Except as expressly provided in this Plan, the Wind-Down Debtors may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or its successor of any and all claims, rights, and Causes of Action that such Debtor or its successor may possess against the applicable Holder.

J.       *Claims Paid or Payable by Third Parties.*

1.       <u>Claims Paid by Third Parties.</u>

To the extent that the Holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor or Wind-Down Debtor, such Holder shall be barred from asserting such Claim against the Debtors and precluded from voting on any plans of reorganization Filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such Claims in these Chapter 11 Cases.  The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any Claims Filed with respect to an Executory Contract or Unexpired Lease that received payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or a Wind-Down Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or a Wind-Down Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor or Wind-Down Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this <u>Article VI</u>.

2.       <u>Claims Payable by Third Parties.</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove the applicable portion of such Claim.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this Article VI.

3.    Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Notwithstanding anything herein to the contrary (including, without limitation, Article X), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, the GUC Equity Trust Documents, and the GUC Sub-Trust Documents, as applicable, and shall not be subject to this Article VI.

K.    *Co-Defendant Defensive Rights*

Except with respect to Indemnification Rights, the Insurer Injunction set forth in Article X.H or clause (ii) of the penultimate sentence of this Article VI.K, notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, nothing will release, bar, enjoin, impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve or enhance any Co-Defendant Defensive Rights of any Holder of a Co-Defendant Claim as such rights exist or might in the future exist under applicable non-bankruptcy law.  Further, except as provided below, nothing in the Plan, any of the Definitive Documents or in the Confirmation Order shall preclude, operate to or have the effect of, impairing any Holder of a Co-Defendant Claim from asserting in any proceeding any and all Co-Defendant Defensive Rights that it has or may have under applicable law.  Further, except as provided above, nothing in the Plan, any of the Definitive Documents or the Confirmation Order shall be deemed to waive any Co-Defendant Defensive Rights, and further, except as provided above, nothing in the Chapter 11 Cases, the Plan, any of the Definitive Documents or the Confirmation Order may be used as evidence of any determination regarding any Co-Defendant Defensive Rights, and, except as provided above, under no circumstances shall any Person be permitted to assert issue preclusion or claim preclusion, waiver, estoppel, or consent in response to the assertion of any Co-Defendant Defensive Rights.  This provision shall be included in the Confirmation Order.  Except with respect to Indemnification Rights, Co-Defendant Defensive Rights (i) may be used to offset, set off, recoup, allocate or apportion fault, liability, or damages, or seek judgment reduction or otherwise to defend against any Cause of Action or Claim brought by any Person against the Holder of any Co-Defendant Claim based in whole or in part on Opioid-Related Activities; and (ii) shall in no case be used to seek any affirmative monetary recovery from any Protected Party or any asset of any Protected Party (including from any applicable Insurance Policy of a Protected Party) on account of any Claim or Cause of Action released pursuant to Article X.  Nothing in this paragraph shall impair, limit, or restrict the discharge, release, injunction, and exculpation provisions in the Plan as to the Debtors or the Reorganized Debtors.

**ARTICLE VII**
**THE PLAN ADMINISTRATOR**

This Article VII shall apply to a Sale Transaction Restructuring.

A.    *The Plan Administrator.*

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the amounts set forth in the Administrative / Priority Claims Reserve and the Wind-Down Reserve in accordance with the Plan, and wind-down the business and affairs of the Debtors and Wind-Down Debtors, including (all without further order of the Bankruptcy Court):  (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors, the Administrative / Priority Claims Reserve, and the Wind-Down Reserve; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Administrative / Priority Claims Reserve and the Wind-Down Reserve; (3) making distributions from the Administrative / Priority Claims Reserve and the Wind-Down

Reserve as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (8) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (9) complying with the Debtors' continuing obligations under a Sale Order and Purchase Agreement; and (10) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind-Down Reserve.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Purchasers, the Wind-Down Debtors, and the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, to be chosen by the Purchasers, with the consent of the Debtors (and the Required AHG Noteholders, not to be unreasonably withheld). Upon any other vacancy of the Plan Administrator, a permanent or interim successor Plan Administrator shall be chosen by the Wind-Down Debtors. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

      1.      <u>Plan Administrator Rights and Powers.</u>

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down Reserve, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

      2.      <u>Retention of Professionals.</u>

The Plan Administrator shall have the right, subject to the Wind-Down Reserve, to retain the services of attorneys, accountants, and other Professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such Professionals shall be paid by the Wind-Down Debtors from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator to the extent set forth in the Wind-Down Reserve. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

      3.      <u>Compensation of the Plan Administrator.</u>

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement and paid out of the Wind-Down Reserve. Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder.

      4.      <u>Plan Administrator Expenses.</u>

All costs, expenses and obligations incurred by the Plan Administrator in administering this Plan, the Wind-Down Debtors, or in any manner connected, incidental or related thereto, in effecting distributions from the Wind-Down Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid in accordance with the Wind-Down Budget. Such costs, expenses and obligations shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

B.      *Wind-Down.*

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind-down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) cause the Debtors and the Wind-Down Debtors, as applicable, to comply with, and abide by, the terms of the Plan, Confirmation Order, the Purchase Agreement(s), the Sale Order, and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Debtor. From and after the Effective Date, except with respect to Wind-Down Debtors as set forth herein, the Debtors (a) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (b) shall be deemed to have canceled pursuant to this Plan all Interests, and (c) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

C.      *Exculpation, Indemnification, Insurance & Liability Limitation.*

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

D.      *Tax Returns.*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

## ARTICLE VIII
## RESERVES ADMINISTERED BY THE PLAN ADMINISTRATOR

This <u>Article V.III</u> shall apply to a Sale Transaction Restructuring.

A.      *Establishment of Reserve Accounts.*

The Plan Administrator shall establish each of the Administrative / Priority Claims Reserve and the Wind-Down Reserve (which may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Plan Administrator).  The Wind-Down Reserve shall be funded in the amount set forth in the Wind-Down Budget.

B.      *Undeliverable Distribution Reserve.*

1.      Deposits.

If a distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VIII.B..2 of this Plan.

2.      Forfeiture.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an undeliverable or unclaimed distribution within twelve months after the first distribution is made to such Holder shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such Claim for the undeliverable or unclaimed distribution against any Debtor, any Estate, the Plan Administrator, the Wind-Down Debtors, or their respective properties or assets.  In such cases, any Cash or other property held by the Wind-Down Debtors in the Undeliverable Distribution Reserve for distribution on account of such Claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become the property of the Wind-Down Debtors, notwithstanding any federal or state escheat Laws to the contrary, and shall promptly be transferred to the Wind-Down Reserve to be distributed according to the priority set forth in Article VIII.C without any further action or order of the Court.

3.      Disclaimer.

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to attempt to locate any Claim Holder; *provided* that in his or her sole discretion, the Plan Administrator may periodically publish notice of unclaimed distributions.

4.      Distribution from Reserve.

Within 15 Business Days after the Holder of an Allowed Claim satisfies the requirements of this Plan, such that the distribution(s) attributable to its Claim is no longer an undeliverable or unclaimed distribution (provided that satisfaction occurs within the time limits set forth in Article VIII.B of this Plan), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the undeliverable or unclaimed distribution attributable to such Claim.

C.      *Wind-Down Reserve.*

On the Effective Date, the Wind-Down Debtors shall establish the Wind-Down Reserve by depositing Cash, in the amount set forth in the Wind-Down Budget into the Wind-Down Reserve.  The Wind-Down Reserve shall be used by the Wind-Down Debtors solely to satisfy the expenses of the Wind-Down Debtors and the Plan Administrator as set forth in the Plan and Wind-Down Budget; *provided* that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents of the Wind-Down Debtors (and excluding, for the avoidance of doubt, records and documents related to any Acquired Assets or Assumed Liabilities) shall constitute expenses of the Wind-Down Debtors and shall be paid from the Wind-Down Reserve to the extent set forth in the Wind-Down Budget.  Any amount remaining in the Wind-Down Reserve after the dissolution of the Wind-Down

Debtors shall be distributed pursuant to the Waterfall Recovery. In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

> D.      *Administrative / Priority Claims Reserve.*

On the Effective Date, the Wind-Down Debtors shall establish the Administrative / Priority Claims Reserve by depositing Cash in the amount of the Administrative / Priority Claims Reserve Amount into the Administrative / Priority Claims Reserve (and the Plan Administrator shall deposit Cash into or withdraw Cash from the Administrative / Priority Claims Reserve if the Administrative / Priority Claims Reserve Amount changes at any time). The Administrative / Priority Claims Reserve Amount shall be used to pay Holders of all Allowed Priority Claims, Allowed Other Priority Claims, Allowed Administrative Claims (other than Professional Fee Claims or DIP Claims), Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Secured Claims in full; *provided, however*, for the avoidance of doubt, that, in the event of a Sale Transaction Restructuring, any such Allowed Priority Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, or other Allowed Other Secured Claims that are Assumed Liabilities shall be satisfied under the Purchase Agreement(s) and shall not be satisfied from the Administrative / Priority Claims Reserve.

If all or any portion of any such Claim shall become a Claim that is not Allowed, then the amount on deposit in the Administrative / Priority Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Administrative / Priority Claims Reserve, shall remain in the Administrative / Priority Claims Reserve to the extent that the Wind-Down Debtors determine necessary to ensure that the Cash remaining in the Administrative / Priority Claims Reserve is sufficient to ensure that all Allowed Priority Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, or other Allowed Other Secured Claims (that are not Assumed Liabilities) will be paid in accordance with the Plan without any further action or order of the Court. Any amounts remaining in the Administrative / Priority Claims Reserve after payment of all Allowed Priority Claims, Allowed Administrative Claims, Allowed Other Priority Tax Claims, Allowed Secured Tax Claims, or other Allowed Other Secured Claims (or any amount in excess of that reasonably needed to be reserved for any Disputed Claims) shall promptly be transferred to the Wind-Down Reserve until such time the Wind-Down Debtors are dissolved in accordance with the provisions herein.

## ARTICLE IX
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

> A.      *Disputed Claims Process*

The Debtors, the Reorganized Debtors, or the Wind-Down Debtors (as applicable), and the Litigation Trust (solely with respect to General Unsecured Claims), or GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed and (ii) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan. Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of: (a) the Effective Date or (b) the applicable Claims Bar Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor, Reorganized Debtor, Wind-Down Debtor, or GUC Equity Trust, as applicable, without the need for any objection by the Debtor, Reorganized Debtor, Wind-Down Debtor, or GUC Equity Trust, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, and notwithstanding anything in this Article IX to the contrary, the Litigation Trust (with respect to General Unsecured Claims) or GUC Sub-Trust (with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

> B.      *Allowance of Claims.*

After the Effective Date, subject to Article IV.R, the Reorganized Debtors, the Litigation Trust (solely with respect to General Unsecured Claims), the GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust), or the Wind-Down Debtors, as applicable, shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date except

for such rights and defenses assigned or transferred to the Senior Secured Noteholders or their Designee(s) in accordance with the Plan, in the event of a Plan Restructuring, or in accordance with the Purchase Agreement(s) in the event of a Credit Bid Transaction (which, for the avoidance of doubt, shall include all rights and defenses of the Debtors with respect to any Claims that constitute Assumed Liabilities (as defined in the Purchase Agreement), which the Purchaser shall have and retain).

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by the Plan or pursuant to the Litigation Trust Documents or a Final Order is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

For the avoidance of doubt, and notwithstanding anything in this <u>Article IX</u> to the contrary, the Litigation Trust (with respect to General Unsecured Claims) or GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

C.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors, the Reorganized Debtors, the Litigation Trust, or the Wind-Down Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor, Reorganized Debtor, Wind-Down Debtor, or Litigation Trust (solely with respect to General Unsecured Claims), as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 14 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court. For the avoidance of doubt, this <u>Article IXC</u> shall not apply with respect to General Unsecured Claims, which may be estimated and Allowed in the applicable amounts pursuant to the applicable Litigation Trust Documents, or as otherwise set forth herein, and shall not be subject to estimation by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors, the Litigation Trust (solely with respect to General Unsecured Claims) or the Wind-Down Debtors, as applicable, without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim against or Interest in the same Debtor or another Debtor may be adjusted or expunged on the Claims Register by the Reorganized Debtors, the Litigation Trust (solely with respect to General Unsecured Claims) or the Wind-Down Debtors, as applicable, without the applicable Reorganized Debtor or the Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, and notwithstanding anything in this <u>Article IX</u> to the contrary, the Litigation Trust (with respect to General Unsecured Claims) or GUC

Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

      E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed by the Debtors, the Reorganized Debtors, the Wind-Down Debtors, the Litigation Trust, as applicable, on or before the Claims Objection Deadline, as such deadline may be extended from time to time. For the avoidance of doubt, and notwithstanding anything in this <u>Article IX</u> to the contrary, the Litigation Trust (with respect to General Unsecured Claims) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

      F.      *Disallowance of Claims or Interests.*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors or the Wind-Down Debtors, as applicable. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Subject to the terms of the Bar Date Order, if a Proof of Claim is not received by the Claims and Noticing Agent on or before the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, the Holder of the underlying Claim shall be barred from asserting such Claim against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such Claims in these Chapter 11 Cases. Subject to the terms of the Bar Date Order, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any claims not received by the Claims and Noticing Agent before the Claims Bar Date or the Administrative Claims Bar Date, as applicable;** *provided* **that the Debtors will provide notice to such claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such claimant that its Claim will be removed from the Claims Register as a result of being untimely filed;** *provided, further,* **that governmental Entities, including states, local governments and municipalities or native American tribes shall not be required to File Proofs of Claim related to any Tort Claims and the Allowance or Disallowance of Tort Claims held by those Entities shall be governed in all respects by the applicable Litigation Trust Documents.**

For the avoidance of doubt, and notwithstanding anything in this <u>Article IX</u> to the contrary, the Litigation Trust (with respect to General Unsecured Claims) or GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

      G.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Disputed Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Interest; *provided* that if the Allowed amount of a Claim or Interest is Disputed, but not the existence or nature of such Claim, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount. For the avoidance of doubt, and notwithstanding anything in this <u>Article IX</u> to the contrary, the Litigation Trust (with respect to General Unsecured Claims) GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

H.      *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.  For the avoidance of doubt, and notwithstanding anything in this Article IX to the contrary, the Litigation Trust (with respect to General Unsecured Claims) GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

I.      *Tax Treatment of Reserves for Disputed Claims.*

After the Effective Date, Cash may be distributed to Holders of Claims ultimately determined to be Allowed after the Effective Date (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III hereof.  Pending the resolution of such Claims, a portion of the Cash to be received by Holders of such Claims may be held back and deposited into the Wind-Down Reserve as described further in Article IV.I.2, and to the extent that any property is deposited into such a reserve, the reserve is expected to be subject to "disputed ownership fund" treatment under section 1.468B-9 of the United States Treasury Regulations.

J.      *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim; *provided* that interest on any Disputed Priority Tax Claim that (i) becomes an Allowed Priority Tax Claim and (ii) is treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code shall accrue and be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

K.      *Amendments to Claims.*

Except as otherwise expressly provided for in the Plan or the Confirmation Order, on or after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, a Claim may not be Filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, the Litigation Trust, as applicable (solely with respect to General Unsecured Claims) or a GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust), or the Wind-Down Debtors, as applicable.  Absent such authorization, any new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.  For the avoidance of doubt, and notwithstanding anything in this Article IX to the contrary, the Litigation Trust (GUC Sub-Trust with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

# ARTICLE X
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Settlement, Compromise, and Release of Claims and Interests.*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, the assets of the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, are being and shall be used for the satisfaction of expense obligations and/or the payment of Claims only in the manner set forth in the Plan and shall not be available for any other purpose. Except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, compromise, and release, effective as of the Effective Date, of Claims, including General Unsecured Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors or the Wind-Down Debtors, as applicable), Interests, controversies, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date (including any Causes of Action or Claims based on theories or allegations of successor liability), any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. Therefore, notwithstanding anything in section 1141(d)(3) to the contrary, all Persons or Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Chapter 11 Cases, that occurred prior to the Effective Date, other than as expressly provided in the Plan, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan. The Confirmation Order shall be a judicial determination of the settlement, discharge, compromise, and release of all Claims and Interests subject to the occurrence of the Effective Date.

Notwithstanding anything herein to the contrary, and for the avoidance of doubt, the Debtors, and/or the Wind-Down Debtors, as applicable, shall not be released from liability for any Tort Claims; *provided*, *however*, that any recovery from any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets and shall in no circumstances extend to the Reorganized Debtors, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.

B.      *Release of Liens.*

**On the Effective Date, concurrently with the Consummation of the Restructuring Transaction and except as otherwise set forth in the Purchase Agreement, as applicable, the Retail Acquired Assets shall be transferred to and vest in New Rite Aid free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Purchase Agreement(s), each as applicable. Without limiting the foregoing, except as otherwise provided in the Purchase Agreement(s), the Plan, the Plan Supplement, the Exit Facilities Documents, the Takeback Notes Documents, the MedImpact NewCo Notes Documentation (if applicable), the AHG Notes Documentation, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in**

full of the portion of the Other Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with <u>Article III</u> hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases, and the Debtors and their successors and assigns shall be authorized to file and record such terminations or releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. Notwithstanding anything to the contrary in the Plan, the Liens securing the DIP Claims shall not be released and such Liens shall remain in full force and effect until the DIP Claims are paid in full in Cash or otherwise treated in a manner consistent with <u>Article II.E</u> of the Plan.

  *C.*  *Debtor Release.*

  [Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates and, if applicable, the Wind-Down Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, or through, for, or because of, the foregoing Entities, from any and all claims and Causes of Action, including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, and the Wind-Down Debtors (if applicable), whether liquidated or unliquidated, fixed or contingent, accrued or unaccrued, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in Law, equity, contract, tort, or under federal or state statutory of common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, their Estates, and the Wind-Down Debtors (if applicable), or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), or the Estates, the Chapter 11 Cases, the Restructuring Transactions, their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the pursuit of the Restructuring Transaction, the Committee Settlement, the Committee Settlement Documents, the UCC / TCC Recovery Allocation Agreement, the AHG New-Money Commitment Agreement, the MedImpact Term Loan Backstop Commitment Agreement, the MedImpact Term Loan Rights Offering, the MedImpact Term Loan Rights Offering Procedures, the MedImpact Term Loan Sales Process, the administration and implementation of the Plan equitization (if applicable) or the Wind-Down (if applicable), the restructuring of any Claim or Interest before or during the Chapter 11 Cases, in all cases upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. For the avoidance of doubt, nothing contained in this Plan, including this <u>Article X.C</u>, shall release, compromise, impair, or in any way affect any Assigned Claims, Assigned Insurance Rights or Tort Claims Insurance Proceeds and no Assigned Claims against any Excluded Parties shall be released; *provided, further*, that nothing in this Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, any Assigned Claim against any Excluded Parties or any claims or Causes of Action arising out of,

or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this <u>Article X .C</u> by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this <u>Article X.C</u> is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good-faith settlement and compromise of the claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; (vi) a sound exercise of the Debtors' business judgment; and (vii) a bar to any of the Debtors or their respective Estates or, if applicable, the Reorganized Debtors or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.]

D.     *Third-Party Release.*

[Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in Law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them, including any derivative claims asserted or assertable on behalf of any of the Debtors, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the pursuit of the Restructuring Transaction, the Committee Settlement, the Committee Settlement Documents, the UCC / TCC Recovery Allocation Agreement, the AHG New-Money Commitment Agreement, the MedImpact Term Loan Backstop Commitment Agreement, the MedImpact Term Loan Rights Offering, the MedImpact Term Loan Rights Offering Procedures, the MedImpact Term Loan Sales Process, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the administration and implementation of the Plan Restructuring (if applicable) and the Wind-Down (if applicable), in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; *provided, that,* notwithstanding anything in this Plan, the Plan Supplement or the Confirmation Order to the contrary, the Debtors and/or the Wind-Down Debtors, as applicable, shall not be released from liability for any Tort Claims; *provided, however,* that any recovery from any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets, and shall in no circumstances extend to the Reorganized Debtors, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.  For the avoidance of doubt, nothing contained in this Plan, including this <u>Article X.D</u>, shall release, compromise, impair, or in any way affect any Assigned Claims, Assigned Insurance Rights, or Tort Claims

Insurance Proceeds and no Assigned Claims against any Excluded Parties shall be released; *provided, further*, that nothing in this Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, Assigned Claims against any Excluded Parties or any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article X.D, which include by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article X.D is: (i) consensual; (ii) given in exchange for the good and valuable consideration provided by the Released Parties; (iii) a good-faith settlement and compromise of such claims and Causes of Action; (iv) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (v) fair, equitable, and reasonable; (vi) given and made after due notice and opportunity for hearing; (vii) a sound exercise of the Debtors' business judgment; and (viii) a bar to any of the Releasing Parties or the Debtors or their respective Estates or, if applicable, the Reorganized Debtors or the Wind-Down Debtors, asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Without limiting the foregoing, from and after the Effective Date, any Entity that is given the opportunity to opt out of the releases contained in this Article X.D in accordance with this Plan and does not exercise such opt out may not assert any Claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Reorganized Debtors. From and after the Effective Date, any Entity that opted out of (or otherwise did not participate in) the releases contained in this Article X.D in accordance with this Plan may not assert any Claim or other Cause of Action against any Released Party for which it is asserted or implied that such Claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such Claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Released Party. For the avoidance of doubt, the terms of this paragraph shall not apply to the Plan Administrator. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying Claim or Cause of Action.[10] Notwithstanding anything herein to the contrary, and for the avoidance of doubt, the Debtors shall not be released from liability for any Tort Claims; *provided, however*, that any recovery from any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets and shall in no circumstances extend to the Reorganized Debtors or the Wind-Down Debtors, and no Person, Entity, or other party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets and the GUC Equity Pool, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.

For the avoidance of doubt and notwithstanding anything to the contrary herein, in the Plan Supplement, the Confirmation Order or otherwise, any recovery on behalf of claims or Causes of Action (if any) contributed to the Litigation Trust or a GUC Sub-Trust against any officer or director of Rite Aid or any of its directors or officers not released by the Debtors in accordance with this Plan (including those not included in the definition of Debtor Related Parties) shall be expressly limited to proceeds of the applicable Insurance Policies, and no Person, Entity, or otherwise shall attempt to collect on assets of any officer or director of Rite Aid or any of its directors or officers not released by the Debtors in accordance with the provisions of this Plan (including those not included in the definition of Debtor Related Parties), except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such

---

[10]    The Solicitation Materials will not include a form or mechanism for Holders of Claims or Interests to Opt-Out of the Third-Party Release. Solicitation of Opt-Out Elections will occur after Confirmation of the Plan, pursuant to the Confirmation Order or separate Court order and will not occur pursuant to the Solicitation Materials; provided, that for the avoidance of doubt, such solicitation will be completed prior to the Effective Date. of the Plan. The forms for the Opt-Out Election will be incorporated in the Plan Supplement, and will be filed with sufficient notice in advance of the Combined Hearing.

liability, and all such directors and officers shall have the full protections of any existing D&O Liability Insurance Policies.]

       E.      *Exculpation.*

[Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any claim or Cause of Action for any act or omission arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims or Causes of Action in each case arising out of or related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided, however*, that no Person or Entity that is not an Exculpated Party shall be entitled to rely on the exculpation provided for in this Article X.E, including by asserting this Article X.E as a defense or the basis for a claim or Cause of Action in its own name (whether directly or derivatively, and, whether or not in the capacity as a subrogee, assignee, or successor to an Exculpated Party, except to the extent that such relation renders such Person or Entity an Exculpated Party in its own right). For the avoidance of doubt, nothing contained in this Plan, including this Article X.E, shall release, compromise, impair, or in any way affect any Assigned Claims, Assigned Insurance Rights, or Tort Claims Insurance Proceeds and no Excluded Party shall be exculpated for any Assigned Claims; *provided, further*, that nothing in this Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, Claims or Causes of Action against any Excluded Parties or any claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

For the avoidance of doubt, the Committees, each of their members, and the advisors to the Committees' and their members shall be Exculpated Parties and shall be exculpated for any Claims or Causes of Action associated with the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Committee Settlement, the Settlement of Tort Claims, the UCC / TCC Recovery Allocation Agreement, or any of the Committee Settlement Documents.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The exculpation will be in addition to, and not a limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability; *provided*, *however*, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under the Plan or any document, instrument, or agreement (including

those set forth in the Plan Supplement) executed to implement the Plan (including any Purchase Agreement and any documents in connection therewith).]

F.    *Injunction.*

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article X.C of the Plan, released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan (including the release of Liens pursuant to Article X.B of the Plan), or are subject to exculpation pursuant to Article X.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind-Down Debtors (or their Affiliates) (if applicable), the GUC Equity Trust, the Litigation Trust, the Exculpated Parties, or the Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.  For the avoidance of doubt, nothing contained in this Plan, including this Article X.F, shall release, compromise, impair, or in any way affect any Assigned Claims.  This Article X.F shall not apply to Tort Claims, which shall be subject to Article XG of the Plan.

No Person or Entity may commence or pursue a claim or Cause of Action of any kind against the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind-Down Debtors (or their Affiliates) (if applicable), the GUC Equity Trust (with respect to General Unsecured Claims), the Litigation Trust (with respect to General Unsecured Claims), the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a claim or Cause of Action subject to Article X.C, Article X.D, or Article X.E hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Debtor (or their Affiliates), Reorganized Debtor (or their Affiliates), Wind-Down Debtor (or their Affiliates), GUC Equity Trust, Litigation Trust, Exculpated Party, or Released Party.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article X.F of the Plan.

For the avoidance of doubt and notwithstanding section 1141(d)(3) of the Bankruptcy Code, as of the Effective Date, except as otherwise specifically provided in the Plan and Sale Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors (or their Affiliates), the Estates, the Purchaser, or, if applicable, the Reorganized Debtors (or their Affiliates) or the Wind-Down Debtors (or their Affiliates), except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Reorganized Debtors or the Wind-Down Debtors, as applicable, or otherwise contemplated under the Sale Order.  Such injunction will not enjoin Persons or Entities that

do not consent to the Third-Party Release from pursuing any direct (but not derivative) claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, the Purchaser, the Reorganized Debtors (if applicable), or the Wind-Down Debtors (if applicable).

G.      *Channeling Injunction.*

1.      Terms.

Pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons or Entities that have held or asserted or that hold or assert any Tort Claim shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of, on or with respect to any Tort Claim from or against any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates), including:

(i)     commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Tort Claims, against, or affecting any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates), or any property or interests in property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims;

(ii)    enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) or against the property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims;

(iii)   creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) or the property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates), or against the property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims; and

(v)     taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Definitive Documents, with respect to any Tort Claims.

2.      Reservations.

Notwithstanding anything to the contrary in this Article X.G or the Confirmation Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:

(i)     the rights of Holders of Tort Claims to the treatment afforded them under the Plan and the Definitive Documents, including the rights of Holders of Tort Claims to assert such Tort Claims in accordance with the Plan and the Litigation Trust Documents;

(ii)    the rights of Persons to assert any claim, debt, litigation, or liability for payment of expenses against the Litigation Trust and/or any GUC Sub-Trust as provided in the Litigation Trust Documents;

(iii)   the rights of the Litigation Trust and/or GUC Sub-Trust to pursue, litigate, collect on and enforce Assigned Insurance Rights and the Assigned Claims in accordance with the terms of the Plan;

(iv)    the Litigation Trust and/or any GUC Sub-Trust from enforcing its rights, on behalf of itself, against the Debtors or the Reorganized Debtors in accordance with the terms of the Plan; or

(v) the Litigation Trustee(s) and/or any GUC Sub-Trust Trustee(s) from assigning and/or transferring the Assigned Insurance Rights for Tort Claims to Holders of Allowed Tort Claims subject to reasonable restrictions so as not to interfere with, in-crease costs to, or impede the efforts of, the Litigation Trust and/or any GUC Sub-Trust, as further described in the Litigation Trust Documents, provided, however, that any such assignee or transferee shall remain subject to the terms and conditions of this Plan and the Confirmation.

3.    <u>Modifications.</u>

There can be no modification, dissolution or termination of this Channeling Injunction, which shall be a permanent injunction.

4.    <u>Non-Limitation of Channeling Injunction.</u>

Except as expressly set forth in paragraph (2) of this <u>Article X.G</u>, nothing in the Plan or the Litigation Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of this Channeling Injunction issued in connection with the Plan.

5.    <u>Bankruptcy Rule 3016 Compliance.</u>

The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

*H.    Insurer Injunction.*

1.    <u>Terms.</u>

In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted or that hold or assert any claim based on, arising under or attributable to an Insurance Policy (excluding (a) the Unassigned Insurance Policies and (b) the Unassigned Insurance Rights) shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such claim based on, arising under or attributable to such Insurance Policy from or against any insurer, including:

(i) commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any insurer, or against the property of any insurer, on account of any claim based on, arising under or attributable to an Insurance Policy;

(ii) enforcing, attaching, levying, collecting, or otherwise recovering, by any manner or means, any judgment, award, decree, or other order against any insurer, or against the property of any insurer, on account of any claim based on, arising under or attributable to an Insurance Policy;

(iii) creating, perfecting or enforcing in any manner any Lien of any kind against any insurer, or against the property of any insurer, on account of any claim based on, arising under or attributable to an Insurance Policy;

(iv) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any insurer, or against the property of any insurer, on account of any claim based on, arising under or attributable to an Insurance Policy; and

(v) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any claim based on, arising under or attributable to an Insurance Policy.

2.      Reservations

The provisions of this Insurer Injunction shall not preclude the Litigation Trust from pursuing any claim based on, arising under or attributable to an Insurance Policy excluding (a) the Unassigned Insurance Policies and (b) the Unassigned Insurance Rights, or any other claim that may exist under any such Insurance Policy against any insurer, or enjoin the rights of the Litigation Trust to prosecute any action based on or arising from the Insurance Policies or the rights of the Litigation Trust to assert any claim, debt, obligation, Cause of Action or liability for payment against an insurer based on or arising from the Insurance Policies.  The provisions of this Insurer Injunction are not issued for the benefit of any insurer, and no such insurer is a third-party beneficiary of this Insurer Injunction. This Insurer Injunction shall not (a) enjoin, impair or affect (i) any claims between or among insurers; or (ii) the rights of current and former directors, officers, employees and authorized agents of the Debtors or (b) prohibit any current and former directors, officers, employees, and authorized agents of the Debtors from seeking insurance coverage in their capacities as such under the D&O Liability Insurance Policies.

Notwithstanding anything to the contrary in this Article X.H, the Litigation Trustee shall have the right to assign and/or transfer Assigned Insurance Rights for Tort Claims to Holders of Allowed Tort Claims subject to reasonable restrictions so as not to interfere with, increase costs to, or impede the efforts of, the Litigation Trust, as further described in the Litigation Trust Documents; *provided, however*, that any assignee or transferee shall remain bound by the provisions in this Plan (including, for the avoidance of doubt, Article X.D of this Plan).

Notwithstanding anything to the contrary in this Plan (including this Insurer Injunction), the Plan Supplement, the Confirmation Order, or otherwise, no Person, Entity, or party, including the Litigation Trust and the Litigation Trustee (including any successors, beneficiaries, transferees, and assigns), shall oppose any effort by any current or former director, officer, or employee of the Debtors or Reorganized Debtors or any its subsidiaries and Affiliates to seek defense cost coverage under the Insurance Policies (including under the D&O Liability Insurance Policies and including with respect to Assigned Claims).

3.      Modifications

To the extent the Litigation Trustee makes a good faith determination that some or all of the proceeds of the Assigned Claims, including the Tort Claim Insurance Proceeds, (excluding (a) the Unassigned Insurance Policies and (b) the Unassigned Insurance Rights) are substantially unrecoverable by the Litigation Trust, the Litigation Trust with the consent of the Debtors and Reorganized Debtors, as applicable, shall have the authority at any time, upon written notice to any affected insurer, to terminate, reduce or limit the scope of this Insurer Injunction with respect to any insurer, provided that any termination, reduction, or limitation of this Insurer Injunction (i) shall apply in the same manner to all beneficiaries of the Litigation Trust and (ii) shall comply with any procedures set forth in the Litigation Trust Documents.

I.      *Controlled Substance Injunction*

From and after the date on which the Controlled Substance Injunction Order is entered by the Bankruptcy Court, the Debtors and the Reorganized Debtors, as applicable, and any successors to the Debtors' and the Reorganized Debtors' business operations relating to the manufacture and sale of opioid Product(s) in the United States and its territories shall abide by the Controlled Substance Injunction as set forth in **Exhibit A**.

The Debtors and the Reorganized Debtors, as applicable, consent to the entry of a final judgment or consent order upon the Effective Date imposing all of the provisions of the Controlled Substance Injunction in the state court of each of the Settling States (as defined in the Controlled Substance Injunction), as applicable.  The Debtors and the Reorganized Debtors agree that seeking entry or enforcement of such a final judgment or consent order in accordance with the Controlled Substance Injunction will not violate any other injunctions or stays that it will seek, or may otherwise apply, in connection with these Chapter 11 Cases or Confirmation.

Each of the Settling States has agreed to be bound by, and each of the Settling States shall be bound by, the terms of the Controlled Substance Injunction, including, for the avoidance of doubt, the release provisions set forth therein.  For the avoidance of doubt, as set forth in the Controlled Substance Injunction, the terms of the Controlled Substance Injunction are not effective until after the Effective Date.

J.  *Preservation of Setoff Rights.*

Notwithstanding anything in <u>Article X</u> to the contrary or in a Sale Order, any right of setoff or recoupment is preserved against the Debtors, the Purchasers in the event of a Sale Transaction Restructuring or the Other Asset Sale, and any of their affiliates and successors to the extent such right(s) exist under applicable law and subject to the Debtors', Purchasers', and any of their Affiliates' and successors', as applicable, right to contest any such right(s) of setoff or recoupment; *provided, however,* that notwithstanding the foregoing or anything in the Plan to the contrary, the right of any Entity or Holder of a Claim or Interest to assert setoff or recoupment as a defense or affirmative defense to claims brought against them is expressly preserved to the extent permitted by applicable law and shall not be impaired, enjoined, precluded, restricted, or otherwise limited by the Plan or the Confirmation Order.

Notwithstanding anything to the contrary herein, nothing in the Plan or the Confirmation Order shall modify the rights, if any, of any counterparty to any Executory Contract or Unexpired Lease to assert any right of setoff or recoupment that such party may have under applicable bankruptcy law or non-bankruptcy law, including, but not limited to, the (i) ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their Unexpired Lease(s) with the Debtors, under the Plan, (ii) assertion of rights or setoff or recoupment, if any, in connection with the claim reconciliation process, or (iii) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors.

K.  *Protections Against Discriminatory Treatment.*

To the maximum extent provided by section 525 of the Bankruptcy Code and the supremacy clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

L.  *Document Retention.*

On and after the Effective Date, the Reorganized Debtors and the Wind-Down Debtors, as applicable, may maintain documents in accordance with the Litigation Trust Cooperation Agreement and the Debtors' standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors or the Wind-Down Debtors, as applicable, in accordance with the Litigation Trust Cooperation Agreement or in connection with the terms of the Purchase Agreement(s). The Litigation Trust shall bear the costs of the document retention by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors necessary for the "Cooperation" provision in <u>Article IV.E..6</u>.

M.  *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

N.  *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the

Confirmation Order shall remain in full force and effect on and following the Effective Date in accordance with their terms.

       *O.*      *Subordination Rights.*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies relating to the subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Estates, their respective property, and Holders of Claims and Interests and is fair, equitable, and reasonable.

# ARTICLE XI
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

       *A.*      *Conditions Precedent to the Effective Date.*

It shall be a condition to the occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of <u>Article XI.B</u> hereof:

1.      the DIP ABL Facility, the DIP FILO Facility, the DIP Term Loan Facility, and the Financing Orders each remains in full force and effect;

2.      in the event of a Plan Restructuring or a Credit Bid Transaction, each of the Definitive Documents must be, in form and substance acceptable to the Required AHG Noteholders and the Agents (subject to any additional consent rights set forth in <u>Article I.A.96</u>);

3.      the Plan, the Confirmation Order, the Disclosure Statement, the Sale Order, if applicable, and the Disclosure Statement Order must be, in form and substance acceptable to the Debtors and reasonably acceptable to the Required AHG Noteholders, the Agents, and the Committees;

4.      the Restructuring Transactions shall have been implemented in accordance with the Restructuring Transactions Memorandum in all material respects;

5.      each of the Confirmation Order and the Sale Order, if applicable, shall have been entered and shall not be stayed;

6.      the Bankruptcy Court shall have entered the Controlled Substance Injunction Order, and such order shall be a Final Order;

7.      in the event of a Credit Bid Transaction, New Rite Aid shall have been formed;

8.      all documents necessary to consummate this Plan shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith and in accordance with any applicable consent rights set forth in this Plan;

9.        the Bankruptcy Court shall have entered the Final Financing Order and the Final Financing Order shall not have been vacated, stayed, revised, modified, or amended in any manner without the prior written consent of the DIP Agents and, to the extent set forth in the Final Financing Order, and there shall be no default or event of default existing under the DIP Credit Agreement or the Final Financing Order;

10.        the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, and documents that are necessary to implement and effectuate the Plan;

11.        in the event of a Sale Transaction Restructuring, the Wind-Down Reserve and the Administrative / Priority Claims Reserve shall have each been funded;

12.        the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

13.        all accrued and unpaid reasonable and documented fees and expenses of the Ad Hoc Secured Noteholder Group (including any advisors thereto) in connection with the Restructuring Transactions, to the extent invoiced three Business Days prior to the Effective Date, shall have been paid in accordance with the terms and conditions set forth in the Financing Order, and the DIP Credit Agreement, as applicable;

14.        the GUC Equity Trust Agreements shall have been executed and the GUC Equity Pool shall have been issued to the GUC Equity Trust;

15.        the Litigation Trust Documents necessary for the operation of the Litigation Trust to operate on the Effective Date shall have been executed and/or Filed, as applicable and the Committees' Initial Cash Consideration and other Litigation Trust Assets shall have been contributed to the Litigation Trust;

16.        the Committee Settlement shall be in full force and effect and the Committee Settlement and any provisions of any Definitive Documents related to the Committee Settlement or the UCC / TCC Recovery Allocation Agreement (if Filed and subject to the consent rights set forth in this Plan) shall be reasonably acceptable to the Committees and shall not have been modified without the Committees' consent (not to be unreasonably withheld);

17.        in the event of the Plan Restructuring, the New Common Stock shall have been issued;

18.        (i) all waiting periods imposed by any Governmental Unit in connection with the transactions contemplated by the Plan, the Sale Transaction Restructuring, and any Other Asset Sale shall have terminated or expired and (ii) all authorizations, approvals (including regulatory approvals), consents, or clearances under the any applicable antitrust Laws in connection with such transactions shall have been obtained;

19.        as applicable, the Exit Facilities Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facilities shall have been waived or satisfied in accordance with the terms thereof;

20.        in the event of (a) a Plan Restructuring or (b) a Credit Bid Transaction, any Other Asset Sale or Alternative Sale Transaction shall (i) be acceptable to the Required AHG Noteholders and the Agents and (ii) shall have closed on or prior to the Effective Date;

21.        in the event of a Sale Transaction Restructuring, New Rite Aid or the applicable Purchaser shall have acquired the Retail Acquired Assets pursuant to the applicable Purchase Agreement, and in each case all conditions precedent to the closing of such Sale Transaction Restructuring shall have been satisfied or duly waived;

22.        any Sale Transaction Restructuring shall be acceptable to the Required AHG Noteholders;

23.        as applicable, the Takeback Notes Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of

the Effective Date) to the issuance of the Takeback Notes shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Takeback Notes shall be deemed to occur concurrently with the occurrence of the Effective Date;

24.    the New Corporate Governance Documents shall be in full force and effect;

25.    any and all requisite governmental, regulatory, and third-party approvals and consents shall have been obtained;

26.    the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated herein in a manner consistent in all respects with the Plan and the Plan Supplement;

27.    all DOJ Claims are subject to one or more settlement agreements between the Debtors and their non-Debtor Affiliates, including EIC, as applicable, and the DOJ, which settlement agreements (a) provide for no less than $350 million in available proceeds on account of the CMS Receivable to fund distributions to Holders of Allowed DIP Claims and Holders of Allowed Senior Secured Notes Claims and (b) are otherwise in form and substance acceptable to the Debtors, the Required AHG Noteholders, and the Exit Facilities Agent;

28.    on the Effective Date, the Debtors shall have Pro Forma Closing Liquidity of at least $700,000,000;

29.    the Debtors shall have delivered to the Ad Hoc Secured Noteholder Group (a) pro forma consolidated and consolidating financial statements of the Reorganized Debtors as of and for the twelve-month period ending on the last day of the most recently completed four-fiscal quarter period ended at least 45 days prior to the Effective Date, (b) monthly financial statements for the twelve months ended prior to the Effective Date, concluding the month ending at least 30 days prior to the Effective Date, and (c) forecasts, prepared by the management of the Debtors (in consultation with the Debtors' financial advisor) and in form and substance and with assumptions satisfactory to the Ad Hoc Secured Noteholder Group, of (i) balance sheets, income statements, and cash flow statements and (ii) the Revolving Borrowing Base, the FILO Borrowing Base, and Excess Availability (in each case, as defined in the Exit Facilities Credit Agreement), in each case, for each month for the first twelve full fiscal months following the Effective Date and on an annual basis thereafter through the term of the Exit Facilities, which projections shall demonstrate projected Excess Availability in excess of $700,000,000 as of the end of each month for the 12 months following the Effective Date;

30.    in the event of a Plan Restructuring or a Credit Bid Transaction, the Debtors and/or New Rite Aid, as applicable, shall have (a)(i) entered into an amended McKesson Prepetition Contract, as amended pursuant to the McKesson Settlement and (ii) assumed the McKesson Prepetition Contract, or (b) terminated the McKesson Prepetition Contract and entered into the McKesson New Contract or a new contract with an alternative supplier, which shall be effective no later than the Effective Date, in a form reasonably acceptable to the Required AHG Noteholders and the Exit Facilities Agent, as applicable;

31.    the Debtors shall have conducted the sales and marketing process for the Rite Aid Retail Assets in the manner agreed upon between the Debtors and the Required AHG Noteholders.

32.    the aggregate amount of Allowed Administrative Claims, Allowed Priority Claims, Allowed Secured Tax Claims, and Allowed Other Secured Claims to be paid pursuant to the Plan shall be reasonably acceptable to the Required AHG Noteholders;

33.    in the event of a Plan Restructuring or a Credit Bid Transaction, the (a) Allowed amount of the McKesson Claim and (b) treatment of the Allowed McKesson Claim under the Plan shall each be reasonably acceptable to the Required AHG Noteholders and the Exit Facilities Agent, as applicable;

34.    in the event of a Plan Restructuring, (a) if the MedImpact Term Loan Backstop Parties acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures, (i) the MedImpact Term Loan Rights Offering shall have been conducted in accordance with the Plan, the MedImpact Term Loan Rights Offering Procedures and the MedImpact Term Loan Backstop Commitment Agreement, (ii) the MedImpact Term Loan NewCo

shall have been formed, and interests therein distributed to the MedImpact NewCo Trustee, in accordance with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement and the Plan, and (iii) the MedImpact NewCo Notes shall have been distributed in accordance with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement, the MedImpact NewCo Notes Documentation, the MedImpact Term Loan Rights Offering, and the Plan or (b) if the MedImpact Term Loan Backstop Parties do not acquire the MedImpact Term Loan, the Cash proceeds of the MedImpact Term Loan have been allocated in accordance with Section (II)(A) of <u>Exhibit E</u> of the Final Financing Order.

35.     in the event of a Plan Restructuring, the MedImpact Term Loan Sale shall have been conducted in accordance with the MedImpact Term Loan Bidding Procedures and shall have occurred and been consummated on or prior to the Effective Date; and

36.     in the event of a Plan Restructuring, subject to the terms and conditions of the AHG New-Money Commitment Agreement, (a) the SCD Trust shall have been formed, and interests therein distributed, in accordance with the terms and conditions of the SCD Trust Documentation and the Plan, (b) the AHG Notes shall have been issued in accordance with the terms and conditions of the AHG New-Money Commitment Agreement and the AHG Notes Documentation, and (c) the Debtors shall have entered into the Elixir Intercreditor Agreement.

B.     *Waiver of Conditions.*

Subject to and without limiting the rights of each party under the Final Financing Order, the conditions to Consummation set forth in <u>Article XI.A</u>, other than the condition set forth in <u>Article XI.13,</u> may be waived by the Debtors with the consent of (i) the DIP Agents, (ii) the Exit Facilities Agent, (iii) the Required AHG Noteholders, but solely in the event of a Plan Restructuring or Credit Bid Transaction, and (iv) the Committees, to the extent that such waiver directly, materially, and adversely affects the rights or entitlements of Committees under the Committee Settlement, *provided* that the waiver of the condition set forth in <u>Article XI.A.14</u> through <u>Article XI.17</u> shall require the consent of the Committees, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan; *provided that,* the condition in <u>Article XI.A.12</u> may not be waived without the consent of the affected Professionals.

C.     *Effect of Failure of Conditions.*

If the Effective Date of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

D.     *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE XII
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the DIP Agents, the Required AHG Noteholders, and the Committees (solely in respect of any modification that materially and adversely impacts the rights or entitlements of the constituencies of the Committees under the Committee Settlement) reserve the right to modify the Plan, whether such modification is material or immaterial, seek Confirmation consistent with the Bankruptcy Code (provided that any modification or amendment shall be consistent with the Committee Settlement) and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions

on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  .  Any amendments to the UCC / TCC Recovery Allocation Agreement shall require consent of the Committees in their sole discretion.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors reserve the right, with the consent of the Required AHG Noteholders, the DIP Agents, and the Committees (solely to the extent set forth in the Disclosure Statement Order), to revoke or withdraw the Plan before the Confirmation Date and to File subsequent plans, in each case subject to any applicable consent rights as set forth in a Sale Order, the Purchase Agreement(s), or the Financing Orders.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan and the conditional approval of the Disclosure Statement, including the approval of the procedures by which acceptances and rejections of the Plan were solicited, shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests, or the fixing or limiting of the recovery to which the Holders of such Claims were entitled under the Plan and, the Committee Settlement), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims, Causes of Action, or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, or any other Entity; *provided* that for the avoidance of doubt, if the closing date of the Sale Transaction Restructuring, and/or any Other Asset Sale(s) has occurred, then the revocation or withdrawal of the Plan, or the failure to obtain Confirmation or Consummation of the Plan, shall not affect the occurrence of such closing date or the consummation of the Restructuring Transaction.

**ARTICLE XIII**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, except as otherwise set forth below, over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Subject to Article IXA of this Plan, allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or

Unexpired Lease that is assumed (or assumed and assigned); (c) the Reorganized Debtors or the Wind-Down Debtors, as applicable, amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      grant any consensual request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

5.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters that do not relate to the Assigned Claims or the Assigned Insurance Rights, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, except as it relates to the Assigned Claims or Assigned Insurance Rights;

11.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article X hereof and enter such orders as may be necessary to implement such releases, injunctions, and other provisions, except as it relates to the Assigned Claims or Assigned Insurance Rights;

13.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any Assigned Claims;

14.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI hereof;

15.      enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

17.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

18.      enter an order concluding or closing the Chapter 11 Cases;

19.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

20.     consider any modifications of the Plan, including any Plan Supplement documents Filed after the Confirmation Date, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

21.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

22.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Committee Settlement, the UCC / TCC Recovery Allocation Agreement, or the Committee Settlement Documents;

23.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

24.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

25.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article X hereof;

26.     enforce all orders entered by the Bankruptcy Court in the Chapter 11 Cases; and

27.     hear any other matter related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction to:

1.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the UCC / TCC Recovery Allocation Agreement; and

2.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any Assigned Claims and/or any Assigned Insurance Rights.


## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

*A.     Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors (if applicable), the Wind-Down Debtors (if applicable), and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.       *Additional Documents.*

On or before the Effective Date, subject to the terms of this Plan, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Following the Effective Date, the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the GUC Equity Trust or Litigation Trust, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.       *Payment of Statutory Fees.*

All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to the Effective Date, including fees and expenses payable to the U.S. Trustee, shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall pay any and all such fees for each quarter (including any fraction thereof), and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each and every one of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee and File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

D.       *Statutory Committees and Cessation of Fee and Expense Payment.*

On the Effective Date, the Committees shall dissolve automatically and the members thereof and each Professional retained thereby shall be released and discharged from all rights, duties, responsibilities, and liabilities arising on or prior to the Effective Date, from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided* that (a) the Committees will remain in place after the Effective Date solely for the purpose of addressing (i) all final fee applications for all Professionals for the Committees and any matters concerning Professional Fee Claims held or asserted by any Professional retained by the Committees; (ii) the resolution of any appeals of the Confirmation Order or other appeals to which the Committees are a party; and (iii) as necessary to consummate the Committee Settlement, including the UCC / TCC Recovery Allocation Agreement, and (b) the members of the Committees are discharged from all of their duties as of the date that the Committees is dissolved with respect thereto.

E.       *Rights of Purchasers under a Sale Order.*

Nothing contained in the Plan or the Confirmation Order constitutes or shall be construed as any modification or amendment of the rights or obligations of the Purchasers under a Sale Order.

F.       *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

G.       *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.    *Notices.*

All pleadings, notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.    <u>if to the Debtors, to:</u>

Rite Aid Corporation
200 Newberry Commons
Etters, Pennsylvania 17319
Attn:  Thomas Sabatino
Email address:  thomas.sabatino@riteaid.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile: (212) 446-4900
Attn:  Joshua A. Sussberg, P.C.; Aparna Yenamandra, P.C.; Ross J. Fiedler; Zachary R. Manning
Email Addresses:  joshua.sussberg@kirkland.com; aparna.yenamandra@kirkland.com; ross.fiedler@kirkland.com; zach.manning@kirkland.com

2.    <u>if to the DIP Agents, DIP Lenders, or Exit Facilities Agent, to:</u>

Choate, Hall, & Stewart LLP
Two International Place
Boston, Massachusetts 02110
Attn:  John F. Ventola; Kevin J. Simard; J.P. Jaillet; Jonathan D. Marshall
Email Addresses:  jventola@choate.com; ksimard@choate.com; jjaillet@choate.com; jmarshall@choate.com

3.    <u>if to a member of the Ad Hoc Secured Noteholder Group, to:</u>

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064W
Attn:  Andrew N. Rosenberg; Christopher Hopkins; Douglas R. Keeton
Email Addresses:  arosenberg@paulweiss.com; chopkins@paulweiss.com; dkeeton@paulweiss.com

– and –

Fox Rothschild LLP
49 Market Street
Morristown, New Jersey 07960
Attn: Howard A. Cohen and Joseph J. DiPasquale.

Email address:  (hcohen@foxrothschild.com; jdipasquale@foxrothschild.com)

4.          if to the UCC, to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile:  (212) 715-8000
Attn:  Kenneth H Eckstein; Adam C. Rogoff; Rachael Ringer; Megan Wasson
Email Addresses:  keckstein@kramerlevin.com; arogoff@kramerlevin.com;
rringer@kramerlevin.com; mwasson@kramerlevin.com

5.          if to the TCC, to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn:  Arik Preis; Mitchell P. Hurley; Kate Doorley; Theodore James Salwen;
Brooks Barker
Email Addresses:  apreis@akingump.com; mhurley@akingump.com;
kdoorley@akingump.com; jsalwen@akingump.com; bbarker@akingump.com

After the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, may notify Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors or the Reorganized Debtors or the Wind-Down Debtors, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

I.          *Entire Agreement.*

Except as otherwise indicated (including with respect to the Purchase Agreement(s) and a Sale Order, as applicable), the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  If the Effective Date does not occur, nothing herein shall be construed as a waiver by any party in interest of any or all of such party's rights, remedies, claims, and defenses, and such parties expressly reserve any and all of their respective rights, remedies, claims and, defenses.  This Plan and the documents comprising the Plan Supplement, including any drafts thereof (and any discussions, correspondence, or negotiations regarding any of the foregoing) shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any party in interest of any claim or fault or liability or damages whatsoever.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations, discussions, agreements, settlements, and compromises reflected in or related to Plan and the documents comprising the Plan Supplement is part of a proposed settlement of matters that could otherwise be the subject of litigation among various parties in interest, and such negotiations, discussions, agreements, settlements, and compromises shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of the Plan and the documents comprising the Plan Supplement.

J.          *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://restructuring.ra.kroll.com/RiteAid or the Bankruptcy Court's website at www.njb.uscourts.gov.

     *K.*       *Nonseverability of Plan Provisions.*

     If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' and the Purchasers' consent; and (3) nonseverable and mutually dependent.

     *L.*       *Votes Solicited in Good Faith.*

     Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

     *M.*       *Closing of Chapter 11 Cases.*

     The Reorganized Debtors or the Wind-Down Debtors, as applicable, shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

     *N.*       *Waiver or Estoppel.*

     Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

     *O.*       *Conflicts.*

     Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

     *[Remainder of page intentionally left blank]*

Dated:  April 2, 2024

RITE AID CORPORATION
on behalf of itself and all other Debtors


/s/ Jeffrey S. Stein
_____

Jeffrey S. Stein
Chief Executive Officer
Chief Restructuring Officer
Rite Aid Corporation

**Exhibit A**

**Controlled Substance Injunction**

# Rite Aid Controlled Substance Compliance Program & Anti-Diversion Injunctive Terms

**WHEREAS**, on October 15, 2023, Rite Aid Corporation and certain of its affiliates, as the debtors and debtors in possession, commenced with the Bankruptcy Court a voluntary case under chapter 11 of the Bankruptcy Code;

**WHEREAS**, on April __, 2024, the Bankruptcy Court entered the *Order Approving the Disclosure Statement For, and Confirming the [Second ] Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and its Debtor Affiliates* [Docket No. __]; and

**WHEREAS**, Rite Aid has agreed to be bound by the injunctive terms set forth herein, and in consideration of such terms, the Settling States (as defined below) have agreed to the discharge and release terms set forth herein.

**NOW, THEREFORE**, in consideration of the terms set forth herein, Rite Aid and the Settling States agree as follows:

## I.   INTRODUCTION

1. Except where these Injunctive Terms specify a different implementation period, Rite Aid shall implement the Injunctive Terms set forth below by the Injunctive Terms Implementation Date (defined below).

2. For purposed of this Controlled Substance Compliance Program & Anti-Diversion Injunction, the term "Rite Aid" shall mean Rite Aid Hdqtrs. Corp. and its affiliated debtors and debtors in possession in the bankruptcy cases filed on October 15, 2023, captioned *In re Rite Aid Corporation, et al.*, (MBK) Case No. 2023-18993 (Bankr. D.N.J.), a Rite Aid successor pharmacy corporation, and an "Acquiring Third Party." An "Acquiring Third Party" shall mean a retail pharmacy that (i) dispenses Schedule II High Alert Controlled Substances, (ii) is registered or licensed within or by a Settling State, and (iii) purchases, leases, manages, or otherwise controls twenty-five percent (25%) or more of Rite Aid's retail pharmacy stores, measured at the time of the

Bankruptcy Plan Effective Date, within a consecutive two-year period during the term of the agreement.[1]

3. To the extent that Rite Aid already has in place positions, committees, departments, policies or programs that satisfy the Injunctive Terms, no renaming or other change is required by these Injunctive Terms.

4. All sections of the Injunctive Terms, unless explicitly stated otherwise, apply to retail pharmacies that dispense Schedule II High Alert Controlled Substances and that are owned, leased, managed, or otherwise controlled by Rite Aid ("Covered Pharmacies").

5. It shall be a term of any purchase, lease, management, or other agreement between Rite Aid and an Acquiring Third Party that the Acquiring Third Party abide by these Injunctive Terms with respect to Covered Pharmacies acquired from Rite Aid. Nothing in these Injunctive Terms shall require an Acquiring Third Party to implement or apply requirements or standards to Covered Pharmacies that are less stringent than those that it already applies or would apply under its own policies, federal, state or local law or any other settlement or agreement.

6. In the event that (a) an Acquiring Third Party comes to purchase, lease, manage, or otherwise control Covered Pharmacies and, (b) that Acquiring Third Party has entered into a global opioid settlement with injunctive relief provisions, the injunctive relief provisions from the Acquiring Third Party's global opioid settlement to the Covered Pharmacies shall apply.

7. In connection with its chapter 11 cases, Rite Aid consents to the entry of a final judgment or consent order upon the Bankruptcy Plan Effective Date imposing these injunctive terms in the respective court of each of the Settling States. During the pendency of the chapter 11 cases, these injunctive terms are enforceable in the Bankruptcy Court. After the Bankruptcy Plan Effective Date, these injunctive terms are enforceable in state court in each of the Settling States; *provided* that if not entered in the state court of a Settling State, the Bankruptcy Court shall have jurisdiction over the interpretation, implementation, or enforcement of this Injunction.

8. Overview

   a. Rite Aid will implement or maintain a Controlled Substance Compliance Program ("CSCP").

---

[1] The term "Acquiring Third Party" shall not include a retail pharmacy that purchases prescriptions from a Rite Aid pharmacy or successor pharmacy (i.e. a "pourover") but does not otherwise meet the definition set forth above.

b. The CSCP must include written standard operating procedures and/or corporate policies (the "CSCP Policies and Procedures") required by these Injunctive Terms.

c. The CSCP shall apply during the term of these Injunctive Terms, to each of the Covered Pharmacies.

d. Rite Aid shall provide a copy of the relevant CSCP Policies and Procedures to each Settling State within 30 days of the Injunctive Terms Implementation Date or, in the case of Acquiring Third Parties, within 60 days of becoming an Acquiring Third Party. To the extent any implementation is expected to require additional time, the Parties agree to work together in good faith to establish a timeline for implementation. No later than twenty (20) days after the Injunctive Terms Implementation Date, each Settling State shall identify the person or office to whom Rite Aid must provide a copy of the relevant CSCP Policies and Procedures and any other State-specific reporting required under these Injunctive Terms.

e. Settling States shall form the States Injunctive Relief Committee to serve as a point of contact for Rite Aid and to perform such other roles as set forth herein. Upon the committee's formation, Settling States shall provide notice to Rite Aid of the members of the committee.

9. Compliance with Laws

a. Rite Aid acknowledges and agrees that the Covered Pharmacies must comply with applicable state and federal laws, regulations, and rules, including those regarding the dispensing of Controlled Substances. The requirements of these Injunctive Terms are in addition to, and not in lieu of, any other requirements of federal, state, or local law. Nothing in the Injunctive Terms shall be construed as relieving Rite Aid of the obligation of its Covered Pharmacies to comply with all federal, state and local laws, regulations or rules, nor shall any of the provisions of the Injunctive Terms be deemed as permission for Rite Aid to engage in any acts or practices prohibited by such laws, regulations or rules.

b. The Injunctive Terms are not intended to and shall not be interpreted to prevent Rite Aid from taking or implementing any other compliance or policy steps that are more restrictive or that are necessary to conform with federal, state, or local legal requirements, unless such steps would conflict with State or local law. The Injunctive Terms are not intended to and shall not be interpreted to require Rite Aid to inventory any Controlled Substances or any particular Controlled Substances or to require dispensing of any Controlled Substances or of any individual, types, subsets or categories of Controlled Substances prescriptions.

P - 3

    c.   In the event that Rite Aid determines that there may be a conflict between the Injunctive Terms and the express requirements of federal, state, or local laws, or interpretations of such laws articulated by an agency responsible for enforcing such laws or a court ("Express Interpretations"), such that Rite Aid determines that it cannot comply with the Injunctive Terms without violating these express requirements or Express Interpretations, Rite Aid shall follow the express requirements of the federal, state or local law or Express Interpretation thereof and shall provide notice to the Settling State(s). Within thirty (30) days after receipt of a notification from Rite Aid referenced above, Rite Aid and the Settling State shall meet and discuss the potential conflict, and Rite Aid shall comply with any reasonable requests from the Settling State as necessary to determine whether there is a conflict between the Injunctive Terms and the express requirements of federal, state, or local laws, or Express Interpretations. In the event that Rite Aid believes a court or administrative action brought by a governmental body in a Settling State has commenced against it or its pharmacists for actions required by the Injunctive Terms, then Rite Aid may notify the Attorney General of the Settling State of such pending action. If the State agrees that the court or administrative action is a result of actions required by the Injunctive Terms, the State will engage in best efforts to resolve the conflict or assist in achieving resolution of the court or administrative action. Nothing in this paragraph shall (i) limit the right of the Settling State to disagree with Rite Aid as to the conflict; (ii) be deemed to relieve Rite Aid from following any subsequently enacted law or regulation, or judicial decisions from a regulatory authority with jurisdiction over controlled substances that is more restrictive than the provisions of the Injunctive Terms, or from following the Injunctive Terms if they are more restrictive than applicable laws at issue in the administrative action if there is no conflict; (iii) be deemed to relieve Rite Aid from adhering to the outcome of a court or administrative action when it is determined that there is no conflict; or (iv) limit a Settling State's ability to relieve Rite Aid of a duty under these Injunctive Terms if that Settling State determines that that term is in conflict with that Settling State's express legal requirements.

    d.   Rite Aid shall retain all records it is required to create pursuant to its obligations hereunder for a period no shorter than three years, unless otherwise specified. Nothing in these Injunctive Terms shall prevent a Settling State from issuing a lawful subpoena or Civil Investigative Demand (CID) for records pursuant to an applicable law.

9.   **No Admission and No Use as Evidence.**  Rite Aid admits no liability or wrongdoing. These Injunctive Terms shall not be considered, construed, or represented to be (1) an

admission, concession, or evidence of liability, wrongdoing, or to impose the existence of any legal obligations or requirements other than the requirement to follow these Injunctive Terms; (2) an admission, concession or evidence of the reach, requirements, meaning or interpretation of any statute or regulation; or (3) a waiver or limitation of any defense otherwise available to Rite Aid.  These Injunctive Terms shall not be offered or received in evidence or otherwise relied on in any action or proceeding for any purpose other than in an action or proceeding to modify or enforce or monitor compliance with these Injunctive Terms.

## II.   TERM AND SCOPE

1.  The term of these Injunctive Terms shall be for ten years from the Injunctive Terms Implementation Date, unless otherwise specified herein.

2.  Except as otherwise stated herein, the Injunctive Terms shall apply to Covered Pharmacies, including any Schedule II High Alert Controlled Substances dispensed by any such retail pharmacy stores that are mailed or shipped to patients in a Settling State. Should Rite Aid operate an online pharmacy that is registered or licensed to dispense Schedule II High Alert Controlled Substances in any Settling State while these Injunctive Terms are in effect, the Injunctive Terms shall apply to such pharmacy as well.  Notwithstanding the foregoing, these Injunctive Terms shall not apply to the mail order pharmacy of Rite Aid's affiliated pharmacy benefit manger, Elixir.

3.  These Injunctive Terms may be amended by mutual agreement of a majority of the States Injunctive Relief Committee and Rite Aid.  Any such amendments must be in writing.

## III.   DEFINITIONS

1.  For purposes of these Injunctive Terms, the plural shall be interpreted to include the singular and the singular shall be interpreted to include the plural (*e.g.*, "Party" shall include both parties).

2.  The term "Bankruptcy Court" means the court where Rite Aid filed for bankruptcy on October 15, 2023, captioned *In re Rite Aid Corporation, et al.*, (MBK) Case No. 2023-18993 (Bankr. D.N.J.).

3.  The term "Distributor Injunctive Terms" means Exhibit P of the Settlement Agreement, dated as of July 21, 2021, between McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Corporation and certain States and subdivisions.

P - 5

4. The term "Bankruptcy Plan Effective Date" means the date upon which Rite Aid emerges from Bankruptcy, as evidenced by a notice of effective date filed on the Bankruptcy Court's docket.

5. The term "Block" means an action preventing or otherwise prohibiting any pharmacist from filling prescriptions for Controlled Substances from a specific identified Prescriber.

6. The term "Clearinghouse" means the system established by Section XVII of the Distributor Injunctive Terms.

7. The term "Controlled Substances" means those substances designated under schedules II-V pursuant to the federal Controlled Substances Act.

8. The term "High Alert Controlled Substances" shall be limited to: (a) oxycodone; (b) hydrocodone; (c) hydromorphone; (d) tramadol; (e) oxymorphone; (f) morphine; (g) methadone; and (h) fentanyl.

9. The term "Injunctive Terms Implementation Date" means 30 days after the Bankruptcy Plan Effective Date.

10. The term "Patient" means any individual who receives a prescription for a High Alert Controlled Substance from a Prescriber, whether legally valid or not, and attempts to fill it at a Covered Pharmacy in a Settling State.

11. The term "Chapter 11 Plan" means the plan of reorganization (with any technical modifications) under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, or the terms hereof, as the case may be, and the Plan Supplement, which is incorporated herein by reference, including all exhibits and schedules thereto.

12. The term "Prescriber" means any individual that has written a prescription for a High Alert Controlled Substance, whether legally valid or not, that is presented to a Covered Pharmacy in a Settling State.

13. The term "Red Flag(s)" means the enumerated Patient Red Flags, Prescription Red Flags, and Prescriber Red Flags set out in Section IX.

14. The term "Settling State(s)" means any State where Rite Aid operates stores as of the Bankruptcy Plan Effective Date and that _____.

15. The term "States Injunctive Relief Committee" means a committee representing the Settling States composed of between four and eight members designated by the Settling States. The members of the States Injunctive Relief Committee shall be employees of a Settling State's Office of Attorney General and/or employees of another agency of a Settling State.

## IV.   CONTROLLED SUBSTANCE COMPLIANCE PERSONNEL

1. Rite Aid shall designate a Controlled Substance Compliance Director, or other appropriately titled position, to be a member of the Controlled Substance Compliance Committee (described below in Section VI), and to oversee a Controlled Substance Monitoring Department and Rite Aid's compliance with 21 C.F.R. 1306.04 and these Injunctive Terms. As used in these Injunctive Terms, the terms "Controlled Substance Compliance Committee" and "Controlled Substance Monitoring Department" refer to the entity or entities, however titled, that carry out the functions required by these Injunctive Terms. Notwithstanding the preceding sentence, to the extent an existing position, committee or department carries out the functions required by these Injunctive Terms, any other functions undertaken by such position, committee or department shall not be subject to these Injunctive Terms or oversight by the Settling States pursuant to these Injunctive Terms.  The position, committee and department discussed in these Terms may bear different names and need not be limited to the roles and functions set forth herein.

2. The Controlled Substance Compliance Director shall have knowledge of and experience with the laws and regulation of Controlled Substances, in particular the regulations in 21 C.F.R. § 1306.04.

3. The Controlled Substance Compliance Director shall provide at least quarterly reports to the Controlled Substance Compliance Committee (described below in Section VI) regarding Rite Aid's compliance with these Injunctive Terms, including the implementation of any changes to the CSCP Policies and Procedures required by these Injunctive Terms.

4. Staffing levels of Rite Aid's Controlled Substance Monitoring Department shall be reviewed periodically, but at least on an annual basis, by Rite Aid's Controlled Substance Compliance Committee to assess whether such staffing levels are sufficient for the Controlled Substance Monitoring Department to comply with this Agreement. This review shall include consideration of relevant developments in technology, law, and regulations.

5. Throughout the term of these Injunctive Terms, Rite Aid shall maintain a telephone and electronic submission hotline(s) (the "Hotline") to permit employees and/or Patients and/or members of the public to anonymously report suspected inappropriate or

illegitimate dispensing, prescribing or diversion of High Alert Controlled Substances, violations of the CSCP Policies and Procedures, these Injunctive Terms, Rite Aid's company policy, or other applicable law. The Hotline may be implemented by adding a dedicated option to existing systems that includes reporting regarding High Alert Controlled Substances. Rite Aid shall publish its Hotline contact information to its employees and Patients in the Settling States. Rite Aid shall maintain for the duration of Injunctive Terms a record of each complaint made to the Hotline regarding High Alert Controlled Substances and documentation regarding any investigation or response to such complaints. Nothing herein shall require Rite Aid to investigate a pharmacist's professional judgment to refuse a prescription that the pharmacist believes was prescribed or is being used for other than a legitimate medical purpose or that the pharmacist believes was not prescribed by an individual Prescriber acting in the usual course of his or her professional practice.

## V.   <u>INDEPENDENCE</u>

1.  Rite Aid's Controlled Substance Monitoring Department personnel, pharmacists and pharmacist technicians who work at Covered Pharmacies within the Settling States, and field personnel who supervise pharmacists and pharmacist technicians (together, "CSCP Employees") at such pharmacies, shall not be compensated in whole or in part by commissions, bonuses, incentives or any other monetary or non-pecuniary benefit that depends in material part on revenue or profitability targets or expectations to sales of Controlled Substances. Nothing in these Injunctive Terms shall be interpreted to prevent compensation of employees based on sales volume, revenue or profitability targets/expectations for enterprise-, store-, or pharmacy-wide sales that include Controlled Substances.

2.  No CSCP Employees may be terminated, suspended, threatened with or face any other negative employment consequence for failing to meet any revenue or profitability targets or expectations that depend in material part on sales of Controlled Substances. Nothing in these Injunctive Terms shall be interpreted to prevent Rite Aid from taking employment action based on sales volume, revenue or profitability targets/expectations for enterprise-, store-, or pharmacy-wide sales that include Controlled Substances.

3.  Personnel in Rite Aid's Controlled Substance Monitoring Department shall not report to Rite Aid's sales, marketing, or business development departments, and sales, marketing, or business development departments shall not be authorized to make decisions regarding the promotion, compensation, demotion, admonition, discipline, commendation, periodic performance reviews, hiring, or firing of Controlled Substance Monitoring Department personnel. This provision does not apply to an officer or executive to whom both the Controlled Substance Monitoring Department and sales, marketing and/or business development departments report.

4. Rite Aid's sales, marketing and business development departments are prohibited from interfering with, obstructing, or otherwise exerting control over any Controlled Substance Monitoring Department or Controlled Substance Committee decision-making. This provision does not apply to an officer or executive to whom both the Controlled Substance Monitoring Department and sales, marketing and/or business development departments report.

5. To the extent necessary to comply with this section, Rite Aid's Controlled Substance Compliance Committee shall review, modify, and direct any changes to any compensation and non-retaliation policies specific to the sale or dispensing of High Alert Controlled Substances.

## VI.   **OVERSIGHT**

1. To the extent not already established, within two (2) months of the Injunctive Terms Implementation Date or acquisition of the Covered Pharmacies, Rite Aid shall establish a compliance committee, however titled, that includes representatives from its respective legal, compliance, pharmacy operations and asset protection departments, however named, to provide oversight over the CSCP and its compliance with the Injunctive Terms. For the purposes of reference herein, this committee, however named, shall be referred to as the "Controlled Substance Compliance Committee." Rite Aid shall maintain its Controlled Substance Compliance Committee for the duration of the term of the Injunctive Terms. The Controlled Substance Compliance Director shall be a member of the Controlled Substance Compliance Committee.

2. Rite Aid's Controlled Substance Compliance Committees shall have quarterly meetings during which the Controlled Substance Compliance Director shall report on, and the Controlled Substance Compliance Committee shall review, among other things, (a) the Prescription Validation Process, including the CSCP Policies and Procedures on identifying and resolving Patient, Prescriber, and Prescription Red Flags; (b) the training required under the Injunctive Terms; (c) proactive due diligence and site visits; (d) the Prescriber Review Processes; (e) significant new national and regional diversion trends involving Controlled Substances; (f) Rite Aid's adherence to the Injunctive Terms and applicable laws and regulations; and (g) any technology, staffing, or other resource needs for the CSCP. The Controlled Substance Compliance Committee shall have access to all CSCP reports described in the following subsection.

3. On an annual basis, Rite Aid's Controlled Substance Compliance Committees shall provide a written report to the President of Rite Aid's Retail Division, the Chief Financial Officer of its Retail Division, the Chief Legal Officer of its Retail Division, and its corporate Chief Compliance Officer, outlining (a) Rite Aid's adherence to, and any material deviations from these Injunctive Terms; (b) the allocation of resources sufficient to comply with these Injunctive Terms; and (c) any revisions to the CSCP that the Controlled Substance Compliance Committee has approved. The corporate

Chief Compliance Officer shall determine if and when it is appropriate to make a report to the Board or any subcommittee thereof, but shall report at least annually.

4. Rite Aid, through its Controlled Substance Monitoring Department and Committee, shall, at least once every year, review and oversee any enhancements to the CSCP Policies and Procedures and systems for dispensing activity that the Controlled Substance Compliance Committee deems necessary.

5. The Controlled Substance Compliance Committee shall be responsible for the approval of all material revisions to the CSCP Policies and Procedures, provided that nothing herein shall prevent Rite Aid from implementing changes to the CSCP Policies and Procedures pending such review and approval.

## VII.   MANDATORY TRAINING

1. The CSCP Policies and Procedures shall be published in a form and location readily accessible to all pharmacy and compliance personnel at each of the Covered Pharmacies in the Settling States. Online availability is sufficient, so long as pharmacy and compliance personnel have access to a computer with access to the CSCP Policies and Procedures.

2. Rite Aid shall launch training for all existing CSCP Employees, to the extent practical (for example, accounting for employee leave), covering the CSCP Policies and Procedures, including the Prescription Validation Process and corresponding responsibility. Such training shall be launched within 30 days of the Injunctive Terms Implementation Date or, in the case of Acquiring Third Parties, within 90 days of the acquisition of the Covered Pharmacies. All CSCP Employee new hires, to the extent practical, shall be required to participate in such trainings within 30 days of hiring or four months of the Injunctive Terms Implementation Date (or in the case of Acquiring Third Parties, four months of the date that Covered Pharmacies were acquired), whichever is later. Rite Aid will further require that every CSCP Employee, to the extent practical, receive such training at least once every three (3) years for the term of these Injunctive Terms.

3. On an annual basis for the duration of these Injunctive Terms, Rite Aid shall test its CSCP Employees on their knowledge regarding the CSCP Policies and Procedures, including the Prescription Validation Process and corresponding responsibility.

4. It shall be a part of the CSCP Policies and Procedures and all trainings of all CSCP Employees required under these Injunctive Terms that pharmacists shall refuse to dispense Controlled Substances that they believe were prescribed or are being used for other than a legitimate medical purpose or that they believe were not prescribed by an individual Prescriber acting in the usual course of his or her professional practice.

5. All trainings required under these Injunctive Terms shall also make clear that (i) compensation and non-retaliation policies, including pursuant to these Injunctive Terms, prevent CSCP Employees from being compensated or penalized in any way related to revenue or profitability targets or expectations specific to sales of Controlled Substances; and (ii) pharmacists will not be penalized in any way for exercising their professional judgment to refuse to fill prescriptions for Controlled Substances pursuant to their corresponding responsibility.

## VIII.   THE PRESCRIPTION VALIDATION PROCESS

1. As part of its CSCP, Rite Aid shall maintain a Prescription Validation Process in the CSCP Policies and Procedures, as further described and set forth in this section, that each pharmacist employed by Rite Aid at a Covered Pharmacy in a Settling State must follow when dispensing a prescription for a Controlled Substance. The inclusion of an enumerated Red Flag in these Injunctive Terms shall not be considered, construed, or represented to be an admission, concession, or evidence of any factual or legal contention related to such Red Flag. A Red Flag shall not be interpreted to mean that a prescription is, or is more likely than not, illegitimate and/or not issued in the usual course of professional practice or treatment.

2. A Red Flag will be considered "resolved" if, after further investigation as described below, and given other facts and circumstances surrounding the prescription, a pharmacist determines, in his or her professional judgment, that the facts that triggered the Red Flag do not lead him or her to believe that the prescription was written or is being submitted for an illegitimate medical purpose or outside the usual course of a Prescriber's professional practice.

3. Rite Aid's CSCP Policies and Procedures shall provide that if a pharmacist at a Covered Pharmacy identifies any "Patient Red Flags" associated with a Controlled Substances prescription (described in Section IX(3) below), before filling the prescription the pharmacist must resolve them; and that the method of resolution falls within the judgment of the pharmacist and may include reviewing the Patient's profile and history with Rite Aid, calling the Prescriber or Prescribers if appropriate, speaking with the Patient if appropriate, calling on the pharmacist's pre-existing knowledge of the Patient or Prescriber, reviewing available Prescription Monitoring Program ("PMP" or "PDMP") data, and/or reviewing other data or information available to the pharmacist.

4. Rite Aid's CSCP Policies and Procedures shall provide that if at a Covered Pharmacy forgery or fraud is suspected, or if the pharmacist identifies any other "Prescription Red Flags" associated with a Controlled Substances prescription (described in Section IX(4) below), the pharmacist must resolve the Prescription Red Flags before filling the

prescription; and that the method of resolution falls within the judgment of the pharmacist and may include reviewing the Patient's profile and history with Rite Aid, calling the Prescriber or Prescribers if appropriate, speaking with the Patient if appropriate, calling on the pharmacist's pre-existing knowledge of the Patient or Prescriber, reviewing available PMP or PDMP data, and/or reviewing other data or information available to the pharmacist.

5.  Rite Aid's CSCP Policies and Procedures shall require that if a pharmacist identifies any "Prescriber Red Flags" associated with a Controlled Substances prescription (described in Section IX(5) below), the pharmacist must resolve them before filling the prescription; and that the method of resolution falls within the judgment of the pharmacist and may include reviewing any Rite Aid records regarding the Prescriber, calling the Prescriber if appropriate, speaking with the Patient if appropriate, calling on the pharmacist's pre-existing knowledge of the Patient or Prescriber, reviewing available PMP or PDMP data, and/or reviewing other data or information available to Rite Aid.

6.  Rite Aid's CSCP Policies and Procedures related to Schedule II High Alert Controlled Substances shall provide that the resolution of all Red Flags identified by the pharmacist, as well as any prescriptions that were rejected pursuant to Red Flags identified by the pharmacist, and the reasons why they were rejected, must be documented by the pharmacist, unless if based on the pharmacist's pre-existing knowledge of the Patient or Prescriber.  Any such records shall be maintained for the duration of these Injunctive Terms.  To the extent that a Red Flag is resolved based upon facts or circumstances that are already reflected or documented in Rite Aid's records, further documentation of those facts or circumstances is not required for resolution of substantially the same Red Flag, or another Red Flag that is resolved based upon the same facts or circumstances, on subsequent prescriptions. For example, if a Patient lives fifty-five (55) miles from a Rite Aid but works near the pharmacy and that fact is reflected in pharmacy records, no documentation for the resolution of the Red Flag addressing the Patient's distance from the pharmacy is required in connection with individual prescriptions dispensed for that Patient. A lack of documentation shall not be interpreted to create a presumption that a pharmacist did not resolve any identified Red Flags.  Nothing in these Injunctive Terms shall require Rite Aid to create a record in those instances where the pharmacist rejects a prescription when presented without an effort to resolve any red flags, including but not limited to instances where the pharmacist rejects a prescription for clinical reasons, or where the pharmacist identifies on the face of the prescription a Prescription Red Flag (defined in Section IX below) that causes the pharmacist to conclude without further inquiry that the prescription is invalid.

P - 12

7. Rite Aid's CSCP Policies and Procedures shall provide that, even if all Red Flags are resolved, a pharmacist shall reject a prescription if, in his or her professional judgment, he or she believes that it was written or is being submitted for other than a legitimate medical purpose and/or was written outside the usual course of an individual Prescriber's professional practice.

## IX.   RED FLAGS

1. Upon request by the Settling States, but no more than annually, and no earlier than seven (7) months after the Injunctive Terms Implementation Date, Rite Aid shall provide to the Settling States a report (the "Annual Data Report") that sets forth: (1) the total number of prescriptions for Controlled Substances dispensed annually at Covered Pharmacies, aggregated nationally and by state; (2) the top twenty-five prescribers of High Alert Controlled Substances in each Settling State at Covered Pharmacies; (3) the list of prescribers subject to disclosure in section X.5; (4) the specific process, system, metrics or algorithms (if any) sufficient to demonstrate the operational system's ability to identify each category of Red Flag listed in this section;[2] and (5) the total number of prescriptions that pharmacists at the Covered Pharmacies refused to dispense. Unless otherwise required by law, if a Settling State seeks to disclose any data and/or information provided under this provision as part of a proceeding to enforce these Injunctive Terms or otherwise, it shall first provide ten (10) days' notice to Rite Aid unless doing so would conflict with applicable law. A Settling State shall not otherwise disclose or provide any data provided under this provision to third parties during or after the Term of these Injunctive Terms unless required to do so by law. If a Settling State is required to disclose or provide any data under this provision to third parties during or after the Term of these Injunctive Terms, it shall first provide ten (10) days' notice to Rite Aid unless doing so would conflict with applicable law. All data and/or information provided under this paragraph shall be deemed confidential law enforcement material, to the extent state law permits, and shall not be subject to production unless required by law. Nothing in this paragraph shall be deemed to prevent a Settling State from sharing this material with other State or federal law enforcement agencies.

2. Within the three months following the provision of the Annual Data Reports, either Rite Aid or the States Injunctive Relief Committee may propose in writing a meet and confer to discuss potential changes to the scope of one or more categories of Red Flags for Rite Aid. At such a meeting, Rite Aid or the States Injunctive Relief Committee

---

[2] For any Red Flags in Section IX that take effect 18 months after the Injunctive Terms Implementation Date, as set forth in Section IX.6 below, Rite Aid will be under no obligation to report the "process, system, metrics, or algorithms (if any)" relating to those Red Flags until 18 months after the Injunctive Terms Implementation Date.

may provide additional research, information or data available to them beyond that provided in the Annual Data Reports. For example, Rite Aid might propose reducing the threshold for triggering a particular category of Red Flag or consolidating certain Red Flags or subcategories of Red Flags into a single metric, or the States Injunctive Relief Committee might propose increasing the threshold for triggering a particular Red Flag or expanding that Red Flag to include multiple subcategories (*e.g.*, number of prescriptions, distance thresholds).

    a. If Rite Aid and the States Injunctive Relief Committee agree on such changes to one or more Red Flags, they shall document those changes in writing and they shall become a part of these Injunctive Terms for Rite Aid for all intents and purposes.

    b. If Rite Aid and the States Injunctive Relief Committee cannot agree on the proposed changes during their meeting and confer, the Party seeking the change(s) to the Red Flag(s) may seek a 5-day mediation of the issue at its own expense. In such a mediation, the Party seeking the proposed change(s) may provide evidence from Annual Data Reports or from other research, data and information.

    c. In any such mediation, there shall be a presumption against imposition of any proposed Red Flags, or proposed modifications to pre-existing Red Flags, that have not been identified by the United States Drug Enforcement Administration (DEA) or other law enforcement agencies tasked with the regulation of Controlled Substances.

    d. The Red Flags required by these Injunctive Terms shall at no point be too numerous or complex to be reasonably workable for pharmacists in the context of protecting patient safety, performing corresponding responsibility, drug utilization review, and their other responsibilities.

3. Rite Aid's CSCP Policies and Procedures shall direct its pharmacists at Covered Pharmacies to treat the following circumstances as "Patient Red Flags":

    a. A Patient seeks to fill a Schedule II High Alert Controlled Substance prescription more than three days prior to the contemplated exhaustion date of an earlier prescription of the same Schedule II High Alert Controlled Substance (e.g., exhaustion of the days' supply assuming the prescription has been taken in accordance with the prescribers' directions on the face of the prescription), provided the previous prescription was also dispensed by the same Covered Pharmacy;

b. A Patient seeks to fill a High Alert Controlled Substance prescription from a Prescriber after having filled High Alert Controlled Substance prescriptions at the same Covered Pharmacy from more than four other Prescribers, from separate practices, in a given 6-month period;[3]

c. A Patient seeks to fill a High Alert Controlled Substance prescription after having filled three other High Alert Controlled Substance prescriptions written by multiple Prescribers with overlapping days of supply at Rite Aid's pharmacies within thirty (30) days;

d. The distance between a Patient's residence and the Covered Pharmacy receiving the High Alert Controlled Substance prescription is farther than 50 miles;

e. The Patient resides more than one hundred (100) miles from the Prescriber who issued the High Alert Controlled Substances prescription (but this shall not be a Patient Red Flag for patients receiving prescriptions via telehealth or telemedicine);

f. To the extent personally known by the dispensing pharmacist, a Patient seeks to fill a High Alert Controlled Substance prescription after having two other prescriptions for High Alert Controlled Substances subjected to documented refusals to fill by a Rite Aid pharmacist within the past thirty (30) days;

g. To the extent personally known by the dispensing employee, a patient pays in cash for a High Alert Controlled Substance despite having prescription drug insurance on file for that medication;

h. Three or more Patients come to the pharmacy together to fill prescriptions for the same High Alert Controlled Substances;

i. A Patient requests a High Alert Controlled Substance by its slang or street description, such as "Mallinckrodt blues," "M's" or "the blue pill"; and

j. A Patient presenting a prescription for a High Alert Controlled Substance appears visibly altered, intoxicated, or incoherent.

4. Rite Aid's CSCP Policies and Procedures shall direct its pharmacists at Covered Pharmacies to treat the following circumstances as "Prescription Red Flags:"

a. A Controlled Substance prescription fails to meet the requirements of law;

---

[3] In Rite Aid's sole discretion, for administrative convenience Rite Aid may implement this Red Flag without regard to whether Prescribers are at separate practices, thereby resulting in more instances in which the flag occurs.

      b.  A Controlled Substance prescription that appears altered, including but not limited to, a photocopied prescription or a prescription in which an altering agent, such as white out, was used;

      c.  A Controlled Substance prescription written with misspellings suggesting the prescription may not have been written by a valid Prescriber;

      d.  A Controlled Substance prescription using atypical abbreviations suggesting the prescription may not have been written by a valid Prescriber; and

      e.  A Controlled Substance prescription written with multiple colors of ink or in multiple different handwritings.

5.  Rite Aid's CSCP Policies and Procedures shall direct its pharmacists at Covered Pharmacies to treat the following circumstances as "Prescriber Red Flags:"

      a.  A Patient presents simultaneous prescriptions from a single prescriber for all three of a Schedule II High Alert Controlled Substance, a benzodiazepine, and carisoprodol;

      b.  A Prescriber provides a Patient with overlapping prescriptions for all three of a Schedule II High Alert Controlled Substance, a benzodiazepine, and carisoprodol;

      c.  To the extent personally known by the dispensing pharmacist, Prescriber has been the subject of more than ten (10) documented refusals to fill within a six month period;

      d.  A Prescriber has no office within fifty (50) miles of the Covered Pharmacy where a High Alert Controlled Substance prescription is submitted (but this shall not be a Prescriber Red Flag for prescribers issuing prescriptions via telehealth or telemedicine); and

      e.  A Prescriber of High Alert Controlled Substances uses prescriptions that are preprinted or stamped with drug type and amount.

6.  The Red Flags in Section IX (3)(b) through (e), (5)(b), and 5(d) shall take effect 18 months after the Injunctive Terms Implementation Date. All other Red Flags shall take effect four (4) months after the Injunctive Terms Implementation Date. [4]

---

[4] All Red Flags will be incorporated into the relevant CSCP Policies and Procedures and training documents within thirty (30) days of the Injunctive Terms Implementation Date.

## X.        PRESCRIBER REVIEW

1. Rite Aid shall regularly review the prescribing patterns and practices of Prescribers of High Alert Controlled Substances (the "Prescriber Review Process") at Covered Pharmacies.  The Prescriber Review Process shall employ algorithms, or other means, to review data on Rite Aid's retail dispensing for potential Prescribers of concern.

2. Rite Aid shall initiate Prescriber Review Process in the following circumstances:

    a. Personnel implementing the Prescriber Review Process become aware that a Prescriber of High Alert Controlled Substances located in a Settling State has been charged or indicted with a crime related to prescribing High Alert Controlled Substances by the Federal Government or law enforcement in a Settling State;

    b. Rite Aid receives a notification regarding a potentially suspicious Prescriber through its ServiceNow system from a pharmacist; or

    c. Rite Aid has received a Hotline complaint that has been investigated and substantiated concerning a Prescriber's illegitimate prescribing of High Alert Controlled Substances.

3. Based on the professional judgment of the employees operating the Prescriber Review Process, Rite Aid may also initiate the Prescriber Review Process when:

    a. Personnel implementing the Prescriber Review Process are notified in writing by law enforcement that a Prescriber of High Alert Controlled Substances located in a Settling State is the target of an investigation regarding the prescribing of Controlled Substances;

    b. Personnel implementing the Prescriber Review Process are notified in writing by field personnel who supervise Rite Aid's pharmacists in Covered Pharmacies about a Prescriber he or she thinks should be reviewed; or

    c. Rite Aid's review of dispensing data and publicly available information identifies reasons for concern regarding a Prescriber.

4. Once Rite Aid identifies a Prescriber for further investigation, it shall review pertinent and available data or information pertaining to the Prescriber, which may include interviews of pharmacists and support staff when appropriate and of the Prescriber when appropriate.  All data and information collected or created as part of the Prescriber Review Process shall be maintained by Rite Aid for the length of these Injunctive

Terms. When permitted by law, nothing contained in this Section prevents Rite Aid from taking immediate action to Block a Prescriber in lieu of referral for further investigation or prevents a Rite Aid pharmacist from refusing to fill any particular prescription or refusing to fill prescriptions from a given Prescriber.

5.   If after the Prescriber Review Process those making the decision have not resolved the circumstances that caused Rite Aid to further investigate the Prescriber, then the Prescriber shall be Blocked from having Controlled Substance prescriptions filled at Rite Aid's retail pharmacies in the Settling States, when permitted by law, with an opportunity, at the discretion of Rite Aid, for the Prescriber to seek future reinstatement by providing information to Rite Aid that resolves its concerns. This block shall be on top of and in addition to any block based on a Prescriber's licensure. On written demand by a Settling State, Rite Aid shall provide to that Settling State the names and, to the extent available to Rite Aid, the DEA registration or NPI numbers, of Prescribers within that Settling State who have been subject to its Prescriber Review Process and/or whose prescriptions it has blocked pursuant to the Prescriber Review Process.

## XI.    PROACTIVE DUE DILIGENCE AND SITE VISITS

1.   During the term of these Injunctive Terms, Rite Aid shall conduct periodic proactive compliance reviews of its Covered Pharmacies to assist with the identification of potential compliance issues related to the dispensing of High Alert Controlled Substances at its retail pharmacy stores in the Settling States.  This may be satisfied by the use of algorithms, or other electronic means, to analyze data associated with each such pharmacy's dispensing of High Alert Controlled Substances to identify particular pharmacies for review as required under this Section XI.   Documentation of any resulting reviews shall be maintained by Rite Aid and made accessible to all Controlled Substance Monitoring Department personnel upon request for the duration of these Injunctive Terms.

2.   During the term of these Injunctive Terms, Rite Aid personnel or qualified third-party compliance consultants shall conduct site visits to each Covered Pharmacy identified for further review during a calendar year.  These site visits shall at a minimum consist of a review of Controlled Substance dispensing documentation and recordkeeping; and a review of physical surroundings and other circumstances for any indications of potential non-compliance with these Injunctive Terms or the CSCP Policies and Procedures (for Rite Aid), or any violations of other applicable laws and regulations related to the dispensing of Controlled Substances.

3.   During reviews and site visits, Rite Aid personnel or qualified third-party compliance consultants shall (by video or in person) interview relevant pharmacy employees, if

appropriate, about any potential areas or issues of concern, including potential violations of laws related to the dispensing of Controlled Substances, the CSCP Policies and Procedures (for Rite Aid), and these Injunctive Terms.

4. Rite Aid personnel or qualified third-party compliance consultants who conduct site visits shall complete a report reflecting the findings of any site visit pursuant to this section. This report shall document areas or issues of concern, including potential violations of law related to the dispensing of Controlled Substances, the CSCP Policies and Procedures (for Rite Aid), and these Injunctive Terms.

5. The site visit reports described above shall be maintained and made accessible by Rite Aid to all Controlled Substance Monitoring Department personnel for the duration of these Injunctive Terms. Upon its request, the States Injunctive Relief Committee shall be provided sample reports or a report for a particular Covered Pharmacy.

## XII.   THEFT AND LOSS PREVENTION

1. In addition to complying with all theft and loss procedures, policies and precautions required by state and federal law, Rite Aid shall maintain for at least three years information regarding the receipt and disposition of inventory of all High Alert Controlled Substances at each Covered Pharmacy.

2. In addition to any other reporting obligations under state and federal law, Rite Aid must provide to each Settling State on a quarterly basis, upon request, any reports it has made to the DEA regarding the theft or significant loss of High Alert Controlled Substances at a Covered Pharmacy in that Settling State pursuant to 21 C.F.R. §1301.76(b). Each Settling State shall provide contact information in order to receive such reports. There shall be no obligation to provide these reports to Settling States that receive contemporaneous reporting of thefts or significant losses of High Alert Controlled Substances to a Settling State's board of pharmacy.

## XIII.   REPORTING TO LAW ENFORCEMENT

1. Rite Aid shall give Notice to the States Injunctive Relief Committee 10 days prior (or as soon as known to the extent it is less than 10 days) to any Covered Pharmacy being purchased by, leased to, managed by, or otherwise taken control of by an Acquiring Third Party, along with the nature of the transaction, the address of the Covered Pharmacy, and the name and address of the Acquiring Third Party.

2. The Settling States shall inform Rite Aid to what extent their law enforcement authorities would like to receive reports, other than those already required by law or

regulation, of any confirmed forged prescriptions. To the extent not already in place, Rite Aid shall implement standard operating procedures directing its employees at Covered Pharmacies to report any confirmed forged prescriptions for High Alert Controlled Substances to those Settling States who have indicated that they want to accept it, within five (5) days of completing any review of such prescription or conduct. The Settling States shall provide contact information in order to receive such reports.

3. Rite Aid shall document and for at least two (2) years maintain records of any such reports that are made to Settling States regarding confirmed fraudulent or forged prescriptions, which are maintained centrally.

## XIV.   ENFORCEMENT OF INJUNCTIVE TERMS

1. Notice of Potential Violations and Opportunity to Cure.

   a. A "Potential Violation" occurs when the Settling State determines, after appropriate investigation and due diligence, that Rite Aid is not in substantial compliance with a material aspect of the applicable Injunctive Terms. A Potential Violation may be for a single retail pharmacy. A violation of this Agreement is not presumed to occur when a pharmacist, pharmacist technician, or other field personnel who supervise pharmacists and/or pharmacist technicians employed by Rite Aid violates that entity's CSCP Policies and Procedures.

   b. Potential Violation Discovered by Settling State.

      i. In the event of a Potential Violation identified by a Settling State, the Settling State shall notify Rite Aid, as well as the States Injunctive Relief Committee, in writing (the "State's Notice").

      ii. Within thirty (30) days of receipt of the State's Notice, Rite Aid shall provide a written response to the Settling State and the States Injunctive Relief Committee. The response shall include Rite Aid's position as to the act(s) of non-compliance, including, possibly, a statement setting forth why Rite Aid or the Acquiring Third Party believes it is in substantial compliance with the relevant provision(s) or a statement explaining how the Potential Violation has been addressed.

      iii. If the Settling State wishes to meet with Rite Aid, Rite Aid shall promptly make itself available for such a meeting.

c.  If, after review of a written response and any meeting, the Settling State believes that a Potential Violation is ongoing or has not been substantially addressed, it will provide written notice to Rite Aid and work in conjunction with Rite Aid to devise, within thirty (30) days, a corrective action plan ("Corrective Action Plan") to remedy such Potential Violation, including a reasonable period for implementation of such plan.

d.  Within sixty (60) and one hundred twenty (120) days after implementing the Corrective Action Plan, Rite Aid will provide a written compliance update to the Settling State and make itself available to meet with the Settling State if requested. If, after reviewing the compliance update and any meeting, the Settling State believes a Potential Violation remains ongoing or has not been substantially addressed, the Settling State may commence a 30-day mediation period.  If mediation fails to resolve the dispute between the parties, the Settling State may take whatever action it deems necessary, including but not limited to bringing an action to enforce these Injunctive Terms, filing a new action (administrative or civil action) for a violation of the Injunctive Terms,  as allowed by state law, conducting further investigation, or attempting to negotiate an updated Corrective Action Plan with Rite Aid.  But the Settling State may not seek to reinstate claims that have been released as part of the Settlement Agreement.

e.  If Rite Aid fails or refuses to provide a written response, to devise or implement a Corrective Action Plan or to provide a compliance update as required by subsections 1(b), 1(c) and/or 1(d), a Settling State may bring an action to enforce these Injunctive Terms, file a new action (administrative or civil action) for a violation of the Injunctive Terms, as allowed by state law, conduct further investigation, or attempt to negotiate an updated Corrective Action Plan with Rite Aid.  But the Settling State may not seek to reinstate claims that have been released as part of the Settlement Agreement.

f.  If, after review of a written response and any meeting, pursuant to subsections 1b. or 1c., above, the Settling State concludes that a Potential Violation is not ongoing or has been substantially addressed, the Settling State will provide written notice of this conclusion to Rite Aid within thirty (30) days of reaching its conclusion.

2.  Enforcement Action. Each Settling State agrees that prior to taking any court or administrative action, other than an action that the Settling State concludes is necessary to address an immediate threat to the health, safety, or welfare of the citizens of the

Settling State, or that a public emergency requiring immediate action exists, it will follow the process outlined above. If the Settling State concludes that action is necessary to address an immediate threat to the health, safety, or welfare of the citizens of the Settling State or that a public emergency requiring immediate action exists, it will make best efforts to provide reasonable notice to Rite Aid prior to initiating any such action.

## XV.    COMPLIANCE CERTIFICATION

1. Rite Aid's Controlled Substance Compliance Director shall, after diligent inquiry, complete an annual compliance certification as set out in Section XV(4).

2. The certification shall be filed annually for the duration of these Injunctive Terms with a Settling State's appropriate licensing and/or regulatory agency and its Attorney General.

3. The certification shall state:

> "I understand the compliance requirements and responsibilities as they relate to the Controlled Substance Monitoring Department, which is under my supervision. My job responsibilities include attempting to achieve compliance with regard to the Controlled Substance Monitoring Department with all applicable statutory requirements, obligations of the Injunctive Terms, and applicable policies, and I have taken steps to promote such compliance. To the best of my knowledge, the Controlled Substance Monitoring Department is in compliance with the obligations of these Injunctive Terms. I understand that this certification is being provided to and relied upon by the State of [Settling State]."

4. If the Controlled Substance Compliance Director is unable to provide such a certification, the Controlled Substance Compliance Director shall provide a written explanation of the reasons why he or she is unable to provide the certification outlined above.

## XVI.   DATA SHARING

1. Rite Aid shall consent to the provision by its distributors of unblinded "867 Data" (data sent from the distributor to the manufacturer concerning the sale of its products to Rite Aid) from Covered Pharmacies to opioid manufacturers on any particular High Alert Controlled Substances manufactured by them as soon as commercially reasonable and at no cost to the manufacturers, provided that, pursuant to a prior written agreement with Rite Aid, the opioid manufacturers agree (a) to ensure the confidentiality of the

867 Data, except as required by law; (b) to implement safeguards and procedures to limit access to and use of the 867 Data, except as required by law; (c) that the 867 Data shall be used solely for compliance purposes as part of their Suspicious Order Monitoring programs; (d) that the 867 Data shall be shared only with specified personnel and shall not be shared with   sales personnel.[5]

2. To the extent that Rite Aid provides McKesson Corporation, Cardinal Health, Inc., or AmerisourceBergen Corporation (the "Settling Distributors") with Pharmacy Customer Data (as defined in the Distributor Injunctive Terms) for use in its Controlled Substance Monitoring Programs, Rite Aid agrees that the Settling Distributor(s) may share such Pharmacy Customer Data from Covered Pharmacies with the Monitor appointed pursuant to the Distributor Injunctive Terms, provided that the Pharmacy Customer Data does not contain any HIPAA-protected information or is redacted and/or deidentified to remove any HIPAA-protected information, and provided that the Monitor agrees, pursuant to a prior written agreement with Rite Aid, (a) to ensure the confidentiality of the Pharmacy Customer Data; (b) to implement safeguards and procedures to limit access to and use of the Pharmacy Customer Data; (c) that the Pharmacy Customer Data is used solely for the purpose of ensuring the Settling Distributors' compliance with the Distributor Injunctive Terms; and (d) that the Pharmacy Customer Data shall be shared only with specified personnel.

## XVII.  CLEARINGHOUSE

1. Rite Aid will confer with any Settling Distributor that distributes High Alert Controlled Substances to its retail pharmacies and the States Injunctive Relief Committee for a period not to exceed six (6) months from the Injunctive Terms Implementation Date or the date when Covered Pharmacies are acquired by the third party, to determine: (i) what additional deidentified information, if any, is needed from Rite Aid for a Settling Distributor to perform suspicious order monitoring; (ii) if additional deidentified information is needed, how Rite Aid shall provide it to a Settling Distributor; and (iii) what information provided by Rite Aid to a Settling Distributor, if any, may be deposited by the Settling Distributor into the Clearinghouse. For the avoidance of doubt, "deidentified" does not refer to Prescriber personal information.  If agreements are not reached, the matters in dispute shall be submitted to arbitration. Due to patient privacy and legal restrictions and other confidentiality and commercial concerns, in connection with any meet and confer described above, Rite Aid may not be compelled to provide individual patient-level or prescription level data, de-identified or otherwise, to the Settling Distributors.

---

[5] Rite Aid is free to negotiate contractual terms with any opioid manufacturer that seeks its unblinded 867 Data to ensure compliance with the provisions of this paragraph.

P - 23

2.  Any data provided by Rite Aid to a Settling Distributor and/or the Clearinghouse pursuant to these Injunctive Terms shall be maintained, used, and disclosed by the recipient in compliance with state and federal law, including, but not limited to, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and all applicable state and federal privacy and data security laws. Rite Aid shall de-identify any protected health information subject to this Agreement in compliance with the HIPAA de-identification standard set forth at 45 C.F.R. § 164.514, and a Settling Distributor or the Clearinghouse shall not attempt to re-identify such data.

3.  No Settling Distributor or other participant in the Clearinghouse shall receive from the Clearinghouse information specific to Rite Aid.

## XVIII. DOCUMENT DISCLOSURE

1.  Documents Subject to Public Disclosure. The following documents are subject to public disclosure in perpetuity, except for the redactions authorized by Section 2:

    a.  The following documents publicly filed in *In re Opioid Litigation*, Index No. 400000/2017 (N.Y. Sup. Ct., Suffolk County) and *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804 (N.D. Ohio):[6]
        i.   All transcripts for depositions of Rite Aid's current and former employees and management,
        ii.  All Rite Aid summary judgment filings,
        iii. All Rite Aid expert reports, and
        iv.  All Rite Aid expert depositions.

    b.  Rite Aid's filed motions to dismiss and exhibits in the action *United States ex rel. White, et al. v. Rite Aid Corp.*, Index No. 1:21-cv-1239 (N.D. Ohio).

2.  Public Disclosure Through a Document Repository

    a.  Each Settling State may publicly disclose all documents covered by this section through a public repository maintained by a governmental, non-profit, or academic institution. Each Settling State may specify the terms of any such repository's use of those documents, including allowing the repository to index and make searchable all documents subject to public disclosure, including the metadata associated with those documents.

---

[6] If Rite Aid redacted a document prior to publicly filing it, Rite Aid will provide the redacted, publicly-filed version of that document.

3. Timeline for Production

    a. Rite Aid shall produce all documents required by Section 1 within nine months from the Injunctive Terms Implementation Date.

4. Within thirty (3) calendar days of the Injunctive Terms Implementation Date, Rite Aid will make one time payments totaling $100,000 to the University of California, San Francisco Foundation (UCSF Foundation) and The John Hopkins University, to be used to support a public repository of documents subject to this section.

## XIV.   RELEASES[7]

1. Except as otherwise expressly set forth in the Chapter 11 Plan or the Confirmation Order, on and after the Bankruptcy Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, the Settling States agree that Rite Aid is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each of the Settling States, and any and all other Entities who may purport to assert any Cause of Action on behalf of one or more Settling States derivatively, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in Law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Settling State would have been legally entitled to assert in its own right, based on or relating to, or in any manner arising from, in whole or in part, Rite Aid (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of Rite Aid, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Chapter 11 Plan, the business or contractual arrangements between Rite Aid and the Settling States, Rite Aid's out-of-court restructuring efforts, intercompany transactions between or among any individual Rite Aid entities, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the pursuit of the Restructuring Transaction, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the administration and implementation of the Plan Restructuring (if applicable) and the Wind-Down (if applicable), in all cases based

---

[7] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the Chapter 11 Plan.

upon any act or omission, transaction, agreement, event, or other occurrence related to Rite Aid taking place on or before the Bankruptcy Plan Effective Date.

2. For the avoidance of doubt, each Settling State shall not be required to either opt-in or opt-out of any debtor releases that are sought in the Plan of Reorganization, shall instead be bound by the terms of this Agreement, and it is expressly understood and agreed to by the Parties that the failure to opt-in or opt-out of the third-party releases that are sought in the Plan of Reorganization shall have no impact on the agreements set forth herein.