Anthony G. Brown, Attorney General of Maryland
Brian T. Edmunds, Assistant Attorney General (*pro hac vice*)
Sarah A. Zadrozny, Assistant Attorney General (*pro hac vice*)
James McHale, Assistant Attorney General (counsel of record)
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202
(410) 576-6383
jmchale@oag.state.md.us

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, et al.,[1] | Case No. 23-18993 (MBK) |
| Debtors. | (Jointly Administered) |

**STATE OF MARYLAND'S OBJECTION TO CONFIRMATION OF
THE DEBTORS' PROPOSED SECOND AMENDED JOINT CHAPTER 11 PLAN
OF REORGANIZATION**

To the Honorable Michael B. Kaplan, United States Bankruptcy Judge:

The State of Maryland, by and through the Attorney General of Maryland, respectfully objects to Confirmation of the Debtors' proposed Second Amended Joint Chapter 11 Plan of Reorganization [Docket No. 2466], and in support of its objection, Maryland states:

**PRELIMINARY STATEMENT**

1.      Rite Aid Corporation, together with its subsidiaries (collectively, "Debtors" or "Rite Aid") and others who participated in its illegal conduct, has profited extensively from fraudulent, unfair, and deceptive practices, in its marketing of opioids and other controlled substances that

---

[1] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

1

have inflicted a plague of addiction and death, destroying families and communities across the United States. Rite Aid established itself as a trusted partner in consumer health care, touting for decades how its pharmacies and pharmacy employees acted to protect the safety of consumers, consistent with state and federal legal duties. Yet, Rite Aid's internal documents reveal clearly in context that it deliberately ignored these duties and disregarded consumer safety. In Maryland alone, *thousands* of Rite Aid customers have died from addictions that led to overdoses at some point after receiving controlled substance prescriptions from Rite Aid that caused or contributed to their ultimate deaths.

2. With the specter of accountability for that conduct looming, implying that the claims of its victims and the governments that protect them were unfair, Rite Aid pursued pre-petition agreements with its secured creditors and ultimately filed the instant Chapter 11 proceeding to free itself from the "litigation overhang" that could have impaired its business success. Under those agreements, Rite Aid and its senior secured creditors have pushed these proceedings forward with incredible speed, setting deadlines for the completion of discovery, filing of claims, and for confirmation without adequate notice and at a pace that deprives Rite Aid's likely millions of tort creditors—and even its more sophisticated and better resourced corporate and governmental creditors—of a fair opportunity to protect and preserve their interests. It has asked to put the proceedings into hyperdrive for what seems to be little more than the need to secure confirmation of a plan of reorganization that is, as set forth below, deficient under both the United States Bankruptcy Code and Constitution.

3. Even under these circumstances, however, the shelter of bankruptcy has permitted Rite Aid to secure significant agreement to a plan that deprives most of Rite Aid's creditors, especially those without the resources or ability to protect themselves and the governmental units

2

bound to protect them. To these creditors, who number in the at least tens of thousands, and the government units who represent affected citizens or other interested parties who number in the millions, Rite Aid has provided essentially corporate scraps. Rite Aid has inflicted damages on the public at large in the hundreds of billions—if not the trillions—of dollars. Although it has already been restructuring successfully outside of bankruptcy for years, *see* Rite Aid Corp., Quarterly Report (Form 10-Q)(filed July 11, 2023), Rite Aid would use bankruptcy to escape these claims and move forward with a contribution of only pennies on the dollar of these claims.

4.  Rite Aid cannot achieve that relief under its Second Amended Plan, which cannot be confirmed consistently with the Bankruptcy Code and Constitution for a variety of reasons set forth below.

## OBJECTIONS

### I. Because Unsecured Creditors Did Not Receive Adequate Notice of the Bar Date, the Plan, or the Confirmation Hearing and Were Deprived of the Right to Vote, the Plan is Unconfirmable

5.  At the outset, the Plan cannot be confirmed because the timing, notice, and voting procedures employed in this Chapter 11 proceeding has deprived the State and others of statutorily and constitutionally protected rights to preserve and protect their interests in this bankruptcy.

6.  The Court's March 28, 2024 Order approving the disclosure statement and confirmation procedures sets only 25 days between the filing of the Disclosure Statement and Second Amended Plan that morning and confirmation hearings. Objecting creditors then were afforded only seven days following the Debtors' service of expert reports to task their experts with evaluating, developing opinions regarding, and preparing and serving the objecting creditors' expert reports. Debtors have made clear that "[j]ust seven days is inadequate time to review a new expert report, take [an expert] deposition, and prepare for a confirmation hearing." Docket No.

3

2711. As set forth in more detail in its objections to the disclosure statement (docket no. 2037), motion for extension of time to serve a rebuttal expert report (docket no. 2691), and reply in support of that motion (docket no. 2728), and objection to the Debtor's cross-motion (docket no. 2734), and as stated at oral argument on March 28, 2024, all of which the State of Maryland incorporates here by reference in full and renews, the State has been deprived of the ability to fully examine Debtors and to fully evaluate and explore the Second Amended Plan. The rapid timing of these proceedings, combined with the fragmented manner in which they have taken place, where, for example, plan discovery needed to be completed long before the Second Amended Plan was filed, deprives creditors of a full and fair opportunity to protect their interests in this bankruptcy and militates against confirmation. There has been no legitimate justification, not of Debtors' own making, for the rapid pace of these proceedings.

7. The speed of these proceedings only compounds the failure to provide adequate notice of (1) the bar date, (2) the Second Amended Plan, (3) the confirmation objection deadline, and (4) the confirmation hearing to unsecured creditors.

8. Rite Aid distributed pills to millions of individuals across the United States. In Maryland alone, which accounts for approximately two percent of the U.S. population, Rite Aid appears to have injured tens of thousands of by dispensing prescriptions unsafely. Thousands in Maryland alone have died at some point after receiving prescriptions dispensed by Rite Aid pharmacies. Rite Aid personal injury or wrongful death claimants across the United States therefore likely number in the millions.[2]

9. Yet Rite Aid set an early bar date and provided only a one-time publication notice in the New York Times to apprise these claimants of the bar date. Docket No. 703, Order Setting

---

[2] The State of Maryland asserts the rights of its injured citizens and communities as *parens patriae*.

Bar Dates for Submitting Proofs of Claims. at 20. Rite Aid's notice therefore failed to meet the requirement of the Fifth Amendment that it be "reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objection." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

10. One-time publication in the New York Times cannot possibly be reasonably calculated to apprise millions of interested parties of the pendency of this action and the bar date order, especially not when Rite Aid had other means available. At least some of Rite Aid victims are known creditors; a review of Rite Aid's records should disclose that they received high-dose opioids without the safety checks promised in Rite Aid's advertising or required by law. For at least these individuals, Rite Aid's customer lists and contact information, including the email addresses and mobile phone numbers to which Rite Aid sends general advertising and reminder texts, or street addresses, could have been utilized to provide actual notice. And even for claimants whose records do not disclose to Rite Aid that they may be claimants, Rite Aid had available means to disseminate better notice than it did. Under the totality of facts and circumstances here, Rite Aid failed to provide adequate notice of the bar date.

11. Rite Aid also failed to provide these creditors with adequate notice of the Second Amended Plan. Unsecured creditors are impaired creditors who receive minimal value –but value– under the Plan. These creditors—including tort claimants and state and subdivision government units, among others—received no disclosure statement at all. The Plan is therefore unconfirmable as a matter of law because it comports with neither the notice requirements of the Bankruptcy Code, 11 U.S.C. § 342, nor those required by the Fifth Amendment.

12. Unsecured creditors received instead only a Notice of Non-Voting Status that does not provide any information concerning the objection deadline or confirmation hearing date.

5

Docket No. 2482, Notice of Non-Voting Status to Holders or Potential Holders of Impaired General Unsecured Claims (Including Tort and Non-Tort Claimants) Conclusively Presumed to Reject the Plan at 64. The form of notice, however, is even deficient in what it purports to do because it does not disclose the confirmation schedule, objection deadline, and hearing date and therefore fails to give unsecured creditors notice of their right to object to the Plan before confirmation.

13. Indeed, the Notice of Non-Voting Status confusingly suggests to Debtors that they are not entitled to vote because "Debtors believe that this treatment [the Plan provides] obviates the need to solicit votes. . . ." *Id.* Confusingly, however, the Notice goes on to state in bold text that **"the 'deemed to reject' determination is solely for procedural purposes, as the Debtors remain hopeful that resolutions reached in the Mediation will result in improved recoveries for the Holders of General Unsecured Claims."** *Id.* Finally, the Notice of Non-Voting Status then notes that in bold all caps that negotiations are ongoing concerning releases and that ""YOU WILL BE GIVEN AN OPPORTUNITY TO ELECT TO "OPT OUT" OF THE THIRD-PARTY RELEASE AT A LATER DATE."" *Id.* Accordingly, but for the procedural wrinkle that Debtors introduced by failing to abide by the right to vote that 11 U.S.C. 1126(a) provides to impaired classes that receive some value under the Plan, which the notice does not explain, unsecured creditors who receive the Notice of Non-Voting Status may assume that the Court has not approved the procedures, that any plan of reorganization remains under negotiation, and that they may ultimately have the right to object to provisions in the Plan.

14. And even if the Notice of Non-Voting Status were sufficient in form, the plan to distribute it only 13 days before the objection deadline, and only by delivery to certain creditors and publications in one national (the New York Times) and one global (the Financial Times)

6

publication cannot possibly be reasonably calculated to apprise parties of the proceedings, for the reasons already stated above.

15. Finally, as set forth in the State of Maryland's objection to these disclosure procedures, the failure to provide the right to vote to unsecured creditors on the Plan is fatal to confirmation of the Plan. Section 1126(g) allows creditors to be deemed to reject the plan when they receive no value. The right to vote, however, is essential when they do. The Second Amended Plan's treatment of and provision for allocation among creditors, Docket No. 2466, Second Amended Joint Chapter 11 Plan, clearly necessitates that these creditors vote on the Plan.

16. Debtors' assertion that the value the Plan confers on these creditors is a gift is specious. First, the statute does not distinguish value that constitutes a gift in expressing its clear command that impaired classes that receive value under the Plan be entitled to vote. 11 U.S.C. § 1126(a). The plain meaning of the text controls. Second, as the Debtors make clear in their Disclosure Statement motion, the unsecured creditors committees' negotiated relief. Docket No. 1976, Debtors' Amended Motion for Entry of an Order (I) Conditionally Approved the Adequacy of the Disclosure Statement. Debtors' expert Mr. Hayes makes clear that there is residual value left over after paying off all other secured creditors. The portion of that value distributed to unsecured creditors clearly is not a gift.

17. For all these reasons, the timing and voting procedures through which the Plan is to be confirmed and the failure to provide adequate notice of the bar date, the Plan itself, the confirmation objection deadline, and the confirmation hearing date all require rejection of the Plan. Only with adequate notice and the opportunity to participate can unsecured creditors be bound to a plan that is consistent with law, feasible, and can be confirmed.

## II. The Plan Purports to Discharge Government Unit Fraud Claims in Violation of 11 U.S.C. 1141(d)(6).

18. The Plan purports to discharge government unit claims for "actual fraud, misrepresentation of fact, and false pretenses" that are not dischargeable under 11 U.S.C. 1141(d)(6) of the Bankruptcy Code. Rite Aid repeatedly made statements that it followed regulatory duties and protected customer safety on which consumers, public regulatory agencies, and state Medicaid plans relied and, as a result, sustained damages. These claims under federal and state common law and statutory fraud causes of action, including common law fraud and misrepresentation doctrines, the federal Racketeer Influenced Corrupt Organization Act ("RICO"), state and federal false claims and Medicaid fraud statutes, and statutes barring fraud in advertising and marketing, cannot be discharged in bankruptcy. *Ellis v. Westinghouse Electric Co.*, 11 F.4th 221, 235 (3d Cir. 2021). To the extent that the Plan purports to discharge or to channel these claims under the Plan to the gatekeeping injunction, the plan must be rejected as contrary to section 1141(d)(6).

19. Around the country, claims of these types have been asserted by the federal government, states and their agencies, and local subdivisions as a basis for holding actors who manufactured, distributed, and dispensed prescription opioids and other controlled substances accountable. There can be no question that such claims can be brought against Rite Aid. But, as Rite Aid concedes in its Motion to Dismiss Maryland's adversary complaint, this Court cannot determine at this stage the validity of these claims. Because they have been brought, they are not yet ripe for review. *See* Adversary Proceeding Case No. 24-1091, Docket No. 7, Rite Aid Motion to Dismiss, at 5-7 ("It is without question that any dispute over the dischargeability of Maryland's purported fraud claims is unripe and lies merely in the future.")

20. As Rite Aid now concedes, the Plan cannot discharge these government unit fraud claims and they must remain for later courts to determine if and when they are asserted against a restructured Rite Aid. The Plan therefore cannot be confirmed unless it is amended to exclude such claims, as is fairly common in practice.

**III.  The Plan Fails to Secure $20 Million For Creditors Under An Executory Contract That it Fails to Assume Or Reject**

21. The Plan also fails to reject under 11 U.S.C. § 365 Bankruptcy Code a Consulting Agreement that debtors reached on October 15, 2023 with their newly appointed Chief Executive Officer and Chief Restructuring Officer, Jeffrey Stein. Under the agreement, he receives a fee of $300,000 per month and a reorganization success bonus of $20 million upon confirmation of a plan of reorganization. Rite Aid 10-Q October 2024. This fee and incentive structure vastly exceeds that Mr. Stein and other restructuring executives in comparable roles have received for their work. Upon confirmation of the Plan, this executory contracted would be deemed "accepted." *See Federal's, Inc. v. Edmonton Inv. Co.*, 555 F.2d 577, 579 (6th Cir.1977).

22. Information that Maryland has received indicates that Rite Aid's previous CEO received about $1 million per year and a target bonus of about $2 million. Consistent with that amount, Mr. Stein's similar past work as the CEO and CRO of CWG Holdings earned him a far more reasonable monthly fee of $100,000 and a success fee of $1.25 million. Comparable fees and success bonuses do not appear to approach this total amount. If the plan were confirmed, Mr. Stein is therefore likely to receive in total a windfall of approximately $20 million more than what the market dictates—roughly the full amount of his anticipated bonus.

23. This amount is absurd, especially under the circumstances of this case. The amount is far more than any individual tort claimant or government unit would likely receive under the

9

plan and is likely to be a significant portion of the total recovery of *all* tort claimants and government units under the Plan.

24. Debtors must reject the Consulting Agreement at confirmation. Moreover, the Plan cannot be confirmed unless it confers this $20 million in value to the creditor to whom it belongs. Rite Aid's attempt to circumvent creditors and confer a windfall on professionals supporting its restructuring should not be allowed.

### IV. The Plan's Opt-Out Third-Party Releases And Gate Keeping Injunction Are Impermissible

25. The Plan also cannot be confirmed because its third-party releases (obtained through an opt-out mechanism that does not require consent (especially in light of the notice issues set forth above) and gatekeeping injunction are neither authorized by the Bankruptcy Code nor constitutional.

26. The Plan's third-party releases are extraordinary, both in the definition of Released Parties and in the conduct released. The third-party releases apply to:

> (a) the Debtors (including any Debtor Related Party); (b) the Reorganized Debtors; (c) the Wind-Down Debtors; (d) the Releasing Parties (except to the extent that any Excluded Party would otherwise constitute a Releasing Party); (e) the Senior Secured Noteholders (including the Ad Hoc Secured Noteholder Group and each of its members); (f) the Agents; (g) the Trustees; (h) the DIP Secured Parties; (i) the Prepetition Secured Parties; (j) each of the lenders under the Exit Facilities; (k) the Committees and each member of the Committees; (l) the Litigation Trustee, the GUC Equity Trustee, and the GUC Sub-Trust Trustee (if any); (m) in the event of any Sale Transaction Restructuring or Other Asset Sale, the Purchaser(s); (n) the MedImpact Term Loan Backstop Parties, MedImpact Term Loan NewCo, and the MedImpact NewCo Trustee; (o) the AHG New-Money Commitment Parties and the SCD Trustee; (p) each current and former Affiliate of each Entity in clauses (a), (b), and (c); (q) each Debtor Related Party of each Entity in clauses (a), (b), and (c); (r) each current and former Affiliate of each Entity in clauses (d) through (p) and the following clause (s); and (s) each Related Party of each Entity in clauses (d) through (p) and this clause (r); *provided* that, in each case, any Holder of a Claim or Interest that is not a Releasing Party shall not be a "Released Party."

Plan at 29–30. And it releases those parties from

10

> any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in Law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party . . . in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Plan at 96.

27. It is difficult, if not impossible, to determine in advance what parties will be released and from what claims. It is equally difficult to determine the purpose that such releases serve for the bankruptcy. Among other problems, the definition of Released Party includes any Releasing Party, the releasing party's current or former Affiliates, and any Related Parties.[3] The Plan therefore releases debtors, every creditor, and a broad set of undefined parties related to every creditor who does not opt out of the releases.

28. Such releases are particularly inappropriate given that there may be intercreditor claims to the extent certain creditors knew or should have known of Rite Aid's unlawful conduct and nonetheless participated in that conduct or failed to exercise a right to stop it. *See F.T.C. v. Amy Travel Serv., Inc.*, 875 F.2d 564, 572-74 (7th Cir. 1989*), overruled on other grounds by Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019*); Consumer Protection*

---

[3] Related Party "means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees." Plan at 29.

*Division v. Morgan*, 387 Md. 125, 874 A.2d 919 (2005); *F.T.C. v. Ross*, 897 F. Supp. 2d 369, 382-86 (D. Md. 2012). Under the Federal Trade Commission Act, 15 U.S.C. 45 generally holds co-participants who have knowledge or who recklessly disregard unfair and deceptive trade practices liable if they participate in the conduct or fail to exercise a right to stop it. On these facts, numerous secured creditors may have participated in the conduct. It is inappropriate and inequitable to provide these creditors with a release a release.

29. Debtors attempt to overcome the breadth of their excessive release by suggesting that the opt-out mechanism release can be justified because of the opt-out mechanism that the Plan provides. But because section 524(e) of the Bankruptcy Code provides that only a debtor may receive a discharge in bankruptcy, the Court may release non-debtor third-parties only by creditor consent. 11 U.S.C. § 524(e); *see also Law v. Siegel*, 571 U.S. 415, 426–27 (2014) (holding that the Bankruptcy Code is a statutory creation that is organized to provide only the limited relief that Congress intended to grant).

30. Non-consensual non-debtor releases of state law claims are also objectionable because they may intrude on state police power exercises that are protected by principles of federalism and the Tenth Amendment. *See* U.S. Const. Art. 1, Sect. 8, Cl. 4 (circumscribing Congress' power around the "subject of bankruptcies"); U.S. Const. Amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). The Court held in *Central Virginia Community College v. Katz*, 546 U.S. 356, 375–78 (2006), and *Midlantic Nat. Bank v. New Jersey Dep't of Env't Prot.,* 474 U.S. 494, 505–07 (1986), that there is an outer limit to the sweep of the subject of Bankruptcties. In *Midlantic*, for example, the Court held that the bankruptcy court's authorization of an abandonment in contravention of state law designed to protect the public health and safety

fell outside that power. *Id.* at 507. State police power regimes regulating the conduct of non-debtors are within the traditional functions of states to which Congress' otherwise broad powers must yield. *See, e.g., Morrison*, 529 U.S. 598, 615–19 (2000); *United States v. Lopez*, 514 U.S. 549, 579–81 (1995); *United States v. Nat'l Fed. Of Ind. Business v. Sebelius*, 567 U.S. 519, 554–58 (2012).

31. In this case, the Plan extends beyond the Bankruptcy Code's limits and because it provides no mechanism to obtain consent for the third-party releases of creditors who have not received notice of the bankruptcy and, for those who have, the opt-out mechanism improperly reads consent into a failure to respond to the opt-out solicitation. The Plan, which releases even those who make no response to the solicitation, cannot possibly provide adequate consent for this release.[4] Plan at 30 (definition of Releasing Party (o)-(s)) & 97 (barring claims from any party that "is given the opportunity to opt out" and "does not exercise such opt out"). As a matter of law, failing to opt out is not the same as granting consent. *In re Arrowmill Development Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (quoting Paul E. Meltzer, *Getting Out of Jail Free*, 71 Am. Bankr. L. J. 1, 40 (Winter 1997) ("[T]he 'validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order."); *In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) ("Failing to return a ballot is not a sufficient manifestation of consent to a third-party release."); *see also Norica v. Samsung Telecommunications America, LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017) (holding that a consumer had not agreed to an arbitration provision where the consumer "did not expressly assent to any agreement" and did not "act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." (internal quotation marks

omitted)). The Plan selects the law of the State of New York (Plan at 36) to govern contracts entered into in connection with the Plan: Under New York law "absent a duty to speak, one party's silence does not constitute acceptance." *Diarassouba v. Urban*, 71 A.D. 3d 51, 58 (N.Y.S.2d 2009).

32. This problem is compounded by the plan's constitutionally inadequate scheme of notice and the absence of a voting mechanism for unsecured claimants. It is clearly likely that there are claimants who have no notice of the bankruptcy, the Plan, or its releases. To proceed on an opt-out basis only compounds the separate problem of notice and reinforces that the Plan should not be confirmed. Any inference of consent from an unreturned opt-out form would be especially dubious here, given how difficult it is to identify the released parties or the released claims.

33. In addition, the Plan appears to provide release to parties who have an indiscernible relationship with the debtors or the debtors' estate, make no substantial contribution to the plan, and are likely not to know they are being released. The definition of Releasing Party (Plan at 30) includes (t) each current and former Affiliate of claim holders as well as (s) each Related Party to those claim holders. Thus, creditors who execute the release will also release their current and former Affiliates, managers, directors, employees, et cetera. Plan at 29 (defining Related Party). There is no guarantee that these persons or entities have received any notice about this case or that they are creditors to Rite Aid. The *Delaware BSA* court rejected similar releases, and the Court should do so here. 642 B.R. at 678 (holding that it is inconsistent with consensual notice "to permit releases from persons who do not receive notice by virtue of creditor (or shareholder) status"); *see also Washington Mutual*, 442 B.R. at 354.

34. Finally, these third-party releases are not "integral to the restructuring," "well-reasoned," or "well-supported by the record," as the Third Circuit has required. *In re Millennium*

14

*Lab Holdings II, LLC*, 945 F.3d 126, 140 (2019). There is no evidence that the releases have brought in additional funds to the estate or otherwise made a substantial contribution to the plan outside of the fiduciary and professional responsibilities that they already owed. The fact that the Plan is moving forward through confirmation, without any indication of how many parties, or which parties, will actually exercise the opt-out, conclusively shows that the third-party releases are not an essential component of the Plan. The purpose for providing these non-debtor third-parties is not clear and opt-out or not, their inclusion in the Plan is not appropriate.[5]

35. Relatedly, the Plan's gatekeeping injunction (Plan at 99, Article X.F., para. 2) is impermissible because it interferes with claims against non-debtors in violation of section 524(e) and, when applied to state police power claims, principles of federalism.

V. **The gatekeeping injunction is overbroad and interferes with preserved police power claims.**

36. Parties who do not consent to the Plan's third-party releases have not consented to have their preserved claims impaired by the gatekeeping injunction (Plan at 99, Article X.F, para. 2), nor has Congress provided bankruptcy courts the power to police claims, especially state law claims, that are not within the scope of the bankruptcy. To the contrary, to the extent state courts are called upon to review claims, these courts can determine whether releases have been granted.

37. The broad language in Article X.F.. however, encompasses preserved claims against non-debtors:

> No Person or Entity may commence or pursue a claim or Cause of Action of any kind against the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind-Down Debtors (or their Affiliates) (if applicable), the GUC Equity Trust (with respect to General Unsecured Claims), the Litigation Trust (with respect to General Unsecured Claims), the Exculpated

---

[5] The availability of non-consensual, non-debtor releases in Chapter 11 plans of reorganization and, relatedly, the contours of what constitutes a consensual release are questions that may be decided in *Harrington v. Purdue Pharma, L.P., et al.*, No. 23-124 (U.S. argued December 4, 2023).

> Parties, or the Released Parties, as applicable, *that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a claim or Cause of Action subject to Article X.C, Article X.D, Article X.E, hereof*, without the Bankruptcy Court first (i) determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Debtor (or their Affiliates), Reorganized Debtor (or their Affiliates), Wind-Down Debtor (or their Affiliates), GUC Equity Trust, Litigation Trust, Exculpated Party, or Released Party.

Plan at 99.

38. Although there is clarifying language following the discussion of the permanent injunction the fourth paragraph of Article X.F (which precludes and permanently enjoins all claims against the Debtors, the Estates, the Purchaser, or, if applicable, the Reorganized Debtor or the Wind-Down Debtors) that "such injunction will not enjoin Persons or Entities that do not consent to the Third-Party Release from pursuing any direct (but not derivative) claims or Cause of Action such Persons or Entities may have against Released Parties" (Plan at 99–100, Article X.F, para. 4.), it is not clear that the same exception applies to the gate keeping language described in the second paragraph of Article X.F (and excerpted above).

39. The Plan's subjection of a non-releasor's claims against non-debtors to a gatekeeping injunction in an inappropriate forum interferes with the non-releasing creditor's rights and with the ordinary functions of other courts by requiring that that they be brought in the particular manner and forum described above. *Celotex Corp. v. Edwards,* 514 U.S. 300, 308 n.6 (1995) ("[B]ankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor."). Claims that are not included in the plan by the consent of the creditor are by definition not within the jurisdiction of the Court. 28 U.S.C. § 1334; *see Nuveen Mun. Trust ex rel. Nuveen High Yield Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 294–95 (3d Cir. 2012) ( "[P]ost-confirmation context of the dispute alters the 'related to' inquiry. Because a

bankruptcy court's jurisdiction wanes after the confirmation of a case, retention of bankruptcy jurisdiction may be problematic . . . ." (internal quotation marks omitted)). The Court's exercise of jurisdiction over such claims by means of a gatekeeping injunction interferes with the States ability to establish extra-bankruptcy claims against third-party non-debtors and forces parties to litigate claims unnecessarily in a foreign forum. Rite Aid's invitation to impose a gatekeeping injunction not authorized by the Bankruptcy Code is unnecessary and impermissible. *See also Shafer v. Heitner*, 433 U.S. 186, 216 (1977) (holding that parties may not be haled into a foreign forum without adequate constitutional basis for doing so).*Central Virginia Community College v. Katz*, 546 U.S 356, 377 (2006). Gatekeeping state law claims against non-debtor third parties is not a permitted exercise of jurisdiction over the *res* of the estate. *Cf. Central Virginia Community College v. Katz*, 546 U.S 356, 377 (2006).

## VI. RESERVATION OF RIGHTS AND ADDITIONAL OBJECTIONS

40. The State reserves all its respective rights, claims, defenses, and remedies, including without limitation, the right to amend, modify, or supplement this Objection. The State also reserves the right to make further objections at the hearing on the confirmation of the Plan, or otherwise as may be appropriate.

41. Additional compelling arguments appear to warrant rejection of the plan. As previously noted in Maryland's Reply Last Week And Cross-Motion, however, discovery is ongoing and will include depositions of experts and other party witnesses, as contemplated by the Court's March 28 Order, between now and the confirmation hearing date. The State of Maryland therefore reserves the right to supplement these objections following the completion of discovery or later to add additional grounds that support the following specific objections and any other objections warranted by the information received.

a. That the plan fails to provide for the best interest of creditors because it leaves creditors worse off than a liquidation would leave them.

b. That the plan is not fair and equitable to creditors because it does not consider the need for equitable subordination of creditors who were involved in Debtors' unlawful conduct.

c. That the plan confers impermissibly confers more value upon secured creditors than they are entitled to receive.

d. That debtors' bankruptcy petitions were filed, and the plan submitted, in bad faith in the absence of financial necessity to avoid litigation.

e. That the plan, while disclaiming the invocation of the doctrine, impermissibly makes use of substantive consolidation to deprive unsecured creditors of the recovery to which the Bankruptcy Code entitles them.

## CONCLUSION

42. For all these reasons, the Plan should not be confirmed.

Dated April 15, 2024

Respectfully Submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ James McHale
JAMES M.C. MCHALE
BRIAN T. EDMUNDS (*pro hac vice*)
SARAH A. ZADROZNY (*pro hac vice*)
Assistant Attorneys General

Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
(410) 576-6383
jmchale@oag.state.md.us

*Attorneys for the State of Maryland*

**CERTIFICATE OF SERVICE**

    I, James M.C. McHale, hereby certify that on this 15th day of April, 2024, I caused the foregoing Objection to be served by this Court's CM/ECF System on all parties who are scheduled to receive notice through the Court's CM/ECF system.

                                            /s/ James McHale
                                            JAMES M.C. MCHALE