**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## NOTICE OF (I) SUCCESSFUL BIDDER, (II) PROPOSED WALGREENS APA, AND (III) PROPOSED WALGREENS SALE ORDER, EACH SOLELY WITH RESPECT TO THE ACQUIRED ASSETS

**PLEASE TAKE NOTICE** that, on October 18, 2023, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I) Approving the Auction and Bidding Procedures, (I)Approving Bidding Procedures and Bid Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 129] (the "Bidding Procedures Order") and on January 9, 2024, entered

---

[1] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

the *Amended Order (I) Approving the Auction and Bidding Procedures, (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 1413] (the "Amended Bidding Procedures Order") approving certain dates, deadlines, and procedures for the potential sale of certain of the Debtors' assets (the "Bidding Procedures").[2]

**PLEASE TAKE FURTHER NOTICE** that the deadline by which Bids were required to be submitted with respect to the Debtors' Rite Aid Retail Assets occurred on February 6, 2024 (the "Qualified Bid Deadline"). The Debtors received a Qualified Bid from Walgreen Co. with respect to the assets set forth in section 1.1 of that certain Asset Purchase Agreement, dated May 8, 2024, by and among Walgreen Co. and Rite Aid Corporation and its subsidiaries named therein (the "Walgreens APA," such assets, the "Acquired Assets," and the sale of the Acquired Assets free and clear of all Claims (as defined in the Walgreens Sale Order (as defined below)), the "Walgreens Transaction").

**PLEASE TAKE FURTHER NOTICE** that, as of the Qualified Bid Deadline, the Debtors did not receive a Qualified Bid with respect to the Acquired Assets other than the bid submitted by Walgreen Co. In accordance with the Amended Bidding Procedures Order and in consultation with the Consultation Parties, **the Debtors have determined Walgreen Co. to be the Successful Bidder with respect to the Acquired Assets (the "Acquired Assets Successful Bidder")**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Walgreens Transaction with the Acquired Assets Successful Bidder at a Sale Hearing on **June 20, 2024, at 11:30 a.m., prevailing Eastern Time**, before the Honorable Chief Judge Kaplan of the United States Bankruptcy Court for the District of New Jersey. Directions on how to participate in the Sale Hearing are available by visiting the Court's website at https://www.njb.uscourts.gov/riteaid.

**PLEASE TAKE FURTHER NOTICE** that the final form of the Walgreens APA proposed to be approved at the Sale Hearing is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that the proposed form of order to approve the Walgreens Transaction (the "Walgreens Sale Order") is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors do not intend to assume or assume and assign any executory contracts or unexpired leases pursuant to the terms of the Walgreens APA.

**PLEASE TAKE FURTHER NOTICE** that if you object the Walgreens Transaction, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Rules, and any order governing the administration of these chapter 11 cases;

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Amended Bidding Procedures Order or Bidding Procedures, as applicable.

(iii) state with specificity the nature of the objection; and (iv) be filed with the Court and served and **actually received no later than June 19, 2024 at 5:00 p.m. (prevailing Eastern Time)** (the "**Walgreens Transaction Objection Deadline**") by the Court and the following parties: (i) the Debtors, Rite Aid Corporation, 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112; (ii) counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com), Aparna Yenamandra (aparna.yenamandra@kirkland.com), Ross J. Fiedler (ross.fiedler@kirkland.com), and Zachary R. Manning (zach.manning@kirkland.com), 300 North LaSalle, Chicago, Illinois, 60654, Attn:  Steve Toth (steve.toth@kirkland.com); (iii) co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn:  Michael D. Sirota (msirota@coleschotz.com), Warren A. Usatine (wusatine@coleschotz.com), Felice R. Yudkin (fyudkin@coleschotz.com), and Seth Van Aalten (svanaalten@coleschotz.com); (iv) Office of the United States Trustee for Region 3, District of New Jersey, Raymond Boulevard, Suite 2100, Newark, NJ 07102, Attn:  Jeffrey M. Sponder and Lauren Bielskie; (v) counsel to the DIP Agents, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn:  John F. Ventola (jventola@choate.com); Jonathan D. Marshall (jmarshall@choate.com); and Mark D. Silva (msilva@choate.com) and Greenberg Traurig, LLP, 500 Campus Drive, Suite 400, Florham Park, New Jersey 07932, Attn:  Alan J. Brody (brodya@gtlaw.com) and Oscar N. Pinkas (pinkaso@gtlaw.com); (vi) counsel to the Ad Hoc Secured Noteholder Group, Paul, Weiss, Rifkind, Wharton & Garrison, 1285 6th Avenue, New York, NY 10019, Attn:  Andrew N. Rosenberg (arosenberg@paulweiss.com); Brian S. Hermann (bhermann@paulweiss.com); and Christopher Hopkins (chopkins@paulweiss.com) and Fox Rothschild LLP, 49 Market Street, Morristown, NJ 07960, Attn:  Howard A. Cohen (hcohen@foxrothschild.com); Joseph J. DiPasquale (jdipasquale@foxrothschild.com) and Michael R. Herz (mherz@foxrothschild.com); (vii) counsel to the Official Committee of Unsecured Creditors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, Attn:  Kenneth H. Eckstein (keckstein@kramerlevin.com) and Adam C. Rogoff (arogoff@kramerlevin.com), and Kelley Drye & Warren LLP, One Jefferson Road, 2nd Floor, Parsippany, NJ 07054, Attn:  James S. Carr (jcarr@kelleydrye.com) and Robert L. LeHane (rlehane@kelleydrye.com); (viii) counsel to the Official Committee of Tort Claimants, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn:  Arik Preis (apreis@akingump.com) and Mitchell P. Hurley (mhurley@akingump.com), and Sherman, Silverstein, Kohl, Rose & Podolsky, P.A., 308 Harper Drive, Suite 200, Moorestown, NJ 08057, Attn:  Arthur J. Abramowitz (aabramowitz@shermansilverstein.com) and Ross J. Switkes (rswitkes@sehrmansilverstein.com); and (ix) counsel to the Acquired Assets Successful Bidder, Sidley Austin LLP, One South Dearborn, Chicago, IL 60603, Attn.: Joseph Michaels (joseph.michaels@sidley.com); and Matthew Clemente (mclemente@sidley.com).

PLEASE TAKE FURTHER NOTICE that **this notice does not, and shall not be construed to affect, impact, or otherwise alter the sale process with respect to the Debtors' remaining Rite Aid Retail Assets other than the Acquired Assets, and, for the avoidance of doubt, the Rite Aid Retail Assets sale process remains ongoing.  For the avoidance of doubt, the Debtors continue to pursue the Plan Restructuring pursuant to the Plan.**

PLEASE TAKE FURTHER NOTICE that copies of pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of the Debtors' notice, claims, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid.  You

may also obtain copies of any pleadings by visiting the Court's website at https://www.deb.uscourts.gov in accordance with the procedures and fees set forth therein.  If you have questions with respect to your rights under this notice, the Walgreens Transaction, or anything contemplated hereby or thereby, or would like to obtain additional information, contact the Debtors' notice, claims, and solicitation agent and consult with your counsel.

Dated:  June 14, 2024

*/s/  Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:     msirota@coleschotz.com
              wusatine@coleschotz.com
              fyudkin@coleschotz.com
              svanaalten@coleschotz.com


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:     esassower@kirkland.com
              joshua.sussberg@kirkland.com
              aparna.yenamandra@kirkland.com
              ross.fiedler@kirkland.com
              zach.manning@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

## Exhibit A

**Walgreens APA**

*Execution Version*

---

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**WALGREEN CO.**

**AND**

**RITE AID CORPORATION**

**AND ITS SUBSIDIARIES NAMED HEREIN**

**DATED AS OF MAY 8, 2024**

---

TABLE OF CONTENTS

## TABLE OF CONTENTS

Page

ARTICLE I PURCHASED AND EXCLUDED ASSETS; EXCLUDED LIABILITIES .............1
  Section 1.1    Assets to be Purchased ...........................................................................1
  Section 1.2    Excluded Assets .....................................................................................2
  Section 1.3    Excluded Liabilities ...............................................................................2
  Section 1.4    Assumed Liabilities ...............................................................................3

ARTICLE II MERCHANDISE IDENTIFICATION AND VALUATION .......................3
  Section 2.1    Inventory Included in Purchased Assets .................................................3
  Section 2.2    Handling of Excluded Inventory ............................................................3
  Section 2.3    Valuation of the Inventory .....................................................................3

ARTICLE III PURCHASE PRICE, PAYMENT AND ALLOCATION.............................4
  Section 3.1    Purchase Price ........................................................................................4
  Section 3.2    Payment Procedures ...............................................................................4
  Section 3.3    Allocation of the Purchase Price ............................................................4
  Section 3.4    Premise Post-Closing Restriction ...........................................................5
  Section 3.5    Withholding ............................................................................................5

ARTICLE IV CLOSING .................................................................................................5
  Section 4.1    Closing ...................................................................................................5
  Section 4.2    Seller's Deliveries at Closing .................................................................6
  Section 4.3    Buyer's Deliveries at Closing .................................................................6

ARTICLE V ADDITIONAL AGREEMENTS OF THE PARTIES ................................7
  Section 5.1    ██████████████████████████████████████████████████
  Section 5.2    Access to Information; Confidentiality....................................................7
  Section 5.3    Compliance with Law .............................................................................9
  Section 5.4    Non-Competition ..................................................................................10
  Section 5.5    Protected Health Information.................................................................10
  Section 5.6    License ..................................................................................................10
  Section 5.7    DSCSA ..................................................................................................10
  Section 5.8    Further Assurances ...............................................................................11
  Section 5.9    No Successor Employer or Other Liabilities .........................................11
  Section 5.10   Public Announcements ..........................................................................11
  Section 5.11   Reasonable Efforts; Cooperation ..........................................................12
  Section 5.12   Regulatory ............................................................................................12
  Section 5.13   Acknowledgement by Buyer ................................................................14

ARTICLE VI ENCUMBRANCES..................................................................................15
  Section 6.1    UCC Searches .......................................................................................15

ARTICLE VII BANKRUPTCY MATTERS ...................................................................15
  Section 7.1    Bankruptcy Actions ..............................................................................15
  Section 7.2    Sale Order .............................................................................................16
  Section 7.3    Approval................................................................................................16

TABLE OF CONTENTS

ARTICLE VIII REPRESENTATIONS AND WARRANTIES.....................................................17
    Section 8.1       Seller's Representations and Warranties..................................................17
    Section 8.2       Buyer's Representations and Warranties ................................................20

ARTICLE IX CONDITIONS PRECEDENT ...........................................................................22
    Section 9.1       Parties' Conditions to █████ Closing ..................................................22
    Section 9.2       Seller's Conditions to █████ Closing ..................................................23
    Section 9.3       Buyer's Conditions to █████ Closing ..................................................23

ARTICLE X TERMINATION ...............................................................................................24
    Section 10.1      Termination ..........................................................................................24
    Section 10.2      Effects of Termination .........................................................................25

ARTICLE XI MISCELLANEOUS ........................................................................................26
    Section 11.1      Non-Survival of Representations and Warranties and Certain
                       Covenants; Certain Waivers.................................................................26
    Section 11.2      Definitions and Interpretation ..............................................................26
    Section 11.3      Notices .................................................................................................28
    Section 11.4      Binding Effect; Successors and Assigns; No Third Party
                       Beneficiaries........................................................................................29
    Section 11.5      Non-Recourse.......................................................................................29
    Section 11.6      Risk of Loss. ........................................................................................30
    Section 11.7      Entire Agreement; Amendment; No Waiver.........................................30
    Section 11.8      Expenses...............................................................................................30
    Section 11.9      Counterparts; Signatures ......................................................................31
    Section 11.10    Arms-Length Transaction .....................................................................31
    Section 11.11    Specific Performance ...........................................................................31
    Section 11.12    Governing Law; Waiver of Jury Trial...................................................32
    Section 11.13    Jurisdiction and Exclusive Venue ........................................................32
    Section 11.14    Partial Invalidity..................................................................................33
    Section 11.15    Acknowledgement Regarding Representation; Construction ...............33
    Section 11.16    Exhibits and Schedules ........................................................................33
    Section 11.17    No Right of Set-Off..............................................................................34
    Section 11.18    Bulk Sales Laws...................................................................................34
    Section 11.19    Seller's Representative .........................................................................34



## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement") is made and entered into as of May 8, 2024, by and among **WALGREEN CO.**, an Illinois corporation ("Buyer"), and **RITE AID CORPORATION**, a Delaware corporation (as in existence on the date hereof), as a debtor-in-possession and a reorganized debtor, as applicable ("RAD"), and the Subsidiaries of RAD that are indicated on the signature pages attached hereto (collectively with RAD, "Seller"). Each of Buyer and Seller is referred to herein individually as a "Party" and collectively as the "Parties".

████████████████████████████████████

**WHEREAS**, on October 15, 2023, Seller, together with certain of Seller's Subsidiaries and Affiliates, commenced voluntary cases under chapter 11 of the United States Code, 13 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-18993 (MBK) (Bankr. D.N.J.) (collectively, the "Bankruptcy Cases");

**WHEREAS**, Buyer desires to purchase the Purchased Assets from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Purchased Assets, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order; and

████████████████████████████████████

**NOW, THEREFORE**, in consideration of the covenants and agreements hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## PURCHASED AND EXCLUDED ASSETS; EXCLUDED LIABILITIES

**Section 1.1    Assets to be Purchased**. Pursuant to sections 105 and 363 of the Bankruptcy Code, at the ██████ Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, upon the terms and subject to the conditions set forth in this Agreement and in the Sale Order, all of Seller's right, title, and interest, as of such Closing, in and to the assets ████ (collectively, the "Purchased Assets"), free and clear of all Encumbrances to the maximum extent permitted by Section 363(f) of the Bankruptcy Code, as they exist as of the ████████ Closing, excluding in all cases the Excluded Assets.

**Section 1.2    Excluded Assets**. Notwithstanding the provisions of Section 1.1, the Purchased Assets shall not include, and in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, any right, title and interest to, in and under, any assets other than the Purchased Assets, including the following assets of Seller (all such assets that are not Purchased Assets, collectively, the "Excluded Assets"):

 (a) The Excluded Inventory described on Exhibit B (the "Excluded Inventory");

 (b) Excluded Tax Returns; and

 (c) All assets of Seller and its Affiliates not set forth in Section 1.1, including: (i) front-end store inventory and over the counter inventory; (ii) signature logs;



(v) cash, cash deposits and accounts receivable related to periods ending prior to the ███ Closing Date; (vi) store and trade fixtures, furniture and equipment; ████████████████████ (viii) employee benefit plans, programs or arrangements and all contracts of insurance; (ix) computer software programs and systems and web sites; (x) corporate minute books and the corporate seal of Seller; and (xi) ████████ ████████████████████ including all rights in and to the name "Rite Aid" and all derivatives thereof; (xii) electronic copies of any and all controlled substance invoices (including those used for sale, receipt and delivery of controlled substances), (xiii) records of all controlled substances disposed of, (xiv) electronic copies of all used DEA 222 forms (blue copies for orders placed, blue copies for unaccepted or defective forms, and/or executed originals for received single-page forms with each statement attached); (xv) annual controlled substance inventory logs dated older than two (2) years prior to the ██████ Closing Date and (xvi) unused DEA 222 forms or blue copies for unaccepted or defective forms.

**Section 1.3    Excluded Liabilities**. Except for Assumed Liabilities, Buyer shall not assume or be obligated to pay, perform or otherwise discharge any liability, claim, Encumbrance or obligation of Seller or any predecessor or Affiliate of the Seller whatsoever, regardless of whether any such liabilities or obligations are absolute or contingent, liquidated or unliquidated, known or unknown, or otherwise (collectively, the "Excluded Liabilities"). Seller shall remain liable for all Excluded Liabilities. Without limiting the generality of the foregoing, the Excluded Liabilities shall include: (i) any liabilities or obligations arising out of the operations of Seller prior to the ██████ Closing Date; (ii) any liabilities or obligations for any violations by Seller prior to the ██████ Closing of the Health Insurance Portability and Accountability Act of 1996, Pub.L. 104-191, as amended by the Health Information Technology for Economic and Clinical Health Act, Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, Pub.L. 111-5, or of the regulations promulgated thereunder, 45 C.F.R. Parts 160, 162 and 164 (collectively, "HIPAA"), or of any other Privacy and Security Requirements; (iii) any mortgages, security interests, conditional sales or title retention

2

agreements, pledges, hypothecations, Encumbrances, judgments, Orders, or claims of any kind or nature, including any Encumbrances or security interests of any creditor, any reclamation claims and any other claims, Encumbrances or rights held or asserted by any party whatsoever with respect to any of the Purchased Assets; (iv) all liabilities relating to the Excluded Assets; and (v) any Excluded Taxes.

**Section 1.4    Assumed Liabilities**. Pursuant to sections 105 and 363 of the Bankruptcy Code, at the ▮▮▮▮ Closing, Buyer shall assume, upon the terms and subject to the conditions set forth in this Agreement and in the Sale Order, all liabilities related to its ownership of the applicable Purchased Assets and the use of such Purchased Assets in connection with Buyer's business that arise after such Closing, as applicable, including Assumed Taxes (collectively, the "Assumed Liabilities").

**ARTICLE II**
**MERCHANDISE IDENTIFICATION AND VALUATION**

**Section 2.1    Inventory Included in Purchased Assets**. Subject to Section 2.2, excluding in all cases the Excluded Inventory, the "Purchased Inventory" means, in respect of the inventory ▮▮▮▮▮▮▮, all items in ▮▮▮▮▮▮ stock of prescription pharmaceutical inventory. Notwithstanding the foregoing and anything to the contrary set forth elsewhere herein, if proper 3T Documentation and DEA Documentation, as applicable, as determined by Buyer in its reasonable discretion, is not provided by Seller for any of the Purchased Inventory, Buyer has the right to refuse to purchase at the ▮▮▮▮ Closing that portion of the Purchased Inventory for which Seller did not so provide proper 3T Documentation and DEA Documentation, as applicable. Any inventory that Buyer declines to purchase hereunder shall remain the property of Seller and shall constitute Excluded Inventory.

**Section 2.2    Handling of Excluded Inventory**. The Parties understand that Buyer will purchase, and the Purchased Assets will include, only those items of inventory that are determined to be Purchased Inventory according to the procedures set forth on ▮▮▮▮ and that Buyer will not purchase any Excluded Inventory. To the extent reasonably possible, Seller shall physically separate all applicable Excluded Inventory from the applicable Purchased Inventory prior to the ▮▮▮▮ Closing.

**Section 2.3    Valuation of the Inventory**.

(a) The Parties shall commission WIS International or another mutually acceptable inventory valuation firm (the "Inventory Service") to conduct a full review and valuation of the Purchased Inventory at ▮▮▮▮▮▮▮▮▮▮ using the methods, standards and procedures set forth on Exhibit B ▮▮▮▮▮▮▮▮▮▮ the "Inventory Amount" and, ▮▮▮▮▮▮▮▮▮▮, the "Inventory Amounts"). For the avoidance of doubt, each of RAD and Buyer shall be responsible for fifty percent (50%) of the cost and expense of the Inventory Service for all purposes hereunder (with the portion thereof for which RAD is responsible being paid through a corresponding reduction of the Purchase Price payable by Buyer, to the extent elected by RAD).

(b) Notwithstanding anything to the contrary set forth herein, the Inventory Amount ███████████████████████ shall be capped at and shall not exceed the amount of the applicable "Inventory Cap" ████████████████████ set forth on Schedule A ████████████████████████████████████████ ██████ In the event the Inventory Amount ████████████████████ would otherwise exceed the applicable Inventory Amount Cap, ████████████ with an aggregate value in excess of the applicable Inventory Amount Cap shall constitute Excluded Inventory and Seller shall be entitled to retain such excess inventory at and following the ████████ Closing.

## ARTICLE III
## PURCHASE PRICE, PAYMENT AND ALLOCATION

**Section 3.1    Purchase Price**. The aggregate purchase price (the "Purchase Price") for the Purchased Assets and the covenants and agreements set forth herein shall be an amount equal to the Inventory Amounts (as determined as set forth in Section 2.3), payable in accordance with the terms and conditions set forth in Section 3.2.

**Section 3.2    Payment Procedures**. Subject to the satisfaction or waiver of the conditions precedent set forth in Article VIII and the occurrence of the ████████ Closing, Buyer shall pay an amount equal to the ████████████████████ subject to such Closing (as determined as set forth in Section 2.3), taking into account all deductions from the Inventory Amount in accordance with this Section 3.2, and such amount shall be paid within three (3) Business Days of the applicable "Closing Date" to be set forth on Schedule A in accordance with Section 4.1(b), in cash by wire transfer of immediately available funds to such account(s) as may be designated by RAD at least two (2) Business Days prior to the date such payment is to be made; provided that Buyer has then received each of the following ████████████████ : (i) a complete inventory report prepared in accordance with Article II (which report shall identify the Purchased Inventory and ██████████████████████████████ signed by representatives of RAD, Buyer and the Inventory Service; and (ii) the 3T Documentation and DEA Documentation, as applicable. In the event Buyer reviews an inventory report, 3T Documentation and DEA Documentation, as applicable, provided for purposes of the foregoing and reasonably disputes the Inventory Amount, the 3T Documentation or the DEA Documentation, as applicable, Buyer shall promptly notify RAD of the dispute. Buyer shall promptly pay any amount(s) not in dispute in accordance herewith, and the Parties shall negotiate in good faith to resolve the dispute within three (3) Business Days of such notice. Within two (2) Business Days of the date the dispute is resolved, Buyer shall pay the agreed ██████████████████████ (minus any amounts of such Inventory Amount previously paid by Buyer) in cash by wire transfer of immediately available funds to such account(s) as may be designated by RAD at least two (2) Business Days prior to the date such payment is to be made.

**Section 3.3    Allocation of the Purchase Price**. The Purchase Price will be allocated for Tax purposes as set forth in this Section 3.3:

(a) For the covenants not to compete set forth in Section 5.4, an amount equal to twenty percent (20%) of the respective Inventory Amount actually paid shall be allocated among the covenantors at their discretion.

(b) The remaining Inventory Amount shall be allocated to the Purchased Inventory.

Seller and Buyer each agree to file IRS Form(s) 8594 and all federal, state and local income Tax returns in accordance with the above allocations, and neither Party shall thereafter take an income Tax return position inconsistent with such allocation unless otherwise required by a "determination" within the meaning of section 1313(a) of the Code.  Seller (including Seller as may be reorganized in the Bankruptcy Cases) and Buyer shall promptly advise one another of the existence of any tax audit, controversy or litigation related to any allocation hereunder.



**Section 3.5**    **Withholding**. Buyer and its Affiliates and any their respective agents or service providers shall be entitled to deduct and withhold from any amount otherwise payable pursuant to this Agreement such amounts as they are required to deduct and withhold with respect to the making of such payment under any provision of federal, state, local or foreign Law; provided that, unless Seller fails to provide an IRS Form W-9 consistent with Section 4.2(c), Buyer and its Affiliates shall use commercially reasonable efforts to provide notice to Seller of any such deduction or withholding reasonably prior to making any such deduction or withholding and reasonably cooperate with Seller to reduce or eliminate any such deduction or withholding.

**ARTICLE IV**
**CLOSING**

**Section 4.1**    **Closing**.

(a) Subject to the satisfaction or waiver of the conditions precedent set forth in Article IX and the terms and conditions and the other applicable provisions of this Agreement, the closing of the purchase and sale of the Purchased Assets for a given ████████████████ an "Inventory Closing" or a "Closing" ██████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████,

██████████████████████ in each case by electronic exchange of documents or another mutually agreeable manner.



**Section 4.2    Seller's Deliveries at Closing.** At ███ Closing (except as set forth below), Seller shall deliver to Buyer each of the following:

(a) Possession of the applicable Purchased Assets;

(b) A Bill of Sale with respect to the applicable Purchased Assets duly executed by an authorized officer of RAD, in the form attached hereto as Exhibit C;

(c) An IRS Form W-9 duly executed by an authorized officer of the applicable Seller; provided that Buyer's sole remedy for the failure to provide any such form shall be to withhold any required amount under applicable Tax Law;

(d) For purposes of any Closing, a full and complete copy of Seller's 3T Documentation and DEA Documentation, as applicable, as required for the applicable Purchased Inventory; and

(e) Such other instruments or documents as may be necessary or appropriate to carry out ████████████████ in accordance herewith, none of which instruments or documents will increase the rights, remedies, or liabilities of any Party.

**Section 4.3    Buyer's Deliveries at Closing.** At ███ Closing (except as set forth below), Buyer shall deliver to Seller each of the following:

(a) a Bill of Sale with respect to the applicable Purchased Assets duly executed by an authorized officer of Buyer, in the form attached hereto as <u>Exhibit C</u>; and

(b) such other instruments or documents as may be necessary or appropriate to carry out ██████████████ in accordance herewith, none of which instruments or documents will increase the rights, remedies, or liabilities of any Party.

## ARTICLE V
## ADDITIONAL AGREEMENTS OF THE PARTIES



(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated or required by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on <u>Schedule 5.1</u>, Seller shall, and shall cause its Subsidiaries to, (A) between the date hereof and the date Seller closes ████████████ on the day prior to the ██████ Closing Date, (i) operate ████████████ in the Ordinary Course and substantially as presently operated and (ii) maintain ██████████ normal operating hours, staffing levels, inventory levels and merchandise mix (other than with regard to front-end retail inventory) and (B) between the date hereof and the ██████ Closing Date, (i) keep and maintain the Purchased Assets in good saleable condition, and maintain the security controls at the facilities holding the Purchased Inventory, (ii) protect and preserve the integrity of all patient information, instituting all necessary safeguards to ensure that such patient information and other confidential information is delivered to Buyer, ███████████ ███████████████████████████████████████████████████

(b) Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated or required by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability, (v) as set forth on <u>Schedule 5.1</u> or (vi), with the express prior written approval of Buyer, between the date hereof and the ██████ Closing Date, Seller shall not, and shall not permit its Subsidiaries to: (A) take any action that would reasonably be expected to result in any of the conditions to the Closing set forth in this Agreement not being satisfied or (B) sell, lease, transfer or otherwise dispose of (including any transfers from Seller to any of its Affiliates), or impose or suffer to be imposed any Encumbrance on, any of the Purchased Assets, other than pharmaceutical inventory (that will not be deemed to be Purchased Assets hereunder) sold or otherwise disposed of for fair value in the Ordinary Course and Encumbrances that will be removed by the Sale Order.

## Section 5.2     Access to Information; Confidentiality.

(a) Buyer and Seller hereby covenant and agree that discussions and negotiations and any other non-public information provided by the other (or its Affiliates or

representatives) relating to this Agreement ▮▮▮▮▮▮▮▮ will be governed by all the terms and conditions of the Confidentiality Agreement and the Clean Team Agreement, which Confidentiality Agreement and Clean Team Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein but will be deemed terminated as of the ▮▮▮▮ Closing. Until the ▮▮▮▮ Closing, Buyer will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement and the Clean Team Agreement with respect to such access and any information furnished to Buyer or any of its Advisors in accordance therewith.

(b) From and after the ▮▮▮▮▮ Closing, Seller shall not, and shall cause its Affiliates and their respective representatives and Advisors not to, disclose to any Person other than authorized officers, directors and employees of Buyer or its Affiliates any Confidential Information (as defined below) except (i) as expressly authorized in writing by Buyer or its Affiliates or (ii) if and to the extent disclosure is specifically required by applicable Law; provided, however, that in the event disclosure is required by applicable Law, Seller shall, to the extent legally permissible and feasible, provide Buyer with reasonable prior notice of such requirement prior to making any disclosure so that Buyer may seek an appropriate protective order. Seller shall, and shall cause its Affiliates to and to instruct its and their respective representatives and Advisors to, take the same degree of care to protect the Confidential Information that such Person uses to protect his, her or its own trade secrets and confidential information of a similar nature, which shall be no less than a reasonable degree of care. For purposes of this Section 5.2(b), "Confidential Information" means any information with respect to or concerning the applicable Purchased Assets, Buyer or any of its Affiliates, including methods of operation, customers, customer lists, products, prices, fees, costs, trade secrets, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters, whether in written, verbal, graphic or other form. Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) is or becomes generally available to the public other than as a result of breach by the Seller hereunder, (ii) is or has been independently developed or conceived by Seller or its representatives without use of the Confidential Information and (z) is or becomes available to Seller or its representatives on a nonconfidential basis from a source other than Buyer or its Affiliates or their respective representatives; provided that such source was not known by Seller or its representatives to be prohibited from disclosing such information to Seller or its representatives by a legal, contractual or fiduciary obligation. The provisions of this Section 5.2(b) shall be in addition to, and not in lieu of, any confidentiality or non-use obligation under any other agreement between Buyer, on the one hand, and Seller, on the other hand. For the avoidance of doubt, nothing herein shall prevent Seller from disclosing this Agreement or any terms contained herein (i) to any Affiliate or representative of Seller, (ii) if and as required to be filed with the Bankruptcy Court and (iii) as may be made available by Seller to potential bidders, to the extent required by the Bidding Procedures Order.

(c) The Parties acknowledge that Buyer and Seller are "Covered Entities" as that term is defined under HIPAA. To facilitate the transition of care from Seller to Buyer, it may be necessary that Buyer have access to electronic patient records prior to the ▮▮▮▮▮▮ Closing Date.  For data migration and integration purposes, Buyer agrees to implement

appropriate safeguards to restrict the access and use of such electronic patient records prior to ██ ██ Closing Date in compliance with all applicable Laws, including HIPAA. If for whatever reason the Transaction (or any component thereof) does not close, Buyer agrees to take reasonable steps to remove or destroy any such relevant electronic patient records from its active servers and dispensing system.

(d) Subject to <u>Section 5.2(b)</u>, from the date hereof until the ██ Closing, Seller will provide Buyer and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours (and in accordance with the reasonable procedures established by Seller) to the books and records of Seller to the extent related to the Purchased Assets, in order for Buyer and its authorized Advisors to access such information regarding the Purchased Assets as is reasonably necessary in order to consummate ████████; <u>provided</u> that (i) such access does not unreasonably interfere with the normal operations of any Seller, (ii) such access will occur in such a manner as Seller reasonably determine to be appropriate to protect the confidentiality of ████████ such books and records, (iii) all requests for access will be directed to Guggenheim Securities or such other Person(s) as Guggenheim Securities may designate in writing from time to time, (iv) Seller is not obligated to disclose and may redact or remove any information that is not related to the Purchased Assets and (v) nothing herein will require Seller to provide access to, or to disclose any information to, Buyer if such access or disclosure (A) would cause significant competitive harm to any Seller if the ████████ not consummated, (B) would waive any legal privilege, (C) would be in violation of applicable Laws ████████ or the provisions of any agreement to which Seller is bound or would violate any fiduciary duty, or (D) is or relates to any Excluded Tax Return. Notwithstanding anything to the contrary contained herein, nothing in this Agreement will permit Buyer or its authorized Advisors to conduct any sampling or testing of environmental media or any other similar invasive investigation or assessment, including of the type commonly known as Phase II environmental site assessment.

(e) From and after the ██ Closing until the three (3) year anniversary of the ██ Closing Date, Seller (including Seller as may be reorganized in the Bankruptcy Cases) will provide Buyer and its authorized Advisors with reasonable access (including electronic access for the purpose of examining and copying) and upon reasonable advance notice and during regular business hours (and in accordance with the reasonable procedures established by Seller) to the books and records of Seller to the extent related to the Purchased Assets in a manner that allows Buyer to address, progress or comply with any third party payor audits, insurance claims, governmental requests, audits or investigations, litigation or other disputes, legal compliance, financial statement preparation or similar matters. Nothing in this <u>Section 5.2(e)</u> shall prohibit, delay, or otherwise impair the Seller's ability to wind down their respective corporate existence and operations following the ██ Closing in compliance with all applicable Laws, including HIPAA.

**Section 5.3    <u>Compliance with Law</u>**. The Parties agree to comply fully with the provisions of the United States Controlled Substance Act of 1970 (the "<u>Controlled Substance Act</u>") and Laws administer by the DEA, as such act may relate to the transfer of the Purchased Inventory, and with the Federal Food, Drug and Cosmetic Act (the "<u>FDCA</u>") and Laws administered by the United States Food and Drug Administration and all applicable state Laws as they may relate to

the transfer of the Purchased Inventory. Seller shall notify the appropriate Governmental Bodies, including the appropriate State Board of Pharmacy or similar office and the regional office of the DEA, and the Centers for Medicare & Medicaid Services, ██████████████ to the extent required by applicable Law.

**Section 5.4      Non-Competition**.



**Section 5.5      Protected Health Information.** Seller acknowledges and agrees that Buyer shall not assume any legal obligations of Seller or any of its Subsidiaries under HIPAA relating to uses and disclosures of health information made by any Seller or any of its Subsidiaries prior to the ████████ Closing. All inquiries relating to patient rights under HIPAA relating to uses or disclosures of health information made prior to the ████████ Closing shall be forwarded to Seller or its designated agent for handling.

**Section 5.6      License.** Subject to Section 5.12, Seller agrees to send all required notifications of the sale of the Purchased Assets hereunder to Buyer to all applicable Governmental Bodies and other-third parties in accordance with Seller's legal and contractual obligations. ████████████████████████████████████████████████████████████████████████████████ he Parties agree to cooperate and to use commercially reasonable efforts to effectuate the provisions of this Section 5.6.

**Section 5.7      DSCSA.** Seller agrees to provide Buyer with all product tracing information and other information required by the DSCSA for the Purchased Inventory, including the 3T Documentation. At no additional cost to Buyer, Seller shall reasonably cooperate and assist Buyer, in Buyer's efforts to effect a transfer of such 3T Documentation using such means and efforts as

determined by Buyer in its reasonable discretion. Such cooperation may include Seller taking such acts as may be reasonably necessary, including executing a release or authorization for the benefit of any third parties that are maintaining any such 3T Documentation on behalf of Seller, as may be necessary to facilitate the transfer of all such 3T Documentation to Buyer.

**Section 5.8    Further Assurances.** From time to time following ▮▮▮ Closing, as and when requested by any Party and at such requesting Party's expense, any other Party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence or effectuate ▮▮▮▮▮▮▮▮

**Section 5.9** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



**Section 5.10    Public Announcements**. Except as expressly permitted by this Agreement, including Buyer's right to send patient letters to customers pursuant to Section 5.8 hereof, no public release or announcement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, including any press statement or comment or social media communication, shall be issued by the Buyer or Seller (or their respective Affiliates or representatives) without the prior approval of the other Party as to the form and substance of any press release or announcement related to this Agreement ▮▮▮▮▮▮▮▮▮▮, and the Parties hereto will consult with each other as to the form and substance of any other public disclosures related thereto (which approval shall not be unreasonably withheld or delayed), except, in each case, as such release or announcement that is in the opinion of its counsel required by applicable Law, by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or the rules, regulations or policies of any United States or foreign securities exchange, in which case the Party required to make the release or announcement shall (to the extent permissible under such applicable Law or Bankruptcy Court requirement, if applicable) allow the other Party reasonable time to comment on such release or announcement in advance of such issuance; provided that on or after the date of this Agreement,

(a) each Party may make internal announcements to their respective employees after reasonable prior notice to the other and approval by the other with regard to the content and timing of such announcement, (b) Seller may make patient notifications in accordance with applicable Law and contractual obligations, and (c) the Parties hereto acknowledge that this Agreement (including the Purchase Price as expressly set forth herein) shall be filed publicly on the docket with the Bankruptcy Court.

**Section 5.11    <u>Reasonable Efforts; Cooperation</u>.**

(a)    Subject to the other terms of this Agreement (including <u>Section 5.12</u>), each Party shall (whether directly or through its Advisors) use its commercially reasonable efforts to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause ███████████ to be effected as soon as reasonably practicable, but in any event on or prior to the Outside Date, subject to the conditions herein and in accordance with the terms hereof, and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of such obligations.

(b)    The obligations of Seller pursuant to this Agreement, including this <u>Section 5.11</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), and Seller's obligations as debtors in possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order), and Seller's duty to seek and obtain the highest or otherwise best price for the Purchased Assets as required by the Bankruptcy Code.

(c)    After the ████████ Closing, Seller or any of its Subsidiaries (including Seller or such Subsidiaries as may be reorganized in the Bankruptcy Cases) and Buyer and its Affiliates shall: (i) make available to the other Party and to any Governmental Body, as reasonably requested, all information, records and documents relating to Taxes relating to the Purchased Assets; and (ii) furnish the other Party with copies of all correspondence received from any Governmental Body in connection with any Tax audit or information request with respect to the Purchased Assets; <u>provided</u> that Seller shall not be required to provide any Excluded Tax Return and neither Party will be required to provide any information if providing such information would waive any legal privilege.

**Section 5.12**    ███████████





**Section 5.13    Acknowledgement by Buyer**.

(a)    Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, the Purchased Assets, and the Assumed Liabilities, and, in making its determination to proceed with ███████████, Buyer and the Buyer Group have relied solely, are relying, and will rely, solely, on the Express Representations and the results of the Buyer Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Buyer or any of its Affiliates or representatives in the Dataroom, any Information Presentation, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Buyer and the Buyer Group have relied only on the Express Representations), ████████████████████████████ ███████████. Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Buyer or any member of the Buyer Group on which Buyer or any member of the Buyer Group may rely █ █████████████████████████ (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information, including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of any Seller, any of the Seller Parties or any other Person on behalf of any Seller or any of the Seller Parties or any of their respective Affiliates or representatives and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, liabilities, properties, contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, or the quality, quantity or condition of any of the Purchased Assets, are, in each case, specifically disclaimed by each Seller, on its behalf and on behalf of the Seller Parties, ████████████████████████████ ███████████ except for the Express Representations.

(b)    Without limiting the generality of the foregoing, in connection with the investigation by the Buyer Group of the Purchased Assets, Buyer and the members of the Buyer Group, and the representatives of each of the foregoing, have received or may receive, from or on behalf of any Seller, or other Seller Parties, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom and management meetings) (collectively, "Projections"). Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that (i) such Projections are being provided solely for the convenience of Buyer to facilitate its own independent investigation of the Purchased Assets, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Buyer is familiar with such uncertainties, and (iv) Buyer is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)     Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that it will not assert, institute, or maintain, and will cause each member of the Buyer Group not to assert, institute or maintain, any claim, action, proceeding that makes any claim contrary to the agreements and covenants set forth in this <u>Section 5.13</u>.

(d)     Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that the covenants and agreements contained in this <u>Section 5.13</u> (i) require performance after █████ Closing to the maximum extent permitted by applicable Law and (ii) are an integral part of ████████████ and that, without these agreements set forth in this <u>Section 5.13</u>, Seller would not enter into this Agreement.

(e)     Notwithstanding anything to the contrary contained herein, nothing contained in this <u>Section 5.13</u> or elsewhere in this Agreement shall be construed to limit any claims or remedies for Fraud.

## ARTICLE VI
## ENCUMBRANCES

**Section 6.1    <u>UCC Searches</u>**. Buyer may conduct Uniform Commercial Code searches of state and county records.

## ARTICLE VII
## BANKRUPTCY MATTERS

**Section 7.1    <u>Bankruptcy Actions</u>**.

(a)     The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Buyer agrees and acknowledges that Seller, including through its representatives, is and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order. Seller may modify the motion seeking approval of the Sale Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, with such modifications being acceptable to Buyer in its commercially reasonable discretion.

(b)     Subject to <u>Section 5.12</u>, from the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article X and (ii) ████████████████████████████████████████

(c)     Subject to <u>Section 5.12</u>, Buyer shall reasonably promptly take all actions as are reasonably requested by RAD to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary ████████ as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Buyer and its Affiliates available to testify before

the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" Buyer under section 363(m) of the Bankruptcy Code.

(d)      Each of Seller and Buyer shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court ███████████████████ and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court ████████████
████████



(e)      Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to higher and better bids and Bankruptcy Court approval. Buyer acknowledges that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an Auction.

(f)      Nothing in this <u>Section 7.1</u> shall prevent Seller from modifying the bidding procedures as necessary or appropriate to maximize value for Seller's estate in accordance with Seller's fiduciary obligations.

**Section 7.2      <u>Sale Order</u>**. The Sale Order shall, among other things, (a) approve, pursuant to sections 105 and 363 of the Bankruptcy Code (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Encumbrances, and (iii) the performance by Seller of its obligations under this Agreement, (b) find that Buyer is a *"good faith"* buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Buyer is not a successor to any Seller, and grant Buyer the protections of section 363(m) of the Bankruptcy Code, (c) find that Buyer shall have no liability or responsibility for any liability or other obligation of any Seller arising under or related to the Purchased Assets, including successor or vicarious liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto merger, or substantial continuity and (d) find that Buyer shall have no liability for any Excluded Liability.

**Section 7.3      <u>Approval</u>**. Seller's obligations under this Agreement a███████████
████████ are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

**ARTICLE VIII**
**REPRESENTATIONS AND WARRANTIES**

**Section 8.1    Seller's Representations and Warranties**. As an inducement to Buyer to enter into this Agreement and to consummate ███████████, except as disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with the SEC by RAD in respect of Seller, its Affiliates, and its businesses to the extent publicly available on the EDGAR system of the SEC (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements" and any other disclosures included therein to the extent they are forward-looking in nature) or set forth in the Schedules delivered by Seller concurrently herewith (each, a "Schedule" and collectively, the "Schedules") and subject to Section 11.16, Seller represents and warrants to Buyer, as of the date of this Agreement and as of the ████████ Closing Date, as follows:

(a) Organization and Authority. Each Seller is duly incorporated or organized, validly existing, and in good standing under the Laws of its respective jurisdiction of incorporation or organization and in good standing in all other jurisdictions in which such Seller conducts business. Subject to requisite Bankruptcy Court approvals, (i) each Seller has the power and other authority to execute, deliver and perform this Agreement ███████████████████████ to which such Seller is a party and to perform its obligations hereunder and to consummate the Transaction; (ii) the execution, delivery and performance by each Seller of this Agreement and ████████████████ to which such Seller is a party, and the consummation by such Seller ████████████, have been duly authorized by all requisite corporate action, limited liability company action or other action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement ███████████████████ and (iii) when fully executed and delivered by all Parties and thereto, as applicable, this Agreement ████████████████, will be legal, valid and binding obligations of Seller enforceable in accordance with their terms, in each case subject to bankruptcy, insolvency, reorganization, moratorium and similar Laws of general application relating to or affecting creditors' rights and to general equity principles.

(b) No Conflicts. Assuming that the Sale Order and all other requisite Bankruptcy Court approvals are obtained █████████████████████████████████████████ neither the execution, delivery and performance of this Agreement by Seller nor the consummation by Seller ████████████ will: (i) conflict with or violate any provision of a Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, or other governing documents, as applicable, (ii) violate any Law or Order to which any of the Purchased Assets is subject or by which Seller is bound, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any material contract or accelerate any of Seller's obligations under any such material contract, (iv) require the approval, consent, authorization or act of, or the making by Seller of any declaration, filing or

registration with, any Person or (v) result in the creation of any Encumbrance on any Purchased Assets.

(c) <u>Title to Assets</u>. Seller has good and valid title to all of the Purchased Assets, free and clear of any Encumbrance. At the ██████ Closing, Seller will transfer to Buyer good and valid title to the applicable Purchased Assets and such property will not be subject to any Encumbrance.

(d) <u>Inventory</u>. The Purchased Inventory is in good, merchantable and useable condition, and consists only of items of quality commercially usable and salable in the ordinary course of ██████ business, except for any items excluded under <u>Exhibit B</u>. The Purchased Inventory is neither adulterated nor misbranded, nor are they suspect or illegitimate, as those terms are defined by the FDCA, and since January 1, 2022, they have been purchased and stored in accordance in all material respects with the requirements of the Controlled Substance Act and any similar state Law requirements.

(e) Legal Proceedings. Except as set forth on Schedule 8.1(e) ██████ ███████████████████████████████ or where such item would not reasonably be expected to impair the use or value of the ownership of the Purchased Assets, there are no (i) complaints (including *qui tam* complaints), claims, actions, suits, investigations, civil investigative demands, subpoenas or proceedings pending or, to Seller's knowledge, threatened by or against Seller or, to Seller's knowledge, any employee of Seller affecting any of the Purchased Assets or (ii) Orders of any court or Governmental Body to which Seller is a party with respect to any ████████████████████ of the Purchased Assets is subject. Since January 1, 2022, Seller has not received any notice of complaints filed against Seller under HIPAA or any Privacy or Security Requirements in connection with any of the ██████████████ Purchased Assets and, to Seller's knowledge there has been no violation of such laws.

(f) <u>Compliance with Law</u>. Except as set forth on <u>Schedule 8.1(f)</u>, Seller is not in violation, and since January 1, 2022, Seller has not been in violation, of any Laws or Orders, including all laws and regulations relating to the provision, marketing and sale of healthcare items and services, including the Medicare and Medicaid Statutes (42 U.S.C. §§ 1395 et seq. and 42 U.S.C. §§ 1396 et seq.), the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the federal Beneficiary Inducement Statute (42 U.S.C. § 13201-7a(a)(5)), state anti-kickback and all-payer laws, the Civil False Claims Act (31 U.S.C. §§ 3729 et seq.), the federal criminal False Statements Law (42 U.S.C. § 1320a-7b(a)), and the criminal healthcare fraud statutes (18 U.S.C. §§ 286, 287, 1347 and 1349), the FDCA, including the DSCSA, and the Controlled Substance Act (collectively, the "<u>Healthcare Laws</u>") with respect to any of the Purchased Assets. Seller has timely filed all material reports, registrations and statements required to be filed by it with any Governmental Body, including all applicable state boards of pharmacy, state Medicaid agencies, and the Centers for Medicare and Medicaid Services, and has paid all related fees and assessments due and payable, ██████████████████. All Medicare, Medicaid and third-party reports and claims filed or required to be filed by or on behalf of Seller ██ ████████████████ have been timely filed and are complete and accurate in all material respects. Such reports and claims properly claim and disclose all information

and other items to be disclosed for the periods covered thereby.  Seller has not and to Seller's knowledge, no employee of Seller or its Affiliate █████████████████████ ████████████ has received any written or oral notice that alleges any material noncompliance or that the Seller is under investigation for any alleged material noncompliance with any Healthcare Laws.  Seller has not and to Seller's knowledge, no employee of Seller or its Affiliate ████████████████████████ has been disciplined or sanctioned by any Governmental Body or suspended, excluded, disbarred, or threatened to be suspended, excluded, or disbarred from participation in any federal healthcare payment program (as such term is defined in 42 U.S.C. § 1320a-7b(f)). Seller maintains all required 3T Documentation pursuant to the DSCSA.

(g) <u>Taxes</u>. Seller has, in respect of ████████████████ and the Purchased Assets filed all tax returns that are required to be filed (subject to any applicable extensions) and has paid all taxes that have become due pursuant to such tax returns (subject to any applicable extensions) or pursuant to any assessment that has become payable or for which Buyer may otherwise have any transferee liability. Seller has, in respect of ████████ ████████ the Purchased Assets, withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder or other party, and complied with all information reporting and backup withholding provisions of applicable Law. No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller with respect to ████████████ or the Purchased Assets. All deficiencies asserted, or assessments made, against Seller as a result of any examinations by any Governmental Body with respect to ████████████ and the Purchased Assets have been fully paid. Seller is not a party to any administrative or judicial proceeding by any Governmental Body relating to ████████████ and the Purchased Assets. There are no pending or threatened administrative or judicial proceedings by any Governmental Body relating to ████████████ or the Purchased Assets. There are no Encumbrances for Taxes upon any of the Purchased Assets nor is any Governmental Body in the process of imposing any Encumbrances for Taxes on any of the Purchased Assets.

(h) <u>Brokers</u>. Except for Guggenheim Securities, LLC ("<u>Guggenheim Securities</u>"), the fees and expenses of which will be paid by Seller, no agent, broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission ████████████ ████████████ based upon arrangements made by or on behalf of Seller for which Buyer could have any liability.

(i) <u>No Other Representations or Warranties</u>. Except for the representations and warranties of Buyer expressly contained in this <u>Article VIII</u> (it being understood that Seller has relied only on such representations and warranties), Seller acknowledges and agrees, on its own behalf and on behalf of the Seller Parties, that no Seller nor any other Person on behalf of any Seller makes, and neither Seller nor any member of the Seller Parties has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to Buyer or its businesses or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to Seller or any of its Affiliates or Advisors on behalf of Buyer or any of its Affiliates or Advisors, ████████████

19

███████████████████████████. Without limiting the foregoing, neither Buyer or any of its Affiliates nor any of their Advisors will have or be subject to any liability whatsoever to Seller, or any other Person, resulting from the distribution to Seller or any of its Affiliates or Advisors, or Seller's or any of its Affiliates' or Advisors' use of or reliance on, any such information made available to Seller or any of its Affiliates or Advisors in expectation of █████████████ any discussions with respect to any of the foregoing information ██████████████████████. Notwithstanding anything to the contrary contained herein, nothing contained in this <u>Section 8.1(i)</u> or elsewhere in this Agreement shall be construed to limit any claims or remedies for Fraud.

**Section 8.2    <u>Buyer's Representations and Warranties</u>.** As an inducement to Seller to enter into this Agreement and to consummate ████████████, Buyer hereby represents and warrants to Seller and agrees, as of the date of this Agreement and as of the ███████ Closing Date, as follows:

(a) <u>Organization and Authority</u>. Buyer is a corporation duly incorporated, validly existing and in good standing under the Laws of its jurisdiction of incorporation and Buyer or one of its Affiliates, as applicable, is in good standing in all other jurisdictions ██████████ except (other than with respect to Buyer's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to consummate ███████████. Subject to requisite Bankruptcy Court approvals, Buyer has the power and other authority to execute, deliver and perform this Agreement ██████████████████ to which Buyer is a party and to perform its obligations hereunder ████████████████; (ii) the execution, delivery and performance by Buyer of this Agreement █████████████ to which Buyer is a party, and the consummation by Buyer ████████, have been duly authorized by all requisite corporate action on the part of Buyer and no other organizational proceedings on Buyer's part are necessary to authorize the execution, delivery and performance by Buyer of this Agreement ████████████████ and the consummation by it ██████████; and (iii) when fully executed and delivered by all Parties and thereto, as applicable, this Agreement and all documents and agreements required to be delivered hereunder, will be legal, valid and binding obligations of Buyer enforceable in accordance with their terms, subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general application relating to or affecting creditors' rights and to general equity principles.

(b) <u>No Conflicts</u>. Assuming that the Sale Order and all other requisite Bankruptcy Court approvals are obtained █████████████ neither the execution, delivery and performance of this Agreement by Buyer nor the consummation by Buyer ████████████ will (i) conflict with or violate any provision of Buyer's organizational documents, (ii) violate any Law or Order applicable to Buyer, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other material contract to which Buyer is a party or accelerate Buyer's obligations under any such contract, or (iv) result in the creation of any

Encumbrance on any properties or assets of Buyer or any of its Subsidiaries, except, in the case of clauses (i) through (iv), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Buyer to consummate ███████ .

(c) Legal Proceedings. There are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay ███████ .

(d) Brokers. No agent, broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission ███████████ based upon arrangements made by or on behalf of Buyer for which Seller could have any liability.

(e) Governmental Consents. Assuming that the Sale Order and all other requisite Bankruptcy Court approvals are obtained, ██████████████████████ ████████████████ all required notifications to the DEA relating to the transfer of the Purchased Inventory are provided, Buyer is not required to submit, seek or obtain any notice, report, authorization, approval, Order, permit, consent or other filing with any Governmental Body in connection with the execution, delivery or performance by it of this Agreement ████████████ and no consent, approval or authorization of any Governmental Body or any other party or Person is required to be obtained by Buyer in connection with its execution, delivery and performance of this Agreement or the consummation by Buyer ████████ except where the failure to submit, seek or obtain any such notice, report, authorization, approval, Order, permit, consent or other filing would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Buyer to consummate ██ ████ .

(f) Solvency. After giving effect ████████ , Buyer shall be able to pay its debts as they become due and shall own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities). After giving effect ████████ , Buyer shall have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred ████████ with the intent to hinder, delay or defraud either present or future creditors of Buyer. ████████ , Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

(g) Financing. Buyer has and at all times until the payment of the applicable portion of the Purchase Price is made in connection with the ███ Closing will have sufficient cash, available committed lines of credit or other sources of immediately available funds to pay the full consideration payable to Seller hereunder and to make all other payments required by Buyer ████████ . Buyer acknowledges and agrees that its obligations under this Agreement, including its obligation to consummate ████████ , are not contingent upon its ability to obtain any financing.

(h) <u>Certain Arrangements</u>. As of the date hereof, there are no contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Buyer Group, on the one hand, and any member of the management of any Seller or its respective board of directors (or member of management or applicable governing body of any Affiliate of any Seller), any holder of equity or debt securities of any Seller, or any lender or creditor of any Seller or any Affiliate of any Seller, on the other hand, (i) relating in any way to the acquisition of the Purchased Assets ███████ or (ii) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of any Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

(i) <u>No Other Representations or Warranties</u>. Except for the representations and warranties of Seller expressly contained in this <u>Article VIII</u> (as qualified by the Schedules as set forth herein, the "<u>Express Representations</u>") (it being understood that Buyer and the Buyer Group have relied only on the Express Representations), Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that no Seller nor any other Person on behalf of any Seller makes, and neither Buyer nor any member of the Buyer Group has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Seller or any of their businesses, or the Purchased Assets or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Guggenheim Securities) (the "<u>Information Presentation</u>") or in that certain "Project Return" datasite administered by Datasite Global Corporation (the "<u>Dataroom</u>") or elsewhere to Buyer or any of its Affiliates or Advisors on behalf of Seller or any of their Affiliates or Advisors, ████████████████████████. Without limiting the foregoing, no Seller nor any of its Advisors will have or be subject to any liability whatsoever to Buyer, or any other Person, resulting from the distribution to Buyer or any of its Affiliates or Advisors, or Buyer's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, made available to Buyer or any of its Affiliates or Advisors in the Dataroom ████████████████ or any discussions with respect to any of the foregoing information ████████████████████████ Notwithstanding anything to the contrary contained herein, nothing contained in this <u>Section 8.2(i)</u> or elsewhere in this Agreement shall be construed to limit any claims or remedies for Fraud.

**ARTICLE IX**
**CONDITIONS PRECEDENT**

**Section 9.1    Parties' Conditions to ████ Closing**. The respective obligations of Seller and Buyer under this Agreement to consummate ████ Closing shall be subject to the satisfaction (or, to the extent permitted by Law, written waiver by Seller and Buyer), on or prior to the ████ Closing Date, of each of the following conditions:

(a) ████████████████████████████████
████████████████████████████████████████
████████████████████████████████

(b)      no Governmental Body or court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Law or Order (including any temporary restraining Order or preliminary or permanent injunction) that is in effect and does restrain, enjoin, or otherwise prohibit or make illegal the ██████████████ ██ Closing;

(c)      the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order; and

(d)      

**Section 9.2    Seller's Conditions to ██ Closing**. The obligations of Seller under this Agreement to consummate ██ Closing shall be subject to the satisfaction (or, to the extent permitted by Law, written waiver by Seller), on or prior to the ██████ Closing Date, of the following conditions:

(a)      Buyer's representations and warranties in Section 8.2 shall be true and correct in all respects (without giving effect to any "material", "materially", "materiality", "material adverse effect", "material adverse change" or similar qualifiers contained in any of such representations and warranties) at and as of such Closing Date as though made at and as of such Closing Date (except to the extent expressly made as of an earlier date, in which case only as of such date), except to the extent the failure of such representations and warranties to be true and correct as of such date has not had, and would not reasonably be expected to have, a material adverse effect on the ability of Buyer to consummate ████████████ ; and

(b)      Buyer shall have performed and complied with in all material respects all the covenants and agreements required to be performed by it under this Agreement at or prior to such Closing.

**Section 9.3    Buyer's Conditions to ██ Closing**. The obligations of Buyer under this Agreement to consummate ██ Closing shall be subject to the satisfaction (or to the extent permitted by Law, written waiver by Buyer), on or prior to the ██████ Closing Date, of the following conditions:

(a) (i) Seller's representations and warranties in Section 8.1 (in each case, other than the Fundamental Representations) shall be true and correct in all respects (without giving effect to any "material", "materially", "materiality", "material adverse effect", "material adverse change" or similar qualifiers contained in any of such representations and warranties) at and as of such Closing Date as though made at and as of such Closing Date (except to the extent expressly made as of an earlier date, in which case only as of such date), except to the extent the failure of such representations and warranties to be true and correct as of such dates has not had, and would not reasonably be expected to have, a Material Adverse Effect and (ii) Seller's representations and warranties in Section 8.1(a) (*Organization and Authority*), Section 8.1(c) (*Title to Assets*) and Section 8.2(d) (*Brokers*)

(collectively, the "Fundamental Representations") shall be true and correct in all but *de minimis* respects at and as of such Closing Date as though made at and as of such Closing Date (except to the extent expressly made as of an earlier date, in which case only as of such date);

        (b)      Seller shall have performed and complied with in all material respects all the covenants and agreements required to be performed by it under this Agreement at or prior to such Closing; and

        (c)      Seller shall have delivered, or caused to be delivered, to Buyer all of the items set forth in Section 4.2, as applicable for such Closing.

## ARTICLE X
## TERMINATION

**Section 10.1    Termination**. Notwithstanding anything contained in this Agreement to the contrary, this Agreement and the obligations hereunder may be terminated ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

        (a)      by the mutual written consent of Buyer and RAD;

        (b)      by written notice from Buyer to RAD in the event of a breach by Seller of any of its agreements, covenants, obligations, representations or warranties contained herein, in each case, ████████████████████████████████████████ ████████████ provided that (i) if such breach is curable by Seller then Buyer may not terminate this Agreement ██████████████████████ under this Section 10.1(b) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Buyer notifies RAD of such breach and (ii) the right to terminate this Agreement pursuant to this Section 10.1(b) will not be available to Buyer at any time that Buyer is in material breach of any covenant, representation or warranty hereunder; ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████

        (c)      by written notice from RAD to Buyer in the event of a breach by Buyer of any of Buyer's agreements, covenants, obligations, representations or warranties contained herein, in each case, such that the conditions set forth in Section 9.2(a) and (b) would not be satisfied; provided that (i) if such breach is curable by Buyer then RAD may not terminate this Agreement under this Section 10.1(c) unless such breach has not been cured by the date which that the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after RAD notifies Buyer of such breach and (ii) RAD's right to terminate this Agreement pursuant to this Section 10.1(c) will not be available to RAD

at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(d)      by written notice from either Buyer or RAD to RAD or Buyer, respectively,



(e)      by written notice from RAD to Buyer, if Seller receives a bona fide third party proposal for one or more Alternative Transactions and any Seller or the board of directors (or similar governing body) of any Seller, as applicable, determines in good faith, after consultation with their respective outside legal counsel, that, in connection with such proposal, ██████████████████████ failure of such Seller to terminate this Agreement would be inconsistent with such Person's or body's fiduciary duties under applicable Law;

(f)      by written notice from either Buyer or RAD to RAD or Buyer, respectively, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Buyer, or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Buyer; or

(g)



**Section 10.2   Effects of Termination**. In the event that a Party terminates this Agreement, such termination shall be in addition to, and not by way of limitation of, its other rights and remedies in law and equity, including the right to sue for damages and sue for performance pursuant to Section 11.13. ████████████████████████████████████████████ nd Purchased Assets for which a Closing has not yet occurred that are subject to such termination, and such termination shall be without liability of any Party (or any equityholder, member, director, officer, manager employee, agent, consultant or representative of such Party) under this Agreement; underlined provided that nothing herein shall relieve any Party from liability for any willful and material breach hereof.

**ARTICLE XI**
**MISCELLANEOUS**

**Section 11.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers**. Each of the representations and warrantie ████████████████████████████████████████████████████████ and each of the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to such Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of such Closing, and all representations and warranties and covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the ████ Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the ████ Closing, such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the ████████ Closing ████ ███████████████. Each covenant and agreement that explicitly contemplates performance after the ███████ Closing ███ ████ ███████████, will, in each case and to such extent, expressly survive such Closing in accordance with its terms, and if no term is specified, then for five (5) years following such Closing Date, and nothing in this Section 11.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Buyer and Seller acknowledge and agree, on their own behalf and on behalf of the Buyer Group or the Seller Parties, as the case may be, that the agreements contained in this Section 11.1 (a) require performance after the ███████ Closing ████████████ to the maximum extent permitted by applicable Law and will survive the ████████████ Closing, ██████████, for five (5) years and (b) are an integral part ██████████ and that, without the agreements set forth in this Section 11.1, none of the Parties would enter into this Agreement.

**Section 11.2    Definitions and Interpretation**.

(a)    Capitalized terms used in this Agreement shall have the meanings specified in Exhibit A or Schedule A to, or elsewhere in, this Agreement. Article titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. References in this Agreement to Articles, Schedules or Exhibits shall be to the corresponding Articles, Schedules or Exhibits of this Agreement, unless the context otherwise requires. The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement.

(b)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

26

(c)     Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement with respect to the Express Representations, if such document or item is (i) accessible by Buyer or Buyer's Advisors in the Dataroom or (ii) actually delivered or provided to Buyer or Buyer's Advisors, in each case, at least two (2) Business Days prior to the date hereof (or at such other time as is specified in this Agreement).

(d)     Any reference to any particular Bankruptcy Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code section or Law, the reference to such Bankruptcy Code section or Law means such Bankruptcy Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(e)     Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(f)     The words "to the extent" shall mean "the degree by which" and not simply "if."

(g)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(h)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(i)     All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(j)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(k)     Any reference to any agreement or contract will be a reference to such agreement or contract, as amended, modified, supplemented or waived.

(l)     A reference to an Advisor in such capacity excludes such Person in any other capacity or individually.

(m)     █████████████████████████████████
████████████████████████████████████████████████

**Section 11.3** <u>Notices</u>. All notices, demands, and other communications to be given or delivered under or by reason of this Agreement shall be in writing and will deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (so long as no error message or notice of non-delivery is generated) if delivered by 5:00 P.M. local time of the recipient on a Business Day and otherwise on the following Business Day, (c) the day following the day on which such notice was delivered prepaid to a reputable national overnight courier service and (d) the third (3rd) Business Day following the day on which such notice was sent by United States certified or registered mail, postage prepaid, in each case, addressed to:

  (i)  if to Seller:

    Rite Aid Corporation
    200 Newberry Comments
    Etters, PA 17319
    Attention:  Thomas Sabatino
    Email:    Thomas.Sabatino@riteaid.com

    with copies to (which shall not constitute notice):

    Kirkland & Ellis LLP
    601 Lexington Avenue
    New York, NY 10022
    Attention: Aparna Yenamandra, P.C.
    Email: aparna.yenamandra@kirkland.com

    Kirkland & Ellis LLP
    300 N. Lasalle
    Chicago, IL 60654
    Attention: Steve Toth
    Email: steve.toth@kirkland.com

  (ii)  if to Buyer:

    Walgreen Co.
    Legal Department
    108 Wilmot Road, MS 1446
    Deerfield, Illinois 60015
    Attention: Sean Bauer
      Paul Lim
    Email: sean.bauer@walgreens.com
      paul.lim@walgreens.com

with a copy (which shall not constitute notice) to:

Sidley Austin LLP
One South Dearborn
Chicago, IL 60613
Attention: Chris E. Abbinante
           Matthew A. Clemente
           Joseph P. Michaels
Email: cabbinante@sidley.com
        mclemente@sidley.com
        joseph.michaels@sidley.com

provided that each Party by like notice may designate any further or different addresses to which subsequent notices shall be sent.

**Section 11.4**   **Binding Effect; Successors and Assigns; No Third Party Beneficiaries**.

(a)     This Agreement shall be binding upon Buyer and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Buyer and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void.

(b)     Prior to any Closing, Buyer shall be entitled to designate, by written notice to Seller no later than five (5) Business Days prior to the ▮▮▮▮▮▮ Closing Date, one or more Affiliates to (i) purchase any of the corresponding Purchased Assets and/or pay the corresponding Purchase Price amount or (ii) take title directly to any such Purchased Asset (any such Affiliate that shall be designated in accordance with this clause, a "Designated Buyer"), and, to the extent of any such designation, this Agreement shall be binding upon each of such Affiliates, their successors and permitted assigns, which shall be treated as Buyer to such extent hereunder; provided that Buyer shall remain primarily liable until the transfer to any such Designated Buyer and the satisfaction by such Designated Buyer of any related obligations hereunder.

(c)     This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their successors and permitted assigns. Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than (i) for purposes of Section 11.5, the Non-Recourse Persons and (ii) the Parties and their successors and permitted assigns any right, remedy or claim under or by reason of this Agreement.

**Section 11.5**   **Non-Recourse**. This Agreement may only be enforced against, and any claim, cause of action, lawsuit, litigation, arbitration, mediation, demand, hearing, or proceeding

("Action") based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as Parties. Except to the extent named as a Party, and then only to the extent of the specific obligations of such Parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party (each, a "Non-Recourse Person") will have any liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or liabilities of any of the Parties or for any Agreement Dispute and (ii) in no event shall any Party have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions or fraud (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Persons are intended third party beneficiaries of this Section 11.5 and shall be entitled to enforce this Section 11.5 as if a party directly hereto.

Section 11.6    **Risk of Loss.** The risk of loss or damage to the assets described in Section 1.1 hereof shall be upon Seller until Buyer receives physical possession of such assets in accordance with this Agreement.

Section 11.7    **Entire Agreement; Amendment; No Waiver**. This Agreement, together with the Confidentiality Agreement and the other documents expressly referred to herein, constitutes the entire agreement among the Parties respecting the sale and purchase of the Purchased Assets ███████████████ and supersedes all prior offers, negotiations, and understandings, whether oral or written, among the Parties and may only be modified by a writing executed by the Parties. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties. The failure of either Party to insist on the performance of any term, condition, covenant or restriction of this Agreement shall not be construed as a waiver or relinquishment of any rights or remedies hereunder or for the future performance of any such term, condition, covenant or restriction and the obligations of the other Party with respect thereto shall continue in full force and effect. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. No waiver shall be binding upon any Party unless set forth in writing signed by or on behalf of such Party.

Section 11.8    **Expenses**. Whether or not any Closings take place, each Party hereto will pay all costs and expenses incurred by such Party in connection with the negotiation and preparation of this Agreement ████████████████, such Party's performance and compliance with all agreements and conditions contained herein ████████████████ ████████, or the consummation ████████████, including in each case the fees, expenses and disbursements of its Advisors; provided that each Party shall be responsible for any costs directly ascribed to such Party in this Agreement, including:

(a)    Buyer and Seller will share equally in the costs and expenses of the inventory service invoiced by the Inventory Service (in accordance with Section 2.3) (with

the portion of the foregoing for which Seller is responsible being paid through a corresponding reduction of the Purchase Price payable by Buyer, to the extent elected by RAD);

(b) 

(c)     Buyer and Seller will share equally in all transfer, documentary, sales, use, value added, goods and services, stamp, registration and similar Taxes, and all conveyance fees and recording charges (including any penalties and interest thereon), ███████████████████████, as applicable ("Transfer Taxes").

**Section 11.9   Counterparts; Signatures**. This Agreement and any other agreements referred to herein may be executed in one or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement. Signatures transmitted by facsimile, .pdf, or other electronic transmission shall be treated as an original and shall be sufficient and binding upon the Parties hereto.

**Section 11.10 Arms-Length Transaction**. Each of Buyer and Seller hereby acknowledges and agrees that: (i) it is not the purpose of this Agreement ██████████████ to exert influence in any way over the judgment of any Party with respect to the referral of patients or business, (ii) it is the intent of the Parties that any referrals that may be made by Seller to Buyer's business shall be based solely upon the professional judgment and discretion of the referring Party while acting in the best interests of the patient, and (iii) the consideration hereunder is consistent with fair market value in an arm's length transaction and no part of the purchase price or other amounts payable hereunder takes into consideration the volume or value, if any, of referrals or business generated between the Parties.

**Section 11.11 Specific Performance**. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate ███████████. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 11.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right to specific performance and other equitable relief is an integral part ██████████████ and without that right, neither Seller nor Buyer would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 11.11 will not be required to provide any bond or other security in connection with any such Order.   The remedies available to the Parties pursuant to this

Section 11.13 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages.

### Section 11.12 <u>Governing Law; Waiver of Jury Trial</u>.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware, including all matters of construction, validity, performance and enforcement, without regard to its Laws regarding conflicts of Law.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.12</u>.

Section 11.13 <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement ▮▮▮▮▮▮▮▮▮▮▮ and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "<u>Agreement Dispute</u>") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds,

including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 11.3</u>. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

      **Section 11.14 <u>Partial Invalidity</u>**. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable Law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, in any jurisdiction, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability and only in such jurisdiction, without invalidating the remainder of such provision or provisions or any other provisions hereof or in any other jurisdiction. If, for any reason, any provision set forth herein is held by a court of competent jurisdiction to cover an area or a length of time which is unreasonable or in any other way is construed to be too broad or to any extent invalid, such provision shall not be determined null, void, and of no effect, but shall be reformed so as to be valid and enforceable under applicable Law.

      **Section 11.15 <u>Acknowledgement Regarding Representation; Construction</u>**. Each of Buyer and Seller acknowledge that: (a) it has consulted with or has had an opportunity to consult with independent counsel of its choice concerning this Agreement ▬▬▬▬▬▬▬▬; and (b) it has read and understood this Agreement, is fully aware of its legal effect, and has entered into it freely based on its own judgment. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.

      **Section 11.16 <u>Exhibits and Schedules</u>**. The Exhibits hereto and the Schedules are incorporated and made a part hereof and are an integral part hereof. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement. Any item set forth in any section of the Schedules shall apply to and qualify another section if such item's relevance to such other section is reasonably apparent on its face. Capitalized terms used in the Exhibits and the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the Schedules is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item. The information contained in the Schedules is disclosed solely for purposes of this Agreement, and no information contained therein will be deemed to be an admission by any

Party to any third party of any matter whatsoever, including any violation of Law or breach of contract.

**Section 11.17 <u>No Right of Set-Off</u>**. Buyer, on its own behalf and on behalf the Buyer Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off or similar rights that Buyer, any member of the Buyer Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Buyer pursuant to this Agreement or any other document or instrument delivered by Buyer in connection herewith.

**Section 11.18 <u>Bulk Sales Laws</u>**. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Encumbrances in the Purchased Assets including any Encumbrances or claims arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions ███████████████████.

**Section 11.19 <u>Seller's Representative</u>**. Each Party agrees that RAD has the power and authority to unilaterally act on behalf of all or any Seller for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, Consents and determinations on behalf of all or any Seller, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Buyer shall be entitled to rely on any action or omission taken by RAD on behalf of all or any Seller.

*[The remainder of this page is intentionally left blank.]*

**EXHIBIT A**

DEFINITIONS

"Advisors" means, with respect to any Person as of any relevant time, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Seller and its Affiliates or Buyer and its Affiliates) acquires (i) beneficial ownership of a majority of the equity interests of Seller or (ii) a material portion of the Purchased Assets for which a Closing has not occurred, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, neither a liquidation or wind-down of Seller's estates nor a reorganization of Seller that permits ▮▮▮▮▮▮▮▮▮ to be consummated in accordance with the terms hereof shall be an Alternative Transaction.

"Assumed Taxes" means, without duplication: (i) all liabilities for Taxes with respect to the Purchased Assets for any taxable period (or portion thereof) beginning after the Closing Date for such Purchased Assets and (ii) all liabilities for Transfer Taxes for which Buyer is responsible pursuant to Section 11.8(c).

"Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

"Bidding Procedures Order" means the Amended Order (I) Approving the Auction and Bidding Procedures, (II) Approving Bidding Procedures and Bid Protections, (III) Scheduling Certain Dates and Deadlines With Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving the Elixir Stalking Horse APA, (VI) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VII) Authorizing the Assumption and Assignment of Assumed Contracts, (VIII) Authorizing the Sale Of Assets, and (IX) Granting Related Relief Docket No. 1413.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

"Buyer Group" means Buyer (including any Designated Buyer), any Affiliate of Buyer, and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

"Clean Team Agreement" means that certain Clean Team Confidentiality Agreement, dated as of November 3, 2023, by and between RAD and Walgreens Boots Alliance, Inc.

"Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of October 26, 2023, by and between RAD and Walgreens Boots Alliance, Inc.

A-1

"Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"Dataroom" means that certain "Return Retail Business Sale Process" datasite administered by Datasite.

"Debtors" means, collectively, the debtors-in-possession under the Bankruptcy Cases.

"Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, assignment, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title, right of first refusal or restrictions on transfer or use.

"Excluded Tax Returns" means income Tax returns (or any portion of any income Tax return) and other books and records related to (i) Taxes that are not related primarily to any Purchased Asset or (ii) any consolidated, combined, affiliated or unitary group for Tax purposes that includes any of Seller or Buyer or any of their Affiliates.

"Excluded Taxes" means, without duplication: (i) any Taxes of Seller (or any direct or indirect equityholder in or Affiliate of Seller) of any kind or description (including any liability for Taxes of Seller (or any direct or indirect equityholder in or Affiliate of Seller) that becomes a liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law), (ii) all liabilities for Taxes with respect to the Purchased Assets for any taxable period (or portion thereof) on or before the Closing Date for such Purchased Assets, and (iii) all liabilities for Transfer Taxes for which Seller is responsible pursuant to Section 11.8(c).

"Final Order" means an Order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Case (or the docket of such other court), in full force and effect which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"Fraud" means an act committed by (a) Seller, in the making to Buyer of the representations and warranties in Section 8.1 or (b) Buyer, in the making to the Seller of the representations and warranties in Section 8.2, in any such case, with intent to deceive another Party or to induce such other Party to enter into this Agreement and requires (i) a false representation of material fact made in such representation; (ii) with knowledge that such representation is false; (iii) with an intention to induce the Party to whom such representation is made to act or refrain from acting in reliance upon it; (iv) causing that Party, in justifiable reliance upon such false representation, to take or refrain from taking action; and (v) causing such Party to suffer damage by reason of such reliance, which together constitutes common law fraud under the Laws of the State of Delaware (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

"Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator of applicable jurisdiction.

██████████████████████████████████████████████████
██████████████████████████████████████████

"Laws" means any state or federal laws, Healthcare Laws, statutes, ordinances, codes, rules or regulations.

"Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") that has or would reasonably be expected to have a material adverse effect on (x) the Purchased Assets and Assumed Liabilities, taken as a whole, or (y) the ability of Seller to perform its obligations under this Agreement ████████████ ██████████ provided that, with respect to clause (x) of this definition, none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (A) any Effect in, arising from or relating to general business or economic conditions affecting the industry in which Seller operates; (B) Effects in, arising from or relating to national or international political or social conditions, including riots, protests, the engagement by the United States or other countries in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States; (C) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine related thereto; (D) Effects in, arising from or relating to the decline or rise in price of any currency or any equipment or supplies necessary to or used in the provision of services by Seller or its Subsidiaries; (E) Effects in, arising from, or relating to general financial, banking, or securities markets (including any disruption of the foregoing markets); (F) Effects in, arising from or relating to changes in GAAP or the interpretation thereof; (G) Effects in, arising from or relating to changes in Laws or other binding directives or determinations issued or made by any Governmental Body;

(H) Effects in, arising from or relating to (1) the taking of any action required by this Agreement or at the express request of Buyer or its Affiliates, (2) the failure to take any action if such action is prohibited by this Agreement or (3) the announcement or pendency of this Agreement ██ ██████████, the identity, nature, or ownership of Buyer or Buyer's plans with respect to the Purchased Assets, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller or its Affiliates with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement ███ ██████████; (I) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Buyer or its Affiliates or representatives) and any other failure to win customers or business, except that the underlying cause of such failure may be taken into account; (J) the Effect of any action taken by Buyer or its Affiliates ████████████████ or the financing thereof or any breach by Buyer of this Agreement; or (K) (1) the commencement or pendency of the Bankruptcy Cases; or (2) any objections in the Bankruptcy Court to (x) this Agreement █████████████, (y) the Sale Order or the reorganization or liquidation of any Seller or their Affiliates, or (z) any Order of the Bankruptcy Court or any actions or omissions of any Seller or their Affiliates in compliance therewith; except that with respect to any of the foregoing clauses (A) through (G), if an Effect has or would be reasonably expected to have a materially disproportionate adverse effect on Seller (taken as a whole) relative to similarly situated participants in the industries and geographic areas in which Seller operates, then such Effect may be taken into account in determining whether there is a Material Adverse Effect only to the extent of such materially disproportionate adverse effect.

"Order" means any order, injunction, judgment, decree, ruling, writ, decisions or arbitration award of a Governmental Body of competent jurisdiction, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

"Ordinary Course" means consistent with the ordinary and usual course of operations of the business of Seller.

"Outside Date" means the date that is twelve (12) months following the date hereof.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

"Privacy and Security Requirements" means all applicable federal, provincial, local, state and international Laws relating to (i) the privacy, collection, use, access, processing, protection, security, deletion or disclosure of Personal Information, including, to the extent applicable, (a) the EU General Data Protection Regulation, (b) the HIPAA privacy standard requiring accounting of certain disclosures of Protected Health Information, as that term is defined at 45 C.F.R. Section 160.103, (c) data security and data privacy Laws; (ii) cybersecurity (including secure software development); or (iii) artificial intelligence, automated decision making, or machine learning technologies.

"Sale Order" means the sale Order or Orders (i) approving this Agreement and the terms and conditions hereof, including pursuant to section 363 of the Bankruptcy Code and (ii) approving

and authorizing Seller to consummate ███████████, in a form to be reasonably acceptable to the Parties.

"<u>Seller Parties</u>" means each Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

"<u>Subsidiary</u>" or "<u>Subsidiaries</u>" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

"<u>Tax</u>" or "<u>Taxes</u>" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

**<u>Exhibit B</u>**

**Proposed Walgreens Sale Order**

Caption in Compliance with D.N.J. LBR 9004-1(b)

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Jointly Administered) |

# ORDER (I) APPROVING
# THE SALE OF ACQUIRED ASSETS
# FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS,
# INTERESTS, AND ENCUMBRANCES, (II) AUTHORIZING THE
# DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS
# UNDER THE WALGREENS APA, AND (III) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered three (3) through twenty-six (26), is

**ORDERED**.

---

[1]   The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

Caption in Compliance with D.N.J. LBR 9004-1(b)

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel for Debtors and Debtors in Possession*

(Page | 3)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Sale Order"):   (a) authorizing and approving the entry into and performance under the terms and conditions of that certain Asset Purchase Agreement, dated May 8, 2024, by and among certain of the Debtors (the "Sellers") and Walgreen Co. (the "Purchaser"), substantially in the form attached hereto as **Exhibit 1** (as may be amended, supplemented, restated, or otherwise modified from time to time, the "Walgreens APA"), and all other transaction documents necessary and desirable to consummate the transactions contemplated by the Walgreens APA (the "Transaction Documents"); (b) authorizing and approving the sale(s) (collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the Walgreens APA, the "Sale") of those assets set forth in section 1.1 of the Walgreens APA (the "Acquired Assets"), on an "as is, where is" basis, free and clear of all liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), liabilities, Encumbrances, rights, remedies, restrictions and interests of any kind or nature whatsoever whether arising before or after the Petition Date, whether at law or in equity, including all claims or rights based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Acquired Assets to the Purchaser or to be excused from accepting performance by the Purchaser, and all rights at law or in equity (collectively, "Claims"),

---

[2]   Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the Amended Bidding Procedures Order (as defined herein), the Bidding Procedures (as defined in, and amended pursuant to, the Amended Bidding Procedures Order), or the Walgreens APA (as defined herein), as applicable.

(Page | 4)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

except to the extent set forth in the Walgreens APA, and the assumption of certain assumed liabilities set forth in section 1.4 of the Walgreens APA (the "<u>Assumed Liabilities</u>"), in each case pursuant to the Walgreens APA, as of the applicable Closing Date (as defined in section 4.1 of the Walgreens APA), upon one or more closings with respect to the Acquired Assets (each, a "<u>Closing</u>"); and (c) granting related relief, all as more fully set forth in the Motion; and this Court having entered the *Order (I) Approving the Auction and Bidding Procedures, (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases,(VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 129] (the "<u>Bidding Procedures Order</u>") and the *Amended Order (I) Approving the Auction and Bidding Procedures, (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases,(VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 1413] (the "<u>Amended Bidding Procedures Order</u>"); and the Debtors having scheduled an auction (the "<u>Auction</u>") for the Acquired Assets; and the Auction having been cancelled by the Debtors in accordance with the Bidding Procedures after no Qualified Bids for the Acquired Assets other than the bid submitted by the Purchaser having been

(Page | 5)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

received by the Bid Deadline; and the Debtors having determined that the Purchaser has submitted the highest or otherwise best bid for the Acquired Assets and determined that the Purchaser is the Successful Bidder, in accordance with the Bidding Procedures; and the Court having held a hearing on June 20, 2024 (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, the Walgreens APA, and any and all objections to the Sale, the Walgreens APA, and the other Transaction Documents filed in accordance with the Amended Bidding Procedures Order; and the Court having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and upon the First Day Declaration, the Frejka Declaration [Docket No. 34], the Rifkin Declaration [Docket No. 36] (the "First Rifkin Declaration"), and the *Declaration of Adam Rifkin in Support of Entry of an Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Walgreens APA, and (III) Granting Related Relief* (the "Second Rifkin Declaration"), filed concurrently herewith; and it appearing that due notice of the Motion, the Sale Hearing, the Walgreens APA, and the Sale has been provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their stakeholders, and all other parties in interest; and it appearing that the Court has jurisdiction over this matter; and it appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation, it is hereby

(Page | 6)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

**FOUND, CONCLUDED, AND DETERMINED THAT:**

**Jurisdiction, Venue, and Final Order**

A.        This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.        This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), any other applicable Bankruptcy Rules or Local Rules, and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.        The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Notice of the Bidding Procedures
Order, the Amended Bidding Procedures
Order, the Bidding Procedures, the Auction,
the Sale Hearing, and the Walgreens APA and Sale**

D.        As evidenced by the affidavits of service and publication previously filed with this Court, proper, timely, adequate, and sufficient notice of the Bidding Procedures Order, the

(Page | 7)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

Amended Bidding Procedures Order, the Bidding Procedures, the Auction, the Sale Hearing, the

Walgreens APA, and the Sale has been provided in accordance with section 363 of the Bankruptcy

Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Local Rule 6004-3. The Debtors

have complied with all obligations to provide notice of the Bidding Procedures Order, the

Amended Bidding Procedures Order, the Bidding Procedures, the Auction, the Sale Hearing, the

Walgreens APA, and the Sale as required by the Amended Bidding Procedures Order. The

foregoing notice was good, sufficient, and appropriate under the circumstances, and no other or

further notice of the Bidding Procedures Order, the Amended Bidding Procedures Order, the

Bidding Procedures, the Auction, the Sale Hearing, the Walgreens APA, and the Sale is required.

  E.  A reasonable opportunity to object or to be heard regarding the relief requested in

the Motion was afforded to all interested persons and entities.

## **Highest and Best Offer**

  F.  As demonstrated by the evidence proffered or adduced at the Sale Hearing, and the

representations of counsel made on the record at the Sale Hearing, the Debtors conducted a sale

process in accordance with, and have, along with the Purchaser, complied in all respects with, the

Amended Bidding Procedures Order and afforded a full, fair, and reasonable opportunity for any

interested party to make a higher or otherwise better offer to purchase the Acquired Assets and

assume the Assumed Liabilities.

  G.  (i) The Debtors and their advisors engaged in a robust and extensive marketing and

sale process, both prior to the commencement of these chapter 11 cases and through the

postpetition sale process in accordance with the Amended Bidding Procedures Order and the

(Page | 8)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

sound exercise of the Debtors' business judgment, as more fully detailed in the First Day Declaration, the First Rifkin Declaration, and the Second Rifkin Declaration; (ii) the Bidding Procedures were substantively and procedurally fair to all parties and the Debtors conducted a fair and open sale process in compliance therewith; (iii) the sale process, the Bidding Procedures, and the Auction were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either expressed an interest in acquiring the Acquired Assets, or who the Debtors believed may have had an interest in acquiring the Acquired Assets, to make an offer to purchase the Debtors' assets, including, without limitation the Acquired Assets; (iv) the Debtors and the Purchaser have negotiated and undertaken their roles leading to the entry into the Walgreens APA in a diligent, non-collusive, fair, reasonable, and good-faith manner; and (v) the sale process conducted by the Debtors pursuant to the Amended Bidding Procedures Order and the Bidding Procedures resulted in the highest or otherwise best value for the Acquired Assets for the Debtors and their estates, was in the best interest of the Debtors, their estates, their creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result. There is no legal or equitable reason to delay entry into the Walgreens APA and the transactions contemplated therein.

H.     Approval of the Walgreens APA, and the consummation of the Sale contemplated thereby, is in the best interests of the Debtors, their respective creditors, estates, and other parties in interest.  The Debtors have demonstrated good, sufficient, and sound business reasons and justifications for entering into the Sale and the performance of their obligations under the

| (Page \| 9) | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

Walgreens APA.  The Sale must be approved and consummated in order to maximize the value of the Debtors' estates.

I.      The consummation of the Sale outside a plan of reorganization pursuant to the Walgreens APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors.  The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

J.      Entry of an order approving the Walgreens APA and all the provisions thereof is a necessary condition precedent to Purchaser's consummation of the Sale, as set forth in section 9.1 of the Walgreens APA.

**Personally Identifiable Information**

K.      As set forth in the Frejka Declaration, the sale, conveyance, assignment, and transfer of Personal Information pursuant to the terms of the Walgreens APA (if any) complies with the terms of the Debtors' policies regarding the transfer of such personally identifiable information as of the Petition Date and, as a result, consummation of the Sale as set forth in the Walgreens APA is permitted pursuant to section 363(b)(1)(A) of the Bankruptcy Code.  Accordingly, appointment of a consumer privacy ombudsman in accordance with sections 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the Sale and the other transactions contemplated by the Walgreens APA.

(Page | 10)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

## **Good Faith of Purchaser**

L.      The consideration to be paid by the Purchaser under the Walgreens APA was negotiated at arm's-length, in good faith and without collusion pursuant to section 363(m) of the Bankruptcy Code and constitutes reasonably equivalent value and fair and adequate consideration for the Acquired Assets.  Specifically:  (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in purchasing the Acquired Assets; (ii) the Purchaser complied in all respects with the provisions in the Amended Bidding Procedures Order in negotiating and entering into the Walgreens APA and the other Transaction Documents, and the Walgreens APA, the other Transaction Documents, and the transactions described therein comply with the Amended Bidding Procedures Order; (iii) the Purchaser agreed to subject any bid to the competitive bid procedures set forth in the Amended Bidding Procedures Order; (iv) all payments made by the Purchaser in connection with the Sale have been disclosed in the Walgreens APA; (v) no common identity of directors, officers, or controlling stockholders exists among the Purchaser and the Debtors; (vi) the negotiation and execution of the Walgreens APA and the other Transaction Documents were at arm's-length and in good faith, and at all times each of the Purchaser and the Debtors were represented by competent counsel of their choosing; and (vii) the Purchaser has not acted in a collusive manner with any person.  The Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Walgreens APA and the other Transaction Documents.  The terms and conditions set forth in the Walgreens APA are fair and reasonable under the

(Page | 11)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtors or their creditors under any applicable laws.

M.  The Debtors, the Purchaser, and each of their respective management, boards of directors, members, officers, directors, employees, agents, and representatives, as applicable, have acted in good faith.  The Walgreens APA and the other Transaction Documents, and each of the transactions contemplated therein, were negotiated, proposed, and entered into by the Debtors and the Purchaser in good faith, without collusion or fraud, and from arm's-length bargaining positions.  The Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby.

### No Fraudulent Transfer

N.  The consideration provided by the Purchaser pursuant to the Walgreens APA for its purchase of the Acquired Assets and the assumption of the Assumed Liabilities constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

O.  Neither the Purchaser nor its past, present and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies or partners (collectively, the "Purchaser Parties") is a continuation of the Debtors or their respective estates and the Purchaser is not holding itself out to the public as a

(Page | 12)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

continuation of the Debtors or their respective estates and the Sale does not amount to a consolidation, merger, or *de facto* merger of the Purchaser and the Debtors.

## **Validity of Transfer**

P.     The applicable boards of directors or managers, as applicable, of the Debtors have authorized the execution and delivery of the Walgreens APA and the Sale of the Acquired Assets to the Purchaser.  Subject to entry of this Sale Order, the Debtors (i) have full corporate power and authority to execute and deliver the Walgreens APA and all other documents contemplated thereby, as applicable, (ii) have all of the power and authority necessary to consummate the Sale, and (iii) have taken all action necessary to authorize and approve the Walgreens APA and to consummate the Sale, and no further consents or approvals, other than those expressly provided for in the Walgreens APA, are required for the Debtors to consummate the transactions contemplated by the Walgreens APA, except as otherwise set forth in the Walgreens APA.  The Acquired Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code and title thereto is presently vested in the Debtors' estates.

## **Section 363(f) Is Satisfied**

Q.     The Sale of the Acquired Assets to the Purchaser under the terms of the Walgreens APA meets the applicable provisions of section 363(f) of the Bankruptcy Code such that the Sale of the Acquired Assets will be free and clear of any and all Claims and will not subject the Purchaser to any liability for any Claims whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the Walgreens APA with respect to the Assumed Liabilities.  All holders of Claims who did

(Page | 13)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale

pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of Claims are adequately

protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their Claims, if

any, attach to the proceeds of the Sale ultimately attributable to the property against or in which

they assert Claims, or other specifically dedicated funds, in the same order of priority and with

the same validity, force, and effect that such holder had prior to the Sale, subject to any rights,

claims, and defenses of the Debtors or their estates, as applicable. Those holders of Claims who

did object and that have an interest in the Acquired Assets fall within one or more of the other

subsections of section 363(f) of the Bankruptcy Code.

R.      The transfer of the Acquired Assets to the Purchaser under the Walgreens APA will

be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial right, title, and

interest in and to the Acquired Assets free and clear of all Claims, except as expressly provided

in the Walgreens APA with respect to the Assumed Liabilities. The Debtors may sell their

interests in the Acquired Assets free and clear of all Claims because, in each case, one or more of

the standards set forth in section 363(f) has been satisfied. The Purchaser would not have entered

into the Walgreens APA and the Transaction Documents and would not consummate the

transactions contemplated thereby, including, without limitation, the Sale (i) if the transfer of the

Acquired Assets was not free and clear of all interest of any kind or nature whatsoever, including,

without limitation, rights or claims based on any successor, transferee, derivative or vicarious

liability or any similar theory and/or applicable state or federal law or otherwise or (ii) if the

Purchaser or any of its affiliates or designees would, or in the future could, be liable for any

(Page | 14)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

interests, including, without limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, in each case subject only to the Assumed Liabilities. Not transferring the Acquired Assets free and clear of all interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state or federal law or otherwise (subject only to the Assumed Liabilities), would adversely impact the Debtors' efforts to maximize the value of their estates.

### Prompt Consummation

S.      Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the Sale of the Acquired Assets must be approved and consummated promptly to comply with the terms of the Walgreens APA and maximize value for the Debtors' estates. Time, therefore, is of the essence in effectuating the Walgreens APA. As such, the Debtors and the Purchaser intend to close the sale of the Acquired Assets as soon as reasonably practicable in accordance with the terms of the Walgreens APA. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Walgreens APA. Accordingly, there is sufficient cause to waive the stay provided in the Bankruptcy Rules 6004(h) and 6006(d) and any other applicable Bankruptcy Rules or Local Rules.

(Page | 15)

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.      The Motion is GRANTED to the extent set forth herein.

2.      All objections to or reservation of rights with respect to the Motion or the relief requested therein that have not been withdrawn or resolved are overruled with prejudice.  All persons and entities who did not object or withdraw their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

3.      The Walgreens APA and the other Transaction Documents, and all terms and conditions thereof, are hereby approved in all respects.  The failure to specifically include any particular provision of the Walgreens APA or the Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provision.

**Transfer of the Acquired Assets as set forth in the Walgreens APA**

4.      The Debtors, their respective officers, employees, and agents, and all other applicable parties are authorized and directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Sale in accordance with the terms and conditions set forth in the Walgreens APA, the Transaction Documents, and this Sale Order, and (b) take all further actions and execute, deliver, and perform under the Walgreens APA and Transaction Documents and any and all additional instruments and documents that may be necessary or appropriate to implement the Walgreens APA and the other Transaction Documents and consummate the Sale in accordance with the terms thereof, all without further order of the Court.

(Page | 16)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

5.    The Purchaser is not acquiring any of the Excluded Assets or assuming any of the Excluded Liabilities, as set forth in sections 1.2 and 1.3 of the Walgreens APA, respectively.

6.    Except for the Assumed Liabilities expressly set forth in section 1.4 of the Walgreens APA or described therein, none of the Purchaser, its successors or assigns, or any of their respective affiliates shall have any liability for any Claim that (a) arose prior to the date of each applicable Closing, or (b) otherwise is assertable against the Debtors or is related to the Acquired Assets prior to the date of such applicable Closing, including, for the avoidance of doubt, Claims arising out of the Excluded Liabilities.

7.    All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Acquired Assets to the Purchaser in accordance with the Walgreens APA, the other Transaction Document, and this Sale Order.

8.    At each applicable Closing, all of the Debtors' right, title, and interest in and to, and possession of, the corresponding Acquired Assets shall be immediately vested in the Purchaser pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code.  Such transfer shall constitute a legal, valid, enforceable, and effective transfer of such Acquired Assets.  All persons or entities, presently or at or after each applicable Closing, in possession of some or all of the corresponding Acquired Assets, are directed to surrender possession of any and all portions of such Acquired Assets to the Purchaser or its respective designees on each applicable Closing or at such time thereafter as the Purchaser may request.

(Page | 17)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

9.       This Sale Order (a) shall be effective as a determination that, as of each applicable Closing, (i) no claims other than the corresponding Assumed Liabilities will be assertable against the Purchaser or any of its assets, (ii) the corresponding Acquired Assets shall have been transferred to the Purchaser free and clear of all Claims, subject only to the applicable Assumed Liabilities, and (iii) the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Walgreens APA and the other Transaction Documents. The Acquired Assets are sold free and clear of any reclamation rights. All Claims on the Acquired Assets shall attach to the proceeds of the Sale ultimately attributable to the property against which such Claims applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such Claims applied prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

10.       Except as otherwise provided in the Walgreens APA, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory authorities, lenders,

(Page | 18)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, and the ownership, sale, or operation of the Acquired Assets prior to each applicable Closing or the transfer of the applicable Acquired Assets to the Purchaser, are hereby forever barred, estopped, and permanently enjoined from asserting such claims against the Purchaser and its property (including, without limitation, the Acquired Assets). Following each applicable Closing, no holder of any claim or interest shall interfere with the Purchaser's title to or use and enjoyment of the corresponding Acquired Assets based on or related to any such claim or interest, or based on any action the Debtor may take in their chapter 11 cases.

11.     If any person or entity that has filed financing statements, mortgages, mechanic's claims, *lis pendens*, or other documents or agreements evidencing claims against the Debtors or in the Acquired Assets shall not have delivered to the Debtors prior to each applicable Closing of each Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all Claims that the person or entity has with respect to the Debtors or the Acquired Assets or otherwise, then only with regard to the Acquired Assets that are purchased by the Purchaser pursuant to the Walgreens APA and this Sale Order, (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Acquired Assets, (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Purchaser Parties and the Acquired Assets, and

(Page | 19)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

(c) upon consummation of the Sale, the Purchaser may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all Claims that are extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Acquired Assets. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office. Notwithstanding the foregoing, the provisions of this Sale Order authorizing the Sale and assignment of the Acquired Assets free and clear of Claims shall be self-executing and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

**<u>No Successor or Transferee Liability</u>**

12.    The Purchaser shall not be deemed, as a result of any action taken in connection with the Walgreens APA, the consummation of the Sale, or the transfer, operation, or use of the Acquired Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any Assumed Liabilities arising after each applicable Closing), (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, the Employee Retirement Income Security Act of 1974 ("<u>ERISA</u>"), tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including,

(Page | 20)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation.

13.     Immediately prior to each Closing, the Purchaser was not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or controlling stockholders existed between the Purchaser and the Debtors.

14.     Other than as expressly set forth in the Walgreens APA, the Purchaser shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Acquired Assets or (b) any claims against the Debtors or any of their predecessors or affiliates. Except as expressly provided in the Walgreens APA with respect to the Purchaser, the Purchaser shall not have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as defined herein, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of each applicable Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, liabilities on account of (a) any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Acquired Assets or the Assumed Liabilities prior to each applicable Closing or in respect of pre-Closing periods or (b) any plan, agreement, practice, policy, or program, whether

(Page | 21)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

written or unwritten, providing for pension, retirement, health, welfare, compensation or other employee benefits which is or has been sponsored, maintained or contributed to by any Debtor or with respect to which any Debtor has any liability, whether or not contingent.

15.     Effective upon each applicable Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser or its assets (including, without limitation, the Acquired Assets), with respect to any (a) claim in these chapter 11 cases or in connection with or related to the Sale or the Debtors or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b):  (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, claim, interest, or Encumbrance; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any business in connection with the Acquired Assets or conduct any of the businesses operated with respect to such assets.

(Page | 22)

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

## **Good Faith of Purchaser**

16.    The Sale contemplated by the Walgreens APA is undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

17.    Neither the Debtors nor the Purchaser have engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Acquired Assets under the Walgreens APA is fair and reasonable and the Sale may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

## **Other Provisions**

18.    To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or License relating to the Acquired Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale contemplated by the Walgreens APA.

19.    The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court, (a) to allow the Purchaser to give the Debtors any notice provided for in the Walgreens APA, (b) to allow the Purchaser to take any and all actions permitted by the Walgreens APA in accordance with the terms and conditions thereof, including, without limitation, effectuating the Sale and the other

(Page | 23)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

transactions contemplated by the Walgreens APA and the other Transaction Documents, and (c) to otherwise implement the terms and provisions of the Walgreens APA, the other Transaction Documents, and this Sale Order.

20.     The terms and provisions of the Walgreens APA, the other Transaction Documents and this Sale Order shall be binding in all respects upon the Debtors, their Affiliates, their estates, all creditors of (whether known or unknown) and holders of equity interests in any Debtor, any holders of claims against or on all or any portion of the Acquired Assets, the Purchaser, and all of their respective successors and assigns including, but not limited to, as applicable, any subsequent trustee(s), examiner(s), or receiver(s) appointed in any of the Debtors' chapter 11 cases or upon conversion to chapter 7 under the Bankruptcy Code, as to which trustee(s), examiner(s), or receiver(s) such terms and provisions likewise shall be binding.  The Walgreens APA shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their shareholders, or any trustee(s), examiner(s), receiver(s), or any other successor parties in interest.

21.     The terms and provisions of this Sale Order and any actions taken pursuant hereto shall survive entry of an order which may be entered:  (a) confirming any chapter 11 plan in any of these chapter 11 cases; (b) converting any of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the chapter 11 cases; (d) transferring venue of the Chapter 11 cases to a court other than this Court; or (e) pursuant to which this Court abstains from hearing any of the chapter 11 cases.  The terms and provisions of this Sale Order, notwithstanding the entry of any such orders described in (a)-(d) above, shall continue in these chapter 11 cases, or following dismissal of these chapter 11 cases.

(Page | 24)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No.: | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

22.     Each and every federal, state, and local governmental agency, department, or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Walgreens APA.

23.     The Walgreens APA and the Sale contemplated hereunder shall not be subject to any bulk sales laws or any similar law of any state or jurisdiction.

24.     The Walgreens APA may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court; *provided* that any such modification, amendment, or supplement does not, based on the Debtors' business judgment, and in consultation with the Consultation Parties (as defined in the Bidding Procedures), have a material adverse effect on the Debtors' estates or their creditors.  The Debtors shall provide the Consultation Parties and the U.S. Trustee with prior notice of any such modification, amendment, or supplement of the Walgreens APA.  For the avoidance of doubt, Court approval (subject to such notices as may be required by applicable Bankruptcy Rules, Local Rules, or orders of this Court) shall be required for all other modifications, amendments, or supplements to the Walgreens APA that have a material adverse effect on the Debtors' estates or their creditors.

25.     For the avoidance of doubt, (a) nothing herein shall modify, alter, impair, or otherwise affect any of the provisions of the *Third Amended Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. [●]] (the "Final DIP Order") or the DIP Documents (as defined in the Final DIP

(Page | 25)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

Order), or the rights or remedies of the DIP Agent or the DIP Secured Parties under the DIP Documents except with respect to the Acquired Assets and (b) the allocation of the proceeds of the Sale is subject to the Final DIP Order except as otherwise agreed between the DIP Lenders and the Ad Hoc Secured Noteholder Group (each as defined in the Final DIP Order).

26.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

27.     For the avoidance of doubt, nothing in this Sale Order affects the rights of the Debtors or any other party to take any actions contemplated under or authorized pursuant to the Amended Store Closing Order.[3]

28.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014 or any other Bankruptcy Rules or Local Rules to the contrary, the terms and conditions of this Sale Order shall be effective immediately upon entry and the Debtors and the Purchaser are authorized to close the Sale immediately upon entry of this Sale Order.

29.     To the extent there is any conflict between the terms of this Sale Order and the Walgreens APA or any other Transaction Document, unless as specifically set forth in this Sale Order, the terms of this Sale Order shall control.

---

[3]     "Amended Store Closing Order" means the Court's *Amended Final Order (I) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (II) Granting Related Relief* [Docket No. 1648].

(Page | 26)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the Walgreens APA, and (III) Granting Related Relief |

30.     The Court shall retain exclusive jurisdiction with respect to the enforcement and interpretation of this Sale Order and the terms and provisions of thereof, including, for the avoidance of doubt, the Walgreens APA and all other Transaction Documents.