# Exhibit A

# Memorandum Opinion

Case 23-18993-MBK    Doc 3974-1    Filed 06/27/24    Entered 06/27/24 20:59:14    Desc Main
Exhibit A - Memorandum Opinion    Page 2 of 20

Case 23-18993-MBK    Doc 3907    Filed 06/25/24    Entered 06/25/24 14:27:57    Desc Main
Document    Page 1 of 19

NOT FOR PUBLICATION

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1(b)** | Case No. 23-18993 (MBK)<br><br>Chapter 11 |
| In re:<br><br>RITE AID CORP. et al.,<br><br>    Debtors. | Hearing Date: June 20-21, 2024<br><br>Judge: Michael B. Kaplan |

*All Counsel of Record*

## MEMORANDUM OPINION

This matter comes before the Court on a motion (the "Motion") filed by Debtors' Rite Aid Corporation ("Debtors") seeking to Enforce and Compel Performance under a Sale Order, dated January 17, 2024 (ECF No. 1510, the "Sale Order"), and Asset Purchase Agreement ("APA") incorporated therein. This matter has been fully briefed, and the Court has fully considered the parties' pleadings as well as the testimony, evidence, and arguments presented during two days of hearings. For reasons expressed below, the Court will grant the Debtors' Motion. The Court issues the following findings of fact and conclusions of law as required by FED. R. BANKR. P. 7052.[1]

---

[1] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

1

I. **Venue and Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.). This is a core matter pursuant to 28 U.S.C. §§ 157(b)(2)(A),(N) and(O). Venue is proper in this Court pursuant to 28 U.S.C. § 1408. The statutory bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 9013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Moreover, pursuant to Paragraph 50 of the Sale Order, this Court explicitly retains "exclusive jurisdiction with respect to the enforcement and interpretations of this Sale order and the terms and provisions thereof." *Sale Order* ¶ 50, ECF No. 1510).

II. **Background & Procedural History**

The factual background and procedural history of this case are well known to the parties and will not be repeated in detail here. The issue before the Court involves the Sale Order and APA, which memorialize a sale of Debtors' business, Elixir Solutions ("Elixir"), to MedImpact Healthcare Systems, Inc. ("MedImpact"). Therefore, the Court will limit the background recitation to those portions relevant to that transaction.

The Debtors acquired Elixir, a pharmacy benefit manager ("PBM"), in 2015. "Like other PBMs, Elixir acts as an intermediary to process prescriptions, help with drug utilization, and control costs for the groups that pay for drugs, such as insurance companies, unions, and large employers ('Plan Sponsors')." *Debtors' Motion* ¶ 8, ECF No. 3664. Among other things, PBMs

2

like Elixir reimburse pharmacies for prescription costs and seek reimbursement from Plan Sponsors; they also accept rebates from drug manufacturers and distribute a share to Plan Sponsors. In sum, because of the contractual relationships which PBMs manage and maintain with parties such as manufacturers, drug wholesalers, and pharmacies, PBMs increase customer access to prescription drugs and improve affordability of prescriptions by negotiating discounted drug prices with manufacturers. *See id.* ¶¶ 8-11.

As early as summer 2023, the Debtors worked with Guggenheim Securities to begin a marketing process to sell Elixir. Because of the niche operational and regulatory expertise required to operate a PBM, the marketing efforts initially focused on potential strategic buyers; and the Debtors contacted 12 parties pre-petition, nine of whom signed non-disclosure agreements ("NDAs") and received non-public materials about Elixir. *Id.* at ¶ 12. MedImpact was among these potential bidders. "MedImpact's final bid was $575,000,000 in cash and certain debt instruments, plus the assumption of certain liabilities, subject to a net working capital ['NWC'] adjustment" and other standard purchase price adjustments. *Id.* at ¶ 13. The Debtors selected MedImpact as the stalking horse bidder on October 15, 2023, and formalized a stalking horse asset purchase agreement. On December 21, 2023, after determining that MedImpact made the highest or otherwise best offer for the Elixir assets, the. Debtors announced MedImpact as the successful bidder." *Id.* at ¶ 14.

This Court conducted a hearing on the sale on January 9, 2024. A Sale Order was entered on January 17, 2024, which incorporated the APA. The MedImpact APA dictates the scope of liabilities that MedImpact agreed to assume as part of the purchase price (the "Assumed

3

Case 23-19993-MBK    Doc 3974-1    Filed 06/25/24    Entered 06/25/24 20:37:59    Desc Main
Exhibit A - Memorandum Opinion    Page 5 of 20

Case 23-19993-MBK    Doc 3924    Filed 05/24/24    Entered 05/24/24 14:27:57    Desc Main
Document    Page 4 of 19

Liabilities" set forth in § 1.3 of the APA), and carves out certain liabilities that the Debtors agreed to retain (the "Excluded Liabilities", set forth in § 1.4 of the APA). *Id.* at ¶ 16. The scope of the Assumed Liabilities drives much of the overall value of what MedImpact acquired; therefore, it was specifically negotiated by the parties. *Id.* at ¶ 17.

MedImpact also "agreed to step into the working capital of the Elixir business at Closing, taking both the liabilities and assets therein, and the parties negotiated to specifically define the scope of Elixir business's working capital." *Id.* This figure, which incorporates the Assumed Liabilities, was estimated to be a large negative figure in the hundreds of millions. Because of the impact that this figure would have on the value of MedImpact's bid, the parties agreed on a methodology for calculating the post-closing NWC and used advisors to prepare NWC calculations based on Elixir's June 2023 financials. The agreed-to methodology incorporates the line items used in Exhibit E to the APA, which are derived from specific general ledger accounts.

Ultimately, the sale closed on February 1, 2024. Pursuant to its rights under § 2.7 of the APA, MedImpact engaged in a post-closing purchase price adjustment—removing more than $225 million of liabilities from Closing Working Capital. MedImpact explains that the debts removed were actually Excluded Liabilities under the APA and, thus, did not belong in the NWC calculation. The Debtors assert that MedImpact's post-closing calculation deviates from the agreed methodology in Exhibit E. Unable to resolve the issues, the Debtors filed the instant Motion to Enforce the Sale Order and to Compel Performance by MedImpact. After the Motion was filed, the Court held a status conference and established a framework and timeline for submissions and discovery. MedImpact filed its Opposition (ECF No. 3797), and Debtors submitted a Reply (ECF

4

No. 3821). The Court conducted a hearing on the Motion over the course of two days, during which both sides presented oral argument, submitted evidence, and introduced witnesses. Specifically, the Court considered live testimony from the following witnesses:

- Marc Liebman, Managing Director at Alvarez & Marsal North America, LLC, the Debtor's financial advisor;
- James Gollaher, Chief Financial Officer of MedImpact Healthcare Systems, Inc.;
- Gary Kleinrichert, Managing Director at Secretariat Advisors, LLC, an expert consulting firm engaged by MedImpact Healthcare Systems, Inc. in connection with its purchase of Elixir Solutions;
- Jeffery Kirshner, Managing Director of Guggenheim Securities, LLC, an investment banking firm serving as advisors to Debtors; and
- Anna Khais, Vice President of Transition Services and Chief Financial Officer of Elixir Solutions.

On June 21, 2024, the Court heard closing arguments and the parties submitted electronic versions of their exhibits admitted into evidence by the Court.

### III. Discussion

At the heart of the dispute is the question of which party—Debtors or MedImpact—is responsible for more than $200 Million of liabilities, comprised of six categories of liabilities (the "Disputed Liability Types"). Both parties cite to this Court's Sale Order and the incorporated APA in support of their positions, but they each present vastly different interpretations of the agreement and of their respective obligations.

#### A. Due Process and Procedural Challenges

Before reaching the merits of the argument, the Court addresses the due process concerns raised by MedImpact. Specifically, MedImpact asserts that the Motion is "procedurally flawed" in that it seeks declaratory and injunctive relief by way of a motion, and that the dispute—at its

5

core—should more properly be treated as a breach of contract action, also requiring the initiation of an adversary proceeding. MedImpact cites Federal Rule of Bankruptcy Procedure 7001 for the proposition that such relief may only be requested by way of an adversary proceeding. The Court disagrees and views the Motion as seeking the interpretation and enforcement of a prior order issued by this Court; namely, the Sale Order. This task is well within this Court's discretion. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 S. Ct. 2195, 2197, 174 L. Ed. 2d 99 (2009) (stating that "[t]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders."); *see also In re Congoleum Corp.*, 636 B.R. 362, 372 n.3 (Bankr. D.N.J. 2022) (explaining that movant was not seeking injunctive relief but was requesting interpretation and enforcement of the confirmation order). Additionally, the Court again refers to Paragraph 50 of the Sale Order, which explicitly states that this Court "shall retain exclusive jurisdiction with respect to the enforcement and interpretations of this Sale order and the terms and provisions thereof." *Sale Order* ¶ 50, ECF No. 1510.

Moreover, to the extent this *were* a matter falling under Rule 7001—as MedImpact suggests—the Court determines that it may decide the matter by way of motion notwithstanding the Rule. There exists a host of case law supporting such a determination. *See, e.g.*, *In re Guterl Special Steel Corp.*, 316 B.R. 843, 852 (Bankr. W.D. Pa. 2004) ("A matter that was incorrectly brought as a contested matter when it should have been brought as an adversary action nonetheless may proceed as originally filed if the party against whom it was brought has suffered no prejudice as a consequence."). The Court additionally cites *In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 425 (3d Cir. 2013), in which the Third Circuit rejected the argument that the bankruptcy court should

6

have held an adversary proceeding to determine the enforceability of a contract clause rather than proceeding by motion. In short, where there is no prejudice to the nonmoving party, courts will "not elevate form over substance" and require an adversary proceeding when a motion will suffice. *In re Orfa Corp. of Philadelphia*, 170 B.R. 257, 276 (E.D. Pa. 1994).

This Court has noted repeatedly on record in the past that the time and liquidity pressures on these Debtors place critical constraints on procedures and timetables employed in this case. The Court strives to address issues in such ways as best possible to balance the due process rights of parties, with the economic, health and welfare needs of customers, tort victims and employees. Here, MedImpact has not suffered any prejudice due to this matter being brought as a contested matter, versus an adversary proceeding. MedImpact has been afforded notice; it was able to engage in discovery; and it had the opportunity to be heard. Although MedImpact complains, generally, about the expedited nature of the discovery process, it has not established that it was unable to depose a desired witness or that it was not able to engage in meaningful document production. Moreover, the Court views the issues presented in this matter to be limited to contract interpretation and order-enforcement. Any "lost" opportunities to present procedural defenses would not have assisted MedImpact in advocating its position. Accordingly, due process has been satisfied.

Finally, the Court notes that MedImpact asserts that this is a matter more appropriately resolved through the dispute resolution mechanism baked into the APA. The Court reiterates that the Motion presents a matter of contract interpretation, not a computational dispute or

7

disagreement as to application of accounting principles; therefore, the dispute resolution procedures in the APA have not been triggered.

Having determined that resolution of this matter in this Court by way of motion practice is procedurally and substantively appropriate, the Court turns to the merits of the issue.

### B. Delaware Law

Both parties maintain that the contract is unambiguous. The Court agrees. In reaching this conclusion, the Court applies Delaware law—as it must pursuant to Section 10.14 of the APA. "When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021). The Supreme Court of Delaware recently addressed contract interpretation under the laws of the First State:

> Delaware law adheres to the objective theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party. The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. If a contract is plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent. Stated differently, clear and unambiguous language is reasonably susceptible of only one interpretation. Language from a contract need not be perfectly clear for an interpretation of it to be deemed as the only reasonable one.

*BitGo Holdings, Inc. v. Galaxy Digital Holdings, Ltd.*, 2024 WL 2313115, at *8 (Del. May 22, 2024) (quotations and citations omitted).

Delaware law is clear that "[a]mbiguity does not exist simply because the parties disagree about what the contract means" and "extrinsic, parol evidence cannot be used to manufacture an

8

Case 23-19928-MBK Doc 3207-4 Filed 06/25/24 Entered 06/25/24 12:37:59 Desc Main
Exhibit A - Memorandum Opinion Page 10 of 20

Case 23-19865-MBK Doc 3204 Filed 06/24/24 Entered 06/24/24 07:55:19 Desc Main Document Page 9 of 20

ambiguity in a contract that facially has only one reasonable meaning." *Bailey v. Tektronix, Inc.*, 2024 WL 748521, at *6 (D. Del. Feb. 23, 2024). Here, where the parties agree—and the Court finds—that the contract is unambiguous, there is no need for introduction of parol evidence. *See United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

Nevertheless, the context of the contract language, the economic realities underlying the transaction at issue, and the circumstances in which the agreement was reached are helpful in assessing the objective construction of the contract. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006). Thus, it is appropriate for this Court to inquire into the context of the APA negotiations as an aid to interpretation.

In doing so, the Court is guided by the Delaware Chancery Court's decision in *Greenstar IH Rep, LLC v. Tutor Perini Corp.*, 2019 WL 6525206, (Del. Ch. Dec. 4, 2019) where—as here—the parties agreed that the contract term was unambiguous, but nevertheless disagreed about its meaning. Using the framework for contract interpretation undertaken in that case, this Court examines whether the relevant provisions of the APA have only one reasonable interpretation when read in full and situated in the commercial context between the parties. "In this regard, when assessing 'commercial context,' the court may consider the parties' 'view of the overall transaction' and associated "description[s] of the transaction" without running afoul of the parol evidence rule." *Id.* at *9.

A resort to consideration of "some extrinsic evidence" to interpret unambiguous contracts was explicitly approved by the Third Circuit in *In re Combustion Eng'g, Inc.*, 366 F. Supp. 2d 224 (D. Del. 2005). In a footnote, the Third Circuit explained that "state and federal courts in the Third

9

Circuit adhere to a relaxed version of the traditional 'four corners' rule, allowing courts to consider some extrinsic evidence in determining whether a contract's language is ambiguous." *Id.* at 230 n.3.  The Circuit cited to a Delaware Chancery Court decision that stated "when determining the meaning or ambiguity of a contract, the court will consider 'relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties . . . ." *Kier Constr., Ltd., v. Raytheon Co.,* No. 19526, 2005 WL 628498, *5 (Del.Ch. Mar. 10, 2005). Accordingly, here, the Court considers the overall situation and circumstances in which the APA was negotiated and finalized and—in doing so—concludes that the only reasonable interpretation of the APA is the interpretation advanced by Debtors.

**C. Analysis**

This Court has in the past made passing comments that in resolving substantial commercial disputes, a court generally should ignore the number of zeroes in the dollars at issue and reach a decision based upon the facts presented and application of the law, as if the dispute involved hundreds of dollars—not millions.  Here, however, the number of zeroes in dispute reflect the significant amount of contested Assumed Liabilities and has relevance for this Court in distilling the economic essence of the underlying sale transaction.  To start, the Court approved the Sale on January 17, 2024, bottomed on the terms of the submitted APA.  It is undisputed that pursuant to Section 2.1 of the APA, the aggregate consideration or "Purchase Price" for the Elixir assets included a cash deposit of $57.5 Million, a Seller's note of $519 Million and the assumption of Assumed Liabilities, all subject to adjustments under Sections 2.7(b) – (e) of the APA.  While the

10

face value of the Seller's note and cash deposit are readily apparent, not so with respect to the Assumed Liabilities—it takes a bit more work, but such value is discernible from a plain reading of the APA. Section 1.3(d) of the APA provides the definition of Assumed Liabilities, stating, in relevant part, that the Purchaser shall irrevocably assume:

> (d) all trade payables of Sellers to non-Affiliated third parties in connection with the Business existing on the Closing Date that remain unpaid and are not delinquent as of the Closing Date and incurred in the Ordinary Course and other Liabilities of Sellers of the types included in the definition of Closing Working Capital but not including any Excluded Rebate Liability or any Liabilities to the extent relating to or otherwise arising, whether before, on or after the Closing, under any of the Excluded Contracts (collectively, the "Assumed Current Liabilities").

*Sale Order – APA* § 1.3(d), ECF No. 1510.

This definition brings in the concept of "Closing Working Capital," found in Section 11.1(o) and the APA clarifies that it includes "Current Assets," which—in turn—means, "without duplication, the total current assets of Sellers using those line items used in the example calculation attached hereto as Exhibit E." *APA*, Article XI, § 11.1(u). Likewise, "Current Liabilities" expressly includes the "total current liabilities of Sellers using those line items used in the example calculation attached hereto as Exhibit E." *Id.* at § 11.1(w). The APA itself tells us the amount of working capital anticipated by the parties as part of the consideration for the transaction and, thus, the range of expected Assumed Liabilities.

Pertinently, the initial terms of the APA, at Section 11.1(aaaa) reflects a Target Working Capital figure of negative $206,628,000. The parties subsequently adjusted this figure in Paragraph 3 of Amendment 15 to the APA, dated January 31, 2024, which unambiguously provides that "the Estimated Closing Working Capital shall be deemed to be an amount equal to

11

negative $192,288,920." *Amendment 15 to APA* ¶3, ECF No. 3664 at 34. The substantial negative working capital at closing should have come as no surprise to MedImpact, or its experienced financial advisors. Indeed, the undisputed record reflects that BDO USA, P.C. ("BDO"), retained by MedImpact, undertook financial due diligence which confirmed the history of Elixir's negative working capital going back to July of 2022. *See Debtor's Ex. 35 – BDO Financial Due Diligence Report* at 30-34; *see also MedImpact's Ex. 8 – Decl. of James Gollaher* ¶¶ 8-9, ECF No. 3797-1. In the days preceding the execution of the APA, BDO calculated the NWC at negative $206 Million. *See Debtors' Ex. 35 – Chan Email.* Thus, considering the negative Closing Working Capital, and the Assumed Liabilities incorporated therein, the total consideration for the transaction presented to and approved by the Court, including the amendments to the APA, was in the range of $770 Million. This stands in stark contrast to the economics of the transaction as suggested by MedImpact based on their proffered reading of the APA.

Much of this contest involves the interpretation of Section 1.3 of the APA. That section, again, states, in relevant part, that the Purchaser shall irrevocably assume:

> (d) all trade payables of Sellers to non-Affiliated third parties in connection with the Business existing on the Closing Date that remain unpaid and are not delinquent as of the Closing Date and incurred in the Ordinary Course **and** other Liabilities of Sellers of the types included in the definition of Closing Working Capital but not including any Excluded Rebate Liability or any Liabilities to the extent relating to or otherwise arising, whether before, on or after the Closing, under any of the Excluded Contracts (collectively, the "Assumed Current Liabilities").

*Sale Order – APA* § 1.3(d), ECF No. 1510 (emphasis added).

MedImpact's suggested reading of Section 1.3 is that the first clause—referring to all existing, non-delinquent trade payables—and the second clause—referring to liabilities included

12

in the definition of Closing Working Capital—are mutually exclusive and to be read in the disjunctive. The Court cannot agree.

As an initial matter, the clauses are joined by "and," indicating that a particular liability does not necessarily have to be *either* a trade payable *or* a non-trade payable. Rather, the clauses are additive. Such a reading is consistent with traditional principles of contract interpretation. *Williams v. State*, 818 A.2d 906, 912 (Del. 2002) ("In its commonly accepted meaning ' "and" is a connective, and is not generally used to express an alternative—unless it is followed by words which clearly indicate that intent.' " (quoting *State v. Klosowski*, 310 A.2d 656, 657 (Del. Super. Ct. 1973)), *superseded by statute*, 74 Delaware Laws Ch. 246 §§ 2, 3 (codified at DEL. CODE ANN. tit. 11, § 636(a)); *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2008 WL 902406, at *7 (Del. Ch. Apr. 3, 2008) ("Usually, one would interpret 'and' only in the conjunctive, joining two or more elements in a list and requiring all of those elements . . . ."); 11 WILLISTON ON CONTRACTS § 30:12 (4th ed.) ("It has been said that the words 'and' and 'or' should not be considered interchangeable in construing a contract, absent strong supporting reasons.").

The Court is cognizant that in *Weinberg v. Waystar, Inc.* the Delaware Supreme Court undertook a lengthy analysis of the interpretation of the word "and" in litigation, finding that the "two avenues of interpretation—the 'conjunctive or disjunctive' path and the 'joint or several' path—have emerged from the, at times, lively debate." *Weinberg v. Waystar, Inc.,* 294 A.3d 1039, 1044-45 (Del. 2023). The court further explained that, although the ordinary use of "and" is conjunctive, "sloppy drafting sometimes confuses the two" uses, and thus "courts [will] interpret

13

'and' in the disjunctive sense to prevent an absurd or unreasonable result, or to give effect to the parties' intent and reasonable expectations." *Id.* at 1045. This is not the case here.

Debtor's interpretive approach does not lead to absurd or unreasonable results and interpreting the word "and" in the disjunctive sense does not give effect to the parties' intent and reasonable expectations. Quite the opposite. As Debtors point out, such an interpretation requires this Court in effect to read qualifying language into the APA that simply is not there; specifically, the words "non-trade payable." *See Debtors' Reply* ¶ 14, ECF No. 3821.

The Court recognizes that the two clauses seem to overlap. Pointedly, during the hearing, the Court questioned the purpose of the two clauses when the second clause—the Closing Working Capital clause—appears to be a "catch-all" and encompasses any liability that would qualify under the first clause—the non-delinquent trade payables clause. In response, counsel for Debtors acknowledged the overlap and the intentionally broad scope of the Closing Working Capital clause[2], and offered examples of liabilities where there would be no such overlap.

Even assuming—without finding—that the "catch-all" in the Closing Working Capital clause encompasses any liability that would fit under the non-delinquent trade payables clause, the

---

[2] Indeed, in reviewing pleadings in preparation for the upcoming confirmation hearing in this case, this Court learned that Debtor may owe the California Department of Health Care Services for possible overpayment of reimbursements. The procedure for determining the accuracy of claims submitted to the Department spans a long timeframe. Essentially, the Department audits a report submitted by a provider within three years after the close of the period covered by the report, or after the date of submission of the original or amended report by the provider, whichever is later. Cal. Welf. & Inst. Code Section 14170(a)(1). To the extent the audit reveals that there has been an overpayment, the provider must reimburse the Department after all administrative appeals are exhausted. The timing of such a procedure means that a liability may not exist until several years after the provider submitted its claim to the Department. Thus, potential liabilities for overpayments, subject to pending audits at the time of Closing, would *not* fall within the clause for non-delinquent trade payables, as defined in Section 1.3, because payment was not due on the Closing Date. This possibility illustrates and highlights the purpose of the broad catchall in the Closing Working Capital clause—it reflects how the parties sought to characterize and capture liabilities that take years to be fixed and come due.

14

Court determines that this is not fatal to the Debtors' argument. Rather, the Court views the two clauses as the Debtors' attempt at a "belt-and-suspenders" approach to the APA: an effort to ensure that MedImpact assumed all the liabilities contemplated by the contract; specifically, those of the type listed in Exhibit E. As counsel for the Debtors expressed during oral argument, the Closing Working Capital clause is undeniably broader, but more explicit. This Court agrees.

In its pleadings, testimony, and during oral argument, MedImpact offers analysis as to the reasons why each of the Disputed Liability Types constitutes an Excluded Liability (as opposed to an Assumed Liability) under the APA. MedImpact's efforts in this regard are unpersuasive and its reasoning is incompatible with the parties' expectations in pursuing the transaction. Simply put, the Debtors' suggested interpretation as to the scope of Section 1.3(d) is the only reasonable one.[3] As previously stated, the appropriate test is what a reasonable person in the position of the parties

---

[3] Were this Court to accept MedImpact's interpretation, impermissible absurd results would follow. *See Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1211 (Del. 2021) (explaining that "interpretations that are commercially unreasonable or that produce absurd results must be rejected") (citations omitted). By way of example, Section 1.4 of the APA covers "excluded liabilities" and subsection (v) states that MedImpact shall not assume "drafts or checks outstanding as of the Closing." Mr. Kleinrichert explained that adjustments were made to the Working Capital calculation "to exclude checks outstanding per the APA." *Kleinrichert Decl.* ¶ 20, ECF No. 3797-2. The Court inquired about this procedure during the hearing and discovered that—under MedImpact's view—Debtors would have been better off *not* writing checks at all once the APA was signed. This is an illogical result. Additionally, MedImpact adjusted the Working Capital calculation to exclude certain liabilities on the basis that they constitute cure costs and, thus, are not Assumed Liabilities within the meaning of the APA. *See, e.g.*, *Kleinrichert Decl.* ¶ 56. However, under MedImpact's view, nearly all liabilities arising from a pharmacy contract would constitute a cure cost—whether the Debtors are in default—which, again, produces a questionable result. The Court agrees with Debtors' argument—consistent with Section 365—that "cure costs" relate to obligations that are in default. As a logical corollary, liabilities that arise from a contract but *not* out of a default are not necessarily cure costs. Here, again, the Court steps back and look at the "bigger picture." As part of the Sale Order, Debtors represented, and the Court found that Debtors had "met all requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts" and had "cured and/or provided adequate assurance of any cure of any default existing prior to the Closing." *Sale Order* ¶ V, ECF No. 1510. It simply does not make sense that Debtors—who had previously assured the Court and all interested parties that no cure costs remained (apart from the "Big 4" pharmacies)—would agree to a cure cost cap of $1.4 Million in the APA, *see* § 1.3(a), and leave themselves exposed to liability in the tens of millions; especially after this Court made a finding that there were no such cure obligations.

15

would have thought the contract meant. Here, the Court approved the Sale on January 17, 2024. The parties signed Amendment 15 to the APA on January 31, 2024—Paragraph 3 of which clearly establishes that "the Estimated Closing Working Capital shall be deemed to be an amount equal to negative $192,288,920." This figure is consistent with the reported figure for NWC since the inception of the parties' negotiations. A reasonable person in the position of the parties—with access to the financial information exchanged between the parties, including Exhibit E—would understand the Estimated Closing Working Capital figure to include and account for the Disputed Liability Types. This is the only logical interpretation.

The Court is cognizant that the Estimated Closing Working Capital figure was reached with the understanding that it could be adjusted post-closing pursuant to § 2.7 of the APA. There is no dispute that the APA provides the parties with purchase price adjustments to account for post-signing and post-closing changes in working capital to preserve the economics of the transaction. MedImpact took advantage of its right to make a post-closing purchase price adjustment and changed the NWC figure from negative $192 Million to a positive $84 Million: a $276 Million swing. MedImpact achieved this result by backing out many of the Disputed Liability Types from the calculation of NWC. The Court cannot accept that a reasonable person in the position of the parties would understand the contract to permit this size of adjustment, even taking into account that the increased NWC figure requires an additional payment by the purchaser-capped at $50 Million. *See APA* § 2.7(a)(i). Frankly, a $276 Million adjustment on a transaction with anticipated consideration in the range of $770 Million (representing nearly 35% of the value flowing to the bankruptcy estate) is shocking, and to use the term employed repeatedly the Debtors: "absurd."

16

There is nothing in the record to suggest—and MedImpact fails to offer a convincing reason as to why—the NWC figure changed so dramatically in such a short time frame (under 90 days). Instead, MedImpact cites only "significant problems with how the debtors operated" that could only be discovered post-Closing when it gained access to the sellers' books and records. However, the evidence confirms MedImpact's pre-closing knowledge of Elixir's historical negative working capital situation. Indeed, it was factored into calculation of the purchase price. MedImpact's position is inconsistent with the terms of the APA and the Court's Sale Order, and is more akin to a re-write of the parties' contract. Given the contract's language and the circumstances in which the agreement was reached, the only reasonable interpretation is that the Estimated Closing Working Capital—and, thus, the Closing Working Capital referenced in § 1.3— included the Disputed Liability Types set forth in detail in line items appearing in Exhibit E. MedImpact assumed these liabilities by virtue of the APA.

Stepping back even further, the Court looks to the larger context in which this sale was conducted. The sale was always contemplated as part the bankruptcy reorganization. As discussed during the Sale Approval Hearing on January 9, the sale of the Elixir assets was "a critical part of the debtors' efforts to reorganize." *Jan. 9. 2024 Hrg. Tr.* 5:14-15, ECF No. 1443. Further, it is no secret that money is tight in this bankruptcy—there is little wiggle room, let alone room for approximately $225 Million in additional liabilities. If this Court were to accept MedImpact's suggested interpretation, it would have to accept that Debtors did one of two things: (1) that Debtors entered into the APA knowing that it would remain responsible for over $225 Million that it did not—and could not—account for in its plan of reorganization; thus destroying any possibility

17

of successful reorganization; or (2) that Debtors entered into the APA hoping that they could "pull a fast one" and sneak $225 Million in liabilities onto MedImpact without anyone noticing. Both options are implausible and belied by the record.

The notion that the Debtors—or any debtor—would enter into an agreement that it knew would render its plan unconfirmable is unfathomable. It specially makes no sense in the context of *this* case, where counsel has worked tirelessly and devoted countless hours to make it this far—now mere days from a confirmation hearing, albeit a contested hearing. It is also worth pointing out the unlikely scenario in which the existing lenders, who supported the sale, would thereafter agree to inject tens of millions of dollars in additional DIP and exit financing were MedImpact's interpretation of its responsibilities under the APA reasonable and accurate.

Given these "big picture" considerations, the Court concludes that the only reasonable interpretation of the APA is that advanced by the Debtors. The Court simply remains unpersuaded that each Disputed Liability Type is more appropriately characterized as an Excluded Liability. Rather, the Court determines that, generally, each Disputed Liability Type is accounted for as an Assumed Liability in the line items in Exhibit E, consistent with the language of the APA.

IV. **Conclusion**

For the foregoing reasons, the Court will grant the Debtors' Motion. The parties are directed to settle a proposed form of Order consistent with this Opinion.

*Michael B. Kaplan*
Michael B. Kaplan, Chief Judge
U.S. Bankruptcy Court
District of New Jersey

Dated: June 25, 2024

19