**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF MCCLAIN THOMPSON IN SUPPORT OF**
**THE DEBTORS' SECOND MOTION TO ENFORCE THE SALE ORDER**

I, McClain Thompson, declare as follows under penalty of perjury:

1. I am an attorney at Kirkland & Ellis LLP and counsel to the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I am licensed to practice law in the District of Columbia, the State of Illinois, and State of New York. I am admitted pro hac vice in the above-captioned cases.

---

[1] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

2. I submit this declaration in support of the Debtors' *Debtors' Second Motion to Enforce the Sale Order and Compel Performance by MedImpact Healthcare Systems, Inc. Under the MedImpact Asset Purchase Agreement* (the "Motion"), filed contemporaneously herewith.

3. Attached as **Exhibit A** to this Declaration is a true and correct copy of an excerpt from the transcript of the June 20, 2024 hearing before this Court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 2, 2024                                  Respectfully submitted,

                                                     */s/ McClain Thompson*
                                                     McClain Thompson

## Exhibit A

**Excerpt of Transcript of June 20, 2024 Hearing**

```
               IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE DISTRICT OF NEW JERSEY


IN RE:                        .    Case No. 23-18993-MBK
                              .    (Jointly Administered)
                              .
 RITE AID CORPORATION,        .    Clarkson S. Fisher U.S.
                              .           Courthouse
                              .    402 East State Street
            Debtors.          .    Trenton, NJ 08608
                              .
                              .    June 20, 2024
. . . . . . . . . . . . . .        11:30 a.m.

     TRANSCRIPT OF HEARING ON NOTICE OF (I) SUCCESSFUL
  BIDDER, (II) PROPOSED WALGREENS APA, AND (III) PROPOSED
     WALGREENS SALE ORDER, EACH SOLELY WITH RESPECT TO
            THE ACQUIRED ASSETS [DOCKET NO.3792]

             BEFORE THE HONORABLE MICHAEL B. KAPLAN
           UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

TELEPHONIC APPEARANCES:

For the Debtors:         Kirkland & Ellis, LLP
                         BY:  ROSS J. FIEDLER, ESQ.
                         601 Lexington Avenue
                         New York, NY 10022

                         Kirkland & Ellis, LLP
                         BY:  APARNA YENAMANDRA, ESQ.
                         601 Lexington Avenue
                         New York, NY 10022

                         Kirkland & Ellis, LLP
                         BY:  MARK McKANE, ESQ.
                         555 California Street, 27th Floor
                         San Francisco, CA  94104



Audio Operator:          Kiya Martin

 Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.
_____

                    J&J COURT TRANSCRIBERS, INC.
                        268 Evergreen Avenue
                     Hamilton, New Jersey 08619
                     E-mail:  jjcourt@jjcourt.com

             (609) 586-2311    Fax No. (609) 587-3599
```

<pre>
                                                                        2

     TELEPHONE APPEARANCES (Continued):

     For the Debtors:          Kirkland & Ellis, LLP
                               By:  BRENTON ROGERS, P.C., ESQ.
                               333 West Wolf Point Plaza
                               Chicago, Illinois 60654

                               Kirkland & Ellis, LLP
                               By:  SHAYNE HENRY, ESQ.
                               401 Congress Avenue
                               Austin, Texas 78701

                               Cole Schotz, P.C.
                               BY:  WARREN A. USATINE, ESQ.
                               Court Plaza North
                               25 Main Street
                               Hackensack, New Jersey 07601

     For the U.S. Trustee:     United States Department of Justice
                               BY:  LAUREN BIELSKI, ESQ.
                               One Newark Center, Suite 2100
                               1085 Raymond Boulevard, Suite 2100
                               Newark, NJ  07102

     For the Unsecured         Kramer Levin Naftalis & Frankel LLP
     Creditors Committee:      BY:  RACHEL RINGER, ESQ.
                               1177 Avenue of the Americas
                               New York, NY  10036

     For Tort Claimants        Akin Gump Strauss Hauer & Feld LLP
     Committee:                BY:  ARIK PREIS, ESQUIRE
                               One Bryant Park
                               Bank of America Tower
                               New York, NY 10036

     For MedImpact Healthcare  DLA Piper, LLC
     Systems, Inc.             BY:  JEFFREY S. TOROSIAN, ESQ.
                               444 W. Lake Street, Suite 900
                               Chicago, IL  60606


                                   - - -
</pre>

**WWW.JJCOURT.COM**

Gollaher - Direct/Rogers                                73

1  A    Yes.
2  Q    The 84.7 million-dollar number in the MedImpact closing
3  working capital statement, that was 290 million dollars better
4  than the target working capital of negative 206 million
5  dollars, is that right?
6  A    I'm not sure I follow the question.
7  Q    So the target working -- networking capital in the APA was
8  206 million dollars, true?  Negative 206 million dollars.
9  A    Yes.
10 Q    And as calculated by MedImpact, the actual networking
11 capital position was 84.7 million dollars positive, right?
12 A    That's correct.
13 Q    That's a difference of 290 million dollars, correct?
14 A    Yes.
15 Q    Now, there was a purchase price adjustment mechanism in
16 the APA, is that true?
17 A    Well, the APA used networking capital as a mechanism to
18 adjust the price, yes.
19 Q    And the way that the APA used networking capital as a
20 mechanism to adjust the price in part was if the networking
21 capital position of the company was better at closing than the
22 negative 206 million-dollar target, that would increase the
23 purchase price subject to a cap, is that correct?
24 A    Yes.
25 Q    And it was a dollar-for-dollar increase.  For every dollar

Gollaher - Direct/Rogers                                    74

1  that networking capital was better than negative 206 million
2  dollars, the purchase price would increase by one dollar, true?
3  A    Yes, it was a 50 million-dollar cap on that, yes.
4  Q    And so absent the 50 million-dollar cap, if that cap
5  didn't exist, the purchase price as a result of this 84.7
6  million-dollar calculation of networking capital would have
7  increased by 290 million dollars.  Is that fair?
8  A    The difference was 290 million.  You know, we negotiated
9  the cap, as well as a limitation on the EIC related, you know,
10 amounts as part of, you know, the purchase price, as part of,
11 you know, what we wanted to absorb as an asset.  You know, we
12 were undergoing a bid process here and this was all
13 negotiation, so this was all factored into potentially it could
14 give us upside and realized value from this transaction moving
15 forward.
16           So you know, I see the one side but, you know, the
17 working capital, we owe the 50 million dollars.  We've said
18 that and, you know, from our perspective these items that were
19 listed in here were exclusions.
20 Q    I appreciate that, sir.  I think my question was a little
21 simpler.
22 A    Yeah.
23 Q    The cap did not exist with the purchase price adjustment
24 in the contract as -- based on the 84.7 million-dollar
25 networking capital position that MedImpact calculated --

1  A    Um-hum.
2  Q    -- the purchase price would have increased by 290 million
3  dollars.
4  A    Well, I don't think we would have signed the deal.
5  Q    As a result of having the cap --
6  A    It was the only reason we signed into the deal.
7  Q    As a result of having the cap, the purchase price can only
8  increase by 50 million dollars, true?
9  A    Well, that wasn't the calculation.  I think you're
10 assuming if there's no cap, yeah, it would have been 290
11 million dollars greater, but we wouldn't have signed into this
12 deal, we wouldn't have done this deal without a cap.
13 Q    But with the cap, the purchase price can only increase by
14 50 million dollars, right?
15 A    That's correct.
16         MR. ROGERS:  May I have a moment to consult with --
17         THE COURT:  Sure.  And I'd like to ask a question.
18 I'm going to ask you to dumb it down for me.
19         THE WITNESS:  Oh.
20         THE COURT:  All right.  This Court approved a
21 transaction of 576 million dollars.  You could look at probably
22 countless press releases --
23         THE WITNESS:  Yes.
24         THE COURT:  -- that went out from Forbes to Reuters
25 to Bloomberg, all speaking to a 576 million-dollar purchase

1  price.
2         If the Court accepts the adjusted working capital --
3  net working capital --
4         THE WITNESS:  Right.
5         THE COURT:  -- submission of MedImpact --
6         THE WITNESS:  Yes.
7         THE COURT:  -- that we've just been reviewing, what
8  is the total value of -- what is the value?  And by "value," I
9  mean, cash.
10        THE WITNESS:  Right.
11        THE COURT:  And assumed liability.  What's the value
12 flowing to the debtor?
13        THE WITNESS:  We will pay 590 million dollars for the
14 business.  The original 575 we gave -- we -- during this we
15 signed a seller note where we're paying an additional -- we
16 gave them a 31 million-dollar discount on the note, so that's
17 additional cost to us.  We paid an additional 1.5 million
18 dollars for the EGWP business.  When we originally got into
19 this deal, we thought we were getting the EIC business as well
20 at 7 to 700.  We didn't get that business because it's tied up,
21 so we took -- we wanted the EGWP business -- employer-group
22 waiver plan business.  It was a smaller subset.  We paid extra
23 for that.
24        So our purchase price on the books, cash out the door
25 to us at this point, is right around 591 million dollars,

Gollaher - Direct/Rogers                77

1 plus --

2 　　　　THE COURT: And that's cash and assumed liabilities?

3 　　　　THE WITNESS: Right. And then -- yes, then the
4 assumed liabilities component on this we would owe an
5 additional 50 million dollars, so it would be roughly 650
6 million dollars due to pay out.

7 　　　　THE COURT: So from my understanding the assumed
8 liabilities under your analysis would be the 50 million-dollar
9 cap plus what you paid --

10 　　　　THE WITNESS: Yes. Yes.

11 　　　　THE COURT: In addition to the cash; that is the
12 intent is?

13 　　　　THE WITNESS: Yes.

14 　　　　THE COURT: And as a package, that would be how much?

15 　　　　THE WITNESS: I'd say it's roughly 650 million total.

16 　　　　THE COURT: All right. Thank you.

17 　　　　MR. ROGERS: I've no further questions for the
18 witness, Your Honor.

19 　　　　THE COURT: All right. Then this is a good time to
20 stop. We'll have redirect, however you want to phrase it,
21 cross after. Let's come back at 2:00. Let's get ready to
22 start at 2:00.

23 　　　　MR. TOROSIAN: Thank you, Your Honor.

24 　　　　MR. ROGERS: Thank you, Your Honor.

25 　　　　(Off the record at 1:15 p.m. Back on the record at

# **C E R T I F I C A T I O N**

    I, RUTH ANN HAGER, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

/s/ Ruth Ann Hager

RUTH ANN HAGER, AAERT C.E.T. D-641    DATE:  June 24, 2024

J&J COURT TRANSCRIBERS, INC.