| |
|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** |
| John Dellaportas<br>Courtney Leon<br>**EMMET, MARVIN & MARTIN, LLP**<br>Tel: (212) 238-3000<br>Fax: (212) 238-3100<br>Email: jdellaportas@emmetmarvin.com<br>         cleon@emmetmarvin.com<br><br>*Counsel for Thomas A. Pitta,*<br>*as Trustee of RAD Sub-Trust A* |

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al*., | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**MOTION OF RAD SUB-TRUST A FOR AN ORDER
(I) ENFORCING THE PLAN AND CONFIRMATION ORDER AGAINST
MCKESSON CORPORATION AND (II) GRANTING RELATED RELIEF**

RAD Sub-Trust A (the "Trust"), formed pursuant to the confirmed *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (With Further Modifications)*, dated August 16, 2024 (the "Plan")[2] of Rite Aid Corporation ("Rite Aid"), the above-captioned debtor and its debtor affiliates, or post-Effective Date Debtors, the Reorganized Debtors or Wind-Down Debtors, as applicable (collectively, the

---

[1]   The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

[2]   Docket No. 4532, Exhibit A. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them under the Plan.

"Debtors" or "Reorganized Debtors"), by and through its undersigned counsel, hereby moves (the "Motion") this Court for entry of an Order, substantially in the form attached hereto as **Exhibit A**: (i) finding that McKesson Corporation ("McKesson") has violated the Plan Injunction (as defined below); (ii) enforcing the Plan Injunction; (iii) directing that McKesson cease interfering with the implementation of the Plan and enter into an assignment agreement with the Trust to assign to the Trust the Requested Antitrust Claims; (iv) awarding attorney fees and costs in an amount to be determined; and (v) granting related relief.  In support of this Motion, the Trust relies on the *Declaration of Thomas A. Pitta in Support of RAD Sub-Trust for an Order (I) Enforcing the Plan and Confirmation Order Against McKesson Corporation and Granting Related Relief* (the "Pitta Declaration"), attached hereto as **Exhibit B**.  In further support of this Motion, the Trust respectfully states as follows:

### PRELIMINARY STATEMENT[3]

1.      The Trust brings this Motion for an Order from this Court to stop McKesson from interfering with the implementation of the Debtors' Plan in violation of the Plan Injunction.  Specifically, McKesson has refused to turn over to the Trust certain Assigned Claims that are property of the Trust under the Confirmation Order and Plan.

2.

---

[3]      Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to them below in the Motion.

3.      The Plan and Confirmation Order provide that, on the Effective Date, the Debtors fully transferred all Litigation Trust Assets, which included all of the Assigned Claims, to the Trust.  The Assigned Claims were defined broadly to include any and all of the Debtors' inchoate and contingent claims that arose before, on, or after the Petition Date in contract.

By refusing to assign these Assigned Claims to the Trust, McKesson is interfering with the implementation of the Plan in violation of the Plan Injunction.

## JURISDICTION

4.      The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this Motion under 28 U.S.C. § 1334(b), Article XIII of the Plan, and Paragraph 275 of the Confirmation Order.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      This Court has authority to enforce its own orders. 11 U.S.C. § 105(a); *see Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150 (2009) ("[W]here the plain terms of a court order unambiguously apply, as they do here, they are entitled to their effect.").

## BACKGROUND

I.    **The Chapter 11 Cases**

6.    On October 15, 2023 (the "Petition Date"), each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  On October 17, 2023, the Court entered an order authorizing the joint administration and procedural consolidation of these Chapter 11 cases (the "Chapter 11 Cases") pursuant to Bankruptcy Rule 1015(b), under the lead case of *In re Rite Aid Corporation, et al.*, Case No. 23-18993 (MBK) (Bankr. D.N.J.).[4]

7.    On August 16, 2024, the Court entered the *Order Approving the Disclosure Statement and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (With Further Modifications)* (the "Confirmation Order")[5] confirming the Plan.

8.    On August 30, 2024, the Effective Date of the Plan occurred.[6]

9.    Pursuant to the Plan and Confirmation Order, on the Effective Date, the Litigation Trust was created and established pursuant to the Master Trust Agreement (the "RAD Master Trust").[7]  Also on the Effective Date, the Trust was created and established pursuant to the Sub-Trust A Agreement (the "Trust Agreement").[8]

---

[4]    Docket No. 122.

[5]    Docket No. 4532.

[6]    Docket No. 4800.

[7]    The substantially final form of the Master Trust Agreement was filed on August 31, 2024 as part of the Eleventh Amended Plan Supplement.  *See* Docket No. 4793.

[8]    The substantially final form of the Sub-Trust A Agreement was filed on August 31, 2024 as part of the Eleventh Amended Plan Supplement.  *See* Docket No. 4793.

## II.    **The Assigned Claims Transferred to the Trust**

10.    The Plan and Confirmation Order provide that on the Effective Date, the

Debtors shall fully transfer all "Litigation Trust Assets" to the RAD Master Trust "free and clear

of any and all actual or alleged Claims, Interests, Liens, other encumbrances and liabilities of any

kind."[9]   The "Litigation Trust Assets" are defined under the Plan to include the "Assigned

Claims" and the "proceeds of the Assigned Claims."[10]

11.    Assigned Claims are defined broadly under the Plan to mean all of the

Debtors' claims and Causes of Action (as defined under the Plan) other than certain specifically

identified categories of claims.[11]   One notable exception is that Assigned Claims do not include

any claims or Causes of Action "*against* McKesson."[12]

12.    The "Causes of Action" that are included in the Assigned Claims are the

following:

---

[9]      Plan § IV.E.3(b); Confirmation Order, ¶ 40.

[10]     Plan § I.A.74.

[11]     Plan § I.A.42.  The Plan carves out the following types of claims from the definition of Assigned Claims, none of which are relevant to this Motion: (a) preference actions waived or settled during the Chapter 11 Cases, (b) claims or Causes of Action against third parties, with respect to which the Reorganized Debtors have an ongoing trade or commercial relationship and with respect to which the Reorganized Debtors assume indemnification obligations under the Plan or otherwise through the Chapter 11 Cases (other than indemnification claims against potential joint tortfeasors and Co-Defendants); (c) claims or Causes of Action (including Avoidance Actions) against contractual counterparties, vendors, or other go-forward commercial counterparties with the Reorganized Debtors (other than indemnification claims against potential joint tortfeasors and Co-Defendants); (d) claims or Causes of Action (including Avoidance Actions) against the DIP Secured Parties, the Junior DIP Secured Parties, the Prepetition Secured Parties, the Senior Secured Noteholders, and in each case their respective Agents, Trustees, and other Related Parties; (e) any and all claims or Causes of Action against any Debtor Related Party; and (f) any and all claims or Causes of Action against MedImpact or any of its affiliates or subsidiaries arising postpetition in connection with the enforcement of the Elixir Sale Order (including the Elixir Purchase Agreement) and the acquisition by MedImpact of the Elixir Acquired Assets.

[12]     Plan § I.A.42 ("Notwithstanding anything to the contrary herein, Assigned Claims shall not include any claims or Causes of Action against McKesson . . . ."); *see also* Confirmation Order ¶¶ 184, 238.

any claim, controversy, demand, right, action . . . of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, *contingent or non-contingent*, director or indirect, *choate or inchoate* . . . assertable, directly or indirectly, matured or unmatured, . . . whether arising before, on, or after the Petition Date, in contract, in tort, at law, in equity or otherwise.[13]

13.    The Plan provides that on the Effective Date, the Debtors "shall be deemed to have irrevocably vested in, transferred, granted and assigned to" the RAD Master Trust, and the RAD Master Trust shall receive and accept, "any and all of the Assigned Claims and the Assigned Insurance Rights."[14]

14.    The Confirmation Order provides:

[n]otwithstanding anything to the contrary in the Plan, in the Plan Supplement or in this Confirmation Order, the Debtors shall preserve, transfer, and/or assign to the [RAD Master Trust] the Assigned Claims, along with the right to commence, prosecute, or settle all such claims belonging to the Debtors or their Estates, subject to the occurrence of the Effective Date and other conditions in the Plan; *provided that*, subject to the terms and conditions of the Plan, (a) the [RAD Master Trust] or GUC Sub-Trust(s) shall be the successor-in-interest to the Debtors' rights, title, and interest in any Assigned Claims . . . , (b) the [RAD Master Trust]  or GUC Sub-Trust(s) as may be applicable, shall have exclusive standing to pursue the Assigned Claims . . . , and (c) the Litigation Trustee or GUC Sub-Trust Trustee(s), pursuant to the Committee Settlement Documents, shall (i) retain and may exclusively enforce any and all Assigned Claims . . . , and (ii) have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment all such Assigned Claims . . . and to decline to do any of the foregoing in its discretion and without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.[15]

---

[13]    Plan § I.A.61. (emphasis added).

[14]    Plan § IV.E.3(a).

[15]    Confirmation Order ¶ 144.

15.     Upon its creation, the RAD Master Trust transferred, vested, assigned and delivered to the Trust all of its rights, title, and interest in the Assigned Claims free and clear of all Liens and Claims, including the right to prosecute, settle, and/or monetize the Assigned Claims.[16]  The Trust also became the successor-in-interest to the Debtors and/or the Reorganized Debtors with respect to the Assigned Claims.[17]

### III.    The Plan Injunction

16.     The Plan contains an injunction (the "Plan Injunction") that provides, in relevant part:

> Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, . . . *all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article X.C of the Plan, released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan . . . , or are subject to exculpation pursuant to Article X.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable*, the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind-Down Debtors (or their Affiliates) (if applicable), the GUC Equity Trust, *the Litigation Trust*, the Exculpated Parties, or the Released Parties: . . . (iii) *creating, perfecting, or enforcing any encumbrance of any kind against* such Entities *or the property or the estates of such Entities* on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities . . .
>
> [ . . . ]
>
> Upon entry of the Confirmation Order, *all Holders of Claims and Interests* and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates *shall be enjoined from taking any actions to interfere*

---

[16]    Master Trust Agreement, Recital (g), §§ 1.2(c)-(d); Sub-Trust A Agreement, Recital (d), §§ 1.2(a)-(c).

[17]    Sub-Trust A Agreement § 1.2(d).

*with the implementation or Consummation of the Plan.*  Except as otherwise set forth in the Confirmation Order, *each Holder of an Allowed Claim or Allowed Interest*, as applicable, *by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article X.F of the Plan.*[18]

17.     Section X.N of the Plan provides that "[a]ll injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect on and following the Effective Date in accordance with their terms."[19]   Paragraph 196 of the Confirmation Order approves and confirms the effect of the injunction provisions set forth in Article X of the Plan.[20]

### IV.     The McKesson Supply Agreement

18.     Prior to the Petition Date, Rite Aid and McKesson were parties to that certain Supply Agreement, originally entered into and dated as of December 22, 2003 (as amended, supplemented, or otherwise modified from time to time, the "McKesson Supply Agreement"), pursuant to which McKesson supplied certain of the Debtors with, among other things, pharmaceutical products, prior to the Petition Date.[21]

19.

---

[18]   Plan § X.F. (emphasis added).

[19]   Plan § X.N.

[20]   Confirmation Order ¶ 196.

[21]   Plan § I.A.87.  A copy of the McKesson Supply Agreement is attached as Exhibit 1 to the Pitta Declaration. Due to the confidential nature of the McKesson Supply Agreement, the Trust is simultaneously filing a motion to file the McKesson Supply Agreement under seal and redact this Motion as necessary.

20.

21.

As a result, the Antitrust Claims existed on the Petition Date.

22.     During the Chapter 11 Cases, Rite Aid and McKesson entered into the McKesson Settlement that resolved the treatment of McKesson's prepetition claims arising under the McKesson Supply Agreement or otherwise, including any 503(b)(9) claims.  The McKesson Settlement was incorporated into the Plan and approved by Confirmation Order.[25]

23.     The Confirmation Order also provides that McKesson and the Debtors and the Reorganized Debtors shall exchange full and complete mutual releases of claims and causes

---

[22]

[23]

[24]

[25]     Plan § IV.A; Confirmation Order ¶¶ 26-27, 138-140, 184.

of action against each other, as provided under the McKesson Settlement Documents.[26]   The

Confirmation Order further states that "Assigned Claims shall not include any claims or Causes

of Action *against* McKesson."[27]

### V.      The Antitrust Claims

24.     The Antitrust Claims include


As an example, Antitrust Claims could exist against a pharmaceutical manufacturer who

sold drugs to McKesson, that were thereafter sold to Rite Aid, where such manufacturer had

engaged in a "Reverse Payment Scheme" causing Rite Aid and similarly situated retailers to pay

inflated prices.[28]

25.

---

[26]      Confirmation Order ¶ 184.

[27]      *Id.* (emphasis added).

[28]      A Reverse Payment Scheme exists where a pharmaceutical manufacturer fraudulently secures patents on a specific drug and then leverages those patents to initiate litigation against generic drug makers that result in anticompetitive settlements designed to delay the entry of generic alternatives into the market.  This conduct enables the manufacturer to unlawfully maintain a monopoly on the market, stifle competition, and charge artificially inflated prices for an extended period to the detriment of pharmacy distributors like Rite Aid.

.

**VI.**    **McKesson's Refusal to Assign the Requested Antitrust Claims**

26.    In January 2025, the Trust became aware of potential Antitrust Claims relating to Rite Aid's purchases of the drug         made through the middle of 2022 (the "the "Requested Antitrust Claims").

27.

28.

McKesson argued that: (i) Rite Aid's alleged prepetition breach of the

—as asserted in McKesson's $725 million claim against the estates—

and (ii) the Confirmation Order granted McKesson a full and complete release of all claims held by Rite Aid, and accordingly,

As provided below, McKesson is wrong on both accounts.

## **RELIEF REQUESTED**

29.     By this Motion, the Trust respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**: (i) finding that McKesson has violated the Plan Injunction; (ii) enforcing the Plan Injunction; (iii) directing that McKesson cease interfering with the implementation of the Plan and enter into an assignment agreement with the Trust regarding transfer of the Requested Antitrust Claims; and (iv) awarding attorneys' fees and costs in an amount to be determined; and (v) granting related relief.

## **BASIS FOR RELIEF**

## I.     **The Requested Antitrust Claims Are Assigned Claims That Were Transferred to the Trust**

30.     The Requested Antitrust Claims are Assigned Claims under the Plan that automatically transferred to, and vested in, the Trust on the Effective Date.  The definition of Assigned Claims under the Plan is very broad and includes any and all "inchoate" and "contingent claims" that Rite Aid held as of the Effective Date.[29]

---

[29]     *See* Plan § I.A.61.

31.     Furthermore, even if the McKesson Supply Agreement had terminated before the Petition Date, as McKesson asserts,

30

32.     Finally, the mutual releases between McKesson and the Debtors in the Confirmation Order are irrelevant.[31]  This specific Confirmation Order release does not apply to the Requested Antitrust Claims

## II.                                                                  McKesson is Violating the Plan Injunction and Its Prohibition Against Interference with Implementation of the Plan

33.     As Assigned Claims, the Requested Antitrust Claims were transferred to and vested in the Trust on the Effective Date.[32]  Specifically, Section IV.E of the Plan provides that: "on the Effective Date, the Debtors shall be deemed to have irrevocably vested in, transferred, granted and assigned to the Litigation Trust, and the Litigation Trust shall receive, and accept, any and all of the Assigned Claims  . . . ."[33]

---

30

[31]     Confirmation Order ¶ 184.

[32]     Plan, § IV.E.3(a); Confirmation Order, ¶ 40.

[33]     Plan, § IV.E.3(a).

34.     Likewise, Paragraph 40 of the Confirmation Order provides that "[a]s set forth in Article IV of the Plan, on the Effective Date, new Rite Aid shall transfer, or cause to be transferred, to the Litigation Trust all the Litigation Trust Assets."[34]

35.     Accordingly, the express terms of the Plan, the Confirmation Order, and the Trust Agreement are clear: the Requested Antitrust Claims were transferred to and vested in the Trust, and the Trust was plainly authorized to take possession or control of such assets, even if in the possession or control of a third party.[35]   Additionally, the Trust was expressly vested with the authority to investigate, analyze, prosecute, and if, necessary and appropriate, settle and compromise the Requested Antitrust Claims.[36]   These rights and powers were vested in the Trust pursuant to the Plan, Confirmation Order and the Trust Agreement in furtherance of the Trust's primary purpose of maximizing value for the benefit of its beneficiaries.

36.

McKesson violates the terms of the Plan Injunction prohibiting holders of Claims from taking any actions to interfere with implementation of the Plan.[37]   McKesson is interfering with and obstructing the Trust's ability to liquidate or pursue Assigned Claims for the benefit of the Trust's beneficiaries as authorized by the Plan.  McKesson's assertions that

are a mere pretext designed to

---

[34]     Confirmation Order, ¶ 40; *see also* Trust Agreement, § 1.2(b).

[35]     *See* Master Trust Agreement § 1.4 (providing for the transfer of all Litigation Trust Assets to the Master Trust, "including all such assets held or controlled by third parties").

[36]     Trust Agreement, § 3.1.

[37]     Plan, § X.F.

allow McKesson to co-opt the value of these Assigned Claims for itself.  In reality, McKesson is attempting to seize control of property that was transferred to the Trust on the Effective Date pursuant the Plan and Confirmation Order.

37.    For all of the foregoing reasons, the Plan and Confirmation Order should be enforced, and McKesson should be compelled to perform under the McKesson Supply Agreement to assign the Requested Antitrust Claims to the Trust.

## III.    The Court Should Award Reasonable Attorneys' Fees and Expenses

38.    In the Third Circuit Court, the elements for a cause of action for contempt are as follows: "(1) a valid order of the court existed; (2) the defendant had knowledge of the order; and (3) the defendant disobeyed the order."[38]  Furthermore, "[a] subjective belief that one was complying with an order ordinarily will not insulate them from civil contempt if that belief was objectively unreasonable."[39]  Section 105(a) of the Bankruptcy Code permits this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[40]

39.    Here, the Court should order McKesson to pay the Trust's reasonable attorney's fees and expenses.  First, the Confirmation Order approving the Plan Injunction has been in effect since August 2024, months before McKesson violated the Plan Injunction.  Second, McKesson clearly had knowledge of the Confirmation Order because it had negotiated for the inclusion of the mutual release with Rite Aid in that order.  Third, McKesson disobeyed the Confirmation Order by taking the objectively unreasonable position

---

[38]    *In re Achaogen, Inc.*, 649 B.R. 238, 248 (Bankr. D. Del. 2023).

[39]    *In re Craytor*, 650 B.R. 470, 483 (Bankr. D.N.J. 2023).

[40]    11 U.S.C. § 105(a).

and its mutual release with Rite Aid somehow allowed it to control the Trust's Assigned Claims in violation of the Plan Injunction. As such, this Court is empowered to order and should order that McKesson pay the Trust's reasonable attorneys' fees and expenses.

## **NOTICE**

40.     The Trust has provided notice of this Motion to the following parties and/or their respective counsel, as applicable: (i) the office of the U.S. Trustee; (ii) counsel to McKesson; (iii) Halperin, Battaglia Benzija, LLP as counsel to Alan D. Halperin, as Trustee of RAD Sub-Trust B and Co-Trustee of the RAD Master Trust; and (iv) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Trust submits that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PRIOR REQUEST**

41.     No prior motion for the relief requested herein has been made to this or any other Court.

**WHEREFORE**, the Trust respectfully requests that this Court enter an order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested herein and such other relief as this Court deems just, proper and necessary.

Dated: May 28, 2025

By: *<u>/s/ John Dellaportas</u>*
John Dellaportas
Jennifer R. Pierce
**EMMET, MARVIN & MARTIN, LLP**
Tel: (212) 238-3000
Fax: (212) 238-3100
Email: jdellaportas@emmetmarvin.com
　　　jpierce@emmetmarvin.com

*Counsel for Thomas A. Pitta, as Trustee
of the RAD Sub-Trust A*