| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>Anthony Sodono<br>Michele M. Dudas<br>McManimon, Scotland & Baumann, LLC<br>75 Livingston Avenue, 2nd Floor<br>Roseland, NJ 07068<br>Telephone: 973.622.1800<br>Email: asodono@msbnj.com<br>        mdudas@msbnj.com | Dennis Twomey (admitted pro hac vice)<br>SIDLEY AUSTIN LLP<br>One South Dearborn<br>Chicago, IL 60603<br>Telephone:  312.853.7438<br>Email: dtwomey@sidley.com<br><br>John J. Kuster (admitted pro hac vice)<br>SIDLEY AUSTIN LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>Telephone:  212.839.7336<br>Email: jkuster@sidley.com |
| Jeffrey K. Garfinkle (admitted pro hac vice)<br>Brian T. Harvey (admitted pro hac vice)<br>BUCHALTER, A PROFESSIONAL CORPORATION<br>18400 Von Karman Avenue, Suite 800<br>Irvine, CA 92612-0514<br>Telephone: 949.760.1121<br>Email: jgarfinkle@buchalter.com<br>        bharvey@buchalter.com<br><br>*Counsel for McKesson Corporation and certain corporate affiliates* | |

| | |
|---|---|
| In re:<br><br>RITE AID CORPORATION, *et al.*,<br><br>                    Debtors. | Chapter 11<br><br>Case No. 23-18993 (MBK)<br><br>(Jointly Administered)<br><br>Hearing Date: July 23, 2025<br>Re: Docket No. 5922 |

**MCKESSON CORPORATION'S OPPOSITION TO MOTION OF RAD SUB-TRUST A FOR AN ORDER (I) ENFORCING THE PLAN AND CONFIRMATION ORDER AGAINST MCKESSON CORPORATION AND (II) GRANTING RELATED RELIEF**

McKesson Corporation ("McKesson") respectfully submit this Opposition (the "Opposition") to the *Motion of RAD Sub-Trust A for an Order (I) Enforcing the Plan and Confirmation Order Against McKesson Corporation and (II) Granting Related Relief* [Dkt. 5922] (the "Motion") filed by RAD Sub-Trust A (the "Trust") and states:

## INTRODUCTION[1]

1.      As the Court is aware, McKesson is Rite Aid's long-term supplier of pharmaceutical products, both generic and branded.  As set forth in the court-approved Disclosure Statement [Docket No. 2512, p. 71]:

> For 20 years, McKesson has supplied Rite Aid's pharmacies with pharmaceutical products. Under the McKesson Prepetition Contract, McKesson supplied—on a just-in-time basis—almost all of the pharmaceutical products that Rite Aid sells in its 2,000-plus pharmacies. McKesson is the sole supplier to the Debtors for a majority of all products within the Debtors' retail business. Rite Aid purchases all of its branded pharmaceutical products and almost all generic pharmaceutical products from McKesson.

Under this business relationship, McKesson is the direct purchaser of pharmaceuticals from thousands of third party pharmaceutical companies.  As one of McKesson's customers, Rite Aid is an indirect purchaser of those pharmaceutical products.

2.      The distinction between direct purchasers and indirect purchasers is critical under Federal antitrust law.  As a general matter, only direct purchasers of goods have standing to assert Federal antitrust claims; indirect purchasers do not.  *See Illinois Brick v. Illinois*, 431 U.S. 720 (1977).

---

[1] Defined terms used in this Introduction section have the meaning set forth in Factual and Procedural Background section below.

3.      When Rite Aid filed its bankruptcy case,[2] it was in breach of its pre-petition supply agreement with McKesson.  In addition to numerous other breaches, Rite Aid owed McKesson nearly $725,000,000 for pharmaceutical products received during the twenty days before the Petition Date.  That entire amount was entitled to administrative priority pursuant to Section 503(b)(9) of the Bankruptcy Code.

4.      Against this backdrop, the Trust has filed a deeply-flawed motion seeking extraordinary relief:  a finding that that McKesson violated the "Plan Injunction" by failing to assign certain "Antitrust Claims" against numerous third party pharmaceutical companies to the Trust and an order compelling McKesson to assign those claims to the Trust.[3]

5.      The Motion is predicated on the erroneous assumption that, as of the effective date of the Plan (through which the Trust was created), Rite Aid owned certain antitrust-related litigation claims against various pharmaceutical manufacturers, including those being prosecuted in the Dexilant lawsuit (mentioned in paragraph 26 of the Motion) (the "Antitrust Claims") and that those claims were assigned to the Trust.[4]

---

[2] All references to the "bankruptcy case" are to Rite Aid's first bankruptcy case which was filed on October 15, 2023 (the "Petition Date").

[3] Noticeably absent from the Motion is any claim against McKesson for breach of contract, even though that is the true essence of the Motion.   The reason for this is obvious.  Any breach of contract claim would be barred by the release which McKesson received in connection with Rite Aid's confirmed plan.

[4] To be clear, there are two subgroups of Antitrust Claims:  i) those for which McKesson delivered executed claim assignments prior to the commencement of the bankruptcy case; and ii) those for which McKesson had not delivered executed claim assignments.  As McKesson understands the Motion, it only involves the second subgroup of antitrust claims, i.e., those antitrust claims, including the Dexilant-related Antitrust Claims, for which McKesson had not delivered executed claim assignments as of the Petition Date.

Rite Aid's Bankruptcy Schedules [Docket No. 859, Part 11, Question 74] list nine lawsuits against various pharmaceutical companies as estate assets.  McKesson has not investigated which, if any, of these lawsuits assert antitrust-related claims and which have a pre-petition executed claim assignment delivered by McKesson.  To the extent that these lawsuits involve antitrust-related claims for which McKesson has not delivered executed assignments, those Antitrust Claims belong to McKesson.  To the extent that McKesson delivered assignments to Rite Aid for these lawsuits, the underlying Antitrust Claims belong to the Trust.

6.      Rite Aid never owned the at-issue and unassigned Antitrust Claims.  Rather, as of the Petition Date, it merely possessed the contractual right to request assignments of those Antitrust Claims.

7.      The right to bring a claim for antitrust violations under Federal law belongs to McKesson in its capacity as the direct purchaser of the underlying goods.  It is irrelevant that McKesson may have re-sold the products to Rite Aid.  Indirect purchasers lack standing to sue for violations of Federal antitrust laws.  This is black-letter law approved by the Supreme Court in *Illinois Brick v. Illinois*.

8.      The only means by which Rite Aid could have had a property interest in McKesson's Federal antitrust claims is if McKesson actually assigned those claims to Rite Aid.  But McKesson did not do so.  While Rite Aid had a qualified contractual right to seek from McKesson an assignment of antitrust-related claims arising from products Rite Aid had purchased from McKesson, the provisions of the assignment clause were not automatic or self-executing.  Indeed, to effectuate an assignment of McKesson's rights, an executed formal assignment was required.  As expressly set forth in the pre-petition supply agreement between McKesson and Rite Aid, this writing was "necessary to effectuate any such assignment."  Because McKesson has not at any time delivered an executed assignment of the unassigned Antitrust Claims, those claims were and continue to be McKesson's property.

9.      To be clear, McKesson's failure to deliver an assignment of the at-issue Antitrust Claims was not an oversight.  Rather, in January 2024, while the bankruptcy case was pending, Rite Aid made demand for assignment of certain of the Antitrust Claims, and McKesson declined to do so due to Rite Aid's material breaches of the pre-petition supply agreement and the then ongoing mediation regarding McKesson's claims, the go-forward business relationship, and the

contours of a reorganization plan.  That plan, by necessity, would need to address the treatment of McKesson's $725 million administrative claim.

10.     The fact that McKesson never assigned the at-issue Antitrust Claims should be the beginning and end of this matter, but the Trust nonetheless appears to contend the contractual right to request and obtain assignments of those Antitrust Claims was somehow transferred to the Trust as "Assigned Claims" under the Plan.  Not so.  The Trust's argument flat-out ignores the express carve-out of "claims and Causes of Action" against McKesson from the definition of "Assigned Claims." (Plan at § A.42 ("Notwithstanding anything to the contrary herein, Assigned Claims shall not include any claims or Causes of Action against McKesson . . .")).  Boiled down, at the time of Rite Aid's bankruptcy, Rite Aid at most had a contractual claim against McKesson for failing to provide assignments of the Antitrust Claims.  Given the express exclusion of claims against McKesson from Assigned Claims, the Motion is utterly lacking in merit.

11.     Furthermore, any claims that Rite Aid (and by succession, the Trust) may have had against McKesson for failing to provide an assignment of the at-issue Antitrust Claims were expressly released under the Court-approved settlement agreement between Rite Aid and McKesson (the "McKesson Settlement") and the confirmed Plan.  The McKesson Settlement, as clearly set forth in the Confirmation Order, contains a general release of all claims that Rite Aid had or could have had against McKesson.  This release includes all of Rite Aid's contractual claims against McKesson, including McKesson's refusal to provide post-bankruptcy assignments of those Antitrust Claims.  The Trust, as the successor to Rite Aid, is bound by that release.

12.     There are two additional points of significance.  First, McKesson was justified in not assigning the at-issue Antitrust Claims to Rite Aid given the massive sums of money owed by Rite Aid and Rite Aid's multiple breaches of the pre-petition supply agreement.  Under California

contract law, when a party to a contract materially breaches its obligations, the counterparty is relieved of its performance obligations.  Here, McKesson has strong defenses to any such contract claims due to the $725 million owed to McKesson and Rite Aid's numerous other breaches of the prepetition supply agreement.

13.     Second, to McKesson's knowledge, there is no mention of Rite Aid's claims against McKesson related to the unassigned Antitrust Claims in the Disclosure Statement, Plan, or any other bankruptcy court filed documents.  The failure of Rite Aid to address the unassigned Antitrust Claims during the Plan confirmation process and disclose that the Trust would preserve and possess such claims (as seemingly now argued by the Trust) bars the assertion of any rights and remedies related to those Antitrust Claim, post-confirmation.  *See, e.g.*, *In re Coastal Plains*, 179 F.3d 197, 208 (5th Cir. 1999).

14.     For all of these reasons, the Trust has no basis to seek relief from McKesson for its refusal to deliver assignments of the at-issue Antitrust Claims and the Motion must be denied.

### FACTUAL AND PROCEDURAL BACKGROUND

### I.     The Parties' Pre-Petition Relationship.

15.     McKesson and Rite Aid Corporation were parties to the Supply Agreement originally dated as of December 22, 2003, as subsequently amended from time to time[5] (the "First Supply Agreement").  Under the terms of the First Supply Agreement, McKesson supplied generic and branded pharmaceutical products, as well as other products.  Pursuant to the First Supply

---

[5] The Seventh Amendment to the Supply Agreement is attached to the Motion as Exhibit A.  All references to the "First Supply Agreement" are to that Seventh Amended version.

Agreement and in accordance with general California contract law,[6] McKesson holds various recoupment, setoff, and defensive rights.

16.     Under the terms of the First Supply Agreement, Rite Aid had a contractual right to request an assignment of antitrust claims that arose from products purchased by McKesson and sold to Rite Aid.  The First Supply Agreement provides as follows:

> **Subject to a timely request by Rite Aid**, McKesson shall assign to Rite Aid one hundred percent (100%) of its rights with respect to then-actual and present antitrust claims against one or more of the pharmaceutical vendors whose products are purchased by McKesson and sold to Rite Aid, so long as the claims arise out of Products purchased by McKesson and then sold to Rite Aid under this Agreement. Notwithstanding anything in the foregoing, McKesson shall have no obligation or liability under this Section 21.1 with respect to any antitrust claims for which McKesson, prior to the written request for assignment by Rite Aid has either (a) received a financial settlement payment from the claims administrator for McKesson's direct purchases of the involved brand name product from the manufacturer, or (b) filed a formal claim with the claims administrator for McKesson's direct purchases of the involved brand name product from the manufacturer. **Any such assignment of claims shall be evidenced by an agreement between McKesson and Rite Aid in substantially the form attached as Exhibit L, which the Parties shall execute as necessary to effectuate any such assignment.** If McKesson or Rite Aid, as applicable, initiates an antitrust claim described above, it shall be responsible to the non-initiating Party for all reasonable expenses, including the cost of responding to discovery, copying documents, data retrieval and reasonable attorneys' fees actually incurred in connection therewith. Additionally, McKesson or Rite Aid, as applicable, will reimburse the other Party for all reasonable expenses, including the cost of responding to discovery, copying documents, data retrieval and reasonable attorneys' fees actually incurred by the other Party in connection with a direct request relating to a claim in this Section above. McKesson does not warrant or promise that any assignment of claims that it may provide pursuant to this Section 21.1 is enforceable or legally valid. Rite Aid

---

[6]  The First Supply Agreement is governed by California law.

> acknowledges this and assumes any risk related to the assignment's
> enforceability or validity.

*See* First Supply Agreement ¶ 21.1 (emphasis added).

17.     Under the terms of the First Supply Agreement, Rite Aid's right to obtain
assignments of the Antitrust Claims was not automatic or self-executing.  McKesson's obligation
to transfer any Antitrust Claims to Rite Aid only arose after "timely request by Rite Aid" and any
assignment was not complete unless and until McKesson delivered an executed assignment
agreement, which shall be "necessary to effectuate any such assignment."  Absent Rite Aid's timely
request and McKesson's delivery of an executed assignment, there was no actual assignment.

## II.     Rite Aid's Bankruptcy and Plan of Reorganization.

18.     On October 15, 2023, Rite Aid Corporation and numerous affiliates (collectively,
"Rite Aid") filed voluntary petitions for relief under Title 11 of the United States Code (the
"Bankruptcy Code").

19.     On April 2, 2024, Rite Aid filed the Second Amended Joint Chapter 11 Plan of
Reorganization [Docket No. 2511] (the "Plan") and the Disclosure Statement for the Plan [Docket
No. 2512] (the "Disclosure Statement").

20.     The Plan was the direct result of mediation before the Honorable Shelley C.
Chapman that took place from January through June 2024.  McKesson was an active participant
in that mediation.  *See* Mediator's Report [Docket No. 3951].

21.     On August 16, 2024 the Court entered an order approving the Plan [Docket No.
4532] (the "Confirmation Order").

22.     *Treatment of McKesson under the Plan*.  Through mediation, McKesson, Rite Aid
and the other key constituencies reached a comprehensive agreement regarding McKesson, its

claims including the $725 million administrative claim, and the go-forward business relationship between McKesson and Rite Aid. As described in the Disclosure Statement [pp. 71-72]:

> [Rite Aid] and McKesson reached an agreement in principle in Mediation with respect to the treatment of McKesson Claim and the terms of the go-forward McKesson New Contract, embodied in the McKesson 503(b)(9) Settlement and the McKesson Settlement, respectively. The terms of the McKesson New Contract are highly sensitive commercial information and are therefore confidential. The Debtors will seek approval of the McKesson Settlement, including the New McKesson Contract, with appropriate redactions, through confirmation of the Plan. Among other things, the McKesson 503(b)(9) Settlement provides for the following treatment of McKesson's 503(b)(9) Claim: (a) $25 million paid in Cash at emergence, with a contingent potential increase of up to an additional $25 million based on certain available Cash thresholds at emergence (the "Incremental Initial Payment"); (b) approximately $33.8 million of accounts payable to be assumed and paid in cash by MedImpact to McKesson at emergence; (c) up to $175 million payable semi-annually over a period of three (3) years, which will be reduced on a dollar-for-dollar basis in an amount equal to the Incremental Initial Payment, if any (the "McKesson Guaranteed Cash Obligations"); d) up to five (5) additional contingent deferred Cash payments in an aggregate amount of up to $100 million, based on achieving certain adjusted EBITDA thresholds; and (e) a General Unsecured Claim for any remaining amount. …"

23.    *Provision of the Plan Related to the Trust.*  Pursuant to the Plan and Confirmation Order, on the Plan's effective date, the Litigation Trust was created and established pursuant to the Master Trust Agreement. Also, on the Plan's effective date, the Trust was created and established pursuant to the Sub-Trust A Agreement. (Motion at ¶ 9.)

24.    The Plan includes the following defined terms, which are critical to an understanding what assets and rights were transferred to the Trust at the time of its creation:

**Definition of "Litigation Trust Assets" Plan § I.A.74:** "Litigation Trust Assets" means (i) the Committee's Initial Cash Consideration (ii) the Committee's Post-Emergence Cash Consideration, (iii) the Assigned Claims, (iv) the proceeds of the Assigned Claims, (v) the Assigned Insurance Rights, and (vi) the Tort Claim Insurance Proceeds.

**Definition of Assigned Claim, Plan § I.A.42**: "Assigned Claims" means, collectively, all of the Debtors' claims and Causes of Action, including all of the Debtors' claims and Causes of Action against the Excluded Parties, except: … (b) claims or Causes of Action against third parties, with respect to which the Reorganized Debtors have an ongoing trade or commercial relationship and with respect to which the Reorganized Debtors assume indemnification obligations under the Plan or otherwise through the Chapter 11 Cases (other than indemnification claims against potential joint tortfeasors and Co-Defendants); [and] (c) claims or Causes of Action (including Avoidance Actions) against contractual counterparties, vendors, or other go-forward commercial counterparties with the Reorganized Debtors (other than indemnification claims against potential joint tortfeasors and Co-Defendants)[.] … ***Notwithstanding anything to the contrary herein, Assigned Claims shall not include any claims or Causes of Action against McKesson, which, for the avoidance of doubt, is not an Excluded Party; provided, that, for the avoidance of doubt, Assigned Claims shall include the Debtors' Pass Through Rights, including any Pass Through Rights as provided in any agreement between Rite Aid and McKesson***.

**Definition of "Cause of Action" Plan § I.A..61**: "Cause of Action" or "Causes of Action" means any claim, controversy, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, including Indemnification Rights, guaranty, interest, damage, remedy, cause of action, proceeding, agreement, cross claim, counterclaim, contribution, suit, class action, third-party claim, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, direct or indirect, choate or inchoate, Disputed or undisputed, liquidated or unliquidated, Secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, in tort, at law, in equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and

claims under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Actions arising under chapter 5 of the Bankruptcy Code.

**Plan § I.A.119**:  "Pass Through Rights" means the Debtors' rights to pursue all product warranties and indemnities from all manufacturers and vendors of McKesson with respect to products purchased by McKesson and resold to Rite Aid.

*See* Plan §§ I.A.42, I.A.61, I.A.74, and I.A.119 (emphasis added).

25.      Pursuant to section IV.E.3(b) of the Plan and paragraph 40 of the Confirmation Order, on the effective date of the Plan, Rite Aid transferred all "Litigation Trust Assets" to the Trust, which, as articulated above, includes the "Assigned Claims" and proceeds thereof, which, in turn, include all Causes of Action other than those expressly excluded.

26.      Of note, the definition of "Assigned Claims" includes a carve-out for all "claims or Causes of Action against McKesson other than the "Pass Through Rights" which are defined only to include "the Debtors' rights to pursue all product warranties and indemnities" against third-party sellers.  Nothing in the definition of "Pass Through Rights" includes reference to any unassigned Antitrust Claims.

### III.    McKesson Settlement and Release.

27.      The Confirmation Order contains several paragraphs that are germane to this dispute and McKesson's defenses to the Motion:

26.    **The McKesson Settlement.** The *McKesson Settlement constitutes a good-faith compromise and settlement of all claims, Causes of Action, disputes, and controversies released, settled, compromised, or otherwise resolved between the Debtors and their Affiliates, on the one hand, and McKesson, on the other hand[.]* The McKesson Settlement is fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

60.    Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, …, on the Effective Date, *the provisions of the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan, including the McKesson Settlement*[.] … The entry of this Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

115.    **General Settlement of Claims and Interests.** In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all claims, Interests, and controversies resolved under the Plan and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019, including, for the avoidance of doubt, *the McKesson Settlement*[.]

238.    ***For the avoidance of doubt, claims or Causes of Action, if any, against McKesson are not Assigned Claims and have been released in accordance with the terms of the McKesson Settlement. Notwithstanding anything to the contrary herein, Assigned Claims shall not include any claims or Causes of Action against McKesson, which, for the avoidance of doubt, is not an Excluded Party***; provided, that, for the avoidance of doubt, Assigned Claims shall include the Debtors' Pass Through Rights, including any Pass Through Rights as provided in any agreement between Rite Aid and McKesson.

*See* Plan §§ 26, 60, 115, and 238 (emphasis added).

## IV.      The Motion.

28.      In the Motion, the Trust takes the strained position that the unassigned Antitrust Claims were not carved out from the definition of "Assigned Claims" because they are not claims "*against* McKesson [but rather] they are claims against third-party pharmaceutical [manufacturers]."  (Motion at ¶ 2.)

29.      The Motion alleges that McKesson has violated the Plan injunction by refusing to turn over the unassigned Antitrust Claims to the Trust.  According to the Trust, the unassigned Antitrust Claims are contingent, inchoate claims against the respective manufacturers that are owned by the Trust.  As set forth below, the Trust's arguments do not comport with the terms of the First Supply Agreement, the Plan, the Confirmation Order and the other agreements that were part of the McKesson Settlement.

30.      The Trust's allegations that McKesson has violated the Plan injunction fail under any modicum of scrutiny.  Indeed, the allegations in the Motion need a foundational requirement in order to even assert the relief against McKesson:  that the unassigned Antitrust Claims are "Assigned Claims" under the Plan.  Once that foundational requirement is lacking, the remaining allegations and requested relief in the Motion collapse.  Because the contractual right to request assignment of the Antitrust Claims was not included in the "Assigned Claims," all of the Trust's arguments and requested relief fail.  As such, the Motion must be denied.

## ARGUMENT

## I.      The Unassigned Antitrust Claims Are McKesson's Property.

31.      Under the Supreme Court's precedent in *Illinois Brick Co. v. Illinois*, only a "direct purchaser" of goods has standing to pursue antitrust claims against the manufacturer.  *See Walgreen Co. v. Johnson & Johnson*, 950 F.3d 195, 198 n.3 (3d Cir. 2020) (recognizing that in the

pharmaceutical context, wholesalers, like McKesson, are the "direct purchasers" with standing

under *Illinois Brick* and pharmacies, like Rite Aid, are "indirect purchasers" without standing).

32.     McKesson, not Rite Aid, is the "direct purchaser" of the goods that are the subject

of the unassigned Antitrust Claims.   Accordingly, the unassigned Antitrust Claims were

McKesson's property as of the Petition Date.  This is beyond dispute.  If this were not true, Rite

Aid would not have demanded assignments of McKesson's rights in those Antitrust Claims.

33.     The only exception to this analysis would be if McKesson had actually assigned

the Antitrust Claims to Rite Aid prior to the Petition Date.  But, as discussed in the next section

and is self-evident from the nature of the Trust's motion, McKesson did not deliver any assignment

of its rights to the at-issue antitrust lawsuits to Rite Aid prior to the Petition Date.[7]

**II.     McKesson Did Not Assign the Antitrust Claims.**

34.     Under the terms of the First Supply Agreement, Rite Aid had a contractual right to

seek from McKesson an assignment of antitrust claims that arose from products purchased by

McKesson and sold to Rite Aid.   But as is clear from the express terms of the First Supply

Agreement, set forth *supra* at paragraph 16, the actual assignment of antitrust claims to Rite Aid

was not automatic or self-executing.  To effectuate an assignment, Rite Aid was required to timely

request the assignment and then McKesson had to execute and deliver a separate stand-alone

assignment.   McKesson's delivery of an executed stand-alone assignment was "necessary to

effectuate any such assignment."  (First Supply Agreement at ¶ 21.1.)

35.     McKesson did not deliver executed assignments of the at-issue Antitrust Claims.

To the contrary, in mid-January 2024, McKesson communicated a clear refusal to provide an

---

[7] Again, it is important to emphasize that to the extent McKesson actually delivered executed assignments of Antitrust Claims prior to the Petition Date, those assigned Antitrust Claims belong to the Trust.  The remaining Antitrust Claims (for which no assignments were delivered) still belong to McKesson.

assignment of those Antitrust Claims due to Rite Aid's material breaches of the First Supply Agreement that resulted in massive losses to McKesson and the then ongoing mediation. (Garfinkle Decl. ¶¶ 5-6, Exh. A (January 11, 2024 email from Garfinkle to Noah Sosnick. ("[A]t this time, McKesson is unwilling to assign its rights in any ongoing litigation against pharmaceutical manufacturers.")

36.     The Trust erroneously contends the unassigned Antitrust Claims were Rite Aid's property prior to the Petition Date.  (Motion at ¶ 2.)  Absent a formal assignment of the Antitrust Claims, McKesson, as the direct purchaser, retains those claims.   Rite Aid, at most, had a contractual claim against McKesson for failure to provide an assignment (which, as explained below was released as part of the McKesson Settlement).   But a contractual claim is not remotely akin to Rite Aid having an actual ownership interest in the unassigned Antitrust Claims.

### III.     Rite Aid's Contractual Right to Request Assignments Is Not an Asset of the Trust.

37.     The Trust contends that Rite Aid's rights to the unassigned Antitrust Claims were transferred to it as "Assigned Claims" under the Plan.  (Motion at ¶ 3.)   This contention makes no sense for numerous reasons.   In particular, the definition of "Assigned Claims" specifically excludes any "claims and Causes of Action" against McKesson.   Given that Rite Aid at most had a contractual claim against McKesson, this dooms the Trust's Motion.

38.     To fully appreciate the flaw of the Trust's argument, one must begin by reviewing the "Litigation Trust Assets" that the Trust acquired under the Plan:

> "Litigation Trust Assets" means (i) the Committee's Initial Cash Consideration (ii) the Committee's Post-Emergence Cash Consideration, (iii) the Assigned Claims, (iv) the proceeds of the Assigned Claims, (v) the Assigned Insurance Rights, and (vi) the Tort Claim Insurance Proceeds.

(Plan § 1.74).

39.      The only category of Litigation Trust Assets that could possibly apply to Rite Aid's

rights to assignment of antitrust claims would be "Assigned Claims."  "Assigned Claims" includes

"all of the Debtors' claims and Causes of Action."  Plan § I.A.42.  And "Causes of Action" includes

any contingent "claim," "right," "interest," or "agreement" and "(a) all rights of setoff,

counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law

or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in

part, tort, breach of contract …"  Plan § I.A.61.

40.      While McKesson does not dispute that any claim Rite Aid may have against it

related to its right to an assignment falls within the definition of "Causes of Action," it is clear and

unambiguous that Causes of Action against McKesson are not Assigned Claims that the Trust can

now seek to enforce for the simple reason that all "claims and Causes of Action" **against**

**McKesson** are specifically excluded from the definition of Assigned Claims:

> Notwithstanding anything to the contrary herein, Assigned Claims
> shall not include any claims or Causes of Action against McKesson,
> which, for the avoidance of doubt, is not an Excluded Party;
> provided, that, for the avoidance of doubt, Assigned Claims shall
> include the Debtors' Pass Through Rights, including any Pass
> Through Rights as provided in any agreement between Rite Aid and
> McKesson.

Plan § I.A.61.

41.      Overall, there is a logical fallacy in the Trust's argument.  To the extent the Trust

acquired any contractual rights of Rite Aid, they are limited to those provided for in the Plan.  Here,

those contractual rights do not include any contractual rights against McKesson because the

definition of Assigned Claims explicitly excludes claims and Causes of Action against McKesson.

IV.    **Any Claims the Trust Could Have Against McKesson Were Released.**

42.    The McKesson Settlement includes a general release of all claims that Rite Aid had or could have had against McKesson.   This release is contained in paragraph 184 of the Confirmation Order, which provides:

> Notwithstanding anything to the contrary in the Plan or in this Confirmation Order, consistent with the terms of the McKesson Settlement Documents, with the exception of (i) the Debtors' and Reorganized Debtors' obligations to McKesson under the Plan, (ii) McKesson and the Debtors' and Reorganized Debtors' ongoing business relationships, including under the Interim Agreement (as defined in the McKesson New Contract) and the McKesson New Contract, and (iii) McKesson's right to assert its Co-Defendant Defensive Rights as set forth in Article VI.K of the Plan and in this Confirmation Order, the Debtors and the Reorganized Debtors (and each of the Debtors' and the Reorganized Debtors' Related Parties), on the one hand, and McKesson and McKesson's Related Parties, on the other hand, shall exchange full and complete mutual releases, as set forth in the McKesson Settlement Documents, the Plan and Confirmation Order. *For the avoidance of doubt, (a) McKesson is not an Excluded Party, (b) Assigned Claims shall not include any claims or Causes of Action against McKesson, provided, that, for the avoidance of doubt, Assigned Claims shall include the Debtors' rights to pursue all product warranties and indemnities from all manufacturers and vendors of McKesson with respect to products purchased by McKesson and resold to Rite Aid ("Pass Through Rights"), including any Pass Through Rights as provided in any agreement between Rite Aid and McKesson,* and (c) Assigned Insurance Rights shall not include insurance rights under any Insurance Policy issued to McKesson under which any Debtor is designated as an additional insured party.

Confirmation Order ¶ 184.  That release is also set forth in paragraph 238 of the Confirmation Order.

43.    The Trust attempts to sidestep the settlement release by making the erroneous and inconsistent assertion that the unassigned Antitrust Claims "were claims of Rite Aid contingent

upon Rite Aid's requesting their assignment from McKesson."[8]  As explained herein, this is an

incorrect interpretation of the Rite Aid's interest in the unassigned Antitrust Claims.  Rite Aid

simply held a contractual right under the First Supply Agreement to request from McKesson an

assignment of those Antitrust Claims.  In direct contradiction to the Trust's own assertion of an

ownership interest, the Trust's Motion even concedes its claim for assignment of those Antitrust

Claims is merely a contract claim arising under the First Supply Agreement:

> The Assigned Claims were defined broadly to include any and all of
> the Debtors' inchoate and contingent claims that arose before, on, or
> after the Petition Date in contract. The antitrust claims at issue in
> this Motion are Assigned Claims because they are contingent claims
> that arose under contract — i.e., the McKesson Supply Agreement
> — prior to the Petition Date.[9]

44.    Moreover, while the Trust asserts in the Motion that it first became aware of the

unassigned Antitrust Claims in January 2025,[10] the assignment of those claims was the subject of

a dispute between Rite Aid and McKesson dating back to January 2024, while the plan mediation

process was ongoing.

45.    As detailed in the Garfinkle Declaration, in mid-January 2024 Rite Aid requested

assignment of certain of the Antitrust Claims and McKesson declined and indicated that this topic

would likely be part of the ongoing mediation.  While McKesson will not invade the mediation

confidentiality, suffice it say, the parties agreed to a global settlement that did not preserve Rite

Aid's rights to any unassigned Antitrust Claims.  Instead, McKesson received a broad and all-

encompassing release.

---

[8] Motion ¶ 2.

[9] Motion ¶ 3.

[10] Motion ¶ 26.

46.     Rite Aid was fully aware McKesson disputed any obligation to assign the Antitrust

Claims while the mediation was ongoing.  The fact that there is no preservation of the assignment

rights under the Plan should resolve any uncertainty regarding the applicability of the settlement

release to the claims asserted and the relief sought by the Trust.

47.     At most, McKesson's refusal to assign the at-issue Antitrust Claims upon request

results in a claim for alleged breach of the First Supply Agreement.  Any such claim for breach of

contract was released pursuant to terms of the confirmed Plan and the Confirmation Order.

**V.      McKesson Was Justified in Refusing to Assign the At-Issue Antitrust Claims
Due to Rite Aid's Multiple Contractual Breaches.**

48.     Assuming *arguendo*, that the Trust can establish (1) that the rights at issue are the

Antitrust Claims, not merely the contractual right to request transfer thereof, (2) that the definition

of "Assigned Claims" includes the Antitrust Claims, despite the carve out of claims against

McKesson, (3) that the at-issue Antitrust Claims actually were assigned to the Trust, and (4) the

release McKesson received does not encompass claims related to assignment of those Antitrust

Claims, the Trust's demand for assignment still fails in light of Rite Aid's multiple material

breaches of the First Supply Agreement.

49.     Of critical significance, Rite Aid breached the First Supply Agreement when it

failed to pay McKesson $725 million due for purchased pharmaceuticals.  Accordingly, McKesson

was and remains within its rights under California contract law to withhold the assignment of the

Antitrust Claims.

50.      When a party's failure to perform a contractual obligation constitutes a material

breach of the contract, the other party may be discharged from its duty to perform under the

contract. *De Burgh v. De Burgh*, 39 Cal.2d 858, 863 (1952) ("[I]n contract law a material breach

excuses further performance by [an] innocent party"); *Walker v. Harbor Business Blocks Co.*, 181

Cal. 773, 778 (1919) ("[F]ailure . . . to perform an obligation . . . releases the obligee from the duty

of making demand, and performance or tender, and justifies him in abandoning the contract . . ."); 

Cal. Civ. Code, § 1439 ("Before any party to an obligation can require another party to perform

any act under it, he must fulfill all conditions precedent thereto imposed upon himself; and must

be able and offer to fulfill all conditions concurrent so imposed upon him on the like fulfillment

by the other party. . . ."); 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 813, 814,

p. 906 ("Material failure of consideration discharges the other party's duty . . ."); *see also* 15

Williston on Contracts (4th ed. 2000) § 44:46, pp. 200-201 (when there are a number of

performances for each party to the contract, a breach by a party of one, if material, allows the other

party to treat the contract as discharged).

51.     Under this controlling California law, by virtue of Rite Aid's multiple breaches of

the First Supply Agreement, including its non-payment of $725 million, McKesson is excused

from its remaining obligations, including assigning the at-issue Antitrust Claims.

52.     Here, the assignment rights regarding the at-issue Antitrust Claims must be viewed

in context of the First Supply Agreement as a whole.  Critically, the First Supply Agreement

provides that any obligation on the part of McKesson to act in favor of Right Aid is absolved upon

Rite Aid's failure to make timely payments.  Under section 3.7 of the First Supply Agreement,

"[I]n the event that any amount is not paid by Rite Aid when due, until such payment, together

with any interest and late fees, is paid in full, McKesson shall have no obligation to pay any rebates

or issue any credits."  While the assignment of the Antitrust Claims under section 21 is not a

"rebate," there is a strong argument that it does constitute a "credit" to Rite Aid in the form of an

offset of costs between the parties, should the assignment occur. And because McKesson's

obligation to provide credits to Rite Aid is suspended where payment is past-due and outstanding,

McKesson was within its rights to withhold the assignment of the at-issue Antitrust Claims to Rite Aid (or the Trust).

53.      At most, taking all logical leaps and inferences in favor of the Trust, the Trust has a breach of contract claim against McKesson for refusing to honor its obligations under section 21 of the First Supply Agreement. But any breach of contract claim is procedurally improper in the context of a contested motion seeking proscriptive equitable relief in the form of compelling assignment of the at-issue Antitrust Claims.  On this basis alone, the Motion must be denied.

**VI.      The Trust is Barred from Demanding Assignment of the At-Issue Antitrust Claims Due to Non-Disclosure.**

54.      At no time did Rite Aid disclose in any bankruptcy court filing that the estate had claims against McKesson related to unassigned Antitrust Claims or that those supposed claims were being transferred to the Trust.  Not only is this consistent with the fact that these contract claims were released and not assigned to the Trust, but this non-disclosure also serves to bar the Trust from asserting the relief sought in the Motion.

55.      In bankruptcy, the duty of disclosure is continuing, and, as part of the plan confirmation process, a debtor is required to disclose all potential causes of action.  *See In re Coastal Plains,* 179 F.3d 197, 208 (5th Cir. 1999).  As the Fifth Circuit aptly noted in *Coastal Plains*:

> The courts will not permit a debtor to obtain relief from the bankruptcy court by representing that no claims exist and then subsequently to assert those claims for his own benefit in a separate proceeding. The interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements, and the bankruptcy court, which must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure is incomplete.

*Id.*; *see also CCI Constr. Co. v. Manufacturers and Traders Trust Co.*, 125 Fed. App'x. 273, 274

(3d Cir. 2005) (affirming summary judgment holding that failure to disclose cause of action and subsequent reliance on lack of such claim by creditor voting in favor of plan equitably estops debtor from subsequently bringing undisclosed claim).

56.     For these same reasons, the Trust is barred and judicially estopped from seeking the relief requested in the Motion.

**VII.     McKesson Has Taken No Affirmative Actions to Interfere with the Plan.**

57.     As detailed herein, the unassigned Antitrust Claims are the property of McKesson and continue to be the property of McKesson until such time as Rite Aid, or arguably the Trust, makes a valid demand for assignment of the Antitrust Claims and McKesson actually assigns those claims.  Given Rite Aid's material breach of the First Supply Agreement, the mediated settlement embodied in the Plan, Confirmation Order and other related agreements, and the release which McKesson received, McKesson was within its rights to withhold assignment of the at-issue Antitrust Claims.

58.     Accordingly, any action by McKesson in passively retaining its own property and asserting its rights under the settlement and Plan does not constitute a violation of the plan injunction.  This conclusion is consistent with the Supreme Court's decision in *City of Chicago v. Fulton*, 502 U.S. 154 (2021).  In that case, the Supreme Court ruled that passive retention of estate property did not constitute a stay violation because passively retaining possession of property is not an "act" to "exercise control" over estate property.  502 U.S. at 158.  Where passive retention in light of a turnover request of estate property is not a stay violation, it strains logic to hold that passive retention of non-estate property would constitute a violation of the plan injunction.

## **CONCLUSION**

59.    As explained throughout this Opposition, McKesson is the sole owner of the unassigned Antitrust Claims and it was within its rights to refuse to assign those claims to either Rite Aid or the Trust.  The Motion fails due to the Trust's lack of ownership of any claims against McKesson, the release granted to McKesson, McKesson's contractual defenses, and judicial estoppel.  Accordingly, McKesson respectfully requests that this Court enter an order denying the Motion in full and granting such further relief as this Court deems just and proper.

Dated: July 16, 2025

/s/ *Michele M. Dudas*
McMANIMON, SCOTLAND &
BAUMANN, LLC
Michele M. Dudas, Esq.
75 Livingston Avenue, Suite 201
Roseland, NJ 07068
Telephone: 973.622.1800
Email: mdudas@msbnj.com

Jeffrey K. Garfinkle (admitted *pro hac vice*)
BUCHALTER, A Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA  92612-0514
Telephone: 949.224.6252
Email:  jgarfinkle@buchalter.com

Dennis Twomey (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone:  312.853.7438
Email:  dtwomey@sidley.com

John J. Kuster (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone:  212.839.7336
Email:  jkuster@sidley.com
*Counsel to McKesson Corporation and certain corporate affiliates*